# 24-2564-cv

## United States Court of Appeals
### *for the*
## Second Circuit

JULIO LICINIO, MD, PHD, MBA, MS,

*Plaintiff-Appellant,*

– v. –

STATE OF NEW YORK, STATE UNIVERSITY OF NEW YORK,
STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 1 of 5 (Pages A-0001 to A-0250)

JOSEPH SPADOLA
NEW YORK STATE OFFICE OF THE
    ATTORNEY GENERAL
*Attorneys for Defendants-Appellees*
28 Liberty Street
New York, New York 10005
(212) 416-8019

DANIEL GRACE
DANNY GRACE PLLC
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 1200
New York, New York 10007
(212) 202-2485

CP COUNSEL PRESS    (800) 4-APPEAL • (334400)

# TABLE OF CONTENTS

District Court Docket Entries............................................................................ vi

Plaintiff's Complaint.................................................................................. A-0001

    Exhibit 1 Employment Contract ........................................... A-0039

    Exhibit 2 Demotion Letter.................................................... A-0051

    Exhibit 3 Civil Cover Sheet.................................................. A-0054

Answer ....................................................................................................... A-0055

Amended Answer........................................................................................ A-0061

Defendant's Notice of Motion for Summary Judgment ............................. A-0072

Attorney Declaration................................................................................... A-0074

    Exhibit A Position Summary................................................ A-0078

    Exhibit B Offer Letter......................................................... A-0084

    Exhibit C Chart.................................................................... A-0095

    Exhibit D Business Certification and notes.......................... A-0096

    Exhibit E Business Certification and notes .......................... A-0101

    Exhibit F Email.................................................................... A-0103

    Exhibit G EEOC Charge....................................................... A-0106

    Exhibit H DHR Decision...................................................... A-0135

    Exhibit I DHR Dismissal Order............................................ A-0146

    Exhibit J Deposition Transcript Excerpt – Licinio................ A-0149

    Exhibit K Deposition Transcript Excerpt – Botash............... A-0214

    Exhibit L Plaintiff Response to Interrogatories.................... A-0220

    Exhibit M Deposition Transcript Excerpt- Wong ................. A-0240

Declaration Albanese ................................................................................. A-0246

Declaration Chin ........................................................................................ A-0250

Exhibit A Email ........................................................................ A-0263

Exhibit B Affirmative Action/Equal Opportunity Report ...................... A-0268

Exhibit C Email ........................................................................ A-0269

Exhibit D Letter: Post Probation Survey Visit ................................... A-0271

Exhibit E Letter: Survey Visit for Full Accreditation ........................... A-0279

Exhibit F Letter: Status Report ...................................................... A-0289

Declaration Corona .................................................................... A-0294

Exhibit A Letter ....................................................................... A-0299

Exhibit B Email ........................................................................ A-0300

Declaration Dewan ..................................................................... A-0301

Exhibit A Email ........................................................................ A-0329

Exhibit B Email ........................................................................ A-0333

Exhibit C Notice of Meeting ......................................................... A-0335

Exhibit D Email ........................................................................ A-0340

Exhibit E Demotion Letter ........................................................... A-0341

Exhibit F Faculty Executive Summary Report .................................... A-0343

Exhibit G Email ........................................................................ A-0349

Exhibit H LCME Letter ............................................................... A-0351

Exhibit I Email ......................................................................... A-0359

Declaration Frost ...................................................................... A-0361

Exhibit A Email ........................................................................ A-0368

Exhibit B Email ........................................................................ A-0369

Exhibit C Human Resources Practices ............................................. A-0370

Exhibit D Email ........................................................................ A-0396

iii

Exhibit E Email..................................................................... A-0397

Declaration Gardner.............................................................. A-0401

    Exhibit A Research Results ............................................... A-0406

Declaration Gilbertson ......................................................... A-0407

    Exhibit A University Policy Manual ................................. A-0411

    Exhibit B Harassment Prevention Policy ........................ A-0415

    Exhibit C Managing Conduct and Performance Guide......... A-0431

    Exhibit D Sexual Harassment Prevention Program .............. A-0490

Declaration Lesperance......................................................... A-0540

    Exhibit A Text .................................................................. A-0545

    Exhibit B Email ............................................................... A-0569

    Exhibit C Email ............................................................... A-0573

    Exhibit D Email ............................................................... A-0577

    Exhibit E Email ............................................................... A-0582

Declaration Schmitt.............................................................. A-0584

    Exhibit A Email ............................................................... A-0588

    Exhibit B Resume Dahmoon ........................................... A-0590

Declaration Schwartz ........................................................... A-0596

    Exhibit A Email ............................................................... A-0610

    Exhibit B Email ............................................................... A-0614

    Exhibit C Email ............................................................... A-0621

    Exhibit D Summary Statistics Medical School Compensation.............. A-0623

    Exhibit E Offer Letter – Wong ......................................... A-0624

    Exhibit F Offer Letter: Department of Psychology................. A-0630

Exhibit G Email ...................................................................... A-0632

Exhibit H Email ...................................................................... A-0634

Exhibit I Email ....................................................................... A-0639

Exhibit J Email ....................................................................... A-0641

Exhibit K Letter: Wong Salary Supplement - 4/22/19 ........................ A-0642

Exhibit L Letter: Wong Salary Supplement – 10/28/19 ...................... A-0643

Exhibit M State Compensation – Wong .......................................... A-0644

Exhibit N Chart: Compensation of Full Research Professors ............... A-0645

Memorandum of Law .................................................................. A-0646

Statement of Material Facts .......................................................... A-0701

Plaintiff Memorandum of Law ...................................................... A-0731

Response to Defendants' Statement of Material Facts Not in Dispute ........... A-0767

Declaration Licinio .................................................................... A-0820

Exhibit 1 Employment Contract .............................................. A-0875

Exhibit 2 Demotion Letter ..................................................... A-0887

Exhibit 3 Strategic Plan ....................................................... A-0890

Exhibit 4 Department of Human Rights Probably Cause.................... A-0895

Exhibit 5 Faculty Minutes ..................................................... A-0918

Declaration Attorney.................................................................. A-0923

Exhibit 6 Deposition Transcript Excerpt – Licinio ....................... A-0924

Exhibit 7 Deposition Transcript Excerpt – Dewan......................... A-1018

Reply Memorandum of Law .......................................................... A-1031

Statement of Material Facts in Response to Plaintiff's Counterstatement of
   Material Facts .................................................................... A-1059

Declaration Weinstock ............................................................... A-1073

Declaration Brangman ...................................................................... A-1075

    Exhibit A Email ....................................................................... A-1079

Declaration Frost ............................................................................. A-1080

    Exhibit A Deposition Transcript Excerpt – Frost.................... A-1085

Declaration White ........................................................................... A-1096

    Exhibit A Diagram.................................................................. A-1101

    Exhibit B MC Performance Appraisal Form…. .................... A-1102

Declaration Attorney ...................................................................... A-1108

    Exhibit A Decision and Order – Court of Claims ................... A-1111

    Exhibit B SUNY honors ......................................................... A-1126

    Exhibit C Deposition Transcript Excerpt – Dewan................ A-1129

    Exhibit D Deposition Transcript Excerpt – Botash................ A-1135

    Exhibit E Deposition Transcript Excerpt – Licinio................ A-1136

Decision and Order Granting Defendants Summary Judgment ....................... A-1149

Judgment Granting Defendants Summary Judgment ....................... A-1230

Plaintiff's Notice of Appeal ............................................................ A-1232

vi

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED

# U.S. District Court
## Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.8 (Revision 1.8.1)] (Syracuse)
## CIVIL DOCKET FOR CASE #: 5:21-cv-00387-FJS-TWD

| | |
|---|---|
| Licinio v. State of New York et al | Date Filed: 04/04/2021 |
| Assigned to: Senior Judge Frederick J. Scullin, Jr | Date Terminated: 08/28/2024 |
| Referred to: Magistrate Judge Therese Wiley Dancks | Jury Demand: Both |
| Cause: 42:2000e Job Discrimination (Employment) | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Julio Licinio**
*MD, PhD, MBA, MS*

represented by **Daniel Grace**
Danny Grace PLLC
225 Broadway - Suite 1200
New York, NY 10007
212-202-2485
Fax: 718-732-2821
Email: danny@dannygracepc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Douglas Mace**
Danny Grace, PLLC
225 Broadway - Suite 1200
Brooklyn, NY 11217
347-528-8229
Email: douglas@dannygracepc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Athena Pantelopoulos**
Danny Grace, PC
222 Broadway - 19th Floor
New York, NY 10038
646-515-2821
Email: athena@dannygracepc.com
*TERMINATED: 05/02/2022*

V.

**Defendant**

**State of New York**

represented by **Aimee Cowan**
New York State Attorney General -
Syracuse Regional Office
300 South State Street - Suite 300
Syracuse, NY 13202

vii

315-448-4808
Fax: 315-448-4808
Email: aimee.cowan@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E. Arnold , IV**
New York State Supreme Court - Onondaga
County
333 E. Washington Street - 8th Floor
Syracuse, NY 13202
315-395-6120
Email: wearnold1984@gmail.com
*TERMINATED: 11/21/2022*

**Defendant**

**The State University of New York**      represented by **Aimee Cowan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E. Arnold , IV**
(See above for address)
*TERMINATED: 11/21/2022*

**Defendant**

**The State University of New York Upstate**      represented by **Aimee Cowan**
**Medical University**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William E. Arnold , IV**
(See above for address)
*TERMINATED: 11/21/2022*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/04/2021 | 1 | COMPLAINT against State of New York, The State University of New York and The State University of New York Upstate Medical University (Filing fee $402 receipt number ANYNDC-5482207) filed by Julio Licinio. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet) (dpk) (Entered: 04/05/2021) |
| 04/05/2021 | 2 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 7/7/2021 at 10:00 AM before Magistrate Judge Therese Wiley Dancks. All conferences are conducted by telephone. Plaintiff's attorney will initiate the call (unless the Court directs differently) and shall contact Judge Dancks' Chambers at 315-234-8618 (a dedicated line solely for telephone conferences) once all parties are on the line. Counsel may use a teleconferencing service for assistance initiating conference calls to the Court. For cases involving pro se parties, the Court will initiate the call for the Rule 16 Conference. Pro se parties are instructed to provide the Court with a telephone number where they may be reached for a conference call. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 6/30/2021. (Pursuant to Local Rule 26.2, mandatory |

| | | |
|---|---|---|
| | | disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (dpk) (Main Document 2 replaced on 4/6/2021) (khr, ). (Entered: 04/05/2021) |
| 04/05/2021 | 3 | Summons Issued as to State of New York, The State University of New York and The State University of New York Upstate Medical University. (Attachments: # 1 Summons Issued as to the State University of New York, # 2 Summons Issued as to the State University of New York Upstate Medical University) (dpk) (Entered: 04/05/2021) |
| 04/06/2021 | | CLERK'S CORRECTION OF DOCKET ENTRY re 2 G.O. 25 Filing Order. Replaced the General Order #25 to reflect the name of the correct Judges. (khr) (Entered: 04/06/2021) |
| 04/21/2021 | 4 | NOTICE of Appearance by William E. Arnold, IV on behalf of All Defendants (Arnold, William) (Entered: 04/21/2021) |
| 05/03/2021 | 5 | ANSWER to 1 Complaint, by State of New York, The State University of New York, The State University of New York Upstate Medical University.(Arnold, William) (Main Document 5 replaced on 5/4/2021) (khr, ). (Entered: 05/03/2021) |
| 05/04/2021 | | CLERK'S CORRECTION OF DOCKET ENTRY re 5 Answer to Complaint. The original answer field was numbered incorrectly, replaced with a corrected numbered Answer. (khr) (Entered: 05/04/2021) |
| 05/04/2021 | | TEXT NOTICE -RESCHEDULING OF RULE 16 CONFERENCE: The Telephone Initial Conference has been RESCHEDULED for 6/14/2021 at 10:30 AM before Magistrate Judge Therese Wiley Dancks. Civil Case Management Plan must be filed no later than 6/7/2021, and Mandatory Disclosures are to be exchanged by the parties on or before 6/7/2021. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) **Counsel are directed to call the following number for this conference: 1-877-336-1829, access code 8029754, security code 9342.** (sg ) (Entered: 05/04/2021) |
| 05/24/2021 | 6 | AMENDED ANSWER to 1 Complaint, by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Arnold, William) (Entered: 05/24/2021) |
| 06/07/2021 | 7 | CIVIL CASE MANAGEMENT PLAN by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Arnold, William) (Entered: 06/07/2021) |
| 06/07/2021 | 8 | TEXT ORDER: Court has reviewed the Civil Case Management Plan submitted by the parties. (Dkt. No. 7.) A corrected Civil Case Management Plan should be filed by 6/9/2021, signed by attorney of record for plaintiff who is admitted in the Northern District of NY. Electronic signatures are acceptable. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 6/7/2021.(sg) (Entered: 06/07/2021) |
| 06/08/2021 | 9 | CIVIL CASE MANAGEMENT PLAN by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Arnold, William) (Entered: 06/08/2021) |
| 06/14/2021 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Initial Pretrial Conference held on 6/14/2021. Appearances: Daniel Grace, Esq. for Plaintiff; William Arnold, Esq. for Defendants. Court reviews Civil Case Management Plan. Rule 26 Mandatory Disclosures completed. Stipulated protective order to be submitted for Court approval by 8/2/2021. Mandatory Mediation deferred (not opted out) and will be discussed at future conferences. Pretrial deadlines are established, a scheduling order will be issued. (sg) (Entered: 06/14/2021) |
| 06/14/2021 | 10 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: 5 days, to be held at Syracuse, NY. Joinder of Parties due by 9/17/2021. Amended Pleadings due by |

ix

| | | 9/17/2021. Plaintiff's Expert Disclosure Deadline is 1/4/2022. Defendant's Expert Disclosure Deadline is 2/28/2022. Rebuttal Expert Disclosure Deadline is 3/15/2022. Discovery due by 4/14/2022. Discovery Motions due 5/16/2022. Dispositive Motions to be filed by 7/14/2022. Mandatory Mediation deferred. Signed by Magistrate Judge Therese Wiley Dancks on 6/14/2021. (sg) (Entered: 06/14/2021) |
|---|---|---|
| 06/14/2021 | | TEXT NOTICE of Telephone Conference: A Telephone Status Conference has been set for 11/4/2021 at 9:30 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 1-877-336-1829, access code 8029754, security code 2493.(sg) (Entered: 06/14/2021) |
| 06/15/2021 | 11 | NOTICE of Appearance by Athena Pantelopoulos on behalf of Julio Licinio (Pantelopoulos, Athena) (Entered: 06/15/2021) |
| 07/29/2021 | 12 | Letter Motion from William Arnold for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting that Defendants be permitted to submit a proposed protective order at a future date if necessary submitted to Judge Dancks . (Arnold, William) (Entered: 07/29/2021) |
| 07/29/2021 | 13 | TEXT ORDER: Court reviewed letter motion (Dkt. No. 12 ) regarding need for protective order at the present time. Since the parties do not believe a protective order is necessary at this time, the deadline to submit a proposed order is adjourned without new date. If the parties determine a protective order is needed in the future, they should immediately submit a proposed order such that discovery will not be held up unnecessarily. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/29/2021. (sg) (Entered: 07/29/2021) |
| 11/04/2021 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Status Conference held on 11/4/2021. Appearances: Athena Pantelopoulos, Esq. for Plaintiff; William Arnold, Esq. for Defendants. Counsel report on status of discovery and depositions anticipated. Court issues directives and sets deadlines, a separate text order will follow. (sg) (Entered: 11/04/2021) |
| 11/04/2021 | 14 | TEXT ORDER: The Court made the following directives and set deadline during the 11/4/2021 Telephone Conference: All responses to discovery demands due by 11/12/2021. Any objections to responses must be detailed and specific. A detailed privilege log must be provided for any responses where privilege is claimed. Plaintiff to file joint status report by 12/13/2021 re: sufficiency of discovery responses and any issues the parties are working on; and confirmed dates for depositions to include the name of the individual being deposed and date of deposition. Mediation deferral continued. All deadlines remain as previously established. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/4/2021. (sg) (Entered: 11/04/2021) |
| 11/09/2021 | 15 | Letter Motion from William Arnold for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting proposed confidentiality stipulation submitted to Judge Dancks . (Arnold, William) (Entered: 11/09/2021) |
| 11/10/2021 | 16 | Confidentiality Stipulation and Protective Order. Signed by Magistrate Judge Therese Wiley Dancks on 11/10/2021. (sg) (Entered: 11/10/2021) |
| 12/13/2021 | 17 | STATUS REPORT by Julio Licinio. (Pantelopoulos, Athena) (Entered: 12/13/2021) |
| 12/13/2021 | 18 | TEXT ORDER: Court reviewed status report (Dkt. No. 17 ) regarding discovery. The parties are directed to meet and confer in good faith regarding the discovery issues identified concerning their respective responses to the other party's demands. The parties should serve any supplemental responses by 1/18/2022. Plaintiff to file a further status report by 1/31/2022 regarding paper discovery issues that have not been resolved. SO |

| | | ORDERED by Magistrate Judge Therese Wiley Dancks on 12/13/2021. (sg) (Entered: 12/13/2021) |
|---|---|---|
| 01/17/2022 | 19 | Letter Motion from Counsel for Plaintiff for Julio Licinio requesting Extension to serve supplemental responses to discovery and complete party depositions submitted to Judge Therese Wiley Dancks . (Pantelopoulos, Athena) (Entered: 01/17/2022) |
| 01/18/2022 | 20 | TEXT ORDER: Court reviewed status report/letter motion (Dkt. No. 19 ) seeking an extension of time regarding discovery which is granted. The parties should serve all supplemental responses to discovery demands as referenced in Dkt. No. 19 by 2/24/2022. Plaintiff to file further status report by 2/28/2022 regarding any further paper discovery issues that have not been resolved. All discovery is now due 5/16/2022; discovery motions due 5/31/2022; dispositive motions remain due 7/14/2022. All other deadlines also remain as previously set in Dkt. No. 10 . SO ORDERED by Magistrate Judge Therese Wiley Dancks on 1/18/2022. (sg) (Entered: 01/18/2022) |
| 02/19/2022 | 21 | NOTICE of Appearance by Aimee Cowan on behalf of State of New York, The State University of New York, The State University of New York Upstate Medical University (Cowan, Aimee) (Entered: 02/19/2022) |
| 02/28/2022 | 22 | STATUS REPORT *pursuant to the Courts January 18, 2022 Text Order* by Julio Licinio. (Pantelopoulos, Athena) (Entered: 02/28/2022) |
| 03/02/2022 | 23 | TEXT ORDER: Court has reviewed status report (Dkt. No. 22 ) regarding discovery progress. The parties are to confer in good faith to set a deposition schedule. Plaintiff to file status report by 3/18/2022 regarding confirmed dates for depositions. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/2/2022. (sg ) (Entered: 03/02/2022) |
| 03/18/2022 | 24 | STATUS REPORT/Letter Motion by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/18/2022 (sg, ). (Entered: 03/18/2022) |
| 03/21/2022 | 25 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 24 ) for an extension of the remaining discovery deadlines which is granted as follows: All discovery is now due 7/15/2022; discovery motions due 7/29/2022; dispositive motions remain due 8/31/2022. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/21/2022. (sg) (Entered: 03/21/2022) |
| 05/02/2022 | 26 | Letter Motion from Athena Pantelopoulos for Julio Licinio requesting Withdraw as Attorney submitted to Judge Therese Wiley Dancks . (Pantelopoulos, Athena) (Entered: 05/02/2022) |
| 05/02/2022 | 27 | TEXT ORDER granting 26 Letter Request. Attorney Athena Pantelopoulos no longer represents Plaintiff. Plaintiff continues to be represented by Daniel Grace, Esq. and the law firm of Danny Grace PLLC. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 5/2/2022. (sg) (Entered: 05/02/2022) |
| 07/06/2022 | 28 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting discovery deadline and dispositive motion deadline extension submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 07/06/2022) |
| 07/06/2022 | 29 | TEXT ORDER: Court reviewed letter request (Dkt. No. 28 ) for extensions which is granted for the reasons stated. All discovery is now due 9/16/2022; discovery motions due 9/30/2022; dispositive motions due 10/28/2022. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/6/2022. (sg) (Entered: 07/06/2022) |
| 09/01/2022 | 30 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting Joint |

xi

| | | |
|---|---|---|
| | | parties' request for 60-day deadline extension submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 09/01/2022) |
| 09/02/2022 | 31 | TEXT ORDER granting 30 Letter Request as follows: Discovery due by 11/15/2022. Discovery Motions due 11/29/2022. Dispositive Motions to be filed by 12/27/2022. **The Court has granted several extensions (Dkt. Nos. 20, 25, 29) since the initial scheduling order was issued. Counsel therefore must provide extraordinary cause for any further requests for extension.** SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/2/2022. (sg) (Entered: 09/02/2022) |
| 09/27/2022 | 32 | NOTICE of Appearance by Douglas Mace on behalf of All Plaintiffs (Mace, Douglas) (Entered: 09/27/2022) |
| 10/19/2022 | 33 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting discovery conference submitted to Judge Therese Wiley Dancks . (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D)(Cowan, Aimee) (Entered: 10/19/2022) |
| 10/26/2022 | 34 | TEXT ORDER : Court reviewed letter motion (Dkt. No. 33 ) regarding discovery dispute and requesting a discovery conference which is denied at this time without prejudice. From a review of Dkt. No. 33, it appears that the parties have only exchanged written notice of the perceived deficiencies in their respective responses. Defendant does not identify any conference the counsel had to confer in good faith by speaking to each other regarding the deficiencies. Additionally, a review of counsel's respective deficiency letters (Dkt. Nos. 33-3, 33-4), and in consideration of the claims and defenses alleged, the Court finds the information requested by both parties to be relevant. Therefore, both parties are directed to serve supplemental responses which fully respond to the various deficiencies set forth in Dkt. Nos. 33-3 and 33-4 by 11/4/2022. If either party claims any responsive documents are privileged, a complete privilege log must be provided with the responses. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 10/26/2022. (sg) (Entered: 10/26/2022) |
| 11/09/2022 | 35 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting discovery conference and deadline extension submitted to Judge Therese Wiley Dancks . (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B)(Cowan, Aimee) (Entered: 11/09/2022) |
| 11/16/2022 | 36 | TEXT ORDER granting 35 Letter Request for a telephone conference with the Court: Telephone Discovery Conference set for 11/21/2022 at 10:00 AM before Magistrate Judge Therese Wiley Dancks. **The parties are each directed to submit a short letter brief, no longer than 3pp, single spaced, 12pt font, by 4pm on 11/18/2022, setting forth their respective positions on the disputed discovery.** The remaining discovery deadlines are held in abeyance at this time and will be reset at the conference. Counsel are directed to call the following number for this conference: 1-877-336-1829, access code 8029754, security code 2493. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/16/2022. (sg) (Entered: 11/16/2022) |
| 11/18/2022 | 37 | LETTER BRIEF *in Response to ECF #36* by Julio Licinio. (Attachments: # 1 Appendix) (Grace, Daniel) (Entered: 11/18/2022) |
| 11/18/2022 | 38 | LETTER BRIEF by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) A)(Cowan, Aimee) (Entered: 11/18/2022) |
| 11/21/2022 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Discovery Conference held on 11/21/2022. Appearances: Douglas Mace, Esq. for Plaintiff; Aimee Cowan, Esq. for Defendants. Court reviews discovery issues, makes rulings and sets deadlines. A separate text order will follow. (sg) (Entered: 11/21/2022) |

| 11/21/2022 | 39 | TEXT ORDER: Court made the following rulings during the 11/21/2022 Telephone Discovery Conference: Plaintiff to respond to Defendants' Requests for Production 1 & 2 by providing to defendant authorizations and provider names of physical and/or mental health care/treatment received by Plaintiff during the period of 2009 to present, or file a letter with the Court clearly stating that those damages claims will not be pursued by Plaintiff, by 11/30/2022. Defendants' Request for Production 4 is denied without prejudice, Plaintiff does not need to further respond. With respect to Defendants' Requests for Production 6 and 7, plaintiff is to provide the names of places Plaintiff applied for jobs, and the offers or rejections received by text, email, letter or other written communication, for the period 2009 to present, by 12/16/2022. Any other disputes between the parties have either been resolved or waived. Court extends remaining deadlines as follows: Discovery due by 1/9/2023. Discovery Motions due 1/23/2023. Dispositive Motions to be filed by 3/3/2023. Court received oral request from defendant that Attorney Arnold is no longer representing the defendant and should be terminated from the docket, which is granted by the Court. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/21/2022. (sg) (Entered: 11/21/2022) |
| 11/29/2022 | 40 | LETTER BRIEF by Julio Licinio. (Mace, Douglas) (Entered: 11/29/2022) |
| 11/30/2022 | 41 | TEXT ORDER: Court reviewed plaintiff's letter (Dkt. No. 40 ) regarding update on discovery and damages issues. Defendants to file status report regarding remaining discovery by 1/3/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/30/2022. (sg) (Entered: 11/30/2022) |
| 12/16/2022 | 42 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 12/16/2022 (sg, ). (Entered: 12/16/2022) |
| 12/19/2022 | | TEXT NOTICE of Telephone Discovery Conference: A Telephone Discovery Conference has been set for 1/5/2023 at 11:00 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 1-877-336-1829, access code 8029754, security code 2493.(sg ) (Entered: 12/19/2022) |
| 01/05/2023 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Discovery Conference held on 1/5/2023. Appearances: Douglas Mace, Esq. for Plaintiff; Aimee Cowan, Esq. for Defendants. After hearing from the parties during this telephone conference, which included discussion of the parties' submissions and positions re: the discovery dispute, the Court made rulings which will be memorialized in a written order. Court encourages the parties to discuss resolving the case and advises the Court is available for a settlement conference at the parties' request. (sg) (Entered: 01/05/2023) |
| 01/05/2023 | 43 | ORDER: for the reasons set forth herein it is ORDERED: Court GRANTS Defendants' 42 Letter Request; Plaintiff's emotional distress damages are limited to garden variety emotional distress as set forth herein; Plaintiff shall provide employment authorizations as directed herein to Defendants' counsel by 1/17/2023; Plaintiff shall provide a detailed written settlement demand to Defendants by 1/17/2023 and the parties shall confer in good faith regarding settlement; Defendants shall file a status report by 2/17/2023 regarding obtaining the employment records pursuant to the authorizations, and settlement negotiations; and all deadlines remain as previously established, and no other discovery is permitted except as directed in this Order. Signed by Magistrate Judge Therese Wiley Dancks on 1/5/2023. (sg) (Entered: 01/05/2023) |
| 02/17/2023 | 44 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 2/17/2023 (sg, ). (Entered: 02/17/2023) |

| 02/22/2023 | 45 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 44 ) regarding discovery completion and settlement potential. To the extent defendants request an adjournment of the dispositive motion deadline so the parties may explore settlement, the request is granted. The dispositive motion deadline is held in abeyance at this time. Defendants to file further status report on settlement and whether a settlement conference is definitely requested by 3/6/2023.SO ORDERED by Magistrate Judge Therese Wiley Dancks on 2/22/2023. (sg) (Entered: 02/22/2023) |
|---|---|---|
| 03/05/2023 | 46 | STATUS REPORT?Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/6/2023 (sg, ). (Entered: 03/05/2023) |
| 03/08/2023 | 47 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 46 ) and grants the defendants' request to extend the time to file a status report on settlement and whether a settlement conference is requested. Defendants to file the report by 3/15/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/8/2023. (sg) (Entered: 03/08/2023) |
| 03/15/2023 | 48 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/15/2023 (sg, ). (Entered: 03/15/2023) |
| 03/15/2023 | 49 | TEXT ORDER: Court reviewed status report/letter request (Dkt. No. 48 ) and grants the defendants' request to extend the time to file a further status report on settlement and whether a settlement conference is requested. If so, Court will then schedule the conference at a mutually agreeable date and time. Defendants to file the report by 4/3/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/15/2023. (sg) (Entered: 03/15/2023) |
| 03/31/2023 | 50 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/31/2023 (sg, ). (Entered: 03/31/2023) |
| 04/03/2023 | 51 | TEXT ORDER granting 50 Letter Request for a settlement conference with the Court. The Court will reach out separately to counsel with proposed dates for the in person settlement conference. The parties should make a good faith effort to settle the matter amongst themselves prior to the conference, and be prepared to report to the court all efforts made to resolve the case if it is not settled before the conference. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 4/3/2023. (sg) (Entered: 04/03/2023) |
| 04/12/2023 | | TEXT NOTICE of In Person Settlement Conference: In Person Settlement Conference set for 5/18/2023 at 10:00 AM in Syracuse before Magistrate Judge Therese Wiley Dancks. The parties will meet in Chambers of Judge Wiley Dancks located on the 3rd floor, James M. Hanley Federal Building, 100 South Clinton Street, Syracuse, New York. Parties must appear in person as directed by the Court. The Confidential Settlement Statement is being sent to counsel via separate email with instructions on submission to the Court and is due to be submitted NO LATER THAN 5PM ON 5/11/2023. The settlement statement MUST NOT be electronically filed with the Court or exchanged among the parties. (sg) (Entered: 04/12/2023) |
| 04/13/2023 | 52 | TEXT ORDER : In view of the difficulties in scheduling the upcoming settlement conference, any request to amend the date of the conference MUST be received by the Court a minimum of 72 hours prior to the currently scheduled date and time of the conference, and MUST state good cause for the request. Any request that does not comport with this directive will be summarily denied, and any party or counsel who does not appear for the conference in person as directed may be sanctioned. The parties should continue to negotiate in good faith in efforts to settle the matter between now and the conference as |

| | | directed in Dkt. No. 51 . SO ORDERED by Magistrate Judge Therese Wiley Dancks on 4/13/2023. (sg) (Entered: 04/13/2023) |
|---|---|---|
| 05/18/2023 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Settlement Conference held on 5/18/2023. Appearances: Daniel Grace, Esq. and Douglas Mace, Esq. for Plaintiff; Plaintiff Julio Licinio; Aimee Cowan, Esq. for Defendants; Anne Dotzler, Esq., SUNY Office of General Counsel, for Defendants. Settlement conference held and was adjourned after progress made. Parties will continue to discuss settlement. Defendants to file a status report by 6/30/2023 re: status of progress of settlement and whether the parties want to revisit another settlement conference with the Court. Dispositive Motions deadline continues to be held in abeyance. (sg) (Entered: 05/18/2023) |
| 06/30/2023 | 53 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 7/5/2023 (sg, ). (Entered: 06/30/2023) |
| 07/05/2023 | 54 | TEXT ORDER : Court reviewed 53 status report/letter request regarding further settlement negotiations. To the extent the parties request additional time to submit a status report on settlement progress, that request is granted. Defendant to file a further status report on settlement by 7/17/2023. The dispositive motion deadline, which has been held in abeyance while the parties attempted to reach a settlement agreement, is reset to 8/31/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/5/2023. (sg) (Entered: 07/05/2023) |
| 07/17/2023 | 55 | STATUS REPORT by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) (Entered: 07/17/2023) |
| 07/21/2023 | 56 | TEXT ORDER: Court reviewed status report (Dkt. No. 55 ) and directs defendant to file a further status report on settlement by 8/4/2023. Dispositive motion deadline remains set at 8/31/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/21/2023. (sg) (Entered: 07/21/2023) |
| 08/04/2023 | 57 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 8/4/2023 (sg, ). (Entered: 08/04/2023) |
| 08/07/2023 | 58 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 57 ) regarding settlement negotiations and dispositive motion deadline. Defendants to file a further status report on settlement by 9/8/2023; dispositive motion deadline extended to 10/6/2023. No further extensions will be granted. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 8/7/2023. (sg) (Entered: 08/07/2023) |
| 09/07/2023 | 59 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B)(Cowan, Aimee) Modified on 9/7/2023 (sg, ). (Entered: 09/07/2023) |
| 09/07/2023 | 60 | TEXT ORDER: Court reviewed status report/letter request (Dkt. No. 59 ) for extension of dispositive motion deadline which is granted for the reasons stated. The dispositive motion deadline is reset to 10/31/2023. The parties are to confer in good faith regarding potential further document discovery as discussed in Dkt. No. 59 and plaintiff to produce supplemental responses to defendants' demands 8, 10, and 17 by 9/21/2025 if further responses are located. No other discovery is permitted. Defendants to file a further status report regarding the additional document discovery outlined in Dkt. No. 59 by 9/25/2023 SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/7/2023. (sg) (Entered: 09/07/2023) |

xv

| 09/25/2023 | 61 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 9/26/2023 (sg, ). Modified on 9/26/2023 (sg, ). (Entered: 09/25/2023) |
|---|---|---|
| 09/26/2023 | 62 | TEXT ORDER granting 61 Letter Request for a Court conference for the reasons stated. Telephone Discovery Conference set for 10/2/2023 at 11:00 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 315-691-0477, and enter ID code 615 018 984 to connect to the conference. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/26/2023. (sg) (Entered: 09/26/2023) |
| 09/26/2023 | 63 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting reschedule 10/2/23 conference submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 09/26/2023) |
| 09/26/2023 | 64 | TEXT ORDER granting 63 Letter Request for the reasons stated. Telephone Discovery Conference RESCHEDULED for 10/3/2023 at 9:30 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 315-691-0477, and enter ID code 615 018 984 to connect to the conference. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/26/2023. (sg) (Entered: 09/26/2023) |
| 10/03/2023 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Discovery Conference held on 10/3/2023. Appearances: Douglas Mace, Esq. for Plaintiff; Aimee Cowan, Esq. for Defendants. Court discusses issues raised in Dkt. 61. Court issues directives, a separate text order will follow. (sg) (Entered: 10/03/2023) |
| 10/03/2023 | 65 | TEXT ORDER: As directed during the 10/3/2023 Telephone Discovery Conference, Defendants to file a status report by 10/16/2023 re: whether counsel has received the transcripts as discussed during the conference, any issues re: the emails, and any progress with respect to resolving the case. Dispositive motions deadline remains as currently set. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 10/3/2023. (sg) (Entered: 10/03/2023) |
| 10/16/2023 | 66 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 10/16/2023 (sg, ). (Entered: 10/16/2023) |
| 10/17/2023 | 67 | TEXT ORDER: Court reviewed 66 status report/letter request for extension of dispositive motion deadline which is granted for the reasons stated. The dispositive motion deadline is extended to 12/1/2023. Defendants to file status report by 11/13/2023 regarding whether the transcripts of Drs. Schwartz and Laraque-Arena have been received, and the status of settlement negotiations. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 10/17/2023. (sg) (Entered: 10/17/2023) |
| 11/13/2023 | 68 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 11/14/2023 to reflect letter request (jcl). (Entered: 11/13/2023) |
| 11/14/2023 | 69 | TEXT ORDER: Court reviewed status report/letter request (Dkt. No. 68 ) for further extension of the dispositive motion deadline. Letter request granted for the reasons stated. Dispositive motions due 1/5/2024. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/14/2023. (jcl) (Entered: 11/14/2023) |

| 12/30/2023 | 70 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting 2-week dispositive motion deadline and 20-page memo of law page extension submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 12/30/2023) |
|---|---|---|
| 01/02/2024 | 71 | RESPONSE in Opposition re 70 Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting 2-week dispositive motion deadline and 20-page memo of law page extension submitt filed by Julio Licinio. (Mace, Douglas) (Entered: 01/02/2024) |
| 01/03/2024 | 72 | TEXT ORDER : Court reviewed defendants' letter request (Dkt. No. 70 ) for extension of dispositive motion deadline and a request to exceed the memorandum of law page limit, and plaintiff's opposition (Dkt. No. 71 ) to the request. Letter request granted. Dispositive motion due 1/19/2024; both parties may submit a 45-page brief if necessary. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 1/3/2024. (sg) (Entered: 01/03/2024) |
| 01/19/2024 | 73 | MOTION for Summary Judgment filed by State of New York, The State University of New York, The State University of New York Upstate Medical University. Motion returnable before Judge Glenn T. Suddaby. Response to Motion due by 2/9/2024. Reply to Response to Motion due by 2/16/2024 (Attachments: # 1 Declaration, # 2 Exhibit(s) A, # 3 Exhibit(s) B, # 4 Exhibit(s) C, # 5 Exhibit(s) D, # 6 Exhibit(s) E, # 7 Exhibit(s) F, # 8 Exhibit(s) G, # 9 Exhibit(s) H, # 10 Exhibit(s) I, # 11 Exhibit(s) J, # 12 Exhibit(s) K, # 13 Exhibit(s) L, # 14 Exhibit(s) M, # 15 Declaration, # 16 Declaration, # 17 Exhibit(s) A, # 18 Exhibit(s) B, # 19 Exhibit(s) C, # 20 Exhibit(s) D, # 21 Exhibit(s) E, # 22 Exhibit(s) F, # 23 Declaration, # 24 Exhibit(s) A, # 25 Exhibit(s) B, # 26 Declaration, # 27 Exhibit(s) A, # 28 Exhibit(s) B, # 29 Exhibit(s) C, # 30 Exhibit(s) D, # 31 Exhibit(s) E, # 32 Exhibit(s) F, # 33 Exhibit(s) G, # 34 Exhibit(s) H, # 35 Exhibit(s) I, # 36 Declaration, # 37 Exhibit(s) A, # 38 Exhibit(s) B, # 39 Exhibit(s) C, # 40 Exhibit(s) D, # 41 Exhibit(s) E, # 42 Declaration, # 43 Exhibit(s) A, # 44 Declaration, # 45 Exhibit(s) A, # 46 Exhibit(s) B, # 47 Exhibit(s) C, # 48 Exhibit(s) D, # 49 Declaration, # 50 Exhibit(s) A, # 51 Exhibit(s) B, # 52 Exhibit(s) C, # 53 Exhibit(s) D, # 54 Exhibit(s) E, # 55 Declaration, # 56 Exhibit(s) A, # 57 Exhibit(s) B, # 58 Declaration, # 59 Exhibit(s) A, # 60 Exhibit(s) B, # 61 Exhibit(s) C, # 62 Exhibit(s) D, # 63 Exhibit(s) E, # 64 Exhibit(s) F, # 65 Exhibit(s) G, # 66 Exhibit(s) H, # 67 Exhibit(s) I, # 68 Exhibit(s) J, # 69 Exhibit(s) K, # 70 Exhibit(s) L, # 71 Exhibit(s) M, # 72 Exhibit(s) N, # 73 Memorandum of Law, # 74 Statement of Material Facts) (Cowan, Aimee) (Entered: 01/19/2024) |
| 01/23/2024 | 74 | Letter Motion from Douglas Mace for Julio Licinio requesting Extension of time oppose summary judgment submitted to Judge Hon. Glenn T. Suddaby . (Mace, Douglas) (Entered: 01/23/2024) |
| 01/23/2024 | 75 | TEXT ORDER granting Plaintiff's 74 letter-motion requesting a 90 day extension of time to respond to Defendants' 73 Motion for Summary Judgment. Plaintiff's Response to this Motion is due by 5/9/2024. Any reply to this motion is due by 5/23/2024. SO ORDERED by U.S. District Judge Glenn T Suddaby on 1/23/2024. (sal) (Entered: 01/23/2024) |
| 05/06/2024 | 76 | Letter Motion from Douglas Mace for Julio Licinio requesting Extension of Page Limit submitted to Judge Therese Wiley Dancks . (Mace, Douglas) (Entered: 05/06/2024) |
| 05/06/2024 | 77 | TEXT ORDER granting Plaintiff's 76 letter requesting a 20-page extension of the page limit for Plaintiff's Memorandum of Law in response to Defendants' Motion for Summary Judgment, for a total of 45 pages. SO ORDERED by U.S. District Judge Glenn T Suddaby on 5/6/2024. (sal ) (Entered: 05/06/2024) |
| 05/09/2024 | 78 | RESPONSE in Opposition re 73 Motion for Summary Judgment,,,,,,, filed by Julio Licinio. (Attachments: # 1 Declaration of Douglas Mace, Esq., # 2 Exhibit(s) 6, # 3 Exhibit(s) 7, # |

| | | 4 Declaration of Plaintiff Julio Licinio, # 5 Exhibit(s) 1, # 6 Exhibit(s) 2, # 7 Exhibit(s) 3, # 8 Exhibit(s) 4, # 9 Exhibit(s) 5, # 10 Memorandum of Law)(Grace, Daniel) (Entered: 05/09/2024) |
|---|---|---|
| 05/20/2024 | 79 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting 2-week extension to reply to summary judgment opposition and 10-page memo of law enlargement submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 05/20/2024) |
| 05/20/2024 | 80 | TEXT ORDER granting Defendants' 79 letter requesting an extension of time to file a reply on or before June 6, 2024 to Defendants' 73 summary judgment motion and a 10-page enlargement for the reply memorandum of law, for a total of twenty pages. SO ORDERED by U.S. District Judge Glenn T Suddaby on 5/20/2024. (sal ) (Entered: 05/20/2024) |
| 06/06/2024 | 81 | REPLY to Response to Motion re 73 Motion for Summary Judgment,,,,,,, filed by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Attachments: # 1 Statement of Material Facts Response to Plaintiff's Counterstatement of Material Facts, # 2 Declaration, # 3 Declaration, # 4 Exhibit(s) A, # 5 Declaration, # 6 Exhibit(s) A, # 7 Declaration, # 8 Exhibit(s) A, # 9 Exhibit(s) B, # 10 Declaration, # 11 Exhibit(s) A, # 12 Exhibit(s) B, # 13 Exhibit(s) C, # 14 Exhibit(s) D, # 15 Exhibit(s) E)(Cowan, Aimee) (Entered: 06/06/2024) |
| 08/21/2024 | 82 | TEXT ORDER REASSIGNING CASE. Having reviewed this matter more closely, it has come to my attention that I may have a conflict of interest, and therefore I recuse myself from this case. WHEREFORE, it is hereby ORDERED that the Clerk enter this Text Order of Recusal for the undersigned; and it is further ORDERED that the Clerk shall randomly reassign this case to another United States District Judge. (U.S. District Judge Glenn T. Suddaby recused. Case reassigned to Senior Judge Senior Judge Frederick J. Scullin, Jr. for all further proceedings. Magistrate Judge Therese Wiley Dancks remains the assigned magistrate judge in this action). SO ORDERED by U.S. District Judge Glenn T Suddaby on 8/21/2024. (sal) (Entered: 08/21/2024) |
| 08/27/2024 | 83 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting District Judge Mae A. D'Agostino's summary judgment decision in Wong v. State of New York, et al. be considered by the Court for the pending summary judgment motion submitted to Judge Frederick J. Scullin, Jr. . (Attachments: # 1 Exhibit(s) A)(Cowan, Aimee) (Entered: 08/27/2024) |
| 08/28/2024 | 84 | DECISION AND ORDER granting 73 Motion for Summary Judgment; ORDER DISMISSING Plaintiff's Complaint 1 ; and further ORDERS that the Clerk of the Court shall enter judgment in favor of Defendants and close this case. Signed by Senior Judge Frederick J. Scullin, Jr on 8/28/2024. (tll) (Entered: 08/28/2024) |
| 08/28/2024 | 85 | JUDGMENT: IT IS ORDERED that Defendants' motion for summary judgment 73 is GRANTED; and the Court further ORDERS that Plaintiff's Complaint 1 is DISMISSED; and the Court further ORDERS that the Clerk of the Court shall enter judgment in favor of State of New York, The State University of New York, The State University of New York Upstate Medical University and close this case. Pursuant to the order of the Honorable Frederick J. Scullin, Jr., dated August 28, 2024. (tll) (Entered: 08/28/2024) |
| 09/25/2024 | 86 | NOTICE OF APPEAL as to # 84 Order on Motion for Summary Judgment filed by Julio Licinio. (Mace, Douglas) (Entered: 09/25/2024) |
| 09/25/2024 | | Clerk's Correction of Docket Entry: Docket # 86 Notice of Appeal was removed from the docket and re-filed as it was filed using the incorrect event. The Notice of Appeal was re-filed using the "Notice of Appeal" event so that it will transmit to the Second Circuit Court |

xviii

| | | of Appeals via NEF. Because the incorrect event was used, no appeal fee was received. (lmw) (Entered: 09/25/2024) |
|---|---|---|
| 09/25/2024 | | Filing Fee: $605.00, receipt number 27HVG9QE. {Payment of Appeal Filing Fee for # 86 Notice of Appeal} (kck) (Entered: 09/25/2024) |
| 09/26/2024 | 87 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re the # 86 Notice of Appeal. (kck) (Entered: 09/26/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/19/2024 08:48:10 | | | |
| **PACER Login:** | cpwashington16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cv-00387-FJS-TWD |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JULIO LICINIO, MD, PhD, MBA, MS,

    Plaintiff,

        v.

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE STATE
UNIVERSITY OF NEW YORK UPSTATE
MEDICAL UNIVERSITY,

    Defendants.

Case No.:
5:21-cv-387 (GTS/TWD)

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

    Plaintiff Julio Licinio, MD, PhD, MBA, MS, ("Plaintiff" or "Dr. Licinio") by and through his attorneys, Danny Grace, P.C., as and for his Complaint in this action against the State of New York ("NYS"), The State University of New York ("SUNY"), and The State University of New York Upstate Medical University ("SUNY Upstate" or "University"), hereinafter known collectively as "Defendants", alleges upon personal knowledge and upon information and belief as to the matters as follows:

**NATURE OF THE CLAIMS**

    1.    This is an action for declaratory, injunctive, and equitable relief, as well as monetary damages to redress Defendants' unlawful employment practices against Plaintiff, including discriminatory and retaliatory treatment of Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title VII").

1

2.       Defendants, their owners, managers, and employees intentionally, unlawfully and recklessly discriminated against Plaintiff directly, and retaliated against Plaintiff following his protected activities in violation of Title VII.

3.       After Plaintiff complained about and acted in opposition to Defendants' unlawful and discriminatory practices and entrenched structural racism, and asserted his rights under Title VII, Defendants retaliated and demoted Plaintiff absent any other cause.

4.       Said demotion resulted in not only a significant negative change in Plaintiff's salary causing an annual loss of income of $378,000.00, but it also resulted in significant and arguably irreparable damage to Plaintiff's distinguished reputation in his field of academics.

5.       Defendants' conduct was knowing, malicious, willful, and wanton and showed a reckless disregard for Plaintiff, which has caused and continues to cause economic and non-economic damages, mental anguish and distress.

## JURISDICTION AND VENUE

6.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 as this action involves a federal question regarding the deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq.

7.       This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

8.       Venue is proper in the United States District Court, Northern District of New York, pursuant to 28 U.S.C. §1391, because Defendants maintain their headquarters in this district, and Defendants regularly transact business in the State of New York and in the Northern District of New York, and because the events giving rise to this Complaint took place in the Northern District of New York.

A0002

**PROCEDURAL REQUIREMENTS**

9.      Prior to the commencement of this action, Plaintiff filed a Verified Complaint with the State of New York Executive Division of Human Rights ("DHR") on November 18, 2019, charging Defendant with unlawful discriminatory practices relating to employment in violation of N.Y. Exec Law, art. 15.

10.      Plaintiff also noticed Defendants of his claim through a verified claim, which was served upon Defendants within ninety (90) days of his claim arising.

11.      Plaintiff's DHR Complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC") at or about the same time.

12.      On April 9, 2020, DHR determined that it had jurisdiction in the matter and that probable cause existed to believe that Defendants engaged in or are engaging in the unlawful discriminatory practice complained of by Plaintiff, and thereafter recommended the case to public hearing.

13.      By letter dated September 28, 2020, Plaintiff's attorney requested that the DHR dismiss the complaint for administrative convenience in order to pursue his claim in federal court.

14.      On October 14, 2020, the DHR granted Plaintiff's request to dismiss for administrative convenience.

15.      Plaintiff then received a Right to Sue letter from the EEOC dated January 5, 2021.

16.      This Complaint has been filed within 90 days of Plaintiff's receipt of Right to Sue letter.

17.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

18.     Plaintiff is an employee of Defendants and works directly for Defendant SUNY Upstate.

19.     Plaintiff is a Medical Doctor and Psychiatrist currently serving on the faculty at Defendant SUNY Upstate.

20.     On March 14, 2017, Plaintiff was appointed as Senior Vice President and Dean of the College of Medicine of Defendant SUNY Upstate and remained in that position until his unlawful demotion on September 12, 2019, when Defendants changed his role to tenured Professor in the Department of Psychiatry, a role he has continued in through the filing of this Complaint.

21.     Defendant New York State controls and maintains Defendants SUNY and SUNY Upstate. Governance of Defendants SUNY and SUNY Upstate is by appointment of the Governor of the State of New York, with consent of the New York State Senate. Defendant New York State assists in financing and funding the SUNY system.

22.     During the events described herein, upon information and belief Defendant New York State maintains its headquarters in the New York State Capitol in Albany, New York, in Albany County.

23.     Defendant SUNY is a system of public colleges and universities in New York State with a total enrollment of 424,051 students, plus 2,195,082 adult education students spanning sixty-four (64) campuses across New York State, including Defendant SUNY Upstate.  Defendant SUNY has 91,182 employees, including 32,496 faculty members.  Upon information and belief, Defendant SUNY maintains their administrative offices in Albany, New York with satellite offices in Manhattan and Washington, D.C.

4

24.     Defendant SUNY Upstate is a public medical university, including a medical school, and is a part of the State University of New York ("SUNY") system.  Defendant SUNY Upstate is an upper-division transfer and graduate college with degree programs within the College of Medicine, College of Nursing, College of Health Professions, and the College of Graduate Studies.

25.     During the events described herein, upon information and belief Defendant SUNY Upstate was/is located at 750 East Adams Street, Syracuse, New York in Onondaga County.

26.     At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

27.     At all relevant times, Defendants met the definition of an "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

28.     Plaintiff holds an MD, PhD, MBA and Master of Science in healthcare leadership, and is the (unpaid) Matthew Flinders Distinguished Professor at Flinders University in Australia. His appointments and honors are internationally known, and he has served as faculty in teaching institutions worldwide.

29.     Plaintiff, who is of Latino National Origin, is a physician-scientist with over 20 years of experience as a tenured professor in some of the world's leading universities and an abundant record of competitive, peer-reviewed, federal funding in Australia and in the United States, that exceeds $20 million cumulatively. That federal funding has included a National Institutes of Health (NIH) R24 award to mentor physician-scientists. At the time that Plaintiff received that award, the National Center for Research Resources at the NIH had only ever issued 9 such awards.

A0005

30.     Through his work, Plaintiff has developed a translational program of research that spans the bench and the clinic to unravel the biology of antidepressants and major depressive disorder (MDD) and co-morbid conditions, such as obesity and anxiety.

31.     Plaintiff has a considerable academic track record that goes back over twenty (20) years. This includes national and international experience as a tenured professor continuously since 1999, in some of the world's leading universities, including University of California, Los Angeles (UCLA), the number one ranked public university in the United States.

32.     During his term as full professor, Plaintiff has been a principal investigator of multiple federal research grants in Australia and in the United States, author of over 300 publications, and has had previous leadership experience as Center Co-director and Vice-Chair of the Department of Psychiatry at UCLA, Chair of the Department of Psychiatry at University of Miami, Director, John Curtin School of Medical Research at the Australian National University, Matthew Flinders Distinguished Professor at Flinders University, and Mind and Brain Theme Leader and Deputy Director at the South Australian Health and Medical Research Institute. All of those positions were attained through open and stringent national and international searches.

33.     For over twenty-five (25) years, Plaintiff has contributed to prestigious medical journals, ranked at the top of his field worldwide.

34.     Pursuant to his appointment by Defendants as Senior Vice President and Dean of the College of Medicine, Plaintiff entered into an employment contract with Defendant SUNY Upstate which included an eight-month notice and transition period were he to be removed from his position in the future. **See Exhibit 1.**

35.     Specifically, the employment contract states that if for any reason a decision was made by Plaintiff or Defendants that he would step down as Dean, he would be entitled to eight

6

months' notice in writing prior to the step-down date, and that during that eight-month transition the parties would work together to enable a smooth transition to new leadership as well as Plaintiff's transition to a faculty position.

36.     Furthermore, the employment contract states that if he were to transition to the position of tenured Professor in the Department of Psychiatry, his total compensation would be no lower than the total compensation of the highest paid faculty member at the same rank in the Psychiatry Department, and in Plaintiff's case, his total compensation would be paid in its entirety by Defendant NYS.

37.     Plaintiff's employment contract further states that he would be reimbursed for professional expenses and be provided with secretarial support, both as Dean and after his term as Dean, as a Professor.

38.     Plaintiff began working to the terms of his employment contract as Senior Vice President and Dean of the College of Medicine for Defendant SUNY Upstate on July 1, 2017.

39.     As Senior Vice President and Dean, Plaintiff's job duties included:

a.  Executive responsibility for all activities related to the accreditation of graduate degree, medical student degree programs and graduate medical education, ensuring and maintaining their accreditation status, including Liaison Committee on Medical Education ("LCME"), and addressing New York State Department of Education requirements relating to existing and new program requirements.

b.  Collaborate with the Vice President for Academic Affairs and University Leadership on ensuring and maintaining Middle States accreditation status for the University.

7

c.  Contributions to enhance the educational experience, to include continued efforts at curriculum reform in the College of Medicine and a renewed emphasis on transformative education including Graduate Medical Education, Continuing Medical Education, and Inter Professional Education, to bring SUNY Upstate to the forefront in these areas.

d.  In areas that he oversaw, Plaintiff was committed to improving diversity and inclusion, research productivity, educational goals, clinical growth and quality, supervision of the performance and professional conduct of department members and other related activities.

40.     Other duties included supporting the university efforts in its initiatives and leading the process for senior leadership recruitments within the School of Medicine.

41.     Pursuant to his employment contract, Plaintiff initially received a total annual compensation of $585,000.00 plus $48,000.00 in additional compensation.

42.     Plaintiff was routinely awarded merit increases to his salary and, as of September 12, 2019, and prior to his unlawful demotion, was earning a salary of $605,000.00 per year.

43.     As Senior Vice President and Dean, Plaintiff reported directly to Defendant SUNY Upstate's President (formerly Interim President).

44.     As Dean, Plaintiff led Defendant SUNY Upstate's efforts that resulted in a highly positive accreditation assessment, with full eight-year accreditation, which is the maximum granted by the LCME, despite Defendant's history of accreditation probation, for example when in 2011 the medical school received a comprehensive probation letter from the LCME.

45.     As Dean, Plaintiff also led an effort that resulted in 100% residency matching[1] for graduating medical students, for the first time in Defendant SUNY Upstate's history, as he was particularly supportive of underrepresented minority students, who all matched exceptionally well.

46.     In fact, Plaintiff's accomplishments in improving the University's accreditation and residency matching were routinely highlighted by Defendant SUNY Upstate and its President in Town Hall meetings and presentations with legislators, though credit was never afforded to Plaintiff personally.

47.     On September 11, 2019, Plaintiff was honored as a Distinguished Professor at the SUNY Upstate Annual Convocation.  "Distinguished Professor" is the highest honor awarded to Upstate professors.

48.     Notably, at no time during his tenure did Plaintiff commit misconduct in his capacity as Dean, nor has he ever been accused of committing misconduct, either as defined by his employment contract or by any other definition or standard.

49.     At no point in his term as Dean were either performance deficiencies or any type of performance-related counselling ever brought up to Plaintiff by Defendants.

50.     However, Plaintiff was subject to unlawful discrimination and retaliation because he opposed institutional discrimination within Defendants, and in particular Defendant SUNY Upstate, leading to his unlawful and sudden demotion from Senior Vice President and Dean of the College of Medicine on September 12, 2019.

---

[1] The Match process is a uniform system by which residency candidates and residency programs simultaneously "match" to fill first-year and second-year postgraduate training positions accredited by the Accreditation Council for Graduate Medical Education (ACGME). https://www.aafp.org/students-residents/medical-students/become-a-resident/match.html

9

51.    And Plaintiff's own Hispanic/Latino national origin, contributed to Defendants' decision to unlawfully demote him.

52.    Since the founding of Defendant SUNY Upstate University College of Medicine in 1834, there had been no previous Deans who were women, Hispanic/Latino or African-American.

53.    In an effort to facilitate LCME accreditation, Plaintiff as the first Hispanic/Latino Dean, was held out as the leader and face of Defendant SUNY Upstate's College of Medicine. Once full accreditation was secured, Defendants reverted to course and unlawfully demoted Plaintiff. And the Dean that followed Plaintiff was neither a woman, Hispanic/Latino nor African-American, and was promoted to the position without open and inclusive processes as required by Defendants' own written policies to promote diversity and inclusion.

54.    In essence, Defendants took what they needed from Plaintiff and tossed him aside when it suited them.

**Promoting Diversity in Furtherance of LCME Accreditation**

55.    Plaintiff worked assiduously to address the decline in minority enrollment in Defendant SUNY Upstate by recruiting minority faculty and creating novel accelerated partnership programs that combine BA in partner institutions and the MD degree at Defendant SUNY Upstate.

56.    Those partner institutions included two leading Historically Black College and Universities ("HBCU"), namely Spelman College and Hampton University, ranked as number one (1) and number five (5) HBCUs in the country by U.S. News & World Report[2].

57.    On October 29, 2019, the Liaison Committee on Medical Education ("LCME"), the accreditation authority for medical education programs in the United States, determined that

---

[2] https://www.usnews.com/best-colleges/rankings/hbcu

A0010

ongoing monitoring was required at SUNY Upstate in order to ensure compliance with diversity standards.

58.    On several occasions when Plaintiff discussed his efforts to recruit minority faculty with Defendant SUNY's President (formerly Interim President), he was told, in sum and substance, "we spend too much [money] on diversity" [sic].

59.    Specifically, Defendant SUNY Upstate's President (formerly Interim President) made verbal comments to Plaintiff regarding the University spending too much money on supporting diversity on June 3, 2019, June 17, 2019, July 2, 2019, July 15, 2019, and August 5, 2019.

60.    Plaintiff would also often receive multiple verbal comments from Defendant SUNY Upstate's President (formerly Interim President) severely questioning the 'need for' various minority professors and the extent of their contributions to the University.

61.    Specifically, Plaintiff received questions about what a named Professor who is Native American, does all day. Plaintiff repeatedly explained that the Professor was the Assistant Dean for Diversity and had a crucial role in supporting diversity efforts within the Native American Community. Moreover, Plaintiff explained on several occasions that it had been previously determined that the Professor should be promoted to Assistant Vice-President for Native American Affairs, a move that Defendants refused to make.

62.    Plaintiff also received questions about what a named Professor of Neurosurgery who is female and Hispanic, "does in diversity." Plaintiff repeatedly explained that the Professor organized Defendant SUNY Upstate's diversity data for purposes of LCME accreditation and was the only person able to provide that data within the tight timeframe of the accreditation process.

63.     Plaintiff also received questions regarding the need for the named Director of Multicultural Affairs & Student Inclusion, who is African American. Plaintiff repeatedly explained that the named Director does substantial work supporting Defendant SUNY Upstate's minority students.

64.     Plaintiff did not receive similar push-back or questions regarding the need for his non-minority professors and staff. Defendant SUNY Upstate's President (formerly Interim President) never mentioned any non-minority faculty or staff by name, asking specifically what they were doing, as would occur with minority staff and faculty.

65.     Plaintiff persistently defended his support and recruitment of minority staff and faculty, even in the face of incessant badgering and harassment from Defendants.

66.     Plaintiff's efforts toward pushing back against discriminatory comments, as well as his overall efforts to increase diversity were ultimately proven to benefit Defendants as the final LCME report, released on October 29, 2019, contained comments that were highly supportive and praising of Plaintiff and his work.

67.     Additionally, the LCME granted Defendant SUNY Upstate full re-accreditation for an eight-year term, the maximum term that can be granted.

68.     Plaintiff's role as Dean was key to the re-accreditation process, as he was the person who started the accreditation visit process, and was presented by Defendants to the accreditation body as the face and leader of SUNY Upstate's College of Medicine.

69.     Should Defendants have had any concerns regarding Plaintiff's performance at that time, they clearly would not have allowed Plaintiff to represent SUNY Upstate's College of Medicine as its leader during a critically important three-day long accreditation visit by the LCME.

70.    However, Defendant ultimately retaliated against Plaintiff based on Defendants' continued opposition to diversity and inclusion when they suddenly and unlawfully demoted him on September 13, 2019.

**Creation of an External Scientific Advisory Board**

71.    Defendant SUNY Upstate ranks very poorly in terms of gender balance nationwide. Significantly, SUNY Upstate ranks 116 out of 128 medical schools in terms of male to female faculty ratio, with only 15% of the faculty being female.[3]

72.    In efforts to combat the underrepresentation of female employees, Plaintiff appointed an all-female External Scientific Advisory Board (the "Board"), with members of the National Academies of Science and Medicine.  The Board first met on June 29, 2018 in order to have an ongoing relationship with SUNY Upstate.

73.    Plaintiff's purpose in having this group and working with them over time was to have outside input aimed at improving University programs and making Defendant SUNY Upstate more attractive and more competitive, and to provide much needed input from highly successful women in academic medicine in order to bridge the gender equity gap at SUNY Upstate.

74.    Plaintiff asked the External Scientific Advisory Board for ideas on how to best promote horizontal integration, both across the basic sciences and clinical components of the university, and fostering translational integration, within various large thematic areas such as neuroscience, that exist across multiple departments and which could benefit from helpful suggestions for further cohesion.

75.    Plaintiff also asked the External Scientific Advisory Board to look at SUNY Upstate's graduate program, in order to see how to make it robust and more competitive.

---

[3] https://www.statnews.com/2016/01/12/women-medical-school-faculty/

76.     Thereafter the Board was provisionally scheduled to have its second meeting at SUNY Upstate on October 17, 2019, but in the summer of 2019, when Plaintiff discussed the upcoming visit with the SUNY Upstate's President (formerly Interim President), he replied with sarcasm "Oh, do we have an External Scientific Advisory Board?" [sic].

77.     After Plaintiff's unlawful demotion on September 12, 2019, the Board was never convened again, and it was ultimately disbanded by Defendants.

**Diversity Committee**

78.     As part of Plaintiff's continued work in advancing diversity in the face of a lack thereof in SUNY Upstate, Plaintiff strongly supported a Diversity Committee (the "Committee") within the SUNY Upstate College of Medicine.  The Committee was an important component for Defendant SUNY Upstate's review and accreditation by the LCME.

79.     This committee met monthly and had a broad agenda aimed at infusing diversity throughout the College.  Membership included underrepresented minority faculty and students. The existence, functions, and involvement of the Committee was part of Defendant SUNY Upstate's structure presented to the LCME for accreditation, outlined earlier herein.

80.     The Committee was led by a female Hispanic neurosurgeon. On several occasions, Defendants aggressively questioned Plaintiff as to why this abundantly qualified individual had that role.  It was clear to Plaintiff that the principal reason for Defendants' questions was because of the individual's identity as a Hispanic woman, since Plaintiff never received the same pushback regarding non-minority employees, nor would Defendants ever single-out non-minority employees in the same fashion.

81.     In response, Plaintiff continuously affirmed the neurosurgeon's qualifications and the work she did to advance the missions of the Committee to Defendants.

14

82.     After the LCME visit and after Plaintiff's demotion, the Diversity committee was downgraded to meeting quarterly, and given a much-reduced role of only providing some oversight to the Office of Diversity and Inclusion.

**Budget Committee/University Executive Committee**

83.     Plaintiff also acted in opposition to discrimination in May and June 2019, when he notified Defendants about his concern regarding the gender-imbalance of the Budget Committee and recommended that women be included.

84.     Defendant SUNY Upstate's administrative structure includes a University Executive Committee (the "UEC"), which is presented to accreditation agencies as SUNY Upstate's decision-making body as the UEC is gender-balanced.

85.     But although the UEC is held out by Defendants to be a decision-making body, at that time the UEC rarely met, with scheduled meetings every other week that were often cancelled.

86.     Instead, the Budget Committee, which meets every Tuesday and reviews every executive-level decision for SUNY Upstate, was the *de facto* decision-making body for Defendants.  In most cases, executive-level decisions are rarely brought to the UEC.

87.     Furthermore, the agenda items for the Budget Committee are significantly more substantial than those of the UEC, both in terms of quantity and quality.

88.     In June of 2019, the Budget Committee consisted of six men.  On several occasions, Plaintiff heard women employees of Defendants refer to the Budget Committee as the "new boy's club" and the place "where all the decisions are made." [sic].  The lone female who routinely attended the Budget Committee meetings was tasked only with taking notes and did not act as a decision-maker.

89.     In June of 2019, Plaintiff notified Defendants that the decision-making Budget Committee was too gender-imbalanced and suggested that the female Chief Medical Officer and the female Senior Associate Dean of Faculty Affairs and Faculty Development should be added to the Budget Committee group.

90.     Plaintiff's communication of the gender-imbalance and efforts to abolish gender discrimination in the decision-making processes of Defendants constituted a protected activity. Less than three months after Plaintiff's protected activity; notifying Defendants of a potential discriminatory gender-imbalance, Defendants retaliated against Plaintiff and unlawfully demoted him.

**Attempts to Improve the Division of Student Affairs and Creation of the Director of College of Medicine Career Development Position**

91.     Defendant SUNY Upstate has a Division of Student Affairs ("Student Affairs"), which is the office responsible for career planning and career development of all students, including those in the College of Medicine.

92.     The Division of Student Affairs has been plagued by multiple complaints of discrimination, including a complaint by a former SUNY Upstate employee, that was posted on social media in 2019, prior to Plaintiff's demotion.

93.     The public complaint stated:

"Hi Everyone – Wanted to share a little about what I'm going through. Last year, I left my job at SUNY Upstate Medical University after experiencing a discriminatory environment and was underpaid comparable to my White colleagues in the division (perpetuated by my former supervisor and her supervisor). This past August, I filed a report with the New York State Division of Human Rights (NYS DHR). I went through the process, including a conference facilitated by an investigator, with my former supervisor and her supervisor, an Upstate attorney, and two women from HR. Recently, NYS DHR concluded the investigation and determined

16

that there was probable cause for discrimination, which was incredibly validating. The next step is a public hearing for the case before an Administrative Law Judge. During my time at Upstate, I did my part in reporting my experiences with HR, my union, and higher-ranking administrators. I was often turned away with no resolution or was told that there was already an investigation going on. That is why I decided to go through an external agency after I left Upstate. It was difficult to be part of an environment that was so hostile towards people of color and other people with marginalized identities. Witnessing the hostile and racist treatment towards students was the worst. Universities and colleges need to do a better job holding administrators accountable who believe that …" [sic].

94.    Earlier in 2019, Plaintiff referred African-American medical students from SUNY Upstate to a colleague of his at a highly-ranked, Ivy League-affiliated, national institution so that they could negotiate to do external rotations there.

95.    After each of those SUNY Upstate African-American medical students contacted that highly-ranked national institution, Plaintiff received phone calls expressing serious concerns about how unprepared the SUNY Upstate medical students were and how they seemed to be "lost" and not well mentored in terms of their career development.

96.    Each time he was called about each student that he had referred, Plaintiff promptly raised this with Defendant SUNY Upstate's Dean of Student Affairs.

97.    During each of those interactions, the Dean of Student Affairs was exceptionally defensive and would only say very angrily "N-of-1," meaning that this was a sporadic case and that it did not need to be taken seriously[4].

98.    Furthermore, the Dean of Student Affairs never showed any interest in the plight of the "lost students" and not once expressed to Plaintiff any interest in supporting those students or identifying and addressing the underlying root causes.

---

[4] In scientific circles, an "N-of-1" trial is a clinical trial in which a single patient represents the entire investigation: a single case study.

17

99.     Based on the negative feedback Plaintiff received regarding SUNY Upstate students and their career development and Plaintiff's concerns that there was a discriminatory motive behind Student Affair's actions, Plaintiff referred the Dean of Student Affairs to the Defendant SUNY Upstate's Organizational Training and Development Office to receive standardized feedback by way of a "360-degree evaluation," which usually include both numerical feedback and written comments.

100.    However, the Organizational Training and Development Office only recommended numerical feedback because they were concerned that any written comments could include the accusations of racism or discrimination and, if they did, the written comments would be required to be reported to the Defendant SUNY Upstate's Department of Human Resources and potentially subject SUNY Upstate to liability.

101.    In light of this and in a continuing effort to promote diversity, Plaintiff also decided to create a new position of Director of College of Medicine Career Development to oversee the career development plans of all students in the SUNY Upstate College of Medicine, particularly those from underrepresented diverse backgrounds who are members of protected categories.

102.    Plaintiff posted the position of Director of College of Medicine Career Development and created a search committee, emphasizing the need to promote diversity and inclusion in the search process.

103.    Plaintiff appointed the then SUNY Upstate Associate Dean of Student Affairs and Campus Life, to represent the Division of Student Affairs in the search process for the new position of Director of College of Medicine Career Development.

104.    Plaintiff referred as a candidate to the search process an African-American female Educator who had an MSEd with a concentration in Student Affairs Administration and who was working towards her EdD in Higher Education Leadership and Policy.

105.    This individual's husband had just been hired by Plaintiff to Defendant SUNY Upstate as the only tenure-track or tenured African-American basic science faculty member at SUNY Upstate Medical University.

106.    Plaintiff's initiatives towards diversity and increasing support in student affairs for minority students was intolerable to Defendants, and prior to his unlawful demotion he received protest from Defendant SUNY Upstate's Dean of Student Affairs regarding his appointment of a Director of College of Medicine Career Development.

107.    Specifically, instead of acting for the students and working to prevent any type of discrimination, the Dean of Student Affairs was insulted that they were not included in the search for the new Director and complained that "career development efforts are moving to [Plaintiff] and this new person."

108.    After Plaintiff's unlawful demotion the search committee that he had created was rapidly disbanded and recruitment for the position of Director of College of Medicine Career Development was discontinued.

**Creation of a part-time Assistant Dean for Cultural Competence**

109.    In July of 2019, Plaintiff created a new part-time position of Assistant Dean for Cultural Competence at SUNY Upstate, and identified an Assistant Professor of Orthopedic Surgery, a well-respected African-American orthopedic surgeon, as an ideal candidate, who would himself be an outstanding role model for underrepresented students.

19

110.    In the face of aggressive objections by Defendant SUNY Upstate's President (formerly Interim President), including demanding to know what the other specifically named individuals of diverse backgrounds were contributing to the University and why there existed a need for another position related to Diversity and Inclusion, on August 7, 2019 Plaintiff verbally offered that position to earlier mentioned Assistant Professor.

111.    Less than three months after Plaintiff fought for this appointment, Plaintiff was unlawfully demoted from his position of Senior Vice President and Dean.

112.    Notably, after Plaintiff's unlawful demotion, the processing of that appointment was discontinued.

**Promoting Diversity Among Appointments to Chair Positions**

113.    Defendant SUNY Upstate runs a multitude of departments, such as Medicine, Otolaryngology and Communication, and Anesthesiology, which are each headed by a Department Chair.

114.    Should a Chair position need to be temporarily filled while a long-term successor be appointed, as Senior Vice President and Dean, it was Plaintiff's responsibility to oversee the process resulting in the nomination of finalists for Interim Chair roles.

115.    It was also Plaintiff's responsibility as Senior Vice President and Dean to oversee the process resulting in the nomination of finalists for permanent Chair roles.

116.    In Plaintiff's contract with Defendant SUNY Upstate[5], it is stated that Plaintiff would "Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics and Psychiatry."

---

[5] Exhibit 1

20

117.    Plaintiff was working with an external search firm that informed him on or around September 5, 2019 that an external national search for the Chair of Medicine had been posted and fully launched and that the search firm was already in conversations with candidates.

118.    Plaintiff had emphasized to this external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories.

119.    After Plaintiff was unlawfully demoted Defendants ended the Medicine Chair search efforts and appointed the Interim Chair to the (permanent) Chair of Medicine position without the national search explicitly specified in Plaintiff's employment contract.

120.    The Individual who was appointed as Chair of Medicine was not a member of a group that Defendants presented to the LCME as being targets for diversity, and he was appointed without a search process which would have given candidates of diverse backgrounds an opportunity to be considered.

121.    Defendants were also informed by the external search firm, on or around September 5, 2019, that they were making sure to "move quickly to launch the [national] Chair [search] of Otolaryngology" and Communication.

122.    Again, Plaintiff had emphasized to the external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories.

123.    After Plaintiff was demoted Defendants ended that search effort and appointed the Interim Chair to the position of (permanent) Chair of Otolaryngology and Communication.

124.    The Individual who was appointed as Chair of Otolaryngology and Communication was not a member of a group that Defendants presented to the LCME as being targets for diversity,

21

and he was appointed without a search process which would have given candidates of diverse backgrounds an opportunity to be considered.

125.    During Plaintiff's term as Dean, it became necessary to replace the Chair of Anesthesiology.

126.    Defendants then immediately began pressuring Plaintiff to appoint a male faculty member from the Anesthesiology Department as Interim Chair, stating on three different occasions in sum and substance that that specific male was the "only one who could do the job."

127.    Plaintiff heard that women employees considered the push for that specific man to be strongly suggestive of gender discrimination because that individual was not entirely qualified for the position.

128.    Therefore, Plaintiff in his capacity as Dean organized a broad and diverse interview panel and on or around August 8, 2019, the panel interviewed four candidates for the Interim Chair of Anesthesiology role.

129.    After the interviews, the panel unanimously recommended the selection of a female candidate as Interim Chair based on her abundant experience in managing clinical affairs.

130.    On August 13, 2019, Plaintiff informed Defendants in a small group setting of the panel's unanimous choice for interim successor.

131.    Plaintiff's insistence upon a gender-neutral search process for the Interim Chair was actively designed to contend against discrimination.

132.    According to Defendant SUNY Upstate Board of Trustees' policies, Chair appointments are made by the President; however, by creating a panel that assessed diverse candidates fairly and objectively, Plaintiff effectively challenged Defendants not to appoint the female whom the committee unanimously identified as the most qualified.

22

133.    Thus, at the very next one-on-one meeting with Defendants, Plaintiff was abruptly and unlawfully demoted from his position as Senior Vice President and Dean, without any cause being presented to him.

**Lobbying Against a Discriminatory Salary Reduction**

134.    Plaintiff's wife also works for Defendant SUNY Upstate as a Professor of Psychiatry and Behavioral Sciences and Professor of Neuroscience and Physiology.   At the beginning of 2019, she was notified that her salary was going to be reduced by $45,000.00.

135.    On August 12, 2019, Plaintiff attended a regularly scheduled meeting with Defendant SUNY Upstate's President (formerly Interim President).

136.    During the meeting, Plaintiff asked if it would be appropriate to discuss this Professor's salary reduction to which the President agreed.

137.    Plaintiff had no direct effect on her salary change and, in his position as Dean, had no power or influence in Defendants' decision to either maintain or reduce this Professor's salary.

138.    Plaintiff stated that his wife, the Professor, is of Asian ancestry, she is culturally Hispanic and Latin American, and her national origin is Brazilian.   Plaintiff further stated that, based on his understanding of the situation and facts, the Professor felt she may have a claim under Title VI and/or Title IX for discrimination since, to her knowledge, no white male professor was ever subjected to a salary reduction of this type.

139.    SUNY Upstate's President (formerly Interim President) offered no response to Plaintiff's report of potential discriminatory conduct on the part of Defendant but told Plaintiff that he would get back to him.

140.    Less than a month after Plaintiff opposed discrimination by reporting a female employee's potential discrimination claims on August 12, 2019, and less than a month since his

actions to prevent discrimination in the appointment of the Interim Chair of Anesthesiology on August 13, 2019, Plaintiff was unlawfully and suddenly demoted on September 12, 2019, in the absence of any other intervening interactions with the Defendants.

**Plaintiff's Demotion**

141.    On September 12, 2019, Plaintiff was hand delivered a letter (hereinafter the "Demotion Letter"), stating that his positions of Senior Vice President and Dean of the College of Medicine were terminated immediately. **See Exhibit 2.**

142.    Defendants provided no justification for the demotion.

143.    The Demotion Letter additionally stated that, effective September 13, 2019, Plaintiff's annual salary would be reduced from $605,000.00 to $227,000.00.

144.    Plaintiff was given no notice of the contemplated demotion, nor was he provided any transition period.  At no point did he ever enter into an agreement to modify his contractually provided transition and notice period or give any indication that he no longer wanted to maintain his position as Dean.

145.    Furthermore, Plaintiff was told that if he did not want to accept the Demotion Letter, his only other option was to resign.

146.    Referring to Plaintiff's demotion, in Defendant SUNY Upstate's Council Meeting that occurred on September 16, 2019, Defendants stated to the Faculty Council that "there is not one horrible thing that happened for this change to occur, rather a change was needed in leadership"[6] a statement wholly indicative of the fact that performance issues were not the cause of the unlawful demotion.

_____

[6] Evidenced by minutes of the meeting

147.    The Demotion Letter stated that as of September 13, 2019, Plaintiff's job title would change to Distinguished Professor in the Department of Psychiatry and Behavioral Sciences.

148.    Although this new title could be considered one of prestige, it was a significant demotion in rank and responsibility from Plaintiff's former position as Senior Vice President and Dean of the College of Medicine and was accompanied with a significant salary reduction, loss of job benefits and support staff, and materially adverse change in terms and conditions of his employment.

149.    In his role as a Distinguished Professor, Plaintiff's job duties now included conducting research, publishing scientific articles, as well as teaching and mentoring students, despite the fact that no resources were assigned to Plaintiff to build his own research program.

150.    Following the demotion, Plaintiff in good-faith retained legal representation to engage with Defendants and Defendants' general counsel and explain that there appeared to be a retaliatory motive behind the demotion. Defendants and Defendants' general counsel dismissed the claims and said, in sum and substance, that "there was nothing to discuss."

151.    In light of Defendants' response to Plaintiff's allegations of retaliation, on September 13, 2019, Plaintiff immediately filed for temporary injunctive relief in Onondaga County Supreme Court[7] in an effort to mitigate the damages of this unlawful demotion and protect his reputation from any inference of wrongdoing that might otherwise issue from the abrupt demotion.

152.    Plaintiff believed it necessary to make all efforts necessary to protect his considerable reputation in his field, that Defendants were systematically dismantling.

_____

[7] The injunction was ultimately denied by the court as moot, as just a few hours before the case was scheduled to come before the court for relief, the Defendants hastily made the decision public and thus the damage could not be restrained.

25

153.    Nearly a month after Plaintiff's initial public filing to the New York State Division of Human Rights, on September 30, 2019, Plaintiff received notice that Defendants were now investigating his prior complaints of discrimination, after Plaintiff had been unlawfully demoted and his reputation being almost irreparably damaged.

154.    A representative of Defendants, insisted upon meeting with Plaintiff on October 21, 2019. Following that meeting, upon information and belief, the representative went on to ask Plaintiff's colleagues questions designed to elicit negative information about him, such as whether he contacts them through his personal email account and what they think of him.

155.    There was no basis for Defendants' representative to ask Plaintiff's colleagues these particular questions, and the inappropriateness of the questions further indicate Defendants' attempt and intention to damage Plaintiff's reputation and career in further retaliation to his protected activities and opposition to discrimination within SUNY Upstate.

**Ongoing Retaliation against Plaintiff and Ongoing Discriminatory Practices at SUNY Upstate**

156.    Defendants continue to engage in discriminatory and anti-diversity practices that retaliate against Plaintiff, which has already cost him his career as Dean, and which has actively prevented him from applying for other senior administrative positions within SUNY.

157.    Since filing his discrimination complaint with the New York State Division of Human Rights ("DHR"), Plaintiff has experienced ongoing retaliation and discrimination.

158.    The SUNY Diversity, Equity, and Inclusion Policy Memorandum dated September 10, 2015 specifies that searches that bring into consideration candidates from diverse backgrounds need to be conducted to fill senior positions. Moreover, the SUNY Policies of the Board of Trustees specifies procedures for senior administrative appointments.

26

159.    In retaliation to his prior protected activities, Plaintiff (the former Senior Vice President and Dean of the College of Medicine of SUNY Upstate) has been either denied or not considered for the roles, of i) President of SUNY Upstate, ii) SUNY Chancellor, iii) Dean of Medicine, iv) Director of the MD-PhD program, and v) Chair of the Department of Psychiatry.

160.    Based on the timing of these appointments and Plaintiff's ample qualifications for each of those positions, there is no other reason as to why Plaintiff was not given opportunities to be considered for, and to interview for, those roles other than the fact that Defendants were acting in retaliation to Plaintiff's protected activities.

161.    In fact, for the appointment of the President of SUNY Upstate position, Defendant violated the State University of New York, Policies of the Board of Trustees Article IX Title A, Chief Administrative Officer, § 1[8] when a subgroup of local Council members (excluding faculty), decided on their own, with no faculty consultation, that Defendant SUNY Upstate's aforementioned Interim President should be appointment to the permanent President's position.

162.    Interim Presidents are not eligible to apply for a permanent position unless they receive a waiver in writing from the Chancellor.  Such waivers are rarely granted, and they typically follow broad and inclusive requests from the faculty. But this, of course, did not occur. Instead, a hastily arranged "Zoom" meeting was held, where the Interim President was appointed SUNY Upstate President.

---

[8] "There shall be a chief administrative officer of each state-operated institution of the university who shall be designated president. Presidents shall be appointed by the Board of Trustees after receipt of recommendations of the campus councils (or of the Trustees of the College of Environmental Science and Forestry) and of the Chancellor, and shall serve at the pleasure of the Board of Trustees. Before making its recommendations, the campus council shall consult with a presidential search committee designated for such purposes by the chair of the council and comprised of members of the various campus constituencies, including faculty, students, professional employees, administration, alumni and members of the council. Reflecting the significance of the role that faculty are expected to play in academic governance, the faculty should predominate among the non-council constituencies on the search committee. The Chancellor, or designated representative, before making recommendations to the Trustees, shall consult with the chair or other designated representative of the college council."

163.    This irregular appointment occurred in the absence of any search process, any faculty input, and any effort to bring candidates of diverse faculty members to the table, as required by Defendant SUNY's own policies and guidelines.

164.    The rapidity of this process, including the immediate waiver, appointment with no search, absence of any consultation with faculty and students as required by SUNY Board of Trustees policies, deliberate exclusion of qualified minority candidates, such as Plaintiff, and very high salary assignment, occurring all within a matter of less than three hours over "Zoom" was highly suggestive that that this entire process was pre-arranged, in complete violation of SUNY's guidelines and policies.

165.    In over two years prior to the determination of probable cause by the DHR, Defendants have not conducted any open and transparent national searches for senior leadership positions with Defendant SUNY Upstate and Defendants have not named a single new individual to a senior position, who are members of categories that Upstate identified as priorities for diversity.

166.    In an admission of wrongdoing, following the DHR's determination in Plaintiff's case, Defendants hastily named three (3) individuals of diverse backgrounds to leadership roles; it is noteworthy that those three individuals had all been previously identified for promotion by Plaintiff.

**Damage to Plaintiff's Career and Reputation**

167.    In addition to denying through retaliation the opportunity for Plaintiff to apply for multiple positions within the SUNY system, Defendants' actions severely harmed and continue to harm Plaintiff's career and reputation.

28

168.    In his field of employment, if an individual does not hold a Dean position for at least three years, it is generally assumed that the removal was due to some gross misconduct or incompetence.

169.    To be clear, during Plaintiff's tenure at SUNY Upstate he was never accused of misconduct or lack of competence and has no record of prior counselling or discipline, related to any type of performance issues.

170.    Notwithstanding Plaintiff's efforts to prevent career damage, because of Defendants' unlawful demotion he immediately experienced significant reputational and professional damage by way of lost job opportunities and exclusion from the professional community because of concern that Plaintiff would be considered controversial due to his sudden removal from the positions of Senior Vice President and Dean of Medicine at SUNY Upstate.

171.    As a result of Plaintiff's unlawful demotion, he received a sudden and significant pay cut of around $378,000.00, not including the facilities, memberships, and other benefits he received as Senior Vice President that he was now required to personally finance.

172.    Following Plaintiff's complaints and subsequent unlawful demotion, he has not been provided with an adequate research support package, his own laboratory, adequate start-up funding for a laboratory, a laboratory technician, a laboratory manager, an Assistant Professor, arrangements for postdoctoral fellow, or research expenses.  Absent this proper support, it is particularly challenging for Plaintiff to obtain data to support research grant funding that would allow him to pursue his distinguished scientific career.

173.    Furthermore, Defendants' actions harmed Plaintiff's career and reputation by depriving him of even the most basic funding for his scientific research or the ability to continue his membership and participation in professional organizations.

29

174.    Following Plaintiff's complaints and subsequent unlawful demotion, he was informed by Defendant SUNY Upstate's Psychiatry Department Chair that Defendants were withdrawing the budget support they has previously committed for Plaintiff's membership fees, license fees, and academic travel, including but not limited to his attendance at the Association of American Medical Colleges ("AAMC") meeting in Tucson, Arizona in November of 2019, for which Plaintiff was enrolled to attend prior to the demotion.

175.    Additionally, Plaintiff's salary increase for which he is entitled to as a Distinguished Professor was removed from his base salary.

176.    Defendants have a thorough investigation and recording policy for any incidents or complaints of substantial performance deficiencies or misconduct and Plaintiff was never notified nor were there ever any indications that any investigation or alleged performance deficiency or misconduct occurred on the part of Plaintiff that would lead to his demotion.

177.    The abrupt demotion from a major leadership position without any type of documentation of substantial performance deficiencies or misconduct is inconsistent with Defendants' own internal policies.

178.    To the contrary, Plaintiff was highly regarded in his position as Senior Vice President and Dean of the College of Medicine, had been celebrated as a Distinguished Professor, and had been presented by Defendants to the LCME accreditation agency as the leader and face of Defendant SUNY Upstate's College of Medicine.

179.    In November of 2019 Defendant's College of Medicine received full LCME accreditation for eight years, the longest accreditation period granted by that agency, as a result of a meticulous LCME review process that Plaintiff led as Dean of the College of Medicine, and which occurred entirely during Plaintiff's term as Dean.

180.    The previous accreditation visit by the LCME in 2011, prior to Plaintiff's employment, resulted in Defendant SUNY Upstate's College of Medicine being put on probation, and being issued with a substantial letter of probation.

181.    As a result of being unlawfully demoted after opposing discrimination, Plaintiff has suffered significant mental anguish and emotional harm, as well as lost wages and other benefits of employment.

182.    Furthermore, Plaintiff's reputation and distinguished scientific career have been almost irreparably damaged, such that he has lost both identifiable and unidentifiable employment opportunities, and as a consequence his future earnings are significantly harmed.

183.    As a result of Plaintiff's unlawful demotion, he has and continues to incur significant expenses in the effort to salvage his career, including career coaching, job search expenses, travel and moving expenses, and similar costs.

184.    Based on the proximity between Plaintiff's protected actions and his demotion and in the absence of any documentation of performance-related issues there is no other explanation other than Defendants unlawfully demoted Plaintiff in retaliation to his several protected actions in opposition to Defendants' discriminatory practices.

185.    Plaintiff was, and still is, distressed and suffering life altering consequences as a result of the retaliation he suffered because of his protected activities.

186.    This Complaint ensues.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII – Race/Color)

187.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

188.    Plaintiff, as a person of color, belongs to a protected class within the meaning of Title VII.

189.    Plaintiff was qualified for his position as Senior Vice President and Dean of the College of Medicine of Defendant SUNY Upstate based on his academic and professional credentials and considerable experience his industry.

190.    Defendants discriminated against Plaintiff on the basis of his race/color by, inter alia, demoting Plaintiff's employment due to his race/color, which constitutes an adverse employment action under Title VII.

191.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, for which he is entitled to an award of monetary damages including attorney fees.

192.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress, decrease of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief including attorney fees.

193.    Defendants' unlawful and discriminatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

A0032

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of Title VII – National Origin)

194.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

195.    Plaintiff, as a person of Latino/Hispanic national origin, belongs to a protected class within the meaning of Title VII.

196.    Plaintiff was qualified for his position as Senior Vice President and Dean of the College of Medicine of Defendant SUNY Upstate based on his academic and professional credentials and considerable experience his industry.

197.    Defendants discriminated against Plaintiff on the basis of his national origin by, inter alia, demoting Plaintiff's employment due to his national origin, which constitutes an adverse employment action under Title VII.

198.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, for which he is entitled to an award of monetary damages including attorney fees.

199.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress, decrease of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief including attorney fees.

A0033

200.    Defendants' unlawful and discriminatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Retaliation in Violation of Title VII – race/color)**

201.    Plaintiffs hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

202.    Plaintiff participated in a protected activity, namely, reporting race/color discrimination to Defendants.

203.    Defendants unlawfully retaliated against Plaintiff by demoting him from his position as Senior Vice President and Dean, which constitutes an adverse employment action under Title VII, because of his prior protected activities.

204.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

205.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress, decrease of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief including attorney fees.

A0034

206.    Defendants' unlawful and retaliatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of Title VII – Gender)

207.    Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

208.    Plaintiff participated in a protected activity, namely, reporting gender discrimination to Defendants.

209.    Defendants unlawfully retaliated against Plaintiff by demoting him from his position as Senior Vice President and Dean, which constitutes an adverse employment action under Title VII, because of his prior protected activities.

210.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

211.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to humiliation, embarrassment, stress, decreased self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief including attorney fees.

212.   Defendants' unlawful and retaliatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### FIFTH CAUSE OF ACTION
**(Retaliation in Violation of Title VII – National Origin)**

213.   Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

214.   Plaintiff participated in a protected activity, namely, reporting national origin discrimination to Defendants.

215.   Defendants unlawfully retaliated against Plaintiff by demoting him from his position as Senior Vice President and Dean, which constitutes an adverse employment action under Title VII, because of his prior protected activities.

216.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

217.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including but not limited to humiliation, embarrassment, and stress, decreased self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief including attorney fees.

218.   Defendants' unlawful and retaliatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

36

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate Title VII;

B.    An order directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' retaliatory and/or otherwise unlawful conduct, as well as to take such affirmative action, including reinstatement, as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

C.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to the loss of pass and future income, wages, compensation, job security and other benefits of employment;

D.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress, humiliation, embarrassment, stress, decrease in self-esteem self-confidence and personal dignity, emotional pain and suffering and any other physical or mental injuries;

E.    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

F.    An award of punitive damages, pursuant to Title VII in an amount to be determined at trial;

G.      An award of damages for any and all other monetary and/or non-monetary damages losses suffered by Plaintiff an amount to be determined at trial, plus prejudgment interest;

H.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by laws; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated: April 4, 2021
New York, New York                          Respectfully submitted,

                                            DANNY GRACE, P.C.
                                            *ATTORNEYS FOR PLAINTIFF*

                                            222 BROADWAY, 19TH FLOOR
                                            NEW YORK, NY 10038
                                            (646) 515-2821


                                            _____/S/_____
                                              DANIEL GRACE, ESQ.

A0038

# Exhibit 1



**UPSTATE**
MEDICAL UNIVERSITY
OFFICE OF THE PRESIDENT

March 14, 2017

Julio Licinio, MD, PhD
6 Baliol Street College Park
South Australia 5069 Australia

Dear Dr. Licinio:

I am pleased to offer you a Management/Confidential appointment as Senior Vice President and Dean of the College of Medicine. This appointment will be effective July 1, 2017. You will receive total annual state compensation, subject to changes as may be authorized or required by law, of $585,000.

You will also receive $48,000 in additional compensation not added to base pay, payable as $4,000 bi-weekly for each of your first 12 bi-weekly pay periods.

In this position you will report to me as President and you will have a seat on the University Executive Committee. In accordance with the SUNY Board of Trustees Policies, Article IX, Title B, Section 4, this is a Management/Confidential position that reports to and serves at the pleasure of the President. This M/C appointment is not for a designated period of time and SUNY does not have a mandatory retirement age.

This offer is contingent upon the satisfactory result of a routine criminal background investigation. This appointment is subject to the Policies of the Board of Trustees for the State University of New York (www.suny.edu/boardoftrustees/pdf/policies.pdf) as well as the responsibilities of a state employee as described in the Public Officers Law (http://www.suny.edu/hr/handbook/).

It is our understanding that you will use your best effort to obtain and maintain an unrestricted license to practice medicine in New York State.

**Faculty Appointment**

Concurrent with your management/confidential appointment as Senior Vice President and Dean of the College of Medicine, I am pleased to offer you a faculty appointment at the rank of Professor with tenure in the department of Psychiatry & Behavioral Sciences. Upon receipt of your signed acceptance of the terms of this offer I will provide an official appointment letter under my authority as President of SUNY Upstate Medical University. I will also then recommend to the Chancellor of SUNY for approval that your appointment be continuing (tenured).

1

I am also pleased to offer you an academic appointment as Professor in the Department of Psychiatry, consistent with the College of Medicine review process, and the Policies of the Board of Trustees. You will also have secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism.

In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department.

You inquired regarding a SUNY Distinguished Professorship. The eligibility/selection criteria require that candidates must have at least one year of full-time service at the nominating institution. I agree to nominate you for a SUNY Distinguished Professorship when you satisfactorily complete the required service time. For additional information, please visit: http://system.suny.edu/media/suny/content-assets/documents/academic-affairs/distinguished-faculty-ranks/2015-2017-Distinguished-Guidelines.pdf

**Office and Other Support for Administrative and Tenured Professor Positions**

You will be provided with an adequate office, with secretarial support.

A full-time research/academic assistant will be hired to support your needs, effective July 1, 2017. You will be able to participate in academic conferences and other educational opportunities as you determine necessary for the functioning of each of your roles and continued educational advancement and we will reimburse costs for such activities, including but not limited to, travel, CME, publications and professional society memberships, in each of your roles. In addition, the section on tuition reimbursement itemizes other opportunities for career-related advancement support.

I will also explore further the opportunity to gain additional academic opportunities in support of your desire to obtain an executive MBA.

The University will also provide executive coaching services for two years, not to exceed $60,000.

**Current Resources Available to the College of Medicine**

The dollars projected to be spent by the College of Medicine from state and non-state sources during academic year 2016-17 of approximately $75 million are the basis from which we will start and will continue.

The College of Medicine has played a vital role in over the last three years in eliminating structural deficits that once existed for the University resulting in a sustainable operating plan with unallocated operating funds available for investment in strategic priorities, as further discussed below.

Based on our expectation of new resources available at the College of Medicine, it is our expectation that you will maintain and improve upon the current financial state of the University by identifying and

2

implementing efforts to grow academic, research, and clinical revenues necessary to provide adequate funding of mandatory costs (salary and non-salary increases) relating to current obligations and any new strategic initiatives that may evolve in the future.

It is projected that new funds that become available through growth or turnover from these current sources, after annual funding of mandatory cost increases, will be available for reinvestment in the College of Medicine in alignment with the strategic plan of the University. Beginning in fiscal year 2017-18, should external funding sources of the University decline, the College of Medicine will share the decreases proportionately through expense reductions, reductions in new resources as noted below and/or through other actions.

**New Resources to be made available to the College of Medicine**

It is projected that new resources totaling $25 million over five years will be available to the College of Medicine as follows:

- State Allocated Funds - $2.5 million annually, $12.5 million over 5 years - This is the funding that is expected and is to be used for both recurring costs (i.e., new faculty base salaries) and one-time investments (i.e., academic faculty start-up packages). As faculty recruitments occur over this five-year period, it is expected that most of these funds will be fully committed and less will be available annually for new one-time investments.

- Chief Administrative Officer's (CAO) Fund - $2.5 million annually, $12.5 million over 5 years. This funding is derived from a 5% assessment on clinical revenues of the Clinical Practice Plan in accordance with Article XVI of the SUNY Policies of the Board of Trustees. The Fund is administered by the President of the University, as CAO of the University, and is intended to provide limited duration support for program investment while limiting its use for ongoing operating expenses. This amount represents approximately 25% of the annual CAO Fund assessment revenues as the remaining 75% is currently committed to ongoing support and one-time commitments and institutional strategic priorities primarily pertaining to the College of Medicine.

**Additional Resources:**

Additional resources are available from the clinical revenues of University Hospital and the Clinical Practice Plan. These resources provide the primary sources of investments in the clinical mission of the College of Medicine.  As Senior Vice President and Dean of the College of Medicine, you will participate in the Hospital's annual budget process along with the Senior Vice President for Finance and Administration of the University. In collaboration with the Hospital, Clinical Practice Plan, and University leadership, you will be involved with establishing the annual priorities to be funded from clinical operations to ensure alignment with the University's strategic plan, including the priorities of the College of Medicine and the needs of an integrated clinical system. Examples of Clinical Practice Plan commitments included in the Hospital's 2016/17 budget process are as follows:

- Approval of $12 million in requests, including $3 million in limited duration recruitment (i.e. start-up) contracts, physician services and on-call contracts ($4.4M) and additional house staff ($2.5M).

3

- Approval of additional one-time funding to support the development of a primary care strategy and a cutting edge clinical technology/data analytics fund, contingent on realization of Hospital budgeted revenues over multiple years. The approximate amount of these funds to be set aside is $10 million for primary care and $10 million for technology/data analytics over the next 2-3 years. The primary care investments will need to coincide with a rigorous strategic plan in collaboration with the Strategic Planning Office. The technology investments will involve detailed planning with the University Executive Committee, of which the Senior VP and Dean of the College of Medicine is a member.

In addition, certain revenues of the Clinical Practice Plan have been made available in the past to support joint initiatives, subject to the approval of Upstate University Medical Associates at Syracuse (UUMAS). The Clinical Practice Plan is also in the process of identifying funds in support of strategic priorities of the University, in collaboration with University leadership.

This should provide you with sufficient confidence in the commitment of the University, including the Hospital and the Clinical Practice Plan, in supporting clinical initiatives of the College of Medicine.

**Expectations and Initiatives**

Based on the foregoing projections and expectations of resources to be made available, our expectations and initiatives are as follows:

- Executive responsibility for all activities related to the accreditation of graduate degree, medical student degree programs and graduate medical education, ensuring and maintaining their accreditation status, including LCME, and addressing New York State Department of Education requirements relating to existing and new program requirements. Collaborate with the Vice President for Academic Affairs and University Leadership on ensuring and maintaining Middle States accreditation status for the University.

- Contribute to enhance the educational experience, to include continued efforts at curriculum reform in the College of Medicine and a renewed emphasis on transformative education including Graduate Medical Education, Continuing Medical Education, and Inter Professional Education, to bring us to the forefront in these areas. You will work collaboratively with the other Deans and the Vice President for Academic Affairs to develop inter-professional and educational simulation training. The lead for such collaborative efforts in inter-professional education will be the Vice President for Academic Affairs.

- Explore opportunities to expand and enhance our academic model, both internally and externally, including increasing the class size of the College of Medicine, increasing the percentage of incoming students who are non-resident, and increasing the percentage of incoming students from underrepresented backgrounds. Develop cross-campus collaborations within SUNY and other regional partnerships to address these and other needs and opportunities.

- Assist in developing an integrated clinical system and aligned clinical growth strategy, in collaboration with the University leadership, including the President, Senior Vice President for Finance and Administration, the Hospital CEO, and UUMAS leadership, to enable the University to thrive and grow successfully in a new era of payment for clinical services. Immediate priorities

4

include the development of a regional strategy with a focus on cancer and ambulatory I primary care services. These improvements should better position the College of Medicine and the University for federal and state payment reforms anticipated in 2017 and beyond.

- In collaboration with the Vice President for Research, refresh the strategic plan for research to be in alignment with the University strategic plan in order to build interdisciplinary programs, increase expectations for extramural funding, and improve collaborative efforts across the campus and with other institutions.

- Manage the resources of the University and College of Medicine in such a fashion as to leverage them to the fullest extent to support the academic programs in alignment with our strategic plan. This will include a process to repurpose funds through reexamination of our funds flow methodology, and developing new incentives and expectations for performance. Develop measurable expectations of departments and faculty in the College, including teaching, research and clinical productivity and quality, to be incorporated into a financial plan for the College. Lead efforts to develop a standard compensation model across clinical departments of the College of Medicine, while recognizing inherent differences between departments.

- Work with the University Office of Development and the Upstate Foundation and the Medical Alumni Foundation and participate actively in fundraising efforts designed to enhance our capability of addressing issues such as scholarships, faculty growth and development and program support.  In your role as Dean, you will have a role with the governing bodies of both entities.

- Develop appropriate mechanisms to evaluate department chairs in conformance with the intent of Article IX, Title C of the SUNY Board of Trustees Policies. The evaluations will include the success of the chairs in achieving the strategic goals of the University, including improving diversity and inclusion, research productivity, educational goals, clinical growth and quality, supervision of the performance and professional conduct of department members and other related activities.

- Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics, and Psychiatry to be staggered over the first three years of your appointment and as otherwise may be needed according to the urgency of the circumstance of other departments.   Collaborate with University leadership in these efforts and also in the recruitment of the Director of the Cancer Center, which is a shared reporting relationship to the Dean of the College of Medicine and the CEO of University Hospital.  Opportunities to combine the Medicine chair and Cancer Center recruitment efforts is encouraged but not required.

**Honoraria and other Outside Income:**

The Senior Vice President and Dean of the College of Medicine is considered a New York State policy-maker, and is therefore subject to certain parameters and/or limitations on outside income as outlined in regulations of the New York State Joint Commission on Public Ethics (JCOPE), and:

5

- Is prohibited from serving as an officer, director or board member of a political party or political organization or as a member, officer, director, board member or district leader of a committee of a political party;

- Must obtain my prior approval as well as the approval of JCOPE (or successor agency) before holding other public office or engaging in other public employment for more than $5,000 annually; engaging in any private employment, business or other activity for more than $5,000 annually; or my approval if serving as director or officer of a for-profit corporation or institution, regardless of compensation;

- Must obtain my prior approval before engaging in private employment or other activity for annual compensation between $1,000 and $5,000;

- Must report any honorarium or travel reimbursement received from each source which is over $1,000 on your annual financial disclosure statements;

- Subject to my prior approval, you may serve on no more than two corporate boards of directors for compensation, and an unlimited number of not-for-profit boards without compensation.

For information as to the above requirements and additional requirements within the statutes of the Public Officers Law and the regulations enforced by JCOPE, see www.jcope.ny.gov.

It is also hereby agreed that you may continue to write, publish and edit books, journals and other texts/media, including, but not restricted to, print and electronic, in your field and other areas, and that you may retain the income from such publications for your personal use, with the understanding that this private income must be reported on your annual Financial Disclosure Statement as outlined in the paragraph above and must not interfere with the performance of your responsibilities outlined above.

**Annual Financial Disclosure**

All state policy-makers must file with JCOPE (or any successor agency) an annual financial form which requires disclosures in general categories of all sources of income and assets, including income earned by a spouse or assets held by a spouse.

**Defense/Indemnification in Civil Proceedings and Reimbursement in Criminal Proceedings**

If sued in a civil matter in an individual capacity, defense and indemnification are available upon request to the Attorney General in those situations in which the act underlying the complaint is alleged to have occurred within the scope of the officer's public duties, provided that the individual has not engaged in intentional wrongdoing. Certain procedural steps must be followed.

Our Central New York Office of General Counsel is available to provide you with any assistance you may need. As a state officer, the Senior Vice President and Dean of the College of Medicine is accorded criminal defense reimbursement and civil defense and Indemnification protection by statute (Sections 17 and 19 of the Public Officers Law).

6

In criminal cases, reimbursement is available, with the approval of the Attorney General, for reasonable attorneys' fees and litigation expenses incurred by an officer in the defense of a criminal proceeding arising out of an act which occurred within the scope of the officer's public duties, following acquittal or dismissal of the proceeding.

**Employment of Related Persons**

Section 73(14)(a) of the Public Officers Law states: *No state officer or employee may participate in any decision to hire, promote, discipline or discharge a relative for any compensated position at, for or within any state agency.* The SUNY Code of Ethical Conduct for University Officers policy contains similar language.  For additional information on this subject, please visit:

http://www.jcope.ny.gov/training/2016%20Public%20Officers%20Law%20for%20State%20Officers%20and%20Employees.pdf

http://www.suny.edu/sunypp/documents.cfm?doc_id=61

It is understood that your wife, Ma-Li Wong, MD, PhD and you are moving together to the College of Medicine and that your ongoing scientific collaboration does represent a potential conflict of interest under this clause which is mitigated as detailed by the posting above.

Please refer to the Appendix to this document for information on health and retirement plans, as well as, moving expenses and other benefits.

**Mutual Understanding of Notice for Transitional Need**

In the event a decision is made by you or the University, for any reason other than misconduct[1], that you will step down from the position of Senior Vice President (SVP) and Dean of the College of Medicine (COM), we will provide each other with 8 months' notice in writing of the end date of your stepping down from the position of SVP and Dean, COM, and we will work together during this period of time to enable a smooth transition to new leadership, as well as your own transition into a faculty position at SUNY Upstate Medical University, under the terms described on page 2 of this letter, and such time period may be modified upon mutual written agreement.

**Mutual Understanding of Non-Compete Notice**

In consideration of the terms of compensation in this offer of employment, you agree, when your employment with the University ends, you will not obtain employment within 200 miles of the University for a period of 3 years.

I will be pleased to welcome you to Upstate on July 1, 2017. Should your relocation arrangements take longer than expected we will work with you to re-negotiate a mutually agreeable date for your start that is

---

[1] Misconduct is defined as the failure to fulfill the conditions of employment as described in the offer letter, violation of a provision of the Public Officers Law or a written policy of Upstate Medical University and/or the State University of New York, as well as acts of dishonesty, theft, conviction of a felony, disorderly or immoral conduct at work, insubordination, engaging in conduct which constitutes a violation of the Penal Law of New York State, breach of a fiduciary duty owed to the University and/or actions that expose the University to liability.

7

no later than September 15, 2017, maintaining all the terms and conditions of this offer. I look forward to your many future contributions to the University.

If these terms and conditions are acceptable, please indicate by signing below and returning the signed copy to me at your earliest convenience.

Sincerely,

Danielle Laraque-Arena, MD, FAAP
President
Professor of Pediatrics, Psychiatry, and Public
Health & Preventive Medicine

cc: Personnel File Enclosure

I hereby accept the foregoing appointment and the terms described herein.

_____          March 15, 2017
[Name]                                    [Date]

8

**APPENDIX**

Please be advised that the information contained in this appendix is provided for summary purposes only. In all cases, actual terms and conditions of employment and benefits are governed by applicable State and federal regulations, SUNY policy, plan documents, insurance contracts, etc.

**Payroll Procedures**

New York State employees are paid on a two-week lag basis. There is a five-day deferral of pay for new Management/Confidential employees, which results in one day's wages being withheld in each of the first five paychecks.

**Moving Expenses**

Qualified moving expenses for household goods and personal effects will be paid for by Upstate. Moving expenses must be reasonable and in accordance with IRS guidelines and Upstate's policies. You will be required to get no fewer than 3 estimates and select the lowest responsible carrier. Moving expenses relating to your laboratory will also be paid for by Upstate directly to the contracted moving company using the same standards as noted above.

**Tuition Reimbursement**

The M/C Tuition Reimbursement Program provides financial support for approved course work on a reimbursement basis that is categorized as either job-related or career-related and offered by approved schools or organizations. Covered tuition expenses are currently reimbursed at the rate of 75%, up to a maximum reimbursement of $2,000 per fiscal year. As noted in the offer letter, we will explore the opportunity for additional academic support in line with the seeking of an advanced degree (e.g. MBA).

**Retirement Benefits**

There are three retirement program options available:

1. New York State Employees' Retirement System (ERS);
2. New York State Teachers' Retirement System (TRS); or
3. Optional Retirement Program (ORP).

ERS: A state-administered defined benefit retirement fund consisting of employer and employee contributions. Salaries of $100,000 or more requires a 6 percent employee contribution, which is tax-deferred for federal taxes. A participant's retirement benefit is computed as a percentage of his or her final average salary. The percentage received is determined by the number of years of service credit earned. Ten years of full-time service credit is required to be vested.

TRS: The retirement benefit is calculated similarly under the TRS system as under ERS. Vesting rights under the two systems are also similar and salaries of $100,000 or more require a 6% employee contribution.

ORP: This is a defined contribution program available to full-time professional employees of the State University. The ORP is offered through the Teachers Insurance Annuity Association (TIAA), VOYA, and VALIC. Three hundred and sixty-six (366) days of continuous employment are necessary to vest retirement benefits under this program. Vesting is immediate if you currently own annuity contracts that include employer contributions with any of these investment providers.

The State contributes 8% of salary for the first seven years of employment, and 10% thereafter; up to the maximum pensionable limit. Salaries of $100,000 or more require a 6% employee contribution; for a total contribution rate of 14 to 16% of salary. Employee contributions are tax deferred for Federal Income tax purposes, and all distributions are exempted from NYS taxes.

**Health Insurance**

As a new New York State employee, you may participate in the New York State Health Insurance Program (NYSHIP) in accordance with its terms and conditions. There is a fifty-six (56) calendar day waiting period before health insurance becomes effective. NYSHIP offers the availability of a modified indemnity fee-for-service plan (the Empire Plan) or Health Maintenance Organization (HMO) in a particular area. Health insurance premiums are paid on a "pre-tax" basis, unless an individual files a declination within the first 56 days of employment.

NYSHIP coverage is available for you, your spouse or domestic partner, and children up to age 26.

NYSHIP coverage is also available:
- For unmarried dependent child(ren) age 26 or older who are incapable of supporting themselves due to a mental or physical disability acquired before termination of their eligibility for health insurance; and
- For children ages 26 to age 30 to purchase young adult individual coverage at full cost with no employer subsidy.

**Management/Confidential Benefit Program**

Dental: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. Coverage becomes effective on the first day of the month following the completion of six (6) months of continuous employment. This program, offered through the GHI Insurance Company, provides coverage on a fee-for-service basis.

Vision Care: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. The plan provides eye care coverage, including an eye exam and one pair of glasses or contact lenses at a participating doctor every two years. Coverage becomes effective following a fifty-six (56) day waiting period.

10

Flexible Spending Accounts: The Health Care Spending Account (HCSA) and the Dependent Care Advantage Account (DCAA) offer a way to pay for un-reimbursed medical expenses and dependent care expenses with pre-tax dollars. An employee may contribute up to $5,000 annually to the DCAA and from $150 to $2,500 to the HCSA.

Group Life Insurance Program: This is a group-term life insurance program available on a payroll deduction basis. Employees may enroll for a fixed dollar amount or multiple of salary levels of coverage up to a maximum of five time's annual salary, currently capped at $500,000. Coverage is available without proof of insurability if the employee enrolls within 12 weeks of employment. Dependent group life insurance is also available up to 50 percent of the enrollee's benefit to a maximum of $20,000 for a spouse and in a flat amount of $4,000 for each eligible child.

Group Disability Insurance Program: The Group Disability insurance Program for full-time Management/Confidential employees is a cost-free benefit which provides income protection for a total disability after completing one year of State University service. (If you were covered within three months of appointment under a similar disability insurance plan by your last employer, the waiting period may be waived.) The plan provides an income benefit of 60% of salary to a maximum of $7,500 per month and also makes payment to a pension plan on the employee's behalf.

Tax-Deferred Savings Plans: SUNY offers a variety of tax-deferred savings options under Sections 403(b) and 457 of the internal Revenue Code. These tax-deferred savings plans permit savings toward retirement through automatic payroll deductions. The taxable salary is lowered since deduction is not subject to Federal, New York State or local income tax. An employee may direct his or her investment into 403(b) plans administered by TIAA, VOYA, VALIC or Fidelity and/or a 457 plan, the NYS Deferred Compensation Plan, administered by Nationwide.

**Annual and Sick Leave Accruals**

Management/Confidential employees accrue sick leave up to 200 days and annual leave (not to exceed 40 days at calendar year end) at a rate of 1.75 days per month in each category. Payment for up to thirty {30} days of unused annual leave at full salary is permitted upon resignation or retirement in good standing. Additionally, Management/Confidential employees earn an additional day of annual leave each January 2nd.

# Exhibit 2



*Office of the President*

September 12, 2019


HAND-DELIVERED
Julio Licinio, MD, PhD, MBA
7 Brattle Road
Syracuse, NY 13203


Dear Dr. Licinio:

You have been employed by the State University of New York Upstate Medical University in the title of Senior Vice President for Academic Health Affairs and Dean, College of Medicine, which is an unclassified Management Confidential position. By this letter, you are notified that your employment in this position is terminated effective immediately. Any other association, position or role, including any held ex officio, with the State University of New York, Upstate Medical University, Upstate University Hospital and any campus-related entity of Upstate Medical University, that you held by virtue of your position as Senior Vice President for Academic Health Affairs and Dean are also terminated effective immediately.

Effective September 13, 2019, your state title will become Distinguished Professor in the Department of Psychiatry & Behavioral Sciences and you will be compensated at a base annual State salary of $227,000. Effective September 13, 2019, your office location is your lab space on the third floor of IHP and you will report to the Chair of Psychiatry & Behavioral Sciences, Dr. Thomas Schwartz.

You are required to immediately return all property of the State University of New York Upstate Medical University associated with your position as Senior Vice President for Academic Health Affairs and Dean, College of Medicine, including any and all property of the Upstate University Hospital and including any property purchased by you with reimbursement from the State University of New York, Upstate Medical University, Upstate University Hospital, or any other campus related entity, including without limitation any and all keys, identification badges, cell phones, computer equipment and software, thumb drives, parking passes, hard copy and electronically stored files, documents and notes, passwords for all Upstate devices, procurement cards, and travel cards.

750 East Adams Street | Syracuse, NY 13210 | Ph: 315.464.4513 | Fax: 315.464.5275 | www.upstate.edu | State University of New York

JL0A0052

A-0053

Please contact the Human Resources Benefits Office to review the applicable benefit changes resulting from this change.

Sincerely,

Mantosh Dewan, MD
Interim President


cc:     Payroll
        Employee/Labor Relations
        Personnel File

A-0054

5:21-cv-3879

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JULIO LICINIO, MD, PhD, MBA, MS

**(b)** County of Residence of First Listed Plaintiff   ONONDAGA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Danny Grace PC, 222 Broadway, 19th Flr, NY 10038
646-515-2821

## DEFENDANTS

State of New York, et al

County of Residence of First Listed Defendant   ALBANY
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury - Product Liability | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | Product Liability | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | 368 Asbestos Personal Injury Product | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | Liability | | 835 Patent - Abbreviated New Drug Application | 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle | 370 Other Fraud | 710 Fair Labor Standards Act | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit (15 USC 1681 or 1692) |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 720 Labor/Management Relations | | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 360 Other Personal Injury | 380 Other Personal Property Damage | 740 Railway Labor Act | **SOCIAL SECURITY** | 490 Cable/Sat TV |
| 195 Contract Product Liability | 362 Personal Injury - Medical Malpractice | 385 Property Damage Product Liability | 751 Family and Medical Leave Act | 861 HIA (1395ff) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | | | 790 Other Labor Litigation | 862 Black Lung (923) | 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 791 Employee Retirement Income Security Act | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 440 Other Civil Rights | **Habeas Corpus:** | | 864 SSID Title XVI | 893 Environmental Matters |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | [x] 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 896 Arbitration |
| 240 Torts to Land | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment | 535 Death Penalty | **IMMIGRATION** | 871 IRS—Third Party 26 USC 7609 | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other | **Other:** 540 Mandamus & Other | 462 Naturalization Application | | |
| | 448 Education | 550 Civil Rights | 465 Other Immigration Actions | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq.

Brief description of cause:
EMPLOYMENT DISCRIMINATION AND RETALIATION

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   04/02/2021

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT  $402.00   APPLYING IFP _____   JUDGE  GTS   MAG. JUDGE  TWD

ANYNDC-5482207

A0054

A-0055

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JULIO LICINIO, MD, PhD, MBA, MS,

                        Plaintiff,

    -against-

THE STATE OF NEW YORK; THE STATE
UNIVERSITY OF NEW YORK; and THE STATE
UNIVERSITY OF NEW YORK UPSTATE
MEDICAL UNIVERSITY,

                        Defendants.

**ANSWER**
*Jury Trial Demanded*

5:21-CV-387
(GTS/TWD)

Defendants, the State of New York, the State University of New York ("SUNY"), and the SUNY Upstate Medical University, by their attorney, LETITIA JAMES, Attorney General of the State of New York, William E. Arnold, IV, Assistant Attorney General, of counsel, answer the Complaint as follows:

1.    Answering paragraph number 1 of the Complaint, admit only that this is Plaintiff's characterization of the proceeding and the relief sought, but deny his entitlement thereto and the allegations contained therein.

2.    Deny each and every allegation contained in paragraphs numbered 2, 3, 4, 5, 50, 51, 70, 156, 159, 160, 161, 164, 173, 190, 191, 192, 193, 197, 198, 199, 200, 203, 204, 205, 206, 209, 210, 211, 212, 215, 216, 217, and 218 of the Complaint.

3.    Deny any knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs numbered 9, 10, 11, 12, 13, 14, 15, 16, 23, 28, 29, 30, 31, 32, 33, 34, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 52, 53, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 71, 72, 73, 74, 75, 76, 78, 79, 80, 81, 82, 84, 85, 86, 87, 88, 89, 91,

1

93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 107, 109, 110, 113, 114, 115, 117, 118,

120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 134, 135, 136, 137, 138, 139,

142, 144, 145, 146, 148, 149, 150, 152, 154, 157, 158, 162, 163, 165, 168, 169, 175, 176, 177,

178, 179, and 180 of the Complaint.

4.      Plaintiff states legal allegations and/or conclusions in paragraphs 6, 7, 8, 17, 26, 27,

54, 69, 83, 90, 140, 155, 167, 181, 182, 183, 184, 185, 186, 188, 189, 195, 196, 202, 208, 214, and

the paragraph entitled "Prayer for Relief" of the Complaint to which no response is required.

Insofar as a response is required, Defendants deny those allegations and disagree with those

conclusions.

5.      Admit the allegations contained in paragraphs numbered 18, 19, 21, 22, 24, and 25

of the Complaint

6.      Deny knowledge or information sufficient to form a belief as to the allegations

contained in paragraphs numbered 34, 35, 36, 37, 116, 141, 143, and 147 of the Complaint, and

respectfully refer the Court to the exhibits annexed to the Complaint as the best evidence of their

contents, which speak for themselves.

7.      Deny that the Division of Student Affairs has been "plagued" by multiple

complaints of discrimination, as alleged in paragraph number 92 of the Complaint.  Deny

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained therein.

8.      Deny that Defendants admitted any wrongdoing, as alleged in paragraph number

166 of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth

of the remaining allegations contained therein.

2

A-0057

9.    Deny that Plaintiff was unlawfully demoted, as referenced in paragraphs numbered 20, 53, 77, 106, 108, 111, 112, 119, 133, 151, 153, 170, 171, 172, and 174 of the Complaint, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in those respective paragraphs.

10.    With respect to paragraphs numbered 187, 194, 201, 207, and 213 of the Complaint, Defendants repeat and re-allege every response made to the allegations in the Complaint referenced herein as fully set forth here.

11.    Deny each and every allegation in the Complaint not herein specifically and expressly admitted, denied, or contradicted.

12.    Deny any wrongdoing and deny violating Plaintiff's rights in any way.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE,
DEFENDANTS ALLEGE AS FOLLOWS:**

13.    The Complaint fails to state a claim upon which relief can be granted.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE,
DEFENDANTS ALLEGE AS FOLLOWS:**

14.    The Complaint fails to establish a violation of federal constitutional rights and thus this Court lacks subject matter jurisdiction.

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE,
DEFENDANTS ALLEGE AS FOLLOWS:**

15.    The Complaint is barred, in whole or in part, under principles of *res judicata* and collateral estoppel.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE,
DEFENDANTS ALLEGE AS FOLLOWS:**

16.    The Complaint is barred, in whole or in part, by the applicable statute of limitations.

3

A-0058

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE,<br>DEFENDANTS ALLEGE AS FOLLOWS:**

17.     The Complaint is barred, in whole or in part, under the Eleventh Amendment.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE,<br>DEFENDANTS ALLEGE AS FOLLOWS:**

18.     Plaintiff has failed to exhaust his administrative remedies.

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE,<br>DEFENDANTS ALLEGE AS FOLLOWS:**

19.     Any injuries allegedly sustained by Plaintiff were due in whole or in part to his own culpable conduct.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE,<br>DEFENDANTS ALLEGE AS FOLLOWS:**

20.     To the extent Plaintiff raises State law claims, including claims under the New York State Human Rights Law, they are barred by New York State Executive Law Section 297(9) and the Eleventh Amendment.

**AS AND FOR A NINETH AFFIRMATIVE DEFENSE,<br>DEFENDANTS ALLEGE AS FOLLOWS:**

21.     The Complaint may not be sustained against Defendants because it fails to allege any policy or practice on the part of any of the Defendant condoning such alleged acts.

**AS AND FOR A TENTH AFFIRMATIVE DEFENSE,<br>DEFENDANTS ALLEGE AS FOLLOWS:**

22.     Plaintiff has failed to mitigate his damages.

**AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE,<br>DEFENDANTS ALLEGE AS FOLLOWS:**

23.     At all times relevant to the Complaint, all of Defendants' actions were based on legitimate, nondiscriminatory grounds.

4

A-0059

### AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

24.     To the extent that the claims in this action are not reasonably related to those stated in the DHR/EEOC complaint, Plaintiff is barred from bringing such claims.

### AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

25.     Defendants are entitled to qualified immunity.

### AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

26.     Defendants hereby assert a defense under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989) and *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), which prevents recovery against an employer whose decision was in part motivated by some wrongful consideration, where the employer can show that, even in the absence of the wrongful consideration, it would have reached the same decision.

### AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

27.     Defendants reserve the right to raise additional defenses, which may become known during further investigation and discovery in this case.

### AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

28.     Defendants hereby demand a trial by jury.

WHEREFORE, Defendants respectfully ask that this Court deny the relief requested, dismiss the Complaint, and grant such other relief as the Court shall deem just and equitable.

Dated:          Syracuse, New York
                May 3, 2021

                          LETITIA JAMES
                          Attorney General of the State of New York
                          Attorney for Defendants

                          /s / William E. Arnold, IV

                          By:  William E. Arnold, IV
                               Assistant Attorney General
                               Bar Roll No. 519178
                               300 So. State St., Suite 300
                               Syracuse, New York 13202
                               Telephone: (315) 448-4800

TO:       Danny Grace, Esq. (via CM/ECF)
          Danny Grace, P.C.
          222 Broadway, 19th Floor
          New York, New York 10038

6

A-0061

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JULIO LICINIO, MD, PhD, MBA, MS,                        **AMENDED ANSWER**
                                                                                    *Jury Trial Demanded*
                                              Plaintiff,

                                                                                        5:21-CV-387
        -against-                                                                      (GTS/TWD)

THE STATE OF NEW YORK; THE STATE
UNIVERSITY OF NEW YORK; and THE STATE
UNIVERSITY OF NEW YORK UPSTATE
MEDICAL UNIVERSITY,

                                              Defendants.
_____

        Defendants, the State of New York, the State University of New York ("SUNY"), and the

SUNY Upstate Medical University, by their attorney, LETITIA JAMES, Attorney General of the

State of New York, William E. Arnold, IV, Assistant Attorney General, of counsel, answer the

Complaint as follows:

        1.        Answering paragraph number 1 of the Complaint, admit only that this is Plaintiff's

characterization of the proceeding and the relief sought, but deny his entitlement thereto and the

allegations contained therein.

        2.        Deny each and every allegation contained in paragraphs numbered 2, 3, 4, 5, 42,

44, 46, 48, 49, 50, 51, 52, 53, 54, 58, 59, 60, 61, 62, 63, 64, 65, 69, 70, 76, 77, 80, 83, 85, 87, 89,

90, 97, 98, 100, 106, 107, 108, 121, 126, 133, 136, 138, 139, 140, 144, 145, 146, 150, 153, 154,

155, 156, 157, 159, 160, 161, 162, 163, 164, 165, 167, 169, 172, 173, 174, 175, 176, 177, 178,

181, 182, 183, 184, 185, 186, 190, 191, 192, 193, 197, 198, 199, 200, 202, 203, 204, 205, 206,

208, 209, 210, 211, 212, 214, 215, 216, 217, and 218 of the Complaint.

1

3.      Deny any knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs numbered 10, 12, 15, 16, 28, 29, 30, 31, 32, 33, 40, 45, 55, 56, 66, 71, 72, 73, 74, 75, 79, 81, 93, 94, 95, 96, 101, 102, 103, 104, 105, 109, 117, 118, 122, 125, 127, 128, 130, 131, 142, 148, 168, and 180 of the Complaint.

4.      Admit the allegations contained in paragraphs numbered 11, 18, 19, 22, 24, 25, 43, 67, 91, 113, 114, 115, 129, 135, and 137 of the Complaint.

5.      With respect to paragraph number 9 of the Complaint, admit that Plaintiff filed a Verified Complaint with the State of New York Executive Division of Human Rights ("DHR") but deny any knowledge or information sufficient to form a belief as to the truth of when the Verified Complaint was filed with the DHR.  To the extent the allegations of paragraph number 9 seek to paraphrase or characterize the contents of the DHR Complaint, the document speaks for itself and Defendants deny the allegations to the extent that they are inconsistent with that document.

6.      To the extent the allegations of paragraphs numbered 13, 14, 57, 143, 147, and 158 of the Complaint seek to paraphrase or characterize the contents of a written document, the document speaks for itself and Defendants deny the allegations to the extent that they are inconsistent with the document.

7.      Deny that Plaintiff was appointed Senior Vice President and Dean of the College of Medicine on March 14, 2017, and that he was unlawfully demoted, as alleged in paragraph number 20 of the Complaint.  Admit that Plaintiff stopped serving in the roles of Senior Vice President and Executive Dean of the College of Medicine on September 12, 2019.

8.      Admit that New York State assists in financing and funding the SUNY system as alleged in paragraph number 21 of the Complaint but deny the characterization of the remaining

2

allegations contained therein.  The Court is respectfully referred to N.Y. EDUC. LAW §§ 352 and 353, which discuss the creation and governance of the SUNY system, and speak for themselves.

9.     Admit that SUNY has sixty-four (64) campuses across New York State and maintains administrative offices in Albany, New York, as alleged in paragraph number 23 of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein.

10.     Deny that Plaintiff entered into an employment contract with Defendant SUNY Upstate as alleged in paragraph numbers 34, 35, 36, 37, 41, and 116 of the Complaint.  With respect to the remaining allegations contained in those respective paragraphs, the Court is referred to the exhibits annexed to the Complaint as the best evidence of their contents, which speak for themselves, and Defendants deny the allegations to the extent that they are inconsistent with those documents.

11.     Deny that Plaintiff entered into an employment contract with Defendant SUNY Upstate as alleged in paragraph number 38 of the Complaint. Admit that Plaintiff began his employment with SUNY Upstate on July 1, 2017.

12.     Admit that Plaintiff, as Senior Vice President and Dean, performed the job duties described in subsections "a," "b," and "c" of paragraph number 39 in the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein.

13.     Admit that Plaintiff was honored as a Distinguished Professor on September 11, 2019, as alleged in paragraph number 47 of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein.

14.    Admit that Plaintiff was presented to the accreditation body as the face of SUNY Upstate's College of Medicine as alleged in paragraph number 68 of the Complaint but deny the remaining allegations contained therein.

15.    Deny that there was a lack of advancing diversity at SUNY Upstate as alleged in paragraph number 78 of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein.

16.    Deny knowledge or information sufficient to form a belief as to the truth of how frequently the Diversity Committee met as alleged in paragraph number 82 of the Complaint and deny the remaining allegations contained therein.

17.    Admit that the University Executive Committee is part of SUNY Upstate's administrative structure as alleged in paragraph number 84 of the Complaint but deny the remaining allegations contained therein.

18.    Admit that the Budget Committee meets every Tuesday as alleged in paragraph number 86 of the Complaint but deny the remaining allegations contained therein.

19.    Deny knowledge or information sufficient to form a belief as to the truth of what Plaintiff heard from "women employees" as alleged in paragraph number 88 of the Complaint but deny the remaining allegations contained therein.

20.    Deny that the Division of Student Affairs has been "plagued" by multiple complaints of discrimination, as alleged in paragraph number 92 of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained therein.

21.    Deny knowledge or information sufficient to form a belief as to the truth of whether Plaintiff referred the Dean of Student Affairs to SUNY Upstate's Organizational Training and

4

Development Office as alleged in paragraph number 99 of the Complaint and deny the remaining allegations contained therein.

22.     Deny knowledge or information sufficient to form a belief as to the truth of whether Plaintiff verbally offered the position of part-time Assistant Dean for Cultural Competence to an assistant professor as alleged in paragraph number 110 of the Complaint and deny the remaining allegations contained therein.

23.     Admit that the Interim Chair was appointed to the Chair of Medicine position as alleged in paragraph number 119 of the Complaint but deny the remaining allegations contained therein.

24.     Deny knowledge or information sufficient to form a belief as to the truth of whether the "Individual who was appointed as Chair of Medicine was not a member of a group that Defendants presented to the LCME as being targets for diversity" as alleged in paragraph number 120 of the Complaint.  Deny the remaining allegations contained therein.

25.     Admit that the Interim Chair of Otolaryngology and Communication was appointed to role of permanent Chair of the same Department as alleged in paragraph number 123 of the Complaint but deny the remaining allegations contained therein.

26.     Deny knowledge or information sufficient to form a belief as to the truth of whether the "Individual who was appointed as Chair of Otolaryngology and Communication was not a member of a group that Defendants presented to the LCME as being targets for diversity" as alleged in paragraph number 124 of the Complaint.  Deny the remaining allegations contained therein.

27.     Admit that the Board of Trustees' policies require chair appointments to be made by the President as alleged in paragraph 132 of the Complaint but deny the remaining allegations

contained therein.  Further, to the extent the allegations of paragraph 132 seek to paraphrase or characterize the contents of the Board of Trustees' policies, those policies speak for themselves and Defendants deny the allegations to the extent that they are inconsistent with said policies.

28.    Admit that Plaintiff's wife works for SUNY Upstate as a Professor of Psychiatry and Behavioral Sciences and has a dual-appointment as Professor of Neuroscience and Physiology as alleged in paragraph number 134 of the Complaint.  Deny the remaining allegations contained therein.

29.    Admit that Plaintiff was hand delivered a letter on September 12, 2019, as alleged in paragraph number 141 of the Complaint.  To the extent the allegations of paragraph 141 seek to paraphrase or characterize the contents of exhibit 2 to the Complaint, the document speaks for itself and Defendants deny the allegations to the extent that they are inconsistent with that document.

30.    Admit that Plaintiff, in his role as a Distinguished Professor, performed the job duties described in paragraph number 149 of the Complaint but deny the remaining allegations contained therein.

31.    Admit that Plaintiff made an application for temporary injunctive relief in Onondaga County Supreme Court on or about September 13, 2019, as alleged in paragraph number 151 of the Complaint but deny the remaining allegations contained therein.

32.    Deny knowledge or information sufficient to form a belief as to the truth of what Plaintiff believed as alleged in paragraph number 152 of the Complaint.  Deny that Defendants were "systematically dismantling" Plaintiff's reputation in his field.

6

33.     Admit that SUNY Upstate named at least three individuals of diverse backgrounds to leadership roles as alleged in paragraph number 166 of the Complaint but deny the remaining allegations contained therein.

34.     Admit that Plaintiff's compensation was reduced and he was no longer entitled to reimbursement for certain benefits/memberships after he transitioned to the role of distinguished professor as alleged in paragraph number 171 of the Complaint but deny the remaining allegations contained therein.

35.     Deny that the College of Medicine received full LCME accreditation in November 2019 "as a result of a meticulous LCME review process that Plaintiff led as Dean of the College of Medicine" as alleged in paragraph number 179 of the Complaint.   Admit the remaining allegations contained therein.

36.     Plaintiff states legal allegations and/or conclusions in paragraphs 6, 7, 8, 17, 26, 27, 188, 189, 195, 196, and the paragraph entitled "Prayer for Relief" of the Complaint to which no response is required.   Insofar as a response is required, Defendants deny those allegations and disagree with those conclusions.

37.     Deny that Plaintiff was unlawfully demoted, as referenced in paragraphs numbered 111, 112, and 170 of the Complaint, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in those respective paragraphs.

38.     With respect to paragraphs numbered 187, 194, 201, 207, and 213 of the Complaint, Defendants repeat and re-allege every response made to the allegations in the Complaint referenced herein as fully set forth here.

39.     Deny each and every allegation in the Complaint not herein specifically and expressly admitted, denied, or contradicted.

7

40.     Deny any wrongdoing and deny violating Plaintiff's rights in any way.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE,**
**DEFENDANTS ALLEGE AS FOLLOWS:**

41.     The Complaint fails to state a claim upon which relief can be granted.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE,**
**DEFENDANTS ALLEGE AS FOLLOWS:**

42.     The Complaint fails to establish a violation of federal constitutional rights and thus this Court lacks subject matter jurisdiction.

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE,**
**DEFENDANTS ALLEGE AS FOLLOWS:**

43.     The Complaint is barred, in whole or in part, under principles of *res judicata* and collateral estoppel.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE,**
**DEFENDANTS ALLEGE AS FOLLOWS:**

44.     The Complaint is barred, in whole or in part, by the applicable statute of limitations.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE,**
**DEFENDANTS ALLEGE AS FOLLOWS:**

45.     The Complaint is barred, in whole or in part, under the Eleventh Amendment.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE,**
**DEFENDANTS ALLEGE AS FOLLOWS:**

46.     Plaintiff has failed to exhaust his administrative remedies.

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE,**
**DEFENDANTS ALLEGE AS FOLLOWS:**

47.     Any injuries allegedly sustained by Plaintiff were due in whole or in part to his own culpable conduct.

A0068

A-0069

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

48.     To the extent Plaintiff raises State law claims, including claims under the New York State Human Rights Law, they are barred by New York State Executive Law Section 297(9) and the Eleventh Amendment.

## AS AND FOR A NINETH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

49.     The Complaint may not be sustained against Defendants because it fails to allege any policy or practice on the part of any of the Defendant condoning such alleged acts.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

50.     Plaintiff has failed to mitigate his damages.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

51.     At all times relevant to the Complaint, all of Defendants' actions were based on legitimate, nondiscriminatory grounds.

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

52.     To the extent that the claims in this action are not reasonably related to those stated in the DHR/EEOC complaint, Plaintiff is barred from bringing such claims.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

53.     Defendants are entitled to qualified immunity.

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

54.     Defendants hereby assert a defense under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989) and *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977),

9

which prevents recovery against an employer whose decision was in part motivated by some wrongful consideration, where the employer can show that, even in the absence of the wrongful consideration, it would have reached the same decision.

### AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

55.    Plaintiff failed to commence the instant action within 90 days of receiving a right-to-sue letter from the EEOC and his Title VII claims are therefore untimely.

### AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

56.    Defendants reserve the right to raise additional defenses, which may become known during further investigation and discovery in this case.

### AS AND FOR A SEVENTEENTH AFFIRMATIVE DEFENSE, DEFENDANTS ALLEGE AS FOLLOWS:

57.    Defendants hereby demand a trial by jury.

WHEREFORE, Defendants respectfully ask that this Court deny the relief requested, dismiss the Complaint, and grant such other relief as the Court shall deem just and equitable.

Dated:    Syracuse, New York
          May 24, 2021

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants

/s/ William E. Arnold, IV

By:  William E. Arnold, IV
     Assistant Attorney General
     Bar Roll No. 519178
     300 So. State St., Suite 300
     Syracuse, New York 13202
     Telephone: (315) 448-4800

10

TO: Danny Grace, Esq. (via CM/ECF)
   Danny Grace, P.C.
   222 Broadway, 19th Floor
   New York, New York 10038

A0071

A-0072

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
.........................................................................X
**JULIO LICINIO, MD, PhD, MBA, MS,**

<table>
<tr><td></td><td>Plaintiff,</td><td>**NOTICE OF MOTION**</td></tr>
<tr><td></td><td></td><td>Case No.: **5:21-cv-387(GTS/TWD)**</td></tr>
</table>

- against -

**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, and THE**
**STATE UNIVERSITY OF NEW YORK**
**UPSTATE MEDICAL UNIVERSITY,**

Defendants

.........................................................................X

| | |
|---|---|
| Motion By: | LETITIA JAMES<br>Attorney General of the State of New York<br>Attorney for Defendants<br><br>By: Aimee Cowan<br>Assistant Attorney General, of Counsel<br>Bar Roll No. 516178 |
| Time and Place of Hearing: | _____, at 10:00 a.m. before United States District Judge Glenn T. Suddaby to be held at the United States District Courthouse in Syracuse, New York **upon submission only** |
| Relief and Basis: | An Order pursuant to Fed. R. Civ. P. 56(a) dismissing Plaintiff's Complaint with prejudice, and for such other and further relief as the Court deems just and proper. |
| Supporting Papers: | Statement of Material Facts Not in Dispute, Declaration of Attorney Aimee Cowan, with attached exhibits, Declaration of Robert Corona, DO, with attached exhibits; Declaration of Mantosh Dewan, MD, with attached exhibits; Declaration of Stephen Albanese, MD; Declaration of Eric Frost, |

1

A-0073

with attached exhibits; Declaration of Alexandria Gilbertson, with attached exhibits; Declaration of Lawrence Chin, MD, with attached exhibits; Declaration of Mark Schmitt, PhD, with attached exhibits; Declaration of Thomas Schwartz, MD, with attached exhibits; Declaration of Richard Gardner with attached exhibits; Declaration of Leann Lesperance, PhD, with attached exhibits; and Defendants' Memorandum of Law.

Dated:      Syracuse, New York
            January 19, 2024

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, New York 13202

By: _s/Aimee Cowan_____
Aimee Cowan
Assistant Attorney General, of Counsel
Bar Roll No. 516178
Telephone:    (315) 448-4800
Fax: (315) 448-4853
Email: aimee.cowan@ag.ny.gov

To:     Douglas Mace, Esq.
        Danny Grace PLLC
        225 Broadway, Suite 1200
        New York, New York 10007

2

A0073

A-0074

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
...............................................................X
**JULIO LICINIO, MD, PhD, MBA, MS,**

Plaintiff,          **ATTORNEY DECLARATION**

Case No.: **5:21-cv-387(GTS/TWD)**

- against -

**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, and THE**
**STATE UNIVERSITY OF NEW YORK**
**UPSTATE MEDICAL UNIVERSITY,**

Defendants

...............................................................X

Aimee Cowan, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.      I am an Assistant Attorney General for the State of New York and appear in this action on behalf of Letitia James, Attorney General for the State of New York, attorney for State of New York, the State University of New York, and the State University of New York Upstate Medical University ("Defendants") in this action.

2.      I make this Declaration in support of Defendants' motion pursuant to Federal Rule of Civil Procedure 56(a) for an order granting summary judgment and dismissing Plaintiff's Complaint in its entirety and with prejudice.

3.      The alleged facts and legal arguments are set forth in detail in the accompanying Declarations, Statement of Material Facts Not in Dispute and Memorandum of Law.

4.      Plaintiff filed his Complaint in this action on April 4, 2021. (ECF No. 1). In his

1

Complaint, Plaintiff alleges that he was removed from his position as the Dean of the Upstate

Medical University ("UMU") as a result of discrimination based on his national origin and race,

and in retaliation for complaining of discrimination, in violation of Title VII of the Civil Rights

Act of 1964 ("Title VII"). (ECF No. 1).

     5.     Defendants answered Plaintiff's Complaint on May 3, 2021. (ECF No. 5).

     6.     The parties exchanged extensive paper discovery. Some of the following

documents relevant to this motion are as follows:

     a.     Attached as **Exhibit "A"** is a copy of UMU's position summary for the

Senior Vice President/Dean position to which Plaintiff was appointed in July 2017.

     b.     Attached as **Exhibit "B"** is a copy of Plaintiff's UMU offer letter, dated

March 14, 2017.

     c.     Attached as **Exhibit "C"** is a copy of a March 19, 2019, organizational chart

for the Dean of the College of Medicine.

     d.     Attached as **Exhibit "D"** is a copy of notes written by former UMU

President Danielle Laraque-Arena, MD, regarding meetings with Plaintiff.

     e.     Attached as **Exhibit "E"** is a copy of notes dated October 8, 2018, detailing

criticism of Plaintiff by President Laraque-Arena.

     f.     Attached as **Exhibit "F"** is a copy of emails forwarded to President

Mantosh Dewan from former President Danielle Laraque-Arena regarding

Plaintiff's response to a discrimination investigation.

     g.     Attached as **Exhibit "G"** is a copy of Plaintiff's New York State Division

of Human Rights ("DHR") Complaint, dated November 15, 2019.

A-0076

h.      Attached as **Exhibit "H"** is a copy of DHR's Determination After Investigation.

i.      Attached as **Exhibit "I"** is a copy of DHR's Recommended Order dismissing the complaint.

7.      Plaintiff was deposed on May 31, 2022. A copy of a portion of his transcript is attached as **Exhibit "J."**

8.      Non-party witness Ann Botash, M.D., was deposed on June 8, 2022. A copy of a portion of her transcript is attached as **Exhibit "K."**

9.      A copy of Plaintiff's Responses to Defendants' First Set of Interrogatories, dated November 12, 2021, is attached as **Exhibit "L"** (without exhibits).

10.     Plaintiff's wife, Ma-Li Wong, MD, has filed a federal complaint ("Wong case") alleging that she was subjected to discrimination and retaliation during her employment at UMU. See, Wong v. State of New York, et al., 5:21-cv-1338. Dr. Wong was deposed in that matter on July 12, 2023. A copy of a portion of her transcript is attached as **Exhibit "M."**

11.     Based upon Defendants' Statement of Material Facts Not in Dispute; Attorney Aimee Cowan's Declaration, along with attached exhibits; the Declarations of Robert Corona, DO, with attached exhibits; Mantosh Dewan, MD, with attached exhibits; Stephen Albanese, MD; Eric Frost, with attached exhibits; Alexandria Gilbertson, with attached exhibits; Lawrence Chin, MD, with attached exhibits; Mark Schmitt, PhD, with attached exhibits; Thomas Schwartz, MD, with attached exhibits; Richard Gardner with attached exhibits; Leann Lesperance, PhD, with attached exhibits; and Defendants' Memorandum of Law, Defendants respectfully request that this Court grant their motion for summary judgment and dismiss Plaintiff's Complaint in its entirety, with prejudice.

3

A-0077

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2024

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
Office of the Attorney General
Syracuse Regional Office
300 S. State Street, Ste. 300
Syracuse, New York 13202


*s/Aimee Cowan*
Aimee M. Cowan, Esq.
Assistant Attorney General
Federal Bar Roll No. 516178



**CONFIDENTIAL**

# SUNY Upstate Medical University

### Position Summary – Senior Vice President and Dean

The Senior Vice President and Dean (SVP/Dean) is the principal leader and advocate for the College of Medicine's programs.   The SVP/Dean serves as a member of the President's University Executive Committee and, as such, participates in providing direction related to the university-wide institutional  vision, mission, values and strategic direction of SUNY Upstate Medical University.  She/he is responsible for the definition  and implementation of strategic priorities for the College of Medicine and also for the development of mechanisms to review performance in achieving the objectives of those priorities.  The SVP/Dean is expected to work constructively and collaboratively with faculty and other leaders to achieve the overall institutional goals.

The SVP/Dean is responsible for the oversight and evaluation of the medical school education programs for medical and graduate programs. The Dean is responsible for all activities related to the accreditation of graduate medical education and medical  student degree programs and ensuring their successful re-accreditation, by agencies such as the LCME.  The Dean is also responsible for oversight and evaluation of graduate education leading to the Ph.D. and MD/Ph.D., working cooperatively with the Dean of the Graduate School.

The SVP/Dean provides oversight of the research agenda for the College of Medicine, supports the conduct of research and ensures the continuing review of the research  programs within the college. S/he works cooperatively with the Vice-President for Research.

The SVP/Dean provides leadership for the clinical mission of SUNY Upstate with oversight over clinical practice plans of the faculty of the College of Medicine, the services of University Hospital, and other programs, by working collaboratively with leaders of the medical service groups, the University  Hospital and others in the community.

The SVP/Dean is responsible for the fiscal integrity of the College of Medicine and leadership for global finance and budget that leads to alignment of the academic and health services delivery goal of a well-integrated health system.  Active fundraising to support aspirational goals is also part of the Dean of the College of Medicine's responsibilities.

The SVP/Dean is responsible for maintaining and enhancing the ongoing collaboration with our strong affiliate, Syracuse VA Medical Center, toward their shared mission of providing an excellent educational experience for students and Residents/Fellows; an excellent teaching environment for affiliated Attending MDs; collaborative Research endeavors; and excellent care and outcomes for the Veteran patients.

**A-0079**

## Key Relationships

**Reports to:**         The SVP/Dean reports to the President of SUNY Upstate Medical
                        University who in turn reports to the SUNY Chancellor.

**Direct reports:**     Dean, Binghamton Clinical Campus
                        Senior Associate Dean for Education
                        Senior Associate Dean for Faculty Affairs and Faculty Development
                        Dean, College of Graduate Studies
                        Associate Dean of Clinical Affairs
                        Assistant Dean for Diversity
                        Department Chairs - College of Medicine
                        Chief of Staff, College of Medicine

**Other key relationships:**   Senior Vice President for Finance and Administration
                        Senior Vice President for Operations
                        Senior Vice President for Hospital Affairs and CEO University Hospital
                        Senior Vice President for Strategic Affairs
                        Vice President for Research
                        Vice President for Academic Affairs
                        Dean, College of Health Professions
                        Dean, College of Nursing
                        Executive Director, Alumni Association
                        President, Upstate University Medical Associates at Syracuse (UUMAS)
                        Vice President for Development and Director, Upstate Foundation
                        Chief Diversity Officer & Assistant Vice President for Diversity &
                        Inclusion

## Major Responsibilities

* Overseeing all the academic activities of the basic and clinical science departments,
  including education and research in the College of Medicine

* Committing to a process that leads to being a learning organization.

* Overseeing all activities related to the accreditation of all educational programs, including
  LCME, ACGME, and ACCME reviews; developing and overseeing, in collaboration with
  department chairs, the regular evaluation of faculty as teachers and scholars at all levels of
  medical education as well as the development and oversight of faculty as teachers at both
  the college and affiliated facilities.

* Developing an open and transparent process for the allocation and effective use of
  financial and physical resources in the college, including the allocation and effective
  use of all space assigned for medical education and research, and all academic
  program support space within the College of Medicine.

* Serving as the chief academic and executive officer for undergraduate and graduate
  medical education; fostering scholarly activity in all medical school academic
  departments and within the Dean's office.

                                                                    2                A0079

- Working with chairs of departments, directors of sections and center directors to develop goals, policies, long range plans and quality improvement initiatives that will assist and support the medical staff to effectively function within the medical school and hospital.

- Maintaining and enhancing undergraduate, graduate, graduate medical, and continuing medical education. This includes providing coordinated oversight of the curriculum and curricular change; and overseeing and evaluating the quality and appropriateness of its content and presentation to undergraduate medical students in all of their training.

- Recruiting all basic and clinical science department chairs with a commitment to a process that leads to a broad, diverse applicant pool and the selection of the candidates with the utmost scientific and educational qualifications and experience.

- Approving all College of Medicine faculty appointments, promotions and reviews. Ensuring retention and mentoring of key M.D. and Ph.D. faculty and leading the ongoing recruitment of top, diverse talent across the teaching and research components.

- Working closely and collaboratively with the CEO of Upstate University Hospital and his/her officers to support a clinical enterprise that leads to a progressive, responsive health care system and state of the art training experience for students, residents and fellows.

- Endeavoring to support a clinical environment that is conducive to appropriate integration of the educational and research programs.

- Enhancing clinical research and teaching; and providing leadership and responsibility for the educational and research effectiveness of the clinical departments.

- Being active in issues involving faculty in their clinical roles in the hospital and affiliated hospitals, creating opportunities and connections between clinical and basic science faculty and working to reallocate existing resources deployed by the College of Medicine and secure new resources that will enable the faculty to better participate in the teaching and research mission of the College of Medicine.

- Understanding and meeting the college's responsibilities to students, faculty and academic staff; creating a transparent, collaborative climate in which everyone is working to support a set of commonly understood goals and objectives, with clear, specific metrics for evaluation of targeted outcomes.

- Initiating and sustaining, in coordination with the President, academic relationships with other academic institutions within Central New York and New York at large, as well as across the country and internationally.

## KEY SELECTION CRITERIA

**Requirements:**

- A Medical Degree or the equivalent, (MD, MD/PhD, PhD or equivalent).

A-0081

- Scholarly and professional achievement meriting the academic rank of Professor with a continuing appointment (a continuing appointment is equivalent to tenure) in an appropriate clinical department.
- Knowledge of and experience in the support and conduct of research.

- Knowledge of and experience in faculty development.

- Knowledge of and experience in recruitment of a diverse faculty

- Knowledge of and experience in medical curricula and education.

- Demonstrated administrative ability, including planning and timely and effective execution.

- Knowledge of VA healthcare and teaching.

- Decision-making in complex environments.

- Understanding of and experience in fiscal management.

- Experience in dealing with contemporary healthcare issues including a big data strategy and the latest information technology.

- Leading or significant participation in institutional strategic planning

- Experience in and ability to manage the clinical activities of the medical faculty.

- Demonstrated leadership in an academic medical center as a department chair, senior dean or other relevant position

- Interpersonal skills that support an open, inclusive, transparent process that invites participation and effective collaborative relationships with colleagues within and outside Upstate Medical University.

- Ability to set and clearly articulate an academic vision.

- Record of integrity, ethical behavior, and treatment of others with respect, fairness, and concern for their welfare.

- Respect and advocacy for diversity of culture, ethnicity, gender, sexual orientation, and perspectives.

- Experience in setting fundraising goals and participating in fundraising.

- Ability to build consensus among relevant and diverse constituencies.

- The university seeks candidates whose research, teaching, or service has prepared them to contribute to our commitment to diversity and inclusion in higher education.

Licinio v. SUNY Upstate, et al., 5:21-cv-387   009730
A0081

4

A-0082

- The university seeks candidates whose research, teaching and service has prepared them to contribute to the economic vitality of the region's largest employer (Upstate Medical University) and to address the pressing health and health systems needs of the region.

**Ideal Experience**
**Critical Competencies for Success**

*Leadership/Collaboration:* In a highly matrixed, complex environment and a culture that strongly values collaboration and teamwork, the successful candidate must have the demonstrated ability to motivate and guide faculty to success across the tripartite academic mission by:

- Recruiting, retaining and developing superb academic faculty and a strong leadership team; creating an environment of trust, integrity and accountability while fostering a climate for creativity, learning and development of self and others.

- Having a thorough understanding of the LCME process.

- Having a proven ability to champion academic aspects of clinical practice in a complex environment.

- Emphasizing and having an understanding of the importance of data-driven approaches and supporting the collaborative efforts for a big data strategy for the university.

- Emphasizing and having an understanding of the importance of teamwork as vital to the success of a collegial environment and identifying evidence-based approaches that can be utilized to support teamwork.

- Possessing the strategic, financial and operational skills necessary to promote the integration and coordination of the teaching, research and clinical missions of the COM and the other colleges within Upstate (namely, the College of Health Professions, Nursing).

- Creating the opportunity to build key relationships across the College and the health system, generating excitement and high morale among all components within the broad enterprise.

- Possessing the qualities to effectively balance different perspectives that lead to clarity and timely, decisive actions.

- Possessing the quality to communicate decisions and strategic direction effectively across the university.

- Providing educational and fiscal leadership and responsibility for key matters for the College including the Graduate Medical Education Programs (residents and fellows).

- In collaboration with other senior leaders, leading the regular review of the performance of all chairs and other designated senior leaders within Upstate.

- Demonstrated knowledge and experiences associated with collaborative relationships with VA healthcare and teaching.

**Demonstrated Vision:** The Dean must be able to establish, articulate and drive the vision for the College developing and growing the clinical, educational and research components while creating an environment that fosters achievement, excellence and continued success in education and the basic sciences by:

- Having a powerful grasp and strategic view of the many challenges facing academic health sciences universities today, with an understanding and approach to navigating through these challenges to greater success across the three missions.

- Having the ability to assess the College's current position within this context and articulate a compelling vision consistent with the strategic plan of the health system and the overall university.

- Possessing a thorough understanding of the development of clinical and translational research activities.

- Providing vision, leadership and management for the biomedical research enterprise within the COM, attracting research faculty and setting clear expectations and targets for faculty research in collaboration with departmental chairs, VP for Research and individual faculty members.

**Demonstrated Financial/Executive Abilities:** The Dean must have the skill sets necessary to manage a complex multi-faceted, matrixed organization by:

- Having a strong understanding of the complex financial issues and pressures facing medical schools and healthcare delivery organizations.

- Demonstrating successful executive experience at the departmental or central administrative level at a complex academic institution, with demonstrated strategic and implementation skills.

- Having experience in managing faculty performance and building accountabilities in support of academic excellence.

- Ensuring that all clinical activities are conducted in a manner that promotes excellent patient care and responsiveness to community health needs and health system needs.

- Managing all office, educational and research space, faculty evaluations, appointments, promotions, tenure decisions, compliance and discipline.

**Other Personal Characteristics**

- Unquestioned ethics and integrity.

- Powerful intellect and intellectual curiosity.

- Flexible, adaptable, open minded, as well as decisive.

- Commitment to collegiality, inclusive excellence, diversity and cross-cultural understanding.

- Caring and positive approach to problem solving.

A-0084



**UPSTATE**
MEDICAL UNIVERSITY

March 14, 2017

Julio Licinio, MD, PhD
6 Baliol Street College Park
South Australia 5069 Australia


Dear Dr. Licinio:

I am pleased to offer you a Management/Confidential appointment as Senior Vice President and Dean of the College of Medicine. This appointment will be effective July 1, 2017. You will receive total annual state compensation, subject to changes as may be authorized or required by law, of $585,000.

You will also receive $48,000 in additional compensation not added to base pay, payable as $4,000 bi-weekly for each of your first 12 bi-weekly pay periods.

In this position you will report to me as President and you will have a seat on the University Executive Committee. In accordance with the SUNY Board of Trustees Policies, Article IX, Title B, Section 4, this is a Management/Confidential position that reports to and serves at the pleasure of the President. This M/C appointment is not for a designated period of time and SUNY does not have a mandatory retirement age.

This offer is contingent upon the satisfactory result of a routine criminal background investigation. This appointment is subject to the Policies of the Board of Trustees for the State University of New York (www.suny.edu/boardoftrustees/pdf/policies.pdf) as well as the responsibilities of a state employee as described in the Public Officers Law (http://www.suny.edu/hr/handbook/).

It is our understanding that you will use your best effort to obtain and maintain an unrestricted license to practice medicine in New York State.

**Faculty Appointment**

Concurrent with your management/confidential appointment as Senior Vice President and Dean of the College of Medicine, I am pleased to offer you a faculty appointment at the rank of Professor with tenure in the department of Psychiatry & Behavioral Sciences. Upon receipt of your signed acceptance of the terms of this offer I will provide an official appointment letter under my authority as President of SUNY Upstate Medical University. I will also then recommend to the Chancellor of SUNY for approval that your appointment be continuing (tenured).

1

A-0085

I am also pleased to offer you an academic appointment as Professor in the Department of Psychiatry, consistent with the College of Medicine review process, and the Policies of the Board of Trustees. You will also have secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism.

In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department.

You inquired regarding a SUNY Distinguished Professorship. The eligibility/selection criteria require that candidates must have at least one year of full-time service at the nominating institution. I agree to nominate you for a SUNY Distinguished Professorship when you satisfactorily complete the required service time. For additional information, please visit: http://system.suny.edu/media/suny/content-assets/documents/academic-affairs/distinguished-faculty-ranks/2015-2017-Distinguished-Guidelines.pdf

**Office and Other Support for Administrative and Tenured Professor Positions**

You will be provided with an adequate office, with secretarial support.

A full-time research/academic assistant will be hired to support your needs, effective July 1, 2017. You will be able to participate in academic conferences and other educational opportunities as you determine necessary for the functioning of each of your roles and continued educational advancement and we will reimburse costs for such activities, including but not limited to, travel, CME, publications and professional society memberships, in each of your roles. In addition, the section on tuition reimbursement itemizes other opportunities for career-related advancement support.

I will also explore further the opportunity to gain additional academic opportunities in support of your desire to obtain an executive MBA.

The University will also provide executive coaching services for two years, not to exceed $60,000.

**Current Resources Available to the College of Medicine**

The dollars projected to be spent by the College of Medicine from state and non-state sources during academic year 2016-17 of approximately $75 million are the basis from which we will start and will continue.

The College of Medicine has played a vital role in over the last three years in eliminating structural deficits that once existed for the University resulting in a sustainable operating plan with unallocated operating funds available for investment in strategic priorities, as further discussed below.

Based on our expectation of new resources available at the College of Medicine, it is our expectation that you will maintain and improve upon the current financial state of the University by identifying and

2

A-0086

implementing efforts to grow academic, research, and clinical revenues necessary to provide adequate funding of mandatory costs (salary and non-salary increases) relating to current obligations and any new strategic initiatives that may evolve in the future.

It is projected that new funds that become available through growth or turnover from these current sources, after annual funding of mandatory cost increases, will be available for reinvestment in the College of Medicine in alignment with the strategic plan of the University. Beginning in fiscal year 2017-18, should external funding sources of the University decline, the College of Medicine will share the decreases proportionately through expense reductions, reductions in new resources as noted below and/or through other actions.

**New Resources to be made available to the College of Medicine**

It is projected that new resources totaling $25 million over five years will be available to the College of Medicine as follows:

- State Allocated Funds - $2.5 million annually, $12.5 million over 5 years - This is the funding that is expected and is to be used for both recurring costs (i.e., new faculty base salaries) and one-time investments (i.e., academic faculty start-up packages). As faculty recruitments occur over this five-year period, it is expected that most of these funds will be fully committed and less will be available annually for new one-time investments.

- Chief Administrative Officer's (CAO) Fund - $2.5 million annually, $12.5 million over 5 years. This funding is derived from a 5% assessment on clinical revenues of the Clinical Practice Plan in accordance with Article XVI of the SUNY Policies of the Board of Trustees. The Fund is administered by the President of the University, as CAO of the University, and is intended to provide limited duration support for program investment while limiting its use for ongoing operating expenses. This amount represents approximately 25% of the annual CAO Fund assessment revenues as the remaining 75% is currently committed to ongoing support and one-time commitments and institutional strategic priorities primarily pertaining to the College of Medicine.

**Additional Resources:**

Additional resources are available from the clinical revenues of University Hospital and the Clinical Practice Plan. These resources provide the primary sources of investments in the clinical mission of the College of Medicine. As Senior Vice President and Dean of the College of Medicine, you will participate in the Hospital's annual budget process along with the Senior Vice President for Finance and Administration of the University. In collaboration with the Hospital, Clinical Practice Plan, and University leadership, you will be involved with establishing the annual priorities to be funded from clinical operations to ensure alignment with the University's strategic plan, including the priorities of the College of Medicine and the needs of an integrated clinical system. Examples of Clinical Practice Plan commitments included in the Hospital's 2016/17 budget process are as follows:

- Approval of $12 million in requests, including $3 million in limited duration recruitment (i.e. start-up) contracts, physician services and on-call contracts ($4.4M) and additional house staff ($2.5M).

3

Case: 24-2564, 12/02/2024, DktEntry: 26.1, Page 106 of 269

A-0087

Case 5:21-cv-00387-GTS-TWD    Document 73-3    Filed 01/19/24    Page 4 of 11
Case 5:21-cv-00387-GTS-TWD    Document 1-1    Filed 04/04/21    Page 5 of 12

- Approval of additional one-time funding to support the development of a primary care strategy and a cutting edge clinical technology/data analytics fund, contingent on realization of Hospital budgeted revenues over multiple years. The approximate amount of these funds to be set aside is $10 million for primary care and $10 million for technology/data analytics over the next 2-3 years. The primary care investments will need to coincide with a rigorous strategic plan in collaboration with the Strategic Planning Office. The technology investments will involve detailed planning with the University Executive Committee, of which the Senior VP and Dean of the College of Medicine is a member.

In addition, certain revenues of the Clinical Practice Plan have been made available in the past to support joint initiatives, subject to the approval of Upstate University Medical Associates at Syracuse (UUMAS). The Clinical Practice Plan is also in the process of identifying funds in support of strategic priorities of the University, in collaboration with University leadership.

This should provide you with sufficient confidence in the commitment of the University, including the Hospital and the Clinical Practice Plan, in supporting clinical initiatives of the College of Medicine.

**Expectations and Initiatives**

Based on the foregoing projections and expectations of resources to be made available, our expectations and initiatives are as follows:

- Executive responsibility for all activities related to the accreditation of graduate degree, medical student degree programs and graduate medical education, ensuring and maintaining their accreditation status, including LCME, and addressing New York State Department of Education requirements relating to existing and new program requirements. Collaborate with the Vice President for Academic Affairs and University Leadership on ensuring and maintaining Middle States accreditation status for the University.

- Contribute to enhance the educational experience, to include continued efforts at curriculum reform in the College of Medicine and a renewed emphasis on transformative education including Graduate Medical Education, Continuing Medical Education, and Inter Professional Education, to bring us to the forefront in these areas. You will work collaboratively with the other Deans and the Vice President for Academic Affairs to develop inter-professional and educational simulation training. The lead for such collaborative efforts in inter-professional education will be the Vice President for Academic Affairs.

- Explore opportunities to expand and enhance our academic model, both internally and externally, including increasing the class size of the College of Medicine, increasing the percentage of incoming students who are non-resident, and increasing the percentage of incoming students from underrepresented backgrounds. Develop cross-campus collaborations within SUNY and other regional partnerships to address these and other needs and opportunities.

- Assist in developing an integrated clinical system and aligned clinical growth strategy, in collaboration with the University leadership, including the President, Senior Vice President for Finance and Administration, the Hospital CEO, and UUMAS leadership, to enable the University to thrive and grow successfully in a new era of payment for clinical services. Immediate priorities

4

Case: 24-2564, 12/02/2024, DktEntry: 26.1, Page 107 of 269

A-0088

Case 5:21-cv-00387-GTS-TWD   Document 73-3   Filed 01/19/24   Page 5 of 11
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 6 of 12

include the development of a regional strategy with a focus on cancer and ambulatory I primary care services. These improvements should better position the College of Medicine and the University for federal and state payment reforms anticipated in 2017 and beyond.

- In collaboration with the Vice President for Research, refresh the strategic plan for research to be in alignment with the University strategic plan in order to build interdisciplinary programs, increase expectations for extramural funding, and improve collaborative efforts across the campus and with other institutions.

- Manage the resources of the University and College of Medicine in such a fashion as to leverage them to the fullest extent to support the academic programs in alignment with our strategic plan. This will include a process to repurpose funds through reexamination of our funds flow methodology, and developing new incentives and expectations for performance. Develop measurable expectations of departments and faculty in the College, including teaching, research and clinical productivity and quality, to be incorporated into a financial plan for the College. Lead efforts to develop a standard compensation model across clinical departments of the College of Medicine, while recognizing inherent differences between departments.

- Work with the University Office of Development and the Upstate Foundation and the Medical Alumni Foundation and participate actively in fundraising efforts designed to enhance our capability of addressing issues such as scholarships, faculty growth and development and program support. In your role as Dean, you will have a role with the governing bodies of both entities.

- Develop appropriate mechanisms to evaluate department chairs in conformance with the intent of Article IX, Title C of the SUNY Board of Trustees Policies. The evaluations will include the success of the chairs in achieving the strategic goals of the University, including improving diversity and inclusion, research productivity, educational goals, clinical growth and quality, supervision of the performance and professional conduct of department members and other related activities.

- Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics, and Psychiatry to be staggered over the first three years of your appointment and as otherwise may be needed according to the urgency of the circumstance of other departments. Collaborate with University leadership in these efforts and also in the recruitment of the Director of the Cancer Center, which is a shared reporting relationship to the Dean of the College of Medicine and the CEO of University Hospital. Opportunities to combine the Medicine chair and Cancer Center recruitment efforts is encouraged but not required.

**Honoraria and other Outside Income:**

The Senior Vice President and Dean of the College of Medicine is considered a New York State policy-maker, and is therefore subject to certain parameters and/or limitations on outside income as outlined in regulations of the New York State Joint Commission on Public Ethics (JCOPE), and:

5

A-0089

- Is prohibited from serving as an officer, director or board member of a political party or political organization or as a member, officer, director, board member or district leader of a committee of a political party;

- Must obtain my prior approval as well as the approval of JCOPE (or successor agency) before holding other public office or engaging in other public employment for more than $5,000 annually; engaging in any private employment, business or other activity for more than $5,000 annually; or my approval if serving as director or officer of a for-profit corporation or institution, regardless of compensation;

- Must obtain my prior approval before engaging in private employment or other activity for annual compensation between $1,000 and $5,000;

- Must report any honorarium or travel reimbursement received from each source which is over $1,000 on your annual financial disclosure statements;

- Subject to my prior approval, you may serve on no more than two corporate boards of directors for compensation, and an unlimited number of not-for-profit boards without compensation.

For information as to the above requirements and additional requirements within the statutes of the Public Officers Law and the regulations enforced by JCOPE, see www.jcope.ny.gov.

It is also hereby agreed that you may continue to write, publish and edit books, journals and other texts/media, including, but not restricted to, print and electronic, in your field and other areas, and that you may retain the income from such publications for your personal use, with the understanding that this private income must be reported on your annual Financial Disclosure Statement as outlined in the paragraph above and must not interfere with the performance of your responsibilities outlined above.

**Annual Financial Disclosure**

All state policy-makers must file with JCOPE (or any successor agency) an annual financial form which requires disclosures in general categories of all sources of income and assets, including income earned by a spouse or assets held by a spouse.

**Defense/Indemnification in Civil Proceedings and Reimbursement in Criminal Proceedings**

If sued in a civil matter in an individual capacity, defense and indemnification are available upon request to the Attorney General in those situations in which the act underlying the complaint is alleged to have occurred within the scope of the officer's public duties, provided that the individual has not engaged in intentional wrongdoing. Certain procedural steps must be followed.

Our Central New York Office of General Counsel is available to provide you with any assistance you may need. As a state officer, the Senior Vice President and Dean of the College of Medicine is accorded criminal defense reimbursement and civil defense and Indemnification protection by statute (Sections 17 and 19 of the Public Officers Law).

6

Case: 24-2564, 12/02/2024, DktEntry: 26.1, Page 109 of 269

A-0090

Case 5:21-cv-00387-GTS-TWD   Document 73-3   Filed 01/19/24   Page 7 of 11
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 8 of 12

In criminal cases, reimbursement is available, with the approval of the Attorney General, for reasonable attorneys' fees and litigation expenses incurred by an officer in the defense of a criminal proceeding arising out of an act which occurred within the scope of the officer's public duties, following acquittal or dismissal of the proceeding.

**Employment of Related Persons**

Section 73(14)(a) of the Public Officers Law states: *No state officer or employee may participate in any decision to hire, promote, discipline or discharge a relative for any compensated position at, for or within any state agency.* The SUNY Code of Ethical Conduct for University Officers policy contains similar language.  For additional information on this subject, please visit:

http://www.jcope.ny.gov/training/2016%20Public%20Officers%20Law%20for%20State%20Officers%20and%20Employees.pdf

http://www.suny.edu/sunypp/documents.cfm?doc_id=61

It is understood that your wife, Ma-Li Wong, MD, PhD and you are moving together to the College of Medicine and that your ongoing scientific collaboration does represent a potential conflict of interest under this clause which is mitigated as detailed by the posting above.

Please refer to the Appendix to this document for information on health and retirement plans, as well as, moving expenses and other benefits.

**Mutual Understanding of Notice for Transitional Need**

In the event a decision is made by you or the University, for any reason other than misconduct[1], that you will step down from the position of Senior Vice President (SVP) and Dean of the College of Medicine (COM), we will provide each other with 8 months' notice in writing of the end date of your stepping down from the position of SVP and Dean, COM, and we will work together during this period of time to enable a smooth transition to new leadership, as well as your own transition into a faculty position at SUNY Upstate Medical University, under the terms described on page 2 of this letter, and such time period may be modified upon mutual written agreement.

**Mutual Understanding of Non-Compete Notice**

In consideration of the terms of compensation in this offer of employment, you agree, when your employment with the University ends, you will not obtain employment within 200 miles of the University for a period of 3 years.

I will be pleased to welcome you to Upstate on July 1, 2017. Should your relocation arrangements take longer than expected we will work with you to re-negotiate a mutually agreeable date for your start that is

---

[1] Misconduct is defined as the failure to fulfill the conditions of employment as described in the offer letter, violation of a provision of the Public Officers Law or a written policy of Upstate Medical University and/or the State University of New York, as well as acts of dishonesty, theft, conviction of a felony, disorderly or immoral conduct at work, insubordination, engaging in conduct which constitutes a violation of the Penal Law of New York State, breach of a fiduciary duty owed to the University and/or actions that expose the University to liability.

7

Case: 24-2564, 12/02/2024, DktEntry: 26.1, Page 110 of 269

A-0091

Case 5:21-cv-00387-GTS-TWD   Document 73-3   Filed 01/19/24   Page 8 of 11
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 9 of 12

no later than September 15, 2017, maintaining all the terms and conditions of this offer. I look forward to your many future contributions to the University.

If these terms and conditions are acceptable, please indicate by signing below and returning the signed copy to me at your earliest convenience.

Sincerely,

Danielle Laraque-Arena, MD, FAAP
President
Professor of Pediatrics, Psychiatry, and Public
Health & Preventive Medicine

cc: Personnel File Enclosure

I hereby accept the foregoing appointment and the terms described herein.

[Name]                                   [Date]

8

Case: 24-2564, 12/02/2024, DktEntry: 26.1, Page 111 of 269

A-0092

Case 5:21-cv-00387-GTS-TWD   Document 73-3   Filed 01/19/24   Page 9 of 11
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 10 of 12

## APPENDIX

Please be advised that the information contained in this appendix is provided for summary purposes only. In all cases, actual terms and conditions of employment and benefits are governed by applicable State and federal regulations, SUNY policy, plan documents, insurance contracts, etc.

### Payroll Procedures

New York State employees are paid on a two-week lag basis. There is a five-day deferral of pay for new Management/Confidential employees, which results in one day's wages being withheld in each of the first five paychecks.

### Moving Expenses

Qualified moving expenses for household goods and personal effects will be paid for by Upstate. Moving expenses must be reasonable and in accordance with IRS guidelines and Upstate's policies. You will be required to get no fewer than 3 estimates and select the lowest responsible carrier. Moving expenses relating to your laboratory will also be paid for by Upstate directly to the contracted moving company using the same standards as noted above.

### Tuition Reimbursement

The M/C Tuition Reimbursement Program provides financial support for approved course work on a reimbursement basis that is categorized as either job-related or career-related and offered by approved schools or organizations. Covered tuition expenses are currently reimbursed at the rate of 75%, up to a maximum reimbursement of $2,000 per fiscal year. As noted in the offer letter, we will explore the opportunity for additional academic support in line with the seeking of an advanced degree (e.g. MBA).

### Retirement Benefits

There are three retirement program options available:

1. New York State Employees' Retirement System (ERS);
2. New York State Teachers' Retirement System (TRS); or
3. Optional Retirement Program (ORP).

ERS: A state-administered defined benefit retirement fund consisting of employer and employee contributions. Salaries of $100,000 or more requires a 6 percent employee contribution, which is tax-deferred for federal taxes. A participant's retirement benefit is computed as a percentage of his or her final average salary. The percentage received is determined by the number of years of service credit earned. Ten years of full-time service credit is required to be vested.

A0092

A-0093

TRS: The retirement benefit is calculated similarly under the TRS system as under ERS. Vesting rights under the two systems are also similar and salaries of $100,000 or more require a 6% employee contribution.

ORP: This is a defined contribution program available to full-time professional employees of the State University. The ORP is offered through the Teachers Insurance Annuity Association (TIAA), VOYA, and VALIC. Three hundred and sixty-six (366) days of continuous employment are necessary to vest retirement benefits under this program. Vesting is immediate if you currently own annuity contracts that include employer contributions with any of these investment providers.

The State contributes 8% of salary for the first seven years of employment, and 10% thereafter; up to the maximum pensionable limit. Salaries of $100,000 or more require a 6% employee contribution; for a total contribution rate of 14 to 16% of salary. Employee contributions are tax deferred for Federal Income tax purposes, and all distributions are exempted from NYS taxes.

## Health Insurance

As a new New York State employee, you may participate in the New York State Health Insurance Program (NYSHIP) in accordance with its terms and conditions. There is a fifty-six (56) calendar day waiting period before health insurance becomes effective. NYSHIP offers the availability of a modified indemnity fee-for-service plan (the Empire Plan) or Health Maintenance Organization (HMO) in a particular area. Health insurance premiums are paid on a "pre-tax" basis, unless an individual files a declination within the first 56 days of employment.

NYSHIP coverage is available for you, your spouse or domestic partner, and children up to age 26.

NYSHIP coverage is also available:
- For unmarried dependent child(ren) age 26 or older who are incapable of supporting themselves due to a mental or physical disability acquired before termination of their eligibility for health insurance; and
- For children ages 26 to age 30 to purchase young adult individual coverage at full cost with no employer subsidy.

## Management/Confidential Benefit Program

Dental: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. Coverage becomes effective on the first day of the month following the completion of six (6) months of continuous employment. This program, offered through the GHI Insurance Company, provides coverage on a fee-for-service basis.

Vision Care: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. The plan provides eye care coverage, including an eye exam and one pair of glasses or contact lenses at a participating doctor every two years. Coverage becomes effective following a fifty-six (56) day waiting period.

10

A-0094

Flexible Spending Accounts: The Health Care Spending Account (HCSA) and the Dependent Care Advantage Account (DCAA) offer a way to pay for un-reimbursed medical expenses and dependent care expenses with pre-tax dollars. An employee may contribute up to $5,000 annually to the DCAA and from $150 to $2,500 to the HCSA.

Group Life Insurance Program: This is a group-term life insurance program available on a payroll deduction basis. Employees may enroll for a fixed dollar amount or multiple of salary levels of coverage up to a maximum of five time's annual salary, currently capped at $500,000. Coverage is available without proof of insurability if the employee enrolls within 12 weeks of employment. Dependent group life insurance is also available up to 50 percent of the enrollee's benefit to a maximum of $20,000 for a spouse and in a flat amount of $4,000 for each eligible child.

Group Disability Insurance Program: The Group Disability insurance Program for full-time Management/Confidential employees is a cost-free benefit which provides income protection for a total disability after completing one year of State University service. (If you were covered within three months of appointment under a similar disability insurance plan by your last employer, the waiting period may be waived.) The plan provides an income benefit of 60% of salary to a maximum of $7,500 per month and also makes payment to a pension plan on the employee's behalf.

Tax-Deferred Savings Plans: SUNY offers a variety of tax-deferred savings options under Sections 403(b) and 457 of the internal Revenue Code. These tax-deferred savings plans permit savings toward retirement through automatic payroll deductions. The taxable salary is lowered since deduction is not subject to Federal, New York State or local income tax. An employee may direct his or her investment into 403(b) plans administered by TIAA, VOYA, VALIC or Fidelity and/or a 457 plan, the NYS Deferred Compensation Plan, administered by Nationwide.

**Annual and Sick Leave Accruals**

Management/Confidential employees accrue sick leave up to 200 days and annual leave (not to exceed 40 days at calendar year end) at a rate of 1.75 days per month in each category. Payment for up to thirty (30) days of unused annual leave at full salary is permitted upon resignation or retirement in good standing. Additionally, Management/Confidential employees earn an additional day of annual leave each January 2nd.

A-0095



Licinio v. SUNY Upstate, et al., 5:21-cv-387   009707

A0095

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

JULIO LICINIO, MD, PhD, MBA, MS,

Plaintiff,

Case No.: **5:21-cv-387(GTS/TWD)**

- against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

Defendants.

---------------------------------------------------------X

## BUSINESS CERTIFICATION

The undersigned, being duly sworn, deposes and states:

1.   The attached is a true and accurate copy of documents maintained by SUNY Upstate Medical University.

2.   That said documents were made in the regular course of SUNY Upstate Medical University's business, and that it was in the regular course of business to make such documents at the time they were made, or within a reasonable period of time thereafter.

Signature: _____
Print Name: Erin Peters
Title: Executive Assistant to the President
Date: 1/19/24

State of New York )
                 ) ss.:
County of Onondaga)

Sworn to before me this
19th day of January, 2024

_____
Notary Public

NANCY A. PROTT
Notary Public, State of New York
No. 01PR5065256
Qualified in Onondaga County
Commission Expires 11-14- 2 6

7/9/08   Met ē Dr. Licinio in the
7:30 pm   presence of Dr. Corona. Dr. Licinio
spoke for nearly one hour to
express his anxiety over the
multiple demands on his time &
attention — Dr. eval'n re LCME,
running of the COM, University
demand for meeting at UEC, EUEC
and asked for a determination
of meetings we agreed on.

C

Requested               1. 1 UEC meeting / month
accommodation   2. 1 EUEC meeting / month

                3. Ways that I could
support his endeavor to
succeed as a new Dean

                4. Continued meetings — jointly
ē Dr. Corona

                5. Personal issues discussed
that have contributed to
his anxiety despite wanting to
continue as COM Dean.
(as ē discussion ē the ; Dr. A____)
(coach).

Licinio v SUNY Upstate et al , 5:21-CV-387   003871

over →

7/10/18                                      on the part of Dr. Licinio
- Lack of professional demeanor made
conversations difficult. Chose to
listen - and to write the following to
be shared with him = Dr. Corona
at next meeting. (see attached 7/10/18).
- Prior discussion = Dr. Shapiro : Dr. Licinio
6/20/18 - discussed progress in preparing
for LCME - = hiring/expanding of
appropriate people to support this effort.
I indicated to Dr. Shapiro that communication
at times to be a concern - = a work
in progress.

3.12.18   Concerns:        — Sue improvement but continued
                                            concerns

Call so          • Disruptive of reports — e.g. annual
be                                                        report
scheduled        • Continued lateness x — SAME reqly
c Deziro                                          — nearly all
                 • Still not cohesive —
                 Global recruitment example
                 Luis Mejico — 3.5 recruits
                 Academic mission — alignment of one university
                 • Lack of cohesion — S
Solution:   — stays on completing MBA / overwhelmed
            — Not final placement year yet
            — Invite Devon Scott ; Janise Licinio
            to talk c Coach
            Organizational focus
         *  SDb's role    — transparency
                          — trust

                 Neuroscience — UEC → action
                                          connan
                 decision agenda

Licinio v. SUNY Upstate, et al., 5:21-CV-387     003874
                                                          A0099

**Things to Discuss with Licinio -1 -8 2018:**

1. Executive Coaching –next call
   a. Calibrate, Focus, Methods of communication
2. Chairs meeting – his message to Chairs – unequivocal support for the restructuring plan
3. Portfolio of accountability/responsibility/authority
4. Cancer Center visit ⟶ I cao
5. TSI transition – discuss structure ⟶ Onria
6. PR materials
7. Samaritan
8. Evaluation

*[Handwritten annotations in right margin and lower portion of page, partially illegible]*

1/9/18

Car — Claire of red
a.) Donis de Ce

Dr. Shapiro
Dr. Licinio

— Doing strong
evident — I am ast
of Onis
recognize
& United stressors
a high states
rs & electronic
a direct com — Onis

— No longer a vision
"What is my role"
as related by Dr. Licinio

Five priorities
• Meeting search
• Pittsburgh recruit
• Peds      Sti K.A.
• Carlos health disparities
• Bio-informatics division

1/8/18. Dr. Licinio cancelled — discussed
discussion caused by his e-mail dated
12/27/17. Discussed c̄ Dr. Shapiro —
Executive Coach — I will free c̄
a call c̄ Drs Licinio & Shapiro

Licinio v. SUNY Upstate, et al., 5:21-CV-387      003875
A0100

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

.......... .................. .................. X

**JULIO LICINIO, MD, PhD, MBA, MS,**

                                        Plaintiff,

                                        Case No.: **5:21-cv-387(GTS/TWD)**

        - against -

**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, and THE**
**STATE UNIVERSITY OF NEW YORK**
**UPSTATE MEDICAL UNIVERSITY,**

                                        Defendants.
.......... .................. .................. X

### BUSINESS CERTIFICATION

The undersigned, being duly sworn, deposes and states:

    1.    The attached is a true and accurate copy of documents maintained by
SUNY Upstate Medical University.

    2.    That said documents were made in the regular course of SUNY Upstate
Medical University's business, and that it was in the regular course of business to make
such documents at the time they were made, or within a reasonable period of time
thereafter.

                        Signature: _Erin Peters_
                        Print Name: Erin Peters
                        Title: Executive Assistant to the President
                        Date: 1/19/24

State of New York    )
                     ) ss.:
County of Onondaga)

Sworn to before me this
19th day of January, 2024

_Nancy A. Prott_
Notary Public

                        NANCY A. PROTT
                        Notary Public, State of New York
                        No. 01PR5065256
                        Qualified in Onondaga County
                        Commission Expires 11-14-_26_

A-0102

Factual events: 10 08 2018 notes

1. Dr. Julio Licinio started as the Dean of the College of Medicine on July 5, 2017 after a national search

2. Merritt-Hawkins-Academic Advisory Group (MH-AAG) was the search firm engaged in the national/international search.

3. Reorganization of the university senior leadership structure was championed by Dr. Licinio and instituted in October 2017.

4. Reorganization was reviewed with SUNY System Administration late summer/early Fall 2017, and Dr. Licinio received a SUNY System Administration approved $10K increase in salary to support his new title of Executive Dean in addition to the Dean of the COM. This increase became effective October 2017.

5. Several months after this reorganization Dr. Licinio sent an email (now archived) to Dr. Laraque-Arena stating that he believed that the University Hospital CEO should report to him –in contradiction to the agreed upon reorganization.

6. This email prompted President Laraque-Arena to request a three-way conversation with Dr. Licinio, his executive coach (Daniel Shapiro) and Dr. Laraque-Arena. The evident insubordination of this comment was discussed by Dr. Shapiro with Dr. Licinio –and following an extensive discussion Dr. Licinio agreed to not repeat this kind of email, communicate effectively with the President and support the strategic plan and agenda as set by the University Executive Committee. Continued support through executive coaching would focus on supporting Dr. Licinio in his role as Dean with special emphasis on the LCME and establishing his leadership team. LCME accreditation visit is scheduled for March 2019. Quarterly three-way conversations were to be held with Dr. Licinio and the executive coach.

7. Three conference calls occurred throughout the spring/summer of 2018 to discuss the lack of improvement in Dr. Licinio's leadership although he seemed to be gaining more comfort with the LCME process. Price-Waterhouse-Cooper had been engaged by the university to assist the Dean in achieving the goals of the LCME. He was also supported to obtain an MBA at Cornell and in engaging MH-AAG for his Medicine and Pediatric Chair searches.

8. Summer 2018 a memo is sent to Dr. Licinio to detail to him how the meetings with the President were to be conducted. 7/10/18

9. Last conference call with Executive Coach –Daniel Shapiro concluded that despite some improvement in Dr. Licinio's functioning as a Dean –e.g. appointing the necessary Senior Associate Deans, his role as Senior Vice President of the university and member of the University Executive Committee fell short and was divisive.

Danielle Laraque-Arena - Re: (EXTERNAL) Re: Response to the Pediatrics Chair Search memo

**From:** Danielle Laraque-Arena
**To:** Julio Licinio
**Date:** 12/6/2018 6:11 PM
**Subject:** Re: (EXTERNAL) Re: Response to the Pediatrics Chair Search memo
**Cc:** Gloria Lopez; Robert Corona; Mantosh Dewan

I will append your response.

Danielle Laraque-Arena, MD, FAAP
President, Upstate Medical University
750 East Adams Street
Syracuse, New York USA
Ph:315-464-4513
Fax: 315-464-5275
laraqued@upstate.edu
www.upstate.edu
State University of New York

**UPSTATE** MEDICAL UNIVERSITY

Please direct all scheduling inquiries to Erin Crolick Peters at 315-464-4513; peterse@upstate.edu

>>> Julio Licinio <licinioj@upstate.edu> 12/06/18 6:06 PM >>>
Dear Danielle:
I would respectfully request that at the very least you append my e-mail below a supplement to the ODI report in question. I have in my whole entire life been highly supportive of the plight of women in the work place. I was raised by a mother who earned less than what she could because she was a woman. It is highly disturbing to me to have a written report that indicates that I simply chose not to appoint a woman who is described as being equal to a male candidate, when that is factually untrue, and you know it is untrue. It is disturbing that when presented with factual evidence that something reported to you is factually inaccurate and biased, you choose to ignore reality and stand by what is not true. While I respect your determination and conviction, we have all suffered tremendously through a devastating experience that is ultimately the outcome of institutional support to what was not factually truthful. Very respectfully, I would like to ask your guidance as to the appropriate mechanisms to appeal a report that is replete with bias and selectively chosen information.

Kindest regards,

Julio

On Dec 6, 2018, at 17:47, Danielle Laraque-Arena <LaraqueD@upstate.edu> wrote:

The report of ODI is as it is and provided to you.  Your decision as Dean is respected.

**Danielle Laraque-Arena, MD, FAAP**
President, Upstate Medical University
750 East Adams Street
Syracuse, New York USA
Ph:315-464-4513
Fax: 315-464-5275
laraqued@upstate.edu
www.upstate.edu
State University of New York
<Mail Attachment.bmp>

Please direct all scheduling inquiries to Erin Crolick Peters at 315-464-4513; peterse@upstate.edu

>>> Julio Licinio <licinioj@upstate.edu> 12/6/2018 5:24 PM >>>

Dear Danielle:

This is to confirm receipt today after my request of Gloria Lopez's review of the Pediatrics Chair appointment. I was perplexed that in our last meeting you expected comments from me about a memo which was purposefully not shared with me. I do not have the ability to comment on what is not shared with me.

Regarding the memo in question, I would like to say that its conclusion is highly biased and factually inaccurate. Very respectfully, comments to Gloria Lopez were selectively considered by her and presented to you in a manner that leads to a biased conclusion. If I exercised that same level of biased selectiveness in the presentation of research data, I would be accused of fraud.

Specifically, I did explain to Gloria Lopez that Dr. Cunningham stepped down from leading a clinical division of infectious diseases at Duke two years ago to focus on research, yet she is not PI of an NIH grant. How can someone who steps down from being a clinical division head under unclear circumstances then suddenly be up to the task of directing a Children's Hospital? One could arguably make the case that we could benefit from he research expertise, but then we would not receive any NIH funding as a result of her recruitment, which is a requirement for the appointment of basic science chairs who are focused on research. I brought this to Ms. Lopez's attention, who selectively chose not present this in her report to you.

Another selective bias in the report was the synthesis of Dr. Audrey Bernstein's comments, which were witnessed by me in their entirety. Ms. Lopez only stated ref Dr. Bernstein that Dr. Bernstein reported the fact that it was difficult for us to make conversation with Dr. Cunningham. That was stated by Dr Bernstein as a minor aside and the thrust of Dr. Bernstein's comments that Dr. Cunningham exhibited no evidence of leadership skills, while Dr. Conners clearly had those skills was completely disregarded and selectively omitted in the report by Ms. Lopez.

Additionally and selectively omitted was my statement to Ms. Lopez that Dr. Conners was a successful head of a large division in the country's 12th largest Children's Hospital. Moreover, my comments were not restricted to Dr. Conners ability to manage finances of that enterprise but to lead a large and vibrant clinical program in pediatrics, which he turned around from being in trouble prior to his appointment in Kansas to being now, under his leadership, greatly successful. Furthermore, as stated by me to Ms. Lopez, but mysteriously omitted from her report, Dr. Conners has had the experience of being interim Chair of a large clinical department, an experience that Dr. Cunningham lacks.

An additional implicit bias can be evidenced in the comments made by Ms. Lopez that the fact that Dr. Cunningham has inside knowledge of the institution gives her a competitive edge. We are told that we need to do external searches to seek diverse candidates and that we should not give special consideration to insiders. Is it the case that when the insider is a man, having an insider track record is bad but when the insider track record is presented by a woman that then becomes a positive feature? I am confused.

I also found that the fact that report was sent to you, but not to me disingenuous.

My conclusion is that Ms. Gloria Lopez's report regarding the Pediatrics Chair Search is factually incorrect, with both implicit and explicit bias, and selective presentation of evidence. It is my determination based on ALL of the evidence (as opposed to Ms Lopez determination based on selective data) that the two candidates are absolutely not comparable and that Dr. Conners is clearly superior to Dr. Cunningham as Chair of Pediatrics and Executive Director of our Children's Hospital.

I would also respectfully suggest that Ms. Lopez should undergo formal training in implicit bias to deal with her clear and factual favoritism towards a candidate that belongs to a category that is shared with herself.

As Dr. Conners will report to Dr. Corona in his role at the Children's Hospital, I am CC'ing him in this response.

All my best,

Julio

| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | PERSON FILING CHARGE: |
|---|---|

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

TO:
New York State, State University of New York,
Upstate Medical University
Office of General Counsel, 750 East Adams
Street, Jacobsen Hall, 9th Floor
Syracuse, NY 13210

PERSON FILING CHARGE:
   Julio Licinio, MD.
THIS PERSON (Check one):
   Claims to be aggrieved [x]
   Files on behalf of other(s) [ ]
DATE OF ALLEGED VIOLATION:
   9/12/2019
PLACE OF ALLEGED VIOLATION:
   Onondaga County
EEOC CHARGE NUMBER:
   16GC000651
FEPA CHARGE NUMBER:
   10204906

NOTICE OF CHARGE OF DISCRIMINATION WHERE AN FEP AGENCY WILL INITIALLY PROCESS

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

   [X]   Title VII of the Civil Rights Act of 1964
   [ ]   The Age Discrimination in Employment Act of 1967 (ADEA)
   [ ]   The Americans with Disabilities Act (ADA)

HAS BEEN RECEIVED BY: The New York State Division of Human Rights (FEP Agency) and sent to the EEOC for dual filing purposes.

While the EEOC has jurisdiction (upon expiration of any deferral requirements if this I a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the FEP Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the FEP Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the FEP Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

As a party to the charge, you may request that EEOC review the final decision and order of the above named FEP Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's issuing a final finding and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission.

For further correspondence on this matter, please use the charge number(s) shown.

[ ]   An Equal Pay Act investigation (29 U.S.C. §206(d)) will be conducted by the
      Commission concurrently with the FEP Agency's investigation of the charge.

[X]   Enclosure: Copy of the Charge

BASIS FOR DISCRIMINATION:  Sex, Race/Color, National Origin, Opposed
      Discrimination/Retaliation

CIRCUMSTANCES OF ALLEGED VIOLATION:
      SEE ATTACHED N.Y.S. DIVISION OF HUMAN RIGHTS COMPLAINT

DATE: November 19, 2019
                                    TYPED NAME OF AUTHORIZED EEOC OFFICIAL:
                                    Kevin J. Berry

*C-10204906*

**STATE OF NEW YORK**
**EXECUTIVE DEPARTMENT**
--------------------------------------------------X
State Division of Human Rights
On the Complaint of

JULIO LICINIO, MD, PhD, MBA, MS

                Complainant,

   -against-

SUNY UPSTATE MEDICAL UNIVERSITY,

              Respondents,
--------------------------------------------------X

Rec    

NOV 1 8 2019

NYS D. ?
Syracuse Satellite

VERIFIED COMPLAINT
EXECUTIVE LAW ART. 15
SDHR CASE NO:

    I, Dr. Julio Licinio, presently residing at 7 Brattle Road, Syracuse, NY 13203, telephone

number 315-294-2248, charge the above named respondent, whose address is 750 East Adams

Street, Syracuse, NY 13210, with unlawful discriminatory practices relating to employment in

violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) on

the basis of my opposition to discrimination.

Date most recent or continuing discrimination took place:  September 12, 2019 and continuing

violation.

    The particulars are:

   1.  I am a Doctor and Psychiatrist and am serving as faculty at SUNY Upstate Medical

University ["Upstate," "Employer," or "University"].

   2.  Until September 12, 2019 I was the Senior Vice President and Dean of the College of

Medicine at Upstate. I am a Distinguished Professor at Upstate. I hold an MD, PhD, MBA, and

Master of Science in healthcare leadership. I am also the Matthew Flinders Distinguished

Professor at Flinders University in Australia.  My appointments and honors are internationally

known and I have served as faculty in teaching institutions worldwide.  I have more than 330

publications to my credit and have founded and serve as editor in chief of several journals of psychiatry and genetics. My full curriculum vitae is 95 pages long; therefore I attach herewith a one-page summary of my CV. *Annexed hereto as Exhibit A is the CV of Dr. Licinio.*

3.  Pursuant to my appointment I was offered and accepted an employment contract, which includes an eight-month notice and transition period if I am removed from my positions of Senior Vice President and Dean of Medicine. *Annexed hereto as Exhibit B is a letter dated 3/14/17 appointing Dr. Licinio as Senior Vice President and Dean of the College of Medicine of SUNY Upstate.*

4.  Specifically, the employment contract states that if a decision is made by either myself or Upstate that I will step down from the position of Senior Vice President and Dean of Medicine, I am entitled to eight months' notice in writing of the end date of my stepping down, and that during that eight month period Upstate will work together with me to enable a smooth transition to new leadership as well as my own transition to a faculty position. *Exhibit B.*

5.  Additionally my employment contract states that, if I hold only the position of tenured Professor in the Department of Psychiatry, my compensation is to be "no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department." *Exhibit B.*

6.  My contract further states that I will be reimbursed for professional expenses and that I will be provided with secretarial support.

7.  I began working pursuant to the terms of the employment contract on July 1, 2017. *Exhibit B.*

8.  Earlier this year I led Upstate's efforts in a process that resulted in a highly positive accreditation assessment, despite a previous history of accreditation probation.

9.  Moreover, earlier this year, I led an effort that resulted in 100% residency matching for graduating medical students, for the first time in Upstate's history.

10. The accomplishments I made in improving the University's accreditation and residency matching were routinely highlighted by Dr. Dewan in Town Hall meetings and presentations to legislators.

11. On September 11, 2019, I was honored as Distinguished Professor at the SUNY Upstate Annual Convocation. "Distinguished Professor" is the highest honor awarded to Upstate professors.

12. As Distinguished Professor, I am entitled to a salary increase, in addition to my negotiated salary increases, to be added to my base salary.

13. From time to time, I have been awarded with merit increases in my salary, so that on September 12, 2019, I was earning $605,000.00.

14. I report to Dr. Dewan.

15. At no time during my tenure have I committed misconduct, nor have I ever been accused of committing misconduct, either as defined by the employment contract or by any other definition or standard.

## MORE SPECIFICALLY REGARDING MY OPPOSITION TO GENDER, RACE, AND NATIONAL ORIGIN DISCRIMINATION

### *LCME ACCREDITATION*

16. The Liaison Committee on Medical Education ["LCME"], the accreditation authority for medical education programs in the United States, has determined that ongoing monitoring is required at Upstate in order to ensure compliance with diversity standards because, *inter alia*, the number of minority students enrolled at Upstate has been dropping.

17. I worked assiduously to combat the decline in our minority enrollment by recruiting minority faculty.

18. On several occasions when I discussed my efforts to recruit minority faculty with Dr. Dewan, he told me, in sum and substance, "we spend too much on diversity."

19. Specifically, on June 3, June 17, July 2, July 15, and August 5, 2019 Dr. Dewan made comments about diversity costing too much.

20. Dr. Dewan has asked me on multiple occasions what Professor Brian Thompson, who is Native American, does all day. As I have explained to Dr. Dewan repeatedly, Dr. Thompson is Assistant Dean for Diversity and has a crucial role in supporting our diversity efforts with the Native American Community.

21. Dr. Dewan has asked me on multiple occasions what Dr. Tovar Spinoza, who is female and Hispanic, is doing "in diversity." I have explained repeatedly that Dr. Spinoza is in charge of organizing all of Upstate's diversity data for purposes of LCME accreditation, and that she was the only person able to provide that data within the tight timeframe of the accreditation process.

22. Dr. Dewan has asked me on multiple occasions, what Director of Multicultural Affairs & Student Inclusion Nakeia Chambers, MSEd, who is African American, does. As I have explained to Dr. Dewan repeatedly, Ms. Chambers does substantial work supporting our minority students.

23. Dr. Dewan has not asked me similar questions about non-minority professors.

24. Upon information and belief, the final LCME report, released on October 29, 2019, contains comments that are extremely favorable to me and my work.

25. The LCME granted full re-accreditation for an eight-year term, which is the maximum term that can be granted.

26. My role as Dean, including my ongoing commitment to diversity, was key to the re-accreditation process.

27. Notwithstanding the extensive part I played in Upstate's success, I was excluded from emails announcing the full re-accreditation, and the report has not been shared with me in spite of my substantial role in the process.

### UNIVERSITY EXECUTIVE COMMITTEE

28. Upstate's administrative structure includes a University Executive Committee ["UEC"], which is presented to accreditation agencies as Upstate's decision-making body. The UEC is gender-balanced.

29. The UEC rarely meets. Instead, the Budget Committee, which meets on Tuesdays and reviews every executive-level decision for the University, is the *de facto* decision-making body at Upstate. In most cases, executive-level decisions are not even brought to the UEC.

30. The Budget Committee consists of six men. I have heard some women in the University system refer to the Budget Committee as the "new boy's club" and the place "where all the decisions are made."

31. In or around June 2019, I told Dr. Dewan that the Budget Committee was too gender-imbalanced, and I suggested that Chief Medical Officer Dr. Amy Tucker and Senior Associate Dean of Faculty Affairs and Faculty Development Dr. Ann Botash should be added to the Budget Committee group.

### INTERIM CHAIR OF ANESTHESIOLOGY

32. Upstate runs an Anesthesiology Department which is headed by a Chair. The Chair of Anesthesiology needs to have, *inter alia,* a solid understanding of the department's methods for scheduling anesthesiologists for operating room coverage and service.

33. The person in charge of scheduling, who is known as the "Officer or the Day," plays a key role in the administration of the Anesthesiology Department.

34. In or around July 2019, Upstate began discussing who should be the interim successor to long-time Anesthesiology Department Chair, Sebastian Thomas, MD.

35. Dr. Dewan immediately began pressuring me to appoint Dr. Reza Gorji as Interim Chair of Anesthesiology, stating in sum and substance that Dr. Gorji was "the only one who could do the job."

36. I was concerned that Dr. Gorji was Dr. Dewan's choice, as Dr. Gorji had never served as Officer of the Day, and it was key that the Interim Chair have that experience.

37. I learned from Dr. Xiuli Zhang, who has long-term service in clinical operations including serving as the primary Officer of the Day, that she considered the push for Dr. Gorji strongly suggestive of gender discrimination, because Dr. Gorgji had never had a role in charge of clinical operations or as Officer of the Day.

38. In my capacity as Dean, I put together an interview panel consisting of Anesthesiology Physician Angela Majahan, MD; Department of Surgery Physician Amie Lucia, MD; Chief Medical Officer Ann Botash, MD; Senior Associate Dean for Faculty Affairs and Faculty Development MaryGrace VanNortwick; Dean's Chief of Staff Stacy Mehlek; and myself.

39. On or around August 8, 2019, the panel interviewed Dr. Zhang, Dr. Gorgi, and Dr. Bettina Smallman.

40. After the interview, the panel unanimously selected Dr. Zhang as Interim Chair, based on her abundant experience in managing clinical affairs.

41. On or around August 13, 2019, I met with Dr. Dewan, Upstate CEO Dr. Robert Corona, Upstate CMO Dr. Amy Tucker, Department Chair of Surgery Dr. Roberty Cooney, Department of Urology Chair Dr. Gennady Bratslavasky, Department of Neurosurgery Chair Dr. Lawrence Chin, Department of Orthopedics Dr. Steven Albanese, Division of Cardiac Surgery Dr. G. Randall Green, Dr. Botash, and Ms. VanNortwick.

42. At this meeting, I told the above attendees that the panel had unanimously identified Dr. Zhang as interim successor for Dr. Thomas.

43. At the very next one-on-one meeting that I had with Dr. Dewan, he demoted me, as discussed in greater detail *infra*.

### DR. WONG'S SALARY REDUCTION

44. My wife, Dr. Ma Li Wong, MD, PhD, ["Dr. Wong"] also works for Respondent as Professor of Psychiatry and Behavioral Sciences and Professor of Neuroscience and Physiology. At the beginning of the year we received news that her salary is going to be reduced by $45,000.00.

45. On or about August 12, 2019 I attended a regularly-scheduled meeting with Dr. Dewan.

46. During that meeting I asked if it would be appropriate to discuss Dr. Wong's salary reduction. Dr. Dewan encouraged me to discuss the issue.

47. I stated that Dr. Wong is of Asian ancestry, she is culturally Hispanic and Latina, and that her national origin is Brazil.

48. I stated that Dr. Wong may have a claim under Title VII and/or Title IX, as to my knowledge, no white male professor was ever subjected to a salary reduction of this type.

49. Dr. Dewan made no response to my statement, but he did say he would get back to me.

50. Dr. Dewan did not get back to me to address my concern.

51. Less than a month after my opposition to Dr. Wong's salary reduction and the actions I took to prevent discrimination in the appointment of the Interim Chair of Anesthesiology, Dr. Dewan demoted me.

### MORE SPECIFICALLY REGARDING ACTIONS TAKEN AGAINST ME IN RETALIATION FOR MY OPPOSITION TO DISCRIMINATION

52. On September 12, 2019 at 11:30 am, Dr. Dewan hand-delivered a letter ["demotion letter"] to me stating that my role in the positions of Senior Vice President for Academic Health Affairs and Dean of the College of Medicine were terminated immediately. *Annexed hereto as Exhibit C is the letter, dated 9/12/19, from Dr. Dewan to Dr. Licinio.*

53. Dr. Dewan provided no justification for the demotion.

54. The demotion letter additionally stated that, effective September 13, 2019, my annual salary would drop to $227,000.00. *Exhibit C.*

55. Dr. Dewan stated to me that I could resign instead of accepting the demotion letter.

56. Dr. Dewan did not provide me with any notice of the contemplated demotion, nor was I provided any transition period. At no point did I enter into an agreement to modify my contractually-provided transition and notice period.

57. The demotion letter stated that as of September 13, 2019, my title would become Distinguished Professor in the Department of Psychiatry and Behavioral Sciences. *Exhibit C.*

58. I retained an attorney, who reached out to Upstate's general counsel to explain that there appears to be a retaliatory motive behind Dr. Dewan's actions. My attorney was told, in sum and substance, that "there was nothing to discuss."

59. In light of Upstate's response to my attorney, I immediately filed for temporary injunctive relief in an effort to protect my reputation from any inference of wrongdoing that might otherwise issue from Dr. Dewan's abrupt action.

60. Although I understood that I was unlikely to be granted injunctive relief, my attorney and I considered it necessary to make such a public filing in order to protect my reputation as best I could. The injunction was not granted.

61. Nearly a month after I submitted my public filing, I received a communication from a person named Kathy Barany, stating that she had been hired by Upstate General Counsel Lisa Alexander to investigate my complaints of discrimination.

62. I explained to Ms. Barany that my affidavit contained all the information that I had at the time and that I did not understand why Upstate was undertaking an investigation so long after I had reported retaliation.

63. Notwithstanding, Ms. Barany insisted upon meeting with me on October 21, 2019. Upon information and belief, since she met with me, Ms. Barany is now asking my colleagues questions designed to elicit negative information about me, such as whether I contact them via my personal email account, and what they think of me.

64. I am not aware of any reason Ms. Barany would have to ask my colleagues these questions about me, other than that Upstate is attempting to find a way to further damage my reputation and career in retaliation for my opposition to discrimination.

## MORE SPECIFICALLY WITH REGARD TO DAMAGES

65. Notwithstanding my efforts to prevent career damage, I was almost immediately dropped from the interview list for a position as Dean of Medicine at a state university. Previously, I had

been one of ten candidates interviewed for a senior administrative position at one of the country's most respected ivy-league universities.

66. I have also learned that the Dean of Medicine at another state university will not consider me for a position because of the concern that I might be considered controversial due to my having been removed suddenly from the positions of Senior Vice President and Dean of Medicine at Upstate.

67. Following my complaint and subsequent demotion, I have not been provided with an adequate research support package, my own laboratory, adequate start-up funding for a laboratory, a laboratory technician, a laboratory manager, an Assistant Professor, arrangements for postdoctoral fellows, or research expenses. Absent proper support, it will be nearly impossible for me to obtain data to support research grant funding that would allow me to pursue my distinguished scientific career.

68. Following my complaint and subsequent demotion, I have been informed by Upstate Psychiatry Department Chair Thomas Schwartz that the University is withdrawing the budget support it had previously committed for membership fees, license fees, and academic travel, including but not limited to my attendance at the Association of American Medical Colleges ("AAMC") meeting in Tucson, Arizona in November 2019, for which I was enrolled prior to the demotion.

69. The salary increase I am entitled to as a Distinguished Professor has been removed from my base salary.

70. The Employer's actions harm my career and reputation. In my field, if an individual does not hold a Dean position for at least three years, it is generally understood that the removal is due to some gross misconduct or incompetence.

71. To be clear, during my tenure at Upstate, I have never been accused of misconduct or incompetence. To the contrary, on September 11, 2019, Upstate held a ceremony celebrating my Distinguished Professorship.

72. Moreover, in November, 2019 the Upstate College of Medicine received full LCME accreditation for eight years, the longest accreditation period granted by that agency, as the result of a meticulous LCME review process that I led as Dean of the College of Medicine, and which occurred entirely during my term as Dean. Of note, the previous accreditation visit by the LCME, in 2011, resulted in the College of Medicine being put on probation.

73. The Employer's actions further harm my career and reputation by depriving me of even the most basic funding for my scientific research or the ability to continue my membership and participation in professional organizations.

74. As the result of being summarily demoted by Upstate after opposing discrimination, I have suffered significant mental anguish and emotional harm, and have suffered lost wages and other benefits of employment.

75. As the result of being summarily demoted by Upstate after opposing discrimination, my reputation and career have been irremediably damaged, such that I have lost identifiable employment opportunities, and as a consequence my future earnings are significantly harmed.

76. As the result of being summarily demoted by Upstate after opposing discrimination, I will incur significant expenses in the effort to salvage my career, including career coaching, search expenses, travel and moving expenses, and similar costs.

77. Based on the foregoing, I charge the above-named respondent with unlawful discriminatory practices in retaliation for my opposition to discrimination, in violation of the New York State Human Rights Law, Section 296.

78. Simultaneously with the instant charge, I am pursuing a claim for breach of contract in the New York State Court of Claims; however, that claim is based solely on the breach of contract, and does not address the underlying retaliatory reasons for the breach nor remedies for retaliation.

Julio Licinio

STATE OF NEW YORK )
COUNTY OF ONONDAGA )   ss.:

Julio Licinio, being duly sworn, deposes and says: that he is complainant herein; that he has read the foregoing complaint and knows the content thereof; that the same is true of his own knowledge except as to the matters therein stated on information and belief; and that as to those matters, he believes the same to be true.

Julio Licinio

Subscribed and sworn to me
this ___ day of _____, 2019.

Notary Public

MARY JO BELLUSH
Notary Public ... w York
Qua... ... nty
Commission ...pires July 10, 2023

**Julio Licinio, MD, PhD, MBA, MS (healthcare leadership)**          **Summary Curriculum Vitae 2019**

**Qualifications:** MD, University of Bahia School of Medicine, Brazil, 1982; Residency in Medicine, University of São Paulo, Brazil, 1984; Fellowship in Endocrinology, University of Chicago, Pritzker School of Medicine, 1985; Internship in Psychiatry, Albert Einstein College of Medicine, Bronx, NY, USA, 1986; Residency in Psychiatry, New York Hospital-Cornell Medical Center, USA, 1989; PhD in Psychiatry, Flinders University, 2017. Cornell Executive MBA and MS in Healthcare Leadership, 2019. Board Certified in Psychiatry, ABPN and Fellow, Royal Australian & New Zealand College of Psychiatrists. Current medical licenses in the USA (CA, PA, TX, FL, NY), Australia and Ireland (EU).

**Current Primary Appointments:** Senior Vice President for Academic & Health Affairs, Executive Dean, College of Medicine, SUNY Distinguished Professor, Upstate Medical University, Syracuse, NY.

**Secondary Appointments:** Matthew Flinders Distinguished Professor, Flinders University, Australia.

**Previous Appointments:** Deputy Director, Translational Medicine and Head, Mind – Brain Theme, South Australian Health and Medical Research Institute and Matthew Flinders Distinguished Professor of Psychiatry, Flinders University School of Medicine, Adelaide, Australia (2013-2017). Professor and Director, John Curtin School of Medical Research, and Head, Translational Medicine Department, Australian National University (2009-2013); Miller Professor, Chairman of Psychiatry and Associate Dean, University of Miami (2006-2009); Professor, Vice-Chairman of Psychiatry and Head, Interdepartmental Center for Clinical Pharmacology and Pharmacogenomics, University of California, Los Angeles (UCLA, 1999-2006); Unit Chief, Clinical Neuroendocrinology Branch, National Institute of Mental Health, USA (1993-1999); Fellow, Assistant Professor of Psychiatry, and Co-Director, Mood Disorders Inpatient Unit Yale University and West Haven VAMC (1990-1993).

**Bibliometric Assessment:** h-index: 74          **Google Scholar Citation Report:** Sum of citations: 28,531

**Research interests – Diseases:** Major depression, obesity, metabolic syndrome. **Methods:** Genomics, pharmacogenomics, endocrinology, neuroimmunology and microbiology.

**Publications (6 Most Significant – lifetime, out of 337 total)**
1. Wong M-L, Rettori V, Al-Shekhlee A, Bongiorno PB, Canteros G, McCann SM, Gold PW, Licinio J. Inducible nitric oxide synthase gene expression in the brain during systemic inflammation. *Nature Medicine* 1996;2:581-584. (298 citations)
2. Licinio J, Mantzoros C, Negrão AB, Cizza G, Wong M-L, Bongiorno PB, Chrousos GP, Karp B, Allen C, Flier JS, Gold PW. Human leptin levels are pulsatile and inversely related to pituitary-adrenal function. *Nature Medicine* 1997;3:575-579. (750 citations)
3. The International HapMap Consortium (Licinio J, co-author). The international HapMap project. *Nature* 2003;426:789-796. (4,599 citations)
4. The International HapMap 3 Consortium (Licinio J, co-author). Integrating common and rare genetic variation in diverse human populations. *Nature* 2010;467:52-58. (2,184 citations)
5. Simonds SE, Pryor JT, Ravussin E, Greenway FL, Dileone R, Allen AM, Bassi J, Elmquist JK, Keogh JM, Henning E, Myers Jr MG, Licinio J, Brown RD, Enriori PJ, O'Rahilly S, Sternson SM, Spanswick DC, Grove JL, Farooqi IS, Cowley MA. Leptin mediates the increase in blood pressure associated with obesity. *Cell* 2014;159:1404-1416. (183 citations)
6. Wong ML, Inserra A, Lewis M, Mastronardi C Leong L, Choo J, Kentish S, Xie P, Morrison M, Wesselingh S, Rogers G, Licinio J. Inflammasome signaling affects anxiety- and depressive-like behavior and gut microbiome composition. *Molecular Psychiatry* 2016;21:797-805. (128 citations)

**Founding and Current Editor-in-Chief:**
*Molecular Psychiatry* (Springer Nature) Impact Factor (IF): 11.973, 6th in Psychiatry (1st in 2009-14)
*The Pharmacogenomics Journal* (Springer Nature) IF: 3.503, 73rd in Pharmacology
*Translational Psychiatry* (Springer Nature) IF: 5,182, 18th in Psychiatry worldwide

**Competitive Grant Funding. Total funds: $27,388,864**
**Agencies:** National Health and Medical Research Council; Commonwealth International Science Program – Australia-Europe Research Collaboration Fund; ANU Connect Ventures, Discovery Translation Fund Project; US National Institutes of Health (National Institute of General Medical Sciences, National Human Genome Research Institute, National Center for Research Resources, National Heart, Lung and Blood Institute, National Institute of Diabetes, Digestive and Kidney Diseases); Diana, Princess of Wales, Memorial Fund; PhRMA Foundation, and Wellcome Trust.

# EXHIBIT B



**UPSTATE**
MEDICAL UNIVERSITY
OFFICE OF THE PRESIDENT

March 14, 2017

Julio Licinio, MD, PhD
6 Baliol Street College Park
South Australia 5069 Australia

Dear Dr. Licinio:

I am pleased to offer you a Management/Confidential appointment as Senior Vice President and Dean of the College of Medicine. This appointment will be effective July 1, 2017. You will receive total annual state compensation, subject to changes as may be authorized or required by law, of $585,000.

You will also receive $48,000 in additional compensation not added to base pay, payable as $4,000 bi-weekly for each of your first 12 bi-weekly pay periods.

In this position you will report to me as President and you will have a seat on the University Executive Committee. In accordance with the SUNY Board of Trustees Policies, Article IX, Title B, Section 4, this is a Management/Confidential position that reports to and serves at the pleasure of the President. This M/C appointment is not for a designated period of time and SUNY does not have a mandatory retirement age.

This offer is contingent upon the satisfactory result of a routine criminal background investigation. This appointment is subject to the Policies of the Board of Trustees for the State University of New York (www.suny.edu/boardoftrustees/pdf/policies.pdf) as well as the responsibilities of a state employee as described in the Public Officers Law (http://www.suny.edu/hr/handbook/).

It is our understanding that you will use your best effort to obtain and maintain an unrestricted license to practice medicine in New York State.

**Faculty Appointment**

Concurrent with your management/confidential appointment as Senior Vice President and Dean of the College of Medicine, I am pleased to offer you a faculty appointment at the rank of Professor with tenure in the department of Psychiatry & Behavioral Sciences. Upon receipt of your signed acceptance of the terms of this offer I will provide an official appointment letter under my authority as President of SUNY Upstate Medical University. I will also then recommend to the Chancellor of SUNY for approval that your appointment be continuing (tenured).

A-0123

I am also pleased to offer you an academic appointment as Professor in the Department of Psychiatry, consistent with the College of Medicine review process, and the Policies of the Board of Trustees. You will also have secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism.

In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department.

You inquired regarding a SUNY Distinguished Professorship. The eligibility/selection criteria require that candidates must have at least one year of full-time service at the nominating institution. I agree to nominate you for a SUNY Distinguished Professorship when you satisfactorily complete the required service time. For additional information, please visit: http://system.suny.edu/media/suny/content-assets/documents/academic-affairs/distinguished-faculty-ranks/2015-2017-Distinguished-Guidelines.pdf

**Office and Other Support for Administrative and Tenured Professor Positions**

You will be provided with an adequate office, with secretarial support.

A full-time research/academic assistant will be hired to support your needs, effective July 1, 2017. You will be able to participate in academic conferences and other educational opportunities as you determine necessary for the functioning of each of your roles and continued educational advancement and we will reimburse costs for such activities, including but not limited to, travel, CME, publications and professional society memberships, in each of your roles. In addition, the section on tuition reimbursement itemizes other opportunities for career-related advancement support.

I will also explore further the opportunity to gain additional academic opportunities in support of your desire to obtain an executive MBA.

The University will also provide executive coaching services for two years, not to exceed $60,000.

**Current Resources Available to the College of Medicine**

The dollars projected to be spent by the College of Medicine from state and non-state sources during academic year 2016-17 of approximately $75 million are the basis from which we will start and will continue.

The College of Medicine has played a vital role in over the last three years in eliminating structural deficits that once existed for the University resulting in a sustainable operating plan with unallocated operating funds available for investment in strategic priorities, as further discussed below.

Based on our expectation of new resources available at the College of Medicine, it is our expectation that you will maintain and improve upon the current financial state of the University by identifying and

2

implementing efforts to grow academic, research, and clinical revenues necessary to provide adequate funding of mandatory costs (salary and non-salary increases) relating to current obligations and any new strategic initiatives that may evolve in the future.

It is projected that new funds that become available through growth or turnover from these current sources, after annual funding of mandatory cost increases, will be available for reinvestment in the College of Medicine in alignment with the strategic plan of the University. Beginning in fiscal year 2017-18, should external funding sources of the University decline, the College of Medicine will share the decreases proportionately through expense reductions, reductions in new resources as noted below and/or through other actions.

**New Resources to be made available to the College of Medicine**

It is projected that new resources totaling $25 million over five years will be available to the College of Medicine as follows:

- State Allocated Funds - $2.5 million annually, $12.5 million over 5 years - This is the funding that is expected and is to be used for both recurring costs (i.e., new faculty base salaries) and one-time investments (i.e., academic faculty start-up packages). As faculty recruitments occur over this five-year period, it is expected that most of these funds will be fully committed and less will be available annually for new one-time investments.

- Chief Administrative Officer's (CAO) Fund - $2.5 million annually, $12.5 million over 5 years. This funding is derived from a 5% assessment on clinical revenues of the Clinical Practice Plan in accordance with Article XVI of the SUNY Policies of the Board of Trustees. The Fund is administered by the President of the University, as CAO of the University, and is intended to provide limited duration support for program investment while limiting its use for ongoing operating expenses. This amount represents approximately 25% of the annual CAO Fund assessment revenues as the remaining 75% is currently committed to ongoing support and one-time commitments and institutional strategic priorities primarily pertaining to the College of Medicine.

**Additional Resources:**

Additional resources are available from the clinical revenues of University Hospital and the Clinical Practice Plan. These resources provide the primary sources of investments in the clinical mission of the College of Medicine. As Senior Vice President and Dean of the College of Medicine, you will participate in the Hospital's annual budget process along with the Senior Vice President for Finance and Administration of the University. In collaboration with the Hospital, Clinical Practice Plan, and University leadership, you will be involved with establishing the annual priorities to be funded from clinical operations to ensure alignment with the University's strategic plan, including the priorities of the College of Medicine and the needs of an integrated clinical system. Examples of Clinical Practice Plan commitments included in the Hospital's 2016/17 budget process are as follows:

- Approval of $12 million in requests, including $3 million in limited duration recruitment (i.e. start-up) contracts, physician services and on-call contracts ($4.4M) and additional house staff ($2.5M).

3

- Approval of additional one-time funding to support the development of a primary care strategy and a cutting edge clinical technology/data analytics fund, contingent on realization of Hospital budgeted revenues over multiple years. The approximate amount of these funds to be set aside is $10 million for primary care and $10 million for technology/data analytics over the next 2-3 years. The primary care investments will need to coincide with a rigorous strategic plan in collaboration with the Strategic Planning Office. The technology investments will involve detailed planning with the University Executive Committee, of which the Senior VP and Dean of the College of Medicine is a member.

In addition, certain revenues of the Clinical Practice Plan have been made available in the past to support joint initiatives, subject to the approval of Upstate University Medical Associates at Syracuse (UUMAS). The Clinical Practice Plan is also in the process of identifying funds in support of strategic priorities of the University, in collaboration with University leadership.

This should provide you with sufficient confidence in the commitment of the University, including the Hospital and the Clinical Practice Plan, in supporting clinical initiatives of the College of Medicine.

**Expectations and Initiatives**

Based on the foregoing projections and expectations of resources to be made available, our expectations and initiatives are as follows:

- Executive responsibility for all activities related to the accreditation of graduate degree, medical student degree programs and graduate medical education, ensuring and maintaining their accreditation status, including LCME, and addressing New York State Department of Education requirements relating to existing and new program requirements. Collaborate with the Vice President for Academic Affairs and University Leadership on ensuring and maintaining Middle States accreditation status for the University.

- Contribute to enhance the educational experience, to include continued efforts at curriculum reform in the College of Medicine and a renewed emphasis on transformative education including Graduate Medical Education, Continuing Medical Education, and Inter Professional Education, to bring us to the forefront in these areas. You will work collaboratively with the other Deans and the Vice President for Academic Affairs to develop inter-professional and educational simulation training. The lead for such collaborative efforts in inter-professional education will be the Vice President for Academic Affairs.

- Explore opportunities to expand and enhance our academic model, both internally and externally, including increasing the class size of the College of Medicine, increasing the percentage of incoming students who are non-resident, and increasing the percentage of incoming students from underrepresented backgrounds. Develop cross-campus collaborations within SUNY and other regional partnerships to address these and other needs and opportunities.

- Assist in developing an integrated clinical system and aligned clinical growth strategy, in collaboration with the University leadership, including the President, Senior Vice President for Finance and Administration, the Hospital CEO, and UUMAS leadership, to enable the University to thrive and grow successfully in a new era of payment for clinical services. Immediate priorities

A-0126

include the development of a regional strategy with a focus on cancer and ambulatory I primary care services. These improvements should better position the College of Medicine and the University for federal and state payment reforms anticipated in 2017 and beyond.

- In collaboration with the Vice President for Research, refresh the strategic plan for research to be in alignment with the University strategic plan in order to build interdisciplinary programs, increase expectations for extramural funding, and improve collaborative efforts across the campus and with other institutions.

- Manage the resources of the University and College of Medicine in such a fashion as to leverage them to the fullest extent to support the academic programs in alignment with our strategic plan. This will include a process to repurpose funds through reexamination of our funds flow methodology, and developing new incentives and expectations for performance. Develop measurable expectations of departments and faculty in the College, including teaching, research and clinical productivity and quality, to be incorporated into a financial plan for the College. Lead efforts to develop a standard compensation model across clinical departments of the College of Medicine, while recognizing inherent differences between departments.

- Work with the University Office of Development and the Upstate Foundation and the Medical Alumni Foundation and participate actively in fundraising efforts designed to enhance our capability of addressing issues such as scholarships, faculty growth and development and program support. In your role as Dean, you will have a role with the governing bodies of both entities.

- Develop appropriate mechanisms to evaluate department chairs in conformance with the intent of Article IX, Title C of the SUNY Board of Trustees Policies. The evaluations will include the success of the chairs in achieving the strategic goals of the University, including improving diversity and inclusion, research productivity, educational goals, clinical growth and quality, supervision of the performance and professional conduct of department members and other related activities.

- Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics, and Psychiatry to be staggered over the first three years of your appointment and as otherwise may be needed according to the urgency of the circumstance of other departments. Collaborate with University leadership in these efforts and also in the recruitment of the Director of the Cancer Center, which is a shared reporting relationship to the Dean of the College of Medicine and the CEO of University Hospital. Opportunities to combine the Medicine chair and Cancer Center recruitment efforts is encouraged but not required.

**Honoraria and other Outside Income:**

The Senior Vice President and Dean of the College of Medicine is considered a New York State policy-maker, and is therefore subject to certain parameters and/or limitations on outside income as outlined in regulations of the New York State Joint Commission on Public Ethics (JCOPE), and:

5

- Is prohibited from serving as an officer, director or board member of a political party or political organization or as a member, officer, director, board member or district leader of a committee of a political party;

- Must obtain my prior approval as well as the approval of JCOPE (or successor agency) before holding other public office or engaging in other public employment for more than $5,000 annually; engaging in any private employment, business or other activity for more than $5,000 annually; or my approval if serving as director or officer of a for-profit corporation or institution, regardless of compensation;

- Must obtain my prior approval before engaging in private employment or other activity for annual compensation between $1,000 and $5,000;

- Must report any honorarium or travel reimbursement received from each source which is over $1,000 on your annual financial disclosure statements;

- Subject to my prior approval, you may serve on no more than two corporate boards of directors for compensation, and an unlimited number of not-for-profit boards without compensation.

For information as to the above requirements and additional requirements within the statutes of the Public Officers Law and the regulations enforced by JCOPE, see www.jcope.ny.gov.

It is also hereby agreed that you may continue to write, publish and edit books, journals and other texts/media, including, but not restricted to, print and electronic, in your field and other areas, and that you may retain the income from such publications for your personal use, with the understanding that this private income must be reported on your annual Financial Disclosure Statement as outlined in the paragraph above and must not interfere with the performance of your responsibilities outlined above.

**Annual Financial Disclosure**

All state policy-makers must file with JCOPE (or any successor agency) an annual financial form which requires disclosures in general categories of all sources of income and assets, including income earned by a spouse or assets held by a spouse.

**Defense/Indemnification in Civil Proceedings and Reimbursement in Criminal Proceedings**

If sued in a civil matter in an individual capacity, defense and indemnification are available upon request to the Attorney General in those situations in which the act underlying the complaint is alleged to have occurred within the scope of the officer's public duties, provided that the individual has not engaged in intentional wrongdoing. Certain procedural steps must be followed.

Our Central New York Office of General Counsel is available to provide you with any assistance you may need. As a state officer, the Senior Vice President and Dean of the College of Medicine is accorded criminal defense reimbursement and civil defense and Indemnification protection by statute (Sections 17 and 19 of the Public Officers Law).

6

JL000006

A-0128

In criminal cases, reimbursement is available, with the approval of the Attorney General, for reasonable attorneys' fees and litigation expenses incurred by an officer in the defense of a criminal proceeding arising out of an act which occurred within the scope of the officer's public duties, following acquittal or dismissal of the proceeding.

**Employment of Related Persons**

Section 73(14)(a) of the Public Officers Law states: *No state officer or employee may participate in any decision to hire, promote, discipline or discharge a relative for any compensated position at, for or within any state agency.* The SUNY Code of Ethical Conduct for University Officers policy contains similar language.  For additional information on this subject, please visit:

http://www.jcope.ny.gov/training/2016%20Public%20Officers%20Law%20for%20State%20Officers%20and%20Employees.pdf

http://www.suny.edu/sunypp/documents.cfm?doc_id=6)

It is understood that your wife, Ma-Li Wong, MD, PhD and you are moving together to the College of Medicine and that your ongoing scientific collaboration does represent a potential conflict of interest under this clause which is mitigated as detailed by the posting above.

Please refer to the Appendix to this document for information on health and retirement plans, as well as, moving expenses and other benefits.

**Mutual Understanding of Notice for Transitional Need**

In the event a decision is made by you or the University, for any reason other than misconduct[1], that you will step down from the position of Senior Vice President (SVP) and Dean of the College of Medicine (COM), we will provide each other with 8 months' notice in writing of the end date of your stepping down from the position of SVP and Dean, COM, and we will work together during this period of time to enable a smooth transition to new leadership, as well as your own transition into a faculty position at SUNY Upstate Medical University, under the terms described on page 2 of this letter, and such time period may be modified upon mutual written agreement.

**Mutual Understanding of Non-Compete Notice**

In consideration of the terms of compensation in this offer of employment, you agree, when your employment with the University ends, you will not obtain employment within 200 miles of the University for a period of 3 years.

I will be pleased to welcome you to Upstate on July 1, 2017. Should your relocation arrangements take longer than expected we will work with you to re-negotiate a mutually agreeable date for your start that is

---

[1] Misconduct is defined as the failure to fulfill the conditions of employment as described in the offer letter, violation of a provision of the Public Officers Law or a written policy of Upstate Medical University and/or the State University of New York, as well as acts of dishonesty, theft, conviction of a felony, disorderly or immoral conduct at work, insubordination, engaging in conduct which constitutes a violation of the Penal Law of New York State, breach of a fiduciary duty owed to the University and/or actions that expose the University to liability.

7

no later than September 15, 2017, maintaining all the terms and conditions of this offer. I look forward to your many future contributions to the University.

If these terms and conditions are acceptable, please indicate by signing below and returning the signed copy to me at your earliest convenience.

Sincerely,

Danielle Laraque-Arena, MD, FAAP
President
Professor of Pediatrics, Psychiatry, and Public
Health & Preventive Medicine

cc: Personnel File Enclosure

I hereby accept the foregoing appointment and the terms described herein.

_____        March 15, 2017
[Name]                             [Date]

8

JL000008

A0129

## APPENDIX

Please be advised that the information contained in this appendix is provided for summary purposes only. In all cases, actual terms and conditions of employment and benefits are governed by applicable State and federal regulations, SUNY policy, plan documents, insurance contracts, etc.

### Payroll Procedures

New York State employees are paid on a two-week lag basis. There is a five-day deferral of pay for new Management/Confidential employees, which results in one day's wages being withheld in each of the first five paychecks.

### Moving Expenses

Qualified moving expenses for household goods and personal effects will be paid for by Upstate. Moving expenses must be reasonable and in accordance with IRS guidelines and Upstate's policies. You will be required to get no fewer than 3 estimates and select the lowest responsible carrier. Moving expenses relating to your laboratory will also be paid for by Upstate directly to the contracted moving company using the same standards as noted above.

### Tuition Reimbursement

The M/C Tuition Reimbursement Program provides financial support for approved course work on a reimbursement basis that is categorized as either job-related or career-related and offered by approved schools or organizations. Covered tuition expenses are currently reimbursed at the rate of 75%, up to a maximum reimbursement of $2,000 per fiscal year. As noted in the offer letter, we will explore the opportunity for additional academic support in line with the seeking of an advanced degree (e.g. MBA).

### Retirement Benefits

There are three retirement program options available:

1. New York State Employees' Retirement System (ERS);
2. New York State Teachers' Retirement System (TRS); or
3. Optional Retirement Program (ORP).

ERS: A state-administered defined benefit retirement fund consisting of employer and employee contributions. Salaries of $100,000 or more requires a 6 percent employee contribution, which is tax-deferred for federal taxes. A participant's retirement benefit is computed as a percentage of his or her final average salary. The percentage received is determined by the number of years of service credit earned. Ten years of full-time service credit is required to be vested.

JLC00009

A-0131

TRS: The retirement benefit is calculated similarly under the TRS system as under ERS. Vesting rights under the two systems are also similar and salaries of $100,000 or more require a 6% employee contribution.

ORP: This is a defined contribution program available to full-time professional employees of the State University. The ORP is offered through the Teachers Insurance Annuity Association (TIAA), VOYA, and VALIC. Three hundred and sixty-six (366) days of continuous employment are necessary to vest retirement benefits under this program. Vesting is immediate if you currently own annuity contracts that include employer contributions with any of these investment providers.

The State contributes 8% of salary for the first seven years of employment, and 10% thereafter; up to the maximum pensionable limit. Salaries of $100,000 or more require a 6% employee contribution; for a total contribution rate of 14 to 16% of salary. Employee contributions are tax deferred for Federal Income tax purposes, and all distributions are exempted from NYS taxes.

## Health Insurance

As a new New York State employee, you may participate in the New York State Health Insurance Program (NYSHIP) in accordance with its terms and conditions. There is a fifty-six (56) calendar day waiting period before health insurance becomes effective. NYSHIP offers the availability of a modified indemnity fee-for-service plan (the Empire Plan) or Health Maintenance Organization (HMO) in a particular area. Health insurance premiums are paid on a "pre-tax" basis, unless an individual files a declination within the first 56 days of employment.

NYSHIP coverage is available for you, your spouse or domestic partner, and children up to age 26.

NYSHIP coverage is also available:
- For unmarried dependent child(ren) age 26 or older who are incapable of supporting themselves due to a mental or physical disability acquired before termination of their eligibility for health insurance; and
- For children ages 26 to age 30 to purchase young adult individual coverage at full cost with no employer subsidy.

## Management/Confidential Benefit Program

Dental: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. Coverage becomes effective on the first day of the month following the completion of six (6) months of continuous employment. This program, offered through the GHI Insurance Company, provides coverage on a fee-for-service basis.

Vision Care: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. The plan provides eye care coverage, including an eye exam and one pair of glasses or contact lenses at a participating doctor every two years. Coverage becomes effective following a fifty-six (56) day waiting period.

10

A-0132

Flexible Spending Accounts: The Health Care Spending Account (HCSA) and the Dependent Care Advantage Account (DCAA) offer a way to pay for un-reimbursed medical expenses and dependent care expenses with pre-tax dollars. An employee may contribute up to $5,000 annually to the DCAA and from $150 to $2,500 to the HCSA.

Group Life Insurance Program: This is a group-term life insurance program available on a payroll deduction basis. Employees may enroll for a fixed dollar amount or multiple of salary levels of coverage up to a maximum of five time's annual salary, currently capped at $500,000. Coverage is available without proof of insurability if the employee enrolls within 12 weeks of employment. Dependent group life insurance is also available up to 50 percent of the enrollee's benefit to a maximum of $20,000 for a spouse and in a flat amount of $4,000 for each eligible child.

Group Disability Insurance Program: The Group Disability insurance Program for full-time Management/Confidential employees is a cost-free benefit which provides income protection for a total disability after completing one year of State University service. (If you were covered within three months of appointment under a similar disability insurance plan by your last employer, the waiting period may be waived.) The plan provides an income benefit of 60% of salary to a maximum of $7,500 per month and also makes payment to a pension plan on the employee's behalf.

Tax-Deferred Savings Plans: SUNY offers a variety of tax-deferred savings options under Sections 403(b) and 457 of the internal Revenue Code. These tax-deferred savings plans permit savings toward retirement through automatic payroll deductions. The taxable salary is lowered since deduction is not subject to Federal, New York State or local income tax. An employee may direct his or her investment into 403(b) plans administered by TIAA, VOYA, VALIC or Fidelity and/or a 457 plan, the NYS Deferred Compensation Plan, administered by Nationwide.

### Annual and Sick Leave Accruals

Management/Confidential employees accrue sick leave up to 200 days and annual leave (not to exceed 40 days at calendar year end) at a rate of 1.75 days per month in each category. Payment for up to thirty (30) days of unused annual leave at full salary is permitted upon resignation or retirement in good standing. Additionally, Management/Confidential employees earn an additional day of annual leave each January 2nd.

11



Office of the President

September 12, 2019

HAND-DELIVERED
Julio Licinio, MD, PhD, MBA
7 Brattle Road
Syracuse, NY 13203

Dear Dr. Licinio:

You have been employed by the State University of New York Upstate Medical University in the title of Senior Vice President for Academic Health Affairs and Dean, College of Medicine, which is an unclassified Management Confidential position. By this letter, you are notified that your employment in this position is terminated effective immediately. Any other association, position or role, including any held ex officio, with the State University of New York, Upstate Medical University, Upstate University Hospital and any campus-related entity of Upstate Medical University, that you held by virtue of your position as Senior Vice President for Academic Health Affairs and Dean are also terminated effective immediately.

Effective September 13, 2019, your state title will become Distinguished Professor in the Department of Psychiatry & Behavioral Sciences and you will be compensated at a base annual State salary of $227,000. Effective September 13, 2019, your office location is your lab space on the third floor of IHP and you will report to the Chair of Psychiatry & Behavioral Sciences, Dr. Thomas Schwartz.

You are required to immediately return all property of the State University of New York Upstate Medical University associated with your position as Senior Vice President for Academic Health Affairs and Dean, College of Medicine, including any and all property of the Upstate University Hospital and including any property purchased by you with reimbursement from the State University of New York, Upstate Medical University, Upstate University Hospital, or any other campus related entity, including without limitation any and all keys, identification badges, cell phones, computer equipment and software, thumb drives, parking passes, hard copy and electronically stored files, documents and notes, passwords for all Upstate devices, procurement cards, and travel cards.

750 East Adams Street | Syracuse, NY 13210 | Ph: 315 464 4513 | Fax 315 464 5275 | www.upstate.edu | State University of New York

JL000031

A0133

Please contact the Human Resources Benefits Office to review the applicable benefit changes resulting from this change.

Sincerely,

Mantosh Dewan, MD
Interim President

cc:     Payroll
        Employee/Labor Relations
        Personnel File

A-0135



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of | |
| JULIO LICINIO, MD., | **DETERMINATION AFTER INVESTIGATION** |
| Complainant, | |
| v. | Case No. |
| NEW YORK STATE, STATE UNIVERSITY OF NEW YORK, UPSTATE MEDICAL UNIVERSITY, | 10204906 |
| Respondent. | |

Federal Charge No. 16GC000651

On 11/18/2019, Julio Licinio, MD. filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of sex, race/color, national origin, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division has determined that it has jurisdiction in this matter and that <u>PROBABLE CAUSE</u> exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of.

Pursuant to the Human Rights Law, this matter is recommended for public hearing. The parties will be advised of further proceedings.

Dated:     APR 0 9 2020
Syracuse, New York

STATE DIVISION OF HUMAN RIGHTS

*Julio B Day*

By:

Julia B. Day
Regional Director

A-0137

## Information to the Parties
## Following Determination of Probable Cause

The New York State Division of Human Rights ("Division") is the administrative agency charged with enforcing the New York State Human Rights Law. The Division investigates complaints of discrimination, determines whether there is probable cause to believe that discrimination has occurred, and conducts a public hearing of the complaint where probable cause is found. Probable cause has been found in this case, and the matter will now proceed to a public hearing before an Administrative Law Judge.

If a Complainant does not have a private attorney, the Division will assign an attorney to present the case in support of the complaint. The Division attorney at all times represents the Division, not the Complainant personally. Substitutions and reassignments of Division attorneys and Administrative Law Judges are within the Division's discretion.

The Division generally schedules public hearings for two consecutive days, which may be allocated with one day each for the presentation of Complainant's and Respondent's cases. There is no formal discovery. Parties may exchange document and witness lists at the preliminary conference, which will take place during the first hour of the first day of the public hearing.

Prior to receiving the notice setting out the date and time of the public hearing, parties may receive notice of a Pre-Hearing Settlement Conference, which will be scheduled several weeks before the public hearing. If Respondent wishes to make an offer of settlement prior to that time, Respondent should contact the Hearing Attorneys Unit at (718) 741-8396.

The Division has its own Rules of Practice which can be found on the Division's website, www.dhr.ny.gov. The New York Civil Practice Law and Rules and the Federal Rules of Procedure and Evidence are inapplicable to Division proceedings. Please cite to New York State case law wherever possible in all submissions to the Division.

The parties have a continuing obligation to keep the Division advised as to any changes in the case including:

1.    Changes in name, address and/or telephone number of the parties and successors in interest.

2.    Commencement of proceedings in another forum.

3.    Settlement of the case.

Any of the above information should be timely provided to the Division, IN WRITING on the attached form to the following by mail or fax:

**New York State Division of Human Rights**
**Attn: Chief Calendar Clerk**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8333**

Information to the Parties
Page 2

If the Complainant wishes to seek dismissal of this matter to proceed in an alternate forum, an application should be filed with the Chief Calendar Clerk at the above listed address, preferably within twenty (20) days of the date of this determination.

The parties also have a continuing obligation to maintain certain information, records, etc., as follows:

1.    Parties must keep track of the whereabouts of their witnesses.

2.    Parties are obligated to identify and preserve all evidence relating to the case, including evidence relating to any incidents which relate to the case that occur after the Division makes a finding of probable cause, and including all evidence whether for or against that party's interests.

3.    Parties are responsible for recording and keeping evidence relating to any increase or reduction in damages.

Finally, if you would like to request a copy of the investigation file, please do so promptly. Put your request in writing to:

**New York State Division of Human Rights**
**Attn: FOIL Officer**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8256**
**Email: foil@dhr.ny.gov**

Please note that your request for documents, or the Division's response or date of response thereto, will not affect the date of the hearing, and cannot be used to request a postponement or rescheduling of the hearing. Costs for copying, established by statute, will apply.

# FREQUENTLY ASKED QUESTIONS

The New York State Human Rights Law and the Division's Rules of Practice outline the policies and procedures that govern hearings administered by the New York State Division of Human Rights. The Law and the Rules are available on the Division's website at www.dhr.ny.gov. Parties may consult with their own attorneys on questions about and interpretations of the Law and/or the Rules. The following are general responses to frequently asked questions. The responses are not legal advice, and should be used for informational purposes only.

A-0139

Information to the Parties
Page 3

## Before the Public Hearing

1. **I recently received a "Determination After Investigation" letter from the Division, stating that there is probable cause to believe that discrimination has occurred in my case and that the case will be scheduled for a public hearing.  What does this mean and when will the case be scheduled for a hearing?**

   Where the Division finds probable cause after investigation, the Human Rights Law requires that the entire case be heard at a public hearing before an administrative law judge, where all relevant evidence is presented and the testimony of witnesses is taken under oath and subject to cross-examination.  You will receive written notice from the Division of the hearing date, time, and location of the hearing. The hearing usually is scheduled to occur 4 to 6 weeks from the date of the written notice.  Prior to receiving this notice, you may receive notice of a Pre-Hearing Settlement Conference, where your case will come before an Administrative Law Judge for the purpose of exploring settlement.

2. **Do we pick the dates for the hearing?**

   No.  The Division selects dates for a public hearing, and notifies the parties in writing through the notice of hearing.

3. **What do I bring to the hearing, such as documents, witnesses, etc.?**

   The parties should identify and bring all documents and witnesses relevant to their claims and/or defenses.  The parties should review the notice of hearing, which is issued via mail.

4. **Now that the case is scheduled for a hearing, what happens next?**

   The case proceeds to a public hearing on the scheduled date.  The Complainant may consult with his or her own attorney.  If Complainant does not have an attorney, please wait to be contacted by a Division attorney, who will present the case in support of the complaint.  Further, the parties should review the notice of hearing, which is issued via mail.

5. **When should an answer be filed and can it be faxed?**

   An answer should be served by the respondent(s) on all parties and the Administrative Law Judge at least two (2) business days before the public hearing.  This is a statutory requirement.  All formal papers, including but not limited to the answer, must be submitted via personal service, mail, or fax (with an original to follow) for proper docketing and timely filing.  Formal papers submitted via electronic mail are deemed courtesy copies and do not constitute proper service.

Information to the Parties
Page 4

## Adjournments

6. **What should I do if I have a conflict with the hearing date that is scheduled?**

You should submit, as early as possible, a written request for an adjournment of the hearing, stating the basis for your request, to all parties and the Administrative Law Judge.

7. **On what basis will the judge grant an adjournment? Will I receive a letter with new dates?**

Adjournment of a public hearing is granted only for actual engagement before a higher tribunal on the specific dates of the public hearing, or for other good cause shown as determined by the Division. If a case is adjourned, the Division will schedule a new hearing date.

## Public Hearing

8. **What happens if I do not appear for the hearing?**

A complainant's failure to appear at a public hearing may result in a dismissal of a complaint, and a respondent's failure to appear may result in a default finding against a respondent.

9. **How long is the hearing?**

Public hearings are generally scheduled for two (2) days.

10. **Can I speak with the Judge?**

*Ex parte* communication (*i.e.*, by only one party) with the judge assigned to the case is strictly prohibited. The parties may jointly request a conference with a judge through the Office of Administrative Law Judges.

## Additional Information

11. **I have more questions. Where can I call for more information?**

If necessary, you may call Shirese Taylor, Chief Calendar Clerk, at (718) 741-8400. We do request that you call only if the situation is urgent. Please do not call to ask the status of your case; the Division will contact *you* at the appropriate time. Frequent telephone contact can interfere with the prompt processing of your hearing. Please do not call your regional office; they will not have information on the hearing process.

A-0141

### IF YOU MOVE, SETTLE, OR INTEND TO CHANGE FORUM
#### Complete, sign and date, and return this form to:

**New York State Division of Human Rights**
**Attn: Chief Calendar Clerk**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8333**

Re:     Julio Licinio, MD. v. New York State, State University of New York, Upstate Medical
University
Case No. 10204906

Name: _____

Address: _____

_____

Telephone: _____

I will be at my new address after: _____

### New NAME ☐  ADDRESS ☐  and/or  TELEPHONE NUMBER ☐

Please indicate below the name, address, and telephone number of a person who may be
contacted and who will know your whereabouts if the Division cannot locate you:

_____

_____

_____

### Commencement of proceedings in another forum, or settlement:
Below please indicate, for other proceedings, the name of the forum and the name, address, and
telephone number of the attorney handling the matter. For settlement, please explain briefly the
circumstances under which the case was settled, and whether terms have been complied with.

_____

_____

_____

Signature _____     Date _____

Print Name _____

# NEW YORK STATE
# DIVISION OF HUMAN RIGHTS

TO:      Files

REGION:  Rochester

FROM:    Julia B. Day
         Regional Director

DATE: April 3, 2020

SDHR CASE NO: 10204906-19-E-RSON-E

Federal Charge No. 16GC000651

SUBJECT:   Julio Licinio, MD. v. New York State, State University of New York, Upstate
           Medical University

---

## FINAL INVESTIGATION REPORT AND BASIS OF DETERMINATION

### I.      CASE SUMMARY

This is a verified complaint, filed by complainant, Julio Licinio, MD., on Mon 11/18/2019. The complainant who is male, Hispanic, Brazilian, and maintians that he opposed discriminatory practices, charges the respondent with unlawful discriminatory practices in relation to employment because of sex, race/color, national origin, opposed discrimination/retaliation.

### II.     SUMMARY OF INVESTIGATION

Complainant's Position:
Complainant alleged that he was demoted in retaliation for opposing discrimination when he made Respondent aware of discrimination as it relates to women and minority staff and students. Complainant further asserted that he was qualified for the position and performed his duties as required without performance deficiency; yet, Respondent demoted him without good cause.

Respondent's Position:
Respondent denied that Complainant engaged in protected activity under the law. Respondent maintains that Complainant had performance issues that did not improve when counseled and so Respondent removed him from his leadership role. Respondent maintains that Complainant is still employed by Respondent regardless of his protected classes.

Investigator's Observations:

The investigation has revealed:

It should be noted that the complaint describes, and the record establishes that Complainant is also alleging breach of his employment contact. The parties agree that Complainant has brought this action before the proper tribunal. The New York State Human Rights Law can not be utilized to resolve the breach of contract issue.

It should further be noted that Complainant is male and so has the same protected characteristic of those whom Complainant maintains received more favorable treatment, and Complainant was hired into the position(s) in question despite his race/color and/or national origin. However, Complainant is alleging that due to his engagement in protected activity, he became a target of Respondent.

Complainant began working for Respondent pursuant to an employment contract and terms where he served as Professor in the Department of Psychiatry and Senior Vice President and Dean of Medicine sometime around July 2017. Apparently, that resulted in a salary of approximately $601,700. Complainant alleged that when the Respondent removed him from the role of Senior Vice President and Dean of Medicine, he was demoted based on the change in the terms and the conditions of his employment and also his salary was reduced to approximately $227,000.

Complainant maintains that he engaged in protected activity several times during his employment. First, Complainant maintains that he complained to his supervisor, Dr. Dewan, Respondent's Interim President, that the budget committee was too gender imbalanced, and that a great deal of the university's business was being conducted by a committee that was made up of mostly men. Complainant maintains that he expressed his concerns regarding this on two separate occasions in June 2019, but Complainant maintains that Dr. Dewan never responded to his concerns or denied them.

Complainant also maintains that he has performed search committees in an effort to get more diverse staff employed for Respondent openings, and he believes that Respondent takes issues with his efforts to promote diversity within the institution. Respondent denied that it take issue with diversity efforts but indicated that it did takes issue with Complainant hiring individuals because he knows them or is acquainted with them. Complainant denied this. Complainant maintains that in July, 2019, he blocked Dr. Dewan from appointing an underqualified male for a chair position over a qualified female. The female that Complainant believed to be more qualified was hired.

Complainant alleged that on or around August 12, 2019, while meeting with Dr. Dewan, he brought up issues concerning Complainant's wife's salary reduction. Complainant indicated that Dr. Dewan never told Complainant that it was inappropriate to bring up, and Complainant maintains that Dr. Dewan indicated that it was appropriate to bring it up, and he did not discourage Complainant from doing so. Complainant maintains that during that discussion, he brought up that he believed his wife has grounds to bring a complaint under Title VII or Title IX. Complainant maintains that there was not much response from Dr. Dewan during that meeting as he stated that Dr. Dewan was "quiet". Dr Dewan denied that Complainant raised any allegation of discrimination as it pertained to his wife's salary reduction. Dr. Dewan produced an email

- 2 -

where it shows that nowhere in the email is discrimination raised. Complainant maintains that it was verbal, and so this is a contention in dispute between the parties.

Respondent denied that it subjected Complainant to any retaliatory acts and indicated that Complainant had a history of poor performance. Respondent maintains that as early as January 8, 2018, the former president began to lose confidence in Complainant's ability to perform in his role as Senior Vice President Dean of Medicine. Respondent provided a document with handwritten notes that are difficult to decipher, but according to Respondent, the notes indicated that there were issues with Complainant arriving to meetings late, texting arrogant stories, lack of focus, poor interactions, and undermining the former president's agendas. It appears that this meeting was related to counseling of Complainant due to an email sent by Complainant on December 27, 2017 where it was felt that Complainant was undermining the former president. On or around March 12, 2018, there were more handwritten notes by the former president which indicated that there was some improvements but concerns were outstanding as it relates to Complainant being dismissive of requests, being late, and Complainant's misalignment with the academic mission. Then it appears that the former president met with Complainant and Complainant's job coach, the former president made mention of Complainant having a lack of professional demeanor, and Complainant having anxiety while trying to fulfill multiple work obligations. A letter submitted by the Respondent suggests that the president at that time agreed to excuse Complainant from some meetings and requested brief reports. There are also records to show that around November/December 2018, Complainant was accused of gender discrimination when he hired a male over a female candidate. It appears that diversity training was being recommended and Complainant was resistant. Respondent also takes issue with Complainant, on January 24, 2019, having sent his personal email to students and told them to contact him directly if they had any concerns of discrimination. There was a text message and emails exchanged on May 2019 where Respondent maintains that it had to do damage control for an inappropriate speech that Complainant made to 3rd year medical students. A review of the record shows that a student complained to the student affairs office in relation to the Complainant's May 2019 speech. Respondent also maintains that the Faculty Executive Summary Report of the Standpoint Survey conducted by faculty in June and July 2019 shows low percentage ratings for items that directly relate to the Dean's functioning. Respondent maintains that Complainant was insubordinate on or around August 13, 2019 in a meeting that included his superior Dr. Dewan and Complainant's colleagues. In addition, on August 24, 2019, Complainant allegedly made a speech to incoming medical students and their parents that was inappropriate.

On the other hand, Complainant denied that Respondent informed him that it took issue with his performance. Complainant maintains that he was instrumental during Respondent's accreditation process. Complainant denied that he was ever counseled or disciplined. Complainant denied having knowledge of any complaints, and he denied being insubordinate to his superior.

The record shows that Complainant was removed as Dean in or around September 12, 2019. According to Respondent, Complainant was removed because he repeatedly failed to show leadership and professionalism.

- 3 -

It is the prerogative of the Respondent to establish terms, conditions, and standards of Complainant's employment. However, there is very little documentation that would establish that his removal from his position as Dean resulted from Complainant's behaviors and/or actions.. especially because there is no record of prior discipline. There is also a dispute among the parties concerning Complainant's knowledge of Respondent's dissatisfaction. The lack of documentation, coupled with the short time frame between Complainant's claim that he opposed discrimination and the adverse employment action, raises material issues of fact that should be resolved at public hearing.

Submitted by: _____ *Johnnaya Edmond*
                              Johnnayea Edmond
                              Human Rights Specialist II

## III.   BASIS FOR DETERMINATION

There are material issues of fact in dispute. The record shows that Complainant maintains that after he began opposing discrimination, Respondent adversely impacted his employment by removing a significant title from him and a portion of his pay. Respondent maintains that Complainant had a long history of performance issues that both predated and continued after the alleged opposition to discrimination. In addition, Respondent also disputes that Complainant's actions constitute engagement in protected activity which is another point in contention amongst the parties. However, the investigation did not show any documented attempts to cure the alleged behavior that Complainant was exhibiting; this lack of documentation which would lead one to question whether his actions rose to the level of severity that would result in adverse employment action. Complainant maintains that a month prior to his demotion, he informed his superior that he thought his wife's dispute with the Respondent concerning her pay was grounds for a discrimination case. Respondent denied that discrimination was raised as it pertains to this issue. In looking at the evidence in light of the Complainant's version of events, the timing of Complainant's demotion, a mere one month after he proposed to his superior that his wife's pay issues may constitute discrimination, may be suspect. Therefore, the remaining issues of fact in dispute include, but are not limited to, whether Complainant opposed discrimination under the law, whether Respondent was motivated by Complainant's alleged engagement in protected activity when it demoted him, and whether Respondent relied on legitimate, non-discriminatory business reasons when it removed him as Dean. These issues should be resolved in the context of a full public hearing where there is sworn testimony and the opportunity for cross-examination. Therefore, there is probable cause.

Reviewed & Approved: _____ *Johnnaya Edmond*
                                    Johnnayea Edmond
                                    Human Rights Specialist II

A0145

**A-0146**



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS<br>on the Complaint of<br><br>JULIO LICINIO, MD.,<br>Complainant,<br><br>v.<br><br>NEW YORK STATE, STATE UNIVERSITY OF NEW YORK, UPSTATE MEDICAL UNIVERSITY,<br>Respondent. | RECOMMENDED ORDER OF DISMISSAL FOR ADMINISTRATIVE CONVENIENCE<br><br>Case No. **10204906** |

Federal Charge No. 16GC000651

## PROCEEDINGS IN THE CASE

On November 18, 2019, Complainant filed a verified complaint with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the case to public hearing.

The case was assigned to Edward Luban, an Administrative Law Judge ("ALJ") of the Division. Complainant was represented by Siddartha Rao, Esq. Respondent was represented by Anne Burak Dotzler, Esq.

A-0147

 **Division of Human Rights**

**ANDREW M. CUOMO**
Governor

**JOHNATHAN J. SMITH**
Interim Commissioner


State University of New York

NOV 02 2020

Office of General Counsel
System Hearing Office

October 14, 2020

Re:   Julio Licinio, MD. v. New York State, State University of New York, Upstate Medical
      University
Case No.   10204906

To the Parties Listed Below:

Enclosed please find a copy of my proposed Recommended Order dismissing the complaint,
which complainant requests and to which the respondent does not object. The Recommended
Order will be submitted to the Commissioner for consideration as a Final Order.

Very truly yours,

Edward Luban
Administrative Law Judge

A-0148



**NEW YORK STATE** | **Division of Human Rights**

ANDREW M. CUOMO
Governor

JOHNATHAN J. SMITH
Interim Commissioner

## Notice of Important Document

| | |
|---|---|
| **ENGLISH** | This is an important document. If you need help to understand it, please call (718) 741-8255. An interpreter will be provided free. |
| **Español** **Spanish** | Este es un documento importante. Si necesita ayuda para entenderlo, por favor llame al (718) 741-8255. Se le proveerá un intérprete gratis. |
| 简体字 **Simplified Chinese** | 这是一份重要文件。 如果您需要帮助理解此文件， 请打电话至 (718) 741-8255。 您会得到免费翻译服务。 |
| 簡體字 **Traditional Chinese** | 這是一份重要文件。如果您需要幫助理解此文件，請打電話至 (718) 741-8255。 您會得到免費翻譯服務。 |
| **Kreyòl Ayisyen** **Haitian Creole** | Sa a se yon dokiman enpòtan. Si ou bezwen èd pou konprann li, tanpri rele: (718) 741-8255. Y ap ba ou yon entèprèt gratis. |
| **Italiano** **Italian** | Il presente documento è importante. Per qualsiasi chiarimento può chiamare il numero (718) 741-8255. Un interprete sarà disponibile gratuitamente. |
| 한국어 **Korean** | 이것은 중요한 서류입니다. 도움이 필요하시면, 연락해 주십시오: (718) 741-8255. 무료 통역이 제공됩니다. |
| **Русский** **Russian** | Это важный документ. Если Вам нужна помощь для понимания этого документа, позвоните по телефону (718) 741-8255. Переводчик предоставляется бесплатно. |

Office of Administrative Law Judges, One Fordham Plaza, Fourth Floor, Bronx, New York 10458
(718) 741-8255 | Facsimile (718) 741-8333 | WWW.DHR.NY.GOV

A0148

Page 1

Licinio, M.D. v Soni, et al   5/31/2022   J. Licinio, M.D.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT Of NEW YORK

JULIO LICINIO, M.D., P.H.D., M.B.A., M.S.,

      Plaintiff,

v                                    Index No. 1:21CV-387

STATE OF NEW YORK, STATE UNIVERSITY

OF NEW YORK, STATE UNIVERSITY OF NEW

YORK UPSTATE MEDICAL UNIVERSITY,

      Defendants.

_____X

            DEPOSITION OF: JULIO LICINIO, M.D.

            DATE:        May 31, 2022

            TIME:        10:00 a.m. to 5:45 p.m.

            VENUE:       WebEx

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 111

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                    Q.   Did you delegate any of the

3        responsibilities for this list to other people?

4                    A.   Yes, there was a whole team

5        involved.  And to be, you know, fair, the team was

6        already, you know, formed and beginning to work on

7        this before -- before I arrived.  There was a meeting

8        right in July.  So like, right when I was arriving

9        and so there was a team already involved in this

10       process.  And so different people were already

11       working in different components.  So I did not, you

12       know, change that.

13                    Q.   Do you know when they began to

14       work on this process?

15                    A.   Sometime before that but I don't

16       know, I wasn't there.  I really cannot comment.

17                    Q.   Did you assist in hiring a

18       consulting firm to assist in this accreditation

19       process?

20                    A.   Yes, I did.

21                    Q.   What -- what consulting firm was

22       that?

23                    A.   Was that P.W.C., Pricewater --

24       yeah, PWC.

25                    A.   Price-Waterhouse?  Yes, Coopers

ARII@courtsteno.com                            www.courtsteno.com

800.523.7887                              Associated Reporters Int'l., Inc.

Page 143

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                 A.    Not -- I don't recall, I don't

3        know what the outcome was.  And a lot of the

4        discipline issues are confidential so I -- I was not

5        privy to that.

6                 Q.   All right.  With respect to

7        investigating complaints of discrimination, who at

8        Upstate was tasked with those investigations while

9        you were dean?

10                A.    There are two ways that a person

11       can go and -- and is this as an observer, so if you

12       can, maybe, you know, memory may be failing, but as

13       far as I recall, there are two pathways you can take.

14       You can go straight to the Office of Diversity and

15       Inclusion and launch -- there are three ways

16       actually.

17                You can go to the Office of Diversity

18       and Inclusion and then launch a complaint there to

19       that office.  You can go to your supervisor and --

20       and it has -- did a workshop to all, you know,

21       Upstate heads of administrative units, and said that

22       if someone under them raises a complaint that's in

23       the scope of O.D.I. then it's that person's

24       responsibility to pass it to O.D.I.

25                And I have the slide that that was

ARII@courtsteno.com                        www.courtsteno.com

800.523.7887                                          Associated Reporters Int'l., Inc.

Page 144

Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        presented and it was provided to me as part of

3        discovery.  So -- so it can be -- a complaint can be

4        made by the supervisor, if the supervisor hears about

5        it, told O.D.I.

6             And the person can also go

7        independently, you know, they can do all three, but

8        like, another pathway that could be independent is

9        that they can go straight to H.R.  And so in H.R., I

10       would imagine that they would refer them to the

11       O.D.I. if it's an -- an issue related to

12       discrimination or inclusion of retaliation, so they

13       could go -- I'm just talking about the starting

14       point.

15            So you could start talking to your

16       supervisor and the supervisor, job states and

17       materials has a responsibility should then report to

18       O.D.I. and O.D.I. probably would approach the person

19       and then take it from there.

20            And the person at some point would

21       have to file a complaint if they want to have the

22       issue pursued.  But the pathway would begin through

23       the supervisor, the person can on his or her own go

24       straight to O.D.I. or the person his or her own can

25       also go straight to H.R. and then the pathways would

ARII@courtsteno.com                                   www.courtsteno.com

800.523.7887                          Associated Reporters Int'l., Inc.

Page 146

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2          alleges that you appointed an all-female external

3          scientific advisory board, correct?

4                     A.   Yes.

5                     Q.   And when was that?

6                     A.   It's my belief that it was in

7    2018.  I don't think it was in '19, but -- no, it was

8    in '18.

9                     Q.   Do you recall what month in 2018?

10                    A.   It was earlier -- earlier in the

11   year because they -- they did do a visit in Upstate.

12                    Q.   How many women were on that

13   board?

14                    A.   And the visit was in '18 -- was

15   in '18.

16                    Q.   Okay.  How many women did you

17   appoint to that board?

18                    A.   I don't recall and I -- I mean,

19   the -- the membership of the board is part of the --

20   of the university's records.  So you can look at

21   that, but I appointed more than ten and a subset of

22   those --.

23                    Q.   All right.  And -- and did you

24   personally appoint those numbers?

25                    A.   Yes, all of them.

800.523.7887                          Associated Reporters Int'l., Inc.

Page 150

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2                    Q.   Did you ask anybody about why

 3   that meeting didn't happen?

 4                    A.   No.

 5                    Q.   Did that -- did that board ever

 6   meet again?

 7                    A.   Not to my knowledge.

 8                    Q.   Did you ever ask whether that

 9   board had been disbanded?

10                    A.   I asked Renaida if she received

11   anything about the board being disbanded.  When I did

12   ask, she did not receive any note about, I think it

13   was the same conversation even if the board had

14   disbanded them.  She said -- she told her that that

15   meeting was not going to happen.

16                    Q.   Did any of the other board

17   members reach out to you regarding the board or the

18   board disbanding, or the meetings not happening?

19                    A.   Many of them knew that I was no

20   longer the dean so they did not ask.  I didn't have

21   that -- those conversations with people.

22                    Q.   Did you ever --?

23                    A.   I think it was a Kathleen

24   (phonetic spelling) I may not have cited her

25   initially, but now since you asked then she did ask
```

ARII@courtsteno.com                          www.courtsteno.com

A-0155

800.523.7887                              Associated Reporters Int'l., Inc.

Page 151

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        me like it's a national conference that we -- I

3        bumped into her.  She says, what happened, are we

4        meeting again, et cetera.  We, you know, because

5        another dean could still have the same board.

6                    And I said I did not know.  It was a

7        very like, you know, when two people are walking like

8        this, you just crossed paths and she asked me

9        something quickly now that you asked, I recall that

10       very brief interaction like whoa, what's going on

11       with the board, is it still on or what's going on, I

12       do not know.

13                    Q.   Did you ever -- did you ever make

14       any complaints to anyone at Upstate about the board

15       disbanding, or the meetings not happening again?

16                    A.   Not specifically.

17                    Q.   Did any of the women on the

18       board, did they ever make any complaints to your

19       knowledge?

20                    A.   I think they -- those two, they

21       didn't make like a complaint.  But they commented oh,

22       how come and I wasn't -- the process, why -- why

23       isn't this going on, but they did not file a

24       complaint to anybody.

25                    Q.   And when you say they -- they

ARII@courtsteno.com                       www.courtsteno.com

A-0156

800.523.7887                                    Associated Reporters Int'l.. Inc.

Page 154

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2       just happened incidentally, but I was curious to see

 3       if he was going to say, oh you know, we don't need

 4       one or, you know, he didn't make any comment about

 5       whether the board was necessary or not.

 6                   He didn't tell me not to do it and I

 7       said, we're going to have this upcoming meeting, he

 8       did not say, oh, how come and why and he didn't

 9       question me in any way as to whether the meeting was

10       necessary.

11                   Q.   Did he make any comments

12       specifically about the gender of the board members?

13                   A.   No.

14                   Q.   Sorry, I didn't catch that.

15                   A.   No.

16                   Q.   No, okay.  Your complaint

17       indicates that you supported a Diversity Committee

18       that met monthly, correct?

19                   A.   Yes.

20                   Q.   That diversity committee, did

21       that committee already exist or did you create that

22       committee?

23                   A.   No, it already existed and I kind

24       of revamped it.

25                   Q.   When you say revamp, what do you
```

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                              Associated Reporters Int'l., Inc.

Page 167

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2                  Q.    Okay.  Now, the budget committee

 3    they discuss, I guess, the financial aspects of

 4    different branches of the university.  Is that fair?

 5                  A.    That was the stated goal of the

 6    committee.

 7                  Q.    Okay.  Do you know how committee

 8    members are chosen?

 9                  A.    They were appointed.  I don't

10    know how.

11                  Q.    But you did --?

12                  A.    Yeah, I -- I did not choose them

13    and I don't know what thought processes were in the

14    person, who's the head of the person, who made those

15    choices.

16                  Q.    Sure.  Are there are a set number

17    of -- of numbers for that committee?

18                  A.    Not to my knowledge.

19                  Q.    And May and June of 2019, do you

20    know who the members were at that time?

21                  A.    There was myself, Dr. Jean, who

22    was representing the practice group for the

23    physicians.  So the two C.F.O.s -- the C.F.O. for the

24    university, Eric Smith, the C.F.O. for the hospital,

25    and Stuart Wright, the head of the hospital, Dr.
```

ARII@courtsteno.com                            www.courtsteno.com

800.523.7887                              Associated Reporters Int'l., Inc.

Page 168

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        Robert Corona, the president.

3                 And there was also the president's

4        chief of staff who was there and she could make a

5        comment every now and then but it was not like -- she

6        was not there to be a member of the committee if you

7        understand what I'm saying, like she was taking notes

8        and organizing the meetings, et cetera.

9                 So that was at that time, Linda Vate.

10       Before had been Sergio Garcia, but anyway -- and

11       there may have been one more person, I'm trying to

12       remember who, that wasn't missing.  I may have been

13       -- I may be missing one member, but that's -- these

14       people that I told you were members ...

15                 Q.   Now the members of this

16       committee, did their positions at the hospital

17       directly oversee the -- the finances of the

18       university?

19                 A.   Principle, yes.  But for example,

20       I'm the dean of the College of Medicine.  The other

21       three deans they were -- there is a College of

22       Nursing, and there's a College of Allied Health.  So

23       those two deans they were not in that meeting.

24                 So I mean, the College of Medicine is

25       the biggest one, but -- but I was not told ever why

ARII@courtsteno.com                          www.courtsteno.com

A-0159

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 169

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2       aren't the other colleges' deans represented.  So if

3       you ask -- if, you know, all the budget units, they

4       were not the College of Nursing and Health

5       Professions were not representative in this meetings.

6                    Q.    Then your complaint indicates

7       that you suggested that a senior associate dean of

8       faculty affairs be added to this budget committee

9       Who is that?

10                   A.    Dr. Ann Botash.

11                   Q.    And is -- in her position as a

12      senior associate dean of faculty affairs, did she

13      directly oversee finances for the college?

14                   A.    The simple answer is no, more

15      lengthy answer is that that budget committee even

16      though the name was a budget committee, over the

17      course of time, really oversaw all the business of

18      the university.

19                   So we discussed multiple, multiple

20      items that had nothing to do with budget.  So if you

21      say, okay, was this a budget committee that only

22      discussed budgetary issues, and you're suggesting

23      that someone who's not a budget person be there.

24                   So no I suggested someone who's not a

25      budget person be there because there were many items

A-0160

800.523.7887                           Associated Reporters Int'l., Inc.

Page 170

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2        related to faculty, and to the school of medicine

3        that were being discussed there.  And she was the

4        senior associate dean for the -- for faculty affairs

5        and faculty development.

6                    So the answer is no, she did not have

7        a budgetary, you know, responsibility.  But yes, she

8        oversaw a lot of items that were under active

9        discussion in the -- in those regions.  So the

10       meetings -- budget committee, it was not -- the

11       meetings were not restricted to discussion of budget

12       items.

13                    Q.   Who did she report to directly?

14                    A.   Jimmy.

15                    Q.   Did you speak to her about her

16       wanting to be added to that committee?

17                    A.   I didn't.  Knowing her well, you

18       know, I didn't know -- yes -- yes.

19                    Q.   Did she ever talk to you?  Did

20       she ever request to be added to that budget

21       committee?

22                    A.   She didn't, but at some point, I

23       did -- after I had made the request, and I have no,

24       you know, input, you know, no response that didn't

25       happen.  I talked to her about it, so I did talk to

ARII@courtsteno.com                          www.courtsteno.com

A-0161

800.523.7887                        Associated Reporters Int'l., Inc.

Page 171

1     Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2          her.  And then she -- she said, within the university

3          everybody knows that the group was the boys club.

4                    And she -- my understanding from the

5          context of the conversation is that she would very

6          much like to be part of the group.  But just so it

7          was a boys' club, and was not included.

8                    Q.    Did she ever ask to be included

9          into the budget committee to your knowledge?

10                   A.    No.

11                   Q.    No, she hadn't asked to be part

12         of the budget committee?

13                   A.    No.  And just for you to know I

14         -- what I suggested to Dr. Dewan, people who could be

15         considered for the committee and of course, at that

16         point, since I don't run the committee, he would have

17         to talk to them.

18                   And then invite.  I'm not going to --

19         I don't run the committee, I'm not in charge of the

20         committee.  I think to be -- it have been highly

21         inappropriate for me to tell the person, do you want

22         to be in this committee that I have no decision-

23         making power to make them join.

24                   So I suggested that for them to him as

25         potential, you know, kind of a useful people to have

ARII@courtsteno.com                        www.courtsteno.com

A-0162

800.523.7887                                Associated Reporters Int'l., Inc.

Page 173

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2                     Q.   Okay.  You didn't -- you didn't

 3   say anything after you suggested that?

 4                     A.   It was just kind of dead silence,

 5   you know.

 6                     Q.   Okay.  And how many times did you

 7   suggest this to Dr. Dewan?

 8                     A.   To my -- to the best of my

 9   recollection right now, twice.

10                     Q.   Do you recall exactly when you

11   recommended this to Dr. Dewan?

12                     A.   No, the chronology I don't

13   remember off the top of my head.

14                     Q.   And his response to both times

15   you suggesting this was -- was silence?

16                     A.   Icy, glacial silence.

17                     Q.   Okay.  So he didn't mention

18   anything about Dr. Botash's gender in response to you

19   making this recommendation?

20                     A.   I mean, I mentioned we needed

21   women at the committee, and I said -- nominated a

22   woman, he didn't say, you know, he didn't say

23   anything, so.

24                     Q.   Okay.  So obviously he never made

25   any comments about her gender or her national origin
```

ARII@courtsteno.com                              www.courtsteno.com

A-0163

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 174

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2         or her race or anything like that?

 3                   A.   Not that I recall.

 4                   Q.   Did you specifically say to Dr.

 5    Dewan that you thought that women should be added --

 6                   A.   Yes --

 7                   Q.   -- or did you just --?

 8                   A.   -- specifically.

 9                   Q.   Okay.  And -- and again, that was

10    on two separate occasions?

11                   A.   Yes.

12                   Q.   Your complaint states you

13    suggested a female chief medical officer be added to

14    this budget committee?

15                   A.   Yes.

16                   Q.   Who was that?

17                   A.   I'm blanking her name right now.

18    It's in the complaint I can look, you know, if you --

19    I don't know if the names is in the committee but in

20    the complaint but it's Amy Tucker -- Amy Tucker.

21                   Q.   Okay.  And some questions with

22    respect to her that I just asked about Dr. Botash,

23    did -- what was her position at that time, did it

24    directly oversee finances?

25                   A.   Well, she's the Chief Medical
```

ARII@courtsteno.com                                    www.courtsteno.com

A-0164

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 175

1   Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2       Officer so she oversees all the clinical services in

3       the hospital.  So the clinical services are actually

4       a major source of a financial expenditure, so she is

5       very on the pulse of where the money is going, what

6       the expenditures are, what's needed clinically, what,

7       you know, where we have to, you know, hire additional

8       nurses or more doctors or the services here needs

9       extra, you know, coverage.

10                  So she knows the pulse of where the

11      money, you know, is being, you know, spent.  So --

12                  Q.   Who did she report --?

13                  A.   -- I don't -- I don't know her

14      job, because she works at the hospital.  So she -- I

15      don't -- I'm not her supervisor so I don't know if

16      she has a budgetary, you know, she signs for budget

17      items, I don't have that answer.  I don't know the

18      information.

19                  But I do know that she knows where the

20      expenditures are and if you, you know, if you're

21      talking about the budget, budget is how you spend the

22      money so.

23                  Q.   Who did she report to at that

24      time?

25                  A.   Dr. Robert Corona.

ARII@courtsteno.com                            www.courtsteno.com

A-0165

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 176

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                        Q.    Was he a part of the budget

3    committee?

4                        A.    He was a part of the budget

5    committee.

6                        Q.    Did you ever speak to Dr. Tucker

7    about the same questions that I just asked and I

8    think you've already answered these, but --?

9                        A.    Yes.  No, not to Dr. Corona

10   either.

11                       Q.    Did Dr. Tucker ever express

12   interest to you about joining the budget committee?

13                       A.    No.

14                       Q.    To your knowledge, did she ever

15   complain that she wasn't added to the budget

16   committee?

17                       A.    No.

18                       Q.    Who was -- who established the

19   budget committee, if you know?

20                       A.    The previous president, but --

21   and I sat in the budget committee with her and with

22   Dr. Dewan.  So with her it was really discussing

23   budget items, the items are purely budget.  And then

24   she had other meetings to discuss administrative and

25   like, you know, other ongoing issues.  And that I

ARII@courtsteno.com

www.courtsteno.com

A-0166

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 178

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                    I don't know what the other people

3    were, who else called it the boys' club.  But based

4    on what she told me, other people called it that

5    including her, but I only know her.  She's the only

6    one who spoke to me.

7                    Q.    To your knowledge, were there any

8    women who expressed interest in becoming a committee

9    member and they were denied membership?

10                   A.    Not to my knowledge, other than

11   what we've just spoken, yes.

12                   Q.    Well, you said other than what we

13   just spoke about, neither Dr. Botash nor Dr. Tucker

14   ever expressed interest in becoming part of that

15   committee to your knowledge, right?

16                   A.    Well, when I talked to them -- to

17   them and to Dr. Botash I mean, she said the boys'

18   club.  She -- it was implicit in what she said that

19   she would be happy to be part of the community, but

20   she didn't, you know, she was not petitioned.  Let's

21   put it like that.

22                   Q.    All right.  Okay.  So she didn't

23   express that to the budget committee that she wanted

24   to join in?

25                   A.    No.  Excuse me, sorry.

ARII@courtsteno.com                            www.courtsteno.com

A-0167

800.523.7887                                     Associated Reporters Int'l., Inc.

Page 193

 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2        for sure.  So just for the record, I -- I don't know

 3        the exact title, but it's publicly available.

 4                    And she's African American and her

 5        name is Nikkia Chambers and then Dr. Dewan would say

 6        very exasperated.  We already have Nikkia Chambers in

 7        -- in diversity, why -- what should -- what did she

 8        do all day, why can't you do this and what's she

 9        doing all day, and it said that on multiple

10        occasions.

11                    Q.   Okay.  So --

12                    A.   And then I --.

13                    Q.   -- so his complaint was that --

14        strike that.

15                    Essentially what he was saying was

16        that, why do we need another position if we already

17        have someone who is covering those duties?

18                    A.   Yes, but the duty is not --

19        Nikkia Chambers has a master's degrees.  She's not a

20        doctor, she does not -- she cannot teach cultural

21        competence in the medical -- she cannot like embed

22        cultural competence in the medical curriculum.

23                    So just as an example, we had

24        dermatology class, some students complained to me

25        that they had the whole dermatology course and so

ARII@courtsteno.com                              www.courtsteno.com

A-0168

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 195

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         that job, but my -- my answer to you is that no, that

3         person cannot do that job.

4                   Q.   Okay.  So when you say aggressive

5         objection, how many times are you alleging that Dr.

6         Dewan objected to this position?

7                   A.   That I recall specifically three.

8                   Q.   Do you recall when that happened?

9                   A.   No.

10                  Q.   Any ballpark figure of any months

11        or -- or when in 2019 --?

12                  A.   It's spring of 2019.

13                  Q.   And were those objections in

14        writing or were they verbal, how did he make them?

15                  A.   Verbal.

16                  Q.   Did he specifically say anything

17        about the gender or the race or national origin of

18        the person that you were seeking to fill that role?

19                  A.   No, but I did.

20                  Q.   Okay.  So he didn't -- he didn't

21        bring up the race or gender or national origin in

22        these conversations you brought it up, correct?

23                  A.   I brought it up.  It was part of

24        the conversation, yes.

25                  Q.   After your demotion, was that

ARII@courtsteno.com                              www.courtsteno.com

A-0169

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 203

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         express any disagreement with that -- with that

3         choice?

4                        A.   He didn't express agreement or

5         disagreement.  He didn't express anything.  And then

6         the next meeting that I had with him I was removed

7         from the position as dean.

8                        Q.   At any point did --?

9                        A.   The last interaction that I had

10        with him before the demotion of exactly that meeting

11        that I -- it was a group meeting that I disclosed

12        that that I had talked to people and with the panel.

13        And the panel had identified this person as the

14        candidate, as the leading candidate.

15                       Q.   And at any point did Dr. Dewan

16        express disagreement with that choice?

17                       A.   He didn't say anything.  He

18        didn't express agreement, he didn't express

19        disagreement.

20                       Q.   Okay.  And according to what you

21        just said, he needs to sign off on that chair choice?

22                       A.   Yes.

23                       Q.   And he signed off on Dr. Xhang as

24        the choice?

25                       A.   It's my understanding although it

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                                   Associated Reporters Int'l., Inc.

Page 204

```
1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2         would be very awkward for him to have a panel --the
3         panel recommend somebody and then he says no just
4         appoint a person and then he appoint --.
5                   Q.   Okay.  Well, you said that he had
6         -- you said that he had told you that he thought that
7         Dr. Gorji was --.
8                   A.   He already was qualified, yes, to
9         do the job.
10                  Q.   Okay.  Did he say it was because
11        he was a man?
12                  A.   Not specifically, no.
13                  Q.   Did he say that a -- a female
14        doctor was not fit for that position?
15                  A.   No.
16                  Q.   Did he indicate that the outgoing
17        chair had told him that his recommendation would be
18        -- would be Dr. Gorji?
19                  A.   I don't recall him specifying
20        that.  And the outgoing chair is also -- actually not
21        supposed to make any recommendations.  So but if he
22        did he did not -- Dr. Dewan did not pass the
23        knowledge to me.
24                  Q.   Is Dr. Xhang still in that
25        position as the -- as the chair of anesthesiology?
```

ARII@courtsteno.com                           www.courtsteno.com

800.523.7887                              Associated Reporters Int'l., Inc.

Page 205

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                    A.    She was actually promoted -- that

3    was -- she was interim chair.  So this was a whole

4    discussion was she appointed as -- as interim chair.

5                    Q.    All right.

6                    A.    So typically then you find -- do

7    a national search and Dr. Dewan said in a public

8    meeting that there would be a national search for

9    that position.  Then he just appointed her as a

10   permanent chair at some point.

11                   Q.    Okay.  Initially --.

12                   A.    That's when I filed my complaint

13   by the way.

14                   Q.    Okay.  Initially as -- as dean in

15   2017 you reported to President Danielle Laraque-

16   Arena, correct?

17                   A.    Yes.

18                   Q.    And did you meet with her on a --

19   a regularly-scheduled basis?

20                   A.    Yes.  Weekly.

21                   Q.    Was it always just the two of you

22   during those weekly meetings or did anybody else

23   join?

24                   A.    At different points depending on

25   the level of -- on the topic being discussed there

ARII@courtsteno.com                        www.courtsteno.com

A-0172

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 206

```
1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         could be -- one day I remember I brought the student

3         if I wanted her to meet the very talented African

4         American student with considerable profession --

5         potential.  Had already been a nurse and, you know,

6         like a higher role before and I thought she, you

7         know, should meet the president.

8                   I -- sometimes if the topic was the

9         hospital -- the hospital director would be there.

10        Sometimes it was finance -- the head of finance would

11        be there.  Typically, the meetings would be just me

12        and the president, but occasionally there would be

13        somebody else.

14                  Q.   At some point did Dr. Corona

15        start attending these meetings with you and -- and

16        the president?

17                  A.   Yes.

18                  Q.   Do you remember when that was?

19                  A.   I don't remember a date.  It was

20        late in the process.  The president has -- had

21        already been -- you know, there was a whole situation

22        with she hired someone who turned out to be an

23        imposter.  The person had been exposed.  There was a

24        lot of negative publicity at the university so it was

25        after that.  So it was towards the end of her time.
```

ARII@courtsteno.com                              www.courtsteno.com

A-0173

800.523.7887                                          Associated Reporters Int'l., Inc.

Page 211

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                        MS. COWAN:  Yeah, that was in your

3          letter that you just sent to me on last week.  I

4          think it was Friday.

5                        MR. GRACE:  Yeah.  And -- and was in

6          our original request as well.  It just hasn't seemed

7          to be turned over.

8                        BY MS. COWAN:  (Cont'g.)

9                        Q.   Dr. Licinio, the evaluation did

10          -- did the president fill that out completely herself

11          or did you have a part that you filled out?  Or -- or

12          what was it like?

13                        A.   I arrived.  She handed it to me.

14                        Q.   Okay.  Now you -- you said that

15          the president never -- never critiqued your

16          performance as a dean.  Did she ever discuss any

17          concerns about your behavior?

18                        A.   Not specifically.  She did say

19          that I had an issue in communication with her because

20          I'm very direct.  If I something is wrong I say

21          something is not right.  I tend to be very, very

22          direct with the people that I speak to.  And a lot of

23          the people in administration are more kind of

24          circumspect and they don't say exactly what they are

25          thinking.  So she said so we have to work on our

ARII@courtsteno.com                                    www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 224

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2        coach himself.  And that we had to negotiate that

 3        with him.  That's how I actually even learned to --

 4        to know that this was a possibility.  And --.

 5                    Q.    Did you have any --?

 6                    A.    Yeah, and talking to people it's

 7        very common across the country.  So whether other

 8        people at Upstate had requested, not to my knowledge.

 9        But I know it's a common procedure across the

10        country.

11                    Q.    Did you have an executive coach

12        at any of the other universities that you worked at

13        other than Upstate?

14                    A.    No.

15                    Q.    Did -- when President Laraque-

16        Arena was -- was there as president, did she ever

17        speak to you about arriving late to meetings?

18                    A.    Sometimes she did.

19                    Q.    Did she criticize you for

20        arriving late to meetings at times?

21                    A.    She did in passing so it was not

22        -- when we had our one-to-one she never said to me

23        like, you know, I'm, you know, please make sure to

24        arrive on time at the meetings.  But when I would

25        arrive in the meeting a little late she would say --
```

ARII@courtsteno.com                              www.courtsteno.com

A-0175

800.523.7887                          Associated Reporters Int'l., Inc.

Page 230

1     Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2            you know, for this role.  Or do I go and talk to the

3            minority students so and leave the meeting which

4            gives the signal that you're not that interested.

5                        So I left and I went to meet with the

6            minority students.  It was PAW, a preadmission

7            workshop for Native American students that I, you

8            know, kind of supported and took place during my term

9            as dean for the first time in many years.  So anyway

10           so I recognized that over the -- over the interest on

11           being president.  So, yes, I showed some interest but

12           I -- I mean, I said all I had to say.

13                       Q.    Okay.  So Dr. Dewan was chosen as

14           interim president December 2018.

15                       A.    Yes.

16                       Q.    Shortly after his appointment did

17           he have a conversation with you where he expressed

18           that there was concerns about your performance?

19                       A.    No.  He never said specifically

20           that there are like, you know, concerns about your

21           performance or that you, you know, and the concerns

22           are A, B, C and you should work on A, B, C and then

23           we -- we -- he never brought to me any performance-

24           related issues.

25                       Q.    Did he discuss with you that he

ARII@courtsteno.com                          www.courtsteno.com

A-0176

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 231

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2        was going to give you a chance to be successful under
 3        his presidency?
 4                     A.   He did say that but -- and I was
 5        kind of a little perplexed because he didn't say
 6        specifically like, you know.  I mean, I know you're
 7        hired by one president, of course.  You want, you
 8        know, during the new administration and -- and you
 9        work in that -- you want to continue in that
10        position.  So I was happy to hear that but he didn't
11        -- he never said, you know, you are not doing A, B,
12        and C well.  And, now, you know, if you want to stay
13        as dean you should be, you know, do D, E, and F
14        instead.
15                     Q.   So he never passed on any
16        concerns that others shared about your performance as
17        the dean?
18                     A.   No, never.
19                     Q.   Did he have a conversation with
20        you shortly after he was appointed where he indicated
21        that you were not invited to certain events like the
22        State of the University address?
23                     A.   I mean, everybody is invited to
24        those events.  There was no -- no such a thing, it's
25        an event at the university, there is no such a thing
```

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 236

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    Q.   Dr. Licinio, I don't want to cut

3        you off.  But really --.

4                    A.   Yeah, but -- but - but my point

5        is that he did say -- he did say -- but I think the

6        question is a little bit misleading, because he did

7        say that I should look for another -- that I should

8        explore other jobs, because he said that, you know,

9        when a new -- a new permanent president come there is

10       a seventy percent possibility that that person will

11       want to bring their own team and their own dean.

12                   So he did say that in that context,

13       but not my about my performance as dean.

14                   Q.   Okay.  Do you recall speaking

15       with Dr. Dewan and asking him if he was going to fire

16       you?

17                   A.   I don't recall that specifically,

18       no.

19                   Q.   During the course of Dr. Dewan's

20       interim presidency, and then presidency, did he have

21       any conversations with you about anything that you

22       said or did where he thought it was inappropriate?

23                   A.   No.

24                   Q.   He never told you that anything

25       you -- you ever said or did was inappropriate?

ARII@courtsteno.com                         www.courtsteno.com

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 267

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                      And I just wanted to share with Dr.

3    Dewan what -- how that salary structure was created

4    in the first place.

5                      Q.  At that time when you talked to

6    Dr. Dewan in March 2019, did you tell him or did you

7    complain to him that you felt that this was due to

8    discrimination?

9                      A.  In the email correspondence that

10   you have, no.  And -- and it shows there is email,

11   but there is another email at Upstate has that --

12   then as his response to my email, and it says, thanks

13   for bringing me to my -- this to my attention, it's

14   very polite.

15                     But it doesn't in any way criticize

16   the fact that I brought it to him, or that I was

17   involved in.  I then got myself for that one, you

18   know, iteration involved in that one interaction --

19                     Q.   Okay.  But if that --.

20                     A.   -- my wife talked to Dr., you

21   know, Swortz multiple times through Dr. Dewan, the

22   two of them together.  So there were multiple --

23   multiple interactions around the issue of her salary.

24   I just got involved in that one, you know, via email

25   and then subsequently in the conversation in his

ARII@courtsteno.com                           www.courtsteno.com

A-0179

800.523.7887                              Associated Reporters Int'l., Inc.

Page 268

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2        office.
 3                    But he wrote back, you know, thank you
 4        so much, you know, he didn't say, you know, that is
 5        not appropriate or you should not be involved here.
 6                    Q.  Right.  But in March 2019, you
 7        didn't complain to Dr. Dewan that your wife was being
 8        discriminated against?
 9                    A.   No.
10                    Q.   And the first time that you
11        complained that your wife was being discriminated
12        against was in the August 12, 2019, meeting, correct?
13                    A.   Yeah.
14                    Q.   When did your wife complain to
15        you that she was -- she felt she was being
16        discriminated against?
17                    A.   I don't recall the date.
18                    Q.   Was it before your August 12,
19        2019, meeting?
20                    A.   It was before that, yeah --
21                    Q.   Was there --?
22                    A.    -- I'm trying to determine if it
23        was before or after that -- the March email, I don't
24        recall.
25                    Q.   Did you report her complaint to
```

ARII@courtsteno.com                              www.courtsteno.com

Page 273

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    A.    I cannot comment on that.  I

3        don't know to Dr. Swortz specifically, I was not in

4        the meetings.

5                    Q.    Okay.

6                    MR. GRACE:  I just want to note my

7        objection for the record.

8                    BY MS. COWAN::  (Cont'g.)

9                    Q.    During that meeting with Dr.

10       Dewan on August 12, 2019, you indicated in your

11       complaint that you told him you felt that she was

12       being discriminated against because no other white

13       male professor was facing the same salary challenges.

14       Is that --

15                   A.    Yeah.

16                   Q.    -- is that fair to say?

17                   A.    Yes.  And I even -- yeah, I

18       specifically said that she would have reason both

19       under Title Seven, and I use those words, both under

20       Title 7 and Title 9, to file a complaint.  But I hope

21       we could resolve this amicably, something along those

22       lines, but I just -- I -- I did say that I felt she

23       would have reason to file a complaint under Title 7.

24                   Q.    So you told Dr. Dewan in this

25       meeting between the two of you that she could file a

Page 288

Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

1

2       withdrawn, after it became known that I had -- I was

3       no longer the dean at Upstate.

4                       Q.    When did you apply for the UNLV

5       position?

6                       A.    I don't remember -- I mean, the

7       exact date was obviously, before because they were

8       already -- I had reviewed -- usually there is an open

9       period that during which people send applications

10      then the -- the closed search, the committee has

11      about two weeks to study the candidates.

12                      And then they choose, but I don't

13      remember the exact dates that I sent the application.

14                      Q.    Sure.  I'm just trying to get a

15      timeline, was it one month before this -- this

16      meeting, was it two months, six months?

17                      A.    That -- that typical timeline

18      would have been two to three months, maybe two months

19      --

20                      Q.    Okay.

21                      A.      -- two to three, but one month

22      would have been too short.  But between one and

23      three, but I don't remember when it was, but it was

24      -- it was not the year before, it was not six months

25      before.

A-0182

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 289

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                          Q.    Did you apply to any other

3    colleges or universities for any other positions

4    during the time that Dr. Dewan was president?

5                          A.    Yes.

6                          Q.    Where else?

7                          A.    I applied at Harvard to be the

8    Senior Associate Dean for Faculty Affairs, and I was

9    interviewed.  I applied at University of Arizona

10   College of Medicine, and I was interviewed.  I went

11   to Tucson and I was interviewed.

12                         Remember that I told that there were

13   two of them in Phoenix, the other one in Tucson so I

14   was the dean of the one in Tucson, I interviewed

15   there.  I applied to be president of the Rosalind

16   Franklin University of Medicine and Science in

17   Chicago, and I was interviewed by the Board of

18   Trustees.  And I was a finalist and interviewed.

19                         Q.    Okay.  So let's go through those

20   then, specifically with respect to Harvard, when did

21   you interview -- when did you apply for that

22   position?

23                         A.    Again, I don't have -- I don't

24   have a clear recollection, it was after Dr. Dewan

25   began and before of course, before I was demoted, but

ARII@courtsteno.com                              www.courtsteno.com

A-0183

800.523.7887                          Associated Reporters Int'l., Inc.

Page 290

```
1    Licinio, M.D. v SONY, et al – 5/31/2022 - J. Licinio, M.D.

2         it was like spring of 2019.

3                    Q.   And you obviously were not chosen

4         for that position?

5                    A.   No, but I was -- usually they

6         receive like, a large number of applicants.  I was

7         interviewed, I was selected, I was -- ten people

8         selected for, you know, shortlisted for interview.

9         But I was ultimately not given the position.

10                   Q.   When did you find out you were

11        not given that position?

12                   A.   Sometime in the spring.

13                   Q.   The spring of 2019?

14                   A.   Yes.

15                   Q.   Okay.  Do you know if Harvard

16        called any references or spoke to any references?

17                   A.   No, I don't know.

18                   Q.   All right.  So you -- you were

19        interviewed and you were one of ten people who --

20                   A.   Yeah.

21                   Q.    -- possibly could be taking over

22        this position, but you found out in the spring 2019,

23        you did not get the position?

24                   A.   Yes.

25                   Q.   So that was before your demotion
```

ARII@courtsteno.com                    www.courtsteno.com

A-0184

800.523.7887                          Associated Reporters Int'l., Inc.

Page 291

```
1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2         occurred, right?
3                   A.    Yes.
4                   Q.    With respect to the Arizona --
5         the Tucson location, when did you apply for that
6         position?
7                   A.    It -- I think it was in -- that
8         was before, so maybe in the winter of that year, like
9         from 2018 to '19.
10                  Q.    Okay.  I'm sorry, I can't
11        remember what you said, did you interview for that
12        position?
13                  A.    Yes, I went to Tucson and
14        interviewed there, yes.
15                  Q.    And what was the result of that
16        process?
17                  A.    I was not given the job.  But as
18        we go along here -- I just would like to tell you
19        that, typically these positions they have like
20        seventy applicants so to be one of like, you know,
21        around eight who is called for an in-person interview
22        is a -- is a big deal.
23                  And I was selected for interview, so I
24        was selected for interview, I was a finalist but I
25        was not offered the position as were seven or eight
```

ARII@courtsteno.com                            www.courtsteno.com

A-0185

800.523.7887                                      Associated Reporters Int'l., Inc.

Page 292

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         other people who they interviewed, eight people and

3         they only offer to one, the other seven are not

4         offered a position.

5                    Q.   When did you find out that you

6         were not chosen for that position?

7                    A.   I don't recall, I don't have the

8         timeframe.

9                    Q.   Was it before or after your

10        demotion?

11                   A.   That was all before.

12                   Q.   And then I think you said there

13        was a university in Chicago that you applied to as

14        well?

15                   A.   Yes.  They contacted me -- the

16        recruiters contacted me to be considered for the

17        president role, I became a finalist.  And then I went

18        to like a very final meeting with the board of

19        trustees in that institution.

20                   Q.   Okay.  So when did they contact

21        you about this position?

22                   A.   Again, it was -- that time period

23        between, you know, the winter or spring of 2019.

24                   Q.   When did you find out that you

25        did not receive that position?

ARII@courtsteno.com                               www.courtsteno.com

A-0186

800.523.7887                                        Associated Reporters Int'l., Inc.

Page 293

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2                      A.   Well, I found that I was one of

 3        the four or five people that they interviewed on site

 4        and then, you know, they offered to the internal

 5        candidate, and then the other three people didn't get

 6        it.  And I -- that information came to me around that

 7        -- you know, the spring of 2019.

 8                      Q.   Okay.  So -- again, before your

 9        demotion in the fall of 2019?

10                      A.   Yes.

11                      Q.   Okay.  Any other positions that

12        you applied for while President Dewan was the interim

13        president or the president?

14                      A.   There may have been, I don't -- I

15        cannot recall like specific institutions.  But I was

16        looking broadly --

17                      Q.   Okay.

18                      A.   -- and I think what's relevant

19        here is that before my demotion, I was being called

20        to interview with Harvard, at Arizona, and Rosalind

21        Franklin to be president.  And after my demotion,

22        I've applied to a lot of places much more than I ever

23        applied before.

24                      And I get very few, if any, interview

25        requests -- literally very few, yes.  So very
```

ARII@courtsteno.com                                  www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 302

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                      Q.    What's -- I'm assuming that

3        you're -- that you're alleging that your national

4        origin is Hispanic?

5                      A.    Latino, yeah.

6                      Q.    Latino, okay.  And you in -- in

7        your complaint it indicates that your national

8        origin, your Hispanic national origin, contributed to

9        defendant's decision to demote -- to demote you.

10                     A.    Yeah.

11                     Q.    And I'm interested in what the

12       basis of your claim is on that now?

13                     A.    Well, the institution was founded

14       in 1834.  It never had as dean a member of a group

15       that's underrepresented in medicine before me, or

16       after.  And my replacement was installed in that

17       position without any violation of the guidelines from

18       the SUNY Board of Trustees and without any effort to

19       bring to the table qualified applicants from

20       distinctive backgrounds.

21                     So I can only assume that, you know,

22       they -- the previous president appointed me from an

23       underrepresented background.  And the current

24       administration does not want that anymore.  And I do

25       feel also the cultural issue that, you know, some can

ARII@courtsteno.com                                www.courtsteno.com

A-0188

800.523.7887                                    Associated Reporters Int'l., Inc.

                                                            Page 307

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    BY MS. COWAN:  (Cont'g.)

3                    Q.   I'm just trying to get to the

4         bottom of the basis for your national origin

5         discrimination claim, and it sounds like one of the

6         bases is -- is that there were no previous deans who

7         were Hispanic?

8                    A.   Yes, and no future --.

9                    Q.   Okay.

10                   A.   And -- and for the appointment

11        that succeeded me, there was no effort to bring to

12        the table anybody of a Hispanic background to be

13        considered for the position.

14                   Q.   All right.  And then you said

15        that it was because of your cultural background that

16        you didn't feel that you belonged?

17                   A.   I didn't say -- I never used that

18        word.

19                   Q.   Okay.  I -- I'm -- I'm

20        misunderstanding then.  There's a difference in

21        culture I think you said something about that.

22                   A.   Yes, I mean you can see the

23        deposition, we -- we just talk a little too much and

24        we are very, you know, nothing -- you know, very full

25        of you know, energy and we talk and so I am just

ARII@courtsteno.com                          www.courtsteno.com

A-0189

800.523.7887                                    Associated Reporters Int'l.. Inc.

Page 308

1     Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2          saying that there are cultural differences between,

3          you know, the way that I express myself that just

4          reflects the culture that I come from.

5                    Q.   Okay.  And then the other reason

6          was you said there's a systematic pattern of not

7          promoting diversity and leadership?

8                    A.   Yes, absolutely.  Very -- it

9          became crystal clear after my demotion.

10                   Q.   All right.  And -- and at any

11         point during your time at Upstate, was anything said

12         to you specifically about your Hispanic or Latino

13         background?

14                   A.   No, if you're asking me do people

15         come to me and say, okay, I'm going to discriminate

16         against you because you're Hispanic no, they never

17         say that to me.

18                   Q.   Anything at all in general about

19         Hispanic people or Latino people, or anything like

20         that?

21                   A.   The President had this Chief of

22         Staff, Sergio Garcia who turned out to have some, you

23         know, fake credentials that were exposed.  But before

24         that was exposed, people would talk to him like oh,

25         Sergio, and they would like, you know, make fun and

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 309

Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

1    mock and talk about his name, you know, and imitate

2    Hispanic, you know, or Spanish accent when using his

3    name.

4          So there was like a tone of mockery

5    related to him and related to his national origin.

6    But then he did something, you know, that was

7    completely inappropriate, and that kind of superseded

8    everything else. But I -- I -- I would think, okay,

9    I'm from the same culture, you know, they're mocking

10   him you know, what they think about me you know.

11         But that's -- but that's -- so there

12   was --.

13         Q.   Who are the people that you --?

14         A.   Many people you know from

15   administration and faculty members, the chairs and

16   you know, chairs of departments and people would, you

17   know, speak of him, you know, use his name in Spanish

18   kind of say it with a very kind of a fake Hispanic

19   accent and mocking it.  So there was a kind of a

20   derision about his national origin before.

21         Q.   At any -- at any point, did

22   anyone mock your name?

23         A.   Well, you know, people call me

24   Julio and they you know -- and the chair of surgery

ARII@courtsteno.com                          www.courtsteno.com

A-0191

800.523.7887                                          Associated Reporters Int'l., Inc.

Page 312

```
1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2                        Q.    Have you ever filed any
3         complaints about what we just talked about?
4                        A.    If I was to file a complaint,
5         what would I complain about?
6                        Q.    My question is, have you filed
7         any complaints?
8                        A.    I haven't filed any complaints.
9         So it's a very subtle like, you know, kind of dog
10        whistle kind of issue, but there is nothing very
11        concrete you can file a complaint about.
12                       Q.    Okay.  With respect to your
13        discrimination complaint, you state that you were
14        demoted due to your race or color.  What race or
15        color are you referring to?
16                       A.    I am one-eighth black.  My great
17        grandfather was black.  My grandfather was black.  My
18        family is biracial.  So many of my first cousins are
19        black and some are white.  So we are from a mixed-
20        race family.
21                       Q.    So are you alleging that you were
22        demoted because you are one-eighth black?
23                       A.    I'm not -- I'm alleging that
24        there was an issue of a racial -- when you're dealing
25        with Latino, it's very difficult to separate the two.
```

ARII@courtsteno.com                                 www.courtsteno.com

A-0192

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 313

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2         So it was like, you know, I think it's part of my

 3         background altogether.  I don't think I can parcel

 4         out, you know, which component is like you know,

 5         thirty-five percent is the -- is the race and all my

 6         -- my ancestors are and the other one is my culture.

 7              So I think it counts as one package

 8         and so I cannot give you a percentage as to what

 9         component is one, what component is the other, but I

10         think they come together.

11              Q.   Okay.  So what is the basis for

12         your allegation that you were demoted because of you

13         are one-eighth black or -- or the remaining

14         percentage was Hispanic or Latino?

15              A.   Yes.  The fact that, you know,

16         this had to do more with the retaliation part of the

17         component.  There is -- academic medicine is very

18         structured in many ways.  All these top leadership

19         positions, they put a search, there is a search

20         process and search committee, a search firm is hired.

21              Part of the -- the -- the charge of

22         the committee to the members and to the search firm,

23         you should go out there, reach out to members of you

24         know, diverse groups that are not represented in

25         medicine including particularly Hispanics and blacks
```

ARII@courtsteno.com                             www.courtsteno.com

A-0193

800.523.7887                              Associated Reporters Int'l., Inc.

Page 315

```
1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2                   Q.    Okay.  So the basis for your
3        belief that you were demoted because of your race or
4        your color was the fact that after you were demoted,
5        there were searches -- there were not searches for
6        open positions?
7                   A.    That was not the basis.  It was -
8        - I -- I -- I found -- I told you about feeling
9        uncomfortable and about a discriminatory environment,
10       that's very pervasive within the institution.  And
11       then I'm -- what I'm telling you is that as further
12       confirmation of my feelings, I had objective, you
13       know, data based on the fact that after my demotion,
14       then there was no effort made -- there was an effort
15       actually made not to bring to the table people who
16       were like me to be considered for positions.  So --.
17                  Q.    What positions are you
18       specifically referring to?
19                  A.    Positions of leadership like you,
20       know, dean, chair and like, you know, higher level
21       position, so yes.
22                  Q.    Dean or --?
23                  A.    But what I said -- what I said
24       just now is like it was confirmation.  So I would've
25       have filed the lawsuit.  I mean, when I filed the
```

ARII@courtsteno.com                       www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

                                                          Page 322

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        day we received a comment, an email about the

3        appointment.  And there was not a broad process of

4        consultation with the faculty, and no effort to bring

5        a person of diverse background to the position.

6                      Q.   Who is currently in that

7        position?

8                      A.   Dr. Schwartz.

9                      Q.   Okay.  Dr. Schwartz has been in

10       that position, right?

11                     A.   He was interning before and then

12       he became permanent --

13                     Q.   All right.

14                     A.   -- chair after I was demoted.

15                     Q.   Okay.

16                     A.   And I was not given an

17       opportunity to be considered for that position.

18                     Q.   Now, with respect to your

19       retaliation claims, you indicate that you reported

20       race discrimination to defendants on behalf of

21       certain individuals?

22                     A.   Yes.

23                     Q.   One of which was Brian Thompson?

24                     A.   Yes.

25                     Q.   And he is a -- I'm -- my

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                           Associated Reporters Int'l., Inc.

                                                      Page 325

 1  Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

 2      that you talked about Dr. Zulma Spinoza and also

 3      about Nikkia Chambers that I mentioned before in the

 4      same meetings.

 5                  Q.    When did that occur?  I don't

 6      remember what you said.

 7                  A.    It was like you know, the spring

 8      -- like you know, April through June or July of '19

 9      -- 2019.

10                  Q.    Any -- any witnesses to those

11      conversations, or was it just you and him in those

12      meetings?

13                  A.    Just me and him in the meetings.

14                  Q.    Okay.  Did you make any

15      complaints on behalf of Brian Thompson to O.D.I. or

16      to H.R. based on Dr. Dewan's statements?

17                  A.    No.

18                  Q.    Did he ever make any complaints

19      to you that he felt he was being discriminated

20      against?

21                  A.    He felt that -- he felt that

22      Native Americans were the -- the invisible minority

23      that his people are not given a proper

24      representation.  He was the only Native American

25      student here for twenty-five years, you know, from

ARII@courtsteno.com                      www.courtsteno.com

A-0196

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 328

```
1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2       asked me what was the situation with him?

3                     Why was he not so happy?  And I said,

4       you know, because he was promised something and it

5       was not given to him.

6                     Q.    Okay.  But did you ever complain

7       to anyone on behalf of Brian Thompson that he was

8       personally being discriminated against?

9                     A.    No.

10                    Q.    You mentioned Nikkia Chambers?

11                    A.    Yeah.

12                    Q.    And I think you're alleging that

13      you complained on her behalf that she was being

14      discriminated against because she was African

15      American?

16                    A.    No, I didn't say that.

17                    Q.    Okay.  So -- so you're not

18      claiming that you -- you're not claiming that you --

19      you were retaliated against because you opposed

20      discrimination based on her ethnic background?

21                    A.    Well, I did oppose

22      discrimination, and oppose people being berated

23      because of their background, and being berated by the

24      president because of their ethnic background.  So

25      yes, I oppose that, and then, you know, if it was,
```

ARII@courtsteno.com                              www.courtsteno.com

A-0197

800.523.7887                                        Associated Reporters Int'l., Inc.

Page 333

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2                   I know the salaries, I know the
 3        stipends for people who are assistant dean and you
 4        know, associate dean, et cetera.  So those I -- I --
 5        I -- I -- I have access to.  So I don't have access
 6        to the information about the salaries for people who
 7        are not -- so if you're asking me how much does
 8        someone earn in the college of nursing, I don't know,
 9        you know.  I don't have access to that.
10                   I only know the salaries for the
11        college of medicine.  So if someone is assistant
12        vice-president, I don't know how much they would get
13        for that.
14                   Q.   Okay.  With respect to Nikkia
15        Chambers, did she ever make any complaints to you
16        that she was being discriminated against?
17                   A.   No.
18                   Q.   Did you ever report to anyone
19        that anyone had ever discriminated against Ms.
20        Chambers?
21                   A.   No.
22                   Q.   Did you make any complaints to
23        O.D.I. or to human resources that Ms. Chambers was
24        being discriminated against?
25                   A.   No.
```

ARII@courtsteno.com                                 www.courtsteno.com

A-0198

800.523.7887                          Associated Reporters Int'l., Inc.

                                                            Page 335

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    Q.   Okay.  So I'm referring

3    specifically to --.

4                    MS. COWAN:  Actually Anthony, if we

5    can mark this as Exhibit Three that would be great.

6                    THE WITNESS:  What -- what is this --

7                    THE REPORTER:  Absolutely.

8                    THE WITNESS:  -- document?  What is

9    the nature of the document?

10                   BY MS. COWAN:  (Cont'g.)

11                   Q.   So these are your responses and

12   objections to defendant's interrogatories.  I'm going

13   to scroll down to the last page here.  Your attorney

14   at the time, Athena, she -- she signed off on these

15   responses.  So that's what I'm referring to right

16   now.  And I'm specifically going to go to

17   interrogatory number sixteen.

18                   It's asked of you specifically to

19   identify individuals that you allegedly acted on

20   behalf of when you reported gender discrimination.

21   And after some objections, your attorney indicated

22   that Nikkia Chambers is one of those people.

23                   A.   Yes, I think I remember that

24   iteration I had at that point.  And my -- my issue is

25   like, similar to the question that you asked me to

ARII@courtsteno.com                      www.courtsteno.com

Page 336

Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

 1     what degree is it race, to what degrees is it

 2     national origin.  So she's a black woman, so I cannot

 3     parcel out to what degree that -- what I -- you know,

 4     what you just described came up, specifically because

 5     she's black or specifically because she's a woman.

 6              So I put that in both.  So I cannot

 7     give a percentage, you know, and say, okay, it's like

 8     seventy-three percent because she's black and you

 9     know, twenty-seven percent because she's a woman, but

10     I think that they're both within two categories that

11     tend to be discriminated at Upstate and

12     underrepresented.

13              So I -- I -- I cannot you know, parcel

14     out to what degree is one or to what degree is the

15     other.  It's like really the combo of being like a

16     black woman.

17         Q.  Okay.  Well, my question I think

18     that is, is when did you advocate on her behalf at

19     all with respect to her gender?  I'm still not

20     understanding when that occurred.

21         A.  I stood up against -- and I -- I

22     -- I would say to the president, you know, that I --

23     I didn't think it was appropriate to ask that kind of

24     question.  So I -- like he was asking me like, you

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 337

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         know, what does she do all day, et cetera, et cetera.

3         I don't think this is -- this is the answer.

4              She's very busy.  She has her

5         responsibilities and we want an additional role here.

6         And so I cannot tell you like, you know, to what

7         degree it was because she's a woman versus to what

8         degree is because she's black, I cannot separate

9         those two.

10             Q.   Okay.  So you're alleging that

11        you're opposing discrimination when you responded to

12        Dr. Dewan asking you what Ms. Chambers did all day?

13             A.   Yes, yes, yes, yes.

14             Q.   Okay.

15             A.   She has multiple roles to support

16        the -- she supports the African American students and

17        -- and you know, diversity students and she is very

18        busy and it is a different role.  And I tried to

19        explain and then he'd say, but she's there -- she's -

20        - she's -- what she's doing all day, you know.

21             Q.   Okay.  But you --

22             A.   Yeah.

23             Q.   -- but again, I guess I'm trying

24        to parse out what is the basis of your belief that he

25        was asking that question because she's a woman?

ARII@courtsteno.com                              www.courtsteno.com

A-0201

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 339

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         Otherwise, they would be, you know -- so anyways --

3         so that's -- that's -- I mean you asked me why I put

4         her there and I said, because she's both black and a

5         woman and I cannot parcel out and say it's because

6         she's black, or that's all because she's a woman so I

7         put it in both.

8                    Q.   So according to you, he also

9         asked about Brian Thompson.  He's a man, right?

10                   A.   He's a man.  But he -- but you

11        asked -- he also asked Zuma Spinoza who is also a

12        woman, so to what degree it's the gender, to what

13        degree it's the minority status I cannot parcel that

14        out.

15                   Q.   Okay.  I'm going to -- I'm going

16        to show you the rest of this list here that's listed

17        and -- and we can kind of go through that a little

18        bit.  With respect to -- it looks like your -- your

19        wife is on here, Dr. Wong.

20                   A.   Can you go up a little bit so I

21        can see where this list is coming from like, you

22        know, a list of something?

23                   Q.   Sure.

24                   A.   Uh-huh.  Yes, yes, yes, yes, yes,

25        yes.

ARII@courtsteno.com                          www.courtsteno.com

A0201

A-0202

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 340

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    Q.    Sure.  So -- so your allegations

3           --.

4                    A.    Okay, now I see.  You can scroll

5           back down.

6                    Q.    So your allegations are that you

7           opposed gender discrimination on behalf of your wife?

8                    A.    Yes.

9                    Q.    Are we talking about -- are we

10          talking about that meeting that you had with -- with

11          Dr. Dewan in August of 2019, where you talked about

12          her salary?

13                   A.    Yes, yes, yes, yes, yes.

14                   Q.    Okay.  With respect to Dr.

15          Tucker, are your allegations that you oppose gender

16          discrimination when you suggested that she joined the

17          Budget Committee?

18                   A.    Yes.

19                   Q.    Anything else?  Any other reason?

20                   A.    No.

21                   Q.    With respect to Dr. Botash  are

22          we again referring to your suggestion that she joined

23          the Budget Committee?

24                   A.    Yes.

25                   Q.    And --.

ARII@courtsteno.com                                    www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 342

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         said, okay, yes, I want to be considered for dean.

3         And I am -- I was very surprised that very rapidly

4         Dr. Chin was appointed, who had substantially less

5         experience than her in the -- in the, you know, in

6         the dean's role.

7                   And so I think that she has been

8         discriminated -- she was not given opportunity to --

9         to -- to apply for the dean's position.  The fact

10        that it was not open, I think was discriminatory

11        against her because of her gender.

12                  Q.    Okay.  When did that occur?

13                  A.    Just when I was being demoted,

14        because soon thereafter, Dr. Chin was appointed

15        interim and then early the following year, like in

16        early 2019, we just received an email that he was now

17        the permanent one, and there was no effort to let

18        anybody else have -- be considered.  And I know she

19        was someone who wanted to be considered for that job.

20                  Q.    I'm just a little confused about

21        the timeline I guess when -- when was she being

22        considered or when did she want to be considered for

23        that job?

24                  A.    At some point in time that I -- I

25        mean, I -- that I -- I come into this role, because I

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 346

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         not my -- my prerogative to make that decision.

3                        Q.   Did you express that to Dr.

4         Dewan?

5                        A.   No, because the way that these

6         things happen, you're sitting at a desk and you

7         receive an email and then it says so and so was

8         appointed.  He said in a public setting and there are

9         minutes as part of discovery that he said that there

10        would be a national search for the position of -- of

11        dean for the permanent position.

12                       Dr. Chin was inferring and also the

13        faculty council that the -- Dr. Chin was inferring

14        that there would be a national search.  And then we

15        are expecting the search.  And -- and one day you --

16                       Q.   All right.

17                       A.   -- receive an email and it says

18        Dr. Chin is appointed.  So no, I did not suggest to

19        anybody because there was no mechanism or no process

20        that will enable me to suggest it.

21                       Q.   All right.  So neither you nor

22        Dr. Botash complained at all about her not receiving

23        that dean position because she was a female?

24                       A.   No.

25                       Q.   Okay.  With respect to Dr. Zheng,

A-0205

800.523.7887                                Associated Reporters Int'l., Inc.

Page 347

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         is this in regards to the anesthesiology chair

3         position that she --

4                        A.   Yes.

5                        Q.   -- received?

6                        A.   Yes.

7                        Q.   And in what way did you oppose

8         gender discrimination against her that you were

9         retaliated against for?

10                       A.   Well, because that's very clear

11        because I -- Dr. Dewan told me repeatedly that she

12        was the only person that should be considered for the

13        job.  I created this panel, created the situation, an

14        objective panel, thought that she was the most

15        qualified.  And that Dr. (unintelligible) withdrew

16        his application.

17                       She had already been told by her chair

18        that he was going to be the next person.  And that he

19        had information that she was going to be that and she

20        told me after the panel -- I mean, I -- I did the

21        panel without knowing what I'm going to tell you.

22                       But then after the panel was over, she

23        came to me and said, I'm so glad you did this and if

24        it hadn't gone this way, would have filed a complaint

25        because -- for gender discrimination.

ARII@courtsteno.com                              www.courtsteno.com

A-0206

800.523.7887                                Associated Reporters Int'l., Inc.

Page 348

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                        Q.    Okay.  But --

3                        A.    So --.

4                        Q.    -- no complaint was ever filed

5    because she --

6                        A.    Yeah.

7                        Q.    -- received the position, right?

8                        A.    She received the position.

9    Thanks to my efforts to -- to make the process open

10   and transparent and inclusive.  And I presented that

11   -- that to Dr. Dewan in August.  And then the next

12   meeting that I had with him I was demoted.

13                       Q.    He didn't express any concerns or

14   any dissatisfaction with her being chosen for that

15   position, right?

16                       A.    No, not to me specifically.

17                       Q.    Your last claim is that you were

18   retaliated against for reporting national origin

19   discrimination to defendants, and I'm going to be

20   showing you this exhibit I think it's Exhibit Three,

21   your responses to interrogatories.

22                       A.    Yes.  Okay.

23                       Q.    Your response says numerous

24   medical students enrolled at SUNY Upstate.

25                       A.    Yes.

ARII@courtsteno.com                              www.courtsteno.com

A-0207

800.523.7887                                    Associated Reporters Int'l., Inc.

                                                                    Page 349

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                        Q.    Do you know what that means?

3                        A.    It means numerous medical

4          students.

5                        Q.    Okay.  So you opposed

6          discrimination against numerous medical students

7          when?

8                        A.    When they brought up issues to me

9          that they were -- I -- I told him before that there

10         was this egregious example that they told to me when

11         I had meetings with them about the challenges that

12         they faced.

13                       And then I -- I sent that email that

14         they said that they could not -- they felt very --

15         one of them came to my office at one point, I was

16         literally sitting at the edge of the chair shaking,

17         like, you know, shaking like the person -- the person

18         is having a seizure, yeah, but like shaking so

19         anxious about how discriminated he felt and looking

20         down.

21                       I've never seen a person like so kind

22         of -- I'm going to say, beaten down, you know, by a

23         system.  So I -- that's why I sent that email to, you

24         know, to the students that they could use my personal

25         email and come to me and I would guide them et

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                              Associated Reporters Int'l., Inc.

                                                          Page 350

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        cetera.  And then, you know, Mr. Frost said that, you

3        know, I am just -- that they had to go straight to

4        H.R.

5                    That there were processes and

6        mechanisms, but there was -- I have to tell you one

7        thing that you brought up before about Dr. White that

8        I -- I -- I brought her --.

9                    Q.   Dr. Licinio, I really need you to

10       just --.

11                   A.   But anyway numerous medical

12       students came to me with issues of like egregious

13       issues of discrimination.  And they came and I you

14       know, when I tried to stand up for them you know,

15       things have not evolved very positively.

16                   Q.   So you're referring to when you

17       had those focus groups back in early 2019?

18                   A.   That plus individual meetings

19       some of them -- this one that I just narrated to you

20       was solicited by a student.  So some students wanted

21       to meet with me individually, and asked for the

22       meeting, and some I met in that context that you just

23       said.

24                   Q.   Okay.  And when did these

25       meetings take place?

ARII@courtsteno.com                        www.courtsteno.com

A-0209

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 353

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         were discussing how you're alleging that you can --

3         you oppose discrimination against a number of medical

4         students based on their national origin, correct?

5                   Well, now I can't hear you.

6                   A.   Sorry.

7                   Q.   There we go.

8                   A.   Can you hear me now?

9              MR. GRACE:   Yes.

10             MS. COWAN:   Yes.

11             THE WITNESS:   That is correct.

12             BY MS. COWAN:   (Cont'g.)

13                  Q.   Okay.  And I think you were

14        referring to the -- the focus group meetings that you

15        had the beginning of 2019?

16                  A.   Yes.  And also individual

17        meetings that students would unsolicited come to see

18        me to say how they felt.

19                  Q.   Okay.  And -- and as a result of

20        those meetings with the students, did you file any

21        complaints on their behalf with anyone at Upstate?

22                  A.   No, because my role I saw more as

23        kind of helping them, telling them what the pathways

24        were and giving them the options of filing those

25        complaints.  So I cannot, you know, -- I -- the

ARII@courtsteno.com                          www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 354

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        purpose of the meetings was to be like confidential

3        for them.  They were very reluctant to even bring

4        anything up.

5                    So I said, you can bring it to me in

6        confidence, I'll hear you and then I'll -- I'll tell

7        you what the next steps are and you can pursue them.

8        So they --

9                    Q.   Okay.  So you --.

10                   A.   -- they could -- they were all

11       told that there is an office of O.D.I. that there is

12       a place that they can go to, but they did not want to

13       pursue any kind of complaint at that point.

14                   Q.   Okay.  So these meetings that you

15       had with these students, that's the basis for your

16       national origin retaliation claim.  They were kept in

17       confidence, you said?

18                   A.   In partial confidence.  I mean, I

19       would bring up the issues to the people involved like

20       to Dr. White, because some of them are related to

21       student affairs.  And -- and then I would not be, you

22       know, kind of emphasizing,  you know -- was not

23       making -- filing a direct complaint, but I will bring

24       the issues up.

25                   Q.   Did you bring the --?

800.523.7887                                      Associated Reporters Int'l., Inc.

Page 355

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2              A.    Yeah, go ahead.

3              Q.    Did you bring the issues up to

4    anyone other than Dr. White?

5              A.    Brought to her and I brought to

6    Dr. Dewan.  And I can tell you that one thing that

7    really shocked me is that when I would bring up the

8    issues, not once one of them said, oh, you know, what

9    can we do?  I'm sorry that this person is going

10   through these and et cetera.  So Dr. White

11   particularly was very defensive and would say, you

12   know, one -- one person unhappy doesn't prove

13   anything.

14             And never said, you know, you know, I

15   feel sorry for this person, how can we make their

16   experience better?  How can we make sure that people

17   are not like, you know, lost in the shuffle, in

18   particular the minority students.  So there was no --

19   no -- how can you say this, there was no empathy

20   about that person and trying to see what you could do

21   to help the person you know.

22             Q.    What specifically did you bring

23   up to Dr. Dewan, and when?

24             A.    So I would bring that when these

25   positions were being that I would suggest this roles

A-0212

800.523.7887                                          Associated Reporters Int'l., Inc.

Page 363

 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2         then at U.C.L.A., we began co-directing at the same

 3         lab.

 4                        Q.   Okay.  You've also alleged that

 5         you don't have adequate startup funding for a lab.

 6         Is that right?

 7                        A.   Yes, I don't -- I personally

 8         don't.

 9                        Q.   You personally don't?

10                        A.   No.

11                        Q.   Have you made a request for

12         startup funding?

13                        A.   I talked to Dr. Schwartz about

14         that on different occasions and -- so the answer is

15         no, they did not make -- I -- I discussed that and I

16         said, I didn't have any specific allocation.  But

17         there were much smaller items in the contract that

18         were not followed and not delivered to me.

19                        So my thinking is that it -- it takes

20         a lot of time and effort to put those requests

21         together.  So the answer is no, I have not made those

22         requests, because I had other requests that were --

23         were part of my contract have not been delivered to

24         me, a much smaller -- for much smaller amounts.

25                        So if they're not giving me the

ARII@courtsteno.com                                   www.courtsteno.com

A-0213

800.523.7887                                        Associated Reporters Int'l., Inc.

Page 364

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2          smaller amounts, they're not going to give me the big

3          ones.

4                         Q.   Are you referring to things like

5          reimbursing license fees, and things like that?

6                         A.   Yes, and travel, travel to

7          scientific meetings as a research, you know,

8          associate.  So those things are no longer available

9          to me.  So I don't -- you know, they're much smaller

10         and lower cost than my lab.

11                        Q.   Is it the policy of the

12         psychiatry department to not reimburse for fees like

13         license fees and travel, things like that?

14                        A.   It is, and it's exactly why I had

15         that in my contract.  But it was the policy, I will

16         just, you know, if I'm no longer the dean, I can just

17         follow the policy.  But I knew it was not part of the

18         policy.  That's why I put it in the contract.  So it

19         was specified in the contract as an item to be

20         delivered by the institution because it was not part

21         of their regular policy.

22                        Standard procedure I will not request

23         a standard procedure then.  I will just get it

24         automatically.

25                        Q.   When you're referred to the

ARII@courtsteno.com                                    www.courtsteno.com

Page 1

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF NEW YORK

3          _____

4      JULIO LICINIO, MD, PhD, MBA, MS,

5              Plaintiff,

6          v.                                    Case No.

7      STATE OF NEW YORK, THE STATE              5:21-cv-387

8      UNIVERSITY OF NEW YORK, and THE           (GTS/TWD)

9      STATE UNIVERSITY OF NEW YORK

10     UPSTATE MEDICAL UNIVERSITY,

11             Defendants.

12         _____

13                 VIDEOCONFERENCE DEPOSITION OF

14                      ANN BOTASH, M.D.,

15     DATE:          Wednesday, June 8, 2022

16     TIME:          10:01 a.m.

17     LOCATION:      Remote Proceeding

18                    750 East Adam Street

19                    Syracuse, NY 13210

20     REPORTED BY:   Paul Grasso, Notary Public

21     JOB NO.:       5271452

22

23

24

25

A-0215

Page 19

1                          A. BOTASH

2   training finished?

3        A    I was a pediatrician in the

4   pediatric department in general

5   pediatrics.  That was my initial role.

6        Q    Okay.  You can continue.

7   Basically I'd like to just get a good idea

8   of your education and employment history

9   from then until now.

10       A    So I've worked at Upstate since

11  then, and I -- let's see.  Over the years

12  I developed an interest in child abuse

13  pediatrics and took the board

14  certification in child abuse pediatrics in

15  2009, and passed that; developed the child

16  abuse program at Upstate; created a

17  division of child abuse pediatrics at

18  Upstate, which really didn't take,

19  probably take place until 2019, '20,

20  somewhere in there.

21            2017, I took this role as a

22  senior associate dean for faculty affairs

23  and faculty development.

24       Q    And that's your current role

25  today?

Page 20

A. BOTASH

1

2      A     Yes.  I still work in the

3  Department of Pediatrics, so I'm in both

4  places.

5      Q     Okay.  Do you have an academic

6  title that's different?

7      A     Yes.  I am a SUNY Distinguished

8  Teaching professor.

9      Q     Okay.  And then your

10  administrative title would be the Senior

11  Associate Dean for Faculty Affairs;

12  correct?

13      A     Correct.

14      Q     Okay.  And you also have an

15  involvement in faculty development; would

16  that be correct?

17      A     Yes.  So faculty affairs and

18  faculty development is all part of that

19  title, and I do both.

20      Q     Okay.  Do you have any other

21  titles currently with SUNY Upstate?

22      A     I do.  I'm vice chair for

23  education in the Department of Pediatrics.

24      Q     And any other ones?

25      A     Yeah.  I mean, within the child

Page 40

```
 1                    A. BOTASH
 2  needed to do more to support women.
 3  I've -- you know, I did have conversations
 4  with him on the topic, but not specific,
 5  you know, answers to the question how to
 6  do it.
 7      Q    Okay.  When you say you think he
 8  felt strongly, what do you mean by that?
 9      A    It's just a sense that I got, I
10  guess.  He had -- he is the one who
11  pointed it out to me that we were the
12  bottom, you know, tier for women in
13  academics.  I really don't recall any more
14  than that.
15      Q    Okay.  Do you know if he -- was
16  it just you this was shared with by
17  Dr. Licinio, or do you know if he shared
18  it with others?
19      A    I don't -- I don't know.
20      Q    Okay.  And you're aware that
21  Dr. Licinio was removed from his position
22  as dean in 2019; correct?
23      A    Yes.
24      Q    Okay.  Did you apply for the
25  dean's role in his stead after he was
```

Page 41

```
 1                      A. BOTASH
 2   removed from the position?
 3        A    No.
 4        Q    And why not?
 5        A    I guess I was happy in what I
 6   was doing.
 7        Q    At that time, did you feel that
 8   you were qualified for the role?
 9        A    I don't think I really thought
10   about that.  I probably really -- I just
11   thought I didn't want it.  It looks like a
12   terrible role.
13        Q    Fair.  And who was appointed to
14   that role?
15        A    An interim dean was appointed.
16   Dr. Chin was appointed.  And I believe he
17   was appointed, you know, immediately upon
18   Dr. Licinio's departure.
19        Q    Okay.  What's an interim?
20   What's interim versus -- an interim dean
21   versus a dean?
22        A    Well, interim implies that it's
23   temporary or until a dean is named.
24        Q    Okay.  And you say you believe
25   he was appointed immediately.  How do you
```

Page 91

```
 1                    A. BOTASH
 2    committee group.  Did I read that correct?
 3         A     Yes.
 4         Q     Do you recognize the female
 5    senior associate dean of faculty affairs
 6    and faculty development to be you?
 7         A     Yes.
 8         Q     Okay.  And do you know who the
 9    female chief medical officer is in this
10    paragraph?
11         A     I think it's Dr. Tucker.
12    Dr. Amy Tucker.
13         Q     Okay.  And what's the budget
14    committee group?
15         A     I'm not really sure.  I don't
16    think anything was really called a budget
17    committee.  I'm not sure.
18         Q     Okay.  Do you remember this
19    taking place, you being recommended to be
20    added to this group?
21         A     No.
22         Q     Okay.  Paragraph 93.  It's very
23    long and probably not -- it's too long to
24    read for the record, but if you want to
25    have a read to it yourself and tell me if
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JULIO LICINIO, MD, PhD, MBA, MS,

                                  Plaintiff,

                                                    Case No.: **5:21-cv-387(GTS/TWD)**

        - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE STATE
UNIVERSITY OF NEW YORK UPSTATE
MEDICAL UNIVERSITY,

                                  Defendants
-----------------------------------------------------------------X

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF

## INTERROGATORIES TO PLAINTIFF

        Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Civil

Rules of the United States District Court for the Northern District of New York, Plaintiff Julio

Licinio, MD, PhD, MBA, MS, ("Plaintiff"), by his undersigned attorneys, Danny Grace P.C.,

hereby responds and objects to Defendant's first set of interrogatories to Plaintiff dated July 12,

2021 in accordance with the numbered responses as set forth below. These responses and

objections reflect Plaintiff's current knowledge and the results of his investigations to date.

Plaintiff reserves the right to amend or supplement these responses and objections in the future in

accordance with Fed. R. Civ. P. 26(e) as may be necessary or appropriate.

## GENERAL OBJECTIONS

        Each of Plaintiff's responses incorporates the General Objections set forth below.  These

General Objections may be referenced in response to specific Interrogatories for purposes of clarity,

1

however, the failure to refer specifically to a General Objection in response to a particular Interrogatory does not waive, and it is not to be construed as a waiver of, any General Objection even if other General Objections are indicated.

These responses are based upon documents and information known to Plaintiff at the present time. Plaintiff will supplement or amend these responses in the event she discovers additional documents or information that requires such supplementation or amendment under the Federal Rules of Civil Procedure ("Federal Rules") and/or Local Rules of the United State District Court for the Northern District of New York ("Local Rule"). Should Plaintiff at any time supplement or amend their responses to any Interrogatory, by agreement or otherwise, Plaintiff reserves the right to assert any applicable objection, privilege, or other protection in connection with such supplementation or amendment. Plaintiff further reserves the right to use such information at any trial, hearing, or proceeding related to this action.

1.      Plaintiff objects to these Interrogatories to the extent they seek information or documents that are not relevant to any party's claim or defense or proportional to the needs of the case.

2.      Plaintiff objects to each Interrogatory to the extent that it is overly broad, unduly burdensome, and oppressive.

3.      Plaintiff objects to each Interrogatory to the extent that it is vague, ambiguous, and/or lacking sufficient particularity.

4.      Plaintiff objects to each Interrogatory to the extent that it is not reasonably limited in time or seeks the disclosure of information outside the time period relevant to the present litigation.

2

5.    Plaintiff objects to each Interrogatory to the extent that it seeks the disclosure of any confidential information that concerns individuals other than Plaintiff who are not parties to this action, the disclosure of which would violate the privacy interests of such individuals.

6.    Plaintiff objects to each Interrogatory to the extent that it seeks the disclosure of confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place.

7.    Plaintiff objects to the Interrogatories to the extent they seek information regarding the identity of documents or the provision of information that constitutes work product, trial preparation materials, documents or information prepared after the commencement of this litigation, or documents or information protected by the attorney-client or any other applicable privilege or immunity from disclosure. Plaintiff's responses do not include information that is privileged or otherwise immune from disclosure. If any such information or document is disclosed inadvertently in response to any Interrogatory, such disclosure does not waive, and it is not to be construed as a waiver, of any applicable privilege or protection.

8.    Plaintiff objects to each Interrogatory to the extent that it seeks the disclosure of information already known or available to Defendant or documentation in Defendant's possession that is more readily obtained by Defendant without subjecting Plaintiff to unreasonable burden and expense.

9.    Plaintiff objects to each Interrogatory to the extent that it is duplicative and cumulative of other Interrogatories.

10.    Plaintiff objects to each Interrogatory to the extent that it exceeds the

3

permissible scope of interrogatory requests as set forth in the Federal Rules of Civil Procedure and/or Local Civil Rules.

11.    Plaintiff objects to the Interrogatories to the extent they seek or purport to impose upon Plaintiff obligation other than those imposed by Rules 26, 33, and 34 of the Federal Rules and the Local Rules.

12.    Plaintiff objects to the definitions in the Interrogatories to the extent such definitions are broader than permitted by the Federal Rules or the Local Rules.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.    Plaintiff objects to the "Instructions" and "Definitions" to the extent that they seek to impose obligations that go beyond the provisions and requirements of the Federal Rules of Civil Procedures and/or the Local Civil Rules. Plaintiff's responses shall not be constructed as an admission that any particular fact, issue or piece of information contained in any response (or otherwise) is relevant, material or admissible.

2.    Plaintiff objects to Defendant's Interrogatories on the following general grounds. All applicable general objections are also included among Plaintiff's specific objections to each of the Defendant's interrogatories as if fully set forth therein.

## SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

## INTERROGATORY NO. 1

Identify each and every person who provided any information in connection with answers to these Interrogatories.

4

**RESPONSE:**

Plaintiff objects to Interrogatory No. 1 on the ground that the phrase "provided any information" is vague and ambiguous, because it is not defined and is subject to more than one interpretation. Plaintiff further objects to Interrogatory No. 1 on the ground it seeks information protected by the attorney-client privilege, the attorney work product doctrine or any other applicable privilege or immunity. Plaintiff also objects to Interrogatory No. 1 to the extent that it seeks disclosure of information already known or available to Defendants.

**INTERROGATORY NO. 2**

State the name(s), age(s) and address(es) of all witness(es) to the incidents set forth in the Complaint and indicate each witness from whom a written or recorded statement has been obtained by Plaintiff, your agent(s) or your attorney;

        (a) For each witness, provide a detailed description of what information they possess relevant to the incidents set forth in the Complaint.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 2 on the grounds that it is premature. Discovery is ongoing and Plaintiff has not identified every single witness that he intends to use to support his claims. Plaintiff further objects to Interrogatory No. 2 to the extent that it seeks disclosure of information protected by the attorney-client privilege, the work product doctrine, or any other privilege or protection from disclosure. Plaintiff also objects to Interrogatory No. 2 to the extent that it seeks the disclosure of information already known or available to Defendant.

Subject to, and without waiver of the foregoing, Plaintiff refers to his Initial Disclosures and Responses to the other Interrogatories herein. Plaintiff further states Ann Botash, Senior Associate Dean for Faculty Affairs and Faculty Development; MaryGrace VanNortwick, Chief of Staff, Office of the Dean; Ma-Li Wong, Professor of Psychiatry and Neuroscience; and, Xiuli Zhang,

5

Chair of Anesthesiology.  Plaintiff reserves the right to supplement this Response pursuant to Fed. R. Civ. P. 26(e)(1).

## INTERROGATORY NO. 3

State whether any photographs, videotapes, audio tapes or film were taken of the scene of the occurrence(s), the injuries, or any other matter described in the Complaint and state:

> (a)  The date each was taken;
> (b)  The identity of the individual who took the photograph, audio or film;and
> (c)  The identity of the individual who has possession of the photograph, audio or film.

## RESPONSE:

Plaintiff objects to Interrogatory No. 3 to the extent it seeks disclosure of information protected by the attorney-client privilege, the word product doctrine, or any other privilege or protection from disclosure.  Plaintiff further objects to Interrogatory No. 3 to the extent that it seeks the disclosure of confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place.  Plaintiff also objects to Interrogatory No. 3 to the extent that it seeks the disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff states that, upon information and belief at the time of the drafting of these responses, no photographs, videotapes, audio tapes or film were taken as indicated in this Request, at least none that are in Plaintiff's possession.  Plaintiff reserves the right to supplement this Response pursuant to Fed. R. Civ. P. 26(e)(1).

6

A-0226

## INTERROGATORY NO. 4

Describe any ailment, injury, ache, pain, or other form of discomfort (mental, physical, oremotional), which you claim to have suffered as a result of the actions of the Defendants and how **each Defendants'** alleged actions caused your alleged injuries.

## RESPONSE:

Plaintiff objects to Interrogatory No. 4 to the extent it seeks information that is not relevant to any party's claim or defense in this action.  Plaintiff further objects to Interrogatory No. 4 to the extent it seeks disclosure of any confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place.  Plaintiff also objects to Interrogatory No. 4 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, or any other privilege or protection that has not been waived by Plaintiff.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff states that at this time he limits his non-economic claims to "garden variety" non-economic damages. Therefore, a description of any "ailment, injury, ache, pain, or other form of discomfort (mental, physical, oremotional), which you claim to have suffered as a result of the actions of the Defendants" is not relevant to this action. *See Misas v. North-Shore Long Island Jewish Health System*, 2016 WL 4082718, at *4 (S.D.N.Y. July 25, 2016); *Feltenstein v. City of New Rochelle*, 2018 WL 3752874, at *5 (S.D.N.Y. Aug. 8, 2018). Should Plaintiff seek non-economic damages in excess of "garden variety," this demand will be revisited.

7

## INTERROGATORY NO. 5

List the name and address of each hospital, clinic, physician, therapist, and/or psychiatrist that provided care, treatment and/or diagnosis of the injuries and/or conditions alleged in the Complaint, **including pre-existing injuries**, and provide the dates of treatment for the Plaintiff.

## RESPONSE:

Plaintiff objects to Interrogatory No. 5 to the extent it seeks information that is not relevant to any party's claim or defense in this action. Plaintiff further objects to Interrogatory No. 5 to the extent it seeks disclosure of any confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place. Plaintiff also objects to Interrogatory No. 5 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, or any other privilege or protection that has not been waived by Plaintiff.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff states that at this time he limits his non-economic claims to "garden variety" non-economic damages. Therefore, a list of "name and address of each hospital, clinic, physician, therapist, and/or psychiatrist that provided care, treatment and/or diagnosis of the injuries and/or conditions" is not relevant to this action. *See Misas v. North-Shore Long Island Jewish Health System*, 2016 WL 4082718, at *4 (S.D.N.Y. July 25, 2016); *Feltenstein v. City of New Rochelle*, 2018 WL 3752874, at *5 (S.D.N.Y. Aug. 8, 2018). Should Plaintiff seek non-economic damages in excess of "garden variety," this demand will be revisited.

## INTERROGATORY NO. 6

8

If Plaintiff claims any permanent disability and/or psychiatric condition resulting from the actions by the Defendants, state the nature of the disability, the extent to which it restricts his activities, and the name of any physician and/or therapist, psychologist or psychiatrist who has stated that he has a permanent disability.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 6 to the extent it seeks information that is not relevant to any party's claim or defense in this action. Plaintiff further objects to Interrogatory No. 6 to the extent it seeks disclosure of any confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place. Plaintiff also objects to Interrogatory No. 6 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, or any other privilege or protection that has not been waived by Plaintiff.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff states that at this time he limits his non-economic claims to "garden variety" non-economic damages. Therefore, any disclosure of "any permanent disability and/or psychiatric conditions" is not relevant to this action. *See Misas v. North-Shore Long Island Jewish Health System*, 2016 WL 4082718, at *4 (S.D.N.Y. July 25, 2016); *Feltenstein v. City of New Rochelle*, 2018 WL 3752874, at *5 (S.D.N.Y. Aug. 8, 2018). Should Plaintiff seek non-economic damages in excess of "garden variety," this demand will be revisited.

**INTERROGATORY NO. 7**

List each item of special damage, loss and expense which Plaintiff claims resulted from the alleged incidents, including but not limited to, hospital and medical expenses, lost earnings, household and other help at home and in business, and/or property damages, and state the name and address of the organization or person to whom each item of expense was paid or is payable.

9

A-0229

**RESPONSE:**

Plaintiff objects to Interrogatory No. 7 on the grounds that it is premature. Plaintiff's specific economic damages and attorney's fees continue to accrue on a daily basis. Plaintiff further objects to Interrogatory No. 7 to the extent it is overly broad, unduly burdensome, and oppressive because it requests information regarding the "each item of special damages." Plaintiff further objects to Interrogatory No. 7 to the extent that it seeks disclosure of information protected by the attorney-client privilege, the work product doctrine, or any other privilege or protection from disclosure. Plaintiff also objects to Interrogatory No. 7 to the extent that it seeks the disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff refers to his Initial Disclosures Schedule A and Plaintiff's document production. Plaintiff further states:

2020

| | | |
|---|---|---|
| American Psychiatric Association APA dues | | $587.00 |
| NYS license renewal – Medicine | | $630.00 |
| American College of Neuropsychopharmacology (ACNP) Registration | | $435.00 |
| American College of Neuropsychopharmacology (ACNP) Dues | | $400.00 |
| NetCE 2020 | | $24.00 |
| FL License renewal | | $389.00 |
| RANZCP membership - convert $1137 Australian to USD 3/5/20 | | $845.60 |
| Society of Biological Psychiatry membership – 2020 | | $180.00 |
| SFN - Society for Neuroscience dues | | $420.00 |
| Ireland Med Council-conv 605 Eur to | $734.69 USD | $702.90 |
| CA License renewal | | $820.00 |
| American College of Healthcare Executives | | $160.00 |

2020 Subtotal                                                    $5593.50

10

A-0230

2021

| | | |
|---|---|---|
| American Psychiatric Association APA dues | | $587.00 |
| American College of Neuropsychopharmacology (ACNP) Registration | | $435.00 |
| American College of Neuropsychopharmacology (ACNP) Dues | | $400.00 |
| NetCE 2020 | | $24.00 |
| RANZCP membership - convert $1137 Australian to USD 3/5/20 | | $845.60 |
| Society of Biological Psychiatry membership – 2020 | | $180.00 |
| SFN - Society for Neuroscience dues | | $420.00 |
| Ireland Med Council-conv 605 Eur to | $734.69 USD | $702.90 |
| American College of Healthcare Executives | | $160.00 |

2021 Subtotal                                                                        $3754.50

TOTAL                                                                                $9348.00

Plaintiff reserves the right to supplement the Response pursuant to Fed. R. Civ. P.26(e)(1).

## INTERROGATORY NO. 8

If violations of Plaintiff's constitutional rights are claimed, state each and every act committed by Defendants or their representatives, employees, or agents that constituted adeprivation of Plaintiff's constitutional rights, specifying how **each Defendant** or its representatives, employees, or agents is alleged to have acted unconstitutionally and in what manner.

## RESPONSE:

Plaintiff objects to Interrogatory No. 8 on the ground it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further object to Interrogatory No. 8 on the ground that it is overly broad and unduly burdensome because it purports to require Plaintiff to list "each and every act committed by Defendants" to which Plaintiff claims to have constituted a violation of Plaintiff's constitutional rights, including extensive details for each and every act. Plaintiff further objects to Interrogatory

11

A-0231

No. 8 to the extent that it seeks disclosure of information already known or available to Defendant. Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to his Complaint (ECF Doc #1) and his allegations detailed therein. Plaintiff also states that additional inquires may be appropriately made during Plaintiff's deposition.

## INTERROGATORY NO. 9

If violations of statutes, ordinances, codes, rules or regulations are claimed against Defendants, set forth the statutes, ordinances, codes, rules, regulations or laws of the United States, New York State, County, administrative or regulatory agencies which are claimed to have been violated by Defendants or its representatives, employees, or agents and the facts and circumstances supporting your allegation.

## RESPONSE:

Plaintiff objects to Interrogatory No. 9 on the ground it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further object to Interrogatory No. 9 on the ground that it is overly broad and unduly burdensome because it purports to require Plaintiff to set forth the facts and circumstances supports each and every alleged violation of statutes, ordinances, codes, rules or regulations claimed against Defendants. Plaintiff further objects to Interrogatory No. 9 to the extent that it seeks disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to his Complaint (ECF Doc #1) and his allegations for discrimination and retaliation detailed therein in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. Plaintiff also states that additional inquires may be appropriately made during Plaintiff's deposition.

## INTERROGATORY NO. 10

State with specificity each and every way that **each Defendant** or their representatives, employees, or agents allegedly discriminated against Plaintiff.

12

(a) Include specific facts that Plaintiff plans to introduce to support this claim, including but not limited to the time, place, form of communication(s) or acts/omissions. together with witnesses to said communication(s) or acts/omissions.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 10 on the ground it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further object to Interrogatory No. 10 on the ground that it is overly broad and unduly burdensome because it purports to require Plaintiff to "state with specificity each and every way that each Defendants" allegedly discriminated against Plaintiff, including extensive details for each and every act. Plaintiff further objects to Interrogatory No. 10 to the extent that it seeks disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to his Complaint (ECF Doc #1) and his allegations detailed therein. Plaintiff also states that additional inquires may be appropriately made during Plaintiff's deposition.

**INTERROGATORY NO. 11**

State with specificity what adverse employment action(s), if any, that Plaintiff claims he was subjected to and on what dates the adverse employment action(s), if any, occurred.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 11 on the ground it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further object to Interrogatory No. 11 on the ground that it is premature, overly broad and unduly burdensome because it purports to require Plaintiff to "state with specificity what adverse

13

A-0233

employment actions" Plaintiff alleges and the dates they occurred, since Plaintiff's claims of retaliation are listed in his Complaint (ECF Doc #1) and are ongoing to through this day. Plaintiff further objects to Interrogatory No. 11 to the extent that it seeks disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to his Complaint (ECF Doc #1) and his allegations detailed therein. Plaintiff also states that additional inquires may be appropriately made during Plaintiff's deposition.

## INTERROGATORY NO. 12

If Plaintiff contends that he suffered an adverse employment action(s), state withspecificity what damages were sustained, if any.

## RESPONSE:

Plaintiff objects to Interrogatory No. 12 on the ground it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further object to Interrogatory No. 12 on the ground that it is premature, overly broad and unduly burdensome because it purports to require Plaintiff to specify all damages sustained as a result of the alleges adverse employment action, which remain ongoing. Plaintiff further objects to Interrogatory No. 12 to the extent that it seeks disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to his Complaint (ECF Doc #1) and his allegations detailed therein. Plaintiff also states that his damages include economic damages (loss of wages and out of pocket expenses), non-economic damages (punitive and compensatory damages), and statutory attorney fees. Plaintiff also refers to Schedule

14

A of Plaintiff's initial disclosures and notes that to the extent those calculations depend on the expiration of time and attorney work-product, they remain ongoing.

**INTERROGATORY NO. 13**

Set forth all lawsuits, administrative hearings, or grievances brought by Plaintiff, or in which Plaintiff was involved, that concern Plaintiff's employment with SUNY Upstate Medical University. Include the date, location, subject matter, and result of each and identify and produce all documents concerning each.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 13 to the extent it is not relevant to any party's claim or defense in this action. Plaintiff further objects to Interrogatory No. 13 to the extent it seeks disclosure of any confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff states that the only lawsuits, administrative hearings, or grievances brought by Plaintiff that concern Plaintiff's employment with SUNY Upstate Medical University are the present action, Index No. 5:21-cv-387(GTS/TWD); the corresponding November 18, 2019, filing with the New York Executive Division of Human rights, and cross filing with the EEOC at or around the same time; Claim No. 134212 in the New York State Court of Claims for breach of contract regarding Plaintiff's employment at SUNY Upstate; and Index No. 008414/2019 in New York Supreme Court, Onondaga County requesting a preliminary injunction regarding Plaintiff's demotion from Senior Vice President and Dean of the College of Medicine at SUNY Upstate.

A-0235

**INTERROGATORY NO. 14**

Set forth all lawsuits, administrative hearings, or grievances brought by Plaintiff, or in which Plaintiff was involved, that concern Plaintiff's employment with any employer other than SUNY involving allegations by Plaintiff that he was discriminated and/or retaliated against or accused his employer of violating some law, rule, or regulation. Include the date, location, subject matter and result of each and identify and produce all documents concerning each.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 14 to the extent it is not relevant to any party's claim or defense in this action. Plaintiff further objects to Interrogatory No. 14 to the extent it seeks disclosure of any confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff states: None.

**INTERROGATORY NO. 15**

With respect to paragraph no. 202 of the Complaint, identify the individual(s) and their race/color that Plaintiff allegedly acted on behalf of when he reported race/color discrimination to Defendants as alleged in the Third Cause of Action.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 15 to the extent it is not relevant to any party's claim or defense in this action. Plaintiff further objects to Interrogatory No. 15 to the extent it seeks disclosure any confidential information that concerns individuals other than Plaintiff who are not parties to this action, the disclosure of which would violate the privacy interests of such individuals. Plaintiff further objects to Interrogatory No. 15 to the extent that it seeks disclosure of information already

16

known or available to Defendant.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff refers

Defendants to his Complaint (ECF Doc #1) and the details therein, and further states:

    i.  Dr. Brian Thompson; Native American

    ii.  Nakeia Chambers, MSEd; African American

    iii.  Dr. Ma-Li Wong; Hispanic

    iv.  Numerous medical students enrolled with SUNY Upstate.

## INTERROGATORY NO. 16

With respect to paragraph no. 208 of the Complaint, identify the individual(s) and their gender that
Plaintiff allegedly acted on behalf of when he reported gender discrimination to Defendants as
alleged in the Fourth Cause of Action.

## RESPONSE:

Plaintiff objects to Interrogatory No. 16 to the extent it is not relevant to any party's claim or defense

in this action. Plaintiff further objects to Interrogatory No. 16 to the extent it seeks disclosure any

confidential information that concerns individuals other than Plaintiff who are not parties to this

action, the disclosure of which would violate the privacy interests of such individuals. Plaintiff

further objects to Interrogatory No. 16 to the extent that it seeks disclosure of information already

known or available to Defendant.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff refers

Defendants to his Complaint (ECF Doc #1) and the details therein, and further states:

    i.  Nakeia Chambers, MSEd; female

A0236

A-0237

ii.  Dr. Ma-Li Wong; female

iii. Dr. Amy Tucker; female

iv. Dr. Ann Botash; female

v.  Dr. Xiuli Zhang; female

**INTERROGATORY NO. 17**

With respect to paragraph no. 214 of the Complaint, identify the individual(s) and their national origin that Plaintiff allegedly acted on behalf of when he reported national origin discrimination to Defendants as alleged in the Fifth Cause of Action.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 17 to the extent it is not relevant to any party's claim or defense in this action.  Plaintiff further objects to Interrogatory No. 17 to the extent it seeks disclosure any confidential information that concerns individuals other than Plaintiff who are not parties to this action, the disclosure of which would violate the privacy interests of such individuals.  Plaintiff further objects to Interrogatory No. 17 to the extent that it seeks disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections and General Objections, Plaintiff refers Defendants to his Complaint (ECF Doc #1) and the details therein, and further states:

i.  Numerous medical students enrolled with SUNY Upstate.

**INTERROGATORY NO. 18**

Identify each and every instance Plaintiff has been subjected to damage to his good name, loss of an employment opportunity, humiliation, indignity and shame as a result of Defendants' alleged discriminatory and retaliatory acts and policies. Also produce all documentation in support of each and every separate instance that Plaintiff has been subjected to damage to his good name, loss of

18

A-0238

an employment opportunity, humiliation, indignity and shame as a result of Defendants' alleged discriminatory and retaliatory acts and policies.

**RESPONSE:**

Plaintiff objects to Interrogatory No. 18 on the ground it seeks information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity. Plaintiff further object to Interrogatory No. 18 on the ground that it is premature, overly broad and unduly burdensome because it purports to require Plaintiff to identify "each and every instance" Plaintiff was subject to a damage to his good name, loss of employment opportunity, humiliation, indignity, and shame as alleged in his Complaint. Plaintiff's claims for such are ongoing and it would be unduly burdensome to allege each and every instance of "a damage to his good name, loss of employment opportunity, humiliation, indignity" including in circumstances that he is not directly aware of, such as the denial of future employment based on the public nature of his unlawful demotion. Plaintiff further objects to Interrogatory No. 18 to the extent that it seeks disclosure of information already known or available to Defendant.

Subject to and without waiver of the foregoing objections, Plaintiff refers Defendants to his Complaint (ECF Doc #1) and his allegations detailed therein. Plaintiff also states that additional inquires may be appropriately made during Plaintiff's deposition.

**INTERROGATORY NO. 19**

Identify each person whom Plaintiff expects to call as an expert witness at trial and state the following for each:

- a. The subject matter on which the expert is expected to testify;
- b. The substance of the opinions and conclusions to which the expert is expected to testify;
- c. A summary of the grounds for each such opinion and conclusion; and
- d. Identify each expert's resume or curriculum vitae.

19

A-0239

**RESPONSE:**

Plaintiff objects to Request No. 19 on the grounds that it is premature. Discovery is ongoing and Plaintiff has not yet retained an expert. Plaintiff further objects to Request No. 19 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, or any other privilege or production that has not been waived by Plaintiff.

Subject to and without waver of the foregoing objections and General Objections, Plaintiff states that at the date of these responses he has not retained any expert witnesses and does not anticipate the need of an expert witness. Plaintiff reserves the right to supplement this response if necessary at the appropriate time as determined by the Court and/or required by the applicable Federal Rules, Local Rules, the Court's Individual Rules, and/or any pretrial order entered by the Court.

New York, New York

Dated: November 12, 2021

Respectfully Submitted,

_____/s/_____

Athena Pantelopoulos, Esq.
Danny Grace P.C.
*Attorneys for Plaintiff*
225 Broadway, Suite 1200
New York NY 10007
Email: athena@dannygracepc.com
(646) 515-2821

20

Page 1

Wong v SUNY Upstate Medical Univ.   7-12-23 - Ma-Li Wong

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

MA-LI WONG,

    Plaintiff,

v                                  Index No.: 21-CV-1338

SUNY UPSTATE MEDICAL

UNIVERSITY, ET AL.,

    Defendants.

_____X

        DEPOSITION OF: Ma-Li Wong

        DATE:        July 12, 2023

        TIME:        10:04 a.m. to 5:07 p.m.

        VENUE:       WebEx

Reported by Anthony McClain

**ORIGINAL**

800.523.7887                          Associated Reporters Int'l., Inc.

Page 98

```
 1   Wong v SUNY Upstate Medical Univ. - 7-12-23 - Ma-Li Wong
 2                    A.   Was when I needed to go to doctor
 3   -- Dr. Laraque-Arena.
 4                    Q.   Okay.  So that would've been
 5   April or May of 2018.  Is that --
 6                    A.   Yes.
 7                    Q.   -- correct?
 8                    A.   Yeah.
 9                    Q.   Okay.  And what did you believe
10   the basis of that discrimination was?
11                    A.   I think it was primarily because
12   I am a woman.
13                    Q.   Okay.  Did you -- did you make
14   any complaints to Dr. Laraque-Arena during your
15   conversation with her that you felt discriminated
16   against because of your gender?
17                    A.   No.
18                    Q.   Okay.  As of June of 2018, had
19   you made any complaint to anyone at SUNY Upstate that
20   you felt discriminated against because of your
21   gender?
22                    A.   No.  Well, let me -- let me, you
23   know, rephrase that.  Maybe I talk to my husband.
24                    Q.   Okay.  Other than your husband,
25   did you make any complaints to anyone at SUNY
```

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                          Associated Reporters Int'l., Inc.

Page 99

1   Wong v SUNY Upstate Medical Univ. - 7-12-23 - Ma-Li Wong

2       regarding gender discrimination as of June of 2018?

3                       A.   No.

4                       Q.   All right.  When did you next

5   make a request for an increase in your state-based

6   salary?

7                       A.   I don't think I -- I did -- I

8   made the request, I don't remember.

9                       Q.   Okay.  Did there come a time in

10  2019 where you sought a meeting with Dr. Dewan and

11  Dr. Schwartz regarding your compensation?

12                      A.   Yes.

13                      Q.   Okay.  And -- and what was --

14  what was -- what -- what was the driving force behind

15  requesting that meeting?

16                      A.   It was Dr. Schwartz email saying

17  that my A.L.R. was going to be cut.

18                      Q.   Okay.  And when did Dr. Schwartz

19  indicate that to you, I'm sorry, I don't know if you

20  just said that.

21                      A.   I think it was sometime in 2019,

22  mid -- mid -- mid-2019.

23                      Q.   Okay.  And -- and how did you

24  learn -- well, strike that.

25                      Did Dr. Schwartz tell you that he was

ARII@courtsteno.com                          www.courtsteno.com

A0242

800.523.7887                          Associated Reporters Int'l., Inc.

                                                        Page 110

1    Wong v SUNY Upstate Medical Univ. - 7-12-23 - Ma-Li Wong

2          thank you for this follow up note and thank you for

3          making the time to meet with me, correct?

4                    A.    Yeah.

5                    Q.    Okay.  All right.  So at -- at

6          this meeting it was agreed that your A.L.R. was going

7          to be extended through 2020, correct?

8                    A.    Yes.

9                    Q.    Okay.  During the meeting with

10         Dr. Schwartz and Dr. Dewan, did you complain of any

11         allegations that you were being discriminated against

12         based on your gender?

13                   A.    No, but I noticed that they were

14         comparing my salary to two other people and --

15                   Q.    Okay.

16                   A.    -- that they were males, and I

17         could not earn more than those two other people.  And

18         --

19                   Q.    Okay.

20                   A.    -- they told me that, you know,

21         these two other people had the -- the highest salary

22         in the department, which I then afterwards learn that

23         was not correct.  So --

24                   Q.    Okay.

25                   A.    -- I was really uncomfortable,

ARII@courtsteno.com                        www.courtsteno.com

                                                        A0243

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 111

1    Wong v SUNY Upstate Medical Univ. - 7-12-23 - Ma-Li Wong
2        you know, being comparing to just men and I couldn't
3        really -- my salary couldn't go above those men, but
4        I didn't complaint.  I'm not a person who will
5        complain easily.
6                        Q.   Okay.  And in this email
7        response, did you make any claims of gender
8        discrimination?
9                        A.   No.
10                       Q.   Okay.  All right.
11                       MR. DOLAN:  All right.  You can take
12       that down, Anthony.
13                       THE REPORTER:  Okay.
14                       MR. DOLAN:  And if we could put up the
15       Exhibit G?
16                       THE REPORTER:  Okay.
17                       MR. DOLAN:  Okay.  And if -- if you
18       could please mark this as Exhibit G?
19                       THE REPORTER:  No problem.
20                       MR. DOLAN:  All right.
21                       BY MR. DOLAN:  (Cont'g.)
22                       Q.   And Dr. Wong, I'm showing you
23       what's been marked as Defendant's Exhibit G for
24       identification.  And again, this is a -- this is a
25       copy of a letter on Upstate Medical University

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 134

```
 1      Wong v SUNY Upstate Medical Univ. - 7-12-23 - Ma-Li Wong
 2                      Q.   What was the nature of his lab
 3      and the issues that he was having?
 4                      A.   I believe they didn't have the
 5      space to put some of his equipment.
 6                      Q.   Okay.  Was he having a lab
 7      constructed?
 8                      A.   Don't know.  But some equipment
 9      need -- need a special place.
10                      Q.   Okay.  And -- and what else do
11      you know about the construction issues that Dr. Gaou
12      had in 2014?
13                      A.   Not much.
14                      Q.   Okay.  After your meeting with
15      Dr. Dewan and Dr. Schwartz in April of 2019, and the
16      extension of your A.L.R.  Did you make any additional
17      complaint -- strike that.
18                      Did you make any complaints of
19      discrimination to anyone at SUNY Upstate before
20      October of 2020 -- 2019?
21                      A.   Yes.  I talked to my husband.
22                      Q.   Okay.  Did you speak with anyone
23      at SUNY Upstate?
24                      A.   No.
25                      Q.   Okay.  If we could take another
```

ARII@courtsteno.com                              www.courtsteno.com

A-0246

UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK
.................................................................X

JULIO LICINIO, MD, PhD, MBA, MS,

         Plaintiff,      **DECLARATION OF**
                   **STEPHEN ALBANESE, MD**

                  Case No.: **5:21-cv-387(GTS/TWD)**

   - against -

**STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,**

         Defendants
.................................................................X

    STEPHEN ALBANESE, MD, pursuant to § 1746 of Title 28 of the United States Code,

declares the following to be true and correct under penalty of perjury under the laws of the United

States of America:

    1.   I am an orthopedic surgeon and have been licensed to practice medicine in New

York State since 1981. I am currently employed at SUNY Upstate Medical University ("UMU")

as a Distinguished Service Professor and Chair of the Department of Orthopedic Surgery and have

held that position since September 2000. I am also the Medical Director of the Ambulatory Surgery

Center at Upstate Bone and Joint Center and have held that position since approximately 2010.

    2.   I respectfully submit this Declaration in support of the Defendants' motion for

summary judgment. I make this Declaration based upon my personal knowledge.

    3.   I have reported to six different College of Medicine Deans at UMU since I became

Chair of UMU's Orthopedics Department 23 years ago, including reporting to President Dewan

1

when he was interim Dean and reporting to Plaintiff when he was Dean from July 1, 2017 to September 12, 2019.

4.      During the time that Plaintiff was Dean, he was my supervisor and I interacted with him on a number of occasions. My overall impression of the Plaintiff is that he was not organized or effective as a leader, he made decisions and comments that caused faculty and leaders to complain, and he did not have a plan that would advance the goals of UMU or UMU's College of Medicine.

5.      During Department Chair meetings that Plaintiff held twice a month, and that I attended, I observed Plaintiff ramble endlessly and lead circular discussions which were mostly unproductive. Many of my colleagues would remark after Department Chair meetings that they were unclear as to the purpose of the meetings and that they didn't understand what the Plaintiff was talking about. I agreed. He did not seem to have a cohesive plan to move the College of Medicine forward in a positive direction, much less at all. He also seldom prioritized clinical medicine, seeming to know relatively little about it, even though UMU's clinical enterprise generates the most revenue for UMU.

6.      In approximately the Fall of 2018, Plaintiff selected me and Ruth Weinstock MD, PhD to co-chair a search committee to select a candidate for UMU's open Pediatrics Department Chair position. Plaintiff requested that the committee recommend three candidates that he should consider hiring for the position. After the committee spent months vetting and interviewing candidates, Dr. Weinstock and I provided Plaintiff with a list of three candidates that were recommended by the Committee. One of the three candidates withdrew his candidacy for the position, leaving one male and one female candidate. Plaintiff selected the male candidate. Following the Plaintiff's decision to select the male candidate, Plaintiff contacted me and informed

2

me that a complaint had been filed against him by female faculty members for selecting the male candidate over the female candidate. He told me that I may be contacted by UMU's Office of Diversity and Inclusion and stated that the female faculty members who had complained were being "irrational."

7.      Thereafter, UMU's former Chief Diversity Officer Gloria Lopez contacted me and spoke with me about the search committee and our recommendations to Plaintiff. I was not privy to the results of her investigation.

8.      There were several other instances that I am aware of where Plaintiff was inappropriate and caused individuals to be offended.

9.      In a Department Chair meeting that Plaintiff held before the LCME visit in April 2019, upon information and belief, Plaintiff gave sexually explicit examples of what Chairs should not do because such conduct would constitute harassment. While I was not in attendance when these comments were made, I did speak with other Department Chairs who were shocked by and took offense to the Dean's comments. There are ways to train Chairs on the topic of harassment without providing graphic examples of what not to do.

10.      During another meeting that I attended in August 2019 with Plaintiff, President Dewan, and several other members of leadership, Plaintiff called out President Dewan in front of the entire group without any purpose or having any effect, stating that the Chairs are going behind Plaintiff's back to the President with Department issues and that President Dewan is letting it happen. Plaintiff's comments were significant enough that one of the Chairs in attendance commented afterwards about how uncomfortable the meeting was. There was no reason for Plaintiff to publicly air his issues with President Dewan in front of this entire group of leaders and the President.

3

A-0249

11.     President Dewan has been a faculty member and leader at UMU for as long as I have been Department Chair. He is well respected amongst Department Chairs and other UMU leaders and is viewed by many as an effective leader and President. Plaintiff's comments suggested that he greatly resented Dr. Dewan for being in good favor with the Department Chairs.

12.     On September 11, 2019, I received an award at UMU's annual convocation award ceremony. As I was leaving the ceremony, President Dewan approached me and asked me to come into his office. Dr. Dewan confided in me that he was concerned about Plaintiff's leadership and where the College of Medicine was going under his leadership and that, for these reasons, he was planning to remove the Plaintiff from his Dean position. He asked for my opinion of his decision. In response, I shared with Dr. Dewan the concerns that are summarized herein and that I agreed with his decision.

13.     I believe that President Dewan's decision was appropriate and necessary to allow UMU to move forward as an organization. Plaintiff did not have the skills necessary to lead UMU's College of Medicine, made controversial statements and decisions that caused UMU faculty and leaders to take offense, and did not have a vision as to where the organization should go.

Dated:        January 2, 2024___
              Syracuse, New York

Stephen Albanese, MD

4

A-0250

UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK

................................................................................X

JULIO LICINIO, MD, PhD, MBA, MS,

                         Plaintiff,

**DECLARATION OF
LAWRENCE CHIN, MD,
FAANS, FACS**

Case No.: **5:21-cv-387(GTS/TWD)**

      - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

                    Defendants.

................................................................................X

      LAWRENCE CHIN, MD, FAANS, FACS, pursuant to § 1746 of Title 28 of the United

States Code, declares the following to be true and correct under penalty of perjury under the laws

of the United States of America:

      1.      I am a neurosurgeon and have been licensed to practice medicine since 1987.

      2.      I am currently employed by SUNY Upstate Medical University ("UMU") as the

Dean of the UMU's Norton College of Medicine. On September 13, 2019, I was appointed Interim

Dean of the College of Medicine after Plaintiff Julio Licinio was removed, and in January 2020, I

was appointed Dean.

      3.      I became employed by UMU in August 2011, and held various leadership positions

between that time and the time I became Interim Dean in September 2019. From August 2011 -

September 12, 2019, I served as Robert B. and Molly G. King Endowed Professor and Chair of

1