# 24-2564-cv

## United States Court of Appeals
### *for the*
## Second Circuit

JULIO LICINIO, MD, PHD, MBA, MS,

*Plaintiff-Appellant,*

— v. —

STATE OF NEW YORK, STATE UNIVERSITY OF NEW YORK,
STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 2 of 5 (Pages A-0251 to A-0500)

JOSEPH SPADOLA
NEW YORK STATE OFFICE OF THE
    ATTORNEY GENERAL
*Attorneys for Defendants-Appellees*
28 Liberty Street
New York, New York 10005
(212) 416-8019

DANIEL GRACE
DANNY GRACE PLLC
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 1200
New York, New York 10007
(212) 202-2485

CP COUNSEL PRESS    (800) 4-APPEAL • (334400)

## TABLE OF CONTENTS

District Court Docket Entries...................................................................... vi

Plaintiff's Complaint............................................................................ A-0001

    Exhibit 1 Employment Contract................................................. A-0039

    Exhibit 2 Demotion Letter......................................................... A-0051

    Exhibit 3 Civil Cover Sheet....................................................... A-0054

Answer ................................................................................................ A-0055

Amended Answer.................................................................................. A-0061

Defendant's Notice of Motion for Summary Judgment ...................... A-0072

Attorney Declaration............................................................................ A-0074

    Exhibit A Position Summary..................................................... A-0078

    Exhibit B Offer Letter............................................................... A-0084

    Exhibit C Chart......................................................................... A-0095

    Exhibit D Business Certification and notes.............................. A-0096

    Exhibit E Business Certification and notes ............................. A-0101

    Exhibit F Email......................................................................... A-0103

    Exhibit G EEOC Charge........................................................... A-0106

    Exhibit H DHR Decision........................................................... A-0135

    Exhibit I DHR Dismissal Order................................................ A-0146

    Exhibit J Deposition Transcript Excerpt – Licinio.................. A-0149

    Exhibit K Deposition Transcript Excerpt – Botash................. A-0214

    Exhibit L Plaintiff Response to Interrogatories...................... A-0220

    Exhibit M Deposition Transcript Excerpt- Wong ................... A-0240

Declaration Albanese ........................................................................... A-0246

Declaration Chin .................................................................................. A-0250

Exhibit A Email ...................................................................... A-0263

Exhibit B Affirmative Action/Equal Opportunity Report ...................... A-0268

Exhibit C Email ...................................................................... A-0269

Exhibit D Letter: Post Probation Survey Visit ................................ A-0271

Exhibit E Letter: Survey Visit for Full Accreditation ........................... A-0279

Exhibit F Letter: Status Report ................................................. A-0289

Declaration Corona ..................................................................... A-0294

Exhibit A Letter ...................................................................... A-0299

Exhibit B Email ...................................................................... A-0300

Declaration Dewan ..................................................................... A-0301

Exhibit A Email ...................................................................... A-0329

Exhibit B Email ...................................................................... A-0333

Exhibit C Notice of Meeting ...................................................... A-0335

Exhibit D Email ...................................................................... A-0340

Exhibit E Demotion Letter ........................................................ A-0341

Exhibit F Faculty Executive Summary Report ................................ A-0343

Exhibit G Email ...................................................................... A-0349

Exhibit H LCME Letter ............................................................ A-0351

Exhibit I Email ....................................................................... A-0359

Declaration Frost ..................................................................... A-0361

Exhibit A Email ...................................................................... A-0368

Exhibit B Email ...................................................................... A-0369

Exhibit C Human Resources Practices .......................................... A-0370

Exhibit D Email ...................................................................... A-0396

iii

Exhibit E Email ......................................................................... A-0397

Declaration Gardner ...................................................................... A-0401

    Exhibit A Research Results ....................................................... A-0406

Declaration Gilbertson ................................................................... A-0407

    Exhibit A University Policy Manual ......................................... A-0411

    Exhibit B Harassment Prevention Policy ................................. A-0415

    Exhibit C Managing Conduct and Performance Guide ........... A-0431

    Exhibit D Sexual Harassment Prevention Program ................ A-0490

Declaration Lesperance .................................................................. A-0540

    Exhibit A Text ........................................................................... A-0545

    Exhibit B Email ........................................................................ A-0569

    Exhibit C Email ........................................................................ A-0573

    Exhibit D Email ........................................................................ A-0577

    Exhibit E Email ........................................................................ A-0582

Declaration Schmitt ....................................................................... A-0584

    Exhibit A Email ........................................................................ A-0588

    Exhibit B Resume Dahmoon ................................................... A-0590

Declaration Schwartz ..................................................................... A-0596

    Exhibit A Email ........................................................................ A-0610

    Exhibit B Email ........................................................................ A-0614

    Exhibit C Email ........................................................................ A-0621

    Exhibit D Summary Statistics Medical School Compensation ............. A-0623

    Exhibit E Offer Letter – Wong ................................................ A-0624

    Exhibit F Offer Letter: Department of Psychology ................. A-0630

iv

Exhibit G Email ........................................................................ A-0632

Exhibit H Email ........................................................................ A-0634

Exhibit I Email ......................................................................... A-0639

Exhibit J Email ........................................................................ A-0641

Exhibit K Letter: Wong Salary Supplement - 4/22/19 ........................... A-0642

Exhibit L Letter: Wong Salary Supplement – 10/28/19 ......................... A-0643

Exhibit M State Compensation – Wong ............................................. A-0644

Exhibit N Chart: Compensation of Full Research Professors ................ A-0645

Memorandum of Law ...................................................................... A-0646

Statement of Material Facts .............................................................. A-0701

Plaintiff Memorandum of Law ........................................................... A-0731

Response to Defendants' Statement of Material Facts Not in Dispute ............ A-0767

Declaration Licinio ........................................................................ A-0820

Exhibit 1 Employment Contract ............................................ A-0875

Exhibit 2 Demotion Letter ................................................... A-0887

Exhibit 3 Strategic Plan ..................................................... A-0890

Exhibit 4 Department of Human Rights Probably Cause ...................... A-0895

Exhibit 5 Faculty Minutes ................................................... A-0918

Declaration Attorney ...................................................................... A-0923

Exhibit 6 Deposition Transcript Excerpt – Licinio ................................ A-0924

Exhibit 7 Deposition Transcript Excerpt – Dewan ................................ A-1018

Reply Memorandum of Law .............................................................. A-1031

Statement of Material Facts in Response to Plaintiff's Counterstatement of
Material Facts ......................................................................... A-1059

Declaration Weinstock ..................................................................... A-1073

Declaration Brangman ...................................................................... A-1075

    Exhibit A Email ........................................................................ A-1079

Declaration Frost ............................................................................ A-1080

    Exhibit A Deposition Transcript Excerpt – Frost.................... A-1085

Declaration White .......................................................................... A-1096

    Exhibit A Diagram.................................................................... A-1101

    Exhibit B MC Performance Appraisal Form…...................... A-1102

Declaration Attorney ...................................................................... A-1108

    Exhibit A Decision and Order – Court of Claims ................... A-1111

    Exhibit B SUNY honors ........................................................ A-1126

    Exhibit C Deposition Transcript Excerpt – Dewan................ A-1129

    Exhibit D Deposition Transcript Excerpt – Botash................ A-1135

    Exhibit E Deposition Transcript Excerpt – Licinio................ A-1136

Decision and Order Granting Defendants Summary Judgment ....................... A-1149

Judgment Granting Defendants Summary Judgment ....................... A-1230

Plaintiff's Notice of Appeal ............................................................ A-1232

UMU's Neurosurgery Department, performing neurosurgery on patients, supervising 6 Neurosurgery physicians, and managing Neurosurgery teaching, research, and clinical activities. From 2011 - 2019, I was the Program Director for the Neurosurgery Department's Medical Residency program. From 2018 - 2019, I was Chair of the Governing board of Upstate University Medical Associates at Syracuse, Inc. ("UUMAS"), which is the umbrella entity over the 18 medical service groups that provide clinical care to UMU's patients.

4.     In addition to being Dean of UMU's College of Medicine, I continue to practice as a Neurosurgeon in UMU's Neurosurgery Department. I have held a range of leadership positions outside of UMU in the American Association of Neurological Surgeons, the Congress of Neurological Surgeons, and other organizations. Prior to coming to Upstate in August 2011, I was Chair of Neurosurgery at Boston University School of Medicine, and a Professor of Neurosurgery at the University of Maryland School of Medicine, where I was involved in many aspects of academic medicine, from clinical care and teaching to research.

5.     I respectfully submit this Declaration in support of the Defendants' motion for summary judgment. I make this Declaration based upon my personal knowledge and based upon records maintained by UMU in the usual course of business.

6.     As Dean of UMU's College of Medicine, I am responsible for overseeing all of its education, biomedical research, and clinical care operations.

7.     My oversight over College of Medicine education includes overseeing College of Medicine curriculum, recruitment, admissions, and retention of medical students, interns, residents and fellows, and ensuring the success of our programs, faculty and students. It also includes ensuring that College of Medicine programs and processes comply with accreditation standards of the College's accreditating bodies, including the Liaison Committee on Medical Education

2

("LCME"), Accreditation Council for Graduate Medical Education ("ACGME"), and Middle States Commission on Higher Education ("Middle States"). UMU must meet accreditation standards to be able to competitively recruit the highest caliber students, residents, fellows, faculty and Department Chairs. My oversight also includes ensuring that UMU's student population is diverse in such a way that UMU can better serve the community, including by recruiting and retaining students, faculty and leaders with diverse backgrounds.

8.      My oversight over research includes all aspects of biomedical research conducted by faculty within the College of Medicine, including overseeing research laboratory space and laboratory renovation and build out expenses, faculty research start up dollars, and management of research grant funds that UMU's College of Medicine faculty obtain, which has grown at an annual rate of 10% for the past five years and has resulted in approximately $45 million in research expenditures just in the last year.

9.      My oversight over clinical care operations includes overseeing the nineteen (19) Clinical Departments whose clinicians have a faculty appointment in our College of Medicine. Clinical faculty provide clinical training to our medical students, residents and fellows while providing medical care for the approximately 1.8 million patients that UMU serves, whether at UMU's University Hospital, the region's only level-1 trauma center, Golisano Children's hospital, the region's only children's hospital, or another of UMU's patient care sites. I oversee the appointment of all medical staff faculty, and the appointment of and relationship with volunteer faculty who teach UMU's medical students, residents and fellows in the community.

10.     In total, I am responsible for overseeing the twenty-six (26) Departments and two (2) Centers and Programs listed in the table below:

3

| Clinical Departments | Basic Science Departments |
|---|---|
| • Anesthesiology | • Biochemistry and Molecular Biology |
| • Emergency Medicine | • Cell and Developmental Biology |
| • Family Medicine | • Microbiology and Immunology |
| • Geriatrics | • Neuroscience and Physiology |
| • Medicine | • Pharmacology |
| • Neurology | |
| • Neurosurgery | Other Departments |
| • Obstetrics and Gynecology | • Bioethics and Humanities |
| • Ophthalmology & Visual Sciences | • Public Health and Preventive Medicine |
| • Orthopedic Surgery | |
| • Otolaryngology and Communication Sciences | Centers and Programs |
| • Pathology | • MD/PhD Program |
| • Pediatrics | • NY Master of Public Health |
| • Physical Medicine and Rehabilitation | |
| • Psychiatry and Behavioral Sciences | |
| • Radiation Oncology | |
| • Radiology | |
| • Surgery | |
| • Urology | |

11.     Each of these 26 Departments has a Department Chair, whom I am responsible for recruiting, appointing and directly supervising. In total, approximately 700 Norton College of Medicine faculty members report up through me to provide education for 750 medical, graduate and master's of public health students at Upstate, and I oversee UMU's relationship with approximately 2,000 volunteer faculty in our community.

12.     I also oversee four (4) Administrative Offices, including the Office of Graduate Medical Education, the Office of Undergraduate Medical Education, and the staff in my own office, among others.

13.     The Administrative Offices that I oversee are led by Associate Deans and Assistant Deans who report directly to me. There are Associate Deans in my Office who also directly report to me.

4

14.     I have reviewed the Complaint in this matter and I am generally familiar with the allegations made in the Complaint.

15.     Prior to my appointment as interim Dean of the College of Medicine, I interacted with and observed Plaintiff regularly during leadership meetings that we attended together in our respective leadership roles. These included meetings of the UMU University Executive Committee and the Budget Committee, which he attended as Dean and I attended as UUMAS President from 2018 - 2019. They also included Department Chair meetings that he held with all Department Chairs and one evaluation meeting that he had with me as Chair of Neurosurgery. In addition to my observations and interactions with Plaintiff during leadership meetings, I also interacted with him during meetings with UMU's former President Danielle Laraque-Arena, MD and, separately, during meetings with UMU's current President Mantosh Dewan, MD.

16.     Based on my interactions and observations of Plaintiff while he was Dean, my opinion of Plaintiff is that he is a bright individual with innovative ideas but that he is not an effective leader.

17.     I have directly reported to four College of Medicine Deans since I have been employed at UMU.  Plaintiff in comparison to the other Deans lacked the requisite follow through and focus that a Dean must possess in order to effectively lead a College of Medicine at an Academic Medical Center like UMU.  He was not clear as to what his agenda was as Dean and was not effective at getting Department Chairs to act, due to being easily distracted and diffuse.

18.     For example, during Department Chair meetings, Plaintiff habitually relayed long, involved anecdotes that were not germane to the meeting or the topic at hand and substantive decisions were rarely made.

5

19. At University leadership meetings, he was often on his phone, at times watching videos online and distracting other leaders who were participating in the meeting by showing them the videos he was watching. Shortly before he was removed as Dean, during a leadership meeting, he chose to play a news video depicting a local politician using vulgar and inappropriate language to myself, President Dewan and other UMU leaders. It was inappropriate and awkward and President Dewan asked him to stop playing the video because others in the meeting were visibly uncomfortable.

20. In another instance, Plaintiff appointed me and Geriatrics Chair Dr. Sharon Brangman as co-chairs of a search committee to search for a new Chair of the Department of Medicine – the largest Clinical Department here at UMU. The search committee was made up of approximately 19 faculty members and leaders at UMU, who met regularly from mid-2018 through January 2019, to consider candidates and select the most qualified candidate for the job. It was apparent that Plaintiff wanted to influence who the search committee selected to move forward in the process. Specifically, the Plaintiff urged the committee to seriously consider two candidates who he knew personally. The Plaintiff publicly accused the search committee of giving the other candidates confidential information to gain an advantage over his preferred candidates. Multiple Committee members complained to me about the Plaintiff's attempts to influence the search and I finally told Plaintiff that he should disband the search committee and do what he wanted. The search committee was disbanded after a multi-month search and the search was declared a failed search. Upon information and belief, President Dewan had to ask Plaintiff to start the search over as a matter of fairness due to the concerns raised about his interference with the process.

6

21.    In the Summer of 2019, after President Dewan was appointed Interim President, Plaintiff seemed to become very engaged in hospital functions when he had previously not been involved. He became fixated on talking about fixing problems that were occurring in the Anesthesia Department.

22.    In August 2019, Plaintiff scheduled an "urgent" meeting to be held on August 13, 2019, at 6am, including myself, President Dewan, and Hospital leaders. A copy of an email sent from Christine Liberty, the College of Medicine's Coordinator for Executive Searches, on behalf of Plaintiff on August 12, 2019, including a printout of the email's recipients, is attached as **Exhibit "A."** The email reminds all receipients of the "Urgent Meeting" called by Dr. Licinio to discuss the "immediate future of the Department of Anesthesia." I viewed this meeting to be out of the ordinary for the Dean to schedule with hospital leadership, and there was no reason why the President needed to be there to discuss this topic. Additionally, President Dewan has always indicated his preference not to attend early morning meetings. At the meeting, I don't recall that anesthesia was the main discussion topic. Instead, the meeting was all about how President Dewan was not letting Plaintiff do his job, how Plaintiff disapproved of Department Chairs and faculty going around Plaintiff to speak with President Dewan about Departmental issues, and how Chairs should come to him and not the President. Plaintiff talked mostly during this meeting and everyone else was silent, including President Dewan. The attendees were visibly uncomfortable, as the Dean was essentially publically blaming his supervisor in front of UMU's highest level leaders as the reason why Plaintiff was not effective in his job. I viewed Plaintiff's behavior to be incredibly disrespectful towards President Dewan, inappropriate, and insubordinate. It was a topic that should have been raised one-on-one with the President alone – not in front of the President's entire leadership team. Given the unusual nature of Plaintiff calling such a meeting and inviting President

Dewan, and given that he did little to discuss Anesthesiology, I questioned afterwards whether Plaintiff intentionally called the meeting so that he could publicly berate President Dewan.

23.     Plaintiff had scheduled a similar "urgent" mandatory meeting with Department Chairs for 7am on August 13, 2019. I attended this meeting also, as Neurosurgery Chair at the time. Similar to the 6am meeting, the entire purpose of this 7am meeting was to publicly blame President Dewan as the reason why he was ineffective at his job and to instruct Chairs to only raise concerns to him and not to President Dewan. His instruction seemed unnecessarily controlling. I have known President Dewan for many years, as a fellow Department Chair, then as interim Dean, and then as President. He is a stable, fair-minded person who has spent his entire 40+ year career at Upstate. People view him as a loyal, kind person. Individuals, including myself, spoke to President Dewan because they respected and trusted him to hear their issues. In contrast, it wasn't always clear whether Plaintiff would listen to or be effective at resolving such issues for the reasons described above. Some Department Chairs, including myself, felt that Plaintiff's behavior during this 7am meeting was troubling and provocative towards his boss. He publicly aired a matter that should have been discussed as part of a private conversation directly with President Dewan – not to UMU Department Chairs. It was clear at that juncture that Plaintiff's focus was on President Dewan as his adversary.

24.     After the August 13, 2019 meetings, President Dewan approached me to see if I would be willing to assume the role of interim Dean of the College of Medicine. I was not surprised that President Dewan was making a change with respect to this position given Plaintiff's behavior while Dean – which had grown increasingly more unpredictable over the prior few months. I agreed that I would be willing to step into the role and was appointed as Interim Dean of UMU's

8

College of Medicine on September 13, 2019, the day after Plaintiff was removed on September 12, 2019.

25.     It is my understanding that the Plaintiff is alleging that, after he filed his Division of Human Rights complaint, UMU failed to have external, open searches for certain positions in retaliation for his filing a complaint. This is far from the truth. Appointing individuals without a search is not done all the time, but is requested on occasion when circumstances warrant.  One of the most important duties as Dean is naming Department Chairs. Searches take approximately 9-12 months, so when an interim Chair has gained experience, has been successful in their role, and the faculty members whom he/she supervises have a favorable opinion of their performance, the interim Chair is sometimes made permanent. This helps to ensure stability and certainty within the Medical School, giving it the ability to more competitively recruit high caliber chair and faculty candidates, as well as students, residents and fellows. Requests to appoint interim Chairs to the Chair position have been made by Deans who served before Plaintiff and by Plaintiff himself.

26.     Under my leadership in particular, I have appointed the following 9 Department Chairs:

| Date of Appointment | Chair | Department | Race | Gender |
|---|---|---|---|---|
| 5/11/2020 | Xiuli Zhang, MD | Anesthesiology | Asian | female |
| 9/1/2020 | Thomas Schwartz, MD | Psychiatry & Behavior Sciences | Caucasian | male |
| 7/1/2021 | Francesca Pignoni, MD | Neuroscience & Physiology | Caucasian | female |
| 11/11/2021 | William Paolo, MD | Emergency Medicine | Caucasian | male |
| 9/15/2022 | Clyde Satterly, MD | Family Medicine | Caucasian | male |
| 10/27/2022 | Stephen Thomas, MD | Microbiology and Immunology | Caucasian | male |
| 6/1/2023 | Michel Nasr, MD | Pathology | Caucasian | male |
| 9/1/2023 | Jonathan Miller, MD | Neurosurgery | Caucasian | male |
| 8/28/2023 | Cynthia Taub, MD, MBA | Medicine | Asian | female |

A0258

All were appointed pursuant to external searches except Xiuli Zhang, MD, Francesca Pignoni, MD, and Thomas Schwartz, MD. Dr. Zhang and Schwartz were appointed without searches being conducted because they had served as interim Department Chairs of their Departments throughout the COVID-19 pandemic and I assessed, with input from faculty within their department, that they were highly qualified as judged by their credentials and they performed exceptionally well as interim Chairs during that very difficult time. Dr. Pignoni was appointed Chair of her Department for similar reasons after an attempted, but failed search. In order to make such appointments without a search, I requested a waiver of search for these positions. My request was reviewed and approved by UMU's former Chief Diversity Officer Darryl Dykes for the reasons stated. A copy of the approved request for waiver of search form for the Psychiatry Chair position is attached as **Exhibit "B."**

27.    I also appointed Amit Dhamoon, MD, PhD as Director of the MD/PhD Program, which was a 0.1 FTE student mentor role that he took on in addition to his faculty duties. This role was not a "job" that needed to be posted, but simply an added mentorship responsibility that a faculty member would take on. In order to select the best faculty member for this role, I worked with the Dean of the College of Graduate Studies Mark Schmitt to consider a list of faculty members provided to us by MD/PhD students as individuals whom they thought would be good mentors to them. The students recommended the candidates whom they wanted as their mentor, with Dr. Dhamoon being the preferred candidate. Upon review, Dean Schmitt and I agreed based on his having graduated from UMU's MD/PhD program, his qualifications, and his reputation as an excellent mentor to students. A copy of a January 30, 2020 email sent from a student to President Dewan, Dr. White, Dr. Schmitt and me containing the compiled list of the students' suggestions is attached as **Exhibit "C."**

10

28.   My decision to appoint these individuals, whether with or without a search, had nothing whatsoever to do with Plaintiff or his complaint, but had to do solely with the fact that these individuals had proven that they were highly qualified to perform their job and the operational need for stability within the College of Medicine – particularly during the uncertainty that was caused by COVID – so that it could do a better job of positioning itself to recruit and retain high quality faculty. Any claim by Plaintiff that UMU's decision to appoint certain individuals without a search constitutes discrimination or retaliation towards him is negated by the fact that, as Dean, Plaintiff likewise appointed several Department Chairs and Associate Deans without conducting searches.  These individuals included:

| Date of Appointment | Person Appointed | Position Appointed To | Race | Gender |
|---|---|---|---|---|
| 11/13/2017 | Christopher Morley, PhD, MA, CAS | Chair, Public Health & Preventative Medicine | Caucasian | male |
| 4/2/2018 | Richard Wojcikiewicz, PhD | Chair, Pharmacology | Caucasian | male |
| 5/28/2018 | Zulma Tovar-Spinoza, MD | Associate Dean for Diversity and Inclusion | Hispanic | female |
| 6/1/2018 | Thomas Schwartz, MD | Senior Associate Dean of Education | Caucasian | male |
| 7/1/2018 | Sharon Brangman, MD | Chair, Geriatrics | African-American | female |
| 8/14/2018 | Leann Lesperance, MD | Interim Associate Dean of Undergraduate Medical Education | Caucasian | female |
| 7/9/2019 | Rebecca Garden, PhD | Assistant Dean for Disability and Inclusion | Caucasian | female |

11

29.     Separately, I was involved in the LCME accreditation process in 2019 as co-chair of a session with UMU's Dean of Student Affairs, Julie White. I am familiar with the results of that accreditation process, as well as the College of Medicine's past accreditation results. While true that the College of Medicine was placed on probation by LCME in 2011, that had nothing to do with diversity, as Plaintiff suggests.  Moreover, a team of individuals within the College of Medicine under the leadership of former Dean David Duggan, MD worked quickly to get off of probation and back in good accreditation standing by June 2013. See, **Exhibit "D."** When Plaintiff became Dean in 2017, the College of Medicine was fully accredited. Many of the same individuals from that team worked behind the scenes for a year and a half before LCME conducted their site review in April 2019, to ensure that the review would be successful while Plaintiff was Dean. While the College of Medicine's accreditation status was not put on probation by LCME during Licinio's leadership, LCME's review was not perfect. There were areas that LCME identified as needing to be monitored, including the area of diversity. See, **Exhibits "E"** and **"F."** For example, the LMCE noted that although new policies, procedures and programs designed to increase diversity among students, faculty and senior administrative staff were implemented under Plaintiff's leadership, there were only modest gains in diversity of senior administrative staff and faculty during the first year of implementation – suggesting that the changes Plaintiff had made were not yet effective at increasing diversity. See, Exhibit E at p. 2.

30.     Since I have become Dean, we have worked tirelessly to address these issues, including restructuring the Dean's office and the University at large, to ensure more effective diversity oversight and direction for the entire University. For example, Plaintiff created a number of diversity related Associate Dean positions, but I found when I took over that many of those

12

A-0262

positions were created without foresite into what they would be responsible for doing and how they could improve diversity within the College and University as a whole.  I have continued to build the resources available to Diversity Representatives in each College of Medicine Department and, instead of having dedicated Deans in the College of Medicine, have worked with President Dewan to ensure we have University level diversity leadership.

Dated:  January 19, 2024
        Syracuse, New York

                                        _____
                                        Lawrence Chin, MD, FAANS, FACS

13

A0262

A-0263

Licinio v. SUNY Upstate, et al., 5:21-CV-387   008384

**REMINDER - Urgent Meeting 8/13:  Immediate Future of Anesthesia**

| | |
|---|---|
| **From** | Chris Liberty |
| **To** | Stephen AlbaneseMary Arseneau, Ann Botash, Gennady BratslavskyRosaria CarellaAndrew ChapmanHeidi Chapman, Lawrence Chin, Robert Cooney, Robert Corona, Mantosh Dewan, G. Randall GreenKim HanifinMichele HendersonMarilyn Higgins, Julio LicinioDiane MantoothLaurie NicolettiErin Crolick PetersShari Sterle-Grant, Amy Tucker, Grace VanNortwick |
| **Date** | 2019/08/12 09:18 |
| **Subject:** | REMINDER - Urgent Meeting 8/13:  Immediate Future of Anesthesia |
| **Attachments:** | TEXT.htm |

**Security: Confidential**

**REMINDER:**

An Urgent Meeting to discuss the immediate future of the Department of Anesthesia is scheduled for <u>Tuesday, August 13 at 6:00 am in C1071 (Upstate Cancer Center Board Room)</u>


Thank you.
Chris

Christine M. Liberty

Coordinator for Executive Searches
Office of the Dean, College of Medicine
SUNY Upstate Medical University
750 East Adams Street
Syracuse, NY 13210
Phone:  315-464-1682
Fax:  315-464-1687
Email:  libertyc@upstate.edu

 UPSTATE MEDICAL UNIVERSITY | State University of New York

This message and any attachments are privileged and confidential and are intended solely for the addressee. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying or retention of this e-mail or the information contained herein is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately.

| Properties | Licinio v. SUNY Upstate, et al., 5:21-CV-387   008385 |
|---|---|
| **Property** | **Value** |
| MessageID | 5D512EFB.HSCHOSP2.HSC2.100.1707569.1.1A9 C77.1 |
| Message Path | xml\Julio email\5D512EFB.HSCHOSP2.HSC2.100.170756 9.1.1A9C77.1.xml |
| From | Chris Liberty |
|    Display Name | Chris Liberty |
|    Email | LIBERTYC@upstate.edu |
|    UUID | CC5FA982-04F5-0000-B068-0060B03D84AF |
|    Reply To | LIBERTYC@upstate.edu |
|    Text | Chris Liberty |
| To | Stephen Albanese; Ann Botash; Gennady Bratslavsky; Lawrence Chin; Robert Cooney; Robert Corona; Mantosh Dewan; G. Randall Green; Julio Licinio; Amy Tucker; Grace VanNorwick |
| Cc | Mary Arseneau; Rosaria Carella; Andrew Chapman; Heidi Chapman; Kim Hanifin; Michele Henderson; Marilyn Higgins; Diane Mantooth; Laurie Nicoletti; Erin Crolick Peters; Shari Sterle-Grant |
| Subject | REMINDER - Urgent Meeting 8/13: Immediate Future of Anesthesia |
| Scheduled date | 2019-08-12 09:18:48 |
| Creation date | 2019-08-12 09:18:48 |
| Modified date | 2019-10-12 10:23:05 |
| Delivered date | 2019-08-12 09:18:52 |
| Message size | 849 |
| Attachments size | 7250 |
| Total size | 8110 |
| Attachments | 1 |
|    Attachment | TEXT.htm |
|    Name | TEXT.htm |
|    Content ID | 5D512EFB.HSCHOSP2.HSC2.200.2000093.1.34A AB3.1@45:5D512EFB.HSCHOSP2.HSC2.100.1707 569.1.1A9C77.1@1:5BE5B521.HSCHOSP2.HSC2. 100.1707569.1.1828E4.1@13 |
|    Is Inline | false |
|    Type | file |
|    Size | 7250 |
|    Date | 2019-08-12 05:18:43 |
|    CA | content\A6\A69A3DA8402640804178D326F2BD1 309A4B49AEA0FB2A8602806748A0C041D6116F22 675 |
|    Hash | A69A3DA8402640804178D326F2BD1309A4B49AEA 0FB2A8602806748A0C041D6116F22675 |
| Recipients | 22 |
|    Recipient | Stephen Albanese |
|    Display Name | Stephen Albanese |
|    Email | AlbanesS@upstate.edu |
|    UUID | 6C4AA050-0AAD-0000-B61B-0060B03D84AF |
|    Distribution Type | TO |
|    Recipient Type | User |
|    Recipient | Mary Arseneau |
|    Display Name | Mary Arseneau |
|    Email | ARSENEAM@upstate.edu |
|    UUID | 11693940-3185-0000-8432-0060B03D84AF |
|    Distribution Type | CC |
|    Recipient Type | User |
|    Recipient | Ann Botash |
|    Display Name | Ann Botash |
|    Email | BOTASHA@upstate.edu |
|    UUID | D5D73730-04F5-0000-B068-0060B03D84AF |
|    Distribution Type | TO |
|    Recipient Type | User |
|    Recipient | Gennady Bratslavsky |
|    Display Name | Gennady Bratslavsky |
|    Email | BratslaG@upstate.edu |
|    UUID | 838CE801-1E1B-0000-98F5-001CC47AD304 |
|    Distribution Type | TO |
|    Recipient Type | User |
|    Recipient | Rosaria Carella |
|    Display Name | Rosaria Carella |
|    Email | CarellaR@upstate.edu |
|    UUID | D1832681-1FA8-0000-885E-CE5655287E1B |
|    Distribution Type | CC |
|    Recipient Type | User |
|    Recipient | Andrew Chapman |
|    Display Name | Andrew Chapman |

| | |
|---|---|
| Email | ChapmaAn@upstate.edu |
| UUID | 398C3F01-2A76-0000-9C68-736362333834 |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Heidi Chapman |
| Display Name | Heidi Chapman |
| Email | ChapmanH@upstate.edu |
| UUID | D999E281-1893-0000-869A-00805FBB36E5 |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Lawrence Chin |
| Display Name | Lawrence Chin |
| Email | ChinL@upstate.edu |
| UUID | DF75SD81-2022-0000-9B35-001CC47AD304 |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Robert Cooney |
| Display Name | Robert Cooney |
| Email | CooneyR@upstate.edu |
| UUID | C74701F0-078E-0000-A425-772F309D2FBA |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Robert Corona |
| Display Name | Robert Corona |
| Email | CoronaR@upstate.edu |
| UUID | 6F77C1B0-1811-0000-BE2E-284569947D4E |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Mantosh Dewan |
| Display Name | Mantosh Dewan |
| Email | DEWANM@upstate.edu |
| UUID | 6ABAD300-3185-0000-8432-0060B03D84AF |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | G. Randall Green |
| Display Name | G. Randall Green |
| Email | GreenG@upstate.edu |
| UUID | DC6E9A01-2A31-0000-885E-CD47232A446A |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Kim Hanifin |
| Display Name | Kim Hanifin |
| Email | HanifinK@upstate.edu |
| UUID | 4B2690B0-3185-0000-8432-0060B03D84AF |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Michele Henderson |
| Display Name | Michele Henderson |
| Email | HendermH@upstate.edu |
| UUID | 313DA281-1C34-0000-9891-0302A5374B8C |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Marilyn Higgins |
| Display Name | Marilyn Higgins |
| Email | HigginMM@upstate.edu |
| UUID | 89149A81-1910-0000-9649-00805FBB1C60 |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Julio Licinio |
| Display Name | Julio Licinio |
| Email | LicinioJ@upstate.edu |
| UUID | 8FF59701-20E0-0000-A463-616D353-3062 |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Diane Mantooth |
| Display Name | Diane Mantooth |
| Email | MantootD@upstate.edu |

Licinio v. SUNY Upstate, et al., 5:21-CV-387   008386

| UUID | 1F418101-20C6-0000-9C68-736362333834 | Licinio v. SONY Upstate, et al., 5:21-CV-387    008387 |
|---|---|---|
| Distribution Type | CC | |
| Recipient Type | User | |
| Recipient | Laurie Nicoletti | |
| Display Name | Laurie Nicoletti | |
| Email | NICOLETL@upstate.edu | |
| UUID | A2A32722-04F5-0000-B068-0060B03D84AF | |
| Distribution Type | CC | |
| Recipient Type | User | |
| Recipient | Erin Crofck Peters | |
| Display Name | Erin Crolick Peters | |
| Email | PetersE@upstate.edu | |
| UUID | 6C21DB16-0F6D-0000-AE7F-6803130000E0 | |
| Distribution Type | CC | |
| Recipient Type | User | |
| Recipient | Shari Sterle-Grant | |
| Display Name | Shari Sterle-Grant | |
| Email | STERLES@upstate.edu | |
| UUID | 14F4F814-3185-0000-8432-0060B03D84AF | |
| Distribution Type | CC | |
| Recipient Type | User | |
| Recipient | Amy Tucker | |
| Display Name | Amy Tucker | |
| Email | TuckerAm@upstate.edu | |
| UUID | 053E8781-2134-0000-885E-747ECA984A5A | |
| Distribution Type | TO | |
| Recipient Type | User | |
| Recipient | Grace VanNortwick | |
| Display Name | Grace VanNortwick | |
| Email | VANNORTG@upstate.edu | |
| UUID | 1C210F28-3185-0000-8432-0060B03D84AF | |
| Distribution Type | TO | |
| Recipient Type | User | |
| Expire | 0 | |
| Delay delivery until | 0 | |
| Delegated | false | |
| Archived | false | |
| Read | true | |
| Deleted | false | |
| Opened | true | |
| Completed | false | |
| Security | Normal | |
| Box type | Inbox | |
| Return notification when opened | false | |
| Return notification when deleted | false | |
| Return notification when completed | false | |
| Return notification when declined | false | |
| Return notification when accepted | false | |
| Archive Version | 5.3 | |
| Internal ID | 5D512EFB.HSCHOSP2.HSC2.100.1707569.1.1A9 C77.1@1:5BE5B521.HSCHOSP2.HSC2.100.17075 69.1.1828E4.1@13 | |
| Source | received | |
| Class | Public | |
| Account | Ann Botash@BOTASHA.HSC2.HSCHOSP2 | |
| Location ID | 155448452122S | |
| Class Name | GW.MESSAGE.MAIL | |
| Enclosing Folders | 1 | |
| Folder | Julio emails | |
| ID | 5BE5B521.HSCHOSP2.HSC2.100.1707569.1.182 8E4.1@13 | |
| Name | Julio emails | |
| Type | Normal | |
| System | false | |
| Share Type | NotShared | |

A-0267

Licinio v. SUNY Upstate, et al., 5:21-CV-387    008388

| The following attachments could not be rendered: | | | | |
|---|---|---|---|---|
| Sender | Date | Subject | MessageID | File |
| LIBERTYC@upstate.edu | 2019-08-12T09:18:48.000-04:00 | REMINDER - Urgent Meeting 8/13: Immediate Future of Anesthesia | {"owner":"Chris Liberty","hc":"1594099512279","iaf":"ea7dca252259c14ceda05b1eeb6i99f4695776f1b3935ce0ee78c1e92132195d","afn":"Arni Botasha@BOTASHA.HSC2.HSCHOSP2","hcName":"Archives","rp":"Julio emails"} | Updates for FAD.docx |

A-0268

**SUNY Upstate Medical University**
**Affirmative Action/Equal Opportunity Report**
**Request for Waiver of Search**

**Instructions:** This form and supporting documents (resume, F1 form) must be submitted to the office of Diversity and Inclusion for all professional level positions (UUP, Faculty, etc.) that are not being advertised and posted. If a Waiver of Search Process form is not approved, the position must be advertised and/or posted and a full search conducted. (Offers of employment should not be made until the Human Resources Recruitment Unit has been consulted (464-4830.)

**Position Title:** Professor & Chair       **Department:** Psychiatry

**Line #:** 20705       **F1#:** 64500       **Salary Grade:** NSC2

ꟾ **Mgmt/Confidential**    ꟾX **Faculty**    ꟾ **Professional**    ꟾ **Other** (Specify): _____

**Position Type:**       Xꟾ **State**       ꟾ **Research Foundation**

**Please provide specific justification for requesting a waiver of search:**

The Department of Psychiatry has been led by Dr. Thomas Schwartz as Interim Chair since 8/1/16. Dr. Schwartz has been successful as Interim Chair in this time. In looking at the future of the Department of Psychiatry and the financial strain on the institution due to the current COVID pandemic, I would like to appoint Dr. Schwartz as Chair of the Department of Psychiatry.

(Attach additional justification if necessary. i.e., evidence that candidate has previously participated in a full search.)

**Name of person recommended for appointment:** Thomas Schwartz, M.D.

Xꟾ **Male**  ꟾ **Female  Ethnicity:** white       **Exp. Start Date:** 7/15/2020

**Departmental Chair/Hiring Official:** _____       **Date:** 8 12 2020

**President, Dean, or Vice President:** _____ N/A _____       **Date:** _____

**Waiver is:** ✓ **Approved** _____ **Not approved for reasons indicated below**

_____

**Affirmative Action Approval:** Mary Meier       **Date:** 8-20-2020

| For Office Use Only: | Copies to: | Department | Human Resources |
|---|---|---|---|

AA-2 Form
2003                                 An AA/EEO/ADA Employer
                                              4

**Friday, November 5, 2021 at 01:02:58 Eastern Daylight Time**

**Subject:** Md/PhD program meeting follow-up
**Date:** Thursday, January 30, 2020 at 11:24:17 AM Eastern Standard Time
**From:** █████████
**To:** Lawrence Chin, Mantosh Dewan, Mark Schmitt, Julie White
**CC:** ████████████████████
**Attachments:** md phd program assessment.docx

MD/PhD program. We really appreciated your time and support.

Deans Chin, Schmitt, and White – attached please find several suggestions █████████████ compiled for important characteristics and suggestions for a leader, labs we would recommend, as well as other points to which we would like particular attention paid as you make a comprehensive assessment of the program.

Thank you again for your time and please let us all know how we may be of any assistance moving forward.

Also, Dr. Chin, congratulations on your official appointment as Dean!

Thank you,



**Important qualities for a director:** empathetic, trustworthy, open-minded (values many forms of success), strong advocate, personable, high emotional intelligence

**Potential Directors:**
Drs. Amit Dhamoon
Darrell Dykes
Joseph Domachowske
Gennady Bratslavsky
Mehdi Mollapour
Dimitra Bourboulia

**Recommended Labs:**
Drs. Juntao Luo
Stewart Loh
Patty Kane
Xin Jie Chen
Michael Cosgrove
Mehdi Mollapour
Dimitra Bourboulia
Jeffrey Amack
Mira Krendel
Jessica Ridilla
Gary Chan
Saravanan Thangamani
Andreas Koenig
Joel Wilmore
Peter Calvert
Stephen Glatt
Tim Damron
Megan Oest
Likely others in Neuroscience and elsewhere, but they are outside of the disciplines of the four of us.

**Additional important points:** a full-time coordinator, structure in place to help students identify potential labs, strong mentorship throughout PhD to keep progress on track and help in identifying additional (clinical) mentors, re-structured and more formalized peer mentorship program, workable and reasonable budget that needs to be rebuilt and reallocated, redefine program mission/vision, define roles of (co)director and staff, updated program guidebook and website, clear communication

**MD/PhD specific courses:**
– Grand rounds course functions reasonably well.
– Grant writing course could likely use some work; particular attention needs to be paid to developing a training plan, biosketch, etc. in addition to the research strategy

Licinio v. SUNY Upstate, et al., 5:21-CV-387    002618

A0270

Barbara Barzansky, PhD, MHPE
Co-Secretary
Council on Medical Education
American Medical Association
515 North State Street
Chicago, IL 60654
Phone: 312-464-4933
Fax: 312-464-5830
E-mail: barbara.barzansky@ama-assn.org

**LCME**

LIAISON COMMITTEE ON
MEDICAL EDUCATION

www.lcme.org

Dan Hunt, MD, MBA
Co-Secretary
Association of American
Medical Colleges
2450 N Street, N.W.
Washington, DC 20037
Phone: 202-828-0596
Fax: 202-828-1125
E-mail: dhunt@aamc.org

SUNY UPSTATE
MEDICAL UNIVERSITY

JUN 17 2013

OFFICE OF THE DEAN
COLLEGE OF MEDICINE

June 12, 2013

David Duggan, MD
Dean, College of Medicine
State University of New York Upstate Medical University
750 E Adams St
Syracuse, NY 13210-2342

RE: Post Probation survey visit, March 10-13, 2013

Dear Dean Duggan:

The purpose of this letter is to inform you of the determinations made by the Liaison Committee on Medical Education (LCME) at its June 4-6, 2013 meeting regarding the accreditation status of the medical education program leading to the MD degree at the State University of New York Upstate Medical University College of Medicine and to transmit to you the enclosed report of the LCME survey team that conducted a post probation survey of the program on March 10-13, 2013.

After reviewing the enclosed report, and the dean's letter dated April 5, 2013 containing the school's response to the survey team findings, the LCME voted to rescind the status of probation and to continue the program's accreditation for an undetermined term. The LCME also noted that the school had made swift and significant progress in addressing the identified areas of concern.

DETERMINATIONS REGARDING COMPLIANCE WITH ACCREDITATION STANDARDS

I. COMPLIANCE

The LCME determined that the medical education program is currently in compliance with the following accreditation standards and that no further follow-up is required:

A.   *IS-16 (diversity)*

B.   *ED-1 (educational program objectives)*

C.   *ED-2 (required clinical experiences and monitoring)*

D.   *ED-30 (formative and summative assessment)*

E.   *ED-31 (mid-course feedback)*

Licinio v. SUNY Upstate, et al., 5:21-cv-387   008965

David Duggan, MD
Page 2

    F.    *ED-36 (authority and sufficient resources to manage and evaluate the program)*

    G.    *ED-39 (responsibility of the chief academic officer)*

    H.    *ER-9 (affiliation agreements)*

## II. COMPLIANCE, WITH A NEED FOR MONITORING

The LCME determined that the medical education program is in compliance with the following accreditation standards, but that ongoing monitoring is required to ensure continued compliance:

    A.    *ED-3. The objectives of a medical education program must be made known to all medical students and to the faculty, residents, and others with direct responsibilities for medical student education and assessment.*

    B.    *ED-8. The curriculum of a medical education program must include comparable educational experiences and equivalent methods of assessment across all instructional sites within a given discipline.*

    C.    *ED-33. There must be integrated institutional responsibility in a medical education program for the overall design, management, and evaluation of a coherent and coordinated curriculum.*

    D.    *ED-37. A faculty committee of a medical education program must be responsible for monitoring the curriculum, including the content taught in each discipline, so that the program's educational objectives will be achieved.*

    E.    *ED-42. A medical education program must have a single standard for the promotion and graduation of medical students across all instructional sites.*

    F.    *ED-47. In assessing program quality, a medical education program must consider medical student evaluations of their courses, clerkship rotations, and teachers, as well as a variety of other measures.*

    G.    *MS-27-A. The health professionals at a medical education program who provide psychiatric/psychological counseling or other sensitive health services to a medical student must have no involvement in the academic assessment or promotion of the medical student receiving those services.*

    H.    *MS-31-A: A medical education program must ensure that its learning environment promotes the development of explicit and appropriate professional attributes in its medical students (i.e., attitudes, behaviors, and identity).*

A-0273

David Duggan, MD
Page 3

I. *MS-32. A medical education program must define and publicize the standards of conduct for the faculty-student relationship and develop written policies for addressing violations of those standards.*

J. *FA-2. A medical education program must have a cohort of faculty members with the qualifications and time needed to deliver the curriculum and to meet the other needs and missions of the institution.*

## III. NONCOMPLIANCE WITH STANDARDS

The LCME determined that the medical education program is currently out of compliance with the following accreditation standards:

A. *ED-25. Supervision of medical student learning experiences at an institution that offers a medical education program must be provided throughout required clerkship rotations by members of the institution's faculty.*

### REQUIRED FOLLOW-UP

In order to address the compliance issues mentioned above, the LCME has requested that the dean submit a status report by April 15, 2014 containing the information listed below. Please refer to http://www.lcme.org/submission_status.htm for current LCME submission requirements.

### STATUS REPORT DUE APRIL 15, 2014

#### I. COMPLIANCE, WITH A NEED FOR MONITORING

A. *ED-3 (dissemination of the educational program objectives)*

1. Provide data for the 2013-2014 academic year on the percent of Syracuse residents, by department, who completed the online module on graduation competencies. Note if the use of the module has been extended to residents at other sites.

2. Describe how the residents at the Binghamton campus receive the educational program and clerkship objectives and how that receipt is being monitoring (for example, through a log system). Provide data, by department, on the percent of residents on the Binghamton campus who received the objectives.

B. *ED-8 (comparability across instructional sites)*
*ED-42 (single standard for promotion and graduation)*

1. For the 2013-2014 academic year and following years, describe the status of plans to ensure the comparability of graduation requirements at the Syracuse and Binghamton campuses. Describe especially the status of implementation of changes related to geriatrics, neuroscience, and urology teaching.

Licinio v. SUNY Upstate, et al., 5:21-cv-387   008967

David Duggan, MD
Page 4

2.  Complete the following table that compares graduation requirements for the 2014 and 2015 graduating classes.

| Clerkship/Course Name* | 2013-2014 | | 2014-2015 | |
|---|---|---|---|---|
| | Syracuse credits | Binghamton credits | Syracuse credits | Binghamton credits |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Note if the names of courses and/or clerkships have changed between 2013-2014 and 2014-2015.

C.  *ED-33 (curriculum management)*

1.  Describe the activities of the New Directions Task Force since the time of the 2013 limited (focused) survey visit. Provide examples of recommendations from the task force have been brought to the Curriculum Committee and describe the outcome of Curriculum Committee deliberations.

2.  Provide sample minutes from the Curriculum Committee for the 2013-2014 academic year. Describe the current major areas of focus for the Curriculum Committee.

D.  *ED-37 (monitoring curriculum content)*

1.  Describe the implementation of the MedHub searchable curriculum database, including the status of entering course and clerkship information.

2.  Provide examples of how MedHub has been used to identify curricular gaps and redundancies and to support horizontal and vertical curriculum integration.

E.  *ED-47 (use of student evaluation data in program evaluation)*

1.  Provide data from an internal survey of students in all classes during the 2013-2014 academic year that addresses student satisfaction with the accessibility, awareness of student concerns, and responsiveness to student problems of the Office of Student Affairs and the Office of Curricular Affairs. Please provide the response rate to the survey, by class, and present the data for the M-1/M-2 and M-3/M-4 classes. For the M-3/M-4 students, present the data by campus.

2.  Provide data from the 2013 AAMC Medical School Graduation Questionnaire on student satisfaction with the accessibility, awareness of student concerns, and

David Duggan, MD
Page 5

responsiveness to student problems of the Office of Student Affairs and the Office of Curricular Affairs. Include the response rate to the survey.

F. *MS-27-A (health care providers' involvement in student assessment)*

1. Describe the status of assuring that students on the Binghamton campus do not receive health services from physicians who evaluate them.

2. Provide a copy of the information available to Binghamton students (for example, from the Student Handbook) that describes their access to health services.

G. *MS-31-A (learning environment and professionalism)*

1. Describe the status of the professionalism thread for the 2013-2014 academic year, including where in the curriculum teaching related to professionalism is located.

2. Provide data from an internal student survey and/or course/clerkship evaluations on student satisfaction with the teaching of professionalism.

H. *MS-32 (student mistreatment)*

1. Provide data from the 2013 AAMC Medical School Graduation Questionnaire data, by campus, related to student mistreatment:
   • Knowledge of mistreatment policies
   • Knowledge of procedures for reporting mistreatment
   • Total percent of students reporting that personally experienced any of the listed behaviors
   • Sources of behaviors personally experienced (e.g., clerkship faculty, nurses)
   • Percent of students who reported behaviors that they personally experienced

2. Describe how the learning environment is being monitored on the Binghamton campus.

3. Summarize the current systems in place, by campus, to address the issue of medical student mistreatment.

I. *FA-2 (sufficient faculty)*

1. Provide the number of new faculty hires, by department, during the 2012-2013 and 2013-2014 academic years. Note if any additional recruitments are underway and the timeline for their completion.

2. Describe how plans for curriculum change emanating from the New Directions Task Force may impact: a) the overall number of faculty needed to deliver the curriculum and b) the need for faculty in specific disciplines. If such planning has not been completed, provide the approximate timeline for completion.

Licinio v. SUNY Upstate, et al., 5:21-cv-387   008969

David Duggan, MD
Page 6

## II. NONCOMPLIANCE WITH STANDARDS

A. *ED-25 (faculty appointments)*

1. Describe the status of granting faculty appointments to all physicians who precept and evaluate students in the rural medicine track. Provide the percent of physicians teaching in the track who hold faculty appointments, by department.

2. If any physicians who precept/evaluate students have not yet received a faculty appointment, provide a timeline for the granting of faculty status.

### COMPLIANCE TERMINOLOGY

In reviewing the compliance determinations above, please refer to the attached memorandum for an overview of LCME compliance terminology and note the October 2011 implementation of a new category of compliance called *compliance, with a need for monitoring*, which indicates that the program is in compliance with the cited accreditation standard, but that monitoring is required to ensure continued compliance. A determination of *noncompliance* indicates that the program does not meet one or more of the requirements of the cited standard.

### UNITED STATES DEPARTMENT OF EDUCATION REGULATIONS

The LCME is bound by the regulations of the United States Department of Education to document compliance with all cited LCME accreditation standards **within two years of a program's initial notification of noncompliance.** Therefore, the LCME will require timely follow-up on all determinations of *noncompliance*. Please see the "Required Follow-up" section above for details.

### NOTIFICATION POLICY

The LCME is required to notify the United States Department of Education and the relevant regional accrediting body of all final accreditation actions, including determinations of "Accredited," "Accredited, with Warning," and "Accredited, on Probation." The LCME will also make final determinations of "Accredited" and "Accredited, on Probation" available to the public. Note that the determination "Accredited, on Probation" is only final after a program has exercised its right to waive or undergo an official reconsideration by the LCME.

### ACCREDITATION STANDARDS

To review the current list of LCME accreditation standards and their annotations, please refer to the most recent version of the *Functions and Structure of a Medical School* document, available on the LCME Web site at http://lcme.org/standard.htm. Programs asked to submit future status reports will be responsible for aligning the follow-up items in the report with the *Functions and Structure of a Medical School* document that is current at the time the status report is due.

Licinio v. SUNY Upstate, et al., 5:21-cv-387    008970

A-0277

David Duggan, MD
Page 7

CHANGES THAT MAY IMPACT ACCREDITATION

Accreditation is awarded to a medical education program based on a judgment that there exists an appropriate balance between student enrollment and the total resources of the institution, including faculty, facilities, and operating budget. If there are plans to significantly modify the educational program, or if there is to be a substantial change in student enrollment or in the resources of the institution such that the balance becomes distorted, the LCME expects to receive prior notice of the proposed change. Substantial changes may lead the LCME to re-evaluate a program's accreditation status. More specific information about notification requirements is available on the LCME Web site at http://www.lcme.org/submission_significant_change.htm.

This report is for the use of the State University of New York Upstate Medical University College of Medicine and the university, and any public dissemination or distribution of its contents is at the discretion of institutional officials.

Sincerely,

Barbara Barzansky, PhD, MHPE            Dan Hunt, MD, MBA
LCME Co-Secretary                        LCME Co-Secretary

Enc (2): New Category of Compliance with LCME Accreditation Standards and Glossary of
          Compliance Terminology Memorandum

          Team report of the post probation survey of the State University of New York Upstate
          Medical University College of Medicine, March 10-13, 2013



**LIAISON COMMITTEE ON MEDICAL EDUCATION**

# Memorandum

SUBJECT:   New Category of Compliance with LCME Accreditation Standards and Glossary of Compliance Terminology

In its review of survey reports and follow-up status reports, the Liaison Committee on Medical Education (LCME) determines a medical education program's compliance with individual accreditation standards.

Historically, the LCME has used the terms *compliance* and *noncompliance* to describe a program's conformance with accreditation standards. At its June 2011 meeting, the LCME approved a third term called *compliance, with a need for monitoring*, which falls under the category of *compliance with accreditation standards* (implemented October 2011). The LCME also adopted formal definitions for the three compliance terms. These three terms are defined below.

### COMPLIANCE WITH ACCREDITATION STANDARDS

**Compliance:**

The required policy, process, resource, or system is in place and, if required by the standard, there is evidence to indicate that it is effective.

**Compliance, with a Need for Monitoring:**

1) The medical education program has the required policy, process, resource, or system in place, but there is insufficient evidence to indicate that it is effective. Therefore, monitoring is required to ensure that the desired outcome has been achieved.

   OR

2) The medical education program is currently in compliance with the standard, but known circumstances exist that could lead to future noncompliance (*formerly "area in transition"*).

### NONCOMPLIANCE WITH ACCREDITATION STANDARDS

The medical education program has not met one or more of the requirements of the standard: The required policy, process, resource, or system either is not in place or is in place, but has been found to be ineffective.

Updated October 2012

Licinio v. SUNY Upstate, et al., 5:21-cv-387   008972

A-0279

Barbara Barzansky, PhD, MHPE
Co-Secretary
Liaison Committee on Medical Education
American Medical Association
330 North Wabash Avenue, Suite 39300
Chicago, IL 60611-5885
Phone: 312-464-4933
E-mail: barbara.barzansky@ama-assn.org



LIAISON COMMITTEE ON
MEDICAL EDUCATION
www.lcme.org

Veronica M. Catanese, MD, MBA
Co-Secretary
Liaison Committee on Medical Education
Association of American Medical Colleges
655 K Street, NW, Suite 100
Washington, DC 20001-2339
Phone: 202-828-0596
E-mail: vcatanese@aamc.org

October 29, 2019

Mantosh Dewan, MD
Interim President
State University of New York Upstate Medical University
750 East Adams Street
Syracuse, NY 13210

RE: Survey visit for full accreditation on March 24-27, 2019

Dear President Dewan:

The purpose of this letter is to inform you of the decisions made by the Liaison Committee on Medical Education (LCME) at its October 15-17, 2019 meeting regarding the accreditation status of the medical education program leading to the MD degree at the State University of New York Upstate Medical University College of Medicine. This letter also serves to transmit to you the determinations regarding compliance with accreditation standards and performance in accreditation elements on which those decisions were based. Enclosed‡ with this letter is the report of the LCME survey team that conducted a survey visit for full accreditation on March 24-27, 2019.

After reviewing the survey report and survey team findings, the LCME voted as follows:

| LCME Determination | Continue full accreditation of the medical education program for an eight-year term |
|---|---|
| Required Follow-Up for the School | Status report due by August 17, 2020 |
| Next Full Survey Visit | 2026-27 academic year |

The Medical School Directory on the LCME website, lcme.org/directory, will be updated to reflect this change in the next full survey date.

Section I of this letter summarizes the medical education program's compliance with each of the 12 LCME standards based on the program's performance in the elements that collectively constitute each standard. Sections II and III of this letter summarize the LCME's determinations for the medical education program's performance in accreditation elements requiring follow-up. Section IV of this letter summarizes the required follow-up. Section V of this letter contains additional information important for the medical education program. **Note especially information related to the new LCME policy regarding timing for a program to achieve**

A-0280

Mantosh Dewan, MD
Page 2

satisfactory performance in accreditation elements and to achieve compliance with standards.

### I.  LCME DETERMINATIONS OF COMPLIANCE WITH ACCREDITATION STANDARDS

| Standard | LCME Determination |
|---|---|
| Standard 1: Mission, Planning, Organization, and Integrity | C |
| Standard 2: Leadership and Administration | C |
| Standard 3: Academic and Learning Environments | C |
| Standard 4: Faculty Preparation, Productivity, Participation, and Policies | C |
| Standard 5: Educational Resources and Infrastructure | C |
| Standard 6: Competencies, Curricular Objectives, and Curricular Design | C |
| Standard 7: Curricular Content | C |
| Standard 8: Curricular Management, Evaluation, and Enhancement | C |
| Standard 9: Teaching, Supervision, Assessment, and Student and Patient Safety | CM |
| Standard 10: Medical Student Selection, Assignment, and Progress | C |
| Standard 11: Medical Student Academic Support, Career Advising, and Educational Records | CM |
| Standard 12: Medical Student Health Services, Personal Counseling, and Financial Aid Services | NC |

C = Compliance, CM = Compliance with a Need for Monitoring, NC = Noncompliance

### II.  ACCREDITATION ELEMENTS IN WHICH THE PROGRAM'S PERFORMANCE IS SATISFACTORY WITH A NEED FOR MONITORING

| Element | LCME Finding |
|---|---|
| Element 3.3 (diversity/pipeline programs and partnerships) | Under the dean's leadership, new policies, procedures, and programs have been implemented and are designed to increase diversity among students, faculty, and senior administrative staff. In the first year of the implementation of these interventions, there were modest gains in diversity of senior administrative staff and faculty. There are insufficient data to assess the ongoing effectiveness of these programs. This requires monitoring. |
| Element 7.1 (biomedical, behavioral, social sciences) | Medical student respondents to the 2018 AAMC GQ and the ISA report concerns regarding their preparation by pre-clerkship education for the clerkships. The college of medicine has recognized these concerns and has made some curricular changes. There are insufficient data to assess the effectiveness of these interventions. This requires monitoring. |
| Element 9.7 (formative assessment and feedback) | Less than two-thirds of respondents to the ISA at the Binghamton campus were satisfied with the amount and quality of formative feedback in the clinical phase of the curriculum. |
| Element 12.1 (financial aid/debt management counseling/student educational debt) | Medical students have no required counseling regarding debt management between years one and three, and they graduate with student debt higher than the national average. The school recently has increased staffing in the Office of Financial Aid and has implemented additional required counseling sessions. There are insufficient data to assess the effectiveness of these interventions. This requires monitoring. |

A-0281

Mantosh Dewan, MD
Page 3

### III. ACCREDITATION ELEMENTS IN WHICH THE PROGRAM'S PERFORMANCE IS UNSATISFACTORY

| Element | LCME Finding |
|---|---|
| Element 9.9 (student advancement and appeal process) | The policies governing the medical school progress, review, and appeal committees do not require that all committee members, both voting and non-voting, recuse and absent themselves from any discussion of an adverse action toward a medical student with whom such committee members have a conflict of interest. |
| Element 11.2 (career advising) | Medical students in the pre-clerkship phase of medical school receive required career advising from basic scientists, though optional experiences can involve physicians. In the 2018 AAMC GQ, less than 60% of respondents at both the Syracuse and Binghamton campuses were satisfied with career planning services. Respondents to the ISA report dissatisfaction with the adequacy of career counseling and about the adequacy of counseling about elective choices. |
| Element 12.5 (non-involvement of providers of student health services in student assessment/location of student health records) | Medical students receive personal counseling and mental health services administered by the college of medicine's psychiatry department. Psychiatry residents, supervised by psychiatry faculty, provide medication evaluation and management. While policies and procedures are in place to reduce the risks of conflicts of interest and breaches of medical student privacy, they do not eliminate this risk. |
| Element 12.8 (student exposure policies/procedures) | The college of medicine was unable to provide a medical school policy that addresses student exposures to environmental hazards, especially the education of students about preventing exposure and the procedures for managing exposures to environmental hazards beyond blood and body fluids. |

### IV. REQUIRED FOLLOW-UP FOR THE SCHOOL

The LCME requests a status report by **August 17, 2020**, containing the information listed below. Include a dated and signed cover letter addressed to both LCME Co-Secretaries. Email the status report and cover letter to lcmesubmissions@aamc.org as a single PDF file. Do not submit a scanned PDF file. Do not mail a paper copy of the status report nor include hyperlinks in the submitted document(s). If there is a need to reference a website, create an appendix with a table of contents and include (non-scanned) PDF files of the relevant webpages and/or screenshots; appendix documents should be placed at the end of a report, not embedded in each response. The dean should contact the LCME Co-Secretaries for clarification on a specific request. Email lcmesubmissions@aamc.org for questions regarding the submission or formatting of materials.

*In the status report, specify the LCME's determination of the program's performance in each element (i.e., unsatisfactory or satisfactory with a need for monitoring) as listed in this letter.*

**Element 3.3 (diversity/pipeline programs and partnerships) – Satisfactory with a Need for Monitoring**

1. Summarize the current status of programs to support the recruitment and retention of medical students, faculty, and senior administrative staff in the school-identified diversity

A-0282

Mantosh Dewan, MD
Page 4

      categories. Note any new programs or program enhancements made during the 2019-20
      academic year.

2. Complete the following tables with data from the indicated academic years.

| Offers Made to Applicants to the Medical School | | | | | | |
|---|---|---|---|---|---|---|
| Provide the total number of offers of admission to the medical school made to individuals in the school's identified diversity categories for the indicated academic years. Add rows as needed for each diversity category. | | | | | | |
| | 2019 Entering Class | | | 2020 Entering Class | | |
| School-identified Diversity Category | # of Declined Offers | # of Enrolled Students | Total Offers | # of Declined Offers | # of Enrolled Students | Total Offers |
| | | | | | | |

| Offers Made for Faculty Positions | | | | | | |
|---|---|---|---|---|---|---|
| Provide the total number of offers of faculty positions made to individuals in the school's identified diversity categories. Add rows as needed for each diversity category. | | | | | | |
| | AY 2018-19 | | | AY 2019-20 | | |
| School-identified Diversity Category | # of Declined Offers | # of Faculty Hired | Total Offers | # of Declined Offers | # of Faculty Hired | Total Offers |
| | | | | | | |

| Offers Made for Senior Administrative Staff Positions | | | | | | |
|---|---|---|---|---|---|---|
| Provide the total number of offers of senior administrative staff positions made to individuals in the school's identified diversity categories. Add rows as needed for each diversity category. | | | | | | |
| | AY 2018-19 | | | AY 2019-20 | | |
| School-identified Diversity Category | # of Declined Offers | # of Staff Hired | Total Offers | # of Declined Offers | # of Staff Hired | Total Offers |
| | | | | | | |

3. Complete the following table with data from the 2020-21 academic year.

| Students, Faculty, and Senior Administrative Staff | | | | |
|---|---|---|---|---|
| Provide the requested information for the 2020-21 academic year on the number and percentage of enrolled students, employed faculty, and senior administrative staff in each of the school-identified diversity categories. If the diversity categories differ among the groups, include the category for each group in a separate row and provide the data in the corresponding row. | | | | |
| School-identified Diversity Category | First-Year Students | All Students | Employed/ Full-Time Faculty | Senior Administrative Staff |
| | | | | |

Mantosh Dewan, MD
Page 5

**Element 7.1 (biomedical, behavioral, social sciences) – Satisfactory with a Need for Monitoring**

1. Describe the status of curriculum changes directed at enhancing student satisfaction with their basic science preparation for the clinical clerkships, especially in immunology, physiology, and anatomy. Note especially any enhanced opportunities for clinical correlations in the first and second years of the curriculum.

2. Provide school and national comparison data from the 2019 and 2020 AAMC Medical School Graduation Questionnaire (AAMC GQ) on the percentage of respondents who rated preparation for clinical clerkships and electives as *excellent or good* (aggregated) in the following basic medical sciences.

| Basic Science Education | AAMC GQ 2019 | | AAMC GQ 2020 | |
|---|---|---|---|---|
| | School % | National % | School % | National % |
| Biochemistry | | | | |
| Biostatistics and epidemiology | | | | |
| Genetics | | | | |
| Gross anatomy | | | | |
| Immunology | | | | |
| Microbiology | | | | |
| Pathology | | | | |
| Pharmacology | | | | |
| Physiology | | | | |
| Behavioral Science | | | | |
| Pathophysiology | | | | |

3. Provide data from evaluations of courses in the first and second years of the curriculum or from other internal surveys addressing student satisfaction with the availability of clinical correlations.

**Element 9.7 (formative assessment and feedback) – Satisfactory with a Need for Monitoring**

1. Describe the steps taken to address student concerns about the availability and quality of formative feedback during clinical clerkships, especially at the Binghamton campus.

2. Provide data from a survey of students in the third and fourth years of the curriculum on satisfaction with the following:
a. Availability of (mid-clerkship) formative feedback in clinical clerkships
b. Quality of (mid-clerkship) formative feedback in clinical clerkships
[Use the following scale: very dissatisfied, dissatisfied, satisfied, very satisfied, NA/no opportunity to observe]

A-0284

Mantosh Dewan, MD
Page 6

Provide the data by class and campus using the following:

| Formative (Mid-clerkship) Feedback | | | | |
|---|---|---|---|---|
| Number of Total Responses to this item | Number of Total Responses to this item | Number and % of N/A Responses | Number and % of combined Dissatisfied and Very Dissatisfied Responses | Number and % of combined Satisfied and Very Satisfied Responses |
| Availability - Syracuse | | | | |
| Availability - Binghamton | | | | |
| Quality - Syracuse | | | | |
| Quality - Binghamton | | | | |

**Element 9.9 (student advancement and appeal process) – Unsatisfactory**

1. Provide a copy of the current policies governing the Academic Review Board (ARB), the Appeals Committee that reviews the ARB decision, and the Student Progress Committees.

2. Summarize any changes in the policies governing an adverse action by these committees, especially related to recusals of members who may have a conflict of interest.

**Element 11.2 (career advising) – Unsatisfactory**

1. Describe the steps taken to address student concerns about the adequacy of career counseling during years one and two of the curriculum.

2. Provide a list of the required and optional career advising activities in place during years one and two of the curriculum in 2020-21 and note the category/categories of individuals who provide this advice (e.g., basic science faculty, clinical faculty, member of the administration).

3. Describe when in the curriculum, how, and by whom students receive counseling about their choice of electives.

4. Provide data from a survey of students in all classes on satisfaction with the following:
   a. adequacy of career counseling
   b. adequacy of counseling about choice of electives
   [Use the following scale: very dissatisfied, dissatisfied, satisfied, very satisfied, NA/no opportunity to observe]

A-0285

Mantosh Dewan, MD
Page 7

Provide the data by class and campus, using the following:

| Career Counseling | | | | | | | |
|---|---|---|---|---|---|---|---|
| Medical School Class | Number of Total Responses to this item | Number and % of N/A Responses | | Number and % of combined Dissatisfied and Very Dissatisfied Responses | | Number and % of combined Satisfied and Very Satisfied Responses | |
| | | N | % | N | % | N | % |
| M1 - Syracuse | | | | | | | |
| M2 - Syracuse | | | | | | | |
| M3 - Syracuse | | | | | | | |
| M3 - Binghamton | | | | | | | |
| M4 - Syracuse | | | | | | | |
| M4 - Binghamton | | | | | | | |
| Total | | | | | | | |

| Counseling About Electives | | | | | | | |
|---|---|---|---|---|---|---|---|
| Medical School Class | Number of Total Responses to this item | Number and % of N/A Responses | | Number and % of combined Dissatisfied and Very Dissatisfied Responses | | Number and % of combined Satisfied and Very Satisfied Responses | |
| | | N | % | N | % | N | % |
| M1 - Syracuse | | | | | | | |
| M2 - Syracuse | | | | | | | |
| M3 - Syracuse | | | | | | | |
| M3 - Binghamton | | | | | | | |
| M4 - Syracuse | | | | | | | |
| M4 - Binghamton | | | | | | | |
| Total | | | | | | | |

**Element 12.1 (financial aid/debt management counseling/student educational debt) – Satisfactory with a Need for Monitoring**

1. Provide school data from the AAMC Part I-B Financial Aid Questionnaire (AAMC FAQ) on the **median** reported medical school educational indebtedness of all medical student graduates with medical school debt and the percentage of graduates with indebtedness **equal to or** more than $200,000.

| Median Medical School Educational Debt | | |
|---|---|---|
| | AAMC FAQ 2019 | AAMC FAQ 2020 |
| | School | School |
| **Median** medical school debt | | |
| Percentage of graduates with debt **equal to or** more than $200,000 | | |

Mantosh Dewan, MD
Page 8

2. Complete the following table with information on financial aid debt management activities planned for the 2020-21 academic year.

| Financial Aid/Debt Management Activities |
|---|
| Describe financial aid and debt management counseling/advising activities (including one-on-one sessions) that were available for medical students in each year of the curriculum during the most recently completed academic year. Note whether they were required (R) or optional (O). *Indicate which of the required and optional advising sessions will be available at each campus during the 2020-21 academic year.* |

| Financial Aid/Debt Management Activities | | | |
|---|---|---|---|
| Year 1 | Year 2 | Year 3 | Year 4 |
| | | | |

3. Describe the mechanisms that are being used by the medical school and the university/parent institution to limit medical student debt. Note changes made since the time of the 2019 full survey.

4. Provide data from a survey of students in all classes on student satisfaction with debt management counseling.
[Use the following scale: very dissatisfied, dissatisfied, satisfied, very satisfied, NA/no opportunity to observe]

Provide the data by class and campus, using the following:

| Debt Management Counseling | | | | | | | |
|---|---|---|---|---|---|---|---|
| Medical School Class | Number of Total Responses to this item | Number and % of N/A Responses | | Number and % of combined Dissatisfied and Very Dissatisfied Responses | | Number and % of combined Satisfied and Very Satisfied Responses | |
| | | N | % | N | % | N | % |
| M1 - Syracuse | | | | | | | |
| M2 - Syracuse | | | | | | | |
| M3 - Syracuse | | | | | | | |
| M3 - Binghamton | | | | | | | |
| M4 - Syracuse | | | | | | | |
| M4 - Binghamton | | | | | | | |
| Total | | | | | | | |

**Element 12.5 (non-involvement of providers of student health services in student assessment/location of student health records) – Unsatisfactory**

1. Describe any changes made to medical school policies and practices to ensure that residents and faculty from the Department of Psychiatry who provide personal counseling and mental health services to medical students, including medication evaluation and management, also do not participate in the assessment of those students to whom they have provided such care.

A-0287

Mantosh Dewan, MD
Page 9

   2. Summarize how the school of medicine monitors and ensures compliance with the policies and practices described above.

### Element 12.8 (student exposure policies/procedures) – Unsatisfactory

1. Describe and provide copies of institutional policies in the following areas related to medical student exposure to infectious and environmental hazards:
   a. The education of medical students about methods of prevention of environmental exposures
   b. The procedures for care and treatment after exposure to environmental hazards, including but not limited to exposure to blood and body fluids
   c. The effects of infectious and/or environmental disease or disability on medical student learning activities

2. Describe when and in what way(s) the school's own medical students and visiting medical students are informed of the medical school's policies and procedures related to exposure to infectious and environmental hazards at all instructional sites.

## V.   IMPORTANT INFORMATION FOR THE MEDICAL EDUCATION PROGRAM

### NOTIFICATION TO THE U.S. DEPARTMENT OF EDUCATION OF ACCREDITATION STATUS

The LCME is required to notify the United States Department of Education and the relevant regional accrediting body of all of its final accreditation determinations, including determinations of "accredited," "accredited, with warning," and "accredited, on probation." The LCME is also required by the U.S. Department of Education to make available to the public all final determinations of "accredited" and "accredited, on probation."

### TIMING FOR A PROGRAM TO ACHIEVE SATISFACTORY PERFORMANCE IN ELEMENTS AND COMPLIANCE WITH STANDARDS

If the LCME determines a program to be in noncompliance with a standard at the same time that the program's performance in an associated element is found to be unsatisfactory, the total time for correction of the deficiencies in compliance and performance will be two years, in accordance with requirements of the U.S. Department of Education. If the LCME determines a program to be in compliance or compliance with a need for monitoring with a standard but if the performance in an element within that standard is unsatisfactory, the program must achieve a status of satisfactory or satisfactory with a need for monitoring in that element within a maximum of two years; if that does not occur, the LCME will find the program to be in noncompliance with the relevant standard. U.S. Department of Education regulations require that the LCME document compliance with all LCME accreditation standards within two years of the LCME meeting at which the noncompliance determination was made. For more details, refer to the most recent version of the LCME *Rules of Procedure*, available on the LCME website, lcme.org publications.

Mantosh Dewan, MD
Page 10

### ALIGNING FOLLOW-UP WITH THE APPROPRIATE ACCREDITATION ELEMENTS

Programs that have status reports due to the LCME are responsible for aligning the follow-up items in the reports with the *Functions and Structure of a Medical School* document whose effective academic year corresponds with the academic year in which each status report is due. To review the current list of LCME accreditation standards and elements, refer to the most recent version of the *Functions and Structure of a Medical School* document, available on the LCME website, lcme.org publications.

### CHANGES THAT REQUIRE NOTIFICATION TO THE LCME

The LCME awards accreditation to a medical education program based on a judgment that there exists an appropriate balance between student enrollment and the total resources of the institution, including faculty, facilities, and operating budget. If there are plans to significantly modify the educational program, or if there is to be a substantial change in either student enrollment or in the resources of the institution such that the balance becomes distorted, the LCME requires advance notice of the proposed change. Substantial changes may lead the LCME to re-evaluate a program's accreditation status. All schools are responsible for keeping up to date on current LCME notification requirements detailed on the LCME website, lcme.org/about/accreditation-process-overview/#maintaining-accreditation.

A copy of this letter and of the team report is being sent to Interim Dean Lawrence S. Chin via postal mail. The survey report is for the use of the State University of New York Upstate Medical University College of Medicine and the university. Any public sharing of its contents is at the discretion of institutional officials.

Sincerely,

Barbara Barzansky, PhD, MHPE
LCME Co-Secretary

Veronica M. Catanese, MD, MBA
LCME Co-Secretary

Enclosure‡ (1): Team report of the full survey of the medical education program leading to the
MD degree at the State University of New York Upstate Medical University
College of Medicine, March 24-27, 2019

‡ The team report is enclosed only with the printed version of this letter that you will receive by
postal mail.

CC:    Lawrence S. Chin, MD
    Interim Dean, State University of New York Upstate Medical University College of
    Medicine

**A-0289**

Barbara Barzansky, PhD, MHPE
Co-Secretary
Liaison Committee on Medical Education
American Medical Association
330 North Wabash Avenue, Suite 39300
Chicago, IL 60611-5885
Phone: 312-464-4933
E-mail: barbara.barzansky@ama-assn.org



LIAISON COMMITTEE ON
MEDICAL EDUCATION
www.lcme.org

Veronica M. Catanese, MD, MBA
Co-Secretary
Liaison Committee on Medical Education
Association of American Medical Colleges
655 K Street, NW, Suite 100
Washington, DC 20001-2339
Phone: 202-828-0596
E-mail: vcatanese@aamc.org

October 20, 2020

Lawrence S. Chin, MD
Dean
State University of New York Upstate Medical University College of Medicine
750 East Addams Street
Weiskotten Hall 1256
Syracuse, NY 13210

RE: Status Report dated August 17, 2020

Dear Dr. Chin:

At its October 13-14, 2020 meeting, the Liaison Committee on Medical Education (LCME) reviewed the status report submitted on August 17, 2020 on behalf of the medical education program leading to the MD degree at the State University of New York Upstate Medical University College of Medicine

The status report addressed the program's performance in the following elements: Element 3.3 (diversity/pipeline programs and partnerships), Element 7.1 (biomedical, behavioral, social sciences), Element 9.7 (formative assessment and feedback), Element 9.9 (student advancement and appeal process), Element 11.2 (career advising), Element 12.1 (financial aid/debt management counseling/student educational debt), Element 12.5 (non-involvement of providers of student health services in student assessment/location of student health records), and Element 12.8 (student exposure policies/procedures).

Based on the information provided, the LCME voted as follows:

| Required Follow-Up for the School | Status report due by April 1, 2021 |
|---|---|
| Next Full Survey Visit | 2026-27 academic year |

Section I of this letter summarizes the medical education program's compliance with each of the 12 LCME standards based on its performance in the accreditation elements that collectively constitute each standard. Section II of this letter summarizes the LCME's determinations for the medical education program's performance in accreditation elements addressed in the status report. Section III of this letter summarizes the required follow-up. Section IV contains additional information important for the medical education program.

Licinio v. SUNY Upstate, et al., 5:21-cv-387    008984

A-0290

Lawrence S. Chin, MD
Page 2

## I.  LCME DETERMINATIONS OF COMPLIANCE WITH ACCREDITATION STANDARDS

The table below represents the program's current compliance with each of the standards. LCME determinations of compliance with standards that were not addressed in the status report were taken from the most recent LCME review of the program's compliance with those standards.

| Standard | LCME Determination |
|---|---|
| Standard 1: Mission, Planning, Organization, and Integrity | C |
| Standard 2: Leadership and Administration | C |
| Standard 3: Academic and Learning Environments | C |
| Standard 4: Faculty Preparation, Productivity, Participation, and Policies | C |
| Standard 5: Educational Resources and Infrastructure | C |
| Standard 6: Competencies, Curricular Objectives, and Curricular Design | C |
| Standard 7: Curricular Content | C |
| Standard 8: Curricular Management, Evaluation, and Enhancement | C |
| Standard 9: Teaching, Supervision, Assessment, and Student and Patient Safety | C |
| Standard 10: Medical Student Selection, Assignment, and Progress | C |
| Standard 11: Medical Student Academic Support, Career Advising, and Educational Records | C |
| Standard 12: Medical Student Health Services, Personal Counseling, and Financial Aid Services | C |

C = Compliance, CM = Compliance with a Need for Monitoring, NC = Noncompliance

## II.  LCME DETERMINATIONS FOR PERFORMANCE IN ACCREDITATION ELEMENTS

| Element | LCME Determination |
|---|---|
| Element 3.3 (diversity/pipeline programs and partnerships) | S |
| Element 7.1 (biomedical, behavioral, social sciences) | S |
| Element 9.7 (formative assessment and feedback) | S |
| Element 9.9 (student advancement and appeal process) | S |
| Element 11.2 (career advising) | SM |
| Element 12.1 (financial aid/debt management counseling/student educational debt) | SM |
| Element 12.5 (non-involvement of providers of student health services in student assessment/location of student health records) | S |
| Element 12.8 (student exposure policies/procedures) | S |

S = Satisfactory, SM = Satisfactory with a Need for Monitoring, U = Unsatisfactory

## III.  REQUIRED FOLLOW-UP FOR THE SCHOOL

The LCME requests a status report due by **April 1, 2021** containing the information listed below. Include a dated and signed cover letter addressed to both LCME Co-Secretaries. Email the status report and cover letter to lcmesubmissions@aamc.org as a single PDF file. Do not submit a scanned PDF file. Do not mail a paper copy of the status report nor include hyperlinks in the submitted document(s). If you need to reference a website, create an appendix with a table of contents and include (non-scanned) PDF files of the relevant webpages and/or screenshots: appendix documents should be placed at the end of a report, not embedded in each response. Contact the LCME Co-Secretaries for clarification on a specific request. Email lcmesubmissions@aamc.org for questions regarding the submission or formatting of materials.

A-0291

Lawrence S. Chin, MD
Page 3

*In the status report, specify the LCME's determination of the program's performance in each element (i.e., satisfactory with a need for monitoring) as listed in this letter.*

**Element 11.2 (career advising) – Satisfactory with a Need for Monitoring**

1.  Complete the following table with data from an internally-administered survey of students in all classes and campuses on satisfaction with the adequacy of career counseling.

| Satisfaction with the Adequacy of Career Counseling | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Medical School Class | Number of Total Responses/Response Rate to this Item | | Number and % of N/A* Responses | | Number and % of Combined Dissatisfied and Very Dissatisfied Responses | | Number and % of Combined Satisfied and Very Satisfied Responses | |
| | N | % | N | % | N | % | N | % |
| M1 Syracuse | | | | | | | | |
| M2 Syracuse | | | | | | | | |
| M3 Syracuse | | | | | | | | |
| M3 Binghamton | | | | | | | | |
| M4 Syracuse | | | | | | | | |
| M4 Binghamton | | | | | | | | |
| Total | | | | | | | | |

* N/A = have not experienced this

2.  Provide a summary analysis of the data from the above table and describe any actions taken by the school based on these data.

3.  Complete the following table with data from an internally-administered survey of students in all classes and campuses on satisfaction with the adequacy of counseling about choice of electives.

| Satisfaction with the Adequacy of Counseling about Choice of Electives | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Medical School Class | Number of Total Responses/Response Rate to this Item | | Number and % of N/A* Responses | | Number and % of Combined Dissatisfied and Very Dissatisfied Responses | | Number and % of Combined Satisfied and Very Satisfied Responses | |
| | N | % | N | % | N | % | N | % |
| M1 Syracuse | | | | | | | | |
| M2 Syracuse | | | | | | | | |
| M3 Syracuse | | | | | | | | |
| M3 Binghamton | | | | | | | | |
| M4 Syracuse | | | | | | | | |
| M4 Binghamton | | | | | | | | |
| Total | | | | | | | | |

* N/A = have not experienced this

4.  Provide a summary analysis of the data from the above table and describe any actions taken by the school based on these data.

Licinio v. SUNY Upstate, et al., 5:21-cv-387   008986

A-0292

Lawrence S. Chin, MD
Page 4

**Element 12.1 (financial aid/debt management counseling/student educational debt) –
Satisfactory with a Need for Monitoring**

1. Provide school data from the AAMC Part I-B Financial Aid Questionnaire (AAMC FAQ)
   on the median reported medical school educational indebtedness of all medical student
   graduates with medical school debt and the percentage of graduates with indebtedness
   equal to or more than $200,000.

| Median Medical School Educational Debt | | | |
|---|---|---|---|
| | FAQ 2019 | FAQ 2020 | FAQ 2021 |
| | School | School | School |
| Median medical school debt | | | |
| Percentage of graduates with debt equal to or more than $200,000 | | | |

2. Complete the following table with data from an internally-administered survey of
   students in all classes and campuses on satisfaction with the adequacy of debt
   management counseling.

| Satisfaction with the Adequacy of Debt Management Counseling | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Medical School Class | Number of Total Responses/Response Rate to this Item | | Number and % of N/A* Responses | | Number and % of Combined Dissatisfied and Very Dissatisfied Responses | | Number and % of Combined Satisfied and Very Satisfied Responses | |
| | N | % | N | % | N | % | N | % |
| M1 Syracuse | | | | | | | | |
| M2 Syracuse | | | | | | | | |
| M3 Syracuse | | | | | | | | |
| M3 Binghamton | | | | | | | | |
| M4 Syracuse | | | | | | | | |
| M4 Binghamton | | | | | | | | |
| Total | | | | | | | | |

* N/A = have not experienced this

3. Provide a summary analysis of the data from the above table and describe any actions
   taken by the school based on these data, including any changes in the structure and/or
   availability of debt management counseling.

Lawrence S. Chin, MD
Page 5

## IV.   IMPORTANT INFORMATION FOR THE MEDICAL EDUCATION PROGRAM

### ALIGNING FOLLOW-UP WITH THE APPROPRIATE ACCREDITATION ELEMENTS

Programs that have status reports due to the LCME are responsible for aligning the follow-up items in the reports with the *Functions and Structure of a Medical School* document whose effective academic year corresponds with the academic year in which each status report is due. To review the current list of LCME accreditation standards and elements, refer to the most recent version of the *Functions and Structure of a Medical School* document, available on the LCME website, lcme.org/publications.

### CHANGES THAT REQUIRE NOTIFICATION TO THE LCME

The LCME awards accreditation to a medical education program based on a judgment that there exists an appropriate balance between student enrollment and the total resources of the institution, including faculty, facilities, and operating budget. If there are plans to significantly modify the educational program, or if there is to be a substantial change in either student enrollment or in the resources of the institution such that the balance becomes distorted, the LCME requires advance notice of the proposed change. Substantial changes may lead the LCME to re-evaluate a program's accreditation status. All schools are responsible for keeping up to date on current LCME notification requirements detailed on the LCME website. lcme.org/about/accreditation-process-overview/#maintaining-accreditation.

Sincerely,

Barbara Barzansky, PhD, MHPE
LCME Co-Secretary

Veronica M. Catanese, MD, MBA
LCME Co-Secretary

A-0294

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF NEW YORK**

...................................................................... X

**JULIO LICINIO, MD, PhD, MBA, MS,**

|                              |                                              |
|------------------------------|----------------------------------------------|
| Plaintiff,                   | **DECLARATION OF ROBERT CORONA, DO, MBA**    |
|                              | Case No.: **5:21-cv-387(GTS/TWD)**           |
| - against -                  |                                              |

**STATE OF NEW YORK, THE STATE UNIVERSITY OF NEW YORK, and THE STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,**

Defendants.

...................................................................... X

ROBERT CORONA, DO, MBA, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.      I am a neuropathologist and have been licensed to practice medicine in New York State since 1987. I am currently employed by SUNY Upstate Medical University ("UMU") as the Chief Executive Officer of UMU's University Hospital, and have been employed by UMU from 1987 to 1996 and 2012 to present in various roles. I was appointed interim Hospital CEO in or about March 2018 by former UMU President Dr. Danielle Laraque-Arena and later appointed permanent Hospital CEO in or about December 2018 by President Mantosh Dewan. Prior to becoming Hospital CEO, I served as the John B. Henry Professor and Chair of the Department of Pathology and Laboratory Medicine, Medical Director of Neuropathology, Chief Innovation Officer and Vice President for Business Development at UMU from 2012 to 2018. From 1996 to

1

2012, I held a leadership position at Welch Allyn Inc. as Chief Medical Officer and Vice President of Medical and Scientific Affairs.

2.      I respectfully submit this Declaration in support of the Defendants' motion for summary judgment. I make this Declaration based upon my personal knowledge and based upon records maintained by UMU in the usual course of business.

3.      During Plaintiff's tenure as Dean of the College of Medicine, I became friends with him and we corresponded often. From July 2017 to April 2018, I was the Chair of UMU's Department of Pathology and Laboratory Medicine, during which time I reported directly to Plaintiff. Thereafter, as Hospital CEO, I was part of UMU's leadership team with Plaintiff until he was removed as Dean of UMU's College of Medicine in September 2019.

4.      While Plaintiff was Dean of UMU's College of Medicine, Plaintiff frequently confided to me that he believed he would be removed from his position as Dean by former President Laraque-Arena and current President Dewan. Those conversations took place as early as April 2018 and continued through 2019. In the second half of 2018, President Laraque-Arena had become agitated with his frequent emails questioning her decisions and off-putting comments during meetings. After one particular meeting in July 2018, which I attended with Plaintiff and President Laraque-Arena, President Laraque-Arena sent Plaintiff a formal letter (copying me) that set boundaries for their future meetings, including that they would only meet for 30 minutes per week, that the President's Chief of Staff would be present for all future meetings, and that the meetings should be productive, with Plaintiff focusing on giving brief reports of his work progress and speaking only about operational issues. See, **Exhibit "A."** SUNY leadership, including SUNY's Chief Officer of Academic Health and Hospital Affairs Ricardo Azziz, MD, was also unhappy with Plaintiff. I suspect this was due to Plaintiff frequently sending lengthy emails to him

2

and requesting to meet with SUNY leadership to try to influence SUNY's view of UMU's leadership team and President.

5.     In April 2019, Plaintiff sent me an email confirming his belief that two individuals "REALLY want me out" of the Dean position for making "two very bad political moves" for which "I now [] have to pay the price." He indicated that UMU was cutting his wife Ma-Li Wong, MD's salary by $45,000 as a means to punish him for the bad political moves that he made and to try to force him to leave his position. Attached as **Exhibit "B"** is a copy of an email string dated April 8, 2019, which includes emails sent by Plaintiff from his personal email address to me, at my personal email address.

6.     In the months that followed, in late Spring and Summer of 2019, Plaintiff appeared to grow increasingly hostile towards President Dewan and angry with Department Chairs for notifying President Dewan about issues that Plaintiff felt were issues for the Dean. In fact, I began hearing Plaintiff speak negatively about President Dewan more and more frequently. Plaintiff stated many times that he thought he should be President of UMU and began making President Dewan out to be the opponent.

7.     I have a lot of respect for President Dewan, who has been a longtime colleague of mine, is a person of high integrity, and is held in high regard by his colleagues. I disagreed with Plaintiff's negativity about President Dewan and advised Plaintiff to stop saying these negative things and to focus on preserving his job. I tried to distance myself from Plaintiff as a result.

8.     I was also aware that President Dewan was becoming more and more troubled about Plaintiff continuing in his role as Dean. In early 2019, President Dewan informed me that he wanted to give Plaintiff the opportunity to prove himself under a new President and asked me to help him make Plaintiff succeed in his role as Dean. However, throughout the Spring and Summer

3

of 2019, during my meetings with President Dewan, he conveyed more and more frequently his concerns about Plaintiff as Dean. For example, President Dewan was concerned about allowing Plaintiff to interact with local politicians and SUNY officials who came to campus for fear that Plaintiff would say something off-putting or present UMU in a negative light. In the meetings that I attended with Plaintiff during this time, Plaintiff was distracted by his phone and would distract other attendees by constantly texting them. President Dewan confided in me that he did not know how to salvage Plaintiff, that Plaintiff's behavior had become so disruptive that he was not being effective, and that President Dewan wanted to stabilize the institution.

9.     In August 2019, Plaintiff scheduled an "urgent" meeting to take place on August 13, 2019, at 6am, regarding "Anesthesia" and invited me, President Dewan, UMU's Chief Medical Officer, and Department Chairs who oversee different types of surgeries.  Scheduling a 6am meeting with President Dewan was very unusual, as it is common knowledge that he prefers not to have meetings before 7am.

10.     At the meeting, Plaintiff spent the hour disparaging President Dewan in front of the group and the President, making the individuals in the room—and me—visibly uncomfortable. He told the group that he couldn't do his job because President Dewan was doing his job for him by allowing Chairs to come to him with Departmental issues. Dr. Dewan listened and did not respond to Plaintiff's comments.

11.     I was concerned that Plaintiff would so publicly behave that way towards the President, who was his supervisor.

12.     I spoke with President Dewan several days after that meeting, who shared with me his belief that Plaintiff's behavior during the meeting was unprofessional and insulting and informed me that he felt he could no longer tolerate the Plaintiff's overt attempts to undermine his

4

leadership and had made the decision to remove Plaintiff from his position as Dean. My impression was that his behavior during that meeting was the last straw for the President.

13.    When Plaintiff was removed as Dean in September 2019, I reached out to him to ask him how he was doing. He responded to me that he believed that his removal violated a notice provision in his offer letter. However, he never indicated to me that he believed he was removed because of his membership in a protected class or for complaining of protected class-based discrimination. Despite many conversations I had with him while he was Dean, he never indicated that he believed that he or his wife or anyone else at UMU was being discriminated against based on their protected classes. Nor did he ever indicate to me that he had complained of discrimination to anyone else.

Dated:    January 2, 2024
Syracuse, New York

Robert Corona, DO, MBA



UPSTATE

July 10, 2018

Dear Dr. Licinio,

At our last meeting on 7/9/2018 you stated that you would be more effective if the number of meetings were reduced that you need to attend on the university side to more decidedly focus on the college of medicine, which I agree is your foremost responsibility. I support you and want you to have the best possible conditions to do your work and to accomplish the goals of the university and the college of medicine. I agree to excuse you, from two meetings per month (1 UEC and 1 EUEC) that you have requested, otherwise required of other senior leaders, as long as this does not interfere with our operations.

We will continue our regular meetings. We will meet for:
- ½ hour weekly – My Chief of Staff will attend the meetings. As in the past, others will join our meetings to address operations, academics etc. as necessary.
- I ask that you focus on giving brief reports of your work progress and the support you need to carry out your work. As usual please submit an agenda ahead of time.
- Our meetings should be productive and focus on operational issues.

Thank you and I look forward to meeting.

Respectfully,

Danielle Laraque-Arena, MD
President & Health System CEO
SUNY Upstate Medical University

Cc:   Robert Corona, DO

Licinio v. SUNY Upstate, et al., 5:21-CV-387        003870

750 East Adams Street | Syracuse, NY 13210 | Ph: 315.464.4513 | Fax: 315.464.5275 | www.upstate.edu | State University of New York          A0299

9/26/23, 3:48 PM                                                    Gmail - Re: Do You Want To Be Less Angry?

# M Gmail                                              Robert Corona ◄ ██████ @gmail.com>

---

## Re: Do You Want To Be Less Angry?
1 message

---

**Julio Licinio** ◄ ██████ @gmail.com>                               Mon, Apr 8, 2019 at 10:16 AM
To: Robert Corona ◄ ██████ @gmail.com>

You do, Bob. Upstate doesn't. If it did why would it be cutting Ma-Li's salary by $45,000? I totally get it now – an orchestration between two very self-centered people, who REALLY want me out. I made two very bad political moves, and I now I have to pay the price. One has to take full responsibility for one's actions. You are the nicest person and I could truly make a difference here, but the agenda now is not to make the institution great.

All my best,

Julio

> On Apr 8, 2019, at 09:50, Robert Corona ◄ ██████ @gmail.com> wrote:
>
> I think you are one of the key drivers to make Upstate Great Again.  We need you and care for you deeply.
>
> On Apr 8, 2019, at 9:36 AM, Julio Licinio < ██████ @gmail.com> wrote:
>
>> Thanks - you are a good friend.
>> Julio
>>
>>
>> On Apr 8, 2019, at 09:28, Robert Corona ██████ @gmail.com> wrote:
>>
>>
>>
>>> Begin forwarded message:
>>>
>>> **From:** "Daily Stoic" <info@dailystoic.com>
>>> **Date:** April 8, 2019 at 9:02:20 AM EDT
>>> **To:** "Robert" < ██████ @gmail.com>
>>> **Subject: Do You Want To Be Less Angry?**



>>> Few people have studied the life and writings of Seneca as deeply as James Romm has. Romm is the author of a great biography of Seneca, *Dying Every Day*, a translation of Seneca's various thoughts on death, *How to Die: An Ancient Guide to the End of Life*, and his newest work, *How To Keep Your Cool: An Ancient Guide to Anger Management*, presenting one of Seneca's most timely essays, *On Anger*.
>>>
>>> Each of us should take a minute to think back, even in just the past week, to the times we've been angry or short-tempered and

Licinio v. SUNY Upstate et al., 5:21-cv-387    00010607

**UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK**

........................................................................................X

**JULIO LICINIO, MD, PhD, MBA, MS,**

                         Plaintiff,              **DECLARATION OF
MANTOSH DEWAN, MD**

                                                   Case No.: **5:21-cv-387(GTS/TWD)**

         - against -

**STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,**

                         Defendants

........................................................................................X

     MANTOSH DEWAN, M.D., pursuant to § 1746 of Title 28 of the United States Code,

declares the following to be true and correct under penalty of perjury under the laws of the United

States of America:

     1.    I am currently employed as the President of the State University of New York

Upstate Medical University ("UMU"). I have served as UMU's President since December 2018,

first in an interim capacity from December 2018 to November 2020 and then in a permanent

capacity from November 2020 to present.  I am of Indian descent.

     2.    I am not named as a Defendant in this action, but I respectfully submit this

Declaration in support of the Defendants' motion for summary judgment.

     3.    I make this Declaration based upon my personal knowledge and based upon records

maintained by UMU in the usual course of business.

## OVERVIEW OF UMU AND MY EMPLOYMENT HISTORY

4.      I am a psychiatrist and have been licensed to practice medicine since 1975. Since that time, I have been employed by UMU where I have spent my entire career working as a faculty member in the Department of Psychiatry and serving in various leadership roles.

5.      From 1975-1979, I was a resident in UMU's Psychiatry Residency Program. Upon completing the Program, I was hired as Assistant Professor of Psychiatry. Thereafter, in 1985, I was promoted to Associate Professor and, in 1992, to a full, tenured Professor of Psychiatry. From 1999 to 2011, I served as the Chair of UMU's Psychiatry Department and, in 2009, I was selected to be a SUNY Distinguished Service Professor. I have served on various Committees within UMU's College of Medicine, including Chair of the Committee on Staff Health from 2000 to 2011 and Chair of the Appointments and Promotions Committee from 2007 to 2011.  From 2002 to 2011, I was on the Executive Committee of the governing board of UMU's faculty practice plan corporation, Upstate University Medical Associates at Syracuse ("UUMAS"), including serving as Vice President of UUMAS from 2006 to 2011. From October 15, 2016, to June 30, 2017, I served as interim Dean of UMU's College of Medicine.

6.      Outside of UMU, I have also been active in the medical community, including serving on the New York State Mental Health Services Council from 2007 to 2013.

7.      UMU, with most of its operations in Syracuse, New York, is the region's only public academic medical center. It is one of five health science centers within the State University of New York. UMU's mission is to improve the health of the community through education, biomedical research, and health care. UMU has four colleges— the College of Medicine, College of Nursing, College of Health Professions, and College of Graduate Studies (biomedical sciences) – where faculty from 26 different Departments provide clinical and didactic training to students

2

and trainees in medicine and sub-specialties of medicine, nursing, health sciences, and graduate studies across UMU's health and research enterprises. UMU's health enterprise consists of two hospitals, including the region's only level 1 trauma center, the region's only children's hospital, a cancer center, many outpatient clinical locations across Upstate New York. UMU serves approximately 1.8 million patients across a 17 county region and is the region's largest employer with approximately 10,000 employees.

8.      During my 40-year career at UMU, I have developed strong relationships with my colleagues, including the Deans of UMU's four colleges, Department Chairs, members of leadership, administration, and faculty.  I have devoted my career at UMU to performing work, setting and supporting initiatives, and providing leadership that is strategically aligned with and supportive of UMU's mission.

### CONCERNS ABOUT PLAINTIFF'S LEADERSHIP AS DEAN OF THE COLLEGE OF MEDICINE UNDER PRESIDENT DANIELLE LARAQUE-ARENA

9.      I was the interim Dean of the College of Medicine when Plaintiff was recruited and appointed as the Dean of UMU's College of Medicine by UMU's former President Danielle Laraque-Arena, MD. While I did not participate in the decision to hire Plaintiff, I was made aware by Dr. Laraque-Arena that she, Plaintiff, and his wife, Ma-Li Wong, MD had engaged in extensive negotiations surrounding Plaintiff and his wife's onboarding package.

10.     Both Plaintiff and Dr. Wong accepted the offers of employment made in March 2017. Pursuant to those offers, Plaintiff began his employment as Dean of UMU's College of Medicine on July 1, 2017, and Plaintiff's wife, Dr. Wong, began her employment with UMU as a tenured research Professor in the Department of Psychiatry and Behavioral Sciences with a

A0303

concurrent appointment as a Professor in the Department of Neuroscience and Physiology in December 2017.

11.     When Plaintiff became Dean, I stepped out of the interim Dean position and went back to serving full time in my role as Distinguished Service Professor in the Department of Psychiatry, seeing patients and teaching UMU's medical students and residents. However, President Laraque-Arena reached out to me on occasion to consult regarding various UMU matters. In doing so, I learned that, in the months following his being appointed as Dean, the relationship between Plaintiff and President Laraque-Arena had become increasingly complicated.

12.     In the Fall of 2018, President Laraque-Arena asked if I would be willing to assume the responsibilities of Dean under the title "Vice President of Administration." She indicated to me that she was unhappy with Plaintiff's performance as the Dean of the College of Medicine and that the College of Medicine was dysfunctional under his leadership. Further, she informed me that Plaintiff was hostile and inappropriate in his interactions with her and that he was demeaning and undercut her. For example, she relayed to me that he had given her a book about sexual dreams and that she now refused to meet with him one-on-one, always requiring a witness to be present during her meetings with him.  She did not want Plaintiff to function as Dean but did not want to terminate Plaintiff, however, due to her strong desire to maintain the appearance of stability for UMU's College of Medicine.

13.     I declined to step into the position that President Laraque-Arena proposed, as I did not want to clash with Plaintiff who still held the position of Dean. Soon after, it was announced that the President would step down at the end of the year. Although I did not apply, I was offered the interim President position in the Fall of 2018.

4

14.     In preparation for my transition into the Interim President role, in November and December 2018, President Laraque-Arena updated me on high-level UMU issues that she believed I should be aware of as incoming President.

15.     In late December 2018, President Laraque-Arena emailed me to alert me to a discrimination complaint that several female faculty members filed against Plaintiff with UMU's Office of Diversity and Inclusion relating to a search for a Department Chair. I have never been made aware of such a complaint being filed against a UMU Dean previously. While there was no finding of discrimination, as the investigation revealed that two candidates were equally qualified, the Chief Diversity Officer at that time noted that it could have been an opportunity for UMU to take a "positive step towards addressing the historical underrepresentation of women in prominent leadership positions…" See, **Exhibit "A"** at p. 4.

16.     President Laraque-Arena ultimately resigned from her position on December 22, 2018. I became Interim President of UMU on December 23, 2018.

### CONCERNS ABOUT PLAINTIFF'S LEADERSHIP AS DEAN OF THE COLLEGE OF MEDICINE AFTER I BECAME INTERIM PRESIDENT

17.     When I took over as Interim President, senior leadership at SUNY System Administration immediately expressed their concerns about Plaintiff remaining in the Dean position. For instance, former SUNY Chief Officer of Academic Health and Hospital Affairs Ricardo Azziz, M.D. told me in January 2019 and in every subsequent monthly one-on-one meeting that we had that Plaintiff needed to be removed as Dean.  Although Plaintiff was bright and had done well in research, Dr. Azziz relayed that Plaintiff had poor judgment and lacked the professional diplomacy needed to effectively interact with internal and external constituents of UMU. This was demonstrated by his frequently contacting Dr. Azziz and other SUNY leadership

5

to complain about President Laraque-Arena and ignoring directives by SUNY leadership to stop contacting them. I informed Dr. Azziz that I was not going to remove Plaintiff right away. I wanted to give him the benefit of the doubt and allow him the chance to succeed under new leadership.

18.     Shortly after my first one-on-one meeting with Dr. Azziz in January 2019, Plaintiff came to me in a panic and informed me that he had just met with Dr. Azziz and Dr. Azziz told him "as a friend" to look for another job. Plaintiff asked if I had plans to remove him as Dean. I responded by informing him that I had been instructed by SUNY administration that my highest priority was to remove him from the Dean position. I shared with Plaintiff that this instruction from SUNY was completely atypical and a clear indication that Plaintiff had not fostered appropriate relationships with SUNY Administration or high-level officials at UMU and that he is "persona non-grata with SUNY". I informed him that, despite these instructions, I was willing to give Plaintiff a chance to prove himself under my Presidency and give him the benefit of the doubt that his unsatisfactory performance to date was due to a personality conflict he had with President Laraque-Arena. I warned Plaintiff though, that he was under a microscope and that I expected him to do well in order to have the best chance of succeeding.

19.     Unfortunately, over the months that followed, it became evident that Plaintiff was unable to be a successful Dean. As Dean, he was ineffective, non-responsive, wasteful and had alienated and lost the trust of Chairs, faculty and staff. An individual who holds the prestigious position of Dean of a College of Medicine should be a role model for students, faculty and Department Chairs and an esteemed representative of UMU. Plaintiff fell far short of this standard, with his repeated inappropriate comments, lack of diplomacy, and poor judgment in his interactions with others and his insubordination towards me.

20.    After I became interim President, Ruth Weinstock, MD approached me about concerns she had with Plaintiff's interference with the search process for the new Chair of UMU's Department of Medicine. Dr. Weinstock shared that she was on the search committee, that the committee members had been searching for and interviewing candidates for months, that the committee had recommended that certain individuals be put forward for consideration, but that Plaintiff was ignoring the Search Committee's recommendations and insisting that his personal friends be moved forward in the process even though the Committee had already rejected them. As President, I do not get involved in searches, but I am required to give final approval of the faculty and chairs who are selected for hire at UMU. As such, I spoke with the Committee members following the concerns raised by Dr. Weinstock to understand their position. They reiterated their exasperation with Plaintiff's subversion of their search process and recommended that I not approve the hire of the individual selected by Plaintiff, whom they did not believe was qualified. The Chair of UMU's Department of Medicine is a key position at UMU as the person selected would be at the center of everything UMU does. Due to the Committee's concerns and the Plaintiff's failure to follow the process, I advised Plaintiff to call off the search, resulting in months of wasted time for the approximately 20 very busy UMU doctors and faculty who sat on the search committee. It is unprecedented for a President to order a Dean to end a search because the Dean had corrupted the required fair process.

21.    On February 4, 2019, Plaintiff asked to attend SUNY Chancellor Kristina Johnson's State of the University Address in Albany, New York with me and other members of UMU leadership. I informed him that he was not to come due to the concerns expressed by SUNY about him. It is also unprecedented that a Dean was not welcome to attend an open SUNY address.

22.     Later that month, I learned that Chancellor Johnson would be in Syracuse for the Duke/Syracuse basketball game. I made plans for myself, SUNY ESF's President, and other UMU leaders to take her to lunch, and included Plaintiff in the invitation as a first step towards his rehabilitation. Before lunch, I spoke with Plaintiff and asked him to please keep the conversation high level and pleasant. The lunch went well and, thankfully, Plaintiff behaved appropriately. However, two days later, I received an email from the Chancellor forwarding an email that Plaintiff sent her immediately following the lunch asking for $5 million to recruit a specific doctor for a Chair of Medicine position at UMU. Plaintiff did not copy me on the email. I apologized to the Chancellor, told her that I did not know Plaintiff had written to her and assured her that I would address it with Plaintiff. I also spoke on the phone with the Chancellor following the email exchange, at her request. Consistent with the message I received when I started as Interim President, she asked me why I had not fired Plaintiff yet, expressed her ongoing concerns about Plaintiff continuing as UMU's College of Medicine Dean, and asked me to ensure that Plaintiff not contact her directly again in the future. A copy of the referenced email chain is attached as **Exhibit "B."**

23.     I was upset with Plaintiff and in disbelief that he would make such a bold request to the Chancellor – particularly without first discussing it with me and after I had already told him that he was not to communicate directly with SUNY.  It was an embarrassment to me. I spoke with Plaintiff and let him know that I had heard from the Chancellor about the email that he had sent her, that she was very upset, and that she did not want to hear from Plaintiff and would not respond to his email. I expressed my extreme frustration with him and let him know that this type of conduct by him doesn't just hurt his relationship with the Chancellor, but mine as well. As was often the case, Plaintiff failed to grasp the gravity of his transgression, instead repeating his belief that this

8

recruitment would be a major win for Upstate. So, I repeated that the Chancellor had again insisted I remove him as Dean and that he was not to contact anyone at SUNY System under any circumstance.

24.    Thereafter, I continued to get complaints about Plaintiff. He was absent, ineffective, did not follow required processes, and was inappropriate. Many of these complaints were generic, without clarity as to when the complained about events occurred. Others were specific. For example, in approximately March 2019, I was contacted by Sharon Brangman, MD, who had been appointed Chair of the newly created Geriatrics Department. She was distressed and relayed that Plaintiff had been non-responsive to her requests to help her get financial support for the Department, which had been created in July 2018 under President Laraque-Arena's leadership. Despite having been appointed Chair of this brand-new Department more than one-half year earlier, Dr. Brangman still had no financial resources for the Department to operate. She informed me that she had been requesting that Plaintiff assist her to get finances in place for the Department for months, but that Plaintiff never responded to her requests, which was preventing her from getting anything done.

25.    Dr. Brangman also relayed other concerns about Plaintiff making inappropriate comments and not behaving appropriately as Dean. She shared that during an Admissions Committee end of year dinner, which she, Plaintiff, other faculty and students attended in 2018, Plaintiff had told a story during dinner about a patient he used to treat as a psychiatrist in Miami. As part of the story, he shared with students and other faculty explicit details about the sexual issues that the individual was having, which was a violation of patient privacy and completely inappropriate and unprofessional to be sharing with students, much less anyone. Dr. Brangman shared that she was horrified.

26.     She also reiterated the concerns that I had previously learned about Plaintiff's attempts to subvert the Committee search process during the search for a new Chair of the Department of Medicine, which Dr. Brangman Co-Chaired.

27.     Objectively, any one of Plaintiff's many transgressions would be grounds for dismissal as Dean, as the Chancellor had urged me to do, and I did have significant concerns with Plaintiff continuing as Dean. However, I did not feel that I could remove him due to the need for UMU's College of Medicine to maintain the appearance of stability during the upcoming Liaison Committee on Medical Education ("LCME") site visit scheduled for March 2019.[1] There were discussions held with myself and senior leadership about how to minimize Plaintiff's role in the LCME accreditation process given the concerns about his unpredictable, inappropriate, and undiplomatic statements.

28.     In addition to concerns over Plaintiff's indiscreet statements, I began to have concerns about Plaintiff's excessive and unnecessary spending of State dollars. When I took over as President, I learned that President Laraque-Arena had significantly increased the number of administrative positions in the President's office and that Plaintiff had done the same in the College of Medicine.  Faculty had shared their dissatisfaction with UMU dollars being spent on hiring so many administrators and I was of the mindset that we needed to model and ensure that our administration was efficient in the duties they were performing, as we asked for others to be efficient and accountable. I began to reduce the number of administrative staff in the President's office by eliminating what I viewed as unnecessary and/or duplicative functions. Over my first

---

[1]     The LCME is an accrediting body of UMU's College of Medicine and sets forth accreditation standards by which medical schools are evaluated. It is important for Medical Schools to be fully accredited by the LCME as it allows them to competitively recruit high caliber medical students, residents, fellows, faculty, and department chairs to their programs and to better serve the community at large.

A0310

year as President, I eliminated 8 positions in the President's office, which resulted in a savings of over $1 million annually.

29.    I became aware that Plaintiff was creating a significant number of new positions within the College of Medicine. I had three serious concerns about this: the cost of unnecessary administrative bloat; the lack of clarity regarding their responsibilities; and the lack of these positions being connected to the objective outcomes that we had agreed on for the College of Medicine.

30.    As to the cost of unnecessary administrative bloat, I learned that, after Plaintiff took over from me as Dean, he had grown the Dean's staff from 4 to 11 people and was in the process of creating additional positions. That was a more than 250% increase (see table below). These full time and part time positions cost hundreds of thousands of dollars in additional expense.

| Comparison of Number of Positions in the College of Medicine Deans' Office/ created by the Dean | | |
|---|---|---|
| Dean | Mantosh Dewan, MD | Julio Licinio, MD |
| 1. | Senior Associate Dean, Faculty Affairs | Same |
| 2. | Associate Dean for Undergraduate Education | Same |
| 3. | Associate Dean for Graduate Education | Same |
| 4. | Assistant Dean for Diversity | Same |
| 5. | | Associate Dean for Diversity |
| 6. | | Assistant Dean for Disability |
| 7. | | Senior Associate Dean for Education |
| 8. | | Assistant Dean for Research |
| 9. | | Associate Dean for Student Advising |
| 10. | | Project Manager |
| 11. | | Director of Special Programs |
| Total | 4 | 11 |

In addition to the positions listed above, Plaintiff was also proposing to create an additional position of Assistant Dean of Cultural Competency.

11

31.    In addition, it was unclear what duties these positions would be responsible for performing. The titles of the positions that Plaintiff was creating suggested that their duties would overlap with the duties that individuals in existing positions were already responsible for performing. This generated complaints from those holding the existing positions in or around the Spring and Summer of 2019. For example, UMU's longtime College of Medicine Assistant Dean for Diversity Brian Thompson, MD came to me and complained that Plaintiff had demoted and sidelined him by creating an Associate Dean for Diversity and Inclusion position, which would be performing essentially the same functions that he was already responsible for performing. Similarly, UMU's Dean of Students Julie White complained that Plaintiff was proposing to create a new Associate Dean for Student Advising position even though she was already responsible for student advising.

32.    Finally, I had concerns that there was no connection between these new positions and the objective outcomes that Plaintiff and I had agreed on, that is, to increase the number of Under-Represented in Medicine (URiM) students entering UMU.

33.    With Plaintiff's addition of 6 new positions to his office, and his proposal to create more positions, I repeatedly asked Plaintiff to provide me with an updated organizational chart for the Dean's office and written job descriptions for the positions he had already created and was proposing to create, to ensure that Plaintiff was spending State dollars appropriately and not creating duplicative positions. I asked him how each position would help recruit more URiM students. I also emphasized that he needed to manage the performance of the individuals who already held existing positions to ensure their success before creating new positions that had the same responsibilities. Plaintiff never provided me with an organizational chart or written job

A0312

descriptions despite my requests and, instead, became angry that I was questioning his decision making.

34.     Increasing URiM remained a high priority and a significant increase was achieved after Plaintiff was removed:

| Class of 2018 | Plaintiff as Dean | URiM | 18% |
| Class of 2019 | Plaintiff as Dean | URiM | 18% |
| Class of 2020 | New Dean | URiM | 23% |
| Class of 2021 | New Dean | URiM | 26% |
| Class of 2022 | New Dean | URiM | 19% |
| Class of 2023 | New Dean | URiM | 26% |

35.     I also knew that Plaintiff and former President Laraque-Arena had hired an outside consultant to assist with the LCME accreditation process, agreeing to pay the consultant approximately $1 million. This was unprecedented for a process that is important but entirely routine. I heard much scrutiny regarding the decision to retain outside consultants at such a high cost – particularly when most of the preparation for the LCME site visit had already been performed by UMU employees in the Academic Affairs and Undergraduate Medical Education offices. I shared similar concerns. These concerns further led me to question Plaintiff's creation of so many new administrative positions to ensure that we were being fiscally responsible and adding value.

36.     Throughout the Summer of 2019, I heard and witnessed more and more about Plaintiff's inappropriate conduct that caused me concern.

37.     In the Summer of 2019, I arranged for local political representatives to separately visit UMU's campus so that we could describe the significance of UMU's services to the Upstate

13

New York Community and garner political support for UMU's initiatives.  I invited all members of UMU's University Executive Committee to attend 1-hour meetings with representatives when they visited to provide an overview of UMU.  Due to Plaintiff's history of making inappropriate statements and going off on tangents, I had concerns that he might say something or behave in a way that would leave these representatives with a negative impression of UMU. In fact, during one such visit, Plaintiff went off on a tangent in a manner that was contrary to how I would expect UMU's College of Medicine Dean to present themselves and, in my view, was an embarrassment to UMU and me as its President. After that, I spoke with my staff and asked them to preferably schedule these visits when Plaintiff was not going to be on campus.

38.     I also learned that Plaintiff had begun to instruct Chairs not to talk to me about Departmental concerns and blamed me as the reason he wasn't doing his job.  On August 8, 2019, I met with former UMU President Gregory Eastwood, MD and discussed my concerns about Plaintiff's troubling conduct, including his disparaging me to others. This was exactly the same pattern of negative conduct that Plaintiff exhibited with the previous President, Dr. Laraque-Arena.

39.     On August 13, 2019, at 6am, Plaintiff held an "urgent" meeting regarding the Department of Anesthesia and requested that I attend. Also in attendance were UMU's Hospital Chief Executive Officer Dr. Robert Corona, UMU's Chief Medical Officer Dr. Amy Tucker, the Dean's Chief of Staff Grace VanNortwick, and various Department Chairs who oversaw different areas of surgery, including Dr. Randy Green, Dr. Stephen Albanese, Dr. Larry Chin, Dr. Robert Cooney and Dr. Gennady Bratslavsky.  See, **Exhibit "C."**

40.     Plaintiff requested that I attend the meeting even though it was a meeting that I typically would not attend, and I have made very clear to him and others my preference not to attend meetings before 7am. A 6am meeting is extremely rare.

14

41.     During the meeting, Plaintiff spent almost the entire hour attacking me in front of the group, stating that I was preventing him from performing his job, that I was the reason Plaintiff was failing as Dean, and that I was the reason why Plaintiff could not remove the Anesthesia Chair. All of his comments were factually incorrect. Plaintiff had already decided that a change of Chair needed to occur and in fact this did occur. This was entirely his decision and I was not interfering with it. He also had every opportunity since he became Dean to speak with the existing Chair to resolve the concerns, but he failed to do so.  Even if he did feel this way, at no time did he ever approach me one-on-one about his concern. In fact, I had a one-on-one meeting with him the day before and he never raised these concerns to me. I said nothing but viewed the Plaintiff's behavior to be highly insubordinate and inappropriate.

42.     His overt attempt to undermine my leadership, as he had done with the previous President, was the tipping point and I walked out of that meeting with a clear decision to remove him. Months of repeated egregious behaviors, ineffective and wasteful management, and now his undermining of my leadership – all after giving Plaintiff a fair chance despite insistent directives from my superiors to remove him – made it a sad but clear choice. He was toxic, inappropriate, and an embarrassment to me and UMU, and a risk to UMU's College of Medicine if he remained as Dean.

43.     At the beginning of a leadership meeting held shortly thereafter, Plaintiff played a video on his phone as everyone was walking into the meeting of a public figure using ethnic slurs and making derogatory comments about Italians in the most vulgar language. My Chief of Staff, Linda Veit, who is Italian, was visibly offended by the video. His poor judgment in playing that video for all attendees to hear was unacceptable for a Dean of the College of Medicine. I had to

15

instruct Plaintiff to turn it off. His conduct and failure to appreciate that it was inappropriate further reenforced why I needed to remove him.

44.     Following those events, I contacted UMU's Associate Vice President of Human Resources Eric Frost and UMU Counsel to discuss how to remove Plaintiff. I also confided in several trusted UMU and SUNY leaders about my decision, including Dr. Corona, Dr. Chin, Dr. Albanese, Dr. Azziz and Chancellor Johnson. They all acknowledged their understanding of why I had made this decision and were strongly supportive. Dr. Chin graciously agreed to my request that he step into the role of Interim Dean after Plaintiff was removed.

45.     I was out of the country at the end of August and beginning of September, but I continued to hear concerns raised about him. For example, on September 2, 2019, Dr. Brangman expressed that she was unable to spend a grant that was secured to hire staff into her Department because Plaintiff was continuing to not support her. She shared that Plaintiff had chastised clinical Chairs the week before for "going around him" to speak with me about Dean issues. Regardless, since her meeting with Plaintiff on that issue had been unproductive and confusing, she sought my guidance. See, **Exhibit "D."**

46.     On September 12, 2019, I met with Plaintiff, with Mr. Frost present, and told Plaintiff that I had made the decision to remove him as Dean effective immediately. He informed me that he was in the process of interviewing for another job and requested that I delay his removal. However, given the events leading up to that point which were preventing UMU from functioning properly, I felt it best for the institution to remove him effective immediately. A copy of the letter that I gave him confirming that his employment as the Dean of the College of Medicine was terminated immediately, and his new title would be Distinguished Professor in the Department of Psychiatry & Behavioral Sciences, is attached as **Exhibit "E."**

16

47.      There were many clear and compelling reasons to remove the Plaintiff, a decision that my superiors had insisted on for 9 months. Following his removal as Dean, UMU received the results of an independent faculty survey that was conducted in June and July of 2019. The faculty who took the survey ranked Plaintiff's job performance as unsatisfactory. Three of the 10 bottom items were on Plaintiff's performance: they rated Plaintiff extremely low in making his priorities for the medical school transparent or reasonable and in the reasonableness of the pace of his decision making. These results were consistent with what I had seen from Plaintiff throughout 2019. A copy of the survey is attached as **Exhibit "F."**

**PLAINTIFF'S ALLEGATIONS**

48.      Contrary to Plaintiff's claims, I did not remove him due to his membership in a protected class or because he complained of protected class-based discrimination. Instead, my decision to remove him was based on: my being told by my SUNY superiors to remove Plaintiff from my first day as Interim President; his repeated inappropriate behavior and comments unbecoming of a Dean despite my giving him feedback; and the overt public attack on me which was a repeat of his behavior with the previous President – this was the tipping point for me.

49.      Plaintiff makes a number of allegations in his Complaint that are simply not true or are taken out of context.

50.      For example, Plaintiff alleges in his Complaint that I commented to him that the university "spends too much on diversity." I have never made that comment. To the contrary, I believe diversity at UMU is very important. As stated above, my goal as President continues to be to increase the percentage of URiM students at the COM, which I communicated on many occasions to Plaintiff. We have been successful in doing just that (see Paragraph 34 above).

17

51.    I did, however, have concerns that the Plaintiff was creating numerous positions within the College of Medicine that were duplicative of other existing positions and lacked any strategic foresight. The more than 250% increase in administration (see Paragraph 30 above) caused me to question whether we were being fiscally responsible with State dollars, whether we were assessing what others in existing positions were doing, and whether the positions were going to contribute to the student body diversity goal that I had established.

52.    Plaintiff also alleges that I asked what Dr. Brian Thompson, the Assistant Dean for Diversity and a Native American male, "does all day." He contends that I asked what Dr. Zulma Spinoza, a Hispanic female Neurosurgeon whom Plaintiff had recently appointed Associate Dean for Diversity over Dr. Thompson, "does in diversity."[2] Lastly, he alleges that I asked what Nakeia Chambers, an African-American female Director of Multicultural Affairs, "does all day." However, these are mischaracterizations of my discussions with Plaintiff, which were centered around my requesting additional information about the new positions that he had created, including an updated organizational chart for the Dean's office, job descriptions for each position, whether the duties performed in the new positions overlapped with existing positions, and how the newly created positions would add value to UMU and help it to meet its goals. The discussions also addressed the concerns that had been raised with me about individuals in existing positions being demoted or having duties removed from them and given to the individuals in the new positions, even though it appeared that they had less experience. The gender, race, or national origin of these or any other individuals had nothing to do any of my inquiries. It is also important to note that,

---

[2]    Plaintiff's Complaint alleges that he supported a Diversity Committee at UMU. To be clear, the Diversity Committee already existed at UMU *prior* to Plaintiff's appointment as Dean of the COM and was established in approximately 2013 by former Dean David Duggan. I did not question the need for a Diversity Committee and, after Plaintiff's demotion, Dean Lawrence Chin assumed oversight responsibilities for the Diversity Committee.

despite my overall concerns, I did allow the Plaintiff to make these appointments since it was in his purview. While I may have questioned the operational need for and duties of these positions, I did not interfere with Plaintiff's functioning.

53.     By way of further example, Plaintiff created and/or was proposing to create a part-time role titled "Assistant Dean for Cultural Competence." Plaintiff contends that I "aggressively objected" to this position. Similar to the other positions that Plaintiff had created, I did not object to the position or a specific individual filling this position and I certainly did not object to this position based on the race, gender or national origin of the candidate sought. Again, I questioned the need for this and other positions Plaintiff was creating based on the overlap of the position with other existing positions and whether it would assist the College of Medicine in meeting the student diversity goals that I had set for it. After Plaintiff was removed as Dean, Dr. Chin and I worked together to create a more impactful University-wide diversity structure to address diversity needs of the University at large, as opposed to part-time positions solely within the College of Medicine Dean's office. As part of that effort, we did appoint the African-American individual whom Plaintiff sought for the position of Assistant Dean for Cultural Competence as UMU's Chief Diversity Officer in May 2020 to handle University-wide strategic diversity initiatives.

54.     Plaintiff's Complaint indicates that he created an External Scientific Advisory Board to combat the underrepresentation of female employees. Plaintiff alleges that he discussed an upcoming External Scientific Advisory Board meeting with me, to which I replied with sarcasm, "Oh, do we have an External Scientific Advisory Board?" Again, any implication that I opposed having such a Board because of the members' gender, much less opposed having such a Board at all, is patently false. I had no input into whether the Board would continue to meet. In fact, Plaintiff mentioned the Board to me because he was proud of creating it, but was not looking

for any input from me as to whether it could continue. It is my understanding that the Plaintiff organized the Board and it met only on one occasion in June 2018. I am not aware that there was any discernible outcome from this effort and I do not believe Plaintiff organized any additional Board meetings after the first meeting that was held.

55.     Plaintiff further contends that he observed that there was a gender imbalance amongst the Budget Committee and suggested the addition of female members.   The Budget Committee was created by former President Laraque-Arena, a Haitian female. The purpose of the Budget Committee was for senior leadership to have a platform to discuss confidential financial matters regarding UMU. Committee membership was based on the functions/title of each member. Senior leadership members include the President, the Hospital CEO, the Hospital Chief Financial Officer, UMU's Senior Vice President for Finance and Administration, the Dean of the College of Medicine, the President of UUMAS, and the President's Chief of Staff. The members of the Budget Committee directly oversee all the finances of UMU. I recall Plaintiff suggesting that females be added to the Budget Committee, including our Chief Medical Officer and Senior Associate Dean of Faculty Affairs and Faculty Development. However, the positions that those individuals held did not justify their inclusion in the Budget Committee as they did not directly deal with the finances of UMU. Adding women to the Budget Committee simply because of their gender, with no regard to the contributions they could make from their specific role at UMU, would not further the interests of the Budget Committee.   President Laraque-Arena's decision not to include those positions in the Budget Committee when she first created it recognized that fact.

56.     Plaintiff contends that I pressured him to appoint a male faculty member to fill a vacant Anesthesiology Department Chair position. This is untrue. I asked Plaintiff to conduct a search to fill the position, which he did by assembling a small search committee. With no input or

20

pressure from me, the search committee recommended that a female, Dr. Xiuli Zhang, become interim Chair. As President, I approved their recommendation and Dr. Zhang's appointment. Plaintiff announced the appointment at 8:13 am on August 15th. I wrote to Dr Zhang at 8:44 am congratulating her, thanking her, and expressing that she had our full support. I later approved Dr. Zhang's appointment on a permanent basis. See, **Exhibit "G."**

57.    Plaintiff further indicates in his Complaint that he was responsible for ensuring that UMU received a positive accreditation assessment from the Liaison Committee on Medical Education ("LCME"), despite the College of Medicine's "history of accreditation probation." Plaintiff's assertion is misleading. In 2011, the College of Medicine was placed on probation because the LCME had determined the College of Medicine was not compliant with several accreditation standards largely relating to the curriculum at UMU's Binghamton Clinical Campus. Under the leadership of former College of Medicine Dean David Duggan, the College of Medicine employed remedial measures, "made swift and significant progress" and was released from probation and received accreditation as of June 2013. See, **Exhibit "H."** Academic probation was a one-time event, swiftly corrected, and in a clear vote of confidence, the next LCME site visit was scheduled for 6 years later in 2019. Although Plaintiff technically oversaw the LCME site visit in 2019, I had been repeatedly asked to remove him as Dean by that time. I viewed removing the Plaintiff as Dean to be too risky right before the LCME visit as UMU needed to appear stable. I did have several discussions with other leaders at SUNY and UMU about how to minimize Plaintiff's role in the accreditation process, given his often inappropriate and unpredictable behavior and comments. The success of LCME was due in large part to the robust team within the Office of Academic Affairs and Undergraduate Medical Education who had spent years before the LCME site visit preparing for the LCME accreditation process.

58.     Plaintiff also alleges that he was removed as Dean for complaining that his wife was being discriminated against. His claim could not be farther from the truth. Plaintiff was removed as Dean due to his own incompetence and ineffectiveness as a leader, as outlined in detail above.

59.     While Plaintiff is correct that he raised concerns about Dr. Wong's salary to me, he presented the issue as a "misunderstanding," claiming that, at the time they signed their offer letters, they did not understand that the "ALR" portion of Dr. Wong's State salary was at risk of being removed and that Dr. Wong was not being paid what Dr. Laraque-Arena had verbally promised her. See, **Exhibit "I."** Dr. Wong discussed this "misunderstanding" extensively with President Laraque-Arena and Dr. Schwartz several times in 2017 and 2018, but she never claimed that she was being paid differently because of her membership in a protected class. Likewise, in 2019, Dr. Wong raised the same "misunderstanding" with me and Dr. Schwartz. Plaintiff also raised it with me on two occasions in March 2019 by email and in August 2019 in person.

60.     In March 2019, I received an email from Plaintiff in which he expressed concerns and inquiries about his wife, Dr. Ma-Li Wong's, salary. A copy of the email is attached as **Exhibit "I."** The email said there was a "misunderstanding" and that Dr. Wong was not being paid what Dr. Laraque-Arena promised her. I did not respond because the Plaintiff was not supposed to be discussing his wife's salary with me given that he was the Dean, and it would be a conflict of interest for him to discuss it. I did, however, meet with Dr. Wong within the next week or two and discussed the issue with her personally. At no time during that meeting did she claim she was being treated differently because of her gender, race or national origin. Instead, she claimed that the planned removal of her $45,000 Also Receives ("ALR") in July 2019, was contrary to what Dr. Laraque-Arena had promised her, which she claimed was to make her State base pay $220,000.

22

She also claimed that no other professor's ALR had ever been removed. However, she failed to identify any other professor who, similar to her, was given an ALR without additional job responsibilities tied to it.

61.    I was interim Dean at the time Dr. Laraque-Arena made the offer to Dr. Wong, and had access to faculty members' compensation packages in that role. I also had access to faculty compensation data when I served as Chair of the Department of Psychiatry from 1999 to 2011. Dr. Wong's offer was more generous than what has ever been offered to any other faculty member in the Department of Psychiatry, to my knowledge. The mere fact that Dr. Wong had been hired as a tenured faculty member despite being unfunded by grants made her offer unusual. Psychiatry rarely, if ever, hires unfunded researchers. Even without any grants, Dr. Wong was offered one of the highest salaries of any tenured researcher in the Department and over $5 million in funding for her lab. Further, I do not know of any research professor in Psychiatry ever getting an ALR without specific additional duties. This atypical and atypically large ($100,000) ALR was meant to be temporary, as are all ALRs.  Dr. Wong was to benefit from the Department of Psychiatry plan under which, once she began receiving grants, the funding would serve as additional income to her that would supplement her State salary. It was my understanding that she was given this unusually rich deal as part of Dr. Laraque-Arena's attempts to recruit Plaintiff.

62.    After my initial meeting with Dr. Wong in March 2019, I met with her again approximately a week later with Dr. Schwartz present. Dr. Wong repeated what she had raised during her first meeting with me, essentially stating that the removal of her ALR was inconsistent with what Dr. Laraque-Arena had promised her, which was a $220,000 State base salary. Dr. Schwartz and I did not believe this to be true. If what she was saying was correct, Dr. Laraque-Arena would have increased her State base to $220,000 in 2018 when they had discussed her

compensation structure. Dr. Laraque-Arena did not do that. Dr. Wong also repeated that no other full professor's ALR had ever been removed, but again, was not able to identify any other full professor who received an ALR for performing no extra duties. At no time did she claim that her ALR was being removed, or that she was being paid less favorably, than other similarly situated professors because of her gender, race, or national origin. Dr. Schwartz and I explained to Dr. Wong that it would not be fair to the other research faculty in the Department if we increased her State base salary as her State base would far exceed theirs, even though they all had grants and she still had none. Regardless, after the meeting, Dr. Schwartz suggested that we continue Dr. Wong's ALR until December 31, 2020, which was a year and a half beyond the planned expiration date of July 2019. I supported Dr Schwartz's suggested extension.

63.     On August 12, 2019, Plaintiff raised the issue of Dr. Wong's salary with me during a one-on-one meeting. After I spoke with him about a few follow up business issues, he told me that he had been struggling with something and he didn't know if he should raise it. I invited him to please raise it. He then pulled out the two offer letters that his wife had received from UMU and the Psychiatry Faculty Practice ("PFP") group in March 2017 and said that the PFP letter had promised her a guaranteed State base salary of $220,000. He claimed that UMU was not honoring that agreement with his wife, that she was very upset and had informed him that she would not stay at UMU past December 2019. Plaintiff told me that there was some tension between him and his wife as a result of the salary dispute and that she was urging him to look for another job, which he told me he was doing. He did mention that his wife is a Chinese woman and is also Hispanic, and may have retained a lawyer, but I viewed him to be making these comments in the context of his plea to help him keep his job while also resolving the tension in his marriage. I did not view what Plaintiff was sharing with me to constitute an actual complaint of discrimination --

24

particularly in light of the fact that Plaintiff and Dr. Wong had, for several years, continually raised this as an issue of "misunderstanding" of what was promised to Dr. Wong as compensation and never before alleged that she was being treated differently based on her national origin or gender or being discriminated against. I informed Plaintiff at the end of the meeting that I would consider what he had shared. Because Dr. Wong had received such a generous deal, Dr. Schwartz and Dr. Chin allowed her ALR to expire in December 2020. By that time, she had begun to bring in grant dollars which supplemented her salary. She had also been named Distinguished Professor and received a corollary salary increase.

64.     Plaintiff also contends that he was discriminated against and/or retaliated against following his demotion because the following positions at SUNY and UMU were filled without a search: President of SUNY Upstate; SUNY Chancellor; Dean of Medicine[3]; Director of the MD-PhD program; and Chair of the Department of Psychiatry. This is untrue. The decisions to select the individuals for the positions Plaintiff identified were based on their being highly qualified and demonstrated success as a leader and there was a legitimate, business need to appoint them. That selection had nothing to do with Plaintiff or his membership in a protected class or having complained.

65.     Specifically, the Board of Trustees appointed the SUNY Chancellor and me as UMU President. I was appointed after UMU's University Council recommended me as a candidate and I interviewed with then SUNY Chancellor Jim Malatras and a subcommittee of the Board of Trustees. It is my understanding that UMU faculty members wrote letters of support for me to become President.

---

[3]   It appears that Plaintiff is referring to the Dean of the College of Medicine position. See, ECF No. 1 at ¶¶ 159 and 170. However, it is illogical for Plaintiff to expect to be named to a position from which he had been removed.

25

66.     I appointed Dr. Chin to become interim Dean immediately after I removed Plaintiff to maintain stability for the College of Medicine. He was exceptionally well-qualified and well-respected as a leader at UMU, having been the Neurosurgery Department Chair for nearly a decade, President of UUMAS, Chair the Department of Medicine search committee, and Chair of various committees to help prepare the College of Medicine for the LCME accreditation. For the sake of stability of the College of Medicine, I appointed him Dean on January 30, 2020, after consulting with and garnering the support of other members of UMU leadership. I was required to apply to the Office of Diversity and Inclusion for permission to appoint him Dean without a search and my request was approved. Dr. Chin is an Asian male.

67.     Dean Chin made the decision to appoint interim Department Chair Thomas Schwartz, M.D. to the Department Chair position in September 2020. I approved the decision knowing that Dr. Schwartz, a nationally recognized psychiatrist, had served as interim Chair for four (4) years and had done exceptionally well academically and financially with the Department even in the face of the COVID-19 pandemic.

68.     Dr. Dhamoon was appointed Program Director of the MD/PhD program at the request of MD/PhD students who had brought concerns forward to me, Dean of Students Dr. White, Dean of Graduate Studies Dr. Schmitt, and Dr. Chin about the existing program directors' inability to allocate enough time to mentoring the students. Dr. Dhamoon was unanimously selected as the top preferred candidate by the students, as he was a graduate of the UMU MD/PhD program and had significant experience mentoring students.

69.     There are multiple ways that a position can be filled at UMU. An open national search involves outside consultants and provides the largest pool. But an open national search is costly and takes a great deal of time. For leadership positions, individuals are frequently appointed

on an interim basis until the position is filled. Sometimes, an interim will be appointed to the position if the interim has performed satisfactorily, and circumstances warrant the appointment. Plaintiff knows that each of these options, even if not all are ideal, are reasonable and routinely used. In fact, as Dean, the Plaintiff used each of these processes.

70.     Plaintiff himself appointed numerous individuals to positions without conducting searches. This included appointing Dr. Schwartz as Senior Associate Dean for Education; Rebecca Garden as Associate Dean for Disability; Zulma Spinoza, MD as Associate Dean for Diversity and Inclusion; Christopher Morley, MD as Public Health & Preventative Medicine Department Chair; Richard Wojcikiewicz, MD as Pharmacology Department Chair; and Sharon Brangman, MD as Geriatrics Department Chair.[4]

71.     Moreover, unlike the individuals who were appointed to these positions, the Plaintiff was removed from his position as Dean for poor performance, poor judgment, financial waste, repeated inappropriate conduct and comments that were an embarrassment to the University, and for overtly undermining me as President (as he had done with the previous President as well). Many of his transgressions were unprecedented for UMU's College of Medicine Dean. All of this despite being clearly warned, given direct feedback, and supported for 9 months despite SUNY's insistence that I remove him. It is a continuing sign of poor judgment (and precisely why Plaintiff does not merit a leadership position at any level) that the Plaintiff, knowing that he was not even allowed to attend an open State of the University address or contact

---

[4]     For two of the largest searches that he did orchestrate, Plaintiff was criticized for inappropriately interfering, ignoring committee recommendations, and trying to put forward candidates whom he knew personally, but were not qualified for the position.

A0327

anyone at SUNY System, believes that he would be a strong candidate for SUNY Chancellor, or UMU President, or that I would choose him to be Dean after having just removed him.

72.    The appointment of certain individuals to positions without a search after he was removed as Dean had nothing to do with Plaintiff, who had already demonstrated that he was not qualified to hold another leadership position. It was because the selected individuals had been deemed to be highly qualified for the position and/or proven themselves in their interim roles and there was a legitimate, business need to appoint them.

73.    In sum, Plaintiff was not unlawfully discriminated against or retaliated against. Instead, he was removed for numerous, repeated, egregious, legitimate, non-discriminatory reasons related to his performance as outlined above. For these reasons, I respectfully request that Plaintiff's claims be dismissed.

Dated:         January _19_, 2024
               Syracuse, New York

                                              _Mantosh Dewan_
                                              Mantosh Dewan, M.D.

               NANCY A. PROTT
        Notary Public, State of New York
              No. 01PR5065256
        Qualified in Onondaga County
        Commission Expires 11-14-_26_

28

Page 1 of 1

**Danielle Laraque-Arena - Chair of Pediatrics**

**From:** Danielle Laraque-Arena
**To:** Dewan, Mantosh
**Date:** 12/6/2018 6:14 PM
**Subject:** Chair of Pediatrics
**Cc:** Veit, Linda J.

Mantosh, sorry to copy you but I thought it necessary.  There was a letter sent to ODI signed by a number of women faculty objecting to the choice.  Gloria reviewed all information and her report needs to remain independent.  We can review when you get back.  Gloria will need to meet with you to update you on a number of current issues that I will outline for you.  I am copying Linda who is fully aware as Chief of Staff.

Danielle Laraque-Arena, MD, FAAP
President, Upstate Medical University
750 East Adams Street
Syracuse, New York USA
Ph:315-464-4513
Fax: 315-464-5275
laraqued@upstate.edu
www.upstate.edu
State University of New York



Please direct all scheduling inquiries to Erin Crolick Peters at 315-464-4513; peterse@upstate.edu

Memo: Chair of Pediatrics
To: President Laraque-Arena
From: Gloria Lopez
Date: 28 November 2018

I met with Dean Licinio last week and discussed the Chair position. I explained that I had reviewed the job descriptions, the resumes of each of the candidates, and the two voluntary self-identification forms.

Response to the letter
I asked about the letter that was sent by the individuals concerning selecting the chair for the department. Dean Licinio stated that he did not respond in writing to the group, but met with the group. It appears as if he received the letter about the time that he met with the group. He had informed the group that he had selected Dr. ███████ to be the next Chair of Pediatrics, provided an explanation, and answered questions from the group. He explained that the department needed a person who had a finance and pediatrics background and could lead the department and the Golisano Children Center.

When I met with Melissa Schafer she stated that because there are more women in pediatrics and we do not have many Chairs who are women and she and others would like a woman to be appointed to the position, she stated that Dr. ███████ had worked at Upstate, knew the culture, and had a strong research background. She also stated that she had worked with Dr. ███████ and liked him. He was qualified to be chair as would Dr. ███████ She confirmed Dean Licinio's statement that he had told the group that he needed a person with a strong finance background as well as pediatrics.

Job descriptions
I explained to Dean Licinio that I had reviewed two job description – one that seemed to have been posted (provided to me by Dr. Shafer) and the other had information by the Executive recruiter. There were similarities in both job description. It seemed that the position suggests a need for an administrator/finance person to run the Children hospital, provide mentoring, and the ability to grow and manage a NIH portfolio. It appears from the job description that we were searching for someone who had pediatrics experience and mentoring with a preference for NIH grants and philanthropic research

Chairs of search conversation

I was not able to speak with Stephen Albanese, but spoke with Ruth Weistock. She stated that the Dean had asked for the names of individuals, unranked. Ruth stated the following:
- The committee had forwarded three names to him: Dr. ███████ Dr. ███████ and Dr. ███████ . Dr. ███████ withdrew.
- The candidates were extremely qualified
- ███████ was the only female forwarded. The other female candidates did not match up with the requirements
- ███████ and ███████ had different strengths: ███████, more business and experience in running a department. He has a MBA.; ███████ has the ability to obtain grants.
- In addition to being chair the job is similar to a CEO position and the hired person should have the ability to make a business case.
- Felt that Dr. ███████ has the ability to run the department similar to a business, while Dr. ███████ had more experience in obtaining NIH grants.
- Felt both were nice, reasonable, honest, reliable human beings.
- The decision was that of the Dean to select the person whom best met the needs of the department and Golisano Children Center.

I also spoke with Stephen Albanese. He stated that the search committee had sent 3 qualified unranked candidates to Dean Licinio. Any three could do the job. The differences are their background – one with a more emphasis on research and the other with an emphasis on finance and administration.



CONFIDENTIAL

I also spoke with Dr. Audrey, Bernstein, who was not on the search committee, but attended the dinner with DR. ██████. Dr. Bernstein stated that she meet with the candidates. While Dr. ██████ had an excellent academic CV, the group at dinner struggled to make conversation with her.

| | ██████ | ██████ |
|---|---|---|
| Current position | Professor/ Associate Chair of Pediatrics for Finance | Interim Chief, Div. Hematology/Onocology |
| Degrees | M.D.,M.P.H., M.B.A. | M.D. |
| Grant | National Institute for Nursing Research (NIH) and Maternal & Child Health Bureau: Home Nursing to Replace Pediatric Hospitalization, 1997. (RO1 NR04501-01). Co-investigator. PI: Dr. Kenneth McConnochie. Total funding: $1,553,486 | 2 U01 AI27535-13S2 (Cunningham) NIH Pediatric AIDS Clinical Trials Unit<br><br>This project will provide access to clinical trials for mothers/infants who are HIV exposed/infected. P530 AI51445-02 (Haynes) NIH<br><br>Duke University Center for Translational Research (HIC) This project will provide funds for faculty development. NIH International Clinical Trials Unit (Bartlett; Cunningham Co-I) |
| Mentor | University of Rochester: Faculty sponsor/mentor for EM Resident Journal Club series Selected as "Master Clinician" for MS-? Ambulatory Clerkship, Master Clinician Rounds Research mentor for a Resident in Emergency Medicine Research mentor for a Fellow in Pediatric Emergency Medicine | Prime Contract HHSN275201300003C (Mmbaga PI; Cunningham Site PI) NICHD (Cunningham site PI) This project supports the research site in Moshi, Tanzania to conduct multicenter clinical trials through the IMPAACT Network. Dr. Cunningham's role is to provide mentorship and training to the Tanzanian site PI. Faculty Mentor- Pathway to Independence<br><br>AMA-WPC (American Medical Association Women Physician Congress Physician Mentor Award<br><br>Provided mentoring and education to Pediatric residency committee Seems to have mentored numerous trainees and junior faculty. |
| Licensure | MD: # 2009009261; KS: # 04-33860; DC: (inactive); NY: (inactive) | North Carolina License # 2003-00769 Date of License: 2003 |

It appears that both Dr. ██████ and Dr ██████ would need to obtain the NY License.

In addition to speaking with the Chairs of the search, Dean Licinio, and Dr. Shafer, I also looked at the demographics data of faculty provided by the AAMC, Upstate's 2017 – 2018 Affirmative Action Plan (AAP), and demographics of our 25 department chairs, which information was provided to me earlier this year.  Based upon the AAMC and the AAP, there are more women in pediatrics than men. (See the attached appendix)  Generally, the position of chair is filled by someone at the rank of Professor and sometimes from the Associate Professor.  If so, the AAMC Table 13 (See the appendix) indicates that more men are Professors, but in the Associate Professor position women have a slight edge.  The data seems to indicate that there large numbers of women at the junior ranks in academic pediatrics.

Based upon my discussion and reading of the CVs, I am comfortable with both of the final candidates. The Search Chairs, Dr. ▬▬▬ and Dr. ▬▬▬ appeared to be "equally qualified." If the position requires a person who can run the Golisano Center as well as the Pediatrics department more than a grant writing ability, Dr. ▬▬▬ may be better suited. If the position requires a strong research background/grant writing ability, Dr ▬▬▬ may be better suited. Both seemed able to provide professional development to the faculty.

However, taking into consideration the statements by both chairs that the three candidates submitted to Dean Licinio for review were equally qualified and the May 2018 chair demographic data provided to me indicates that there were only three women chairs of the 25 departments, we should consider that this may be an opportunity for Upstate to take a positive step towards addressing the historical underrepresentation of women in prominent leadership positions in academia and in chair positions at Upstate.

Attachments:  Both job descriptions
              Resumes of both individuals
              Dean Licinio's justification
              Appendix of demographic data

Copy memo: L. Viet

Licinio v. SUNY Upstate, et al. 5:21-CV-387   006036

A0332

A-0333

**Michael V. Jurbala**

| | |
|---|---|
| **From:** | "Johnson, Kristina" <Kristina.Johnson@suny.edu> <Kristina.Johnson@suny.edu> |
| **Sent:** | Sunday, February 24, 2019 7:29 PM |
| **To:** | Mantosh Dewan |
| **Subject:** | Re: (EXTERNAL) Fwd: Time-sensitive follow up from yesterday's lunch |

Let's chat when you have time - thx kj

> On Feb 24, 2019, at 7:26 PM, Mantosh Dewan <dewanm@upstate.edu> wrote:
>
> Thanks. I am so sorry- did not know he had written to you and will
> deal with it.
> Good ideas, not so good follow up...
> Warm regards
> Mantosh
>
> Sent from my iPhone
>
>> On Feb 24, 2019, at 4:26 PM, Johnson, Kristina
> <Kristina.Johnson@suny.edu> wrote:
>>
>>
>> FYI - kJ
>>
>> Begin forwarded message:
>>
>> From: "Julio Licinio"
> <licinioj@upstate.edu<mailto:licinioj@upstate.edu>>
>> To: "Johnson, Kristina"
> <Kristina.Johnson@suny.edu<mailto:Kristina.Johnson@suny.edu>>
>> Subject: Time-sensitive follow up from yesterday's lunch
>>
>> Dear Kristina:
>>
>> It was wonderful to have had lunch with you yesterday.
>>
>> I would like to follow up on two items, if that is OK.
>>
>> 1) Would you be willing to share the name/contact of your contact at
> McGraw-Hill whom I could approach about AI-driven medical school
> courses?
>>
>> 2) We have identified a finalist for our Chair of Medicine position,
> who would be truly transformational, Dr. Mone Zaidi. As background, at
> any university the Department of Medicine is the university's biggest
> single department. Here it represents 25% of our enterprise. Please
> note that our clinical chairs tend to be purely clinical and having
> Mone Zaidi as the Chair would be truly paradigm-shifting and would
> place our entire institution in a much more academic pathway going

1

> forward. As you can see in his attached CV and attached report from
> NIH he has over $3.5 million in NIH funding annually. If we recruit
> him, he would transfer from existing NIH grants, approximately $15
> million in total. His U19 grant (awarded in 2019 and going for 5
> years) would be our largest single grant, with annual funding of $2.4 million for that grant alone.
> Some people are "grant grabbers," but their science is not so good.
> That is not the case here. Please see attached his full article in
> Nature that is truly paradigm shifting (and that was the basis for the
> U19 grant). To recruit him we need to offer about a $15 million
> research package (that would be a 1:1 match over what he would bring
> to SUNY and to Upstate). We have about $10 million to offer him as research support.
> Could you/SUNY come up with the other $5 million? I know this is a big
> ask, but it is very rare to come up with this type of transformational
> leadership recruitment. As far Departments of Medicine rank in NIH
> funding, our is now ranked 105 out of 115 (see attached Excel file for
> ranking of Departments of Medicine in terms of NIH funding). With the
> funding that Dr. Zaidi would bring himself (not even including
> additional funding from his research recruits), our Department of
> Medicine would go up from 105 to 87 in the ranking, just above
> Dartmouth. I know this is a steep curve for us to move up in, and that
> is why someone this transformational and paradigm shifting at the
> leadership level is so needed. Please let me know either way if you
> can help financially with this recruitment.
>>
>> Please confirm receipt and let me know if you need further
> information/clarification.
>>
>> All my best,
>>
>> Julio
>> ------------------
>> Julio Licinio, MD, PhD
>> Senior Vice President for Academic and Health Affairs Executive Dean,
>> College of Medicine Professor of Psychiatry, Medicine, Pharmacology,
>> and Neuroscience &
> Physiology
>> State University of New York
>> Upstate Medical University
>>
>>
>>
>>
>>
>>
>>
>>
>> <TEXT.htm>
>> <Zaidi NIH Report Feb 2019.pdf>
>> <NIH Bio Zaidi 2018.pdf>
>> <Zaidi Nature 2017 final2.pdf>
>> <Medicine_2018.xls>
>

2

Licinio v. SUNY Upstate, et al., 5:21-CV-387    008384

**REMINDER - Urgent Meeting 8/13:  Immediate Future of Anesthesia**

| | |
|---|---|
| **From** | Chris Liberty |
| **To** | Stephen AlbaneseMary Arseneau, Ann Botash, Gennady BratslavskyRosaria CarellaAndrew ChapmanHeidi Chapman, Lawrence Chin, Robert Cooney, Robert Corona, Mantosh Dewan, G. Randall GreenKim HanifinMichele HendersonMarilyn Higgins, Julio LicinioDiane MantoothLaurie NicolettiErin Crolick PetersShari Sterle-Grant, Amy Tucker, Grace VanNortwick |
| **Date** | 2019/08/12 09:18 |
| **Subject:** | REMINDER - Urgent Meeting 8/13:  Immediate Future of Anesthesia |
| **Attachments:** | TEXT.htm |

**Security:** Confidential

<mark>REMINDER:</mark>

An Urgent Meeting to discuss the immediate future of the Department of Anesthesia is scheduled for <u>Tuesday, August 13 at 6:00 am in C1071 (Upstate Cancer Center Board Room)</u>

Thank you.
Chris

Christine M. Liberty
Coordinator for Executive Searches
Office of the Dean, College of Medicine
SUNY Upstate Medical University
750 East Adams Street
Syracuse, NY 13210
Phone: 315-464-1682
Fax: 315-464-1687
Email: libertyc@upstate.edu



**UPSTATE** | State University
MEDICAL UNIVERSITY | of New York

This message and any attachments are privileged and confidential and are intended solely for the addressee. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying or retention of this e-mail or the information contained herein is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately.

| Properties | Licinio v. SUNY Upstate, et al., 5:21-CV-387    008385 |
|---|---|
| Property | Value |
| MessageID | 5D512EFB.1ISCHOSP2.1ISC2.100.1707569.1.1A9 C77.1 |
| Message Path | xmlJulio emails\5D512EFB.1ISCHOSP2.1ISC2.100.170756 9.1.1A9C77.1.xml |
| From | Chris Liberty |
| Display Name | Chris Liberty |
| Email | LIBERTYC@upstate.edu |
| UUID | CC5FA982-04F5-0000-B068-0060B03D84AF |
| Reply To | LIBERTYC@upstate.edu |
| Text | Chris Liberty |
| To | Stephen Albanese; Ann Botash; Gennady Bratslavsky; Lawrence Chin; Robert Cooney; Robert Corona; Mantosh Dewan; G. Randall Green; Julio Licinio; Amy Tucker; Grace VanNorwick |
| Cc | Mary Arseneau; Rosaria Carella; Andrew Chapman; Hekti Chapman; Kim Hanifin; Michele Henderson; Marilyn Higgins; Diane Mantooth; Laurie Nicoletti; Erin Crolick Peters; Shari Sterle-Grant |
| Subject | REMINDER - Urgent Meeting 8/13: Immediate Future of Anesthesia |
| Scheduled date | 2019-08-12 09:18:48 |
| Creation date | 2019-08-12 09:18:48 |
| Modified date | 2019-10-12 10:23:05 |
| Delivered date | 2019-08-12 09:18:52 |
| Message size | 849 |
| Attachments size | 7250 |
| Total size | 8110 |
| Attachments | 1 |
| Attachment | TEXT.htm |
| Name | TEXT.htm |
| Content ID | 5D512EFB.1ISCHOSP2.1ISC2.200.2000093.1.34A AB3.1@45:5D512EFB.1ISCHOSP2.1ISC2.100.1707 569.1.1A9C77.1@1:5BE5B521.1ISCHOSP2.1ISC2. 100.1707569.1.1N28E4.1@13 |
| Is Inline | false |
| Type | file |
| Size | 7250 |
| Date | 2019-08-12 05:18:43 |
| CA | content\A6 A69A3DA840264080417BD326F2BD1 309A4B49AEA0FB2A8602806748A0C041D6116F22 675 |
| Hash | A69A3DA840264080417BD326F2BD1309A4B49AEA 0FB2A8602806748A0C041D6116F22675 |
| Recipients | 22 |
| Recipient | Stephen Albanese |
| Display Name | Stephen Albanese |
| Email | AlbanesS@upstate.edu |
| UUID | 6C4AA050-0AAD-0000-B61B-0060B03D84AF |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Mary Arseneau |
| Display Name | Mary Arseneau |
| Email | ARSENEAM@upstate.edu |
| UUID | 11693940-3185-0000-8432-0060B03D84AF |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Ann Botash |
| Display Name | Ann Botash |
| Email | BOTASHA@upstate.edu |
| UUID | D5D73730-04F5-0000-B068-0060B03D84AF |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Gennady Bratslavsky |
| Display Name | Gennady Bratslavsky |
| Email | BratslaG@upstate.edu |
| UUID | 838CE801-1E1B-0000-98F5-001CC47AD304 |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Rosaria Carella |
| Display Name | Rosaria Carella |
| Email | CarellaR@upstate.edu |
| UUID | D1832681-1FA8-0000-885F-CE5655287E1B |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Andrew Chapman |
| Display Name | Andrew Chapman |

| Email | ChapmaAn@upstate.edu |
|---|---|
| UUID | 398C3F01-2A76-0000-9C68-736362333834 |
| Distribution Type | CC |
| Recipient Type | User |
| **Recipient** | Heidi Chapman |
| Display Name | Heidi Chapman |
| Email | ChapmanH1@upstate.edu |
| UUID | D999E281-1893-0000-869A-00805FBB36E5 |
| Distribution Type | CC |
| Recipient Type | User |
| **Recipient** | Lawrence Chin |
| Display Name | Lawrence Chin |
| Email | ChinL@upstate.edu |
| UUID | DF758D81-2022-0000-9B35-001CC47AD304 |
| Distribution Type | TO |
| Recipient Type | User |
| **Recipient** | Robert Cooney |
| Display Name | Robert Cooney |
| Email | CooneyR@upstate.edu |
| UUID | C74701F0-078E-0000-A425-772F309D2FBA |
| Distribution Type | TO |
| Recipient Type | User |
| **Recipient** | Robert Corona |
| Display Name | Robert Corona |
| Email | CoronaR@upstate.edu |
| UUID | 6F77C1B0-1811-0000-BE2E-284569947D4E |
| Distribution Type | TO |
| Recipient Type | User |
| **Recipient** | Mantosh Dewan |
| Display Name | Mantosh Dewan |
| Email | DEWANM@upstate.edu |
| UUID | 6ABAD300-3185-0000-8432-0060B03D84AF |
| Distribution Type | TO |
| Recipient Type | User |
| **Recipient** | G. Randall Green |
| Display Name | G. Randall Green |
| Email | GreenG@upstate.edu |
| UUID | DC6E9A01-2A31-0000-885E-CD47232A446A |
| Distribution Type | TO |
| Recipient Type | User |
| **Recipient** | Kim Hanifin |
| Display Name | Kim Hanifin |
| Email | HanifinK@upstate.edu |
| UUID | 4B2690B0-3185-0000-8432-0060B03D84AF |
| Distribution Type | CC |
| Recipient Type | User |
| **Recipient** | Michele Henderson |
| Display Name | Michele Henderson |
| Email | HendermH@upstate.edu |
| UUID | 313DA281-1C34-0000-9891-0002A5374B8C |
| Distribution Type | CC |
| Recipient Type | User |
| **Recipient** | Marilyn Higgins |
| Display Name | Marilyn Higgins |
| Email | HigginMM@upstate.edu |
| UUID | 89149A81-1910-0000-9649-00805FBB1C60 |
| Distribution Type | CC |
| Recipient Type | User |
| **Recipient** | Julio Licinio |
| Display Name | Julio Licinio |
| Email | LicinioJ@upstate.edu |
| UUID | 8FF59701-20E0-0000-A463-616D35383062 |
| Distribution Type | TO |
| Recipient Type | User |
| **Recipient** | Diane Mantooth |
| Display Name | Diane Mantooth |
| Email | MantootD@upstate.edu |

Licinio v. SUNY Upstate, et al., 5:21-CV-387    008386

| UUID | 1F418101-20C6-0000-9C68-736362333834 |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Laurie Nicoletti |
| Display Name | Laurie Nicoletti |
| Email | NICOLETL@upstate.edu |
| UUID | A2A32722-04F5-0000-B068-0060B03D84AF |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Erin Crolick Peters |
| Display Name | Erin Crolick Peters |
| Email | PetersE@upstate.edu |
| UUID | 6C21DB10-0F6D-0000-AE7F-6803130000E0 |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Shari Sterle-Grant |
| Display Name | Shari Sterle-Grant |
| Email | STERLES@upstate.edu |
| UUID | 14F4F814-3185-0000-8432-0060B03D84AF |
| Distribution Type | CC |
| Recipient Type | User |
| Recipient | Amy Tucker |
| Display Name | Amy Tucker |
| Email | TuckerAm@upstate.edu |
| UUID | 053E8781-2134-0000-885E-747ECA984A5A |
| Distribution Type | TO |
| Recipient Type | User |
| Recipient | Grace VanNortwick |
| Display Name | Grace VanNortwick |
| Email | VANNORTG@upstate.edu |
| UUID | 1C210F28-3185-0000-8432-0060B03D84AF |
| Distribution Type | TO |
| Recipient Type | User |
| Expire | 0 |
| Delay delivery until | 0 |
| Delegated | false |
| Archived | false |
| Read | true |
| Deleted | false |
| Opened | true |
| Completed | false |
| Security | Normal |
| Box type | Inbox |
| Return notification when opened | false |
| Return notification when deleted | false |
| Return notification when completed | false |
| Return notification when declined | false |
| Return notification when accepted | false |
| Archive Version | 5.3 |
| Internal ID | 5D512EFB.HSCHOSP2.HSC2.100.1707569.1.1A9 C77.1@15BE5B521.HSCHOSP2.HSC2.100.17075 69.1.1828E4.1@13 |
| Source | received |
| Class | Public |
| Account | Ann Botash@BOTASHA.HSC2.HSCHOSP2 |
| Location ID | 1554484521225 |
| Class Name | GW.MESSAGE.MAIL |
| Enclosing Folders | 1 |
| Folder | Julio emails |
| ID | 5BE5B521.HSCHOSP2.HSC2.100.1707569.1.182 8E4.1@13 |
| Name | Julio emails |
| Type | Normal |
| System | false |
| Share Type | NotShared |

Licmio v. SUNY Upstate, et al., 5:21-CV-387   008387

A-0339

Licinio v. SUNY Upstate, et al., 5:21-CV-387    008388

| The following attachments could not be rendered: | | | | |
|---|---|---|---|---|
| Sender | Date | Subject | MessageID | File |
| LIBERTYC@upstate.edu | 2019-08-12T09:18:48.000-04:00 | REMINDER - Urgent Meeting 8/13: Immediate Future of Anesthesia | {"owner":"Chris Liberty","loc":"1594999512279","iaf":"ea7dca252259c14eeda05b1ceb6f99f86957760b3935ec0ce78c1e92132195f","afn":"Ann for Botash@BOTASHA.HSC2.HSC1(OSP2","locName":"Archives","rp":"Julio emails"} | Updates for FAD.docx |



A-0340

**Michael V. Jurbala**

| | |
|---|---|
| **From:** | Sharon Brangman <brangmas@upstate.edu> <brangmas@upstate.edu> |
| **Sent:** | Monday, September 2, 2019 11:30 AM |
| **To:** | Mantosh Dewan |
| **Cc:** | Eileen Pezzi |
| **Subject:** | Re: Research |

Hi Mantosh,

I know. This issue has been top of my list but I need some help. I met with Julio the other day since I need assistance identifying someone in the basic sciences and the pragmatic way to get them to campus etc for one of the EIP positions. The clinical/translational EIP position would likely be in Neurology since that's the specialty doing dementia research. I need some other eyes and hands to assist me in surveying the national landscape and I was thinking today that maybe I'd contact Louis Mejico.

Plus I have tons of clinical work to do, 2 grants I'm launching and nursing admin at 550 that's systematically breaking down the nurses in my office which threatens my clinical team....so lots of things taking my attention all at once.

Also, Julio played down the value of EIP money since it doesn't come with a state line as in years past and is less money than in previous years. He told me these funds should just be part of my Chair "package" which I told him doesn't make sense and won't help me in terms of Geri faculty and growing Geriatrics. EIP was targeted to support the Nappi Longevity Institute and start our Alzheimer's Reseach program going. Julio then said he would use the basic science funds of EIP for a position in pharmacology which he told me he would "take care of". Apparently they are recruiting in pharmacology. So now I'm totally confused since this wasn't really the point of my meeting with him. I need support/assistance in fulfilling the EIP as it was written. Julio also chastised the clinical Chairs last week for going "around him" to you with Dean issues.

Trying to sort this all out and get the work done.

Sharon

Sent from my iPhone

> On Sep 2, 2019, at 4:07 AM, Mantosh Dewan <DEWANM@upstate.edu> wrote:
>
> Dear Sharon,
>
> Would love to move forward on the research recruitments. They start pressuring us to take the EIP monies back if we don't use them within a year or so. Also, would like to leverage a real person [or two] and get matching money from Sam.
>
> Could you target a few potential well funded folks please. Let's go after them...
>
> Thanks and warm regards
> Mantosh

Licinio v. SUNY Upstate, et al., 5:21-CV-387    005225

A0340

Case: 24-2564, 12/02/2024, DktEntry: 27.1, Page 97 of 256

A-0341

Case 5:21-cv-00387-GTS-TWD    Document 73-31    Filed 01/19/24    Page 1 of 2
Case 5:21-cv-00387-GTS-TWD    Document 1-2    Filed 04/04/21    Page 2 of 3



*Office of the President*

September 12, 2019

HAND-DELIVERED
Julio Licinio, MD, PhD, MBA



Dear Dr. Licinio:

You have been employed by the State University of New York Upstate Medical University in the title of Senior Vice President for Academic Health Affairs and Dean, College of Medicine, which is an unclassified Management Confidential position. By this letter, you are notified that your employment in this position is terminated effective immediately. Any other association, position or role, including any held ex officio, with the State University of New York, Upstate Medical University, Upstate University Hospital and any campus-related entity of Upstate Medical University, that you held by virtue of your position as Senior Vice President for Academic Health Affairs and Dean are also terminated effective immediately.

Effective September 13, 2019, your state title will become Distinguished Professor in the Department of Psychiatry & Behavioral Sciences and you will be compensated at a base annual State salary of $227,000. Effective September 13, 2019, your office location is your lab space on the third floor of IHP and you will report to the Chair of Psychiatry & Behavioral Sciences, Dr. Thomas Schwartz.

You are required to immediately return all property of the State University of New York Upstate Medical University associated with your position as Senior Vice President for Academic Health Affairs and Dean, College of Medicine, including any and all property of the Upstate University Hospital and including any property purchased by you with reimbursement from the State University of New York, Upstate Medical University, Upstate University Hospital, or any other campus related entity, including without limitation any and all keys, identification badges, cell phones, computer equipment and software, thumb drives, parking passes, hard copy and electronically stored files, documents and notes, passwords for all Upstate devices, procurement cards, and travel cards.

750 East Adams Street | Syracuse NY 13210 | Ph 315 464 4513 | Fax 315 464 5255 | www.upstate.edu | State University of New York

JL000031

A0341

Case: 24-2564, 12/02/2024, DktEntry: 27.1, Page 98 of 256

A-0342

Case 5:21-cv-00387-GTS-TWD   Document 73-31   Filed 01/19/24   Page 2 of 2
Case 5:21-cv-00387-GTS-TWD   Document 1-2   Filed 04/04/21   Page 3 of 3

Please contact the Human Resources Benefits Office to review the applicable benefit changes resulting from this change.

Sincerely,

Mantosh Dewan, MD
Interim President

cc:     Payroll
        Employee/Labor Relations
        Personnel File

JL000032

A0342



AAMC
Tomorrow's Doctors, Tomorrow's Cures®

# StandPoint™ Surveys

2019 Faculty Executive Summary
Report

SUNY Upstate Medical University

Association of
American Medical Colleges

Licinio v. SUNY Upstate Medical University

A0343

## PREFACE

StandPoint™ Surveys is a collaborative partnership between the Association of American Medical Colleges (AAMC) and U.S. medical schools around the country focusing on measuring and enhancing medical school faculty engagement. This evidence-based initiative is designed to build capacity for academic medical centers to understand and develop the organizational cultures and talent management practices more likely to attract and retain excellent faculty.

### The StandPoint Engagement Survey

A central offering of the StandPoint Surveys initiative is the *StandPoint Faculty Engagement Survey,* the largest national workplace data collection designed to address the issues unique to faculty engagement in academic medicine. This independent, research-based survey—developed and reviewed by experts in survey design, academic medicine, talent management, and organizational development—grew from a series of in-depth focus groups with medical school clinical and basic science faculty members in 2006. After a pilot test in 2007, the StandPoint Surveys program launched with an expanded administration in 2009—marking the largest-ever collection of workplace engagement and satisfaction benchmarking data for academic medicine institutions in the U.S.

The *StandPoint Faculty Engagement Survey* assesses levels of U.S. medical school faculty engagement—defined as the emotional and cognitive attitudes that faculty members have toward their workplace experiences (i.e., what is often referred to as "job satisfaction" within the literature) and behavioral outcomes such as contribution and effort. Please refer to the Executive Summary section of this report to review the survey dimensions.

## Report Contents

The following report contains the results from SUNY Upstate Medical University participation in the StandPoint Surveys initiative and its administration of the *StandPoint Faculty Engagement Survey.* Contents of this institutional report include the following:

- ❖ **An Executive Summary** that contains:
  - o A brief methodology section with information on the survey dimensions, survey administration, and population and participant characteristics
  - o Instructions for interpreting the executive summary and its data displays
  - o Displays of your institution's results—including tables and graphs of global satisfaction items highlighting faculty group differences and easy-to-interpret survey dimension summary scores
  - o Benchmarking comparisons between your institution, your selected peer group, and all schools participating in this StandPoint cohort.
- ❖ **Appendices** that contain:
  - o A more detailed methodology section that includes data analysis techniques applied and detailed survey population information
  - o A copy of the *StandPoint Faculty Engagement Survey* items
- ❖ **A Comprehensive Data Report** that contains:
  - o Frequency distributions, means, and other statistical reporting of all survey items
  - o Data breakouts across faculty demographic groups
  - o Data breakouts across divisions
  - o Benchmarking comparisons between your institution, your selected peer group, and all schools participating in the StandPoint cohort.

## Contact

If you have any questions about your report, please contact StandPoint:

**StandPoint Surveys**
Association of American Medical Colleges
655 K Street NW Suite 100
Washington, DC 20001
E-mail: StandPointSurveys@aamc.org
Phone: 202-828-0521

## Copyright and Reproduction

©2019 Association of American Medical Colleges. This report and its appendices, in whole or in part, may be reproduced and distributed for internal — medical school or college — purposes only. Portions of this report and its appendices may be reproduced and distributed to external organizations provided that: (a) peer benchmark data and survey instrument are not included; (b) particular survey items are paraphrased and not reproduced in their entirety; and (c) cohort data are not used without prior permission from the AAMC.

StandPoint™ Surveys

# RESULTS OVERVIEW

## Summary Scores across All Faculty

StandPoint Surveys created summary scores representing conceptually-related items with compatible scales (e.g., all agreement response scales) within the survey dimensions. Page 1 of this Executive Summary contains a table that displays the survey dimensions and item numbers from which these summary scores were calculated.

The summary scores in Figure 1 represent the overall top two response options (e.g., strongly agree or agree) across all faculty members at your institution.

**Figure 1: Summary Scores (Top Two %) Across All Faculty at your Institution**



*Note: IRB requires suppression of data cells with n<5 respondents

Liginio v. SUNY Upstate, et al.  5:21-cv-387    @-0681

StandPoint™ Surveys

## Summary Scores by Respondent Characteristics

Table 6 displays summary scores for the overall top two response options (e.g., strongly agree or agree) by appointment status (full-time or part-time), department type (basic science or clinical), rank (senior [i.e., full or associate] or junior [i.e., assistant]), gender (male vs. female), race/ethnicity (majority [i.e., White or Asian] or minority [i.e., all other]), and administrative title (holds administrative title or does not hold administrative title).

**Table 6: Summary Scores (Top Two %) by Demographic Groups**

| Summary Score | Appointment Status | | Department Type | | Rank | | Gender | | Race/Ethnicity | | Administrative Title | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Full-Time | Part-Time | Basic Science | Clinical | Senior | Junior | Male | Female | Majority | Minority | Admin. Title | Non Admin. Title |
| My Job | 78.2% | 77.2% | 86.7% | 76.6% | 81.9% | 74.3% | 80.4% | 74.0% | 78.3% | 75.0% | 78.1% | 78.0% |
| Focus on Medical School Mission | 65.1% | 70.3% | 63.6% | 65.9% | 63.8% | 67.5% | 67.1% | 62.7% | 65.6% | 64.9% | 64.7% | 65.5% |
| Workplace Culture | 58.4% | 61.1% | 55.6% | 59.2% | 54.9% | 63.0% | 60.7% | 55.1% | 58.9% | 55.2% | 56.3% | 60.0% |
| Department Governance | 70.9% | 69.2% | 74.6% | 70.1% | 70.3% | 71.7% | 72.9% | 66.8% | 71.3% | 61.5% | 70.9% | 70.6% |
| Medical School Governance | 45.3% | 47.2% | 38.3% | 46.9% | 43.1% | 48.9% | 45.4% | 45.7% | 44.3% | 63.7% | 46.9% | 43.7% |
| Relationship with Supervisor | 74.3% | 79.9% | 72.2% | 75.3% | 73.3% | 76.9% | 77.9% | 69.3% | 75.4% | 66.3% | 74.8% | 74.3% |
| Growth Opportunities | 61.4% | 58.4% | 50.9% | 63.0% | 62.6% | 59.0% | 62.1% | 59.3% | 61.1% | 60.9% | 64.9% | 57.1% |
| Promotion and Tenure Requirements | 69.1% | 64.5% | 70.8% | 68.4% | 75.5% | 62.4% | 68.1% | 69.7% | 68.6% | 70.4% | 71.7% | 64.8% |
| Promotion Equality | 75.4% | 68.5% | 68.8% | 76.0% | 74.5% | 74.8% | 79.3% | 65.1% | 75.5% | 64.4% | 78.9% | 71.3% |
| Collegiality and Collaboration | 76.1% | 80.5% | 77.0% | 76.5% | 75.4% | 78.3% | 77.3% | 75.2% | 76.9% | 71.6% | 79.4% | 73.4% |
| Compensation and Benefits | 70.7% | 70.8% | 68.9% | 71.0% | 74.6% | 66.0% | 73.0% | 66.3% | 70.7% | 70.9% | 74.9% | 67.1% |
| Faculty Recruitment and Retention | 52.2% | 55.9% | 55.4% | 52.0% | 52.5% | 53.1% | 54.3% | 49.5% | 52.2% | 57.3% | 52.4% | 53.2% |
| Faculty Diversity and Inclusion | 68.4% | 63.7% | 51.2% | 71.0% | 63.9% | 73.2% | 72.0% | 60.6% | 68.3% | 64.1% | 71.2% | 64.8% |
| Clinical Practice | 61.2% | 68.5% | N<5 | 61.6% | 60.1% | 64.1% | 62.8% | 60.0% | 62.3% | 53.8% | 60.3% | 62.5% |

Licinio v. SUNY Upstate, et al., 5:21-cv-387    009682

StandPoint™ Surveys

## Top 10 and Bottom 10 Survey Items

The following lists display the "top 10" survey items at your institution (i.e., the items with the highest percentage of faculty choosing the top two response options on scales of agreement or satisfaction and the "bottom 10" survey items at your institution (i.e., the items with the lowest percentage of faculty choosing the top two response options on scales of agreement or satisfaction). This excludes satisfaction with mentoring and part-time faculty items.

**Top 10 Survey Items at Your Institution:**

|     | Top two % | Top survey items |
| --- | --- | --- |
| 1.  | 85.0% | Q30b The faculty in my department usually get along well together |
| 2.  | 84.6% | Q31c Health benefits |
| 3.  | 83.9% | Q28d My medical school offers equal opportunities to all faculty members regardless of sexual orientation |
| 4.  | 83.7% | Q31d Retirement benefits |
| 5.  | 83.7% | Q29b I am satisfied with the quality of professional interaction I have with departmental colleagues |
| 6.  | 83.3% | Q29a I am satisfied with the quality of personal interaction I have with departmental colleagues |
| 7.  | 83.2% | Q11a I am satisfied with my autonomy at my work |
| 8.  | 82.5% | Q30c I feel appreciated by my departmental colleagues |
| 9.  | 81.6% | Q33a My department is successful in recruiting female faculty members |
| 10. | 81.5% | Q11d I feel personally driven to help this medical school succeed |

**Bottom 10 Survey Items at Your Institution:**

|     | Top two % | Bottom survey items |
| --- | --- | --- |
| 1.  | 23.1% | Q17b Senior leadership is transparent about medical school finances |
| 2.  | 34.1% | Q32c My medical school is successful in retaining high quality faculty members |
| 3.  | 37.5% | Q18a The pace of decision making in the dean's office is reasonable |
| 4.  | 41.8% | Q13e I feel that the workplace culture at this medical school cultivates faculty wellness |
| 5.  | 44.8% | Q17c The dean's priorities for the medical school are clear |
| 6.  | 46.6% | Q31b My incentive-based compensation, such as bonuses |
| 7.  | 47.1% | Q17d The dean's priorities for the medical school are reasonable |
| 8.  | 47.1% | Q18c Faculty can express their opinions about the medical school without fear of retribution |
| 9.  | 48.1% | Q12f Overall, my school fosters research excellence |
| 10. | 48.8% | Q13c I feel that the workplace culture at this medical school cultivates innovation |

Licinio v. SUNY Upstate, et al., 5:21-cv-387    009683

| From: | Mantosh Dewan |
|---|---|
| To: | Xiuli Zhang |
| Subject: | Fwd: Leadership change in the Department of Anesthesiology |
| Date: | Thursday, August 15, 2019 8:44:34 AM |

Dear Xuili,

Congratulations and thank you for stepping up at this time. You have our full support and we wish you many successes.

Warm regards
Mantosh

>>> Julio Licinio 8/15/2019 8:13 AM >>>

Dear colleagues:

I would like to share with you news regarding a leadership change in our Anesthesiology Department. Sebastian Thomas, MD, is voluntarily stepping down from his role as Chair of Anesthesiology on Monday, August 19, 2019. Dr. Thomas received his MD degree from Gandi Nager Medical College, India in 1972. He went on to complete his residency in Anesthesia at Montefiore Hospital and Medical Center, Bronx, NY, where he also was named Chief Resident in 1979, and subsequently completed fellowship training in pain treatment. In 1984 he joined Upstate Medical University as an Instructor in the Department of Anesthesiology. Soon thereafter, he was appointed Director of the Pain Treatment Center where he was credited with the revitalization of the pain service, converting it to an outstanding program. Dr. Thomas continued his career at Upstate, advancing to the title of Professor. In 2015 he was appointed as Chair of the Department of Anesthesiology and assumed responsibility for bringing stability to the department that had been faced with challenging times. Dr. Thomas has served Upstate Medical University with great distinction and he will continue his full-time activities with us as a Professor of Anesthesiology, specializing in pain treatment. He will also be known as Chair Emeritus of the Department of Anesthesiology.

Effective Monday, August 19, 2019, the SUNY Upstate Department of Anesthesiology's new Interim Chair will be Xiuli Zhang, MD, who graduated from Qingdao Medical College, in Qingdao, China in 1986. Dr. Zhang initially worked as a gynecologist. After two years of research work in immunology at Dr. Theresa Imanishi-Kari's lab at Tufts University, she completed her internship in surgery at The Brooklyn Hospital Center in 2002. She then came to Upstate Medical University for her anesthesiology residency. She was our anesthesiology chief resident in 2004-2005. After residency graduation in 2005, Dr. Zhang joined our faculty and she is currently a clinical associate professor. Shortly after joining the faculty, in addition to her activities as a clinician and educator, Dr. Zhang took responsibility as Officer of the Day (OOD), managing daily operating room (OR) anesthesiology operations. Dr. Zhang assumed the role of Chief OOD in 2009. Since then, Dr. Zhang has managed anesthesia clinical services to meet our highly dynamic and ever increasing surgical demands. She collaborates with perioperative services hospital-wide on a daily basis to run the OR efficiently, to maximize resource utilization, and to assure high quality and continuity in patient care.

A national search for a permanent Chair of Anesthesiology will be initiated in a timely manner. Meanwhile, the College of Medicine and University Hospital will work collaboratively to rapidly strengthen and grow our Department of Anesthesiology, which is so critical to our University, to our community, and to our region.

Please join me in thanking Dr. Thomas for his 35 years of exceptional, dedicated service to

Upstate and in welcoming Dr. Zhang in her new role as Interim Chair of Anesthesiology.

All my best,

Julio

Julio Licinio, MD, PhD, MBA, MS
Senior Vice President for Academic and Health Affairs
Executive Dean, College of Medicine
SUNY Distinguished Professor of Psychiatry, Medicine, Pharmacology, and Neuroscience & Physiology
State University of New York
Upstate Medical University
750 E. Adams Street
Syracuse, NY 13210

Executive Assistant: Mary Arsenau

Twitter: @licimo

A-0351

Barbara Barzansky, PhD, MHPE
Co-Secretary
Council on Medical Education
American Medical Association
515 North State Street
Chicago, IL 60654
Phone: 312-464-4933
Fax: 312-464-5830
E-mail: barbara.barzansky@ama-assn.org

**LCME**

LIAISON COMMITTEE ON
MEDICAL EDUCATION

www.lcme.org

Dan Hunt, MD, MBA
Co-Secretary
Association of American
Medical Colleges
2450 N Street, N.W.
Washington, DC 20037
Phone: 202-828-0596
Fax: 202-828-1125
E-mail: dhunt@aamc.org



SUNY UPSTATE
MEDICAL UNIVERSITY

JUN 17 2013

OFFICE OF THE DEAN
COLLEGE OF MEDICINE

June 12, 2013

David Duggan, MD
Dean, College of Medicine
State University of New York Upstate Medical University
750 E Adams St
Syracuse, NY  13210-2342

RE: Post Probation survey visit, March 10-13, 2013

Dear Dean Duggan:

The purpose of this letter is to inform you of the determinations made by the Liaison Committee on Medical Education (LCME) at its June 4-6, 2013 meeting regarding the accreditation status of the medical education program leading to the MD degree at the State University of New York Upstate Medical University College of Medicine and to transmit to you the enclosed report of the LCME survey team that conducted a post probation survey of the program on March 10-13, 2013.

After reviewing the enclosed report, and the dean's letter dated April 5, 2013 containing the school's response to the survey team findings, the LCME voted to rescind the status of probation and to continue the program's accreditation for an undetermined term.  The LCME also noted that the school had made swift and significant progress in addressing the identified areas of concern.

DETERMINATIONS REGARDING COMPLIANCE WITH ACCREDITATION STANDARDS

I.   COMPLIANCE

    The LCME determined that the medical education program is currently in compliance with the following accreditation standards and that no further follow-up is required:

    A.   *IS-16 (diversity)*

    B.   *ED-1 (educational program objectives)*

    C.   *ED-2 (required clinical experiences and monitoring)*

    D.   *ED-30 (formative and summative assessment)*

    E.   *ED-31 (mid-course feedback)*

Licinio v. SUNY Upstate, et al., 5:21-cv-387    008965

A-0352

David Duggan, MD
Page 2

   F.    *ED-36 (authority and sufficient resources to manage and evaluate the program)*

   G.    *ED-39 (responsibility of the chief academic officer)*

   H.    *ER-9 (affiliation agreements)*

## II.   COMPLIANCE, WITH A NEED FOR MONITORING

The LCME determined that the medical education program is in compliance with the following accreditation standards, but that ongoing monitoring is required to ensure continued compliance:

   A.    *ED-3. The objectives of a medical education program must be made known to all medical students and to the faculty, residents, and others with direct responsibilities for medical student education and assessment.*

   B.    *ED-8. The curriculum of a medical education program must include comparable educational experiences and equivalent methods of assessment across all instructional sites within a given discipline.*

   C.    *ED-33. There must be integrated institutional responsibility in a medical education program for the overall design, management, and evaluation of a coherent and coordinated curriculum.*

   D.    *ED-37. A faculty committee of a medical education program must be responsible for monitoring the curriculum, including the content taught in each discipline, so that the program's educational objectives will be achieved.*

   E.    *ED-42. A medical education program must have a single standard for the promotion and graduation of medical students across all instructional sites.*

   F.    *ED-47. In assessing program quality, a medical education program must consider medical student evaluations of their courses, clerkship rotations, and teachers, as well as a variety of other measures.*

   G.    *MS-27-A. The health professionals at a medical education program who provide psychiatric/psychological counseling or other sensitive health services to a medical student must have no involvement in the academic assessment or promotion of the medical student receiving those services.*

   H.    *MS-31-A: A medical education program must ensure that its learning environment promotes the development of explicit and appropriate professional attributes in its medical students (i.e., attitudes, behaviors, and identity).*

A-0353

David Duggan, MD
Page 3

    I.      *MS-32. A medical education program must define and publicize the standards of conduct for the faculty-student relationship and develop written policies for addressing violations of those standards.*

    J.      *FA-2. A medical education program must have a cohort of faculty members with the qualifications and time needed to deliver the curriculum and to meet the other needs and missions of the institution.*

## III. NONCOMPLIANCE WITH STANDARDS

The LCME determined that the medical education program is currently out of compliance with the following accreditation standards:

    A.      *ED-25. Supervision of medical student learning experiences at an institution that offers a medical education program must be provided throughout required clerkship rotations by members of the institution's faculty.*

## REQUIRED FOLLOW-UP

In order to address the compliance issues mentioned above, the LCME has requested that the dean submit a status report by April 15, 2014 containing the information listed below. Please refer to http://www.lcme.org/submission_status.htm for current LCME submission requirements.

## STATUS REPORT DUE APRIL 15, 2014

### I. COMPLIANCE, WITH A NEED FOR MONITORING

A. *ED-3 (dissemination of the educational program objectives)*

    1.  Provide data for the 2013-2014 academic year on the percent of Syracuse residents, by department, who completed the online module on graduation competencies. Note if the use of the module has been extended to residents at other sites.

    2.  Describe how the residents at the Binghamton campus receive the educational program and clerkship objectives and how that receipt is being monitoring (for example, through a log system). Provide data, by department, on the percent of residents on the Binghamton campus who received the objectives.

B. *ED-8 (comparability across instructional sites)*
    *ED-42 (single standard for promotion and graduation)*

    1.  For the 2013-2014 academic year and following years, describe the status of plans to ensure the comparability of graduation requirements at the Syracuse and Binghamton campuses. Describe especially the status of implementation of changes related to geriatrics, neuroscience, and urology teaching.

Licinio v. SUNY Upstate, et al., 5:21-cv-387    008967

A-0354

David Duggan, MD
Page 4

2.  Complete the following table that compares graduation requirements for the 2014 and 2015 graduating classes.

| Clerkship/Course Name* | 2013-2014 | | 2014-2015 | |
|---|---|---|---|---|
| | Syracuse credits | Binghamton credits | Syracuse credits | Binghamton credits |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

*Note if the names of courses and/or clerkships have changed between 2013-2014 and 2014-2015.

C.  *ED-33 (curriculum management)*

1.  Describe the activities of the New Directions Task Force since the time of the 2013 limited (focused) survey visit. Provide examples of recommendations from the task force have been brought to the Curriculum Committee and describe the outcome of Curriculum Committee deliberations.

2.  Provide sample minutes from the Curriculum Committee for the 2013-2014 academic year. Describe the current major areas of focus for the Curriculum Committee.

D.  *ED-37 (monitoring curriculum content)*

1.  Describe the implementation of the MedHub searchable curriculum database, including the status of entering course and clerkship information.

2.  Provide examples of how MedHub has been used to identify curricular gaps and redundancies and to support horizontal and vertical curriculum integration.

E.  *ED-47 (use of student evaluation data in program evaluation)*

1.  Provide data from an internal survey of students in all classes during the 2013-2014 academic year that addresses student satisfaction with the accessibility, awareness of student concerns, and responsiveness to student problems of the Office of Student Affairs and the Office of Curricular Affairs. Please provide the response rate to the survey, by class, and present the data for the M-1/M-2 and M-3/M-4 classes. For the M-3/M-4 students, present the data by campus.

2.  Provide data from the 2013 AAMC Medical School Graduation Questionnaire on student satisfaction with the accessibility, awareness of student concerns, and

A-0355

David Duggan, MD
Page 5

    responsiveness to student problems of the Office of Student Affairs and the Office of Curricular Affairs. Include the response rate to the survey.

F.  *MS-27-A (health care providers' involvement in student assessment)*

    1.  Describe the status of assuring that students on the Binghamton campus do not receive health services from physicians who evaluate them.

    2.  Provide a copy of the information available to Binghamton students (for example, from the Student Handbook) that describes their access to health services.

G.  *MS-31-A (learning environment and professionalism)*

    1.  Describe the status of the professionalism thread for the 2013-2014 academic year, including where in the curriculum teaching related to professionalism is located.

    2.  Provide data from an internal student survey and/or course/clerkship evaluations on student satisfaction with the teaching of professionalism.

H.  *MS-32 (student mistreatment)*

    1.  Provide data from the 2013 AAMC Medical School Graduation Questionnaire data, by campus, related to student mistreatment:
- Knowledge of mistreatment policies
- Knowledge of procedures for reporting mistreatment
- Total percent of students reporting that personally experienced any of the listed behaviors
- Sources of behaviors personally experienced (e.g., clerkship faculty, nurses)
- Percent of students who reported behaviors that they personally experienced

    2.  Describe how the learning environment is being monitored on the Binghamton campus.

    3.  Summarize the current systems in place, by campus, to address the issue of medical student mistreatment.

I.  *FA-2 (sufficient faculty)*

    1.  Provide the number of new faculty hires, by department, during the 2012-2013 and 2013-2014 academic years. Note if any additional recruitments are underway and the timeline for their completion.

    2.  Describe how plans for curriculum change emanating from the New Directions Task Force may impact: a) the overall number of faculty needed to deliver the curriculum and b) the need for faculty in specific disciplines. If such planning has not been completed, provide the approximate timeline for completion.

David Duggan, MD
Page 6

## II. NONCOMPLIANCE WITH STANDARDS

A. *ED-25 (faculty appointments)*

1. Describe the status of granting faculty appointments to all physicians who precept and evaluate students in the rural medicine track. Provide the percent of physicians teaching in the track who hold faculty appointments, by department.

2. If any physicians who precept/evaluate students have not yet received a faculty appointment, provide a timeline for the granting of faculty status.

## COMPLIANCE TERMINOLOGY

In reviewing the compliance determinations above, please refer to the attached memorandum for an overview of LCME compliance terminology and note the October 2011 implementation of a new category of compliance called *compliance, with a need for monitoring*, which indicates that the program is in compliance with the cited accreditation standard, but that monitoring is required to ensure continued compliance. A determination of *noncompliance* indicates that the program does not meet one or more of the requirements of the cited standard.

## UNITED STATES DEPARTMENT OF EDUCATION REGULATIONS

The LCME is bound by the regulations of the United States Department of Education to document compliance with all cited LCME accreditation standards within two years of a program's initial notification of noncompliance. Therefore, the LCME will require timely follow-up on all determinations of *noncompliance*. Please see the "Required Follow-up" section above for details.

## NOTIFICATION POLICY

The LCME is required to notify the United States Department of Education and the relevant regional accrediting body of all final accreditation actions, including determinations of "Accredited," "Accredited, with Warning," and "Accredited, on Probation." The LCME will also make final determinations of "Accredited" and "Accredited, on Probation" available to the public. Note that the determination "Accredited, on Probation" is only final after a program has exercised its right to waive or undergo an official reconsideration by the LCME.

## ACCREDITATION STANDARDS

To review the current list of LCME accreditation standards and their annotations, please refer to the most recent version of the *Functions and Structure of a Medical School* document, available on the LCME Web site at http://lcme.org/standard.htm. Programs asked to submit future status reports will be responsible for aligning the follow-up items in the report with the *Functions and Structure of a Medical School* document that is current at the time the status report is due.

David Duggan, MD
Page 7

CHANGES THAT MAY IMPACT ACCREDITATION

Accreditation is awarded to a medical education program based on a judgment that there exists an appropriate balance between student enrollment and the total resources of the institution, including faculty, facilities, and operating budget. If there are plans to significantly modify the educational program, or if there is to be a substantial change in student enrollment or in the resources of the institution such that the balance becomes distorted, the LCME expects to receive prior notice of the proposed change. Substantial changes may lead the LCME to re-evaluate a program's accreditation status. More specific information about notification requirements is available on the LCME Web site at http://www.lcme.org/submission_significant_change.htm.

This report is for the use of the State University of New York Upstate Medical University College of Medicine and the university, and any public dissemination or distribution of its contents is at the discretion of institutional officials.

Sincerely,

Barbara Barzansky, PhD, MHPE
LCME Co-Secretary

Dan Hunt, MD, MBA
LCME Co-Secretary

Enc (2): New Category of Compliance with LCME Accreditation Standards and Glossary of
    Compliance Terminology Memorandum

    Team report of the post probation survey of the State University of New York Upstate
    Medical University College of Medicine, March 10-13, 2013

Licinio v. SUNY Upstate, et al., 5:21-cv-387    008971

A0357



# Memorandum

**SUBJECT:**   New Category of Compliance with LCME Accreditation Standards and Glossary of Compliance Terminology

In its review of survey reports and follow-up status reports, the Liaison Committee on Medical Education (LCME) determines a medical education program's compliance with individual accreditation standards.

Historically, the LCME has used the terms *compliance* and *noncompliance* to describe a program's conformance with accreditation standards. At its June 2011 meeting, the LCME approved a third term called *compliance, with a need for monitoring*, which falls under the category of *compliance with accreditation standards* (implemented October 2011). The LCME also adopted formal definitions for the three compliance terms. These three terms are defined below.

### COMPLIANCE WITH ACCREDITATION STANDARDS

**Compliance:**

The required policy, process, resource, or system is in place and, if required by the standard, there is evidence to indicate that it is effective.

**Compliance, with a Need for Monitoring:**

1) The medical education program has the required policy, process, resource, or system in place, but there is insufficient evidence to indicate that it is effective. Therefore, monitoring is required to ensure that the desired outcome has been achieved.

OR

2) The medical education program is currently in compliance with the standard, but known circumstances exist that could lead to future noncompliance (*formerly "area in transition"*).

### NONCOMPLIANCE WITH ACCREDITATION STANDARDS

The medical education program has not met one or more of the requirements of the standard: The required policy, process, resource, or system either is not in place or is in place, but has been found to be ineffective.

Updated October 2012

Licinio v. SUNY Upstate, et al., 5:21-cv-387    008972

A0358

A-0359

Page 1 of 2

EXHIBIT

Ex. Two - 220531amc

Dear Mantosh:

Please help here. There is a misunderstanding on Tom's part ref Ma-Li's salary. I discussed this extensively with Danielle. When we first got our letters of offer it was unclear to us what an ALR was. Ma-Li had requested a total salary of $240,000, which is what what she had in Australia as a base (none of that was at risk). In the letter that Ma-Li received it stated that her state compensation would be $220,000. In Ma-Li's letter from Tom Schwartz - attached here, it is stated that "In addition to your State base salary of **$220,000**, …" That really led us to believe that the $220,000 (state line + ALR) were a base, as it was described as such. Note the word "base" in Tom's letter to Ma-Li. Based on that wording from Tom, Ma-Li, myself and our attorney understood that the base had an ALR built in that was NOT at risk. When I arrived and understood what ALR's were, I immediately went to Danielle who told me on multiple occasions that that ALR was an ongoing part of part of Ma-Li's compensation and that it was NOT at risk. However, at one point I heard Eric Frost say again ALR's were not safe and I communicated that to Ma-Li, who then spoke with Danielle and she was able to get her ALR decreased and the state line increased commensuretely. At that time again Danielle made it clear to Ma-Li and to me that the ALR was not at risk, and Danielle approved that just to be collegial to Ma-Li. It is very upsetting to see this correspondence from Tom. As you know, our lab is not ready, and for that reason we have not yet recruited an Assistant Professor that was to be a key part of our program. It is two years now and our program is dysfunctional due to operational issues. Meanwhile, Tom sends Ma-Li a note which is really unsettling and we both upset here. In the original letter, also attached here there is no statement that this ALR had an expiration date. It said that it was subjected to yearly renewal, which we assumed would be there unless Ma-Li slacked off and became unproductive. We both and our attorney saw that as as a safeguard from the institution to ensure productivity moving forward. Ma-Li has been very active, has submitted 4 NIH grants - she has been here for only 15 months (see started after me), and the last grant is under renewal. She cannot do more without a lab, and it is surprising to get Tom's letter. Can you please help?

All my best,

Julio

Begin forwarded message:

**From:** Mali Wong <maliwong7@gmail.com>
**Subject: Re: salary 2019 checking in**
**Date:** March 4, 2019 at 10:58:22 EST
**To:** THOMAS SCHWARTZ <SchwartT@upstate.edu>
**Cc:** Barbara Svoboda <SvobodaB@upstate.edu>

Hi Tom

I was just checking my letter, which states that the PFP is guaranteed for the first two years of membership within the PFP. I signed my contract in December 2017. Won't the 2 years be from the start of my appointment?
Best
Ma-Li

CONFIDENTIAL

JL00055
12/2/2019
A0359

A-0360

Page 2 of 2

On Mar 4, 2019, at 10:40, THOMAS SCHWARTZ
<SchwarlT@upstate.edu> wrote:

Hi Ma-Li

I am going through salaries of each faculty now to make sure we are accurate in
what we promised at job hiring vs what was paid out/earned.


In reviewing your records, I know we increased your state permanent base and
lowered you state ALR via discussion with Dr Laraque-Arena.

Your ALR was lowered to $45,000 and is due to expire July 1, 2019 as a reminder. It
will not be renewed in conjunction with your initial offer letters.

Your Deptartment (PFP) temporary salary of $30,000 is also set to expire on July 1,
2019 as well.

This is a negative swing of $75,000 which I suspect you are already aware based on
your offer letters.

Let me know if there is any discrepancy on your end.

Thanks
Tom


Thomas L Schwartz MD
Sr Assoc Dean of Education-
Interim Chair/Professor - Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St, Syracuse, NY 13210
315 464-3166   315 464-3163(FAX)

WARNING:  Email transmission is the least safe in regards to maintaining your
information in a private and secure manner.  Also, email should not be used to
convey information if you are in a crisis situation as email is not checked regularly.
This email is intended only for the use of the individual to which it is addressed and
may contain privileged information and may not be re-disclosed under applicable
laws.  If you have received this in error, please notify us and distribution of this
information is prohibited.  This entire email or portions thereof may be covered
under NYS Ed law regarding quality control initiatives

CONFIDENTIAL
JL00056
12/2/2019
A0360

A-0361

UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK
...................................................................................X
**JULIO LICINIO, MD, PhD, MBA, MS,**

                        Plaintiff,          **DECLARATION OF
ERIC FROST**

                                           Case No.: **5:21-cv-387(GTS/TWD)**

        - against -

**STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,**

                   Defendants
...................................................................................X

      **ERIC FROST**, pursuant to § 1746 of Title 28 of the United States Code, declares the

following to be true and correct under penalty of perjury under the laws of the United States of

America:

      1.     I became employed by SUNY Upstate Medical University ("UMU") in 1997, and

was employed as UMU's Associate Vice President for Human Resources from February 2008

through May 17, 2021, when I retired from full-time State service. After my retirement, I worked

part-time as a Human Resources Generalist from May 2021 to December 2022 to assist UMU's

Human Resources department where necessary.

      2.     I have read the Complaint filed by Plaintiff in this matter and am familiar with his

allegations. I respectfully submit this Declaration in support of the Defendants' motion for

summary judgment. I make this Declaration based upon my personal knowledge and based upon

records maintained in the usual course of business at UMU.

1

A-0362

3.      UMU is a large academic medical center that operates two hospitals in Syracuse, New York and many clinical sites across Upstate New York. It has four colleges – a College of Graduate Studies, College of Medicine, College of Health Professions, and College of Nursing – attended by the next generation of health care professionals, who are taught through didactic and clinical training at UMU. UMU is the largest employer in Central New York.

4.      As UMU's Associate Vice President for Human Resources, I was responsible for overseeing all of UMU's Human Resources functions, including Employee/Labor Relations, Staffing and Compensation Services, Benefits, Professional Development and Learning, Employee/Student Health, Performance Management, among other areas. I regularly provided advice to UMU's leadership regarding recruitments, union relations, retention, discipline, and termination of employees.

5.      For high-level leadership positions at UMU, I was consulted regarding the hiring and selection of both external and internal candidates. While ideally a search committee is formed to search for, interview, and recommend candidates to the hiring manager, there are occasions that justify the hire of an internal candidate without a search. For example, at times, individuals who had been appointed to a position on an interim basis, are qualified for the position, and have demonstrated that they will be successful are offered the position. At other times, individuals will be appointed without a search if a leadership role has been vacated and it is critical to fill that position to ensure the stability of the institution. Before a search can be waived by a hiring manager, UMU's Office of Diversity and Inclusion was required to review the justification for waiving the search to ensure that there was a legitimate, non-discriminatory basis for doing so.

2

6.      With respect to the hiring process for the UMU President, the Upstate University Council recommends candidates to the SUNY Board of Trustees and the SUNY Chancellor, who, in turn, make the final hiring decision.

7.      In 2016-early 2017, I was aware of the search for the Dean of the College of Medicine position. I was not on the search committee, but I was asked by then-UMU President Danielle Laraque-Arena, MD for my input regarding the candidates and I listened to a presentation that Plaintiff gave at UMU prior to his selection. Upon conducting my own due diligence, I expressed my concerns to Dr. Laraque-Arena about hiring Plaintiff due to his poor employment history in other leadership positions at University of Miami and in Australia. Dr. Laraque-Arena proceeded with hiring him for the Dean position despite my negative findings.

8.      As AVP for Human Resources at UMU, I interacted with Plaintiff routinely while he was the Dean. There were several occasions where I disagreed with his decision-making and in my opinion, he crossed the line with respect to what was appropriate conduct for a Dean.

9.      Plaintiff gave titles and additional compensation to faculty that were not appropriate. For example, Plaintiff appointed a number of faculty members to Associate Dean and Assistant Dean positions that he created within the Dean's office. These faculty members were union-represented by United University Professionals (UUP), however, Plaintiff inappropriately gave them non-union management/confidential titles. He also paid them additional State compensation for holding such titles in the form of an "also receives" ("ALR") even though the positions seemed to overlap with other existing positions within the Dean's office, the University's Student Affairs department, and the Office of Diversity and Inclusion. This was problematic and Plaintiff did not consult with Human Resources before he established these roles. After receiving guidance from SUNY System Administration, I explained to Plaintiff that he could not assign roles

3

and titles to union-represented faculty unilaterally. See, **Exhibit "A."** I also asked Plaintiff for job descriptions for the new positions that he was creating to justify that State dollars were being spent appropriately. See, **Exhibit "B"**. However, Plaintiff ignored my guidance and failed to provide all job descriptions.

10.     In 2019, while Plaintiff was Dean of the College of Medicine, the Office of the New York State Comptroller ("OSC") audited UMU's Human Resources practices including those relating to paying ALR to employees and faculty members. The audit covered the period from January 1, 2015, through June 24, 2019. In September 2019, OSC concluded the audit, finding that for the sample of 19 ALRs it reviewed, there was not sufficient documentation for either the basis for the dollar amount paid for ALR or the additional duties that employees were tasked with beyond their normal professional obligations. A copy of the audit, which can also be found at https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2019-18s57.pdf, is attached at **Exhibit "C."** See, **Exhibit C** at 7. Many of the noted ALR samples were in the College of Medicine. As a result, OSC recommended that Upstate develop written procedures for ALR-related transactions and establish and enforce policies and procedures to require stronger oversight of assignments. **Exhibit C** at 15. Accordingly, a revised policy for ALR compensation was created and went in effect as of July 1, 2021.

11.     After Plaintiff's removal as Dean, Dean Lawrence Chin, MD eliminated the Associate and Assistant Dean positions that Plaintiff had created and worked with myself and President Dewan to reorganize the Office of Diversity and Inclusion. The reorganization resulted in the appointment of a new Chief Diversity Officer with a plan for ODI's main focus to be on setting high level strategic diversity initiatives impacting the University, rather than allowing those functions to be performed in silo'ed, overlapping positions in the Dean's office.

4

12.    In addition to creating roles that were not reviewed or approved by Human Resources, there were instances when Plaintiff exercised poor judgment relating to other matters and was unprofessional in his interactions with others.

13.    I was a member of the Extended University Executive Committee (E-UEC) with Plaintiff, UMU's President Danielle Laraque-Arena, and approximately 30 other UMU leaders. E-UEC standing meetings were held approximately once a month. Plaintiff showed up late to those meetings on several occasions and, when he addressed leadership, he raised issues that were not relevant to the topic being discussed and some were unprofessional. For example, in early February 2018, I attended an E-UEC meeting during which Plaintiff gave a presentation to leadership about suicide. During the presentation, he played videos and displayed photos that were sexually provocative and added little value to the topic of his presentation. I emailed Sergio Garcia, who was then the President's Chief of Staff, expressing my concerns. See, **Exhibit "D"**. It was clear by other attendees' facial expressions and responses that many thought that the presentation content was inappropriate.

14.    In August 2018, I was in a meeting with President Laraque-Arena and SUNY counsel in the President's office when Plaintiff entered the President's office uninvited, in an emotional state and expressed his concerns that he was going to lose his job. On several occasions, Dr. Laraque-Arena verbally expressed her frustrations and concerns regarding Plaintiff's performance to me.

15.    In 2018, I met with Plaintiff, UMU's Chief Diversity Officer Gloria Lopez, and UMU's Affirmative Action Officer Dawn Norcross on multiple occasions regarding concerns of discrimination and harassment that had been raised internally regarding faculty within the Colleges he oversaw. We shared with Plaintiff multiple times that concerns of discrimination and

5

harassment on campus needed to be reported to the Office of Diversity and Inclusion and could not be kept confidential and he was trained on this procedure as Dean. Regardless, on January 24, 2019, Plaintiff emailed a group of approximately 80 faculty and students inviting them to email him at his personal Gmail address to report instances of discrimination or offensive behavior and to label the email "confidential." See, **Exhibit "E"** at pp. 3-4. Neither I nor our Office of Diversity and Inclusion representatives were copied on this email and I only learned that he had sent it after concerns were expressed to me by UUP, after faculty had complained. Having students and faculty report concerns of discrimination and harassment directly to Plaintiff's private email address was inconsistent with multiple Upstate policies and inappropriate. As a result, I informed Plaintiff that his email was inappropriate and was inconsistent with UMU's collective bargaining agreements, policies and established practices. I ultimately had to write another email for Plaintiff to send to the same group of email recipients to clarify that, although the January 24, 2019 email encouraged parties to communicate directly with him, it should not preclude them from contacting all other appropriate parties. The corrective email further provided a link to the Upstate Code of Conduct, which provides a comprehensive list of Upstate resources and policies.

16.     In addition, Plaintiff was often off campus which made it difficult at times to communicate with him regarding matters involving the College of Medicine.

17.     Shortly before Plaintiff's demotion, in August 2019, President Dewan consulted me about his decision to remove Plaintiff from the Dean position. President Dewan informed me that Plaintiff had recently held a meeting at 6am in which he verbally attacked President Dewan. He also informed me that he had learned that Plaintiff had been recently instructing Department Chairs not to come to Dr. Dewan with concerns. These attacks towards Dr. Dewan were in addition to other concerns that Dr. Dewan already had about Plaintiff inappropriately reaching out to SUNY

6

leadership asking for money for the College of Medicine and making indiscrete and inappropriate comments during meetings and presentations, including to students. For all of these reasons, Dr. Dewan concluded that Plaintiff needed to be removed as Dean of UMU's College of Medicine. I supported Plaintiff's removal for the reasons President Dewan gave, along with my own personal knowledge of Plaintiff's performance and behavior, as I did not believe that Plaintiff possessed the qualities that are required to be a UMU College of Medicine Dean.

Dated:       January _17_, 2024
             _Hilton Head_ , South Carolina                    Eric Frost

7

A0367

A-0368



**From:** Eric Frost FrostE@upstate.edu
**Subject:** Fwd: Follow up
**Date:** September 7, 2018 at 12:23 PM
**To:** Julie Petti Julie.Petti@suny.edu, Liesl Zwicklbauer Liesl.Zwicklbauer@suny.edu
**Bcc:** Eric Frost FrostE@upstate.edu

Please see the attached e-mail from our College of Medicine Dean. He has named UUP represented faculty to Associate Dean roles and I have repeatedly told him that he can't do this. Rather than make the change to Assistant Dean, he is taking this action.

I am around today if you want to discuss.

Thanks,
Eric
(315) 464-5876

TEXT.htm

"Julio Licinio <licinioj@upstate.edu>" <LicinioJ@upstate.edu>
**Follow up**
September 7, 2018 at 9:56:42 AM EDT
Eric Frost <FrostE@upstate.edu>
Grace VanNortwick <VANNORTG@upstate.edu>

Dear Eric:

Stony Brook, Buffalo and us will go through LCME at around the same time. It will not go well if we have different titles across these schools and blame it all on the same university system. I am scheduling a conference call of the leadership of these three colleges of medicine plus SUNY Administration to address your concerns. I will keep you posted.

All my best,

Julio  Mime.822

A-0369

**From:** Eric Frost FrostE@upstate.edu  
**Subject:** Re: New Positions  
**Date:** July 30, 2018 at 1:06 PM  
**To:** Julio Licinio LicinioJ@upstate.edu  
**Cc:** Grace VanNortwick VANNORTG@upstate.edu  
**Bcc:** Eric Frost FrostE@upstate.edu

Thanks Julio.

Grace - please give me a call at your earliest convenience (4-4927). Another challenge - Assistant Dean and Associate Dean are MC titles.

Thanks,
Eric

>>> Julio Licinio <licinioj@upstate.edu> 7/30/2018 11:50 AM >>>
Dear Eric:
This was all done with Grace's support. I am out of town. Would you please be so kind as to liaise with Grace and liaise with her? She can answer all of your questions.
All my best,
Júlio

## From my iPhone

On Jul 30, 2018, at 11:46, Eric Frost <FrostE@upstate.edu> wrote:

Hi Julio:

At EUEC, you mentioned some of the new roles in the COM:

- Senior Associate Dean for Education - Tom Schwartz
- Associate Dean for Diversity - Zulma Tovar-Spinoza
- You also mentioned Matt Mason, I think as Assistant Dean in the Curriculum Office

Do you have job descriptions for these positions? Do you know what portion of their time will be spent on these COM duties? Did they sign offer letters?

On the attached org chart, Paul Ko and Danielle Katz show as reporting to Tom. We have been advised by SUNY System Administration that MC employees cannot report to a UUP represented employee. Have the new roles been run by Darlene Noyes?

Thanks,
Eric
<COM Dean Org Chart - 7-10-2018_1.pdf>

TEXT.htm

# State University of New York
# Upstate Medical University

## Human Resource Practices

Report 2018-S-57 | September 2019



OFFICE OF THE NEW YORK STATE COMPTROLLER

**Thomas P. DiNapoli, State Comptroller**

Division of State Government Accountability

A0370

# Audit Highlights

## Objective

To determine if State University of New York (SUNY) Upstate Medical University has developed and consistently applied policies and procedures related to select human resource functions. This audit covered the period from January 1, 2015 through June 24, 2019.

## About the Program

As Central New York's largest employer, SUNY Upstate Medical University (Upstate) has roughly 10,000 employees supporting its operations. The Human Resource Department (HR) manages and supports resources for Upstate's workforce across four colleges, a research enterprise, and a network of patient care facilities. HR develops local human resource-related policies in conjunction with SUNY System Administration, maintains personnel records, and oversees many other daily activities, such as verifying references on prospective employee job applications and processing employee leave requests.

Established human resource policies and procedures help ensure applicants are qualified for employment and employees receive appropriate compensation. Policies and procedures also provide guidance for ensuring the safety and security of staff, students, patients, and visitors; protecting confidential data and information; and preventing the loss of university property.

## Key Findings

Insufficient HR monitoring and oversight and inadequate or poorly enforced policies and procedures have contributed to questionable and/or weak practices that render Upstate vulnerable to misuse of funds and safety and security risks. For example:

- Upstate paid 12 employees a total of $4.7 million in additional compensation for work beyond their regular job duties (known as an "Also Receives" [ALR] allowance), but did not maintain adequate documentation to support either the basis for the dollar amount or the additional duties that employees were tasked with. Where ALRs are not appropriately supported, there is a risk they're not being used for the intended and approved purpose and funds are potentially being misspent.

- Upstate has not established policies or procedures for alternate work (off-campus) assignments (Assignments). As such, department supervisors who oversee these Assignments lack guidance regarding how to manage them (e.g., setting work details for employees, monitoring their progress), increasing the risk that department supervisors are accepting, and Upstate is paying for, inferior work products. We reviewed 38 Assignments from January 1, 2015 to November 11, 2018. Of those 38 Assignments, for which Upstate paid $1,374,670, 20 (amounting to nearly $940,000 in payroll costs) were deemed not useful, of poor quality, or otherwise inadequate by the supervisors.

- SUNY System Administration continued to pay a former President her presidential salary of $608,000 while she was on leave in the job title of Special Assistant to the President –

A0371

and while Upstate was also paying an interim President a presidential salary – but could not provide documentation to justify this decision.

- HR does not adequately follow, enforce, or monitor its policies and procedures that address when employees leave Upstate, increasing safety and security risks and rendering Upstate vulnerable to inappropriate access of confidential data and loss of property. The files for 169 of the 274 former employees we reviewed did not have the required separation documentation supporting that the former employees' access rights have been terminated and that Upstate property in their possession has been returned.

- HR did not maintain documentation to support that the required two references had been checked for 17 of 80 new hires. In response to our preliminary findings, officials were subsequently able to locate documentation from either the applicable department or hiring agency for 13 of the 17 to support that two references had been obtained. For the remaining 4 new hires, Upstate officials relied on verbal assertions to support hiring the individual and either did not check or did not document having checked two references.

## Key Recommendations

- Develop written procedures for ALR-related transactions, including documenting the specific duties that justify additional pay and obtaining and retaining the justification for decisions concerning the dollar amount associated with each ALR.

- Establish and enforce policies and procedures to require stronger oversight of Assignments, including more clearly defined processes for work product submission and retention to ensure work products are useful and sufficient given the duration of the Assignments.

- Formally document leave salary decisions to justify that the amount granted is commensurate with the job title and duties performed.

- Develop, monitor, and enforce a comprehensive set of policies and procedures that address hiring and separation. These policies and procedures should be standardized and applied uniformly to all Upstate departments and groups of employees and should include a consistent process for checking professional references and verifying that all required reference checks have been conducted.



## Office of the New York State Comptroller
## Division of State Government Accountability

September 25, 2019

Mantosh J. Dewan, M.D.
Interim President
State University of New York
Upstate Medical University
750 East Adams Street
Syracuse, NY 13210

Dear Dr. Dewan:

The Office of the State Comptroller is committed to helping State agencies, public authorities, and local government agencies manage their resources efficiently and effectively. By so doing, it provides accountability for the tax dollars spent to support government operations. The Comptroller oversees the fiscal affairs of State agencies, public authorities, and local government agencies, as well as their compliance with relevant statutes and their observance of good business practices. This fiscal oversight is accomplished, in part, through our audits, which identify opportunities for improving operations. Audits can also identify strategies for reducing costs and strengthening controls that are intended to safeguard assets.

Following is a report of our audit entitled *Human Resource Practices*. This audit was performed pursuant to the State Comptroller's authority under Article V, Section 1 of the State Constitution and Article II, Section 8 of the State Finance Law.

This audit's results and recommendations are resources for you to use in effectively managing your operations and in meeting the expectations of taxpayers. If you have any questions about this draft report, please feel free to contact us.

Respectfully submitted,

*Division of State Government Accountability*

# Contents

**Glossary of Terms** .................................................................................... 5

**Background** .............................................................................................. 6

**Audit Findings and Recommendations** ....................................................... 7

    Additional Compensation ........................................................................ 7

    Off-Campus Assignments ........................................................................ 9

    Presidential Transition Agreement ........................................................... 12

    Employee Separations ............................................................................ 13

    Reference Check Policies and Procedures ................................................. 14

    Recommendations .................................................................................. 15

**Audit Scope, Objective, and Methodology** .................................................. 17

**Statutory Requirements** ........................................................................... 18

    Authority ............................................................................................... 18

    Reporting Requirements .......................................................................... 18

**Agency Comments - SUNY Upstate Medical University** ................................ 20

**Agency Comments - SUNY System Administration** ...................................... 23

**Contributors to Report** ............................................................................ 25

# Glossary of Terms

| Abbreviation | Description | Identifier |
|---|---|---|
| ALR | "Also Receives" compensation, an additional amount paid to an unclassified service employee above the base salary for work beyond the employee's normal professional obligation | *Key Term* |
| Assignment | Off-campus assignment | *Key Term* |
| Clearance Form | Employee Separation Clearance Form | *Form* |
| HR | Human Resources Department | *Department* |
| MC | Management Confidential | *Key Term* |
| Policy | Employee Separation and Transfer Policy | *Policy* |
| Pre-Employment Policy | Upstate's Pre-Employment Process Policy, which addresses concerns such as reference checks for some potential Upstate employees | *Policy* |
| Separation Form | Employee Separation Form | *Form* |
| SUNY | State University of New York | *Agency* |
| System Administration | SUNY System Administration | *Division* |
| Upstate | SUNY Upstate Medical University | *Auditee* |
| UUP | United University Professionals | *Key Term* |

# Background

Since 1950, Upstate Medical University (Upstate) has been part of the State University of New York (SUNY). Its mission is to improve the health of the communities it serves through teaching, research, and patient care. Upstate is the only academic medical center in Central New York and comprises four colleges, a research enterprise, one hospital with two locations (Upstate University Hospital and Upstate University Hospital at Community Campus), and over 80 outpatient clinics and other centers. Based on information provided by Upstate, it serves approximately 1.8 million people and is Central New York's largest employer, with a workforce of more than 10,000 supporting its operations. According to Upstate officials, each year, Upstate's Human Resources Department (HR) receives over 30,000 employment applications and processes approximately 1,600 new hires, 1,000 separations, and 1,700 job changes.

Professional staff positions within the SUNY system, including United University Professions (UUP) represented positions and Management Confidential (MC) designated positions, have been designated "unclassified service" and therefore are not under State Civil Service jurisdiction. Accordingly, the recruitment and selection process, as well as classification and appointment processes, are governed by separate mandates, including but not limited to the SUNY Board of Trustees Policies, the bargaining agreement between the State of New York and UUP, and the Upstate Medical University Affirmative Action Program.

HR is responsible for classifying and recruiting for position vacancies and ensuring timely appointment of candidates for all positions, except those under Nursing Recruitment and faculty in the College of Medicine. The Nursing Recruitment and Retention Office is responsible for hiring nursing positions, and the College of Medicine Faculty Affairs Office posts faculty positions for the College of Medicine. Positions are categorized based on funding and may be campus funded, hospital funded, or both.

HR is also responsible for developing local human resource-related policies in conjunction with SUNY System Administration (System Administration), ensuring employees receive appropriate compensation, maintaining personnel records, and handling many other miscellaneous daily activities, including verifying references on prospective employee job applications and processing leave requests. Additionally, Upstate supervisors and managers work with HR on the counseling and discipline process. The Labor Relations office will also interact with local union officers to resolve more sensitive and complicated labor matters, such as employee grievances or instances of potential employee misconduct.

A0376

# Audit Findings and Recommendations

Upstate's policies and procedures related to select HR functions are inadequately developed and documented, and existing policies and procedures are inconsistently applied and communicated. This has led to undocumented justifications for compensation, work products, leave decisions, separation forms, and reference checks.

## Additional Compensation

Compensation for positions at Upstate comes from various funding mechanisms. In general, all employees earn a base salary. Upstate then pays certain employees additional compensation using State funds through an "Also Receives" (ALR) allowance. According to System Administration, ALR compensation is an amount paid to unclassified service employees in addition to their base salaries for work beyond their regular job duties. Officials stated ALRs are usually limited in duration and are not subject to contractual increases. For example, a faculty member selected as department chair would receive an ALR for the chair position, in addition to the salary for their normal duties. Upstate distributes over $10 million in ALR payments to about 800 employees annually. Although System Administration was unable to provide a formal written policy, officials stated all SUNY campuses should have a process for approving ALR amounts, which includes defining each ALR's purpose. Each campus should also provide the employee with written information about the ALR, including what it is for and when or how the ALR payment will end.

We reviewed supporting documents for a sample of 19 ALRs, totaling $6.2 million in payments, to 17 Upstate employees (2 individuals had 2 ALRs each – Employees 3 and 8 in the following table) between January 1, 2015 and March 20, 2019. Our findings, as discussed next, cause us to question whether Upstate is using the ALRs for their intended and approved purpose and whether Upstate is paying appropriate compensation for the services it receives.

For 15 of the 19 sampled ALRs (79 percent), totaling $5.5 million, Upstate did not sufficiently document either the basis for the dollar amount paid (8) or the additional duties the employees were tasked with beyond their normal professional obligations (2); and 5 ALRs lacked documentation for both the dollar amount and additional duties, as shown in the following table.

A0377

### Review of ALR Payments

| Employee | Insufficient Documentation of Basis for Amount of ALR | Insufficient Documentation of Additional Services Provided | Insufficient Documentation of Additional Services and Basis for Amount | Sufficient Documentation of Additional Services and Basis for Amount | Total ALR Compensation |
|---|---|---|---|---|---|
| 1 | | $158,333* | | | $158,333 |
| 2 | $1,218,518 | | | | $1,218,518 |
| 3 | $8,055 | | | $218,629 | $226,684 |
| 4 | | $158,334* | | | $158,334 |
| 5 | | | | $377,186 | $377,186 |
| 6 | | | $774,791* | | $774,791 |
| 7 | $658,510 | | | | $658,510 |
| 8 | $9,589 | | $47,200 | | $56,789 |
| 9 | | | $873,340* | | $873,340 |
| 10 | $866,961 | | | | $866,961 |
| 11 | | | $188,108* | | $188,108 |
| 12 | | | $345,204* | | $345,204 |
| 13 | | | | $40,082 | $40,082 |
| 14 | $144,986 | | | | $144,986 |
| 15 | $32,219 | | | | $32,219 |
| 16 | $32,794 | | | | $32,794 |
| 17 | | | | $23,767 | $23,767 |
| **Totals** | **$2,971,632** | **$316,667** | **$2,228,643** | **$659,664** | **$6,176,606** |

*ALR was used to pay the individual a particular salary.

We also found six instances where additional duties were not adequately documented, and it appears that the ALRs were used to achieve a particular salary. For example, Employee 11 in the previous table received a base salary of $38,827 and an ALR of $161,173 to arrive at an overall salary of $200,000. However, we found no documentation justifying why this individual received the additional $161,173. (Employee 11 received a total of $188,108 in ALR payments between January 1, 2015 and March 20, 2019.)

In another instance, Employee 8 in the table received what appeared to be an incentive to work at Upstate. For the ALRs paid during the period, the only documentation provided was an offer letter stating, "You will receive $48,000 in additional compensation not added to base pay, payable as $4,000 bi-weekly for each of your first 12 bi-weekly pay periods." At first, officials said that the $48,000 may have been used for moving expenses; however, we found this individual already received a separate payment specifically for moving expenses. Upstate did not document its justification, and it was unclear why this individual was authorized to receive the additional $48,000. However, after the draft report was issued, Upstate provided documentation that showed the employee requested a one-time housing allowance of

A-0379

$90,000. Officials stated that they agreed to pay $48,000 for the housing allowance.

Not only do we question whether Upstate is using the ALRs for their intended and approved purpose, but, without adequate documentation, we cannot be certain Upstate is receiving additional services for the extra compensation. Although Upstate officials explained their processes for determining ALRs, Upstate has neither developed nor documented its procedures for granting ALRs. In response to our findings, Upstate officials agreed to formally document procedures for handling ALRs.

After we issued our draft report to Upstate, officials provided additional documentation to support the questionable ALRs. We reviewed this information and determined that Upstate was able to provide sufficient documentation to support either the basis for the dollar amount paid or the additional duties employees were tasked with for 3 of the 15 ALRs noted earlier. However, Upstate still has not provided adequate support for 12 of the 19 sampled ALRs (63 percent), totaling $4.7 million. Additionally, we first presented these findings to Upstate in a written preliminary report on May 20, 2019. We issue preliminary findings to correct any potential errors of fact and ask officials to review this information carefully to ensure no additional information should be considered in formulating our audit conclusions. We question why it took Upstate more than three months after our preliminary findings were issued to provide additional information supporting the ALRs.

## Off-Campus Assignments

The bargaining agreement between New York State and UUP establishes that certain employees may perform an alternate work assignment, which can be at an alternate work location. This is more commonly referred to as an off-campus assignment (Assignment), and the alternate work location may include the employee's home. Upstate has also extended this provision to MC employees. Assignments are typically part of settlement agreements for employees who are going through the disciplinary process and are used in lieu of arbitration. Additionally, Upstate uses Assignments as a method to remove certain employees from campus to ensure safety and protect access to confidential information. The employee's designated supervisor is responsible for both developing the Assignment and ensuring that the work is being completed adequately and timely.

We reviewed 38 Assignments granted by Upstate during the period January 1, 2015 through November 11, 2018. Upstate paid $1,374,670 in gross payroll expenses for these Assignments, which included independent studies of physical therapy codes for billing purposes, different staffing models, and

ways to improve staff retention and address overcrowding in emergency departments. Our review, which included interviews with the 29 supervisors of these Assignments, identified numerous issues. In response to our questions, Department supervisors stated that many of the Assignment work products were "not useful" or were insufficient in either quality, quantity, or completeness. For example:

- Supervisors of 13 Assignments (34 percent), costing $748,335, stated the resulting work product was not useful. Notably, one Assignment, which covered a 20-month period and for which Upstate paid $395,495, was described as "busy work."

- Supervisors of 13 Assignments described the work product as poor in quality or inadequate. In general, the supervisors believed the inadequate work products had been "copy and pasted" from various sources or were not commensurate with the amount of time allowed. For one Assignment, the supervisor stated that, "being generous," the work product constituted about 4 months' worth of work, despite the Assignment's duration of 20 months. Another supervisor stated that, as long as the employee turned in something, it would be acceptable.

- For 4 Assignments, constituting $147,646 in payroll costs, supervisors noted that the work product had not been completed by the employee. Further, for 14 of the Assignments (37 percent), for which Upstate paid $680,817, we were unable to determine whether employees completed the assignments or completed them timely because department supervisors failed to maintain all or some of the work product.

  · For 6 of these, Upstate was unable to provide any of the work product.

  · For the other 8, supervisors retained only a portion of the work product to support its completion. Additionally, for 4 of these 8 partial Assignments, while the supervisor had not retained the work products, HR was able to locate some of them in its records, despite the fact that it is not part of its standard process to receive work products.

On a related note, we also identified $10,015 in questionable compensation in addition to the regular salary for seven employees with Assignments. Of this amount, $8,050 was for ALRs. The remaining $1,965 was for "inconvenience payments." Because each of these employees was performing an alternate assignment from home, HR should not have allowed these amounts to be paid during the Assignment period. Employees on Assignments are no longer performing their regular duties, much less the additional duties for which they

Report 2018-S-57

A-0381

were receiving an ALR. Currently, HR's process for Assignments does not include reviewing the components of an employee's compensation before granting the Assignment.

Upstate officials stated that employees no longer have access to Upstate's resources during Assignments, which contributes to difficulties in fulfilling work obligations. HR officials stated they rely heavily on the departments for Assignment oversight and details. Due to a lack of communication, HR was unaware of the work product quality issues because supervisors didn't report them.

When we asked supervisors about their role in overseeing Assignments, there was a general consensus that HR did not clearly define or communicate requirements for overseeing Assignments and that more guidance from HR was needed.

Our interviews with supervisors revealed the following:

- 7 of the 29 supervisors stated HR did not communicate with them outside the initial drafting of the Assignment;

- 11 stated that they had some communication with HR, with 7 stating that they initiated those communications; and

- 11 others had no comment or stated they did not remember the level of communication with HR.

In addition to the lack of written processes and oversight regarding Assignment work product quality and quantity, departments were not aware of retention policies. According to Upstate officials, there is not a specific Upstate or System Administration policy for retaining Assignment work products, and, as such, departments would default to the General Retention and Disposition Schedule for New York State Government Records. This schedule states the minimum retention and disposition for this type of record is four years.

Overall, although HR does follow a general process when granting Assignments, it has not established policies or procedures for departments to use when setting Assignment work details, monitoring the progress, and retaining the work product. As such, department supervisors lack guidance for and awareness of requirements. Upstate officials agreed and indicated that they are preparing additional guidance materials and are considering centralizing oversight of these Assignments.

A0381

A-0382

## Presidential Transition Agreement

Upon resigning from her presidential position on December 22, 2018 – a position held since January 14, 2016 – Upstate's then President was granted leave under a transition agreement by System Administration. The leave, granted under Article XIII, Title F of the SUNY Policies of the Board of Trustees, lasted from December 23, 2018 through June 7, 2019. Upon completion of her 5½-month leave, the former President agreed to return to Upstate and transition to a faculty appointment in the Department of Pediatrics at a salary of $255,544.

Title F "leaves of absence" typically are granted to academic or professional employees; university presidents are typically granted Title H "study leaves." However, unlike a Title F leave of absence, which has no service requirement, a Title H study leave has a three-year service requirement, which the former President did not meet. Furthermore, in granting the former President a leave under Title F leaves of absence, System Administration was able to offer more flexibility in terms of duration – longer than the two-month leave allowed under Title H. Moreover, whereas Title F leaves of absence are granted "for the purpose of professional development" and "acceptance of assignments of limited duration" with other entities, Title H study leaves are specifically for "improving the administrative and academic performance" of the administrative officer. The work plan submitted by the former President – where she notably used the Title H term "study leave" – contained, among other entries, planned lectures, a review of definitions of health equity and disparities, and work on two books.

A System Administration official stated that, had the President served longer, they may have used Title H leave instead of Title F. As it was, System Administration changed her title to Special Assistant to the President but continued to pay her the President's salary of $608,000 while also paying an interim President a full presidential salary. For her 5½-month leave, the former President was paid a total of $279,897 as Special Assistant. System Administration explained this decision was made to allow the former President time to transition to a faculty appointment, and they continued to pay the Special Assistant the presidential salary based upon their own judgment. However, System Administration provided no documentation to justify why Upstate paid the former President a presidential salary as Special Assistant while also paying an interim President.

A0382

# Employee Separations

Upstate processes roughly 1,000 employee separations annually. Separations can be voluntary, such as a retirement or resignation, or forced through termination or contract non-renewal. The Employee Separation and Transfer Policy (Policy) in Upstate's University-Wide Policy Manual outlines separation procedures and responsibilities of Upstate supervisors and employees. The purpose of the Policy is to ensure the safety and security of staff, students, patients, and visitors; to protect confidential data and information; to prevent the loss of university property; and to communicate benefit and payment information.

According to the Policy, after receiving an employee's notice of separation, the supervisor must provide HR an Employee Separation Form (Separation Form), which must be submitted at least one week before the last day of employment to document the employee's reason for leaving and ensure timely processing and formal termination of employment. The supervisor also completes an Employee Separation Clearance Form (Clearance Form), which contains a checklist for ensuring the collection and return of Upstate property. HR is required to maintain these documents for at least six years after separation.

We found HR does not adequately follow, enforce, or monitor its policies and procedures when employees leave Upstate. This potentially creates an increased risk to the safety and security of Upstate's staff, students, patients, and visitors. It also makes Upstate more vulnerable to threats of inappropriate access of confidential data and the loss of property.

For instance, while the Policy calls for notices of separation to be processed contemporaneous with the employee's date of separation, for a sample of 274 former employees, we found instances where HR is only notified annually of any employee separations that have occurred – potentially many months after a given employee's last day of employment. Until HR formally processes their separation and inputs a separation date, these former employees may have continued access to Upstate's facilities, devices, and data systems and confidential records, including those related to patient care.

Upstate officials stated that, for certain groups, such as residents, student federal grant employees, and research fellows (which would account for 43 of the employees in our sample), HR allows for different separation processes. We note that these exceptions are not documented either in the Policy or elsewhere.

Furthermore, HR does not properly maintain personnel files in accordance

A0383

with its record retention policy. Based on our review of separation files for this sample of 274 former employees, we determined HR does not maintain all separation documents as required. In particular, our review of the 274 files found 169 that were missing a significant number of two required documents. For example:

- For 153 employees, HR was missing the Clearance Form; and

- For 98 employees, HR was missing the Separation Form. For 82 of the 98, the Clearance Form was also missing.

This issue notwithstanding, we also note that HR's processing of its purportedly exempted employees' separations was not consistent. Files for 11 of the 43 exempted employees in our sample contained one or both of the required separation forms, supporting that Upstate is inconsistent with both its unwritten and written policies and procedures.

Upstate officials stated they are evaluating and enhancing their HR policies and procedures to ensure they are comprehensive and are also implementing an online process, which will streamline separations and eliminate a significant part of the manual work involved.

## Reference Check Policies and Procedures

Reference checks can provide valuable information about a candidate's work history, education, and characteristics, giving recruiters insights about previous on-the-job performance. Typically, reference checks are conducted during a pre-employment process to ensure that an applicant's listed qualifications and other claims are genuine. Hiring without conducting and documenting an established number of reference checks could potentially lead to claims of negligent hiring.

Upstate has overall policies and processes for hiring, yet varies in its requirements for the number of references to be checked, based on factors such as funding source, recruitment office, and position classification (e.g., classified or unclassified). This leads to an inconsistent application of hiring practices and the risk that sufficient prospective employee background information is not being obtained.

Hospital-funded positions and positions that share funding between the hospital and campus are subject to Upstate's Pre-Employment Process Policy (Pre-Employment Policy), while campus-funded positions are subject to a different set of processes. The Pre-Employment Policy requires the appropriate recruitment office to check two professional references for each external candidate offered employment with SUNY Upstate University

A0384

A-0385

Hospital. Although Upstate has no formal written policy for hiring 100 percent campus-funded positions, HR said it applies the reference-checking requirements from the Pre-Employment Policy for these hires.

For 17 of 80 new hire files we reviewed, HR did not maintain documentation to support that the required two references had been obtained. In response to our preliminary findings, officials were subsequently able to locate documentation for 13 of the 17, either from the applicable department or hiring agency, to support that two references had been obtained. For the other 4 new hires, Upstate officials relied on verbal assertions to support hiring the individual and either did not check or did not document having checked two references.

The lack of a uniform process contributes to confusion and inconsistent oversight of reference checks at Upstate. For example, although HR obtains copies of references for College of Nursing and College of Health Professions applicants, its counterpart at the College of Medicine Faculty Affairs Office doesn't collect references from the hiring departments in the College of Medicine. Documentation provides assurance that reference checks have actually been conducted and provides support for the decision that the candidate hired was competent and fit for the position.

Although, in the majority of the cases, Upstate officials ultimately were able to determine that the required reference checks had been conducted, HR did not have the information readily available and was not informed at the time of hire that the reference checks had been completed. Upstate officials agreed that HR should verify that reference checks have been performed and maintain documentation of all reference checks, and stated they are in the process of implementing a more comprehensive set of policies and procedures. Upstate officials also stated they are currently reviewing their hiring practices to better align them with Upstate's needs.

## Recommendations

**To Upstate:**

1. Develop written procedures for ALR-related transactions, including documenting the specific duties that justify additional pay and obtaining and retaining the justification for decisions concerning the dollar amount associated with each ALR.

2. Establish and enforce policies and procedures to require stronger oversight of Assignments, including more clearly defined processes for work product submission and retention, and to ensure work products are useful and sufficient given the duration of the Assignments.

A0385

A-0386

3. Develop, monitor, and enforce a comprehensive set of policies and procedures that address hiring and separation. These policies and procedures should be standardized and applied uniformly to all Upstate departments and groups of employees – including residents, student federal grant employees, and research fellows – and should include a consistent process for checking professional references and verifying that all required reference checks have been conducted.

**To System Administration:**

4. Formally document leave salary decisions to justify that the amount granted is commensurate with the job title and duties performed.

A0386

A-0387

# Audit Scope, Objective, and Methodology

The objective of our audit was to determine if Upstate has developed and consistently applied policies and procedures related to select human resource functions. The audit covered the period from January 1, 2015 through June 24, 2019.

To accomplish our objective, we reviewed relevant laws, regulations, and SUNY Board of Trustees and Upstate policies. We also spoke with Upstate officials to understand their processes. In addition, we assessed internal controls related to the audit objective.

Our audit focused on HR practices for select aspects related to hiring, compensation, and separations. We judgmentally selected separation transactions that occurred from January 1, 2015 to November 7, 2018 based on their separation category description. We chose 13 of 26 categories based on the type of leave code. Then we either randomly selected samples within those categories or selected all when there were fewer than 10 former employees. In total, we selected and reviewed a sample of 274 of 4,879 former employees (separations). We also reviewed a judgmental and random sample of 80 of 6,401 new hire transactions from January 1, 2015 to November 8, 2018. For the judgmental sample, we selected the top five earning salaries for each calendar year of our scope (2015–2018) for both hospital and campus hires, anyone with a full-time equivalent greater than one, and individuals hired into the President's or the Dean's Office. Additionally, we judgmentally selected a sample of 19 of 1,008 employees who received ALRs. We selected the ten individuals with the highest annual ALR amounts, six individuals who received ALR increases, and the Dean of the College of Medicine. We also obtained and assessed payroll information for select individuals. Our random and judgmental samples cannot be projected to the entire population. We assessed the files and concluded they were reliable for the purposes of our audit objective. We also reviewed all employees placed on Assignment from January 1, 2015 to November 11, 2018, except for one employee whose Assignment was being reviewed by another entity. We also reviewed the former President's transition agreement. For all samples, we reviewed available documentation to determine whether Upstate followed applicable policies and had adequate documentation to support the decisions made.

A-0388

# Statutory Requirements

## Authority

The audit was performed pursuant to the State Comptroller's authority as set forth in Article V, Section 1 of the State Constitution and Article II, Section 8 of the State Finance Law.

We conducted our performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objective.

In addition to being the State Auditor, the Comptroller performs certain other constitutionally and statutorily mandated duties as the chief fiscal officer of New York State. These include operating the State's accounting system; preparing the State's financial statements; and approving State contracts, refunds, and other payments. In addition, the Comptroller appoints members to certain boards, commissions, and public authorities, some of whom have minority voting rights. These duties may be considered management functions for purposes of evaluating organizational independence under generally accepted government auditing standards. In our opinion, these functions do not affect our ability to conduct independent audits of program performance.

## Reporting Requirements

We provided a draft copy of this report to Upstate and System Administration officials for their review and formal comment. We considered their comments in preparing this final report and have included them in their entirety at the end of it.

Several changes were made to the final report based on information Upstate provided after the draft report was issued.

Upstate generally agreed with the recommendations and is in the process of instituting changes and implementing the recommendations. System Administration maintains that the presidential transition agreement was wholly appropriate and did not respond to how it plans on implementing the recommendation.

Within 90 days after final release of this report, as required by Section 170 of the Executive Law, the President of Upstate Medical University shall report to the Governor, the State Comptroller, and the leaders of the Legislature

A0388

A-0389

and fiscal committees, advising what steps were taken to implement the recommendations contained herein, and where recommendations were not implemented, the reasons why.

A0389

# Agency Comments - SUNY Upstate Medical University



September 16, 2019

Brian Reilly, Audit Director
Office of the State Comptroller
Division of State Government Accountability
110 State Street – 11th Floor
Albany, NY 12236-0001

RE: Audit Report 2018-S-57 Human Resource Practices

Dear Mr. Reilly:

Thank you for the review of Human Resource Practices at the State University of New York Upstate Medical University (Upstate). Attached please find Upstate's response to the key findings and key recommendations for the draft report, Human Resource Practices.

Upstate remains committed to its mission to improve the health of the communities it serves through teaching, research and excellent patient care. To that end, we strive to hire the best practitioners across the country. In addition, as Central New York's largest employer, Upstate is tasked with recruiting, hiring, deploying and managing the resources for a workforce of over 10,000 people across four colleges, a research enterprise, a hospital with four main locations (Upstate University Hospital-Downtown, Upstate University Hospital-Community Campus, Upstate Golisano Children's Hospital and Upstate Cancer Center) as well as a network of outpatient clinics and other care facilities.

While we consider the recommendations referenced in the report, we also maintain that Upstate has processes in place to ensure applicants are qualified for employment and compensation is appropriate. Furthermore, high quality patient care and the safety and security of all staff, students, patients and visitors are our top priorities at all times throughout all departments of our institution. All actions taken have been consistent with our approach to provide the best patient care, as well as excellence in teaching, and forward-thinking research.

Recommendation:

Develop written procedures for ALR-related transactions, including documenting the specific duties that justify additional pay and obtaining and retaining the justification for decisions concerning the dollar amount associated with each ALR.

Upstate Response:

Upstate compensates its staff appropriately for the work they perform. "Also Receives" (ALR's) are intended to give Upstate the flexibility to meet the compensation needs

750 East Adams Street | Syracuse, NY 13210 | Ph: 315 464 4513 | Fax: 315 464 5775 | www.upstate.edu | State University of New York

A0390

required in a complex medical and higher education environment and they are used to meet varied needs of the organization.

The majority of the individuals identified by the OSC audit were clinical faculty physicians practicing medicine at Upstate which, as the only academic medical center in the Central New York region, strives to recruit clinical faculty physicians who provide the highest quality medical care to patients in Central NY. The total compensation package for the clinical faculty physicians at Upstate is often complex and involves multiple funding sources comprised of different components, one of which may be an ALR, as these clinical faculty physicians provide medical, teaching, and research services across the enterprise. The total compensation packages for these physicians is based on market rate salary data for Upstate Medical University's specific region and medical specialty provided by organizations such as AAMC, AAHC, MGMA, etc. The compensation amounts including ALRs paid to clinical faculty physicians were properly supported by external market data, documented, reviewed, and approved. For example, the physician specifically noted in the audit report was hired at a salary of $200,000 based on the market value for that particular specialty and was comprised of a base salary and ALR.

While we feel the basis for paying ALR's is well thought out and justified, we agree with this recommendation that documentation can be enhanced to better provide the justification of the amount and the purpose of the ALR. We are in the process of developing written procedures to supplement and enhance existing practices and documentation relating to ALR's.

Recommendation:

Establish and enforce policies and procedures to require stronger oversight of Assignments, including more clearly defined processes for work product submission and retention, and to ensure work products are useful and sufficient given the duration of the Assignments.

Upstate Response:

There were 38 off-campus assignments reported by OSC and cover OSC's scope period of 1/1/15- 11/11/18 (approximately four years). These 38 off-campus assignments were all of the UUP and MC off-campus assignments over that period and represents less than 0.095% of Upstate's annual workforce. These arrangements are rarely utilized compared to the whole of employee activity at Upstate. In addition, as OSC states, the use of these off-campus assignments is typically part of settlement agreements for employees who are going through the disciplinary process and are used in lieu of arbitration.

Obtaining meaningful work product from employees under these agreements with off-campus assignments is important but challenging due to the fact that Upstate does not allow the employee to be on campus and typically does not allow access to systems. We recognize the need to further enhance our procedures for educating supervisors when they are called upon in these rare situations.

While Upstate has procedures in place for off-campus assignments, we agree these should be enhanced. Upstate is in the process of strengthening its communication and education of supervisors regarding quality and retention of work product while employees are on off-campus assignments.

**Recommendation:**

Develop, monitor, and enforce a comprehensive set of policies and procedures that address hiring and separation. These policies and procedures should be standardized and applied uniformly to all Upstate departments and groups of employees – including residents, student federal grant employees, and research fellows – and should include a consistent process for checking professional references and verifying that all required reference checks have been conducted.

**Upstate Response:**

With a workforce of over 10,000 employees being managed at any point in time, Upstate has a process supported by numerous policies and procedures that protects our employees', patients', visitors' and students' safety and security including confidential data. We agree that these can be strengthened and are in the process of reviewing all Human Resource policies and procedures with a comprehensive look across all areas of this complex organization. In addition, we are launching an online separation process which will eliminate manual aspects of the process including elimination of the paper separation forms which will further reduce our risk profile. Upstate is also putting steps in place to ensure that each appropriate office maintains reference documentation going forward.

Thank you and if you have any questions regarding the response, please contact Michael Jurbala, AVP Internal Audit and Advisory Services at 315-464-4692.

Best Regards,

Mantosh Dewan, MD
Interim President
SUNY Distinguished Service Professor

cc:    Chancellor Johnson, Ph.D.
       Eileen McLoughlin
       Amy Montalbano

A0392

# Agency Comments - SUNY System Administration



Office of the
Chief Financial Officer

www.suny.edu

September 16, 2019

Brian Reilly
Office of the New York State Comptroller
Division of State Government Accountability
110 State Street
11th floor
Albany, New York 12236

Dear Mr. Reilly,

In accordance with Section 170 of the Executive Law, we are providing our comments to the draft audit report on the State University of New York Upstate Medical University (Upstate), Human Resources Practices (2018-S-57). The State University of New York (SUNY) System Administration and the Upstate Medical Center have a responsibility to the public to provide high quality and accessible health care, as well as an affordable and excellent education. Upstate's employees, including staff, professors, and physicians are all necessary in the accomplishment of these public service and community goals. SUNY campuses, including Upstate, take seriously the importance of compliance with guidelines and the need for documentation of processes and actions as they relate to our largest resource, personnel.

Below is SUNY System's response to the Office of the State Comptroller's recommendation #4, related to certain transitional responsibilities and compensation.

4. Formally document leave salary decisions to justify that the amount granted is commensurate with the job title and duties performed.

Presidential transitions and transfer of authority require significant and often lengthy operational considerations and detailed processes. This is especially so when a leadership transfer occurs at a complex organization that the Office of the State Comptroller acknowledges is "...the only academic medical center in central New York and comprises four colleges, a research enterprise, three hospitals, ...and over 80 outpatient clinics and other centers...serves 1.8 million people and is central New York's largest employer, with more than 10,000 employees."

To Learn
To Search
To Serve



SUNY has been transparent regarding the leadership transition, issuing a press release to media and posting it to its website to ensure understanding about the leadership changes to take place at Upstate. This was distributed on September 27, 2018, and widely reported—particularly by the Syracuse and Albany press.

When this arrangement was planned, it was preferred that former President Laraque-Arena be an available resource to the incoming leadership and to also complete an assignment within the prescription of NYCRR Article 8, Chapter V, Subchapter B, Part 337, Title F. This was a part of the transition for the former president before taking on her faculty position, which was a part of her initial employee contract with SUNY. Most SUNY presidents have faculty positions from the point they are hired.

Further, SUNY maintains that the Title F designation was wholly appropriate, as Title H criteria requires the incumbent to be in a Presidential role, of which she was not. Further, for clarity, it should be noted that of the $608,000 annual salary referenced by OSC, the State portion of the annual salary of $408K was continued for a period of 5 1/2 months under Title F, totaling $ 187,590.

Thank you for the opportunity to respond.

Sincerely,

*Eileen McLoughlin*

Eileen McLoughlin
Senior Vice Chancellor for Finance and Chief Financial Officer

cc:    Chancellor Johnson, Ph.D.
       Amy Montalbano, C.P.A.
       Mantosh J. Dewan, M.D.

# Contributors to Report

## Executive Team
**Tina Kim** - *Deputy Comptroller*
**Ken Shulman** - *Assistant Comptroller*

## Audit Team
**Brian Reilly**, CFE, CGFM - *Audit Director*
**Nadine Morrell**, CIA, CISM - *Audit Manager*
**Amanda Eveleth**, CFE - *Audit Supervisor*
**Christopher Herald**, CIA, CGAP - *Examiner-in-Charge*
**Philip Boyd** - *Senior Examiner*
**Molly Kramm** - *Senior Examiner*
**Mary McCoy** - *Supervising Editor*
**Andrea Majot** - *Senior Editor*

**Contact Information**
(518) 474-3271
StateGovernmentAccountability@osc.ny.gov
Office of the New York State Comptroller
Division of State Government Accountability
110 State Street, 11th Floor
Albany, NY 12236



Like us on Facebook at facebook.com/nyscomptroller
Follow us on Twitter @nyscomptroller
For more audits or information, please visit: www.osc.state.ny.us/audits/index.htm

A0395

A-0396

From: Eric Frost FrostE@upstate.edu
Subject: EUEC
Date: February 20, 2018 at 9:47 AM
To: Sergio Garcia GarciaSe@upstate.edu
Bcc: Eric Frost FrostE@upstate.edu

Hi Sergio:

Just thought I'd drop you a quick note on this morning's EUEC meeting. Dr. Licinio conducted a presentation on suicide. There were two scenes he used that were a bit questionable (Heath Ledger kissing Jake Gyllenhaal in Brokeback Mountain and Adam Levine in a music video). He also made some comments that I didn't think made sense (Amy Winehouse appeared depressed in a music video given her excessive makeup and hyper-sexual behavior?)

The discussion that followed was good, and the presentation itself made some good points, but was for me it was a little too out there.

Thanks,
Eric

TEXT.htm

A-0397

Page 1 of 1

### Anne Dotzler - Draft clarification e-mail

| | |
|---|---|
| From: | Eric Frost <FrostE@upstate.edu> |
| To: | Julio Licinio <LicinioJ@upstate.edu> |
| Date: | 1/29/2019 3:09 PM |
| Subject: | Draft clarification e-mail |
| Attachments: | TEXT.htm; Re: (EXTERNAL) FW: ZERO tolerance policy towards abuse/mistreatment/discrimination |

Hi Julio:

Below is a first draft for your review.  Thanks, Eric
****************************************************

I am sending this e-mail to clarify and expand on some of the points I made in my earlier e-mail of January 24th.  My intent was to show our strong commitment to a learning environment that is supportive/collegial and not to change established policies, procedures, practices, etc.

Upstate has many resources for its students, staff and faculty to reach out to for assistance if they believe that they have been subjected to inappropriate conduct .  In my January 24th e-mail, I expressed my desire to have parties communicate directly with me.  That should not preclude any of you from contacting all other appropriate parties.  Your health, safety and well-being are always the first priority.  I encourage you to become familiar with Upstate's policies, printed materials and websites that provide important information on what is expected of us as members of the Upstate community as well as the resources that are available to help.  One good place to start is the Upstate Code of Conduct which can be found on-line at https://upstate.ellucid.com/documents/view/2943 which provides a comprehensive list of Upstate resources.

Together we can make this special place all that we collectively envision it can be.

Kindest regards,
Julio
.................
Julio Licinio, MD, PhD
Senior Vice President for Academic and Health Affairs
Executive Dean
Dean, College of Medicine
Professor of Psychiatry, Medicine, Pharmacology, and Neuroscience & Physiology
State University of New York
Upstate Medical University
750 E. Adams Street
Syracuse, NY 13210, USA

Executive Assistant: Mary Arseneau ARSENEAM@upstate.edu 315-464-9723
Twitter: @licinio

Page 1 of 3

**Anne Dotzler - Re: (EXTERNAL) FW: ZERO tolerance policy towards abuse/mistreatment/discrimination**

| | |
|---|---|
| **From:** | "Julio Licinio <licinioj@upstate.edu>" <licinioj@upstate.edu> |
| **To:** | Eric Frost <FrostE@upstate.edu> |
| **Date:** | 1/28/2019 11:22 AM |
| **Subject:** | Re: (EXTERNAL) FW: ZERO tolerance policy towards abuse/mistreatment/discrimination |
| **Attachments:** | TEXT.htm |

Dear Eric:

Yes, please draft the corrective statement for me and email it, so I can send it to the same stakeholders.

Thanks!

Julio

From my iPhone

On Jan 28, 2019, at 12:14, Eric Frost <FrostE@upstate.edu> wrote:

Hi Julio:

We were contacted by UUP regarding the following e-mail.  They understand and appreciate the intent, but have issues with some of its content:

- Most terms and conditions of state employment are mandatory subjects of collective bargaining.  A policy of zero tolerance would require consultation with our unions and they would likely claim it would need to be negotiated.
- Your e-mail doesn't reference all of the resources available to our students and employees (student counseling, employee/student health, EAP, ODI, ELR, etc.)
- You are asking those who have witnessed or experienced abuse/mistreatment/discrimination to notify you and you will address it with the appropriate parties and their supervisors.  With regard to employees, this would be inconsistent with the language in our collective bargaining agreements, policies and established practices.

UUP advised that they will not take any formal action, if a second clarifying e-mail is sent.  Please let me know if you'd like me to draft some wording for your review.

file:///C:/Users/DotzlerA/AppData/Local/Temp/XPgrpwise/5E2D9A3CHSCHOSP2HSC21...    2/4/2020

Licinio v. SUNY Upstate, et al., 5:21-CV-387    005487

A0398

Page 2 of 3

Thanks,

Eric

From: Julio Licinio <LicinioJ@upstate.edu>
Sent: Thursday, January 24, 2019 2:12 PM
To:

Subject: ZERO tolerance policy towards abuse/mistreatment/discrimination

Dear colleagues and students:

My highest priority as Dean is to ensure an inclusive and welcoming work / learning
environment for all. On a day to day basis, there may be cases in which staff/faculty/students

Licinio v. SUNY Upstate, et al., 5:21-CV-387   005488

A0399

hear comments that are either implicitly or explicitly abusive, discriminatory, or offensive. In a renewed effort to enforce a policy of ZERO tolerance policy towards abuse/mistreatment/discrimination, I would ask you to communicate directly to me instances in which this has occurred, so that I can address it with the appropriate parties and their supervisors. Please reach out to me with your personal case examples. I can assure you with ABSOLUTE CERTAINTY that your reports will NOT affect your work performance evaluation or your student evaluations/letters of recommendation.

If you want this on the record, please e-mail me to my work e-mail: licinioj@upstate.edu.

If you want confidentiality you can email me from your private email to my private e-mail: juliolicinio@gmail.com. Please write CONFIDENTIAL on the subject heading.

If you are a student, please come to one of my open office hours and talk to me then.

If you want to reach me 1:1 in person to report abuse/mistreatment/discrimination, please schedule an appointment through Mary Arseneau: arseneam@upstate.edu.

Upstate does not tolerate abuse/mistreatment/discrimination. I cannot fix what I do not know about; therefore, I need your cooperation to ensure our new ZERO tolerance policy. Please help me create an optimal learning/work environment at Upstate.

Kindest regards,

Julio

---------------------

Julio Licinio, MD, PhD
Senior Vice President for Academic and Health Affairs
Executive Dean
Dean, College of Medicine
Professor of Psychiatry, Medicine, Pharmacology, and Neuroscience & Physiology
State University of New York
Upstate Medical University
750 E. Adams Street
Syracuse, NY 13210, USA

Executive Assistant: Mary Arseneau
ARSENEAM@upstate.edu
315-464-9723

Twitter: @licinio

file:///C:/Users/DotzlerA/AppData/Local/Temp/XPgrpwise/5E2D9A3CHSCHOSP2HSC21...   2/4/2020

A-0401

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
............................................................... X
JULIO LICINIO, MD, PhD, MBA, MS,

                         Plaintiff,                        **RICHARD GARDNER**
                                                    **DECLARATION**

                                               Case No.: **5:21-cv-387(GTS/TWD)**

              - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

                       Defendants
............................................................... X

       Richard Gardner, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

       1.    I am currently employed by the Research Foundation of the State University of New York ("SUNY") as a Senior Associate Dean for Resource Management in the Dean's Office of UMU's College of Medicine ("COM") and have been employed in the Office of the Dean since March 25, 2002. I was previously in the position of Director of Research Accounting from July 1, 2000 to March 24, 2002, and have been employed at Upstate since 1998. My duties as Senior Associate Dean for Resource Management include advising the UMU College of Medicine Dean regarding the salary and research startup packages current and former UMU research faculty members have been offered to ensure that fair salary and research startup packages are offered to

1

A-0402

prospective faculty, and also overseeing the establishment of research startup packages promised to UMU research faculty members after they have been appointed.

2.   I respectfully submit this Declaration in support of the Defendants' motion for summary judgment.

3.   I make this Declaration based upon my personal knowledge and based upon records maintained in the usual course of business at UMU and, in particular, in UMU's College of Medicine Dean's Office.

4.   Based on my review of UMU College of Medicine records, and my personal knowledge from the positions I've held at UMU, Ma-Li Wong, M.D. has received one of the most generous salary and research startup packages that any research faculty member has received at UMU since my employment in the Office of the Dean.

5.   Attached as **Exhibit "A"** is a spreadsheet that I created based upon my review of the data maintained by UMU's Faculty Affairs and Faculty Development offices. The spreadsheet depicts the salary and research startup packages promised to research faculty members hired by UMU from 2017 through 2020. The spreadsheet depicts the starting State salary of newly hired UMU research faculty from 2017 to 2020; "start up" commitment provided to those newly hired UMU research faculty for start up lab and research costs; research expenditures; and the dollar value of the research grants that the faculty member brought with them to UMU.

6.   As depicted on the spreadsheet, when Dr. Wong was hired in 2017, she was paid a total starting salary package of $220,000.00, which was comprised of $120,000.00 in state base salary and $100,000.00 in "ALR." ALR is an abbreviation for "also receives" compensation. This compensation is permitted where an employee or faculty member assumes responsibility for additional duties or assignments (typically within their primary department) which may be

2

unrelated to, or independent of, their standard work responsibilities. It is also given to research faculty members in the Psychiatry Department to assist them with starting up their research at UMU, with the expectation that they will apply for and receive grant funding that will supplement their base salary. Each ALR given to employees and faculty members is reviewed and renewed on an annual basis; it is not intended to supplement that employee or faculty member's income indefinitely. Instead, the ALR portion of their salary is expected to either be reduced, eliminated or be transitioned to departmental funding within 2-3 years of their hire unless the additional duties or assignments continue.

7.  The ALR portion of Dr. Wong's salary was not permanent and it was subject to an annual review.

8.  According to UMU's records, Dr. Wong's total starting institutional salary was more than the total starting salary of each of the twenty-six (26) other research faculty members that UMU hired between 2017 and 2020. See Exhibit A. Her salary was modified in July 2018 so that much of her ALR was absorbed into her state base salary, with her state base salary becoming $177,400.00 and her ALR being reduced to $45,000.00.

9.  Additionally, Dr. Wong's total "startup commitment" was for $5,386,668.00. The startup commitment promised to Dr. Wong included promise to pay $1,400,000.00 to design and build her a lab, $75,000.00 to move the lab and Dr. Wong's specimens, and $3,911,668 for staff, equipment and lab operating expenses.

10. Her research lab itself involved a major renovation project in which an entire wing of the third floor of an Upstate building was rebuilt. This is almost unheard of to do for newly hired UMU faculty and has not before been done for a UMU faculty member who is not funded by any grants since my employment in the Office of the Dean. While it took longer than anticipated to construct

3

her research lab, this was due to the State bidding and procurement process that needed to be followed, including the requirement to follow state procurement rules after Dr. Wong requested changes to the construction plan. In the meantime, she was provided temporary space within which to perform her research. Her lab was finished in March 2019, and includes three lab bays, an office area consisting of 3-4 offices, and a reception meeting area -- all dedicated to her. Most other research faculty have to share lab space and have much smaller lab space.

11. Dr. Wong's startup commitment far surpasses any other faculty member hired during the timeframe mentioned and, based on my personal knowledge, was one of the largest startup commitments that UMU has agreed to pay a research faculty member during my employment in the Office of the Dean.

12. The extremely generous package promised to Dr. Wong was not only in excess of all other research faculty members at UMU, but was, to my knowledge, unprecedented in light of the fact that Dr. Wong was not funded by *any* grants when she was hired by UMU.

13. This salary and startup funding data is maintained in the ordinary course of business by the UMU College of Medicine Dean's Office. All salaries and ALRs have to be approved by the Dean of the College of Medicine every year, including when Dr. Licinio was Dean from 2017 – 2019. We do this so that current statistical data can guide the Dean as to what should be offered to prospective faculty to ensure that we don't create disparities in pay for faculty who are doing similar work and are similarly qualified.

14. Dr. Licinio set the salary and start up packages for faculty, although the initial package for Dr. Wong specifically was set by former UMU President Danielle Laraque-Arena. Regardless, Dr. Licinio would have had direct knowledge that Dr. Wong received a far greater salary/start up

4

A-0405

package than any other research faculty member who was hired to work in the UMU College of Medicine between 2017-2019 and that her lab was the largest lab buildout done while he was Dean.

15. Dr. Licinio provided UMU researchers in certain cases with an ALR for the first few years of their employment at UMU, with the intent to replace their ALR compensation with compensation that they receive from external grants after they establish their research. Such a practice ensures that UMU research faculty are given the resources to be successful, while simultaneously incentivizing them to bring in grants to the institution. A percentage of their grant money goes directly to UMU.

Dated:   December 27, 2023
             Syracuse, New York

Richard Gardner

Case 5:21-cv-00387-GTS-TWD    Document 73-43    Filed 01/10/24    Page 1 of 1

Research Recruits Provided with Startup Support
Hire Dates 2017 thru 2020

| Last Name | First Name | ID | Ethnicity | Gender | misc. | Funding | FTE | Hire Date | Degree | Title | Department | | Starting Academic Salary | | | Startup Commitment | | | Research Expenditures | | | | Grant Transfers | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Base | A/R | Total | Institution | Department | Total | FY16-17 | FY18-19 | FY 20-21 | Sponsor | Amount | Comments |

**A-0407**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
................................................................................X
JULIO LICINIO, MD, PhD, MBA, MS,

                        Plaintiff,

                        - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

                        Defendants
................................................................................X

**DECLARATION OF
ALEXANDRA GILBERTSON**

Case No.: **5:21-cv-387(GTS/TWD)**

    Alexandra Gilbertson, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

    1.    I am currently employed by SUNY Upstate Medical University ("UMU") as the Interim Institutional Equity Officer and Title IX Coordinator in charge of UMU's Office of Institutional Equity. I have been employed in this position since October 30, 2023. Prior to being appointed Interim Institutional Equity Officer and Title IX Coordinator, I was employed by UMU as a Complaint Investigator in UMU's Office of Institutional Equity from April 2020 to October 29, 2023.

    2.    I respectfully submit this Declaration in support of the Defendants' motion for summary judgment. I make this Declaration based upon my personal knowledge and based upon records maintained in the usual course of business at UMU.

1

3.      UMU is committed to maintaining a work, educational, and clinical care environment that is free from discrimination and harassment based on race, color, national origin, religion, age, disability, sex, gender, pregnancy, gender identity, gender expression, sexual orientation, transgender status, predisposing genetic characteristics, marital status, familial status, veteran status, military status, domestic violence victim status, criminal conviction record, and any other category protected under state, federal, or local law.

4.      OIE was created in May 2020 and is responsible for: (i) receiving complaints and concerns of discrimination and harassment impacting UMU's campus or workplace and in UMU's educational programs or activities, (ii) conducting prompt, fair, and unbiased investigations into such complaints to ensure a safe working and learning environment, (iii) maintaining and making appropriate revisions to UMU's policies on Equal Opportunity and Non-Discrimination, Harassment Prevention, and Title IX, (iv) training supervisors and managers on how to recognize and address concerns of discrimination and harassment; and (v) maintaining records relating to concerns brought forward to OIE and complaints made.

5.      Prior to May 2020, including from July 1, 2017 to September 12, 2019, when Plaintiff was Dean of UMU's College of Medicine, all of the functions now handled by UMU's OIE were handled by UMU's Office of Diversity and Inclusion ("ODI") along with high level strategic diversity initiatives. The Office of Diversity and Inclusion was divided into two separate offices in May 2020 – one being OIE to handle internal investigations and handle the responsibilities described above; and a second being Office of Diversity Equity and Inclusion to handle high level strategic diversity initiatives.

6.      All records of internal complaints of discrimination and harassment that were previously maintained by ODI are now maintained by OIE, including those records maintained by

2

ODI from July 1, 2017 through September 12, 2019 when Plaintiff was Dean of UMU's College of Medicine.

7.    Attached as **Exhibits "A" and "B"** are UMU's Non-Discrimination Policy and Harassment Prevention Policy which were in place from July 1, 2017 through September 12, 2019 when Plaintiff was Dean.

8.    As Dean, Plaintiff was trained on these policies and was made aware that all complaints of discrimination and harassment at UMU were to be brought to UMU's Office of Diversity and Inclusion, which investigated such complaints.

9.    ODI has records indicating that Plaintiff received in-person training in March 2018 and in February 2019 regarding UMU's Non-Discrimination and Harassment Prevention policies and on his obligation as a leader at UMU to notify ODI of concerns of discrimination and harassment. The training materials that were distributed during one such training entitled "Don't Let a Molehill Turn into a Mountain" is attached as **Exhibit "C."** Pages 3-23 of Exhibit "C" were the most relevant to Plaintiff's reporting obligations as a supervisor. The training materials reviewed with Plaintiff on Sexual Harassment Prevention in February 2019 are attached as **Exhibit "D."**

10.    UMU's discrimination and harassment policies and the instruction for Plaintiff and other supervisors to raise concerns of discrimination and/or harassment to UMU's Chief Diversity Officer or Affirmative Action Officer in the Office of Diversity and Inclusion are described in detail on Exhibit A – pages 2-3, Exhibit B – pages 4 -5 and 12-14, Exhibit C – Pages 5, 10, 11, 12, 21, and 13-23, and Exhibit D – Pages 4, 5, 7, 16, and 26.

11.    Moreover, ODI has records of Plaintiff being notified of, and working closely to address, various complaints of discrimination by and with Chief Diversity Officer Gloria Lopez

3

and later, interim Chief Diversity Officer Malika Carter, who both oversaw the Office of Diversity and Inclusion during the time that Plaintiff served as Dean. Thus, he had direct knowledge that these individuals oversaw concerns of discrimination and harassment at UMU.

12.     The policies that Plaintiff had knowledge of, the training he took regarding those policies, and his multiple interactions with Ms. Lopez and Dr. Carter confirm that Plaintiff, as a person in position of leadership at SUNY Upstate, was well aware of his obligation to deal with allegations of discrimination "expeditiously," and to immediately report those allegations to ODI.

13.     After completing a diligent search of our records, OIE has no record of Plaintiff filing any complaints of discrimination with OIE or ODI —either on his own behalf or on anyone else's behalf — prior to his removal from the Dean position on September 12, 2019.

14.     Further, after completing a diligent search of our records, our search has confirmed that OIE has no record of Plaintiff's wife, Ma-Li Wong, filing any complaints of discrimination or harassment with OIE or ODI prior to Plaintiff's removal from the Dean position on September 12, 2019.

Dated:     January 7, 2024
           Syracuse, New York          Alexandra Gilbertson

4

A-0411



# UNIVERSITY-WIDE POLICY MANUAL

| Policy Number: **UW E-01** | Approved by: CEO Cabinet & University Executive Committee |
|---|---|
| **Issue Date:** 04/30/1989<br>**Value(s):** *Drive Innovation & Discovery, Respect People, Value Integrity, Serve Community, Embrace Diversity and Inclusion* | **Applies to:** Upstate Medical University<br>**Page(s): 1 of 4** |

## Non-Discrimination and Equal Opportunity Policy

| Review Date: | Change Description: |
|---|---|
| 12/20/2017 | |
| Revised Date: | Change Description: |
| 12/20/2017 | Removed much of the content related to harassment and created separate, University-Wide Harassment Prevention Policy which defines harassment in detail and provides examples of prohibited harassment. Removed much of the content related to harassment and created separate, University-Wide Harassment Prevention Policy. Revised sections addressing which persons the policies applies to, responsibilities for reporting conduct in violation of this policy, and prohibition against retaliation. |

**Applies to:**

All members of the SUNY Upstate Medical University community, including but not limited to faculty, medical providers, staff, students, applicants, volunteers, vendors, visitors, guests, and all other individuals present on SUNY Upstate Medical University's campus or participating in SUNY Upstate Medical University's programs or activities, whether on or off campus, including overseas programs (hereinafter referred to as "SUNY Upstate Community Members").

**Policy:**

SUNY Upstate Medical University and its affiliates ("SUNY Upstate") are committed to fostering a diverse community of outstanding medical providers, faculty, staff, and students, as well as ensuring equal educational opportunity, employment opportunity, and access to programs, activities and medical services, without regard to an individual's race, religion, color, gender, age, national origin or ancestry, disability, sexual orientation, gender identity and expression, marital status, familial status, predisposing genetic characteristics, criminal conviction, domestic violence victim status, veteran status, or other protected category under federal, State and/or local law ("protected categories"). SUNY Upstate prohibits any form of discrimination, including harassment, within its community or in its programs on the basis of these protected categories.

This policy applies to all aspects of employment, education, programs and activities sponsored by SUNY Upstate, including but not limited to recruitment, hiring, examination and testing, training, grading, disciplinary actions, rates of pay or other compensation, advancement, classification, transfer and reassignment, layoffs, return from layoffs, discharge, educational opportunity, tuition assistance, and participation and administration of social and recreational programs.

This policy also applies to all aspects of medical care provided to the public by or on behalf of SUNY Upstate. All medical care and services will be provided to existing or prospective patients without regard to their membership in the above protected categories, or their chosen source of payment for services.

Licinio v. SUNY Upstate, et al., 5:21-CV-387   006326

A-0412

## Non-Discrimination and Equal Opportunity Policy (continued)   UW E-01

Page 2 of 4

In furtherance of this policy, SUNY Upstate aims to promote the full realization of equal employment opportunity by maintaining an Affirmative Action Program and monitors affirmative action-related employment decisions and statistics in accordance with state and federal law and executive orders.

**Reporting Conduct in Violation of This Policy:**

A. **Reporting Process For SUNY Upstate Community Members.**

If SUNY Upstate Community Members believe that they or any other Upstate Community Member have been subjected discrimination based on their protected category, they may address the situation directly and immediately to the offender, when it is safe to do so. If the inappropriate conduct does not cease, or if the Community Members are unable to or are uncomfortable addressing the offender directly, they should promptly report the incident or conduct through one or more of the following channels depending on their role:

1. **Employees, including Faculty, Residents, Fellows, and Medical Staff:** Report to their Supervisor, Employee/Labor Relations, Graduate Medical Education, and/or the Office of Diversity and Inclusion.

2. **Students:** Report to Student Affairs, the Dean of their College, and/or the Office of Diversity and Inclusion.

3. **Volunteers:** Promptly report to their Supervisor, Volunteer Services, and/or the Office of Diversity and Inclusion.

4. **Employees of SUNY Upstate Affiliates, such as MedBest, Research Foundation, Temp Agencies:** Promptly report to their Supervisor, Employee/Labor Relations, and/or the Office of Diversity and Inclusion. Employees of affiliates should also report discrimination to their own employer even though the conduct took place on SUNY Upstate campus or within its programs.

5. **Interns and Participants in SUNY Upstate-Sponsored Programs Or Activities:** Promptly report complaints to their Supervisor, Program Coordinator, Employee/Labor Relations, and/or the Office of Diversity and Inclusion.

SUNY Upstate Community Members may also file a written complaint using the form located at: http://www.upstate.edu/diversityinclusion/complaint/

B. **Reporting Requirements For Managers, Supervisors, Administrators, Faculty, and Leadership Who Become Aware Of Potential Discrimination.**

Managers, supervisors, administrators, faculty and any other person in a position of leadership at SUNY Upstate must deal expeditiously and fairly with allegations of discrimination within their departments or colleges whether or not there has been a written or formal complaint. They must:

Licino v. SUNY Upstate, et al., 5:21-CV-387  00832/

A0412

A-0413

## Non-Discrimination and Equal Opportunity Policy (continued)   UW E-01

| | Page 3 of 4 |
|---|---|

- Take all complaints or concerns of alleged or possible discrimination seriously no matter how minor or who is involved;

- Ensure that discriminatory conduct is immediately reported to Employee Labor Relations and/or the Office of Diversity and Inclusion so that a prompt investigation can occur; and

- Take any appropriate action to prevent retaliation or prohibited conduct from reoccurring during and after any investigations of complaints.

Managers, supervisors, or any other person in a leadership position at SUNY Upstate who knowingly allow or tolerate discrimination or retaliation, including the failure to immediately report such misconduct to Employee/Labor Relations or the Office of Diversity and Inclusion, are in violation of this policy and may be subject to discipline.

<u>Prohibition Against Retaliation:</u>

SUNY Upstate prohibits retaliation against any individual who files a complaint with the Office of Diversity and Inclusion, opposes or complains of discrimination, including harassment, or assists or participates in any manner in a discrimination investigation, proceeding, or hearing (such as an internal investigation or lawsuit), including as a witness. Retaliation against these protected individuals will result in appropriate sanctions or other disciplinary action under relevant collective bargaining agreements and/or SUNY Upstate policies.

Education/Related Resources:
  University-Wide Policy UW H-01, Harassment Prevention Policy
  University-Wide Policy UW D-04, Disability and Workplace Reasonable Accommodation Policy
  University-Wide Policy UW V-01, Domestic Violence and the Workplace Policy
  University-Wide Policy UW C-05 , Consensual Relationship Policy
  Hospital Compliance Plan Policy HCP C-12, Fair Treatment of Personnel
  Hospital Compliance Plan Policy HCP G-03, Non-Retaliation
  Administration Policy A-05, Admission to University Hospital
  The Upstate Code of Conduct UW C-02
  Medical Staff Bylaws
  Equal Opportunity: Access, Employment and Fair Treatment in the State University of New York
  SUNY Discrimination Complaint Procedure
  SUNY Discrimination Complaint Procedure
  SUNY Diversity, Equity, and Inclusion Policy
  RF Nondiscrimination and Nonharassment Policy
  RF Solving Problems in the Workplace Policy
  Students Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX Policy
  Student Handbook Policy, Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX

Form Name(s) and Number(s):
  None

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

Lidrio v. SUNY Upstate, et al., 5:21-CV-387-005328

A-0414

## Non-Discrimination and Equal Opportunity Policy (continued)   UW E-01

| | Page 4 of 4 |
|---|---|

**Originating Department:** Office of the President
**Contributing Department(s):** Patient Relations Department
Community Campus Quality Services Department
Office of Diversity and Inclusion
Office of General Counsel
Human Resources
Student Affairs
College of Medicine
Upstate University Hospital TCU at Community Campus #122236-C

**References:**
- Title VI of the Civil Rights Act of 1964, as amended
- Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e
- Regulations of the U.S. Health and Human Services
- SUNY Upstate University Hospital Affirmative Action Program
- Age Discrimination in Employment Act of 1967
- Americans with Disabilities Act of 1990, as amended
- Equal Pay Act of 1963
- New York State Human Rights Law, N.Y. Executive Law §296, et seq.
- Section 504 of the Rehabilitation Act of 1973, as amended
- Title IX of the Education Amendments Act of 1972
- Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended
- New York State Corrections Law Sections 752 & 753
- Genetic Information Nondiscrimination Act of 2008
- Pregnancy Discrimination Act
- New York State Executive Order No. 161
- Executive Order 11246

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

Licina v. SUNY Upstate, et al., 5:21-CV-387  008329

A0414

**A-0415**

 **UNIVERSITY-WIDE POLICY MANUAL**

| | |
|---|---|
| **Policy Number: UW H-01** | **Approved by:** CEO Cabinet & University Executive Committee |
| **Issue Date:** 11/29/2017 | **Applies to:** Upstate Medical University |
| **Value(s):** *(Drive Innovation & Discovery, Respect People, Serve Community, Value Integrity, Embrace Diversity and Inclusion)* | **Page(s):** 1 of 7 |

## Harassment Prevention Policy

| Review Date: | Change Description: |
|---|---|
| 11/29/2017 | |
| **Revised Date:** | **Change Description:** |
| 11/29/2017 | This is a NEW policy. Formerly a part of the Non-Discrimination and Equal Opportunity Policy (# UW E-01) and the Upstate Code of Conduct (# UW C-02) and is now a new separate, stand-alone policy.  Policy has been expanded to include examples of prohibited harassment, including sexual harassment, avenues and requirements for reporting harassment, and prohibition against retaliation. |

**Applies to:**

All members of the SUNY Upstate Medical University community, including but not limited to faculty, medical providers, supervisors, managers, staff, students, applicants, volunteers, vendors, visitors, guests, and all other individuals present on SUNY Upstate Medical University's campus or participating in SUNY Upstate Medical University's programs or activities, whether on or off campus, including overseas programs (hereinafter referred to as "SUNY Upstate Community Members").

**Policy:**

SUNY Upstate Medical University and its affiliates ("SUNY Upstate") are committed to maintaining a work, educational, and clinical care environment that is free from harassment, including sexual harassment, intimidation, and violence.  Harassment based on a person's race, color, national origin, religion, age, disability, gender, pregnancy, gender identity, gender expression, sexual orientation, predisposing genetic characteristics, marital status, familial status, veteran status, military status, domestic violence victim status, criminal conviction record, or any other category protected under state or federal law is unlawful and undermines the character and purpose of SUNY Upstate.

All SUNY Upstate CommunityMembers are covered by and expected to comply with this policy and to take appropriate measures to ensure that prohibited conduct does not occur. Individuals who violate this policy will be subject to discipline up to and including termination, expulsion, removal and/or other appropriate sanctions or actions pursuant to federal, state, local law and/or relevant collective bargaining agreements.

**Harassment Prevention Policy (continued)**                              **UWH-01**

|  |
|---|
| *Page 2of 7* |

**Prohibited Conduct:**

**A.** **Harassment.**

Harassment is unwelcome conduct targeted toward an individual or group because of their race, color, national origin, religion, age, disability, gender, pregnancy, gender identity, gender expression, sexual orientation, predisposing genetic characteristics, marital status, familial status, veteran status, military status, domestic violence victim status, criminal conviction record, or any other category protected under state or federal law ("protected category") that interferes with an individual's employment, education, or other access to university programs and activities. Harassment is a form of discrimination.

Determining what constitutes harassment depends on the specific facts and context in which the conduct occurs. Harassment may take many forms. Harassment may be subtle and indirect or may be blatant and overt. The harasser can be an individual's supervisor, faculty member, a supervisor in another area, a co-worker/colleague, or someone who is not an employee of the University, such as a vendor or guest or employee of an affiliate such as the Research Foundation, MedBest, etc. The harasser can be of the same or different gender as the victim. Harassment may consist of repeated actions or may arise from a single incident if sufficiently egregious.

Examples of harassment that is prohibited under this policy include, but are not limited to:

- Offensive or degrading remarks, verbal abuse, or other hostile behavior such as insulting, teasing, mocking, degrading or ridiculing another person on the basis of a person's protected category;

- Slurs, derogatory remarks about a person's accent, or display of offensive symbols directed toward a person's membership in a protected category;

- Unwelcome or inappropriate physical contact, comments, questions, advances, jokes, epithets or demands because of a person's protected category;

- Displays or electronic transmission of derogatory, demeaning or hostile materials based on a person's protected category; and

- Unwillingness to train, evaluate, assist, or work with a person because of their membership in a protected category.

Drive Innovation & Discovery  Respect People  Serve our Community  Value Integrity  Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.
Licinio v. SUNY Upstate, et al., 5:21-CV-387  006335

A0416

## Harassment Prevention Policy (continued)                    UWH-01

| | |
|---|---|
| | *Page 3 of 7* |

B. **Sexual Harassment.**

Sexual harassment is a form of unlawful discrimination and harassment under Title VII of the Civil Rights Act of 1964 and under Title IX of the Education Amendments Act of 1972, and is prohibited. Sexual harassment can be physical and/or psychological in nature. An aggregation of a series of incidents can constitute sexual harassment even if one of the incidents considered on its own would not be harassing.

Sexual harassment in the employment setting is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

- submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of an individual's employment (quid pro quo),

- submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual (quid pro quo), or

- such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment (hostile work environment).

Sexual harassment in the educational setting is defined as unwelcome conduct of a sexual nature, and can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual harassment of a student, resident, or fellow denies or limits, on the basis of sex, the student, resident, or fellow's ability to participate in or receive benefits, services, or opportunities in the educational institution's program.

The following are examples of sexual harassment that violates this policy:

- Physical sexual harassment including but not limited to: unwelcome, unwanted physical contact, including touching, tickling, pinching, patting, grabbing, brushing up against, hugging, cornering, kissing and fondling and forced sexual intercourse or assault.

- Verbal sexual harassment including but not limited to: unwelcome sexual advances, sexual innuendoes, propositions or other sexual comments such as sexually oriented remarks, jokes or comments about a person's sexuality or experience, jokes of a sexual nature, lewd remarks and threats, requests for any type of sexual favor (this includes repeated, unwelcome requests for dates).

Licinio v. SUNY Upstate, et al., 5:21-CV-387   006336

A0417

## Harassment Prevention Policy (continued)          UWH-01

| | Page 4 of 7 |
|---|---|

- Non-verbal sexual harassment including but not limited to: the distribution, display or discussion of any written or graphic material, including calendars, posters and cartoons that are sexually suggestive or show hostility toward an individual or group because of sex; suggestive or insulting sounds; leering; staring; whistling; obscene gestures; content in letters and notes, facsimiles, e-mail, photos, text messages, tweets and Internet postings; or other forms of communication that are sexual in nature and offensive.

- Preferential treatment or promises of preferential treatment in exchange for submitting to sexual conduct, including soliciting or attempting to solicit any individual to engage in sexual activity for compensation or reward.

- Subjecting, or threats of subjecting, an individual to unwelcome sexual attention or conduct or intentionally making performance of a person's job, engagement in an Upstate-sponsored activity or program, or learning environment more difficult because of that person's sex.

- Sexual or discriminatory displays or publications anywhere on SUNY Upstate's campus.

When a person subject to this policy is notified that their behavior is unwanted or unwelcome, the behavior should stop immediately.

**Reporting Conduct in Violation of this Policy:**

A. **Reporting Process For SUNY Upstate Community Members.**

If SUNY Upstate Community Members believe that they or any other Upstate Community Member have been subjected to harassment or any unwelcome sexual conduct, they may address the situation directly and immediately to the harasser, if it is safe to do so. If the inappropriate conduct does not cease, or if the Community Member is unable to or is uncomfortable with addressing the alleged harasser directly, they should promptly report the incident or conduct to one or more of the following channels depending on their role at Upstate:

1. **Employees, including Faculty, Residents, Fellows, and Medical Staff:** Report to their Supervisor, Employee/Labor Relations, Graduate Medical Education, and/or the Office of Diversity and Inclusion.

2. **Students:** Report to Student Affairs, the Dean of their College, and/or the Office of Diversity and Inclusion.

3. **Volunteers:** Promptly report to their Supervisor, Volunteer Services, and/or the Office of Diversity and Inclusion.

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.
Licinio v. SUNY Upstate, et al., 5:21-CV-387  006337

A0418

## Harassment Prevention Policy (continued) UWH-01

*Page 5of 7*

4. **Employees of SUNY Upstate Affiliates, such as MedBest, Research Foundation, Temp Agencies:** Promptly report to their Supervisor, Employee/Labor Relations, and/or the Office of Diversity and Inclusion. Employees of affiliates should report harassment to their own employer even though the conduct took place on SUNY Upstate campus or within its programs.

5. **Interns and Participants in SUNY Upstate-Sponsored Programs Or Activities:** Promptly report complaints to their Supervisor, Program Coordinator, Employee/Labor Relations, and/or the Office of Diversity and Inclusion.

Upstate Community Members may also file a written complaint using the form located at: http://www.upstate.edu/diversityinclusion/complaint/

B. **Reporting Requirements for Managers, Supervisors, Administrators, Faculty, and Leadership Who Become Aware of Potential Harassment.**

Managers, supervisors, administrators, faculty and any other person in a position of leadership within SUNY Upstate must deal expeditiously and fairly with allegations of harassment within their departments or collegeswhether or not there has been a written or formal complaint. They must:

- Take all complaints or concerns of alleged or possible harassment or discrimination seriously no matter how minor or who is involved;

- Ensure that harassment or inappropriate sexually-oriented conduct is immediately reported to the Office of Diversity and Inclusion so that a prompt investigation can occur; and

- Take any appropriate action to prevent retaliation or prohibited conduct from reoccurring during and after any investigations of complaints.

Managers, supervisors, or any other person in a leadership position at SUNY Upstate who knowingly allow or tolerate harassment or retaliation, including the failure to immediately report such misconduct to the Office of Diversity and Inclusion, are in violation of this policy and may be subject to discipline.

In cases where an investigation confirms a violation of this policy, management or administration in the appropriate College or Department must ensure that the remedial action prescribed by the Office of Diversity and Inclusion is implemented. Managers or Administrators must provide confirmation to the Office of Diversity and Inclusion that appropriate remedial action has occurred unless a collective bargaining agreement requires the university to go through the disciplinary process. If, during the course of the investigation, it appears that disciplinary or other action may be warranted, Employee/Labor Relations and/or the Medical Executive Committee may additionally become involved. Management and Administration is also responsible for regular monitoring to ensure that all remedial and/or

Licinio v. SUNY Upstate, et al., 5:21-CV-387  006338

A0419

## Harassment Prevention Policy (continued)                    UWH-01

| Page 6 of 7 |
| --- |

disciplinary steps are completed and no further discrimination or harassment occurs in the work, educational, or clinical care environments.

### Investigation and Confidentiality:

All reports and/or complaints of harassment, including sexual harassment, will be taken seriously and dealt with promptly.  The specific action taken in any particular case will depend on the nature and gravity of the conduct reported and may include intervention, mediation, investigation, and discipline, up to and including termination, expulsion or removal.

The University will maintain the confidentiality of the complaint and the privacy of the persons involved to the greatest extent possible, consistent with its goal of conducting a thorough and complete investigation and to the extent permitted by law.  However, the identity of the complainant may be revealed to the respondent and witnesses if necessary during the investigation or proceedings.

### Prohibition Against Retaliation:

Retaliation is any adverse action taken against an individual because s/he filed a charge of discrimination or harassment, complained to the University or a government agency about discrimination or harassment on the job or in the educational setting, or participated in a discrimination or harassment proceeding (such as an internal investigation or lawsuit), including as a witness.  Retaliation also includes adverse action taken against someone who is associated with the individual opposing the perceived discrimination or harassment, such as a family member.

Examples of retaliation include termination, demotion, refusal to promote, changing a grade, denying access to a program, or any other adverse action that would discourage a reasonable person from opposing perceived discrimination.

SUNY Upstate will not tolerate retaliation by or against any protected individual described above.  Retaliation is a serious violation of this policy, as well as federal, state, and local law. Anyone who believes they are a victim of retaliation should report the matter immediately according to the same procedure provided in this policy for making complaints of harassment. Any person found to have retaliated against another individual will be subject to the same disciplinary action provided under this policy for other violations.

Licinio v. SUNY Upstate, et al., 5:21-CV-387   006339

A0420

## Harassment Prevention Policy (continued)                    **UWH-01**

*Page 7of 7*

**Education/Related Resources:**

University-Wide Policy UW E-01, Non-Discrimination and Equal Opportunity Policy

University-Wide Policy UW D-04, Disability and Workplace Reasonable Accommodation Policy

University-Wide Policy UW V-01, Domestic Violence and the Workplace Policy

University-Wide Policy UW C-05 , Consensual Relationship Policy

Hospital Compliance Plan Policy HCP C-12, Fair Treatment of Personnel

Hospital Compliance Plan Policy HCP G-03, Non-Retaliation

AdministrationPolicy A-05, Admission to University Hospital

The Upstate Code of Conduct UW C-02

Medical Staff Bylaws

Equal Opportunity: Access, Employment and Fair Treatment in the State University of New York

SUNY Discrimination Complaint Procedure

SUNY Discrimination Complaint Procedure

SUNY Diversity, Equity, and Inclusion Policy

RF Nondiscrimination and Nonharassment Policy

RF Solving Problems in the Workplace Policy

Students Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX Policy

Student Handbook Policy, Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX

**Form Name(s) and Number(s):**

None

**Originating Department:**   Office of the President

**Contributing Department(s):** Office of Diversity & Inclusion

Office of General Counsel

Human Resources

**Reference(s):**

- Title VI of the Civil Rights Act of 1964, as amended
- Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e
- Age Discrimination in Employment Act of 1967
- Americans with Disabilities Act of 1990, as amended
- New York State Human Rights Law, N.Y. Executive Law §296, et seq.
- Section 504 of the Rehabilitation Act of 1973, as amended
- Title VI of the Civil Rights Act of 1964, as amended
- Title IX of the Education Amendments Act of 1972
- Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended
- New York State Corrections Law Sections 752 & 753
- Genetic Information Nondiscrimination Act of 2008
- Pregnancy Discrimination Act
- New York State Executive Order No. 161

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion

See MCN Policy Manager System for the latest version

Licinio v. SUNY Upstate, et al., 5:21-CV-387  006340



# UNIVERSITY-WIDE POLICY MANUAL

| Policy Number: **UW H-01** | Approved by: **University Executive Committee &** **Hospital Officers Leadership Team** |
|---|---|

| Issue Date: **11/29/2017** Value(s): *Drive Innovation & Discovery, Respect People, Serve Community, Value Integrity, Embrace Diversity and Inclusion* | Applies to: **Upstate Medical University** Page(s): **1 of 9** |
|---|---|

## Harassment Prevention Policy

| Review Date: | Change Description: |
|---|---|
| 05/08/2019 | |
| **Revised Date:** | **Change Description:** |
| 05/08/2019 | This is a revised policy. Changes to wording; addition of examples of harassment; updating links to the Office of Diversity and Inclusion's internal complaint form, SUNY Upstate's internal complaint process and procedure for investigating complaints, and external enforcement agencies; clarifying that link to Upstate's internal complaint form is also link to SUNY Upstate's internal complaint process and procedure for investigating complaints; adopting SUNY Sexual Harassment Response and Prevention Statement; adding details about who may be a victim or perpetrator of harassment under policy; adding details about the role of managers, leaders, supervisors, chairs, and faculty of reporting known, reported or suspected harassment and consequences for failing to do so. |

**Applies to:**

All members of the SUNY Upstate Medical University community, including but not limited to faculty, medical providers, supervisors, managers, staff, students, applicants, volunteers, vendors, visitors, guests, and all other individuals present on SUNY Upstate Medical University's campus or participating in SUNY Upstate Medical University's programs or activities, whether on or off campus, including overseas programs (hereinafter referred to as "SUNY Upstate Community Members").

**Policy:**

SUNY Upstate Medical University and its affiliates ("SUNY Upstate") are committed to maintaining a work, educational, and clinical care environment that is free from harassment, including sexual harassment, intimidation, and violence. Harassment based on a person's race, color, national origin, religion, age, disability, gender, pregnancy, gender identity, gender expression, sexual orientation, predisposing genetic characteristics, marital status, familial status, veteran status, military status, domestic violence victim status, criminal conviction record, or any other category protected under state or federal law is unlawful and undermines the character and mission of SUNY Upstate.

All SUNY Upstate CommunityMembers are covered by and expected to comply with this policy and to take appropriate measures to ensure that prohibited conduct does not occur. Individuals who violate this policy will be subject to discipline up to and including termination, expulsion, removal and/or other appropriate sanctions or actions pursuant to federal, state, local law, applicable policies and/or relevant collective bargaining agreements.

Licinlo v. SUNY Upstate, et al., 5:21-CV-387  006341

A0422

**Harassment Prevention Policy (continued)**                    **UW H-01**

*Page 2 of 9*

*Prohibited Conduct:*

A.  **Harassment.**

Harassment is a form of unlawful discrimination.  It is defined as unwelcome conduct targeted toward an individual or group because of their race, color, national origin, religion, age, disability, gender, pregnancy, gender identity, gender expression, sexual orientation, predisposing genetic characteristics, marital status, familial status, veteran status, military status, domestic violence victim status, criminal conviction record, or any other category protected under state or federal law ("protected category") that interferes with an individual's employment, education, or other access to University programs and activities.

Harassment may take many forms.  Determining what constitutes harassment depends on the specific facts and context in which the conduct occurs.  Harassment may be subtle and indirect or may be blatant and overt.  The harasser can be an individual's supervisor, faculty member, a supervisor in another area, a co-worker/colleague, student, or someone who is not an employee of the University, such as a contractor, a vendor or guest, intern, temporary worker, or employee of an affiliate such as the Research Foundation, MedBest, etc.

Harassment may consist of repeated actions or may arise from a single incident if sufficiently egregious.

Examples of harassment that is prohibited under this policy include, but are not limited to:

- Offensive remarks, verbal abuse, or other hostile behavior such as insulting, teasing, mocking, degrading or ridiculing another person on the basis of a person's protected category;

- Slurs, derogatory remarks about a person's accent, or display of offensive symbols directed toward a person's membership in a protected category;

- Unwelcome or inappropriate physical contact, intimidation, comments, questions, advances, jokes, epithets or demands because of a person's protected category;

- Displays or electronic transmission of derogatory, demeaning or hostile materials based on a person's protected category;

- Texts/"sexts"; and/or

- Unwillingness to train, evaluate, assist, or work with a person because of their membership in a protected category.

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

Licinio v. SUNY Upstate, et al., 5:21-CV-387  006342

A0423

## Harassment Prevention Policy (continued)          UW H-01

*Page 3 of 9*

B.  **Sexual Harassment.**

Sexual harassment is a form of unlawful discrimination and harassment under Title VII of the Civil Rights Act of 1964 and under Title IX of the Education Amendments Act of 1972, and is prohibited. Sexual harassment can be physical, verbal, non-verbal, electronic, and/or psychological in nature. An aggregation of a series of incidents can constitute sexual harassment even if one of the incidents considered on its own would not be harassing. However, one incident may be enough to establish sexual harassment.

Sexual harassment is a form of sex discrimination. Sexual harassment in the employment setting is defined as unwelcome sexual advances, requests for sexual favors, and other verbal, non-verbal or physical conduct of a sexual nature when:

- submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of an individual's employment (quid pro quo),

- submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual (quid pro quo), or

- such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment (hostile work environment).

Sexual harassment in the educational setting is defined as unwelcome conduct of a sexual nature, and can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, electronic communications, or physical conduct of a sexual nature. Sexual harassment of a student, resident, or fellow denies or limits, on the basis of sex, the student, resident, or fellow's ability to participate in or receive benefits, services, or opportunities in the educational institution's program.

The following are examples of sexual harassment that violates this policy:

- Physical sexual harassment includes but is not limited to: unwelcome, intentional, unwanted physical contact, including touching, tickling, pinching, patting, grabbing, brushing up against another person, hugging, cornering, kissing and fondling and forced sexual intercourse or assault.

- Verbal sexual harassment includes but is not limited to: unwelcome sexual advances, sexual innuendoes, propositions or other sexual comments such as sexually oriented remarks, jokes or comments about a person's sexuality or experience, jokes of a sexual nature, lewd remarks and threats, requests for any type of sexual favor (this includes repeated, unwelcome requests for dates); making/asking offensive comments or questions about someone's sexual history, orientation, gender expression, or gender identity; using position to request dates, sex, etc.

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

Licinio v. SUNY Upstate, et al., 5:21-CV-387   006343

## Harassment Prevention Policy (continued)                    UW H-01

*Page 4 of 9*

- Non-verbal sexual harassment includes but is not limited to: the distribution, display or discussion of any written or graphic material, including calendars, posters and cartoons that are sexually suggestive or show hostility toward an individual or group because of sex; sharing sexually inappropriate images or videos, such as pornography, with others in the workplace; suggestive or insulting sounds; leering; staring; whistling; obscene gestures; content in letters and notes, facsimiles, e-mail, photos, text messages, tweets, Facebook messaging, social media, and Internet postings; or other forms of communication that are sexual in nature and offensive.

- Preferential treatment or promises of preferential treatment in exchange for submitting to sexual conduct, including soliciting or attempting to solicit any individual to engage in sexual activity for compensation or reward in employment or education.

- Subjecting, or threats of subjecting, an individual to unwelcome sexual attention or conduct or intentionally making performance of a person's job, engagement in an Upstate-sponsored activity or program, or learning environment more difficult because of that person's sex.

- Sexual or discriminatory displays or publications anywhere on SUNY Upstate's campus, on SUNY Upstate's email server, or on any SUNY Upstate electronic device.

- Hostile actions taken against an individual because of that individual's sex, sexual orientation, gender identity and the status of being transgender, such as:
  - Interfering with, destroying or damaging a person's workstation, tools or equipment, or otherwise interfering with the individual's ability to perform the job;
  - Sabotaging an individual's work;
  - Bullying, yelling, name-calling; or
  - Any other examples of inappropriate harassment set forth in this policy.

When a person subject to this policy is notified that their behavior is unwanted or unwelcome, the behavior should stop immediately.

C.  **Individuals Subjected to Harassment.**
    Harassment, including Sexual Harassment, can occur between any individuals in the workplace, on campus, or participating in University-sponsored programs or activities. These individuals may include, but are not limited to the following:

- University employees, faculty, students;

- Applicants for employment;

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

Licinio v. SUNY Upstate, et al., 5:21-CV-387   006344

A0425

**Harassment Prevention Policy (continued)**                    **UW H-01**

*Page 5of 9*

- Non-employees[1] who interact with University faculty, employees, and agency personnel;

- Anyone who believes that their work or educational environment is impacted by the conduct, not just the individual at whom the offensive conduct is directed;

- Both males and females may experience harassment;

- Sexual harassment can occur between people of the same sex as well as people of the opposite sex.

D.  **Perpetrator of Harassment.**
   A perpetrator of harassment, including sexual harassment, can be, but is not limited to a supervisor, manager, faculty, chair of a department, attending, intern, subordinate, co-worker, Independent contractor, contract worker, vendor, client, customer, student, or visitor, etc.

   When a person subject to this policy is notified that their behavior is unwanted or unwelcome, the behavior must stop immediately. Harassment, including sexual harassment, is considered a form of employee and student misconduct, which may lead to discipline, up to and including termination, expulsion or removal.

E.  **Adoption of SUNY Sexual Harassment Response and Prevention Statement.**
   SUNY Upstate has adopted the State University of New York Sexual Harassment Response and Prevention Statement to notify all SUNY Upstate Community Members of SUNY's no tolerance policy for behavior that constitutes sexual harassment in violation of this policy. The Sexual Harassment Response and Prevention Statement can be found at:  https://www.suny.edu/sunypp/documents.cfm?doc_id=878

*Reporting Conduct in Violation of this Policy:*
A.  **Reporting Process For SUNY Upstate Community Members.**
   SUNY Upstate cannot decrease the likelihood of sexual harassment unless it knows about it. If SUNY Upstate Community Members believe that they or any other Upstate Community Member have been subjected to harassment or any unwelcome sexual conduct, they may address the situation directly and immediately to the harasser, if it is safe to do so. However, they are not required to do so. If the inappropriate conduct does not cease, or if the Community Member is unable to or is uncomfortable with addressing the alleged harasser directly, they should promptly report the incident or conduct to one or more of the following channels depending on their role at Upstate:

   1.  **Employees, including Faculty, Residents, Fellows, and Medical Staff:** Report to their Supervisor, Employee/Labor Relations,Graduate Medical Education, and/or the Office of Diversity and Inclusion.

---

[1]  Non-Employee is defined as an employee of a contractor, subcontractor, vendor, consultant, or any other entity or individual providing services on campus. Protected non-employees include persons commonly referred to as independent contractors, "gig" workers, and temporary workers. Also included are persons providing equipment repair, cleaning services, or any other services provided pursuant to a contract with the University.

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

## Harassment Prevention Policy (continued)                    UW H-01

*Page 6 of 9*

2.  <u>Students:</u>  Report to Student Affairs, the Dean of their College, and/or the Office of Diversity and Inclusion.

3.  <u>Volunteers:</u>  Promptly report to their Supervisor, Volunteer Services, and/or the Office of Diversity and Inclusion.

4.  <u>SUNY Upstate Affiliate employees, such as MedBest, Research Foundation, Temp Agencies:</u>  Report to their Supervisor and/or the Office of Diversity and Inclusion. Employees of affiliates should report harassment to their own employer even if the conduct took place on SUNY Upstate campus or within its programs.

5.  <u>Interns and Participants in SUNY Upstate-Sponsored Programs or Activities:</u> Report complaints to their Supervisor, Program Coordinator, Employee/Labor Relations, and/or the Office of Diversity and Inclusion.

SUNY Upstate Community Members may file a written complaint using the form attached SUNY Upstate's Complaint Procedure for Review of Allegations of Unlawful Discrimination located at the following link: http://www.upstate.edu/diversityinclusion/complaint/complaint_process.php

B.  <u>Reporting Requirements for Managers, Supervisors, Administrators, Faculty, and Leadership Who Observe of Become Aware of Potential Harassment.</u>
Managers, supervisors, administrators, faculty and any other person in a position of leadership within SUNY Upstate must deal expeditiously and fairly with allegations of harassment within their departments or colleges whether or not there has been a written or formal complaint by doing the following:

•  Take all complaints or concerns of alleged or possible harassment or discrimination seriously no matter how minor or who is involved;

•  Ensure that harassment or inappropriate sexually-oriented conduct is <u>immediately</u> reported to the Office of Diversity and Inclusion so that a prompt review can be taken and investigation can occur when appropriate; and

•  Take any appropriate action to prevent retaliation or prohibited conduct from reoccurring during and after any investigations of complaints.

•  Notify the Office of Diversity and Inclusion, if any of the individuals involved are funded by a National Science Foundation ("NSF") grant or cooperative agreement.

Managers, supervisors, faculty, Department Chairs, or any other person in a leadership position at SUNY Upstate who knowingly allows, tolerates, or engages in harassment or retaliation, including the failure to immediately report such misconduct to the Office of

Drive Innovation & Discovery  Respect People  Serve our Community  Value Integrity  Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version

Licinio v. SUNY Upstate, et al., 5:21-CV-387  006346

A0427

**Harassment Prevention Policy (continued)**                    **UW H-01**

*Page 7of 9*

Diversity and Inclusion, in violation of this policy and may be subject to employment action up to and including termination.

In cases where an investigation confirms a violation of this policy, management or administration in the appropriate College or Department must ensure that the remedial action prescribed by the Office of Diversity and Inclusion (ODI) is implemented. Managers or Administrators must provide confirmation to the Office of Diversity and Inclusion that appropriate remedial action has occurred unless a collective bargaining agreement requires the university to go through the disciplinary process. If, during the course of the investigation, it appears that disciplinary or other action may be warranted, Employee/Labor Relations and/or the Medical Executive Committee may additionally become involved. Management and Administration is also responsible for regular monitoring to ensure that all remedial and/or disciplinary steps are completed and no further discrimination or harassment occurs in the work, educational, or clinical care environments.

*Investigation and Confidentiality:*
SUNY Upstate's Complaint Process and Procedure for Investigating Complaints of Discrimination, Harassment, Sexual Assault, and/or Sexual Violence is located at the following link:  http://www.upstate.edu/diversityinclusion/complaint/complaint_process.php

All reports and/or complaints of harassment, including sexual harassment, whether in written or verbal form, will be taken seriously and dealt with promptly. The specific action taken in any particular case will depend on the nature and gravity of the conduct reported and may include intervention, mediation, investigation, and discipline, up to and including termination, expulsion or removal.

The University will maintain the confidentiality of the complaint and the privacy of the persons involved (e.g., complainant, witnesses, and the identity of the alleged harasser) to the fullest extent possible, consistent with its goal of conducting a thorough and complete investigation and to the extent permitted by law. However, the identity of the complainant may be revealed to the respondent and witnesses during the investigation if the University deems it necessary to do so to maintain a safe work and/or educational environment.

*Prohibition Against Retaliation:*
Retaliation is any adverse action taken against an individual because they engaged in any of the following protected activities:
- filed a charge of discrimination or harassment;
- complained to the University or a government agency about discrimination or harassment on the job or in the educational setting;
- participated in a discrimination or harassment proceeding (such as an internal investigation or lawsuit), including as a witness; or
- opposed unlawful discrimination or harassment.

Licinio v. SUNY Upstate, et al., 5:21-CV-387  006347

A0428

## Harassment Prevention Policy (continued)      UW H-01

*Page 8 of 9*

Retaliation also includes adverse action taken against someone who is associated with the individual opposing the perceived discrimination or harassment, such as a family member.

Examples of retaliation include termination, demotion, refusal to promote, changing a grade, denying access to a program, or any other adverse action that would discourage a reasonable person from making or supporting a claim of harassment or discrimination.

SUNY Upstate will not tolerate retaliation by or against any protected individual described above. Retaliation is a serious violation of this policy, as well as federal, state, and local law. Anyone who believes they are a victim of retaliation should report the matter immediately according to the same procedure provided in this policy for making complaints of harassment. Any person found to have retaliated against another individual will be subject to the same disciplinary action provided under this policy for other violations.

*Underline External Agencies:*
In addition to filing an internal complaint pursuant to SUNY Upstate's unlawful discrimination complaint procedure, an individual may file a complaint with any of the External Enforcement Agencies listed at the following link:
http://www.upstate.edu/diversityinclusion/complaint/external.php

Complaining internally to the University does not extend your time to file with any of the external agencies identified.

Education/Related Resources:
    University-Wide Policy UW E-01, Non-Discrimination and Equal Opportunity Policy
    University-Wide Policy UW D-04, Disability and Workplace Reasonable Accommodation Policy
    University-Wide Policy UW V-01, Domestic Violence and the Workplace Policy
    University-Wide Policy UW C-05 , Consensual Relationship Policy
    Institutional Compliance Plan Policy HCP C-12, Fair Treatment of Personnel
    Institutional Compliance Plan Policy HCP G-03, Non-Retaliation
    Administration Policy A-05, Admission to University Hospital
    The Upstate Code of Conduct UW C-02
    Medical Staff Bylaws
    Equal Opportunity: Access, Employment and Fair Treatment in the State University of New York
    SUNY Discrimination Complaint Procedure
    SUNY Diversity, Equity, and Inclusion Policy
    SUNY Upstate Complaint Process and Procedure for Investigating Complaints of Discrimination, Harassment, Sexual Assault, and/or Sexual Violence
    RF Nondiscrimination and Nonharassment Policy
    RF Solving Problems in the Workplace Policy
    Students Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX Policy
    Student Handbook Policy, Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

Licinlo v. SUNY Upstate, et al., 5:21-CV-387   006348

A0429

**Harassment Prevention Policy (continued)**　　　　　**UW H-01**

**Form Name(s) and Number(s):**
　　None


**Originating Department:**　　**Office of the President**
**Contributing Department(s):**　**Office of Diversity & Inclusion**
　　　　　　　　　　　　　　　**Office of General Counsel**
　　　　　　　　　　　　　　　**Human Resources**

**References/Evidence Based References:**
- **Title VI of the Civil Rights Act of 1964, as amended**
- **Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e**
- **Age Discrimination in Employment Act of 1967**
- **Americans with Disabilities Act of 1990, as amended**
- **New York State Human Rights Law, N.Y. Executive Law §296, et seq.**
- **Section 504 of the Rehabilitation Act of 1973, as amended**
- **Title VI of the Civil Rights Act of 1964, as amended**
- **Title IX of the Education Amendments Act of 1972**
- **Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended**
- **New York State Corrections Law Sections 752 & 753**
- **Genetic Information Nondiscrimination Act of 2008**
- **Pregnancy Discrimination Act**
- **New York State Executive Order No. 161**
- **New York Labor Law § 201-g**

**Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion**
See MCN Policy Manager System for the latest version.
Licinio v. SUNY Upstate, et al., 5:21-CV-387   006349

A0430



# DONT LET A MOLE HILL TURN INTO A MOUNTAIN

## Managing Conduct and Performance *at* *Upstate Medical University*



Licinio v. SUNY Upstate, et al., 5:21-CV-387      003648

A0431

## Table of Contents

**Resources for Addressing Performance and/or Conduct Issues:**

Office of Diversity & Inclusion ............................................................................1

    Non-Discrimination and Equal Opportunity Policy ...........................................11

    Harassment Prevention Policy ...........................................................................15

Employee/Labor Relations....................................................................................22

Medical Staff Services ..........................................................................................31


**Contact Information for Resources**....................................................................41

    Flow Chart for Resources ...................................................................................42


**Helpful Information:**

Healthy Workplace Environment Policy ................................................................43

Faculty Term Renewal and Non-Renewal for State Faculty ........................................46

Resident Due Process.............................................................................................52

Licinio v. SUNY Upstate, et al., 5:21-CV-387      003649

A0432



Licinlo v. SUNY Upstate, et al., 5:21-CV-387   003659

A0433

## On behalf of the Office of Diversity & Inclusion

**Presented by:**
**Dawn Norcross**
Affirmative Action Officer &
Title IX Coordinator
Office of Diversity and Inclusion
(315) 464-5234

**Anne Burak Dotzler, Esq.**
Assistant Counsel, Labor and Employment
Office of General Counsel
(315) 464-4704

## Current Landscape

- "Me Too" movement
- Use of social media has sent harassment claims viral
- Ongoing changes to anti-discrimination laws in NYS
- At Upstate:  Increase in number of internal complaints



# Office of Diversity and Inclusion
## Affirmative Action & Title IX

- Investigates claims of discrimination and harassment in employment and under Title IX in order to:

  - Ensure a respectful, harassment and discrimination-free work environment and educational setting

  - Ensure compliance with the law

  - Ensure anti-discrimination policies are followed



# Federal and State
# Anti-Discrimination Laws, including Title IX

- Federal and State Anti-Discrimination laws prohibit:

  - Discrimination and harassment in employment based on membership in a protected class;

  - Sex discrimination, including sexual harassment, in any education program or activity receiving Federal financial assistance;

  - Retaliation against individuals who oppose discrimination or harassment.

## Discrimination

- Different treatment of or taking adverse action against someone because of a personal characteristic protected by law including:

- Race
- Gender, including Pregnancy
- Creed
- Color
- Religion
- National Origin
- Age
- Disability
  - Physical or Mental
  - Actual or Perceived
- Military Status
- Familial Status

- Marital Status
- Domestic Violence Victim Status
- Arrest record
- Conviction record
- Pre-Disposing Genetic Characteristics
- Gender Identity
- Transgender Status
- Gender Dysphoria
- Sexual Orientation

 

## Harassment

- Harassment, including sexual harassment, is a form of discrimination.

- Two Types:

| Quid Pro Quo: | Hostile Work Environment: |
|---|---|
| Employee's submission to unwelcome sexual advances is used as a basis for making an employment or educational decision, including as a condition of continued employment or education. | Offensive and unwanted actions, communication, or behavior that is severe and pervasive enough to create a work environment that a reasonable individual would find intimidating, hostile, or abusive. |

## Examples of Sexual Harassment

- Physical:
  - Any unwelcome touching
  - Massaging
  - Stalking
- Verbal:
  - Telling sexually explicit jokes
  - Discussing sexual thoughts, fantasies or activities
  - Repeated requests for a date with someone who is not interested
- Non-Verbal:
  - Displaying sexually explicit pictures;
  - Emailing, tweeting, texting, instant messaging sexually explicit materials, comments, propositions
  - Leering or making cat-calls or sexual gestures at someone

## Retaliation

- Adverse action against or harassment of an individual because:

  - He/she complained of discrimination or harassment

  - He/she filed a charge of discrimination or harassment

  - Testified or participated in an investigation, proceeding, or lawsuit alleging claims of discrimination or harassment

  - Opposed employment practices that they reasonably believe discriminate against individuals in violation of these laws

A-0438

## Institutional Liability:
## Supervisor Discrimination/ Harassment

- The actions of supervisors, managers, and chairs are considered actions of our organization

- Tangible employment action ➡ automatic liability – no defense.

- No tangible employment action ➡ can only avoid liability if we:

  1) Reasonably tried to prevent and promptly correct the harassing behavior; and

  2) Complainant unreasonably failed to take advantage of any preventive or corrective opportunities provided.

## Institutional Liability:
## Co-worker or Non-Employee Discrimination/Harassment

- Liable for harassment by:
  - non-supervisory employees
  - non-employees over whom it has control
    - (e.g., independent contractors, temporary employees, or vendors on the premises)
- Liability if university:
  - knew or should have known about the harassment; and
  - failed to take prompt and appropriate corrective action

A-0439

## Supervisor's Personal Liability

- Supervisors can be held personally liable for unlawful harassment as an "aider and abettor" where:
  - Informed about offensive conduct
  - but failed to take appropriate investigative or remedial measures.

## Upstate's Anti-Discrimination Policies

- **Zero tolerance:**
  - We do not tolerate any form of harassment or discrimination.
  - Our policy is more strict than the law
  - Conduct that may not rise to the level of illegal harassment may not be appropriate
  - Goal: To create a culture that is free from harassment and/or discrimination – not simply to avoid unlawful behavior



## Your Role As Supervisors

- As a supervisor, you have a heightened obligation to help address and eliminate discrimination and harassment.
- Keep complainant's complaint confidential, except to inform the appropriate persons who can address the matter.
- Elevate harassment/discrimination that you have witnessed or have received complaints about to appropriate persons (i.e., AAO or CDO)
- Work with ODI and ELR to take prompt corrective measures as necessary

## ODI's Process

Manager notifies AAO of concerning behavior witnessed or reported that may be considered harassment/discrimination

If not yet severe or egregious: early intervention (i.e., training, etc.)

If severe or egregious: commence investigation process

Complaint Received

Contact Parties

Notify Department Chair, Dean, HR, Legal, or Others Where Necessary

Take Appropriate Interim Steps (i.e., removal from campus, separate parties)

Interview Complainant

Interview Witnesses

Collect Documentary Evidence

If not a potential subject of discipline, interview Respondent

If a potential subject of discipline, disciplinary interrogation

Make Findings and Conclusions

Notify Parties and Other Appropriate Internal Decision Makers

## Your Role As Supervisors

- Remember to refer the employee and report the complaint to Title IX Coordinator/AAO rather than:
  - Handling them yourself
  - Promising confidentiality to the complainant

- After a complaint has been made, stay neutral and allow the process to play out
  - Avoid joking about the incident with others, judging, taking sides, or treating the complainant differently
  - Avoid sending emails regarding what you believe may have happened.

- Maintain the status quo during an investigation.
  - If you absolutely feel that adverse action needs to be taken, fully review the matter with ELR and Legal to determine the best/least risky course of action.

## Potential Consequences of Not Reporting Harassment/Discrimination

- Biased or no investigation

- Placing students and other employees at risk of retaliation or further discrimination/harassment

- Violation of the Law

- Personal liability



Licinio v. SUNY Upstate, et al., 5:21-CV-387    003659

A-0442

## How to Prevent a Mole Hill From Becoming A Mountain?

- Cultivate a harassment-free culture from the top down by setting the tone for the department

- Conduct should be addressed before it reaches the level of severe and pervasive.

- Make training a priority

- Be a Bystander:

    "*If you see something, say something*"

- When in doubt, contact ODI for guidance



A-0443

 **UPSTATE** MEDICAL UNIVERSITY

# UNIVERSITY-WIDE POLICY MANUAL

| | |
|---|---|
| Policy Number: **UW E-01** | Approved by: CEO Cabinet & University Executive Committee |
| Issue Date:   04/30/1989<br>Value(s): *Drive Innovation & Discovery, Respect People, Value Integrity, Serve Community, Embrace Diversity and Inclusion* | Applies to:   Upstate Medical University<br>Page(s): 1 of 4 |

## Non-Discrimination and Equal Opportunity Policy

| Review Date: | Change Description: |
|---|---|
| 12/20/2017 | |
| **Revised Date:** | **Change Description:** |
| 12/20/2017 | Removed much of the content related to harassment and created separate, University-Wide Harassment Prevention Policy which defines harassment in detail and provides examples of prohibited harassment. Removed much of the content related to harassment and created separate, University-Wide Harassment Prevention Policy.  Revised sections addressing which persons the policies applies to, responsibilities for reporting conduct in violation of this policy, and prohibition against retaliation. |

**Applies to:**

All members of the SUNY Upstate Medical University community, including but not limited to faculty, medical providers, staff, students, applicants, volunteers, vendors, visitors, guests, and all other individuals present on SUNY Upstate Medical University's campus or participating in SUNY Upstate Medical University's programs or activities, whether on or off campus, including overseas programs (hereinafter referred to as "SUNY Upstate Community Members").

**Policy:**

SUNY Upstate Medical University and its affiliates ("SUNY Upstate") are committed to fostering a diverse community of outstanding medical providers, faculty, staff, and students, as well as ensuring equal educational opportunity, employment opportunity, and access to programs, activities and medical services, without regard to an individual's race, religion, color, gender, age, national origin or ancestry, disability, sexual orientation, gender identity and expression, marital status, familial status, predisposing genetic characteristics, criminal conviction, domestic violence victim status, veteran status, or other protected category under federal, State and/or local law ("protected categories").  SUNY Upstate prohibits any form of discrimination, including harassment, within its community or in its programs on the basis of these protected categories.

This policy applies to all aspects of employment, education, programs and activities sponsored by SUNY Upstate, including but not limited to recruitment, hiring, examination and testing, training, grading, disciplinary actions, rates of pay or other compensation, advancement, classification, transfer and reassignment, layoffs, return from layoffs, discharge, educational opportunity, tuition assistance, and participation and administration of social and recreational programs.

This policy also applies to all aspects of medical care provided to the public by or on behalf of SUNY Upstate.  All medical care and services will be provided to existing or prospective patients without regard to their membership in the above protected categories, or their chosen source of payment for services.

**Non-Discrimination and Equal Opportunity Policy (continued)**    **UW E-01**

*Page 2 of 4*

In furtherance of this policy, SUNY Upstate aims to promote the full realization of equal employment opportunity by maintaining an Affirmative Action Program and monitors affirmative action-related employment decisions and statistics in accordance with state and federal law and executive orders.

Reporting Conduct in Violation of This Policy:

A. **Reporting Process For SUNY Upstate Community Members.**

If SUNY Upstate Community Members believe that they or any other Upstate Community Member have been subjected discrimination based on their protected category, they may address the situation directly and immediately to the offender, when it is safe to do so. If the inappropriate conduct does not cease, or if the Community Members are unable to or are uncomfortable addressing the offender directly, they should promptly report the incident or conduct through one or more of the following channels depending on their role:

1. **Employees, including Faculty, Residents, Fellows, and Medical Staff:** Report to their Supervisor, Employee/Labor Relations, Graduate Medical Education, and/or the Office of Diversity and Inclusion.

2. **Students:** Report to Student Affairs, the Dean of their College, and/or the Office of Diversity and Inclusion.

3. **Volunteers:** Promptly report to their Supervisor, Volunteer Services, and/or the Office of Diversity and Inclusion.

4. **Employees of SUNY Upstate Affiliates, such as MedBest, Research Foundation, Temp Agencies:** Promptly report to their Supervisor, Employee/Labor Relations, and/or the Office of Diversity and Inclusion. Employees of affiliates should also report discrimination to their own employer even though the conduct took place on SUNY Upstate campus or within its programs.

5. **Interns and Participants in SUNY Upstate-Sponsored Programs Or Activities:** Promptly report complaints to their Supervisor, Program Coordinator, Employee/Labor Relations, and/or the Office of Diversity and Inclusion.

SUNY Upstate Community Members may also file a written complaint using the form located at: http://www.upstate.edu/diversityinclusion/complaint/

B. **Reporting Requirements For Managers, Supervisors, Administrators, Faculty, and Leadership Who Become Aware Of Potential Discrimination.**

Managers, supervisors, administrators, faculty and any other person in a position of leadership at SUNY Upstate must deal expeditiously and fairly with allegations of discrimination within their departments or colleges whether or not there has been a written or formal complaint. They must:

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

## Non-Discrimination and Equal Opportunity Policy (continued)   UW E-01

*Page 3 of 4*

- Take all complaints or concerns of alleged or possible discrimination seriously no matter how minor or who is involved;

- Ensure that discriminatory conduct is immediately reported to Employee Labor Relations and/or the Office of Diversity and Inclusion so that a prompt investigation can occur; and

- Take any appropriate action to prevent retaliation or prohibited conduct from reoccurring during and after any investigations of complaints.

Managers, supervisors, or any other person in a leadership position at SUNY Upstate who knowingly allow or tolerate discrimination or retaliation, including the failure to immediately report such misconduct to Employee/Labor Relations or the Office of Diversity and Inclusion, are in violation of this policy and may be subject to discipline.

Prohibition Against Retaliation:

SUNY Upstate prohibits retaliation against any individual who files a complaint with the Office of Diversity and Inclusion, opposes or complains of discrimination, including harassment, or assists or participates in any manner in a discrimination investigation, proceeding, or hearing (such as an internal investigation or lawsuit), including as a witness. Retaliation against these protected individuals will result in appropriate sanctions or other disciplinary action under relevant collective bargaining agreements and/or SUNY Upstate policies.

Education/Related Resources:
University-Wide Policy UW H-01, Harassment Prevention Policy
University-Wide Policy UW D-04, Disability and Workplace Reasonable Accommodation Policy
University-Wide Policy UW V-01, Domestic Violence and the Workplace Policy
University-Wide Policy UW C-05 , Consensual Relationship Policy
Hospital Compliance Plan Policy HCP C-12, Fair Treatment of Personnel
Hospital Compliance Plan Policy HCP G-03, Non-Retaliation
Administration Policy A-05, Admission to University Hospital
The Upstate Code of Conduct UW C-02
Medical Staff Bylaws
Equal Opportunity: Access, Employment and Fair Treatment in the State University of New York
SUNY Discrimination Complaint Procedure
SUNY Discrimination Complaint Procedure
SUNY Diversity, Equity, and Inclusion Policy
RF Nondiscrimination and Nonharassment Policy
RF Solving Problems in the Workplace Policy
Students Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX Policy
Student Handbook Policy, Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX

Form Name(s) and Number(s):
None

---

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

A-0446

## Non-Discrimination and Equal Opportunity Policy (continued)   UW E-01

*Page 4 of 4*

Originating Department:       Office of the President
Contributing Department(s): Patient Relations Department
                            Community Campus Quality Services Department
                            Office of Diversity and Inclusion
                            Office of General Counsel
                            Human Resources
                            Student Affairs
                            College of Medicine
                            Upstate University Hospital TCU at Community Campus #122236-C

References:
- Title VI of the Civil Rights Act of 1964, as amended
- Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e
- Regulations of the U.S. Health and Human Services
- SUNY Upstate University Hospital Affirmative Action Program
- Age Discrimination in Employment Act of 1967
- Americans with Disabilities Act of 1990, as amended
- Equal Pay Act of 1963
- New York State Human Rights Law, N.Y. Executive Law §296, et seq.
- Section 504 of the Rehabilitation Act of 1973, as amended
- Title IX of the Education Amendments Act of 1972
- Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended
- New York State Corrections Law Sections 752 & 753
- Genetic Information Nondiscrimination Act of 2008
- Pregnancy Discrimination Act
- New York State Executive Order No. 161
- Executive Order 11246

Licinio v. SUNY Upstate, et al., 5:21-CV-387   003653

A0446

A-0447



# UPSTATE
MEDICAL UNIVERSITY

# UNIVERSITY-WIDE POLICY MANUAL

| | |
|---|---|
| Policy Number: **UW H-01** | Approved by: CEO Cabinet & University Executive Committee |
| Issue Date: **11/29/2017**<br>Value(s): *(Drive Innovation & Discovery, Respect People, Serve Community, Value Integrity, Embrace Diversity and Inclusion)* | Applies to: **Upstate Medical University**<br>Page(s): 1 of 7 |

## Harassment Prevention Policy

| Review Date: | Change Description: |
|---|---|
| 11/29/2017 | |
| **Revised Date:** | **Change Description:** |
| 11/29/2017 | This is a NEW policy.<br>Formerly a part of the Non-Discrimination and Equal Opportunity Policy (# UW E-01) and the Upstate Code of Conduct (# UW C-02) and is now a new separate, stand-alone policy. Policy has been expanded to include examples of prohibited harassment, including sexual harassment, avenues and requirements for reporting harassment, and prohibition against retaliation. |

**Applies to:**

All members of the SUNY Upstate Medical University community, including but not limited to faculty, medical providers, supervisors, managers, staff, students, applicants, volunteers, vendors, visitors, guests, and all other individuals present on SUNY Upstate Medical University's campus or participating in SUNY Upstate Medical University's programs or activities, whether on or off campus, including overseas programs (hereinafter referred to as "SUNY Upstate Community Members").

**Policy:**

SUNY Upstate Medical University and its affiliates ("SUNY Upstate") are committed to maintaining a work, educational, and clinical care environment that is free from harassment, including sexual harassment, intimidation, and violence. Harassment based on a person's race, color, national origin, religion, age, disability, gender, pregnancy, gender identity, gender expression, sexual orientation, predisposing genetic characteristics, marital status, familial status, veteran status, military status, domestic violence victim status, criminal conviction record, or any other category protected under state or federal law is unlawful and undermines the character and purpose of SUNY Upstate.

All SUNY Upstate CommunityMembers are covered by and expected to comply with this policy and to take appropriate measures to ensure that prohibited conduct does not occur. Individuals who violate this policy will be subject to discipline up to and including termination, expulsion, removal and/or other appropriate sanctions or actions pursuant to federal, state, local law and/or relevant collective bargaining agreements.

## Harassment Prevention Policy (continued)          UWH-01

*Page 2 of 7*

**Prohibited Conduct:**

**A. Harassment.**

Harassment is unwelcome conduct targeted toward an individual or group because of their race, color, national origin, religion, age, disability, gender, pregnancy, gender identity, gender expression, sexual orientation, predisposing genetic characteristics, marital status, familial status, veteran status, military status, domestic violence victim status, criminal conviction record, or any other category protected under state or federal law ("protected category") that interferes with an individual's employment, education, or other access to university programs and activities. Harassment is a form of discrimination.

Determining what constitutes harassment depends on the specific facts and context in which the conduct occurs. Harassment may take many forms. Harassment may be subtle and indirect or may be blatant and overt. The harasser can be an individual's supervisor, faculty member, a supervisor in another area, a co-worker/colleague, or someone who is not an employee of the University, such as a vendor or guest or employee of an affiliate such as the Research Foundation, MedBest, etc. The harasser can be of the same or different gender as the victim. Harassment may consist of repeated actions or may arise from a single incident if sufficiently egregious.

Examples of harassment that is prohibited under this policy include, but are not limited to:

- Offensive or degrading remarks, verbal abuse, or other hostile behavior such as insulting, teasing, mocking, degrading or ridiculing another person on the basis of a person's protected category;

- Slurs, derogatory remarks about a person's accent, or display of offensive symbols directed toward a person's membership in a protected category;

- Unwelcome or inappropriate physical contact, comments, questions, advances, jokes, epithets or demands because of a person's protected category;

- Displays or electronic transmission of derogatory, demeaning or hostile materials based on a person's protected category; and

- Unwillingness to train, evaluate, assist, or work with a person because of their membership in a protected category.

Licinio v. SUNY Upstate, et al., 5:21-CV-387     003666

A0448

## Harassment Prevention Policy (continued)                                    UWH-01

| |
|---|
| *Page 3 of 7* |

**B.  Sexual Harassment.**

Sexual harassment is a form of unlawful discrimination and harassment under Title VII of the Civil Rights Act of 1964 and under Title IX of the Education Amendments Act of 1972, and is prohibited.  Sexual harassment can be physical and/or psychological in nature.  An aggregation of a series of incidents can constitute sexual harassment even if one of the incidents considered on its own would not be harassing.

Sexual harassment in the employment setting is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

- submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of an individual's employment (quid pro quo),

- submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual (quid pro quo), or

- such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment (hostile work environment).

Sexual harassment in the educational setting is defined as unwelcome conduct of a sexual nature, and can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.  Sexual harassment of a student, resident, or fellow denies or limits, on the basis of sex, the student, resident, or fellow's ability to participate in or receive benefits, services, or opportunities in the educational institution's program.

The following are examples of sexual harassment that violates this policy:

- Physical sexual harassment including but not limited to:  unwelcome, unwanted physical contact, including touching, tickling, pinching, patting, grabbing, brushing up against, hugging, cornering, kissing and fondling and forced sexual intercourse or assault.

- Verbal sexual harassment including but not limited to:  unwelcome sexual advances, sexual innuendoes, propositions or other sexual comments such as sexually oriented remarks, jokes or comments about a person's sexuality or experience, jokes of a sexual nature, lewd remarks and threats, requests for any type of sexual favor (this includes repeated, unwelcome requests for dates).

---

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion

## Harassment Prevention Policy (continued)                    UWH-01

*Page 4 of 7*

- Non-verbal sexual harassment including but not limited to: the distribution, display or discussion of any written or graphic material, including calendars, posters and cartoons that are sexually suggestive or show hostility toward an individual or group because of sex; suggestive or insulting sounds; leering; staring; whistling; obscene gestures; content in letters and notes, facsimiles, e-mail, photos, text messages, tweets and Internet postings; or other forms of communication that are sexual in nature and offensive.

- Preferential treatment or promises of preferential treatment in exchange for submitting to sexual conduct, including soliciting or attempting to solicit any individual to engage in sexual activity for compensation or reward.

- Subjecting, or threats of subjecting, an individual to unwelcome sexual attention or conduct or intentionally making performance of a person's job, engagement in an Upstate-sponsored activity or program, or learning environment more difficult because of that person's sex.

- Sexual or discriminatory displays or publications anywhere on SUNY Upstate's campus.

When a person subject to this policy is notified that their behavior is unwanted or unwelcome, the behavior should stop immediately.

<u>Reporting Conduct in Violation of this Policy:</u>

A. <u>Reporting Process For SUNY Upstate Community Members.</u>

If SUNY Upstate Community Members believe that they or any other Upstate Community Member have been subjected to harassment or any unwelcome sexual conduct, they may address the situation directly and immediately to the harasser, if it is safe to do so. If the inappropriate conduct does not cease, or if the Community Member is unable to or is uncomfortable with addressing the alleged harasser directly, they should promptly report the incident or conduct to one or more of the following channels depending on their role at Upstate:

1. <u>Employees, including Faculty, Residents, Fellows, and Medical Staff:</u> Report to their Supervisor, Employee/Labor Relations, Graduate Medical Education, and/or the Office of Diversity and Inclusion.

2. <u>Students:</u> Report to Student Affairs, the Dean of their College, and/or the Office of Diversity and Inclusion.

3. <u>Volunteers:</u> Promptly report to their Supervisor, Volunteer Services, and/or the Office of Diversity and Inclusion.

---

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

A-0451

**Harassment Prevention Policy (continued)**                                    **UWH-01**

*Page 5of 7*

    4.  <u>Employees of SUNY Upstate Affiliates, such as MedBest, Research Foundation, Temp Agencies:</u>  Promptly report to their Supervisor, Employee/Labor Relations, and/or the Office of Diversity and Inclusion.  Employees of affiliates should report harassment to their own employer even though the conduct took place on SUNY Upstate campus or within its programs.

    5.  <u>Interns and Participants in SUNY Upstate-Sponsored Programs Or Activities:</u>  Promptly report complaints to their Supervisor, Program Coordinator, Employee/Labor Relations, and/or the Office of Diversity and Inclusion.

Upstate Community Members may also file a written complaint using the form located at: <u>http://www.upstate.edu/diversityinclusion/complaint/</u>

B.  <u>Reporting Requirements for Managers, Supervisors, Administrators, Faculty, and Leadership Who Become Aware of Potential Harassment.</u>

Managers, supervisors, administrators, faculty and any other person in a position of leadership within SUNY Upstate must deal expeditiously and fairly with allegations of harassment within their departments or collegeswhether or not there has been a written or formal complaint. They must:

- Take all complaints or concerns of alleged or possible harassment or discrimination seriously no matter how minor or who is involved;

- Ensure that harassment or inappropriate sexually-oriented conduct is immediately reported to the Office of Diversity and Inclusion so that a prompt investigation can occur; and

- Take any appropriate action to prevent retaliation or prohibited conduct from reoccurring during and after any investigations of complaints.

Managers, supervisors, or any other person in a leadership position at SUNY Upstate who knowingly allow or tolerate harassment or retaliation, including the failure to immediately report such misconduct to the Office of Diversity and Inclusion, are in violation of this policy and may be subject to discipline.

In cases where an investigation confirms a violation of this policy, management or administration in the appropriate College or Department must ensure that the remedial action prescribed by the Office of Diversity and Inclusion is implemented.  Managers or Administrators must provide confirmation to the Office of Diversity and Inclusion that appropriate remedial action has occurred unless a collective bargaining agreement requires the university to go through the disciplinary process.  If, during the course of the investigation, it appears that disciplinary or other action may be warranted, Employee/Labor Relations and/or the Medical Executive Committee may additionally become involved.  Management and Administration is also responsible for regular monitoring to ensure that all remedial and/or

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

## Harassment Prevention Policy (continued)                    UWH-01

*Page 6 of 7*

disciplinary steps are completed and no further discrimination or harassment occurs in the work, educational, or clinical care environments.

### Investigation and Confidentiality:

All reports and/or complaints of harassment, including sexual harassment, will be taken seriously and dealt with promptly. The specific action taken in any particular case will depend on the nature and gravity of the conduct reported and may include intervention, mediation, investigation, and discipline, up to and including termination, expulsion or removal.

The University will maintain the confidentiality of the complaint and the privacy of the persons involved to the greatest extent possible, consistent with its goal of conducting a thorough and complete investigation and to the extent permitted by law. However, the identity of the complainant may be revealed to the respondent and witnesses if necessary during the investigation or proceedings.

### Prohibition Against Retaliation:

Retaliation is any adverse action taken against an individual because s/he filed a charge of discrimination or harassment, complained to the University or a government agency about discrimination or harassment on the job or in the educational setting, or participated in a discrimination or harassment proceeding (such as an internal investigation or lawsuit), including as a witness. Retaliation also includes adverse action taken against someone who is associated with the individual opposing the perceived discrimination or harassment, such as a family member.

Examples of retaliation include termination, demotion, refusal to promote, changing a grade, denying access to a program, or any other adverse action that would discourage a reasonable person from opposing perceived discrimination.

SUNY Upstate will not tolerate retaliation by or against any protected individual described above. Retaliation is a serious violation of this policy, as well as federal, state, and local law. Anyone who believes they are a victim of retaliation should report the matter immediately according to the same procedure provided in this policy for making complaints of harassment. Any person found to have retaliated against another individual will be subject to the same disciplinary action provided under this policy for other violations.

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.

Licinio v. SUNY Upstate, et al., 5:21-CV-387      003689

A0452

## Harassment Prevention Policy (continued)                              UWH-01

| | Page 7 of 7 |
|---|---|

**Education/Related Resources:**
  University-Wide Policy UW E-01, Non-Discrimination and Equal Opportunity Policy
  University-Wide Policy UW D-04, Disability and Workplace Reasonable Accommodation Policy
  University-Wide Policy UW V-01, Domestic Violence and the Workplace Policy
  University-Wide Policy UW C-05 , Consensual Relationship Policy
  Hospital Compliance Plan Policy HCP C-12, Fair Treatment of Personnel
  Hospital Compliance Plan Policy HCP G-03, Non-Retaliation
  Administration Policy A-05, Admission to University Hospital
  The Upstate Code of Conduct UW C-02
  Medical Staff Bylaws
  Equal Opportunity: Access, Employment and Fair Treatment in the State University of New York
  SUNY Discrimination Complaint Procedure
  SUNY Discrimination Complaint Procedure
  SUNY Diversity, Equity, and Inclusion Policy
  RF Nondiscrimination and Nonharassment Policy
    RF Solving Problems in the Workplace Policy
    Students Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX Policy
  Student Handbook Policy, Equal Opportunity, Non-Discrimination, Sexual Harassment and Title IX

**Form Name(s) and Number(s):**
  None

**Originating Department:**     Office of the President
**Contributing Department(s):** Office of Diversity & Inclusion
                                Office of General Counsel
                                Human Resources

**Reference(s):**
- Title VI of the Civil Rights Act of 1964, as amended
- Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e
- Age Discrimination in Employment Act of 1967
- Americans with Disabilities Act of 1990, as amended
- New York State Human Rights Law, N.Y. Executive Law §296, et seq.
- Section 504 of the Rehabilitation Act of 1973, as amended
- Title VI of the Civil Rights Act of 1964, as amended
- Title IX of the Education Amendments Act of 1972
- Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended
- New York State Corrections Law Sections 752 & 753
- Genetic Information Nondiscrimination Act of 2008
- Pregnancy Discrimination Act
- New York State Executive Order No. 161

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version.



Licinio v. SUNY Upstate, et al., 5:21-CV-387    003622

A0454

A-0455









Licinio v. SUNY Upstate, et al., 5:21-CV-387    003628



## If the Wrong person may have been hired...

- Address issues/concerns quickly
- Avoiding them doesn't make them go away
- If coaching/mentoring isn't working, progress quickly to counseling.
- If State and on a term appointment, consider recommending non-renewal.
- If RF, consider termination of employment.

## Faculty Counseling & Discipline

A-0458

## Counseling

- Counseling is <u>not</u> discipline
- Counseling attempts to correct behavior and/or performance through face-to-face communication and problem solving
- Counseling session/meeting occurs at the department level, between the employee and supervisor
- Employee has no contractual right for union representation
- Verbal or Written Counseling

## Counseling

Verbal Counseling

- Supervisor meets with employee
- Reviews issue/concern and reinforces expectations going forward
- Supervisor documents meeting for his/her own record
- No written document to employee, official personnel file or Employee/Labor Relations

**A-0459**

## *Counseling*

Written Counseling

- Supervisor meets with employee
- Reminds employee of verbal counseling session
- Reviews new issue/concern and reinforces expectations going forward
- Supervisor then summarizes meeting in a memo to the employee.
- Memo is copied to employee's official personnel file, Employee/Labor Relations and Supervisor's supervisor

## *Discipline*

- Discipline attempts to correct behavior and performance through the imposition of a penalty.
- Discipline should be sought after counseling sessions have proven ineffective, or
- When the action(s) of an employee is severe or egregious, such as workplace violence, violating patient confidentiality, patient abuse, theft, sexual harassment, discrimination, use/sale of drugs, etc.





**A-0461**

## Disciplinary Process

- Involves the Employee/Labor Relations Office, as the President's designee for formal discipline.
- Disciplinary "Interrogation" Meeting
- Employee has right to be represented by union representative, private counsel or to represent themselves.
- Issuance of Notice of Discipline with <u>Proposed</u> Penalty
- Arbitration

## REMINDERS

- Hire the right person
- Address issues early
- If issues continue, progress to the next step
- End employment when appropriate





# SUNY Upstate University Hospital

## *DONT LET A MOLE HILL TURN INTO A MOUNTAIN*

*Medical Staff Peer Review and Other Concerns*

Beth Erwin, CPCS, CPMSM
Director, Medical Staff Services

A-0464

## Peer Review

### Types

- Quality assurance/utilization review
- Review of medical staff applications and requests for reappointment
- Disciplinary actions involving physicians
- Immunity

### Laws/ Protection

- New York Public Health Law 2805-m
- New York State Medical Malpractice Prevention Program
  - Public health Law section 2805-j, and 2805-m.
- "Professional review body" as defined in federal Health Care Quality Improvement Act (HCQIA)

## Initial Appointment

- Opportunities to address concerns:
  - Review of Credentials File (Flags)
  - Peer recommendation (from Chief of Service)
  - Focused evaluation plan (FEP)

## FLAGS:

### Typical / Less Common

**Typical**
- Incomplete application
- Time gaps
- References
- Disciplinary action
- Failure to disclose
- Extra time needed
- Inability to verify
- Information not listed
- Professional misconduct or impairment.
- Liability insurance issues
- Loss of privileges, restriction, loss of license/DEA
- Malpractice lawsuits

**Less Common**
- Unexplained Resignations
- Extended provisional status
- Civil suits
- Clinical practice anomalies
- Health
- Frequent changes in location / malpractice

## More Opportunities

- Reappointment
  - Peer recommendation (from Chief of Service)
  - Focused evaluation plan (FEP) - increases
- Between appointments
  - Exit evaluations
  - Note / memo to MSS
  - Quality chart reviews
  - FPPE
  - Review of data / OPPE

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003683

A0465

## Conduct versus Competence

- Conduct
  - Sexual harassment
  - Impairment (Physical, mental, chemical)
  - Workplace violence
  - U-Turn failure
  - Communication

- Competence
  - Not appropriate for U-Turn
  - Clinical
  - Cannot perform well / well enough
  - Patient safety
  - Communication

## Competence – Additional Notes

- When a privilege is not recommended

- When a physician does not meet the criteria







## Pros and Cons

**Pros**
- Self-correction
- Less punitive measures
- Clinical concerns
- File support
- Improvement in performance
- Improved patient safety
- Oversight

**Cons**
- Corrective Action
- Consequences
- End result

## Requests to Medical Executive Committee

- Action Requested by:
  - The Chief of Service/Division/Section at the relevant campus
  - Medical Director
  - President, Medical Staff
  - Chief Executive Officer
  - President, SUNY Upstate Medical University
  - Any physician member of the Medical Executive Committee
  - The Chair of any Medical Staff Committee
  - The Medical Executive Committee
  - Associate Director of Advanced Practice physicians

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003686

A0468

A-0469

## Action by Medical Executive Committee

- Corrective action (CAP) may include, *but is not limited to*:
  - Professional counseling
  - Continuing professional education
  - Mandated supervision or consultation
  - Suspension, revocation or curtailment of the practitioner's privileges, in whole or in part
  - Termination of appointment or denial of reappointment
  - Letter of admonition, reprimand, or warning to be placed in the practitioner's credentials file
  - Retrospective or prospective review of records
  - Probation for a specified period

## Due Process for Physicians*

- Triggered by adverse review action
- Process includes:
  - Notice
  - Statement
  - Right to counsel
  - Witnesses
  - Recorded by court reporter
  - Review of written decision by Governing Body

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003686

A0469

A-0470

## Confidentiality

- Intended to encourage discourse and candor among peer review participants
- Protects records and proceedings from
  - Discovery
  - Subpoenas (civil litigation v. NYS DOH)
  - Public Freedom of Information Law (FOIL requests; open records requests)
  - Open Meetings Act*
- Limitations
  - Does not apply to records made or maintained in the regular course of business
  - May be waived
  - Permissive disclosures*
  - Defense of committee or members*
  - Some reporting is required and does not constitute a waiver

## Immunity

- Participants in the peer review process are protected from civil liability and discipline or discrimination
  - Committee members and employees
  - Witnesses
  - Reporting parties
- Limitations
  - Good faith
  - Without malice or knowledge of falsity
  - Reasonable belief that action or recommendation is warranted by the facts
  - Does not apply to some actions
    - Civil rights suits or actions by the United States or a state's attorney general







## Contact Information

| Name/Title | Area | Email | Phone |
|---|---|---|---|
| Gloria Lopez<br><br>Chief Diversity Officer | Managing Discrimination & Harassment Complaints | lopezg@upstate.edu | 464-5234 |
| Dawn Norcross<br><br>Affirmative Action Officer & Title IX Coordinator | Managing Discrimination & Harassment Complaints | norcrosd@upstate.edu | 464-5234 |
| Anne B. Dotzler<br><br>Assistant Counsel Labor and Employment | Managing Discrimination & Harassment Complaints | dotzlera@upstate.edu | 464-4700 |
| Lisa Tesorio<br><br>Employee Labor Relations Manager | Faculty Counseling & Discipline | tesoriol@upstate.edu | 464-5872 |
| Beth Erwin<br><br>Director, Medical Staff Services | Medical Staff / Peer Review | erwine@upstate.edu | 464-8521 |
| Ann S. Botash, MD<br><br>Senior Associate Dean for Faculty Affairs and Development | Faculty Term Renewal and Non-Renewal for State Faculty | botasha@upstate.edu | 464-1681 |
| Danielle A. Katz, MD<br><br>Associate Dean, Graduate Medical Ed. Associate Professor, Department of Orthopedic Surgery | Resident Due Process | katzd@upstate.edu | 464-5136 |



 **UPSTATE** UNIVERSITY HOSPITAL   **ADMINISTRATIVE MANUAL**    **UPSTATE** UNIVERSITY HOSPITAL COMMUNITY CAMPUS

| Policy Number: **W-07** | Approved by: Executive Leadership Team |
| Issue Date: 10/2015 | Applies to: Downtown & Community |
| *Values: Respect People* | Page(s): 1 of 3 |

## Healthy Workplace Environment Policy

| Review Date: | Change Description: |
|---|---|
| *01/29/2018* | *Policy reviewed, no changes required* |
| **Revised Date:** | **Change Description:** |
| *10/2015* | *New policy* |

**Applies to:**  **All Staff**

**Policy:**  At Upstate University Hospital, we are committed to creating and maintaining a healthy work environment. On the path to sustaining a healthy work environment, we recognize that conflict will happen, and it is the position of the University that employees attempt to resolve conflict themselves.

Conflict that arises regarding compliance or legal matters is exempt from this policy. It is the responsibility of all employees to immediately notify the appropriate parties in these cases.

**Procedure:**

**A.**  **Process for Conflict Resolution**



## Healthy Workplace Environment Policy (continued) W-07

| |
|---|
| Page 2 of 3 |

The Caregiver Pathway to Resolution (U-Turn Model) provides a process to facilitate appropriate steps to alleviate conflict. The U-Turn model is a well-defined process of conflict mediation to:

1. Decrease interpersonal conflict that occurs in patient care areas
2. Understand what creates tension and identify ways to remove barriers to success
3. Identify and educate caregivers on appropriate steps to alleviate conflict
4. Through a well-defined process of conflict mediation, improve the spirit of teamwork

<u>Grey Zone</u>: the intent is to make all parties aware that a patient or family member is present, and the conversation is not appropriate to have take place in that moment. Employees are asked to use the language, "can we yield this conversation"? At this time, all parties should redirect the conversation. No documentation exists of the conversation.

<u>Green Zone</u>: the intent is by using the language, "can we please u-turn that conversation?", employees are given the opportunity to identify uncomfortable conversations or interactions and through this wording, be able to:

1. Describe the event/perception to your peer
2. Take the time to reach a solution
3. End the conversations with a closure phrase; "are we good?", or "are we on the same page?"

No documentation exists of the conversation.

<u>Yellow Zone</u>: the intent is for employees who are not able to resolve disagreement through a U-Turn conversation to have the opportunity for third-party mediation, ideally being a supervisor. Staff may also engage a third-party mediator in cases where repeat behaviors exist or commitments in the U-Turn conversation are not met.

1. Supervisor(s) of parties involved are encouraged to mediate the conversation for staff members
2. Resolution is sought and may take more than one face-to-face conversation to reach an agreement
3. The parties may request a neutral third-party mediator
4. Documentation of agreement is maintained with the supervisor(s) and employees

<u>Red Zone</u>: While not part of the collaboration process, the intent is to address repeat or consistent behavior that is deemed counterproductive to creating and sustaining a healthy work environment. The supervisor has encouraged employees to have a U-Turn conversation and served as mediator in an attempt to resolve the conflict. If one or more parties isn't able to reach a resolution and the behavior continues, it is the responsibility of the supervisor to notify Human Resources/Employee Labor Relations to identify the appropriate next steps.

*For medical staff, where U-Turn conversations and mediation attempts have failed to resolve the conflict, the Chief of Service (or supervisor, as applicable) should refer to MSB X-03, Section 5, for next steps.*

Drive Innovation & Discovery    Respect People    Serve our Community    Value Integrity    Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version

A0476

## Healthy Workplace Environment Policy (continued)     W-07

Page 3 of 3

B.    **Mediation Resources**

Upstate University Hospital is committed to facilitating conflict resolution and recognizes that there will be times when staff are not able to do so themselves. In this case, Upstate provides certified mediators to serve as a neutral third-party to facilitate a resolution conversation.

While mediation is available, it may not be the appropriate course of action. For example, if the mediation request involves staff who feel discrimination is present, retaliation, or for reasons that clearly violate Upstate policy, mediation is not an option.

Here is what can be expected:

The parties involved in the conflict must agree to mediation. Parties should make their supervisor aware of the request and be given the flexibility to work with the mediator.

Mediators will facilitate up to two 90-minute conversations between the parties. They may opt to increase this time if the mediator believes resolution will occur.

When resolution is reached, one of two steps (or both) will happen. First, the supervisor(s) of the parties is notified of the successful outcome. Second, any agreement between the two parties moving forward is documented and a copy given to the employees and supervisor(s). These agreements are for monitoring and coaching purpose only and not to be part of an employee file.

For information on the U-turn model and the mediator request visit the Upstate U-turn website: http://upstate.edu/uturn/index.php

Staff Education/Related Resources:       N/A

Form Name(s) and Number(s): N/A

Originating Department:       Hospital Quality

Contributing Department(s):       Human Resources
                                    Nursing Department

References:

Rosenstein, AH et al: Disruptive behavior and clinical outcomes: Perception of nurses and physicians. American Journal of Nursing, 2005, 105, 1, 54-64

Hayes, S. (2009) The 5 Ps of conflict resolution: Designing systems to manage workplace disputes. North Carolina Employee Assistant Program Annual Spring Training, Winston-Salem, NC. Hayes, S. (2009)

Porath, C., Pearson, C. (2009). How Toxic Colleagues Corrode Performance. Harvard Business Review. April, (#)35.

Drive Innovation & Discovery   Respect People   Serve our Community   Value Integrity   Embrace Diversity & Inclusion
See MCN Policy Manager System for the latest version

Idicho v. SUNY Upstate, et al.: 5:21-CV-387     003698

A0477



# Faculty Term Renewal and Non- Renewal for State Faculty

Ann S. Botash, MD

Senior Associate Dean for Faculty Affairs and Development

For more information, see:
http://www.upstate.edu/facultydev/intra/term_renewal.php

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003606

A0478

A-0479

## Board of Trustees Policies

- Term appointments are for a specified period of time, no greater than three years.
- Certain steps are required to maintain the appointment, and to monitor continuing (tenure) eligibility status, if applicable.



## Renewal



- Chair receives a memo asking whether they intend to renew or non-renew--*at the appropriate time*
- If RENEW – a partially completed form is sent by the faculty appointment specialist (Stacy Mehlek) for appropriate future date
- Department completes form (home address) and assembles:
  - Updated CV
  - Teaching Evaluations
  - Most recent Agreement of Academic Expectations

A-0480

## Renewal: Next Steps



- Instructions on the form
  **You do this:**
  - A copy of the form **and required attachments** must be mailed to the faculty members home address
  - **Wait 5 days before forwarding the original packet to the Deans office**

  **Deans office does this:**
  - Upon the Deans endorsement of the recommendation a (another) copy of the packet will be mailed to the faculty members home address
  - The Deans office will wait 5 days before forwarding the form to the Faculty Appointment Specialist (FAS)
  - The FAS will prepare for the President and mail the renewal notice letter

## Non-renewal



- Specific notification requirements must be followed, in the event that a term appointment will not be renewed beyond its expiration date.

- Chairs must make a decision regarding the renewal of faculty appointments in accordance with the notification requirements so that the recommendation is on file well in advance of the non-renewal notification date.



Licinio v. SUNY Upstate, et al., 5:21-CV-387     003608

A0480

A-0481

## Non-Renewal Notification Requirements

- First year non-renewal (only appointed for one year term)?
  - Notify of non-renewal prior to three months prior to end of year (with nuances)
- Two year non-renewal (only appointed for two year term)?
  - Notify of non-renewal prior to 6 months prior to the end of the second year
- Three year non-renewal (appointed for three year term)?
  - Must notify with a twelve month notice prior to end of third year for non-renewal

## Part-time faculty

- 45 day notice, at the end of their term



https://www.westsoundworkforce.com/tips-for-managing-a-part-time-employee-workforce/

A-0482

## Turning the Mountain into a Molehill

- Can always give more notification
- Can always rescind a non-renewal



https://www.psychologytoday.com/blog/headshrinkers-guide-the-galaxy/201312/how-make-mountain-out-molehill

## Non-Renewal

- Faculty Appointment Specialist will contact chair to review the process and send the form
- Instructions – **a copy of the form must be mailed to home address or handed to the faculty member. Wait 5 days before forwarding the original to the Dean's office**
- Letter is sent by FAS to faculty member, with opportunity to review the form in the FA office and/or provide a written response to the President within 5 business days.

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003699

A0482

A-0483

## Non-Renewal

- The FAS will send the form to the President as well as any response from the faculty member
- If the President agrees with the non-renewal recommendation, the notice of non-renewal letter is mailed to the faculty member's home address





Office of Faculty Affairs and Development
Stacy Mehlek, Faculty Appointments Specialist
315-464-5239
http://www.upstate.edu/facultydev/intra/term_renewal.php

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003700

A0483

A-0484

Don't let a molehill become a mountain

Resident Due Process

Danielle A. Katz, MD
Associate Dean, Graduate Medical Education
Associate Professor, Department of Orthopedic Surgery

Licinio v. SUNY Upstate, et al., 5:21-CV-387   003702

A0484

A-0485

## Disclosures/Disclaimers

- Stock in health care companies
- Travel reimbursed by ACS, AAOS

- Still new to job
- Revising handbooks
  - Resident, program director, chair
  - Not one process nationwide

## Introduction

- Tension between residents as learners and residents as employees (UUP, ADA, etc)

- Evaluation processes
- Documentation
- Options and consequences
- Appeals

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003782

A0485

A-0486

## Evaluations

- Rotations
  - Accurate, honest, formative
  - Professional
  - Narrative
- Milestones
  - Evaluation of program
  - Progression over time
- In-training exams

## Documentation

- Required
  - Rotation evaluations
  - Semi-annual feedback to residents
- Additional
  - Positive feedback
  - Concerns: academic, communication, professionalism, safety (patients, resident)

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003788

A0486

A-0487

## Options

- Not reportable
- Remediation
- (Letter of improvement)

- Reportable
- Probation
- Non-promotion
- Non-renewal
- Suspension
- Dismissal/termination

- Resignation

## Appeal

- Currently
  - Probation, non-promotion, non-renewal, termination
  - Associate Dean, GME; Dean, College of Medicine
- Future
  - Panel?



## Important take-home points

- Give feedback early
- Document, document, document
- Involve GME Office early
- Follow processes

- Will update when revision of manuals complete

## Thank you

### Questions??

Licinio v. SUNY Upstate, et al., 5:21-CV-387    003765

A0488

A-0489



# ACT
# Early & Effectively

## DOCUMENT, DOCUMENT, DOCUMENT!

Licinio v. SUNY Upstate, et al., 5:21-CV-387   003763

# Sexual Harassment Prevention

## Presented by:

- **Anne Dotzler, Legal**

- **Chris Kosakowski, Vera House**

- **Gloria Lopez, Chief Diversity Officer**
  **Office of Diversity and Inclusion**

- **Sipho Mbuqe, Ph.D.**
  **Senior Counselor, Student Counseling**

- **Nicholas Newcomb, Captain**
  **University Police Department**

ONE UPSTATE

A0490

# Information to share

- Little history
  - Law
  - Title IX
  - Clery
- What is sexual harassment
- Spectrum of Sexual Harassment
- Responsibilities
- The Boss
- Surprise!

ONE UPSTATE

Agree/Disagree/Unsure

I have the knowledge and power to prevent sexual harassment

ONE UPSTATE

# Why is Sexual Harassment Prevention training important?

• Upstate Medical University is committed to creating and maintaining a learning environment that is free from all forms of harassment and intimidation.

• Students come here to learn and employees come here to work, not to be coerced and mistreated.

• In March 2018, NY legislatures promulgated a sexual harassment law, which requires interactive training of all employees.

• Do you know who is Geoff Marcy?

A "culture of quiet" in science enabled Geoff Marcy's harassment of others at Berkley to go on for so long.

ONE UPSTATE

# Law: Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act or Clery Act

- Federal statute signed in 1990 (Only Higher Ed)

- Requires all colleges and universities that participate in federal financial aid programs to keep and disclose information about crime on and near their respective campuses.

- The United States Department of Education, which can impose civil penalties, up to $54,789[2] per violation, against institutions for each infraction and can suspend institutions from participating in federal student financial aid programs.



ONE UPSTATE

# Laws that Prohibit Sexual Harassment
## In Education and Employment

## Federal

**Title VII of the Civil Rights Act of 1964: (Employers with 15+ Employees)**

- Prohibits sexual harassment in workplace or sponsored programs

**Title IX of the Education Amendments Act of 1972: (All education programs which receive federal funding)**

- Prohibits sex discrimination in educational programs, including sexual harassment and sexual violence

## State

**NYS Executive Law 296, i.e., Human Rights Law: (All NY Employers)**

- Prohibits sexual harassment in the workplace

**NYS Education Law 129-b: (NY Colleges and Universities)**

- Requires Colleges to adopt COC prohibiting domestic violence, dating violence, stalking or sexual assault against students & display victims' rights

**ONE UPSTATE**

# What is sexual harassment?

- A form of sex discrimination

**Two Types:**

- Quid Pro Quo

- Hostile environment



19 February 2019

ONE UPSTATE

# Quid Pro Quo
## (This for That)



- Occurs when a person in authority (with power)

- Trades or tries to trade job or education benefits, security or advancement for sexual favors; or

- Retribution/punishes for rejecting a person's advances

- Examples:
  - "Come to my hotel room and we'll talk about you getting an A."
  - "Since you won't go out with me, I'm demoting you."

- **Strict Liability**

ONE UPSTATE

# Hostile Environment

Unwelcome conduct "of a sexual nature" that is:

- So sufficiently severe or pervasive

- Unreasonably interferes with, denies, or limit

- Person's ability to carry out their job duties or participate in or benefit from an education program or activity.

## Can be between:

Co-worker/Co-worker,

Supervisor/Subordinate,

Professor/Student,

Employee/Contractor employee,

Third-party witness



ONE UPSTATE

# Hostile Environment



## "Of a Sexual Nature"

- **Verbal/Written:** Sexual jokes, Comments about person's body, telling rumors about a person's sex life, text messages or emails of a sexual nature, asking about sexual preferences, cat calls

- **Physical:** Assault, stalking, blocking movement, hugging, patting

- **Nonverbal:** Looking up and down a person's body, stalking, facial expressions, licking lips

- **Visual:** Posters, drawings, emails, pictures, text messages

- Needs to be 'objectively' and 'subjectively' hostile



ONE UPSTATE

# Hostile Environment



- Employers/Universities liable where it or its agents knew or should have known of the conduct, unless it can be shown that immediate and appropriate corrective action was taken.

- **Supervisors/Managers** can be held liable as aiders and abettors.

- If a **public employee** is found personally liable for "an intentional wrongdoing related to a claim of sexual harassment" they must personally reimburse any State agency or entity that makes a payment on its behalf.
  -NYS Public Officers §§ 17-a, 18-a (4/2018).

**ONE UPSTATE**