# 24-2564-cv

## United States Court of Appeals

*for the*

## Second Circuit

JULIO LICINIO, MD, PHD, MBA, MS,

*Plaintiff-Appellant,*

– v. –

STATE OF NEW YORK, STATE UNIVERSITY OF NEW YORK,
STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 3 of 5 (Pages A-0501 to A-0750)

JOSEPH SPADOLA
NEW YORK STATE OFFICE OF THE
  ATTORNEY GENERAL
*Attorneys for Defendants-Appellees*
28 Liberty Street
New York, New York 10005
(212) 416-8019

DANIEL GRACE
DANNY GRACE PLLC
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 1200
New York, New York 10007
(212) 202-2485

CP COUNSEL PRESS    (800) 4-APPEAL • (334400)

# TABLE OF CONTENTS

District Court Docket Entries ................................................................ vi

Plaintiff's Complaint ................................................................ A-0001

    Exhibit 1 Employment Contract ................................................ A-0039

    Exhibit 2 Demotion Letter ...................................................... A-0051

    Exhibit 3 Civil Cover Sheet .................................................... A-0054

Answer ................................................................................ A-0055

Amended Answer ...................................................................... A-0061

Defendant's Notice of Motion for Summary Judgment .......................... A-0072

Attorney Declaration .................................................................. A-0074

    Exhibit A Position Summary .................................................. A-0078

    Exhibit B Offer Letter ........................................................ A-0084

    Exhibit C Chart ................................................................ A-0095

    Exhibit D Business Certification and notes .................................. A-0096

    Exhibit E Business Certification and notes .................................. A-0101

    Exhibit F Email ................................................................ A-0103

    Exhibit G EEOC Charge ........................................................ A-0106

    Exhibit H DHR Decision ........................................................ A-0135

    Exhibit I DHR Dismissal Order ................................................ A-0146

    Exhibit J Deposition Transcript Excerpt – Licinio ............................ A-0149

    Exhibit K Deposition Transcript Excerpt – Botash ............................ A-0214

    Exhibit L Plaintiff Response to Interrogatories .............................. A-0220

    Exhibit M Deposition Transcript Excerpt- Wong ................................ A-0240

Declaration Albanese .................................................................. A-0246

Declaration Chin ...................................................................... A-0250

Exhibit A Email ................................................................. A-0263

Exhibit B Affirmative Action/Equal Opportunity Report ...................... A-0268

Exhibit C Email ................................................................. A-0269

Exhibit D Letter: Post Probation Survey Visit ................................ A-0271

Exhibit E Letter: Survey Visit for Full Accreditation ........................ A-0279

Exhibit F Letter: Status Report ............................................... A-0289

Declaration Corona ............................................................. A-0294

Exhibit A Letter ............................................................... A-0299

Exhibit B Email ................................................................. A-0300

Declaration Dewan ............................................................. A-0301

Exhibit A Email ................................................................. A-0329

Exhibit B Email ................................................................. A-0333

Exhibit C Notice of Meeting ................................................... A-0335

Exhibit D Email ................................................................. A-0340

Exhibit E Demotion Letter ..................................................... A-0341

Exhibit F Faculty Executive Summary Report ................................. A-0343

Exhibit G Email ................................................................. A-0349

Exhibit H LCME Letter ......................................................... A-0351

Exhibit I Email ................................................................. A-0359

Declaration Frost ............................................................... A-0361

Exhibit A Email ................................................................. A-0368

Exhibit B Email ................................................................. A-0369

Exhibit C Human Resources Practices ......................................... A-0370

Exhibit D Email ................................................................. A-0396

Exhibit E Email ........................................................................ A-0397

Declaration Gardner .................................................................. A-0401

    Exhibit A Research Results ...................................................... A-0406

Declaration Gilbertson .............................................................. A-0407

    Exhibit A University Policy Manual ......................................... A-0411

    Exhibit B Harassment Prevention Policy .................................. A-0415

    Exhibit C Managing Conduct and Performance Guide ............. A-0431

    Exhibit D Sexual Harassment Prevention Program ................. A-0490

Declaration Lesperance .............................................................. A-0540

    Exhibit A Text ......................................................................... A-0545

    Exhibit B Email ....................................................................... A-0569

    Exhibit C Email ....................................................................... A-0573

    Exhibit D Email ....................................................................... A-0577

    Exhibit E Email ........................................................................ A-0582

Declaration Schmitt ................................................................... A-0584

    Exhibit A Email ....................................................................... A-0588

    Exhibit B Resume Dahmoon .................................................... A-0590

Declaration Schwartz ................................................................ A-0596

    Exhibit A Email ....................................................................... A-0610

    Exhibit B Email ....................................................................... A-0614

    Exhibit C Email ....................................................................... A-0621

    Exhibit D Summary Statistics Medical School Compensation .............. A-0623

    Exhibit E Offer Letter – Wong ................................................ A-0624

    Exhibit F Offer Letter: Department of Psychology ................. A-0630

Exhibit G Email ...................................................................... A-0632

Exhibit H Email ...................................................................... A-0634

Exhibit I Email ....................................................................... A-0639

Exhibit J Email ....................................................................... A-0641

Exhibit K Letter: Wong Salary Supplement - 4/22/19 ........................... A-0642

Exhibit L Letter: Wong Salary Supplement – 10/28/19 ......................... A-0643

Exhibit M State Compensation – Wong ................................................ A-0644

Exhibit N Chart: Compensation of Full Research Professors ................ A-0645

Memorandum of Law ................................................................................ A-0646

Statement of Material Facts .................................................................... A-0701

Plaintiff Memorandum of Law ............................................................... A-0731

Response to Defendants' Statement of Material Facts Not in Dispute ........... A-0767

Declaration Licinio ................................................................................. A-0820

Exhibit 1 Employment Contract ............................................. A-0875

Exhibit 2 Demotion Letter ..................................................... A-0887

Exhibit 3 Strategic Plan ......................................................... A-0890

Exhibit 4 Department of Human Rights Probably Cause...................... A-0895

Exhibit 5 Faculty Minutes ...................................................... A-0918

Declaration Attorney............................................................................... A-0923

Exhibit 6 Deposition Transcript Excerpt – Licinio ................................. A-0924

Exhibit 7 Deposition Transcript Excerpt – Dewan................................. A-1018

Reply Memorandum of Law .................................................................... A-1031

Statement of Material Facts in Response to Plaintiff's Counterstatement of
Material Facts ...................................................................................... A-1059

Declaration Weinstock ............................................................................ A-1073

Declaration Brangman ........................................................................ A-1075

    Exhibit A Email ......................................................................... A-1079

Declaration Frost ............................................................................... A-1080

    Exhibit A Deposition Transcript Excerpt – Frost................................... A-1085

Declaration White ............................................................................. A-1096

    Exhibit A Diagram.......................................................................... A-1101

    Exhibit B MC Performance Appraisal Form…...................................... A-1102

Declaration Attorney......................................................................... A-1108

    Exhibit A Decision and Order – Court of Claims .................................. A-1111

    Exhibit B SUNY honors.................................................................. A-1126

    Exhibit C Deposition Transcript Excerpt – Dewan............................... A-1129

    Exhibit D Deposition Transcript Excerpt – Botash............................... A-1135

    Exhibit E Deposition Transcript Excerpt – Licinio............................... A-1136

Decision and Order Granting Defendants Summary Judgment ...................... A-1149

Judgment Granting Defendants Summary Judgment ..................................... A-1230

Plaintiff's Notice of Appeal ............................................................... A-1232

19 February 2019



ONE UPSTATE

Q. An office decides to go to happy hour at Phoebe. Ann asks Dan, an employee and student of Upstate, for a date numerous times. He repeatedly refuses. Ann offers Dan a ride to his car. He accepts because this is Syracuse, NY and it is -19°. She keeps him in her car to tell him about her divorce.

Does this event occur at a workplace environment?

Could this be perceived as sexual harassment? Why or why not?

19 February 2019

# Power dynamics

- Result of an exploitative unequal power relations in work place.

- Structural aspect of the organization

  ○ Such as their hierarchical nature

  ○ Occupational sex ratio



ONE UPSTATE

A0502

# Power dynamics

- Taxonomy of Power Sources

  ○ Legitimate Power

  ○ Expert Power

  ○ Reward Power

  ○ Coercive Power

  ○ Referent Power

"In addition to formal power derived from position within the organizational hierarchy, individuals gain power from sociocultural as well as interpersonal or individual sources." (Cleveland and Kerst, 1993).



ONE UPSTATE

A0503

# What is Retaliation?

Subjecting an employee or student to an adverse employment or education action because they engaged in a "protected activity", including:

- Filing a complaint of harassment or discrimination;

- Complaining about harassment to supervisor or ODI;

- Serving as a witness in a sexual harassment investigation;

- Testifying against the employer in a lawsuit or administrative proceeding



**Beware:** Employer can be held liable for retaliating against an employee even if the employee's complaint was unsubstantiated.

ONE UPSTATE

Case 5:21-cv-00387-GTS-TWD   Document 73-48   Filed 01/19/24   Page 16 of 50

# The Spectrum of Sexual Misconduct at Work

Knowing where a behavior falls depends on the situation, history of the relationship, tone of delivery, and nonverbal actions.

**1 Generally not offensive**
Common remarks on things such as hairstyle and dress

**2 Awkward/mildly offensive**
Comments involving or implying gender distinctions unfavorable to women

**3 Offensive**
Gender-insensitive or superior manner

**4 Highly offensive**
Intentionally denigrating comments or behaviors

**5 Evident sexual misconduct**
Behaviors that are crude or physically intrusive

**6 Egregious sexual misconduct**
Behaviors involving coercion, sexual abuse, or assault

SOURCE KATHLEEN KELLEY REARDON, PROFESSOR EMERITA, UNIVERSITY OF SOUTHERN CALIFORNIA MARSHALL SCHOOL OF BUSINESS   © HBR.ORG

ONE UPSTATE

A0505

After inviting you to a meeting, a colleague notes that you will be a great addition to the team because you will bring a woman's gentle perspective.

A more senior person in your organization tells you that she is taken an interest in you and regularly insist you sit next to her at meetings, pulling your chair close. You over hear her tell your boss, with a smile that makes you uncomfortable that she plans to mentor you.

Your boss tens to use his hands when he speaks. One time in an animated discussion, he throws his arms out wide – and accidentally touches your chest.

You came to work wearing a new dress. Your attending comments in passing that it looks nice on you.

ONE UPSTATE

19 February 2019

# 5 Social Norms that Support Sexual Violence

1. limited roles for and objectification of women

2. value placed on claiming and maintaining power

3. tolerance of aggression and attribution of blame to victims

4. traditional constructs of manhood

5. notions of individual and family privacy that foster secrecy and silence

ONE UPSTATE

# What is your responsibility?

- To report to Title IX Coordinator or Chief Diversity Officer or University Police

- Honor student's rights

- Whether a person is a visitor or not, your responsibility is the same

- Report immediately if you become aware of a violation

**Your actions can create liability for Upstate and/or yourself**

ONE UPSTATE

# What is your responsibility?

- You are responsible for any harassment or discrimination that you should have known of with reasonable care and attention to the workplace for which they are responsible.

- Supervisors and managers will be subject to discipline for failing to report suspected sexual harassment or otherwise knowingly allowing sexual harassment to continue.

ONE UPSTATE

# Complaint Procedure and Investigation

- Complaints will be investigated promptly, thoroughly, and impartially

- Confidentiality is not guaranteed but will be maintained to the extent practicable

- Responsive action, if appropriate, will be taken

- http://www.upstate.edu/diversityinclusion/complaint/complaint process.php

**ONE UPSTATE**

A0510

19 February 2019

ONE UPSTATE

https://youtu.be/SrlOlocgP00



The Boss

19 February 2019

Rating 12+

This app is only available on the
App Store for iOS devices.

LINKS
Privacy Policy
Developer Website

© 2017 Capptivation Inc.

# Reach Out Editions

Details   Ratings and Reviews

iPhone Screenshots

Reach Out Editions covers
2600+ colleges, 17,000+
high schools, and MORE!

Intuitive user interface
designed to inform and
empower people-in-need.

Easy to use Start Here guide
that will take you step-by-step
from getting safe to healing.

Directory of campus resources,
links to school policies and
definitions of important terms.

Full contact detail
for every resou
tap to call or

https://www.capptivation.com/

ONE UPSTATE

A0512

# Any Questions, please call:

- **Gloria Lopez, Chief Diversity Officer - Office of Diversity and Inclusion**
  Telephone: 315.464.4392
  Office fax: 315.464.5232
  Rm 711 Jacobson Hall
  Electronic mail: lopezg@upstate.edu

- **University of Police: Paul Waltz, Chief Police Officer or Nicholas Newcomb, Captain**
  Phone: 315-464-4134
  Building 49 (University Police) Rm. 214
  Electronic mail: waltzd@upstate.edu

- **Student Counseling Center**
  Psychiatry and Behavioral Sciences Building, 3rd Fl.
  713 Harrison Street
  Syracuse, NY 13210
  Phone: 315 464-3120 ext. 6
  Hours: Monday-Friday 8:30 am- 4:30 pm

- **VERA HOUSE, INC.**
  723 James Street
  Syracuse, NY 13203
  Phone: 315-425-0818
  TTYL: 315-484-7263 (for Deaf community - during business hours)

19 February 2019

ONE UPSTATE

A0513

# Sexual Harassment Case Studies

- Let's take a look at a few scenarios that help explain the kind of behaviors that can constitute sexual harassment.

- These examples describe inappropriate behavior in the workplace that will be dealt with by corrective action, including disciplinary action.

- Remember, it is up to all employees to report inappropriate behavior in the workplace.

# Not Taking "No" for an Answer

Li Yan's coworker Ralph has just been through a divorce. He drops comments on a few occasions that he is lonely and needs to find a new girlfriend.

Li Yan and Ralph have been friendly in the past and have had lunch together in local restaurants on many occasions. Ralph asks Li Yan to go on a date with him—dinner and a movie. Li Yan likes Ralph and agrees to go out with him. She enjoys her date with Ralph but decides that a relationship is not a good idea. She thanks Ralph for a nice time, but explains that she does not want to have a relationship with him.

Ralph waits two weeks and then starts pressuring Li Yan for more dates. She refuses, but Ralph does not stop. He keeps asking her to go out with him.





When Ralph first asked Li Yan for a date, this was sexual harassment.

- **FALSE**: Ralph's initial comments about looking for a girlfriend and asking Li Yan, a coworker, for a date are not sexual harassment. Even if Li Yan had turned Ralph down for the first date, Ralph had done nothing wrong by asking for a date and by making occasional comments that are not sexually explicit about his personal life.





Li Yan cannot complain of sexual harassment because she went on a date with Ralph.

- **FALSE**: Being friendly, going on a date, or even having a prior relationship with a coworker does not mean that a coworker has a right to behave as Ralph did toward Li Yan. She has to continue working with Ralph, and he must respect her wishes and not engage in behavior that has now become inappropriate for the workplace.



# Not Taking "No" for an Answer: Part 2

Li Yan complains to her supervisor, and the supervisor (as required) reports her complaint to the person designated by her employer to receive complaints.

Ralph is questioned about his behavior and he apologizes. He is instructed by the designated person to stop. Ralph stops for a while but then starts leaving little gifts for Li Yan on her desk with accompanying love notes.

The love notes are not overtly offensive, but Ralph's behavior is starting to make Li Yan nervous, as she is afraid he may start stalking her.

Case 5:21-cv-00387-GTS-TWD   Document 73-48   Filed 01/19/24   Page 32 of 50



Ralph's subsequent behavior with gifts and love notes is not sexual harassment because he has stopped asking Li Yan for dates as instructed. He is just being nice to Li Yan because he likes her.

○ A) True
● B) False

Correct - Click anywhere or press

Control Y

Your answer:

You did not answer this question

You must answer the question before continuing

Incorrect - Click anywhere or

Submit    Clear

Ralph's subsequent behavior with gifts and love notes is not sexual harassment because he has stopped asking Li Yan for dates as instructed. He is just being nice to Li Yan because he likes her.

**FALSE:** Li Yan should report Ralph's behavior. She was entitled to have effective assistance in getting Ralph to stop his inappropriate workplace behavior. Because Ralph has returned to pestering Li Yan after being told to stop, he could be subject to serious disciplinary action for his behavior.

# The Boss with a Bad Attitude

Sharon transfers to a new location with her employer. Her new supervisor, Paul, is friendly and helps her get familiar with her new job duties. After a few days, when no one else is around, Paul comes over to Sharon's work area to chat.

Paul talks about what he did last night, which was to go to a strip club. Sharon is shocked that Paul would bring up such a topic in the workplace and says nothing in response. Paul continues talking and says that all the women in the office are so unattractive that he needs to get out and "see some hot chicks" once in a while. He tells Sharon he is glad she joined the staff because, unlike the others, she is "easy on the eyes."

Sharon feels very offended and demeaned that she and the other women in her workplace are being evaluated on their looks by their supervisor.





Because Paul did not tell Sharon that she is unattractive, he has not harassed her.

**FALSE:** Paul has made sexually explicit statements to Sharon, which are derogatory and demeaning to Sharon and her female coworkers. It does not matter that Paul supposedly paid Sharon a "compliment." The discussion is still highly offensive to Sharon, as it would be to most reasonable persons in her situation.



By bringing up his visit to the strip club, Paul is engaging in inappropriate workplace behavior.

**TRUE**: Simply bringing up the visit to the strip club is inappropriate in the workplace, especially by a supervisor, and it would be appropriate for Sharon to report this conduct. A one-time comment about going to a strip club is behavior that Paul would be told to stop, even though it probably would not rise to the level of unlawful harassment, unless it was repeated on multiple occasions.



A0528

Paul should be instructed to stop making these types of comments, but this is not a serious matter.

**FALSE:** Paul's comments about the female employees are a serious matter and show his contempt for women in the workplace. Paul is required to model appropriate behavior, and must not exhibit contempt for employees on the basis of sex or any protected characteristic. Sharon should not have to continue to work for someone she knows harbors such contempt for women, nor should the other employees have to work for such a supervisor. Management should be aware of this, even if the other employees are not, and Paul should be disciplined and, most likely, removed from his current position.

Lindsey v. SUNY Upstate et al. 5:21-CV-387 00529

Case 5:21-cv-00387-GTS-TWD   Document 73-48   Filed 01/19/24   Page 41 of 50



# An Issue about Appearances

Leonard works as a clerk typist for a large employer. He likes to wear jewelry, and his attire frequently includes earrings and necklaces. His boss, Margaret, thinks it's "weird" that, as a man, Leonard wears jewelry and wants to be a clerical worker. She frequently makes sarcastic comments to him about his appearance and refers to him "jokingly" as her office boy.

Leonard, who hopes to develop his career in the area of customer relations, applies for an open promotional position that would involve working in a "front desk" area, where he would interact with the public. Margaret tells Leonard that if he wants that job, he had better look "more normal" or else wait for a promotion to mailroom supervisor.

A0530





Leonard's boss is correct to tell him wearing jewelry is inappropriate for customer service positions.

**FALSE:** Leonard's jewelry is only an issue because Margaret considers it unusual for a man to wear such jewelry. Therefore, her comments to Leonard constitute sex stereotyping.

# An Issue about Appearances: Part 2

Margaret also is "suspicious" that Leonard is gay, which she says she "doesn't mind," but she thinks Leonard is "secretive."

She starts asking him questions about his private life, such as "Are you married?" "Do you have a partner?" "Do you have kids?"

Leonard tries to respond politely "No" to all her questions but is becoming annoyed. Margaret starts gossiping with Leonard's coworkers about his supposed sexual orientation.





Leonard is the recipient of harassment on the basis of sex and sexual orientation.

○ A) True
● B) False

Correct - Click anywhere or press

Incorrect - Click anywhere or

Control Y tYour answer:

You did not answer this question

You must answer the question
before continuing

Submit

Clear

Leonard is the recipient of harassment on the basis of sex and sexual orientation.

**TRUE:** Leonard is harassed on the basis of sex because he is being harassed for failure to adhere to Margaret's sex stereotypes. Leonard is also harassed on the basis of his perceived sexual orientation. It does not matter whether or not Leonard is a gay man in order for him to have a claim for sexual orientation harassment.

Leonard might also be considered a victim of harassment on the basis of gender identity, which is a form of sex and/or disability discrimination prohibited by the Human Rights Law. Leonard should report Margaret's conduct, which is clearly a violation of the sexual harassment policy, to a person designated by his employer to receive complaints (i.e. his employer's "designee").

# An Issue about Appearances: Part 3

Leonard decides that he is not going to get a fair chance at the promotion under these circumstances, and he complains to the employer's designee about Margaret's behavior.

The designee does an investigation and tells Margaret that Leonard's jewelry is not in violation of any workplace rule, that she is to consider him for the position without regard for his gender, and that she must stop making harassing comments, asking Leonard intrusive questions, and gossiping about his personal life.

Margaret stops her comments, questions, and gossiping, but she then recommends a woman be promoted to the open position. The woman promoted has much less experience than Leonard and lacks his two year degree in customer relations from a community college.



Leonard has likely been the victim of discrimination on the basis of sex, sexual orientation and/or retaliation.

**TRUE:** We don't know Margaret's reason for not recommending Leonard for the promotion, but it is not looking good for Margaret. It appears that she is either biased against Leonard for the same reasons she harassed him, or she is retaliating because he complained, or both.

Leonard should speak further with the employer's designee, and the circumstances of the promotion should be investigated. If it is found that Margaret had abused her supervisory authority by failing to fairly consider Leonard for the promotion, she should be subject to disciplinary action.

This scenario shows that sometimes more severe action is needed in response to harassment complaints, in order to prevent discrimination in the future.

Leonard v. SUNY Upstate, et al., 5:21-CV-387



UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK
................................................................................X

JULIO LICINIO, MD, PhD, MBA, MS,

                           Plaintiff,

            - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

                        Defendants
................................................................................X

**DECLARATION OF
LEANN LESPERANCE, MD,
PhD**

Case No.: **5:21-cv-387(GTS/TWD)**

**LEANN LESPERANCE, MD, PhD,** pursuant to § 1746 of Title 28 of the United States

Code. declares the following to be true and correct under penalty of perjury under the laws of the

United States of America:

     1.    I am currently employed by Upstate Medical University ("UMU") and have been

employed by UMU since August 2004. From 2004 until the present, I have worked on UMU's

Binghamton Clinical Campus, which is a branch campus of UMU located in Binghamton, New

York. The Clinical Campus hosts approximately forty (40) medical students for clinical clerkships

and electives that they are required to take during their third and fourth years of medical school.

     2.    I started at UME in 2004 as a Clinical Assistant Professor in the Department of

Pediatrics. I was promoted to Clinical Associate Professor effective October 1, 2019. I have been

licensed to practice medicine in the State of New York since 2004 and actively practiced pediatrics

1

in the Binghamton area from 2004 until May 2018 when I paused clinical practice for the Associate Dean position.

3.      I have held various leadership positions since I began my employment with UMU. From 2012 to 2018, I was the site director for the Binghamton Pediatric Clerkship. From March 2018 - August 2018, I served as interim Associate Dean for Academic Affairs at the Binghamton Clinical Campus and in August 2018, I was made permanent in that role. In March 2019, I was additionally appointed Interim Associate Dean for Undergraduate Medical Education and, on July 1, 2020, I was made permanent in that role. I am stepping down from the Associate Dean for Undergraduate Medical Education position on December 31, 2023 so that I can focus my efforts on upcoming projects at the Binghamton Clinical Campus.

4.      I respectfully submit this Declaration in support of the Defendants' motion for summary judgment in this matter. I make this Declaration based upon my personal knowledge.

5.      During the course of Plaintiff's tenure as Dean of the College of Medicine, I witnessed him give presentations to large groups of students on several occasions. On each such occasion, I felt he presented himself in an unprofessional, inappropriate manner towards the medical students.

6.      For example, in May 2019, while at the Binghamton Clinical Campus, I attended orientation for third year medical students. The orientation was over the course of several days and was being held in person on UMU's Syracuse campus in front of 130 third year medical students and also by livestream video presentation to students at UMU's Binghamton campus. I attended by livestream video from the Binghamton campus with approximately 40 medical students. During the orientation, several speakers address the third-year medical students. Plaintiff specifically

2

requested the opportunity to speak to the medical students and was given the opportunity to make closing remarks to them.

7.     Plaintiff's speech was shocking and unlike anything you would expect from a Dean of a College of Medicine. Not only was it negative in tone, but it was long and rambling and did not paint the school in a good light. Instead of celebrating these third-year students' accomplishments to date and honoring their moving on to the clinical portion of their education, Plaintiff advised these third year medical students that "it's only going to get worse and worse— residency, fellowship and having a family will be very hard" and that if the students do not do well in their clerkships, they will not get into their chosen specialty. He then went on to talk about student depression and suicide. I was horrified. I found the speech to be offensive and shocking. I observed that students at the Binghamton campus had a similar reaction to the speech, and I sincerely wondered if Plaintiff might lose his job as a result. During Plaintiff's speech, I was so shocked that I began exchanging text messages with Matt Mason, MD, Assistant Dean for Clinical Sciences and Assistant Professor in Urology at UMU. A copy of the text messages that I exchanged with Dr. Mason is attached as **Exhibit "A."** My messages are on the right-hand side; Dr. Mason's messages are on the left-hand side.

8.     In the text messages, Dr. Mason expressed his intent to send an email to all third-year medical students as "damage control" following the speech, which I subsequently reviewed. Additionally, Dr. Julie White, UMU's Dean of Student Affairs, was out of town at the time but I reached out to her and asked if she was viewing the speech. She was not watching the speech at that time. However, Sharon Huard, UMU's Associate Dean of Student Affairs and Campus Life, had separately reached out to Dr. White by email and notified her that a student wanted to make a complaint regarding Plaintiff's speech. An email string followed, during which Dr. White, Dr.

3

Mason, Ms. Huard and I discussed how to best address the impact Plaintiff's speech had on the students. A copy of the email string is attached as **Exhibit "B."**

9.       The entire orientation was being video recorded with the plan to publish it so that individuals who had missed it could view it in the future. Plaintiff's speech was so concerning that we reached out to UMU Audio-Video Technician Gerard Roy and instructed him <u>not</u> to publish the portion of the orientation that contained Plaintiff's speech. Plaintiff's speech was the only speech made at orientation that was not published. <u>See</u>. **Exhibit "C."**

10.       Ultimately, Dr. White emailed Plaintiff to inform him that a group of students and faculty members were upset with the content of his speech and that a student wanted to file a complaint against him. Before sending the email, Dr. White read it to me and I concurred with the message. After notifying Plaintiff, Dr. White drafted a letter for Plaintiff to disseminate to students after the complaints were brought to his attention. A copy of the email string, on which I was copied, is attached as **Exhibit "D."** A copy of the final letter that was disseminated to students is attached as **Exhibit "E."**

11.       A few months later, on August 22, 2019, I attended a white coat ceremony, that is held annually as a rite of passage for students entering medical school. It is a ceremony attended by incoming first-year medical students and their families during which students receive a white doctor's coat and recite the Hippocratic Oath. The room was full of first-year medical students and their parents/guardians. Plaintiff was supposed to speak and then, later, close the ceremony by spending no more than 5 minutes thanking everyone for attending. While his initial speech was ok, when he came back to briefly thank the students and parents/guardians for coming and close the ceremony, he ended up talking for 10-15 minutes in a long rambling diatribe. Despite having just recently been informed that students and faculty complained about the similar speech he gave

4

A-0544

at the third-year orientation only a few months earlier, he again talked about suicide, depression, and dwelled on related statistics. Dr. White eventually had to intervene and close the meeting.

12.     After his speech, I went to Dr. White and told her that he should never be allowed to address students "off script" again given how disastrous his remarks had been without one.

Dated:          December 28, 2023
                Binghamton, New York

_____
Leann Lesperance, MD, PhD

5

 Verizon  LTE  22:18  37%



Matt >

Fri, May 24, 11:00



Just shoes up

Just showed up



Not yet. Finishing mri safety.



That's why I'm here though

Page 3 of 9



That's why I'm here though.
We will make sure video
feed is live

Page 4 of 9



Matt >

The dean is here but mri guy is still finishing

We are going to start video feed soon


Frank is ready

If anyone has a question, I can text you with it

Can you hear Licinio?


Yup

Cheery thoughts

Yeah. Whoa



Page 6 of 9

 Verizon  LTE  22:18  37%



Matt >

You can't hear us though huh?

We cannot hear you

Cause people are talking a little while doing suturing

The dean can see your video feed. No one else can. We don't hear anything from your end.

Now we are hearing something. Occasional voices. Maybe we can hear you after all

Page 7 of 9

# Hearing some paper rustling and scraping noises.



Page 8 of 9

 Verizon  LTE  22:18  36%



Matt >

Frank is going to get the remote to mute us

We have students doing suturing here and IVs in another room

It is quiet now

I'm not sure this is helpful. What do you think?

Yeah...  probably not the right audience. Too distant into future for these students.

And too negative

Licinio v. SUNY Upstate, et al., 5:21-CV-387    005536

A0551

Page 9 of 9



  

09:39   81%

 

Matt >

I am not sure this is helpful. What do you think?

Yeah... probably not the right audience. Too distant into future for these students.

And too negative

And too ramble

Yes

Rambly

Well, it will all be recorded so we can review it and debrief about it after

Page 3 of 17



Page 4 of 17

 Verizon 





Matt >

Yes



We need music like at the oscars

This is the same thing he said to the rising ms4s

Twice



No

We had no idea what he was going to talk about. I also

think she may be out of town



Page 6 of 17

   

If it's recorded I will send it to her

I'm going to tell her to watch this. We have to keep him away from advising

Yes

We need to move on to the next session

Susan and I are wondering if there's a way to tell him to stop

I could hang up from Binghamton



   

      

Licinio v. SUNY Upstate, et al., 5:21-CV-387          005543

A0558

 

Verizon    09:39    81%

 

Matt >

Are you supposed to be with us for the next talk? For patient privacy?



Nope

Do you want me to hang up?

He won't notice though

You can try it but my guess is he won't stop

When we had technical difficulty before and Binghamton wasn't connected he just talked anyway



Page 9 of 17



   

09:40

Matt

Or a gong



We really need to move on

Does Susan have any ideas?

I should get Paul to do it. He's leaving anyway. Not sure where he went though. He left the room



Darn

How about fire alarm?

She is standing up and staring at him to see if he gets the hint

Page 11 of 17

Lol fire alarm :)



Licinio v. SUNY Upstate, et al., 5:21-CV-387      005547

A0562

Page 12 of 17

  



Matt >

He told us 30 minutes. I figured a psychiatrist would have a better sense of sticking to a time slot. "Our time is up for this session"

 

"Train wreck"



I noticed. He didn't.

He's talking about grocery

Licinio v. SUNY Upstate, et al., 5:21-CV-387    005548

Page 13 of 17

stores and cereal choices now



Licinio v. SUNY Upstate, et al., 5:21-CV-387    005549

A0564



.ıl Verizon 📶 ❄    09:41    ✈ 81% 🔋

Matt ›

You need go just tell him

Ok he's done. No questions from students.

Do you have 2 minutes to read an email I just sent you, that I want to send out to all the new ms3s as "damage control" after that talk from the dean?



Sorry just saw this

I'll check it right now

Thanks for checking the email. Would you like to have it come from both of

have it come from both of us?



UMU00101

Page 16 of 17

 Verizon  09:42    81%

    

Matt >

Thanks for checking the email. Would you like to have it come from both of us?

Sure

Tue, May 28, 10:53

Julie called me and read the email she planned to send. I thought it was perfect. She just sent it

To help Julie, I can just answer briefly – echoing our concerns.

UMU00102                    Licinio v. SUNY Upstate, et al., 5:21-CV-387        005552

A0567

Page 17 of 17

Ok thanks



A-0569

Page 1 of 4

## Anne Dotzler - Fwd: Re: Licinio's orientation presentation

**From:** Julie White
**To:** DotzlerA@upstate.edu <DotzlerA@upstate.edu>
**Date:** 12/19/2019 9:49 AM
**Subject:** Fwd: Re: Licinio's orientation presentation

Julie R. White, Ph.D.
Associate Vice President for Educational Services &
Dean of Student Affairs

Pronouns: She/Hers

>>> Leann Lesperance 12/19/19 9:35 AM >>>

>>> Leann Lesperance 9/25/2019 10:19 AM >>>

>>> Leann Lesperance 5/27/2019 1:55 PM >>>
Hi,
Thanks for your thoughts Julie. I'm sorry - this must have put a damper on your vacation.

Reactions? Each time I listen to it, I think it is worse than the time before (and I've listened several times, so I'm thinking it's really bad). I do not think we should release the recorded version. I think it portrays Dr. Licinio in a very poor light - negative, rambling, and long-winded. A bit loose-lipped, too - sharing stories that are too personal and possibly identifiable. I also resonated with the student's suggestion to Sharon that his words seemed insensitive to mental health concerns. Honestly, I wondered if he might lose his job over this talk.

As for what to do, we cannot leave it alone. As Sharon pointed out, a student has filed a formal complaint about this. Both 2 and 3 seem reasonable.

L

>>> Julie White <whitejul@upstate.edu> 05/27/19 12:25 PM >>>
Ok, I just watched the whole thing. I have three reactions:

1. He introduced the whole thing within a negative context and some students may not have been able to get past that. That is bad.

2. There was very little "good news" in his talk. Also bad.

3. The advice he gave, if within a more positive context, was actually quite good. The question is whether or not students could hear that through all the "bad" and tangential stories.

Next quandary is what to do with all of this? Again, three thoughts:

1. Leave it alone and let it die.

2. Matt and/or Leann and I could meet with Julio to express concern and ask him to send a follow up email.

3. I could send him an email outlining the feedback we heard from students with the request he send a follow

Licinio v. SUNY Upstate, et al., 5:21-cv-387    009667

up email to the class that outlines his advice in a more positive context. I could draft email for him.

Reactions?

Sent from my iPhone

> On May 26, 2019, at 9:13 AM, Sharon Huard <huards@upstate.edu> wrote:
>
> I also viewed. Not good.
> Just want to note that the student who called in specifically said he was calling to make a student complaint, so I considered his call as something we have to respond to, which is different in my mind than general student feedback. I did hear some feedback from a few students as well... FYI, in addition to finding his talk alarming, a few female students also noted that they had fill out and to pass in "down the row" papers that said when they had their last period. Somewhat minor- but also something we can hopefully change for next year.
>
> Sent from my iPhone
>
>
>> On May 26, 2019, at 7:34 AM, Leann Lesperance <lesperal@upstate.edu> wrote:
>>
>> Thanks. I figured that out and listened. It was as bad as I thought.
>>
>> Sent from my iPhone
>>
>>> On May 26, 2019, at 07:13, Matthew Mason <masonm@upstate.edu> wrote:
>>>
>>> Thanks Leann
>>>
>>> For those that want to watch the video, the link does work but you have to log in with your groupwise id and password
>>>
>>> https://upstate.rev.vbrick.com/#/media/videos/category/c5346319-adcd-4271-803c-47f5c7f2bb70
>>>
>>> I got it to work on my phone by clicking the link and then clicking the little button with the 3 horizontal lines in the top left of the screen. That gave me the option to sign in. The video is the one that says May 24th 11:08 AM session. It starts with a hot of the Binghamton clinics campus room and you can hear Leann but then when Julio starts to talk they switch the video to him.
>>>
>>> Sent from my iPhone
>>>
>>>> On May 25, 2019, at 10:52 PM, Leann Lesperance <lesperal@upstate.edu> wrote:
>>>>
>>>> Hi again,
>>>>
>>>> Thank you, Sharon and Matt, for trying to help defuse this situation.
>>>> The students in Binghamton had similar reactions, though not as severe because they were practicing suturing during his session. After the extremely negative start, they stopped listening. Matt and I were texting back and forth about how NOT helpful his comments were and then about how we could get him to stop.
>>>>
>>>> I agree that a conversation with him is necessary. His talk with the MS4 students was not well received either. It would be helpful for us to review the video first. I tried the link to vBrick but there were not any videos there.
>>>>
>>>> I will participate/help in whatever way I can. I will come up to talk with him if you want.
>>>>
>>>> In the meantime, I'll keep my ears open with the Binghamton students. They also were dealing with negative, highly critical comments from Matthew Protas during the student panel on Monday (the first day of orientation). Unfortunately, I was not in the room for that session so have to get more info about what he said. The other MS4 students on the panel and I worked to reassure the students throughout the week. I need to

Licinio v. SUNY Upstate, et al., 5:21-cv-387     009668

A0570

have a conversation with Matthew. He is the AOA rep for neuro, but at his point, I do not want him to reach out to the students.
>>>>
>>>> Leann
>>>>
>>>>>>> Julie White <whitejul@upstate.edu> 05/25/19 2:23 PM >>>
>>>> I'm not sure of the next best step. My gut says, not another meeting. My hope is Julio will consider composing a written follow up. This will, of course, require a conversation with him. Who should do that is something I'm still pondering...
>>>>
>>>> Sent from my iPhone
>>>>
>>>>> On May 25, 2019, at 2:17 PM, Matthew Mason <masonm@upstate.edu> wrote:
>>>>>
>>>>> Julie, would it be worth it to do session where you and I together (and Leann if she wants to team up too) addresses the class to reassure them? I would happily share the story with them where I found out "negative" comments made it into not only my clerkship narratives but even one of my letters of recommendation and I still matched into a competitive specialty. And also... that it does get easier.
>>>>>
>>>>> Maybe we need to give some feedback to Julio too. Best way to do that?
>>>>>
>>>>> Sent from my iPhone
>>>>>
>>>>>> On May 25, 2019, at 12:20 PM, Sharon Huard <huards@upstate.edu> wrote:
>>>>>>
>>>>>> I spoke with Julie briefly about the conversation I had with the student who called and she asked me to write up notes about the feedback from the student.
>>>>>>
>>>>>> The student called Lori's office looking for Julie, he indicated that he wanted to report a complaint. When he learned Julie was out, he told Lori that he would rather not email Julie and did not want to wait until next week to talk with Julie. She transferred the call to me and he told me that he wanted to make an anonymous complaint about a session at ms3 orientation.
>>>>>>
>>>>>> He said he and a group of his friend were very upset after Dr. Licinio's talk that morning. He said that the talk was extremely negative and depressing.
>>>>>>
>>>>>> -dr. Licinio said that their time studying for boards was a vacation and it is only going to get worse and worse from here - residency, fellowship and having a family will all be terribly hard. -he said that if they don't do well in their clerkship next week, they will never get into that specialty.
>>>>>>
>>>>>> I suggested to the student that maybe Dr. Licinio was trying to be like the coach who breaks you down and builds you up again... the student replied... "are you aware of the national suicide rate of medical students and residents? " he continued "and the worst part is that Dr Lucinio is a psychiatrist, why wouldn't he understand that he should not be saying all of these negative things to us". "We are already all nervous about clerkships and step 2 and matching and this made it so much worse for all of us". "One if my friends has not even taken step 1 yet, imaging what dr Licinio's negativity did to him?"
>>>>>> I tried my best to reassure the student and I apologized for dr Licinio's message. I told him I would talk with sending some positive follow up messages out. Even though he did not give me his name, I gave him mine and told him to feel free to reach out if I can do anything for him. It was a really bad conversation and I honesty don't think I did much to make the student feel better.
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>> Sent from my iPhone
>>>>>>
>>>>>>
>>>>>>> On May 24, 2019, at 2:21 PM, Sharon Huard <huards@upstate.edu> wrote:
>>>>>>>
>>>>>>> Hi Matt,
>>>>>>> I heard from a student about Dr. Licinio's talk during orientation. The student was very upset about

Licinio v. SUNY Upstate, et al., 5:21-cv-387   009669

the negative tone and negative message in general. He did not want to share his name but said that his group of 10-12 friends were also upset. I asked him who else was there and he said you were... so I figured I would reach out to you... give me a call if you want to chat. ▮▮▮▮▮▮▮
>>>>>>>
>>>>>>> Sent from my iPhone
>>>>>>>
>>>>
>>>>
>>>>
>>>>

A-0573

Page 1 of 4

## Anne Dotzler - Fwd: Re: Hold video from 5.24

**From:**    Julie White
**To:**      Dotzler, Anne
**Date:**    12/19/2019 9:50 AM
**Subject:** Fwd: Re: Hold video from 5.24

Julie R. White, Ph.D.
Associate Vice President for Educational Services &
Dean of Student Affairs

Pronouns: She/Hers

>>> Leann Lesperance 12/19/19 9:35 AM >>>

>>> Leann Lesperance 9/25/2019 10:21 AM >>>
Gerard Roy is the person who gave us access to the video.

Leann

>>> Leann Lesperance 5/28/2019 9:57 AM >>>
Hello Gerard,

Please do not release the third talk from May 24 (the one that started at 11:08 AM). The other videos from May 24 may be released.

Thank you.

Leann

Leann Lesperance, MD, PhD, FAAP

Associate Dean for Academic Affairs
Clinical Assistant Professor, Department of Pediatrics
Upstate Medical University, Binghamton Clinical Campus
425 Robinson Street, Binghamton, NY 13904
office: 607-772-3521
cell: ▮▮▮▮▮▮▮
email: lesperal@upstate.edu

Pronouns: she/her/hers
(This has been added to my signature as a way of showing support for transgender and gender nonconforming students, colleagues and friends.)

The information contained is this email is confidential, intended only for the use of the party to whom it is addressed. If you are not the intended recipient, please be aware that you are strictly prohibited from sharing, distributing or copying this information. If you have received this email by mistake, please notify the sender.

>>> Gerard Roy 5/28/2019 9:46 AM >>>
FYI - I never heard back from anyone on posting these MS3 Orientation videos.

Gerard


Gerard Roy

VBrick Rev System Administrator,
Audio-Video Services Technician
Educational Communications
Upstate Medical University
315.464.7934 Desk or Voice Message
315.464.7930 Master Control
royg@upstate.edu

Please use our Technical Service and Support Form to request services:
http://www.upstate.edu/imt/intra/edcomm/tech-service-request-form.php


>>> Gerard Roy 5/24/2019 4:07 PM >>>
Browse Categories: College of Medicine/Class of 2021/MS3 Videos/2021_MS3_Orientation - Link below
https://upstate.rev.vbrick.com/#/media/videos/category/c5346319-adcd-4271-803c-47f5c7f2bb70

Everyone you requested has been given viewing rights and it looks like 3 videos are ready for viewing.

I will be leaving in ten minutes but will keep and eye on email, so I can give students viewing rights when approved.

Thanks

Gerard


Gerard Roy

VBrick Rev System Administrator,
Audio-Video Services Technician
Educational Communications
Upstate Medical University
315.464.7934 Desk or Voice Message
315.464.7930 Master Control
royg@upstate.edu

Please use our Technical Service and Support Form to request services:
http://www.upstate.edu/imt/intra/edcomm/tech-service-request-form.php


>>> Matthew Mason <masonm@upstate.edu> 5/24/2019 3:52 PM >>>
Thank you. Can you also give access to Leann Lesperance and Julie white and Sharon Huard? I want them to be able to review as well.

Sent from my iPhone

On May 24, 2019, at 3:37 PM, Gerard Roy <RoyG@upstate.edu> wrote:


Browse Categories: College of Medicine/Class of 2021/MS3 Videos/2021_MS3_Orientation - Link below
https://upstate.rev.vbrick.com/#/media/videos/category/c5346319-adcd-4271-803c-47f5c7f2bb70

Licinio v. SUNY Upstate, et al., 5:21-cv-387   009663

™™DC ... ™Vice/5DER47D4HSCHOSP2HSC2...   1/30/2020

Hi Dr. Mason,

There are 5 videos from today that were just uploaded to Rev. They need to finish processing before they can be viewed. Susan, Colleen, and yourself are the only people with viewing rights, at this time.

Please let me know how you would like to proceed after viewing the videos.

Thanks

Gerard

Gerard Roy

VBrick Rev System Administrator,
Audio-Video Services Technician
Educational Communications
Upstate Medical University
315.464.7934 Desk or Voice Message
315.464.7930 Master Control
royg@upstate.edu

Please use our Technical Service and Support Form to request services:
http://www.upstate.edu/imt/intra/edcomm/tech-service-request-form.php

>>> Matthew Mason <masonm@upstate.edu> 5/24/2019 2:48 PM >>>
Hi Gerard and Eric,

I'm not sure if you saw my email after Susan's that said that it was OK to release the video, but I take that back. Since then there has been multiple Stunz complaints about the session, and I do want to review the video before we put it online. Please send me a link or attachment so that I can review it myself and show it to one or two other faculty, but don't make it available to students yet.

Sent from my iPhone

On May 24, 2019, at 1:56 PM, Gerard Roy <RoyG@upstate.edu> wrote:

OK - will do...

Gerard Roy

VBrick Rev System Administrator,
Audio-Video Services Technician
Educational Communications
Upstate Medical University
315.464.7934 Desk or Voice Message
315.464.7930 Master Control
royg@upstate.edu

Please use our Technical Service and Support Form to request services:
http://www.upstate.edu/imt/intra/edcomm/tech-service-request-form.php

>>> Susan Anderson 5/24/2019 1:20 PM >>>
Hi Gerard,

Please don't post the video from today right away.

Please email it to me and Dr. Matt Mason as we need to review it.

Thank you
Susan

Susan Anderson

Director of Administration
Curriculum Office
Upstate Medical University
Phone (315) 464-5187

A-0577

Page 1 of 3

## Anne Dotzler - Fwd: Re: (EXTERNAL) Re: Student Complaint-MS3 Orientation

**From:** Julie White
**To:** Dotzler, Anne
**Date:** 12/19/2019 9:50 AM
**Subject:** Fwd: Re: (EXTERNAL) Re: Student Complaint-MS3 Orientation
**Attachments:** Note to MS3 2019 - JL1-JRW LL.docx

Julie R. White, Ph.D.
Associate Vice President for Educational Services &
Dean of Student Affairs

Pronouns: She/Hers

>>> Leann Lesperance 12/19/19 9:35 AM >>>

>>> Leann Lesperance 9/25/2019 10:24 AM >>>

>>> Leann Lesperance 5/28/2019 9:19 PM >>>
I also think this is good and will be helpful. I just tweaked a few words.
Leann

>>> Matthew D Mason <masonm@upstate.edu> 05/28/19 8:29 PM >>>
I think this is a good message. I agree with the streamlining, as I have
found that many of the messages I send to students don't often get read if
they are longer.

Matthew D. Mason, M.D.
SUNY-Upstate Medical University
Assistant Professor, Pediatric Urology, Department of Urology
Assistant Dean for Clinical Sciences
725 Irving Ave., Suite 406
Syracuse, NY 13210
phone: 315.464.6060
fax: 315.464.1968
email: masonm@upstate.edu

This message and any attachments are solely for the use of the intended
recipients. They may contain privileged and/or confidential information or
other information protected from disclosure. If you are not an intended
recipient, you are hereby notified that you received this email in error
and that any review, dissemination, distribution or copying of this email
and any attachment is strictly prohibited. If you have received this email
in error, please contact the sender and delete the message and any
attachment from your system.

On Tue, May 28, 2019 at 5:33 PM Julie White <whitejul@upstate.edu> wrote:

> My two cents attached.
>
> I streamlined and suggest removing any comparisons with other classes.

Page 2 of 3

> 
> 
> Julie R. White, Ph.D.
> Associate Vice President of Educational Services & Dean of Student Affairs
> 1223 Weiskotten Hall
> (315) 464-4816
> 
> My pronouns: She/Her
> 
> 
> >>> Julio Licinio <licinioj@upstate.edu> 5/28/2019 12:28 PM >>>
> 
> Dear Julie:
> 
> 
> Following my conversations with you and Matt (I will reach Leann and
> Sharon next), please find attached a letter to the students. I count on you
> to edit it vigorously.
> 
> 
> Many thanks!
> 
> 
> Julio
> 
> 
> 
> On May 28, 2019, at 10:51, Julie White <whitejul@upstate.edu> wrote:
> 
> 
> Julio,
> 
> 
> I want to let you know that a student called my office on Friday,
> following MS3 orientation, to "file an anonymous complaint" about the
> residency planning session. When Lori told the student I was not here, he
> spoke with Sharon Huard. The student reported that he and a group of
> student colleagues were very upset following your talk as they perceived it
> as "very negative and depressing." He specifically mentioned the following
> comments as disturbing:
> 
> 
> *Studying for the boards was a vacation and it's only going to get worse
> and worse--residency, fellowship, and having a family will be very hard.
> He said if we don't do well in our clerkships we will never get into our
> chosen specialty. *
> 
> 
> Sharon suggested to the student that you were trying to prepare them for
> the realities to come. The student's response:
> 
> "Are you aware of the national suicide rate of medical students and
> residents? And the worst part is that Dr Licinio is a psychiatrist, why
> wouldn't he understand that he should not be saying all of these negative
> things to us? We are already all nervous about clerkships and Step 2 and
> matching and this made it so much worse for all of us. One of my friends
> has not even taken Step 1 yet, imagine what Dr Licinio's negativity did to
> him?"
> 
> Sharon ended the conversation with the student assuring him that she would
> relay the feedback to me. She also gave the student her cell phone number

> in the event he or his friends needed to talk further as she sensed the
> student was still very upset.
>
>
> Because neither Sharon nor I were at the session, we reached out to Matt
> and Leanne to get their take. Evidently, they have heard similar concerns
> about the presentation.
>
> I think this is clearly a situation in which the best of intentions has
> been lost in how the students received your messages. Perhaps it has to do
> with timing and where they are in the process? I'm also not in a good
> position to suggest a next step.
>
>
> I stand ready to assist in any way I can.
>
>
> Julie
>
>
> Julie R. White, Ph.D.
> Associate Vice President of Educational Services & Dean of Student Affairs
> 1223 Weiskotten Hall
> (315) 464-4816
>
> My pronouns: She/Her
>
>
>
>

Licinio v. SUNY Upstate, et al., 5:21-cv-387    009674

A0579

Dear MS3 Ssttudents:

As part of your orientation on May 24, 2019, I spoke with you about the ~~challenges ahead~~residency application process and how you might best position yourselves going forward. While by no means intending to minimize the arduous road that you have taken so far and the pressures and challenges of the exams you have faced, my intent was to note that challenges may continue now, as you work much more closely with patients and will increasingly have more responsibility while trying to negotiate residency matching.

I feel immensely privileged to be a physician, and with that privilege have come multiple responsibilities. I am exceptionally supportive of each student's dream, and ~~have worked very closely with many students in all years of medical, including those who recently graduated to help them to go their dream places. I will continue to do that for you~~I want to work with you to ensure your's is realized. The foundation for that is for you to learn as much as you can and take advantage of the opportunities you have. We know the competition for residency spots is growing.  If you develop a broad plan now, to include a range of options, I am confident you will be successful! ~~Given the growing competition for residency spots, I would strongly encourage you to develop broad plans~~

~~I am accessible directly, or through my office open hours, and through your mentors and supervisors. Upstate is here to help you and support you achieve your dreams. The foundation for that is for you to learn as much as you can and take advantage of the opportunities you have. Given the growing competition for residency spots, I would strongly encourage you to develop broad plans that include your dream positions, as well as other targets that will be at first more accessible. We all worked very hard to support our last class towards 100% Match, including matches to some of the best institutions in the country, and multiple highly successful matches to students' first choices.~~ As you enter your clinical years, I hope that you learn to balance the increasing demands of a medical career with ~~own~~ your own well-being and sense of purpose in life.

~~For your wellbeing, I~~ would encourage you to familiarize yourself with the work of Professor Seligman, founder of positive psychology and former head of the American Psychological Association, and his PERMA framework of five key areas that need to be targeted if we want to build well-being: Positive Emotion, Engagement, Relationships, Meaning, and Accomplishment. ~~In response to consultations with global wellbeing experts, my former colleagues added to the PERMA framework~~Add to that Physical Activity, Nutrition, Sleep and Optimism, to form a holistic framework on building well-being.

While I have tried to alert you to the pitfalls of what is to come, the message that my colleagues and I wanted to convey is that we are confident that you all have what it takes to be successful, and that we will do everything we can to help you become a well-balanced and successful physicians. Position yourselves now to become that

Licinio v. SUNY Upstate, et al., 5:21-cv-387   009675

A0580

reality. , ant that you have what it takes to make it, but you have to position yourselves . Our track record of achieving that is very high and We look forward to working together to help you achieve your dreams. and lead fulfilling and inspiring lives, like so many of those who have come to study medicine here for 185 years. We are proud of your tradition of success in helping students rise to become caring and accomplished physicians and will work closely with you to ensure your success and personal wellbeing.

I am accessible directly, or through my open office open hours, and through your mentors and supervisors. Upstate isRemember, we are here to help you and support you as you work to achieve your dreams.

Licinio v. SUNY Upstate, et al., 5:21-cv-387    009676

A0581

A-0582

Licinio v. SUNY Upstate, et al., 5:21-CV-387   008674

**Michael V. Jurbala**

| | |
|---|---|
| **From:** | Julio Licinio <licinioj@upstate.edu> <licinioj@upstate.edu> |
| **Sent:** | Wednesday, May 29, 2019 6:33 AM |
| **To:** | Matthew Mason |
| **Cc:** | Sharon Huard; Leann Lesperance |
| **Subject:** | Re: (EXTERNAL) Fully edited letter to MS3's |

Thanks, Matt!
Júlio

On May 29, 2019, at 06:27, Matthew Mason <masonm@upstate.edu> wrote:

> I will ask Susan to send it to all MS3s today, and to let you know once it is sent.
>
> Thank you!
> Matt
>
> Sent from my iPhone
>
> On May 28, 2019, at 11:30 PM, Julio Licinio <licinioj@upstate.edu> wrote:
>
>> Can you please send this to all our MS3's? Thanks for your input and support. Please let me know when you send it out. Thanks! All my best, Julio
>> ————————
>>
>> Dear MS3 Students:
>>
>> As part of your orientation on May 24, 2019, I spoke with you about the residency application process and how you might best position yourselves going forward. While by no means intending to minimize the arduous road that you have taken so far and the pressures and challenges of the exams you have faced, my intent was to note that challenges may continue now, as you work much more closely with patients and will increasingly have more responsibility while trying to negotiate residency matching.
>>
>> I feel immensely privileged to be a physician, and with that privilege have come multiple responsibilities. I am exceptionally supportive of each student's dream, and I want to work with you to ensure yours is realized. The foundation for that is for you to learn as much as you can and take advantage of the opportunities you have. We know the competition for residency spots is growing.  If you develop a broad plan now, to include a range of options, I am confident you will be successful!
>>
>> As you enter your clinical years, I hope that you learn to balance the increasing demands of a medical career with your own well-being and sense of purpose in life.
>>
>> I encourage you to familiarize yourself with the work of Professor Seligman, founder of positive psychology and former head of the American Psychological Association, and his PERMA framework of five key areas that need to be targeted if we want to build well-being: Positive Emotion, Engagement, Relationships, Meaning, and Accomplishment.

1

A-0583

Licinio v. SUNY Upstate, et al., 5:21-CV-387      008675

Add to that Physical Activity, Nutrition, Sleep and Optimism to form a holistic framework on building well-being.

While I have tried to alert you to the pitfalls of what is to come, the message that my colleagues and I want to convey is that we are confident that you all have what it takes to be successful, and that we will do everything we can to help you become well-balanced and successful physicians. Position yourselves now to make that reality. We look forward to working together to help you achieve your dreams.

I am accessible directly, or through my open office hours, and through your mentors and supervisors. Several students have reached out to me directly, and I am always happy to meet with you to advise on how to best formulate a strategy for career advancement. Remember, we are here to help you and support you as you work to achieve your dreams.

With best personal regards,

Julio
--------------------
Julio Licinio, MD, PhD, MBA, MS
Senior Vice President for Academic and Health Affairs
Executive Dean, College of Medicine
SUNY Distinguished Professor of Psychiatry, Medicine, Pharmacology, and Neuroscience & Physiology
State University of New York
Upstate Medical University
750 E. Adams Street
Syracuse, NY 13210, USA

Executive Assistant: Mary Arsenau
ARSENEAM@upstate.edu
315-464-9723

Twitter: @licinio

2

A-0584

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF NEW YORK**

........................................................................X

**JULIO LICINIO, MD, PhD, MBA, MS,**

|  |  |
|---|---|
| Plaintiff, | **DECLARATION OF MARK SCHMITT, Ph.D.** |

Case No.: **5:21-cv-387(GTS/TWD)**

- against -

**STATE OF NEW YORK, THE STATE UNIVERSITY OF NEW YORK, and THE STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,**

Defendants

........................................................................X

MARK SCHMITT, PhD, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.      I am currently employed by State University of New York Upstate Medical University ("UMU") as Dean of the College of Graduate Studies. I am also a Professor of Biochemistry and Molecular Biology. I have held the position of Dean in UMU's College of Graduate Studies from June 2013 to January 2022, and then again from January 2023 to present. I also served as Operations Manager and Interim Vice President for Research at UMU from July 2018 to December 2019.

2.      I respectfully submit this Declaration in support of the Defendants' motion for summary judgment.

3.      I make this Declaration based upon my personal knowledge.

1

A-0585

4.     During the time that Plaintiff was Dean of the College of Medicine, I directly reported to him in my role as Dean of the College of Graduate Studies.

5.     From July 2018 until after Plaintiff was removed as Dean in September 2019, I also reported directly to President Mantosh Dewan in my role as Operations Manager and Interim Vice President for Research.

6.     It is my understanding that the Plaintiff is essentially claiming that President Dewan opposed hiring individuals from diverse backgrounds to fill Dean positions that Plaintiff contends he created to ensure that underrepresented students were represented at the COM.

7.     However, based on my meetings with President Dewan, it was my understanding that the President was concerned that Plaintiff was agreeing to pay faculty to hold positions and be responsible for duties that others in similar job titles were already being paid to perform.

8.     Specifically, between January 2019 and September 2019, I had standing one-on-one meetings with Dr. Dewan approximately once a month. According to my calendar, we met on February 28, 2019; March 30, 2019; April 23, 2019; May 16, 2019; June 20, 2019; July 24, 2019; and August 15, 2019. Topics of discussion included, but were not limited to: staffing issues, upcoming UMU events, and UMU grants.

9.     During these meetings, President Dewan discussed his frustration that Plaintiff was creating an additional Diversity Position in the Dean's office even though a similar position already existed and UMU was already paying someone to perform similar duties. President Dewan believed that Plaintiff was creating this position as a means to avoid managing the performance of the individual in the existing position. It was never my impression that President Dewan was opposing the concept of having individuals focused on improving Diversity at UMU.  In fact, President Dewan and I discussed ways in which we could expand diversity efforts related to the

2

College of Graduate Studies and Research on campus. This included initiation of the Upstate PREP (Postbaccalaureate Research Education Program) which focus is to strengthen the research skills and academic competitiveness of program participants in an effort to help meet the critical need for diverse investigators in basic and translational research, particularly individuals from disadvantaged backgrounds. The program, which required President Dewan's approval, was implemented in 2020 and is managed out of my office.

10.    It is also my understanding that Plaintiff in this case is claiming that he was unlawfully retaliated against when he was not selected to be MD/PhD Program Director.

11.    I was involved in the selection of a new MD/PhD Program Director in or about early 2020. The decision not to select Plaintiff had nothing whatsoever to do with his race, national origin, or any complaint of discrimination.

12.    Instead, on January 28, 2020, I attended a meeting with President Dewan, College of Medicine interim Dean Lawrence Chin, Dr. Julie White and three MD/PhD students. We discussed issues that had been brought forward by these students regarding the current MD/PhD program co-directors about their effectiveness in their role and whether a new program director should be selected. After listening to the concerns brought forward by the students, we agreed that a new program director who had more time to devote to mentoring the students should be selected. In doing so, we believed that the students should have a strong voice in the decision as to who should be director of the program. Consequently, we specifically asked the students to identify a list of faculty who had the qualities that they thought were necessary to be a good program director. Dr. Amit Dhamoon, MD, PhD was first on their list. A follow up email from the students suggested additional individuals. A copy of the January 30, 2020 email from the students is attached as **Exhibit "A."** Plaintiff was not on their list.

3

A-0587

13.     After discussion with Dr. Chin, we agreed that Dr. Dhamoon would be an excellent choice as program director for UMU MD/PhD students. First, he graduated from UMU's MD/PhD program. Second, he had a demonstrated history of mentoring students at UMU and was widely acknowledged by students as one of the best teachers at UMU. A copy of his resume is attached as **Exhibit "B."**

14.     Dr. Dhamoon agreed to serve in the role and was officially appointed director on March 13, 2020. He continues to hold that position in addition to his regular tenured faculty position at UMU today.

Dated:     1 / 9 _____ 2024
             Syracuse, New York

Mark Schmitt, PhD

4

**Friday, November 5, 2021 at 01:02:58 Eastern Daylight Time**

| | |
|---|---|
| **Subject:** | Md/PhD program meeting follow-up |
| **Date:** | Thursday, January 30, 2020 at 11:24:17 AM Eastern Standard Time |
| **From:** | ████████ |
| **To:** | Lawrence Chin, Mantosh Dewan, Mark Schmitt, Julie White |
| **CC:** | ████████████████ |

Attachments: md phd program assessment.docx

MD/PhD program. We really appreciated your time and support.

Deans Chin, Schmitt, and White – attached please find several suggestions ████████ ████████ compiled for important characteristics and suggestions for a leader, labs we would recommend, as well as other points to which we would like particular attention paid as you make a comprehensive assessment of the program.

Thank you again for your time and please let us all know how we may be of any assistance moving forward.

Also, Dr. Chin, congratulations on your official appointment as Dean!

Thank you,

████████



**Important qualities for a director:** empathetic, trustworthy, open-minded (values many forms of success), strong advocate, personable, high emotional intelligence

**Potential Directors:**
Drs. Amit Dhamoon
Darrell Dykes
Joseph Domachowske
Gennady Bratslavsky
Mehdi Mollapour
Dimitra Bourboulia

**Recommended Labs:**
Drs. Juntao Luo
Stewart Loh
Patty Kane
Xin Jie Chen
Michael Cosgrove
Mehdi Mollapour
Dimitra Bourboulia
Jeffrey Amack
Mira Krendel
Jessica Ridilla
Gary Chan
Saravanan Thangamani
Andreas Koenig
Joel Wilmore
Peter Calvert
Stephen Glatt
Tim Damron
Megan Oest
Likely others in Neuroscience and elsewhere, but they are outside of the disciplines of the four of us.

**Additional important points:** a full-time coordinator, structure in place to help students identify potential labs, strong mentorship throughout PhD to keep progress on track and help in identifying additional (clinical) mentors, re-structured and more formalized peer mentorship program, workable and reasonable budget that needs to be rebuilt and reallocated, redefine program mission/vision, define roles of (co)director and staff, updated program guidebook and website, clear communication

**MD/PhD specific courses:**
– Grand rounds course functions reasonably well.
– Grant writing course could likely use some work; particular attention needs to be paid to developing a training plan, biosketch, etc. in addition to the research strategy

# Amit S. Dhamoon, MD, PhD, FACP



Page 1 of 6

## CURRENT WORK EXPERIENCE
**SUNY Upstate Medical University,** Syracuse, NY.
- Chief, Division of General Medicine (January 2019-present)
- Clinical Associate Professor (July 2017-present)
- Clinical Assistant Professor in the Department of Medicine (July 2011-July 2017)
- Vice Chair for Quality, Department of Medicine (August 2013-present)
- Associate Program Director for the Internal Medicine Residency Program (September 2011-present)
- NYACP Syracuse District Councilor (April 2019-2022)

## TRAINING AND EDUCATION
**Cornell University,** Ithaca, NY.
- SUNY Upstate Healthcare Leadership Training Program (2019)

**Massachusetts General Hospital,** Boston, MA.
- Resident in Internal Medicine (June 2007-June 2010)

**SUNY Upstate Medical University,** Syracuse, NY.
- MD, PhD May 2007

**Williams College,** Williamstown, MA.
- Bachelor of Arts in Biology, June 1995

## RESEARCH EXPERIENCE
**University of Rochester Medical Center,** Rochester, NY.
- Post-doctoral fellow in the laboratory of Dr. Charles Lowenstein (August 2010-July 2011)

**National Institutes of Health,** Bethesda, MD.
- Clinical Research Training Program (August 2006-June 2007)

**SUNY Upstate Medical University,** Syracuse, NY.
- Pre-doctoral fellow in the laboratory of Dr. Jose Jalife (2000-2004)

## HONORS AND AWARDS
- Gold Standard Award (2019)
- Faculty Who Make a Difference Award by the Dean of the College of Medicine (2017)
- Gold Humanism Honor Society (2016)
- Leonard Tow Humanism in Medicine Award (2016)
- Physician of the Year Excellence in Healthcare Award (2014)
- Medical Alumni Association Clinical Faculty Teaching Award (2013- 2019)
- AΩA Gamma Chapter Faculty Teaching Award (2014, 2015, 2016, 2017).
- University Hospital Faculty Teaching Award, Department of Medicine (2012, 2015).
- Best Hospitalist Teaching Award, Department of Medicine (2012, 2013, 2014, 2015, 2016).
- Senior Resident Excellence in Teaching Award (MGH, 2010).
- Senior Resident Dr. Mort Swartz Award for Humanism in Medicine (MGH, 2010).
- Harvard Medical School Internal Medicine Teaching Award (2010).
- John Bernard Henry, M.D. Endowed Scholarship (2006).

A-0591

# Amit S. Dhamoon, MD, PhD, FACP

Page 2 of 6

## HONORS AND AWARDS
- William J. Williams, M.D. Award in Internal Medicine (2006).
- AΩA Honor Society Junior Year Inductee (2005).
- American Heart Association pre-doctoral research fellowship (July 2002-June 2004).
- Gordon K. Moe Young Investigator Award (2001).
- SUNY Upstate Medical Alumni Merit Scholarship (2000).

## PEER-REVIEWED PUBLICATIONS

Ghimire P, **Dhamoon AS**. Ketoacidosis. *StatPearls* [Internet]. Treasure Island (FL): StatPearls Publishing; 2018 Jan-.2018 Nov 26.

Ojha N, **Dhamoon AS**. Fungal Endocarditis. *StatPearls* [Internet]. Treasure Island (FL): StatPearls Publishing; 2018 Jan-.2018 Nov 18.

Krowl L, Gudlavalleti A, Patel A, Panebianco L, Kosters M, **Dhamoon AS**. A pilot study to standardize and peer-review shift handoffs in an academic internal medicine residency program: The DOCFISH method. *Medicine* (Baltimore). 2018 Oct;97(41):e12798.

Vaidya Y, **Dhamoon AS**. Hepatojugular Reflux. *StatPearls* [Internet]. Treasure Island (FL): StatPearls Publishing; 2018 Jan-. 2018 Sep 7.

Bhatti Z, Bhatti R, Brangman S, Whiting K, **Dhamoon A**. Extensive Cutaneous Scalp Angiosarcoma. *Case Rep Dermatol Med*. 2018 Jun 21; 2018: 8409820.

Subedi R, Dean RK, **Dhamoon AS**. Dofetilide-Induced Severe Hepatotoxicity. *Am J Ther*. 2018 Jun 15. doi: 10.1097/MJT.0000000000000793.

Vaidya Y, **Dhamoon AS**. Left Ventricular Assist Devices (LVAD). *StatPearls* [Internet]. Treasure Island (FL): StatPearls Publishing; 2018 Jan-. 2018 April 25.

Kaufman DP, **Dhamoon AS**. Physiology, Oxyhemoglobin Dissociation Curve. *StatPearls* [Internet]. Treasure Island (FL): StatPearls Publishing; 2018 Jan-. 2018 Apr 9.

Khanal S, Ghimire P, **Dhamoon AS**. Liver Injury During Treatment with Rifampicin, Vancomycin, and Acetaminophen. *Am J Ther*. 2018 Mar 15.

Khanal S, Ghimire P, **Dhamoon AS**. The Repertoire of Adenovirus in Human Disease: The Innocuous to the Deadly. *Biomedicines*. 2018 March 7; 6(1). Pii:E30.

Masood U, Sharma A, Bhatti Z, Carroll J, Bhardwaj A, Sivalingam D, **Dhamoon AS**. A Successful Pharmacist-Based Quality Initiative to Reduce Inappropriate Stress Ulcer Prophylaxis Use in an Academic Medical Intensive Care Unit. *Inquiry*. 2018 Jan-Dec; 55: 46958018759116.

Stein L, Thaler A, Liang JW, Tuhrim S, **Dhamoon AS**, Dhamoon, MS. Intermediate-Term Risk of Stroke Following Cardiac Procedures in a Nationally Representative Data Set. *J Am Heart Assoc*. 2017 Dec 2; 6(12).

Vaidya, GN, Shah R, **Dhamoon**, A. Pulmonary sarcomatoid carcinoma presenting as a necrotizing cavitary lung lesion: diagnostic dilemma. *The Sarcoma Journal*. Fall 2017. Volume 1, issue 1: 22-25.

A-0592

## Amit S. Dhamoon, MD, PhD, FACP

Page 3 of 6

Mousa OY, Dhamoon MS, **Dhamoon AS**. Physicians in the 21st century: Identification with medicine as a calling and self-diagnosing burnout, depression, and anxiety. *Mayo Clinic Proceedings.* 2017 August; 92(8): 1314-1315.

Subedi R, Dean R, Li W, **Dhamoon A**. A novel case of *Raoultella planticola* osteomyelitis and epidural abscess. *BMJ Case Reports.* 2017 Jul 13; 2017.

Pandita A, Madhuripan N, Hurtado R, **Dhamoon A**. Back pain and edematous Schmorl node: a diagnostic dilemma. *BMJ Case Reports.* 2017 May 22; 2017.

Lau C, **Dhamoon AS**. The impact of a multidisciplinary care coordination protocol on patient-centered outcomes at an academic medical center. *Journal of Clinical Pathways.* 2017; 3[4]: 37-46.

Bhatti Z, **Dhamoon A**. Fatal adenovirus infection in an immunocompetent host. *Am J Emerg Med.* 2017 Feb 4. pii: S0735-6757(17)30096-7. doi: 10.1016.

Mousa OY, Shah R, **Dhamoon AS**. Disparate Perceptions of Resident Physicians, Faculty Physicians, and Program Directors in the 2011 ACGME Work Hour Regulations. *J Grad Med Educ.* 2016 Oct; 8(4): 623.

Gudlavalleti A, Dean R, Liu Y, **Dhamoon AS**. Diagnosis and Treatment of a Rare Sinonasal Neuroendocrine Tumour: Adding to the Evidence. *BMJ Case Reports.* 2016 Sep 13; 2016. pii: bcr2016217319.doi: 10.1136/bcr-2016-217319.

Zayac A, Shah R, Shah M, Umar J, Bansal N, **Dhamoon A**. Thyrotoxic Hypokalemic Periodic Paralysis. *QJM.* 2016 Jun 17. Pii: hcw091.

Mousa OY, Dhamoon MS, Lander S, **Dhamoon AS**. The MD Blues: Under-Recognized Depression and Anxiety in Medical Trainees. *PLoS One.* 2016 Jun 10; 11 (6): e0156554.

Lei J, **Dhamoon AS**, Wang J, Iannuzzi M, Liu K. Walking the Tightrope: Using Quantitative Doppler Echocardiography to Optimize Ventricular Filling Pressures in Patients Hospitalized for Acute Heart Failure. *Eur Heart J Acute Cardiovasc Care.* 2015 Feb 18.

**Dhamoon AS**, Liu K. How Can We Improve Inpatient Management of Heart Failure. *JACC: Heart Failure.* 2014 April 2(2): 199-200.

Malhotra A, Jha SS, **Dhamoon A**. Fatal Bleeding Associated with Rivaroxaban in Patient with Gastric Lymphoma. *Journal of Case Reports in Practice.* 2013 October 1 (3).

Annunziata, C, Azad N, **Dhamoon AS**, Whiteley W, Kohn EC. Ovarian Cancer in the Proteomics Era. *International Journal of Gynecological Cancer.* 2008 Mar-Apr; 18 Suppl 1:1-6.

Kohn EC, Azad N, Annunziata C, **Dhamoon AS**, Whiteley G. Proteomics as a tool for biomarker discovery. *Disease Markers.* 2007; 23(5-6): 411-7.

**Dhamoon AS**, Kohn EC, Azad NS. The ongoing evolution of proteomics in malignancy. *Drug Discovery Today.* 2007, 12 (17-18): 700-8.

## Amit S. Dhamoon, MD, PhD, FACP

Muñoz V, Vaidyanathan R, Tolkacheva EG, **Dhamoon AS**, Taffet SM, Anumonwo JMB. Kir2.3 Isoform Confers pH Sensitivity to Heteromeric Kir2.1/Kir2.3 Channels in HEK293 Cells. *Heart Rhythm*. 2007, 4(4): 487-96.

**Dhamoon AS**, Loftus T. Cardiac Stress Testing. In: First Exposure to Internal Medicine: Ambulatory Medicine, 1st edition. Hoellein AR, Griffith CH, Feddock C, Haist S, Loftus T Eds.

Antshel KM, Fremont W, Roizen NJ, Shprintzen R, Higgins AM, **Dhamoon A**, Kates WR. ADHD and simple phobias are prevalent psychiatric conditions in youth with velocardiofacial syndrome (VCFS). *Journal of the American Academy of Child & Adolescent Psychiatry*. 2006; 45(5): 596-603.

Priori SG, Pandit SV, Rivolta I, Berenfeld O, Ronchetti E, **Dhamoon A**, Napolitano C, Anumonwo J, di Barletta MR, Gudapakkam S, Bosi G, Stramba-Badiale M, Jalife J. A novel form of short QT syndrome (SQT3) is caused by a mutation in the KCNJ2 gene. *Circulation Research*. 2005 Apr 15;96(7): 800-7.

**Dhamoon AS**, Jalife J. The inward rectifier current ($I_{K1}$) controls cardiac excitability and is involved in arrhythmogenesis. *Heart Rhythm*. 2005 Mar;2(3):316-24.

**Dhamoon AS**, Pandit SV, Sarmast F, Parisian KR, Guha P, Li Y, Bagwe S, Taffet SM, Anumonwo JM. Unique Kir2.x properties determine regional and species differences in the cardiac inward rectifier K+ current. *Circulation Research*. 2004; 94 (10):1332-9.

Sarmast F, Kolli A, Zaitsev A, Parisian K, **Dhamoon AS**, Guha PK, Warren M, Anumonwo JM, Taffet SM, Berenfeld O, Jalife J. Cholinergic atrial fibrillation: I(K,ACh) gradients determine unequal left/right atrial frequencies and rotor dynamics. *Cardiovascular Research*. 2003; 59(4): 863-73.

Warren M, Guha PK, Berenfeld O, Zaitsev A, Anumonwo JM, **Dhamoon AS**, Bagwe S, Taffet SM, Jalife J. Blockade of the inward rectifying potassium current terminates ventricular fibrillation in the guinea pig heart. *Journal of Cardiovascular Electrophysiology*. 2003; 14(6): 621-31.

Shirodkar NP, Chopra PS, Marker M, Murphy KD, **Dhamoon A**, Kwon OJ. Conjoined gastric and mediastinal benign cystic teratomas. Case report of a rare occurrence and review of literature. *Clinical Imaging*. 1997 Sep-Oct;21(5):340-5.

Anumonwo JMB, Berenfeld O, **Dhamoon A**, Jalife J. Ion channels and fibrillation. In: Heart cell coupling and impulse propagation in health and disease. pp 335-359., DeMello WC and Janse MJ Eds. Kluwer Academic Press. 2002.

## SELECTED PRESENTATIONS

Chahal RK, Wanamaker E, Smith G, **Dhamoon AS**. An Acute Presentation of Distal Intestinal Obstructive Syndrome (DIOS). *Journal of Hospital Medicine*. 2017; 12 (suppl 2).

Masood U, Sharma A, Bhatti Z, Carroll J, Sivilingam D, Bhardwaj A, **Dhamoon AS**. "A successful pharmacist based quality initiative to reduce inappropriate stress ulcer prophylaxis use in an academic medical ICU." Digestive Diseases Week Annual Conference. May 7th, 2017. Chicago, IL.

A-0594

# Amit S. Dhamoon, MD, PhD, FACP

Page 5 of 6

Lappin S, **Dhamoon AS**. The "X" factor: Power of Observation and Feedback in Medical Education. Upstate Faculty Scholars Dinner, June 2016.

Dean R, Gudlavelleti A, **Dhamoon A**. An Interesting Case of Large Cell Paranasal Neuroendocrine Tumor. National ACP Conference. 2016.

Syed, W; Yeager, J; Fariduddin; M; Shah, A; **Dhamoon, A**. Tick bite causing water retention: Lyme's disease manifesting as acute hyponatremia from SIADH. *Critical Care Medicine*. 2015, Dec; 43(12) Supplement 1:315.

Kosters, M, Kothari S, Ghaly T, **Dhamoon A**. Unmasking a Rare Rheumatological Disease with the Atypical Presentation of Acute Onset Shortness of Breath. *Chest*. 2014, 146 (4_MeetingAbstracts): 414A.

Thomas Franzon, Arunpreet Kahlon, **Amit S. Dhamoon**. The unmasking of autoimmune disease in pregnancy, presented at NYACP, Albany, NY, September 6, 2014.

Azad N, Annunziata C, **Dhamoon AS**, Whiteley G, and Kohn EC. Ovarian Cancer in the Proteomics Era. Sixth International Symposium, Advanced Ovarian Cancer Optimal Therapy Update, Valencia, Spain, March 2, 2007.

**Dhamoon AS**, Saul R, Liu C, Kohn EC, Whiteley G. Effects of protein stabilizers and storage time on the mass spectrometry dynamics of human serum proteins. American Association for Cancer Research Annual Meeting, April 2007.

**Dhamoon AS**, Saul R, Liu C, Kohn EC, Whiteley G. Effects of protein stabilizers and storage time on the mass spectrometry dynamics of serum proteins. National Cancer Institute 7th Annual Fellows and Young Investigators Retreat, February 2007.

Muñoz V, **Dhamoon A**, Taffet S, Anumonwo JM, Jalife J. Kir2.3 subunits confer pH sensitivity to Kir2 channels. Heart Rhythm Volume 2, Issue 5, Supplement 1, May 2005, Page S107.

**Dhamoon AS**, Pandit SV, Sarmast F, Anumonwo JMB, Taffet SM, Jalife J. Differential Kir2.x channel expression determines characteristic $I_{K1}$ properties in atrial and ventricular myocytes. New York American College of Physicians Regional Meeting, East Elmhurst, NY, 2006.

**Dhamoon AS**, Pandit SV, Sarmast F, Anumonwo JMB, Taffet SM, Jalife J. Kir2.1 properties predominate in heteromeric $I_{K1}$ channels of guinea pig ventricular myocytes. North American Society of Pacing and Electrophysiology meeting, San Francisco, CA, 2004.

**Dhamoon AS**, Pandit SV, Anghel TM, Sarmast F, Anumonwo JMB, Taffet SM, Jalife J. Differential expression of individual Kir2.x isoforms determines differences in action potential shape and $[K^+]_o$ dependence of $I_{K1}$ in atrial and ventricular myocytes. PACE. 26; 956. 2003.

Anumonwo JMB, **Dhamoon AS**, Sarmast F, Zaitsev A, Berenfeld O, Taffet SM, Jalife. Chamber specific differences in $I_{K,Ach}$ density determine rotor dynamics during atrial fibrillation in the sheep. PACE. 26; 972. 2003.

A-0595

## Amit S. Dhamoon, MD, PhD, FACP

Page 6 of 6

**Dhamoon AS**, Pandit SV, Anghel TM, Sarmast F, Anumonwo JMB, Taffet SM, Jalife J. Rectification properties of Kir2 isoforms determine regional differences in $I_{K1}$: implications for repolarization in the atrium and the ventricle. National MD/PhD Student Conference, Snowmass, CO, 2003.

**Dhamoon AS**, Bagwe S, Guha P, Anumonwo JMB, Taffet SM, Jalife J. Differential expression and whole-cell rectification profiles of guinea pig Kir2.x channels. Biophysical Journal. 81(1); 587a, 2002.

**Dhamoon AS**, Bagwe S, Guha P, Anumonwo JMB, Taffet SM, Jalife J. Differential Expression and Rectification Properties of the Guinea Pig Kir2.x Channels: Insights into the Molecular Mechanisms of Ventricular Fibrillation. Upstate New York Cardiac Electrophysiology Society meeting, Buffalo, NY, 2001.

Shirodkar NP, Chopra PS, **Dhamoon A**, Murphy KD, Kwon OJ.  Review of Current Balloon Angioplasty Catheters. Radiological Society of North America Meeting, Chicago, Illinois, 1995.

A-0596

UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK
........................................................................X

JULIO LICINIO, MD, PhD, MBA, MS,

        Plaintiff,      THOMAS SCHWARTZ, M.D.
                 DECLARATION

                 Case No.: **5:21-cv-387(GTS/TWD)**

   - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

        Defendants
........................................................................X

   THOMAS SCHWARTZ, pursuant to § 1746 of Title 28 of the United States Code, declares

the following to be true and correct under penalty of perjury under the laws of the United States

of America:

   1.  I am a psychiatrist and have been licensed to practice medicine in the State of New

York since 1998. I am currently employed by SUNY Upstate Medical University ("UMU") as a

SUNY Distinguished Teaching Professor and the Chair of the Department of Psychiatry and have

been employed by UMU since 1995, when I began my residency. I was appointed as the interim

Chair of UMU's Psychiatry Department in August 2016, and then became Chair in 2020.

   2.  Additionally, I am the president of Psychiatry Faculty Practice, Inc. ("PFP"), a non-

profit medical service group that is made up of the Psychiatry clinicians and researchers who are

also faculty of UMU.

1

A-0597

3.     I respectfully submit this Declaration in support of the Defendants' motion for summary judgment. I make this Declaration based upon my personal knowledge and based upon records maintained in the usual course of business.

**Interactions with Plaintiff as Dean of the College of Medicine**

4.     While he was Dean of the College of Medicine ("COM"), I reported to Plaintiff as interim Department Chair of Psychiatry. In addition to his position as Dean, Plaintiff also had a concurrent appointment as a tenured faculty member in the Department of Psychiatry.

5.     In June 2018, Plaintiff appointed me to the position of Senior Associate Dean for Education in UMU's College of Medicine, reporting directly to Plaintiff.

6.     My Senior Associate Dean for Education position was in addition to my position as Department Chair and I was paid approximately $69,000 as an "Also Receives" to hold the position in addition to my Chair salary. I did not have to apply for this position and, upon information and belief, Plaintiff selected me for the position without any kind of internal, regional or national search. I am a white male.

7.     As Department Chair and Senior Associate Dean, I had regular encounters with Plaintiff while he was Dean of UMU's College of Medicine. It was my impression that, although he had an impressive background as a researcher in the field of Psychiatry, he was not an effective leader in a few key areas.

8.     For example, as Senior Associate Dean for Education, he never provided me with a job description or any structure for this position and did not delegate many responsibilities or tasks for me to complete. I was not required to meet with Plaintiff routinely. I also was required to personally ask for routine appointments with Plaintiff to better delineate my tasks and to generate the content for these meetings. There was no substance to the position outside of being told to

2

make sure we pass our 2019 Liaison Committee on Medical Education ("LCME") review. After Plaintiff was removed as Dean, the position was dissolved by the new interim Dean.

9.      I also attended monthly Department Chair meetings that were run by Plaintiff when he was Dean. Many times, minimal was accomplished during these meetings and Plaintiff was often distracted, was not focused, and went off on tangents while he was speaking or proposed odd or self-serving items without much discourse.  At some meetings outside of chair meetings, he would become tangential or even alienate his audience with his comments.

10.     I viewed Plaintiff as a "thinking Dean" instead of an "acting Dean." He had a lot of ideas but was either unwilling or unable to take the actions necessary to operationalize those ideas. At times he would micromanage or seem paranoid about his ideas and implementations.  He would often change his mind or the plan.

11.     After Dr. Mantosh Dewan became interim President, Plaintiff became increasingly paranoid about Department Chairs speaking with President Dewan about Departmental issues that they needed help with. In approximately the Summer of 2019, during more than one Department Chair meeting, Plaintiff told the Department Chairs in attendance, including myself, that they should not be speaking with President Dewan about Department issues and that he would view them to be circumventing Plaintiff if they did.

12.     I was not surprised that Department Chairs were speaking directly with the President on various Departmental issues. Plaintiff seemed to be frequently off site at meetings and attending his MBA classes and at times seemed delinquent in responding to concerns voiced by Department Chairs. I think he was viewed largely as an off-site Dean. In contrast, President Dewan has been a faculty member at UMU for more than 40 years and has garnered the respect of faculty and Chairs as a colleague and leader. He listens to concerns raised and works to try to solve

3

and/or address them. I suspect he has accomplished more as interim Dean and now President than most leaders I have worked with since 2000.

13.     A few Department Chairs were upset by Plaintiff's directive not to speak with President Dewan and voiced their opinion that they should be able to speak with a colleague.

14.     Separate and apart from Department Chair meetings, Plaintiff expressed his indignation to me directly on several occasions for speaking with President Dewan about various issues. By way of example, on one occasion, during a casual conversation I was having with President Dewan, we discussed the topic of medical students travelling to New York City for an exchange program which had been an idea that Plaintiff raised with me previously. The topic was raised during a passing conversation, and I viewed this to be an appropriate topic of discussion with the President given my Senior Associate Dean role. I specifically told Dr Dewan it was a good idea and was lobbying for the Plaintiff. When Plaintiff discovered that I had spoken directly to President Dewan about this topic, he became so upset that he angrily confronted me. He threatened to fire me from the Senior Associate Dean for Education position, essentially stating something to the fact that he has never been so dishonored. I believe I relayed to President Dewan that Plaintiff was furious that I had spoken to him directly about this topic. I viewed Plaintiff's strong reaction to be strange and an unnecessary overreaction to a passing conversation that I had with President Dewan, which was not at all intended to circumvent the Plaintiff's authority. This was odd as well, in that I was advocating for the Plaintiff's idea.

15.     On another occasion, in May 2019, I emailed Plaintiff, President Dewan, and Hospital CEO Dr. Robert Corona in support of a colleague, Sharon Brangman, MD, who had been newly appointed as the Geriatrics Department Chair in a newly created Geriatrics Department. I believed that Plaintiff supported this role for Dr. Brangman as he directly appointed her, but I was

4

concerned that other agencies were not as supportive. I expressed to the CEO and President that I was worried as a colleague and co-chair that Dr. Brangman was not being fairly treated as a new Chair, specifically with respect to the hospital's lack of financial backing of the Geriatrics Department. The Hospital CEO added Plaintiff to the email and Plaintiff responded by emailing only me, chastising me for emailing the Hospital CEO and President about this issue even though I felt I was lobbying on his behalf and on behalf of the College of Medicine. In his response, he mocked me for raising the concern and accusing me of being a "busybody" and a "vigilante" for raising the issue, and of insinuating to the Hospital CEO and President that Plaintiff was not doing his job. His response contained thirteen numbered paragraphs that explained how and why he took offense to my email, and in my view, was not warranted. I was shocked at the vitriol he exhibited in his lengthy response to a question that I felt was appropriate to raise about whether my colleague would be getting hospital support. See, **Exhibit "A."**

16.     After he was demoted, Plaintiff continued to be a tenured distinguished research professor in the Department of Psychiatry and reported directly to me. He received the highest State salary out of any other research faculty in the Psychiatry Department, despite having no current grants, and worked with his wife, Ma-Li Wong, MD, PhD, who was also a researcher in the Psychiatry Department. At that time, Plaintiff expressed to me that he would like his academic travel, medical license fees, and professional society memberships to be reimbursed by UMU. However, I denied his request given that <u>no</u> other faculty member in the Psychiatry Department receives reimbursement for such expenses, which I expressed to Plaintiff via email on or about October 11, 2019, January 9, 2020, and January 21, 2020. See, **Exhibit "B".**

17.     Additionally, in January 2020, Plaintiff requested that I provide him with a startup package for his research lab. I asked that he provide me a list of startup items he believed he was

5

entitled to so that I could bring his requests to the Dean and try to negotiate for the College of Medicine to provide it for him. I followed up with him in March 2020. However, he never provided me with any list. See, **Exhibit "C"**.

### Plaintiff's claims regarding his wife, Ma-Li Wong, M.D., PhD

18.     As mentioned above, Plaintiff's wife, Ma-Li Wong, MD, PhD, is currently a Distinguished Professor of Psychiatry and Behavioral Sciences. She is a research faculty member in the Department of Psychiatry who partners with her husband – Plaintiff – to conduct research. I have been her direct supervisor since she began her employment at UMU on December 11, 2017.

19.     I am aware of the compensation package offered to and accepted by Dr. Wong prior to her becoming employed and the changes to Dr. Wong's compensation during her employment.

20.     Specifically, I am aware that former UMU President Danielle Laraque-Arena, MD was recruiting Plaintiff to the position of College of Medicine Dean. As part of that recruitment effort, she offered Plaintiff's wife, Dr. Ma-Li Wong, a tenured research faculty position in UMU's Department of Psychiatry with one of the most generous compensation packages that I have ever seen offered to a researcher in my Department or likely at UMU. There were extensive negotiations between Dr. Laraque-Arena, Plaintiff, and Dr. Wong regarding both of their onboarding packages. Upon information and belief, Plaintiff and Dr. Wong were represented by and consulted with their own attorney during these negotiations.

21.     Even though Dr. Wong did not have any research grants that would transfer to UMU, Dr. Wong was offered a tenured faculty position within my Department. An offer of tenure has never been offered to an unfunded researcher in Psychiatry since I have been Chair, as it is extremely risky to offer a guaranteed position to an unfunded researcher. Without grant funding to conduct research, the institution needs to pay for the researcher's start-up research costs and runs

6

the risk that such costs may never be recouped, as the researcher has little incentive to bring in grants with a guaranteed position.

22.     In addition to a tenured faculty position, Dr. Wong was offered a generous starting State salary of $220,000.00, which was comprised of $120,000.00 in State base salary and $100,000.00 in "ALR." ALR is an abbreviation for "also receives" compensation and was given to Dr. Wong for the purpose of temporarily supplementing her income to give her time to apply for grants and secure grant funding. The salary of $220,000 was above the median salary for psychiatry research faculty in the United States according to the Association of American Medical Colleges (AAMC) salary survey, which is the measure that I use to determine fair and competitive salaries for the faculty within my Department. A copy of the AAMC Faculty Salary Report from 2018 is attached as **Exhibit "D."**

23.     Attached as **Exhibit "E"** is a copy of Dr. Wong's March 13, 2017, offer letter from UMU, which specifically outlines the breakdown of Dr. Wong's State salary, with her starting State base salary set at $120,000.00 and an additional $100,000.00 as ALR. The letter specifically states with respect to the ALR that "[t]his additional compensation is...reviewed annually and is subject to adjustment or renewal..." See, Ex. E at p. 1.

24.     Attached to the March 13, 2017, offer letter from UMU is a copy of the Annual Agreement of Faculty Expectations ("Agreement") that Dr. Wong signed on March 15, 2017. See, Ex. E at 4. The Agreement specifically details the expectations of Dr. Wong's faculty position and delineates the startup research costs that she was awarded, which totaled $5,385,669.00. The Agreement included the following:

A0602

a.  Dr. Wong was to receive a completely renovated space to build her own 2,000-plus square foot state-of-the-art research laboratory at a cost of approximately $700,000.00;

b.  Dr. Wong was allocated approximately $70,000 to relocate her lab from Australia to the United States;

c.  UMU committed to pay $1,000,000 for Dr. Wong's lab operating costs from 2018 -2022;

d.  UMU committed to pay $600,000 for Dr. Wong's lab equipment costs from 2018-2022;

e.  UMU committed to pay $750,000 in startup funding for an Assistant Professor to assist with her research from 2018-2022.

25.    In addition to her State compensation package, Dr. Wong was also offered $30,000 from the PFP, which she would be employed by in addition to her State employment. Attached as **Exhibit "F"** is a copy of Dr. Wong's March 13, 2017, offer letter from the PFP. With respect to the PFP, the letter indicates that the PFP will give Dr. Wong a temporary stipend of $30,000.00, on top of the lucrative state backing. Providing such a stipend was a bit unusual and usually only offered to brand new researchers. While the PFP offer letter indicates that Dr. Wong's State "base salary" is $220,000.00 without including a breakdown of which portion of that salary was "ALR", the breakdown of her State salary is clearly delineated in the offer letter that she received from the State.

26.    The multimillion dollar start up package that UMU gave Dr. Wong to get her lab and research up and running would help her to apply for and receive research grants, which would in turn fund her research expenses and part of her yearly compensation without continued support

8

from State funds. All Department of Psychiatry researchers operate under this incentive-based model wherein the more grant money they are awarded, the more opportunity they have to increase their salaries and research funding.

27. No other researcher in my department has ever received as generous a compensation package as Dr. Wong. In fact, I voiced my concerns about offering the package to her to Dr. Dewan when he was interim Dean as it was treating Dr. Wong more favorably than the other research faculty members in the Psychiatry Department. Nonetheless, I agreed to the package per Dr. Laraque-Arena's insistence that it be offered to help recruit Plaintiff as Dean.

28. On March 13, 2017, Dr. Wong accepted the offers made by signing both her State offer letter and her offer letter from the PFP. She was initially scheduled to begin her employment at UMU on September 1, 2017, but delayed her start date until December 11, 2017.

29. In October 2017, before she began her employment, Dr. Wong reached out to me and asked me if UMU would be willing to increase her State base salary. I notified Dr. Laraque-Arena of Dr. Wong's request and expressed my concern that Dr. Wong would already be one of the highest paid research faculty in the Psychiatry department. Out of fairness to the other researchers, I asked permission to respectfully tell Dr. Wong that she was not entitled to an increase in State base pay – particularly since she was coming without any grants. See, **Exhibit "G."** Dr. Laraque-Arena replied that it was ultimately my decision, but that her advice was to tell Dr. Wong that she had not even begun her position, so it was expected that she would abide by the agreed upon offer letter that she had signed. I followed her advice and informed Dr. Wong of this.

30. With the knowledge that her State base salary would remain $120,000, Dr. Wong began her employment at UMU in December 2017.

9

31.     Thereafter, in 2018, during my annual faculty review meeting with Dr. Wong, she again indicated that she wanted her permanent State base pay to be increased and her ALR to be reduced, with her total compensation continuing to be $220,000. In May and June 2018, I exchanged emails with Dr. Wong indicating what I was comfortable proposing to the President with respect to Dr. Wong's salary requests. See, Exhibit "H."

32.     I noted in my email to Dr. Wong on May 30, 2018, that she was already one of the highest paid research faculty members in the Psychiatry Department (See, Ex. H, at p. 4) but that I agreed to request that her State base salary be increased from $120,000 to $175,000. This State base salary would be similar to some of the higher paid tenured research faculty in the Department, even though the other tenured research faculty were fully funded, and she still had no funding by that time. I also agreed to reduce her ALR from $100,000 to $45,000 so that her total State compensation remained the same and reiterated that the ALR was intended to give her enough time to secure grant funding but was not permanent and could be eliminated. Dr. Wong's brief response suggested that my proposal would be acceptable to her if I raised her base salary to $180,000. See, Ex. H, at p. 3.

33.     I then met with then-President Danielle Laraque-Arena and advocated for Dr. Wong in accordance with our email exchange. [1] During our meeting, I suggested that I just significantly increase her salary so her base pay was $220,000. Dr. Laraque-Arena responded by instructing me to treat Dr. Wong like I would any other similarly situated faculty member. I therefore, proposed a middle ground of maintaining Dr. Wong's total compensation but converting

---

[1] Under normal circumstances, I would have spoken to my direct report, the Dean of the COM. However, in this case, the Dean was Dr. Wong's husband, the Plaintiff in this matter. I approached the President directly to avoid a conflict of interest.

10

some, but not all, of this towards permanent "State base pay" and away from ALR. The President agreed and approved of this proposal.

34.    After my meeting with Dr. Laraque-Arena, I conveyed to Dr. Wong via email that President Laraque-Arena agreed to raise Dr. Wong's base salary to $175,000 and reduce her ALR award to $45,000 so that she would be guaranteed a higher permanent State base salary in the long term. However, that the expectation was for Dr. Wong to apply for research grants to supplement her income in part, so that the ALR that was provided to her as startup salary could be discontinued. Dr. Wong agreed to proceed with that new salary structure. See, Ex. H, at p. 3.

35.    A year later, in March 2019, I performed my usual annual faculty review of each faculty member's salary. As part of that review, on March 4, 2019, I emailed Dr. Wong and informed her that her ALR and the PFF stipend were both scheduled to expire in July 2019. A copy of my March 4, 2019 email to Dr. Wong is attached as **Exhibit "I."**

36.    In response, Dr. Wong voiced an objection to the salary structure that she had previously agreed to a year earlier and met with me and interim President Mantosh Dewan in April 2019 to discuss her requests for another increase in her base salary to $220,000. She insisted that this was something that Dr. Laraque-Arena promised her before she accepted the offer of employment at UMU. This was clearly not the case given that Dr. Laraque-Arena did not increase her State base salary beyond $175,000 the year before.

37.    Dr. Dewan and I informed Dr. Wong during the April 2019 meeting that granting her request for such a high State base salary would be inequitable for all of the other grant funded tenured research faculty within the department. Dr. Wong still did not have any grants by that time. Nonetheless, following our meeting, Dr. Dewan and I agreed to extend her $45,000 ALR through December 31, 2020, a year past its originally planned end date of July 2019. Dr. Wong's lab was

not yet finished, and I felt that extending the ALR for one more year was fair. The PFP stipend, however, would still be eliminated in December 2019. Dr. Wong responded that she felt "mislead" by the salary negotiation and that Dr. Laraque-Arena had told her that the ALR was not at risk and never mentioned a time limit. The emails exchanged between me and Dr. Wong in April, 2019 are attached as **Exhibit "J."**

38.    On April 22, 2019, I requested the continuation of Dr. Wong's salary supplement in the amount of $45,000 through December 31, 2020. President Dewan approved my request. See, **Exhibit "K."**

39.    On October 28, 2019, I requested approval from COM Dean Lawrence Chin to continue Dr. Wong's salary supplement of $45,000 through December 31, 2020. Dr. Chin approved my request. Dr. Wong had also received several across the board negotiated raises by this time, making Dr. Wong's total state compensation $225,948. See, **Exhibit "L".**

40.    On January 1, 2021, Dr. Wong's ALR was finally removed. At around the same time, Dr. Wong began to bring in grants. Since that time, she has brought in additional grants and her compensation has increased commensurate with those grant dollars coming in.

41.    At no time during my discussions with Dr. Wong in 2017, 2018 or 2019 did Dr. Wong ever complain to me that she felt she was being discriminated against or treated differently based on her race, national origin, gender, or any other protected class. She only began making this claim after Plaintiff was removed as College of Medicine Dean.

42.    Moreover, Dr. Wong was not similarly situated with the other tenured research faculty in the Department as she did not bring in any research grants until a few years after being hired. Regardless, she was still offered a far more generous compensation package than any other psychiatry researcher had been given during my tenure.

12

43.     Similarly, Plaintiff never expressed to me while he was Dean of UMU's College of Medicine that he believed that Dr. Wong was being paid less than other faculty members or being treated differently because of her race, national origin, gender or any other protected class.

44.     As Dean of the College of Medicine, Plaintiff is required to approve all College of Medicine faculty compensation, including faculty within the Psychiatry Department.

45.     He was aware that Dr. Wong's salary was among the top three highest salaries of all tenured research professors in my Department at all times. Currently, she is the third highest paid researcher in my Department, only being paid less than the Plaintiff and another researcher who was just recently ranked among the top 80 researchers in the world. A table representing Dr. Wong's salary increases since the beginning of her employment through November 30, 2020 when she filed her lawsuit is attached as **Exhibit "M."** A table comparing Dr. Wong's state compensation to the state compensation of other tenured research professors in the Psychiatry Department from 2017 through 2020 is attached as **Exhibit "N."**

46.     As College of Medicine Dean, Plaintiff was also responsible for the research labs, lab renovation budget, and start up research dollars offered to College of Medicine faculty members. He was aware that Dr. Wong's lab is one of the largest, most expensive labs on campus and that her start up compensation package of more than $5 million was far more than what other Psychiatry researchers in my department have been offered. As Chair, on a few occasions I approached the Dean (Plaintiff) to explain why there were delays in Dr. Wong's lab construction as it was hindering her productivity and asked him to assist with speeding up its completion.

47.     Finally, as a researcher himself, Plaintiff understands that unfunded researchers are not attractive candidates to academic medical centers because they bring in no money (i.e., "indirects"), to support their work and have no funds to cover their research expenses. He also

13

A-0609

understands that the College is forced to provide startup dollars to the researcher with a risk that, if the researcher is tenured, they will have no incentive to recoup those expenses on the College's behalf.

48.    Given that Plaintiff had access to data that confirmed that Plaintiff was given one of the most generous compensation packages amongst any other research faculty in my department, his knowledge that the compensation of Psychiatry research faculty is largely based on the amount of grant dollars that they bring into the institution, and his knowledge of the well-recognized fact that unfunded researchers are not attractive candidates to academic medical centers, it is inconceivable that Plaintiff truly believed that Dr. Wong was being treated differently because of her membership in a protected class.

49.    The fact that neither Plaintiff nor Dr. Wong ever complained of discrimination until after Plaintiff was removed as Dean supports this conclusion.

Dated:     January 19, 2024
           Syracuse, New York

                                                Thomas Schwartz, M.D.

14

**Mary Mendoza**

| | |
|---|---|
| **From:** | THOMAS SCHWARTZ <schwartt@upstate.edu> <schwartt@upstate.edu> |
| **Sent:** | Thursday, May 9, 2019 7:31 AM |
| **To:** | Julio Licinio |
| **Subject:** | Re: Personal comments: Uumas geriatrics |

Hi Julio

I wrote a long email back.

First I am sorry you are hurt.

Second I feel it is way out of context/ your take and reaction but I also feel bad that my email triggered hurt feelings.

You and I seem to have a problem

Probably better to meet to discuss this.

You have accused me now of being hysterical , nay saying and a vigilante which I feel is candid feedback but also hurtful and possibly out of context if we do not discuss.

You are my boss and there is a power differential so this is tough position but guess I would like to talk about this email and our past problems to sort out.

I will book with Mary

Again am truly sorry for your hurt feelings

Tom

On May 9, 2019, at 7:04 AM, Julio Licinio <juliolicinio@gmail.com> wrote:

> Dear Tom:
>
> In confidence, I was deeply troubled by the email you initiated yesterday, which is so wrong in so many ways. I actually have seldom in my entire professional life seen anything that disturbed me so much in so few words. Here is my interpretation:
>
> 1) I am the COM Dean. I was hired after a rigorous international search and after having done senior administrative roles for exactly 20 years in multiple settings. I now also have an MBA and an MS in healthcare leadership. I have been Center Director, Vice Chair, Chair, School Director (Dean), Deputy Institute Director, Theme Leader, Distinguished Professor in two continents, journal editor, and have had senior roles in academic societies. I have managed with the highest degree of integrity very large budgets in the context of highly complex organizations for over 15 years. I am experienced, honest, well regarded, and I know what I am doing. You report to me both as Interim Chair and as Senior Associate Dean. You had a question ref. the COM, which I lead. Why did you go outside the COM to ask a COM question? "what is COM giving for transparency" Why not address that question to me, but instead address it to the hospital CEO? That was very offensive and disrespectful to my role as Dean. I have never encountered this in the entirety of my professional life spanning many decades and many locations. Why do you need to ask the hospital CEO for what I am doing? What are implying here?
>
> 2) Why the cc to the President? Should your faculty cc me when they first have a question to you? I found that cc particularly inappropriate, and profoundly disrespectful.
>
> 3) Geriatrics is a Department in the COM, of which I am the Dean. You stated to the hospital CEO "Is she being treated fairly as a new chair?" Why did you go behaving like that behind my back? If Sharon is not been treated fairly as a new Chair, then you are insinuating to the hospital CEO that I am not treating her fairly and that I am either unfair or incompetent. On what basis are you making this accusation?

i

4) You whole message with a trigger happy cc to the President insinuates that UUMAS is paying for something for which others are not fully contributing. That is so untrue. I really did not like the insinuation.

5) Haven't we discussed the busybody vigilante mentality that is so destructive to Upstate? Why do you have to be the vigilante? Do you think this got to UUMAS thoughtlessly and by accident? Don't you think we have processes? That everything evolved in a very thoughtful and fair manner? What makes you entitled to investigate this? Who appointed you as the Geriatrics vigilante? Why do you assume that the Chair of that Department cannot speak for herself? "I will ask her" Why do you you need to do that? Do you think she is not capable of taking care of herself and needs your help? Does it affect your department? Is anyone else raising any issue? Do you think the CEO of UUMAS would propose that contribution without making sure that it was fair and done in the context of other contributions? Are you insinuating that the UUMAS CEO is a pushover that requests that UUMAS makes contributions without checking that those contributions are fair and matched by other segments of our institution?

6) "I am worried for her/about her" Why didn't you assume that as Dean, when a new Department was created I provided a very generous contribution by the COM, then sought and obtained the maximal contribution I could obtain from the hospital, in two different waves of contribution, leading to their biggest contribution ever to a single campus endeavor, and then sought a small contribution from UUMAS as I am working diligently to get every penny I can get to make that new Department and its Chair as successful as they can be?

7) Transparency is an interesting concept, but again we cannot make everything about everyone transparent all the time. It can also be an excuse for inappropriate busybody behavior. To function as Interim Chair and Senior Associate Dean you do not need to know everything about the entirety of the university, and you certainly do not need to know details that are internal to other departments. "Can you catch me up?" What is your role that requires that you need to be caught up about what I am doing with Geriatrics? If the Chair of every single Department needed to be caught up with what I am doing for every other department, I'd be doing nothing else but catching everyone up. What is the boundary between trust and a need for transparency regarding issues that are outside the scope of one's activities?

8) A degree of trust and respect must exist if we are to function as an institution.

9) The Chair of Surgery makes one brief comment and you get all excited and make that a big issue, brought up in by you multiple forums. This email you sent, who you addressed it to, who you did not address it to, the cc to the President and the multiple, destructive insinuations is far worse than any comment and possible insinuation made by that Chair of Surgery to you. How do you think I feel?

10) As I discussed with you one of your faculty members, doing only research, was not promoted to Professor, in the context of insufficient mentoring. Why don't you focus your energy on addressing issues within psychiatry?

11) I would like to respectfully ask you to stay in your lane and assume that the processes that I oversee are being taken care with thought and fairness. If you have any issues with my activities and with what is in my domain please come to me first, without cc to others. Speaking for my good friend, the hospital CEO, I am certain that he would prefer that you also ask him questions without cc'ing the university president.

12) I appreciate you energy and zeal, but I am afraid that they are being misdirected. Please focus them in your areas, and assume that the leadership the university is fair and competent.

2

A-0612

13) Since you started this via e-mail, I found it only appropriate that I respond via e-mail. However, I would ask you to please NOT respond to this via email. Let us de-escalate and stop this exchange right here and bring any issues you have to me directly in future face to face conversations.

Going forward, please assume that I am competent and that I am doing the best a person can humanly do to ensure the success of this institution and of its constitutive elements. My time is not best spent dealing with this type of interaction. If you have questions, please bring them to me in person, not via e-mail.

All my best,

Julio

Begin forwarded message:

**From:** Julio Licinio <juliolicinio@gmail.com>
**Subject: Re: Uumas geriatrics**
**Date:** May 8, 2019 at 17:40:10 EDT
**To:** Robert Corona <coronar@upstate.edu>
**Cc:** THOMAS SCHWARTZ <SchwartT@upstate.edu>, Mantosh Dewan <DEWANM@upstate.edu>

Dear Tom:

Many thanks for your note.

I brokered this from the beginning and during our previous president's term I (easily) persuaded the hospital to provide $2.5 million to support Geriatrics, which they did with great collegiality. I then came to UUMAS, so that there could be true buy in from this group too. The contribution from UUMAS is disproportionately small, and I wanted it to be at least double, but I brought it down to this level. So the hospital has been exceedingly generous and collegial. The COM provides $2 million or $2.5 million depending on how you count it, over 5 years. While, I am highly supportive of transparency, we need to trust one other, and go from an initial premise of generativity and collegiality. When I ask for something it is based on a real need, not on an intent to disproportionately pile on on any one component of OneUniversity. I have been doing everything I can possibly due to ensure Sharon's success and to embrace her work and her causes.

All my best,

Julio
————

On May 8, 2019, at 17:28, Robert Corona <coronar@upstate.edu> wrote:

$500,000/year for 5 years

3

On May 8, 2019, at 5:26 PM, THOMAS SCHWARTZ
<schwartt@upstate.edu> wrote:

Hi Guys
Uumas is giving $100k now.
In support of Sharon can you tell me what UH is giving
and what is COM giving for transparency?
I will ask her but last she spoke to me few mos back she
was not supported in her mind. Can you catch me up?
Is she being treated fairly as a new chair?
I am worried for her/about her

Thanks

A0613

A-0614

Case: 1575474803665 Search

**Re: Academic expenses**

| | |
|---|---|
| **From** | Julio Licinio |
| **To** | THOMAS SCHWARTZ |
| **Date** | 2020/01/09 12:34 |
| **Subject:** | Re: Academic expenses |
| **Attachments:** | TEXT.htm |

Dear Tom:

It was in the NYS contract. I will be in touch soon.

All my best,

Julio

> On Jan 9, 2020, at 12:23, THOMAS SCHWARTZ <SchwartT@upstate.edu> wrote:
>
>
> Hi Julio
>
> can you send me your contract?
> Was it with NYS in their offer, because you and I do not have such a contract and
> we do not cover this for any other faculty member in our dept.
>
> So- if COM promised you this, my job is to make them pay for it or reimburse me.
> Happy to help you on this, but need to see the contract and then I have some
> ammunition.
>
> ok?
>
> Tom
>
> Thomas L Schwartz MD
> Sr Assoc Dean of Education-
> Interim Chair/Professor - Psychiatry Dept
> SUNY Upstate Medical University
> 713 Harrison St, Syracuse, NY 13210
> 315 464-3166  315 464-3163(FAX)
>
> WARNING: Email transmission is the least safe in regards to maintaining your information in a
> private and secure manner. Also, email should not be used to convey information if you are in a crisis
> situation as email is not checked regularly.
> This email is intended only for the use of the individual to which it is addressed and may contain
> privileged information and may not be re-disclosed under applicable laws. If you have received this
> in error, please notify us and distribution of this information is prohibited. This entire email or
> portions thereof may be covered under NYS Ed law regarding quality control initiatives

>>> Julio Licinio <licinioj@upstate.edu> 1/9/2020 10:44 AM >>>
Dear Tom:

Friday, November 5, 2021 at 01:51:03 Eastern Daylight Time

**Subject:** Re: Update ref meetings
**Date:** Tuesday, January 21, 2020 at 6:04:22 PM Eastern Standard Time
**From:** Julio Licinio
**To:** THOMAS SCHWARTZ
**Attachments:** TEXT.htm

Thanks for the Update, Tom.
Julio

On Jan 21, 2020, at 17:25, THOMAS SCHWARTZ <SchwartT@upstate.edu> wrote:

HI Julio

I am also catching up on things and this one is not the news you want to hear.
I was out sick last week, just got back today.

I presented to COM that our MSG does not reimburse for these things which is our norm and no reimbursement promises were made in our MSG offer as you know.

I presented to COM that you felt per your state offer that you are owed for travel by the COM who extended you the original offer.  I did advocate for this on your behalf, but was informed that COM will not cover your academic meeting travel as it is not the norm either from the state for full professors to have state-covered travel.

I am sorry and am the messenger on this one, but was told that COM will not cover your expenses to travel.  Happy to discuss the process and my legwork on this in person at a later time if you wish.

-Tom

Thomas L Schwartz MD
Sr Assoc Dean of Education-
Interim Chair/Professor - Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St, Syracuse, NY 13210
315 464-3166   315 464-3163(FAX)

WARNING:  Email transmission is the least safe in regards to maintaining your information in a private and secure manner.  Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.
This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws.  If you have received this in error, please notify us and distribution of this information is prohibited.  This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives

>>> Julio Licinio <licinioj@upstate.edu> 1/21/2020 5:17 PM >>>
Dear Tom:

Do you have any updates ref the meeting / professional society membership reimbursement?

All my best,

A-0616

Julio

A-0617

Case: 1575474803665 Search

**Re: Start up**
| | |
|---|---|
| **From** | Julio Licinio |
| **To** | THOMAS SCHWARTZ |
| **Date** | 2020/01/22 14:04 |
| **Subject:** | Re: Start up |
| **Attachments:** | TEXT.htm |

Thanks, Tom. I will do exactly as you say.
All my best,
Julio

> On Jan 22, 2020, at 13:59, THOMAS SCHWARTZ <SchwartT@upstate.edu>
> wrote:

Hi Julio

from the MSG point of view, I do not have any start up dollars for you.
I love having you in the Dept but I did not budget any dollars for a new research
hire. I think I did give you the $35k in salary which was not budgeted but am still
able to send your way. To me this is your start up from the MSG side.

I do see your point as well.

I suggest that you submit to me a list of start up items (Staff, equipment etc) that you
think would be common amongst a new research professor being hired that is
currently unfunded and the associated/expected costs. Let me take that to the Dean
and try to negotiate for the COM to provide. If I was recruiting fresh as a new
professor, I would be expecting the Dean/COM to cover this items.

Get me a list and I will try to help.

-Tom

Thomas L Schwartz MD
Sr Assoc Dean of Education-
Interim Chair/Professor - Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St, Syracuse, NY 13210
315 464-3166   315 464-3163(FAX)

WARNING: Email transmission is the least safe in regards to maintaining your information in a
private and secure manner. Also, email should not be used to convey information if you are in a crisis
situation as email is not checked regularly.
This email is intended only for the use of the individual to which it is addressed and may contain
privileged information and may not be re-disclosed under applicable laws. If you have received this
in error, please notify us and distribution of this information is prohibited. This entire email or
portions thereof may be covered under NYS Ed law regarding quality control initiatives

Case: 1575474803665 Search

>>> Julio Licinio <licinioj@upstate.edu> 1/22/2020 12:55 PM >>>
Dear Tom:

As I am now a professor in the Department, who is expected to conduct research and apply for grants, I would need a start up package to develop my own research program. I have so far been focused on submitting papers and grants based on existing data. However, to be competitive for grants, one needs abundant new preliminary data, for which new resources will be needed. As we start the new year, following my AAE that was signed on 12/31/2019, I would like to launch my own research, which is necessary for successful grant applications. In that context, I would like to negotiate a start up package, with personnel and resources, that is commensurate with my expertise and that would enable me to become competitive for external funding.

With best regards,

Julio

A-0619

Case: 1575474803665 Search

**Re: Academic travel**

| | |
|---|---|
| **From** | Julio Licinio |
| **To** | THOMAS SCHWARTZ |
| **Date** | 2019/10/11 14:16 |
| **Subject:** | Re: Academic travel |

**Attachments:** TEXT.htm

Thanks for the information, Tom.
All my best,
Júlio

On Oct 11, 2019, at 15:11, THOMAS SCHWARTZ <SchwartT@upstate.edu> wrote:

Hi Julio

in our MSG, we do not cover travel, that is a private expense each MSG member pays.  We do not pay for a CME week for example.

Researchers use their funding to cover travel, the MSG/Dept does not.

I do think we offer a $500 stipend if you present a poster and $1000 if a paper, but you must apply to UUP first for an independent award of $1000 as well.

We pay our own professional dues.

So for example- I went to APA two years ago, paid my way.
I pay my own DEA, license, malpractice
I pay my own furniture
I went to Steve Stahl conference, I paid my own registration, hotel and travel.

So we do not have many perks in the Psych MSG.

Hopefully this answers your question?

It is funny but I traveled to NYC 2 weeks ago to the cornell med student conference as assoc dean....  It was the first time I ever had to fill out all the state forms to get reimbursed because for 20 years I have paid all my things privately in the Dept.

Tom

Thomas L Schwartz MD
Sr Assoc Dean of Education-
Interim Chair/Professor - Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St, Syracuse, NY  13210
315 464-3166  315 464-3163(FAX)

WARNING:  Email transmission is the least safe in regards to maintaining your information in a private and secure manner.  Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.

A-0620

Case: 1575474803665 Search

This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws. If you have received this in error, please notify us and distribution of this information is prohibited. This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives

>>> Julio Licinio <licinioj@upstate.edu> 10/11/2019 1:57 PM >>>

Dear Tom:

I was scheduled to go to the AAMC meeting next month. In my new role, is academic travel or membership in profissional societies or medical license fees covered by the institution?

All my best,

Júlio

A-0621

**Re: Start up**

| | |
|---|---|
| **From** | THOMAS SCHWARTZ |
| **To** | Julio Licinio |
| **Date** | 2020/03/05 15:33 |
| **Subject:** | Re: Start up |
| **Attachments:** | TEXT.htm |

thanks

just don;t want you to think I forgot

Tom

Thomas L Schwartz MD
Sr Assoc Dean of Education-
Interim Chair/Professor - Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St, Syracuse, NY 13210
315 464-3166   315 464-3163(FAX)

WARNING: Email transmission is the least safe in regards to maintaining your information in a private and secure manner. Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.
This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws. If you have received this in error, please notify us and distribution of this information is prohibited. This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives

>>> Julio Licinio <licinioj@upstate.edu> 3/5/2020 11:52 AM >>>
Sure, will do - we are going from one deadline to another, but will address this.

Julio

On Mar 5, 2020, at 09:27, THOMAS SCHWARTZ <SchwartT@upstate.edu> wrote:

Hi Julio

sorry I have lost track of time. I think you were in midst of grants.
Let me know when that slows down as I do want to follow up on your start up type requests.

Thanks
Tom

Thomas L Schwartz MD
Sr Assoc Dean of Education-

Licinio v. SUNY Upstate, et al., 5:21-CV-387    002840

A0621

A-0622

WARNING: Email transmission is the least safe in regards to maintaining your information in a private and secure manner. Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.
This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws. If you have received this in error, please notify us and distribution of this information is prohibited. This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives

> > > Julio Licinio <licinioj@upstate.edu> 1/22/2020 12:53 PM > > >
Dear Tom:

As I am now a professor in the Department, who is expected to conduct research and apply for grants, I would need a start up package to develop my own research program. I have so far been focused on submitting papers and grants based on existing data. However, to be competitive for grants, one needs abundant new preliminary data, for which new resources will be needed. As we start the new year, following my AAE that was signed on 12/31/2019, I would like to launch my own research, which is necessary for successful grant applications. In that context, I would like to negotiate a start up package, with personnel and resources, that is commensurate with my expertise and that would enable me to become competitive for external funding.

With best regards,

Julio

Licinio v. SUNY Upstate, et al., 5:21-CV-387     002842

A-0623

**TABLE 26**
**Summary Statistics on Medical School Faculty Compensation for Public Schools**
**PhD or Other Doctoral Degree, Clinical Science Departments/Specialties**
**Total Compensation in Thousands of Dollars (continued)**

**Psychiatry: Child & Adolescent**

|  | Instructor | Assistant Professor | Associate Professor | Professor | Chief | Chair |
|---|---|---|---|---|---|---|
| Count: | 7 | 99 | 39 | 34 | 2 | 0 |
| 25th: | 82 | 85 | 107 | 143 |  |  |
| Median: | 86 | 93 | 123 | 184 |  |  |
| 75th: | 98 | 105 | 151 | 225 |  |  |
| Mean: | 88.7 | 99.5 | 132.9 | 186.2 |  |  |

**Psychiatry: General**

|  | Instructor | Assistant Professor | Associate Professor | Professor | Chief | Chair |
|---|---|---|---|---|---|---|
| Count: | 22 | 384 | 223 | 244 | 8 | 3 |
| 25th: | 59 | 90 | 112 | 155 | 169 |  |
| Median: | 78 | 99 | 126 | 189 | 194 |  |
| 75th: | 98 | 111 | 145 | 229 | 224 |  |
| Mean: | 80.4 | 103.9 | 132.1 | 203.2 | 196.9 |  |

**Psychiatry: Other**

|  | Instructor | Assistant Professor | Associate Professor | Professor | Chief | Chair |
|---|---|---|---|---|---|---|
| Count: | 5 | 113 | 64 | 76 | 1 | 1 |
| 25th: | 56 | 88 | 109 | 161 |  |  |
| Median: | 58 | 100 | 124 | 187 |  |  |
| 75th: | 87 | 120 | 143 | 228 |  |  |
| Mean: | 68.6 | 105.5 | 128.8 | 200.6 |  |  |

**Total Radiology**

|  | Instructor | Assistant Professor | Associate Professor | Professor | Chief | Chair |
|---|---|---|---|---|---|---|
| Count: | 30 | 316 | 209 | 210 | 16 | 0 |
| 25th: | 60 | 98 | 137 | 174 | 203 |  |
| Median: | 65 | 137 | 160 | 216 | 239 |  |
| 75th: | 80 | 167 | 206 | 260 | 315 |  |
| Mean: | 72.1 | 137.5 | 169.6 | 226.2 | 258.1 |  |

**Diagnostic Radiology: Total**

|  | Instructor | Assistant Professor | Associate Professor | Professor | Chief | Chair |
|---|---|---|---|---|---|---|
| Count: | 0 | 45 | 49 | 62 | 4 | 0 |
| 25th: |  | 92 | 121 | 185 |  |  |
| Median: |  | 113 | 140 | 213 |  |  |
| 75th: |  | 140 | 161 | 250 |  |  |
| Mean: |  | 134.4 | 156.3 | 216.6 |  |  |



**UPSTATE**
MEDICAL UNIVERSITY

March 13, 2017

Ma Li Wong M.D., Ph.D.
6 Baliol Street
College Park
South Australia 5069
Australia

Dear Dr. Wong:

On behalf of the faculty of the Department of Psychiatry, and with the approval of Mantosh Dewan, M.D., Interim Dean of the College of Medicine, I am pleased to offer you a faculty appointment at the rank of Professor which is subject to review and recommendation by the College of Medicine Faculty Appointments and Promotions Committee. Upon approval of continuing (tenured) appointment, such recommendation will be made to the Chancellor of SUNY for approval.

Upon receipt of your signed acceptance of the terms of this offer you will receive an official appointment letter from Danielle Laraque-Arena, M.D., FAAP as President of SUNY Upstate Medical University.

Additional details of the offer are listed below, and an Agreement of Academic Expectations is attached.

The terms and conditions of your employment with the State University of New York are as follows:
 a.) All rights and privileges as a member of the Faculty of the State University of New York as defined by the Board of Trustees (www.suny.edu/board_of_trustees/pdf/policies.pdf) and by the current collective bargaining agreement in place with the United University Professions (UUP).
 b.) All rights and privileges of a member of the Faculty of the College of Medicine at Upstate Medical University as defined by the policies and articles of governance of such.
 c.) Your total starting total salary will be $220,000 per annum to be paid by the State University of New York, with state benefits[1]. Your starting tenured state base salary will be $120,000, to which UUP negotiated adjustments will apply. Separate and apart from your base salary you will receive additional compensation in the amount of $100,000. This additional compensation is not subject to UUP negotiated raises, is reviewed annually and is subject to adjustment or renewal, which may also result in an increase in base salary.
 d.) The effective date of this appointment is September 1, 2017 subject to your arrival prior to or on that date to complete necessary employment paperwork with the offices of Human Resources and Payroll. Should your relocation arrangements take longer than expected we will

http://www.upstate.edu/hr/document/uup_summary.pdf
http://www.upstate.edu/hr/document/uup_benefits_glance.pdf
http://www.upstate.edu/hr/document/uup_benefits_pamplet.pdf

Wong v. SUNY 000467

work with you to re-negotiate a mutually agreeable date no later than January 1, 2018 for your start, maintaining all the terms and conditions of this offer.

e.)     This offer is contingent upon the satisfactory result of a routine criminal background investigation. You will use your best effort to obtain and maintain unrestricted license to practice medicine in New York State.

f.)     Laboratory start-up support at various amounts over a five year period after we can provide you with an adequate and reasonable operational lab space to enable you to transfer your research program and maintain a vigorous research effort with a goal of obtaining external funding. This start-up support from the College of Medicine is to be paid in installments in accordance to the attached spreadsheet and as follows:

  i.)   one assistant professor with 5 years of salary and other support, including a $750,000 start-up to be paid over a three year period;

  ii.)  three post-docs to be phased in over the first two years and two graduate students in year two and one senior research technician in the first year, all of which are expected to transition to grant funding in years three through five;

  iii.) one senior clinical research assistant and one clinical research nurse, both in year 3, provided existing deployable resources from the Clinical Research Unit (CRU), as noted below, do not have the capacity to meet your ongoing needs. These additional positions would be expected to transition to grant funding in years four and five;

  iv.)  laboratory equipment, freezers, laboratory supplies totaling approximately $600,000 per the attached summary;

  v.)   relocation costs for transgenic mice strains, clinical research samples, records and books;

  vi.)  Annual operational costs that cover your research costs, as specified in the attached spreadsheet ($250,000 in Year 1, $250,000 in Year 2, $250,000 in Year 3, $200,000 in Year 4, and $50,000 in Year 5), which includes, but is not limited to, access to existing University resources, for which funding will be provided over a five year period, including software licenses, consultant science writer, website development support; and core usage for molecular analysis, animal behavior, microscopy, electrophysiology, CRU, and CRE. This level of support is flexible and cumulative. These funds are not provided on a "use it or lose it" basis. Unused portions of the support for annual operational costs can therefore be carried forward from one year to the next.

  It is understood that the periods of support listed above and in the attached spreadsheet start to count for each item or personnel from the time that each activity commences. For example, the support periods for postdocs, students, and the Assistant Professor (salary and research support) start only after those individuals are hired and start working, and last for the full duration indicated above and in the attached spreadsheet.

g.)     We will provide a combination of laboratory and office space for your research in the Institute for Human Performance adjacent to the Neuroscience Research Building. You will receive sufficient wet lab, dry lab and support space commensurate with the number of people in your laboratory with no less than 2,000 square feet of lab space and desk space for your staff, and with the potential for expansion as your program grows. We understand that your research involves clinical research in humans, as well as pre-clinical studies that include cell culture, electrophysiology, cellular optical imaging, and animal models, surgery and behavior, and we will provide appropriate rooms or space for related equipment and/or procedures.

Wong v. SUNY 000468

A0625

Should you also be eligible for the Empire Innovation Fund, Upstate Medical University will apply all funding received through this program first against the laboratory start- up support noted above.

h) Minimal committee and formal teaching assignments during your first year, in order to allow sufficient time for laboratory set-up, recruitment and training of laboratory personnel, and reasonable and mutually agreed committee and teaching assignments thereafter.

Section 73 of the Public Officers Law states: *No state officer or employee may participate in any decision to hire, promote, discipline or discharge a relative for any compensated position at, for or within any state agency.* The SUNY Code of Ethical Conduct for University Officers policy contains similar language. For additional information on this subject, please visit:

http://www.jcope.ny.gov/training/2016%20Public%20Officers%20Law%20for%20State%20Officers%20and%20Employees.pdf
http://www.suny.edu/sunypp/documents.cfm?doc_id=61

It is understood that your husband, Julio Licinio, MD, PhD, and you are moving together to the College of Medicine and that your ongoing scientific collaboration does represent a potential conflict of interest under this clause which is mitigated as detailed by the posting above.

If you have any questions, please call. Otherwise, if you decide to accept our offer, please sign below and where indicated on the attached Agreement of Academic Expectations and return both documents to me by April 1, 2017.

Mantosh Dewan, M.D.
Interim Dean, College of Medicine

Signature                     03/14/2017
                              Date

Thomas L. Schwartz, M.D.,
Professor and Interim Chair Department
Psychiatry

Signature          03/14/2017
                   Date

Enclosure

I hereby accept the foregoing appointment and the terms described herein.

Ma Li Wong, M.D., Ph.D

March 15, 2017
Date

Wong v. SUNY 000469

A-0627

**ANNUAL AGREEMENT OF FACULTY EXPECTATIONS**
College of Medicine – Clinical Sciences
Area of Excellence: Research

Ma-Li Wong, MD, PhD
Department of Psychiatry and Behavioral Sciences
Professor with Tenure

This agreement has been prepared as a part of the appointment and evaluation process at SUNY Upstate Medical University in order to ensure that the expectations of your faculty position are clearly documented.

a.) <u>Research:</u> *(90%)* Carry out high quality original research and maintain a good publication record in peer-reviewed journals. Develop research activities that promote excellence in research, i.e., leadership role and innovation in research. Endeavor on a continuing basis to fund that research by generating support from extramural granting agencies. Establish and maintain a reputation as a successful independent investigator.

Your specific research responsibilities are:
1. Carry out high level research studies having high impact in your field
2. Publish in high profile journals
3. Seek out grant support

New roles and specific goals for this year are:
(1) Submit for publication 3 original research articles and 2 additional publications
(2) Develop and submit 3 NIH grant proposals
(3) Explore, establish and maintain collaborations with investigators in Psychiatry, Neuroscience, and other departments
(4) Attend and present in conferences in the field, organizing meetings

b.) <u>Teaching:</u> *(10%)* Offer clear and effective instruction within your expertise to students in the Colleges of Medicine and Graduate Studies. It is our expectation that all faculty participate in teaching, both within their Department and in multidisciplinary courses in the College of Medicine. You will be assigned, by your department chair, to participate in these courses as a lecturer or small group leader/participant as part of your professional obligation.

Help in the evaluation of graduate and medical students. Maintain updated lecture series and material.

Your specific educational responsibilities are:
1. Provide lectures in various settings after discussion with the Chair or Research Division Chief

Wong v. SUNY 000470

2. Mentor graduate students, postdoctoral, and medical students in research

New roles and specific goals for this year are:
(1) Participate in teaching medical and graduate courses
(2) Begin mentorship of students and fellows
(3) Begin mentorship of junior faculty members across departments

c.) Mentoring: Offer research training to such medical, graduate, and post-doctoral students as you are able to recruit, support financially, and accommodate in your assigned space.

d.) Consultation: Offer consultation and the opportunity for collaboration in problems related to your area of expertise to colleagues at the University, both in clinical matters and in research activity.

e.) Facilitate the goals of SUNY Upstate Medical University at all times.

f.) Service: Participate in hospital and departmental governance, curriculum development, administration and medical service group meetings. Serve on departmental, institutional, state and society committees as appointed or elected

g.) Collegiality: In accordance with the Upstate Values and the Upstate Pledge, act in a congenial and collegial manner towards other members of the University community, and make a positive contribution to the vitality and morale of that community. Recognize and respect the diversity of the University community.

h.) Evaluation: Participate in a yearly review of your performance with respect to the expectations defined by this document with the Chairperson.

**During this past year you have accomplished the following:**
See TRACK document- NA

I hereby accept the annual expectations as outlined in this document.

| | |
|---|---|
| Faculty     Ma-Li Wong MD,PhD | March 15, 2017 |
| | Date |
| Chair     Thomas Schwartz MD | March 14, 2017 |
| Department | Date |

Reviewed:

Paula M. Trief, Ph.D.                                    Date
Senior Associate Dean for Faculty Affairs and Faculty Development

2

Wong v. SUNY 000471

A0628

**Dr. Wong - Psychiatry Candidate**
**Start Up Research Costs**

Inflation Factor 1.03

| | 2018 | 2019 | 2020 | 2021 | 2022 | |
|---|---|---|---|---|---|---|
| **Personnel** | | | | | | |
| Assistant Professor | 87,000 | 89,610 | 92,298 | 95,067 | 97,919 | |
| Post Docs Phased In | 47,844 | 147,839 | 101,515 | 52,780 | | |
| Grad Students Phased In | | | 53,062 | 27,327 | | |
| Senior Research Technician | 55,000 | 56,650 | 29,175 | 30,050 | | |
| Senior Research Assistant (CRA) | | | 45,000 | 23,175 | | |
| Clinical Research Nurse | | | 65,000 | 33,475 | | |
| SUBTOTAL PERSONNEL | 189,844 | 347,160 | 360,315 | 234,048 | 97,919 | |
| Fringe Benefits | 47,822 | 97,132 | 117,938 | 69,490 | 0 | |
| Personnel and Fringe Total | $237,636 | $444,292 | $478,254 | $303,538 | $97,919 | $1,561,669 |
| | | | | | | |
| Lab Equipment, freezers, supplies (attached) | 500,000 | 25,000 | 25,000 | 25,000 | 25,000 | |
| Lab Costs Total | $500,000 | $25,000 | $25,000 | $25,000 | $25,000 | $600,000 |
| | | | | | | |
| Relocation costs for | | | | | | |
| Transgenic Mice Strains | | | | | | |
| clinical research samples | | | | | | |
| record/books | | | | | | |
| Lab and sample relocation costs | $75,000 | | | | | 75,000 |
| | | | | | | |
| Core Usage | | | | | | |
| molecular analysis | | 20,000 | 10,000 | 5,000 | | |
| DLAR | 20,000 | 30,000 | 15,000 | 7,500 | | |
| microscopy | 9,240 | 9,000 | 1,500 | 1,500 | | |
| electrophysiology | 3,500 | 3,000 | 1,500 | 1,500 | | |
| CRU | 37,500 | 37,500 | 17,500 | 17,500 | | |
| CAE | 8,800 | 8,800 | 8,800 | 8,800 | | |
| Software licenses | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Consultant Science Writer | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Website Development Support | In house support available from IMT/EdCom | | | | | |
| Annual Operational Costs | $250,000 | $250,000 | $230,000 | $200,000 | $50,000 | $1,000,000 |
| | | | | | | |
| Start Up for Assist. Professor | 250,000 | 250,000 | 250,000 | | | |
| Assist. Professor Start-up Total | $250,000 | $250,000 | $260,000 | | | $750,000 |
| | | | | | | |
| Total Research Start Up Package | $1,312,686 | $969,292 | $1,009,254 | $528,538 | $172,919 | $3,986,689 |
| | | | | | | |
| Estimated Capital Costs Lab Renovation | | | | | | |
| Lab, clinical research, & freezer space | $1,400,000 | | | | | $ 1,400,000 |
| | | | | | | |
| NEW TOTAL COSTS | $2,712,686 | $969,292 | $1,009,254 | $528,538 | $172,919 | $ 5,386,689 |
| | | | | | | |
| Additional funding in relation to previous estimation | $221,960 | $127,700 | $175,700 | $138,200 | $30,000 | $ 693,560 |

Wong v. SUNY 000472

A0629

A-0630

# PSYCHIATRY FACULTY PRACTICE, INC.
## DEPARTMENT OF PSYCHIATRY

**750 East Adams Street**
Syracuse, New York 13210
(315) 464-3119

March 13, 2017

Ma Li Wong, M.D., Ph.D.
6 Baliol Street
College Park
South Australia 5069
Australia

Dear Dr. Wong:

Separate and apart from your employment with SUNY Upstate Medical University, for which you received a separate letter, I am pleased to offer you membership in the Department of Psychiatry's Medical Service Group (Psychiatry Faculty Practice Inc.). Terms and conditions of your membership within the private practice are as follows:

a) You will be entitled to the rights and responsibilities of its by-laws (Appendix A).

In addition to your State base salary of $220,000, you will receive an annual stipend from the Psychiatry Faculty Practice Inc. (PFP). The PFP stipend shall be in the amount of $30,000 that includes $27,000 in PFP salary and incentive bonuses, plus $3,000 in PFP employer contributions to retirement. Your total target compensation package for the first year of employment is set at a minimum of $30,000 (guaranteed for the first two years of membership within the PFP)[1].

Your principal duties will include conducting research and teaching/mentoring within your area of expertise. Should you leave employment with the PFP for any reason, for a period of twelve (12) months after separation from the PFP you agree to not enter into an

---

[1] For the first two years of your employment you will receive an annual stipend from the Psychiatry Faculty Practice Inc. (PFP). The amount of the supplement is calculated on an annual basis from your percentage effort on the grants you have obtained. In our current arrangement (subject to change), you would be entitled to receive 70% of monies after Dean's tax (14%) for the salary portion of your grants. As an example, if the percentage effort on your grants totals 50%, then the amount of the supplement would be .50 X NIH maximum 185,100=$92,550 minus ($92,550 X .14 Dean's Tax, which is $12,957) = $79,593 X .7 = $55,715 supplement. The net supplement will continue to include a 10% set aside in employer contributions to retirement. The goal of this additional compensation is to reward success in obtaining grants. As more grants are obtained, income increases accordingly.

Wong v. SUNY 000453

A0630

A-0631

employment or contractual agreement with any agency for which you provided contracted services during your employment with the PFP.

The Medical Service Group (PFP) component of your compensation is neither the responsibility nor the obligation of the State University of New York or Upstate Medical University. There are no health benefits associated with the Medical Service Group (PFP) component of your compensation. The PFP will reimburse at least $500/year for continuing medical education activities the first 3 years for those activities, and establish a professional development account within the PFP. Your retirement contributions will be transferred to a 401(a) account in your name at Voya, and you will be immediately 100% vested.

You are also expected to pay for your own malpractice insurance and other fees necessary to maintain credentialing and licensing.

Your total compensation from the PFP will be reviewed on an annual basis or as needed, and is dependent on monies earned by your clinical practice activities and on your contributions to the mission of Upstate Medical University.

b) Suitable furnished office space will be provided for your use.

If you have any questions, please call. Otherwise, if you decide to accept our offer, please sign below and where indicated on the attached Agreement of Academic Expectations and return both documents to me by April 1, 2017.

Ma Li Wong, M.D., Ph.D.

Thomas Schwartz, M.D.
President, Psychiatry Faculty Practice, Inc.

March 15, 2017
Date

March 19, 2017
Date

Wong v. SUNY 000454

A-0632

Page 1 of 2

**Michael Jurbala - Re: Dr Wong ?**

| | |
|---|---|
| **From:** | "THOMAS SCHWARTZ <schwartt@upstate.edu>" <schwartt@upstate.edu> |
| **To:** | Danielle Laraque-Arena <LaraqueD@upstate.edu> |
| **Date:** | 10/12/2017 10:06 PM |
| **Subject:** | Re: Dr Wong ? |
| **Attachments:** | TEXT.htm |

Agreed and thanks.

On Oct 12, 2017, at 8:42 PM, Danielle Laraque-Arena <LaraqueD@upstate.edu> wrote:

Thanks Tom. I can also talk over the phone. First, this is your call -but my advice is that she has not even begun so I would expect her to abide by the agreed upon letter of offer which she signed. You can say that respectfully. Second, given the relationship between the Dean and Dr. Wong -Julio cannot be consulted on this. It is appropriate for you to consult me on this matter. Happy to talk. Here are her signed letters.

Danielle Laraque-Arena, MD, FAAP
President, Upstate Medical University
750 East Adams Street
Syracuse, New York USA
Ph:315-464-4513
Fax: 315-464-5275
laraqued@upstate.edu
www.upstate.edu
State University of New York

Please direct all scheduling inquiries to Erin Crolick Peters at 315-464-4513;
peterse@upstate.edu

THOMAS SCHWARTZ 10/12/2017 12:49 PM
>>>

Hi Danielle

I hope you are well.

Dr Ma Li Wong called me and asked for a raise in her SUNY base salary which I do not control and would have to ask Julio.
As you recollect this was negotiated by you and Mantosh.

My records show a state base of $220,000 which likely makes her one of my highest paid. It is the most generous state base I have ever seen frankly. My MSG also allows her to keep 70% of her salary items from her future NIH funds. Which is the most generous of all Depts here on campus.

I wanted to check with you politically as I plan to tell her no.

She is not being demanding or difficult, she did ask me matter of fact through in passing conversation. I told her I would get back to her with her agreed to state SALARY and MSG salary (which is another $30k....)and projected salary once she lands NIH funds etc. so that we both have the same #.

Right now my take as chair is that she is well supported by SUNY and the MSG and was not going to add any extra. Can you give me your 2 cents politically and otherwise on this?

Thanks
Tom


Thomas L Schwartz MD

Interim Chair/Professor - Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St, Syracuse, NY 13210
315 464-3166   315 464-3163(FAX)

WARNING: Email transmission is the least safe in regards to maintaining your information in a private and secure manner. Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.
This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws. If you have received this in error, please notify us and distribution of this information is prohibited. This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives

<TEXT.htm>

<IMAGE.BMP>

<DP Wong 031517.pdf>

<FPF Wong 031517.pdf>

A-0634

Ma-Li Wong

| | |
|---|---|
| **From** | THOMAS SCHWARTZ |
| **To** | Danielle Laraque-Arena |
| **Date** | 2018/05/31 14:22 |
| **Subject:** | Ma-Li Wong |
| **Attachments:** | TEXT.htm |

Hi Danielle-

I would propose we alter Dr Wong's salary package to be more commensurate with her peers here in my Dept.

In summary,

I would initially propose that we

1) Increase her permanent SUNY base to $180,000. (Increased from $120,000)

2) Lower the SUNY ALR to $40,000 (Lowered from $100,000)

3) Continue the PFP $30,000 stipend as is

The same amount of COM dollars are being spent but more is being moved into permanent category instead of ALR and MSG stipends.

She has been submitting grants per her report and meeting AAE type benchmarks as far as I can tell. The greatest risk is to offer permanent dollars and then she works less and violates her AAE. The greatest benefit is that she is a good researcher and it may be good strategy to make this conversion.

For safety-sake if you are concerned about raising her permanent state salary if you fear she will slack on her work after the raise, we could make this change contingent upon first NIH grant coming in for her perhaps? If you are not worried as it is good strategy to make this change, we can proceed. This is the type of discussion I would have with the Dean except he is abstained and unaware of this interaction of course.

Can I have your thoughts?

Tom

Thomas L Schwartz MD
Interim Chair/Professor – Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St. Syracuse, NY 13210

A-0635

315 464-3166  315 464-3163(FAX)

WARNING: Email transmission is the least safe in regards to maintaining your information in a private and secure manner. Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.

This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws. If you have received this in error, please notify us and distribution of this information is prohibited. This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives

**From:**    Mali Wong <███████████████████>
**To:**      THOMAS SCHWARTZ <SchwartT@upstate.edu>
**Date:**    6/11/2018 10:18 AM
**Subject:** Re: Salary inquiry, proposal to adjust partially

Hi Tom
Yes, you can proceed.
Best
Ma-Li

> On Jun 11, 2018, at 10:11, THOMAS SCHWARTZ <SchwartT@upstate.edu> wrote:
>
> Hi Ma-Li
>
> I have thought through these ideas and took some counsel with the President.
> I think that I would like to stick with my last formulated plan at this time and hope you can live with that decision.
> I really have to be transparent with the way we manage state and MSG salaries with our researchers and feel the decision which alters your original agreement has to be fair within our Dept/MSG.
>
> I would like to stick with
> - we increase your permanent SUNY base to $175,000.
> - We Lower the SUNY ALR to $45,000 but we make the time limit on this similar to the PFP stipend with similar end date below)
> - We Continue the PFP $30,000 stipend (two years maximum)
>
> This way your permanent base goes from 48% to 70% which is a remarkable jump that no one in   our Dept has ever benefitted from.
>
> We will protect your ALR (now $45,000) and PFP cash stipend (still $30,000) for just over one more year as this was your built in salary protection while we await you to ideally obtain federal grants.   To keep the ALR/PFP monies I do want you to submit grants etc etc.  I know your lab is delayed, but do also need to hold you accountable like our other departmental PhDs to submit, publish etc etc .
>
> The President says she will sign into effect the above, can I proceed?
>
> Thanks
> Tom
>
>
> Thomas L Schwartz MD
> Interim Chair/Professor - Psychiatry Dept
> SUNY Upstate Medical University
> 713 Harrison St, Syracuse, NY  13210
> 315 464-3166   315 464-3163(FAX)
>
> WARNING:   Email transmission is the least safe in regards to maintaining your information in a private and secure manner.  Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.
> This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws.  If you have received this in error, please notify us and distribution of this information is prohibited.  This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives>>> Mali Wong <wongma@upstate.edu>
5/31/2018 10:28 AM >>>
> Hi Tom
>
> Thanks for your message and your careful consideration of this matter. Can you increase my state base to $180,000? I will accept it immediately.
>
> Best
>
> Ma-Li
> ─────
>
>> On May 30, 2018, at 10:33, THOMAS SCHWARTZ <SchwartT@upstate.edu <mailto:SchwartT@upstate.edu> wrote:
>>
>> Hi Ma-Li
>>
>> am trying to follow up on this some more.
>>
>> Some background.
>> You now make a state salary of $220,000 (Base + ALR)
>> The PFP adds $30,000.
>> Total is $250,000.
>>

Wong v. SUNY 001208

>> According to the AAMC this puts you well above the 75%ile in the US. Likely in top 10% paid in US.
>> the AAMC does not delineate state Vs private or permanent Vs temporary salary.
>> You are likely in the top 3 paid research faculty in our Dept.
>>
>> Your salary is odd with the ALR there. I suspect it is a way to give you the top 10% package above while we await ideally for you to have NIH grants come in. As grants come in, you get more PFP salary called merit based salary. More grants = more salary and there is no maximum income cap from our end.
>>
>> I would like to propose what I typically would do as chair for a typical faculty member. Let me know if you agree, and I will talk to the President.
>>
>> I propose we increase your permanent state base from $120,000 to $175,000 and this would actually put you in direct comparison with other peers in the Dept. The peers however right now are fully funded and receive more PFP cash merit based salary. You are not yet in a US funding position to reach these levels of salary and are protected with the SUNY ALR and the PFP cash stipend.
>>
>> The SUNY ALR has no clear stipulations but needs to be renewed and approved by me annually. As we increase your state base above to $175,000, I would lower the ALR down to $45,000. Your state base + ALR is still $220,000 but is more permanent now and commensurate with other faculty. I will continue the ALR for a few years to give you time to get NIH funding, but once your funding allows you a PFP cash take home salary of $45,000+, the ALR should go away. I view that this ALR was likely put into place as a salary protection for you while you got your lab started up and funding to come in. This proposal (state base going up, ALR going down, state dollars staying even) allows you a guaranteed $220,000 for a few years, but if you fail to get funded to drive home a better cash PFP salary, you would fall back eventually to the state permanent base of $175,000.
>>
>> The Dept pays you $30,000 for your first two years also as salary protection but dissolves at the start of your 3rd year regardless of funding status. If you can tell me what grants you have submitted, their funding level and % salary effort you allocated to yourself, I can project what your State $175,000 permanent + your PFP cash based salary will be if you get funded. Most of our researchers wind up doing very well in this model and can stay in the top 10% paid nationally per AAMC.
>>
>> So, in summary, I would initially propose that we increase your permanent SUNY base to $175,000.
>> Lower the ALR to $45,000 (will continue depending on future funding)
>> Continue the PFP $30,000 stipend (two years maximum)
>>
>> Your salary continues at $30,000 but now trends towards more in permanent state base and falls in line more with our Dept standards.
>>
>> Does this work for you?
>>
>> Tom
>>
>>
>> Thomas L Schwartz MD
>> Interim Chair/Professor - Psychiatry Dept
>> SUNY Upstate Medical University
>> 713 Harrison St, Syracuse, NY  13210
>> 315 464-3166   315 464-3163(FAX)
>>
>> WARNING: Email transmission is the least safe in regards to maintaining your information in a private and secure manner. Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.
>> This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws. If you have received this in error, please notify us and distribution of this information is prohibited. This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives
>

Wong v. SUNY 001209



Department of Psychiatry

UPSTATE
MEDICAL UNIVERSITY

Office of the Chair
Thomas Schwartz, MD

June 11, 2018

Danielle Laraque-Arena, M.D., FAAP
President and Health Systems CEO
Office of the President
Weiskotten Hall

Dear Dr. Laraque-Arena:

I am writing to request an increase in the state base salary of Dr. Ma-Li Wong from $120,000 to $175,000 effective July 1, 2018. In addition, I am requesting that the salary supplement that she is currently receiving be reduced to $45,000 effective July 1, 2018. Therefore, her total state compensation will remain at $220,000.

Please indicate your approval by signing below and returning a copy to me. Thank you.

Sincerely,

Thomas L. Schwartz, M.D.
Professor and Interim Chair
Department of Psychiatry

bns

Danielle Laraque-Arena, M.D., FAAP
President and Health Systems CEO

ID# 111052

Wong v. SUNY 000823

A0638

A-0639

**EXHIBIT**

Ex. Two - 220531amc

Page 1 of 2

Dear Mantosh:

Please help here. There is a misunderstanding on Tom's part ref Ma-Li's salary. I discussed this extensively with Danielle. When we first got our letters of offer it was unclear to us what an ALR was. Ma-Li had requested a total salary of $240,000, which is what what she had in Australia as a base (none of that was at risk). In the letter that Ma-Li received it stated that her state compensation would be $220,000. In Ma-Li's letter from Tom Schwartz - attached here, it is stated that "In addition to your State base salary of **$220,000**, …" That really led us to believe that the $220,000 (state line + ALR) were a base, as it was described as such. Note the word "base" in Tom's letter to Ma-Li. Based on that wording from Tom, Ma-Li, myself and our attorney understood that the base had an ALR built in that was NOT at risk. When I arrived and understood what ALR's were, I immediately went to Danielle who told me on multiple occasions that that ALR was an ongoing part of part of Ma-Li's compensation and that it was NOT at risk. However, at one point I heard Eric Frost say again ALR's were not safe and I communicated that to Ma-Li, who then spoke with Danielle and she was able to get he ALR decreased and the state line increased commensuretely. At that time again Danielle made it clear to Ma-Li and to me that the ALR was not at risk, and Danielle approved that just to be collegial to Ma-Li. It is very upsetting to see this correspondence from Tom. As you know, our lab is not ready, and for that reason we have not yet recruited an Assistant Professor that was to be a key part of our program. It is two years now and our program is dysfunctional due to operational issues. Meanwhile, Tom sends Ma-Li a note which is really unsettling and we both upset here. In the original letter, also attached here there is no statement that this ALR had an expiration date. It said that it was subjected to yearly renewal, which we assumed would be there unless Ma-Li slacked off and became unproductive. We both and our attorney saw that as as a safeguard from the institution to ensure productivity moving forward. Ma-Li has been very active, has submitted 4 NIH grants - she has been here for only 15 months (see started after me), and the last grant is under renewal. She cannot do more without a lab, and it is surprising to get Tom's letter. Can you please help?

All my best,

Julio


Begin forwarded message:

**From:** Mali Wong <███████@gmail.com>
**Subject: Re: salary 2019 checking in**
**Date:** March 4, 2019 at 10:58:22 EST
**To:** THOMAS SCHWARTZ <SchwartT@upstate.edu>
**Cc:** Barbara Svoboda <SvobodaB@upstate.edu>

Hi Tom

I was just checking my letter, which states that the PFP is guaranteed for the first two years of membership within the PFP. I signed my contract in December 2017. Won't the 2 years be from the start of my appointment?
Best
Ma-Li

CONFIDENTIAL   JL00055
12/2/2019

A-0640

Page 2 of 2

=========

On Mar 4, 2019, at 10:40, THOMAS SCHWARTZ <SchwartT@upstate.edu> wrote:

Hi Ma-Li

I am going through salaries of each faculty now to make sure we are accurate in what we promised at job hiring vs what was paid out/earned.

In reviewing your records, I know we increased your state permanent base and lowered you state ALR via discussion with Dr Laraque-Arena.

Your ALR was lowered to $45,000 and is due to expire July 1, 2019 as a reminder. It will not be renewed in conjunction with your initial offer letters.

Your Deptartment (PFP) temporary salary of $30,000 is also set to expire on July 1, 2019 as well.

This is a negative swing of $75,000 which I suspect you are already aware based on your offer letters.

Let me know if there is any discrepancy on your end.

Thanks
Tom


Thomas L Schwartz MD
Sr Assoc Dean of Education-
Interim Chair/Professor - Psychiatry Dept
SUNY Upstate Medical University
713 Harrison St, Syracuse, NY  13210
315 464-3166   315 464-3163(FAX)

WARNING:  Email transmission is the least safe in regards to maintaining your information in a private and secure manner.  Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly. This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws.  If you have received this in error, please notify us and distribution of this information is prohibited.  This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives

CONFIDENTIAL

JL00056
A0640

A-0641

From:        Mali Wong <████████████████>
To:          THOMAS SCHWARTZ <SchwartT@upstate.edu>
CC:          Mantosh Dewan <DEWANM@upstate.edu>
Date:        4/12/2019 11:09 AM
Subject:     (EXTERNAL) Re: Salary follow up conclusion

Dear Tom

Thank you for this follow-up note, and thank you for making the time to meet with me.

As I stated in our meeting, and in previous meeting with Dr. Dewan and in conversations with you, I feel mislead by the salary negotiation process during my recruitment and during the process of re-negotiating the proportion of my State base and ALR.

During my recruitment, my negotiations were done with Dr. Laraque-Arena and my offer letters were signed by you and Dr. Dewan. And your letters, signed in the same day, referred to my state base salary not as synonymous, but in what I learnt later, in totally different ways. Also, during the re-negotiating process of the proportion of my State base salary and ALR, my conversation with Dr. Laraque-Arena did not include the terms of my ALR. During my conversation with Dr. Laraque-Arena, she stated numerous times that my ALR was not at risk and she did no mention any time limit to my ALR. Therefore, I think that it was disingenuous that you sent me long emails, and that the end of those emails included a time limit in my ALR.

I would like to thank you for the offer to extend my ALR; however, as I said in the meeting, I am considering my options, and let you know were I stand.

Best,

Ma-Li

> On Apr 12, 2019, at 16:32, THOMAS SCHWARTZ <SchwartT@upstate.edu <mailto:SchwartT@upstate.edu>> wrote:
>
> Dear Ma-Li
>
> Thank you for meeting with Dr Dewan and myself recently.
> I know again that the summary was not what you hoped but for the record, I want to put in writing what Dr Dewan and I have ultimately decided and informed you of at the conclusion of our meeting.
> The following is commensurate with usual department practice except where noted:
>
> -Your permanent base will continue as is. You negotiated that your ratio of permanent salary be increased and temporary ALR salary he decreased at a prior time/negotiation and then did acknowledge receipt and acceptance of this change via email then.  This is being honored.
>
> -Your temporary state ALR will be extended past the two year mark as your lab was not functional until now which the COM has apologized for and was beyond the control of the Department.  You asked for a 2-3 year ALR extension.
>    I will extend it 6-12mos with the minimum of 6 months and the max of Dec 31, 2020 which would be about 3 years past your original SUNY pay check here, or an additional .  As your lab is operating, grants are submitted (ideally obtained), papers are published, etc(items all dept researchers are accountable for) throughout then  I will try to maximize the length of this ALR salary (Dec 2020) as we will have data to show you are wrapping up the 'start up' phase of your time with us.  This is giving you up to 3 years instead of 2 years of start up/salary buffer.  This ALR item is actually in excess of usual Dept practice.
>
>   -The PFP cash start up stipend must end after two years.  This is slated for end of December 2019.
>
> -Tom
>
>
> Thomas L Schwartz MD
> Sr Assoc Dean of Education
> Interim Chair/Professor - Psychiatry Dept
> SUNY Upstate Medical University
> 713 Harrison St, Syracuse, NY  13210
> 315 464-3166   315 464-3163(FAX)
>
> WARNING:  Email transmission is the least safe in regards to maintaining your information in a private and secure manner.  Also, email should not be used to convey information if you are in a crisis situation as email is not checked regularly.
> This email is intended only for the use of the individual to which it is addressed and may contain privileged information and may not be re-disclosed under applicable laws.  If you have received this in error, please notify us and distribution of this information is prohibited.  This entire email or portions thereof may be covered under NYS Ed law regarding quality control initiatives
>



*Department of Psychiatry*

# UPSTATE
MEDICAL UNIVERSITY
College of Medicine

**Office of the Chair**

Thomas L. Schwartz, M.D.
Interim Chair

April 22, 2019

Mantosh Dewan, M.D.
Interim President
Office of the President
Weiskotten Hall

Dear Dr. Dewan:

I am writing to request the continuation of Dr. Ma-Li Wong's salary supplement in the amount of $45,000 through December 31, 2020.  Therefore, her total state compensation will be $220,000.

Please indicate your approval by signing below and returning a copy to me.  Thank you.

Sincerely,

Thomas L. Schwartz, M.D.
Professor and Interim Chair
Department of Psychiatry

rc

Mantosh Dewan, M.D.
Interim President

Wong v. SUNY 000825

A-0643



October 28, 2019

Lawrence Chin, M.D.
Interim Dean
Weiskotten Hall

Dear Dr. Chin:

I am writing to request the continuation of Dr. Ma-Li Wong's salary supplement in the amount $45,000 through December 31, 2020.  Therefore, her total state compensation will be $225,948.

Please indicate your approval by signing below and returning a copy to me.  Thank you.

Sincerely,

Thomas L. Schwartz, M.D.
Professor and Interim Chair
Department of Psychiatry

bas

Lawrence Chin, M.D.
Interim Dean

Wong v. SUNY 001206

A0643

Ma Li Wong's State Compensation -- 12/11/2017 to Present

| Name | Title | Dept | Date | Action Taken | Increase Amount | Base Salary | ALR | Total Compensation |
|------|-------|------|------|--------------|-----------------|-------------|-----|--------------------|
| Ma-Li Wong | Professor HS | Psychiatry | 12/11/17 | New Appointment | | $120,000 | $100,000 | $220,000 |
| | | | 6/28/18 | 2% Salary Increase | $2,400 | $122,400 | $100,000 | $222,400 |
| | | | 7/1/18 | Salary Increase & ALR Decrease | $55,000 | $177,400 | $45,000 | $222,400 |
| | | | 12/24/18 | 2018 UUP Discretionary Lump Sum Payment | | $620 | | |
| | | | 6/27/19 | 2% Salary Increase | $4,048 | $181,448 | $45,000 | $226,448 |
| | | | 11/30/20 | | | $181,448 | $45,000 | $226,448 |

Case 5:21-cv-00387-GTS-TWD   Document 73-71   Filed 01/19/24   Page 1 of 1

A-0644

A0644

Licinio v. SUNY Upstate, et al., 5:21-cv-387   010167

A-0645

NOTE: The Charts below contain the compensation breakdown for all similarly situated full research professors in the Department of Psychiatry from 2017 – 2020. The professors are listed in order of highest total state compensation to lowest total state compensation received each year.

### 2017

| | Name | Title | Hire Date | Start Date in Title and Dept | Primary Ethnic | Gender | 2017 Base Salary | 2017 ALR | 2017 Total State Compensation |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Wong, Ma-Li | Professor HS | 12/11/17 | 12/11/17 | Hispanic | F | $120,000 | $100,000 | $220,000 |
| 2 | | DISTINGUISHED PROF (HS) | 8/4/04 | 5/7/14 | White | M | $217,384 | | $217,384 |
| 3 | | DISTINGUISHED PROF (HS) | 7/1/17 | 9/13/19 | Hispanic | M | n/a | n/a | n/a |
| 4 | | Professor HS | 10/1/14 | 3/1/17 | Asian | M | $180,681 | $10,000 | $190,681 |
| 5 | | Professor HS | | | White | F | $158,001 | $0 | $158,001 |
| 6 | | Professor HS | 12/1/17 | 12/1/17 | Asian | M | $150,000 | $0 | $150,000 |
| 7 | | Professor HS | 8/1/00 | 6/1/07 | Asian | F | $116,779 | $0 | $116,779 |
| 8 | | Professor HS | 10/19/06 | 6/27/19 | White | M | $110,022 | $0 | $110,022 |

### 2018

| | Name | Title | Hire Date | Start Date in Title and Dept | Primary Ethnic | Gender | 2018 Base Salary | 2018 ALR | 2018 Total State Compensation |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Wong, Ma-Li | Professor HS | 12/11/17 | 12/11/17 | Hispanic | F | $177,400 | $45,000 | $222,400 |
| 2 | | DISTINGUISHED PROF (HS) | 8/4/04 | 5/7/14 | White | M | $221,732 | 0 | $221,732 |
| 3 | | DISTINGUISHED PROF (HS) | 7/1/17 | 9/13/19 | Hispanic | M | n/a | n/a | n/a |
| 4 | | Professor HS | 10/1/14 | 3/1/17 | Asian | M | $184,295 | $0 | $184,295 |
| 5 | | Professor HS | | | White | F | $166,261 | $0 | $166,261 |
| 6 | | Professor HS | 12/1/17 | 12/1/17 | Asian | M | $153,000 | $0 | $153,000 |
| 7 | | Professor HS | 8/1/00 | 6/1/07 | Asian | F | $119,115 | $0 | $119,115 |
| 8 | | Professor HS | 10/19/06 | 6/27/19 | White | M | $112,222 | $0 | $112,222 |

### 2019

| | Name | Title | Hire Date | Start Date in Title and Dept | Primary Ethnic | Gender | 2019 Base Salary | 2019 ALR | 2019 Total State Compensation |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | DISTINGUISHED PROF (HS) | 7/1/17 | 9/13/19 | Hispanic | M | $227,000 | $0 | $227,000 |
| 2 | Wong, Ma-Li | Professor HS | 12/11/17 | 12/11/17 | Hispanic | F | $181,448 | $45,000 | $226,448 |
| 3 | | DISTINGUISHED PROF (HS) | 8/4/04 | 5/7/14 | White | M | $226,167 | $0 | $226,167 |
| 4 | | Professor HS | 10/1/14 | 3/1/17 | Asian | M | $188,480 | $0 | $188,480 |
| 5 | | Professor HS | | | White | F | $170,086 | $0 | $170,086 |
| 6 | | Professor HS | 12/1/17 | 12/1/17 | Asian | M | $156,560 | $0 | $156,560 |
| 7 | | Professor HS | 8/1/00 | 6/1/07 | Asian | F | $126,845 | $0 | $126,845 |
| 8 | | Professor HS | 10/19/06 | 6/27/19 | White | M | $114,966 | $0 | $114,966 |

### 2020

| | Name | Title | Hire Date | Start Date in Title and Dept | Primary Ethnic | Gender | 2020 Base Salary | 2020 ALR | Current Total State Compensation |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | DISTINGUISHED PROF (HS) | 7/1/17 | 9/13/19 | Hispanic | M | $227,000 | $0 | $227,000 |
| 2 | | DISTINGUISHED PROF (HS) | 8/4/04 | 5/7/14 | White | M | $226,667 | $0 | $226,667 |
| 3 | Wong, Ma-Li | Professor HS | 12/11/17 | 12/11/17 | Hispanic | F | $181,448 | $45,000 | $226,448 |
| 4 | | Professor HS | 10/1/14 | 3/1/17 | Asian | M | $188,481 | $0 | $188,481 |
| 5 | | Professor HS | | | White | F | $170,086 | $0 | $170,086 |
| 6 | | Professor HS | 12/1/17 | 12/1/17 | Asian | M | $156,560 | $0 | $156,560 |
| 7 | | Professor HS | 10/19/06 | 6/27/19 | White | M | $131,966 | $0 | $131,966 |
| 8 | | Professor HS | 8/1/00 | 6/1/07 | Asian | F | $126,845 | | $126,845 |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
.................................................................X
**JULIO LICINIO, MD, PhD, MBA, MS,**

         Plaintiff,

             Case No.: **5:21-cv-387(GTS/TWD)**

    - against -

**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, and THE**
**STATE UNIVERSITY OF NEW YORK**
**UPSTATE MEDICAL UNIVERSITY,**

         Defendants
_____

**<u>MEMORANDUM OF LAW IN SUPPORT OF</u>**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**
**<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE §56 (a)</u>**


LETITIA JAMES
Attorney General of the State of New York
Syracuse Regional Office
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, NY 13202


By: Aimee Cowan, Esq.
   Assistant Attorney General, of Counsel
   Bar Roll No. 516178
   Telephone: (315) 448-4800
   Fax: (315) 448-4853
   E-mail: Aimee.Cowan@ag.ny.gov


i

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**..................................................................................... iii

**PRELIMINARY STATEMENT**.....................................................................................1

**STATEMENT OF FACTS**.............................................................................................2

**STANDARD OF REVIEW**............................................................................................4

**ARGUMENT**..................................................................................................................7

**POINT I:** **PLAINTIFF'S TITLE VII DISCRIMINATION CLAIM MUST BE DISMISSED**.................................................................................7

   A. Plaintiff Failed to Exhaust his Administrative Remedies with respect to his Title VII Race and National Origin Discrimination Claims.....................................................7

   B. Plaintiff has Failed to Prove a *prima facie* Title VII Discrimination Claim.................9

      1. Plaintiff was not satisfactorily performing the duties required by his Dean position...............................................................................................................11

      2. Plaintiff cannot show that his removal as Dean occurred under circumstances giving rise to an unlawful discrimination...........................................14

         a. Plaintiff cannot demonstrate that similarly situated employees of a different race or national origin were treated more favorably than him.................................................................................................15

         b. Plaintiff cannot show there were remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus.................15

         c. Plaintiff cannot show that there were other circumstances giving rise to an inference of discrimination on the basis of his race or national origin.....................................................................................17

   C. Defendants have shown a legitimate, non-discriminatory business reason for Plaintiff's demotion....................................................................................................20

   D. Plaintiff cannot show that the legitimate non-discriminatory reasons offered by Defendants were a pretext for discrimination....................................................................22

**POINT II:** **PLAINTIFF'S TITLE VII RETALIATION CLAIMS MUST BE DISMISSED**.................................................................................24

   A. Plaintiff cannot demonstrate a *prima facie* claim for retaliation based on his demotion.....25

A-0648

1.   Plaintiff cannot prove that he engaged in any protected activity under Title VII……...25

    a.  Plaintiff did not engage in a protected activity with respect to his alleged reports of "race discrimination" …………………………………………………...26

    b.  Plaintiff did not engage in protected activity with respect to his alleged reports of "gender discrimination" …………………………………………………..31

    c.  Plaintiff did not engage in a protected activity with respect to his alleged reports of "national origin discrimination" …………………………………………..33

2.   Plaintiff cannot prove a causal connection between any alleged protected activity and the decision to demote him………………………………………………………...35

B.  Plaintiff cannot demonstrate a *prima facie* claim for retaliation based on the allegations he was denied or not considered for other positions at the COM…………………………….38

C.  Defendants have shown a legitimate, non-discriminatory business reason for Plaintiff's demotion and their hiring decisions for the positions filled after his demotion………40

D.  Plaintiff cannot show that the legitimate non-discriminatory reasons offered by Defendants were a pretext for discrimination…………………………………………………………41

**CONCLUSION**…………………………………………………………….…………...43

A0648

## TABLE OF AUTHORITIES

**Cases**

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456 (2d Cir. 2001)……………………………6

Abdallah v. Napolitano, 909 F. Supp. 2d 196 (W.D.N.Y. 2012)…………………………………..23

Abeeb v. New York State Div. of Human Rights, No. 20 CIV. 10484 (LGS), 2022 WL 4292704 (S.D.N.Y. Sept. 16, 2022)…………………………………………………………………...42

Abromavage v. Deutsche Bank Sec. Inc., No. 21-668, 2022 WL 4360950 (2d Cir. Sept. 21, 2022)…………………………………………………………………………………………..41

Adeniji v. New York State Off. of State Comptroller, 557 F. Supp. 3d 413 (S.D.N.Y. 2021)…..19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)………………………………………..……5

Bailey v. Sunrise Senior Living Mgmt., Inc., No. 16-CV-7184, 2017 WL 2371196 (E.D.N.Y. May 31, 2017)………………………………………………………………………………….…..8

Barton v. Warren Cnty., 19-CV-1061, 2020 WL 4569465 (N.D.N.Y. Aug. 7, 2020)…………...36

Bennett v. Hofstra Univ., 842 F.Supp.2d 489 (E.D.N.Y. 2012)…………………………………..25

Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275 (E.D.N.Y. 2005)…………..…10

Bromfield v. Bronx Lebanon Special Care Ctr., Inc., No. 16CIV10047ALCSLC, 2022 WL 19406559 (S.D.N.Y. Dec. 8, 2022)………………………………………………………………..9

Brown v. City of New York, 622 F. App'x 19 (2d Cir. 2015)……………………………………36

Brown v. Henderson, 257 F.3d 246 (2d Cir. 2001)……………………………………………….6

Brown v. Xerox Corp., 170 F. Supp. 3d 518 (W.D.N.Y. 2016)…………………...…..17, 28, 35, 42

Bundschuh v. Inn on the Lake Hudson Hotels, LLC, 914 F.Supp.2d 395 (W.D.N.Y. 2012)……25

Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397 (2d Cir.1993)…………7

Callistro v. Cabo, 2013 WL 322497 (S.D.N.Y. Jan. 25, 2013)…………………………………16

Cano v. SEIU Loc. 32BJ, No. 19CV8810PAEKHP, 2023 WL 4830091 (S.D.N.Y. Apr. 17, 2023)…………………………………………………………………………………………16

Casseus v. New York Coll. of Health Pros., No. CV151914SJFAYS, 2016 WL 7029157 (E.D.N.Y. Nov. 10, 2016)……………………………………………………...…………………….19

iv

Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104 (2d Cir. 2017)....................................................................................................5

Chambers v. TRM Copy Centers Corp., 43 F.3d 29 (2d Cir. 1994).................................23

Cherry v. New York City Hous. Auth., 564 F. Supp. 3d 140 (E.D.N.Y. 2021)...............10, 21

CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114 (2d Cir. 2013)..............5

Cyr v. Berry Plastics Corp., 2011 WL 6337713 (N.D.N.Y. 2011)........................................7

Danzer v. Norden Sys., Inc., 151 F.3d 50 (2d Cir.1998)....................................................17

Davis v. NYS Dep't of Corr. Attica Corr. Facility, 110 F.Supp.3d 458 (W.D.N.Y. 2015)........25

Davis v. State Univ. of New York, 802 F.2d 638 (2d Cir.1986)....................................10, 21

Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30 (2d Cir. 2019).....................................5

de la Concha v. Fordham Univ., 5 F. Supp. 2d 188 (S.D.N.Y. 1998)...........................10, 21

De la Cruz v. City of New York, 783 F. Supp. 2d 622 (S.D.N.Y. 2011)..............................21

De La Pena v. Metro. Life Ins. Co., 953 F. Supp. 2d 393 (E.D.N.Y. 2013)..........................20

De La Pena v. Metro. Life Ins. Co., 552 Fed. Appx. 98 (2d Cir. 2014)...............................18

De Figueroa v. New York, 403 F. Supp. 3d 133 (E.D.N.Y. 2019)......................................36

Desrosiers v. Summit Sec. Servs., Inc., 2022 WL 13808524 (S.D.N.Y. Oct. 21, 2022).............16

DiGirolamo v. MetLife Grp., Inc., No. 10 CIV.1537 RMB, 2011 WL 2421292 (S.D.N.Y. June 6, 2011)........................................................................................................23

DiStiso v. Cook, 691 F.3d 226 (2d Cir. 2012)................................................................6

Dister v. Cont'l Grp., 859 F.2d 1108 (2d Cir.1988)........................................................23

Dixon v. Int'l Fed'n of Accountants, 416 Fed.Appx. 107 (2d Cir.2011).............................17

Douglas v. Hip Centralized Laboratory Services, Inc., No. 03-cv-205, 2005 WL 1074959 (E.D.N.Y. Apr. 29, 2005)........................................................................................38

Espinal v. Goord, 558 F.3d 119 (2d Cir.2009)..............................................................35

v

Fabrikant v. French, 691 F.3d 193 (2d Cir. 2012)...........................................................5

Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d 309 (S.D.N.Y. 2020)..................37

Federal Trade Comm'n v. Moses, 913 F.3d 297 (2d Cir. 2019).........................................6

Fleming v. MaxMara USA, Inc., 371 Fed.Appx. 115 (2d Cir. 2010)..................................43

Freeman v. Rochester Psychiatric Ctr., No. 6:12-CV-06045 (MAT), 2017 WL 4169336 (W.D.N.Y. Sept. 20, 2017)...........................................................................19, 25, 29, 35, 41

Gallo v. Prudential Residential Servs., 22 F.3d 1219 (2d Cir. 1994)...................................6

Gelin v. Geithner, 2009 WL 804144 (S.D.N.Y. 2009)...................................................14

Giurca v. Good Samaritan Hosp., No. 19-CV-7761 (CS), 2023 WL 254611 (S.D.N.Y. Jan. 18, 2023).......................................................................................................42

Goldman v. Admin. for Children's Servs., No. 04 CIV. 7890 (GEL), 2007 WL 1552397 (S.D.N.Y. May 29, 2007)........................................................................10, 15

Gonzalez v. Allied Barton Sec. Servs., 2010 WL 3766964 (S.D.N.Y. Sept. 7, 2010)...............16

Gregory v. Daly, 243 F.3d 687 (2d Cir.2001)...........................................................21

Hanks v. City of Syracuse, No. 521CV921GLSATB, 2022 WL 4619877 (N.D.N.Y. Sept. 30, 2022)........................................................................................................20

Hawkins v. N.Y. State Off. of Mental Health, 845 F. App'x 9 (2d Cir. 2021).......................42

Heiden v. New York City Health & Hosps. Corp., No. 20-CV-10288 (LJL), 2023 WL 171888 (S.D.N.Y. Jan. 11, 2023).......................................................................22

Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134 (2d Cir. 2010)................................15

Hernandez v. Kwiat Eye & Laser Surgery, PLLC, No. 1:20-CV-42 (FJS/CFH), 2023 WL 372105 (N.D.N.Y. Jan. 24, 2023).....................................................................17, 18

Hollander v. American Cyanamid Co., 895 F.2d 80 (2d Cir.1990)...................................35

Holmes v. Astor Servs. for Children and Families, No. 16 Civ. 2260 (CS), 2017 WL 3535296 (S.D.N.Y. Aug. 16, 2017)......................................................................33

Holtz v. Rockefeller & Co., 258 F.3d 62 (2d Cir. 2001)..............................................6, 7

House v. Wackenhut Servs. Inc., 2012 WL 4017334 (S.D.N.Y. 2012)...............................19

Hyek v. Field Support Servs., Inc., 702 F. Supp. 2d 84 (E.D.N.Y. 2010)……………………....10, 21

ING Bank N.V. v. M/V TEMARA, IMO No. 9333929, 892 F.3d 511 (2d Cir. 2018)……………4

Johnson v. Cty. of Nassau, 480 F. Supp. 2d 581 (E.D.N.Y. 2007)…………………………………19

Joseph v. Owens & Minor Distribution, Inc., 5 F. Supp. 3d 295 (E.D.N.Y. 2014)……………...23

Kalra v. HSBC Bank USA, N.A., 567 F. Supp. 2d 385 (E.D.N.Y. 2008)…………………………42

Kalsi v. N.Y.C. Transit Auth., 62 F.Supp.2d 745 (E.D.N.Y.1998)…………………………………14

Karim–Seidou v. Hosp. of St. Raphael, 2012 WL 6628886 (D.Conn. 2012)……………………23

Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10 (2d Cir. 2013)……………………………………………………………………………………………25, 29

Kinard v. Crew, No. 20-2803, 2021 WL 5023339 (2d Cir. Oct. 29, 2021)…………………...24, 35

Kirkland v. Cablevision Sys., 760 F.3d 223 (2d Cir. 2014)………………………………………..10, 24

Kirkweig v. New York City Dep't. of Educ., 2013 WL 1651710 (S.D.N.Y. 2013)………………19

Kraiem v. JonesTrading Institutional Servs. LLC, 571 F. Supp. 3d 53 (S.D.N.Y. 2021)…………36

Kwan v. Andalex Grp., LLC, 737 F.3d 834 (2d Cir. 2013)………………………………………22, 41

Lenzi v. Systemax, Inc., 944 F.3d 97 (2d Cir. 2019)………………………………………………24

Livingston v. City of New York, 563 F. Supp. 3d 201 (S.D.N.Y. 2021)…………………………41

Lyons v. Lancer Ins. Co., 681 F.3d 50 (2d Cir. 2012)………………………………………………5

Mandell v. County of Suffolk, 316 F.3d 368 (2d Cir. 2003)………………………………………38

Marinacci v. United States Postal Serv., 403 F. Supp. 3d 116 (E.D.N.Y. 2017)…………………38

Martin v. City Univ. of New York, 2018 WL 6510805 (S.D.N.Y. Dec. 11, 2018)………………16

Mathirampuzha v. Potter, 548 F.3d 70 (2d Cir.2008)………………………………………………7

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)……………………5

McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184 (2d Cir. 2007)……………………………...4

McCullough v. Fin. Info. Servs. Agency, 923 F. Supp. 54 (S.D.N.Y. 1996)........................21

McCullough v. Xerox Corp., 942 F. Supp. 2d 380 (W.D.N.Y. 2013)..................................7

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)........................................9, 21

McLee v. Chrysler Corp., 109 F.3d 130 (2d Cir. 1997)....................................................6

Meagher v. State Univ. Constr. Fund, No. 117CV0903GTSCFH, 2020 WL 5504011 (N.D.N.Y. Sept. 11, 2020)..........................................................................................................25

Mello v. Siena Coll., 15–CV–13, 2017 WL 1013077 (N.D.N.Y. Mar. 14, 2017)...................43

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)..........9

Mesias v. Cravath, Swaine & Moore LLP, 106 F. Supp. 3d 431 (S.D.N.Y. 2015)...................16

Miller v. Nat'l Ass'n of Sec. Dealers, Inc., 703 F. Supp. 2d 230 (E.D.N.Y. 2010)...................24

Miner v. Clinton County, N.Y., 541 F.3d 464 (2d Cir. 2008)..............................................5

Mitchell v. State Univ. of New York Upstate Med. Univ., 723 F. App'x 62 (2d Cir. 2018)..........24

Moore v. Kingsbrook Jewish Med. Ctr., 2013 WL 3968748 (E.D.N.Y. 2013).......................23

Morris v. Bellevue Hosp. Ctr., 2012 U.S. Dist. LEXIS 168076 (E.D.N.Y. 2012)...................19

Nguyen v. Dep't of Corr. & Cmty. Servs., 169 F. Supp. 3d 375 (S.D.N.Y. 2016)...................14

Orsaio v. New York State Dep't of Corr. & Cmty. Supervision, No. 617CV00685BKSTWD, 2022 WL 351827 (N.D.N.Y. Jan. 14, 2022).............................................................................35

Payne v. Cornell Univ., No. 21-109-CV, 2022 WL 453441 (2d Cir. Feb. 15, 2022)................36

Pompey-Howard v. New York State Educ. Dep't, 275 F. Supp. 3d 356 (N.D.N.Y. 2017)..........43

Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)..................................................................................................................10, 21

Ricci v. DeStefano, 557 U.S. 557 (2009)....................................................................5

Riisna v. American Broadcasting Companies, Inc., 219 F. Supp. 2d 568 (S.D.N.Y. 2002)..........38

Risco v. McHugh, 868 F.Supp.2d 75 (S.D.N.Y.2012)......................................................28

Rivera v. Greater Hudson Vallery Health Sys. (Now Known as Garnet Health), No. 21-CV-1324 (NSR), 2023 WL 2588308 (S.D.N.Y. Mar. 21, 2023)....................................................6

Rodriguez v. City of New York, 644 F.Supp.2d 168 (E.D.N.Y. 2008)...............................43

Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir.2011).......................28

Scaria v. Rubin, 117 F.3d 652 (2d Cir.1997).............................................................24

Schiano v. Quality Payroll Sys., 445 F.3d 597 (2d Cir. 2006).........................................6

Scott v. Harris, 550 U.S. 372 (2007).......................................................................5

Sealy v. State Univ. of New York At Stony Brook, 408 F. Supp. 3d 218 (E.D.N.Y. 2019)..........8

Servello v. New York State Off. of Child. & Fam. Servs., No. 118CV0777LEKDJS, 2021 WL 4477229 (N.D.N.Y. Sept. 30, 2021)..................................................................42

Sethi v. Narod, 12 F. Supp. 3d 505 (E.D.N.Y. 2014).......................................17, 18, 23

Smalls v. Cty. of Suffolk, 2019 WL 4038742 (E.D.N.Y. 2019)..........................................4

Smith v. K & F Indus., Inc., 190 F. Supp. 2d 643 (S.D.N.Y. 2002)...................................11

Smith v. New York & Presbyterian Hosp., 2020 WL 777786 (S.D.N.Y. 2020)................15, 16

Smith v. New York & Presbyterian Hosp., 440 F. Supp. 3d 303 (S.D.N.Y. 2020)....................33

Soderberg v. Gunther Int'l Inc., 124 F. App'x 30 (2d Cir.2005).......................................23

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)....................................................10

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003)......................................................11

Thornley v. Penton Publishing, Inc., 104 F.3d 26 (2d Cir.1997)...............................11, 23

Tyler v. Bethlehem Steel Corp., 958 F.2d 1176 (2d Cir. 1992).......................................37

Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)...............................................................................................35

Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483 (S.D.N.Y. 2010).......................36

Walker v. Rochester Tel. Corp., 1992 WL 518685 (W.D.N.Y. April 14, 1992).....................10

Weinstock v. Columbia Univ., 224 F.3d 33 (2d Cir. 2000)........................6, 9, 22, 42

Whipple v. Reed Eye Assocs., 524 F. Supp. 3d 76 (W.D.N.Y. 2021)……………………………….41

White v. City of Middletown, 45 F. Supp. 3d 195 (D. Conn. 2014)……………………..28, 34, 35

Williams v. NYC Housing Auth., 458 F.3d 67 (2d Cir. 2006)……………………………………7, 8

Woodman v. WWOR–TV, Inc., 411 F.3d 69 (2d Cir.2005)……………………………....19

Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59 (2d Cir. 2015)………………………....19

Yoselovsky v. Associated Press, 917 F. Supp. 2d 262, (S.D.N.Y. 2013)………………………...21

Zaja v. SUNY Upstate Med. Univ./Upstate Healthcare Ctr., No. 520CV337MADTWD, 2022 WL 4465498 (N.D.N.Y. Sept. 26, 2022)……………………………………………………………...9, 10

Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834 (2d Cir. 2013)……………………………….41

**Statutes**

42 U.S.C. § 2000e–3(a)……………………………………………………………………………9

Title VII of the Civil Rights Act of 1964……………………………………………………….ibid

x

A-0656

## PRELIMINARY STATEMENT

Plaintiff is a psychiatrist who began his employment with the State University of New York, Upstate Medical University ("UMU") on July 1, 2017, when he was appointed Senior Vice President and Dean of UMU's College of Medicine. Plaintiff remained in that position until he was removed as Dean on September 12, 2019. Since that time, Plaintiff has remained employed at UMU as a tenured Professor in the Department of Psychiatry.

Plaintiff filed a New York State Division of Human Rights ("DHR") complaint on November 18, 2019, alleging that Defendants unlawfully retaliated against him when he was removed from his Senior Vice President/Dean position. The DHR issued a probable cause finding and recommended the case to be heard at an administrative hearing before an administrative law judge. Plaintiff subsequently requested, and was granted, a dismissal of the DHR complaint for administrative convenience, after which he filed this action in Federal Court, alleging that Defendants discriminated against him on the basis of his race and national origin and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

In addition to Plaintiff's failure to exhaust his administrative remedies with respect to his discrimination claim, the material, undisputed facts in this matter establish that his removal as Dean was not discriminatory or retaliatory in nature, but instead, was for legitimate, non-discriminatory business reasons. Simply put, Plaintiff was an ineffective Dean. When interacting with colleagues, students, their families, SUNY officials and others, he was often inappropriate and unprofessional and, on more than one occasion, other UMU leaders had to write clarifying emails or apologies for him to send regarding the comments he made. He interfered with at least one search to fill a Department Chair position, frequently wasted the time of leadership and others by going off on tangents during meetings, failed to spend State dollars prudently, and failed to

1

effectively address issues brought to his attention or that were under his purview. In the Summer of 2019, Plaintiff began undercutting and undermining the UMU President's authority to other UMU leaders. Plaintiff's conduct fell woefully short of what was expected from a Dean of UMU's College of Medicine and it was determined that he must be removed in order to allow the College of Medicine to move forward.

With discovery now completed, Defendants respectfully request that this Court grant their motion for summary judgment pursuant to Fed. R. Civ. P. 56(a) and dismiss Plaintiff's Complaint in its entirety, with prejudice.

## STATEMENT OF FACTS

For a more robust recitation of the relevant facts, please refer to Defendants' Statement of Material Facts not in Despite, and the Declarations of Attorney Aimee Cowan, Robert Corona, DO, Mantosh Dewan, MD, Stephen Albanese, MD, Eric Frost, Alexandria Gilbertson, Lawrence Chin, MD, Mark Schmitt, PhD, Thomas Schwartz, MD, Richard Gardner, and Leann Lesperance, PhD.

Not long after he was hired, Plaintiff began to fall short of the expectations required of a Dean of the College of Medicine. Former President Danielle Laraque-Arena documented and shared her concerns about Plaintiff's leadership with UMU's Associate Vice President of Human Resources Eric Frost, University Hospital Chief Executive Officer Robert Corona, and President Mantosh Dewan, MD, who took over as Interim President after President Laraque-Arena stepped down in December 2018. Her concerns included Plaintiff's lack of professional demeanor, lack of improvement in his leadership, divisiveness, and that the College of Medicine was dysfunctional under Plaintiff's leadership. His conduct led her to send Plaintiff a formal letter in June 2018, setting parameters on their one-on-one meetings and informing him that another person would be

2

present during those meetings moving forward. See, Attorney Aimee Cowan Declaration [Cowan Dec.], Ex. D at ⁋⁋ 2, 3, 6, 7, 9; Declaration of Robert Corona, DO, [Corona Dec.] at ⁋ 4, Exhibit A. It also led her to approach Dr. Dewan in Fall 2018 to ask if he would be willing to assume the responsibilities of Dean under the title "Vice-President of Administration." See, Declaration of Mantosh Dewan, MD [Dewan Dec.] at ⁋ 12.

When Dr. Dewan became Interim President in December 2018, SUNY leaders encouraged him to remove Plaintiff as Dean, due to his poor judgment and lack of professional diplomacy. Id. at ⁋ 17. President Dewan decided to give Plaintiff the chance to succeed under his leadership in hopes that he would do well. However, Plaintiff continued to exhibit similar concerning conduct, including making inappropriate statements to students, faculty, and others outside of UMU, being easily distracted, rambling, and leading circular discussions during meetings which were largely unproductive, interfering with at least one significant Department Chair search, not being prudent in spending State dollars, and not addressing issues within his purview as Dean. His inappropriate conduct and statements were so problematic that they generated complaints from students, at least one union and others. Other UMU leaders drafted email messages for Plaintiff to send as "damage control," attempts were made to schedule UMU events at times when Plaintiff was not available to attend, and, in certain cases, Plaintiff was asked not to attend events at all. See, Declaration of Leann Lesperance, MD [Lesperance Dec.] at ⁋⁋ 6-12; Declaration of Stephen Albanese, MD [Albanese Dec.] at ⁋⁋ 9-10, Corona Dec. at ⁋ 8; Declaration of Eric Frost [Frost Dec.] at ⁋⁋ 13, 14, 16; Dewan Dec. at ⁋⁋ 19-38; Declaration of Lawrence Chin, MD [Chin Dec.] at ⁋⁋ 16-19; Declaration of Thomas Schwartz [Schwartz Dec.] at ⁋⁋ 14, 15.

In the summer of 2019, Plaintiff became increasingly hostile towards President Dewan to Department Chairs and other leadership, instructing them not to go to President Dewan with

3

concerns and to only come to him. On August 13, 2019, Plaintiff called two "urgent" meetings during which Plaintiff disparaged President Dewan in front of Department Chairs, UMU's Chief Medical Officer, UMU's CEO and President Dewan himself. Corona Dec. at ¶ 6, 9-12; Schwartz Dec. at ¶ 11; Chin Dec. at ¶¶ 21, 22, 23; Dewan Dec., at ¶ 39; Albanese Dec. at ¶ 10. These meetings were the tipping point that led to the decision to remove Plaintiff as COM Dean, but Plaintiff's pattern of inappropriate conduct continued thereafter, reinforcing that the decision to remove Plaintiff was appropriate.

The decision to remove Plaintiff was based on months of repeated egregious behaviors, ineffective and wasteful management, and undermining President Dewan's leadership – all after giving Plaintiff a fair chance despite insistent directives from President Dewan's superiors to remove him. Dewan Dec. at ¶¶ 42, 47, 73; see also, Albanese Dec. at ¶¶ 12-13; Frost Dec. at ¶ 17; Chin Dec. at ¶ 24. In sum, Plaintiff's performance was deemed unsatisfactory by President Laraque-Arena, SUNY leadership, and President Dewan, and Plaintiff's demotion was based on legitimate, nondiscriminatory reasons.

## STANDARD OF REVIEW

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Smalls v. Cty. of Suffolk, 2019 WL 4038742, at *7–8 (E.D.N.Y. 2019)(citing ING Bank N.V. v. M/V TEMARA, IMO No. 9333929, 892 F.3d 511, 518 (2d Cir. 2018)). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." Id., citing McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted).

4

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted), and "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009)(quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted). "[W]hen the moving party has carried its burden[,] ... its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [,]" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec., 475 U.S. at 586-87), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" Miner v. Clinton County, N.Y., 541 F.3d 464, 471 (2d Cir. 2008).

The nonmoving party can only defeat summary judgment by "adduc[ing] evidence on which the jury could reasonably find for that party." Lyons v. Lancer Ins. Co., 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)), and "[a] court cannot credit a plaintiff's merely

5

speculative or conclusory assertions." DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012); see also Federal Trade Comm'n v. Moses, 913 F.3d 297, 305 (2d Cir. 2019). As in any other case, a plaintiff in an employment discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Rivera v. Greater Hudson Valley Health Sys. (Now Known as Garnet Health), No. 21-CV-1324 (NSR), 2023 WL 2588308, at *10 (S.D.N.Y. Mar. 21, 2023)(citing Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)).

In addition, the Second Circuit has provided specific guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. See, e.g., Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

Schiano v. Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006), quoting, Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable in discrimination cases is unsupportable.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).

6

## ARGUMENT

**POINT I:     PLAINTIFF'S TITLE VII DISCRIMINATION CLAIM MUST BE DISMISSED**

### A.  Plaintiff Failed to Exhaust his Administrative Remedies with respect to his Title VII Race and National Origin Discrimination Claims

Prior to bringing a lawsuit pursuant to Title VII, an aggrieved employee must first exhaust his administrative remedies. Cyr v. Berry Plastics Corp., 2011 WL 6337713, at *4 (N.D.N.Y. 2011)(citing Mathirampuzha v. Potter, 548 F.3d 70, 74 (2d Cir.2008)). A plaintiff may not pursue unexhausted claims or claims that are not reasonably related to those asserted in a timely charge of discrimination. Id. "A claim raised for the first time in the district court is 'reasonably related' to allegations in an EEOC charge 'where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" McCullough v. Xerox Corp., 942 F. Supp. 2d 380, 383–84 (W.D.N.Y. 2013)(citing Holtz, 258 F.3d at 83 (quoting Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402 (2d Cir.1993). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination [of the type alleged in the civil complaint].'" Id., (citing Williams v. NYC Housing Auth., 458 F.3d 67, 70 (2d Cir. 2006)).

Here, Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR"), alleging that he was retaliated against by Defendants for opposing gender, race and national origin discrimination. See, Declaration of Aimee Cowan, ["Cowan Dec"], Exhibit  G. However, nowhere in Plaintiff's DHR complaint does he allege that he personally was discriminated against based on his race and/or national origin or that his race and/or national origin played any role in his September 2019 demotion. Id. Nowhere in his DHR complaint is his own race or national origin *even mentioned*.

A-0663

Like the instant matter, in <u>Sealy v. State Univ. of New York At Stony Brook</u>, 408 F. Supp. 3d 218, 224–25 (E.D.N.Y. 2019), <u>aff'd</u>, 834 F. App'x 611 (2d Cir. 2020), plaintiff's DHR complaint contained no factual allegations regarding any purported discrimination on the basis of his national origin. Further, as here, the <u>Sealy</u> plaintiff's DHR complaint did not even include information identifying his national origin, or the nationality of any individual plaintiff claimed was treated more favorably than him. The Court dismissed plaintiff's Title VII national origin discrimination claim based on his failure to exhaust that claim. <u>See also</u>, <u>Bailey v. Sunrise Senior Living Mgmt., Inc.</u>, No. 16-CV-7184, 2017 WL 2371196, at *1, 2-3 (E.D.N.Y. May 31, 2017) (finding pro se plaintiff failed to set forth facts from which the court could infer a national-origin-based motivation where plaintiff did not identify his national origin and "left blank the spaces that call for [his] national origin"); <u>see also</u> <u>Williams</u>, 458 F.3d at 70 ("The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on both bases.'").

Here, the Plaintiff's DHR complaint did not give the DHR adequate notice to investigate claims of discrimination. Nor are claims of discrimination reasonably related to the retaliation claim that was pled in the DHR complaint. This is confirmed by the DHR's summary of Plaintiff's claims included in its Final Investigation Report: "Complainant alleged that he was demoted in retaliation for opposing discrimination when he made Respondent aware of discrimination as it relates to women and minority staff and students. Complainant further asserted that he was qualified for the position and performed his duties as required without performance deficiency; yet, Respondent demoted him without good cause." Cowan Dec., Ex. H at 3. Nowhere in the DHR's Final Investigation Report or Determination is there analysis of whether Plaintiff was discriminated against based on his race or national origin—the analysis is *solely* whether he was

8

retaliated against after he allegedly complained about discrimination. It is clear that the complaint that was filed with the DHR did not give it adequate notice to investigate separate discrimination claims of the type alleged in Plaintiff's federal complaint. Consequently, Plaintiff has failed to exhaust his administrative remedies with respect to his Title VII discrimination claims and such discrimination claims should be dismissed. See, Bromfield v. Bronx Lebanon Special Care Ctr., Inc., No. 16CIV10047ALCSLC, 2022 WL 19406559, at *11 (S.D.N.Y. Dec. 8, 2022), report and recommendation adopted, No. 16CV10047ALCSLC, 2023 WL 2706989 (S.D.N.Y. Mar. 30, 2023)(plaintiff's factual allegations in the EEOC Charge "make no reference whatsoever" to her Jamaican heritage or that Defendants discriminated against her based on her national origin).

**B. Plaintiff has Failed to Prove a *prima facie* Title VII Discrimination Claim**

"Title VII provides that it is 'an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or natural origin.'" Zaja v. SUNY Upstate Med. Univ./Upstate Healthcare Ctr., No. 520CV337MADTWD, 2022 WL 4465498, at *6 (N.D.N.Y. Sept. 26, 2022)(citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 63, 106 S. Ct. 2399, 2403, 91 L. Ed. 2d 49 (1986)(quoting 42 U.S.C. § 2000e–3(a)).

Discrimination claims under Title VII are analyzed according to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. Under the McDonnell Douglas framework, a plaintiff must first establish a *prima facie* claim of unlawful discrimination. Id., citing Weinstock, 224 F.3d at 42. To establish a *prima facie* case of discriminatory demotion under Title VII a plaintiff must show that (1) he is a member of a protected class, (2) was qualified and satisfactorily performing the duties required by his position; and (3) was demoted from the position (4) under circumstances giving rise to an inference

9

of discrimination. <u>Brierly v. Deer Park Union Free Sch. Dist.</u>, 359 F. Supp. 2d 275, 297 (E.D.N.Y. 2005)(citing <u>Walker v. Rochester Tel. Corp.</u>, 1992 WL 518685, at *4 (W.D.N.Y. April 14, 1992)); <u>see also</u>, <u>Goldman v. Admin. for Children's Servs.</u>, No. 04 CIV. 7890 (GEL), 2007 WL 1552397, at *4 (S.D.N.Y. May 29, 2007).

"Once an employee makes a prima facie case of [discrimination], the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." <u>Zaja</u>, 2022 WL at *6, citing <u>Kirkland v. Cablevision Sys.</u>, 760 F.3d 223, 225 (2d Cir. 2014). In satisfying its burden of production, a defendant "need not prove that it made the wisest choice, but only that the reasons for its decisions were non-discriminatory." <u>de la Concha v. Fordham Univ.</u>, 5 F. Supp. 2d 188, 194 (S.D.N.Y. 1998), <u>aff'd</u>, 173 F.3d 843 (2d Cir. 1999)(citing <u>Davis v. State Univ. of New York</u>, 802 F.2d 638, 641 (2d Cir.1986)). The defendant's burden "is not a particularly steep hurdle." <u>Cherry v. New York City Hous. Auth.</u>, 564 F. Supp. 3d 140, 165 (E.D.N.Y. 2021)(citing <u>Hyek v. Field Support Servs., Inc.</u>, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), <u>aff'd</u>, 461 F. App'x 59 (2d Cir. 2012)). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" <u>Id.</u>, citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

If the employer provides such a reason, "the burden shifts back to the plaintiff to show that the employer's explanation is a pretext for race [or sex] discrimination." <u>Zaja</u>, 2022 WL at *6. "To rebut the articulated justification for the adverse action, 'the plaintiff must show both that the reason was false, and that discrimination was the real reason.'" <u>Id.</u>, citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 n.4 (1993) (internal quotations omitted). "'[T]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part

10

on discrimination.'" Id., citing Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quotation and citation omitted).

Plaintiff's First and Second Causes of Action allege that he was discriminated against based on his race/color and national origin. ECF No. 1 at 31-33. However, Plaintiff cannot meet his burden of establishing a *prima facie* claim for race or national origin discrimination under Title VII, because he cannot show that he was satisfactorily performing the duties of his Dean position or that his demotion took place under circumstances giving rise to an inference of unlawful discrimination. Even assuming, *arguendo*, that Plaintiff could establish his *prima facie* case, Defendants have set forth legitimate, nondiscriminatory reasons for why they removed him as Dean. Plaintiff has not and cannot set forth any facts that would establish that the reason is false and that discrimination was the real reason, as required to show pretext.

**1. Plaintiff was not satisfactorily performing the duties required by his Dean position**

In order to meet the second prong of *his prima* facie case, Plaintiff must show that he was qualified and satisfactorily performing the duties required by his Dean position. Whether an employee's job performance is satisfactory depends on the employer's criteria for performance of the job, not the standards that a court might feel would be reasonable. Smith v. K & F Indus., Inc., 190 F. Supp. 2d 643, 648 (S.D.N.Y. 2002)(citing Thornley v. Penton Publishing, Inc., 104 F.3d 26, 29 (2d Cir.1997)).

Here, Plaintiff cannot make that showing. As Dean of the COM, Plaintiff was responsible for overseeing all operations within UMU's College of Medicine, including hiring and supervising UMU's twenty-six Department Chairs and at least six Deans within the COM, and all activities related to education, research and clinical training. Cowan Dec., Ex. C; Declaration of Lawrence Chin, MD [Chin Dec.] at ¶¶ 7-13.  Plaintiff's March 14, 2017 offer letter, signed by former UMU

11

President Danielle Laraque-Arena, MD, sets forth the expectations and initiatives for Plaintiff in the role of Dean, which are robust. Cowan Dec., Ex. A; Id., Ex. B at 5-6. The letter clearly states that the Senior Vice President and Dean of the COM positions he was offered were considered to be "Management/Confidential" appointments. Id., Ex. B at 1. The offer letter also clearly states that Plaintiff will be reporting to, and serving at the pleasure of, the President and that the appointment was not for a designated period of time. Id. (emphasis added). Among many other expectations, Plaintiff was expected to "work constructively and collaboratively with faculty and other leaders to achieve the overall institutional goals." Id., Ex. A at 1. However, Plaintiff fell far short of these expectations.

SUNY Administrators supported and encouraged President Dewan to remove Plaintiff when he became Interim President in December 2018. Dewan Dec. at ¶ 17. Examples of Plaintiff's performance and behavioral shortcomings as Dean include, but are not limited to, the following:

- Former President Danielle Laraque-Arena noted criticism of Plaintiff in his performance as Dean, including his "lack of professional demeanor," (Cowan Dec., Ex. D at 2); continued tardiness for meetings (Id. at 3); insubordination (Id., Ex. E at ¶ 6), lack of improvement in his leadership. (Id. at ¶ 7), and divisiveness (Id. at ¶ 9). She indicated to President Dewan that she was unhappy with Plaintiff's performance as Dean and that the College of Medicine was dysfunctional under his leadership. President Laraque-Arena even asked if President Dewan would be willing to assume the responsibilities of Dean under the title "Vice-President of Administration." See, Dewan Dec. at ¶ 12.

- Plaintiff exhibited inappropriate behavior towards former President Danielle Laraque-Arena, which required her to include her Chief of Staff at all meetings with Plaintiff. Corona Dec. at ¶ 4, Ex. A; Dewan Dec. at ¶12. He also exhibited inappropriate behavior towards current President Mantosh Dewan. See, Dewan Dec. at ¶¶ 38-42; Schwartz Dec. at ¶ 11; Chin Dec. at ¶¶ 21, 22, 23.

- In fact, he was increasingly hostile towards President Dewan over the course of 2019. Corona Dec. at ¶ 6; Schwartz Dec. at ¶ 11. Plaintiff called two "urgent" meetings on August 13, 2019, during which Plaintiff disparaged President Dewan in front of Department Chairs, UMU's Chief Medical Officer, UMU's CEO and President Dewan himself. Corona Dec., at ¶¶ 9-12; Chin Dec., at ¶¶ 22, 23; Dewan Dec. at ¶¶ 38-42; Albanese Dec. at ¶ 10.

12

- Plaintiff often exhibited distracted, inappropriate, and even unprofessional behavior towards colleagues, students, local politicians and SUNY officials one-on-one, and at meetings, ceremonies and presentations. His behavior sometimes required a follow-up email or message as "damage control," and he was instructed not to attend at least one SUNY event. See, Lesperance Dec. at ¶¶ 6-12; Albanese Dec. at ¶¶ 9-10, Corona Dec. at ¶ 8; Frost Dec. at ¶¶ 13-17; Dewan Dec. at ¶¶ 20-26, 37; Chin Dec. at ¶¶ 16-19; Schwartz Dec. at ¶¶ 14, 15.

- Plaintiff inappropriately interfered with and tried to influence the search process for one of the largest Department Chair positions at UMU. See, Dewan Dec. at ¶¶ 20, 26; Chin Dec. at ¶ 20. He was the subject of a discrimination complaint by female faculty members relating to a search for a different Department Chair. Dewan Dec. at ¶ 15; Cowan Dec., Ex. F.

- Plaintiff was viewed by colleagues and SUNY Administration as an ineffective leader. He would often ramble and lead circular discussions that were largely unproductive. He was very slow in responding to decisions that needed to be made and was preventing Departments from getting things accomplished. See, Albanese Dec. at ¶¶ 4, 5; Dewan Dec. at ¶¶ 19, 24, 45; Chin Dec. at ¶ 16; Schwartz Dec. at ¶¶ 7, 9.

- President Dewan was concerned about Plaintiff's excessive and unnecessary spending of State dollars, particularly with respect to creating a significant number of new positions within the COM. President Dewan was primarily concerned with the cost of unnecessary administrative bloat; the lack of job descriptions; and the lack of these positions being connected to the objective outcomes agreed on for the College of Medicine. Plaintiff was giving management/confidential titles –and additional money—to the union-represented faculty who he appointed, against the direction of Human Resources. See, Dewan Dec. at ¶¶ 28-33, 51-53; Frost Dec. ¶¶at 9-11; Declaration of Mark Schmitt, PhD [Schmitt Dec.] at ¶¶ 7, 9; Chin Dec. at ¶ 30.

- While UMU did receive accreditation while Plaintiff was Dean following the Liaison Committee on Medical Education ("LCME") accreditation process in 2019, the LMCE noted that although new policies, procedures and programs designed to increase diversity among students, faculty and senior administrative staff were implemented under Plaintiff's leadership, there were only modest gains in diversity of senior administrative staff and faculty during the first year of implementation – suggesting that the changes Plaintiff had made were not yet effective at increasing diversity. Chin Dec., at ¶ 29.

Despite giving Plaintiff a fair chance to succeed after Dr. Dewan became President in December 2018, Plaintiff consistently demonstrated that he could not satisfactorily perform the duties of his job. Plaintiff was ineffective, wasteful, inappropriate, and undermining of President Dewan's leadership. Dewan Dec. at ¶ 42; Albanese Dec. at ¶¶ 12-13; Dewan Dec. at ¶ 44; Frost Dec. at ¶ 17; Chin Dec. at ¶ 24.  This is corroborated by the results of a UMU faculty survey that was conducted in June and July of 2019. The faculty who took the survey ranked Plaintiff's job

13

performance as unsatisfactory. Three of the 10 bottom items were on Plaintiff's performance: they rated Plaintiff extremely low in making his priorities for the medical school transparent or reasonable and in the reasonableness of the pace of his decision making. Dewan Dec., ¶ 47, Ex. F. In sum, Plaintiff's performance was unsatisfactory as Dean and he is unable to meet the second prong of a *prima facie* case of discrimination.

2. **Plaintiff cannot show that his removal as Dean occurred under circumstances giving rise to an unlawful discrimination**

In order to meet the fourth prong of his *prima facie* case, Plaintiff must show that his removal occurred under circumstances giving rise to an inference of unlawful discrimination. A plaintiff can support such an inference by (a) "demonstrating that similarly situated employees of a different race or national origin were treated more favorably," (b) "showing that there were remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," or (c) "proving that there were other circumstances giving rise to an inference of discrimination on the basis of [the] plaintiff's race or national origin." Nguyen v. Dep't of Corr. & Cmty. Servs., 169 F. Supp. 3d 375, 388 (S.D.N.Y. 2016)(citing Gelin v. Geithner, 2009 WL 804144, at *15 (S.D.N.Y. 2009) (citations and internal quotation marks omitted), aff'd, 376 Fed.Appx. 127 (2d Cir.2010). Conclusory and speculative allegations will not suffice to demonstrate discriminatory intent. Rather, a plaintiff "must point to facts that suggest" that the adverse employment action was motivated, at least in part, by discriminatory animus. Id., citing Kalsi v. N.Y.C. Transit Auth., 62 F.Supp.2d 745, 753 (E.D.N.Y.1998), *aff'd*, 189 F.3d 461 (2d Cir.1999)).

14

   **a. Plaintiff cannot demonstrate that similarly situated employees of a different race or national origin were treated more favorably than him**

Plaintiff has not, and cannot, identify any similarly situated individual who was treated more favorably than him.  See gen., ECF No. 1; Cowan Dec., Ex. L. Absent such evidence, Plaintiff's claim must be dismissed. See, Goldman, 2007 WL 1552397 at *7.

   **b. Plaintiff cannot show there were remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus.**

The only remarks alleged by Plaintiff to be "discriminatory" are that President Dewan asked Plaintiff what a Native American professor [Dr. Brian Thompson] "does all day" (ECF No. 1 at ¶61) and what a Hispanic professor [Dr. Zulma Tova-Spinoza] "does in diversity." Id. at ¶62. He also asserts that President Dewan stated to him that "we spend too much [money] on diversity." Id. at ¶58.

First and foremost, President Dewan denies making the remarks as alleged by Plaintiff. See, Dewan Dec. at ¶¶ 50, 52.  Regardless, even if the Court were to credit these statements as having been made by President Dewan, they fall far short of meeting the required proof for discriminatory animus.  When evaluating the probative value of remarks in discrimination cases, courts evaluate the following factors: (1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process). Smith v. New York & Presbyterian Hosp., 2020 WL 777786, at *19 (S.D.N.Y. 2020)(citing Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 149 (2d Cir. 2010)).

While President Dewan was a "decision-maker" at UMU, "[i]solated derogatory remarks by a decisionmaker alone do not raise an inference of discrimination" absent "a nexus between the remarks and the adverse employment action." Desrosiers v. Summit Sec. Servs., Inc., 2022 WL 13808524, at *5 (S.D.N.Y. Oct. 21, 2022)(citing Gonzalez v. Allied Barton Sec. Servs., 2010 WL 3766964, at *5 (S.D.N.Y. Sept. 7, 2010)). The more removed remarks are from an employer's adverse action, the more likely that such remarks will be non-probative "stray remarks." Smith, 2020 WL at *19; Callistro v. Cabo, 2013 WL 322497, at *7 (S.D.N.Y. Jan. 25, 2013) (finding remarks too attenuated where they were not made in connection with the events surrounding the plaintiff's termination, one remark was made at least one month before any discussion of terminating the plaintiff's employment, and the other remark was made at the beginning of her employment).

Indeed, "[c]ourts in this circuit have dismissed claims alleging statements that are more facially discriminatory than the ones alleged here—including remarks made by decisionmakers—for failure to plead a sufficient nexus between the statements and the adverse employment decision." Id., citing Martin v. City Univ. of New York, 2018 WL 6510805, at *9 (S.D.N.Y. Dec. 11, 2018) (dismissing race discrimination claim for lack of casual connection where a decisionmaker made stray remark that "those Irish guys are always up to something"); Mesias v. Cravath, Swaine & Moore LLP, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) (dismissing complaint for lack of nexus with decision making process where supervisor stated multiple times that he was tired of working with "menopausal women"); Cano v. SEIU Loc. 32BJ, No. 19CV8810PAEKHP, 2023 WL 4830091, at *14 (S.D.N.Y. Apr. 17, 2023), report and recommendation adopted sub nom. Cano v. SEIU. Loc. 32BJ, No. 19CIV8810PAEKHP, 2023 WL 4784231 (S.D.N.Y. July 27, 2023) ("Regardless, the context of the comment is not probative of discrimination as to the

suspension or termination because it was not made in connection with any employment decision about Plaintiff.")

Here, the remarks alleged to have been made by President Dewan consist of a few non-probative comments made by President Dewan over a series of months in 2019, and a series of vague and conclusory assertions regarding UMU's historical hiring practices.  None of these allegations are sufficient to meet Plaintiff's evidentiary burden. Cowan Dec., Ex. J at 325. The alleged comments are not derogatory towards any particular race or national origin and have no nexus to Plaintiff's demotion. Significantly, Plaintiff does not allege that President Dewan or any other employees made racially disparaging remarks to Plaintiff, commented on his race or national origin at all, or ever used invidious or derogatory language in front of him about Hispanic individuals. Hernandez v. Kwiat Eye & Laser Surgery, PLLC, No. 1:20-CV-42 (FJS/CFH), 2023 WL 372105, at *7 (N.D.N.Y. Jan. 24, 2023). He presents no evidence whatsoever of any direct race or national origin discrimination such as racial comments, epithets, or slurs made against him. See, Brown v. Xerox Corp., 170 F. Supp. 3d 518, 532 (W.D.N.Y. 2016).

Simply put, the remarks alleged by Plaintiff, even if accepted as true, do not constitute sufficient evidence of discriminatory animus. Sethi v. Narod, 12 F. Supp. 3d 505, 543–44 (E.D.N.Y. 2014)(citing Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir.1998), ("stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."); see also Dixon v. Int'l Fed'n of Accountants, 416 Fed.Appx. 107, 110 (2d Cir.2011).

    **c.  Plaintiff cannot show that there were other circumstances giving rise to an inference of discrimination on the basis of his race or national origin.**

The only bases for Plaintiff's national origin discrimination claim, according to Plaintiff himself, are that (1) there has never been a Dean at UMU who was a member of an

17

A-0673

underrepresented minority group before Plaintiff or after his demotion (Cowan Dec., Ex. J at 302, 307); (2) there is a "systemic pattern of not promoting diversity in leadership" (Id. at pp. 302, 307); (3) there was "no effort to bring to the table anybody of a Hispanic background to be considered for the position" (Id. at 307); (4) since his demotion, a national search hasn't been done for leadership positions; and (5) on some occasions administrators and faculty members would imitate another UMU employee's Hispanic accent when using that employee's name. (Id. at 308-309).[1]

With respect to the alleged basis of his race discrimination claim, Plaintiff alleges that he is one-eighth black and from a mixed-race family. Cowan Dec., Ex. J at 312. Plaintiff alleges, in purely conclusory fashion, that he was discriminated against based on his "background altogether" and cannot parcel out which component of his racial makeup for which he was allegedly discriminated against. Id. at 312-313. He further asserts that the basis for his race discrimination claim is "feeling uncomfortable and about a discriminator environment, that's very pervasive within the institution." Id. at 315.

Bald assertions or conclusory allegations of discrimination, "unsupported by any meaningful comments, actions, or examples of similarly-situated persons outside of plaintiff's protected class being treated differently" are insufficient to raise inferences of discrimination under Title VII. See, De La Pena v. Metro. Life Ins. Co., 552 Fed. Appx. 98, 100 (2d Cir. 2014); see also,

---

[1] Significantly, Plaintiff never made this particular allegation in either his DHR complaint or in his Federal Complaint. See gen., Cowan Dec., Ex. G and ECF No. 1. Consequently, the allegations with respect to unidentified employees allegedly intimating another Hispanic employee's accent cannot support his discrimination claims based on race or national origin. See, Hernandez, 2023 WL 372105 at *7 ("…with respect to Plaintiff's argument that Ms. Foster confirmed in her deposition that the technicians and Dr. Kwiat occasionally discussed patients in derogatory terms, those allegations were neither in Plaintiff's EEOC charge nor in her Amended Complaint; and, thus, they cannot support her discrimination claims based on race or national origin."). Even if the Court were to consider this allegation, "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." Sethi, 12 F. Supp. 3d at 543–44.

Morris v. Bellevue Hosp. Ctr., 2012 U.S. Dist. LEXIS 168076 (E.D.N.Y. 2012); Johnson v. Cty. of Nassau, 480 F. Supp. 2d 581, 598 (E.D.N.Y. 2007) ("conclusory assertions, wholly unsupported by the record, are insufficient to create an inference of discrimination."); Woodman v. WWOR–TV, Inc., 411 F.3d 69, 75 (2d Cir.2005).

"Nor may a plaintiff rely on his subjective 'feelings and perceptions of being discriminated against' to defeat summary judgment." Adeniji v. New York State Off. of State Comptroller, 557 F. Supp. 3d 413, 437 (S.D.N.Y. 2021), aff'd sub nom. Adeniji v. Off. of New York State Comptroller, No. 21-2496-CV, 2022 WL 16543188 (2d Cir. Oct. 31, 2022)(citing Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 75 (2d Cir. 2015)). "Although the Second Circuit ... has stated that the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimis*, it has also noted that [a] jury cannot infer discrimination from thin air." Freeman v. Rochester Psychiatric Ctr., No. 6:12-CV-06045 (MAT), 2017 WL 4169336, at *7 (W.D.N.Y. Sept. 20, 2017).

Plaintiff appears to rely on "nothing more than 'the familiar faulty syllogism: something bad happened to me at work; I am (fill in the blank with one or more protected categories); therefore it must have happened because I am (fill in the blank with the applicable protected categor[ies]).'" See, Casseus v. New York Coll. of Health Pros., No. CV151914SJFAYS, 2016 WL 7029157, at *15 (E.D.N.Y. Nov. 10, 2016), report and recommendation adopted, No. 15CV1914SJFAYS, 2016 WL 7017364 (E.D.N.Y. Dec. 1, 2016)(citing Kirkweig v. New York City Dep't. of Educ., 2013 WL 1651710 at, *4 (S.D.N.Y. 2013) (quoting House v. Wackenhut Servs. Inc., 2012 WL 4017334, at *1 (S.D.N.Y. 2012)). Plaintiff's conclusory allegations and subjective beliefs simply do not suffice to create an inference of discrimination.

A-0675

For example, Plaintiff's assertion that prior Deans and the subsequent Dean have not been Hispanic is not sufficient to connect his removal as Dean to a discriminatory intent. See, Hanks v. City of Syracuse, No. 521CV921GLSATB, 2022 WL 4619877, at *4 (N.D.N.Y. Sept. 30, 2022)(plaintiff cannot premise his discrimination and hostile work environment claims on the fact that both the [specialized details] were comprised of exclusively "European Americans," other than himself)(citing De La Pena v. Metro. Life Ins. Co., 953 F. Supp. 2d 393, 413 (E.D.N.Y. 2013) ("The fact that the [p]laintiff was the only Filipino in his office is not sufficient to connect the [d]efendants' actions and behavior to a discriminatory intent.").

Moreover, the assertions he has made are belied by his own actions. For example, Plaintiff never filed any complaints about alleged discrimination based on his race or national origin while he was Dean, indicating that he did not in fact believe that he or others were being treated differently based on their national origin or race. Cowan Dec., Ex. J at 312; Frost Dec. at ▯ 18; Gilbertson Dec. at ▯ 13.  Moreover, Plaintiff himself appointed individuals to leadership positions without a national search, belying any argument that such a practice is discriminatory towards him. See, Dewan Dec. at ▯ 69; Frost Dec. at ▯ 5; Chin Dec. at ▯ 25.

His assertions are also belied by the facts. For example, since Plaintiff's demotion, Dean Chin has appointed nine Department Chairs, six of which were all appointed pursuant to an external search, and the other three were appointed because they were highly qualified, and Dean Chin assessed, with input from faculty within their department, that they had performed exceptionally well in the role as Chair during that very difficult time. See, Chin Dec. at ▯ 26; Dewan Dec. at ▯ 67. Moreover, the backgrounds of UMU leadership indicate that its leadership team is diverse. UMU President Danielle Laraque-Arena, who hired Plaintiff, is a Haitian female and a member of an "underrepresented community." Id. at 303-304. The President who removed

20

A-0676

Plaintiff, President Dewan, is of Indian descent. Id. at 304. And the Dean of the COM who replaced Plaintiff, Dr. Lawrence Chin, is of Asian descent. Id. at 305.

Plaintiff simply cannot show that his removal occurred under any circumstances giving rise to an inference of unlawful discrimination.

### C. Defendants have shown a legitimate, non-discriminatory business reason for Plaintiff's demotion

Even assuming, *arguendo*, that Plaintiff could demonstrate a *prima facia* claim of unlawful discrimination, Defendants had legitimate, nondiscriminatory business reasons for Plaintiff's demotion. As discussed above under Point I (B)(1), Plaintiff had significant performance issues that led to his inevitable demotion in September 2019.

In satisfying its burden of production, a defendant "need not prove that it made the wisest choice, but only that the reasons for its decisions were non-discriminatory." de la Concha, 5 F. Supp. 2d at 194 (citing Davis, 802 F.2d at 641). The defendant's burden "is not a particularly steep hurdle." Cherry, 564 F. Supp. 3d at 165, citing Hyek, 702 F. Supp. 2d at 93. It "is one of production, not persuasion; it 'can involve no credibility assessment.'" Id., citing Reeves, 530 U.S. at 142.

And it is well-settled that poor job performance constitutes a legitimate, nondiscriminatory reason for a demotion under the second step of the McDonnell Douglas analysis. See, De la Cruz v. City of New York, 783 F. Supp. 2d 622, 640 (S.D.N.Y. 2011); McCullough v. Fin. Info. Servs. Agency, 923 F. Supp. 54, 57 (S.D.N.Y. 1996); Yoselovsky v. Associated Press, 917 F. Supp. 2d 262, 275 (S.D.N.Y. 2013)("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.")(citing Gregory v. Daly, 243 F.3d 687, 696 (2d Cir.2001)); Heiden v.

21

A-0677

New York City Health & Hosps. Corp., No. 20-CV-10288 (LJL), 2023 WL 171888, at *21 (S.D.N.Y. Jan. 11, 2023)(same).

As discussed above, Plaintiff reported to and served at the pleasure of the President. The expectations and initiatives for his position were many. *Two* UMU Presidents were unsatisfied with the quality of his leadership. The decision to remove Plaintiff was based on months of repeated egregious behaviors, ineffective and wasteful management, and undermining President Dewan's leadership – all after giving Plaintiff a fair chance despite insistent directives from President Dewan's superiors to remove him. See, Dewan Dec. at ¶¶ 12, 15, 19-26, 28-33, 37-42, 45, 47, 51-53, 73; Albanese Dec. at ¶¶ 4, 5- 9, 10, 12, 13; Frost Dec. at ¶¶ 9-11, 13-17; Chin Dec. at ¶¶ 16- 21, 22, 24, 29, 30; Cowan Dec., Ex. D at 2, 3; Cowan Dec., Ex. E at ¶¶ 6- 9; Cowan Dec. Ex. F; Corona Dec. at ¶ 4, Ex. A, ¶¶ 6, 9-12; Schwartz Dec. at ¶¶ 7, 9, 11, 14, 15; Lesperance Dec. at ¶¶ 6-12; Schmitt Dec. at ¶¶ 7, 9. Consequently, Defendants have satisfied the second step of the McDonnell Douglas analysis.

### D. Plaintiff cannot show that the legitimate non-discriminatory reasons offered by Defendants were a pretext for discrimination

Once Defendants have established a legitimate, nondiscriminatory reason for Plaintiff's demotion, Plaintiff must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42; see also, Kwan v. Andalex Grp., LLC, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." Weinstock, 224 F.3d at 42 (alterations in original)(internal quotation marks omitted).

22

A-0678

"Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more." Abdallah v. Napolitano, 909 F. Supp. 2d 196, 208 (W.D.N.Y. 2012)(citing Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994)(internal quotation marks and citation omitted). As explained at further length by the Supreme Court: "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." Reeves, 530 U.S. at 146 (emphasis added).

Plaintiff's own subjective beliefs that he was discriminated against are simply not enough to survive summary judgment. See, Karim–Seidou v. Hosp. of St. Raphael, 2012 WL 6628886, at *5 (D.Conn. 2012) (the plaintiff's "own subjective beliefs" that he was discriminated against based on national origin and race were insufficient to survive summary judgment); Sethi, 12 F. Supp. 3d at 536, citing Moore v. Kingsbrook Jewish Med. Ctr., 2013 WL 3968748 (E.D.N.Y. 2013)); Joseph v. Owens & Minor Distribution, Inc., 5 F. Supp. 3d 295, 309 (E.D.N.Y. 2014), aff'd, 594 F. App'x 29 (2d Cir. 2015)(same).

Significantly, "in evaluating whether any evidence of pretext exists, it is not the function of a fact-finder to second-guess business decisions regarding what constitutes satisfactory work performance." DiGirolamo v. MetLife Grp., Inc., No. 10 CIV.1537 RMB, 2011 WL 2421292, at *8 (S.D.N.Y. June 6, 2011), aff'd, 494 F. App'x 120 (2d Cir. 2012)(citing Soderberg v. Gunther Int'l Inc., 124 F. App'x 30, 32 (2d Cir.2005)); see also, Dister v. Cont'l Grp., 859 F.2d 1108, 1116 (2d Cir.1988); Thornley, 104 F.3d at 29 ("Whether job performance was satisfactory depends on

23

the employer's criteria for the performance of the job-not the standards that may seem reasonable to the jury or judge."). In short, "[t]his Court does not sit as a super-personnel department that reexamines an entity's business decisions." <u>Miller v. Nat'l Ass'n of Sec. Dealers, Inc.</u>, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010)(citing <u>Scaria v. Rubin</u>, 117 F.3d 652, 654 (2d Cir.1997)).

Here, Plaintiff cannot show that the legitimate, non-discriminatory reasons proffered by Defendants were false, and that intentional discrimination based on his race and national origin was the real reason for his demotion.

**POINT II:    PLAINTIFF'S TITLE VII RETALIATION CLAIMS MUST BE DISMISSED**

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that he engaged in protected activity, (2) that the employer was aware of the protected activity, and (3) that the protected activity was the cause of an adverse employment action. <u>Kinard v. Crew</u>, No. 20-2803, 2021 WL 5023339, at *1 (2d Cir. Oct. 29, 2021) (citing <u>Lenzi v. Systemax, Inc.</u>, 944 F.3d 97, 112 (2d Cir. 2019)).

If the plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the defendant employer to articulate "a legitimate, non-discriminatory reason for its actions." <u>Mitchell v. State Univ. of New York Upstate Med. Univ.</u>, 723 F. App'x 62, 63–64 (2d Cir. 2018)(citing <u>Kirkland</u>, 760 F.3d at 225 (per curiam). "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is pretext for ... retaliation." <u>Id</u>. To meet that burden, the plaintiff must show "that the adverse action would not have occurred in the absence of the retaliatory motive." <u>Id</u>., citing <u>Kwan</u>, 737 F.3d at 846.

Here, Plaintiff's Third, Fourth and Fifth causes of action allege that he was retaliated against for reporting race, national origin and gender discrimination to Defendants. ECF No. 1 at 34-36. Specifically, Plaintiff alleges that he (1) reported "race discrimination" to Defendants regarding Dr. Brian Thompson, Nakeia Chambers, his wife Dr. Ma-Li Wong, and "numerous

24

medical students enrolled with SUNY Upstate." Cowan Dec., Ex. L at 16-17. Plaintiff alleges that he (2) reported "gender discrimination" to Defendants regarding Nakeia Chambers, Dr. Wong, Dr. Amy Tucker, Dr. Ann Botash, and Dr. Xiuli Zhang. Id., at 17-18. Lastly, Plaintiff alleges that he (3) reported "national origin discrimination" to Defendants on behalf of "numerous medical students enrolled with SUNY Upstate." Id., at 18.

**A. Plaintiff cannot demonstrate a *prima facie* claim for retaliation based on his demotion**

**1. Plaintiff cannot prove that he engaged in any protected activity under Title VII.**

"A plaintiff engages in 'protected activity' when [ ]he (1) opposes employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII." Freeman, 2017 WL 4169336 at *9 (citing Bundschuh v. Inn on the Lake Hudson Hotels, LLC, 914 F.Supp.2d 395, 405 (W.D.N.Y. 2012)). "[I]n order to constitute a protected activity for purposes of a retaliation claim, the complaint must be related to discrimination on a basis prohibited by Title VII." Id., citing Bennett v. Hofstra Univ., 842 F.Supp.2d 489, 500 (E.D.N.Y. 2012). Moreover, the plaintiff must have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Id., citing Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013)(internal quotation omitted). Whether a belief is reasonable is an objective standard that is "to be evaluated from the perspective of a reasonable similarly situated person." Meagher v. State Univ. Constr. Fund, No. 117CV0903GTSCFH, 2020 WL 5504011, at *17 (N.D.N.Y. Sept. 11, 2020)(citing Kelly, 716 F.3d at 16-17). "[S]ubjective good faith belief is insufficient[;] the belief must be reasonable and characterized by objective good faith." Davis v. NYS Dep't of Corr. Attica Corr. Facility, 110 F.Supp.3d 458, 462-63 (W.D.N.Y. 2015) (citations omitted).

25

**a. Plaintiff did not engage in a protected activity with respect to his alleged reports of "race discrimination"**

With respect to "reporting race discrimination" on behalf of Dr. Brian Thompson, Nakeia Chambers, and "numerous medical students enrolled with SUNY Upstate," Plaintiff is attempting to brand his efforts to promote diversity as "reporting discrimination" or "opposing discrimination" for purposes of a Title VII retaliation claim.

For example, Plaintiff alleges that President Dewan asked him what Dr. Thompson and Nakeia Chambers "does all day." However, the discussions between President Dewan and Plaintiff were centered around President Dewan requesting additional information about the new positions that he had created, including an updated organizational chart for the Dean's office, job descriptions for each position, whether the duties performed in the new positions overlapped with existing positions, and how the newly created positions would add value to UMU and help it to meet its goals. Dewan Dec. at ¶ 52. There is nothing in the record to suggest that Plaintiff ever actually complained of <u>discrimination</u> with respect to these individuals. In fact, Plaintiff testified that he <u>never</u> made any complaints on behalf of Dr. Thompson to the Office of Diversity and Inclusion ("ODI") or UMU's Human Resources Department ("HR") to convey that Dr. Thompson was personally being discriminated against or even that Native Americans as a group were being discriminated against. Cowan Dec., Ex. J at 325, 328; <u>see also</u>, Declaration of Alexandra Gilbertson at ¶ 13. He also testified that he never made any complaints on behalf of Ms. Chambers to ODI or HR that she was being discriminated against based on her race. <u>Id</u>. at 333; <u>see also</u>, Gilbertson Dec. at ¶ 13.

Further, Plaintiff contends that President Dewan asked what Dr. Zulma Spinoza, a Hispanic female Neurosurgeon whom Plaintiff had recently appointed Associate Dean for Diversity over Dr. Thompson, "does in diversity." However, again, this is a mischaracterizations of President

26

Dewan's discussions with Plaintiff, which were centered around requesting additional information about the new positions that he had created, including an updated organizational chart for the Dean's office, job descriptions for each position, whether the duties performed in the new positions overlapped with existing positions, and how the newly created positions would add value to UMU and help it to meet its goals. See, Cowan Dec., Ex. J at 193; Dewan Dec. at ⁋ 52. These inquiries were partially due to complaints that President Dewan received that Plaintiff was creating jobs in the Dean's office that overlapped with already existing positions. Dr. Thompson in particular complained that Plaintiff's creation of the Associate Dean for Diversity position that he promoted Dr. Tovar-Spinoza into resulted in a demotion of Dr. Thompson, who had held the Assistant Dean for Diversity long before Plaintiff became Dean.

Plaintiff's contention that he "reported race discrimination" for "numerous medical students enrolled with SUNY Upstate" is vague and conclusory at best. While Plaintiff claims that he held "focus group meetings" in early 2019 and had individual meetings with students regarding their "issues of discrimination" (Cowan Dec., Ex. I at 349, 350, 353), Plaintiff admittedly never filed any complaints on their behalf. Id. at 353; see also, Gilbertson Dec. at ⁋ 13.

In short, Plaintiff cannot show that he opposed employment practices prohibited under Title VII by simply allegedly attempting to create positions relating to diversity, responding to the President's inquiries about whether they were consistent with UMU's goals and overlapped with other positions, and meeting with students to discuss their experience at the COM. Nor has he asserted that he made a charge of discrimination on any of the aforementioned individuals' behalves or participated in an investigation, proceeding or hearing arising under Title VII for any of those individuals.

Indeed, there is nothing in the record to suggest that Plaintiff complained of discrimination or conduct prohibited by Title VII on behalf of any of the above individuals. See Brown, 170 F. Supp. 3d at 526–27 (citing Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 108 (2d Cir.2011) (protected activity to support retaliation claim must involve complaints that are not generalized, but rather complaints that the employer could reasonably understand involves conduct prohibited by Title VII); Risco v. McHugh, 868 F.Supp.2d 75, 110 (S.D.N.Y.2012) ("informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII").

As in Brown, supra, Plaintiff has failed to demonstrate that his purported advocacy on behalf of minorities fell within the scope of protected activity. See, 170 F. Supp. 3d at 527. In Brown, the Court held that "[t]here is nothing in the record suggesting that Plaintiff complained that any of these employees' Title VII rights had been violated or that they had been discriminated against. Rather, the record evidence simply reflects that Plaintiff, in his role as an HR Vice President, pushed for certain employees to receive promotions. That is insufficient to establish protected activity to pursue a retaliation claim. Advocating for certain minority employees to be promoted cannot, without more, be equated with protesting alleged race discrimination." Id. This same reasoning holds true in this case.

Likewise, even if Plaintiff mentioned his concerns about the sentiments of the "focus groups," general complaints that do not put the employer on notice of a claim of unlawful discrimination, do not constitute protected activity[2]. White v. City of Middletown, 45 F. Supp. 3d 195, 215 (D. Conn. 2014).

_____

[2] Plaintiff actually testified that the purpose of his meetings was to keep the contents of the meetings confidential. Cowan Dec., Ex. J at 354.

Lastly, with respect to Plaintiff's contention that he complained about race discrimination on behalf of his wife, Dr. Wong, Plaintiff alleges that he complained to President Dewan during a meeting on August 12, 2019, that Dr. Wong, had "reason both under Title 7 and Title 9 to file a complaint" regarding a salary dispute. Cowan Dec., Ex. J at 273. To provide context to this allegation, when Dr. Wong was hired in 2017, she was paid a total starting institutional salary package which was greater than the total starting salary of each of the twenty-six (26) other research faculty members that UMU hired between 2017 and 2020 (Declaration of Richard Gardner [Gardner Dec.] at ⁋ 8), and above the median salary for psychiatry research faculty in the United States, according to the Association of American Medical Colleges (AAMC) salary survey. Schwartz Dec. at ¶ 22.  See also, Gardner Dec. at ⁋⁋ 5-12; Schwartz Dec. at ⁋⁋ 18-48.

The extremely generous package provided to Dr. Wong was not only in excess of all other research faculty members at UMU, but was unprecedented in light of the fact that Dr. Wong was not funded by *any* grants when she was hired by UMU.  Id. at ⁋ 12.  In fact, no other researcher in the Psychiatry department has ever received as generous a compensation package as Dr. Wong. Id. at ⁋ 27.

While it is true that Dr. Wong later voiced objections to the salary structure that she had initially agreed to, Dr. Wong did not make any complaints of discrimination during any of the meetings she had regarding her salary dispute. Dewan Dec. at ⁋ 62; Schwartz Dec. at ⁋ 41.  In fact, Dr. Wong did not make *any* complaints of discrimination to *anyone* at UMU (other than allegedly her husband) before October 2019. Cowan Dec., Ex. M at 134.

Significantly, for activity to be considered protected, Plaintiff must have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Freeman, 2017 WL 4169336 at *9 (citing Kelly, 716 F.3d at 14)(internal quotation omitted).

29

A-0685

Even if the Court were to assume that Plaintiff did state to President Dewan on August 12, 2019, that his wife has a claim under Title 7 or Title 9, Plaintiff cannot show that he had a good faith, reasonable belief that she was being discriminated against based on her protected class.

Plaintiff, as the Dean of the COM, had access to the respective salaries of employees within Dr. Wong's department. Consequently, he was fully aware that her salary was commensurate to others in her department—and in fact, Dr. Wong received one of the most generous salary and research startup packages that any research faculty member had received at UMU in decades. See, Gardner Dec. at ⁋ 4; Schwartz Dec. at ⁋⁋ 20, 44-46. As a researcher himself, Plaintiff understands that unfunded researchers are not attractive candidates to academic medical centers because they bring in no money (i.e., "indirects"), to support their work and have no funds to cover their research expenses. Schwartz Dec. at ⁋ 47.

Salary and startup funding data is maintained in the ordinary course of business by the UMU College of Medicine Dean's Office.  Gardner Dec. at ⁋ 13. All salaries and ALRs must be approved by the Dean of the College of Medicine every year, including when Plaintiff was Dean from 2017 – 2019. Id. Plaintiff set the salary and start up packages for faculty, although the initial package for Dr. Wong was set by former UMU President Laraque-Arena. Id. at ⁋ 14.  Regardless, Plaintiff would have had direct knowledge that Dr. Wong received a far greater salary/start up package than any other research faculty member who was hired to work in the UMU College of Medicine between 2017-2019 and that her lab was the largest lab buildout done while he was Dean. Id. at ⁋ 14.  At best, Plaintiff's "complaint" to President Dewan regarding Dr. Wong's salary was a disagreement over what Plaintiff and Dr. Wong felt she was entitled to, and nothing more.

As early as April 2018, Plaintiff frequently confided in CEO Robert Corona, DO, that he believed he would be removed from his position as Dean by former President Laraque-Arena and

30

then current President Dewan. See, Corona Dec., at ¶4. In an April 2019 email, Plaintiff confirmed his belief that Dr. Wong's salary reduction was actually a punishment for "bad political moves" he had made and an attempt to force him out of his position. Id. at ¶ 5. It is therefore insincere and in bad faith for Plaintiff to allege that his demotion was in retaliation for the alleged August 12, 2019 complaint about his wife's salary. See, Schwartz Dec. at ¶¶ 48-49.

**b. Plaintiff did not engage in protected activity with respect to his alleged reports of "gender discrimination"**

Once again, with respect to "reporting gender discrimination" on behalf of Nakeia Chambers, Dr. Wong, Dr. Amy Tucker, Dr. Ann Botash, and Dr. Xiuli Zhang, Plaintiff is attempting to repackage his efforts to promote gender diversity as "reporting discrimination" or "opposing discrimination" for purposes of a Title VII retaliation claim. Such efforts do not qualify as protected actions for a retaliation claim.

For example, with respect to Ms. Chambers, Plaintiff testified that he cannot "parcel out to what degree" he believed she was discriminated against based on her race versus her gender. Cowan Dec., Ex. J at 335-336. In fact, the only basis for Plaintiff "opposing discrimination" with respect to Ms. Chambers is he responded to President Dewan allegedly asking what Ms. Chambers "did all day" with an account of her job duties. Id. at 337. It should be noted that according to Plaintiff, President Dewan *also* inquired as to what Dr. Thompson (a male)'s responsibilities were. Id. at 339.

Plaintiff next alleges that the sole basis for his allegation that he reported/opposed gender discrimination on behalf of Dr. Wong is the August 12, 2019 meeting mentioned above. Again, Plaintiff cannot show that he had a good faith, reasonable belief that his wife was being discriminated against based on her gender. Plaintiff, as the Dean of the COM, had access to the respective salaries of employees within Dr. Wong's department. Consequently, he should have

31

been fully aware that her salary was commensurate to other male faculty members in her department—and in fact, she received a package when she was hired that was unusually generous for the COM. At best, Plaintiff's complaint regarding Dr. Wong's salary was a disagreement over what Plaintiff and Dr. Wong felt she was entitled to and nothing more.

Plaintiff next alleges that he opposed gender discrimination when he suggested in June 2019 that Chief Medical Officer Dr. Amy Tucker and Senior Associate Dean for Faculty Affairs Dr. Ann Botash be asked to join the UMU Budget Committee. Cowan Dec., Ex. J at 340; ECF No. 1 at ¶89. The Budget Committee was created by former President Laraque-Arena, a female. Dewan Dec. at ¶ 55. The purpose of the Budget Committee is for senior leadership to have a platform to discuss confidential matters regarding UMU. Id. Senior leadership members include the Chief Executive Officer of the hospital, the Chief Financial Officer of the hospital, the Chief Senior Vice President for Finance and Administration for the university, the Dean of the College of Medicine, and the head of private practice. Id. The members of the Budget Committee directly oversee the finances of UMU. Cowan Dec., Ex. J at 168; see also, Dewan Dec. at ¶ 55.

Significantly, Plaintiff testified that he never asked Dr. Tucker or Dr. Botash if they *wanted* to be part of the Budget Committee, that neither expressed an interest in becoming part of the Budget Committee, and neither complained that they were not members of the Budget Committee. Cowan Dec., Ex. J at 170-171, 176, 178; Cowan Dec., Ex. K at 91.  In their positions, neither directly oversaw UMU finances. Therefore, their inclusion in that group would have been inappropriate and unnecessary given that their direct supervisors, Hospital CEO Dr. Corona and Plaintiff, were members. Plaintiff testified that he is unaware of *any* woman who expressed an interest in becoming a member of the Budget Committee but was denied membership. Id. at 178.

32

Plaintiff further alleges that Dr. Botash was discriminated against for not being considered for the Dean of the College of Medicine position *after* he was removed. Id. at 342. However, Plaintiff cannot show that his removal as Dean constituted retaliation for an alleged protected activity that occurred after the removal. See, Smith v. New York & Presbyterian Hosp., 440 F. Supp. 3d 303, 344 (S.D.N.Y. 2020)(citing Holmes v. Astor Servs. for Children and Families, No. 16 Civ. 2260 (CS), 2017 WL 3535296, at *7 (S.D.N.Y. Aug. 16, 2017))

Lastly, Plaintiff alleges that he "opposed gender discrimination" with respect to Dr. Xiuli Zhang because he created a panel to consider candidates to fill an Anesthesiology Department Interim Chair position. Id. at 347. The panel chose Dr. Zhang to fill the position and Plaintiff presented the results to President Dewan in August 2019. Id. at 348. Plaintiff contends that "…the next meeting that I had with him I was demoted." Id. However, Plaintiff admitted that President Dewan never expressed any concerns or any dissatisfaction with Dr. Zhang being chosen for the position and never indicated that a female doctor was not fit for the position. Id. at 348, 204.  In fact, President Dewan "signed off" on Dr. Zhang as the panel's choice for the position and later appointed her as the permanent Department Chair. Id. at 203, 205; Dewan Dec., at ⁋ 56, Ex. G. No complaint was ever filed regarding her not receiving the Anesthesiology Department Chair position—because she *was* chosen for the position. Cowan Dec., Ex. J at 348.

Again, Plaintiff has failed to demonstrate that his purported advocacy on behalf of women fell within the scope of protected activity for purposes of a Title VII retaliation claim.

c.  **Plaintiff did not engage in a protected activity with respect to his alleged reports of "national origin discrimination"**

Plaintiff alleges that he reported "national origin discrimination" to Defendants on behalf of "numerous medical students enrolled with SUNY Upstate." Cowan Dec., Ex. L at 18. In support of this claim, Plaintiff claims that he met with students at UMU who "brought up issues" to

33

Plaintiff, "issues of like egregious issues of discrimination." Id., Ex. I at 349, 350. In turn, Plaintiff testified that he sent out an email to students indicating that they could email him at his personal email and he would "guide them, et cetera." Id.

The email Plaintiff referenced is a January 24, 2019 email, in which Plaintiff emailed a group of faculty and students stating that they could email complaints of discrimination and harassment to him at his personal Gmail address if they wanted them to be kept "confidential." Frost Dec. at ¶ 15. The faculty union brought Plaintiff's email to UMU's former Associate Vice President of Human Resources Eric Frost's attention. Id. This communication required Frost to instruct Plaintiff that his email was inappropriate and inconsistent with UMU's collective bargaining agreements, policies and established practices. Id. Frost assisted Plaintiff with sending out a clarifying email. Id.

Plaintiff did not file any complaints on behalf of these students. Cowan Dec., Ex. J at 353; Gilbertson Dec., at ¶ 13; Frost Dec. at ¶ 18.  Instead, Plaintiff testified that he relayed to President Dewan that he endeavored to make the faculty more diverse because the students had conveyed to him that they wanted to "see more people like them in…the school." Id. at 356-358. However, such general complaints do not put the employer on notice of a claim of unlawful discrimination and do not constitute protected activity. White, 45 F. Supp. 3d at 215. Plaintiff never communicated to anyone that students allegedly had complaints of national origin discrimination. Instead, Plaintiff testified that he communicated to President Dewan that he wanted to create positions "to have someone who would systematically look at every student regardless of race or color, but with an emphasis placed on the people from minority background to make sure that they were not falling through the shuffle…you know, that they were on a good academic track." Cowan Dec., Ex. J at 356. Plaintiff was reportedly "unsettled" that neither President Dewan nor Dr. White

34

asked him what "can we do to come up with a more diverse workforce?" Id. at 357. Again, here, as in Brown, supra, Plaintiff has failed to demonstrate that his purported advocacy on behalf of minorities fell within the scope of protected activity for purposes of a retaliation claim. See, 170 F. Supp. 3d at 527.

**2. Plaintiff cannot prove a causal connection between any alleged protected activity and the decision to demote him.**

To demonstrate causation, Plaintiff "must show that retaliation was a but-for cause of an adverse employment action—not merely a 'substantial' or 'motivating' factor." Orsaio v. New York State Dep't of Corr. & Cmty. Supervision, No. 617CV00685BKSTWD, 2022 WL 351827, at *2 (N.D.N.Y. Jan. 14, 2022)(citing Kinard, 2021 WL 5023339 at *1); see also, Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 348, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013))."Proof of a causal connection between the protected activity and adverse action can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Freeman, 2017 WL 4169336 at *9 (citing Brown, 170 F. Supp. 3d at 529-30).

A court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the cases." White, 45 F. Supp. 3d at 218 (citing Espinal v. Goord, 558 F.3d 119, 129 (2d Cir.2009) (citing Hollander v. American Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir.1990) (three months between EEOC complaint and adverse conduct too attenuated to create causal connection)).

Here, Plaintiff cannot establish any causal connection between his alleged protected activity and his demotion. First, Plaintiff cannot establish a causal connection indirectly. Plaintiff

35

alleges that in response to expressing the need for certain minority individuals to fill roles that would promote diversity, President Dewan allegedly made comments regarding Dr. Thompson and Ms. Chambers with respect to what they "do all day" in April, May, June or July 2019. Cowan Dec., Ex. J at 325, 358-359. Plaintiff further alleges that he suggested that Dr. Botash and Dr. Tucker be considered for the Budget Committee group in June 2019. ECF No. 1 at ¶89. Plaintiff claims that he held "focus group meetings" in early 2019 wherein unidentified students complained to him; in fact, he claims in response to those meetings, he sent an email in January 2019 directing students to email his personal email directly with their complaints.

At best, the conversations mentioned above were held <u>months</u> before Plaintiff's September 13, 2019 demotion, severing any causal inference. District courts in this circuit have generally found that "the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." <u>Payne v. Cornell Univ.</u>, No. 21-109-CV, 2022 WL 453441, at *4 (2d Cir. Feb. 15, 2022)(citing <u>Barton v. Warren Cnty.</u>, 19-CV-1061, 2020 WL 4569465, at *14 (N.D.N.Y. Aug. 7, 2020); <u>see also</u>, <u>Kraiem v. JonesTrading Institutional Servs. LLC</u>, 571 F. Supp. 3d 53, 59–60 (S.D.N.Y. 2021)("There is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference."); <u>De Figueroa v. New York</u>, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) (citing <u>Walder v. White Plains Bd. of Educ.</u>, 738 F. Supp. 2d 483, 503-04 (S.D.N.Y. 2010) (collecting cases)); <u>see also</u> <u>Brown v. City of New York</u>, 622 F. App'x 19, 20 (2d Cir. 2015) ("The time lapses between Brown's protected activities and the alleged retaliatory acts—ranging from two months to several years—were simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive absent other supporting factual allegations.") Further, Plaintiff's alleged "focus group meetings"

36

clearly took place in early 2019—as evidenced by the January 2019 email—*more than eight* months before his demotion.

While Plaintiff contends that, only one month prior to his demotion, Dr. Zhang was appointed the Anesthesiology Department Chair position and he discussed with President Dewan his wife's salary complaints, Plaintiff has not established that either instance is a protected activity. To be sure, as discussed above, a panel chose Dr. Zhang to fill the Chair position and Plaintiff presented the results to President Dewan in August 2019. Cowan Dec., Ex. J at 348. However, Plaintiff admitted that President Dewan never expressed any concerns or any dissatisfaction with Dr. Zhang being chosen for the position and never indicated that a female doctor was not fit for the position. Id. at 348, 204. In fact, President Dewan "signed off" on Dr. Zhang as the panel's choice for the position and later appointed her as the permanent chair. Id. at 203, 205; Dewan Dec. at ⁋ 56, Ex. G. Further, with respect to the August 12, 2019 meeting in which Plaintiff claims he complained about his wife's discrimination, as discussed above, Plaintiff did not have a good faith, reasonable belief that Defendants' actions violated the law.

Second, Plaintiff has not set forth any other indirect circumstantial evidence, such as disparate treatment of fellow employees who engaged in similar conduct. See, Brown, 170 F. Supp. 3d at 530 (Plaintiff presents no evidence of retaliatory animus or other circumstantial evidence such as disparate treatment of similarly situated employees). Indeed, Plaintiff has not even *mentioned* any other similarly situated employees who were treated differently than Plaintiff. See gen., ECF No. 1; Cowan Dec., Ex. L.

Third, Plaintiff has not made any allegation which constitutes direct evidence of retaliatory animus directed against him by Defendants. See, e.g., "I fired him because he was too old." Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d 309, 333 (S.D.N.Y. 2020)(citing Tyler v.

Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir. 1992); Marinacci v. United States Postal Serv., 403 F. Supp. 3d 116, 130 (E.D.N.Y. 2017)(citing Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003) (direct evidence of retaliatory animus found where termination letter stated that plaintiff was being moved for having "branded the entire department as racists and anti-semites"); Douglas v. Hip Centralized Laboratory Services, Inc., No. 03-cv-205, 2005 WL 1074959, at *3 (E.D.N.Y. Apr. 29, 2005) (collecting cases and finding no direct evidence of retaliatory animus where plaintiff did not adduce evidence of retaliatory statements); Riisna v. American Broadcasting Companies, Inc., 219 F. Supp. 2d 568, 571, 573 (S.D.N.Y. 2002) (finding direct evidence of retaliatory animus where email stated that plaintiff was being removed from project because she had filed an EEOC charge against the company).

### B. Plaintiff cannot demonstrate a *prima facie* claim for retaliation based on the allegations he was denied or not considered for other positions at the COM

Plaintiff also contends that following his demotion, and following the filing of his DHR complaint, he was either denied or not considered for the following positions in retaliation for filing the DHR complaint: President of SUNY Upstate; SUNY Chancellor; Dean of Medicine[3]; Director of the MD-PhD program; and Chair of the Department of Psychiatry. ECF No. 1 at ₱ 159. While filing a complaint with the DHR is a protected activity, Plaintiff cannot prove a causal connection between his protected activity and his not being considered for the aforementioned roles.

As discussed above, there are multiple ways that a leadership position can be filled at the COM. An open national search involves outside consultants and provides the largest pool. But an

---

[3] It appears that Plaintiff is referring to the Dean of the College of Medicine position. See, ECF No. 1 at ₱₱ 159 and 170. However, it is illogical for Plaintiff to expect to be named to a position from which he had been removed.

38

open national search is costly and takes a great deal of time. In certain situations, it may be more appropriate to appoint someone on an interim basis because it is important to fill the position quickly. Sometimes, an interim Chair will be appointed as permanent if the interim has performed satisfactorily and circumstances warrant the appointment. See, Dewan Dec. at ⊮ 69; Frost Dec. at ⊮ 5; Chin Dec. at ⊮ 25. With respect to the President position, President Dewan was appointed as President after he interviewed with then SUNY Chancellor Jim Malatras and a subcommittee of the Board of Trustees; UMU faculty members wrote letters of support for him to become permanent. Dewan Dec. at ⊮ 69. The Board of Trustees and the SUNY Chancellor make the final hiring decision. Frost Dec. at ⊮ 6. Further, the Board of Trustees appoints the SUNY Chancellor. Dewan Dec. at ⊮ 65.

On March 13, 2020, Dr. Amit Dhamoon was appointed Program Director of the MD/PhD program after MD/PhD students brought concerns forward to President Dewan, Dean of Students Dr. White, Dean of Graduate Studies Dr. Schmitt, and Dr. Chin about the existing program directors and their effectiveness in their role. Schmitt Dec. at ⊮ 12; Chin Dec. at ⊮ 27. Dr. Dhamoon was a graduate of the UMU MD/PhD program and had significant experience mentoring students. Dr. Dhamoon was selected as the top candidate by the students, and was subsequently appointed by College of Medicine Dean Lawrence Chin based on his having graduated from UMU's MD/PhD program, his qualifications, and his reputation as an excellent mentor to students. Dewan Dec. at ⊮ 68, Schmitt Dec. at ⊮⊮ 12-13; Chin Dec. at ⊮ 27.

After Plaintiff was demoted, in September 2020, Dean Chin made the decision to make interim Psychiatry Department Chair Thomas Schwartz, M.D. permanent in the Chair position because he had served as an interim Department Chair throughout the COVID-19 pandemic and he assessed, with input from faculty within their department, that he had performed exceptionally

39

well in the role as Chair during that very difficult time. Chin Dec., at ¶ 26. President Dewan approved that decision, given that Dr. Schwartz had already assumed the interim role for the prior four years and had done exceptionally well financially with the Department even the face of COVID-19 pandemic. Dewan Dec. at ¶ 67.

Any decision to hire others for these roles had everything to do with the fact that they were qualified for the position. Plaintiff was not similarly situated to any of the individuals, as he had just been removed from the Dean position after a decision was made that he was a grossly ineffective leader. The same logic would apply as to why he was not considered for such positions. Plaintiff simply cannot show that he was not considered or chosen for these positions in retaliation for filing his DHR complaint.[4]

### C. Defendants have shown a legitimate, non-discriminatory business reason for Plaintiff's demotion and their hiring decisions for the positions filled after his demotion

As discussed above under Point I (B)(1), Defendants have shown a legitimate, nondiscriminatory/nonretaliatory business reason for Plaintiff's demotion and the hiring decisions

---

[4] Although unclear from his complaint, Plaintiff may also allege that following his demotion, in retaliation for his alleged "complaints of discrimination," Plaintiff was not provided with an adequate research support package and funding for his laboratory. ECF No. 1 at ¶ 172. He may further allege that following his demotion, he did not receive reimbursement for membership fees, license fees and academic travel. Id. at ¶174. However, after he was demoted, Plaintiff continued to be a tenured distinguished research professor in the Department of Psychiatry, receiving the highest State salary out of any other research faculty in the Psychiatry Department, despite having no current grants. Schwartz Dec. at ¶ 16. Further, in January 2020, after Plaintiff requested that Dr. Schwartz provide him with a startup package for his research lab, Dr. Schwartz asked that he provide a list of startup items Plaintiff believed he was entitled to so that he could bring his requests to the Dean and try to negotiate for the College of Medicine to provide it for him. Id. at ¶ 17. Plaintiff admittedly never provided any list. Cowan Dec., Ex. J at 363; Schwartz Dec. at ¶ 17. Finally, Plaintiff's reimbursement requests were denied because no other faculty member in the Psychiatry Department receives reimbursement for such expenses. Schwartz Dec. at ¶ 16.

40

made for the positions of President of SUNY Upstate, SUNY Chancellor, Director of the MD-PhD program, and Chair of the Department of Psychiatry.

### D. Plaintiff cannot show that the legitimate non-discriminatory reasons offered by Defendants were a pretext for discrimination

Since Defendants have articulated a legitimate, non-retaliatory business reason for Plaintiff's demotion and their hiring decisions for the positions filled after his demotion, "the presumption of retaliation arising from [Plaintiff's] establishment of [his] *prima facie* case drops from the picture." Livingston v. City of New York, 563 F. Supp. 3d 201, 249 (S.D.N.Y. 2021)(citing Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013)). Plaintiff must now establish that retaliation was a "but-for" cause of Defendants' decision to demote him and select others for such roles. Id. at 846. In other words, Plaintiff must show that "the adverse action would not have occurred in the absence of the retaliatory motive." Id.

Indeed, a "plaintiff alleging retaliation in violation of Title VII must show that retaliation was a '*but-for*' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." Whipple v. Reed Eye Assocs., 524 F. Supp. 3d 76, 95–96 (W.D.N.Y. 2021)(citing Kwan, 737 F.3d at 835). Courts recognize that as a "substantial burden;" a heavier burden than the "substantial or motivating factor" standard applied to discrimination claims. Id. at 95-96, 100.

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Freeman, 2017 WL 4169336 at *9 (citing Kwan, 737 F.3d at 846). However, significantly, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." Id., citing Kwan, 737 F.3d at 847. See also, Abromavage v. Deutsche Bank Sec. Inc., No. 21-668, 2022 WL 4360950, at *2 (2d Cir. Sept. 21,

A0696

2022)("[w]e have long held that 'temporal proximity' between a protected complaint and an adverse employment action 'is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.'"); Abeeb v. New York State Div. of Human Rights, No. 20 CIV. 10484 (LGS), 2022 WL 4292704, at *8 (S.D.N.Y. Sept. 16, 2022); accord Hawkins v. N.Y. State Off. of Mental Health, 845 F. App'x 9, 11 (2d Cir. 2021) (summary order).

"To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination [or retaliation]." Giurca v. Good Samaritan Hosp., No. 19-CV-7761 (CS), 2023 WL 254611, at *11 (S.D.N.Y. Jan. 18, 2023)(citing Weinstock, 224 F.3d at 42 (cleaned up). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination [or retaliation]." Id. "The ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated or retaliated." Id.

Defendants have submitted substantial evidence concerning various issues with Plaintiff's performance as Dean of the COM. In response, Plaintiff cannot present evidence to establish that "but for" intentional retaliation for Plaintiff's alleged protected activities, he would not have been removed from his position. Nor can he present evidence to establish that "but for" intentional retaliation for Plaintiff's alleged protected activities, he would have been considered for the other positions he identifies. See, Brown, 170 F. Supp. 3d at 531. Plaintiff's anticipated disagreement with Defendants' evaluation of his performance and/or behavior is simply not sufficient to show pretext. See, Servello v. New York State Off. of Child. & Fam. Servs., No. 118CV0777LEKDJS, 2021 WL 4477229, at *9 (N.D.N.Y. Sept. 30, 2021), aff'd, No. 21-2541, 2022 WL 17411287 (2d Cir. Dec. 5, 2022)(citing  Kalra v. HSBC Bank USA, N.A., 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008), aff'd, 360 F. App'x 214 (2d Cir. 2010) ("[I]t is well settled that the mere fact that an

A-0698

employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."); Pompey-Howard v. New York State Educ. Dep't, 275 F. Supp. 3d 356, 368 (N.D.N.Y. 2017)(citing Fleming v. MaxMara USA, Inc., 371 Fed.Appx. 115, 117–18 (2d Cir. 2010) (noting that plaintiff's "disagreement with defendants over whether her behavior was inappropriate does not show that their stated reasons for terminating her were not their true reasons"); Mello v. Siena Coll., 15–CV–13, 2017 WL 1013077, at *17 (N.D.N.Y. Mar. 14, 2017) (finding that a plaintiff's assertion that defendant was wrong about her poor performance was not sufficient to show pretext); Rodriguez v. City of New York, 644 F.Supp.2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.").

For these reasons, Plaintiff cannot establish that UMU's legitimate, non-discriminatory business reasons for removing him as Dean and not selecting him for certain other positions are a pretext for retaliation.

## CONCLUSION

For all of the foregoing reasons, the Defendants' motion pursuant to Fed. R. Civ. P 56(a) for an order granting summary judgment and dismissing Plaintiff's Complaint in its entirety and with prejudice must be granted, together with such other and further relief that the Court deems just and equitable.

Dated: Syracuse, New York
      January 19, 2024                LETITIA JAMES
                                       Attorney General of the State of New York
                                       Attorney for Defendants

A-0699

300 S. State Street, Ste. 300
Syracuse, New York 13202
By: _____s/_____
Aimee Cowan, Esq.
Assistant Attorney General
Bar Roll No. 516178
Telephone:    (315) 448-4800
Fax: (315) 448-4853
Email: aimee.cowan@ag.ny.gov

44

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 19, 2024, she filed Defendants' Motion for Summary Judgment by electronically filing with the Clerk of the Court herein, which is understood to have sent notification of such filing electronically to the following:

Douglas Mace, Esq.
Danny Grace PLLC
225 Broadway, Suite 1200
New York, New York 10007


Dated:          January 19, 2024

                                      LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, New York 13202
By:  ____/s_____
Aimee Cowan, Esq.
Assistant Attorney General
Bar Roll No. 516178
Telephone:     (315) 448-4800
Fax:  (315) 448-4853
Email: aimee.cowan@ag.ny.gov

A0700

**UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK**
.........................................................................X
**JULIO LICINIO, MD, PhD, MBA, MS,**

<table>
<tr><td style="text-align:right">Plaintiff,</td><td><b>STATEMENT OF MATERIAL<br>FACTS NOT IN DISPUTE</b></td></tr>
<tr><td></td><td>Case No.: <b>5:21-cv-387(GTS/TWD)</b></td></tr>
</table>

- against -

**STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,**

Defendants
.........................................................................X

Pursuant to Rule 7.1(a)(3) of the Local Rules of this Court, Defendants State of New York, the State University of New York, and the State University of New York Upstate Medical University ("UMU") (collectively, "Defendants") contend that as to the following material facts, no genuine issues exist:

1.   UMU, with most of its operations in Syracuse, New York, is the region's only public academic medical center. See, Declaration of Mantosh Dewan, MD [Dewan Dec.] at ¶ 7.

2.   It is one of five health science centers within the State University of New York. Id.

3.   UMU has four colleges— the College of Medicine, College of Nursing, College of Health Professions, and College of Graduate Studies (biomedical sciences) – where faculty from 26 different Departments provide clinical and didactic training to students and trainees in medicine and sub-specialties of medicine, nursing, health sciences, and graduate studies across UMU's health and research enterprises. Id.

1

A-0702

4.   UMU's health enterprise consists of two hospitals, including the region's only level 1 trauma center, the region's only children's hospital, a cancer center, many outpatient clinical locations across Upstate New York. Id.

5.   UMU serves approximately 1.8 million patients across a 17 county region and is the region's largest employer with approximately 10,000 employees. Id.

6.   Plaintiff was recruited and appointed as the Dean of UMU's College of Medicine by UMU's former President Danielle Laraque-Arena, MD. Id. at ¶ 9.

7.   A letter dated March 14, 2017, memorializes Plaintiff's offer from UMU for the positions of Senior Vice President for Academic Health Affairs and Dean of the College of Medicine. See, Declaration of Attorney Aimee Cowan ("Cowan Dec."), Exhibit B.

8.   Plaintiff's appointment at UMU was effective July 1, 2017. Id., Ex. B.

9.   Plaintiff was responsible for overseeing UMU's College of Medicine operations, including its educational programs, accreditations, admissions, research and hiring, and supervising twenty-six Department Chairs, at least six Deans within the COM and all staff members within the COM Dean's Office. Id., Ex. C; Lawrence Chin, MD [Chin Dec.] at ¶¶ 7-13.

10. The offer letter explicitly states that the Senior Vice President for Academic Health Affairs and Dean of the College of Medicine positions are management confidential positions that report to and serve at the pleasure of the President. Cowan Dec., Ex. B at 1.

11. The letter states, "In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total

2

compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department." Id. at 2.

### Concerns about Plaintiff's Leadership as Dean

12. In the fall of 2018, then UMU President Danielle Laraque-Arena called Dr. Mantosh Dewan, who was a Distinguished Service Professor in the Department of Psychiatry at the time and asked him if he would be willing to assume the responsibilities of Dean under the title "Vice President of Administration." Dewan Dec. at ⁋ 12.

13. Dr. Laraque-Arena offered Dr. Dewan the position because she was unhappy with Plaintiff's performance as Dean. Id.

14. Dr. Laraque-Arena told Dr. Dewan in the fall of 2018 that she was so uncomfortable working with Plaintiff, she refused to meet with him in person one-on-one without another person present. Id.

15. Dr. Laraque-Arena further told Dr. Dewan in the fall of 2018 that Plaintiff was demeaning, hostile, inappropriate, undercut her, and shared sexual dreams with her. Id.

16. By that time, Dr. Laraque-Arena had spoken to Plaintiff about his penchant for arriving late to meetings. Cowan Dec., Ex. J at 224; Ex. D at 3.

17. Dr. Laraque-Arena had also spoken to Plaintiff about his "lack of professional demeanor," (Cowan Dec., Ex. D at 2); insubordination (Id., Ex. E at ⁋ 6), lack of improvement in his leadership, (Id. at ⁋ 7), and divisiveness (Id. at ⁋ 9).

18. Plaintiff admits that at some point while Dr. Laraque-Arena was President, Dr. Robert Corona began attending the meetings between Plaintiff and the President. Cowan Dec., Ex. J at 206.

19. Plaintiff also admits that Dr. Laraque-Arena had a conversation with him where she

3

indicated they need to work on their "communication." Id. at 211.

20. Dr. Laraque-Arena sent a letter to Plaintiff in the summer of 2018, copying CEO Robert Corona, setting parameters on their meetings and confirming that someone would attend their one-on-one meetings in the future. Declaration of Robert Corona [Corona Dec.] at ⁋ 4, Ex. A.

21. Dr. Dewan declined Dr. Laraque-Arena's offer to assume the responsibilities of Dean under the title "Vice President of Administration" because he did not want to clash with Plaintiff, who still held the role of Dean. Dewan Dec. at ⁋ 13.

22. Following Dr. Laraque-Arena's resignation in December 2018, Mantosh Dewan, MD became the interim President of UMU in December 2018. Id. at ⁋ 16.

23. Dr. Dewan is of Indian descent. Id. at ⁋ 1.

24. In late December 2018, President Laraque-Arena emailed Dr. Dewan to alert him to a discrimination complaint that several female faculty members filed against Plaintiff with UMU's Office of Diversity and Inclusion relating to a search for a Department Chair. Id. at ⁋ 15; Cowan Dec., Ex. F.

25. When Dr. Dewan took over as Interim President, senior leadership at SUNY System Administration immediately expressed their concerns about Plaintiff remaining in the Dean position. Dewan Dec. at ⁋ 17.

26. Dr. Ricardo Azziz, former SUNY Chief Officer of Academic Health and Hospital Affairs, persistently encouraged President Dewan to remove Plaintiff from the Dean position. Id.

27. Plaintiff informed President Dewan that Dr. Azziz had told Plaintiff to begin looking for another job. Id. at ⁋ 18; Cowan Dec., Ex. J at 236.

28. However, President Dewan told Plaintiff that despite instructions from SUNY to remove

4

him, he was willing to give Plaintiff a chance to prove himself under his Presidency and give him the benefit of the doubt. Dewan Dec. at ¶ 18; Cowan Dec., Ex. J at 230-231.

29. Between the Winter of 2018 and Spring of 2019, Plaintiff began seeking employment elsewhere. Cowan Dec., Ex. J at 288-293.

30. As early as April 2018, before President Dewan became interim President, Plaintiff frequently confided in UMU CEO Robert Corona, DO, that he believed he would be removed from his position as Dean by former President Laraque-Arena and then eventually by President Dewan. See, Declaration of Robert Corona [Corona Dec.], at ¶4.

31. The Liaison Committee on Medical Education ("LCME") is an accrediting body of UMU's College of Medicine and sets forth accreditation standards by which medical schools are evaluated. Dewan Dec. at fn 1.

32. In 2011, the College of Medicine was placed on probation because the LCME had determined the College of Medicine was not compliant with several accreditation standards largely relating to the curriculum at UMU's Binghamton Clinical Campus. Id. at ¶ 57.

33. Under the leadership of former College of Medicine Dean David Duggan, the College of Medicine employed remedial measures, "made swift and significant progress" and was released from probation and received accreditation as of June 2013. Id., Ex. H.

34. Academic probation was a one-time event, swiftly corrected, and in a clear vote of confidence, the next LCME site visit was scheduled for 6 years later in 2019. Id.; Chin Dec. at ¶ 29.

35. A "whole team" at UMU was involved in the LCME process in 2019 while Plaintiff was Dean. Cowan Dec., Ex. J at 111; Dewan Dec. at ¶ 57.

36. In fact, the team was already formed and had begun to work on the LCME accreditation

5

process before Plaintiff arrived at UMU. Cowan Dec., Ex. J at 111; Dewan Dec. at ¶ 57.

37. Plaintiff and former President Laraque-Arena hired an outside consultant to assist with the LCME accreditation process, agreeing to pay the consultant approximately $1 million. Dewan Dec. at ¶ 35.

38. A consultant was unprecedented at UMU for the LCME process. Id.

39. There were discussions held with President Dewan and senior leadership on how to minimize Plaintiff's role in the accreditation process given the concerns over Plaintiff's behavior. Id. at ¶ 27.

40. While the College of Medicine's accreditation status was not put on probation by LCME during Licinio's leadership, LCME's review was not perfect. Chin Dec. at ¶ 29.

41. There were areas that LCME identified as needing to be monitored, including the area of diversity.  Id.

42. For example, the LMCE noted that although new policies, procedures and programs designed to increase diversity among students, faculty and senior administrative staff were implemented under Plaintiff's leadership, there were only modest gains in diversity of senior administrative staff and faculty during the first year of implementation. Id.

43. After President Dewan became interim President, Ruth Weinstock, MD approached him about concerns she had with Plaintiff's interference with the search process for the new Chair of UMU's Department of Medicine. Dewan Dec. at ¶ 20.

44. The search committee members had been searching for and interviewing candidates for months and the committee had recommended that certain individuals be put forward for consideration, but Plaintiff was ignoring the Search Committee's recommendations and insisting

6

that his personal friends be moved forward in the process even though the Committee had already rejected them. Id.

45. President Dewan spoke with the Committee members following the concerns raised by Dr. Weinstock and they reiterated their exasperation with Plaintiff's subversion of their search process and recommended that he not approve the hire of the individual selected by Plaintiff, whom they did not believe was qualified. Id.

46. Due to the Committee's concerns and the Plaintiff's failure to follow the process, President Dewan advised Plaintiff to call off the search, resulting in months of wasted time for the approximately 20 very busy UMU doctors and faculty who sat on the search committee. Id.

47. On February 4, 2019, Plaintiff asked to attend SUNY Chancellor Kristina Johnson's State of the University Address in Albany, New York with President Dewan and other members of UMU leadership, but President Dewan informed him that he was not to come due to the concerns expressed by SUNY about him. Id. at ℙ 21.

48. Later that month, President Dewan made plans for himself, SUNY ESF's President, and other UMU leaders to take the Chancellor to lunch, and included Plaintiff in the invitation. Id. at ℙ 22.

49. Before lunch, President Dewan spoke with Plaintiff and asked him to please keep the conversation high level and pleasant. Id.

50. Two days later, President received an email from the Chancellor forwarding an email that Plaintiff sent her immediately following the lunch asking for $5 million to recruit a specific doctor for a Chair of Medicine position at UMU. Id.

51. Plaintiff did not copy President Dewan on the email. Id.

52. President Dewan apologized to the Chancellor, told her that he did not know Plaintiff had

written to her and assured her that he would address it with Plaintiff. Id.

53. President Dewan also spoke on the phone with the Chancellor following the email exchange, at her request. Id.

54. The Chancellor asked President Dewan me why he had not fired Plaintiff yet, expressed her ongoing concerns about Plaintiff continuing as UMU's College of Medicine Dean, and asked him to ensure that Plaintiff not contact her directly again in the future. Id., Ex. B.

55. In approximately March 2019, President Dewan was contacted by Sharon Brangman, MD, who had been appointed Chair of the newly created Geriatrics Department. Id. at ¶ 24.

56. She was distressed and relayed that Plaintiff had been non-responsive to her requests to help her get financial support for the Department, which had been created in July 2018 under President Laraque-Arena's leadership. Id.

57. Despite having been appointed Chair of this brand-new Department more than one-half year earlier, Dr. Brangman still had no financial resources for the Department to operate. Id.

58. She informed President Dewan that she had been requesting that Plaintiff assist her to get finances in place for the Department for months, but that Plaintiff never responded to her requests, which was preventing her from getting anything done. Id.

59. Dr. Brangman also relayed other concerns about Plaintiff making inappropriate comments and not behaving appropriately as Dean. Id. at ¶ 25.

60. She shared that during an Admissions Committee end of year dinner, which she, Plaintiff, other faculty and students attended in 2018, Plaintiff had told a story during dinner about a patient he used to treat as a psychiatrist in Miami. Id.

61. As part of the story, he shared with students and other faculty explicit details about the

sexual issues that the individual was having, which was a violation of patient privacy and completely inappropriate and unprofessional to be sharing with students, much less anyone. Id.

62. Dr. Brangman shared that she was horrified. Id.

63. She also reiterated the concerns that President Dewan had previously learned about Plaintiff's attempts to subvert the Committee search process during the search for a new Chair of the Department of Medicine, which Dr. Brangman Co-Chaired. Id.

64. On January 24, 2019, Plaintiff emailed a group of approximately 80 faculty and students inviting them to email him at his personal email address to report instances of discrimination or offensive behavior and to label the mail "confidential." Frost Dec. at ¶ 15.

65. The faculty union brought Plaintiff's email to Frost's attention. Id.

66. This communication required Frost to instruct Plaintiff that his email was inappropriate and inconsistent with UMU's collective bargaining agreements, policies and established practices. Id.

67. Frost assisted Plaintiff with sending out a clarifying email. Id.

68. When President Dewan took over as President, he learned that President Laraque-Arena had significantly increased the number of administrative positions in the President's office and that Plaintiff had done the same in the College of Medicine. Id. at ¶ 28.

69. Faculty had shared their dissatisfaction with UMU dollars being spent on hiring so many administrators and President Dewan was of the mindset that they needed to model and ensure that administration was efficient in the duties they were performing, as they asked for others to be efficient and accountable. Id.

70. President Dewan began to reduce the number of administrative staff in the President's office by eliminating what he viewed as unnecessary and/or duplicative functions. Id.

71. Over the first year as President, he eliminated 8 positions in the President's office, which resulted in a savings of over $1 million annually. Id.

72. President Dewan became aware that Plaintiff was creating a significant number of new positions within the College of Medicine. Id. at ⁋ 29.

73. President Dewan had three serious concerns about this: the cost of unnecessary administrative bloat; the lack of clarity regarding their responsibilities; and the lack of these positions being connected to the objective outcomes that we had agreed on for the College of Medicine. Id.

74. As to the cost of unnecessary administrative bloat, President Dewan learned that, after Plaintiff took over as Dean, he had grown the Dean's staff from 4 to 11 people and was in the process of creating additional positions. Id. at ⁋ 30.

75. That was a 250% increase that cost hundreds of thousands of dollars in additional expense. Id.

76. In addition to the new positions that Plaintiff had created in the Dean's office, Plaintiff had created a Director of Special Programs position in Student Affairs and was proposing to create an additional position of Assistant Dean of Cultural Competency in the Dean's Office. Id.

77. In addition, it was unclear what duties these positions would be responsible for performing. Id. at ⁋ 31.

78. The titles of the positions that Plaintiff was creating suggested that their duties would overlap with the duties that individuals in existing positions were already responsible for performing. Id.

79. This generated complaints from those holding the existing positions in or around the Spring and Summer of 2019. Id.

10

80. For example, UMU's longtime College of Medicine Assistant Dean for Diversity Brian Thompson, MD came to President Dewan and complained that Plaintiff had demoted and sidelined him by creating an Associate Dean for Diversity and Inclusion position, which would be performing essentially the same functions that he was already responsible for performing. Id.

81. Similarly, UMU's Dean of Students Julie White complained that Plaintiff was proposing to create a new Associate Dean for Student Advising position even though she was already responsible for student advising. Id.

82. Finally, President Dewan had concerns that there was no connection between these new positions and the objective outcomes that Plaintiff and he had agreed on, that is, to increase the number of Under-Represented in Medicine (URiM) students entering UMU. Id. at ¶ 32.

83. With Plaintiff's addition of 6 new positions to his office, and his proposal to create more positions, President Dewan repeatedly asked Plaintiff to provide him with an updated organizational chart for the Dean's office and written job descriptions for the positions he had already created and was proposing to create, to ensure that Plaintiff was spending State dollars appropriately and not creating duplicative positions. Id. at ¶ 33.

84. President Dewan asked him how each position would help recruit more URiM students. Id.

85. President Dewan also emphasized that he needed to manage the performance of the individuals who already held existing positions to ensure their success before creating new positions that had the same responsibilities. Id.

86. Plaintiff never provided him with an organizational chart or written job descriptions despite his requests and, instead, became angry that President Dewan was questioning his decision making. Id.

87. In the Summer of 2019, President Dewan arranged for local political representatives to

11

separately visit UMU's campus so that we could describe the significance of UMU's services to the Upstate New York Community and garner political support for UMU's initiatives. Id. at ⁋ 37.

88.  President Dewan invited all members of UMU's University Executive Committee to attend 1-hour meetings with representatives when they visited to provide an overview of UMU. Id.

89. Due to Plaintiff's history of making inappropriate statements and going off on tangents, President Dewan had concerns that he might say something or behave in a way that would leave these representatives with a negative impression of UMU. Id.

90. In fact, during one such visit, Plaintiff went off on a tangent in a manner that was contrary to how one would expect UMU's College of Medicine Dean to present themselves and, in President Dewan's view, was an embarrassment to UMU and him as its President. Id.

91. After that, President Dewan spoke with his staff and asked them to preferably schedule these visits when Plaintiff was not going to be on campus. Id.

92. President Dewan also learned that Plaintiff had begun to instruct Chairs not to talk to him about Departmental concerns and blamed President Dewan as the reason he wasn't doing his job. Id. at ⁋ 38, Ex. D.

93.  On August 8, 2019, President Dewan met with former UMU President Gregory Eastwood, MD and discussed his concerns about Plaintiff's troubling conduct, including his disparaging President Dewan to others. Id.

94. In May 2019, Plaintiff gave a speech at a third year medical student orientation. Declaration of Leann Lesperance, MD [Lesperance Dec.], ⁋ 6.

95. During his speech, Plaintiff advised third year medical students that "it's only going to

12

get worse and worse—residency, fellowship and having a family will be very hard" and that if the students do not do well in their clerkships, they will not get into their chosen specialty.  He then went on to talk about student depression and suicide. Id. at ⁋ 7.

96. Sharon Huard, UMU's Associate Dean of Student Affairs and Campus Life, emailed Dr. Julie White, Dean of Student Affairs and notified her that a student wanted to make a complaint regarding Plaintiff's speech. Id. at ⁋ 8.

97.  Dr. Lesperance emailed UMU Audio-Video Technician Gerard Roy and instructed him not to publish the portion of the orientation that contained Plaintiff's speech. Id. at ⁋ 9.

98. Plaintiff's speech was the only speech made at orientation that was not published. Id.

99. Dr. White emailed Plaintiff to inform him that a group of students and faculty members were upset with the content of his speech and that a student wanted to file a complaint against him. Id. at ⁋ 10.

100.    Dr. White drafted a letter for Plaintiff to disseminate to students after the complaints were brought to his attention. Id.

101.    At the beginning of a leadership meeting, Plaintiff played a video on his phone as everyone was walking into the meeting of a public figure using ethnic slurs and making derogatory comments about Italians in the most vulgar language. Dewan Dec. at ⁋ 43.

102.    President Dewan's Chief of Staff, Linda Veit, who is Italian, was visibly offended by the video. Id.

103.    President Dewan had to instruct Plaintiff to turn it off.  Id.

104.    In May 2019, Thomas Schwartz, MD, the Chair of the Psychiatry Department,

A0713

emailed Plaintiff, President Dewan, and Hospital CEO Dr. Robert Corona in support of a colleague, Sharon Brangman, MD, who had been newly appointed as the Geriatrics Department Chair in a newly created Geriatrics Department.  Schwartz Dec. at ¶ 15.

105.     Dr. Schwartz believed that Plaintiff supported this role for Dr. Brangman as he directly appointed her, but he was concerned that other agencies were not as supportive.  Id.

106.     He expressed to the CEO and President that he was worried as a colleague and co-chair that Dr. Brangman was not being fairly treated as a new Chair, specifically with respect to the hospital's lack of financial backing of the Geriatrics Department. Id.

107.     The Hospital CEO added Plaintiff to the email and Plaintiff responded by emailing only Dr. Schwartz, chastising him for emailing the Hospital CEO and President about this issue even though Dr. Schwartz felt he was lobbying on Plaintiff's behalf and on behalf of the College of Medicine. Id.

108.     In his response, he mocked Dr. Schwartz for raising the concern and accusing him of being a "busybody" and a "vigilante" for raising the issue, and of insinuating to the Hospital CEO and President that Plaintiff was not doing his job. Id.

109.      His response contained thirteen numbered paragraphs that explained how and why he took offense to Dr. Schwartz' email. Id., Ex. A.

110.     On August 22, 2019, Leann Lesperance, MD, UMU's Associate Dean for Academic Affairs at the Binghamton Clinical Campus at the time, attended a white coat ceremony, that is held annually as a rite of passage for students entering medical school. Lesperance Dec. at ¶ 11.

111.     It is a ceremony attended by incoming first-year medical students and their families during which students receive a white doctor's coat and recite the Hippocratic Oath. Id.

14

112.     The room was full of first-year medical students and their parents/guardians. Id.

113.     Plaintiff was supposed to speak and then, later, close the ceremony by spending no more than 5 minutes thanking everyone for attending. Id.

114.     When Plaintiff came back to briefly thank the students and parents/guardians for coming and close the ceremony, he ended up talking for 10-15 minutes in a long rambling diatribe. Id.

115.     Despite having just recently been informed that students and faculty complained about the similar speech he gave at the third-year orientation only a few months earlier, he again talked about suicide, depression, and dwelled on related statistics. Id.

116.     Dr. White eventually had to intervene and close the meeting. Id.

117.     After his speech, Dr. Lesperance went to Dr. White and told her that he should never be allowed to address students "off script" again given how disastrous his remarks had been without one.  Id. at ¶ 12.

### Plaintiff's Allegations

118.     There are multiple ways that a position can be filled at UMU. Dewan Dec. at ¶ 69.

119.     An open national search involves outside consultants and provides the largest pool, but is costly and takes a great deal of time. Id.

120.     For leadership positions, individuals are frequently appointed on an interim basis until the position is filled. Id.; Frost Dec. at ¶ 5.

121.     Sometimes, an interim will be appointed to the position if the interim has performed satisfactorily, and circumstances warrant the appointment. Dewan Dec. at ¶ 69; Frost Dec. at ¶ 5.

122.     As Dean, the Plaintiff used each of these processes. Dewan Dec. at ¶ 69.

123.     Lawrence Chin, M.D. was appointed interim Dean of the College of Medicine

15

after Plaintiff was removed. Declaration of Lawrence Chin, MD [Chin Dec.], at ₱ 24.

124.    Dr. Chin was selected to be interim Dean based on his exceptional qualifications. Dewan Dec. at ₱ 66.

125.    Dean Chin has appointed 9 Department Chairs since becoming Dean. Chin Dec. at ₱ 26.

126.    All Department Chairs were appointed pursuant to external searches except Xiuli Zhang, MD, Francesca Pignoni, MD, and Thomas Schwartz, MD. Id.

127.    Dr. Zhang and Schwartz were appointed without searches being conducted because they had served as interim Department Chairs of their Departments throughout the COVID-19 pandemic and Dr. Chin assessed, with input from faculty within their department, that they were highly qualified as judged by their credentials and they performed exceptionally well as interim Chairs during that very difficult time. Id.

128.    Dr. Pignoni was appointed Chair of her Department for similar reasons after an attempted, but failed search. Id.

129.    While Dean, Plaintiff appointed several Department Chairs and Associate Deans without conducting searches.  Chin Dec. at ₱ 28.

130.    Plaintiff admits that President Dewan never referred to anyone's gender or race or national origin when he allegedly objected to positions that Plaintiff created. Cowan Dec., Ex. J at 195.

131.    Despite his overall concerns, President Dewan did allow the Plaintiff to make these appointments since it was in his purview. Dewan Dec. at ₱ 52.

132.    UMU's Associate Vice President for Human Resources Eric Frost disagreed with a number of decisions Plaintiff made from a human resources perspective. Frost Dec. at ₱ 8.

133.     Plaintiff gave roles and titles to faculty that Frost did not deem appropriate. Id. at ¶ 9.

134.     For example, Plaintiff appointed a number of faculty members to Associate Dean and Assistant Dean positions that he created and inappropriately gave them non-union management/confidential titles. Id.

135.     Plaintiff also paid these individuals additional state compensation in the form of an "also receives" ("ALR") even though the positions appeared to overlap with other existing positions. Id.

136.     Plaintiff did not consult with Human Resources before he established any roles. Id.

137.     Frost explained to Plaintiff that he could not assign roles and titles to faculty unilaterally, but Plaintiff did not comply with his guidance. Id.

138.     Plaintiff alleges that while Dean, in 2018, he appointed an all-female External Scientific Advisory Board. Cowan Dec., Ex. J at 146.

139.     President Dewan had no input into whether the Board would continue to meet. Dewan Dec. at ¶ 54.

140.     Plaintiff organized the Board and it met only on one occasion in June 2018. Id.

141.     President Dewan never made any comments to Plaintiff about the gender of the Board members. Cowan Dec., Ex. J at 154.

142.     President Dewan never made any comments to Plaintiff about whether the Board was necessary or not and he did not tell Plaintiff to not have the Board meeting. Id.

143.     According to Plaintiff, Plaintiff never inquired as to why the Board did not continue to meet and never found out why they did not continue to meet. Id. at 150.

17

144.     Plaintiff never made any complaints about the Board not continuing. Id. at 151.

145.     No one on the Board itself ever filed any complaints about the Board not continuing. Id.

146.     A Diversity Committee already existed prior to Plaintiff's employment at UMU. Id. at 154; Dewan Dec., fn 2.

147.     After Plaintiff's demotion, Dean Chin assumed oversight responsibilities of the Diversity Committee. Dewan Dec., fn 2.

148.     Plaintiff's wife, Ma-Li Wong, MD, PhD, is currently a Distinguished Professor of Psychiatry and Behavioral Sciences and a research faculty member in the Department of Psychiatry who partners with her husband – Plaintiff – to conduct research. Schwartz Dec. at ¶ 18.

149.     When Dr. Wong was hired by UMU in 2017, she was paid a total starting salary package of $220,000.00, which was comprised of $120,000.00 in state base salary and $100,000.00 in "ALR." Declaration of Richard Gardner [Gardner Dec.] at ¶ 6; Schwartz Dec. at ¶ 24.

150.     This salary is above the median salary for psychiatry research faculty in the United States, according to the Association of American Medical Colleges (AAMC) salary survey. Schwartz Dec. at ¶ 22.

151.     ALR is an abbreviation for "also receives" compensation. Gardner Dec. at ¶ 6.

152.     This compensation is permitted where an employee or faculty member assumes responsibility for additional duties or assignments (typically within their primary department) which may be unrelated to, or independent of, their standard work responsibilities. Id.

153.     It is also given to research faculty members in the Psychiatry Department to assist

18

A-0719

them with starting up their research at UMU, with the expectation that they will apply for and receive grant funding that will supplement their base salary. Id.

154.     Each ALR given to employees and faculty members is reviewed and renewed on an annual basis; it is not intended to supplement that employee or faculty member's income indefinitely. Id.

155.     Instead, the ALR portion of their salary is expected to either be reduced, eliminated or be transitioned to departmental funding within 2-3 years of their hire unless the additional duties or assignments continue.  Id.

156.     The ALR portion of Dr. Wong's salary was not permanent and it was subject to an annual review. Id. at ¶ 7.

157.     In addition to her State compensation package, Dr. Wong was also offered $30,000 from the Psychiatry Faculty Practice, Inc.[1]  Schwartz Dec. at ¶ 25.

158.     Providing such a stipend was a bit unusual and usually only offered to brand new researchers. Id.

159.     According to UMU's records, Dr. Wong's total starting institutional salary was more than the total starting salary of each of the twenty-six (26) other research faculty members that UMU hired between 2017 and 2020. Gardner Dec. at ¶ 8.

160.     Her salary was modified in July 2018 so that much of her ALR was absorbed into her state base salary, with her state base salary becoming $177,400.00 and her ALR being reduced to $45,000.00. Id.

161.     Additionally, Dr. Wong's total "startup commitment" was for $5,386,668. Id. at ¶ 9.

---

[1] A non-profit medical service group that is made up of the Psychiatry clinicians and researchers who are also faculty of UMU. Schwartz Dec. at ¶ 2.

19

162.     The startup commitment promised to Dr. Wong included promise to pay $1,400,000 to design and build her a lab, $75,000 to move the lab and Dr. Wong's specimens, and $3,911,668 for staff, equipment and lab operating expenses. Id.

163.     Dr. Wong's startup commitment far surpassed any other faculty member hired during the timeframe mentioned. Id. at ¶ 11.

164.     The package promised to Dr. Wong was not only in excess of all other research faculty members at UMU, but was unprecedented in light of the fact that Dr. Wong was not funded by *any* grants when she was hired by UMU.  Id. at ¶ 12.

165.     It is risky to offer a guaranteed position to an unfunded researcher. Schwartz Dec. at ¶ 21.

166.     No other researcher in the Psychiatry department has ever received as generous a compensation package as Dr. Wong. Id. at ¶ 27.

167.     Without grant funding to conduct research, the institution needs to pay for the researcher's start-up research costs and runs the risk that such costs may never be recouped, as the researcher has little incentive to bring in grants with a guaranteed position. Id. at ¶ 21.

168.     After agreeing to March 13, 2017 offer letter but before she began her employment, Dr. Wong reached out to Dr. Schwartz in October 2017 and asked if UMU would be willing to increase her State base salary. Id. at ¶¶ 23, 29.

169.     Dr. Schwartz asked President Laraque-Arena for permission to respectfully tell Dr. Wong that she was not entitled to an increase in State base pay – particularly since she was coming without any grants. Id. at ¶ 29.

170.     Dr. Laraque-Arena replied that it was ultimately his decision, but that her advice

was to tell Dr. Wong that she had not even begun her position, so it was expected that she would abide by the agreed upon offer letter that she had signed. Id.

171.   Dr. Schwartz followed her advice and informed Dr. Wong of this. Id.

172.   With the knowledge that her State base salary would remain $120,000, Dr. Wong began her employment at UMU in December 2017. Id. at ¶ 30.

173.   Thereafter, Dr. Wong continued to request that her State base pay be increased and her ALR decreased. Id. at ¶¶ 31-34.

174.   In March 2019, Dr. Schwartz informed Dr. Wong that her ALR and PFF stipend were both scheduled to expire in July 2019. Id. at ¶ 35.

175.   Also in March 2019, Plaintiff emailed President Dewan regarding his wife's salary. Dewan Dec. at ¶ 60.

176.   Plaintiff made no mention of any complaints of discrimination in his March 2019 email. Cowan Dec., Ex. J at 267, 268.

177.   President Dewan met with Dr. Schwartz and Dr. Wong soon after the email and discussed the issue with her. Dewan Dec. at ¶ 60; Schwartz Dec. at ¶¶ 36-37.

178.   President Dewan and Dr. Schwartz informed Dr. Wong during an April 2019 meeting that granting her request for such a high State base salary would be inequitable for all of the other grant funded tenured research faculty within the department. Schwartz Dec. at ¶ 37.

179.   Dr. Wong still did not have any grants by that time. Id.

180.   Dr. Wong voiced an objection to the salary structure that she had previously agreed to a year earlier and requested another increase in her base salary to $220,000. Id. at ¶ 36.

181.   President Dewan and Dr. Schwartz agreed to extend her $45,000 ALR through

21

December 31, 2020, a year past its originally planned end date of July 2019. Schwartz Dec. at ¶ 36; Dewan Dec. at ¶ 62.

182.   That request was also subsequently approved by Dean Chin on October 28, 2019. Schwartz Dec. at ¶ 39.

183.   Plaintiff, as the Dean of the COM, had access to the respective salaries of employees within Dr. Wong's department and was fully aware that her salary was commensurate to others in her department. Gardner Dec. at ¶ 4; Schwartz Dec. at ¶¶ 20, 44-46.

184.   Salary and startup funding data is maintained in the ordinary course of business by the UMU College of Medicine Dean's Office.  Gardner Dec. at ¶ 13.

185.   All salaries and ALRs have to be approved by the Dean of the College of Medicine every year, including when Plaintiff was Dean from 2017 – 2019. Id.

186.   Plaintiff set the salary and start up packages for faculty, although the initial package for Dr. Wong specifically was set by former UMU President Laraque-Arena. Id. at ¶ 14.

187.   Plaintiff had direct knowledge that Dr. Wong received a far greater salary/start up package than any other research faculty member who was hired to work in the UMU College of Medicine between 2017-2019 and that her lab was the largest lab buildout done while he was Dean. Id. at ¶ 14.

188.   Dr. Wong did not make any complaints of discrimination during any of the meetings she had regarding her salary dispute. Schwartz Dec. at ¶ 41; Cowan Dec., Ex. M at 110-111.

189.   Dr. Wong did not make *any* complaints of discrimination to *anyone* at UMU (other than allegedly her husband) before October 2019. Cowan Dec., Ex. M at 98-99, 134; Gilbertson Dec. at ¶14.

22

190.     Months prior to his August 12, 2019, meeting with President Dewan, Plaintiff sent an email in April 2019 to UMU CEO Robert Corona, confirming his belief that Dr. Wong's salary reduction was actually a punishment for "bad political moves" he had made. Declaration of Robert Corona at ⁋ 5.

191.     On August 13, 2019, at 6am, Plaintiff held an "urgent" meeting regarding the Department of Anesthesia and requested that President Dewan attend. Dewan Dec. at ⁋ 39.

192.     Also in attendance were UMU's Hospital Chief Executive Officer Dr. Robert Corona, UMU's Chief Medical Officer Dr. Amy Tucker, the Dean's Chief of Staff Grace VanNortwick, and various Department Chairs who oversaw different areas of surgery, including Dr. Randy Green, Dr. Stephen Albanese, Dr. Larry Chin, Dr. Robert Cooney and Dr. Gennady Bratslavsky. Id.

193.     During the meeting, Plaintiff verbally attacked President Dewan in front of the group, stating that President Dewan was preventing him from performing his job, that President Dewan was the reason Plaintiff was failing as Dean, and that President Dewan was the reason why Plaintiff could not remove the Anesthesia Chair. Id. at ⁋ 41.

194.     On September 12, 2019, President Dewan met with Plaintiff and Eric Frost, and told Plaintiff that he had made the decision to remove him as Dean effective immediately. Dewan Dec. at ⁋ 46.

195.     Plaintiff informed President Dewan that he was already in the process of interviewing for another job. Id.

196.     Plaintiff was terminated from his employment as the Dean of the College of Medicine, and his new title was Distinguished Professor in the Department of Psychiatry & Behavioral Sciences. Id.

23

**Title VII Retaliation claims**

197.     Plaintiff contends that he was retaliated against for reporting race discrimination to Defendants on behalf of Brian Thompson. Cowan Dec., Ex. J at 322.

198.     Plaintiff never made any complaints on behalf of Brian Thompson to ODI or HR that Brian Thompson was personally being discriminated against. Id. at 325, 328; Declaration of Alexandra Gilbertson at ⁋ 13.

199.     Another individual Plaintiff alleges he was retaliated against for reporting race discrimination was Nakeia Chambers. Cowan Dec., Ex. J at 328.

200.     President Dewan's discussions with Plaintiff were centered around requesting additional information about the new positions that he had created, including an updated organizational chart for the Dean's office, job descriptions for each position, whether the duties performed in the new positions overlapped with existing positions, and how the newly created positions would add value to UMU and help it to meet its goals.  Id. at 193; Dewan Dec. at ⁋ 52.

201.     President Dewan never objected to Ms. Chamber's gender, race or national origin. Cowan Dec., Ex. J at 195.

202.     Ms. Chambers never complained to Plaintiff that she was being discriminated against based on her race. Id. at 333.

203.     Plaintiff never made a report that anyone had ever discriminated against Ms. Chambers. Id.

204.     Plaintiff never made any complaints on behalf of Ms. Chambers to ODI or HR that she was being discriminated against based on her race. Id.; see also, Gilbertson Dec. at ⁋ 13.

205.     Plaintiff contends that he "reported race discrimination" for "numerous medical

24

students enrolled with SUNY Upstate" but never filed any complaints on their behalf. Cowan Dec., Ex. J at 353; see also, Gilbertson Dec., at ¶ 13.

206.    Plaintiff alleges that he reported "national origin discrimination" to Defendants on behalf of "numerous medical students enrolled with SUNY Upstate." Cowan Dec., Ex. L at 18.

207.    Plaintiff never filed any complaints on their behalf. Cowan Dec., Ex. J at 353; Gilbertson Dec., at ¶ 13; Frost Dec. at ¶ 18.

208.    The Budget Committee was created by former President Laraque-Arena, a Haitian female. Dewan Dec. at ¶ 55.

209.    The purpose of the Budget Committee was for senior leadership to have a platform to discuss confidential financial matters regarding UMU. Committee membership was based on the functions/title of each member. Id.

210.    Senior leadership members include the President, the Hospital CEO, the Hospital Chief Financial Officer, UMU's Senior Vice President for Finance and Administration, the Dean of the College of Medicine, the President of UUMAS, and the President's Chief of Staff. Id.

211.    The members of the Budget Committee directly oversee all the finances of UMU. Id.

212.    Ann Botash, M.D. is currently the Senior Associate Dean for Faculty Affairs and has been in that role since 2017. Cowan Dec., Ex. K at 19-20.

213.    Dr. Botash testified that she did not recall being recommended to be added to the Budget Committee. Id. at 91.

214.    Plaintiff admitted that he did not even speak to Dr. Botash about whether or not she wanted to be added to the Budget Committee. Id., Ex. J at 170.

215.    Dr. Botash never spoke with Plaintiff or the Budget Committee about any interest

25

in joining the Budget Committee. Id. at 170-71, 178.

216.    In her position as a Senior Associate Dean of Faculty Affairs, Dr. Botash did not directly oversee finances for the college. Id. at 169.

217.    Plaintiff testified that he does not recall when he allegedly suggested to President Dewan that Dr. Botash be named to the Budget Committee, however, Plaintiff also testified that President Dewan made no comment regarding Dr. Botash's gender or national origin. Id. at 173-174.

218.     Plaintiff is unaware of *any* woman who expressed an interest in becoming a member of the Budget Committee but was denied membership. Id. at 178.

219.    Plaintiff never asked Dr. Amy Tucker if she wanted to be part of the Budget Committee. Cowan Dec., Ex. J at 176.

220.    Dr. Tucker herself never expressed interest in becoming part of the Budget Committee and never complained that she wasn't a member of the Budget Committee. Id.

221.    Dr. Tucker reported directly to Dr. Robert Corona, who was/is the CEO of the hospital—and a member of the Budget Committee. Id. at 167-168, 175, 176.

222.    Plaintiff is unaware of any women who expressed interest in becoming members of the Budget Committee but were denied membership. Id. at 178.

223.    Plaintiff created a panel to consider candidates to fill an Anesthesiology Department Interim Chair position. Id. at 347.

224.    The panel chose Dr. Zhang to fill the position and Plaintiff presented the results to President Dewan in August 2019. Id. at 348.

225.    President Dewan never expressed any concerns or any dissatisfaction with Dr.

26

Zhang being chosen for the position and never indicated that a female doctor was not fit for the position. Id. at 348, 204.

226.     President Dewan "signed off" on Dr. Zhang as the panel's choice for the position and later appointed her as the permanent chair. Id. at 203, 205; Dewan Dec., at ¶ 56, Ex. G.

227.     No complaint was ever filed regarding her not receiving the anesthesiology department chair position—because she *was* chosen for the position. Cowan Dec., Ex. J at 348.

228.     Plaintiff contends that he was retaliated against for reporting gender discrimination to Defendants on behalf of Nakeia Chambers, but cannot "parcel out to what degree" he believed she was discriminated against based on her race versus her gender. Cowan Dec., Ex. J at 335-336.

229.     The only basis for Plaintiff "opposing discrimination" with respect to Ms. Chambers is he responded to President Dewan allegedly asking what Ms. Chambers "did all day" with an account of her job duties. Id. at 337.

230.     According to Plaintiff, President Dewan *also* inquired as to what Dr. Thompson (a male)'s responsibilities were as well. Id. at 339.

231.     Plaintiff alleges that after his demotion, he was not provided with an adequate research support package and funding for his laboratory (ECF No. 1 at ¶ 172) or reimbursement for membership fees, license fees and academic travel. Id. at ¶174.

232.     After he was demoted, Plaintiff continued to be a tenured distinguished research professor in the Department of Psychiatry, receiving the highest State salary out of any other research faculty in the Psychiatry Department, despite having no current grants. Schwartz Dec. at ¶ 16.

233.     In January 2020, after Plaintiff requested that Dr. Schwartz provide him with a

startup package for his research lab, Dr. Schwartz asked that he provide a list of startup items Plaintiff believed he was entitled to so that he could bring his requests to the Dean and try to negotiate for the College of Medicine to provide it for him. Id. at ¶ 17.

234.    Plaintiff never provided any list. Cowan Dec., Ex. J at 363; Schwartz Dec. at ¶ 17.

235.    Plaintiff's reimbursement requests were denied because no other faculty member in the Psychiatry Department receives reimbursement for such expenses. Schwartz Dec. at ¶ 16; Cowan Dec., Ex. J at 364.

236.    Plaintiff contends that following his demotion, and following the filing of his DHR complaint, he was either denied or not considered for the following positions in retaliation for filing the DHR complaint: President of SUNY Upstate; SUNY Chancellor; Dean of Medicine; Director of the MD-PhD program; and Chair of the Department of Psychiatry. ECF No. 1 at ¶ 159.

237.    With respect to the President position, President Dewan was appointed as President after he interviewed with then SUNY Chancellor Jim Malatras and a subcommittee of the Board of Trustees; UMU faculty members wrote letters of support for him to become permanent. Dewan Dec. at ¶ 65.

238.    The Board of Trustees and the SUNY Chancellor make the final hiring decision. Frost Dec. at ¶ 6.

239.    Further, the Board of Trustees appoints the SUNY Chancellor. Dewan Dec. at ¶ 65.

240.    On March 13, 2020, Dr. Amit Dhamoon was appointed Program Director of the MD/PhD program after MD/PhD students brought concerns forward to President Dewan, Dean of Students Dr. White, Dean of Graduate Studies Dr. Schmitt, and Dr. Chin about the existing program directors and their effectiveness in their role. Schmitt Dec., at ¶ 12; Chin Dec. at ¶ 27.

28

241.     Dr. Dhamoon was a graduate of the UMU MD/PhD program and had significant experience mentoring students; Dr. Dhamoon was selected as the top candidate by the students, and was subsequently appointed by College of Medicine Dean Lawrence Chin based on his having graduated from UMU's MD/PhD program, his qualifications, and his reputation as an excellent mentor to students. Dewan Dec. at ¶ 68, Schmitt Dec. at ¶¶ 12-13; Chin Dec. at ¶ 27.

242.     After Plaintiff was demoted, in September 2020, Dean Chin made the decision to make interim Psychiatry Department Chair Thomas Schwartz, M.D. permanent in the Chair position because he had served as an interim Department Chair throughout the COVID-19 pandemic and he assessed, with input from faculty within their department, that he had performed exceptionally well in the role as Chair during that very difficult time. Chin Dec., at ¶ 26.

243.     President Dewan approved that decision, given that Dr. Schwartz had already assumed the interim role for the prior four (4) years and had done exceptionally well financially with the Department even the face of COVID-19 pandemic. Dewan Dec. at ¶ 67.

244.     UMU had a Non-Discrimination Policy and Harassment Prevention Policy in place while Plaintiff was dean from July 1, 2017 through September 12, 2019. Declaration of Alexandra Gilbertson, at ¶ 7.

245.     Plaintiff was trained on UMU's Non-Discrimination and Harassment Prevention policies. Id. at ¶ 8.

246.     Plaintiff was made aware during his training that all complaints of discrimination and harassment at UMU were to be brought to UMU's Office of Diversity and Inclusion, which investigated such complaints. Id.; Cowan Dec., Ex. J at 143, 144.

247.     Plaintiff was given training specifically with respect to a supervisor's responsibility

29

A-0730

to raise concerns of discrimination or harassment to UMU's Chief Diversity Officer or Affirmative Action Officer in the Office of Diversity and Inclusion. Gilbertson Dec. at ¶ 10.

248.    Plaintiff did not file any complaints of discrimination either on his own behalf or on anyone else's behalf prior to his removal from the Dean position on September 12, 2019. Id. at ¶13.

249.    Plaintiff never filed any complaints about any alleged discrimination based on his national origin. Cowan Dec., Ex. J at 312.


Dated:       January 19, 2024

                                    LETITIA JAMES
                                    Attorney General of the State of New York
                                    Attorney for Defendants
                                    300 S. State Street, Ste. 300
                                    Syracuse, New York 13202

                                    By: _s/Aimee Cowan_____
                                    Aimee Cowan, Esq.
                                    Assistant Attorney General
                                    Bar Roll No. 516178
                                    Telephone:     (315) 448-4800
                                    Fax:  (315) 448-4853
                                    Email: aimee.cowan@ag.ny.gov

A-0731

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JULIO LICINIO, MD, PhD, MBA, MS,

                                   Plaintiff,

                                                        5:21-cv-00387-GTS-TWD

        vs.


STATE OF NEW YORK,
THE STATE UNIVERSITY OF NEW YORK,
and THE STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

                                   Defendants.

_____

_____


**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

_____


                                        Danny Grace PLLC
                                        225 Broadway, Suite 1200
                                        New York, New York 10007
                                        (212)202-2485
                                        Attorneys for Plaintiff Dr.
                                        Julio Licinio

I

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. i

PRELIMINARY STATEMENT ........................................................................ 1

COUNTERSTATEMENT OF MATERIAL FACTS........................................... 1

I.   PLAINTIFF'S EMPLOYMENT WITH DEFENDANTS: DISCRIMINATION AND RETALIATION 1

ARGUMENT.................................................................................................... 3

I.   LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT............................. 3

II.   PLAINTIFF'S TITLE VII DISCRIMINATION CLAIM SHOULD NOT BE DISMISSED .......... 4

   A.   Plaintiff Exhausted his Administrative Remedies with Respect to his Title VII Race and National Origin Discrimination Claims ................................................ 4

   B.   Plaintiff has Proven Prima Facie His Title VII Discrimination Claim ................... 6

      1.   Protected Class ........................................................................ 7

      2.   Plaintiff is Qualified for the Position of Dean ...................... 8

      3.   Adverse Employment Action ................................................ 8

      4.   Circumstances Giving rise to an Inference of Discrimination ............................ 9

   C.   Defendants' Alleged Reason For Demoting Plaintiff Is Pretextual....................... 10

III.   PLAINTIFF'S TITLE VII RETALIATION CLAIM SHOULD NOT BE DISMISSED............. 11

   A.   Protected Activities ............................................................................. 14

      1.   Protected Activity – Promoting Diversity in Furtherance of LCME Accreditation ....................................................................14

      2.   Protected Activity – Creation of an External Scientific Advisory Board .......... 15

      3.   Protected Activity – Diversity Committee ........................................... 16

      4.   Protected Activity – Budget Committee/University Executive Committee ....... 17

      5.   Protected Activity – Attempts to Improve the Division of Student Affairs and Creation of the Director of College of Medicine Career Development Position ....... 18

      6.   Protected Activity – Creation of a Part-time Assistant Dean for Cultural Competence .......................................................................... 20

      7.   Protected Activity – Promoting Diversity Among Appointments to Chair Positions .............................................................................. 21

      8.   Protected Activity – Lobbying Against a Discriminatory Salary Reduction .... 24

   B.   Defendants Were Aware of Plaintiff's Protected Activities................................... 25

I

A-0733

**C.    Adverse Employment Action** ...................................................................... 25

**D.    Causal Connection Exists Between the Protected Activity and the Adverse Action**
26

**1.    Causal Connection – Retaliatory Motive Played a Role** ..................................... 26

**2.    Causal Connection - Temporal Proximity** ........................................................... 28

**CONCLUSION** ..................................................................................................... 29

II

### TABLE OF AUTHORITIES

CASES

Anderson v Liberty Lobby, Inc.,
  477 US 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) .................................................. 4

Bowen-Hooks v. City of New York,
  13 F.Supp.3d 179 (E.D.N.Y. 2014) ..................................................................... 11, 12

Bragdon v. Abbott,
  524 U.S. 624, 118 S.Ct. 2196, 141 L. Ed. 2d 540 (1998) ............................................ 14

Bromfield v. Bronx Lebanon Special Care Ctr., Inc.,
  No. 16CIV10047ALCSLC, 2022 WL 19406559 (S.D.N.Y. Dec. 8, 2022) report and
  recommendation adopted, No. 16CV10047ALCSLC, 2023 WL 2706989 (S.D.N.Y.
  Mar. 30, 2023) ........................................................................................................... 6

Burlington Indus., Inc. v. Ellerth,
  524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ............................................. 10

Chambers v. TRM Copy Centers Corp.,
  43 F.3d 29 (2d Cir. 1994) ......................................................................................... 11

Chung v. City Univ. of New York,
  605 F. App'x 20 (2d Cir. 2015) ................................................................................. 25

Cifra v. Gen. Elec. Co.,
  252 F.3d 205 (2d Cir.2001) ....................................................................................... 28

Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee,
  555 US 271, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009) ......................................... 13, 25

Cronin v. Aetna Life Ins. Co.,
  46 F.3d 196 (2d Cir. 1995) .................................................................................. 10, 11

Davis v. Metropolitan Transp. Auth.,
  No. 07-CV-3561 (DAB), 2012 WL 727696 (S.D.N.Y. Mar. 6, 2012) ....................... 11

Dixit v. City of New York Dept. of General Services,
  972 F. Supp. 730 (S.D.N.Y. 1997) .............................................................................. 4

El Saved v. Hilton Hotels Corp.,
  627 F.3d 931 (2d Cir. 2010) ..................................................................................... 12

i

Ellis v. Century 21 Dept Stores,
      975 F.Supp.2d 244  (E.D.N.Y. 2013) ........................................................ 12

Federal Express Corp. v. Holowecki,
      552 U.S. 389, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008) ............................. 13

Fincher v. Depository Trust and Cleaning Corp.,
      604 F.3d 712 (2d Cir. 2010) .............................................................. 11, 12

Ford v Reynolds,
      316 F.3d 351 (2d Cir 2003) ...................................................................... 4

Fowlkes v. Ironworkers Local 40,
      790 F.3d 378 (2d Cir. 2015) ..................................................................... 4

Holcomb v. Iona College,
      521 F.3d 130 (2d Cir. 2008) ........................................................... 6, 7, 26

Holtz v. Rockefeller & Co., Inc.,
      258 F.3d 62 (2d Cir. 2001) ...................................................................... 10

Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs. P.C.,
      716 F.3d 10 (2d Cir. 2013) ...................................................................... 11

Kessler v Westchester County Dept. of Social Services,
      461 F3d 199 (2d Cir. 2006) ....................................................................... 4

Kwan v. Andalex Group,
      737 F.3d 834 (2d Cir. 2013) .................................................................... 12

McDonnell Douglas Corp. v Green,
      411 US 792, 93 S Ct 1817, 36 L.Ed. 2d 668 (1973) ................................... 6

McGuire v. U.S. Postal Serv.,
      749 F.Supp 1275 (S.D.N.Y. 1990) .......................................................... 12

Perrin v. United States,
      444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) ................................. 13

Raniola v. Bratton,
      243 F.3d 610 (2d Cir. 2001) .................................................................... 12

Richards v. N.Y.C. Bd. of Educ.,
      668 F.Supp. 259 (S.D.N.Y.1987), *cf'd,* 842 F.2d 1288 (2d Cir.1988) ....... 9

A0735

Robinson v. 12 Lofts Realty, Inc.,
    610 F.2d 1032 (2d Cir.1979)........................................................................ 9

Sanders v. New York City Human Res. Admin.,
    361 F.3d 749 (2d Cir. 2004)...................................................................... 12

Santos v. Costco Wholesale, Inc.,
    271 F. Supp. 2d 565 (S.D.N.Y. 2003)...................................................... 6

Sealy v. State Univ. of New York At Stony Brook,
    408 F. Supp. 3d 218 (E.D.N.Y. 2019), aff'd, 834 F. App'x 611 (2d Cir. 2020).............. 5

Shain v. Center for Jewish History, Inc.,
    418 F.Supp.2d 360 (S.D.N.Y. 2005).......................................................... 10

Sorlucco v. N.Y.C. Police Dep't,
    888 F.2d 4 (2d Cir. 1989)........................................................................ 10

Summa v. Hofstra Univ.,
    708 F.3d 115 (2d Cir. 2013)................................................................ 12, 28

Taddeo v L.M.Berry and Co.,
    526 Fed Appx 121(2d Cir 2013) ............................................................ 7

Univ. of Texas Southwestern Med. Ctr. v. Nassar,
    570 U.S. 338, 133 S.Ct 2517, 186 L. Ed.2d 503 (2013).......................... 12

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015)...................................................................... 10

Vogel v CA, Inc.,
    662 Fed Appx 72 (2d Cir 2016)............................................................ 4

Weinstock v. Colombia Univ.,
    224 F.3d 33 (2d Cir. 2000)...................................................................... 7

Zann Kwan v. Andalex Grp.,
    737 F.3d 834 (2d Cir. 2013)...................................................................... 6

**STATUTES**

29 CFR § 1601.28 .......................................................................................... 5

42 U.S.C. § 1981 ............................................................................................ 11

Fed. R. Civ. P. 56(c). ...................................................................................... 3

NYSHRL.......................................................................................................... 11

iii

A-0737

Title VII ........................................................................................................................ 11

**OTHER AUTHORITIES**

Random House Dictionary of the English Language 1359 (2d ed.1987) ..................................... 13

Webster's New International Dictionary................................................................................13

iv

A-0738

## PRELIMINARY STATEMENT

Plaintiff Julio Licinio ("Plaintiff" or "Dr. Licinio"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in Response to Defendants' Motion for Summary Judgment. As set forth in greater detail below and in the accompanying papers, the record is replete with material disputes of fact and Defendants have failed to carry their burden for summary judgment on any of Plaintiff's claims of unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"). Accordingly, Defendants' motion should be denied in its entirety and Plaintiff's claims should be allowed to proceed to trial.

## COUNTERSTATEMENT OF MATERIAL FACTS

**I.     PLAINTIFF'S EMPLOYMENT WITH DEFENDANTS: DISCRIMINATION AND RETALIATION**

Plaintiff is an esteemed doctor and psychiatrist currently serving on the faculty at Defendant SUNY Upstate. Plaintiff began his employment with Defendants on or around July 1, 2017, when he was appointed Senior Vice President and Dean of the College of Medicine of SUNY Upstate. (Licinio Dec., ¶3). Plaintiff remained in that position until his unlawful demotion on September 12, 2019, when SUNY changed his role to tenured Professor in the Department of Psychiatry. (Licinio Dec., ¶27).

Plaintiff, who is of Latino National Origin, is a physician-scientist with over 20 years of experience as a tenured professor in some of the world's leading universities and an abundant record of competitive, peer-reviewed, federal funding in Australia and in the United States, that exceeds $20 million cumulatively. That federal funding has included a National Institutes of Health (NIH) R24 award to mentor physician-scientists. At the time that Plaintiff received that award, the National Center for Research Resources at the NIH had only ever issued 9 such awards. (Licinio Dec., ¶5).

1

Pursuant to his appointment by Defendants as Senior Vice President and Dean of the College of Medicine, Plaintiff entered into an employment contract with Defendant SUNY Upstate which included an eight-month notice and transition period were Plaintiff to be removed from his position at any time in the future. (Licinio Dec., Ex. 1).

Furthermore, the employment contract states that if Plaintiff were to transition to the position of tenured Professor in the Department of Psychiatry, his total compensation would be no lower than the total compensation of the highest paid faculty member at the same rank in the Psychiatry Department, and in Plaintiff's case, his total compensation would be paid in its entirety by Defendant NYS.  Id.

Plaintiff's employment contract further states that he would be reimbursed for professional expenses and be provided with secretarial support, both as Dean and after his term as Dean, as a professor.  Id.

On October 29, 2019, the Liaison Committee on Medical Education ("LCME"), the accreditation authority for medical education programs in the United States, determined that ongoing monitoring was required at SUNY Upstate in order to ensure compliance with diversity standards.  (Licinio Dec., ¶30). And when Plaintiff came to SUNY Upstate, the college was on accreditation probation. (Licinio Dec., ¶21).

In 2011, the medical school had received a probation letter from LCME, citing the college's lack of diversity efforts, among other things. (Licinio Dec., ¶21). Plaintiff brought a progressive viewpoint to SUNY Upstate regarding diversity and improving opportunities for minority students and faculty, and he worked assiduously to address the decline in minority enrollment in Defendant SUNY Upstate by recruiting minority faculty and creating novel accelerated partnership programs

2

that combine BA in partner institutions and the MD degree at Defendant SUNY Upstate. (Licinio Dec., ¶28).

Plaintiff also called out the lack of open job searches at the college, in contravention of SUNY bylaws. (Licinio Tr., 314:3-16). The aforementioned efforts put Plaintiff at odds with the entrenched conservative culture and administration at SUNY Upstate. (Licinio Tr., 315:7-10).

Plaintiff's efforts, as fully set forth in Plaintiff's Declaration, pushing back against discriminatory comments, as well as his overall efforts to increase diversity, and his leading of the accreditation process, resulted in a full, 8-year accreditation from LCME. (Licinio Dec., ¶40)

On September 11, 2019, Plaintiff was honored as a Distinguished Professor at the SUNY Upstate Annual Convocation. (Licinio Dec., ¶24). "Distinguished Professor" is the highest honor awarded to Upstate professors. Id.

The next day on September 12, 2019, Plaintiff was demoted to tenured Professor in the Department of Psychiatry. (Licinio Dec., ¶146). At no time during his tenure did Plaintiff commit misconduct in his capacity as Dean, nor had he ever been accused of committing misconduct, either as defined by the employment contract or by any other definition or standard. (Licinio Dec., ¶25.)

Plaintiff was not afforded the requisite eight-month transition period. (Licinio Dec., ¶224). Nor was he given eight-months' salary at the Dean level. Id.

The final LCME report, released on October 29, 2019, contained comments that were highly supportive of Plaintiff's work. (Licinio Dec., ¶39).

## **ARGUMENT**
### I.    LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is only appropriate where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The Court must view all facts in the light most favorable to

3

the non-moving party, resolving all ambiguities and drawing all inferences in its favor. Vogel v CA, Inc., 662 Fed Appx. 72, 75 (2d Cir 2016).

In ruling on a motion for summary judgment, the district court is required to "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Kessler v Westchester County Dept. of Social Services, 461 F3d199, 206 (2d Cir 2006) (Internal citation omitted). "The judge's function is not . . .to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. To the contrary, "[s]ummary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party. Ford v Reynolds, 316 F. 3d 351, 354 (2d Cir 2003).

A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Anderson v Liberty Lobby, Inc., 477 US 242, 252, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II.  PLAINTIFF'S TITLE VII DISCRIMINATION CLAIM SHOULD NOT BE DISMISSED
### A.  **Plaintiff Exhausted his Administrative Remedies with Respect to his Title VII Race and National Origin Discrimination Claims**

Defendants' contention that Plaintiff failed to exhaust his administrative remedies is entirely unavailing. A plaintiff satisfies the exhaustion requirement when the claims are "reasonably related" to the allegations in an EEOC or DHR charge. Fowlkes v. Ironworkers Local 40, 790 F.3d 378, 386 (2d Cir. 2015) (vacating dismissal and remanding, inter alia, to determine if "close resemblance" of claims to allegations in EEOC charge satisfied "reasonably related" doctrine). For example, the Southern District of New York has held that "the exhaustion requirement has been satisfied" with respect to race and national origin discrimination claims, where the Plaintiff identified himself as "Asian Indian" in an EEOC charge. Dixit v. City of New York Dept. of General Services, 972 F. Supp. 730, 734 (S.D.N.Y. 1997) (holding that "the exhaustion requirement

4

has been satisfied with respect to Mr. Dixit's claims of national origin" where the EEOC complaint identified the complainant as "Asian Indian").

As set forth in the New York State Department of Human Rights ("NYSDHR") 'Determination After Investigation' order, Plaintiff filed his complaint charging Defendants with "an unlawful discriminatory practice relating to employment because of sex, race/color, national origin, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law")". The order concludes that "the Division has determined that it has jurisdiction in this matter and that <u>PROBABLE CAUSE</u> exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."

Defendants rely in part on <u>Sealy v. State Univ. of New York At Stony Brook</u>, 408 F. Supp. 3d 218, 224-25 (E.D.N.Y. 2019), aff'd, 834 F. App'x 611 (2d Cir. 2020) for their position that Plaintiff's NYSDHR filing was somehow deficient because it does not specifically address Plaintiff's national origin. In <u>Sealy</u>, the Plaintiff alleged "only that he was discriminated against because he is 'black' and report[ed] [an] incident," and the court found that "The DHR complaint contains no factual allegations regarding any purported discrimination on the basis of his national origin." <u>Id.</u> at 224. <u>Sealy</u> facts are distinguishable from Plaintiff's, as Plaintiff filed his NYSDHR complaint alleging institutional discrimination based on of sex, race/color, national origin, not a specific episode of discrimination directed at him. The NYSDHR order finding probable cause recognizes this distinction. Clearly, Defendants' allegation that "Plaintiff's DHR complaint did not give the DHR adequate notice to investigate claims of discrimination" is unfounded.

In short, Defendants rely on cases where the Plaintiff did not even raise the issues complained of in litigation with the NYSDHR or EEOC, which is clearly distinguishable from the instant action, as set forth in the 'Determination After Investigation' order. <i>See</i>, <u>Bromfield v.</u>

5

Bronx Lebanon Special Care Ctr., Inc., No. 16CIV10047ALCSLC, 2022 WL 19406559, at *11 (S.D.N.Y. Dec. 8, 2022) report and recommendation adopted, No. 16CV10047ALCSLC, 2023 WL 2706989 (S.D.N.Y. Mar. 30, 2023). Further, the sole administrative prerequisite for filing a discrimination action in federal court is the EEOC 'right to sue'. *See*, 29 CFR § 1601.28 (Westlaw 2024).

### B.  **Plaintiff has Proven Prima Facie His Title VII Discrimination Claim**

In discrimination cases, a three-part burden shifting process applies, with Plaintiff bearing the initial burden to establish its prima facie case which is unchallenged herein and shall not be opined on. *See*, McDonnell Douglas Corp. v Green, 411 US 792, 794, 93 S Ct 1817, 1820, 36 L.Ed. 2d 668 (1973) Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Finally, if the defendant satisfies this burden, the plaintiff must then demonstrate that the proffered reason  is merely a pretext for unlawful discrimination. Id. As set forth below, application of this analysis to the record evidence demonstrates that Defendants' motion for summary judgment fails.

Summary judgment is especially ill-suited to employment cases where—as here—a central dispute of material fact has to do with the employer's motive for terminating an employee. *See*, Zann Kwan v. Andalex Grp., 737 F.3d 834, 843 (2d Cir. 2013) (noting the "need for caution about granting summary judgment to an employer in a discrimination case where …the merits turn on a dispute as to the employer's intent" (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008); *see also*, Santos v. Costco Wholesale, Inc., 271 F. Supp. 2d 565, 571 (S.D.N.Y. 2003)("Summary judgment is 'ordinarily inappropriate' in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision . . ." And

6

"[e]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law.") (citations omitted).

Indeed "[t]he Second Circuit has cautioned that where an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available." Taddeo v L.M.Berry and Co., 526 Fed Appx 121, 122 (2d Cir 2013) (citations omitted).

The Holcomb court continued stating a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors". 521 F.3d. at 138.

To establish a prima facie case of discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and (4) the adverse employment action(s) occurred under circumstances giving rise to an inference of discrimination.  Weinstock v. Colombia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

### 1. Protected Class

It is undisputed that Plaintiff, a Latino male, is part of a protected class. (Licinio Tr. 302: 2-10). Further, Plaintiff is "one-eighth black." (Licinio Tr., 312: 16-20). SUNY Upstate had never before had a Hispanic/Latino Dean, and Plaintiff was held out as the leader and face of Defendant SUNY Upstate's College of Medicine during the accreditation process. (Licinio Dec., ¶¶239-240). Once full accreditation was secured, Defendants reverted to course and unlawfully demoted Plaintiff. (Licinio Dec., ¶¶43, 232).

And the Dean that followed Plaintiff was neither a woman, Hispanic/Latino nor African American, and was promoted to the position without open and inclusive processes as required by

7

the Defendants' own written policies to promote diversity and inclusion. (Licinio Dec., ¶224).

### 2. Plaintiff is Qualified for the Position of Dean

In addition, Plaintiff is highly esteemed in his field and indisputably qualified for the position for which he was hired. (Dewan Tr., 48: 2, 9-10) (Licinio Dec., ¶4-10).

Plaintiff has a considerable academic track record that goes back over twenty (20) years. This includes national and international experience as a tenured professor continuously since 1999, in some of the world's leading universities, including University of California, Los Angeles (UCLA), the number one ranked public university in the United States.  (Licinio Dec., ¶8).

During Plaintiff's term as full professor, he has been a principal investigator of multiple federal research grants in Australia and in the United States, author of over 300 publications, and has had previous leadership experience as Center Co-director and Vice-Chair of the Department of Psychiatry at UCLA, Chair of the Department of Psychiatry at University of Miami, Director, John Curtin School of Medical Research at the Australian National University, Matthew Flinders Distinguished Professor at Flinders University, and Mind and Brain Theme Leader and Deputy Director at the South Australian Health and Medical Research Institute. All of those positions were attained through open and stringent national and international searches. (Licinio Dec., ¶9).

For over twenty-five (25) years, Plaintiff has edited and contributed to prestigious medical journals, ranked at the top of his field worldwide. (Licinio Dec., ¶10).

### 3. Adverse Employment Action

It is incontrovertible that Plaintiff was subjected to an adverse employment action, as Defendant demoted Plaintiff. (Dewan Tr., 37: 9-11). His demotion had a catastrophic effect on his career, including a significant decrease in his salary which continues to this day, a less distinguished title, a material loss of benefits, and significantly diminished material responsibilities. (Licinio Dec., ¶¶234-235).

8

Furthermore, Plaintiff's reputation and distinguished scientific career have been almost irreparably damaged, such that he has lost both identifiable and unidentifiable employment opportunities, and as a consequence his future earnings are significantly harmed. (Licinio Dec., ¶23).

As a result of Plaintiff's unlawful demotion, he has incurred, and continues to incur significant expenses in the effort to salvage his career, including career coaching, job search expenses, travel and moving expenses, and similar costs. (Licinio Dec., ¶236).

 Further, Plaintiff's demotion came shortly after he voiced his concerns about gender discrimination at SUNY Upstate: "and then the next meeting that I had with him I was demoted." (Licinio Tr., 347: 7-25; 348: 1-12).

### 4.  Circumstances Giving rise to an Inference of Discrimination

Plaintiff's Hispanic/Latino national origin contributed to Defendants' decision to unlawfully demote him. (Licinio Dec., ¶238). As stated, SUNY Upstate had never before had a Hispanic/Latino Dean, and Plaintiff was held out as the leader and face of Defendant SUNY Upstate's College of Medicine during the accreditation process (Licinio Dec., ¶¶239-240). Once full accreditation was secured, Defendants reverted to course and unlawfully demoted Plaintiff. In essence, Defendants took what they needed from Plaintiff and tossed him aside when it suited them. (Licinio Dec., ¶241).

Finally, ("[a]s we have recognized, 'clever men may easily conceal their motivations.' Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1043 (2d Cir.1979) (internal quotation marks omitted). Because discrimination claims implicate an employer's usually unstated intent and state of mind, see, Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985), rarely is there 'direct, smoking gun, evidence of discrimination,' Richards v. N.Y.C. Bd. of Educ., 668 F.Supp. 259, 265 (S.D.N.Y.1987), cf"'d, 842 F.2d 1288 (2d Cir.1988). Instead, plaintiffs usually must rely on 'bits

9

and pieces' of information to support an inference of discrimination, *i.e.,* a 'mosaic' of intentional discrimination. Gallagher v. Delaney,139 F.3d 338, 342 (2d Cir.1998), *abrogated in part on other grounds by* Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)."). Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86-7 (2d Cir. 2015).

### C.  **Defendants' Alleged Reason For Demoting Plaintiff Is Pretextual**

Upon establishing his prima facie case of discrimination and retaliation, the burden shifts to defendants to state a nondiscriminatory basis for the adverse employment action taken against the Plaintiff. Sorlucco v. N.Y.C. Police Dep't, 888 F.2d 4 (2d Cir. 1989). If the defendant meets its burden, the burden reverts to Plaintiff to prove that the defendant's proffered reason is pretextual. Id. Even assuming, arguendo, that Defendants demoted Plaintiff in part for a non-discriminatory reason, a plaintiff may prove that that basis is pretextual by relying solely upon the same evidence that established its prima facie case. Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995). In fact, to meet its burden of establishing that Defendants' basis for demotion of the plaintiff was pretextual, the plaintiff is not required to show that the bases asserted by Defendant were not a factor in Defendant's decision to terminate the plaintiff. Instead, the plaintiff need only show that these bases were not the sole reason for Plaintiff's termination, and that discrimination was a factor in the decision. Holcomb, 521 F.3d at 137. Further, "the issue of pretext is 'ordinarily for the jury to decide at trial rather than for the court to determine on a motion for summary judgment.'" Shain v. Center for Jewish History, Inc., 418 F.Supp.2d 360, 366 (S.D.N.Y. 2005)(quoting Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001).

"Thus, unless the employer has come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and

the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial. *See generally*, <u>Chambers v. TRM Copy Centers Corp.</u>, 43 F.3d 29, 38 (2d Cir. 1994)." <u>Cronin</u>, 46 F.3d at 203.

In the instant action, Defendant demoted Plaintiff as the result of his well-documented efforts to address the lack of diversity at SUNY Upstate. (Licinio Tr., 308: 5-9). At the very least, in viewing the evidence in a light most favorable to the non-moving party, Plaintiff has raised a triable issue of fact with respect to whether the proffered basis for Plaintiff's demotion was pretextual.

### III.   PLAINTIFF'S TITLE VII RETALIATION CLAIM SHOULD NOT BE DISMISSED

To establish a prima facie retaliation claim under Title VII and NYSHRL, "a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." <u>Fincher v. Depository Trust and Cleaning Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010) ; *see also*, <u>Davis v. Metropolitan Transp. Auth.</u>, No. 07-CV-3561 (DAB), 2012 WL 727696, at *10 (S.D.N.Y. Mar. 6, 2012); <u>Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs. P.C.</u>, 716 F.3d 10, 14 (2d Cir. 2013). Claims of retaliation brought under Title VII and the NYSHRL are subject to the burden-shifting framework set forth in <u>McDonnell Douglas Corp.</u>, 411 U.S. 792, 802-04; <u>Bowen-Hooks v. City of New York</u>, 13 F.Supp.3d 179, 220 (E.D.N.Y. 2014) ("Retaliation claims under Title VII and the NYSHRL are assessed using the McDonnell Douglas burden-shifting framework"); <u>Fincher</u>, 604 F.3d at 720 ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden shifting analysis").

11

Pursuant to McDonnell Douglas, "first a plaintiff must prove a prima facie case of retaliation. If the plaintiff succeeds, there is a presumption [of retaliation] and the employer must articulate a legitimate, non-retaliatory reason for [its actions.]" Fincher, 604 F.3d at 720. Should the employer articulate a legitimate, non-retaliatory reason, "the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, she would not have been terminated." Bowen-Hooks, 13 F.Supp.3d at 220 (emphasis in original). *See also*, Univ. of Texas Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 362, 133 S.Ct 2517, 2534, 186 L. Ed.2d 503 (2013) (holding that "a plaintiff making a retaliation claim ... must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); Ellis v. Century 21 Dept Stores, 975 F.Supp.2d 244, 277-79 (E.D.N.Y. 2013); Russo v. New York Presbyterian Hosp., 972 F.Supp.2d 429, 454-55 (E.D.N.Y. 2013).

Moreover, Plaintiff need not prove that that retaliation was the sole cause of his termination. Rather, Plaintiff need only show that the termination would not have occurred absent a retaliatory motive. Kwan v. Andalex Group, 737 F.3d 834, 847 (2d Cir. 2013).

As with claims of discrimination, most retaliation "is not carried out so openly as to provide direct proof of it". Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004). Therefore, "[a] causal connection can be proved ... indirectly by showing that the protected activity is followed by adverse treatment". McGuire v. U.S. Postal Serv., 749 F.Supp 1275, 1282 (S.D.N.Y. 1990); *see also*, El Saved v. Hilton Hotels Corp., 627 F.3d 931, 932-33 (2d Cir. 2010); Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001)([P]laintiff's burden with respect to causation is "a light one, usually demanding only that the protected activity preceded the adverse action"); Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013)("[A] temporal connection is enough, in and of itself,... to permit a reasonable jury to find causation").

12

As set forth throughout Plaintiff's Declaration, Plaintiff engaged in a multitude of protected activities aimed at promoting diversity and opposing and eliminating discrimination at SUNY Upstate. (Licinio Dec.§§ 29-114). It is well-settled that "Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* (2000 ed. and Supp. V), forbids retaliation by employers against employees who report workplace race or gender discrimination." <u>Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee</u>, 555 US 271, 273, 129 S. Ct. 846, 849, 172 L. Ed. 2d 650 (2009).

Further, "[t]he opposition clause makes it "unlawful... for an employer to discriminate against any ... employe[e] ... because he has opposed any practice made ... unlawful... by this subchapter." § 2000e-3(a). The term "oppose," being left undefined by the statute, carries its ordinary meaning, <u>Perrin v. United States</u>, 444 U.S. 37, 42-43, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979): "[t]o resist or antagonize ...; to contend against; to confront; resist; withstand," Webster's New International Dictionary 1710 (2d ed.1957). Although these actions entail varying expenditures of energy, "RESIST frequently implies more active striving than OPPOSE." Ibid.; *see also*, Random House Dictionary of the English Language 1359 (2d ed.1987) (defining "oppose" as "to be hostile or adverse to, as in opinion"). <u>Id</u>. at 276.

Moreover, "'When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication' virtually always 'constitutes the employee's *opposition* to the activity.' Brief for United States as *Amicus Curiae* 9 (citing 2 EEOC Compliance Manual §§ 8-II-B(1), (2), p. 614:0003 (Mar. 2003)); *see also*, <u>Federal Express Corp. v. Holowecki</u>, 552 U.S. 389, 399, 128 S.Ct. 1147, 1156, 170 L.Ed.2d 10 (2008) (explaining that EEOC compliance manuals "reflect 'a body of experience and informed judgment

13