# 24-2564-cv

## United States Court of Appeals
### for the
## Second Circuit

JULIO LICINIO, MD, PHD, MBA, MS,

*Plaintiff-Appellant,*

— v. —

STATE OF NEW YORK, STATE UNIVERSITY OF NEW YORK,
STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 4 of 5 (Pages A-0751 to A-1000)

JOSEPH SPADOLA
NEW YORK STATE OFFICE OF THE
  ATTORNEY GENERAL
*Attorneys for Defendants-Appellees*
28 Liberty Street
New York, New York 10005
(212) 416-8019

DANIEL GRACE
DANNY GRACE PLLC
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 1200
New York, New York 10007
(212) 202-2485

CP COUNSEL PRESS    (800) 4-APPEAL • (334400)

# TABLE OF CONTENTS

District Court Docket Entries...................................................................... vi

Plaintiff's Complaint.................................................................. A-0001

    Exhibit 1 Employment Contract .......................................... A-0039

    Exhibit 2 Demotion Letter .................................................. A-0051

    Exhibit 3 Civil Cover Sheet ................................................ A-0054

Answer .................................................................................... A-0055

Amended Answer...................................................................... A-0061

Defendant's Notice of Motion for Summary Judgment ................... A-0072

Attorney Declaration................................................................. A-0074

    Exhibit A Position Summary ................................................ A-0078

    Exhibit B Offer Letter......................................................... A-0084

    Exhibit C Chart .................................................................. A-0095

    Exhibit D Business Certification and notes............................ A-0096

    Exhibit E Business Certification and notes ............................ A-0101

    Exhibit F Email.................................................................. A-0103

    Exhibit G EEOC Charge...................................................... A-0106

    Exhibit H DHR Decision ..................................................... A-0135

    Exhibit I DHR Dismissal Order............................................. A-0146

    Exhibit J Deposition Transcript Excerpt – Licinio................... A-0149

    Exhibit K Deposition Transcript Excerpt – Botash.................. A-0214

    Exhibit L Plaintiff Response to Interrogatories...................... A-0220

    Exhibit M Deposition Transcript Excerpt- Wong .................... A-0240

Declaration Albanese ............................................................... A-0246

Declaration Chin ..................................................................... A-0250

Exhibit A Email ...................................................................... A-0263

Exhibit B Affirmative Action/Equal Opportunity Report ...................... A-0268

Exhibit C Email ...................................................................... A-0269

Exhibit D Letter: Post Probation Survey Visit ................................. A-0271

Exhibit E Letter: Survey Visit for Full Accreditation ........................ A-0279

Exhibit F Letter: Status Report .................................................. A-0289

Declaration Corona .................................................................. A-0294

Exhibit A Letter .................................................................... A-0299

Exhibit B Email ...................................................................... A-0300

Declaration Dewan ................................................................... A-0301

Exhibit A Email ...................................................................... A-0329

Exhibit B Email ...................................................................... A-0333

Exhibit C Notice of Meeting ...................................................... A-0335

Exhibit D Email ...................................................................... A-0340

Exhibit E Demotion Letter ........................................................ A-0341

Exhibit F Faculty Executive Summary Report .................................. A-0343

Exhibit G Email ...................................................................... A-0349

Exhibit H LCME Letter ............................................................. A-0351

Exhibit I Email ...................................................................... A-0359

Declaration Frost ..................................................................... A-0361

Exhibit A Email ...................................................................... A-0368

Exhibit B Email ...................................................................... A-0369

Exhibit C Human Resources Practices ........................................... A-0370

Exhibit D Email ...................................................................... A-0396

Exhibit E Email ....................................................................... A-0397

Declaration Gardner .................................................................. A-0401

Exhibit A Research Results ...................................................... A-0406

Declaration Gilbertson ............................................................. A-0407

Exhibit A University Policy Manual ........................................ A-0411

Exhibit B Harassment Prevention Policy ................................ A-0415

Exhibit C Managing Conduct and Performance Guide ........... A-0431

Exhibit D Sexual Harassment Prevention Program ................ A-0490

Declaration Lesperance ............................................................ A-0540

Exhibit A Text ......................................................................... A-0545

Exhibit B Email ....................................................................... A-0569

Exhibit C Email ....................................................................... A-0573

Exhibit D Email ....................................................................... A-0577

Exhibit E Email ....................................................................... A-0582

Declaration Schmitt .................................................................. A-0584

Exhibit A Email ....................................................................... A-0588

Exhibit B Resume Dahmoon ................................................... A-0590

Declaration Schwartz ............................................................... A-0596

Exhibit A Email ....................................................................... A-0610

Exhibit B Email ....................................................................... A-0614

Exhibit C Email ....................................................................... A-0621

Exhibit D Summary Statistics Medical School Compensation .............. A-0623

Exhibit E Offer Letter – Wong ................................................ A-0624

Exhibit F Offer Letter: Department of Psychology ................. A-0630

Exhibit G Email ...................................................................... A-0632

Exhibit H Email ...................................................................... A-0634

Exhibit I Email ....................................................................... A-0639

Exhibit J Email ....................................................................... A-0641

Exhibit K Letter: Wong Salary Supplement - 4/22/19 ........................... A-0642

Exhibit L Letter: Wong Salary Supplement – 10/28/19 ......................... A-0643

Exhibit M State Compensation – Wong ................................................. A-0644

Exhibit N Chart: Compensation of Full Research Professors ................ A-0645

Memorandum of Law ...................................................................... A-0646

Statement of Material Facts ............................................................. A-0701

Plaintiff Memorandum of Law ........................................................ A-0731

Response to Defendants' Statement of Material Facts Not in Dispute ........... A-0767

Declaration Licinio ...................................................................... A-0820

Exhibit 1 Employment Contract ............................................. A-0875

Exhibit 2 Demotion Letter .................................................... A-0887

Exhibit 3 Strategic Plan ....................................................... A-0890

Exhibit 4 Department of Human Rights Probably Cause...................... A-0895

Exhibit 5 Faculty Minutes .................................................... A-0918

Declaration Attorney...................................................................... A-0923

Exhibit 6 Deposition Transcript Excerpt – Licinio ................................ A-0924

Exhibit 7 Deposition Transcript Excerpt – Dewan............................... A-1018

Reply Memorandum of Law ............................................................ A-1031

Statement of Material Facts in Response to Plaintiff's Counterstatement of
Material Facts ........................................................................ A-1059

Declaration Weinstock ...................................................................... A-1073

Declaration Brangman ........................................................................ A-1075

    Exhibit A Email .......................................................................... A-1079

Declaration Frost ............................................................................... A-1080

    Exhibit A Deposition Transcript Excerpt – Frost.................... A-1085

Declaration White ............................................................................. A-1096

    Exhibit A Diagram...................................................................... A-1101

    Exhibit B MC Performance Appraisal Form…. .................... A-1102

Declaration Attorney......................................................................... A-1108

    Exhibit A Decision and Order – Court of Claims ................... A-1111

    Exhibit B SUNY honors ........................................................... A-1126

    Exhibit C Deposition Transcript Excerpt – Dewan................. A-1129

    Exhibit D Deposition Transcript Excerpt – Botash................ A-1135

    Exhibit E Deposition Transcript Excerpt – Licinio................ A-1136

Decision and Order Granting Defendants Summary Judgment ....................... A-1149

Judgment Granting Defendants Summary Judgment ....................... A-1230

Plaintiff's Notice of Appeal ............................................................. A-1232

to which courts and litigants may properly resort for guidance'" (quoting Bragdon v. Abbott, 524 U.S. 624, 642, 118 S.Ct. 2196, 2207, 141 L. Ed. 2d 540 (1998)).

### A. Protected Activities

**1. Protected Activity – Promoting Diversity in Furtherance of LCME Accreditation**

Plaintiff's opposition to Defendants' deeply entrenched culture of discrimination and its resistance to diversity was unwavering for the entirety of his tenure as Dean. (Licinio Dec., ¶¶ 29-114). As Dean, Plaintiff championed the rights of minorities. Id. In particular, Plaintiff made great efforts to recruit minority faculty. (Licinio Dec., ¶31). In response to these efforts, Plaintiff would often receive multiple verbal comments from Dr. Mantosh Dewan, Defendant SUNY Upstate's President (formerly Interim President) severely questioning the 'need for' various minority professors and the extent of their contributions to the University. (Licinio Dec., ¶31).

Specifically, Plaintiff received questions about what a particular Native American Professor does all day. (Licinio Dec., ¶34). Plaintiff repeatedly explained that the Professor was the Assistant Dean for Diversity and had a crucial role in supporting diversity efforts within the Native American Community. Id. Moreover, Plaintiff explained on several occasions that it had been previously determined that the Professor should be promoted to Assistant Vice-President for Native American Affairs, a move that Defendants refused to make. Id.

Plaintiff also received questions about what a particular Professor of Neurosurgery who is female and Hispanic, "does in diversity." Plaintiff repeatedly explained that the Professor organized Defendant SUNY Upstate's diversity data for purposes of LCME accreditation and was the only person able to provide that data within the tight timeframe of the accreditation process. (Licinio Dec., ¶35).

Plaintiff also received questions regarding the need for the Director of Multicultural Affairs & Student Inclusion, who is African American. Plaintiff repeatedly explained that the named

14

A-0752

Director does substantial work supporting Defendant SUNY Upstate's minority students.  (Licinio Dec., ¶36).

### 2. Protected Activity – Creation of an External Scientific Advisory Board

Defendant SUNY Upstate ranks very poorly in terms of gender balance nationwide. Significantly, SUNY Upstate ranks 116 out of 128 medical schools in terms of male to female faculty ratio, with only 15% of the faculty being female.[1] (Licinio Dec., ¶44).

In efforts to combat the underrepresentation of female employees, Plaintiff appointed an all-female External Scientific Advisory Board (the "Board"), with members of the National Academies of Science and Medicine.  The Board first met on June 29, 2018, in order to have an ongoing relationship with SUNY Upstate. (Licinio Dec., ¶45).

Plaintiff's purpose in having this group and working with them over time was to have outside input aimed at improving University programs and making Defendant SUNY Upstate more attractive and more competitive, and to provide much needed input from highly successful women in academic medicine in order to bridge the gender equity gap at SUNY Upstate. (Licinio Dec., ¶46).

Plaintiff asked the External Scientific Advisory Board for ideas on how to best promote horizontal integration, both across the basic sciences and clinical components of the university, and fostering translational integration, within various large thematic areas such as neuroscience, that exist across multiple departments, and which could benefit from helpful suggestions for further cohesion. (Licinio Dec., ¶47).

Plaintiff also asked the External Scientific Advisory Board to look at SUNY Upstate's graduate program, in order to see how to make it robust and more competitive. (Licinio Dec., ¶48).

---

[1] https://www.statnews.com/2016/01/12/women-medical-school-faculty/

Thereafter the Board was provisionally scheduled to have its second meeting at SUNY Upstate on October 17, 2019, but in the summer of 2019, when Plaintiff discussed the upcoming visit with the SUNY Upstate's President (formerly Interim President), he replied with sarcasm "Oh, do we have an External Scientific Advisory Board?" [sic]. (Licinio Dec., ¶49).

Following Plaintiff's unlawful demotion on September 12, 2019, the Board was never convened again, and it was ultimately disbanded by Defendants. (Licinio Dec., ¶50).

### 3. Protected Activity – Diversity Committee

As part of his continued work in advancing diversity in the face of a lack thereof in SUNY Upstate, Plaintiff strongly supported a Diversity Committee (the "Committee") within the SUNY Upstate College of Medicine. The Committee was an important component for Defendant SUNY Upstate's review and accreditation by the LCME. (Licinio Dec., ¶51).

This committee met monthly and had a broad agenda aimed at infusing diversity throughout the College. Membership included underrepresented minority faculty and students. The existence, functions, and involvement of the Committee was part of Defendant SUNY Upstate's structure presented to the LCME for accreditation, outlined earlier herein. (Licinio Dec., ¶52).

The Committee was led by a female Hispanic neurosurgeon. On several occasions, Defendants aggressively questioned Plaintiff as to why this abundantly qualified individual had that role. It was clear to Plaintiff that the principal reason for Defendants' questions was because of the individual's identity as a Hispanic woman, since Plaintiff never received the same pushback regarding non-minority employees, nor would Defendants ever single-out non-minority employees in the same fashion. (Licinio Dec., ¶53).

In response, Plaintiff continuously affirmed the neurosurgeon's qualifications and the work she did to advance the missions of the Committee to Defendants.

16

After the LCME visit and after his demotion, the Diversity committee was downgraded to meeting quarterly, and given a much-reduced role of only providing some oversight to the Office of Diversity and Inclusion. (Licinio Dec., ¶54).

### 4. Protected Activity – Budget Committee/University Executive Committee

Plaintiff also acted in opposition to discrimination in May and June 2019, when he notified Defendants about his concern regarding the gender-imbalance of the Budget Committee and recommended that women be included. (Licinio Dec., ¶56).

Defendant SUNY Upstate's administrative structure includes a University Executive Committee (the "UEC"), which is presented to accreditation agencies as SUNY Upstate's decision-making body as the UEC is gender-balanced. (Licinio Dec., ¶57). But although the UEC is held out by Defendants to be a decision-making body, at that time the UEC rarely met, with scheduled meetings every other week that were often cancelled. (Licinio Dec., ¶58).

Instead, the Budget Committee, which at that time met every Tuesday and reviewed every executive-level decision for SUNY Upstate, was the *de facto* decision-making body for Defendants. In most cases, executive-level decisions are rarely brought to the UEC. (Licinio Dec., ¶59). Furthermore, the agenda items for the Budget Committee are significantly more substantial than those of the UEC, both in terms of quantity and quality. (Licinio Dec., ¶60).

In June of 2019, the Budget Committee consisted of six men. On several occasions, Plaintiff heard women employees of Defendants refer to the Budget Committee as the "new boy's club" and the place "where all the decisions are made." [sic]. The lone female who routinely attended the Budget Committee meetings was tasked only with taking notes and did not act as a decision-maker. (Licinio Dec., ¶61).

In June of 2019, Plaintiff notified Defendants that the decision-making Budget Committee was too gender-imbalanced and suggested that the female Chief Medical Officer and the female

17

Senior Associate Dean of Faculty Affairs and Faculty Development should be added to the Budget Committee group. (Licinio Dec., ¶62).

Plaintiff's communication of the gender-imbalance and efforts to abolish gender discrimination in the decision-making processes of Defendants constituted a protected activity. Fewer than three months after Plaintiff's protected activity, notifying Defendants of a potential discriminatory gender-imbalance, Defendants retaliated against Plaintiff and unlawfully demoted him. (Licinio Dec., ¶63).

### 5. Protected Activity – Attempts to Improve the Division of Student Affairs and Creation of the Director of College of Medicine Career Development Position

Defendant SUNY Upstate has a Division of Student Affairs ("Student Affairs"), which is the office responsible for career planning and career development of all students, including those in the College of Medicine. (Licinio Dec., ¶64). The Division of Student Affairs has been plagued by multiple complaints of discrimination. (Licinio Dec., ¶65).

Earlier in 2019, Plaintiff referred African-American medical students from SUNY Upstate to a colleague of his at a highly-ranked, Ivy League-affiliated, national institution so that they could negotiate to do external rotations there. (Licinio Dec., ¶67). After each of those SUNY Upstate African-American medical students contacted that highly-ranked national institution, Plaintiff received phone calls expressing serious concerns about how unprepared the SUNY Upstate medical students were and how they seemed to be "lost" and not well mentored in terms of their career development. (Licinio Dec., ¶68).

Each time Plaintiff was called about each student that he had referred, he promptly raised this with Defendant SUNY Upstate's Dean of Student Affairs. (Licinio Dec., ¶69). During each of those interactions, the Dean of Student Affairs was exceptionally defensive and would only say

18

A-0756

very angrily "N-of-1," meaning that this was a sporadic case and that it did not need to be taken seriously[2]. (Licinio Dec., ¶70).

Furthermore, the Dean of Student Affairs never showed any interest in the plight of the "lost students" and not once expressed any interest to Plaintiff in even finding out who those students were, supporting those students, or identifying and addressing the underlying root causes. (Licinio Dec., ¶71). Based on the negative feedback Plaintiff received regarding SUNY Upstate students and their career development and his concerns that there was a discriminatory motive behind Student Affair's actions, he reported his concerns and referred the Dean of Student Affairs to the Defendant SUNY Upstate's Organizational Training and Development Office to receive standardized feedback by way of a "360-degree evaluation," which usually includes both numerical feedback and written comments. (Licinio Dec., ¶72).

However, the Organizational Training and Development Office only recommended numerical feedback because they were concerned that any written comments could include the accusations of racism or discrimination and, if they did, the written comments would be required to be reported to the Defendant SUNY Upstate's Department of Human Resources and potentially subject SUNY Upstate to liability. (Licinio Dec., ¶73).

In light of this and in a continuing effort to promote diversity, Plaintiff also decided to create a new position of Director of College of Medicine Career Development to oversee the career development plans of all students in the SUNY Upstate College of Medicine, particularly those from underrepresented diverse backgrounds who are members of protected categories. (Licinio Dec., ¶74).

---

[2] In scientific circles, an "N-of-1" trial is a clinical trial in which a single patient represents the entire investigation: a single case study.

19

Plaintiff posted the position of Director of College of Medicine Career Development and created a search committee, emphasizing the need to promote diversity and inclusion in the search process. (Licinio Dec., ¶75). He appointed the then SUNY Upstate Associate Dean of Student Affairs and Campus Life to represent the Division of Student Affairs in the search process for the new position of Director of College of Medicine Career Development. (Licinio Dec., ¶76).

Plaintiff referred as a candidate to the search process an African-American female Educator who had an MSEd with a concentration in Student Affairs Administration and who was working towards her EdD in Higher Education Leadership and Policy. (Licinio Dec., ¶77). This individual's husband had just been hired by Plaintiff to Defendant SUNY Upstate as the only tenure-track or tenured African-American basic science faculty member at SUNY Upstate Medical University. (Licinio Dec., ¶78). Plaintiff's initiatives towards diversity and increasing support in student affairs for minority students were intolerable to Defendants, and prior to his unlawful demotion, he received protest from Defendant SUNY Upstate's Dean of Student Affairs regarding his appointment of a Director of College of Medicine Career Development. (Licinio Dec., ¶79).

Specifically, instead of acting for the students and working to prevent any type of discrimination, the Dean of Student Affairs was insulted that they were not included in the search for the new Director and complained that "career development efforts are moving to [me] and this new person." (Licinio Dec., ¶80). After Plaintiff's unlawful demotion, the search committee that he had created was rapidly disbanded and recruitment for the position of Director of College of Medicine Career Development was discontinued. (Licinio Dec., ¶81).

### 6. Protected Activity – Creation of a Part-time Assistant Dean for Cultural Competence

In July of 2019, Plaintiff created a new part-time position of Assistant Dean for Cultural Competence in SUNY Upstate, and identified an Assistant Professor of Orthopedic Surgery, a

20

well-respected African-American orthopedic surgeon, as an ideal candidate, who would himself be an outstanding role model for underrepresented students. (Licinio Dec., ¶82). In the face of aggressive objections by Defendant SUNY Upstate's President (formerly Interim President), including demanding to know what the other specifically named individuals of diverse backgrounds were contributing to the University and why there existed a need for another position related to Diversity and Inclusion, on August 7, 2019, Plaintiff verbally offered that position to the previously mentioned Assistant Professor. (Licinio Dec., ¶83).

Fewer than three months after Plaintiff fought for this appointment, Plaintiff was unlawfully demoted from his position of Senior Vice President and Dean. (Licinio Dec., ¶84). Following Plaintiff's unlawful demotion, the processing of that appointment was discontinued. (Licinio Dec., ¶85).

### 7. Protected Activity – Promoting Diversity Among Appointments to Chair Positions

Defendant SUNY Upstate runs a multitude of departments, such as Medicine, Otolaryngology and Communication, and Anesthesiology, which are each headed by a Department Chair. (Licinio Dec., ¶86). Should a Chair position need to be temporarily filled while a long-term successor be appointed, as Senior Vice President and Dean, it was Plaintiff's responsibility to oversee the process resulting in the nomination of finalists for Interim Chair roles. (Licinio Dec., ¶87). It was also Plaintiff's responsibility as Senior Vice President and Dean to oversee the process resulting in the nomination of finalists for permanent Chair roles. (Licinio Dec., ¶88).

In Plaintiff's employment contract with Defendant SUNY Upstate[3], it is stated that Plaintiff would "Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics and Psychiatry." (Licinio Dec., ¶89). Plaintiff was working with an external search firm that

---

[3] Exhibit 1

21

informed him on or around September 5, 2019, that an external national search for the Chair of Medicine had been posted and fully launched and that the search firm was already in conversations with candidates. (Licinio Dec., ¶90).

Plaintiff had emphasized to this external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories. (Licinio Dec., ¶91). Following Plaintiff's unlawful demotion, Defendants ended the Medicine Chair search efforts and appointed the Interim Chair to the (permanent) Chair of Medicine position without the national search explicitly specified in Plaintiff's employment contract. (Licinio Dec., ¶92).

The Individual who was appointed as Chair of Medicine was not a member of a group that Defendants presented to the LCME as being targets for diversity, and he was appointed without a search process which would have given candidates of diverse backgrounds an opportunity to be considered. (Licinio Dec., ¶93). Defendants were also informed by the external search firm, on or around September 5, 2019, that they were making sure to "move quickly to launch the [national] Chair [search] of Otolaryngology" and Communication. (Licinio Dec., ¶94). Again, Plaintiff had emphasized to the external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories. (Licinio Dec., ¶95).

After Plaintiff was demoted Defendants ended that search effort and appointed the Interim Chair to the position of (permanent) Chair of Otolaryngology and Communication. (Licinio Dec., ¶96). The Individual who was appointed as Chair of Medicine was not a member of a group that Defendants presented to the LCME as being targets for diversity, and he was appointed without a

22

A-0760

search process which would have given candidates of diverse backgrounds an opportunity to be considered. (Licinio Dec., ¶97).

During Plaintiff's term as Dean, it became necessary to replace the Chair of Anesthesiology. (Licinio Dec., ¶98). Defendants then immediately began pressuring Plaintiff to appoint a male faculty member from the Anesthesiology Department as Interim Chair, stating on three different occasions in sum and substance that that specific (male) individual was the "only one who could do the job." (Licinio Dec., ¶99). Plaintiff heard that women employees considered the push for that specific man to be strongly suggestive of gender discrimination because that individual was not entirely qualified for the position. (Licinio Dec., ¶100).

Therefore, Plaintiff in his capacity as Dean organized a broad and diverse interview panel and on or around August 8, 2019, the panel interviewed four candidates for the Interim Chair of Anesthesiology role. (Licinio Dec., ¶101). Following the interviews, the panel unanimously recommended the selection of a female candidate as Interim Chair based on her abundant experience in managing clinical affairs. (Licinio Dec., ¶102).

On August 13, 2019, Plaintiff informed Defendants in a small group setting of the panel's unanimous choice for interim successor. (Licinio Dec., ¶103). Plaintiff's insistence upon a gender-neutral search process for the Interim Chair was actively designed to contend against discrimination. (Licinio Dec., ¶104). According to Defendant SUNY Upstate Board of Trustees' policies, Chair appointments are made by the President; however, by creating a panel that assessed diverse candidates fairly and objectively, Plaintiff effectively challenged Defendants not to appoint the female whom the committee unanimously identified as the most qualified. (Licinio Dec., ¶105). Thus, at the very next one-on-one meeting with Defendants, Plaintiff was abruptly and unlawfully

23

demoted from his position as Senior Vice President and Dean, without any cause being presented to him. (Licinio Dec., ¶106).

### 8. Protected Activity – Lobbying Against a Discriminatory Salary Reduction

Plaintiff's wife also works for Defendant SUNY Upstate as a Professor of Psychiatry and Behavioral Sciences and Professor of Neuroscience and Physiology. (Licinio Dec., ¶107). At the beginning of 2019, she was notified that her salary was going to be reduced by $45,000.00. Id. On August 12, 2019, Plaintiff attended a regularly scheduled meeting with Defendant SUNY Upstate's President (formerly Interim President). (Licinio Dec., ¶108). During the meeting, Plaintiff was asked if it would be appropriate to discuss this Professor's salary reduction to which the President agreed. (Licinio Dec., ¶109). Plaintiff had no direct effect on her salary change and, in his position as Dean, had no power or influence in Defendants' decision to either maintain or reduce this Professor's salary. (Licinio Dec., ¶110).

Plaintiff stated that his wife, the Professor, is of Asian ancestry, she is culturally Hispanic and Latin American, and her national origin is Brazilian. (Licinio Dec., ¶111). Plaintiff further stated that, based on his understanding of the situation and facts, the Professor felt she may have a claim under Title VI and/or Title IX for discrimination since, to her knowledge, no white male professor was ever subjected to a salary reduction of this type. Id. SUNY Upstate's President (formerly Interim President) offered no response to Plaintiff's report of potential discriminatory conduct on the part of Defendant but told him that he would get back to him. (Licinio Dec., ¶112).

Less than a month after Plaintiff opposed discrimination by reporting a female employee's potential discrimination claims on August 12, 2019, and less than a month since his actions to prevent discrimination in the appointment of the Interim Chair of Anesthesiology on August 13, 2019, Plaintiff was unlawfully and suddenly demoted on September 12, 2019, in the absence of any other intervening interactions with the Defendants. (Licinio Dec., ¶113).

24

**B. Defendants Were Aware of Plaintiff's Protected Activities**

Whether an employer is aware of an employee's protected activities requires a factual inquiry: "[a]s a result, an employee claiming retaliation may be able to establish causation simply by showing that, within some time period prior to the adverse action, the employer, by some indirect means, became aware of the views that the employee had expressed. Where the protected conduct consisted of a private conversation, application of this rule would be especially problematic because of uncertainty regarding the point in time when the employer became aware of the employee's private expressions of disapproval." Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, 555 US 271, 283, 129 S. Ct. 846, 855, 172 L. Ed. 2d 650 (2009) (Concurring Opinion).

In the instant case, it is undisputed that Defendants were aware of Plaintiff's protected activities. Each protected activity described above was done in the open and in Plaintiff's official capacity as Dean. At no point in Defendants' motion do they allege that they were unaware of Plaintiff's efforts. Quite the contrary: they opposed those efforts at every turn. (Licinio Dec. ¶¶ 29-114).

**C. Adverse Employment Action**

It is well-settled that "[f]or purposes of a Title VII discrimination claim by a person already employed, an adverse employment action is defined in our Circuit as a materially adverse change in the terms and conditions of employment. Such a change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices … unique to a particular situation." Chung v. City Univ. of New York, 605 F. App'x 20, 22 (2d Cir. 2015) (internal citations and quotations marks omitted).

25

A-0763

It is undisputed that Plaintiff was demoted and that his demotion had a catastrophic effect on his career, including a significant decrease in his salary which is ongoing, a less distinguished title, a material loss of benefits, and significantly diminished material responsibilities. (Licinio Dec., ¶¶234-235).

Furthermore, Plaintiff's reputation and distinguished scientific career have been almost irreparably damaged, such that he has lost both identifiable and unidentifiable employment opportunities, and as a consequence his future earnings are significantly harmed. (Licinio Dec., ¶23).

As a result of Plaintiff's unlawful demotion, he has incurred, and continues to incur significant expenses in the effort to salvage his career, including career coaching, job search expenses, travel and moving expenses, and similar costs. (Licinio Dec., ¶236).

**D.  Causal Connection Exists Between the Protected Activity and the Adverse Action**
  **1.  Causal Connection – Retaliatory Motive Played a Role**
Finally, a causal connection exists between Plaintiff's protected activities and the adverse action taken against him, i.e., that a retaliatory motive played a part in the adverse employment action. Plaintiff's September 12, 2019 demotion, in violation of the terms of his offer letter/employment contract. (Licinio Dec. ¶117).

In fact, Defendant's Associate Vice President for Human Resources, Eric J. Frost, admits that Plaintiff promoted diversity efforts during his time as Dean (Frost Tr., 56: 23-25).  Mr. Frost further states that "I think the intent was good." (Frost Tr., 57: 6). Finally, Mr. Frost concedes that Plaintiff's "intent" to promote diversity could have been a factor in his demotion, exactly the "motivating factor" as contemplated in Holcomb, 521 F.3d at 137:

Q: Were those intents, grounds for his demotion?
A: I think it was a multitude of a lot of things. I think it could have been part of it. (Frost Tr., 58:10-14)

26

Plaintiff was given no notice of the contemplated demotion, nor was he provided any transition period. (Licinio Dec. ¶117). At no point did Plaintiff ever enter into an agreement to modify his contractually provided transition and notice period or give any indication that he no longer wanted to maintain his position as Dean. Id.

Referring to Plaintiff's demotion, in Defendant SUNY Upstate's September 16, 2019 Council Meeting, Defendants stated to the Faculty Council that "there is not one horrible thing that happened for this change to occur, rather a change was needed in leadership" and "overall, this is not a negative change, but rather a moving forward change and a removal of barriers."[4]: these statements are wholly indicative of the fact that performance issues were not the cause of the unlawful demotion. Moreover, these statements suggest that Plaintiff was a barrier to the institution's entrenched discriminatory policies. (Licinio Dec. ¶118).

Ultimately, Plaintiff was never provided with any negative feedback whatsoever with regard to his performance, or that it had to improve in a specific way. (Licinio Dec. ¶193).

The fact that there was no documentation of any performance issues at the time of Plaintiff's demotion was a key reason identified for the NY State Executive Division of Human Rights to issue its preliminary finding of probable cause. (Licinio Dec., Ex. 5) ("It is the prerogative of the Respondent to establish terms, conditions, and standards of Complainant's employment. However, there is very little documentation that would establish that his removal from his position as Dean resulted from Complainant's behaviors and/or actions, especially because there is no record of prior discipline. There is also a dispute among the parties concerning Complainant's knowledge of Respondent's dissatisfaction. The lack of documentation, coupled with the short time frame between Complainant's claim that he

---

[4] Exhibit 5.

27

opposed discrimination and the adverse employment action, raises material issues of fact that should be resolved at public hearing.") (Licinio Dec., ¶193).

Plaintiff's complaints disrupted a workplace culture where a lack of diversity was the norm, and his demotion was in retaliation for both his complaints and his attempts to make SUNY Upstate more in line with other medical schools across the country with regard to diversity initiatives. See (Licinio Dec., ¶44).

### 2. Causal Connection - Temporal Proximity

As stated in the NY State Executive Division of Human Rights preliminary finding, NY State Executive Division of Human Rights, "[t]he lack of documentation, *coupled with the short time frame between Complainant's claim that he opposed discrimination and the adverse employment action*, raises material issues of fact that should be resolved at public hearing." (emphasis added).

The Second Circuit has consistently held that "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir.2001) (internal quotation marks omitted). Furthermore, "[w]e have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" Summa, 708 F.3d at 128.

Defendant demoted Plaintiff in September 2019, in the midst of Plaintiff's ongoing efforts to improve diversity at SUNY Upstate, and only a few weeks after he voiced his concerns about a lack of diversity at an August 2019 meeting with President Dewan. (Licinio Tr., 347: 7-25; 348: 1-12). Consistent with the holdings of the Second Circuit and with the preliminary finding of the NY State Executive Division of Human Rights, Plaintiff's demotion was retaliatory and can be

28

A-0766

established by the temporal proximity of the adverse action to Plaintiff's protected complaints.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests the Court deny Defendants'
Motion for Summary Judgment in its entirety and grant such other and further relief as the Court
may deem just and proper.

Dated:  New York, NY
        May 9, 2024

Douglas Mace
Danny Grace PLLC
225 Broadway, Suite 1200
New York, NY 10007

29

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIO LICINIO, MD, PhD, MBA, MS, <br><br> Plaintiff, <br><br> - against - <br><br> STATE OF NEW YORK, THE STATE UNIVERSITY OF NEW YORK, and THE STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY, <br><br> Defendants. | Case No. 5:21-cv-387 (GTS/TWD) <br><br> **RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rules 7.1 and 56.1, Plaintiff Julio Licinio ("Dr. Licinio") respectfully submits the following Response in opposition to Defendants' Rule 56.1 Statement of Material Facts Not In Dispute in Support of Defendants' Motion for Summary Judgment ("Defendants' Statement of Material Facts").

**Responses to Defendants' Statement of Material Facts**

1.      UMU, with most of its operations in Syracuse, New York, is the region's only public academic medical center. See, Declaration of Mantosh Dewan, MD [Dewan Dec.] at ¶ 7.

**RESPONSE:** Undisputed.

2.      It is one of five health science centers within the State University of New York. Id.

**RESPONSE:** Undisputed.

3.      UMU has four colleges—the College of Medicine, College of Nursing, College of Health Professions, and College of Graduate Studies (biomedical sciences) -- where faculty from 26 different departments provide clinical and didactic training to students and trainees in medicine and sub-specialties of medicine, nursing, health sciences and graduate studies across UMU's health and research enterprises. Id.

1

**RESPONSE:** Undisputed.

     4.     UMU's health enterprise consists of two hospitals, including the region's only level 1 trauma center, the region's only children's hospital, a cancer center, many outpatient clinical locations across Upstate New York. Id.

**RESPONSE:** Undisputed.

     5.     UMU serves approximately 1.8 million patients across a 17 county region and is the region's largest employer with approximately 10,000 employees. Id.

**RESPONSE:** Undisputed.

     6.     Plaintiff was recruited and appointed as the Dean of UMU's College of Medicine by UMU's former President Danielle Laraque-Arena, MD. Id. At ¶ 9.

**RESPONSE:** Disputed as Dr. Licinio was recruited to UMU by an external national search firm. Deposition Transcript from the Deposition of Dr. Licinio ("Licinio Dep. Tr.") 98:9-98:10.

     7.     A letter dated March 14, 2017, memorializes Plaintiff's offer from UMU for the positions of Senior Vice President for Academic Health Affairs and Dean of the College of Medicine. See. Declaration of Attorney Aimee Cowan ("Cowan Dec."), Exhibit B.

**RESPONSE:** Undisputed.

     8.     Plaintiff's appointment at UMU was effective July 1, 2017. Id., Ex. B.

**RESPONSE:** Undisputed.

     9.     Plaintiff was responsible for overseeing UMU's College of Medicine operations, including its educational programs, accreditations, admissions, research and hiring, and supervising twenty-six Department Chairs, at least six Deans within the COM and all staff members within the COM Dean's Office. Id., Ex. C; Lawrence Chin, MD [Chin Dec.] at ¶¶ 7-13.

**RESPONSE:** Undisputed.

10.     The offer letter explicitly states that the Senior Vice President for Academic Health Affairs and Dean of the College of Medicine positions are management confidential positions that report to and serve at the pleasure of the President.  Cowan Dec., Ex. B at 1.

**RESPONSE:**  Undisputed that the document cited contains the cited language.

11.     The letter states, "In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department." Id. at 2.

**RESPONSE:**  Undisputed that the document cited contains the cited language.

12.     In the fall of 2018, then UMU President Danielle Laraque-Arena called Dr. Mantosh Dewan, who was a Distinguished Service Professor in the Department of Psychiatry at the time and asked him if he would be willing to assume the responsibilities of Dean under the title "Vice President of Administration." Dewan Dec. at ¶ 12.

**RESPONSE:**  Undisputed.

13.     Dr. Laraque-Arena offered Dr. Dewan the position because she was unhappy with Plaintiff's performance as Dean. Id.

**RESPONSE:**  Disputed.   The only time Dr. Laraque-Arena provided performance-related feedback to Dr. Licinio, that feedback was positive. Licinio Dep. Tr. 209:9-210:21; 214:6-214:14.

14.     Dr. Laraque-Arena told Dr. Dewan in the fall of 2018 that she was so uncomfortable working with Plaintiff, she refused to meet with him in person one-on-one without another person present. Id.

**RESPONSE:** Disputed. This material proffered in support consists of inadmissible, self-serving hearsay statement. Fed R. Civ. P. 56(c)(2). Moreover, Dr. Licinio denies communicating with Dr. Laraque-Arena in a manner which made her so uncomfortable as not to feel comfortable meeting one-on-one with him. Licinio Dep. Tr. 211:14-212:13; 214:6-215:13. Further, Dr. Licinio met one-on-one with Dr. Laraque-Arena for two and a half hours prior to her leaving. (Licinio Dec., ¶185.)

15.     Dr. Laraque-Arena further told Dr. Dewan in the fall of 2018 that Plaintiff was demeaning, hostile, inappropriate, undercut her, and shared sexual dreams with her. Id.

**RESPONSE:** Disputed. This material proffered in support consists of inadmissible, self-serving hearsay statement. Fed R. Civ. P. 56(c)(2). Dr. Licinio denies communicating with Dr. Laraque-Arena in such a demeaning, inappropriate, hostile or aggressive way. Licinio Dep. Tr. 211:14-212:13; 214:6-215:13.

16.     By that time, Dr. Laraque-Arena had spoken to Plaintiff about his penchant for arriving late to meetings. Cowan Dec. Ex. J at 224; Ex. D at 3.

**RESPONSE:** Undisputed.

17.     Dr. Laraque-Arena had also spoken to Plaintiff about his "lack of professional demeanor" (Cowan Dec. Ex. D at 2); insubordination (Id. Ex. E at ¶ 6), lack of improvement in his leadership (Id. at ¶ 7), and divisiveness (Id. at ¶ 9).

**RESPONSE:** Disputed. The assertion appears to be a mischaracterization of notes recording Dr. Laraque-Arena's after-the-fact recollections, and do not evidence communications to Dr. Licinio. Dr. Licinio disputes that Dr. Laraque-Arena ever communicated concerns regarding Dr. Licinio's behavior, including a "lack of professional demeanor," "insubordination" or "divisiveness." Licinio Dep. Tr. 211:14-212:13; 214:6-215:13.

A0770

18.    Plaintiff admits that at some point while Dr. Laraque-Arena was President, Dr. Robert Corona began attending the meetings between Plaintiff and the President.  Cowan Dec., Ex. J at 206.

**RESPONSE:** Undisputed.

19.    Plaintiff also admits that Dr. Laraque-Arena had a conversation with Plaintiff where she indicated they need to work on their "communication." Id. at 211.

**RESPONSE:** Disputed. Dr. Licinio admits that Dr. Laraque-Arena had conversations regarding Dr. Licinio's tendency to be very direct.  Licinio Dep. Tr. 211:14-212:13. These conversations resulted in productive discussions about improved communication. *Id.*

20.    Dr. Laraque-Arena sent a letter to Plaintiff in the summer of 2018, copying Robert Corona, setting parameters on their meetings and confirming that someone would attend their one-on-one meetings in the future.  Declaration of Robert Corona [Corona Dec.] at ¶ 4, Ex. A.

**RESPONSE:** Undisputed.

21.    Dr. Dewan declined Dr. Laraque-Arena's offer to assume the responsibilities of Dean under the title "Vice President of Administration" because he did not want to clash with Plaintiff, who still held the role of Dean.  Dewan Dec. at ¶ 13.

**RESPONSE:** Dr. Licinio cannot respond to this allegation as the facts are unavailable to him. Fed. R. Civ. P. 56(d).

22.    Following Dr. Laraque-Arena's resignation in December 2018, Mantosh Dewan, MD became the interim President of UMU in December 2018.  Id. at 16.

**RESPONSE:** Undisputed,

23.    Dr. Dewan is of Indian descent. Id. at ¶ 1.

**RESPONSE:** Undisputed.

A0771

24.      In late December 2018, President Laraque-Arena emailed Dr. Dewan to alert him to a discrimination complaint that several female faculty members filed against Plaintiff with UMU's Office of Diversity and Inclusion relating to a search for a Department Chair. Id. at ¶ 15; Cowan Dec. at ¶ 17.

**RESPONSE:** Undisputed.

25.      When Dr. Dewan took over as Interim President, senior leadership at SUNY System Administration immediately expressed their concerns about Plaintiff remaining in the Dean position. Dewan Dec. at ¶ 17.

**RESPONSE:** Disputed.  This material proffered in support consists of inadmissible, self-serving hearsay statements. Fed R. Civ. P. 56(c)(2).  Moreover, Dr. Dewan claimed that concerns did not come from all of SUNY's senior leadership, but specifically Dr. Riccardo Azziz, Vice Chancellor for Academic Affairs, Joe Porter, the Head of Human Resources, and Kristina Johnson, the Chancellor of SUNY UMU.  Deposition Transcript of Dr. Mantosh Dewan, MD (Dewan Dep. Tr., 49:7-52:3).

26.      Dr. Ricardo Azziz, former SUNY Chief Officer of Academic Health and Hospital Affairs, persistently encouraged President Dewan to remove Plaintiff from the Dean position. Id.

**RESPONSE:** Disputed insofar as this appears to be inadmissible hearsay. Fed R. Civ. P. 56(c)(2).

27.      Plaintiff informed President Dewan that Dr. Azziz had told Plaintiff to begin looking for another job. Id. at ¶ 18; Cowan Dec. Ex. J at 236.

**RESPONSE:** Undisputed.

28.      However, President Dewan told Plaintiff that despite instructions from SUNY to remove him, he was willing to give Plaintiff a chance to prove himself under his Presidency and gave him the benefit of the doubt. Dewan Dec. at ¶ 18; Cowan Dec., Ex. J at 230-231.

6

**RESPONSE:** Undisputed.

29.    Between the Winter of 2018 and Spring of 2019, Plaintiff began seeking employment elsewhere.  Cowan Dec., Ex. J at 288-293.

**RESPONSE:** Undisputed.

30.    As early as April 2018, before President Dewan became interim President, Plaintiff frequently confided in UMU CEO Robert Corona, DO, that he believed that he would be removed from his position as Dean by former President Laraque-Arena and then eventually by President Dewan.  See, Declaration of Robert Corona [Corona Dec.] at ¶ 4.

**RESPONSE:** Disputed. Dr. Corona was the one concerned about being removed from his position, not the Plaintiff. Licinio Dec., ¶175.

31.    The Liaison Committee on Medical Education ("LCME") is an accrediting body of UMU's College of Medicine and sets forth accreditation standards by which medical schools are evaluated.  Dewan Dec. at fn 1.

**RESPONSE:** Undisputed.

32.    The Liaison Committee on Medical Education ("LCME") is an accrediting body of UMU's College of Medicine and sets forth accreditation standards by which medical schools are evaluated.  Dewan Dec. at fn 1.

**RESPONSE:** Undisputed.

33.    Under the leadership of former College of Medicine Dean David Duggan, the College of Medicine employed remedial measures, "made swift and significant progress" and was released from probation and received accreditation as of June 2013.  Id., Ex. H.

**RESPONSE:** Undisputed to the extent the document cited contains the cited language.

34.     Academic probation was a one-time event, swiftly corrected, and in a clear vote of confidence, the next LCME site visit was scheduled for 6 years later in 2019. Id.; Chin Dec. at ¶ 29.

**RESPONSE:** Disputed as further remedial action by UMU was required and taken. While UMU was released from academic probation in 2013, the LCME put UMU on notice of eleven different categories which needed to be monitored for continued compliance with LCME standards. UMU was required to submit a status report as to those categories in April of 2014 to ensure monitoring for continued compliance. Chin Dec., Ex. H.

35.     A "whole team" at UMU was involved in the LCME process in 2019 while Plaintiff was Dean. Cowan Dec., Ex. J at 111; Dewan Dec. at ¶ 57.

**RESPONSE:** Undisputed.

36.     In fact, the team was already formed and had begun to work on the LCME accreditation process before Plaintiff arrived at UMU. Cowan Dec., Ex. J at 111; Dewan Dec. at ¶ 57.

**RESPONSE:** Undisputed.

37.     Plaintiff and former President Laraque-Arena hired an outside consultant to assist with the LCME accreditation process, agreeing to pay the consultant approximately $1 million. Dewan Dec. at ¶ 35.

**RESPONSE:** Undisputed.

38.     A consultant was unprecedented at UMU for the LCME process. Id.

**RESPONSE:** Undisputed.

39.     There were discussions held with President Dewan and senior leadership on how to minimize Plaintiff's role in the accreditation process given concerns over Plaintiff's behavior. Id. at ¶ 27.

**RESPONSE:** Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him. *See* Fed. R. Civ. P. 56(d).

40.     While the College of Medicine's accreditation status was not put on probation by LCME during Licinio's leadership, LCME's review was not perfect. Chin Dec. at ¶ 29.

**RESPONSE:** Undisputed.

41.     There were areas that LCME identified as needing to be monitored, including the area of diversity. Id.

**RESPONSE:** Undisputed.

42.     For example, the LMCE noted that although new policies, procedures and programs designed to increase diversity among students, faculty and senior administrative staff were implemented under Plaintiff's leadership, there were only modest gains in diversity of senior administrative staff and faculty during the first year of implementation. Id.

**RESPONSE:** Undisputed.

43.     After President Dewan became interim President, Ruth Weinstock, MD approached him about concerns she had with Plaintiff's interference with the search process for the new Chair of UMU's Department of Medicine. Dewan Dec. at ¶ 20.

**RESPONSE:** Disputed. The material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2).

44.     The search committee members had been searching for and interviewing candidates for months and the committee had recommended that certain individuals be put forward for

A0775

consideration, but Plaintiff was ignoring the Search Committee's recommendations and insisting that his personal friends be moved forward in the process even though the Committee had already rejected them. Id.

**RESPONSE:** Disputed. The material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2).

45.    President Dewan spoke with the Committee members following the concerns raised by Dr. Weinstock and they reiterated their exasperation with Plaintiff's subversion of their search process and recommended that he not approve the hire of the individual selected by Plaintiff, whom they did not believe was qualified. Id.

**RESPONSE:** Disputed. The material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2).

46.    Due to the Committee's concerns and the Plaintiff's failure to follow the process, President Dewan advised Plaintiff to call off the search, resulting in months of wasted time for the approximately 20 very busy UMU doctors and faculty who sat on the search committee. Id.

**RESPONSE:** Disputed. Dr. Licinio brought multiple highly qualified applicants, whom he did not know, to the table, through the external recruiting firm AMN Healthcare, which is recognized by Modern Healthcare as the nation's largest executive search firm. Briefly, the search was called off because as the search was ongoing, myriad scandals were erupting at Upstate, with multiple negative stories in newspapers and online, and the President eventually stepped down in the context of an unprecedented SUNY evaluation of the institution. As this was unfolding, the top candidates withdrew one by one. Who wants to relocate to an institution marred by ongoing scandal? The search committee was very aware of these events and it highly unlikely that they did not understand that the search was affected by the internal turmoil at Upstate and resulting negative

A0776

publicity. (Licinio Dec., ¶195).

47.    On February 4, 2019, Plaintiff asked to attend SUNY Chancellor Kristina Johnson's State of the University Address in Albany, New York with President Dewan and other members of UMU leadership, but President Dewan informed him that he was not to come due to the concerns expressed by SUNY about him. Id. at ⁋ 21.

**RESPONSE:** Disputed.  Dr. Dewan did not indicate to Dr. Licinio that Dr. Licinio could not attend any particular events.  Licinio Dep. Tr. 232:12-15; 402:13-25.

48.    Later that month, President Dewan made plans for himself, SUNY ESF's President, and other UMU leaders to take the Chancellor to lunch and included Plaintiff in the invitation. Id. at ⁋ 22.

**RESPONSE:** Undisputed.

49.    Before lunch, President Dewan spoke with Plaintiff and asked him to please keep the conversation high-level and pleasant.  Id.

**RESPONSE:** Disputed.  Plaintiff arrived at the lunch and was immediately placed just next to the Chancellor, away from Dr. Dewan. Licinio Decl., ¶191.

50.    Two days later, President received an email from the Chancellor forwarding an email that Plaintiff sent her immediately following the lunch asking for $5 million to recruit a specific doctor for a Chair of Medicine position at UMU.  Id.

**RESPONSE:** Dr. Licinio dispute the characterization as he sent this email in response to Chancellor Johnson's solicitation that the group at lunch identify potential targets for recruitment to UMU who could bring research grants and resources into the SUNY system.  Chancellor Johnson explicitly offered to help in the recruiting efforts for such targets.  Dr. Licinio's email

responded to this solicitation by bringing such a candidate to her attention. Licinio Dep. Tr. 402:2-403:9.

51.    Plaintiff did not copy President Dewan on the email. Id.

**RESPONSE:** Undisputed, except as to the implication that the Chancellor wanted or expected Dr. Licinio to copy President Dewan. Licinio Dep. Tr. 402:2-403:9.

52.    President Dewan apologized to the Chancellor, told her that he did not know Plaintiff had written to her and assured her that he would address it with Plaintiff. Id.

**RESPONSE:** Undisputed.

53.    President Dewan also spoke on the phone with the Chancellor following the email exchange, at her request. Id.

**RESPONSE:** Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him. *See* Fed. R. Civ. P. 56(d).

54.    The Chancellor asked President Dewan why he had not fired Plaintiff yet, expressed her ongoing concerns about Plaintiff continuing as UMU's College of Medicine Dean, and asked him to ensure that Plaintiff not contact her directly again in the future. Id., Ex. B.

**RESPONSE:** Disputed. The material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2). Dr. Licinio cannot otherwise respond as to this allegation as the facts are unavailable to him. *See* Fed. R. Civ. P. 56(d).

55.    In approximately March 2019, President Dewan was contacted by Sharon Brangman, MD, who had been appointed Chair of the newly created Geriatrics Department. Id. at ¶ 24.

**RESPONSE:** Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him. *See* Fed. R. Civ. P. 56(d).

12

56.    She was distressed and relayed that Plaintiff had been non-responsive to her requests to help her get financial support for the Department, which had been created in July 2018 under President Laraque-Arena's leadership. Id.

**RESPONSE:** Dr. Licinio disputes the purported factual statement insofar as it is inadmissible hearsay. Fed R. Civ. P. 56(c)(2). Dr. Licinio disputes that that he had been non-responsive to Brangman's requests. Licinio Decl., ¶192. Dr. Licinio cannot otherwise respond to this allegation as the facts are unavailable to him as to whether the communication occurred or the nature of the purported communication. *See* Fed. R. Civ. P. 56(d).

57.    Despite having been appointed Chair of this brand-new Department more than one-half year earlier, Dr. Brangman still had no financial resources for the Department to operate. Id.

**RESPONSE:** Disputed. Licinio Decl., ¶192.

58.    She informed President Dewan that she had been requesting that Plaintiff assist her to get finances in place for the Department for months, but that Plaintiff never responded to her requests, which was preventing her from getting anything done. Id.

**RESPONSE:** Disputed. Licinio Decl., ¶192.

59.    Dr. Brangman also relayed other concerns about Plaintiff making inappropriate comments and not behaving appropriately as Dean. Id. at ¶ 25.

**RESPONSE:** Dr. Licinio disputes the purported factual statement insofar as the material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2). Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him as to whether the communication occurred. *See* Fed. R. Civ. P. 56(d).

A0779

60.     She shared that during an Admissions Committee end of year dinner, which she, Plaintiff, other faculty and students attended in 2018, Plaintiff had told a story during dinner about a patient he used to treat as a psychiatrist in Miami. Id.

**RESPONSE:** Dr. Licinio disputes the purported factual statement insofar as the material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2). Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him as to whether the communication occurred. *See* Fed. R. Civ. P. 56(d).

61.     As part of the story, he shared with students and other faculty explicit details about the sexual issues that the individual was having, which was a violation of patient privacy and completely inappropriate and unprofessional to be sharing with students, much less anyone. Id.

**RESPONSE:** Dr. Licinio disputes the purported factual statement insofar as the material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2). Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him as to whether the communication occurred. *See* Fed. R. Civ. P. 56(d).

62.     Dr. Brangman shared that she was horrified. Id.

**RESPONSE:** Undisputed.

63.     She also reiterated the concerns that President Dewan had previously learned about Plaintiff's attempts to subvert the Committee search process during the search for a new Chair of the Department of Medicine, which Dr. Brangman Co-Chaired. Id.

**RESPONSE:** Dr. Licinio disputes the purported factual statement insofar as the material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2). Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him as to whether the communication occurred. *See* Fed. R. Civ. P. 56(d).

64.     On January 24, 2019, Plaintiff emailed a group of approximately 80 faculty and students inviting them to email him at his personal email address to report instances of discrimination or offensive behavior and to label the mail "confidential." Frost Dec. at ⁋ 15.

**RESPONSE:** Disputed.  Dr. Licinio did not invite the faculty and students to submit reports of discrimination or offensive behavior directly to him to subvert SUNY ODI or HR.  After receiving reports that students were terrified of SUNY retaliating against them for reporting discrimination, Dr. Licinio offered to guide and mentor to those students and faculty through the process of reporting misconduct, such as instructing them on how to file a complaint with ODI or HR.  Licinio Dep. Tr. 187:14-189:23.

65.     The faculty union brought Plaintiff's email to Frost's attention.  Id.

**RESPONSE:** Undisputed.

66.     This communication required Frost to instruct Plaintiff that his email was inappropriate and inconsistent with UMU's collective bargaining agreements, policies and established practices.  Id.

**RESPONSE:** Undisputed that Frost so-instructed Plaintiff, but disputed that Frost was "required" to do so.  Licinio Dep. Tr. 187:14-189:23.

67.     Frost assisted Plaintiff with sending out a clarifying email.  Id.

**RESPONSE:** Undisputed.

68.     When President Dewan took over as President, he learned that President Laraque-Arena had significantly increased the number of administrative positions in the President's office and that Plaintiff had done the same in the College of Medicine.  Id. at ⁋ 28.

**RESPONSE:** Dr. Licinio does not dispute that he increased the number of administrative and faculty positions in the interest of ensuring UMU's compliance with the LCME requirement that

15

UMU improve the diversity among its student body and faculty.  Licinio Dep. Tr. 192:4-193:10; 404:15-408:25; 410:5-410:22.

69.   Faculty had shared their dissatisfaction with UMU dollars being spent on hiring so many administrators and President Dewan was of the mindset that they needed to model and ensure that administration was efficient in the duties they were performing, as they asked for others to be efficient and accountable. Id.

**RESPONSE:** Disputed.  The material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2).

70.   President Dewan began to reduce the number of administrative staff in the President's office by eliminating what he viewed as unnecessary and/or duplicative functions. Id.

**RESPONSE:** Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him as to whether the communication occurred. *See* Fed. R. Civ. P. 56(d).

71.   Over the first year as President, he eliminated 8 positions in the President's office, which resulted in a savings of over $1 million annually. Id.

**RESPONSE:** Undisputed that he eliminated 8 positions.  Disputed as to the savings as there is no evidence concerning whether eliminating these positions created other costs or inefficiencies.

72.   President Dewan became aware that Plaintiff was creating a significant number of new positions within the College of Medicine. Id. at ¶ 29.

**RESPONSE:** Dr. Licinio does not dispute that he increased the number of administrative and faculty positions in the interest of ensuring UMU's compliance with the LCME requirement that UMU improve the diversity among its student body and faculty.  Licinio Dep. Tr. 192:4-193:10; 404:15-408:25; 410:5-410:22.

73.    President Dewan had three serious concerns about this: the cost of unnecessary administrative bloat; the lack of clarity regarding their responsibilities; and the lack of these positions being connected to the objective outcomes that we had agreed on for the College of Medicine. Id.

**RESPONSE:** Dr. Licinio cannot respond as to this allegation as the facts are unavailable to him as to whether the communication occurred. *See* Fed. R. Civ. P. 56(d).

74.    As to the cost of unnecessary administrative bloat, President Dewan learned that, after Plaintiff took over as Dean, he had grown the Dean's staff from 4 to 11 people and was in the process of creating additional positions. Id. at ¶ 30.

**RESPONSE:** Dr. Licinio does not dispute that he increased the number of administrative and faculty positions in the interest of ensuring UMU's compliance with the LCME requirement that UMU improve the diversity among its student body and faculty. Licinio Dep. Tr. 192:4-193:10; 404:15-408:25; 410:5-410:22. Further, many of these positions were not completely new positions, but were additional roles which only involved payment of a small salary stipend. Licinio Dep. Tr. 331:10-332:17. Dr. Licinio disputes the characterization that Dr. Licinio these new hires constituted "unnecessary administrative bloat." Licinio Dep. Tr. 192:4-193:10; 404:15-408:25; 410:5-410:22.

75.    That was a 250% increase that cost hundreds of thousands of dollars in additional expense. Id.

**RESPONSE:** Disputed insofar as these positions ensured UMU's compliance with LCME requirements and that the alternative would have been more costly. Licinio Dep. Tr. 192:4-193:10; 404:15-408:25; 410:5-410:22.

A0783

76.     In addition to the new positions that Plaintiff had created in the Dean's office, Plaintiff had created a Director of Special Programs position in Student Affairs and was proposing to create an additional position of Assistant Dean of Cultural Competency in the Dean's Office. Id.

**RESPONSE:** Undisputed.

77.     In addition, it was unclear what duties these positions would be responsible for performing. Id. at ¶ 31.

**RESPONSE:** Disputed. Dr. Licinio coordinated with UMU human resources with respect to the new positions, and he coordinated twice-weekly meetings to put together those offer letters. These positions were designed to improve diversity among the student body and faculty. Licinio Dep. Tr. 253:14-256:2.

78.     The titles of the positions that Plaintiff was creating suggested that their duties would overlap with the duties that individuals in existing positions were already responsible for performing. Id.

**RESPONSE:** Disputed. The positions Plaintiff created or endeavored to create were focused on improving diversity not just among the UMU student body, but also among the UMU faculty, which were responsibilities that did not overlap with existing roles. Licinio Dep. Tr. 254:11-25.

79.     This generated complaints from those holding the existing positions in or around the Spring and Summer of 2019. Id.

**RESPONSE:** Disputed insofar as the material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2).

80.     For example, UMU's longtime College of Medicine Assistant Dean for Diversity Brian Thompson, MD came to President Dewan and complained that Plaintiff had demoted and

sidelined him by creating an Associate Dean for Diversity and Inclusion position, which would be performing essentially the same functions that he was already responsible for performing. Id.

**RESPONSE:** Disputed as the material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2).

81.    Similarly, UMU's Dean of Students Julie White complained that Plaintiff was proposing to create a new Associate Dean for Student Advising position even though she was already responsible for student advising. Id.

**RESPONSE:** Disputed as the material proffered in support consists of inadmissible hearsay statements. Fed R. Civ. P. 56(c)(2).

82.    Finally, President Dewan had concerns that there was no connection between these new positions and the objective outcomes that Plaintiff and he had agreed on, that is, to increase the number of Under-Represented in Medicine (URiM) students entering UMU. Id. at ¶ 32.

**RESPONSE:** Disputed that there was no connection between these positions and the outcomes agreed on, or that the sole objective that Dr. Licinio and Dr. Dewan had agreed to was to increase the number of URiM students.  Dr. Licinio was equally focused on creating new positions which increased diversity among the UMU faculty as well, while Dr. Dewan was overwhelmingly focused on meeting a quota of 25% URiM students in the UMU student body.  Dewan Dep. Tr. 88:7-18; 89:12-95:18.

83.    With Plaintiff's addition of 6 new positions to his office, and his proposal to create more positions, President Dewan repeatedly asked Plaintiff to provide him with an updated organizational chart for the Dean's office and written job descriptions for the positions he had already created and was proposing to create, to ensure that Plaintiff was spending State dollars appropriately and not creating duplicative positions. Id. at ¶ 33.

**RESPONSE:** Disputed. Dr. Dewan did not ask Dr. Licinio for an updated organizational chart or written job descriptions for the positions he was creating. Licinio Dep. Tr. 253:14-254:10.

84.     President Dewan asked him how each position would help recruit more URiM students. Id.

**RESPONSE:** Disputed. Dr. Dewan repeatedly asked Dr. Licinio about what specific UMU faculty members "did all day." The faculty members Dr. Dewan made these comments about were members of races which were URiM; for example, Brian Thompson, a Native American/First Nation man, Nakeia Chambers, a Black woman, and Zulma Spinoza, a Hispanic woman. Each of these individuals were people Dr. Licinio wanted to appoint to new positions that were intended to promote and improve UMU diversity. Dr. Dewan did not ask the same questions of white faculty members. Licinio Dep. Tr. 323:5-325:4; 328:17-331:9.

85.     President Dewan also emphasized that he needed to manage the performance of the individuals who already held existing positions to ensure their success before creating new positions that had the same responsibilities. Id.

**RESPONSE:** Disputed that the new positions had the same responsibilities. Undisputed that Dr. Dewan made these statements.

86.     Plaintiff never provided him with an organizational chart or written job descriptions despite his requests and, instead, became angry that President Dewan was questioning his decision making. Id.

**RESPONSE:** Disputed. Dr. Dewan did not ask Dr. Licinio for an updated organizational chart or written job descriptions for the positions he was creating. Licinio Dep. Tr. 253:14-254:10. Dr. Licinio did not "become angry" because Dr. Dewan was questioning Dr. Licinio's decision making, but because Dr. Dewan continued to question Dr. Licinio's faculty appointees of URiM

20

races and nationalities by asking what "they did all day" when he did not ask the same question of those appointees' white counterparts. Licinio Dep. Tr. 323:5-325:4; 328:17-331:9.

87.     In the Summer of 2019, President Dewan arranged for local political representatives to separately UMU's campus so that he could describe the significance of UMU's services to the Upstate New York Community and garner political support for UMU's initiatives. Id. at ¶ 37.

**RESPONSE:** Undisputed.

88.     President Dewan invited all members of UMU's University Executive Committee to attend 1-hour meetings with representatives when they visited to provide an overview of UMU. Id.

**RESPONSE:** Undisputed.

89.     Due to Plaintiff's history of making inappropriate statements and going off on tangents, President Dewan had concerns that he might say something or behave in a way that would leave these representatives with a negative impression of UMU. Id.

**RESPONSE:** Disputed insofar as the facts about President Dewan's concerns are unavailable to Dr. Licinio and disputed as to Dr. Licinio's purported history of making inappropriate statements. Deposition Transcript of Ann Botash, MD 96:17-97:7.

90.     In fact, during one such visit, Plaintiff went off on a tangent in a manner that was contrary to how one would expect UMU's College of Medicine Dean to present themselves and, in President Dewan's view, was an embarrassment to UMU and him as its President. Id.

**RESPONSE:** Disputed and object insofar as this does not appear to be a fact capable of being proven or disproven, is a vague and ambiguous assertion, and the material cited cannot be

A0787

presented in a form that would be admissible evidence as to the purported fact.  Fed. R. Civ. P. 56(c)(2).

91.     After that, President Dewan spoke with his staff and asked them to preferably schedule these visits when Plaintiff was not going to be on campus. Id.

**RESPONSE:** Dr. Licinio cannot respond to this assertion as the facts are unavailable to him.  Fed. R. Civ. P. 56(d).

92.     President Dewan also learned that Plaintiff had begun to instruct Chairs not to talk to him about Departmental concerns and blamed President Dewan as the reason he wasn't doing his job. Id. at ⁋ 38, Ex. D.

**RESPONSE:** Disputed.  Dr. Licinio instructed the Chairs not to speak with the President regarding Departmental concerns properly addressed to the Dean of the College of Medicine in the first instance.  Dewan Decl. Ex. D.

93.     On August 8, 2019, President Dewan met with former UMU President Gregory Eastwood, MD and discussed his concerns about Plaintiff's troubling conduct, including his disparaging President Dewan to others. Id.

**RESPONSE:** Dr. Licinio cannot respond to this assertion as the facts are unavailable to him.  Fed. R. Civ. P. 56(d).

94.     In May 2019, Plaintiff gave a speech at a third year medical student orientation. Declaration of Leann Lesperance, MD [Lesperance Dec.], ⁋ 6.

**RESPONSE:** Undisputed.

95.     During his speech, Plaintiff advised third year medical students that "it's only going to get worse and worse—residency, fellowship and having a family will be very hard" and that if

22

the students do not do well in their clerkships, they will not get into their chosen specialty. He then went on to talk about student depression and suicide. Id. at ¶ 7.

**RESPONSE:** Disputed as to characterization and selective omission of context. Prior to delivering these remarks, Dr. Licinio was approached by a group of African American medical students who were experiencing particularly high stress levels regarding their Step One exam. Dr. Licinio met with these students and others, who requested that he provide "tough love" and put the stress of medical school and becoming a doctor in perspective. Many students appreciated Dr. Licinio's comments. Licinio Dep. Tr. 237:3-245:11; Licinio Decl. §202.

96.     Sharon Huard, UMU's Associate Dean of Student Affairs and Campus Life, emailed Dr. Julie White, Dean of Student Affairs and notified her that a student wanted to make a complaint regarding Plaintiff's speech. Id. at ¶ 8.

**RESPONSE:** Undisputed.

97.     Dr. Lesperance emailed UMU Audio-Video Technician Gerard Roy and instructed him not to publish the portion of the orientation that contained Plaintiff's speech. Id. at ¶ 9.

**RESPONSE:** Undisputed.

98.     Plaintiff's speech was the only speech made at orientation that was not published. Id.

**RESPONSE:** Undisputed.

99.     Dr. White emailed Plaintiff to inform him that a group of students and faculty members were upset with the content of his speech and that a student wanted to file a complaint against him. Id. at ¶ 10.

**RESPONSE:** Undisputed.

23

100.    Dr. White drafted a letter for Plaintiff to disseminate to students after the complaints were brought to his attention. Id.

**RESPONSE:** Disputed.  Both Dr. White and Dr. Licinio drafted the letter to students following Dr. Licinio's remarks at the Third Year Medical Student Orientation.  Licinio Dep. Tr. 242:13-243:25.

101.    At the beginning of a leadership meeting, Plaintiff played a video on his phone as everyone was walking into the meeting of a public figure using ethnic slurs and making derogatory comments about Italians in the most vulgar language. Dewan Dec. at ¶ 43.

**RESPONSE:** Disputed.   On August 13, 2019, before a meeting started, Dr. Licinio played a newsworthy viral video on his phone of Chris Cuomo having an outburst.  As people walked into the meeting for it to begin, Dr. Licinio turned the video off.  Licinio Dep. Tr. 250:6-252:18.

102.    President Dewan's Chief of Staff, Linda Veit, who is Italian, was visibly offended by the video. Id.

**RESPONSE:** Disputed. Licinio Decl. §156.

103.    President Dewan had to instruct Plaintiff to turn it off.  Id.

**RESPONSE:** Disputed.  Dr. Dewan was not in attendance at that meeting and did not so instruct Dr. Licinio.  Licinio Dep. Tr. 252:11-18.

104.    In May 2019, Thomas Schwartz, MD the Chair of the Psychiatry Department, emailed Plaintiff, President Dewan, and Hospital CEO Dr. Robert Corona in support of a colleague, Sharon Brangman, MD, who had been newly appointed as the Geriatrics Department Chair in a newly created Geriatrics Department. Schwartz Dec. at ¶ 15.

**RESPONSE:** Undisputed.

24

105.   Dr. Schwartz believed that Plaintiff supported this role for Dr. Brangman as he directly appointed her, but he was concerned that other agencies were not as supportive. Id.

**RESPONSE:** Undisputed.

106.   He expressed to the CEO and President that he was worried as a colleague and co-chair that Dr. Brangman was not being fairly treated as a new Chair, specifically with respect to the hospital's lack of financial backing of the Geriatrics Department. Id.

**RESPONSE:** Undisputed.

107.   The Hospital CEO added Plaintiff to the email and Plaintiff responded by emailing only Dr. Schwartz, chastising him for emailing the Hospital CEO and President about this issue even though Dr. Schwartz felt he was lobbying on Plaintiff's behalf and on behalf of the College of Medicine. Id.

**RESPONSE:** Disputed. Dr. Schwartz, a Chair within the College of Medicine, escalated an issue pertaining to another Department within the College of Medicine to UMU's President and the CEO of UMU's hospital without first consulting with Dr. Licinio as the Dean of the College of Medicine. Dr. Schwartz's improper circumvention of Dr. Licinio had the effect of calling Dr. Licinio's actions into question and signaling an issue within the College of Medicine to Dr. Licinio's superiors before it could be vetted internally. Dr. Licinio sent the response to Dr. Schwartz to prevent him from making this error in future. Schwartz Dec. Ex. A.

108.   In his response, he mocked Dr. Schwartz for raising the concern and accusing him of being a "busybody" and a "vigilante" for raising the issue, and of insinuating to the Hospital CEO and President that Plaintiff was not doing his job. Id.

25

**RESPONSE:** Disputed. Dr. Licinio did not "mock" Dr. Schwartz, but merely reprimanded him for insubordinately signaling an issue with the College of Medicine to Dr. Licinio's superiors without first raising it with Dr. Licinio. Id., Ex. A.

109. His response contained thirteen numbered paragraphs that explained how and why he took offense to Dr. Schwartz' email. Id., Ex. A.

**RESPONSE:** Undisputed that the email contained thirteen numbered paragraphs. Disputed that Dr. Licinio was offended by Dr. Schwartz' email. Id., Ex. A.

110. On August 22, 2019, Leann Lesperance, MD, UMU's Associate Dean for Academic Affairs at the Binghamton Clinical Campus at the time, attended a white coat ceremony, that is held annually as a rite of passage for students entering medical school. Lesperance Dec. at ¶ 11.

**RESPONSE:** Undisputed.

111. It is a ceremony attended by incoming first-year medical students and their families during which students receive a white doctor's coat and recite the Hippocratic Oath. Id.

**RESPONSE:** Undisputed.

112. The room was full of first-year medical students and their parents / guardians. Id.

**RESPONSE:** Undisputed.

113. Plaintiff was supposed to speak and then, later, close the ceremony by spending no more than 5 minutes thanking everyone for attending. Id

**RESPONSE:** Undisputed.

114. When Plaintiff came back to briefly thank the students and parents/guardians for coming and close the ceremony, he ended up talking for 10-15 minutes in a long rambling diatribe. Id.

A0792

**RESPONSE:** Disputed. Dr. Licinio spoke at the white coat ceremony for longer than scheduled, but delivered a realistic perspective on the difficulties and stresses of medical school these students were facing, with emphasis on Dr. Licinio's specialty on depression and suicide. Licinio Dep. Tr. 221:14-15; Licinio Decl. §202.

115.    Despite having just recently been informed that students and faculty complained about the similar speech he gave at the third-year orientation only a few months earlier, he again talked about suicide, depression, and dwelled on related statistics. Id.

**RESPONSE:** Undisputed.

116.    Dr. White eventually had to intervene and close the meeting. Id.

**RESPONSE:** Disputed that Dr. White "had to intervene" as improper characterization of a fact (that Dr. White did close the meeting) inappropriate for a Statement of Facts under Local Rule 56.1.

117.    After his speech, Dr. Lesperance went to Dr. White and told her that he should never be allowed to address students "off script" again given how disastrous his remarks had been without one. Id. at ¶ 12.

**RESPONSE:** Dr. Licinio cannot respond to this allegation as the facts are unavailable to him. Fed. R. Civ. P. 56(d).

118.    There are multiple ways that a position can be filled at UMU. Dewan Dec. at ¶ 69.

**RESPONSE:** Undisputed.

119.    An open national search involves outside consultants and provides the largest pool, but is costly and takes a great deal of time. Id.

**RESPONSE:** Undisputed.

27

120.    For leadership positions, individuals are frequently appointed on an interim basis until the position is filled. Id.; Frost Dec. at ¶ 5.

**RESPONSE:** Undisputed.

121.    Sometimes, an interim will be appointed to the position if the interim has performed satisfactorily, and circumstances warrant the appointment. Dewan Dec. at ¶ 69; Frost Dec. at ¶ 5.

**RESPONSE:** Undisputed.

122.    As Dean, the Plaintiff used each of these processes.  Dewan Dec. at ¶ 69.

**RESPONSE:**  Undisputed.

123.    Lawrence Chin, M.D. was appointed interim Dean of the College of Medicine after Plaintiff was removed.  Declaration of Lawrence Chin, MD [Chin Dec.], at ¶ 24.

**RESPONSE:** Undisputed.

124.    Dr. Chin was selected to be interim Dean based on his exceptional qualifications. Dewan Dec. at ¶ 66.

**RESPONSE:** Undisputed.

125.    Dean Chin has appointed 9 Department Chairs since becoming Dean. Chin Dec. at ¶ 26.

**RESPONSE:** Undisputed.

126.    All Department Chairs were appointed pursuant to external searches except Xiuli Zhang, MD, Francesa Pignoni, MD, and Thomas Schwartz, MD. Id.

**RESPONSE:** Undisputed.

127.    Dr. Zhang and Schwartz were appointed without searches being conducted because they had served as interim Department Chairs of their Departments throughout the COVID-19 pandemic and Dr. Chin assessed, with input from faculty within their department, that they were

28

highly qualified as judged by their credentials and they performed exceptionally well as interim

Chairs during that very difficult time. Id.

**RESPONSE:** Undisputed.

128. Dr. Pignoni was appointed Chair of her Department for similar reasons after an

attempted, but failed search. Id.

**RESPONSE:** Undisputed.

129. While Dean, Plaintiff appointed several Department Chairs and Associate Deans

without conducting searches. Chin Dec. at ⁋ 28.

**RESPONSE:** Undisputed.

130. Plaintiff admits that President Dewan never referred to anyone's gender or race or

national origin when he allegedly objected to positions that Plaintiff created. Cowan Dec., Ex. J at

195.

**RESPONSE:** Disputed.  Dr. Dewan implicitly referred to gender, race, or national origin when

he objected only to individuals Dr. Licinio appointed or attempted to appoint who were of URiM

races (Hispanic, Black) or female.  Licinio Dep. Tr. 323:5-325:4; 328:17-331:9.

131. Despite his overall concerns, President Dewan did allow the Plaintiff to make these

appointments since it was in his purview. Dewan Dec. at ⁋ 52.

**RESPONSE:** Undisputed.

132. UMU's Associate Vice President for Human Resources Eric Frost disagreed with

a number of decisions Plaintiff made from a human resources perspective. Frost Dec. at ⁋ 8.

**RESPONSE:** Undisputed.

133. Plaintiff gave roles and titles to faculty that Frost did not deem appropriate. Id. at

⁋ 9.

**RESPONSE:** Undisputed.

134.   For example, Plaintiff appointed a number of faculty members to Associate Dean and Assistant Dean positions that he created and inappropriately gave them non-union management/confidential titles. Id.

**RESPONSE:** Disputed. Mr. Frost's statement that I assigned roles and titles to non-union represented faculty unilaterally is false. (Frost Dec., ¶9). I was fully aware that I did not have the administrative capacity to unilaterally assign such roles and never did. Each of those offers came through the institution. Those titles are routinely given to union members at SUNY Upstate when the management/confidential roles are not over 50% effort, which was the case in all of Plaintiff's appointments. Licinio Dec., §200.

135.   Plaintiff also paid these individuals additional state compensation in the form of an "also receives" ("ALR") even though the positions appeared to overlap with other existing positions. Id.

**RESPONSE:** Disputed. Dr. Licinio disputes that these additional roles overlapped with existing positions.  Licinio Dep. Tr. 331:10-332:17. Undisputed that some of Dr. Licinio's appointments received additional state compensation.

136.   Plaintiff did not consult with Human Resources before he established any roles. Id.

**RESPONSE:** Disputed.  Dr. Licinio coordinated with Human Resources in the hiring process, and met with Human Resources twice a week.  Licinio Dep. Tr. 255:2-256:2.

137.   Frost explained to Plaintiff that he could not assign roles and titles to faculty unilaterally, but Plaintiff did not comply with his guidance. Id.

A0796

**RESPONSE:** Disputed. Plaintiff was fully aware that he did not have the administrative capacity to unilaterally assign such roles and never did. Each of those offers came through the institution. Licinio Dec., ¶198.

138.    Plaintiff alleges that while Dean, in 2018, he appointed an all-female External Scientific Advisory Board. Cowan Dec., Ex. J at 146.

**RESPONSE:** Undisputed.

139.    President Dewan had no input into whether the Board would continue to meet. Dewan Dec. at ⊩ 54.

**RESPONSE:** Disputed. As President Dewan himself states, Dr. Licinio discussed the Board with President Dewan, seeking his input. Dewan Dec. at ⊩ 54.

140.    Plaintiff organized the Board and it met only on one occasion in June 2018. Id.

**RESPONSE:** Undisputed.

141.    President Dewan never made any comments to Plaintiff about the gender of the Board members. Cowan Dec., Ex. J at 154.

**RESPONSE:** Undisputed.

142.    President Dewan never made any comments to Plaintiff about whether the Board was necessary or not and he did not tell Plaintiff to not have the Board meeting. Id.

**RESPONSE:** Disputed. In the first several months of 2019, Dr. Licinio and Dr. Dewan had a conversation wherein Dr. Dewan sarcastically remarked, "Oh, we do have an external scientific advisory board," to imply that he felt the board was unnecessary and a waste of UMU resources. Licinio Dep. Tr. 152:6-154:15.

143.    According to Plaintiff, Plaintiff never inquired as to why the Board did not continue to meet and never found out why they did not continue to meet. Id. at 150.

A0797

**RESPONSE:** Undisputed.

144.   Plaintiff never made any complaints about the Board not continuing. Id. at 151.

**RESPONSE:** Undisputed.

145.   No one on the Board itself ever filed any complaints about the Board not continuing.

**RESPONSE:** Undisputed.

146.   A Diversity Committee already existed prior to Plaintiff's employment at UMU. Id. at 154; Dewan Dec., fn 2.

**RESPONSE:** Undisputed.

147.   After Plaintiff's demotion, Dean Chin assumed oversight responsibilities of the Diversity Committee. Dewan Dec., fn 2.

**RESPONSE:** Undisputed.

148.   Plaintiff's wife, Ma-Li Wong, MD, PhD, is currently a Distinguished Professor of Psychiatry and Behavioral Sciences and a research faculty member in the Department of Psychiatry who partners with her husband – Plaintiff – to conduct research. Schwartz Dec. at ¶ 18.

**RESPONSE:** Undisputed.

149.   When Dr. Wong was hired by UMU in 2017, she was paid a total starting salary package of $220,000.00, which was comprised of $120,000.00 in state base salary and $100,000.00 in "ALR." Declaration of Richard Gardner [Gardner Dec.] at ¶ 6; Schwartz Dec. at ¶ 24.

**RESPONSE:** Undisputed.

A0798

150.    This salary is above the median salary for psychiatry research faculty in the United States, according to the Association of American Medical Colleges (AAMC) salary survey. Schwartz Dec. at ¶ 22.

**RESPONSE:** Undisputed.

151.    ALR is an abbreviation for "also receives" compensation. Gardner Dec. at ¶ 6.

**RESPONSE:** Undisputed.

152.    This compensation is permitted where an employee or faculty member assumes responsibility for additional duties or assignments (typically within their primary department) which may be unrelated to, or independent of, their standard work responsibilities. Id.

**RESPONSE:** Undisputed.

153.    It is also given to research faculty members in the Psychiatry Department to assist them with starting up their research at UMU, with the expectation that they will apply for and receive grant funding that will supplement their base salary.  Id.

**RESPONSE:** Undisputed.

154.    Each ALR given to employees and faculty members is reviewed and renewed on an annual basis; it is not intended to supplement that employee or faculty member's income indefinitely. Id.

**RESPONSE:** Undisputed.

155.    Instead, the ALR portion of their salary is expected to either be reduced, eliminated or be transitioned to departmental funding within 2-3 years of their hire unless the additional duties or assignments continue. Id.

**RESPONSE:** Undisputed.

A0799

156.   The ALR portion of Dr. Wong's salary was not permanent and it was subject to an annual review. Id. at ⁋ 7.

**RESPONSE:** Disputed.  At the time Dr. Wong's position was offered to her with UMU, UMU represented to her that her ALR compensation would be permanent. Julio Decl., ¶ 216.

157.   In addition to her State compensation package, Dr. Wong was also offered $30,000 from the Psychiatry Faculty Practice, Inc.[1] Schwartz Dec. at ⁋ 25.

**RESPONSE:** Undisputed.

158.   Providing such a stipend was a bit unusual and usually only offered to brand new researchers. Id.

**RESPONSE:** Undisputed.

159.   According to UMU's records, Dr. Wong's total starting institutional salary was more than the total starting salary of each of the twenty-six (26) other research faculty members that UMU hired between 2017 and 2020. Gardner Dec. at ⁋ 8.

**RESPONSE:** Undisputed.

160.   Her salary was modified in July 2018 so that much of her ALR was absorbed into her state base salary, with her state base salary becoming $177,400.00 and her ALR being reduced to $45,000.00. Id.

**RESPONSE:** Undisputed.

161.   Additionally, Dr. Wong's total "startup commitment" was for $5,386,668. Id. at ¶ 9.

**RESPONSE:** Undisputed.

---

[1] A non-profit medical service group that is made up of the Psychiatry clinicians and researchers who are also faculty of UMU.  Schwartz Dec. at ¶ 2.

34

162.   The startup commitment promised to Dr. Wong included promise to pay $1,400,000 to design and build her a lab, $75,000 to move the lab and Dr. Wong's specimens, and $3,911,668 for staff, equipment and lab operating expenses. Id.

**RESPONSE:** Undisputed.

163.   Dr. Wong's startup commitment far surpassed any other faculty member hired during the timeframe mentioned. Id. at ⁋ 11.

**RESPONSE:** Undisputed.

164.   The package promised to Dr. Wong was not only in excess of all other research faculty members at UMU, but was unprecedented in light of the fact that Dr. Wong was not funded by any grants when she was hired by UMU. Id. at ⁋ 12.

**RESPONSE:** Disputed.  Dr. Licinio cannot respond as the facts concerning whether this package was in excess of all other research faculty members or "unprecedented" are not available to him. Dr. Licinio notes that this proposition is based on Dr. Gardner's statement made "to my knowledge," i.e. to the best of his knowledge.

165.   It is risky to offer a guaranteed position to an unfunded researcher.  Schwartz Dec. at ¶ 21.

**RESPONSE:** Disputed.  This is a legal conclusion not properly the subject of a Rule 56.1 Statement.  The risk profile involved in offering tenure to researchers is dependent on, *inter alia*, the researcher in question and the field of research involved.

166.   No other researcher in the Psychiatry department has ever received as generous a compensation package as Dr. Wong. Id. at ⁋ 27.

A0801

**RESPONSE:** Dr. Licinio cannot respond as the facts concerning whether this package was in excess of all other researchers in the Psychiatry department in the history of the department are not available to him.

167.   Without grant funding to conduct research, the institution needs to pay for the researcher's start-up research costs and runs the risk that such costs may never be recouped, as the researcher has little incentive to bring in grants with a guaranteed position. Id. at ¶ 21.

**RESPONSE:** Undisputed.

168.   After agreeing to March 13, 2017 offer letter but before she began her employment, Dr. Wong reached out to Dr. Schwartz in October 2017 and asked if UMU would be willing to increase her State base salary. Id. at ¶¶ 23, 29.

**RESPONSE:** Undisputed.

169.   Dr. Schwartz asked President Laraque-Arena for permission to respectfully tell Dr. Wong that she was not entitled to an increase in State base pay – particularly since she was coming without any grants. Id. at ¶ 29.

**RESPONSE:** Undisputed.

170.   Dr. Laraque-Arena replied that it was ultimately his decision, but that her advice was to tell Dr. Wong that she had not even begun her position, so it was expected that she would abide by the agreed upon offer letter that she had signed. Id.

**RESPONSE:** Undisputed.

171.   Dr. Schwartz followed her advice and informed Dr. Wong of this. Id.

**RESPONSE:** Undisputed.

172.   With the knowledge that her State base salary would remain $120,000, Dr. Wong began her employment at UMU in December 2017. Id. at ¶ 30.

A0802

**RESPONSE:** Undisputed.

173.    Thereafter, Dr. Wong continued to request that her State base pay be increased and her ALR decreased. Id. at ¶¶ 31-34.

**RESPONSE:** Undisputed.

174.    In March 2019, Dr. Schwartz informed Dr. Wong that her ALR and PFF stipend were both scheduled to expire in July 2019. Id. at ¶ 35.

**RESPONSE:** Undisputed.

175.    Also in March 2019, Plaintiff emailed President Dewan regarding his wife's salary. Dewan Dec. at ¶ 60.

**RESPONSE:** Undisputed.

176.    Plaintiff made no mention of any complaints of discrimination in his March 2019 email. Cowan Dec., Ex. J at 267, 268.

**RESPONSE:** Undisputed.

177.    President Dewan met with Dr. Schwartz and Dr. Wong soon after the email and discussed the issue with her. Dewan Dec. at ¶ 60; Schwartz Dec. at ¶¶ 36-37.

**RESPONSE:** Undisputed.

178.    President Dewan and Dr. Schwartz informed Dr. Wong during an April 2019 meeting that granting her request for such a high State base salary would be inequitable for all of the other grant funded tenured research faculty within the department. Schwartz Dec. at ¶ 37.

**RESPONSE:** Undisputed.

179.    Dr. Wong still did not have any grants by that time. Id.

**RESPONSE:** Undisputed.

180.   Dr. Wong voiced an objection to the salary structure that she had previously agreed to a year earlier and requested another increase in her base salary to $220,000. Id. at ¶ 36.

**RESPONSE:** Undisputed.

181.   President Dewan and Dr. Schwartz agreed to extend her $45,000 ALR through December 31, 2020, a year past its originally planned end date of July 2019. Schwartz Dec. at ¶ 36; Dewan Dec. at ¶ 62.

**RESPONSE:** Undisputed.

182.   That request was also subsequently approved by Dean Chin on October 28, 2019. Schwartz Dec. at ¶ 39.

**RESPONSE:** Undisputed.

183.   Plaintiff, as the Dean of the COM, had access to the respective salaries of employees within Dr. Wong's department and was fully aware that her salary was commensurate to others in her department. Gardner Dec. at ¶ 4; Schwartz Dec. at ¶¶ 20, 44-46.

**RESPONSE:** Undisputed.

184.   Salary and startup funding data is maintained in the ordinary course of business by the UMU College of Medicine Dean's Office. Gardner Dec. at ¶ 13.

**RESPONSE:** Undisputed.

185.   All salaries and ALRs have to be approved by the Dean of the College of Medicine every year, including when Plaintiff was Dean from 2017 – 2019. Id.

**RESPONSE:** Undisputed.

186.   Plaintiff set the salary and start up packages for faculty, although the initial package for Dr. Wong specifically was set by former UMU President Laraque-Arena. Id. at ¶ 14.

**RESPONSE:** Undisputed.

A0804

187.   Plaintiff had direct knowledge that Dr. Wong received a far greater salary/start up package than any other research faculty member who was hired to work in the UMU College of Medicine between 2017-2019 and that her lab was the largest lab buildout done while he was Dean. Id. at ¶ 14.

**RESPONSE:** Undisputed.

188.   Dr. Wong did not make any complaints of discrimination during any of the meetings she had regarding her salary dispute. Schwartz Dec. at ¶ 41; Cowan Dec., Ex. M at 110-111.

**RESPONSE:** Disputed. Despite primarily arguing on the basis of her contract, Dr. Wong's salary dispute was brought because she believed that she was being compensated less well, and having her compensation reduced, unfairly in comparison to her white male colleagues. Licinio Decl. §219.

189.   Dr. Wong did not make any complaints of discrimination to anyone at UMU (other than allegedly her husband) before October 2019. Cowan Dec., Ex. M at 98-99, 134; Gilbertson Dec. at ¶14.

**RESPONSE:** Disputed. Dr. Licinio informed Dr. Dewan on August 12, 2019 that Dr. Wong was being treated less well on a salary basis than her white male colleagues. Dr. Licinio informed Dr. Dewan that he thought Dr. Wong had grounds to make a Title VII or IX complaint, specifically through UMU's O.D.I. Dr. Licinio was terminated at his next meeting with Dr. Dewan approximately one month later. Licinio Dep. Tr. 273:9-274:6, 275:15-277:15, 278:16-280:6.

190.   Months prior to his August 12, 2019, meeting with President Dewan, Plaintiff sent an email in April 2019 to UMU CEO Robert Corona, confirming his belief that Dr. Wong's salary

A0805

reduction was actually a punishment for "bad political moves" he had made. Declaration of Robert Corona at ¶ 5.

**RESPONSE:** Disputed. Dr. Licinio speculated at the time of the cited email that Dr. Wong's salary reduction was brought about in retaliation for Dr. Licinio refusing to play politics and to directly voice concerns. Through later discussions with Dr. Wong, Dr. Licinio uncovered more reasons to believe that Dr. Wong's salary reduction was motivated by discrimination. Licinio Decl., ¶221.

191.    On August 13, 2019, at 6am, Plaintiff held an "urgent" meeting regarding the Department of Anesthesia and requested that President Dewan attend. Dewan Dec. at ¶ 39.

**RESPONSE:** Undisputed.

192.    Also in attendance were UMU's Hospital Chief Executive Officer Dr. Robert Corona, UMU's Chief Medical Officer Dr. Amy Tucker, the Dean's Chief of Staff Grace VanNortwick, and various Department Chairs who oversaw different areas of surgery, including Dr. Randy Green, Dr. Stephen Albanese, Dr. Larry Chin, Dr. Robert Cooney and Dr. Gennady Bratslavsky. Id.

**RESPONSE:** Undisputed.

193.    During the meeting, Plaintiff verbally attacked President Dewan in front of the group, stating that President Dewan was preventing him from performing his job, that President Dewan was the reason Plaintiff was failing as Dean, and that President Dewan was the reason why Plaintiff could not remove the Anesthesia Chair. Id. at ¶ 41.

**RESPONSE:** Disputed. Dr. Licinio did not verbally attack Dr. Dewan, but instead emphatically spoke regarding the need for the Dean of Medicine to have autonomy to appoint competent chairs, particularly given that surgeries at UMU were not being adequately serviced by anesthesiology in

A0806

the absence of a chair.  Dr. Licinio specifically referred to Dr. Dewan as a "wonderful Dean."

Licinio Dep. Tr. 246:18-250:4; Dewan Dep. Tr. 144:2-24.

194.    On September 12, 2019, President Dewan met with Plaintiff and Eric Frost, and

told Plaintiff that he had made the decision to remove him as Dean effective immediately. Dewan

Dec. at ꟼ 46.

**RESPONSE:** Undisputed.

195.    Plaintiff informed President Dewan that he was already in the process of

interviewing for another job. Id.

**RESPONSE:** Undisputed.

196.    Plaintiff was terminated from his employment as the Dean of the College of

Medicine, and his new title was Distinguished Professor in the Department of Psychiatry &

Behavioral Sciences. Id.

**RESPONSE:** Undisputed.

197.    Plaintiff contends that he was retaliated against for reporting race discrimination to

Defendants on behalf of Brian Thompson. Cowan Dec., Ex. J at 322.

**RESPONSE:** Undisputed.

198.    Plaintiff never made any complaints on behalf of Brian Thompson to ODI or HR

that Brian Thompson was personally being discriminated against. Id. at 325, 328; Declaration of

Alexandra Gilbertson at ꟼ 13.

**RESPONSE:** Disputed.  Dr. Thompson complained to Dr. Licinio that Native Americans were

underrepresented at UMU and that UMU should follow through with its commitment under

President Laraque-Arena to appoint an Assistant Vice-President for Native American Affairs, and

Dr. Licinio relayed these concerns to Dr. Dewan.  Licinio Dep. Tr. 325:14-328:9.

41

199.    Another individual Plaintiff alleges he was retaliated against for reporting race discrimination was Nakeia Chambers. Cowan Dec., Ex. J at 328.

**RESPONSE:** Undisputed.

200.    President Dewan's discussions with Plaintiff were centered around requesting additional information about the new positions that he had created, including an updated organizational chart for the Dean's office, job descriptions for each position, whether the duties performed in the new positions overlapped with existing positions, and how the newly created positions would add value to UMU and help it to meet its goals. Id. at 193; Dewan Dec. at ¶ 52.

**RESPONSE:** Disputed. Dr. Licinio disputes that President Dewan asked him for an organization chart or related information. Moreover, President Dewan repeatedly asked Dr. Licinio about what specific UMU faculty members "did all day." The faculty members Dr. Dewan made these comments about were members of races which were URiM, and specifically included Nakeia Chambers, a Black woman.  President Dewan did not ask the same questions of white faculty members.  Licinio Dep. Tr. 323:5-325:4; 328:17-331:9; Licinio Decl. §34.

201.    President Dewan never objected to Ms. Chamber's gender, race or national origin. Cowan Dec., Ex. J at 195.

**RESPONSE:** Disputed.  Dr. Dewan repeatedly asked Dr. Licinio about what specific UMU faculty members "did all day."  The faculty members Dr. Dewan made these comments about were members of races which were URiM, including Nakeia Chambers, a Black woman. Dr. Dewan did not ask the same questions of white faculty members.  Licinio Dep. Tr. 323:5-325:4; 328:17-331:9; Licinio Decl. §34.

202.    Ms. Chambers never complaint to Plaintiff that she was being discriminated against based on her race. Id. at 333.

42

**RESPONSE:** Undisputed.

203.    Plaintiff never made a report that anyone had ever discriminated against based on her race. Id.

**RESPONSE:** Disputed.    Dr. Licinio opposed discrimination in his advocacy for Nakeia Chambers, among others, against Dr. Dewan, who singled her and other URiM faculty in questioning what she "did all day" when Dr. Licinio attempted to appoint her to a new position focused on increasing UMU diversity.  Dr. Dewan did not raise similar questions regarding white faculty members.  Licinio Dep. Tr. 323:5-325:4; 328:17-331:9.

204.    Plaintiff never made any complaints on behalf of Ms. Chambers to ODI or HR that she was being discriminated against based on her race. Id.; see also, Gilbertson Dec. at ¶ 13.

**RESPONSE:** Undisputed.

205.    Plaintiff contends that "he reported race discrimination" for "numerous medical students enrolled with SUNY Upstate" but never filed any complaints on their behalf.  Cowan Dec. Ex. J at 353; see also, Gilbertson Dec., at ¶ 13.

**RESPONSE:** Disputed. Dr. Licinio was informed of discrimination by numerous medical students both individually and in group settings, and had subsequent discussions with Dr. White, Dr. Dewan and ODI on the subject.  Licinio Dep. Tr. 179:21-181:17, 188:20-191:24.

206.    Plaintiff alleges that he reported "national origin discrimination" to Defendants on behalf of "numerous medical students enrolled with SUNY Upstate." Cowan Dec., Ex. L at 18.

**RESPONSE:** Undisputed.

207.    Plaintiff never filed any complaints on their behalf. Cowan Dec., Ex. J at 353; Gilbertson Dec., at ¶ 13; Frost Dec. at ¶ 18.

A0809

**RESPONSE:** Disputed. Dr. Licinio had numerous students, as members of focus groups or individually, approach him with concerns of national origin discrimination. Dr. Licinio instructed those students as to how to proceed with HR or ODI, and then reported these issues to both Dr. Dewan and Dr. White.  Licinio Dep. Tr. 353:13-357:17.

208.    The Budget Committee was created by former President Laraque-Arena, a Haitian female. Dewan Dec. at ¶ 55.

**RESPONSE:** Undisputed.

209.    The purpose of the Budget Committee was for senior leadership to have a platform to discuss confidential financial matters regarding UMU. Committee membership was based on the functions/title of each member. Id.

**RESPONSE:** Undisputed.

210.    Senior leadership members include the President, the Hospital CEO, the Hospital Chief Financial Officer, UMU's Senior Vice President for Finance and Administration, the Dean of the College of Medicine, the President of UUMAS, and the President's Chief of Staff. Id.

**RESPONSE:** Undisputed.

211.    The members of the Budget Committee directly oversee all the finances of UMU. Id.

**RESPONSE:** Undisputed.

212.    Ann Botash, M.D. is currently the Senior Associate Dean for Faculty Affairs and has been in that role since 2017. Cowan Dec., Ex. K at 19-20.

**RESPONSE:** Undisputed.

213.    Dr. Botash testified that she did not recall being recommended to be added to the Budget Committee. Id. at 91.

A0810

**RESPONSE:** Undisputed that Dr. Botash testified as such. Dispute the implied fact that Dr. Licinio did not suggest that she be added to the Budget Committee. Dr. Licinio recommended to Dr. Dewan that she join the Budget Committee to increase the number of women on the committee. Dr. Licinio's suggestion was met with "icy silence" from Dr. Dewan. Licinio Dep. Tr. 169:6-174:4.

214. Plaintiff did not even speak to Dr. Botash about whether or not she wanted to be added to the Budget Committee. Id., Ex. J at 170.

**RESPONSE:** Disputed. While Dr. Botash and Dr. Licinio did not speak about her wanting to be added to the Budget Committee, Dr. Botash and Dr. Licinio did speak regarding the Budget Committee being a "boys' club." Dr. Licinio understood from that conversation that Dr. Botash would have liked to be a member of the Budget Committee. Licinio Dep. Tr. 169:6-174:4.

215. Dr. Botash never spoke with Plaintiff or the Budget Committee about any interest in joining the Budget Committee. Id. at 170-171, 178.

**RESPONSE:** Disputed. While Dr. Botash did not speak with Dr. Licinio or the Budget Committee about her wanting to join the committee, Dr. Botash and Dr. Licinio did speak regarding the Budget Committee being a "boys' club." Dr. Licinio understood from that conversation that Dr. Botash would have liked to be a member of the Budget Committee. Licinio Dep. Tr. 169:6-174:4.

216. In her position as a Senior Associate Dean of Faculty Affairs, Dr. Botash did not directly oversee finances for the college. Id. at 169.

**RESPONSE:** Undisputed.

217. Plaintiff testified that he does not recall when he allegedly suggested to President Dewan that Dr. Botash be named to the Budget Committee, however, Plaintiff also testified that

45

President Dewan made no comment regarding Dr. Botash's gender or national origin. Id. at 173-174.

**RESPONSE:** Disputed. In response to Dr. Licinio's suggestion that more women join the Budget Committee and Dr. Botash in particular join the committee, Dr. Dewan responded with "glacial silence." Licinio Dep. Tr. 169:6-174:4.

218.    Plaintiff is unaware of any woman who expressed an interest in becoming a member of the Budget Committee but was denied membership. Id. at 178.

**RESPONSE:** Disputed. Dr. Botash and Dr. Licinio did speak regarding the Budget Committee being a "boys' club." Dr. Licinio understood from that conversation that Dr. Botash would have liked to be a member of the Budget Committee. Licinio Dep. Tr. 169:6-174:4.

219.    Plaintiff never asked Dr. Amy Tucker if she wanted to be part of the Budget Committee. Cowan Dec., Ex. J at 176.

**RESPONSE:** Undisputed.

220.    Dr. Tucker herself never expressed interest in becoming part of the Budget Committee and never complained that she wasn't a member of the Budget Committee. Id.

**RESPONSE:** Undisputed.

221.    Dr. Tucker reported directly to Dr. Robert Corona, who was/is the CEO of the hospital—and a member of the Budget Committee. Id. at 167-168, 175, 176.

**RESPONSE:** Undisputed.

222.    Plaintiff is unaware of any women who expressed interest in becoming members of the Budget Committee but were denied membership. Id. at 178.

A0812

**RESPONSE:** Disputed.  Dr. Botash and Dr. Licinio did speak regarding the Budget Committee being a "boys' club."  Dr. Licinio understood from that conversation that Dr. Botash would have liked to be a member of the Budget Committee.  Licinio Dep. Tr. 169:6-174:4

223.    Plaintiff created a panel to consider candidates to fill an Anesthesiology Department Interim Chair position. Id. at 347.

**RESPONSE:** Undisputed.

224.    The panel chose Dr. Zhang to fill the position and Plaintiff presented the results to President Dewan in August 2019. Id. at 348.

**RESPONSE:** Undisputed.

225.    President Dewan never expressed any concerns or any dissatisfaction with Dr. Zhang being chosen for the position and never indicated that a female doctor was not fit for the position.  Id. at 348, 204.

**RESPONSE:** Disputed.  Dr. Dewan implicitly expressed concern and dissatisfaction with Dr. Zhang being chosen as Interim Chair of Anesthesiology by pushing for a male candidate, Dr. Reza Gorji, to be the interim chair, including going so far as to tell Dr. Licinio that Dr. Gorji was "the only person who's qualified to have that role."  Licinio Dep. Tr. 197:24-203:7

226.    President Dewan "signed off" on Dr. Zhang as the panel's choice for the position and later appointed her as the permanent chair. Id. at 203, 205; Dewan Dec., at ¶ 56, Ex. G.

**RESPONSE:** Undisputed.

227.    No complaint was ever filed regarding her not receiving the anesthesiology department chair position—because she was chosen for the position. Cowan Dec., Ex. J at 348.

**RESPONSE:** Undisputed insofar as Dr. Zhang expressed to Dr. Licinio that, but for her selection, she would have filed a complaint for gender discrimination. Licinio Dep. Tr. 346:25-348:16.

47

228.  Plaintiff contends that he was retaliated against for reporting gender discrimination to Defendants on behalf of Nakeia Chambers, but cannot "parcel out to what degree" he believed she was discriminated against based on her race versus her gender. Cowan Dec., Ex. J at 335-336.

**RESPONSE:** Undisputed.

229.  The only basis for Plaintiff "opposing discrimination" with respect to Ms. Chambers is he responded to President Dewan allegedly asking what Ms. Chambers "did all day" with an account of her job duties. Id. at 337.

**RESPONSE:** Disputed.  Dr. Licinio opposed discrimination in his advocacy for Nakeia Chambers, among others, against Dr. Dewan, who singled her and other URiM faculty in questioning what she "did all day" when Dr. Licinio attempted to appoint her to a new position focused on increasing UMU diversity.  Dr. Dewan did not raise such objections to white male faculty which Dr. Licinio attempted to appoint.  Licinio Dep. Tr. 323:5-325:4; 328:17-331:9; Licinio Decl., §34.

230.  According to Plaintiff, President Dewan also inquired as to what Dr. Thompson (a male)'s responsibilities were as well. Id. at 339.

**RESPONSE:** Disputed.  Dr. Dewan repeatedly asked Dr. Licinio about what specific UMU faculty members "did all day."  The faculty members Dr. Dewan made these comments about were members of races which were URiM, and included Dr. Thompson, a Native American man.  Dr. Dewan did not ask the same questions of white faculty members.  Licinio Dep. Tr. 323:5-325:4; 328:17-331:9; Licinio Decl., §34.

231.  Plaintiff alleges that after his demotion, he was not provided with an adequate research support package and funding for his laboratory (ECF No. 1 at ⁋ 172) or reimbursement for membership fees, license fees and academic travel. Id. at ⁋174.

A0814

**RESPONSE:** Undisputed.

232.   After he was demoted, Plaintiff continued to be a tenured distinguished research professor in the Department of Psychiatry, receiving the highest State salary out of any other research faculty in the Psychiatry Department, despite having no current grants. Schwartz Dec. at ¶ 16.

**RESPONSE:** Undisputed.

233.   In January 2020, after Plaintiff requested that Dr. Schwartz provide him with a startup package for his research lab, Dr. Schwartz asked that he provide a list of startup items Plaintiff believed he was entitled to so that he could bring his requests to the Dean and try to negotiate for the College of Medicine to provide it for him. Id. at ¶ 17.

**RESPONSE:** Undisputed.

234.   Plaintiff never provided any list. Cowan Dec., Ex. J at 363; Schwartz Dec. at ¶ 17.

**RESPONSE:** Undisputed.

235.   Plaintiff's reimbursement requests were denied because no other faculty member in the Psychiatry Department receives reimbursement for such expenses. Schwartz Dec. at ¶ 16; Cowan Dec., Ex. J at 364.

**RESPONSE:** Disputed. Dr. Licinio was contractually obligated to have his expenses reimbursed, and they were not reimbursed out of retaliation for Dr. Licinio's opposing discrimination. Licinio Dep. Tr. 363:4-366:10; Licinio Dec., Ex. 1.

236.   Plaintiff contends that following his demotion, and following the filing of his DHR complaint, he was either denied or not considered for the following positions in retaliation for filing the DHR complaint: President of SUNY Upstate; SUNY Chancellor; Dean of Medicine; Director of the MD-PhD program; and Chair of the Department of Psychiatry. ECF No. 1 at ¶ 159.

**RESPONSE**: Undisputed.

237.   With respect to the President position, President Dewan was appointed as President after he interviewed with then SUNY Chancellor Jim Malatras and a subcommittee of the Board of Trustees; UMU faculty members wrote letters of support for him to become permanent. Dewan Dec. at ₱ 65.

**RESPONSE**: Undisputed.

238.   The Board of Trustees and the SUNY Chancellor make the final hiring decision. Frost Dec. at ₱ 6.

**RESPONSE**: Undisputed.

239.   Further, the Board of Trustees appoints the SUNY Chancellor. Dewan Dec. at ₱ 65.

**RESPONSE**: Undisputed.

240.   On March 13, 2020, Dr. Amit Dhamoon was appointed Program Director of the MD/PhD program after MD/PhD students brought concerns forward to President Dewan, Dean of Students Dr. White, Dean of Graduate Studies Dr. Schmitt, and Dr. Chin about the existing program directors and their effectiveness in their role. Schmitt Dec., at ₱ 12; Chin Dec. at ₱ 27.

**RESPONSE**: Undisputed.

241.   Dr. Dhamoon was a graduate of the UMU MD/PhD program and had significant experience mentoring students; Dr. Dhamoon was selected as the top candidate by the students, and was subsequently appointed by College of Medicine Dean Lawrence Chin based on his having graduated from UMU's MD/PhD program, his qualifications, and his reputation as an excellent mentor to students. Dewan Dec. at ₱ 68, Schmitt Dec. at ₱₱ 12-13; Chin Dec. at ₱ 27.

**RESPONSE**: Undisputed.

50

242.    After Plaintiff was demoted, in September 2020, Dean Chin made the decision to make interim Psychiatry Department Chair Thomas Schwartz, M.D. permanent in the Chair position because he had served as an interim Department Chair throughout the COVID-19 pandemic and he assessed, with input from faculty within their department, that he had performed exceptionally well in the role as Chair during that very difficult time. Chin Dec., at ¶ 26.

**RESPONSE:** Undisputed.

President Dewan approved that decision, given that Dr. Schwartz had already assumed the interim role for the prior four (4) years and had done exceptionally well financially with the Department even the face of COVID-19 pandemic. Dewan Dec. at ¶ 67.

**RESPONSE:** Undisputed.

243.    UMU had a Non-Discrimination Policy and Harassment Prevention Policy in place while Plaintiff was dean from July 1, 2017 through September 12, 2019. Declaration of Alexandra Gilbertson, at ¶ 7.

**RESPONSE:** Undisputed.

244.    Plaintiff was trained on UMU's Non-Discrimination and Harassment Prevention policies. Id. at ¶ 8.

**RESPONSE:** Undisputed.

245.    Plaintiff was made aware during his training that all complaints of discrimination and harassment at UMU were to be brought to UMU's Office of Diversity and Inclusion, which investigated such complaints. Id.; Cowan Dec., Ex. J at 143.

**RESPONSE:** Disputed. In practice, there were three different ways to report discrimination at UMU. Complainants could go to ODI, complainants could report to their supervisor who could

in turn pass the complaint on to ODI, or the complainant could independently go directly to HR. Licinio Dep. Tr. 143:6-145:6.

246.    Plaintiff was given training specifically with respect to a supervisor's responsibility to raise concerns of discrimination or harassment to UMU's Chief Diversity Officer or Affirmative Action Officer in the Office of Diversity and Inclusion.  Gilbertson Dec. at ¶ 10.

**RESPONSE:** Undisputed.

247.    Plaintiff did not file any complaints of discrimination either on his own behalf or on anyone else's behalf prior to his removal from the Dean position on September 12, 2019. Id. at ¶ 13.

**RESPONSE:** Disputed.  While Dr. Licinio did not file any formal complaints on others' behalf or his own behalf, Dr. Licinio informed Dr. Dewan, Dr. White, ODI, and others about reports of pervasive discrimination against the student body, complaints that the UMU faculty was not diverse enough, and opposed pressure from Dr. Dewan and others to refrain from appointing new faculty members who were members of URiM backgrounds to positions meant to promote diversity at UMU.  Licinio Dep. Tr. 152:6-154:15, 169:6-174:4, 179:21-181:17, 188:20-191:24, 197:24-203:7, 273:9-274:6, 275:15-277:15, 278:16-280:16, 323:5-325:4, 325:14-328:9, 329:17-331:9, 353:13-357:17.

248.    Plaintiff never filed any complaints about any alleged discrimination based on his national origin.  Cowan Dec., Ex. J at 312.

**RESPONSE:** Undisputed.

Dated:  May 9, 2024
        New York, New York

52

**DANNY GRACE PLLC**

By:

    Douglas Mace, Esq.
    Douglas Mace
    Daniel Grace
    225 Broadway, Suite 1200
    New York, NY 10007
    (212) 202-2485
    douglas@dannygracepc.com
    danny@dannygracepc.com

*Attorneys for Plaintiff Julio Licinio, MD, PhD, MBA, MS*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JULIO LICINIO, MD, PhD, MBA, MS,

                                          Plaintiff,

                                                              Case No.: 5:21-cv-387(GTS/TWD)

            - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE STATE
UNIVERSITY OF NEW YORK UPSTATE
MEDICAL UNIVERSITY,

                                          Defendants
-----------------------------------------------------------------X

        JULIO LICINIO, on the date noted below and pursuant to §1746 of title 28 of the

United States Code, declares the following to be true and correct under the penalty of perjury

under the laws of the United States of America:

1.      I am the Plaintiff in this matter.

2.      I submit this declaration pursuant to Rule 56 of the Federal Rules of Civil

        Procedure, in opposition to Defendants' motion for summary judgment.

3.      I began my employment with Defendants on or around July 1, 2017.

4.      I hold an MD, PhD, MBA and Master of Science in healthcare leadership, and I was

        formerly the Matthew Flinders Distinguished Professor at Flinders University in

        Australia.   My appointments and honors are internationally known, and I have served

        as faculty in teaching institutions worldwide.

5.      I am of Latino National Origin and a physician-scientist with over 20 years of

        experience as a tenured professor in some of the world's leading universities and an

abundant record of competitive, peer-reviewed, federal funding in Australia and in the United States that exceeds $20 million cumulatively.

6. That federal funding has included a National Institutes of Health (NIH) R24 award to mentor physician-scientists. At the time that I received that award, the National Center for Research Resources at the NIH had only ever issued 9 such awards.

7. Through my work, I have developed a translational program of research that spans the bench and the clinic to unravel the biology of antidepressants and major depressive disorder (MDD) and co-morbid conditions, such as obesity and anxiety.

8. I have a considerable academic track record that goes back over twenty (20) years. This includes national and international experience as a tenured professor continuously since 1999, in some of the world's leading universities, including University of California, Los Angeles (UCLA), the number one ranked public university in the United States.

9. During my term as full professor, I have been a principal investigator of multiple federal research grants in Australia and in the United States, author of over 300 publications, and have had previous leadership experience as Center Co-director and Vice-Chair of the Department of Psychiatry at UCLA, Chair of the Department of Psychiatry at University of Miami, Director, John Curtin School of Medical Research at the Australian National University, Matthew Flinders Distinguished Professor at Flinders University, and Mind and Brain Theme Leader and Deputy Director at the South Australian Health and Medical Research Institute. All of those positions were attained through open and stringent national and international searches.

10.    For over twenty-five (25) years, I have edited and contributed to prestigious medical journals, ranked at the top of my field worldwide.

**Employment Contract/Offer Letter**

11.    Pursuant to my appointment by Defendants as Senior Vice President and Dean of the College of Medicine, I entered into an employment contract with Defendant SUNY Upstate which included an eight-month notice and transition period were I to be removed from my position at any time in the future. **Exhibit 1.**

12.    Specifically, the employment contract states that if for any reason a decision is made by Defendants or me that I would step down as Dean, that I would be entitled to eight months' notice in writing prior to the step-down date, and that during that eight-month transition the parties would work together to enable a smooth transition to new leadership as well as my transition to a faculty position.

13.    Furthermore, the employment contract states that if I were to transition to the position of tenured Professor in the Department of Psychiatry, my total compensation would be no lower than the total compensation of the highest paid faculty member at the same rank in the Psychiatry Department, and in my case, my total compensation would be paid in its entirety by Defendant NYS.

14.    My employment contract further states that I would be reimbursed for professional expenses and be provided with secretarial support, both as Dean and after my term as Dean, as a professor.

15.    I began working to the terms of my employment contract as Senior Vice President and Dean of the College of Medicine for Defendant SUNY Upstate on July 1, 2017.

16.    As Senior Vice President and Dean, my job duties included:

- Executive responsibility for all activities related to the accreditation of graduate degree, medical student degree programs and graduate medical education, ensuring and maintaining their accreditation status, including Liaison Committee on Medical Education ("LCME"), and addressing New York State Department of Education requirements relating to existing and new program requirements.

- Collaborate with the Vice President for Academic Affairs and University Leadership on ensuring and maintaining Middle States accreditation status for the University.

- Contributions to enhance the educational experience, to include continued efforts at curriculum reform in the College of Medicine and a renewed emphasis on transformative education including Graduate Medical Education, Continuing Medical Education, and Inter Professional Education, to bring SUNY Upstate to the forefront in these areas.

- In areas that I oversaw, I was committed to improving diversity and inclusion, research productivity, educational goals, clinical growth and quality, supervision of the performance and professional conduct of department members and other related activities.

17. Other duties included supporting the university efforts in its initiatives and leading the process for senior leadership recruitments within the School of Medicine, including conducting searches for open leadership positions, with specific mention to searches for the positions of Chair of the Departments of Pediatrics, Medicine, Psychiatry, and Cancer Center Director. Pursuant to my employment contract, I initially received a

total annual compensation of $585,000.00 plus $48,000.00 in additional, one-time compensation.

18.   Notice of my demotion with immediate effect was given on September 12, 2019, shortly after my last meeting with Defendant SUNY Upstate's Interim President Dr. Mantosh Dewan, and in blatant violation of my employment contract, which as stated, guaranteed me an eight-month notice and transition period prior to my demotion taking effect. Clearly, in light of the circumstances described above, my demotion was retaliatory.

### Performance

19.   Prior to my unlawful demotion I was routinely awarded merit increases to my salary and, as of September 12, 2019, the date my unlawful demotion took place, was earning a salary of $605,000.00 per year.

20.   As Senior Vice President and Dean, I reported directly to Defendant SUNY Upstate's President (formerly Interim President).

21.   As Dean, I led Defendant SUNY Upstate's efforts that resulted in a highly positive accreditation assessment, with a full eight-year accreditation, which is the maximum granted by the LCME, despite Defendant's history of accreditation probation. For example, in 2011 the medical school received a comprehensive probation letter from the LCME. Two individuals were immediately demoted upon the receipt of that probation letter in 2011, namely Dr. Steven Scheinman, then Dean, and Dr. Mantosh Dewan, then Chairman of Psychiatry. Dr. Dewan was demoted from his Chair role for cause and was later appointed President, in the absence of an open search process.

A-0825

22.     As Dean, I also led an effort that resulted in 100% residency matching[1] for graduating medical students, for the first time in Defendant SUNY Upstate's history, as I was particularly supportive of underrepresented minority students, who all matched exceptionally well.

23.     In fact, my accomplishments in improving the University's accreditation and residency matching were routinely highlighted by SUNY Upstate and its President in Town Hall meetings and presentations with legislators, though credit was never afforded to me personally.

24.     On September 11, 2019, one day before my unlawful demotion, I was honored as a Distinguished Professor at the SUNY Upstate Annual Convocation. "Distinguished Professor" is the highest honor awarded to professors within the entire SUNY system.

25.     Notably, at no time during my tenure did I commit misconduct in my capacity as Dean, nor have I ever been accused of committing misconduct, either as defined by my employment contract or by any other definition or standard.

26.     At no point in my term as Dean were either performance deficiencies or any type of performance-related counselling ever brought up to me by Defendants.

27.     However, I was subject to unlawful discrimination and retaliation because I opposed institutional discrimination within Defendants, and in particular Defendant SUNY Upstate, leading to my unlawful and sudden demotion from Senior Vice President and Dean of the College of Medicine on September 12, 2019.

---

[1] The Match process is a uniform system by which residency candidates and residency programs simultaneously "match" to fill first-year and second-year postgraduate training positions accredited by the Accreditation Council for Graduate Medical Education (ACGME). https://www.aafp.org/students-residents/medical-students/become-a-resident/match.html

A-0826

**Protected Activity – Promoting Diversity in Furtherance of LCME Accreditation**

28.    I worked assiduously to address the decline in minority enrollment in Defendant

SUNY Upstate by recruiting minority faculty and creating novel accelerated

partnership programs that combine BA in partner institutions and the MD degree at

Defendant SUNY Upstate.

29.    Those partner institutions included two leading Historically Black Colleges and

Universities ("HBCU"), namely Spelman College and Hampton University, ranked

as the number one (1) and number five (5) HBCUs in the country by U.S. News &

World Report[2].

30.    On October 29, 2019, the Liaison Committee on Medical Education ("LCME"), the

accreditation authority for medical education programs in the United States,

determined that ongoing monitoring was required at SUNY Upstate in order to ensure

compliance with diversity standards.

31.    On several occasions when I discussed my efforts to recruit minority faculty with

Defendant SUNY's President Dr. Mantosh Dewan (formerly Interim President), I was

told, in sum and substance, "we spend too much [money] on diversity" [sic].

32.    Specifically, Defendant SUNY Upstate's President (formerly Interim President) made

verbal comments to me on June 3, 2019, June 17, 2019, July 2, 2019, July 15, 2019,

and August 5, 2019, regarding the University spending too much money on supporting

diversity.

---

[2] https://www.usnews.com/best-colleges/rankings/hbcu

33.    I would also often receive multiple verbal comments from Defendant SUNY Upstate's President (formerly Interim President) severely questioning the 'need for' various minority professors and the extent of their contributions to the University.

34.    Specifically, I received questions about what a particular Native American Professor does all day. I repeatedly explained that the Professor was the Assistant Dean for Diversity and had a crucial role in supporting diversity efforts within the Native American Community. Moreover, I explained on several occasions that it had been previously determined that the Professor should be promoted to Assistant Vice-President for Native American Affairs, a move that Defendants refused to make.

35.    I also received questions about what a particular Professor of Neurosurgery who is female and Hispanic, "does in diversity." I repeatedly explained that the Professor organized Defendant SUNY Upstate's diversity data for purposes of LCME accreditation and was the only person able to provide that data within the tight timeframe of the accreditation process.

36.    I also received questions regarding the need for the Director of Multicultural Affairs & Student Inclusion, who is African American. I repeatedly explained that the Director does substantial work supporting Defendant SUNY Upstate's minority students.

37.    I did not receive similar push-back or questions regarding the need for his non-minority professors and staff. Defendant SUNY Upstate's President (formerly Interim President) never mentioned any non-minority faculty or staff by name, asking specifically what they were doing.

38.    I persistently defended his support and recruitment of minority staff and faculty, even in the face of incessant badgering and harassment from Defendants.

39.    My efforts toward pushing back against discriminatory comments, as well as my overall efforts to increase diversity were ultimately proven to benefit Defendants as the final LCME report, released on October 29, 2019, contained comments that were highly supportive and praising of my work.

40.    Additionally, the LCME granted Defendant SUNY Upstate full re-accreditation for an eight-year term, the maximum term that can be granted.

41.    My role as Dean was key to the re-accreditation process, as I was the person who started the accreditation visit process and was presented by Defendants to the accreditation body as the face and leader of SUNY Upstate's College of Medicine.

42.    Should Defendants have had any concerns regarding my performance at that time, they clearly would not have allowed me to represent SUNY Upstate's College of Medicine as its leader during a critically important three-day long accreditation visit by the LCME.

43.    However, Defendant ultimately retaliated against me based on Defendants' continued opposition to diversity and inclusion when they suddenly and unlawfully demoted me on September 13, 2019.

**Protected Activity – Creation of an External Scientific Advisory Board**

44.    Defendant SUNY Upstate ranks very poorly in terms of gender balance nationwide. Significantly, SUNY Upstate ranks 116 out of 128 medical schools in terms of male to female faculty ratio, with only 15% of the faculty being female.[3]

---

[3] https://www.statnews.com/2016/01/12/women-medical-school-faculty/

45.     In efforts to combat the underrepresentation of female employees, I appointed an all-female External Scientific Advisory Board (the "Board"), with members of the National Academies of Science and Medicine.  The Board first met on June 29, 2018, in order to have an ongoing relationship with SUNY Upstate.

46.     My purpose in having this group and working with them over time was to have outside input aimed at improving University programs and making Defendant SUNY Upstate more attractive and more competitive, and to provide much needed input from highly successful women in academic medicine in order to bridge the gender equity gap at SUNY Upstate.

47.     I asked the External Scientific Advisory Board for ideas on how to best promote horizontal integration, both across the basic sciences and clinical components of the university, and fostering translational integration, within various large thematic areas such as neuroscience, that exist across multiple departments, and which could benefit from helpful suggestions for further cohesion.

48.     I also asked the External Scientific Advisory Board to look at SUNY Upstate's graduate program, in order to see how to make it robust and more competitive.

49.     Thereafter the Board was provisionally scheduled to have its second meeting at SUNY Upstate on October 17, 2019, but in the summer of 2019, when I discussed the upcoming visit with the SUNY Upstate's President (formerly Interim President), he replied with sarcasm "Oh, do we have an External Scientific Advisory Board?" [sic].

50.     After my unlawful demotion on September 12, 2019, the Board was never convened again, and it was ultimately disbanded by Defendants.

**Protected Activity – Diversity Committee**

51. As part of my continued work in advancing diversity in the face of a lack thereof in SUNY Upstate, I strongly supported a Diversity Committee (the "Committee") within the SUNY Upstate College of Medicine. The Committee was an important component for Defendant SUNY Upstate's review and accreditation by the LCME.

52. This committee met monthly and had a broad agenda aimed at infusing diversity throughout the College. Membership included underrepresented minority faculty and students. The existence, functions, and involvement of the Committee was part of Defendant SUNY Upstate's structure presented to the LCME for accreditation, outlined earlier herein.

53. The Committee was led by a female Hispanic neurosurgeon. On several occasions, Defendants aggressively questioned me as to why this abundantly qualified individual had that role. It was clear to me that the principal reason for Defendants' questions was because of the individual's identity as a Hispanic woman, since I never received the same pushback regarding non-minority employees, nor would Defendants ever single-out non-minority employees in the same fashion.

54. In response, I continuously affirmed the neurosurgeon's qualifications and the work she did to advance the missions of the Committee to Defendants.

55. After the LCME visit and after my demotion, the Diversity committee was downgraded to meeting quarterly, and given a much-reduced role of only providing some oversight to the Office of Diversity and Inclusion.

**Protected Activity – Budget Committee/University Executive Committee**

56.     I also acted in opposition to discrimination in May and June 2019, when I notified Defendants about my concern regarding the gender-imbalance of the Budget Committee and recommended that women be included.

57.     Defendant SUNY Upstate's administrative structure includes a University Executive Committee (the "UEC"), which is presented to accreditation agencies as SUNY Upstate's decision-making body as the UEC is gender balanced.

58.     But although the UEC is held out by Defendants to be a decision-making body, at that time the UEC rarely met, with scheduled meetings every other week that were often cancelled.

59.     Instead, the Budget Committee, which at that time met every Tuesday and reviewed every executive-level decision for SUNY Upstate, was the *de facto* decision-making body for Defendants.  In most cases, executive-level decisions are rarely brought to the UEC.

60.     Furthermore, the agenda items for the Budget Committee are significantly more substantial than those of the UEC, both in terms of quantity and quality.

61.     In June of 2019, the Budget Committee consisted of six men.  On several occasions, I heard women employees of Defendants refer to the Budget Committee as the "new boy's club" and the place "where all the decisions are made." [sic].  The lone female who routinely attended the Budget Committee meetings was tasked only with taking notes and did not act as a decision-maker.

62.     In June of 2019, I notified Defendants that the decision-making Budget Committee was too gender-imbalanced and suggested that the female Chief Medical Officer and

the female Senior Associate Dean of Faculty Affairs and Faculty Development should be added to the Budget Committee group.

63. My communication of the gender-imbalance and efforts to abolish gender discrimination in the decision-making processes of Defendants constituted a protected activity. Less than three months after my protected activity; notifying Defendants of a potential discriminatory gender-imbalance, Defendants retaliated against me and unlawfully demoted me.

**Protected Activity – Attempts to Improve the Division of Student Affairs and Creation of the Director of College of Medicine Career Development Position**

64. Defendant SUNY Upstate has a Division of Student Affairs ("Student Affairs"), which is the office responsible for career planning and career development of all students, including those in the College of Medicine.

65. The Division of Student Affairs has been plagued by multiple complaints of discrimination, including a complaint by a former SUNY Upstate employee, that was posted on social media in 2019, prior to my unlawful demotion.

66. The public complaint stated:

> "Hi Everyone – Wanted to share a little about what I'm going through. Last year, I left my job at SUNY Upstate Medical University after experiencing a discriminatory environment and was underpaid comparable to my White colleagues in the division (perpetuated by my former supervisor and her supervisor). This past August, I filed a report with the New York State Division of Human Rights (NYS DHR). I went through the process, including a conference facilitated by an investigator, with my former supervisor and her supervisor, an Upstate attorney, and two women from HR. Recently, NYS DHR concluded the investigation and determined that there was probable cause for discrimination, which was incredibly validating. The next step is a public hearing for the case before an Administrative Law Judge. During my time at Upstate, I did my part in reporting my experiences with HR, my union, and

higher-ranking administrators. I was often turned away with no resolution or was told that there was already an investigation going on. That is why I decided to go through an external agency after I left Upstate. It was difficult to be part of an environment that was so hostile towards people of color and other people with marginalized identities. Witnessing the hostile and racist treatment towards students was the worst. Universities and colleges need to do a better job holding administrators accountable who believe that …" [sic].

67.     Earlier in 2019, I referred African-American medical students from SUNY Upstate to a colleague of mine at a highly-ranked, Ivy League-affiliated, national institution so that they could negotiate to do external rotations there.

68.     After each of those SUNY Upstate African-American medical students contacted that highly-ranked national institution, I received phone calls expressing serious concerns about how unprepared the SUNY Upstate medical students were and how they seemed to be "lost" and not well mentored in terms of their career development.

69.     Each time I was called about each student that I had referred, I promptly raised this with Defendant SUNY Upstate's Dean of Student Affairs.

70.     During each of those interactions, the Dean of Student Affairs was exceptionally defensive and would only say very angrily "N-of-1," meaning that this was a sporadic case and that it did not need to be taken seriously[4].

71.     Furthermore, the Dean of Student Affairs never showed any interest in the plight of the "lost students" and not once expressed to me any interest in even finding out who those students were, supporting those students, or identifying and addressing the underlying root causes.

---

[4] In scientific circles, an "N-of-1" trial is a clinical trial in which a single patient represents the entire investigation: a single case study.

72.   Based on the negative feedback I received regarding SUNY Upstate students and their
      career development and my concerns that there was a discriminatory motive behind
      Student Affair's actions, I reported my concerns and referred the Dean of Student
      Affairs to the Defendant SUNY Upstate's Organizational Training and Development
      Office to receive standardized feedback by way of a "360-degree evaluation," which
      usually includes both numerical feedback and written comments.

73.   However, the Organizational Training and Development Office only recommended
      numerical feedback because they were concerned that any written comments could
      include the accusations of racism or discrimination and, if they did, the written
      comments would be required to be reported to the Defendant SUNY Upstate's
      Department of Human Resources and potentially subject SUNY Upstate to liability.

74.   In light of this and in a continuing effort to promote diversity, I also decided to create
      a new position of Director of College of Medicine Career Development to oversee the
      career development plans of all students in the SUNY Upstate College of Medicine,
      particularly those from underrepresented diverse backgrounds who are members of
      protected categories.

75.   I posted the position of Director of College of Medicine Career Development and
      created a search committee, emphasizing the need to promote diversity and inclusion
      in the search process.

76.   I appointed the then SUNY Upstate Associate Dean of Student Affairs and Campus
      Life, to represent the Division of Student Affairs in the search process for the new
      position of Director of College of Medicine Career Development.

77.   I referred as a candidate to the search process an African American female Educator who had an MSEd with a concentration in Student Affairs Administration and who was working towards her EdD in Higher Education Leadership and Policy.

78.   This individual's husband had just been hired by me to Defendant SUNY Upstate as the only tenure-track or tenured African American basic science faculty member at SUNY Upstate Medical University.

79.   My initiatives towards diversity and increasing support in student affairs for minority students was intolerable to Defendants, and prior to my unlawful demotion I received protest from Defendant SUNY Upstate's Dean of Student Affairs regarding his appointment of a Director of College of Medicine Career Development.

80.   Specifically, instead of acting for the students and working to prevent any type of discrimination, the Dean of Student Affairs was insulted that they were not included in the search for the new Director and complained that "career development efforts are moving to [me] and this new person."

81.   After my unlawful demotion the search committee that I had created was rapidly disbanded and recruitment for the position of Director of College of Medicine Career Development was discontinued.

**Protected Activity – Creation of a part-time Assistant Dean for Cultural Competence**

82.   In July of 2019, I created a new part-time position of Assistant Dean for Cultural Competence in SUNY Upstate, and identified an Assistant Professor of Orthopedic Surgery, a well-respected African American orthopedic surgeon, as an ideal candidate, who would himself be an outstanding role model for underrepresented students.

83.    In the face of aggressive objections by Defendant SUNY Upstate's President (formerly Interim President), including demanding to know what the other specifically named individuals of diverse backgrounds were contributing to the University and why there existed a need for another position related to Diversity and Inclusion, on August 7, 2019, I verbally offered that position to the previously mentioned Assistant Professor.

84.    Fewer than three months after I fought for this appointment, I was unlawfully demoted from my position of Senior Vice President and Dean.

85.    Notably, after my unlawful demotion, the processing of that appointment was discontinued.

**Protected Activity – Promoting Diversity Among Appointments to Chair Positions**

86.    Defendant SUNY Upstate runs a multitude of departments, such as Medicine, Otolaryngology and Communication, and Anesthesiology, which are each headed by a Department Chair.

87.    Should a Chair position need to be temporarily filled while a long-term successor be appointed, as Senior Vice President and Dean, it was my responsibility to oversee the process resulting in the nomination of finalists for Interim Chair roles.

88.    It was also my responsibility as Senior Vice President and Dean to oversee the process resulting in the nomination of finalists for permanent Chair roles.

89.    In my contract with Defendant SUNY Upstate[5], it is stated that I would "Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics and Psychiatry."

---

[5] Exhibit 1

90.   I was working with an external search firm that informed me on or around September 5, 2019, that an external national search for the Chair of Medicine had been posted and fully launched and that the search firm was already in conversations with candidates.

91.   I had emphasized to this external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories.

92.   After I was unlawfully demoted Defendants ended the Medicine Chair search efforts and appointed the Interim Chair to the (permanent) Chair of Medicine position without the national search explicitly specified in my employment contract.

93.   The Individual who was appointed as Chair of Medicine was not a member of a group that Defendants presented to the LCME as being targets for diversity, and he was appointed without a search process which would have given candidates of diverse backgrounds an opportunity to be considered.

94.   Defendants were also informed by the external search firm, on or around September 5, 2019, that they were making sure to "move quickly to launch the [national] Chair [search] of <u>Otolaryngology</u>" and Communication.

95.   Again, I had emphasized to the external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories.

96.   After I was demoted, Defendants ended that search effort and appointed the Interim Chair to the position of (permanent) Chair of Otolaryngology and Communication.

97.    The Individual who was appointed as Chair of Medicine was not a member of a group that Defendants presented to the LCME as being targets for diversity, and he was appointed without a search process which would have given candidates of diverse backgrounds an opportunity to be considered.

98.    During my term as Dean, it became necessary to replace the Chair of Anesthesiology.

99.    Defendants then immediately began pressuring me to appoint a male faculty member from the Anesthesiology Department as Interim Chair, stating on three different occasions in sum and substance that that specific (male) individual was the "only one who could do the job."

100.   I heard that women employees considered the push for that specific man to be strongly suggestive of gender discrimination because that individual was not entirely qualified for the position.

101.   Therefore, I in my capacity as Dean organized a broad and diverse interview panel and on or around August 8, 2019, the panel interviewed four candidates for the Interim Chair of Anesthesiology role.

102.   After the interviews, the panel unanimously recommended the selection of a female candidate as Interim Chair based on her abundant experience in managing clinical affairs.

103.   On August 13, 2019, I informed Defendants in a small group setting of the panel's unanimous choice for interim successor.

104.   My insistence upon a gender-neutral search process for the Interim Chair was actively designed to contend against discrimination.

105.  According to Defendant SUNY Upstate Board of Trustees' policies, Chair appointments are made by the President; however, by creating a panel that assessed diverse candidates fairly and objectively, I effectively challenged Defendants not to appoint the female whom the committee unanimously identified as the most qualified.

106.  Thus, at the very next one-on-one meeting with Defendants, I was abruptly and unlawfully demoted from my position as Senior Vice President and Dean, without any cause being presented to me.

**Protected Activity – Lobbying Against a Discriminatory Salary Reduction**

107.  My wife also works for Defendant SUNY Upstate as a Professor of Psychiatry and Behavioral Sciences and Professor of Neuroscience and Physiology.  At the beginning of 2019, she was notified that her salary was going to be reduced by $45,000.00.

108.  On August 12, 2019, I attended a regularly scheduled meeting with Defendant SUNY Upstate's President (formerly Interim President).

109.  During the meeting, I asked if it would be appropriate to discuss this Professor's salary reduction to which the President agreed.

110.  I had no direct effect on her salary change and, in my position as Dean, had no power or influence in Defendants' decision to either maintain or reduce this Professor's salary.

111.  I stated that my wife, the Professor, is of Asian ancestry, she is culturally Hispanic and Latin American, and her national origin is Brazilian.  I further stated that, based on my understanding of the situation and facts, the Professor felt she may have a claim under Title VI and/or Title IX for discrimination since, to her knowledge, no white male professor was ever subjected to a salary reduction of this type.

112.  SUNY Upstate's President (formerly Interim President) offered no response to my report of potential discriminatory conduct on the part of Defendant but told me that he would get back to me.

113.  Less than a month after I opposed discrimination by reporting a female employee's potential discrimination claims on August 12, 2019, and less than a month since my actions to prevent discrimination in the appointment of the Interim Chair of Anesthesiology on August 13, 2019, I was unlawfully and suddenly demoted on September 12, 2019, in the absence of any other intervening interactions with the Defendants.

### My Demotion

114.  On September 12, 2019, I was hand delivered a letter (hereinafter the "Demotion Letter"), stating that my positions of Senior Vice President and Dean of the College of Medicine were terminated immediately. **Exhibit 2.**

115.  Defendants provided no justification for the demotion.

116.  The Demotion Letter additionally stated that, effective September 13, 2019, my annual salary would be reduced from $605,000.00 to $227,000.00.

117.  I was given no notice of the contemplated demotion, nor was I provided any transition period.  At no point did I ever enter into an agreement to modify my contractually provided transition and notice period or give any indication that I no longer wanted to maintain my position as Dean.

118.  Referring to my demotion, in Defendant SUNY Upstate's Council Meeting that occurred on September 16, 2019, Defendants stated to the Faculty Council that "there is not one horrible thing that happened for this change to occur, rather a change was

needed in leadership" and "overall, this is not a negative change, but rather a moving forward change and a removal of barriers."[6] **Exhibit 5**. These statements are wholly indicative of the fact that performance issues were not the cause of the unlawful demotion. Moreover, these statements suggest that I was a barrier to the institution's entrenched discriminatory policies.

119.    The Demotion Letter stated that as of September 13, 2019, my job title would change to Distinguished Professor in the Department of Psychiatry and Behavioral Sciences.

120.    Although this new title could be considered one of prestige, it was a significant demotion in rank and responsibility from my former position as Senior Vice President and Dean of the College of Medicine and was accompanied with a significant salary reduction, loss of job benefits and support staff, and materially adverse change in terms and conditions of my employment.

121.    In my role as a Distinguished Professor, my job duties now included conducting research, publishing scientific articles, as well as teaching and mentoring students, despite the fact that no resources were assigned to me to build my own research program.

122.    Following the demotion, I, in good faith, retained legal representation to engage with Defendants and Defendants' general counsel and explain that there appeared to be a retaliatory motive behind the demotion. Defendants and Defendants' general counsel dismissed the claims and said, in sum and substance, that "there was nothing to discuss."

---

[6] Evidenced by minutes of the meeting

123.    In light of Defendants' response to my allegations of retaliation, on September 13, 2019, I immediately filed for temporary injunctive relief in Onondaga County Supreme Court[7] in an effort to mitigate the damages of this unlawful demotion and protect my reputation from any inference of wrongdoing that might otherwise issue from the abrupt demotion.

124.    I believed it necessary to make all efforts necessary to protect my considerable reputation in my field, that Defendants were systematically dismantling.

125.    Nearly a month after my initial public filing to the New York State Division of Human Rights, on September 30, 2019, I received notice that Defendants were now investigating my prior complaints of discrimination, after I had been unlawfully demoted and my reputation being almost irreparably damaged.

126.    A representative of Defendants insisted upon meeting with me on October 21, 2019. Following that meeting, upon information and belief, the representative went on to ask my colleagues questions designed to elicit negative information about me, such as whether I contacted them through my personal email account and what they thought of me and if they could remember any issues they may ever had with me.

127.    There was no basis for Defendants' representative to ask my colleagues these particular questions, and the inappropriateness of the questions further indicates Defendants' attempts and intention to damage my reputation and career in further retaliation to my protected activities and opposition to discrimination within SUNY Upstate.

---

[7] The injunction was ultimately denied by the court as moot, as just a few hours before the case was scheduled to come before the court for relief, the Defendants hastily made the decision public and thus the damage could not be restrained.

**Ongoing Retaliation against Me and Ongoing Discriminatory Practices at SUNY Upstate**

128. Defendants continue to engage in discriminatory and anti-diversity practices that retaliate against me, which has already cost me my career as Dean, and which has actively prevented me from applying for other senior administrative positions within SUNY.

129. Since filing my discrimination complaint with the New York State Division of Human Rights ("DHR"), I experienced ongoing retaliation and discrimination.

130. The SUNY Diversity, Equity, and Inclusion Policy Memorandum dated September 10, 2015, specifies that searches that bring into consideration candidates from diverse backgrounds need to be conducted to fill senior positions. Moreover, the SUNY Policies of the Board of Trustees specifies procedures for senior administrative appointments.

131. In retaliation to my prior protected activities, I (the former Senior Vice President and Dean of the College of Medicine of SUNY Upstate) have been either denied or not considered for the roles, of i) President of SUNY Upstate, ii) SUNY Chancellor, iii) Dean of Medicine, iv) Director of the MD-PhD program, and v) Chair of the Department of Psychiatry.

132. Based on the timing of these appointments and my ample qualifications for each of those positions, there is no other reason as to why I was not given opportunities to be considered for, and to interview for, those roles other than the fact that Defendants were acting in retaliation to my protected activities.

133. In fact, for the appointment of the President of SUNY Upstate position, Defendant violated the State University of New York, Policies of the Board of Trustees Article

IX Title A, Chief Administrative Officer, § 1[8] when a subgroup of local Council members (excluding faculty), decided on their own, with no faculty consultation, that Defendant SUNY Upstate's aforementioned Interim President should be appointed to the permanent President's position.

134. Interim Presidents are not eligible to apply for a permanent position unless they receive a waiver in writing from the Chancellor. Such waivers are rarely granted, and they typically follow broad and inclusive requests from the faculty. But this, of course, did not occur. Instead, a hastily arranged "Zoom" meeting was held, where the Interim President was appointed SUNY Upstate President.

135. This irregular appointment occurred in the absence of any search process, any faculty input, and any effort to bring candidates of diverse faculty members to the table, as required by Defendant SUNY's own policies and guidelines.

136. In accordance with the Public Officers Law of New York State, specifically § 74 - Code of Ethics, state employees are prohibited from utilizing state resources to further their own political ambitions. This statutory provision mandates that no state officer or employee may exploit their official capacity to obtain undue advantages or exemptions, either for themselves or for others. Furthermore, the statute strictly

---

[8] "There shall be a chief administrative officer of each state-operated institution of the university who shall be designated president. Presidents shall be appointed by the Board of Trustees after receipt of recommendations of the campus councils (or of the Trustees of the College of Environmental Science and Forestry) and of the Chancellor, and shall serve at the pleasure of the Board of Trustees. Before making its recommendations, the campus council shall consult with a presidential search committee designated for such purposes by the chair of the council and comprised of members of the various campus constituencies, including faculty, students, professional employees, administration, alumni and members of the council. Reflecting the significance of the role that faculty are expected to play in academic governance, the faculty should predominate among the non-council constituencies on the search committee. The Chancellor, or designated representative, before making recommendations to the Trustees, shall consult with the chair or other designated representative of the college council."

forbids the use of state-owned assets, including property and employee time, for personal or political activities, notably those related to seeking political appointments.

137.   In this context, it was noted that then Interim President engaged New York State resources to facilitate meetings with state legislators at Upstate. These gatherings typically involved both group sessions, during which the President highlighted my achievements as Dean among institutional successes—without disclosing my role in these initiatives—and private discussions. Subsequent to these private discussions, several legislators issued letters endorsing the then-interim President for the permanent presidency. This sequence of events raises concerns under the aforementioned legal framework, as it pertains to the use of state resources in the advancement of a personal political agenda.

138.   Importantly, the scheme described above not only violated the Public Officers Law of New York State, specifically § 74 - Code of Ethics, but it also prevented women and members of other protected categories, including members of ethnic groups that are underrepresented in medicine, such as African American and Latinos, from being considered for the President's role.

139.   The rapidity of this process, including the immediate waiver, appointment with no search, absence of any consultation with faculty as required by SUNY Board of Trustees policies, deliberate exclusion of qualified minority candidates, such as me, and very high salary assignment, occurring all within less than three hours over "Zoom", was highly suggestive that that this entire process was pre-arranged, in complete violation of SUNY's guidelines and policies.

140. In over two years prior to the determination of probable cause by the DHR, Defendants had not conducted any open and transparent national searches for senior leadership positions with Defendant SUNY Upstate and Defendants have not named a single new individual to a senior position who are members of categories that Upstate identified as priorities for diversity.

141. In an admission of wrongdoing, following the DHR's determination in my case, Defendants hastily named three (3) individuals of diverse backgrounds to leadership roles.

**Defendants' Declarations**

142. Defendants' Declarations are rife with hearsay, mischaracterizations of events, and out-and-out falsehoods.

**Stephen Albanese, M.D.**

143. In his declaration, there is a purely pretextual attempt to portray me as less than competent and as someone of whom Chairs did not approve. (Albanese Dec., ¶5). That is simply not true, as documented by the following actions.

144. The Clinical Chairs at SUNY Upstate have had a tradition of meeting approximately monthly for dinner at a restaurant, far from the Upstate campus, to have personal discussions and when it is in their interest, to consider strategies to undermine the administration that they did not like or support. Those meetings were highly secretive and completely off the record. Unexpectedly, one day I was invited to join one of these dinners, and I then became a regular guest, by invitation. When I attended the first dinner, the Chairs told me that these outside secretive meetings had taken place for decades, and that I was the first Dean to join their group. The purpose of said meetings

was for the Chairs to discuss in privacy, strategies to deal with leaders above them that they did not like or have confidence in. It is not at all credible that those same Chairs would invite me to their "secret" meetings on a regular basis, if they did not like and support me and if I did not have their full confidence. The LCME corroborated this by declaring in their accreditation report that "[h]is (my) relationships with university officials, clinical affiliates, department chairs, and faculty members were noted by survey team members to be positive." If I was indeed the person that Dr. Albanese reported in his declaration, I would not have been invited to such dinners in the first place, certainly would not have become a regular, habitual participant in those dinners, and would not be cited by the LCME as having positive relationships with those same clinical chairs, whom the LCME interviewed in private.

145.   Further, while Dr. Albanese states in paragraph eight of his declaration that people were "offended" by me, this was never brought to my attention, verbally, by email, or in writing. (Albanese Dec., ¶8).

146.   Dr. Albanese failed to note that the award ceremony to which he refers included SUNY's highest honor and award, and that that award was bestowed on me. (Albanese Dec., ¶12). The ceremony started at 4 PM on September 11, 2019. I was formally demoted by Dr. Dewan the next day on September 12, 2019, at 11 AM.

147.   Finally, Dr. Albanese stated that I had "no vision" for the College of Medicine. (Albanese Dec. §13). However, he failed to cite the key facts that (1) I led a broad and inclusive effort that created the most recent Strategic Plan for the College of Medicine and that was successfully presented to the LCME and that positively contributed to the College of Medicine's accreditation, and that (2) all Chairs were invited to

participate in that Strategic Planning effort, but Dr. Albanese elected not do so. **Exhibit 3**.

148.  Dr. Albanese's statements are not credible for this critically important additional reason: from mid-August 2019 to the first week of September 2019, Dr. Dewan spent three weeks on vacation in India. We spoke before he left, and Dr. Dewan did not express or convey any concerns about my performance as Dean. He did not offer any type of communication plan between the two of us, and he assigned no one to oversee me in his absence. In other words, he left me in full charge of the College of Medicine, finding no need for my work during those three weeks to be overseen by him or by a designee of his. A President who is concerned about the performance of a Dean of Medicine does not go to the other side of the world for three weeks without any words of advice or advertence, without any type of supervision or communication plan with said Dean, and without nominating anyone at the institution for that Dean to report to and to oversee the work of that Dean.

### Lawrence Chin, M.D., FINNS, FACs

149.  Dr. Chin was first appointed Interim Dean and then permanent Dean of the College of Medicine without a search process, and without the required organized input from faculty and students, in clear violation of SUNY's BOT policies, and in violation of LCME guidelines. Dr. Chin therefore supports the administration that appointed him without the due process that is required by both SUNY and the LCME.

150.  I was able to organize and bring cohesion to the LCME accreditation process and was also the Dean at the time of the Middle States accreditation: something only an effective leader can do.

151. Dr. Lawrence Chin discusses five key ongoing initiatives of the College of Medicine as if they were his own (Chin Dec., ¶7); the initiatives are as follows:

- ACGME accreditation – full 8 years
- Diversity Advocates in each Department
- Three-year medical school curriculum
- Combined BS+MD degrees
- Women Chairs

152. Each of the five points was the fruit of my intellectual labor, the product of my innovative spirit, and the embodiment of my intellectual property. Regrettably, no acknowledgement of my contributions was made. Any listener, unbeknownst to the actuality, would have remained oblivious to the fact that these were indeed, entirely my initiatives.

153. Further, Dr. Chin compares me unfavorably to previous Deans. (Chin Dec., ¶17). While I promoted the above-mentioned initiatives and led the College of Medicine through successful accreditation, the other Deans led the College of Medicine to probation.

154. At that time, the College of Medicine was undergoing multiple crises that actually led SUNY to remove two Presidents in succession. Multiple leaders at the time reported the morale as being very low. I tried and succeeded in building morale and made more effective decisions regarding pressing matters such as the accreditation challenges and the items narrated above than most Deans in the history of the College.

155. Dr. Chin alleges that I would be on my phone or watching videos during meetings. (Chin Dec., ¶19). When this was the case, it was because I was answering time-sensitive messages during a time of crisis at the institution.

156.    On one single occasion, I arrived early at a meeting and was watching the news as Dr. Chin waited for other participants to arrive. Exactly at that moment, a prominent national figure made an inappropriate statement. As soon as I saw that, I turned off the video. This was a very brief episode lasting 1-2 minutes. My supervisor never brought this up as an issue and then, after I commenced litigation regarding my demotion, this one-time, insignificant incident has now been pretextually brought up multiple times in this Motion for Summary Judgment, when it was something that happened once, several months before the demotion.

157.    With respect to the August 13, 2019 meeting regarding the crisis in the Anesthesia Department (Chin Dec., ¶19), Multiple Chairs had insisted on a resolution of the crisis in Anesthesia and suggested 6:00 AM as the time to meet, before they started their surgical activities at 7:00 AM. I never scheduled meetings at that time and only scheduled that one meeting at that time at the request of some of the participants. Dr. Chin never asked me about calling the meeting to allegedly berate President Dewan. That is a false statement. (Chin Dec., ¶22).

158.    Note that after this meeting, I received a text message asking for Dr. Chin and another Interim Chair to spend a night around Labor Day 2019 in the then vacant apartment that I had in Manhattan. Clearly, Dr. Chin was on very friendly terms with me, and I initially accepted Dr. Chin's self-invitation to spend the night in my home, but then had to cancel due to my family's plans having changed, resulting in the apartment no longer being vacant.

159.    With regard to the accreditation process, the College of Medicine was having a serious problem at the time as Chairs were bringing issues directly to the President, which

was one of the reasons the College of Medicine went into probation in its previous accreditation, as that undermines the guidelines of the LCME. I was solely concerned about the challenges that needed to be addressed for the accreditation process.

160.   With respect to the search for the Neuroscience Chair (Chin Dec., ¶23), this process was initiated by me. After my demotion, that search was rapidly deemed "failed," and an internal female candidate, whom I had appointed to an interim role, was appointed as Chair after I had started litigation citing the insufficient appointment of female leaders at Upstate. Dr. Chin failed to note that Drs. Satterly, Paolo, and Thomas were all appointed from Interim positions. It is true that Drs. Miller and Taub came from outside the institution, but that only happened after I launched this litigation. Moreover, in medical schools Chair appointments happen after open and transparent processes, in which all faculty members are informed, so that they can nominate colleagues, and after the positions are announced nationally through a search process that is inclusive and makes active efforts to bring to the table minorities and members of underrepresented groups. Moreover, residents and students participate in that process as part of a search committee that is typically led by professional, external search firms, to avoid nepotism. To the best of my knowledge, there were no search committees and no external professional search firms involved in those appointments.

161.   That is further supported by the fact that that despite the Defendants' provision of a multitude of Exhibits, there is not one single exhibit documenting even one open search which lists search committee members (typically public information) and absolutely no documentation of such processes. Sometimes it is useful to ask about what is not presented and why it is not presented. In their motion, the Defendants do

not present any evidence whatsoever of inclusive processes for leadership appointments at Upstate. Such searches result in abundant documentation, such as ads, outreach efforts, emails to faculty informing them of the search and suggesting nominations, outreach to minority focused publications, societies, and institutions, search committee memberships, names of applicants, schedules of interviews and campus visits. Again, these materials are typically public. None of that has been presented by the Defendants.

162. On the contrary, Drs. Chin and Dewan ended existing search contracts with an external search firm for the Chairs of Medicine and Otolaryngology & Communication and appointed those Chairs without a search. It is noteworthy that Dr Chin's table (Chin Dec., ¶26) is factually incomplete as it fails to mention his Chair of Otolaryngology & Communication appointment. Moreover, Dr. Chin first appointed Dr. Sriram Narsipur as Chair of Medicine without a search and then Dr. Narsipur "stepped down" and was replaced by an Interim Chair in a process that violated SUNY BOT's policies. Only later was Cynthia Taub appointed, apparently without the type of search process described above, as we were in the middle of litigation.

163. Contrary to what Dr. Chin alleges, when making internal appointments, I utilized open internal search processes, in which the positions were advertised to all, and the individuals appointed were all interviewed along with other applicants. (Chin Dec., ¶25). The Defendants have file records of those processes, including search committee members and individuals interviewed. Several faculty members expressed to me their satisfaction that for the first time at SUNY Upstate senior appointments were made through such open and transparent processes. That is no longer the case.

164.   In my two years as Dean, I made modest (but positive) changes in diversity among senior staff. Those changes cannot happen overnight if one is to follow open, inclusive, and transparent processes, but those processes were presented to the LCME as being active, with the goal of increasing diversity. That is why this key item, which has been the cause of citation in other medical schools, was only listed as a citation and not a probation item. Dr Chin rapidly dismantled the diversity structure that the Plaintiff had established and terminated the open searches that had been initiated by me.

165.   In his Declaration at-large Dr Chin now attempts, pretextually, to justify the rapid dismantling of the diversity structure that I had established in the Dean's office. A good example is that just as I was being demoted, I was in the process of appointing Dr. Daryll Dykes, MD, PhD, JD, to Assistant Dean role in the realm of Diversity. Dr. Dewan specifically told me that he was not supportive of appointing Dr. Dykes to a diversity leadership position. Several months after my Demotion, I asked Dr Dykes if his appointment as Assistant Dean had gone through, and he said it had not. Then, after this became a topic in this litigation, Dr. Dykes was rapidly (and pretextually) appointed to a senior university position to address diversity.

**Robert Corona, DO, MBA**

166.   I was appointed by the previous President to be the co-chair of the search committee for the position of head of all clinical services, including the hospital. The previous President appointed Dr. Corona on an Interim basis and when asked, as he was stepping down, she refused to appoint Dr. Corona on a permanent basis as he was not chosen through an open search process. One of Dr. Dewan's first measures as

President was to close down that search process and appoint Dr. Corona without a search.

167. Dr. Ricardo Azziz, cited by Dr. Corona. (Corona Dec.,4) told me that Dr. Corona had never run a health care system, implying that he was not qualified for that role.

168. Dr. Corona acknowledged that the hospital lost approximately $32 million net annually because of the way it operated its operating rooms, yet he did not implement changes to address that.

169. As head of the hospital Dr. Corona failed to establish a merger between the Upstate and Crouse Hospitals, which are adjacent structures. The reasons for that failure include the fact that Upstate has had major financial losses under Dr. Corona.

170. Several Chairs came to talk to me about how dissatisfied they were with Dr. Corona's leadership of the hospital.

171. Nevertheless, according to SeeThrough NY (https://seethroughny.net/payrolls), Dr. Corona had in 2019 a rate of pay of $668,667 and total compensation of $721,810. Despite his multiple failures, Dr. Dewan increased Dr. Corona's pay to $816,280 (2023) and total compensation of $919,124 (2022) and $897,825 (2023).

172. Dr. Corona is the highest paid NY State employee. Please refer to this statement from the Times-Union: "The top earner among state workers last year was Dr. Robert J. Corona Jr., who made $919,000 as CEO of SUNY Upstate Medical University Hospital." Source:   https://www.timesunion.com/projects/2023/new-york-salary-database/

173. Dr. Corona told me on several occasions that SUNY Upstate's prior President Dr. Laraque-Arena and Chief Counsel Lisa Alexander met with Dr. Corona and he "felt

threatened as they accused him" of being a major contributor to the crisis that led to the stepping down of President Laraque-Arena, as he was a major contributor to exposing Dr. Laraque-Arena's Chief of Staff, Mr. Sergio Garcia.

174. This happened as Dr. Corona was trying to bypass the open search process that Dr. Laraque-Arena had instituted for his position (he was Interim then).

175. Most of the statements made by Dr. Corona in his declaration are simply not true. It was actually Dr. Corona who told me repeatedly that he was really concerned that he (Corona) would be demoted after the meeting with President Laraque-Arena and Chief Counsel Lisa Alexander.

176. Dr. Corona on multiple occasions said, unsolicited, that I had the best CV at Upstate and that I should be the University President.

177. The meeting of August 13, 2019, is highly misrepresented. (Corona Dec., ¶9) The meeting lasted 30 minutes (not an hour, as stated by Dr. Corona) as the Clinical Chairs had to go to their operating rooms and I did not spend the "hour" disparaging the President. There had been a major clinical crisis highlighted by multiple surgical Chairs that I addressed promptly to ensure patient safety. I also refused to promote to the Interim Chair role an underqualified male who the President had repeatedly recommended to me and instead opened an open internal search process under a search committee that identified a female who was so qualified that she was subsequently appointed to the permanent Chair's role. The major issue of that meeting was the fact that Dr. Dewan attempted to unilaterally appoint a less qualified male and I created an open search process that led to the identification of a more qualified female.

178. Chair appointments at Upstate are actually made and signed off on by the President. If the President found that the female was not the most qualified, he would not have followed the unanimous recommendation of the search committee and appointed her first as an Interim and then as the permanent Chair. The major sticking point in that meeting was that before an all-male group of surgical chairs and the President, I disclosed a transparent process through which a less qualified male indicated by the President was not nominated (once the male individual saw that there was an open and transparent process and knowing of his shortcomings, that person withdrew from consideration). And a more qualified female was openly, transparently, and unanimously recommended for the role.

**Mantosh Dewan, M.D.**

179. Notably absent from Defendants' motion is a declaration from former President of Defendant SUNY Upstate Dr. Laraque-Arena. Instead Defendants proffer a declaration, fraught with fatal hearsay, from current President Dr. Mantosh Dewan to cure this obvious shortcoming. Regardless, I will address the allegations herein.

180. In 2018, Mr. Sergio Garcia, the person who was then President Laraque-Arena's right hand and head of most, if not all, administrative roles at Upstate, including HR and construction of a $200+ million building, was revealed to be an impostor and that was exposed extensively in the national media. After those revelations, Mr. Sergio Garcia ceased to work at Upstate and President Laraque-Arena's presidency went into a downward spiral that eventually led to her demotion as President.

181. In that context, Dr. Laraque-Arena sought to appoint Dr. Dewan as "Vice President of Administration" to stop the administrative downward spiral of her Presidency. I was

informed that Dr. Dewan was very interested in the role as VP for Administration. However, HR had major concerns about the high salary proposed, supposedly over $500,00 per year, and HR then independently consulted SUNY Administration in Albany that they then stopped the creation of that role.

182. It is simply not credible that as her Presidency was spiraling down due to administrative matters, that Dr. Laraque-Arena would not seek to have Dr. Dewan help with the major crisis that she was facing and which led her to lose her position as President, which was the replacement of Mr. Garcia, but instead to address issues related to me but that she never brought up with me, in the context of giving me a positive performance evaluation.

183. Moreover, the comments made by Dr Dewan are utterly incompatible with the following facts: President Laraque-Arena emphasized the Presidential Symposium Series as a cornerstone of her tenure at Upstate Medical University. Under her initiative, the series titled "Connected to the Future" was launched, designed to draw distinguished experts from diverse fields such as science, industry, and information systems to discuss pivotal trends of the 21st century. In her role, she personally tasked me with organizing the Symposium on Transformative Education, over which she was to preside.

184. Importantly, only after her decision to step down, President Laraque-Arena advised me to discontinue the plans for the Presidential symposium as she would no longer serve as President. This request prompts reflection—would she have entrusted such a significant project to someone with whom she had unresolved tensions?

185.   Furthermore, President Laraque-Arena and I had a planned joint international trip, intended to establish ties with institutions in China and Germany, which also underscores the level of trust and mutual respect we shared. The purpose of this trip was to set up high-profile collaborations, indicative of a shared vision for global outreach. However, following the public demotion of her Chief of Staff, Mr. Sergio Garcia, and subsequent investigations into her presidency by SUNY, she deemed it unwise to proceed with the international visit during the inquiry.

186.   Further, I met one-on-one with Dr. Laraque-Arena for over two and a half hours at her request prior to her leaving.

187.   These developments illustrate a collaboration that adapted to administrative and situational changes rather than one marred by personal conflict.

188.   As to the discrimination complaint (Dewan Dec., ¶15), it was fully addressed in a manner that the then head of the Office of Diversity and Inclusion found satisfactory. That complaint was about the search position for the Chair of Pediatrics. There were two finalists, a male with an MBA and strong clinical, fiscal, and administrative experience leading a major division of a nationally renowned Children's Hospital and a female applicant who had "stepped down" from her clinical division role at a major medical school years before and was then solely involved in research for which was she was not Principal Investigator of a federal research grant.

189.   The female applicant had years before trained and worked at Upstate and had many female friends in the staff. She was interested in leaving the position she had then and applied to be Pediatrics Chair positions of a number of medical schools, including SUNY Buffalo, SUNY Upstate, Albany, and Rochester, which all happened to have

vacant Pediatric Chair positions at that time. Throughout the SUNY Upstate search process none of the female "friends" approached me to recommend the female candidate, while the search was ongoing and when such input would be welcome. While I had already selected the male candidate and was in the final stages of negotiation with that applicant, the female applicant was not appointed as Chair in Buffalo, Albany, or Rochester. The female colleagues/"friends" of that candidate then aggressively demanded that I stop final negotiations with the male candidate and appoint the female one, whom they had not previously recommended. When I told them that I could not reverse a search process at that late stage they filed a discrimination complaint against me, to which I responded to the satisfaction of the then head of the Office of Diversity and Inclusion who ultimately concurred with the appointment of the male candidate.

190.  Ultimately, I saw the crisis at Upstate mounting and on very few occasions, as Upstate was being harshly portrayed in over 100 negative articles in the national press, I did try to alert SUNY administration of the impending crises to avoid the types of negative outcomes that the university eventually ended up having. SUNY Upstate does not have an independent Board of Trustees. When watching the slow disintegration of the administration at SUNY, I had two choices: (1) Do nothing and stay silent and watch the institution collapse or (2) alert those in a position to help the institution. I chose the second option.

191.  Dr. Dewan never told me that I was under the "microscope" (Dewan Dec., ¶18), and just a few months before my demotion Dr. Dewan stated that my vast national network

of connections would be helpful in the recruitment of new Chairs for Upstate, including a new Chair of Psychiatry.

192. The observations surrounding February 4, 2019, are not accurate. (Dewan Dec., ¶21). I do not have a recollection of being told not to go to Albany to attend the Chancellor's State of the Union address. On the contrary, I do remember attending that event in Albany.

193. Dr. Dewan's assertions with regard to my communications with SUNY Chancellor Kristina Johnson's State of the University Address are misleading and inaccurate. (Dewan Dec., ¶21, 22). Just prior to Dr. Dewan's appointment as Interim President, SUNY Chancellor Dr. Kristina Johnson had come to SUNY Upstate and talked with leaders here, including with me, and told them that her major priority was to do private fund raising to bring national stars to SUNY. She then specifically told me that if I identified a national "star" for recruitment to approach her directly with an "ask" as she needed identified potential recruits for her fund raising. I did exactly what I was told, just as the Upstate President was transitioning. Unbeknown to me, that Chancellor was herself falling into disfavor with the State and was seeking employment elsewhere (which she attained) and was apparently no longer interested in dealing with fund raising for SUNY. Had I known that I would have avoided contact with Dr. Johnson. However, it should be noted that my interaction around that potential major recruitment followed the terms from the Chancellor.

194. Dr. Dewan brings up a complaint by Dr. Brangman. (Dewan Dec., ¶24-26). I negotiated a package of over three million dollars of support for Dr. Brangman's then new program. Yet, without using any of that money, Dr. Brangman was demanding

that I allocate additional funds to her that I simply did not have. At that time, I indicated to Dr. Brangman that she should first use the funds already allocated to her program before seeking additional institutional funding.

195.    Ultimately, Dr. Dewan never provided any feedback whatsoever to me that my performance was not satisfactory or that it had to improve in a specific way. The fact that there was no documentation of any performance issues at the time of my demotion was a key reason identified for the NY State Executive Division of Human Rights to issue its preliminary finding of probable cause. **Exhibit 4**. ("It is the prerogative of the Respondent to establish terms, conditions, and standards of Complainant's employment. However, there is very little documentation that would establish that his removal from his position as Dean resulted from Complainant's behaviors and/or actions, especially because there is no record of prior discipline. There is also a dispute among the parties concerning Complainant's knowledge of Respondent's dissatisfaction. The lack of documentation, coupled with the short time frame between Complainant's claim that he opposed discrimination and the adverse employment action, raises material issues of fact that should be resolved at public hearing.")

196.    Further, with regard to Dr. Dewan's allegations with regard to the search for the Chair of UMU's Department of Medicine (Dewan Dec., ¶20), I brought multiple highly qualified applicants, whom he did not know, to the table, through the external recruiting firm AMN Healthcare, which is recognized by Modern Healthcare as the nation's largest executive search firm. Briefly, the search was called off because as the search was ongoing, myriad scandals were erupting at

Upstate, with multiple negative stories in newspapers and online, and the President eventually stepped down in the context of an unprecedented SUNY evaluation of the institution. As this was unfolding, the top candidates withdrew one by one. Who wants to relocate to an institution marred by ongoing scandal? The search committee was very aware of these events, and it is highly unlikely that they did not understand that the search was affected by the internal turmoil at Upstate and resulting negative publicity.

197. Finally, Dr. Dewan was very thankful to me regarding the highly positive outcome of the LCME.

## Eric Frost

198. I have no recollection of the August 2018 meeting narrated by Mr. Frost, and it is not credible that I would storm into the President's Office and state to the person at whose pleasure I served that I was concerned about losing my job. (Frost Dec., ¶14).

199. Further, Mr. Frost distorted an important point: multiple staff and students reported to me that they felt profoundly discriminated against and that they felt that SUNY Upstate had a very strong tradition of harsh retaliation against those who complained of discrimination. (Frost Dec., ¶15). Because they feared such retaliation, they were uncomfortable reporting even the most egregious cases of discrimination. I then did state to the relevant stakeholders that they could approach me privately (as they know that their Upstate emails are monitored by the administration) and that I would work with those who felt discriminated against, so that ultimately, they could feel safe to file the appropriate complaints without fear of retaliation. I was very aware that I did not have an HR role, and never aspired to such a role. Therefore, I simply tried to offer

support to those who felt discrimination so they could have a way to address the perceived discrimination. Instead of trying to understand why the relevant stakeholders felt so fearful of reporting discrimination, Mr. Frost instead focused on himself and asked me to send a follow-up email, which I did.

200.   I would certainly prefer not to be in a position to oversee staff and students who felt grossly discriminated against but who did not trust HR to deal with their complaints fairly and who felt unsafe regarding retaliation that would follow such complaints.

201.   Mr. Frost's statement that I assigned roles and titles to non-union represented faculty unilaterally is false. (Frost Dec., ¶9). Those titles are routinely given to union members at SUNY Upstate when the management/confidential roles are not over 50% effort, which was the case in all of my appointments.

202.   And finally, in his own deposition Mr. Frost himself stated under oath that my intent to promote diversity could have been a factor in my demotion. (Frost Tr., 58:10-14).

**Leann Lesperance, M.D., PhD**

203.   I appointed Dr. Lesperance to a Dean of Education role at the main campus in Syracuse after an open internal search. Dr. Lesperance and I have had multiple friendly and productive interactions.

204.   In the spirit of the Defendants' pretextual efforts to disparage me, one isolated episode is highlighted and magnified. (Lesperance Dec., ¶6). In one student forum I explained to students who were starting and complaining of stress before having any patient care responsibilities that they needed to learn to manage stress because as their roles and responsibilities in the healthcare area evolved, their increasing responsibilities could be perceived by them as substantially more stressful than their current roles as pre-

clinical students. At that time, a small group of students comprising less than 4% of those present later expressed their dissatisfaction to the head of Student Affairs. The head of Student Affairs talked to me and I asked if there was anything that I could say or do to remediate that. The head of Student Affairs responded that she had already talked to them and there was no need for further interactions. Meanwhile, after hearing that feedback, I approached multiple students – many more than those who complained, and they universally told me that they liked the talk, which some of them characterized as "tough love" (their words), and that it helped them put their academic stress in perspective.

205. I had multiple interactions with Ms. Lesperance afterwards and this was never brought up again.

206. Importantly, my supervisor never brought this up as an issue to be addressed by me.

207. In their pretextual efforts to fabricate a case about my demotion, the Defendants have taken small, isolated incidents, occurring weeks, months, and even years before my demotion, and that are part of the course of any busy administrative position, to weave a narrative that deflects from the fact that my demotion was clearly discriminatory and retaliatory and that its timing was very closely related to the Defendants' discriminatory and retaliatory actions.

### Mark Schmitt, PhD

208. Dr. Schmitt states that the fact that I was not selected as the new MD/PhD Program Director had nothing to do with race, national origin or retaliation. (Schmitt Dec., ¶10).

209. Dr. Schmitt does not state why I was not included in the selection process.

210.   Dr. Schmitt does not state that I was substantially more academically qualified for that role than the person who was appointed without due process.

211.   Dr. Schmitt refers to a consultation with the students, but does not state whether the students were ever informed that I was very interested in that role.

212.   In previous iterations SUNY has stated that I had an obligation to disclose my interest in a role that was then occupied by someone else.

213.   No one in academic institutions goes around telling others that they want roles that are occupied by others. That is completely unheard of in academia. The time to disclose that is when there is an open search for a position. That is exactly why it is so critical to have such open searches.

214.   In the case of this specific role, the previous co-Directors were removed and the replacement immediately installed without any due process or timing that could allow me to express my interest.

215.   Moreover, Dr. Schmitt does not state what rationale, other than discrimination and retaliation, there was to deny me the opportunity to apply for that interesting role.

**Thomas Schwartz, PhD.**

216.   As set forth throughout my Declaration, I was very committed to having open national Chair searches that were inclusive and would bring candidates of diverse backgrounds to the table. Dr. Schwartz was Interim Chair of Psychiatry, and he knew well that with me as Dean, that there would be an open search for the position of Chair of Psychiatry. Soon after I was removed as Dean, Dr. Mantosh Dewan appointed Dr. Schwartz, a white male, as Psychiatry Chair without a search, and without broad consultation with the faculty as required by SUNY Upstate's own institutional guidelines, which were

followed by me when I previously appointed two Interim Chairs to Permanent Chair roles.

217.   What Dr Schwartz describes as "paranoia" (Schwartz Dec., ¶11) was actually a response to a previous failure of the College of Medicine that had gone into probation with one of the items for probation being the finding by the accreditation committee that the "dean does not have the explicit authority to ensure the implementation and management of the medical education program". As Dean, I had been specifically told that passing the accreditation visit was a very high priority. Therefore, the perpetuation of the exact same behaviors that directly contributed to the Probation in 2011 and that were cited in that probation letter was a major concern.

218.   Specifically, I wanted to be compliant with LCME guidelines, and for that reason I reminded Chairs that a key item in the previous LCME probation was the finding that the Dean was lacking in authority, and that by bypassing the Dean with administrative issues and going straight to the President without even informing the Dean of the issues in their Departments they were continuing a pattern of behavior that violated LCME guidelines and that had directly resulted in a severe probation in 2011. The centrality of governance issues for the probation was highlighted by Syracuse.com, which reported *"Syracuse, N.Y. -- An accrediting organization has put Upstate Medical University's medical school on probation because of concerns over the school's governance, curriculum and other issues. The Liaison Committee on Medical Education — LCME for short — had recommended last fall that Upstate be put on*

probation. *Officials of the SUNY academic medical center formally appealed the recommendation last week."*[9] That appeal was not successful.

219.   With regard to Dr. Schwartz's allegation that I was too often "off site" (Schwartz Dec. §12), This is factually false: I very specifically chose an MBA program with classes on Saturdays all day and Sunday morning every other week. That program was specifically designed for healthcare professionals with full-time in-person obligations in healthcare facilities. I would depart to such classes either after hours on Friday or Saturday morning every other week and return when such classes ended by noon on Sunday. I was on site full-time.

220.   With respect to Dr. Schwartz's assertions regarding Dr. Wong (Schwartz Dec. §§18-19), Dr. Wong had been a tenured Professor in leading national and global universities longer than one other researcher in the Psychiatry Department at SUNY Upstate: she was first appointed as Professor with tenure at UCLA, ranked as the country's number 1 public university, in 1999, and in 2006 she was appointed to named Professorship (Miller Professor) at University of Miami earning in 2006 a salary of $275,000, which is substantially higher than what Upstate offered her in 2017. Professor Wong came to Upstate in 2017 from a highly prestigious position as Strategic Professor at Flinders University, in Australia. She had had abundant and continuous federal research funding in the USA and in Australia since 1999. Dr. Schwartz falsely described Dr. Wong as an unfunded investigator. (Schwartz Dec., ¶21). She had a federally research project in Australia when she came to Upstate that lasted for a few years after she arrived at Upstate and before said funding ended, Dr. Wong had new NIH funding.

---

[9] https://www.syracuse.com/news/2012/02/upstate_medical_school_put_on.html

There was absolutely nothing risky about hiring Dr. Wong who had a track record of 18 years of being a tenured and federally funded professor. Dr. Schwartz failed to report that all research funding is based on term-limited grants and even if someone is funded, that funding will certainly end and in the long term they will need new grants as well. It is grossly inaccurate to say that Dr. Wong is a "risky hire," after she had proven herself as a highly productive and federally funded researcher at the full professor level at top global institutions for over 18 years continuously. (Schwartz Dec. §21).

221. Likewise, Mr. Schwartz's assertion that Dr. Wong did not make any complaints of discrimination during any of the meetings she had regarding her salary dispute is unfounded. (Schwartz Dec., ¶41). Despite primarily arguing on the basis of her contract, Dr. Wong's salary dispute was brought because she believed that she was being compensated less well, and having her compensation reduced, unfairly in comparison to her white male colleagues.

222. I know this because I specifically discussed the structure of Dr. Wong's salary with President Laraque-Arena at the time of their recruitment to Upstate and subsequently while Dean at Upstate and specifically asked her on multiple occasion whether the ALR for Dr. Wong was time-limited and she said "no, it [was] not time-limited." President Laraque-Arena re-assured me that many other individuals at SUNY Upstate had ongoing ALRs as part of their salary structures. Neither Dr. Wong nor I were ever informed by anyone else while Dr. Laraque-Arena was President that that ALR was time limited. I then discussed the matter with my experienced Chief of Staff, Ms. MaryGrace VanNortwick, who had 15+ years of experience at Upstate. She explained

that some ALR's come from Departmental budgets; therefore, Chairs may have an interest in reducing or eliminating them, as that would free up monies in their Departmental budget that they could then use for other purposes. However, Ms. VanNortwick explained, the funds for Dr. Wong's ALR came from a state appropriated (either 66 or 67 account) and if the ALR was reduced or cut, those funds would no longer come to the Department, and the overall budget of the Psychiatry Department would therefore be reduced. Ms. VanNortwick further stated to me that it was "unheard of" for Chairs to ask that NY State funds stop coming to support a faculty member in their departments. This strongly implied that Dr. Wong should not worry about having her ALR reduced or abolished because those funds would no revert to the Department of Psychiatry.

223.    In my opinion, Dr. Schwartz acting on behalf of Defendants, specifically chose to discriminate against Dr. Wong, reduce her income, and lose funds that were coming from the State to his Department to support Dr. Wong.

224.    To further substantiate the issue of discrimination, when discussing this matter with Dr. Mantosh Dewan, after asking and obtaining his approval to discuss this matter with him, Dr. Dewan specifically told me that Dr. Wong could not have a state salary higher than two male professors, both of whom had less time in the careers as Professors. Just as an example, Dr. Wong had been a full Professor continuously since 1999. In contrast, one of the male individuals that Dr. Dewan stated "could not earn less than Dr. Wong" was first appointed as a full Professor in 2017, the year that Dr Wong started at Upstate. The other one was first appointed Professor in 2002.

225.    I was unlawfully demoted shortly after this discussion.

**Damage to My Career and Reputation**

226.   In addition to denying through retaliation the opportunity for me to apply for multiple positions within the SUNY system, Defendants' actions severely harmed and continue to harm my career and reputation.

227.   In my field of employment, if an individual does not hold a Dean position for at least three years, it is generally assumed that the removal was due to some gross misconduct or incompetence.

228.   To be clear, during my tenure at SUNY Upstate, I was never accused of misconduct or lack of competence and there is no record of prior counselling or discipline related to any type of performance issues.

229.   Notwithstanding my efforts to prevent career damage, because of Defendants' unlawful demotion I immediately experienced significant reputational and professional damage by way of lost job opportunities and exclusion from the professional community because of concern that I would be considered controversial due to my sudden removal from the positions of Senior Vice President and Dean of Medicine at SUNY Upstate.

230.   As a result of my unlawful demotion, I received a sudden and significant pay cut of approximately $378,000.00, not including the facilities, memberships, and other benefits I received as Senior Vice President that I was now required to personally finance.

231.   I was also not given the eight (8) months' notice [or eight (8) months' salary] at the Dean's level after my stepping down from that role, as specified on page 7 of the offer letter (Licinio Dec., Ex. 1).

232.    Following my complaints and subsequent unlawful demotion, I have not been provided with an adequate research support package, my own laboratory, adequate start-up funding for a laboratory, a laboratory technician, a laboratory manager, an Assistant Professor, arrangements for postdoctoral fellow, or research expenses. Absent this proper support, it is nearly impossible for me to obtain data to support research grant funding that would allow me to pursue my distinguished scientific career in the areas that I had been formerly working at. I am currently funded thanks to a collaboration with my wife, Dr. Ma-Li Wong. My own independent research work has been curtailed as a result of the fact that Defendant has not honored the terms of the offer letter (Licinio Dec., Ex. 1).

233.    Furthermore, Defendants' actions harmed my career and reputation by depriving me of even the most basic funding for my scientific research or the ability to continue my membership and participation in professional organizations.

234.    Following my complaints and subsequent unlawful demotion, I was informed by Defendant SUNY Upstate's Psychiatry Department Chair that Defendants were withdrawing the budget support they had previously committed for my membership fees, license fees, and academic travel, including but not limited to my attendance at the Association of American Medical Colleges ("AAMC") meeting in Tucson, Arizona in November of 2019, for which I was enrolled to attend prior to the demotion.

235.    Additionally, my salary increase, to which I was entitled as a Distinguished Professor was removed from my base salary.

A-0872

236. Defendants have a thorough investigation and recording policy for any incidents or complaints of substantial performance deficiencies or misconduct and I was never notified, nor were there ever any indications that an investigation had taken place, or that I had any alleged performance deficiencies or had engaged in misconduct, such that would lead to my demotion.

237. The abrupt demotion from a major leadership position without any type of documentation of substantial performance deficiencies or misconduct is inconsistent with Defendants' own internal policies.

238. To the contrary, I was highly regarded in my position as Senior Vice President and Dean of the College of Medicine, had been celebrated as a Distinguished Professor the day before my demotion, and had been presented by Defendants to the LCME accreditation agency as the leader and face of Defendant SUNY Upstate's College of Medicine.

239. In November of 2019, Defendant's College of Medicine received full LCME accreditation for eight years, the longest accreditation period granted by that agency, as a result of a meticulous LCME review process that I led as Dean of the College of Medicine, and which occurred entirely during my term as Dean.

240. The previous accreditation visit by the LCME in 2011, prior to my employment, resulted in Defendant SUNY Upstate's College of Medicine being issued a substantial letter of probation.

241. As a result of being unlawfully demoted after opposing discrimination, I have suffered significant mental anguish and emotional harm, as well as lost wages and other benefits of employment.

242.   Furthermore, my reputation and distinguished scientific career have been almost irreparably damaged, such that I have lost both identifiable and unidentifiable employment opportunities, and as a consequence my future earnings are significantly harmed.

243.   As a result of my unlawful demotion, I have incurred, and continue to incur significant expenses in the effort to salvage my career, including career search expenses, travel and moving expenses, and similar costs.

244.   Based on the temporal proximity between my protected actions and my demotion, and in the absence of any documentation of performance-related issues, there is no other explanation for my demotion, other than that it was in retaliation for my several protected actions in opposition to Defendants' discriminatory practices.

245.   Additionally, my own Hispanic/Latino national origin contributed to Defendants' decision to unlawfully demote me.

246.   Since the founding of Defendant SUNY Upstate University College of Medicine in 1834, there had been no previous Deans who were women, Hispanic/Latinos or African Americans.

247.   In an effort to facilitate LCME accreditation, I, as the first Hispanic/Latino Dean, was held out as the leader and face of Defendant SUNY Upstate's College of Medicine. Once full accreditation was secured, Defendants reverted to course and unlawfully demoted me. And the Dean that followed me was neither a woman, Hispanic/Latino or African American, and was promoted to the position without open and inclusive processes as required by the Defendants' own written policies to promote diversity and inclusion.

248.   In essence, Defendants took what they needed from me and tossed me aside when it
suited.

249.   I was and remain distressed and suffering life altering consequences as a result of the
retaliation I suffered because of my protected activities.

250.   I declare under the penalty of perjury that the foregoing is accurate and true.

May 9, 2024

Julio Licinio, MD, PhD, MBA, MS
Plaintiff

A-0875

**Exhibit 1**

Case: 24-2564, 12/02/2024, DktEntry: 29.1, Page 132 of 256

A-0876

Case 5:21-cv-00387-GTS-TWD   Document 78-8   Filed 05/09/24   Page 2 of 12
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 2 of 12



**UPSTATE**
MEDICAL UNIVERSITY

March 14, 2017

Julio Licinio, MD, PhD
6 Baliol Street College Park
South Australia 5069 Australia

Dear Dr. Licinio:

I am pleased to offer you a Management/Confidential appointment as Senior Vice President and Dean of the College of Medicine. This appointment will be effective July 1, 2017. You will receive total annual state compensation, subject to changes as may be authorized or required by law, of $585,000.

You will also receive $48,000 in additional compensation not added to base pay, payable as $4,000 bi-weekly for each of your first 12 bi-weekly pay periods.

In this position you will report to me as President and you will have a seat on the University Executive Committee. In accordance with the SUNY Board of Trustees Policies, Article IX, Title B, Section 4, this is a Management/Confidential position that reports to and serves at the pleasure of the President. This M/C appointment is not for a designated period of time and SUNY does not have a mandatory retirement age.

This offer is contingent upon the satisfactory result of a routine criminal background investigation. This appointment is subject to the Policies of the Board of Trustees for the State University of New York (www.suny.edu/boardoftrustees/pdf/policies.pdf) as well as the responsibilities of a state employee as described in the Public Officers Law (http://www.suny.edu/hr/handbook/).

It is our understanding that you will use your best effort to obtain and maintain an unrestricted license to practice medicine in New York State.

**Faculty Appointment**

Concurrent with your management/confidential appointment as Senior Vice President and Dean of the College of Medicine, I am pleased to offer you a faculty appointment at the rank of Professor with tenure in the department of Psychiatry & Behavioral Sciences. Upon receipt of your signed acceptance of the terms of this offer I will provide an official appointment letter under my authority as President of SUNY Upstate Medical University. I will also then recommend to the Chancellor of SUNY for approval that your appointment be continuing (tenured).

1

A-0877

I am also pleased to offer you an academic appointment as Professor in the Department of Psychiatry, consistent with the College of Medicine review process, and the Policies of the Board of Trustees. You will also have secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism.

In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department.

You inquired regarding a SUNY Distinguished Professorship. The eligibility/selection criteria require that candidates must have at least one year of full-time service at the nominating institution. I agree to nominate you for a SUNY Distinguished Professorship when you satisfactorily complete the required service time. For additional information, please visit: http://system.suny.edu/media/suny/content-assets/documents/academic-affairs/distinguished-faculty-ranks/2015-2017-Distinguished-Guidelines.pdf

## Office and Other Support for Administrative and Tenured Professor Positions

You will be provided with an adequate office, with secretarial support.

A full-time research/academic assistant will be hired to support your needs, effective July 1, 2017. You will be able to participate in academic conferences and other educational opportunities as you determine necessary for the functioning of each of your roles and continued educational advancement and we will reimburse costs for such activities, including but not limited to, travel, CME, publications and professional society memberships, in each of your roles. In addition, the section on tuition reimbursement itemizes other opportunities for career-related advancement support.

I will also explore further the opportunity to gain additional academic opportunities in support of your desire to obtain an executive MBA.

The University will also provide executive coaching services for two years, not to exceed $60,000.

## Current Resources Available to the College of Medicine

The dollars projected to be spent by the College of Medicine from state and non-state sources during academic year 2016-17 of approximately $75 million are the basis from which we will start and will continue.

The College of Medicine has played a vital role in over the last three years in eliminating structural deficits that once existed for the University resulting in a sustainable operating plan with unallocated operating funds available for investment in strategic priorities, as further discussed below.

Based on our expectation of new resources available at the College of Medicine, it is our expectation that you will maintain and improve upon the current financial state of the University by identifying and

2

Case: 24-2564, 12/02/2024, DktEntry: 29.1, Page 134 of 256

A-0878

Case 5:21-cv-00387-GTS-TWD   Document 78-3   Filed 05/09/24   Page 3 of 12
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 4 of 12

implementing efforts to grow academic, research, and clinical revenues necessary to provide adequate funding of mandatory costs (salary and non-salary increases) relating to current obligations and any new strategic initiatives that may evolve in the future.

It is projected that new funds that become available through growth or turnover from these current sources, after annual funding of mandatory cost increases, will be available for reinvestment in the College of Medicine in alignment with the strategic plan of the University. Beginning in fiscal year 2017-18, should external funding sources of the University decline, the College of Medicine will share the decreases proportionately through expense reductions, reductions in new resources as noted below and/or through other actions.

**New Resources to be made available to the College of Medicine**

It is projected that new resources totaling $25 million over five years will be available to the College of Medicine as follows:

- State Allocated Funds - $2.5 million annually, $12.5 million over 5 years - This is the funding that is expected and is to be used for both recurring costs (i.e., new faculty base salaries) and one-time investments (i.e., academic faculty start-up packages). As faculty recruitments occur over this five-year period, it is expected that most of these funds will be fully committed and less will be available annually for new one-time investments.

- Chief Administrative Officer's (CAO) Fund - $2.5 million annually, $12.5 million over 5 years. This funding is derived from a 5% assessment on clinical revenues of the Clinical Practice Plan in accordance with Article XVI of the SUNY Policies of the Board of Trustees. The Fund is administered by the President of the University, as CAO of the University, and is intended to provide limited duration support for program investment while limiting its use for ongoing operating expenses. This amount represents approximately 25% of the annual CAO Fund assessment revenues as the remaining 75% is currently committed to ongoing support and one-time commitments and institutional strategic priorities primarily pertaining to the College of Medicine.

**Additional Resources:**

Additional resources are available from the clinical revenues of University Hospital and the Clinical Practice Plan. These resources provide the primary sources of investments in the clinical mission of the College of Medicine. As Senior Vice President and Dean of the College of Medicine, you will participate in the Hospital's annual budget process along with the Senior Vice President for Finance and Administration of the University. In collaboration with the Hospital, Clinical Practice Plan, and University leadership, you will be involved with establishing the annual priorities to be funded from clinical operations to ensure alignment with the University's strategic plan, including the priorities of the College of Medicine and the needs of an integrated clinical system. Examples of Clinical Practice Plan commitments included in the Hospital's 2016/17 budget process are as follows:

- Approval of $12 million in requests, including $3 million in limited duration recruitment (i.e. start-up) contracts, physician services and on-call contracts ($4.4M) and additional house staff ($2.5M).

3

A-0879

- Approval of additional one-time funding to support the development of a primary care strategy and a cutting edge clinical technology/data analytics fund, contingent on realization of Hospital budgeted revenues over multiple years. The approximate amount of these funds to be set aside is $10 million for primary care and $10 million for technology/data analytics over the next 2-3 years. The primary care investments will need to coincide with a rigorous strategic plan in collaboration with the Strategic Planning Office. The technology investments will involve detailed planning with the University Executive Committee, of which the Senior VP and Dean of the College of Medicine is a member.

In addition, certain revenues of the Clinical Practice Plan have been made available in the past to support joint initiatives, subject to the approval of Upstate University Medical Associates at Syracuse (UUMAS). The Clinical Practice Plan is also in the process of identifying funds in support of strategic priorities of the University, in collaboration with University leadership.

This should provide you with sufficient confidence in the commitment of the University, including the Hospital and the Clinical Practice Plan, in supporting clinical initiatives of the College of Medicine.

**Expectations and Initiatives**

Based on the foregoing projections and expectations of resources to be made available, our expectations and initiatives are as follows:

- Executive responsibility for all activities related to the accreditation of graduate degree, medical student degree programs and graduate medical education, ensuring and maintaining their accreditation status, including LCME, and addressing New York State Department of Education requirements relating to existing and new program requirements. Collaborate with the Vice President for Academic Affairs and University Leadership on ensuring and maintaining Middle States accreditation status for the University.

- Contribute to enhance the educational experience, to include continued efforts at curriculum reform in the College of Medicine and a renewed emphasis on transformative education including Graduate Medical Education, Continuing Medical Education, and Inter Professional Education, to bring us to the forefront in these areas. You will work collaboratively with the other Deans and the Vice President for Academic Affairs to develop inter-professional and educational simulation training. The lead for such collaborative efforts in inter-professional education will be the Vice President for Academic Affairs.

- Explore opportunities to expand and enhance our academic model, both internally and externally, including increasing the class size of the College of Medicine, increasing the percentage of incoming students who are non-resident, and increasing the percentage of incoming students from underrepresented backgrounds. Develop cross-campus collaborations within SUNY and other regional partnerships to address these and other needs and opportunities.

- Assist in developing an integrated clinical system and aligned clinical growth strategy, in collaboration with the University leadership, including the President, Senior Vice President for Finance and Administration, the Hospital CEO, and UUMAS leadership, to enable the University to thrive and grow successfully in a new era of payment for clinical services. Immediate priorities

4

Case: 24-2564, 12/02/2024, DktEntry: 29.1, Page 136 of 256

A-0880

Case 5:21-cv-00387-GTS-TWD   Document 78-8   Filed 05/09/24   Page 6 of 12
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 6 of 12

include the development of a regional strategy with a focus on cancer and ambulatory I primary care services. These improvements should better position the College of Medicine and the University for federal and state payment reforms anticipated in 2017 and beyond.

- In collaboration with the Vice President for Research, refresh the strategic plan for research to be in alignment with the University strategic plan in order to build interdisciplinary programs, increase expectations for extramural funding, and improve collaborative efforts across the campus and with other institutions.

- Manage the resources of the University and College of Medicine in such a fashion as to leverage them to the fullest extent to support the academic programs in alignment with our strategic plan. This will include a process to repurpose funds through reexamination of our funds flow methodology, and developing new incentives and expectations for performance. Develop measurable expectations of departments and faculty in the College, including teaching, research and clinical productivity and quality, to be incorporated into a financial plan for the College. Lead efforts to develop a standard compensation model across clinical departments of the College of Medicine, while recognizing inherent differences between departments.

- Work with the University Office of Development and the Upstate Foundation and the Medical Alumni Foundation and participate actively in fundraising efforts designed to enhance our capability of addressing issues such as scholarships, faculty growth and development and program support. In your role as Dean, you will have a role with the governing bodies of both entities.

- Develop appropriate mechanisms to evaluate department chairs in conformance with the intent of Article IX, Title C of the SUNY Board of Trustees Policies. The evaluations will include the success of the chairs in achieving the strategic goals of the University, including improving diversity and inclusion, research productivity, educational goals, clinical growth and quality, supervision of the performance and professional conduct of department members and other related activities.

- Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics, and Psychiatry to be staggered over the first three years of your appointment and as otherwise may be needed according to the urgency of the circumstance of other departments. Collaborate with University leadership in these efforts and also in the recruitment of the Director of the Cancer Center, which is a shared reporting relationship to the Dean of the College of Medicine and the CEO of University Hospital. Opportunities to combine the Medicine chair and Cancer Center recruitment efforts is encouraged but not required.

**Honoraria and other Outside Income:**

The Senior Vice President and Dean of the College of Medicine is considered a New York State policy-maker, and is therefore subject to certain parameters and/or limitations on outside income as outlined in regulations of the New York State Joint Commission on Public Ethics (JCOPE), and:

5

Case: 24-2564, 12/02/2024, DktEntry: 29.1, Page 137 of 256

A-0881

Case 5:21-cv-00387-GTS-TWD   Document 78-3   Filed 05/09/24   Page 7 of 12
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 7 of 12

- Is prohibited from serving as an officer, director or board member of a political party or political organization or as a member, officer, director, board member or district leader of a committee of a political party;

- Must obtain my prior approval as well as the approval of JCOPE (or successor agency) before holding other public office or engaging in other public employment for more than $5,000 annually; engaging in any private employment, business or other activity for more than $5,000 annually; or my approval if serving as director or officer of a for-profit corporation or institution, regardless of compensation;

- Must obtain my prior approval before engaging in private employment or other activity for annual compensation between $1,000 and $5,000;

- Must report any honorarium or travel reimbursement received from each source which is over $1,000 on your annual financial disclosure statements;

- Subject to my prior approval, you may serve on no more than two corporate boards of directors for compensation, and an unlimited number of not-for-profit boards without compensation.

For information as to the above requirements and additional requirements within the statutes of the Public Officers Law and the regulations enforced by JCOPE, see www.jcope.ny.gov.

It is also hereby agreed that you may continue to write, publish and edit books, journals and other texts/media, including, but not restricted to, print and electronic, in your field and other areas, and that you may retain the income from such publications for your personal use, with the understanding that this private income must be reported on your annual Financial Disclosure Statement as outlined in the paragraph above and must not interfere with the performance of your responsibilities outlined above.

**Annual Financial Disclosure**

All state policy-makers must file with JCOPE (or any successor agency) an annual financial form which requires disclosures in general categories of all sources of income and assets, including income earned by a spouse or assets held by a spouse.

**Defense/Indemnification in Civil Proceedings and Reimbursement in Criminal Proceedings**

If sued in a civil matter in an individual capacity, defense and indemnification are available upon request to the Attorney General in those situations in which the act underlying the complaint is alleged to have occurred within the scope of the officer's public duties, provided that the individual has not engaged in intentional wrongdoing. Certain procedural steps must be followed.

Our Central New York Office of General Counsel is available to provide you with any assistance you may need. As a state officer, the Senior Vice President and Dean of the College of Medicine is accorded criminal defense reimbursement and civil defense and Indemnification protection by statute (Sections 17 and 19 of the Public Officers Law).

6

Case: 24-2564, 12/02/2024, DktEntry: 29.1, Page 138 of 256

A-0882

Case 5:21-cv-00387-GTS-TWD   Document 78-3   Filed 05/09/24   Page 8 of 12
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 8 of 12

In criminal cases, reimbursement is available, with the approval of the Attorney General, for reasonable attorneys' fees and litigation expenses incurred by an officer in the defense of a criminal proceeding arising out of an act which occurred within the scope of the officer's public duties, following acquittal or dismissal of the proceeding.

**Employment of Related Persons**

Section 73(14)(a) of the Public Officers Law states: *No state officer or employee may participate in any decision to hire, promote, discipline or discharge a relative for any compensated position at, for or within any state agency.* The SUNY Code of Ethical Conduct for University Officers policy contains similar language.  For additional information on this subject, please visit:

http://www.jcope.ny.gov/training/2016%20Public%20Officers%20Law%20for%20State%20Officers%20and%20Employees.pdf

http://www.suny.edu/sunypp/documents.cfm?doc_id=61

It is understood that your wife, Ma-Li Wong, MD, PhD and you are moving together to the College of Medicine and that your ongoing scientific collaboration does represent a potential conflict of interest under this clause which is mitigated as detailed by the posting above.

Please refer to the Appendix to this document for information on health and retirement plans, as well as, moving expenses and other benefits.

**Mutual Understanding of Notice for Transitional Need**

In the event a decision is made by you or the University, for any reason other than misconduct[1], that you will step down from the position of Senior Vice President (SVP) and Dean of the College of Medicine (COM), we will provide each other with 8 months' notice in writing of the end date of your stepping down from the position of SVP and Dean, COM, and we will work together during this period of time to enable a smooth transition to new leadership, as well as your own transition into a faculty position at SUNY Upstate Medical University, under the terms described on page 2 of this letter, and such time period may be modified upon mutual written agreement.

**Mutual Understanding of Non-Compete Notice**

In consideration of the terms of compensation in this offer of employment, you agree, when your employment with the University ends, you will not obtain employment within 200 miles of the University for a period of 3 years.

I will be pleased to welcome you to Upstate on July 1, 2017. Should your relocation arrangements take longer than expected we will work with you to re-negotiate a mutually agreeable date for your start that is

---

[1] Misconduct is defined as the failure to fulfill the conditions of employment as described in the offer letter, violation of a provision of the Public Officers Law or a written policy of Upstate Medical University and/or the State University of New York, as well as acts of dishonesty, theft, conviction of a felony, disorderly or immoral conduct at work, insubordination, engaging in conduct which constitutes a violation of the Penal Law of New York State, breach of a fiduciary duty owed to the University and/or actions that expose the University to liability.

7

Case: 24-2564, 12/02/2024, DktEntry: 29.1, Page 139 of 256

A-0883

Case 5:21-cv-00387-GTS-TWD   Document 78-3   Filed 05/09/24   Page 9 of 12
Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 9 of 12

no later than September 15, 2017, maintaining all the terms and conditions of this offer. I look forward to your many future contributions to the University.

If these terms and conditions are acceptable, please indicate by signing below and returning the signed copy to me at your earliest convenience.

Sincerely,

Danielle Laraque-Arena, MD, FAAP
President
Professor of Pediatrics, Psychiatry, and Public
Health & Preventive Medicine

cc: Personnel File Enclosure

I hereby accept the foregoing appointment and the terms described herein.

[Name]                                               [Date]

8

Case 5:21-cv-00387-GTS-TWD   Document 1-1   Filed 04/04/21   Page 10 of 12

## APPENDIX

Please be advised that the information contained in this appendix is provided for summary purposes only. In all cases, actual terms and conditions of employment and benefits are governed by applicable State and federal regulations, SUNY policy, plan documents, insurance contracts, etc.

### Payroll Procedures

New York State employees are paid on a two-week lag basis. There is a five-day deferral of pay for new Management/Confidential employees, which results in one day's wages being withheld in each of the first five paychecks.

### Moving Expenses

Qualified moving expenses for household goods and personal effects will be paid for by Upstate. Moving expenses must be reasonable and in accordance with IRS guidelines and Upstate's policies. You will be required to get no fewer than 3 estimates and select the lowest responsible carrier. Moving expenses relating to your laboratory will also be paid for by Upstate directly to the contracted moving company using the same standards as noted above.

### Tuition Reimbursement

The M/C Tuition Reimbursement Program provides financial support for approved course work on a reimbursement basis that is categorized as either job-related or career-related and offered by approved schools or organizations. Covered tuition expenses are currently reimbursed at the rate of 75%, up to a maximum reimbursement of $2,000 per fiscal year. As noted in the offer letter, we will explore the opportunity for additional academic support in line with the seeking of an advanced degree (e.g. MBA).

### Retirement Benefits

There are three retirement program options available:

1. New York State Employees' Retirement System (ERS);
2. New York State Teachers' Retirement System (TRS); or
3. Optional Retirement Program (ORP).

ERS: A state-administered defined benefit retirement fund consisting of employer and employee contributions. Salaries of $100,000 or more requires a 6 percent employee contribution, which is tax-deferred for federal taxes. A participant's retirement benefit is computed as a percentage of his or her final average salary. The percentage received is determined by the number of years of service credit earned. Ten years of full-time service credit is required to be vested.

9

A-0885

TRS: The retirement benefit is calculated similarly under the TRS system as under ERS. Vesting rights under the two systems are also similar and salaries of $100,000 or more require a 6% employee contribution.

ORP: This is a defined contribution program available to full-time professional employees of the State University. The ORP is offered through the Teachers Insurance Annuity Association (TIAA), VOYA, and VALIC. Three hundred and sixty-six (366) days of continuous employment are necessary to vest retirement benefits under this program. Vesting is immediate if you currently own annuity contracts that include employer contributions with any of these investment providers.

The State contributes 8% of salary for the first seven years of employment, and 10% thereafter; up to the maximum pensionable limit. Salaries of $100,000 or more require a 6% employee contribution; for a total contribution rate of 14 to 16% of salary. Employee contributions are tax deferred for Federal Income tax purposes, and all distributions are exempted from NYS taxes.

## Health Insurance

As a new New York State employee, you may participate in the New York State Health Insurance Program (NYSHIP) in accordance with its terms and conditions. There is a fifty-six (56) calendar day waiting period before health insurance becomes effective. NYSHIP offers the availability of a modified indemnity fee-for-service plan (the Empire Plan) or Health Maintenance Organization (HMO) in a particular area. Health insurance premiums are paid on a "pre-tax" basis, unless an individual files a declination within the first 56 days of employment.

NYSHIP coverage is available for you, your spouse or domestic partner, and children up to age 26.

NYSHIP coverage is also available:
- For unmarried dependent child(ren) age 26 or older who are incapable of supporting themselves due to a mental or physical disability acquired before termination of their eligibility for health insurance; and
- For children ages 26 to age 30 to purchase young adult individual coverage at full cost with no employer subsidy.

## Management/Confidential Benefit Program

Dental: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. Coverage becomes effective on the first day of the month following the completion of six (6) months of continuous employment. This program, offered through the GHI Insurance Company, provides coverage on a fee-for-service basis.

Vision Care: Coverage is available for the employee, spouse or domestic partner, children under 19 and dependent children under 26 who are full-time students. The plan provides eye care coverage, including an eye exam and one pair of glasses or contact lenses at a participating doctor every two years. Coverage becomes effective following a fifty-six (56) day waiting period.

10

A-0886

Flexible Spending Accounts: The Health Care Spending Account (HCSA) and the Dependent Care Advantage Account (DCAA) offer a way to pay for un-reimbursed medical expenses and dependent care expenses with pre-tax dollars. An employee may contribute up to $5,000 annually to the DCAA and from $150 to $2,500 to the HCSA.

Group Life Insurance Program: This is a group-term life insurance program available on a payroll deduction basis. Employees may enroll for a fixed dollar amount or multiple of salary levels of coverage up to a maximum of five time's annual salary, currently capped at $500,000. Coverage is available without proof of insurability if the employee enrolls within 12 weeks of employment. Dependent group life insurance is also available up to 50 percent of the enrollee's benefit to a maximum of $20,000 for a spouse and in a flat amount of $4,000 for each eligible child.

Group Disability Insurance Program: The Group Disability insurance Program for full-time Management/Confidential employees is a cost-free benefit which provides income protection for a total disability after completing one year of State University service. (If you were covered within three months of appointment under a similar disability insurance plan by your last employer, the waiting period may be waived.) The plan provides an income benefit of 60% of salary to a maximum of $7,500 per month and also makes payment to a pension plan on the employee's behalf.

Tax-Deferred Savings Plans: SUNY offers a variety of tax-deferred savings options under Sections 403(b) and 457 of the internal Revenue Code. These tax-deferred savings plans permit savings toward retirement through automatic payroll deductions. The taxable salary is lowered since deduction is not subject to Federal, New York State or local income tax. An employee may direct his or her investment into 403(b) plans administered by TIAA, VOYA, VALIC or Fidelity and/or a 457 plan, the NYS Deferred Compensation Plan, administered by Nationwide.

**Annual and Sick Leave Accruals**

Management/Confidential employees accrue sick leave up to 200 days and annual leave (not to exceed 40 days at calendar year end) at a rate of 1.75 days per month in each category. Payment for up to thirty {30} days of unused annual leave at full salary is permitted upon resignation or retirement in good standing. Additionally, Management/Confidential employees earn an additional day of annual leave each January 2nd.

11

A-0887

**Exhibit 2**

A-0888



*Office of the President*

September 12, 2019

HAND-DELIVERED
Julio Licinio, MD, PhD, MBA
7 Brattle Road
Syracuse, NY 13203

Dear Dr. Licinio:

You have been employed by the State University of New York Upstate Medical University in the title of Senior Vice President for Academic Health Affairs and Dean, College of Medicine, which is an unclassified Management Confidential position. By this letter, you are notified that your employment in this position is terminated effective immediately. Any other association, position or role, including any held ex officio, with the State University of New York, Upstate Medical University, Upstate University Hospital and any campus-related entity of Upstate Medical University, that you held by virtue of your position as Senior Vice President for Academic Health Affairs and Dean are also terminated effective immediately.

Effective September 13, 2019, your state title will become Distinguished Professor in the Department of Psychiatry & Behavioral Sciences and you will be compensated at a base annual State salary of $227,000. Effective September 13, 2019, your office location is your lab space on the third floor of IHP and you will report to the Chair of Psychiatry & Behavioral Sciences, Dr. Thomas Schwartz.

You are required to immediately return all property of the State University of New York Upstate Medical University associated with your position as Senior Vice President for Academic Health Affairs and Dean, College of Medicine, including any and all property of the Upstate University Hospital and including any property purchased by you with reimbursement from the State University of New York, Upstate Medical University, Upstate University Hospital, or any other campus related entity, including without limitation any and all keys, identification badges, cell phones, computer equipment and software, thumb drives, parking passes, hard copy and electronically stored files, documents and notes, passwords for all Upstate devices, procurement cards, and travel cards.

750 East Adams Street | Syracuse, NY 13210 | Ph: 315.464.4513 | Fax: 315.464.5275 | www.upstate.edu | State University of New York

JL000031

A0888

A-0889

Please contact the Human Resources Benefits Office to review the applicable benefit changes resulting from this change.

Sincerely,

Mantosh Dewan, MD
Interim President

cc:     Payroll
        Employee/Labor Relations
        Personnel File

A-0890

Exhibit 3

A-0891



UPSTATE
MEDICAL UNIVERSITY

COLLEGE OF MEDICINE

# COLLEGE OF MEDICINE STRATEGIC PLAN – TIER 2 BALANCED SCORECARD

August 21, 2018

*Senior Vice President for Academic Health Affairs, Executive Dean and Dean, College of Medicine:*

Julio Licinio, MD, PhD

*Strategic Plan Lead:*

Robert Corona, DO, MBA – Chief Innovation Officer, Chair of Pathology, and Interim CEO of Upstate University Hospital

A0891

A-0892

Case 5:21-cv-00882-GTS-TWD Document 78-3 Filed 05/6/914 Page 3 of 5

# 2018 College of Medicine Strategic Plan

## THE UPSTATE MEDICAL UNIVERSITY TIER 1 STRATEGIC PLAN – *OUR UPSTATE*

The Upstate Medical University *OUR Upstate* – One University Roadmap – Strategic Plan launched in April 2017. This plan, designed to align Upstate's tripartite missions of education, clinical care and research, utilizes the Balanced Scorecard framework and Strategy Map for identification of institutional key strategic priorities and a tiered approach through which Upstate entities align with the institutional plan. The tier 1 university-wide strategic objectives strive to achieve the organizational strategic results of *integration, innovative learning and discovery, community impact,* and *execution and growth.* Tier 2 represents the business and support units (i.e. colleges, divisions, departments, programs) and Tier 3 consists of employees or teams of individuals who perform similar tasks. Throughout all tiers, perspectives represent the lenses through which we measure performance. Objectives represent areas of continuous quality improvement or high-level goals.

## COLLEGE OF MEDICINE TIER 2 STRATEGIC PLAN

This Tier 2 College of Medicine Strategic Plan directly connects the institutional strategic objectives to the operations and priorities of the College of Medicine. This aligned plan demonstrates how the College of Medicine directly impacts the institutional mission, vision, and strategies and how the larger university directly supports the College of Medicine's focus on training future physicians, educators and researchers. The College of Medicine Tier 2 Strategic Plan identifies and operationalizes the Tier 1 strategy map objectives most relevant to the specific mission of the college.

## MISSION

*The mission of SUNY Upstate Medical University is to improve the health of the communities we serve through education, biomedical research and health care.*

## VISION

The vision for the SUNY Upstate Medical University College of Medicine is to be a transformative asset for the central New York State region be healthcare leaders with depth of knowledge and a life long commitment to make a difference. We will be increasingly known for attracting those dedicated to learning, teaching, conducting research, and receiving outstanding healthcare. We envision a community that is not only diverse, but also highly inclusive of those with different ethnic and personal backgrounds, open to diverse ideas, opinions, and perspectives and that welcomes those who are differently abled. We are committed to excellence, creativity, continuous improvement, collegiality, teamwork, interprofessional education, financial responsibility, transparency, mutual respect, ethics, integrity, and to delivering superb medical care that is both state of the art and compassionate. At Upstate, professional development, new knowledge and discovery are applied to healing.

## STRATEGIC OBJECTIVES

*PERSPECTIVE: ORGANIZATIONAL CAPABILITIES (PEOPLE, TECHNOLOGY, AND FACILITIES)*

**OBJECTIVE: INCREASE DIVERSITY, EQUITY, ACCESS AND INCLUSION**
Intended Results:
- The College of Medicine recruits and retains students, faculty members, and senior administrative staff who reflect the community in terms of race/ethnicity, class, gender, sexuality, religion, disability, region, nationality and other dimensions of diversity.

Upstate Medical University – College of Medicine, Tier 2 Strategic Plan version 8/21/18
*Prepared by the President's Office of Strategic Affairs*

1

A0892

A-0893

Case 5:21-cv-00817-GTS-TWD Document 78-3 Filed 05/0/24 Page 4 of 5

# 2018 College of Medicine Strategic Plan

- The College promotes a welcoming, supportive and stimulating environment that encourages personal and professional development while recognizing the unique needs of individuals and interacting with cultural humility.
- The content of the curriculum is characterized as inclusive and free from bias.

| Initiative(s) | Performance Measure(s) |
|---|---|
| Increase recruitment and retention of diverse students, faculty, and senior administrative staff | Recruitment and retention data for faculty, students, and senior administrative staff |
| Increase student access to research opportunities | 75% of students participate in research activities (e.g. Student Research Day; student publications, posters, presentations at professional meetings) |

**OBJECTIVE: IMPROVE CULTURE OF TRUST**

Intended Results:

- The College of Medicine promotes a safe and collaborative environment in which students trust faculty and staff and faculty and senior administrative staff trusts leadership.
- The learning environment is collaborative, free of mistreatment, with the necessary supports for faculty and senior administrative staff collaboration and optimal student learning.

| Initiative(s) | Performance Measure(s) |
|---|---|
| Improve the learning environment (e.g. address bias, reduce mistreatment, and improve student perception of faculty professionalism) | AAMC GQ and internal learning environment tracking measures |

**OBJECTIVE: INCREASE WORKFORCE AND LEARNER SATISFACTION**

Intended Results:

- The College of Medicine fosters a supportive environment that invests in and promotes faculty and senior administrative staff development.
- Learner satisfaction is a priority, is continually assessed through a variety of mechanisms and student identified concerns are subsequently addressed.

| Initiative(s) | Performance Measure(s) |
|---|---|
| Improve student satisfaction scores in courses and clerkships that are below national or internal benchmarks | AAMC and local assessment data; course and clerkship evaluations; survey data; no courses or clerkship below 50th percentile |
| Support faculty development initiatives | 50% of faculty in each department attend development programs over a 5-year period |

**OBJECTIVE: OPTIMIZE TECHNOLOGY, FACILITIES, AND SUPPORT SERVICES**

Intended Results:

- The College of Medicine employs desirable technology, facilities, and support services for teaching, research, and patient care.
- Current resources are fully utilized and future needs are identified and appropriately resourced to maintain a first-class environment.

| Initiative(s) | Performance Measure(s) |
|---|---|
| Enhance immersive simulation training in the College of Medicine | Track simulation programming and number of students by courses/clerkship; student performance outcome data |

Upstate Medical University – College of Medicine, Tier 2 Strategic Plan version 8/21/18
*Prepared by the President's Office of Strategic Affairs*

2

A0893

A-0894

# 2018 College of Medicine Strategic Plan

| PERSPECTIVE: INTERNAL PROCESSES |
|---|

**OBJECTIVE: INCREASE INTEGRATION (GROW & INTEGRATE THE ACADEMIC ENTERPRISE)**

Intended Results:
- Promote the growth and integration of basic and clinical sciences in the College of Medicine.
- The College of Medicine curriculum is horizontally and vertically integrated.
- Interprofessional Education (IPE) is incorporated within College of Medicine programming.

| Initiative(s) | Performance Measure(s) |
|---|---|
| Increase the research portfolio | 50% increase in NIH funding over the next 5 years |
| Build translational research through integration and increased collaboration between basic and clinical departments | Obtain at least 4 major interdisciplinary, multi-PI research proposals over the next 5 years |
| Integrate basic science and clinical curriculum. | Curriculum inventory; AAMC/GQ data specific to curriculum integration (basic science and clinical integration) |
| Grow Interprofessional Education (IPE) initiatives to develop skills in collaborative care, including simulation | Track IPE programming and number of students by courses/clerkship; Simulation training data |

| PERSPECTIVE: LEARNERS, PATIENTS, COMMUNITY AND OTHER STAKEHOLDERS |
|---|

**OBJECTIVE: REDUCE HEALTH DISPARITIES**

Intended Results:
- The College of Medicine reduces differences in health status among groups through the education and development of appropriately trained and aware future physicians and public health professionals.
- Faculty and students have exposure to underserved settings to reinforce social determinants of health and increase clinical practice in a socially responsible manner.

| Initiative (s) | Performance Measure(s) |
|---|---|
| Review and augment curriculum in bias, equity, health care access, health disparities and social determinants of health | Curriculum inventory tracking of societal issues in the curriculum and student learning outcomes; Bias checklist use for teaching; MPH program projects |
| Develop a Center for Health Disparities Research | Recruit at least 5 NIH-funded researchers with health disparities research portfolios over the next 5 years |

Upstate Medical University – College of Medicine, Tier 2 Strategic Plan version 8/21/18
*Prepared by the President's Office of Strategic Affairs*

3

A0894

Exhibit 4

A-0896



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of<br><br>JULIO LICINIO, MD.,<br>                      Complainant,<br>v.<br>NEW YORK STATE, STATE UNIVERSITY OF NEW YORK, UPSTATE MEDICAL UNIVERSITY,<br>                      Respondent. | DETERMINATION AFTER INVESTIGATION<br><br>Case No.<br>10204906 |

Federal Charge No. 16GC000651

On 11/18/2019, Julio Licinio, MD. filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of sex, race/color, national origin, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of.

Pursuant to the Human Rights Law, this matter is recommended for public hearing. The parties will be advised of further proceedings.

Dated:      APR 0 9 2020
        Syracuse, New York

                   STATE DIVISION OF HUMAN RIGHTS

*Julio B Day*

A-0897

By: _____

    Julia B. Day
    Regional Director

## Information to the Parties
## Following Determination of Probable Cause

The New York State Division of Human Rights ("Division") is the administrative agency charged with enforcing the New York State Human Rights Law. The Division investigates complaints of discrimination, determines whether there is probable cause to believe that discrimination has occurred, and conducts a public hearing of the complaint where probable cause is found. Probable cause has been found in this case, and the matter will now proceed to a public hearing before an Administrative Law Judge.

If a Complainant does not have a private attorney, the Division will assign an attorney to present the case in support of the complaint. The Division attorney at all times represents the Division, not the Complainant personally. Substitutions and reassignments of Division attorneys and Administrative Law Judges are within the Division's discretion.

The Division generally schedules public hearings for two consecutive days, which may be allocated with one day each for the presentation of Complainant's and Respondent's cases. There is no formal discovery. Parties may exchange document and witness lists at the preliminary conference, which will take place during the first hour of the first day of the public hearing.

Prior to receiving the notice setting out the date and time of the public hearing, parties may receive notice of a Pre-Hearing Settlement Conference, which will be scheduled several weeks before the public hearing. If Respondent wishes to make an offer of settlement prior to that time, Respondent should contact the Hearing Attorneys Unit at (718) 741-8396.

The Division has its own Rules of Practice which can be found on the Division's website, www.dhr.ny.gov. The New York Civil Practice Law and Rules and the Federal Rules of Procedure and Evidence are inapplicable to Division proceedings. Please cite to New York State case law wherever possible in all submissions to the Division.

The parties have a continuing obligation to keep the Division advised as to any changes in the case including:

1.   Changes in name, address and/or telephone number of the parties and successors in interest.

2.   Commencement of proceedings in another forum.

3.   Settlement of the case.

Any of the above information should be timely provided to the Division, IN WRITING on the attached form to the following by mail or fax:

**New York State Division of Human Rights**
**Attn: Chief Calendar Clerk**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8333**

Information to the Parties
Page 2

If the Complainant wishes to seek dismissal of this matter to proceed in an alternate forum, an application should be filed with the Chief Calendar Clerk at the above listed address, preferably within twenty (20) days of the date of this determination.

The parties also have a continuing obligation to maintain certain information, records, etc., as follows:

1. Parties must keep track of the whereabouts of their witnesses.

2. Parties are obligated to identify and preserve all evidence relating to the case, including evidence relating to any incidents which relate to the case that occur after the Division makes a finding of probable cause, and including all evidence whether for or against that party's interests.

3. Parties are responsible for recording and keeping evidence relating to any increase or reduction in damages.

Finally, if you would like to request a copy of the investigation file, please do so promptly.  Put your request in writing to:

**New York State Division of Human Rights**
**Attn: FOIL Officer**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8256**
**Email: foil@dhr.ny.gov**

Please note that your request for documents, or the Division's response or date of response thereto, will not affect the date of the hearing, and cannot be used to request a postponement or rescheduling of the hearing.  Costs for copying, established by statute, will apply.

## FREQUENTLY ASKED QUESTIONS

The New York State Human Rights Law and the Division's Rules of Practice outline the policies and procedures that govern hearings administered by the New York State Division of Human Rights.  The Law and the Rules are available on the Division's website at www.dhr.ny.gov.  Parties may consult with their own attorneys on questions about and interpretations of the Law and/or the Rules.  The following are general responses to frequently asked questions.  The responses are not legal advice, and should be used for informational purposes only.

A-0900

Information to the Parties
Page 3

## Before the Public Hearing

1.   **I recently received a "Determination After Investigation" letter from the Division, stating that there is probable cause to believe that discrimination has occurred in my case and that the case will be scheduled for a public hearing.  What does this mean and when will the case be scheduled for a hearing?**

Where the Division finds probable cause after investigation, the Human Rights Law requires that the entire case be heard at a public hearing before an administrative law judge, where all relevant evidence is presented and the testimony of witnesses is taken under oath and subject to cross-examination.  You will receive written notice from the Division of the hearing date, time, and location of the hearing. The hearing usually is scheduled to occur 4 to 6 weeks from the date of the written notice.  Prior to receiving this notice, you may receive notice of a Pre-Hearing Settlement Conference, where your case will come before an Administrative Law Judge for the purpose of exploring settlement.

2.   **Do we pick the dates for the hearing?**

No.  The Division selects dates for a public hearing, and notifies the parties in writing through the notice of hearing.

3.   **What do I bring to the hearing, such as documents, witnesses, etc.?**

The parties should identify and bring all documents and witnesses relevant to their claims and/or defenses.  The parties should review the notice of hearing, which is issued via mail.

4.   **Now that the case is scheduled for a hearing, what happens next?**

The case proceeds to a public hearing on the scheduled date.  The Complainant may consult with his or her own attorney.  If Complainant does not have an attorney, please wait to be contacted by a Division attorney, who will present the case in support of the complaint. Further, the parties should review the notice of hearing, which is issued via mail.

5.   **When should an answer be filed and can it be faxed?**

An answer should be served by the respondent(s) on all parties and the Administrative Law Judge at least two (2) business days before the public hearing.  This is a statutory requirement. All formal papers, including but not limited to the answer, must be submitted via personal service, mail, or fax (with an original to follow) for proper docketing and timely filing.  Formal papers submitted via electronic mail are deemed courtesy copies and do not constitute proper service.

A-0901

Information to the Parties
Page 4

## Adjournments

6.   **What should I do if I have a conflict with the hearing date that is scheduled?**

You should submit, as early as possible, a written request for an adjournment of the hearing, stating the basis for your request, to all parties and the Administrative Law Judge.

7.   **On what basis will the judge grant an adjournment? Will I receive a letter with new dates?**

Adjournment of a public hearing is granted only for actual engagement before a higher tribunal on the specific dates of the public hearing, or for other good cause shown as determined by the Division. If a case is adjourned, the Division will schedule a new hearing date.

## Public Hearing

8.   **What happens if I do not appear for the hearing?**

A complainant's failure to appear at a public hearing may result in a dismissal of a complaint, and a respondent's failure to appear may result in a default finding against a respondent.

9.   **How long is the hearing?**

Public hearings are generally scheduled for two (2) days.

10.   **Can I speak with the Judge?**

*Ex parte* communication (*i.e.*, by only one party) with the judge assigned to the case is strictly prohibited. The parties may jointly request a conference with a judge through the Office of Administrative Law Judges.

## Additional Information

11.   **I have more questions. Where can I call for more information?**

If necessary, you may call Shirese Taylor, Chief Calendar Clerk, at (718) 741-8400. We do request that you call only if the situation is urgent. Please do not call to ask the status of your case; the Division will contact *you* at the appropriate time. Frequent telephone contact can interfere with the prompt processing of your hearing. Please do not call your regional office; they will not have information on the hearing process.

A-0902

**IF YOU MOVE, SETTLE, OR INTEND TO CHANGE FORUM**
**Complete, sign and date, and return this form to:**

**New York State Division of Human Rights**
**Attn: Chief Calendar Clerk**
**One Fordham Plaza, 4th Floor**
**Bronx, New York 10458**
**Fax: (718) 741-8333**

Re:   Julio Licinio, MD. v. New York State, State University of New York, Upstate Medical
       University
       Case No. 10204906

Name: _____

Address: _____

_____

Telephone: _____

I will be at my new address after: _____

**New NAME ☐  ADDRESS ☐  and/or  TELEPHONE NUMBER ☐**

Please indicate below the name, address, and telephone number of a person who may be
contacted and who will know your whereabouts if the Division cannot locate you:

_____

_____

_____

**Commencement of proceedings in another forum, or settlement:**
Below please indicate, for other proceedings, the name of the forum and the name, address, and
telephone number of the attorney handling the matter. For settlement, please explain briefly the
circumstances under which the case was settled, and whether terms have been complied with.

_____

_____

_____

_____        _____
Signature                                Date

_____
Print Name

A-0903

# NEW YORK STATE

# DIVISION OF HUMAN RIGHTS

TO:     Files                                    REGION:  Rochester

FROM:  Julia B. Day                         DATE: April 3, 2020
            Regional Director

SDHR CASE NO: 10204906-19-E-RSON-E

Federal Charge No. 16GC000651

SUBJECT:    Julio Licinio, MD. v. New York State, State University of New York, Upstate
                   Medical University

---

### FINAL INVESTIGATION REPORT AND BASIS OF DETERMINATION

## I.    CASE SUMMARY

This is a verified complaint, filed by complainant, Julio Licinio, MD., on Mon 11/18/2019. The complainant who is male, Hispanic, Brazilian, and maintians that he opposed discriminatory practices, charges the respondent with unlawful discriminatory practices in relation to employment because of sex, race/color, national origin, opposed discrimination/retaliation.

## II.    SUMMARY OF INVESTIGATION

<u>Complainant's Position:</u>
Complainant alleged that he was demoted in retaliation for opposing discrimination when he made Respondent aware of discrimination as it relates to women and minority staff and students. Complainant further asserted that he was qualified for the position and performed his duties as required without performance deficiency; yet, Respondent demoted him without good cause.

<u>Respondent's Position:</u>
Respondent denied that Complainant engaged in protected activity under the law. Respondent maintains that Complainant had performance issues that did not improve when counseled and so Respondent removed him from his leadership role. Respondent maintains that Complainant is still employed by Respondent regardless of his protected classes.

<u>Investigator's Observations:</u>

The investigation has revealed:

A-0904

It should be noted that the complaint describes, and the record establishes that Complainant is also alleging breach of his employment contact. The parties agree that Complainant has brought this action before the proper tribunal. The New York State Human Rights Law can not be utilized to resolve the breach of contract issue.

It should further be noted that Complainant is male and so has the same protected characteristic of those whom Complainant maintains received more favorable treatment, and Complainant was hired into the position(s) in question despite his race/color and/or national origin. However, Complainant is alleging that due to his engagement in protected activity, he became a target of Respondent.

Complainant began working for Respondent pursuant to an employment contract and terms where he served as Professor in the Department of Psychiatry and Senior Vice President and Dean of Medicine sometime around July 2017. Apparently, that resulted in a salary of approximately $601,700. Complainant alleged that when the Respondent removed him from the role of Senior Vice President and Dean of Medicine, he was demoted based on the change in the terms and the conditions of his employment and also his salary was reduced to approximately $227,000.

Complainant maintains that he engaged in protected activity several times during his employment. First, Complainant maintains that he complained to his supervisor, Dr. Dewan, Respondent's Interim President, that the budget committee was too gender imbalanced, and that a great deal of the university's business was being conducted by a committee that was made up of mostly men. Complainant maintains that he expressed his concerns regarding this on two separate occasions in June 2019, but Complainant maintains that Dr. Dewan never responded to his concerns or denied them.

Complainant also maintains that he has performed search committees in an effort to get more diverse staff employed for Respondent openings, and he believes that Respondent takes issues with his efforts to promote diversity within the institution. Respondent denied that it take issue with diversity efforts but indicated that it did takes issue with Complainant hiring individuals because he knows them or is acquainted with them. Complainant denied this. Complainant maintains that in July, 2019, he blocked Dr. Dewan from appointing an underqualified male for a chair position over a qualified female. The female that Complainant believed to be more qualified was hired.

Complainant alleged that on or around August 12, 2019, while meeting with Dr. Dewan, he brought up issues concerning Complainant's wife's salary reduction. Complainant indicated that Dr. Dewan never told Complainant that it was inappropriate to bring up, and Complainant maintains that Dr. Dewan indicated that it was appropriate to bring it up, and he did not discourage Complainant from doing so. Complainant maintains that during that discussion, he brought up that he believed his wife has grounds to bring a complaint under Title VII or Title IX. Complainant maintains that there was not much response from Dr. Dewan during that meeting as he stated that Dr. Dewan was "quiet". Dr Dewan denied that Complainant raised any allegation of discrimination as it pertained to his wife's salary reduction. Dr. Dewan produced an email

- 2 -

where it shows that nowhere in the email is discrimination raised. Complainant maintains that it was verbal, and so this is a contention in dispute between the parties.

Respondent denied that it subjected Complainant to any retaliatory acts and indicated that Complainant had a history of poor performance. Respondent maintains that as early as January 8, 2018, the former president began to lose confidence in Complainant's ability to perform in his role as Senior Vice President Dean of Medicine. Respondent provided a document with handwritten notes that are difficult to decipher, but according to Respondent, the notes indicated that there were issues with Complainant arriving to meetings late, texting arrogant stories, lack of focus, poor interactions, and undermining the former president's agendas. It appears that this meeting was related to counseling of Complainant due to an email sent by Complainant on December 27, 2017 where it was felt that Complainant was undermining the former president. On or around March 12, 2018, there were more handwritten notes by the former president which indicated that there was some improvements but concerns were outstanding as it relates to Complainant being dismissive of requests, being late, and Complainant's misalignment with the academic mission. Then it appears that the former president met with Complainant and Complainant's job coach, the former president made mention of Complainant having a lack of professional demeanor, and Complainant having anxiety while trying to fulfill multiple work obligations. A letter submitted by the Respondent suggests that the president at that time agreed to excuse Complainant from some meetings and requested brief reports. There are also records to show that around November/December 2018, Complainant was accused of gender discrimination when he hired a male over a female candidate. It appears that diversity training was being recommended and Complainant was resistant. Respondent also takes issue with Complainant, on January 24, 2019, having sent his personal email to students and told them to contact him directly if they had any concerns of discrimination. There was a text message and emails exchanged on May 2019 where Respondent maintains that it had to do damage control for an inappropriate speech that Complainant made to 3rd year medical students. A review of the record shows that a student complained to the student affairs office in relation to the Complainant's May 2019 speech. Respondent also maintains that the Faculty Executive Summary Report of the Standpoint Survey conducted by faculty in June and July 2019 shows low percentage ratings for items that directly relate to the Dean's functioning. Respondent maintains that Complainant was insubordinate on or around August 13, 2019 in a meeting that included his superior Dr. Dewan and Complainant's colleagues. In addition, on August 24, 2019, Complainant allegedly made a speech to incoming medical students and their parents that was inappropriate.

On the other hand, Complainant denied that Respondent informed him that it took issue with his performance. Complainant maintains that he was instrumental during Respondent's accreditation process. Complainant denied that he was ever counseled or disciplined. Complainant denied having knowledge of any complaints, and he denied being insubordinate to his superior.

The record shows that Complainant was removed as Dean in or around September 12, 2019. According to Respondent, Complainant was removed because he repeatedly failed to show leadership and professionalism.

A-0906

It is the prerogative of the Respondent to establish terms, conditions, and standards of Complainant's employment.  However, there is very little documentation that would establish that his removal from his position as Dean resulted from Complainant's behaviors and/or actions., especially because there is no record of prior discipline.  There is also a dispute among the parties concerning Complainant's knowledge of Respondent's dissatisfaction.  The lack of documentation, coupled with the short time frame between Complainant's claim that he opposed discrimination and the adverse employment action, raises material issues of fact that should be resolved at public hearing.

Submitted by: _____
Johnnayea Edmond
Human Rights Specialist II

## III.   BASIS FOR DETERMINATION

There are material issues of fact in dispute.  The record shows that Complainant maintains that after he began opposing discrimination, Respondent adversely impacted his employment by removing a significant title from him and a portion of his pay.  Respondent maintains that Complainant had a long history of performance issues that both predated and continued after the alleged opposition to discrimination.  In addition, Respondent also disputes that Complainant's actions constitute engagement in protected activity which is another point in contention amongst the parties.  However, the investigation did not show any documented attempts to cure the alleged behavior that Complainant was exhibiting; this lack of documentation which would lead one to question whether his actions rose to the level of severity that would result in adverse employment action.  Complainant maintains that a month prior to his demotion, he informed his superior that he thought his wife's dispute with the Respondent concerning her pay was grounds for a discrimination case.  Respondent denied that discrimination was raised as it pertains to this issue.  In looking at the evidence in light of the Complainant's version of events, the timing of Complainant's demotion, a mere one month after he proposed to his superior that his wife's pay issues may constitute discrimination, may be suspect.  Therefore, the remaining issues of fact in dispute include, but are not limited to, whether Complainant opposed discrimination under the law, whether Respondent was motivated by Complainant's alleged engagement in protected activity when it demoted him, and whether Respondent relied on legitimate, non-discriminatory business reasons when it removed him as Dean. These issues should be resolved in the context of a full public hearing where there is sworn testimony and the opportunity for cross-examination. Therefore, there is probable cause.

Reviewed & Approved: _____
Johnnayea Edmond
Human Rights Specialist II

## IV.   DETERMINATION

Based on the foregoing, I find probable cause to support the allegations of the complaint.

_____
Julia B. Day
Regional Director

A-0908

LawManager

**NY DHR**
**EVENT HISTORY WITH COMMENTS**

Name: Julio Licinio, MD, v New York State, State University of New York, Upstate Medical University (1)

| Complaint ID | Complaint Code | Date Filed | Investigating Office | HRS |
|---|---|---|---|---|
| 10204906 | 19-E-RSON-E | 11/18/2019 | Rochester | Johnnayca Edmond |

A-0909

LawManager

**NY DHR**
**EVENT HISTORY WITH COMMENTS**

Name: Julio Licinio, MD. v New York State, State University of New York, Upstate Medical University (1)

Events (23)

Unit: Regional
Type: Complaint Filed
SubType:
Date: Mon 11/18/2019
Status: Completed
Date Completed: 11/19/2019
Comments:

Unit: EEOC Contracts
Type: Review Intake (ECU)
SubType:
Date: Mon 11/18/2019
Status: Pending
Date Completed:
Comments:

Unit: Regional
Type: Serve Complaint on Respondent
SubType:
Date: Mon 11/18/2019
Status: Completed
Date Completed: 11/19/2019
Comments:

Unit: Regional
Type: Complainant Contact
SubType: Fax
Date: Fri 11/22/2019
Status: Completed
Date Completed: 11/22/2019
Comments: CP's attorney faxed in minor corrections.

Unit: Regional
Type: Response Due Date
SubType:
Date: Wed 12/18/2019
Status: Completed
Date Completed: 12/20/2019
Comments: 2 wk ext. granted

Unit: Regional
Type: Response Received from Respondent
SubType:
Date: Fri 12/20/2019
Status: Completed
Date Completed: 12/20/2019
Comments:

By: jkennedy                                      A0909

A-0910

LawManager

**NY DHR**
**EVENT HISTORY WITH COMMENTS**

Name: Julio Licinio, MD. v New York State, State University of New York, Upstate Medical University (I)

**Events (23)**

Unit: Regional
Type: Rebuttal Requested
SubType:
Date: Fri 12/20/2019
Status: Completed
Date Completed: 12/20/2019
Comments:

---

Unit: Regional
Type: Respondent Contact
SubType: Telephone
Date: Mon 12/23/2019
Status: Completed
Date Completed: 12/23/2019
Comments: On 12/23 I received a call from the rp atty. She said that the rp had concerns about two paragraphs in the response, which had already been sent to the cp for rebuttal. I explained that the material is not FOILable except to the parties and their representatives, and offered the options of adding a revised response, or a letter concerning the specific paragraphs.

---

Unit: Regional
Type: Notation to file
SubType:
Date: Mon 12/23/2019
Status: Completed
Date Completed: 12/23/2019
Comments: RP emailed a revised response.  It was mailed to CP & CP's attorney today.

---

Unit: Regional
Type: Rebuttal Due Date
SubType:
Date: Tue 1/21/2020
Status: Completed
Date Completed: 1/21/2020
Comments: 2 wks ext granted as requested by CP's attorney

---

Unit: Regional
Type: Rebuttal Received
SubType:
Date: Tue 1/21/2020
Status: Completed
Date Completed: 1/21/2020
Comments:

---

Unit: Regional
Type: Transfer Physical File (no change in region or status)
SubType:
Date: Wed 1/22/2020
Status: Completed
Date Completed: 1/23/2020
Comments: To Edmond #1ZX217240397450218

---

Report run on 04/03/2020                                                                                                      3

By: jkennedy                                                                                                                 A0910

A-0911

LawManager

**NY DHR**
**EVENT HISTORY WITH COMMENTS**

Name: Julio Licinio, MD. v New York State, State University of New York, Upstate Medical University (1)

Events (23)

| | |
|---|---|
| Unit: | All |
| Type: | Receive Physical File (no change in region or status) |
| SubType: | |
| Date: | Thu 1/23/2020 |
| Status: | Completed |
| Date Completed: 1/28/2020 | |
| Comments: | (from Parent: To Edmond) |

| | |
|---|---|
| Unit: | Regional |
| Type: | Additional Information Requested |
| SubType: | Respondent |
| Date: | Wed 1/29/2020 |
| Status: | Completed |
| Date Completed: 1/29/2020 | |
| Comments: | |

| | |
|---|---|
| Unit: | Regional |
| Type: | Respondent Contact |
| SubType: | Phone and E-mail |
| Date: | Thu 1/30/2020 |
| Status: | Completed |
| Date Completed: 1/30/2020 | |
| Comments: | R's atty requested the rebuttal. the rebuttal was sent via email. |

| | |
|---|---|
| Unit: | Regional |
| Type: | Reminder |
| SubType: | |
| Date: | Thu 2/13/2020 |
| Status: | Completed |
| Date Completed: 3/12/2020 | |
| Comments: | R's additional info request due |

| | |
|---|---|
| Unit: | Regional |
| Type: | Additional Information Due Date |
| SubType: | |
| Date: | Thu 2/13/2020 |
| Status: | Completed |
| Date Completed: 3/12/2020 | |
| Comments: | |

By: jkennedy                                            A0911

A-0912

LawManager

**NY DHR**
**EVENT HISTORY WITH COMMENTS**

Name: Julio Licinio, MD. v New York State, State University of New York, Upstate Medical University (1)

Events (23)

Unit: Regional
Type: One Party Conference
SubType: Complainant
Date: Thu 3/12/2020
Status: Completed
Date Completed: 3/13/2020
Comments: A One Party Conference was held.  Present were:

Dr. Licinio, Complainant;
Sarah Ruhlen, Complainant's Attorney; and
Johnnayea Edmond, DHR Investigator.

When asked, Dr. Licinio confirmed that he had one employment contract with the state that included both his Dean appointment and faculty appointment.  He said that they never gave him any additional documentation, and they just gave him a letter of termination for the Dean appointment.  He reported that they gave him distinguished Professor, and he also has academic rank. He said that he had a celebration of distinguished professor one day and the letter from the Chancellor was September 11, and the next day he was called into the President's office and told to step down or be demoted.  He said that they never gave him a revised a letter.  He noted that his understanding of this moment is that whatever was in the original letter for faculty appointment is what stands as they never said that was not the case.

Ms. Ruhlen noted that they have a separate matter pending with the court of claims for a contract violation.

When asked, Dr. Licinio said that the Liaison Committee for Medical Education(LCME) is a body accredited the by secretary of education and recognized as a body to accredit medical schools in the US.  He explained that new and existing schools go through the accreditation process.  He said that probation is when a lot of deficiencies are found, and families and students must be told because if the probation persists it can lead to the school being discontinued.  He further explained that in 2011, the LCME came to a scheduled visit and gave Upstate a 60 plus page letter with multiple deficiencies.  He stated that when that letter came, the current person, Dr. Dewan was asked to step down as a result of the probation.  He said that Dr. Dewan was demoted from being Chair of Psychiatry.  He reported that it took several years but the probation was lifted.  He said that he came here as he begun in July 2017 as Dean.  He said that he sent a lot of documentation to them(LCME) on the date of December of 2018, and they did a visit that was scheduled for March of 2019.  He stated that before he became the Dean, Dr. Dewan was asked to be the interim Dean before Dr. Licinio, and he was there just under a year.  He said that  Dewan did not work on standards for the accreditation process at all, and Dr. Licinio worked hard toward the accreditation.  He noted that many citations were addressed as Dr. Licinio addressed multiple deficiencies.  Dr. Licinio said that he also hired a consulting firm.  He stated that he brings a lot of knowledge and been in different places.  He reported that when he looked at the job and offered the position to be Chair of Department in University of Arizona at Phoenix, around that time there was a lot of institutional turnover.  but he heard that they had passed accreditation.  He reported that he asked them how and they referred a team and he referred that team to Upstate and they placed a bid and they hired them.  He noted that he worked with them.  He said that he knows it came up in their response, but he had a lot of contacts and connections to help Upstate.  He said that during LCME's meetings, Dr. Licinio sets the tone for the school and they already seen written material and they can ask questions.  He said that he's the face of the school at that point.  He said that the school had a problem with diversity.  He reported that he works with minority children to ensure successful outcomes.  He stated that for the first time he got 100% matching because he worked with all the minority students 1:1 and contacted matching organizations and sent strong letters for recommendation.  He went on to say that the school got a preliminary report which was small things that needed to be addressed.  He said that afterwards, they(LCME) go to a supervisory board to make a determination.  He said that that report only became official in October, and they got 8 years full accreditation which is the highest you can get.  He stated that when that accrediting body was here, they gave Dr. Licinio a draft report and they complimented Dr. Licinio and told him that he was doing a good job.  He noted that they have been on probation previously and the community and students were concerned and LCME were meticulous about the problems they had before.  He further noted that he brought the positive preliminary report to Upstate, and they sent a final report and he was told that he was going to get a copy and he never got a copy when he was the face of the accreditation.

Dr. Licinio stated that Dr. Dewan is a new interim president and so things changed slightly.  He reported that the budget committee met to discuss budget items and items that they had a University Executive Committee to address.  Dr. Licinio reported that previous presidents made the effort of making the committees more diverse and more representative of minority as they have several women capable.  He noted that the previous president was supportive of diversity, and Dr. Licinio has a history that was part of pushing diversity.  Dr. Licinio went on to say that Dr. Dewan began to de-emphasize the executive committee and a lot of meetings were canceled and some had restricted agendas, the time was cut from 2 hours to 1 hour.  He continued that at some point 3 hours a week was allotted for the budget committee.  He said that Dr. Dewan kept telling Dr. Licinio that the two other deans (females) don't have to be there because it was not relevant to them.  He reported that there were 27 items for the executive committee.  He said that he felt uncomfortable where a group of men behind closed doors that were running the business of the university.  He reported that he appointed Dr. Ann Botash, Sr. Ass. Dean for faculty affairs and faculty development.  He reported that this un-appointed boys club will meet and run the business of the university.  He said that he did tell Dr. Dewan that he felt that all the university decisions were made by a group of men.  He noted that there was one woman

By: jkennedy                                                                    A0912

A-0913

LawManager

**NY DHR**
**EVENT HISTORY WITH COMMENTS**

Name: Julio Licinio, MD. v New York State, State University of New York, Upstate Medical University (1)

Events (23)

who took notes, but she had no other role in those meetings. He said that he told Dr. Dewan that he can think of Dr. Botash and Dr. Decker- Chief Medical Officer and if input why not include some women with roles in the University. He said that Dr. Dewan did not say one word as there was glacier silence. He reported that he may have said it on two separate occasions. He said that he offered why don't I just suggest some women and two specific women, and Dr. Dewan never said the decisions really get made with the executive committee. He said that he told Dr. Dewan that he was concerned that this is where they are really getting the business done. He stated that Dr. Dewan never said anything back to Dr. Licinio. just kind of. He noted that his problem was the presentation in the group, not the frequency of the meetings, but how the group was making all business decisions.

Dr. Licinio said that he would have to look at the dates, but it was through the spring and summer and around July 2019 where they were talking about who was going to replace the chair of anestilogy in July 2019. He said that there was a problem that is continuing there. As if you want to promote diversity, and you have to have open searches to bring people of diverse backgrounds, according to Dr. Licinio. He went on to say that they don't have to appoint a minority but they must be in the applicant pool for consideration and then the best person gets the job. He said that that is the training and belief that he had. He reported that when he came here that is also what NYS guidelines are. He said that the university doesn't allow for the candidate to reach out to diverse constitutes. He said that this person was chair of anestisology and coming toward the end of his career, and because he was so ineffective 12 people left because they were not happy with his leadership so it was difficult to cover the operating rooms. He said that there was a very severe staff shortage in the area, and Dr. Zhang was been operator of the day and managed the clinical assignments. He said that it was the biggest crisis there. He stated that once Dr. Thompson discussed his stepping down, there are relationships and Dr. Thompson reported to Dr. Licinio as Dean at the time so it should be discussed with the dean as far as retirement. He said that instead, Dr. Thompson met and Dr. Dewan discussed the transition plan and Dr. Licinio was just notified of it. He added that the faculty reports to division, the division reports to the department, the department reports to the dean, and the dean reports to the president. He said that just within that visit, he wanted to make sure they are compliant with guidelines for accreditation. He stated that Dr. Dewan said to Dr. Licinio on 3 separate occasions that Dr. Gorji is the only one who can do this job. He reported that meanwhile he(Licinio) knew that he(Gorji) was not very involved in clinical assignments and taking charge of the dept. He stated that what he has always done for the interim and permanent positions as he did here. Dr. Licinio said that he put together a search committee. he reported that the regulations says a Dean can appoint an interim chair but Dr. Licinio did not think it gave opportunity for diversity and inclusion. He went on to say that he put a panel together and invited a number of people including Dr. Zhang, Dr. Dr. Gorji, and two others. Dr. Licinio confirmed that he was apart of the committee. He noted that, that is the way he appoints people. He said that he does another search when there is a permanent position. He said that the way that Dr. Dewan does it is when Dr. Licinio was demoted, Dr. Lawrence Chin was appointed. He noted that Dr. Botash was not considered, although she was a highly qualified woman to his knowledge. He noted that Dr. Chin was made permanent Dean without any search. He said that for Dr. Licinio's search there was a committee and multiple interviews. He said that more recently there was a position for the Chair of Medicine. He said that he had an open search and was working with the search firm., but after Dr. Licinio was asked to be terminated as Dean, Dr. Dewan sent an appointment to Dr. Merisper(sp?). He said that Dr. Merisper was not qualified to be chair because he was only an associate professor and had no national stature. He said that he did the search before., and he spoke to Dr. Dewan who said he could do an external search-. then Dr. Dewan said D. Mesiper was appointed the Chair of ER Medicine. He reported that there was no search or anything. He said that he( Dr. Johnson) has given him(Dr. Licinio) a letter that he plans to retire in 2021. He reported that Dr. Johnson gave sufficient notice and then within this last 2 weeks, it came out that he(Johnson) was retiring effective immediately and Dr. Dewan made an interim appointment. He said that Dr. Dewan does all of this without searches, inclusion, or any consideration for putting together a diverse workforce. He said that he finished the recruitment for the Anestilogy Chair on August 13th and then the next meeting Dr. Dewan demoted Dr. Licinio. He said that Dr. Dewan never expressed any dissatisfaction. He said that after the meeting Dr. Botash said that she heard that Dr. Gorji was going to be pulled forward for the position. Dr. Licinio stated that he gave everybody fair consideration. He said that Dr. Dewan not once or under any previous president ever gave him any feedback about his performance or negative feedback and you should be doing this or that. He said that nothing was done verbally or in writing. He reported that Upstate has an internal process. He said that if someone is not working out for liability issues, you have to have a conversation and a counseling memo which is pre written and within a conversational tone to have a record of the conversation. He said that this is Upstate's standard procedure. He reported that they never had any performance related feedback for him. He said that there is nothing below expectations, and you ask for an annual report and then give the evaluation. He said that he asked the report and it was positive. He said that Dr. Dewan gave his annual report, and Dr. Licinio accomplished alot of things. He said that they were waiting for his reports to copy and paste his report. He said that he received that and was eager to get it. he stated that he gave it the next day and the weekend. He said that he never got any feedback or anything from them. He said that he was never told that he did not deal with a situation the way it should be handled. He reported that they can say what they want but you will never see any documentation.

When asked, Dr. Licinio said that August 12, 2019 was first time he had a conversation with Dr. Dewan about his wife's salary issue. He said normally the issue would be brought to him, but they discussed it would bypass the Dean and go to the president. He reported that she has been having issues chronically. He noted that she later filed an internal complaint that is being investigated, internally, as they speak. He said that the Diversity and Inclusion office is taking the investigation seriously, and they met with her twice. He stated that they are going over every aspect of what she put in her document. He said that Dr. Dewan did not indicate that he should not be bringing the issue up, and the escalation was difficult. He said that he know what they are investigating it, and it was awkward. He said that he brought it to his(Dewan's) attention but Dr. Licinio made a specific point that it was an ongoing issue with his wife's salary and was it appropriate to discuss. He said that Dr. Dewan wanted Dr. Licinio to bring it up and that it was appropriate. He said that at no point did he(Dewan) discourage Dr. Licinio from continuing

A-0914

LawManager

**NY DHR**
**EVENT HISTORY WITH COMMENTS**

Name: Julio Licinio, MD. v New York State, State University of New York, Upstate Medical University (1)

Events (23)

to talk. He said that he gave him a relevant letter, and Dr. Dewan kept it. He said that he asked him what is going to happen, and he said that you will hear about it. He reported that Tuesday he had that anestiology meeting and the next one with him he was told he would step down. He said that he told him that there was this move toward compensation, and she felt she had grounds to bring under title 7 and title 9. He said that she was considering that, and she talked to legal counsel but had not filed with the Division or anything like that. When asked, he said that he was sort of quiet, but he was not discouraging Dr. Licinio from talking at all. He said that in one thing he told him that it puts him in an awkward position- it she files a complaint does it affect my position as Dean and supporting university and supporting wife. He said that he told him what was going on and what she was feeling and considering, but it was not like he was toying with the idea and she did file the complaint, and she filed with the ODI.

When asked about him hiring people who he knew or were his friends, he said that, that statement is particularly not true. He said that he says when he brought the criticisms in the end, one candidate was viable and it was said the he was pushing it through. He said that he never met that person before. He went on to say that there are some people that you know who they are from other venues, but that wasn't even the case here. He said that, that doctor worked in bone, and Dr. Licinio had no interaction with him prior. He stated that the doctor saw that they had a search. He stated that the individual had questions about Dr. Licinio's vision for the school and chair, but he never met that person before so it was his(Licinio's) first interaction with that person. He reported that he hired a lot of people at higher levels. He said that he do things like dinner at his house for those he hires to be friendly and welcoming. When asked, he said if Dr. Dewan would have addressed that with him, he would have told him immediately that he did not know him. He said that it never happened that Dr. Dewan addressed this with him. He said that there is no documentation of that as It is just untrue.

Dr. Licinio said that the public speaking engagement issues were never brought to his attention either. He said that they(students) have exams and courses and are very stressed. He reported that they(students) are responsible for patients, and he was supportive of them. He said that he never was informed that they were putting people in meetings to check on his performance. He said that there were no performance issues ever brought to him while he was working there as Dean. He said that most of the issues were from Student Affairs, and 3 of their employees filed complaints with the division and they are very concerned about any diversity investigation into their practices. He said that he worked closely with the minority students and African Americans because they get a raw deal there. He said that he referred some of his minority students. He said that he would talk to Julie White, the head of student affairs. He said that she never bought anything like that up. He reported that the Director of Student Affairs was very friendly to him, and she never said they are checking on you and you have to make sure you talk to the students correctly. He said that it was a one time episode and his supervisor never brought it up to his attention at all. He said that this is the first time he heard that someone was sitting in.

When asked, Dr. Licinio said that there were never any conversation with Dr. Dewan where it was told him that his staff felt that he was not responsive and/or accessible. He said that he never failed to address any administrative issue because he was not accessible. He went on to say that the way the office of the dean works is that they have an administrative meeting about 2x a week with senior administration. He reported that Gardner, who is the assistant Dean of Finance as well, and Grace has been there so all the chairs know him. He said that Grace sets the agenda for the meeting, and she brings the business and the whole business of the school are through the meetings. He said that she do not hire or fire without any of that so this story that people could not reach him and the business of the university did not get done is pretextual. He said that it has to go through Grace. He said that they know how the process works better than he does. He said that there was never business not conducted in a timely manner. He said that the business is all done through those meetings and then she goes with different people who made the different request. He said that no business could have gotten done any faster if behaved any differently.

When asked, he reported that on August 13, 2019, the anestiology meeting was totally different business. He noted that on August 12 there was no discussion on anestiogy. He said that there were other people in the room as well so it would not have bought up personal matters on August 13th. He reported that there were two different meetings but they were dealt with in totally different ways but both dealing with discrimination. He said that on August 13th he told people about the changing leadership in anestigiology and how it would affect them. He reported that he told them what happened and how we had the process and open search. He said he now promotes and give pay raises and assign resources so he won't offend anyone in that setting. He said that there was a process that was ongoing that when people had issues will go straight to Dr. Dewan, and if the chairs has any problems, they are welcomed and Dr. Licinio expected the same if issues bring them to his attention. He said that that is what he conveyed to him. He said that he had no intent and he was pretty positive that he did not disparaged Dr. Dewan. He said that he did not put any blame on him. He said that he needed to know what his staff's issues are. So that he can address them. He reported that the way they function is a problem right after the meeting they would call or meet and give feedback about what they did. He said that he got no feedback as there was nothing. He said that he has to say that he went over his emails, and he can not find anything writing a single note or anything from him that was critical of Dr. Licinio's performance. He said that in the meeting on the 12th, the Chair of Psychiatry is interim is a friend of Dr. Dewan and locally based. He reported that Dr. Dewan said that we should do the search for psychiatry soon because with your national visibility good. they need somebody that would move the department forward and complimenting him to do the next search for psychiatry so that he can use his national contacts to find someone else. He said that it was all the opposite of criticisms.

7

By: jkennedy

A0914

A-0915

LawManager

**NY DHR**
EVENT HISTORY WITH COMMENTS

Name: Julio Licinio, MD. v New York State, State University of New York, Upstate Medical University (1)

Events (23)

Unit: Regional
Type: Respondent Contact
SubType: Telephone
Date: Wed 3/18/2020
Status: Completed
Date Completed: 3/18/2020
Comments: R's atty called for a status update and also requested that the Division communicate with her via email since at this time she has limited access to mail and will be working from home.

Unit: Regional
Type: Notation to file
SubType:
Date: Tue 3/24/2020
Status: Completed
Date Completed: 3/24/2020
Comments: started drafting firabod

Unit: Regional
Type: FIRABOD Submitted to Supervisor
SubType:
Date: Fri 4/3/2020
Status: Completed
Date Completed: 4/3/2020
Comments:

Unit: All
Type: Determination Due Date
SubType:
Date: Fri 5/15/2020
Status: Pending
Date Completed:
Comments:

Unit: All
Type: Commissioner's Order Due Date
SubType:
Date: Mon 2/1/2021
Status: Pending
Date Completed:
Comments:

Report complete. Number of main records listed: 1

By: jkennedy                                              A0915

A-0916

# NEW YORK STATE

# DIVISION OF HUMAN RIGHTS

TO:     Files                                          REGION:  Rochester

FROM:  Julia B. Day                                    DATE: April 9, 2020
          Regional Director

SDHR CASE NO: 10204906

SUBJECT: Julio Licinio, MD. v. New York State, State University of New York, Upstate
             Medical University

<u>Service of Probable Cause Determination</u>

The probable cause determination in the above-referenced case has been served upon the
following parties via E-Mail, on the above-referenced date:

<u>Complainant</u>
Julio Licinio, MD.
7 Brattle Road
Syracuse, NY 13203

<u>Complainant Attorney</u>
Sarah Ruhlen, Esq.
Satter Ruhlen Law Firm, PLLC
McCarthy Building, 6th Floor
217 South Salina Street
Syracuse, NY 13202

<u>Respondent</u>
New York State, State University of New York, Upstate Medical University
Attn: Anne Burak Dotzler, Assistant Counsel
Office of General Counsel, 750 East Adams Street, Jacobsen Hall, 9th Floor
Syracuse, NY 13210

A-0917

# NEW YORK STATE
# DIVISION OF HUMAN RIGHTS

TO:      Files                                          REGION:  Rochester

FROM:  Julia B. Day                                 DATE: April 9, 2020
           Regional Director

SDHR CASE NO: 10204906-19-E-RSON-E

SUBJECT: Julio Licinio, MD. v. New York State, State University of New York, Upstate
               Medical University

### CLOSING STATEMENT

Federal Status: Title VII
Federal Charge No. 16GC000651

Date of Filing: Mon 11/18/2019
Date of Violation:    9/12/2019

Jurisdiction:   Employment
Basis:           Sex, Race/Color, National Origin, Opposed Discrimination/Retaliation

**DETERMINATION:**

Probable Cause

A-0918

Exhibit 5

A-0919

**Are Upstate**
Drive Innovation & Discovery
Respect People
Serve Our Community
Value Integrity

## Upstate Faculty Council
### Minutes
#### *September 16, 2019*

| Time | 11:45 a.m. to 1:00 p.m. |
|------|------------------------|
| Chair | Steve Glatt |
| Vice Chair | Kerry Greene-Donnelly |
| Secretary | Adam Rufa |
| Committee Support | Patty Gooden |
| Location | Room 2507/2508 Setnor |
| Videoconference | None |

**Attachments**
- Upstate Faculty Council Meeting Minutes 5/20/19
- Upstate Faculty Council Membership Roster 2019-2020 AY
- Schedule of Meetings 2019-2020 AY
- OUR Upstate One University Road Map Strategic Plan, July 2019
- Open Access – Draft Policy
- Governance of Academic Health Centers and Systems:  A Conceptual Framework for Analysis
- Upstate Affairs Committee Report

**PRESENT:** *Wendi Ackerman, Tammy Austin-Ketch, Dale Avers, Katherine Beissner, Ann Botash, Jay Brenner, Peter Calvert, Matthew Capogreco, Lynn Cleary, Dominick DeMichele, Mantosh Dewan, Nienke Dosa, Rebecca Garden, Stephen Glatt, Steven Grassl, Kerry Greene-Donnelly, Jason Horton, Rebecca Kindon, Carol Anne Kozik, Sherri McMullen, Kim Nolan, Joan O'Brien, Lisa Oliver, Richard O'Neill, Akshay Patel, Cristina Pope, David Pruyne, Renae Rokicki, Adam Rufa, Faisal Siddiqui, Amy Slutzky, Christopher Tanski, Brian Thompson, Linda Veit, James Vossler, Howard Weinstein, Martha Wojtowycz, Virginia Young, Pam Youngs-Maher*

**GUEST(S):** *Robert Lebel*

## Call to Order/Lunch/Introductions

- The meeting was called to order by Steve Glatt at 11:45 a.m.
- This is the first meeting for the 2019-2020 AY and we have new members, therefore, the meeting began with a welcome and introductions.
- Steve Grassl will serve as the UUP representative at the Faculty Council meetings.
- Jay Brenner has been asked by Steve Glatt to serve as the parliamentarian.

## Approval of 9/16/19 Agenda and 5/20/19 Minutes

- The agenda was approved with the following changes:  Microcredentialing was removed and the Social Media Policy was added.
- Minutes from the 5/20/19 meeting – this item was tabled until the next meeting so everyone will have time to read through the minutes.

## Chair's Report – Steve Glatt

- **Membership**
  - It was requested that photos be added to the membership roster in the future.
  - Committee chair continuity and all vacancies are filled.
  - We have more than the minimum for each committee and are at full membership.
  - The new Membership Roster for 2019-2020 has been poster to the website.

- o  Steve Glatt would like to increase the identification of this body.  Jay Brenner and Rich Veenstra have visited different departments throughout Upstate as well.
- o  Steve will be working on arranging a visit to SUNY Faculty Senate and has offered to visit campuses.
- o  He made a video this morning welcoming new faculty, and will be attending the New Faculty Reception in October.
- **Meetings**
  - o  Last year was a transition year and two additional meetings will be held, resulting in seven Faculty Council Meetings for the year.  This will remain the same for this academic year.
  - o  Monday, October 28, 2019, is the next Faculty Council Meeting, 11:45 a.m. to 1:00 p.m.
  - o  Please remember to sign in upon your arrival to the meeting.
  - o  Name cards are available for the voting members.  Please pick up upon your arrival.
  - o  The meeting schedule was sent out.

- **Faculty Forums**
  - o  Faculty forums have been scheduled in the past during months when the Faculty Council didn't have a meeting.  There was general discussion regarding this.
  - o  Steve Glatt will reach out to departments and possibly schedule forums to discuss something innovative, how the institution functions, etc. which will also create transparency and be informational about Faculty Governance.

## President's Report – Dr. Mantosh Dewan

- **College of Medicine, Office of the Dean**
  - o  There has been a change in the COM dean's office effectively immediately.  Dr. Licinio is no longer the dean.  He has been appointed as a faculty member, Professor of Psychiatry.
  - o  Dr. Larry Chin will serve as the Interim Dean for the COM.  He has been on the executive committee and is a delight to work with.  Dr. Dewan is very excited to have Dr. Chin in this role.
  - o  Dr. Satish Krishnamurthy will serve as the Interim Chair of Neurosurgery.
  - o  There is no time table for implementing a search.
  - o  SUNY would like us to have a Provost position.
  - o  It was questioned as to how the change in the dean's position will impact medical students:
    - ▪  Dr. Chin brings a great deal of energy to this position and the change should be seamless.
    - ▪  He will continue to work on a new curriculum.
  - o  The question was raised as to how this should be handled at the Fall Plenary in October.
    - ▪  Dr. Dewan advised that SUNY has been involved with this decision so there are no surprises.
    - ▪  There is not one horrible thing that happened for this change to occur, rather a change was needed in leadership.
  - o  This position will no longer be an Executive Dean position.  Dr. Dewan could not see the value in this.
  - o  An announcement will be sent out to the Upstate community by the end of tomorrow at the latest.
  - o  There has been a lot of restructuring over the last couple of years and the structures started crumbling.
  - o  There was no University organizational chart and the President's Office is working on rebuilding one now.  Everyone cannot report (and should not report) to one person.
  - o  The COM was a top heavy, busy organizational chart and the Office of the Dean will be looking into this.  There has been too much shifting including an additional office in the process for the previous dean.
  - o  Overall, this is not a negative change, but rather a moving forward change and a removal of barriers.  Everyone appreciated Dr. Dewan's openness.

- **Overall Upstate status:**
  - o  We are in good shape at this time, and all colleges are accredited.
  - o  We recently acquired eight new cardiologists from St. Joe's who are seeing approximately 20,000 patients.
  - o  People want to join Upstate and this is very uplifting.  There have been more positive vibes of late, even from SUNY.  We are on a good path and Dr. Dewan is confident where we are going.

A-0921

- o   We will continue to survive and thrive as a medical academic facility, and we being viewed more positively by SUNY and the community.
- o   We have been very transparent with local Syracuse leaders/politicians and are providing them with clear data.
- o   Have received $36 million in research money – highest ever.
- o   There is a SUNY taskforce looking at the academic medical universities.  We have been told that we are the only one of the four in New York that seems sustainable.
- o   As far as our budget, 0% comes from the State.

- **Presidential Search:**
  - o   The hope is to have a search committee in place sometime in January.
  - o   The Department of Psychiatry has submitted a letter of support for Dr. Dewan to become President at Upstate.  A unanimous vote reflected this as well.
  - o   It was expressed that Dr. Dewan has been a catalyst for positive change at Upstate during his time serving as interim president.

- **Dr. Amberg status:**
  - o   As we are all aware, he is currently the Interim President at ESF and is doing extremely well.
  - o   He is a candidate for the permanent position.

## UUP Academic Report – Steve Grassl

- Algorithm getting put together about salary compression.  Half of all State salary will be used based on this algorithm.  Should be finalized by November.
- Pushing to increase transparency of campus foundations, including the right to audit them.

## SUNY Faculty Senate Report

- There is not much to report since this is the first meeting of the academic year.
- The SUNY Senate Fall Plenary will be held in Albany, October 10-12, 2019.
- The faculty senate president has asked to meet with our senators.  Our senators are the voice and representatives from Upstate.

## Old Business

- **Open Access Draft Policy:**
  - o   SUNY Board of Trustees has asked that all state-run campuses implement an open access policy and institutional repository by March, 2020.  The request came out of a faculty senate discussion about unsustainable journal pricing (Elsevier had a profit margin of 36%).
  - o   Trying to advance access to scholarship from SUNY faculty.
  - o   There is a draft policy based on SUNY best practice and is opt-in.  Contains more background information and related resources than it does actual policy.
  - o   Copyright retention is part of the policy so that it may be used as a tool for anyone who wants to negotiate with a publisher for copyright.  Authors and co-authors retain copyright ownership.  This could help with negotiation but is optional and not required.
  - o   Will start a campus green repository for research.  Upstate will use SUNY's (currently DSpace), but will be moving to Open Repository after the first of the year.
  - o   The working group is looking at processes, metadata standards, and other issues so that the IR is ready to use by the time open repository is available.
  - o   The goal is to make the process as simple as possible, and something people really want to do.
  - o   <u>Motion</u>:  A motion was made to endorse the SUNY policy.  Passed with one abstention.

A-0922

- **Social Media**
  - Suggests clarity about when a person is speaking as an individual versus for the institution.
  - **Motion:** A motion was made that we encourage the administration to review the social media policy to make it clear when a person is speaking as an individual versus the institution.  Passed unanimously.

## New Business

- **None**

A motion to adjourn was made and approved.  The meeting adjourned at 1:00 p.m.

## 2019-2020 Schedule of Meetings

| | |
|---|---|
| September 16, 2019, 11:45 a.m. to 1:00 p.m. | Room 2507/2508 Setnor Academic Building |
| October 28, 2019, 11:45 a.m. to 1:00 p.m. | Room 2507/2508 Setnor Academic Building |
| November 18, 2019, 11:45 a.m. to 1:00 p.m. | Room 2507/2508 Setnor Academic Building |
| January 27, 2020, 11:45 a.m. to 1:00 p.m. | Room 2507/2508 Setnor Academic Building |
| March 16, 2020, 11:45 a.m. to 1:00 p.m. | Room 2507/2508 Setnor Academic Building |
| April 20, 2020, 11:45 a.m. to 1:00 p.m. | Room 25072508 Setnor Academic Building |
| May 18, 2020, 11:45 a.m. to 1:00 p.m. | Room 2509/2510 Setnor Academic Building |
| May 20, 2020, 3:30 to 5:00 p.m. (Annual Faculty Meeting) | Room 1159, Medical Alumni Auditorium, Weiskotten Hall |

A-0923

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JULIO LICINIO, MD, PhD, MBA, MS,

                              Plaintiff,

                                                    Case No.: 5:21-cv-387(GTS/TWD)

        - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE STATE
UNIVERSITY OF NEW YORK UPSTATE
MEDICAL UNIVERSITY,

                              Defendants
-------------------------------------------------------------X

Douglas Mace, an attorney admitted to practice in the State of New York, affirms under the

penalty of perjury:

1. I am the Managing Attorney of the firm Danny Grace PLLC.

2. I submit this declaration pursuant to Rule 56 of the Federal Rules of Civil Procedure, in

   opposition to Defendant's motion for summary judgment.

3. Plaintiff incorporates by reference the Exhibits and Declarations annexed to

   Defendant's motion.

4. Attached hereto as **Exhibit 6** is a copy of the relevant pages of the deposition transcript

   of Julio Licinio.

5. Attached hereto as **Exhibit 7** is a copy of the relevant pages of the deposition transcript

   of Mantosh Dewan.

5/9/2024

                                        Douglas Mace, Esq.
                                        Danny Grace PLLC

A-0924

Exhibit 6

Page 98

 1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

 2        that position?

 3                        A.    Yes.

 4                        Q.    Dean of the College of Medicine

 5    at SUNY Upstate?

 6                        A.    Yes.  After broad national and

 7    international search organized by an external search

 8    firm, yes.

 9                        Q.    That position, that was a

10    management confidential position, correct?

11                        A.    It was two positions, actually in

12    one letter.  So there was a management confidential

13    position.  And in the same letter, I was offered a

14    position as a tenured professor of psychiatry, which

15    is what I have now.

16                        Q.    Sure.

17                        A.    So in one letter it was two

18    positions.

19                        Q.    That letter that you're -- that

20    you're talking about that letter's from the president

21    at the time, correct?

22                        A.    Yes.

23                        Q.    Okay.  And with respect to the

24    content of that letter, there were certain items that

25    you requested be part of that letter, is that right?

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 143

Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

1

2          A.   Not -- I don't recall, I don't

3     know what the outcome was.  And a lot of the

4     discipline issues are confidential so I -- I was not

5     privy to that.

6          Q.   All right.  With respect to

7     investigating complaints of discrimination, who at

8     Upstate was tasked with those investigations while

9     you were dean?

10         A.   There are two ways that a person

11    can go and -- and is this as an observer, so if you

12    can, maybe, you know, memory may be failing, but as

13    far as I recall, there are two pathways you can take.

14    You can go straight to the Office of Diversity and

15    Inclusion and launch -- there are three ways

16    actually.

17              You can go to the Office of Diversity

18    and Inclusion and then launch a complaint there to

19    that office.  You can go to your supervisor and --

20    and it has -- did a workshop to all, you know,

21    Upstate heads of administrative units, and said that

22    if someone under them raises a complaint that's in

23    the scope of O.D.I. then it's that person's

24    responsibility to pass it to O.D.I.

25              And I have the slide that that was

A-0927

800.523.7887                           Associated Reporters Int'l., Inc.

Page 144

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         presented and it was provided to me as part of

3         discovery. So — so it can be -- a complaint can be

4         made by the supervisor, if the supervisor hears about

5         it, told O.D.I.

6              And the person can also go

7         independently, you know, they can do all three, but

8         like, another pathway that could be independent is

9         that they can go straight to H.R. And so in H.R., I

10        would imagine that they would refer them to the

11        O.D.I. if it's an -- an issue related to

12        discrimination or inclusion of retaliation, so they

13        could go -- I'm just talking about the starting

14        point.

15             So you could start talking to your

16        supervisor and the supervisor, job states and

17        materials has a responsibility should then report to

18        O.D.I. and O.D.I. probably would approach the person

19        and then take it from there.

20             And the person at some point would

21        have to file a complaint if they want to have the

22        issue pursued. But the pathway would begin through

23        the supervisor, the person can on his or her own go

24        straight to O.D.I. or the person his or her own can

25        also go straight to H.R. and then the pathways would

ARII@courtsteno.com                    www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 145

Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

1    converge at the Office of Diversity and Inclusion.

2    That's my understanding.

3                Q.    Okay.  With respect to O.D.I.,

4    O.D.I. is Office of Diversity and Inclusion, correct?

5

6                A.    Yes.

7                Q.    During the time that you were

8    dean, Gloria Lopez was the chief diversity officer at

9    that time.  Is that right?

10               A.    There were multiple chiefs, you

11   know, because when I began Gloria Lopez was

12   appointed, I was already there, I was already dean

13   for a while there too.  So there was someone before

14   that I forget the person's name, then there was

15   Gloria and then there was Carter after Gloria.

16               Q.    All right.  So you were familiar

17   though, with who that -- with -- with who the manager

18   of the Office of Diversity Inclusion was while you

19   were dean?

20               A.    Yes.

21               Q.    Now another topic that you

22   discussed in your complaint was this external

23   scientific advisory board.  And it's a -- it's

24   paragraph seventy-two in your complaint, I don't know

25   if you want to refer to it.  But your complaint

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        asked what was going on who are you talking about

3        specifically, the -- the two women that you

4        mentioned?

5                    A.   Yes.

6                    Q.   Okay.  Your complaint indicates

7        that you spoke to Dr. Dewan in the summer of 2019 --

8                    A.   Yes.

9                    Q.   -- about an upcoming visit of

10       the advisory board?

11                   A.   Yes.

12                   Q.   Okay.  You indicate in your

13       complaint he said sarcastically, oh, do we have an

14       external scientific advisory board, correct?

15                   A.   Yes.

16                   Q.   Right.  When -- when exactly did

17       that conversation happen?

18                   A.   I really don't recall, it was --

19       he became president, interim president in -- in, you

20       know, just around Christmas.  So like, you know,

21       between Christmas and New Year's, and we didn't have

22       that conversation.  So it was sometime in 2019, so

23       when in 2019, I don't know.

24                   Q.   Do you know if it was towards the

25       beginning of the year, the middle, the end, any

800.523.7887

Associated Reporters Int'l., Inc.

Page 153

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         indication of when that --?

3              A.    It was not the very end, it was

4    not like the summer so it was sometime, you know, the

5    first semester of 2000 -- I don't -- I cannot

6    speculate, I cannot -- I'm under oath so I don't

7    know, you know.

8              Q.    Sure.  That's fine, I -- yeah, I

9    don't want you to guess, I don't want you to

10   speculate.  If you don't know that's -- that's

11   totally fine.

12             A.    Okay.

13             Q.    Was it --?

14             A.    Sometime in 2019.

15             Q.    Sure.  This conversation, was

16   this face-to-face, was it over the phone, how did it

17   -- how did it happen?

18             A.    Face-to-face.

19             Q.    Were there any witnesses to this

20   conversation?

21             A.    Not that I recall.

22             Q.    Did he say anything else about

23   this advisory board to you during that conversation?

24             A.    No.  I didn't pay attention

25   during the con -- it was a short conversation.  It

800.523.7887

Associated Reporters Int'l., Inc.

Page 154

```
1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2         just happened incidentally, but I was curious to see
3         if he was going to say, oh you know, we don't need
4         one or, you know, he didn't make any comment about
5         whether the board was necessary or not.
6                        He didn't tell me not to do it and I
7         said, we're going to have this upcoming meeting, he
8         did not say, oh, how come and why and he didn't
9         question me in any way as to whether the meeting was
10        necessary.
11                       Q.   Did he make any comments
12        specifically about the gender of the board members?
13                       A.   No.
14                       Q.   Sorry, I didn't catch that.
15                       A.   No.
16                       Q.   No, okay.  Your complaint
17        indicates that you supported a Diversity Committee
18        that met monthly, correct?
19                       A.   Yes.
20                       Q.   That diversity committee, did
21        that committee already exist or did you create that
22        committee?
23                       A.   No, it already existed and I kind
24        of revamped it.
25                       Q.   When you say revamp, what do you
```

800.523.7887

Associated Reporters Int'l., Inc.

Page 167
Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

1
2      Q.    Okay.  Now, the budget committee
3   they discuss, I guess, the financial aspects of
4   different branches of the university.  Is that fair?
5      A.    That was the stated goal of the
6   committee.
7      Q.    Okay.  Do you know how committee
8   members are chosen?
9      A.    They were appointed.  I don't
10  know how.
11     Q.    But you did --?
12     A.    Yeah, I -- I did not choose them
13  and I don't know what thought processes were in the
14  person, who's the head of the person, who made those
15  choices.
16     Q.    Sure.  Are there are a set number
17  of -- of numbers for that committee?
18     A.    Not to my knowledge.
19     Q.    And May and June of 2019, do you
20  know who the members were at that time?
21     A.    There was myself, Dr. Jean, who
22  was representing the practice group for the
23  physicians.  So the two C.F.O.s -- the C.F.O. for the
24  university, Eric Smith, the C.F.O. for the hospital,
25  and Stuart Wright, the head of the hospital, Dr.

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 168

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        Robert Corona, the president.

3              And there was also the president's

4        chief of staff who was there and she could make a

5        comment every now and then but it was not like -- she

6        was not there to be a member of the committee if you

7        understand what I'm saying, like she was taking notes

8        and organizing the meetings, et cetera.

9              So that was at that time, Linda Vate.

10       Before had been Sergio Garcia, but anyway -- and

11       there may have been one more person, I'm trying to

12       remember who, that wasn't missing.  I may have been

13       -- I may be missing one member, but that's -- these

14       people that I told you were members ...

15             Q.   Now the members of this

16       committee, did their positions at the hospital

17       directly oversee the -- the finances of the

18       university?

19             A.   Principle, yes.  But for example,

20       I'm the dean of the College of Medicine.  The other

21       three deans they were -- there is a College of

22       Nursing, and there's a College of Allied Health.  So

23       those two deans they were not in that meeting.

24             So I mean, the College of Medicine is

25       the biggest one, but -- but I was not told ever why

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 169

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2       aren't the other colleges' deans represented.  So if

3       you ask -- if, you know, all the budget units, they

4       were not the College of Nursing and Health

5       Professions were not representative in this meetings.

6               Q.    Then your complaint indicates

7       that you suggested that a senior associate dean of

8       faculty affairs be added to this budget committee

9       Who is that?

10              A.    Dr. Ann Botash.

11              Q.    And is -- in her position as a

12      senior associate dean of faculty affairs, did she

13      directly oversee finances for the college?

14              A.    The simple answer is no, more

15      lengthy answer is that that budget committee even

16      though the name was a budget committee, over the

17      course of time, really oversaw all the business of

18      the university.

19              So we discussed multiple, multiple

20      items that had nothing to do with budget.  So if you

21      say, okay, was this a budget committee that only

22      discussed budgetary issues, and you're suggesting

23      that someone who's not a budget person be there.

24              So no I suggested someone who's not a

25      budget person be there because there were many items

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 170

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2         related to faculty, and to the school of medicine
3         that were being discussed there.  And she was the
4         senior associate dean for the -- for faculty affairs
5         and faculty development.
6                    So the answer is no, she did not have
7         a budgetary, you know, responsibility.  But yes, she
8         oversaw a lot of items that were under active
9         discussion in the -- in those regions.  So the
10        meetings -- budget committee, it was not -- the
11        meetings were not restricted to discussion of budget
12        items.
13                    Q.   Who did she report to directly?
14                    A.   Jimmy.
15                    Q.   Did you speak to her about her
16        wanting to be added to that committee?
17                    A.   I didn't.  Knowing her well, you
18        know, I didn't know -- yes -- yes.
19                    Q.   Did she ever talk to you?  Did
20        she ever request to be added to that budget
21        committee?
22                    A.   She didn't, but at some point, I
23        did -- after I had made the request, and I have no,
24        you know, input, you know, no response that didn't
25        happen.  I talked to her about it, so I did talk to

ARII@courtsteno.com                             www.courtsteno.com
                                                      A0935

800.523.7887

Associated Reporters Int'l., Inc.

Page 171

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2        her.  And then she -- she said, within the university
3        everybody knows that the group was the boys club.
4                    And she -- my understanding from the
5        context of the conversation is that she would very
6        much like to be part of the group.  But just so it
7        was a boys' club, and was not included.
8                    Q.    Did she ever ask to be included
9        into the budget committee to your knowledge?
10                   A.    No.
11                   Q.    No, she hadn't asked to be part
12       of the budget committee?
13                   A.    No.  And just for you to know I
14       -- what I suggested to Dr. Dewan, people who could be
15       considered for the committee and of course, at that
16       point, since I don't run the committee, he would have
17       to talk to them.
18                   And then invite.  I'm not going to --
19       I don't run the committee, I'm not in charge of the
20       committee.  I think to be -- it have been highly
21       inappropriate for me to tell the person, do you want
22       to be in this committee that I have no decision-
23       making power to make them join.
24                   So I suggested that for them to him as
25       potential, you know, kind of a useful people to have

800.523.7887

Associated Reporters Int'l., Inc.

Page 172

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2       in the committee and that they could consider, you

3       know, diversifying and broadening to more than what

4       it was.

5                   But I did not -- I did -- I think it

6       would have been highly inappropriate for me to invite

7       -- to mention it to them and then the person who's

8       running the committee doesn't want them and then I'm,

9       you know, in a bad spot.

10                  So I think what I did was appropriate

11      was to suggest -- nominate them to him and then it

12      would have been his job to talk to them and ask if

13      they would be interested if they wanted to do it or

14      not.  And that, you know, I -- I cannot, you know, I

15      think I could be, you know, it would be highly

16      inappropriate for me to nominate someone to committee

17      that I'm not, you know, I don't decide who is in the

18      committee.

19                  Q.   So when you recommended this to

20      Dr. Dewan, what was the response?

21                  A.   Icy silence.

22                  Q.   Sorry, what was that?

23                  A.   Icy silence.

24                  Q.   Icy silence?

25                  A.   Yes.

ARII@courtsteno.com

www.courtsteno.com187

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 173

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                 Q.    Okay.  You didn't -- you didn't

3    say anything after you suggested that?

4                 A.    It was just kind of dead silence,

5    you know.

6                 Q.    Okay.  And how many times did you

7    suggest this to Dr. Dewan?

8                 A.    To my -- to the best of my

9    recollection right now, twice.

10                Q.    Do you recall exactly when you

11   recommended this to Dr. Dewan?

12                A.    No, the chronology I don't

13   remember off the top of my head.

14                Q.    And his response to both times

15   you suggesting this was -- was silence?

16                A.    Icy, glacial silence.

17                Q.    Okay.  So he didn't mention

18   anything about Dr. Botash's gender in response to you

19   making this recommendation?

20                A.    I mean, I mentioned we needed

21   women at the committee, and I said -- nominated a

22   woman, he didn't say, you know, he didn't say

23   anything, so.

24                Q.    Okay.  So obviously he never made

25   any comments about her gender or her national origin

800.523.7887

Associated Reporters Int'l., Inc.

Page 174

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         or her race or anything like that?

3                    A.   Not that I recall.

4                    Q.   Did you specifically say to Dr.

5         Dewan that you thought that women should be added --

6                    A.   Yes --

7                    Q.   -- or did you just --?

8                    A.   -- specifically.

9                    Q.   Okay.  And -- and again, that was

10        on two separate occasions?

11                   A.   Yes.

12                   Q.   Your complaint states you

13        suggested a female chief medical officer be added to

14        this budget committee?

15                   A.   Yes.

16                   Q.   Who was that?

17                   A.   I'm blanking her name right now.

18        It's in the complaint I can look, you know, if you --

19        I don't know if the names is in the committee but in

20        the complaint but it's Amy Tucker -- Amy Tucker.

21                   Q.   Okay.  And some questions with

22        respect to her that I just asked about Dr. Botash,

23        did -- what was her position at that time, did it

24        directly oversee finances?

25                   A.   Well, she's the Chief Medical

800.523.7887

Associated Reporters Int'l., Inc.

Page 179

1  Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                Q.   That's okay.

3          MS. COWAN:  It's one o'clock now, does

4  anybody want to take a quick break or do we keep

5  going?

6          THE WITNESS:  I could go a little

7  longer and then I'd like to have a break.  But I can

8  go like, you know, another --

9          MS. COWAN:  Okay.

10          THE WITNESS:  -- fifteen to ten

11  minutes, whatever.

12          MS. COWAN:  Okay -- okay.  That's

13  fair.

14          MR. GRACE:  Yeah, maybe we -- yeah, we

15  get a little bit further, and then we'll just do a

16  bit of a longer break, get some lunch or something

17  like that.

18          THE WITNESS:  Yeah.

19          MS. COWAN:  Okay.

20          BY MS. COWAN:  (Cont'g.)

21          Q.   Dr. Licinio, your complaint

22  states that you complained to the dean of student

23  affairs about African American students not being

24  prepared with respect to their career development?

25                A.   Yes.

800.523.7887

Associated Reporters Int'l., Inc.

Page 180

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    Q.   Does that sound familiar?  Okay.

3                    A.   Yes.

4                    Q.   Who -- who was the dean of

5    student affairs you complained to?

6                    A.   Julie White.

7                    Q.   Do you recall when you made that

8    complaint?

9                    A.   Which complaint specifically?

10                   Q.   Well, were there more than one

11   complaint made?

12                   A.   Yes.

13                   Q.   How many complaints did you make?

14                   A.   But can you repeat the nature

15   because I -- I -- I interacted with the dean of

16   student affairs a lot.  So I just want to be sure

17   that -- and that's really a specific question that

18   you're asking, so can you just repeat the original

19   question, please?

20                   Q.   Sure.  Your complaint talks about

21   how you complained to her about African American

22   students not being prepared with respect to their

23   career development.

24                   A.   Yes.

25                   Q.   How many occasions did you

ARII@courtsteno.com

www.courtsteno.com

A-0942

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 181

1   Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.
2       complain?
3                   A.    When I was narrating that
4       complaint, I may have complained on more than those
5       occasions.  But like, what was specific to what I put
6       in the -- in the application was three different
7       students that I had referred outside individuals, and
8       then they, you know, that the same person an outside
9       individual.
10                  And he expressed to me concern about
11      how lost those individuals were in terms of a
12      professional development.
13                  Q.    So -- do you recall when you made
14      that complaint?
15                  A.    Those complaints, so it was --
16      no, it was in, I think April 2019 or earlier in 2018,
17      but I don't remember the dates.
18                  Q.    Who did -- who did Julie White
19      report to at that time?
20                  A.    She reported to the president
21      because she was the vice president.
22                  Q.    Did she play any role in -- in
23      your demotion in September 2019?
24                  A.    She reported -- I need to think
25      here, because the reporting structure changed when I

ARII@courtsteno.com                              www.courtsteno.com
                                                          A0942

A-0943

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 187

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         about that which was complicated.  So but I did

3         express that to them and we had a few interactions

4         about that.

5                    Q.   When -- when did that occur?

6                    A.   Again, I don't remember the

7         dates.  But we -- I -- there was an interaction on

8         the email that I sent about, you know, people feeling

9         discriminated what they should do.  And H.R.

10        requested that I -- asked me why I did send -- why I

11        sent that, we interacted about that and then I sent a

12        clarification that H.R. drafted, and so we had

13        interventions about that.

14                   Q.   Okay.  So you're referring to an

15        email that you sent out to students where you listed

16        your personal email address, and indicated they could

17        email you personally if they had any complaints,

18        correct?

19                   A.   Yes.

20                   Q.   All right.  And then H.R. became

21        involved and told you that what you said in your

22        email was not entirely accurate, correct?

23                   A.   Yes, because my -- I don't think

24        it was understood well by H.R., because my intent is

25        that if the student had an issue -- the student felt

Page 188

1      Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2          -- they were terrified of retaliation.  And they --

3          they were very unwilling to say anything, because

4          they felt that they would be retaliated against.

5                        So I said, you come to me and then the

6          idea was for -- for me to mentor and tutor them,

7          like, you know, where to go and how to go to O.D.I.

8          and how to file a complaint, how to go to H.R., if

9          that's the case.  But the idea is for them to talk to

10         me initially and so that I would be very aware who

11         they were and I will be mindful of, you know,

12         avoiding potential retaliation.

13                        So that's -- that's the intent of the

14         email and that's what I said, if they could come to

15         me, not that I would -- I didn't say in the email

16         that I would solve their problem or that I would

17         launch an investigation myself.

18                        But I said, come to me and talk to me

19         and then we'll go from here.  But I -- H.R. didn't

20         like the -- the way that the email was worded and

21         then I sent the clarification.  That was kind of

22         drafted by them and was mutually agreeable between

23         them and I.

24                        But at that point, I did interact with

25         them and I told them the plight of the students and

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 189

1   Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2        why I had sent that et cetera so they knew the level

3        of discrimination.  And they knew the level of

4        systemic racism within Upstate.

5                Q.   Are you saying that you wrote an

6        email that indicated what you just said to H.R.?

7                A.   No, I talked to the head of H.R.

8        at that point.

9                Q.   So you talked to him on the phone

10       or in person?

11               A.   Yeah, phone.

12               Q.   On the phone, and you indicated

13       that there waw systemic racism and that's why you

14       sent that email?

15               A.   Yeah, I don't know if I used the

16       word systemic but I said that there was pervasive,

17       you know, racism and the students were terrified of

18       retaliation.  And they would not come forward and

19       just go, okay, the procedure is this, go to H.R. and

20       file a complaint, that they needed someone to kind of

21       guide them and, you know, orient them during that

22       process.  And I was -- I had volunteered to -- to

23       help them.

24               Q.   Okay.  But you didn't have any

25       specific complaints of specific students or faculty

ARII@courtsteno.com                             www.courtsteno.com
                                                          A0945

800.523.7887

Associated Reporters Int'l., Inc.

Page 190

Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

1     members that you went to H.R. and complained about,

2

3     correct?

4            A.    No, the students told the

5     complaints to me because I had a focus group with

6     them and it was like, you know, I was told this

7     confidential.  You're not going to be retaliated,

8     nothing's going to happen.

9            So they told me some very egregious

10    cases of discrimination.  And once I heard the cases

11    and how egregious they were, I wanted to, you know,

12    facilitate the process for them to -- to stand up for

13    themselves.

14           Q.    And were -- are -- were they

15    discussing discrimination within the university or --

16           A.    Within the university.

17           Q.    -- by specific faculty members,

18    or what?

19           A.    Specific faculty members by

20    staff, and by faculty members, both.

21           Q.    Did you ever report any of these

22    concerns or complaints to O.D.I.?

23           A.    I had conversations with O.D.I.

24    and as part of that process, and there was even --

25    and also, we talked to White because she wanted to be

800.523.7887

Associated Reporters Int'l., Inc.

Page 191

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2        in the meeting.  And I said that I wanted something

3        just with the students and -- and then I reported to

4        her what happened.

5                    So there was a general conversation

6        within the administration about the plight of the

7        African Americans and how discriminated that they

8        felt.

9                    Q.    Was there anything ever in

10       writing about those complaints?

11                   A.    Not that I recall, and the whole

12       purpose of the meetings that I had with the students,

13       I was not taking notes.  I said I'm not going to take

14       notes, I'm not going to narrate your names.  I just

15       want to get a general feeling of like, you know, what

16       the atmosphere here is like.

17                   And so it was not -- I think -- so

18       that actually have been a breach of their trust in me

19       that if I went ahead and then filed a complaint in

20       their name, you know.  So the purpose was like -- it

21       was more of a focus group for them to confidentially

22       say how they felt at the university and how they --

23       what kind of discrimination they encountered as

24       students at Upstate.

25                   Q.    Okay.

ARII@courtsteno.com

800.523.7887                        Associated Reporters Int'l., Inc.

Page 192

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2              A.   And I -- and I was told some very

3    egregious examples.

4              Q.   Now, you created another position

5    called the assistant dean for cultural competence?

6              A.   Yes.

7              Q.   And -- and when was that?

8              A.   That was -- I'd say the spring of

9    2019.

10             Q.   Your complaint says you

11   identified an African American surgeon who you

12   thought should take on that role?

13             A.   Yes.

14             Q.   Who was that?

15             A.   Dr. Darrel Dix.

16             Q.   And your complaint indicates that

17   there was aggressive objections by defendants, who do

18   you mean -- who made those aggressive objections?

19             A.   Dr. Mantosh Dewan.

20             Q.   What do you mean by aggressive

21   objections?

22             A.   We have a person in the office of

23   diversity of student affairs, I don't know her exact

24   role, it was director of multicultural affairs,

25   maybe, but -- I don't -- I don't -- I cannot say that

ARII@courtsteno.com

www.courtsteno.com
A0948

Page 193

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        for sure.  So just for the record, I -- I don't know

3        the exact title, but it's publicly available.

4                    And she's African American and her

5        name is Nikkia Chambers and then Dr. Dewan would say

6        very exasperated.  We already have Nikkia Chambers in

7        -- in diversity, why -- what should -- what did she

8        do all day, why can't you do this and what's she

9        doing all day, and it said that on multiple

10       occasions.

11                   Q.   Okay.  So --

12                   A.   And then I --.

13                   Q.   -- so his complaint was that --

14       strike that.

15                   Essentially what he was saying was

16       that, why do we need another position if we already

17       have someone who is covering those duties?

18                   A.   Yes, but the duty is not --

19       Nikkia Chambers has a master's degrees.  She's not a

20       doctor, she does not -- she cannot teach cultural

21       competence in the medical -- she cannot like embed

22       cultural competence in the medical curriculum.

23                   So just as an example, we had

24       dermatology class, some students complained to me

25       that they had the whole dermatology course and so

800.523.7887                                      Associated Reporters Int'l., Inc.

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.
2        discriminated here and doesn't go to him and it
3        doesn't have -- get involved in that process.
4                    A.    So I'm not familiar how the
5        office is structured now.  But from my conversations
6        with him, the office has been more or less split into
7        two.  So before it was one office.  It was -- was
8        when she was the head.  She was the head of the whole
9        thing.  Now he deals more with policy and what can we
10       do to, you know, be more diverse et cetera.  But he
11       doesn't handle individual complaints.
12                   Q.    Do you know what his official
13       title is now?
14                   A.    I think it's chief diversity
15       officer but, again, I cannot --- for the record, I'd
16       say that -- I would say that I don't know because I
17       believe it's chief diversity officer but without full
18       certainty.
19                   MS. COWAN:  Should we -- we can go off
20       the record.  Should we take our break now?  How long
21       you thinking like twenty minutes?
22                   (Off the record)
23                   BY MS. COWAN:  (Cont'g.)
24                   Q.    Dr. Licinio, during your tenure
25       as dean at SUNY Upstate there came a time where the

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 199

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                    Q.   Did Dr. Dewan play any role in

3    filling that position or was that your role?

4                    A.   That's a very -- I know you're --

5    you're asking like what here should be a simple

6    question but that's a very complex question because

7    as you mentioned before, the school is accredited by

8    the L.C.M.E.  They have certain standards and you

9    have to adhere to those standards to be able to

10   function and to be a medical school.

11                   So one of the standards that you have

12   to function to be an accredited medical school is

13   called Authority of the Dean.  And the school had

14   been on probation.  One of the items that had been

15   brought about as, you know, as a citation, and one of

16   the many things that became the cause of the

17   probation was that the dean didn't have a lot of

18   authority.

19                   So according to the L.C.M.E., the dean

20   appoints the chairs and the -- the chairs report to

21   the dean.  And then therefore the dean becomes the

22   chairs and their responsibility for the medical, you

23   know, school.  According to SUNY board of trustee's

24   policy, chair appointments are made by the president

25   across the entire SUNY system.

800.523.7887                                Associated Reporters Int'l., Inc.

Page 200

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    But what's been customary within the

3    SUNY system is that the deans make the appointment in

4    same terms that they recommend someone to the chair

5    -- to the president, and then the president then, you

6    know, confirms the appointment.  Of course, if the

7    appointment is like completely inappropriate or out

8    of bounds, but typically it's the dean who recommends

9    an appointment.  But the appointment is signed off

10   and that should be approved by the president.  So --.

11                    Q.   All right.  In this instance --

12                    A.   But in this instance --

13                    Q.   -- there was a --.

14                    A.   -- yes.

15                    Q.   Okay.

16                    A.   The -- typically the dean would

17   make a recommendation to the president and then the

18   person becomes the -- the -- so --

19                    Q.   Okay.

20                    A.   -- or -- or could be the chair,

21   you know.  Either the interim or the chair is the

22   same person.  So it's a -- a recommendation from the

23   dean to the president who typically concurs.  And

24   then that kind of in a way you meet both SUNY

25   guidelines and --.

ARII@courtsteno.com                          www.courtsteno.com

A0952

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 201

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2              Q.   All right.   In this instance,

3    it's my understanding that there's an interview panel

4    that was convened to interview candidates for this

5    interim chair, is that right?

6              A.   Yes, absolutely.   Yes.

7              Q.   And -- and Dr. Gorji was part of

8    that candidate pool but he removed himself early on

9    in the process, is that fair?

10             A.   No.   He -- when he came to

11   interview and he sat in the chair in front of the

12   panel, we all thought he was applying.   And then --

13   and he came.  I mean, the panel was to interview

14   people who wanted to be, you know, who wanted the

15   job.   So if someone just wanted to chat that's not

16   the place you come.

17             You know, so we saw one candidate,

18   another, another.   So they -- we only interviewed

19   people who had an interest in the job.   So he came to

20   be interviewed as, you know, as a candidate.   And

21   then when he sat there in the panel he said to us, to

22   our surprise, and I'm not the only one who was

23   surprised.   Everybody surprised that he was not

24   interested in the position but he had to come anyway

25   and he wanted to talk to us, et cetera.   So it was

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 202

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         not early in the process.  It was actually very late,

3         as late as it could be.

4                   Q.   All right.  So during the

5         interview he removed himself from consideration?

6                   A.   Yes.

7                   Q.   Now the panel eventually chose

8         Dr. Xhang, is that right?

9                   A.   Yes.  Yes.

10                  Q.   And she's a female doctor?

11                  A.   Yes.

12                  Q.   Okay.  Now you presented that

13        finding of the panel to Dr. Dewan at some point,

14        correct?

15                  A.   Yes.

16                  Q.   And -- and you told him that she

17        was the one that was chosen by the panel?

18                  A.   Yes.

19                  Q.   What was Dr. Dewan's response to

20        that?

21                  A.   At that meeting he didn't say

22        anything.  The next time I met with him I was removed

23        from my position as dean.

24                  Q.   Okay.  So when you met with him

25        and told him that Dr. Xhang had been chosen, did he

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2          express any disagreement with that -- with that

3          choice?

4                    A.   He didn't express agreement or

5          disagreement.  He didn't express anything.  And then

6          the next meeting that I had with him I was removed

7          from the position as dean.

8                    Q.   At any point did --?

9                    A.   The last interaction that I had

10         with him before the demotion of exactly that meeting

11         that I -- it was a group meeting that I disclosed

12         that that I had talked to people and with the panel.

13         And the panel had identified this person as the

14         candidate, as the leading candidate.

15                   Q.   And at any point did Dr. Dewan

16         express disagreement with that choice?

17                   A.   He didn't say anything.  He

18         didn't express agreement, he didn't express

19         disagreement.

20                   Q.   Okay.  And according to what you

21         just said, he needs to sign off on that chair choice?

22                   A.   Yes.

23                   Q.   And he signed off on Dr. Xhang as

24         the choice?

25                   A.   It's my understanding although it

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 209

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         session and I totally forgot.  Are you alone in the

3         room right now?

4                   A.    Yes, now I closed the door.  My

5         wife I don't think she's even in the house.  I looked

6         around.  There was nobody here so I closed all the

7         doors and I am alone in the floor and maybe possibly

8         in the house.

9                   Q.    Okay.  All right.  During her

10        term as president and during your term as dean, do

11        you recall President Laraque-Arena discussing any

12        performance concerns she had with you?

13                  A.    She gave me one performance

14        evaluation which was positive.  There was no items

15        that was like, you know, negative or things for me to

16        work on.  And then — I don't have a copy of that.

17        She gave me a hard copy which I can no longer find.

18                  And I requested that as part of

19        discovery which was not provided to me.  So she never

20        discussed anything negative about my performance as

21        dean.  No, like well how I, you know, what I did or

22        did not do as the dean.  She never said that there

23        was any deficiency in the performance.  Like --.

24                  Q.    Well, let me ask you this.  So

25        she -- you said that she had an actual written

ARII@courtsteno.com                          www.courtsteno.com

800.523.7887                            Associated Reporters Int'l., Inc.

Page 210

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         evaluation that she handed to you?

3                    A.    Yes.

4                    Q.    Do you recall what was on that

5         evaluation, what the criteria was or what was written

6         on that?

7                    A.    It was like two pages, maybe

8         three.  It was more than one page of -- was not ten

9         pages.  It was like, you know, either two or three

10        pages.  And there was like, you know, meets criteria,

11        doesn't meet criteria, exceeds like, you know,

12        exceeds expectation, meets expectation, below

13        expectation.

14                    So she did that for all her senior

15        personnel.  So for most of us, all of us she sent

16        what -- most people meeting expectation.  And then

17        there was one item that I -- that I exceeded

18        expectations.  I don't recall anything being negative

19        or she ever telling me, oh, this item here is

20        deficient and you have to work on this to improve

21        your performance.  There was no such thing.

22                    MR. GRACE:  Like to renew -- if -- if

23        I may, just renew my request just on the record for a

24        copy of this document we've -- we have requested a

25        couple times.

800.523.7887                                              Associated Reporters Int'l., Inc.

Page 211

```
1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2              MS. COWAN:  Yeah, that was in your

3    letter that you just sent to me on last week.  I

4    think it was Friday.

5              MR. GRACE:  Yeah.  And -- and was in

6    our original request as well.  It just hasn't seemed

7    to be turned over.

8              BY MS. COWAN:  (Cont'g.)

9              Q.   Dr. Licinio, the evaluation did

10   -- did the president fill that out completely herself

11   or did you have a part that you filled out?  Or -- or

12   what was it like?

13             A.   I arrived.  She handed it to me.

14             Q.   Okay.  Now you -- you said that

15   the president never -- never critiqued your

16   performance as a dean.  Did she ever discuss any

17   concerns about your behavior?

18             A.   Not specifically.  She did say

19   that I had an issue in communication with her because

20   I'm very direct.  If I something is wrong I say

21   something is not right.  I tend to be very, very

22   direct with the people that I speak to.  And a lot of

23   the people in administration are more kind of

24   circumspect and they don't say exactly what they are

25   thinking.  So she said so we have to work on our
```

ARII@courtsteno.com                               www.courtsteno.com
                                                            A0958

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 212

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2         communication, et cetera.  But that -- that's not

3         like a performance issue that I'm like my -- how I

4         perform in my job as dean.

5                   Q.   Did she ever tell you --?

6                   A.   But again she brought those

7         things up and then we talked.  And then at one point

8         when I said one of these last meetings that I had

9         with her that we talked for like, you know, way over

10        time.  I think it was -- well, I know it was way over

11        an hour.  She said, oh, this was so productive and my

12        communication is in good track, et cetera.  And was

13        very happy with the meeting.

14                  Q.   Did she ever discuss your

15        communication issues with anyone else other than

16        herself?

17                  A.   I had a coach that I requested

18        and was part of my -- my negotiation with Upstate.

19        And was paid by Upstate.  So at one point she put the

20        coach, me and her on the phone and we talked

21        together.

22                  Q.   Okay.  And what was the content

23        of that conversation?

24                  A.   To be honest, I don't remember

25        specifically.  But was like -- was really

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    Q.    I was just asking -- okay.  You

3    don't remember when that conversation happened?

4                    A.    I did remember -- I do remember

5    it happened but I don't have a date immediately.

6                    Q.    Okay.  Did the president --

7    Laraque -- Laraque-Arena did she ever discuss with

8    you that your behavior was inappropriate?

9                    A.    No.  She never said oh your

10   behavior is inappropriate, you have to behave

11   differently.  She never said that to me.

12                   Q.    She never said that your behavior

13   made her uncomfortable?

14                   A.    No.

15                   Q.    Do you recall a meeting with her,

16   it was about mid 2018 where you asked her to reduce

17   the number of meetings that you had to attend?

18                   A.    Yes.

19                   Q.    And -- and do you recall her

20   accommodating you in that sense?

21                   A.    Yes.

22                   Q.    Do you recall her counseling you

23   on your lack of professional demeanor during that

24   meeting?

25                   A.    No.  Absolutely she didn't at

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2       all.  And I was there.  She -- we had a very open,

3       frank conversation.  And then she said I'm sorry

4       that, you know, you're unhappy with the way things

5       are.  And then subsequently I got a letter from her

6       which specified and I have -- I mean the letter was

7       given to me.  So it is part of the Upstate record.

8       And the only thing written in the letter is that the

9       frequency of meeting was -- was going to be

10      decreased.  There was nothing, to my recollection, I

11      don't have the letter in front of me, but there was

12      nothing in the letter that said that I had to change

13      anything.

14              Q.   Did you discuss with her during

15      that meeting that you were having anxiety over having

16      multiple demands on your time?

17              A.   I remember telling -- I don't

18      know if I used the word anxiety.  I'm sure that I

19      used the word stressed.  I don't remember saying the

20      word anxiety.  I mean, I may have said it, I'm not

21      saying that I didn't say it.  But I didn't take notes

22      during the meeting.  I didn't transcribe the meeting.

23              Q.   Okay.  Did you discuss with her

24      having personal issues that were contributing to your

25      anxiety?

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         as -- the State of the University it's like a - it's

3         an event for the whole --.

4              I mean, if you are a janitor, you can

5         go, you know, so it's a broad event -- I was never

6         told not to go to that event.  I was not invited.  I

7         was not disinvited.  Everybody's invited, you know,

8         all the deans go and all the, you know, all the

9         chairs I mean, all the faculty, all the students if

10        they want to go, it's a -- it's a public, it's a

11        broad event to the whole community.

12             Q.   Did -- did Dr. Dewan ever

13        indicate to you that it was preferred that you not

14        attend certain events?

15             A.   No.

16             Q.   Are you familiar -- are you

17        familiar with Dr. Ricardo Azzes?

18             A.   Yes.

19             Q.   How are you familiar with him?

20             A.   He was the chief academic, he

21        over -- SUNY has three medical centers, there are

22        four medical schools, but Buffalo doesn't have its

23        own hospital, it's an affiliation.  So there are

24        three hospitals that are owned by SUNY.

25             So he has a role of overseeing those

A-0963

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 237

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2                    A.   No.

3                    Q.   Do you recall giving a speech in

4    May 2019 during the third-year medical student

5    orientation?

6                    A.   Yes.  I'm sorry?

7                    Q.   The third-year medical student

8    orientation in May 2019, and -- and Dr. White emailed

9    you regarding a student who wanted to file a

10   complaint against you because of that orientation

11   speech.  Do you recall that?

12                   A.   Yes.

13                   Q.   And in her email, she stated that

14   a group of students were pretty upset.  Do you recall

15   that?

16                   A.   Yes.

17                   Q.   Do you remember why they were

18   upset?

19                   A.   Yes.

20                   Q.   And what was the reason?

21                   MR. GRACE:  Objection.

22                   THE WITNESS:  Huh?

23                   MR. GRACE:  I just note my objection.

24                   BY MS. COWAN:  (Cont'g.)

25                   Q.   You can go ahead and answer.

Page 238

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    A.    Yes, the -- what I recall and --

3    and I have a very specific -- you know, that was

4    something that I spent some time on.  So I am pretty

5    confident about what I'm saying is that I brought up

6    to the students, because there -- there was -- the

7    students have a very stressful exam called Step One

8    for the -- there is an examination called the medical

9    - U.S. medical license examination, U.S.M.L.E., that

10   has three different steps.

11                   But the first one is step one, and the

12   students do this typically after they do their basic

13   science courses, which typically takes most schools

14   two years already and I have been in the curriculum.

15   And that score is very widely used to screen people

16   for residency.

17                   So we're talking for residency

18   matching before, so if you have a low score in that

19   examination, doesn't matter, your G.P.A. doesn't

20   matter, like what else you did, many residency

21   programs will not even interview you so that they put

22   a cut off like I will only interview people who

23   scored above this number.

24                   And the more competitive the specialty

25   is, the higher the number has to be.  So the -- the

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2        higher the number is, so let's say -- I don't -- I
3        don't -- cannot tell you like right now, which
4        specialty has a specific cutoff, the numbers are
5        high.
6                    So the students see that like as a
7        very critical point for them because if they score --
8        if they want to go to a competitive specialty and
9        they score low, they're not going to go for an
10       interview, they're not going to go to that -- those
11       programs.
12                   So there was a lot of stress in the
13       residency class, one particular African -- actually
14       an African American student came to me before the
15       exam, she was shaking so much --.
16                   Q.   Dr. Licinio, I'm sorry --
17                   A.   Yes.
18                   Q.   -- I'm just going to have to cut
19       you off.  My question was, do you remember what the
20       students complained about.
21                   A.   Yeah, that I brought up the issue
22       that -- that as they evolved in their medical career,
23       there would be increasing level of stress --
24       increasing levels of stress.  So they were very
25       stressed about this one exam now that they -- you

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2       know, was stressful for them.

3                    But as they entered, like, you know,

4       the fourth year of medical school, they would be

5       responsible for patients.  When they were interns,

6       they would be, you know, in charge of the patients.

7       When they were chief residents, they will be making

8       life and death decisions.  When they were attending,

9       they will be, you know, additional responsibilities

10      and, you know, more, you know, responsibility, like

11      if someone becomes a surgeon, then they are doing the

12      surgeries themselves.

13                   And then they are -- there is even

14      more stress related to that.  So I try to put in

15      perspective to them that the level of stress that

16      they had now was something that was, you know,

17      tangible and -- and -- and clear, but that they had

18      to understand that that was only one step in their

19      career evolution.

20                   And they had to learn to -- to deal

21      with stressful situations.  And after that meeting,

22      because I got the feedback from those students with

23      Dr. White, I talked to many other students, and they

24      said, oh, we'd love to talk -- we'd like a tough love

25      kind of talk and that we have to, you know, see that

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        there is many, many challenges coming in our head for

3        us and we have to put things in perspective.

4                     So there were multiple students who

5        talked to me informally, and especially after the

6        comment from Dr. White I was concerned is this like,

7        you know, generalized or, you know, or is this just

8        -- few students went to her and so they -- there were

9        many positive comments about the talk.

10                    Q.   Were you -- were you aware that

11       faculty members made complaints about this speech as

12       well?

13                    A.   They never complained to me, so

14       Julie White passed to me the complaints about the

15       students.

16                    Q.   So you weren't aware that there

17       were faculty members who took issue with your -- with

18       your speech?

19                    A.   Not specifically, they never came

20       to me.  And because -- and I want to make something

21       very clear for the record, because that was, you

22       know, Julie brought that up and I'm the dean of, you

23       know, I'm the dean of students in my program.

24                    I was curious to see if Dr. Dewan

25       would be as a, you know, as an issue, et cetera.  So

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 242

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        we had several subsequent meetings, he never once

3        brought to me, oh, these students were not happy,

4        make sure that you improve your performance as it

5        relates to them, he never brought it up.

6                It was never addressed to the

7        performance because Julie White is not my supervisor.

8        If anything I was -- at one point I was supervising

9        her, you know, so -- but the person who was, you

10       know, providing supervision to me is Dr. Dewan.  He

11       never, on any single occasion, brought out this issue

12       of the students to me.

13               Q.   There was a letter that was

14       drafted -- there was a letter that was drafted that

15       was sent out to the students after those complaints

16       were brought to your attention, correct?

17               A.   Yes.

18               Q.   And doctor -- Dr. White actually

19       corrected and modified that letter?

20               A.   I think it was an interactive

21       process, so I wrote part of the time, I don't

22       remember very well on how it happened, but I -- I

23       don't recall the exact process.  That's the -- I

24       wouldn't say that she did not, but I could not say to

25       what degree she contributed.

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 243

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2                    But typically, if anything would go to
 3         the students, I would draft, she would look and then
 4         it would go back and forth.  Very -- I don't think I
 5         would send anything to the students without their
 6         input, but I --.
 7                    Q.    Whose idea was it to draft that
 8         letter to the students?
 9                    A.    I asked her if I should have a
10         subsequent meeting with the students.  And I
11         clarified what I meant that my intent was for them to
12         do well, to be supportive and I'm very aware of -- of
13         the issue of the suicide.  I think had already
14         happened at that point so I didn't want to stress
15         them too much.
16                    And, you know, so I -- I suggested to
17         her, should I meet with them again and she said, no,
18         I don't -- and I think she said, why don't you send a
19         letter.  And I -- I believe that -- that -- that was
20         -- that interaction that we are discussing like, you
21         know, subsequent steps.
22                    I remember me bringing up the -- the
23         issue of the -- of the students and -- and, you know,
24         asked if it's appropriate to have another meeting and
25         she suggested that --.
```

800.523.7887

Associated Reporters Int'l., Inc.

Page 244

Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

1

2        Q.    Were you aware that student

3   affairs began to send a leader to student related

4   events that when she spoke out to monitor your

5   comments?

6             A.    Do you know something, we -- we

7   mentioned before, I had filed a complaint to the H.R.

8   and as part of the -- it's not discovery but like as

9   the information provided by both parties.  I saw that

10  on the day -- material from, you know, from the time

11  when I -- after I filed -- I had -- I had already

12  been out of the dean's role for like several months.

13            So I saw that in the H.R. materials,

14  but it was a complete surprise to me.  And at that

15  point, and because we were, you know, dealing with

16  the H.R., I made a very, you know, concerted effort

17  to recall every direction I had with Dr. Dewan.  He

18  never brought up the issues, the students, he never

19  brought up that there was any concern.

20            And then he never said that it was a

21  performance, you know, related issue and that I

22  should address it, you know, in any way.  And if

23  you're interacting with groups of students, you know,

24  on an ongoing basis, there's always going to be some

25  comment and something -- they're not going to --

Page 245

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         going to say anything that's going to be universally,

3         you know, liked by everybody.

4              So I -- I fought what was believed a

5         good faith effort to try to put their anxiety in

6         context of the -- of what was coming in their

7         careers.  And some students liked it and said it was

8         tough love, some didn't.

9              And I was completely unaware of this

10        issue of, you know, people coming into the meeting to

11        see what I said or didn't say, you know.

12             Q.   Do you recall a meeting in July

13        of 2019 with Dr. Dewan and Dr. Corona, and during

14        that meeting, Dr. Dewan emphasized the need for you

15        to be at the hospital -- at the school and to make

16        timely decisions?

17             A.   Should be -- can you repeat that?

18             Q.   Sure.  Do you recall meeting in

19        July 2019 with Dr. Dewan and Dr. Corona where Dr.

20        Dewan emphasized the need for you to be on site for

21        you to make timely decisions on site?

22             A.   I don't know exactly what you're

23        referring to time -- timely decisions on site sounds

24        very vague.  I don't know what that applies to.  We

25        had a meeting together and the purpose of the meeting

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 246

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         is to make sure that -- because sometimes I mean in

3         every institution there is like a conflict between

4         the medical school and the hospital who gets the

5         resources who -- because the doctors work for both,

6         you know, always really know how -- how things are

7         parceled out.

8                   And so we had a meeting with Dr. Dewan

9         and Dr. Corona to see how we could improve the -- you

10        know, make, you know, the communication with the

11        hospital even better.  But it was not -- there was no

12        criticism of my performance in that meeting, just

13        saying that like, you know, we have to continue to

14        work together and make things continuously better.

15                  But there was no specific deficiency

16        that was noted that -- that I had to address or

17        anything like that.

18                  Q.   Do you recall the meeting that

19        you scheduled in August of 2019 where the purpose was

20        to discuss the future of the Department of

21        Anesthesiology?

22                  A.   Yes.

23                  Q.   Okay.  You requested that Dr.

24        Dewan and Dr. Corona and -- and department chairs be

25        present for that meeting, correct?

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 247

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    A.   Yes, because there was a major --

3        there was a major -- not an uprising, but like a

4        major dissatisfaction from -- because anesthesia

5        provide services to the surgeon, you know, to provide

6        anesthesia to -- to the surgeries.

7                    So a lot of specialties do the

8        surgery, so there is urology, there is surgery, there

9        is -- so -- so anyway, so -- so yes, I -- I convened

10       the meeting with the -- with the relevant

11       stakeholders, the people in, you know, in the

12       administration and also the chairs of surgical

13       departments that were impacted by anesthesiology.

14                   MR. GRACE:  Let me just step in --

15       I'll just step in quickly.  Mr. Licinio, yeah, we'll

16       -- we'll end up being here a lot longer than -- than

17       we need to if you just --

18                   THE WITNESS:  Okay.

19                   MR. GRACE:  -- respond to what Ms.

20       Cowen is asking.  Thanks.

21                   THE WITNESS:  So yes, there was such a

22       meeting.

23                   BY MS. COWAN::  (Cont'g.)

24                   Q.  And it was convened at six a.m.

25       on that -- on that morning, correct?

A-0974

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 248

1   Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2                   A.    It was very early in the morning

3        and it was convened at that time because it was the

4        time when the surgeons were available. They -- they

5        requested that time to -- so that they could go from

6        the meeting straight to the operating room.  So it

7        was at their request, not mine.

8                   Q.    At any time during that meeting,

9        did you indicate that Dr. Dewan was preventing you

10       from doing your job?

11                  A.    I don't remember the exact words

12       that I said, but the context of the time is that

13       there was this -- the anesthesia was a major issue

14       because the -- the surgeries were not being, you

15       know, serviced adequately by the anesthesiology

16       department.

17                  So new leadership was really

18       desperately needed, and I -- I did indicate that it

19       was important for the dean to have autonomy to

20       appoint, you know, people that you thought were

21       competent to do the job.

22                  Q.    But did you specifically say that

23       Dr. Dewan was preventing you from doing your job or

24       something to that effect?

25                  A.    I don't recall.

ARII@courtsteno.com                            www.courtsteno.com

A0974

Page 249

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                  Q.    Did you speak poorly about Dr.

3    Dewan during that meeting at any time?

4                  A.    I don't speak poorly of anybody

5    at any meeting, like, you know, in a public meeting,

6    you know, criticize anybody, especially the person

7    that I'm reporting to.  So I don't remember, you

8    know, being more critical of him.  As I said to you

9    before, and it's part of my culture as well and I'm

10   Latina, I'm from Brazil and that's the way we're very

11   outspoken and, you know, direct.

12                 So I just say, you know, things more,

13   you know, bluntly than I think is customary in a

14   white Anglo-Saxon environment, but that's part of my

15   culture as well.  But I -- I -- I don't recall doing

16   it and I can tell you that is not part of my

17   personality.

18                 Q.    Okay.  Well -- and you said that

19   you are -- one, you said that you're direct because

20   of your -- your heritage and your culture.  Is it

21   possible that you said something during that meeting

22   that was critical of Dr. Dewan?

23                 MR. GRACE:  Objection.

24                 THE WITNESS:  I -- I answered that.  I

25   don't think I did, you know, I -- I -- I don't

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2        recall.  Honest to God, I don't recall the exact

3        words that I said.  So I cannot -- it was a very

4        early meeting, as I said, and I don't recall.

5                    BY MS. COWAN::   (Cont'g.)

6                    Q.   Do you recall playing a video

7        that same day, actually August 13th, 2019, where

8        Chris Cuomo was on that video and he was using some

9        vulgar language and some ethnic -- ethnic slurs.   Do

10       you recall that?

11                   A.    What I recall and very well --

12       because that this was brought up in the material

13       provided to the H.R., so I had, you know, I had seen

14       that before.  So I had gone through this, which is

15       that later that same day, there was a chairs'

16       meeting, which was at five o'clock.

17                   And then I -- and I had some meeting

18       before so it was not that I was free and I arrived

19       there like an hour early.  So I was, you know, at

20       some level, just finishing, I went there, but I

21       arrived a few minutes before five and there were

22       like, two or three chairs and like it's a very small

23       group of people.

24                   And then at that point, there was --

25       Chris Cuomo had just, you know, made this, you know,

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 251

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        kind of outburst that someone recorded and was

3        circulated on social media and I -- I didn't even

4        know what it was.  I saw Chris Cuomo there, I played

5        and when I -- this is weird so I just put it on

6        speaker and then -- but people began to arrive at the

7        meeting and I turned that off, like, you know, right

8        away.

9                    So it's not that I, you know, was --

10       and the chairs that were there -- I think Dr. Corona

11       was there, he was very friendly with me at the time.

12       And there were like two or three people so it was not

13       that I -- as soon as the, you know, a -- a body of

14       people began -- usually for these meetings, the

15       chairs are busy.  They go from one thing to another,

16       like, you know, right, like ten or five, there's

17       usually nobody in the room.

18                    And like, you know, two or five --

19       three to five people begin to arrive, so people began

20       to arrive and I turned it off right away.  So I saw

21       that mentioned and I think it was -- it was a very

22       momentary thing, we didn't, you know, that's not -- I

23       don't think that that -- it was less than a minute, a

24       few seconds.

25                    And when we saw it, what it was and

A-0978

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2   how, you know, I -- I didn't know Chris Cuomo could

3   even speak like that, you know, sorry, it was news to

4   me too.  But when I saw the -- the content I

5   immediately turned it off and people walked into the

6   room and the thing was over.

7                  So that's something that happened over

8   literally a few seconds, and I saw that brought up in

9   the D.H.R. complaint.  And I think that there is

10  really very little to that, you know.

11                 Q.   Did Dr. Dewan tell you to turn

12  off the video?

13                 A.   Dr. Dewan was not in that room,

14  when that happened, was a meeting with me and the

15  chairs, he was not there.

16                 Q.   Did he ever discuss that video

17  with you later on?

18                 A.   He never brought that up, no.

19                 Q.   When you began in the dean

20  position, how many staff members did you have?

21                 A.   Staff members, what do you mean?

22                 Q.   How many people did you have that

23  were reporting to you?

24                 A.   A lot, so I have other chairs

25  reported to me.  Eventually student affairs at one

800.523.7887

Associated Reporters Int'l., Inc.

Page 253

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2        point was reporting to me then before, it wasn't that
 3        it was, then it was not.  But at one point reported
 4        to -- to the dean's position.  There were like, you
 5        know, over thirty people reporting to me.
 6                 Q.   What about directly to you, how
 7        many people reported directly to you?
 8                 A.   There was Grace, there was -- and
 9        she had a small staff that reported to her but then
10        she reported to me.  And then Mary Arsenal and -- but
11        there were many people, you know, then I had Cheryl.
12        There were a few people who reported directly to the
13        -- to the dean.
14                 Q.   Did Dr. Dewan ever ask you to
15        provide him with an organizational chart?
16                 A.   No, he never asked me to provide
17        an organizational chart of the college.  There was a
18        huge controversy about the organizational charts for
19        the institution, because the previous president had
20        done what she called a reorg -- a reorganization and
21        she came up with a completely different
22        organizational chart from what the institution had
23        before.
24                 And she was in the process of
25        implementing that when the -- when she was -- when
```

800.523.7887

Associated Reporters Int'l., Inc.

Page 254

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2    she stepped down herself.  So there were elements of

3    a new organizational chart that had been implemented,

4    there were others that were in implementation, and

5    that there were others that were like, you know,

6    thought of, and planned but nothing had happened

7    about that.

8                  So he did not specifically ask me or

9    provide any organizational charts for the College of

10   Medicine.

11                 Q.   Did Eric Frost (phonetic

12   spelling) ever ask you to provide job descriptions of

13   the positions that you had added?

14                 A.   Well, you know, any position that

15   I had, that there was a discussion and then let's say

16   you brought the one that was for the -- for -- for --

17   and Julie White there, so there was a position

18   description for that, the position was posted.

19                 So for this associate dean, for

20   example, for cultural competence, it was actually

21   discussed with where the students kept bringing up

22   that there was -- there was a need for increased

23   cultural, you know, competency in the curriculum.

24   There were many people who were discussing that and I

25   mean, the --.

A-0981

800.523.7887                                          Associated Reporters Int'l., Inc.

Page 255

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                    Q.   Dr. Licinio, my question was, did

3        Eric Frost ask you for descriptions of particular

4        positions that you added?

5                    A.   I don't recall.  He -- he

6        interfaced with -- so typically about -- so let's say

7        something like that.  Eric would not come to me and

8        say you give me the description, he would go to a

9        Mary Grace, who was the dean's chief of staff and she

10       interfaced with -- with H.R.

11                    And she, like if someone was being

12       hired, then she would draft a letter, she would

13       discuss with H.R.  She had been there for -- at that

14       point, eighteen years.  So he never told me, hey, Dr.

15       Licinio, come up with a position description for

16       this, that I remember.

17                    And if -- and if there was such a

18       request, the process for that would be for it to be

19       discussed and to be, you know, part of the, you know,

20       I met -- I had, you know, formal meetings, Mary Grace

21       and Eric Smith and others about that issue of the

22       college twice a week.

23                    So the -- the point was to bring that

24       in those meetings, but I don't recall a specific --

25       Eric Frost specifically asking me to come up with a

ARII@courtsteno.com                                  www.courtsteno.com
                                                              A0981

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 256

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        position description for Position X.

3                    Q.   Did Dr. Dewan ever express

4    concern about positions being added, and then the

5    salaries that were being added to the organizational

6    structure?

7                    A.   He never brought up the issue of

8    the money, so he said of the -- the -- the cost.  So

9    he did say that -- that he had the concerns like when

10   I wanted to put -- so one thing that I -- I didn't

11   say before is that, in the -- him talking to the

12   students about diversity, what they did say, very,

13   very emphatically in multiple settings, is that they

14   really wanted a structure that had more people who

15   looked like them.

16                    So as they dealt with -- so there was,

17   for example, this school hadn't -- not a single

18   African American medical researcher obtaining, you

19   know, -- was, you know, developing --

20                    Q.   Dr. Licinio, I really -- I hate

21   to keep cutting you off --.

22                    A.   -- so -- so anyways -- so to

23   answer -- to -- to answer your question, he never

24   brought up the issue of the money.

25                    Q.   Okay.

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 273

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                   A.   I cannot comment on that.   I

3   don't know to Dr. Swortz specifically, I was not in

4   the meetings.

5                   Q.   Okay.

6                   MR. GRACE:   I just want to note my

7   objection for the record.

8                   BY MS. COWAN::   (Cont'g.)

9                   Q.   During that meeting with Dr.

10  Dewan on August 12, 2019, you indicated in your

11  complaint that you told him you felt that she was

12  being discriminated against because no other white

13  male professor was facing the same salary challenges.

14  Is that --

15                  A.   Yeah.

16                  Q.   -- is that fair to say?

17                  A.   Yes.   And I even -- yeah, I

18  specifically said that she would have reason both

19  under Title Seven, and I use those words, both under

20  Title 7 and Title 9, to file a complaint.   But I hope

21  we could resolve this amicably, something along those

22  lines, but I just -- I -- I did say that I felt she

23  would have reason to file a complaint under Title 7.

24                  Q.   So you told Dr. Dewan in this

25  meeting between the two of you that she could file a

A-0984

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 274

```
 1   Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

 2       lawsuit against -- against --.

 3                   A.   I said that she could, but I

 4       said, she would have -- there would be grounds for

 5       her to file a complaint and that she was feeling

 6       discriminated and she was very unhappy about it.

 7                   Q.   Okay.  Did you discuss with Dr.

 8       Dewan during that meeting that you were -- that your

 9       marriage was suffering because she was not happy

10       working at Upstate?

11                   A.   Our marriage has never suffered,

12       you know, and actually, many people are surprised

13       that we've been married -- because we're not that

14       old, you know, we were married very young.  So we've

15       been married for how -- many years now, thirty, you

16       know, many years.  Thirty-five I think or, you know,

17       thirty-five, thirty-seven, yeah.

18                   So we've been married like a long

19       time, and -- and our marriage is not -- does not

20       suffer I mean, we have, you know, challenges that

21       every married couple faces.  But our marriage is rock

22       solid and I -- I -- I may have said I mean, our

23       relationship was suffering like, it was tense

24       because, you know, she had this major issue.

25                   Normally she would go to the dean, I
```

ARII@courtsteno.com                                www.courtsteno.com
A0984

A-0985

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 275

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2         am the dean, she cannot come to me so, you know, when

3         you go to the president of the different level -- so

4         she was unhappy and her unhappiness makes me unhappy.

5         But I don't think our marriage was suffering.  I

6         mean, I was unhappy because of her unhappiness, I

7         think it's the best way to put it.

8                    Q.   Did you tell Dr. Dewan that your

9         marriage was in jeopardy if the salary complaints

10        were not addressed?

11                   A.   I never said that -- I never used

12        that word, I can say positive I never used that word

13        to anybody that our marriage was never in jeopardy

14        and I never said that to anyone.

15                   Q.   What did doctor respond -- Dr.

16        Dewan respond with when you told him that she could

17        file a lawsuit under Title 7 or Title 9?

18                   A.   I didn't say lawsuit, I said that

19        you could file the complaint with O.D.I.  I didn't

20        say lawsuit, I didn't use the word lawsuit, I never

21        use that word.  I think it's a very threatening word

22        and I'm positive I never used it.

23                   I said that she would have grounds to

24        go through O.D.I. under that Title 7 and 9, but I was

25        talking about internal Office of Diversity and

A-0986

800.523.7887                                     Associated Reporters Int'l., Inc.

Page 276

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         Inclusion.  I never brought up going to court or

3         going through, you know, external litigation.

4                   So I said that she would have grounds

5         to go to O.D.I. and under Title Seven and Nine and

6         that she was being discriminated.  But that's what I

7         recall, you know, so what was your question

8         specifically?

9                   Q.   Well, my question -- I guess my

10        new question now is that, during your meeting you

11        told Dr. Dewan that she would have or could have a

12        claim under Title 7 or Title 9.  I thought that's

13        what you told me earlier?

14                  A.   Yes -- yes, she believes that she

15        had it, you know, yes -- yes, I conveyed that to him.

16                  Q.   Okay.  And then you listed off

17        all the protected classes that your wife is a part

18        of, according to you?

19                  A.   Yes.  And I did -- just to be

20        clear for the context that I said that like she would

21        have grounds to go to O.D.I. with those claims.  I

22        never said that she would go to, you know, file a

23        lawsuit outside of the university, but I said that

24        she would have grounds to go to O.D.I. with those

25        complaints.

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887

Associated Reporters Int'l., Inc.

Page 277
Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

1

2      Q.   You specifically said O.D.I.?

3      A.   O.D.I.

4      Q.   And what was Dr. Dewan's

5  response?

6      A.   He said -- he looked concerned.

7  Dr. Dewan doesn't talk very much, so we're very

8  different, you know, styles.  So he -- he is very

9  more quiet and more -- less outspoken.  And -- so he

10 -- he -- since you're talking about Dr. Dewan, he did

11 bring up, you know, you're asking me before, we know

12 where he was born, et cetera, he was born in India.

13      There is something in -- in diversity

14 that's called groups that are underrepresented in

15 medicine --

16      Q.   So --

17      A.   -- he is underrepresented in

18 medicine but the question that you asked --.

19      Q.   No, I'm asking you a question

20 right now.  Dr. Licinio, please.

21      A.   So -- so -- please -- yeah, so go

22 ahead.  The whole -- I -- I have to tell you this,

23 you have been very professional.  And you know, I

24 don't think there's anything not professional that

25 you could do.  But I'm just -- a situation that

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 278

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         upsets me a lot, so I am upset not with you, or with

3         your line of questioning, but with the reality of

4         what happened back then, you know/

5                   Q.   Sure.

6                   MR. GRACE:  Let's get to the point,

7    Doctor.

8                   THE WITNESS:  Yeah, I'll keep to the

9    point.  It just that the whole situation was so

10   stressful and so upsetting that I think some of that

11   stress comes up as I'm talking, but not related to

12   you personally or to your questions.  So, you know,

13   can you give me the question again and I'll -- I'll

14   answer more objectively.

15                  BY MS. COWAN::  (Cont'g.)

16                  Q.   My only question was, what was

17   Dr. Dewan's response when you told him that she could

18   file a complaint alleging discrimination?

19                  A.   He was very quiet and he didn't

20   say anything specifically.  And he just looked kind

21   of quiet and nodded, and then at the end, I said,

22   okay, and then what happens next, and he said, well,

23   you know, you -- thanks for bringing this to my

24   attention, and you'll hear from me.  And then the

25   next meeting that I had with him was to tell me that

ARII@courtsteno.com                          www.courtsteno.com

A0988

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 279

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2         I am demoted.
 3                        Q.   Did you encourage your wife to
 4         file a complaint with O.D.I. or with H.R.?
 5                        MR. GRACE:  Objection.
 6                        THE WITNESS:  She didn't file with
 7         H.R.  She filed with O.D.I., but I didn't encourage,
 8         I didn't discourage.  If you knew my wife you would
 9         know that you cannot encourage, so that's what she
10         wants to do.  So you cannot like, you know, tell her
11         what to do and then she goes and does it.
12                        She's very much her own person, so I
13         don't think that neither me nor anybody could tell
14         her, you know, what to do.  So I didn't encourage, I
15         didn't discourage her, I didn't say no, don't file
16         it.  And I said, yes, go ahead and file it.
17                        I didn't do either of those things, so
18         I didn't encourage, I didn't discourage.
19                        Q.   When did --?
20                        A.   But she was --- yeah, she was
21         profoundly upset with the level of discrimination and
22         harassment that she was going through.
23                        Q.   When did she file a complaint
24         with O.D.I.?
25                        MR. GRACE:  Objection.
```

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                    THE WITNESS:  I don't remember very

3    well.  I think I can tell you -- I don't remember.  I

4    mean, the date I don't remember, I mean, the date the

5    complaint was filed, we can -- it's a record, but I

6    don't remember the date that the complaint was filed.

7                    BY MS. COWAN:   (Cont'g.)

8                    Q.   Was it after your demotion in

9    September 2019?

10                   A.   Yes, but way after, maybe like a,

11   you know, close to a year, they had already filed my

12   complaint and -- so it was later.

13                   Q.   Okay.  At -- at that point,

14   August 2019, did your wife practice clinically as a

15   psychiatrist?

16                   A.   No.

17                   Q.   So she didn't see any patients?

18                   A.   No.

19                   Q.   Were there any other

20   psychiatrists in that department that did not

21   practice clinically?

22                   A.   I'm not familiar with the --

23   because I was doing the -- the dean's job and I was

24   not like, you know, specifically, because it's her

25   own department.  And I didn't want to get into the

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         understanding he is -- he is a Native American

3         professor?

4                   A.   Yes.

5                   Q.   Okay.  When did you make a

6    complaint based on race discrimination on his behalf?

7                   A.   Well, Dr. Dewan, when he talked

8    about Nikkia Chambers, he also brought him up and

9    he'd say, oh we already have Brian Thompson.  He's a

10   minority and why'd you get more minorities, we

11   already have him, what does he do all day?  What's he

12   doing, et cetera.  And he only brought, you know,

13   what's the person doing all day?

14              Comments about people of -- you know,

15   minority, underrepresented backgrounds, so Native

16   American, African American, and Hispanic.  He never

17   mentioned not once a white person by name and said,

18   what's this you know, John Smith doing all day?  He

19   never said that to me.  So -- but anyway, so he made

20   those comments to me on multiple occasions and then I

21   -- when I filed the complaint, I -- I -- I brought it

22   up in my complaint.

23                   Q.   When you filed this federal

24   complaint?

25                   A.   Even I think when I filed the

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 324

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2          D.H.R. I may have mentioned it there.

3                          Q.    Okay.  So when you filed your

4          Division of Human Rights Complaint, and I think it

5          was November of 2019, you brought it up?

6                          A.    I have to look at the complaint,

7          but I believe I did.

8                          Q.    Okay.  So --

9                          A.    But I'm not --.

10                         Q.    -- you're alleging that Dr. Dewan

11         asked what Mr. Thompson did with respect to what

12         position?

13                         A.    So that -- because he was

14         assistant dean, and he was saying, like when I was --

15         the students wanted to hire for me -- told me to hire

16         additional people who have underrepresented

17         backgrounds, then when I would bring a suitable

18         candidate for a potential position to Dr. Dewan, he

19         would say, why do you need another person of diverse,

20         we have -- already had Brian Thompson, as assistant

21         dean, what does he do all day?  Why do you need

22         another person?

23                         Q.    When did he make that comment,

24         according to you?

25                         A.    Multiple times the same meetings

A-0993

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 325

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2         that you talked about Dr. Zulma Spinoza and also

3         about Nikkia Chambers that I mentioned before in the

4         same meetings.

5                   Q.   When did that occur?  I don't

6         remember what you said.

7                   A.   It was like you know, the spring

8         -- like you know, April through June or July of '19

9         -- 2019.

10                  Q.   Any -- any witnesses to those

11        conversations, or was it just you and him in those

12        meetings?

13                  A.   Just me and him in the meetings.

14                  Q.   Okay.  Did you make any

15        complaints on behalf of Brian Thompson to O.D.I. or

16        to H.R. based on Dr. Dewan's statements?

17                  A.   No.

18                  Q.   Did he ever make any complaints

19        to you that he felt he was being discriminated

20        against?

21                  A.   He felt that -- he felt that

22        Native Americans were the -- the invisible minority

23        that his people are not given a proper

24        representation.  He was the only Native American

25        student here for twenty-five years, you know, from

ARII@courtsteno.com                                    www.courtsteno.com
                                                              A0993

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 326

 1   Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

 2        when he entered twenty-five years before I came.

 3              And then I -- I supported his efforts

 4        to do this whole pre-admission workshop to engage

 5        Native American students.  In my last year as dean,

 6        there were three students of Native American

 7        background.  That was the first time in, you know, in

 8        decades.  So he did complain a lot and he called

 9        themselves like the -- he said that he was part of

10        the invisible minority.  They called themselves

11        invisible minority.

12              Q.   Okay.  So his concerns were that

13        he was underrepresented as an ethnic group at the

14        college?

15              A.   That his group was

16        underrepresented and that the college didn't pay

17        attention to the -- to inclusion of his group which

18        the reservation is just around us.  And -- and so --

19        so your question was whether he complained about

20        being discriminated and I said, yes.

21              Q.   That he complained to you, is

22        that what you're saying?

23              A.   Yes, he's -- he's complained to

24        me that there was discrimination.  He didn't say that

25        he himself was like, you know, that we are

Page 327

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2         discriminating against him specifically.  But there
 3         was a discussion of -- the previous president had
 4         promised to him and discussed with me and we both
 5         agreed that that he could be promoted to assistant
 6         vice-president for Native American affairs.
 7                   And so that president made a
 8         determination, I had concurred with both.  I mean, I
 9         don't know exactly who -- you know, it wasn't
10         interaction with her, so we both agreed in the end,
11         that he would be -- should become a V.P. for, you
12         know, Native American Affairs.  And then Dr. Dewan
13         asked me many times, what's the situation?
14                   I said you know, there was a
15         discussion, I said what I'm telling you like, right
16         now -- I said to Dr. Dewan three or four times I said
17         you know, he was told -- he was promised that he
18         would be, you know, promoted to a V.P. for Native
19         American Affairs, the previous president talked to
20         him.
21                   I -- I told that I was in agreement,
22         and then -- and I said you know, it's up to you now
23         -- your administration to -- to make that happen,
24         assistant vice-president thing, I cannot -- I have no
25         say in those appointments.  But I -- I gave -- he
```

A-0996

800.523.7887                                Associated Reporters Int'l., Inc.

Page 328

```
1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.
2         asked me what was the situation with him?
3                   Why was he not so happy?  And I said,
4         you know, because he was promised something and it
5         was not given to him.
6                   Q.   Okay.  But did you ever complain
7         to anyone on behalf of Brian Thompson that he was
8         personally being discriminated against?
9                   A.   No.
10                  Q.   You mentioned Nikkia Chambers?
11                  A.   Yeah.
12                  Q.   And I think you're alleging that
13        you complained on her behalf that she was being
14        discriminated against because she was African
15        American?
16                  A.   No, I didn't say that.
17                  Q.   Okay.  So -- so you're not
18        claiming that you -- you're not claiming that you --
19        you were retaliated against because you opposed
20        discrimination based on her ethnic background?
21                  A.   Well, I did oppose
22        discrimination, and oppose people being berated
23        because of their background, and being berated by the
24        president because of their ethnic background.  So
25        yes, I oppose that, and then, you know, if it was,
```

ARII@courtsteno.com                          www.courtsteno.com

A0996

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 329

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         you know -- I don't -- I'm not inside his brain.  I

3         don't know what -- you know.

4                        So I opposed the discrimination and I

5         was demoted.  I -- I cannot speak to you of the --

6         you know, the process that happened you know, when I

7         was not in the room.

8                        Q.    You -- you just said that the

9         president berated people based on their ethnic

10        background?

11                       A.    What is she doing all day?  You

12        know, we have -- they're just -- they're in this

13        position and what is she doing all day?  Why do you

14        need an extra person?  What -- what -- what is she

15        doing?  What's her job?  And you know, I'm -- you

16        know, the supervisor you know.  So yeah --.

17                       Q.    Yeah, so --.

18                       A.    Yeah, and he -- he also said the

19        same thing about Brian Thompson.  Sometimes he would

20        use her as an example.  Sometimes Brian Thompson and

21        then he'd say, we have Brian Thompson, you know,

22        covering for minorities, why do we need another

23        minority person covering for minority issues you

24        know.

25                        And what -- and he -- what does he do

ARII@courtsteno.com                          www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 330

1    Licinio, M.D. v SONY, et al - 5/31/2022 — J. Licinio, M.D.

2       all day?  He said that repeatedly about him and about

3       her.

4                    Q.    Okay.  So when Dr. Dewan was

5       asking those questions, according to you, he didn't

6       say anything about Nikki Chambers being African

7       American?

8                    A.    She is African American, is

9       visibly black.  I mean, there's --.

10                   Q.    That's fine.  But Dr. Dewan

11      didn't specifically --.

12                   A.    I am -- I'm berating her because

13      she's an African American, no, he does not use those

14      words.

15                   Q.    Right.  And he didn't bring up

16      her race at all, when he was asking you about what

17      her job duties were?

18                   A.    Well, but he brought that, you

19      know, three people of minority underrepresented

20      backgrounds, and he did not bring a single white

21      person asking, we already have this person there

22      what's the person doing, you know, in research or in

23      administration, in anything, he never brought up

24      anybody else by name and berated them asking them

25      like, you know, what's -- what's -- what's that

A-0999

800.523.7887                                Associated Reporters Int'l., Inc.

Page 331

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         person doing all day?

3                   Why weren't they more productive?  Why

4    do we need to have -- he never said, why do we need

5    to hire another professor in biochemistry since we

6    have so and so, you know, who's already a professor

7    there.  Why do we need another one?  Why doesn't that

8    person just work harder?  So they never said that to

9    me about the white person.

10                  Q.   So when he was asking these

11   questions, they were in reference to positions that

12   you were creating, correct?

13                  A.   Yes, and the positions and roles

14   because for example, if I -- if I put like that --

15   that -- that position for Dr. -- for Dr. Darrel Dix,

16   it's like -- it's a -- it's a role really.  The

17   person's already hired full-time at Upstate, they

18   remain full-time.  So it gives us additional role of

19   the assistant dean and they get a small stipend like,

20   you know, ten percent of the salary.

21                  It's something really small I'm

22   talking about like twenty thousand dollars a year, or

23   something like, you know, in that range.  So we're

24   not talking like, you know, hiring someone and paying

25   full salary and full benefits.  It's like an

ARII@courtsteno.com                         www.courtsteno.com

A0999

A-1000

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 332

1  Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2      additional role with a potential stipend for that

3      role.

4              But it's a small stipend.  We're not

5      talking like, you know -- you know, it's not -- I

6      know the finance of -- I know the finance of the

7      school then it's something that could easily be

8      afforded.  It's not like we're creating a new

9      position with new benefits, and hiring a -- you know,

10     a full-time person with, you know, the full -- Angela

11     Taylor would -- would have been that for that

12     position.

13             But it was a lower-level position, but

14     for the -- for this specific case of Dr. Darrel Dix

15     of the cultural competence was a stipend for an

16     existing position.  So it was a -- it's an additional

17     role.  It's not an additional position.

18             Q.   What was the stipend for Brian

19     Thompson?

20             A.   I don't know.  I mean, I don't

21     remember at this point the figures at hand.  So Brian

22     Thompson know what was being negotiated I'm not privy

23     to that because it would be -- have been assistant

24     vice-president.  So that's in the president's, you

25     know, reporting structure.