# 24-2564-cv

## United States Court of Appeals
### for the
## Second Circuit

JULIO LICINIO, MD, PHD, MBA, MS,

*Plaintiff-Appellant,*

— v. —

STATE OF NEW YORK, STATE UNIVERSITY OF NEW YORK,
STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 5 of 5 (Pages A-1001 to A-1243)

JOSEPH SPADOLA
NEW YORK STATE OFFICE OF THE
  ATTORNEY GENERAL
*Attorneys for Defendants-Appellees*
28 Liberty Street
New York, New York 10005
(212) 416-8019

DANIEL GRACE
DANNY GRACE PLLC
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 1200
New York, New York 10007
(212) 202-2485

CP COUNSEL PRESS   (800) 4-APPEAL • (334400)

# TABLE OF CONTENTS

District Court Docket Entries..............................................................................vi

Plaintiff's Complaint................................................................................. A-0001

    Exhibit 1 Employment Contract............................................... A-0039

    Exhibit 2 Demotion Letter......................................................... A-0051

    Exhibit 3 Civil Cover Sheet...................................................... A-0054

Answer ........................................................................................................ A-0055

Amended Answer......................................................................................... A-0061

Defendant's Notice of Motion for Summary Judgment ............................. A-0072

Attorney Declaration................................................................................... A-0074

    Exhibit A Position Summary..................................................... A-0078

    Exhibit B Offer Letter............................................................... A-0084

    Exhibit C Chart.......................................................................... A-0095

    Exhibit D Business Certification and notes.............................. A-0096

    Exhibit E Business Certification and notes .............................. A-0101

    Exhibit F Email.......................................................................... A-0103

    Exhibit G EEOC Charge............................................................ A-0106

    Exhibit H DHR Decision........................................................... A-0135

    Exhibit I DHR Dismissal Order................................................. A-0146

    Exhibit J Deposition Transcript Excerpt – Licinio.................... A-0149

    Exhibit K Deposition Transcript Excerpt – Botash................... A-0214

    Exhibit L Plaintiff Response to Interrogatories........................ A-0220

    Exhibit M Deposition Transcript Excerpt- Wong ..................... A-0240

Declaration Albanese .................................................................................. A-0246

Declaration Chin ......................................................................................... A-0250

ii

Exhibit A Email ...................................................................... A-0263

Exhibit B Affirmative Action/Equal Opportunity Report ...................... A-0268

Exhibit C Email ...................................................................... A-0269

Exhibit D Letter: Post Probation Survey Visit ................................. A-0271

Exhibit E Letter: Survey Visit for Full Accreditation ........................... A-0279

Exhibit F Letter: Status Report .................................................. A-0289

Declaration Corona ................................................................... A-0294

Exhibit A Letter ..................................................................... A-0299

Exhibit B Email ...................................................................... A-0300

Declaration Dewan .................................................................... A-0301

Exhibit A Email ...................................................................... A-0329

Exhibit B Email ...................................................................... A-0333

Exhibit C Notice of Meeting .................................................... A-0335

Exhibit D Email ...................................................................... A-0340

Exhibit E Demotion Letter ....................................................... A-0341

Exhibit F Faculty Executive Summary Report.................................. A-0343

Exhibit G Email ...................................................................... A-0349

Exhibit H LCME Letter............................................................ A-0351

Exhibit I Email...................................................................... A-0359

Declaration Frost..................................................................... A-0361

Exhibit A Email ...................................................................... A-0368

Exhibit B Email ...................................................................... A-0369

Exhibit C Human Resources Practices ......................................... A-0370

Exhibit D Email ...................................................................... A-0396

iii

Exhibit E Email.........................................................................A-0397

Declaration Gardner.................................................................A-0401

    Exhibit A Research Results ....................................................A-0406

Declaration Gilbertson .............................................................A-0407

    Exhibit A University Policy Manual .......................................A-0411

    Exhibit B Harassment Prevention Policy ................................A-0415

    Exhibit C Managing Conduct and Performance Guide...........A-0431

    Exhibit D Sexual Harassment Prevention Program ...............A-0490

Declaration Lesperance.............................................................A-0540

    Exhibit A Text ........................................................................A-0545

    Exhibit B Email .....................................................................A-0569

    Exhibit C Email .....................................................................A-0573

    Exhibit D Email .....................................................................A-0577

    Exhibit E Email .....................................................................A-0582

Declaration Schmitt..................................................................A-0584

    Exhibit A Email .....................................................................A-0588

    Exhibit B Resume Dahmoon .................................................A-0590

Declaration Schwartz ...............................................................A-0596

    Exhibit A Email .....................................................................A-0610

    Exhibit B Email .....................................................................A-0614

    Exhibit C Email .....................................................................A-0621

    Exhibit D Summary Statistics Medical School Compensation..............A-0623

    Exhibit E Offer Letter – Wong ..............................................A-0624

    Exhibit F Offer Letter: Department of Psychology...............A-0630

Exhibit G Email ....................................................................... A-0632

Exhibit H Email ....................................................................... A-0634

Exhibit I Email ........................................................................ A-0639

Exhibit J Email ........................................................................ A-0641

Exhibit K Letter: Wong Salary Supplement - 4/22/19 ........................ A-0642

Exhibit L Letter: Wong Salary Supplement – 10/28/19 ....................... A-0643

Exhibit M State Compensation – Wong .................................... A-0644

Exhibit N Chart: Compensation of Full Research Professors ............... A-0645

Memorandum of Law .................................................................... A-0646

Statement of Material Facts ............................................................ A-0701

Plaintiff Memorandum of Law ........................................................ A-0731

Response to Defendants' Statement of Material Facts Not in Dispute ........... A-0767

Declaration Licinio ...................................................................... A-0820

Exhibit 1 Employment Contract ............................................. A-0875

Exhibit 2 Demotion Letter ..................................................... A-0887

Exhibit 3 Strategic Plan ........................................................ A-0890

Exhibit 4 Department of Human Rights Probably Cause....................... A-0895

Exhibit 5 Faculty Minutes ..................................................... A-0918

Declaration Attorney.................................................................... A-0923

Exhibit 6 Deposition Transcript Excerpt – Licinio ............................. A-0924

Exhibit 7 Deposition Transcript Excerpt – Dewan.............................. A-1018

Reply Memorandum of Law ............................................................ A-1031

Statement of Material Facts in Response to Plaintiff's Counterstatement of
Material Facts ....................................................................... A-1059

Declaration Weinstock ................................................................. A-1073

Declaration Brangman ........................................................................ A-1075

    Exhibit A Email ........................................................................ A-1079

Declaration Frost ............................................................................... A-1080

    Exhibit A Deposition Transcript Excerpt – Frost .................... A-1085

Declaration White .............................................................................. A-1096

    Exhibit A Diagram .................................................................... A-1101

    Exhibit B MC Performance Appraisal Form…. ....................... A-1102

Declaration Attorney ......................................................................... A-1108

    Exhibit A Decision and Order – Court of Claims .................... A-1111

    Exhibit B SUNY honors ........................................................... A-1126

    Exhibit C Deposition Transcript Excerpt – Dewan ................. A-1129

    Exhibit D Deposition Transcript Excerpt – Botash ................. A-1135

    Exhibit E Deposition Transcript Excerpt – Licinio ................. A-1136

Decision and Order Granting Defendants Summary Judgment ........ A-1149

Judgment Granting Defendants Summary Judgment ........................ A-1230

Plaintiff's Notice of Appeal ............................................................. A-1232

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 346

Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

1    not my -- my prerogative to make that decision.

2                    Q.   Did you express that to Dr.

3    Dewan?

4                    A.   No, because the way that these

5    things happen, you're sitting at a desk and you

6    receive an email and then it says so and so was

7    appointed.  He said in a public setting and there are

8    minutes as part of discovery that he said that there

9    would be a national search for the position of -- of

10   dean for the permanent position.

11                    Dr. Chin was inferring and also the

12   faculty council that the -- Dr. Chin was inferring

13   that there would be a national search.  And then we

14   are expecting the search.  And -- and one day you --

15                    Q.   All right.

16                    A.   -- receive an email and it says

17   Dr. Chin is appointed.  So no, I did not suggest to

18   anybody because there was no mechanism or no process

19   that will enable me to suggest it.

20                    Q.   All right.  So neither you nor

21   Dr. Botash complained at all about her not receiving

22   that dean position because she was a female?

23                    A.   No.

24                    Q.   Okay.  With respect to Dr. Zheng,

A-1002

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 347

1     Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2              is this in regards to the anesthesiology chair

3              position that she --

4                      A.   Yes.

5                      Q.   -- received?

6                      A.   Yes.

7                      Q.   And in what way did you oppose

8      gender discrimination against her that you were

9      retaliated against for?

10                     A.   Well, because that's very clear

11     because I -- Dr. Dewan told me repeatedly that she

12     was the only person that should be considered for the

13     job.  I created this panel, created the situation, an

14     objective panel, thought that she was the most

15     qualified.  And that Dr. (unintelligible) withdrew

16     his application.

17                     She had already been told by her chair

18     that he was going to be the next person.  And that he

19     had information that she was going to be that and she

20     told me after the panel -- I mean, I -- I did the

21     panel without knowing what I'm going to tell you.

22                     But then after the panel was over, she

23     came to me and said, I'm so glad you did this and if

24     it hadn't gone this way, would have filed a complaint

25     because -- for gender discrimination.

ARII@courtsteno.com                             www.courtsteno.com
                                                       A1002

A-1003

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 348

1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    Q.   Okay.  But --

3                    A.   So --.

4                    Q.   -- no complaint was ever filed

5    because she --

6                    A.   Yeah.

7                    Q.   -- received the position, right?

8                    A.   She received the position.

9    Thanks to my efforts to -- to make the process open

10   and transparent and inclusive.  And I presented that

11   -- that to Dr. Dewan in August.  And then the next

12   meeting that I had with him I was demoted.

13                   Q.   He didn't express any concerns or

14   any dissatisfaction with her being chosen for that

15   position, right?

16                   A.   No, not to me specifically.

17                   Q.   Your last claim is that you were

18   retaliated against for reporting national origin

19   discrimination to defendants, and I'm going to be

20   showing you this exhibit I think it's Exhibit Three,

21   your responses to interrogatories.

22                   A.   Yes.  Okay.

23                   Q.   Your response says numerous

24   medical students enrolled at SUNY Upstate.

25                   A.   Yes.

A-1004

800.523.7887                                  Associated Reporters Int'l., Inc.

Page 353

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         were discussing how you're alleging that you can --

3         you oppose discrimination against a number of medical

4         students based on their national origin, correct?

5                   Well, now I can't hear you.

6                   A.   Sorry.

7                   Q.   There we go.

8                   A.   Can you hear me now?

9                   MR. GRACE:  Yes.

10                  MS. COWAN:  Yes.

11                  THE WITNESS:  That is correct.

12                  BY MS. COWAN:  (Cont'g.)

13                  Q.   Okay.  And I think you were

14        referring to the -- the focus group meetings that you

15        had the beginning of 2019?

16                  A.   Yes.  And also individual

17        meetings that students would unsolicited come to see

18        me to say how they felt.

19                  Q.   Okay.  And -- and as a result of

20        those meetings with the students, did you file any

21        complaints on their behalf with anyone at Upstate?

22                  A.   No, because my role I saw more as

23        kind of helping them, telling them what the pathways

24        were and giving them the options of filing those

25        complaints.  So I cannot, you know, -- I -- the

ARII@courtsteno.com                              www.courtsteno.com

A-1005

800.523.7887                                        Associated Reporters Int'l., Inc.

Page 354

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2         purpose of the meetings was to be like confidential

3         for them.  They were very reluctant to even bring

4         anything up.

5                   So I said, you can bring it to me in

6         confidence, I'll hear you and then I'll -- I'll tell

7         you what the next steps are and you can pursue them.

8         So they --

9                   Q.   Okay.  So you --.

10                  A.   -- they could -- they were all

11        told that there is an office of O.D.I. that there is

12        a place that they can go to, but they did not want to

13        pursue any kind of complaint at that point.

14                  Q.   Okay.  So these meetings that you

15        had with these students, that's the basis for your

16        national origin retaliation claim.  They were kept in

17        confidence, you said?

18                  A.   In partial confidence.  I mean, I

19        would bring up the issues to the people involved like

20        to Dr. White, because some of them are related to

21        student affairs.  And -- and then I would not be, you

22        know, kind of emphasizing,  you know -- was not

23        making -- filing a direct complaint, but I will bring

24        the issues up.

25                  Q.   Did you bring the --?

ARII@courtsteno.com                                  www.courtsteno.com

800.523.7887                                      Associated Reporters Int'l., Inc.

Page 355

Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

1

2          A.    Yeah, go ahead.

3          Q.    Did you bring the issues up to

4    anyone other than Dr. White?

5          A.    Brought to her and I brought to

6    Dr. Dewan.  And I can tell you that one thing that

7    really shocked me is that when I would bring up the

8    issues, not once one of them said, oh, you know, what

9    can we do?  I'm sorry that this person is going

10   through these and et cetera.  So Dr. White

11   particularly was very defensive and would say, you

12   know, one -- one person unhappy doesn't prove

13   anything.

14         And never said, you know, you know, I

15   feel sorry for this person, how can we make their

16   experience better?  How can we make sure that people

17   are not like, you know, lost in the shuffle, in

18   particular the minority students.  So there was no --

19   no -- how can you say this, there was no empathy

20   about that person and trying to see what you could do

21   to help the person you know.

22         Q.    What specifically did you bring

23   up to Dr. Dewan, and when?

24         A.    So I would bring that when these

25   positions were being that I would suggest this roles

A-1007

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 356

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         like if the position for let's say, in the case of

3         the career development, so the Career Development

4         position that you brought up earlier, was really to

5         have someone who would systematically look at every

6         student regardless of race or color, but with an

7         emphasis placed on the people from minority

8         background to make sure that they were not falling

9         through the shuffle that they were not -- you know,

10        that they were on a good academic track.

11                  So essentially, to track them and --

12        and to then put them in you know, in touch with the

13        right people to -- to teach them or to -- to -- to

14        mentor them.  But anyway, so -- so I -- I — I

15        brought up the -- the -- the -- the issue.

16                  So when I would -- so one of the

17        things that they told me is that they need to see

18        more people like them in the -- in the school.  So

19        what I'm telling you right now, I said exactly that

20        to Dr. Dewan and I said, I'm not creating this role

21        because I want to create them.  The students want

22        them because they don't see anybody who looks like

23        them in the school and they feel marginalized.

24                  So he never said to me, oh my God, I'm

25        sorry that the students feel marginalized, we should

ARII@courtsteno.com                         www.courtsteno.com
                                                    A1007

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 357

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2        give them a better experience.  What can we do to --

3        to make their education experience better?  There was

4        no comment like that -- like you know, you have

5        Nikkia Chambers, you know, sitting there all day, why

6        doesn't she do all the minority work you know?

7                   Or you know, we have Brian -- Brian

8        Thompson and what's he doing all day?  And why do you

9        need another person?  But no -- no comments were ever

10       made and that really shocked me that no comments were

11       ever made, oh, my God, I'm sorry that the students

12       are complaining about this.

13                   What can we do to come up with a more

14       diverse workforce?  So that was never said to me.  So

15       what really unsettled me in this whole process is

16       that there was no interest by Dr. Dewan or Dr. White

17       of addressing the issue at hand.

18                   Q.    Okay.  So you endeavored to try

19       to make the faculty more diverse?

20                   A.    Yes.

21                   Q.    Is that fair to say?

22                   A.    Yes, through open national

23       searches and through, you know, close the process for

24       recruitment et cetera.

25                   Q.    So these students came --.

ARII@courtsteno.com                          www.courtsteno.com
                                                  A1008

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 363

```
 1   Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2        then at U.C.L.A., we began co-directing at the same

 3        lab.

 4                  Q.   Okay.  You've also alleged that

 5        you don't have adequate startup funding for a lab.

 6        Is that right?

 7                  A.   Yes, I don't -- I personally

 8        don't.

 9                  Q.   You personally don't?

10                  A.   No.

11                  Q.   Have you made a request for

12        startup funding?

13                  A.   I talked to Dr. Schwartz about

14        that on different occasions and -- so the answer is

15        no, they did not make -- I -- I discussed that and I

16        said, I didn't have any specific allocation.  But

17        there were much smaller items in the contract that

18        were not followed and not delivered to me.

19                  So my thinking is that it -- it takes

20        a lot of time and effort to put those requests

21        together.  So the answer is no, I have not made those

22        requests, because I had other requests that were --

23        were part of my contract have not been delivered to

24        me, a much smaller -- for much smaller amounts.

25                  So if they're not giving me the
```

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 364

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         smaller amounts, they're not going to give me the big

3         ones.

4                   Q.   Are you referring to things like

5         reimbursing license fees, and things like that?

6                   A.   Yes, and travel, travel to

7         scientific meetings as a research, you know,

8         associate.  So those things are no longer available

9         to me.  So I don't -- you know, they're much smaller

10        and lower cost than my lab.

11                  Q.   Is it the policy of the

12        psychiatry department to not reimburse for fees like

13        license fees and travel, things like that?

14                  A.   It is, and it's exactly why I had

15        that in my contract.  But it was the policy, I will

16        just, you know, if I'm no longer the dean, I can just

17        follow the policy.  But I knew it was not part of the

18        policy.  That's why I put it in the contract.  So it

19        was specified in the contract as an item to be

20        delivered by the institution because it was not part

21        of their regular policy.

22                  Standard procedure I will not request

23        a standard procedure then.  I will just get it

24        automatically.

25                  Q.   When you're referred to the

1    Licinio, M.D. v SONY, et al — 5/31/2022 — J. Licinio, M.D.

2         contract, you're referring to the letter from —— from

3         March 2017?

4                        A.    Yes, the letter of offer, yes.

5                        Q.    And that letter of offer for the

6         —— for the dean position, correct?

7                        A.    For both.

8                        Q.    Right.  But one of the positions

9         was for the dean position?

10                       A.    One for the position for the dean

11        and the other was for the —— the —— for the position

12        of a tenured professor.  And there was another

13        component for the transition because nobody's going

14        to be dean forever.  At one point you're not going to

15        be the dean anymore.  So and it was for that

16        transition from —— so it was the dean and the

17        transition and the professor.

18                       Q.    Are you familiar with anyone else

19        in the psychiatry department that is reimbursed for

20        these fees?

21                       A.    I'm not and precisely because of

22        that I put that in my letter.

23                       Q.    Okay.  But —— but again, that

24        letter was for both the dean position and for your ———

25        for your psychiatry position?

A-1012

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 366

 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2                    A.   Yeah, but it said that -- you

 3    know, it specified very clearly that if I am no

 4    longer the dean, then I would have these things as

 5    well.  So it -- it would cover both.  So it would

 6    cover both.

 7                    Q.   Well, according to you, it would

 8    cover both?

 9                    A.   According to what's written in

10    the letter.

11                    Q.   Okay.  President Laura Karina

12    (phonetic spelling), she's no longer the president of

13    Upstate, right?

14                    A.   Yes.

15                    Q.   Have you ever been a defendant in

16    a lawsuit?

17                    A.   That someone sued me?

18                    Q.   Right.

19                    A.   No.

20                    Q.   Has anyone ever filed a complaint

21    against you at any of the facilities or institutions

22    that you worked at?

23                    A.   Never.  There was a complaint at

24    O.G.I.  That was addressed at Upstate, but in any

25    previous institution, no -- no complaint done.

ARII@courtsteno.com                             www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 402

1     Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2                    Q.   Was there a time when you emailed

3     the –- the chancellor directly and Dr. Dewan spoke to

4     you afterwards and directed you to either see –- cc

5     him on emails to the chancellor or speak to him first

6     before you speak with the chancellor directly?

7                    A.   There was one such occasion.  I

8     was just beginning –- Dr. Dewan's just beginning his

9     term and I have sent something to the chancellor

10    because the chancellor had to come here and had

11    talked to us you know, to me, you know, I mean, we –-

12    but spoke to me, you know.

13                   There were a few people said, if you -

14    - but like, you know, if you have any recruitments

15    you would like to make and someone really talented

16    who can come to SUNY was not here would bring

17    research grant and would bring major resource into

18    the system.  Please let me know and I'll help with

19    the recruitment.  So she made that solicitation.

20                   Then I had found someone who could

21    potentially be recruited, who would bring substantial

22    resources with him.  And then I –- I sent a note to

23    her and in response to that.  So the only reason that

24    I contacted her is because she has solicited that

25    kind of letter.

800.523.7887                           Associated Reporters Int'l., Inc.

Page 403

```
1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
2               So I did not go to -- to Dr. Dewan
3    because he wouldn't -- not being part of the process
4    yet, he just was beginning.  I think he had been
5    there like, you know, was the first month that he was
6    there.  So the answer to your question, yes, but
7    that's the context that she had solicited
8    information about people who could be recruited, you
9    know, and that should -- would help.
10              Q.   With respect to the meeting that
11   you held on August 2019 about the anesthesiology
12   group.
13              A.   Yes.
14              Q.   Did anybody say anything to you
15   after the meeting commenting on your behavior is
16   inappropriate towards Dr. Dewan?
17              A.   I'm trying to remember -- was
18   early in the morning and finished at seven.  I had
19   another meeting soon after that.  And the reason that
20   that meeting was scheduled so early is that everybody
21   had other things throughout the day, so we couldn't
22   do it later including myself, but others too.
23              So if someone, as we are leaving that
24   meeting, made a comment to me, I don't recall the
25   comment that I don't recall, you know, any
```

800.523.7887                              Associated Reporters Int'l., Inc.

Page 404

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2         interaction at that point, you know, the time I'm

3         being strictly honest here and not saying that they

4         didn't make a comment.  They may have made the

5         comment it's just that, you know, three years later,

6         with a lot of events happen, I don't remember there

7         was some interaction.

8                   Q.   Did Dr. Carana (phonetic

9         spelling) speak with you after that meeting and

10        indicate that your behavior towards Dr. Dewan was

11        inappropriate?

12                  A.   I don't specifically recall that.

13        He may have spoken to me, he may not.  I -- I really

14        don't recall that interaction.

15                  Q.   I'm just looking through some of

16        my notes here.  While you were the dean of the

17        College of Medicine, did you create positions and

18        appoint individuals without conducting a search?

19                  A.   I think all of the positions that

20        I started was including for the chair of

21        anesthesiology for others.  I would put that list on

22        internal announcement and both -- both came to me at

23        one point, doctor -- one of those meeting.

24                  It's amazing that you do this, it's

25        not been done here before.

 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2          including people from diverse background can apply.

 3                        If you don't do a search, then people

 4          won't even know the position they cannot apply.  So

 5          for senior associate dean of education, I never did a

 6          search for that.  So there was no such search.  There

 7          were just to clarify and I think people distort

 8          things and I like to get the record very clear here.

 9                        There were two people from outside

10          that I -- I did not know them before, but they were

11          introduced to me as people who could be, you know,

12          suitable for that kind of role.  And I was

13          considering opening that position.  So I invited them

14          to come and visit Upstate.

15                        So they were not interviewed.  There

16          was no job description.  There was no position

17          posted.  And I would not have offered them the job

18          like, you know, like that.  And I don't think it can

19          even be done.  So they came, they visited people, you

20          know, check them out.  They checked us.

21                        And -- and we -- I just wanted to know

22          what was available in the market for that kind of

23          role.  But there was never any search and nobody was

24          appointed for that role, and there was no appointment

25          process for that.

A-1017

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 410

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2         vacant.  We don't have anybody here.

 3                      So I had to have a person that they

 4         could shake the hand and talk to.

 5                      Q.   The last position I want to ask

 6         you about is the associate dean for diversity.  Dr.

 7         Spinoza was in the position, correct?

 8                      A.   I think as head of the diversity

 9         committee.  We -- I, you know, it was like a package,

10         so should became -- had that role and was the head of

11         the -- of the -- of the diversity committee.

12                      Q.   Okay.  So there were -- there was

13         not a search for that?

14                      A.   No, and at that point, no.

15                      Q.   You mentioned that doctor --

16                      A.   Yeah.

17                      Q.   -- Dr. Cooney (phonetic spelling)

18         is -- is that doctor -- is that Robert Cooney?

19                      A.   Yes.

20                      Q.   Okay.  Were you his direct

21         supervisor?

22                      A.   Yes.

23                      Q.   Okay.  I think we've been going

24         for quite a while today.  We want to go off the

25         record.
```

ARII@courtsteno.com                                  www.courtsteno.com

Exhibit 7

A-1019

Page 88

```
1                        M. DEWAN
2    wonderful job of that.
3            Q.      Were there any other examples?
4            A.      I'm sure there are others as
5    well, but I was particularly impressed and
6    pleased about that one.
7            Q.      Did Dr. Licinio create any
8    committees or, I'll use the phrase task
9    forces, I know you don't use that phrase,
10   but did Dr. Licinio create anything in
11   furtherance of diversity?
12           A.      Yes, he was, again, as you
13   know, very keen on promoting diversity.  He
14   was building, had built, when I took over,
15   and was building, a larger team of
16   assistant deans to serve those roles.  I
17   don't know if he formally called it as a
18   committee, but it was titles of people.
19           Q.      Did you ever comment to Dr.
20   Licinio regarding the university spending
21   too much money on supporting diversity
22   during 2012?
23           A.      No, his statement is pure
24   fiction.
25           Q.      What do you mean by "his
```

Page 89

1                    M. DEWAN
2    statement," because it was my statement?
3         A.    Well, it was in the record.
4         Q.    In what record?
5         A.    It was in his filing, I
6    thought, where he said that I said that.  I
7    never did say that.  If you would like, I
8    can give you the context for that.  In his
9    statement, I asked him about each one of
10   the people there, but you can take the lead
11   if you want.
12        Q.    No, I mean, I am generally
13   interested to hear your comments on that.
14        A.    I did read the specifics.  I
15   asked about these people specifically and
16   nobody else.  It's just factually
17   incorrect.  The question that I asked Dean
18   Licinio is that we both agree that
19   diversity is important.  His purview,
20   specifically, is students in the College of
21   Medicine.  My interest was in increasing
22   the number of students in the College of
23   Medicine.  That's what I believe diversity
24   means.  I want to see numbers and focus on
25   that.  That was our conversation, saying

Page 90

M. DEWAN

1
2    how can we get to -- my target has always
3    been 25 percent to begin with.  And the
4    numbers were -- put it this way:
5    Basically, the numbers had fallen in 2019.
6    It was a little bit higher the year before,
7    but the numbers had fallen.  We both agreed
8    we wanted to improve the numbers, so my
9    question to Dr. Licinio was if we need to
10   get to 25 percent, what do we need to do to
11   get to 25 percent.
12        Q.    If I can stop you, 25 percent
13   of what?
14        A.    Of all these students coming
15   into the College of Medicine, let's say at
16   that time, it was about 160 students.  How
17   can we get 25 of them be under-represented
18   minorities?  I'm very keen on outcomes and
19   numbers, so we don't have to argue whether
20   we did well or not.  That was our target.
21   We both agreed on it.  Like I said, he
22   consistently said that's a priority and
23   important to him and, for better or worse,
24   we are both are international medical
25   graduates, and so we are, in that sense,

Page 91

1              M. DEWAN

2  minorities.  We did agree very quickly.  I

3  would even sort of said what can we do and

4  how can we work together to get there?  The

5  reason College of Medicine is important is

6  that, you know, we get multiple candidates

7  for each position, so now that we have the

8  pool, it's easier to move the needle.  I

9  was very focused on College of Medicine

10  getting to 25 percent.  His response was,

11  but I just appointed X and I'm going to

12  appoint Y.  But tell me how that is going

13  to get to our 25 percent, what will they do

14  to get to 25 percent, recognizing that we

15  have a whole student admissions group that

16  is also basically charged with doing this.

17  So I said, how will your team, as you

18  enlarge it, help the diversity portion by

19  basically recruiting more students?  And he

20  never could answer that.  And that was

21  where he accused me, saying I asked about

22  this person, that person.  That was not the

23  question.  The question was, what would

24  this person do to attract and nurture these

25  extra minority students?  And I never got a

A-1023

Page 92

M. DEWAN

1

2   structure from him, I never got a job

3   description for any of them, and I think

4   that he got very irritated when I basically

5   said just hiring people doesn't change the

6   needle.  You have to tell me what the

7   program is.

8              I should say, one thing, the

9   other thing I will give him huge credit

10  for, when you asked me what else, was that

11  he did make connections with the historic

12  Black colleges that now, four years later,

13  attract Black students.  A very good idea.

14  It was that kind of a discussion that I

15  wanted, Mr. Grace, to say what are you

16  going to do, are these people going to go

17  make connections, are they going to go

18  speak to students, what is the activity

19  that will attract students?  Having a name

20  and a title and having a conference or a

21  meeting once a month is something -- I

22  cannot see the outcome of that.  Having

23  three wonderful lectures -- and I've used

24  this example multiple times.  You know we

25  have Martin Luther King Day.  Instead of

A-1024

Page 93

M. DEWAN

1
2  having one great lecture, you can have
3  three.  That does not get you 25 percent.
4  My conversations with him, that he got
5  increasingly upset about, was tell me the
6  activity that will get me 25.  Making phone
7  calls and connections with the historic
8  black colleges is wonderful, but you've now
9  just hired four people.  Tell me what they
10 are going to do.  And his answer was
11 nothing to oh, he's in charge of data and
12 meets once a month.  Honestly, physicians
13 don't deal with data.  We have five other
14 people who deal with data.  And then the
15 other answer I got was that yes, we have
16 Dr. X who is supposed to be doing this, but
17 I don't like and trust him so I'm hiring
18 somebody else to replace him.  That's no
19 way to run the system.  As you remember, I
20 was a dean before him.  I had an office of,
21 let's say, four people in this area.  He
22 increased it to ten, even though some of
23 them are part-time.  My question again was,
24 tell me what those people are doing.  And
25 it was not just diversity.  He had

A-1025

Page 94

M. DEWAN

1

2    increased it by adding other people as

3    well, a project manager, for example.  And

4    I just said, I've done the job.  Tell me

5    why you need a full-time project manager

6    who happened to be a White woman.  The

7    questions were across the board, not just

8    about people or where they came from, but

9    tell me how you're going to help me get to

10   a better place in terms of numbers, in

11   terms of outcome.

12        Q.     Fair to say that your focus was

13   on diversity in the student population

14   whereas his was diversity in the staff and

15   faculty?

16             MS. COWAN:  Objection.

17        Q.     Is that fair to say?

18        A.     I would disagree because in our

19   conversations, he really doesn't have

20   anything to do with staff.  It would be

21   faculty and students.  And we agreed that

22   faculty is very difficult to move because

23   you have less candidates for a position.

24   We focused on the students, as I said.  We

25   get five students for every position, and

Page 95

1                         M. DEWAN

2    so the focus was on the students, and

3    definitely not to ignore faculty, but

4    recognizing that's a harder thing.  You

5    know, he did recruit one basic science

6    Black researcher.  That's great, but that's

7    one.  I thought we could make a change by

8    recruiting 40 medical students in one year,

9    not one black student in three years.  I

10   think we were very clear of let's go where

11   we get the biggest return and go there.

12   Again, I'm hoping these students will then

13   continue on to be faculty.  Eighty percent

14   of our faculty trained here, so if we can

15   get a larger minority group, that's how you

16   want to get the diverse faculty.  Not by

17   getting someone to move here from San

18   Diego.

19        Q.     Dr. Brian Thompson was one of

20   those individuals that you discussed with

21   Dr. Licinio, correct?

22        A.     Correct.

23        Q.     Is he Native American?

24        A.     Correct.

25        Q.     You asked Dr. Licinio what he

Page 49

                          M. DEWAN
1
2    conversation, let's say?
3         A.      Frustrating because I heard
4    concerns and conflicts all the time from
5    every source, and I kept hoping that he
6    would actually do better.
7         Q.      To touch on a couple things you
8    said, people actually stated, or I may be
9    paraphrasing, but they said get rid of
10   dean, your first priority is to get rid of
11   the dean?
12        A.      Yes.
13        Q.      Can you tell us who said that?
14        A.      Probably the most persistent
15   person was the person I responded to at
16   SUNY, Dr. Ricardo Azziz.  He was the vice
17   chancellor for academic affairs or
18   something like that.  He told me this when
19   I went to Albany.  He, then, as the person
20   I report to, had monthly meetings set.  He
21   set an agenda, and he put Dean Licinio on
22   that agenda each of those times.  In
23   December he told me very clearly, that's
24   your priority.  In February, he told me
25   that's your priority.  And then I think on

Page 50

```
1                      M. DEWAN
2    one of his trips here -- remember, he had
3    worked with Licinio before, so he had a
4    relationship before.  Licinio met with Dr.
5    Azziz, and Dr. Azziz told him directly to
6    look for another job.
7         Q.     I only ask because you stated
8    he had worked with him before, but when had
9    he worked with him before, and in the
10   capacity?
11        A.     Dr. Azziz had been here working
12   with Dr. Laraque-Arena and Dr. Licinio
13   before I took over.
14        Q.     When Dr. Licinio was a chair?
15        A.     When Dr. Licinio was a dean.
16   He was the SUNY contact, and when Dr.
17   Laraque-Arena ran into trouble Dr. Azziz
18   actually spent a lot of time in Syracuse,
19   so they had a relationship.  I believe
20   they're also both from South America, and
21   so Dr. Azziz told me, kind of as a friend
22   but partly as his boss, he told Dr. Licinio
23   directly to look for a job now and he told
24   me you need to have this as a priority.  I
25   know after that conversation Julio came in
```

```
                                              Page 51
 1                    M. DEWAN
 2    very upset and wanted to talk to me
 3    immediately.  He told me what Azziz told
 4    him and asked me point blank are you going
 5    to fire me.  I said no.
 6         Q.    Dr. Azziz, at that time, what
 7    was his job title?
 8         A.    I think it was Vice Chancellor
 9    for Academic Affairs or Hospital, something
10    like that.
11         Q.    Was that a senior position to
12    the dean at that time?
13         A.    Yes.  It's senior to the
14    president, even.  I reported to him.
15         Q.    Other than Dr. Azziz, who else
16    said, in sum and substance, get rid of the
17    dean?
18         A.    The reporter who was the head
19    of HR at Albany and then the chancellor,
20    Kristina Johnson.
21         Q.    What did Joe Porter say?
22         A.    Same thing.  He had reminded me
23    of that conversation where they told him
24    not to call, said he's undermining,
25    undercutting, and you need to get rid of
```

Page 52

M. DEWAN

1
2   him.  And the same, but similar and
3   somewhat gentler from Chancellor Johnson.
4       Q.    Is that typical amongst or in
5   connection to a position like the dean that
6   people might say, you know, get rid of the
7   dean?  Is that a typical thing to happen?
8       A.    No, Mr. Grace.  This is very
9   atypical, and it is -- I took it as an
10  indication of the really bad relationships
11  and blood that has been created in the
12  past.  I have already indicated that I
13  think the previous president was part of
14  it, which is why I was willing to give Dean
15  Licinio a chance, but it was very clear
16  that Albany saw Upstate — the president,
17  the dean — as someone they would rather not
18  deal with.
19          I can tell you that it was
20  unusual and was unusually specific and
21  unusually pushy for a vice chancellor to
22  say on our regular monthly calls that that
23  should be a high priority.
24      Q.    Earlier you stated that,
25  "Candidly, the president," and I know you

A-1031

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
..................................................................................X
**JULIO LICINIO, MD, PhD, MBA, MS,**

                                        Plaintiff,


                                        Case No.: **5:21-cv-387(GTS/TWD)**


            - against -


**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, and THE**
**STATE UNIVERSITY OF NEW YORK**
**UPSTATE MEDICAL UNIVERSITY,**

                        Defendants
_____

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE §56 (a)**



                                LETITIA JAMES
                                Attorney General of the State of New York
                                Syracuse Regional Office
                                Attorney for Defendants
                                300 S. State Street, Ste. 300
                                Syracuse, NY 13202


By:    Aimee Cowan, Esq.
       Assistant Attorney General, of Counsel
       Bar Roll No. 516178
       Telephone: (315) 448-4800
       Fax: (315) 448-4853
       E-mail: Aimee.Cowan@ag.ny.gov



i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...............................................................…….…….. iii

ARGUMENT.................................................................................…......1

POINT I:     PLAINTIFF'S TITLE VII DISCRIMINATION CLAIMS SHOULD BE
             DISMISSED..................................................................…....1

   A. Plaintiff Failed to Exhaust his Administrative Remedies with respect to his Title VII
      Race and National Origin Discrimination Claims……………………………………1

   B. Plaintiff has Failed to Prove a *prima facie* Title VII Discrimination Claim…………..2

      1. Plaintiff was not satisfactorily performing the duties required by his position…….3

      2. Plaintiff cannot show that his removal as Dean occurred under circumstances
         giving rise to an unlawful discrimination…………………………………………6

   C. Plaintiff cannot show that the legitimate non-discriminatory reasons offered by
      Defendants were a pretext for discrimination…………………………………………7

POINT II:     PLAINTIFF'S TITLE VII RETALIATION CLAIMS SHOULD BE
              DISMISSED……………………………………………………………………8

   A. Plaintiff has not shown that he engaged in a protected activity…………………………..8

      1. Promoting diversity and creating new diversity positions in furtherance of the
         LCME is not a protected activity…………………………………………………8

      2. The creation of the External Scientific Advisory Board is not a protected
         activity………………………………………………………………………..10

      3. "Supporting" the Diversity Committee is not a protected activity……………...10

      4. Notifying Defendants of his "concerns" about the gender imbalance of the
         Budget Committee is not a protected activity…………………………………11

      5. Plaintiff's attempt to improve the Division of Student Affairs and Create a
         Director of College of Medicine Career Development Position is not protected
         activity…………………………………………………………………………12

      6. Creating a part-time Assistant Dean for Cultural Competence was not a
         protected activity………………………………………………………………13

ii

7. Promoting diversity among appointments to Chair positions is not a protected activity........................................................................13

8. Plaintiff's "lobbying" against a "discriminatory salary reduction" for his wife is not a protected activity..............................................................13

B. Plaintiff cannot prove a causal connection between any alleged protected activity and the decision to demote him........................................................15

1. Plaintiff has not demonstrated direct evidence of retaliatory animus..............15

2. Plaintiff has not demonstrated temporal proximity.................................17

C. Plaintiff cannot show that Defendants' legitimate nondiscriminatory reasons offered were a pretext for discrimination...................................................................18

POINT III:   PLAINTIFF   HAS   ABANDONED   HIS   REMAINING   RETALIATION CLAIMS......................................................................20

**CONCLUSION**...........................................................................20

## TABLE OF AUTHORITIES

<u>**Cases**</u>

<u>Abromavage v. Deutsche Bank Sec. Inc.</u>, No. 21-668, 2022 WL 4360950 (2d Cir. 2022)……..18

<u>Arkorful v. New York City Dep't of Educ.</u>, 2024 WL 298999 (E.D.N.Y. 2024)……………20

<u>Avillan v. Donahoe</u>, 483 Fed. Appx. 637 (2d Cir. 2012)……………………………15, 18

<u>Bart v. Golub Corp.</u>, 96 F.4th 566 (2d Cir. 2024)……………………………………7, 8

<u>Branch v. Sony Music Entm't Inc.</u>, 2001 WL 228108 (S.D.N.Y. 2001)………………….....10

<u>Brierly v. Deer Park Union Free Sch. Dist.</u>, 359 F. Supp. 2d 275 (E.D.N.Y. 2005)…………....3

<u>Brown v. Xerox Corp.</u>, 170 F. Supp. 3d 518 (W.D.N.Y. 2016)………………....10, 11, 12, 13

<u>Byerly v. Ithaca Coll.</u>, 290 F. Supp. 2d 301 (N.D.N.Y. 2003)…………………………10

<u>Camarda v. Selover</u>, 673 F. App'x 26 (2d Cir. 2016)……………………………………20

<u>Cobb v. Ellab, Inc.</u>, 2024 WL 1963430 (N.D.N.Y. May 2, 2024)…………………………2

<u>Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.</u>, 643 F. Supp. 3d 421 (S.D.N.Y. 2022)…...20

<u>Cyr v. Berry Plastics Corp.</u>, 2011 WL 6337713, at *4 (N.D.N.Y. 2011)………………………2

<u>DeJohn v. Wal-Mart Stores E., LP</u>, 2012 WL 3679204 (N.D.N.Y. 2012)………………16

<u>De La Pena v. Metro. Life Ins. Co.</u>, 953 F. Supp. 2d 393 (E.D.N.Y. 2013)…………………6, 7

<u>Dixit v. City of New York Dept. of General Services</u>, 972 F. Supp. 730 (S.D.N.Y. 1997)………1

<u>Ezagui v. City of N.Y.</u>, 726 F. Supp. 2d 275 (S.D.N.Y. 2010)…………………………....5

<u>Fenner v. News Corp.</u>, 2013 WL 6244156 (S.D.N.Y. 2013)………………………………10

<u>Finn v. New York State Off. of Mental Health-Rockland Psychiatric Ctr.</u>, 2011 WL 4639827 (S.D.N.Y. 2011)…………………………………………………………16

<u>Fleming v. MaxMara USA, Inc.</u>, 371 Fed.Appx. 115 (2d Cir. 2010)……………………19

<u>Freeman v. Rochester Psychiatric Ctr.</u>, 2017 WL 416933 (W.D.N.Y. 2017)………………8

<u>Giurca v. Good Samaritan Hosp.</u>, 2023 WL 254611 (S.D.N.Y. 2023)…………………19

<u>Hanks v. City of Syracuse</u>, 2022 WL 4619877 (N.D.N.Y. 2022)……………………6

<u>Holcomb v. Iona Coll.</u>, 521 F.3d 130 (2d Cir. 2008)………………………………....2

<u>Howard v. City of New York</u>, 602 F. App'x 545 (2d Cir. 2015)……………………7

iv

Jackson v. Cnty. of Rockland, 450 F. App'x 15 (2d Cir.2011)……………………………………7

Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10 (2d Cir. 2013)………………………………………………………………………………………8

Kovaco v. Rockbestos–Surprenant Cable Corp., 834 F.3d 128 (2d Cir. 2016)…………………20

Krul v. DeJoy, No. 6:20-CV-198, 2023 WL 8449589 (N.D.N.Y. Dec. 6, 2023)…………………2

Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590 (2d Cir. 1988)…10

McPherson v. New York City Dep't of Educ., 457 F.3d 211 (2d Cir. 2006)………………………19

Meagher v. State Univ. Constr. Fund, 2020 WL 5504011 (N.D.N.Y. 2020)………………………8

Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985)……………………………………………………...2

Mello v. Siena Coll., 2017 WL 1013077 (N.D.N.Y. 2017)………………………………………19

Melton v. Malcolm Shabazz, L.P., 2021 WL 535661 (S.D.N.Y. 2021)…………………………..5

Moazzaz v. MetLife, Inc, 2021 WL 827648 (S.D.N.Y. 2021)……………………………10, 12

Moore v. Kingsbrook Jewish Med. Ctr., 2013 WL 3968748 (E.D.N.Y. 2013)…………………19

Morales v. Bottling Grp., LLC, 374 F. Supp. 3d 257, 274 (W.D.N.Y. 2019)……………………9

Prudential Ins. Co. of Am. v. Payne, 2024 WL 707299 (E.D.N.Y. 2024)…………………………5

Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133 (2000)………………………………...2

Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98 (2d Cir.2011)……………………..9

Servello v. New York State Off. of Child. & Fam. Servs., 2021 WL 4477229 (N.D.N.Y. 2021)………………………………………………………………………………………19

Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)…………………………………8

Unicorn Crowdfunding, Inc. v. New St. Enter., Inc., 507 F. Supp. 3d 547 (S.D.N.Y. 2020)…….6

Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013)……………………………………15

Whethers v. Nassau Health Care Corp., 956 F. Supp. 2d 364 (E.D.N.Y. 2013)……………...11

**STATUTES**

v

Fed. R. Civ. P. 56(c)(1)(B), (2)……………………………………………………………6

Fed. R. Civ. P. 56(d)………………………………………………………………………5

Fed. R. Evid. 801(d)(2)……………………………………………………………………6

A1036

A-1037

## ARGUMENT

**POINT I:    PLAINTIFF'S TITLE VII DISCRIMINATION CLAIMS SHOULD BE DISMISSED**

### A. Plaintiff Failed to Exhaust his Administrative Remedies with respect to his Title VII Race and National Origin Discrimination Claims

Plaintiff contends that he has satisfied Title VII's exhaustion requirement because his discrimination claims are "reasonably related" to the allegations in his New York State Division of Human Rights ("DHR") charge. ECF No. 78-10 at 4. He cites Dixit v. City of New York Dept. of General Services, 972 F. Supp. 730, 734 (S.D.N.Y. 1997), explaining that the court held in that case that because the plaintiff identified himself as "Asian Indian" in his EEOC charge, the exhaustion requirement was satisfied with respect to his discrimination claims. The comparison to the instant matter is misplaced. In Dixit, the Court found that plaintiff's claims of national origin and religious discrimination were exhausted where the EEOC's investigation "covered not only the plaintiff's claims of retaliation but also allegations of discrimination on the basis of national origin, age, and religion. This is clear from the EEOC's determination, which specifically identifies each of these categories." Id., at 734. Further, the Court stated that although raising a claim of national origin discrimination before the EEOC did not suffice to exhaust a charge of discrimination on the basis of race, plaintiff noted in his complaint that he was Asian Indian and defendant specifically treated this allegation as a designation of race. Id.

Dixit is readily distinguishable from the instant matter—here, Plaintiff's complaint alleges that he was retaliated against by Defendants for opposing gender, race and national origin discrimination. See, ECF No. 73-8. However, nowhere in his complaint does he allege that he was personally discriminated against based on his race and/or national origin or that they played any role in his removal (id.), which Plaintiff's Opposition Brief does not dispute. He does not

1

dispute that he fails to *even mention* his race or national origin in the complaint. Further, here, the DHR clearly did *not* investigate any discrimination claims—nor could they, given that they could not even ascertain plaintiff's race or national origin from the complaint. ECF No. 73-9. This is confirmed by the DHR's summary of Plaintiff's claims included in its Final Investigation Report. See, Id., at 3. Plaintiff has failed to exhaust his administrative remedies with respect to his Title VII discrimination claims and such discrimination claims should be dismissed[1].

**B.  Plaintiff has Failed to Prove a *prima facie* Title VII Discrimination Claim**

Plaintiff contends that summary judgment is "ill-suited" to an employment case such as this one. However, summary judgment is unequivocally available for employment discrimination cases lacking genuine issues of material fact. Cobb v. Ellab, Inc., 2024 WL 1963430, at *4 (N.D.N.Y. May 2, 2024). While the Second Circuit has "expressed the need for caution" when it comes to employment discrimination motions for summary judgment, see, Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008), disputes about a decision-maker's motive, intent, or state of mind "do[es] not mean summary judgment in these cases must always be denied." Krul v. DeJoy, 2023 WL 8449589, at *43 (N.D.N.Y. Dec. 6, 2023). "To the contrary, the Supreme Court has repeatedly instructed lower courts not to 'treat discrimination differently from other ultimate questions of fact.'" Id., citing Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 148 (citation omitted). After all, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Id., citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

---

[1]Plaintiff contends that the sole administrative prerequisite for filing a discrimination action is the EEOC "right to sue." ECF No. 78-10 at 13. However, it is well-established that a plaintiff may not pursue unexhausted claims or claims that are not reasonably related to those asserted in a timely charge of discrimination. Cyr v. Berry Plastics Corp., 2011 WL 6337713, at *4 (N.D.N.Y. 2011).

2

    **1.  Plaintiff was not satisfactorily performing duties required by his position**[2]

Plaintiff's Opposition Brief states in conclusory fashion that he "is highly esteemed in his field and indisputably qualified for the position for which he was hired."  ECF No. 78-10 at 15. However, Plaintiff must establish that he was satisfactorily performing his duties required by the Dean position, which is required for a *prima facie* case of discriminatory demotion. See, e.g. Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp. 2d 275, 297 (E.D.N.Y. 2005). Instead, he cites to his own self-serving declaration that touts his alleged prior leadership experience. Additionally, he cites to a small portion of President Dewan's deposition, taken out of context. ECF No. 78-10 at 15. For the full context, see Cowan Reply Declaration, Ex. C, at 45-48. President Dewan testified Plaintiff is a bright man with good ideas, accomplished in research— but a "terrible team player." Id., at 47. He continues: "That's where it sort of falls apart. No one wants him on their team…. I have a lot of friends that would say Julio is applying, but we cannot take him because of who he is. His credentials are terrific, a great researcher, I will hire him for that; team player, dean, no one wants to hire him…." Id., at 47-48. Plaintiff seems to acknowledge this distinction, arguing he has a good "academic record," (ECF No. 78-10 at 15) but fails to demonstrate he is a competent leader or qualified for this position specifically.

    Among many other expectations, Plaintiff was expected to "work constructively and collaboratively with faculty and other leaders to achieve the overall institutional goals," and to develop "an open and transparent process for the allocation and effective use of financial and physical resources in the college…." ECF No. 73-2 at 1-2. Plaintiff does not dispute many material facts that support and establish Defendants' position that he was performing his duties *unsatisfactorily*. For example, Plaintiff does not dispute: as early as Fall 2018, former President Laraque-Arena asked if Dr. Dewan would be willing to assume responsibilities as Dean (ECF

---

[2]Please see Defendants' initial memorandum of law discussing the well-established McDonnell Douglas standard. ECF No. 73-73 at 19-21. Please also note, page numbers refer to docket page numbers.

A1039

No. 78, ¶ 12); President Laraque-Arena sent a letter to Plaintiff setting parameters on future meetings and confirming someone would attend their one-on-one meetings in the future (id., ¶ 20); after President Dewan was appointed interim President, Dr. Ricardo Azziz, former SUNY Chief Officer of Academic Health and Hospital Affairs, told Plaintiff to begin looking for another job (id., ¶ 27); President Dewan told Plaintiff that despite instructions from SUNY to remove him, he was willing to give Plaintiff a chance to prove himself under his Presidency and give him the benefit of the doubt (id., ¶ 28); a group of students were upset with a speech he had given and at least one student made a complaint (id., ¶¶ 96, 99); Human Resources disagreed with a number of decisions Plaintiff made regarding creation of positions and giving roles and titles to faculty that Human Resources did not deem appropriate (id., ¶¶ 132, 133). See also, id., ¶¶ 15,[3] 16, 18, 19, 24, 25,[4] 29, 40-42, 52, 56,[5] 62, 65- 67, 68, 71[6], 72, 74, 76, 85[7], 92,[8] 97- 99, 100[9], 101,[10] 107-109,[11] 115, 133, 135, 190[12] and 193.[13]

---

[3] Plaintiff does not dispute that he shared sexual dreams with Dr. Laraque-Arena.

[4] Plaintiff does not dispute that Dr. Azzizz, Mr. Porter and Chancellor Johnson all expressed concerns about Plaintiff continuing in his position as Dean.

[5] Plaintiff does not dispute that Dr. Brangman was distressed and complained to President Dewan about Plaintiff. Dr. Brangman submitted a declaration confirming she made complaints about Plaintiff to President Dewan. See, Declaration of Sharon Brangman, ¶¶ 3-10.

[6] Although Plaintiff disputes this material fact in part, he failed to specifically controvert it with citations to the record.

[7] Although Plaintiff disputes this material fact in part, he failed to specifically controvert it with citations to the record. He does not dispute that President Dewan stated that Plaintiff needed to manage the performance of individuals in existing positions to ensure their success before creating new positions that had the same responsibilities.

[8] Plaintiff admits that he instructed Chairs not to speak with the President regarding Departmental concerns "properly addressed to the Dean….in the first instance." See also, Brangman Decl., ¶ 10.

[9] Plaintiff disputes this material fact but purportedly admits that the letter itself was written to disseminate to students after the complaints were brought to his attention.

[10] Plaintiff disputes this material fact but purportedly admits that he played the video referenced.

[11] Plaintiff admits sending this email, containing thirteen numbered paragraphs, to Dr. Schwartz and admits "reprimanding" him for signaling an issue to Plaintiff's superiors. He does not dispute that he chastised Dr. Schwartz or accused him of being a "busybody" and a "vigilante." The email speaks for itself. ECF No. 73-59.

[12] Plaintiff does not dispute that he sent this email or that he indicated his wife's salary reduction was punishment for "bad political moves." The email speaks for itself.

4

A-1041

Additionally, there are several material facts relevant to his unsatisfactory performance that Plaintiff does not admit—but he also cannot dispute. For example, President Dewan asserts that he had discussions with senior leadership on how to minimize Plaintiff's role in the LCME accreditation process given concerns over Plaintiff's behavior. Plaintiff neither admits nor denies this fact. See, ECF No. 78, ¶ 39. Instead, citing Fed. R. Civ. P. 56(d), Plaintiff states "he cannot respond as to the allegation as the facts are unavailable to him." Id. Under Rule 56(d), if a party responding to a summary judgment motion "shows by affidavit or declaration that, for specified reasons, [she] cannot present facts essential to justify [her] opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Melton v. Malcolm Shabazz, L.P., 2021 WL 535661, at *3 (S.D.N.Y. 2021) (citing Fed. R. Civ. P. 56(d)). Plaintiff has not submitted an affidavit or declaration that satisfies the requirements listed above and he does not contend that he cannot present facts essential to justify his opposition.

The Court should deem true any undisputed fact in Defendants' Rule 56.1 statement to which Plaintiff cites no admissible evidence in rebuttal. Prudential Ins. Co. of Am. v. Payne, 2024 WL 707299, at *1 (E.D.N.Y. Feb. 20, 2024). "[T]o the extent any party responds she 'lacks information sufficient to form a belief as to the truth of' any statement which the opposing party has supported with citations to the record, the Court deems such statement admitted." Id., citing Ezagui v. City of N.Y., 726 F. Supp. 2d 275, 285 n.8 (S.D.N.Y. 2010). Defendants have provided several sworn declarations supporting their contention that Plaintiff's performance was

---

[13] At a minimum, Plaintiff admits that he "emphatically spoke" regarding the need for the Dean of Medicine to have autonomy to appoint competent chairs. Further, Plaintiff contends that he referred to President Dewan during that meeting as a "wonderful dean." That statement is inaccurate and illogical (President Dewan was President, not Dean)—President Dewan *actually* testified that at the meeting, Plaintiff referred to himself as a wonderful dean. See, Cowan Reply Dec., Ex. C, at 144:2-24.

5

unsatisfactory. Plaintiff's failure to specifically controvert these material facts further supports Defendants' contention that Plaintiff cannot demonstrate that he performed his duties as Dean satisfactorily. See, e.g., ECF No. 78, ¶¶ 53, 60, 61,[14] 70, 73, 89[15], 91, 93, and 117. Additionally, Plaintiff fails to address the results of a UMU faculty survey that was conducted in June and July of 2019 that ranked Plaintiff's job performance as unsatisfactory. ECF No. 73-73 at 23-24. Interestingly, although Plaintiff claims he was performing his role as Dean in spectacular fashion, he offers no supporting declarations other than his own, and mentions only one performance evaluation (a copy of which Plaintiff neglected to submit) that was issued to him by UMU's former President only six months after he started.

### 2. Plaintiff cannot show that his removal as Dean occurred under circumstances giving rise to an unlawful discrimination

The only argument in his Opposition Brief regarding a causal connection between his removal as Dean and his membership in a protected class is that "SUNY Upstate had never before had a Hispanic/Latino Dean, and Plaintiff was held out as the leader and face of Defendant SUNY Upstate's College of Medicine during the accreditation process…Once full accreditation was secured, Defendants…unlawfully demoted Plaintiff." ECF No. 78-10, at 16. Plaintiff's Opposition Brief is devoid of any authority that this allegation is enough to satisfy a Title VII national origin and/or race discrimination claim. Cf., Hanks v. City of Syracuse, 2022 WL 4619877, at *4 (N.D.N.Y. 2022) (citing De La Pena v. Metro. Life Ins. Co., 953 F. Supp. 2d 393, 413 (E.D.N.Y. 2013)). Plaintiff's bald assertion that his national origin "contributed to

---

[14] Plaintiff asserts that the statements made in ¶¶ 60 and 61 are inadmissible hearsay statements. However, these statements are alleged to have been made by Plaintiff himself and are not hearsay statements pursuant to Fed. R. Evid. 801(d)(2). In assessing motions for summary judgment, courts may only consider evidence that would be admissible at trial. Unicorn Crowdfunding, Inc. v. New St. Enter., Inc., 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020) (citing Fed. R. Civ. P. 56(c)(1)(B), (2)). And although Plaintiff could have either admitted or denied having made those statements, he did neither.

[15] Notably, Plaintiff cites Ann Botash, MD's transcript purportedly to controvert Defendants' assertion that he had a history of making inappropriate statements. However, Dr. Botash did testify she believed he was occasionally unprofessional with other faculty members. Cowan Reply Decl., Ex. D at 96-97.

6

Defendants' decision to unlawfully demote him" (ECF No. 78-10 at 16) (note the citation to his declaration does not support this assertion) is the type of conclusory allegation of discrimination that Courts have repeatedly found are insufficient to raise an inference of discrimination. See, e.g., De La Pena, 552 F. App'x at 100; Jackson v. Cnty. of Rockland, 450 F. App'x 15, 19 (2d Cir.2011). In sum, "Plaintiff has done little more than cite to his perceived mistreatment" "and ask the [C]ourt to conclude that 'it must have been related to his race. This is not sufficient.'" Howard v. City of New York, 602 F. App'x 545, 548 (2d Cir. 2015) (summary order).

### C. Plaintiff cannot show that the legitimate non-discriminatory reasons offered by Defendants were a pretext for discrimination

Plaintiff contends that because discrimination was one of the factors included in Defendants' decision to remove him, he has established pretext. After Defendants filed their original memorandum of law, the Second Circuit held in Bart v. Golub Corp., 96 F.4th 566 (2d Cir. 2024) that "[w]hile we use 'pretext' as shorthand, we have explained that a more complete characterization of a plaintiff's third-stage burden in mixed-motives cases is to produce 'admissible evidence showing circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole *or in part* on discrimination.'" Id., at 576. Here, Plaintiff failed to produce any admissible evidence showing circumstances sufficient to permit a jury to infer Defendants' decision to remove Plaintiff was more likely than not based in whole, or in part, on discrimination due to his race and/or national origin. Plaintiff only argues pretext is shown because "Defendant demoted Plaintiff as the result of his well-documented efforts to address the lack of diversity at SUNY Upstate." ECF No. 78-10 at 18. This presents as a retaliation claim, *not* a discrimination claim.

Further, although "the plaintiff's ultimate burden may be carried by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence,

it may often be carried by reliance on the evidence comprising the prima facie case, without more," if that evidence is independently sufficient under step three of *McDonnell Douglas*. Bart, 96 F.4th at 576. Here, Plaintiff has not presented evidence showing that he has proven his *prima facie* case, as described more fully above and in Defendants' original memorandum of law. He also has not presented <u>additional</u> evidence showing that Defendants' legitimate, nondiscriminatory business reason for removing him is unworthy of credence. Indeed, he does not dispute that he engaged in much of the behavior described in the Declarations submitted with Defendants' motion, which led to the decision to remove him as Dean. <u>See</u>, Point I(B)(1).

**POINT II:   PLAINTIFF'S TITLE VII RETALIATION CLAIMS SHOULD BE DISMISSED**

    **A.   Plaintiff has not shown that he engaged in a protected activity**

"[I]n order to constitute a protected activity for purposes of a retaliation claim, the complaint must be related to discrimination on a basis prohibited by Title VII." <u>Freeman v. Rochester Psychiatric Ctr.</u>, 2017 WL 4169336, *9 (W.D.N.Y. Sept. 20, 2017). The plaintiff must have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." <u>Id.</u>, citing <u>Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.</u>, 716 F.3d 10, 14 (2d Cir. 2013). Whether a belief is reasonable is an objective standard that is "to be evaluated from the perspective of a reasonable similarly situated person." <u>Meagher v. State Univ. Constr. Fund</u>, 2020 WL 5504011, at *17 (N.D.N.Y. Sept. 11, 2020). Plaintiff bears the burden to show by a preponderance of the evidence that he engaged in protected activity. <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990).

    **1.   Promoting diversity and creating new diversity positions in furtherance of the LCME is not a protected activity**

Plaintiff contends that he "championed the rights of minorities" and made efforts to recruit minority faculty, to which President Dewan questioned the need for various minority

8

professors. (ECF No. 78-10 at 21-22). There is nothing in the record to suggest that Plaintiff complained of discrimination or opposed conduct prohibited by Title VII on behalf of *any* of the individuals he mentions in his Opposition Brief (i.e., Thompson, Spinoza, or Chambers). See, ECF No. 73-11, at 325, 328. Further, there is no admissible evidence in the record that any of the individuals complained *to Plaint*₍ᵢ₎*f* that they were being discriminated against. See e.g., ECF No. 78, ¶ 202. Even if Plaintiff's assertions were true that he complained to President Dewan that Thompson should be promoted to Assistant Vice-President for Native American Affairs, or that Native Americans are "underrepresented," this advocacy is not a protected activity. Similarly, Plaintiff's "advocacy" for Dr. Spinoza to organize diversity data for purposes of LCME accreditation is not "opposing an unlawful discriminatory practice under Title VII" and therefore, not a protected activity. Plaintiff's advocacy for Ms. Chambers, that she does "substantial work supporting" minority students, is not a protected activity. None of these acts or statements of advocacy are protected activities and Plaintiff provides no authority supporting that they are. To the contrary, "protected activity" must involve complaints that are not generalized, but rather complaints that the employer could reasonably understand involves conduct prohibited by Title VII. See, Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 108 (2d Cir.2011). To constitute "protected activity," a plaintiff's complaint must include "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race ... or any other characteristic protected by Title VII." Morales v. Bottling Grp., LLC, 374 F. Supp. 3d 257, 274 (W.D.N.Y. 2019), aff'd sub nom. Campbell v. Bottling Grp., LLC, 814 F. App'x 630 (2d Cir. 2020). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." Id.

9

Significantly, "advocating for certain minority employees to be promoted cannot, without more, be equated with protesting alleged race discrimination." Brown v. Xerox Corp., 170 F. Supp. 3d 518, 527 (W.D.N.Y. 2016). As in Brown, here, Plaintiff has failed to demonstrate that his purported advocacy on behalf of minority employees fell within the scope of protected activity.

### 2. The creation of the External Scientific Advisory Board is not a protected activity

Plaintiff contends that, among other reasons, he created the External Scientific Advisory Board to "bridge the gender equity gap" at UMU. ECF No. 78-10, at 22. He provides no authority that the creation of this board was a "protected activity." Notably, President Dewan had no input on when or whether the Board would meet and he never opposed the creation of the board. ECF No. 73-26, ¶ 54. After its initial meeting in June 2018 (ECF No. 78-4, ¶ 45), Plaintiff never organized another meeting prior to his removal. An ambiguous complaint about a "gender imbalance" or "lack of diversity" does not constitute protected activity because a mere lack of diversity in the workplace is not an unlawful employment practice under the meaning of Title VII. See Moazzaz v. MetLife, Inc, 2021 WL 827648, at *13 (S.D.N.Y. 2021); Fenner v. News Corp., 2013 WL 6244156, at *25 (S.D.N.Y. 2013); Branch v. Sony Music Entm't Inc., 2001 WL 228108, at *6 (S.D.N.Y. 2001), aff'd, 34 F. App'x 23 (2d Cir. 2002). Because a lack of diversity in the workplace does not implicate Title VII, courts have held that advocating for greater diversity in the workplace does not constitute protected activity. See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 594 (2d Cir. 1988); Byerly v. Ithaca Coll., 290 F. Supp. 2d 301, 308-09 (N.D.N.Y. 2003), aff'd, 113 F. App'x 418 (2d Cir. 2004).

### 3. "Supporting" the Diversity Committee is not a protected activity

Plaintiff contends that he supported the Diversity Committee and affirmed a neurosurgeon's qualifications to lead the committee. ECF 78-10, at 23. However, Plaintiff does

not dispute that a Diversity Committee already existed within UMU's College of Medicine *prior* to Plaintiff's appointment as Dean. ECF No. 78, ¶ 146. See, Whethers v. Nassau Health Care Corp., 956 F. Supp. 2d 364, 382 (E.D.N.Y. 2013), aff'd, 578 F. App'x 34 (2d Cir. 2014) (helping to "create" the Office of Diversity not a protected activity where employer itself instituted the office). Plaintiff cannot assert that he opposed discrimination in any way by supporting the existence of the Diversity Committee or by advocating for Dr. Spinoza's qualifications to lead the Committee. In fact, he even testified that President Dewan asked him why Dr. Spinoza was leading the committee, given that she was a neurosurgeon who is very busy. Cowan Reply Decl., Ex. E at 158.[16] Advocating for a minority employee to be in a certain position is not a protected activity. Brown, 170 F. Supp. 3d at 527.

### 4. Notifying Defendants of his "concerns" about the gender imbalance of the Budget Committee is not a protected activity.

Plaintiff contends that he acted in opposition to discrimination when he notified Defendants about his concern regarding the gender-imbalance of the budget committee. ECF No. 78-10 at 24.  Although Plaintiff alleges that he heard female employees refer to the Budget Committee as the "new boy's club" id., he does not identify a single employee who made that comment. He further mentions he made a recommendation that the Chief Medical Officer and Senior Associate Dean for Faculty Affairs be asked to join the Budget Committee; however, he ignores the fact that he never asked either if they *wanted* to be part of the Committee, that neither expressed an interest in becoming part of the Committee (nor did any other woman, ECF No. 73-73 at 42-43), and neither complained that they were not members of the Committee. Id. Again, advocating for women to be part of the Committee does not constitute a protected

---

[16] President Dewan wanted UMU to succeed with respect to diversity but felt Plaintiff was wasting money by putting people into positions without any purpose behind it. ECF No. 73-16, ¶ 29; ECF No. 73-26, ¶¶ 28-34. Dr. White shared similar concerns regarding Dr. Spinoza's ineffectiveness in her role. White Decl., ¶ 15.

activity. As discussed under Point II(A)(2) above, an ambiguous complaint about a "gender imbalance" does not constitute protected activity. See, Moazzaz, 2021 WL 827648 at *13.

> **5. Plaintiff's attempt to improve the Division of Student Affairs and Create a Director of College of Medicine Career Development Position is not protected activity**

Plaintiff alleges he complained to the Division of Student Affairs that he learned African American students were "unprepared" and seemed "lost." ECF No. 78-10, at 25. He contends that he reported his concerns to the SUNY Upstate Organizational Training and Development Office. However, Plaintiff was admittedly trained on UMU's Non-Discrimination policy (ECF No. 78, ¶ 244) and knew as Dean that complaints of discrimination are <u>not</u> reported to the Organizational Training and Development Office, as it does not play a role regarding a student's complaint of discrimination. If Plaintiff was concerned about student complaints, he should have directed those individuals to ODI—or reported them to ODI himself, as he knew he was required to do in his role as Dean. Id., ¶ 246. Or, the complainant could report to a supervisor or Human Resources, as Plaintiff acknowledges. Id., ¶ 245. Significantly, the Dean of the Division of Student Affairs, Julie White, reported directly to Plaintiff, and he gave her a performance evaluation indicating she "exceeded expectations" overall, including specifically with respect to supporting diversity. See, Declaration of Julie White, ¶¶ 6-12.

Plaintiff also alleges that he decided to create a new position to oversee the career development plans of <u>all</u> students in the College of Medicine. He contends that he referred an African American female educator to the search process. ECF No. 78-10, at 27. Plaintiff provides no authority that supports that creating a new position to oversee career development plans constitutes protected activity. Again, advocating for a minority to be promoted or placed into a new position does not constitute protected activity. See, Brown, 170 F. Supp. 3d at 527.

### 6. Creating a part-time Assistant Dean for Cultural Competence was not a protected activity

Plaintiff claims that in July 2019, he created a new part time position and recommended an African American orthopedic surgeon as an ideal candidate. ECF No. 78-10 at 27-28. Again, advocating on the placement of a minority in a newly created position is not a protected activity and Plaintiff provides no authority establishing otherwise. See, Brown,170 F. Supp. 3d at 527.

### 7. Promoting diversity among appointments to Chair positions is not a protected activity

Plaintiff argues that he lobbied for external searches to recruit candidates of diverse backgrounds for Chair positions. As discussed above, advocating on behalf of minorities is not a protected activity. And, recruiting department chairs with a "commitment to a process that leads to a broad, diverse applicant pool…" was one of the requirements of his Dean position. ECF No. 73-2 at 3. In fact, this advocacy effort continues at UMU to present day, as confirmed by Dean Chin's appointment of an Asian female to the permanent Chair of Medicine position pursuant to an external search. ECF No. 73-16, ¶ 26. The Chair of the Anesthesiology Department is also an Asian female, appointed as the permanent chair by Dean Chin as well—after President Dewan approved her recommendation by a search committee while Plaintiff was Dean. Id.; ECF No. 78-26, ¶ 56. Dean Chin personally appointed nine permanent Chairs, all of whom were appointed following an external search except for Dr. Zhang and Dr. Schwartz, who had served as interim Chairs. ECF No. 73-16, ¶ 26. Regardless, as discussed under Point II(A)(2) and (4) above, an ambiguous complaint about a "lack of diversity" does not constitute protected activity.

### 8. Plaintiff's "lobbying" against a "discriminatory salary reduction" for his wife is not a protected activity

If a plaintiff cannot demonstrate an <u>objective</u> good faith, reasonable belief that the underlying challenged actions of the employer violated the law, Courts routinely dismiss

13

retaliation claims. See e.g., Freeman, 2017 WL 4169336 at *9 (citing Kelly, 716 F.3d at 14)(internal quotation omitted); Johnson v. City Univ. of New York, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014). Here, Plaintiff cannot show that he had a good faith, reasonable belief that his wife, Dr. Wong, was being discriminated against based on her gender and/or national origin/race.

First, it is undisputed that when both Plaintiff and his wife Dr. Wong were hired, UMU was aware of their race and national origin, including that they both were Hispanic/Latino. Second, it is undisputed that, with that knowledge: UMU appointed Plaintiff as Dean; UMU gave Dr. Wong a total starting salary package of $220,000.00, which was above the median salary for psychiatry research faculty in the United States (ECF No. 78, ¶¶ 149-150); UMU gave her this package despite the fact that she had no grants (ECF No. 73-58, ¶ 21); Dr. Wong's total starting institutional salary was more than the total starting salary of each of the twenty-six other research faculty members that UMU hired between 2017 and 2020 (ECF No. 78, ¶ 159); Dr. Wong's total "startup commitment" was $5,386,668, which far surpassed any other faculty member hired during the timeframe mentioned. (id., ¶¶ 161, 163); even though Dr. Wong's ALR and stipend were both scheduled to expire in July 2019, (id., ¶¶ 174-176) and even though President Dewan and Dr. Schwartz informed Dr. Wong in April 2019 that granting her request for such a high State base salary would be inequitable for all of the other grant funded tenured research faculty within the department (id., ¶ 178), they agreed to extend the ALR, which would keep her state salary as the third highest in the department through December 2020—and she remains the third highest paid researcher. ECF No. 73-58, ¶ 45.

It is undisputed that Plaintiff had access to employee salaries within Dr. Wong's department and was fully aware her salary was commensurate to others (ECF No. 78, ¶ 183); he knew that ALR was reviewed on an annual basis—it explicitly states so in Dr. Wong's offer

14

letter (ECF No. 73-63); having begun his Dean position in July 2017, he knew for at least 6 months before she began that ALR is not intended to supplement income indefinitely (ECF No. 78, ¶ 154); and he knew that Dr. Wong's stipend was a bit unusual and usually only offered to brand new researchers. Id., ¶ 158. Plaintiff knew that UMU gave Dr. Wong these benefits *despite* being an unfunded researcher, which he knew made her an unattractive candidate. In fact, he acknowledged this during his deposition, confirming he had previously been denied a position at SUNY Downstate because his Australian grants did not transfer to the United States. Cowan Reply Decl., Ex. E at 399-400. Most importantly, Plaintiff admits he had direct knowledge that Dr. Wong received a far greater salary/start up package than any other research faculty member who was hired to work in the UMU College of Medicine between 2017-2019 and that her lab was the largest lab buildout done while he was Dean. ECF No. 78, ¶ 187. Based on Plaintiff's own admissions, it is insincere and in bad faith for Plaintiff to allege his demotion was in retaliation for the alleged August 12, 2019 complaint about his wife's salary. [17]

**B. Plaintiff cannot prove a causal connection between any alleged protected activity and the decision to demote him.**

To demonstrate causation, Plaintiff "must show that retaliation was a but-for cause of an adverse employment action—not merely a 'substantial' or 'motivating' factor." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 348, 360 (2013).

**1. Plaintiff has not demonstrated direct evidence of retaliatory animus**

---

[17] In his declaration, Plaintiff now claims that President Dewan told him during the August 12, 2019 meeting that Dr. Wong could not have a state salary higher than two male professors. (ECF No. 78-4, ¶ 224). That contention is not found in his Opposition Brief (ECF No. 78-10, at 31), his federal complaint (ECF No. 1) or in his deposition (Cowan Reply Decl., Ex. E at 273-279). He cannot allege it now. Avillan v. Donahoe, 483 Fed. Appx. 637, 639 (2d Cir. 2012). Regardless, Dr. Wong was the highest paid research professor in the Department in 2017 (ECF No. 73-72) and is currently the third highest paid, only paid less than Plaintiff and another researcher who is ranked among the top 80 researchers in the world. ECF No. 73-58, ¶ 45.

Plaintiff submits a portion of the deposition testimony of Associate Vice President for Human Resources, Eric Frost, which he takes out of context. Frost confirms that Plaintiff incorrectly took his testimony out of context in his supplemental declaration, which is submitted in conjunction with Defendants' reply. See, Frost Reply Decl., ¶¶ 2-6. Plaintiff also cites to minutes from a Faculty Council meeting in which President Dewan indicated that "there is not one horrible thing that happened for this change to occur, rather a change was needed in leadership." ECF No.78-9 at 3. This document reflects notes taken during a meeting and does *not* reflect a transcription of the whole meeting. Regardless, even assuming it is a true representation of what President Dewan stated, his characterization of removing Plaintiff is accurate: there was not *one* horrible thing that happened—and a change *was* needed in leadership. Plaintiff had demonstrated to him and SUNY leadership that he must be removed from his position as Dean for poor performance, poor judgment, financial waste, repeated inappropriate conduct and comments that were an embarrassment to the University, and for overtly undermining him as President (as he had done with the previous President as well). See gen., ECF No. 78-26; Declaration of Sharon Brangman, MD, ¶¶ 6-12. Nothing was said during that meeting that contradicts this sentiment or demonstrates direct evidence of retaliatory animus. Plaintiff's speculation as to the hidden meaning behind this statement does not suffice.

Plaintiff's reference to the DHR probable cause finding is irrelevant to the Court's decision and should not be considered here, where unlike the DHR investigation, this Court has the benefit of all documents submitted in support of Defendants' motion, including the sworn testimony of the parties. See, Finn v. New York State Off. of Mental Health-Rockland Psychiatric Ctr., 2011 WL 4639827, at *13 (S.D.N.Y. 2011), aff'd sub nom. 489 F. App'x 513 (2d Cir. 2012); DeJohn v. Wal-Mart Stores E., LP, 2012 WL 3679204, at *1 (N.D.N.Y. 2012).

Lastly, the evidence supports that UMU did not remove him as Dean due to his advocacy efforts. Recruiting department chairs with a "commitment to a process that leads to a broad, diverse applicant pool…" was one of the requirements of his Dean position (ECF No. 73-2 at 3) and UMU leadership advocacy efforts continue today – just in a more strategic manner than Plaintiff's "checking the box" method. ECF No. 73-26, ¶¶ 32-34; ECF No. 73-16, ¶ 30; ECF No. 73-55, ¶ 9. These diversity efforts were something that UMU *required* Plaintiff to do in his position as Dean. President Dewan had his own diversity goals and diversity efforts continue at UMU today, which further contradicts his argument that he was removed *because of* this.[18]

## 2. Plaintiff has not demonstrated temporal proximity

Plaintiff provides no recent authority contradicting the temporal proximity standard set forth in Defendants' brief, which states that courts in this circuit have generally found that "the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." ECF No. 73-73 at 46. Plaintiff also fails to address that many of the "protected activities" he has identified in his Opposition Brief are too attenuated to establish a causal connection. For example, the following claimed actions occurred 2 or 3 months or longer prior to his removal: after he suggested different/additional roles for Dr. Thompson and Ms. Chambers, President Dewan inquired as to what they "do all day" in April, May, June or July 2019; after he appointed Dr. Spinoza to lead the Diversity Committee, President Dewan questioned this decision in May, June or early July 2019 (Cowan Reply Decl., Ex. E at 158); Plaintiff allegedly notified Defendants about his concern regarding the gender imbalance of the Budget Committee in May 2019 and Plaintiff suggested that two women be

---

[18] Although not raised in this section, to the extent Plaintiff argues that President Dewan's alleged statements regarding diversity constitute direct evidence of retaliatory animus, he cannot show that they were remarks made by a decisionmaker that could be viewed as reflecting a discriminatory animus, as discussed in Defendants' original memorandum of law. ECF No. 73-73 at 25-27.

17

considered for the Budget Committee group in June 2019 (ECF No. 1 at ¶ 89; ECF No. 78-10, at 24); Plaintiff created the External Scientific Advisory Board in June 2018 (ECF No. 78, ¶ 138).

Notably, for the first time, Plaintiff claims he voiced concerns about a "lack of diversity" during an August 13, 2019, meeting with President Dewan regarding the selection of the Anesthesiology Department Chair. ECF No. 78-10 at 35. Plaintiff cannot now raise that claim. See, Avillan, 483 Fed. Appx. at 639. Further, his statement ignores that he, as Dean, oversaw chair selection, which is confirmed by his offer letter. ECF No. 73-2 at 3.   To suggest this complaint of "lack of diversity" was the but-for cause of his removal as Dean is also inconsistent with the evidence. President Dewan approved the search committee's recommendation and sent Dr. Zhang an email immediately after her selection, congratulating her. ECF No. 73-33.

Regarding Plaintiff's alleged "lobbying" against his wife's salary reduction at his August 12, 2019, meeting with President Dewan, despite an arguable temporal connection, there is no other evidence suggesting that this was the "but-for cause" of his removal. To the contrary, the evidence suggests it was not. Plaintiff's wife had been complaining about the removal of her ALR for several months and the issue had already been discussed and addressed multiple times by President Dewan and Dr. Schwartz.  ECF No. 73-58, ¶¶ 29-38.

### 3.   Plaintiff cannot show that Defendants' legitimate nondiscriminatory reasons offered were a pretext for discrimination

Plaintiff appears to argue that temporal proximity is sufficient to establish a causal connection for purposes of establishing pretext. (ECF No. 78-10, at 35-36). That position is inaccurate. "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." Abromavage v. Deutsche Bank Sec. Inc., 2022 WL 4360950, at *2 (2d Cir. 2022). "To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination [or retaliation]." Giurca v. Good

18

Samaritan Hosp., 2023 WL 254611, at *11 (S.D.N.Y. 2023). And Plaintiff's disagreement with Defendants' evaluation of his performance and/or behavior is simply not sufficient to show pretext. See, Servello v. New York State Off. of Child. & Fam. Servs., 2021 WL 4477229, at *9 (N.D.N.Y. 2021), aff'd, 2022 WL 17411287 (2d Cir. 2022). Plaintiff's poor performance and leadership in his role as Dean are legitimate, nonretaliatory reasons for Plaintiff's removal—even if Plaintiff disputes the merits of the decision. See, Mello v. Siena Coll., 2017 WL 1013077, at *17 (N.D.N.Y. 2017) (citing McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006)); Meiri, 759 F.2d at 995; Moore v. Kingsbrook Jewish Med. Ctr., 2013 WL 3968748, at *13 (E.D.N.Y. 2013).

Plaintiff's declaration is rife with objections to Defendants' characterization of his behavior, his words, and his intentions as Dean. His declaration offers his personal interpretation of meetings, events and conversations that contradicts Defendants' recollection or interpretation of same. However, Plaintiff's disagreement with Defendants regarding whether his behavior was inappropriate or whether his performance was poor is not sufficient to show pretext. See, Servello 2021 WL 4477229, at *9; Fleming v. MaxMara USA, Inc., 371 Fed.Appx. 115, 117–18 (2d Cir. 2010); Mello, 2017 WL 1013077 at *17. Here, as in Mello, supra, President Dewan submitted a declaration providing explicit detail as to the factors included in his decision to remove Plaintiff from the Dean position. Further, Plaintiff admits that President Dewan told Plaintiff that despite instructions from SUNY to remove him, he was willing to give Plaintiff a chance to prove himself under his Presidency. ECF No. 78, ¶ 28. He admits to many performance issues referenced above under Point I(B)(1) and cannot admit or deny several others, which are supported by emails that he sent or other documentary evidence. And, like the defendants in Mello, Defendants have submitted several declarations detailing personal

19

observations regarding Plaintiff's job performance—Plaintiff proffers none, other than his own. This is simply not enough to withstand summary judgment and his claims should be dismissed.

**POINT III:   PLAINTIFF ABANDONED HIS REMAINING RETALIATION CLAIMS**

In their original memorandum of law, Defendants discussed Plaintiff's purported retaliation claims that (1) he was denied or not considered for other positions at the COM following his demotion and the filing of his DHR Complaint and (2) that he was not provided with an adequate research support package and funding for his laboratory. See, ECF No. 73-73, 48-50. Plaintiff's Opposition Brief fails to address *either* legal argument. Even though it includes a specific heading for "adverse employment action" (ECF No. 78-10 at 32), there is no mention of either claim. This Court should deem these claims abandoned. See, Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A., 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022); Arkorful v. New York City Dep't of Educ., 2024 WL 298999, at *17–18 (E.D.N.Y. Jan. 24, 2024) (citing Camarda v. Selover, 673 F. App'x 26, 30 (2d Cir. 2016)).   "[I]t is not the Court's role, on a motion for summary judgment, independently to scour the record to locate factual material that could support a finding that genuine issues of material fact remain…. it is the obligation of the party opposing summary judgment to show, based upon the record, the existence of genuine issues of fact and to identify why they are material with respect to the claims on which the moving party seeks summary judgment." Arkorful, 2024 WL 298999 at *17–18; Kovaco v. Rockbestos–Surprenant Cable Corp., 834 F.3d 128, 143–44 (2d Cir. 2016). Consequently, these claims should be deemed abandoned. Beyond this – Plaintiff has not set forth a *prima facie* retaliation claim or evidence establishing that he was qualified for these positions for the reasons stated in Defendants' original memorandum of law.

**CONCLUSION**

20

A-1057

For all of the foregoing reasons, the Defendants' motion pursuant to Fed. R. Civ. P 56(a) for an order granting summary judgment and dismissing Plaintiff's Complaint in its entirety and with prejudice must be granted, together with such other and further relief that the Court deems just and equitable.

Dated: Syracuse, New York
      June 6, 2024

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, New York 13202
By: _____s/_____
Aimee Cowan, Esq.
Assistant Attorney General
Bar Roll No. 516178
Telephone:　(315) 448-4800
Fax: (315) 448-4853
Email: aimee.cowan@ag.ny.gov

21

A-1058

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 6, 2024, she filed Defendants' Reply Memorandum of Law by electronically filing with the Clerk of the Court herein, which is understood to have sent notification of such filing electronically to the following:

Douglas Mace, Esq.
Danny Grace PLLC
225 Broadway, Suite 1200
New York, New York 10007

Dated:        June 6, 2024

                                LETITIA JAMES
                                Attorney General of the State of New York
                                Attorney for Defendants
                                300 S. State Street, Ste. 300
                                Syracuse, New York 13202
                                By:   /s
                                Aimee Cowan, Esq.
                                Assistant Attorney General
                                Bar Roll No. 516178
                                Telephone:    (315) 448-4800
                                Fax:  (315) 448-4853
                                Email: aimee.cowan@ag.ny.gov

22

A-1059

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
................................................................X

**JULIO LICINIO, MD, PhD, MBA, MS,**

                              Plaintiff,                    **DEFENDANTS' RESPONSE TO**
                                                            **PLAINTIFF'S**
                                                            **COUNTERSTATEMENT OF**
                                                            **MATERIAL FACTS**

                                                            Case No.: **5:21-cv-387(GTS/TWD)**


              - against -


**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, and THE**
**STATE UNIVERSITY OF NEW YORK**
**UPSTATE MEDICAL UNIVERSITY,**

                              Defendants
................................................................X


        Pursuant to Rule 7.1(a)(3) of the Local Rules of this Court, State of New York, the State

University of New York, and the State University of New York Upstate Medical University

("Defendants"), respond to Plaintiff's Counter Statement of Material Facts as follows:[1]

---

[1] Please note that pursuant to Local Rule 56.1(b): "The opposing party [to a motion for summary judgment] shall file a separate Response to the Statement of Material Facts. The opposing party response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. **In addition, the opposing party's Response may set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts in Dispute, containing separately numbered paragraphs, followed by a specific citation to the record where the fact is established.** The moving party may reply to the opposing party's contended assertions in a separate Reply Statement and/or its Reply Memorandum of Law." N.D.N.Y. L.R. 56.1(b)(emphasis added).

        Here, Plaintiff's responses to Defendants' Statement of Material Facts (ECF No. 78) do not include an additional statement of material facts as contemplated by L.R. 56.1. Further, Plaintiff failed to

1

1.  Plaintiff is an esteemed doctor and psychiatrist currently serving on the faculty at Defendant SUNY Upstate.

**RESPONSE**: **L.R. 56.1 states that "[e]ach fact listed <u>shall</u> set forth a specific citation to the record where the fact is established." (N.D.N.Y.L.R. 56.1)(emphasis added). Plaintiff has failed to set forth a specific citation to the record and consequently, this "material fact" should be discounted. Further, the conclusory assertion that Plaintiff is an "esteemed doctor" is improper. Regardless, ADMIT that Plaintiff is a doctor and psychiatrist currently serving on the facility at SUNY Upstate Medical University.**

2.  Plaintiff began his employment with Defendants on or around July 1, 2017, when he was appointed Senior Vice President and Dean of the College of Medicine of SUNY Upstate. (Licinio Dec., ¶3).

**RESPONSE**: **ADMIT**.

3.  Plaintiff remained in that position until his unlawful demotion on September 12, 2019, when SUNY changed his role to tenured Professor in the Department of Psychiatry. (Licinio Dec., ¶27).

---

submit a separate document containing his statement of additional material facts in dispute in accordance with N.D.N.Y. L.R. 56.1(b). Instead, Plaintiff included a "Counterstatement of Material Facts" within his memorandum of law (ECF No. 78-10 at 8-10) that does not fully comport with the requirements of Rule 56.1(b). Specifically, Plaintiff failed to separately number paragraphs, instead including paragraph-length, argumentative narratives. In some instances, he failed to provide a specific citation to the record. Consequently, Defendants respectfully request that the Court reject and disregard Plaintiff's Counterstatement of Material Facts. See, Krul v. DeJoy, No. 6:20-CV-198, 2023 WL 8449589, at *19–20 (N.D.N.Y. Dec. 6, 2023)("…defendant is correct to argue that other parts of this statement of additional material facts are improper. For instance, this document presents certain portions of the story in a paragraph-length, argumentative, narrative form. These are not the kind of 'short and concise' assertions of 'additional' facts that are contemplated by the Local Rules. In sum, the statements in [plaintiff's statement of additional facts] that are just duplicative of the averments in plaintiff's affirmation and those that amount to speculation, improper legal argument, and/or conclusory assertions will be excluded from consideration").

2

**<u>RESPONSE</u>: ADMIT that Plaintiff remained in that position until he was removed from his Dean position on September 12, 2019, leaving him in the state title of Distinguished Professor in the Department of Psychiatry & Behavioral Sciences. DENY that his removal as Dean was unlawful. <u>See</u>, Defendants' legitimate, nondiscriminatory business reasons for Plaintiff's removal, ECF No. 73-73 at 21-27[2] and 31-32. <u>See also</u>, Dewan Decl., ECF No. 73-26, ¶¶ 12, 15, 19-26, 28-33, 37, 38-42, 45, 47 51-53; Schwartz Decl., ECF No. 73-58, ¶¶ 7, 9, 11, 14, 15; Chin Decl., ECF No. 73-16, ¶¶ 16-19, 20-24, 30; Corona Decl., ECF No. 73-23, ¶¶ 4, 6, 8, 9-12; Albanese Decl., ECF No. 73- 15, ¶¶ 4, 5, 9-10, 12, 13; Lesperance Decl., ECF No. 73-49, ¶¶ 6-12; Frost Decl., ECF No. 73-36, ¶¶ 9-11, 13-17; Schmitt Decl., ECF No. 73-55, ¶¶ 7, 9; Declaration of Julie White, ¶¶ 13-16, Declaration of Ruth Weinstock, ¶¶ 3-5; and Declaration of Sharon Brangman, MD, ¶¶ 6-12. These declarations speak to Plaintiff's insubordination, poor performance, poor judgment, financial waste, inappropriate interference with searches, inappropriate conduct and comments and undermining the President. Lastly, Defendants note that Plaintiff already held the tenured Professor title prior to his removal as Dean, per his offer letter. ECF No. 73-3.**

4.   Plaintiff, who is of Latino National Origin, is a physician-scientist with over 20 years of experience as a tenured professor in some of the world's leading universities and an abundant record of competitive, peer-reviewed, federal funding in Australia and in the United States, that exceeds $20 million cumulatively.

---

[2] Page numbers refer to docket page numbers.

**RESPONSE**: L.R. 56.1 states that "[e]ach fact listed **shall** set forth a specific citation to the record where the fact is established." (N.D.N.Y.L.R. 56.1)(emphasis added). Plaintiff has failed to set forth a specific citation to the record and consequently, this "material fact" should be discounted. Further, the conclusory assertion that Plaintiff is "a physician-scientist with over 20 years of experience as a tenured professor in some of the world's leading universities and an abundant record of competitive, peer-reviewed, federal funding in Australia and in the United States, that exceeds $20 million cumulatively" is improper. Defendants ADMIT that Plaintiff purports himself to be of Latino national origin with over 20 years of experience as a tenured professor in some of the world's leading universities and an abundant record of competitive, peer-reviewed, federal funding in Australia and in the United States, but Defendants can neither admit nor deny the truth of those assertions.

5. That federal funding has included a National Institutes of Health (NIH) R24 award to mentor physician-scientists.

**RESPONSE**: L.R. 56.1 states that "[e]ach fact listed **shall** set forth a specific citation to the record where the fact is established." (N.D.N.Y.L.R. 56.1)(emphasis added). Plaintiff has failed to set forth a specific citation to the record and consequently, this "material fact" should be discounted. This conclusory assertion is improper. Defendants can neither admit nor deny.

6. At the time that Plaintiff received that award, the National Center for Research Resources at the NIH had only ever issued 9 such awards. (Licinio Dec., ¶5).

4

**RESPONSE:** **DENY that the citation provided reflects this assertion. There is no information in the record establishing that Plaintiff has personal knowledge of this "fact." Defendants can neither admit nor deny.**

7. Pursuant to his appointment by Defendants as Senior Vice President and Dean of the College of Medicine, Plaintiff entered into an employment contract with Defendant SUNY Upstate which included an eight-month notice and transition period were Plaintiff to be removed from his position at any time in the future. (Licinio Dec., Ex. 1).

**RESPONSE**: **ADMIT that plaintiff received an offer letter dated March 14, 2017 (See, ECF No. 73-3) but DENY that it was an employment contract. See, Attorney Aimee Cowan Reply Declaration, Exhibit "A." In a decision dated December 31, 2020, Court of Claims Judge Diane L. Fitzpatrick held that plaintiff's March 14, 2017 letter was not an enforceable employment contract. Id., at 4-10. Notwithstanding that the offer letter is not an enforceable contract, Defendants refer the Court to Plaintiff's March 14, 2017 offer letter, which speaks for itself.**

8. Furthermore, the employment contract states that if Plaintiff were to transition to the position of tenured Professor in the Department of Psychiatry, his total compensation would be no lower than the total compensation of the highest paid faculty member at the same rank in the Psychiatry Department, and in Plaintiff's case, his total compensation would be paid in its entirety by Defendant NYS. Id.

**RESPONSE**: **ADMIT that plaintiff received an offer letter dated March 14, 2017 (See, ECF No. 73-3) but DENY that it was an employment contract. See, Cowan Reply Decl., Exhibit "A." The Court of Claims held on December 31, 2020,**

5

**that Plaintiff's March 14, 2017 letter was not an enforceable employment contract. Id., at 4-10. Notwithstanding that the offer letter is not an enforceable contract, Defendants refer the Court to Plaintiff's March 14, 2017 offer letter, which speaks for itself.  Further, Plaintiff admits that after he was demoted, he continued to be a tenured distinguished research professor in the Department of Psychiatry, receiving the highest State salary out of any other research faculty in the Psychiatry Department, despite having no current grants. See, ECF No. 78, ¶ 232.**

9.  Plaintiff's employment contract further states that he would be reimbursed for professional expenses and be provided with secretarial support, both as Dean and after his term as Dean, as a professor. Id.

**RESPONSE: ADMIT that Plaintiff received an offer letter dated March 14, 2017 but DENY that it was an employment contract or that the offer letter states Plaintiff would be reimbursed for professional expenses and/or provided secretarial support after his term as Dean. See, ECF No. 73-3; Cowan Reply Decl., Exhibit "A."  The Court of Claims held on December 31, 2020, that Plaintiff's March 14, 2017 letter was not an enforceable employment contract. Cowan Reply Decl., Ex. A, at 4-10. Notwithstanding that the offer letter is not an enforceable contract, Defendants refer the Court to Plaintiff's March 14, 2017 offer letter, which speaks for itself.  See also, Declaration of Thomas Schwartz, ECF No. 73-58, ¶ 16 (no other faculty member in the Psychiatry Department receives reimbursement for academic travel, medical license fees, and professional society memberships).**

6

10. On October 29, 2019, the Liaison Committee on Medical Education ("LCME"), the accreditation authority for medical education programs in the United States, determined that ongoing monitoring was required at SUNY Upstate in order to ensure compliance with diversity standards.  (Licinio Dec., ¶30).

**RESPONSE**: **ADMIT to the extent that the October 29, 2019 letter from the LCME states: "Under the dean's leadership, new policies, procedures, and programs have been implemented and are designed to increase diversity among students, faculty and senior administrative staff. In the first year of the implementation of these interventions, there were modest gains in diversity of senior administrative staff and faculty. There are insufficient data to assess the ongoing effectiveness of these programs. This requires monitoring." See, ECF No. 73-21 at 2. Additionally, the October 29, 2019 letter identifies other areas that were satisfactory but required a need for monitoring, such as financial aid/debt management counseling for students. Id.**

11. And when Plaintiff came to SUNY Upstate, the college was on accreditation probation. (Licinio Dec., ¶21).

**RESPONSE**: **DENY. Plaintiff's citation to his declaration does not reflect this assertion. SUNY Upstate was not on accreditation probation when Plaintiff arrived at SUNY Upstate in 2017. The College of Medicine received full accreditation in June 2013. See, Dewan Decl., ECF No. 73-26, ¶ 57; Chin Decl., ECF No. 73-16, ¶ 29; see also ECF No. 78-10 at ¶ 33 (plaintiff does not dispute that the**

7

A-1066

**document cited indicates the COM was released from probation and received accreditation as of June 2013).**

12. In 2011, the medical school had received a probation letter from LCME, citing the college's lack of diversity efforts, among other things. (Licinio Dec., ¶21).

**RESPONSE: DENY. Plaintiff's citation to his declaration does not reflect this assertion. Further, <u>see</u>, Dewan Decl., ECF No. 73-26, ¶ 57, Exhibit H; Chin Decl., ECF No. 73-16, ¶ 29.**

13. Plaintiff brought a progressive viewpoint to SUNY Upstate regarding diversity and improving opportunities for minority students and faculty, and he worked assiduously to address the decline in minority enrollment in Defendant SUNY Upstate by recruiting minority faculty and creating novel accelerated partnership programs that combine BA in partner institutions and the MD degree at Defendant SUNY Upstate. (Licinio Dec., ¶28).

**RESPONSE: This assertion is an improper, paragraph-length, argumentative narrative and should be disregarded. <u>See</u>, <u>Krul</u>, <u>supra</u>. Regardless, ADMIT that Plaintiff's declaration states that he "worked assiduously to address the decline in minority enrollment in Defendant SUNY Upstate by recruiting minority faculty and creating novel accelerated partnership programs that combine BA in partner institutions and the MD degree at Defendant SUNY Upstate" but DENY any insinuation that either diversity or improving opportunities for minority students and faculty was not a priority for Defendants or that it played any role in Plaintiff's demotion. <u>See</u>, Dewan Decl., ECF No. 73-26, ¶¶ 50-53, 73; Chin Decl., ECF No. 73-16, ¶ 30; Declaration of Julie White, PhD, ¶ 16. <u>See also</u>, Defendants' legitimate,**

8

A-1067

> **nondiscriminatory business reasons for Plaintiff's removal, ECF No. 73-73 at 21-27 and 31-32; Dewan Decl., ECF No. 73-26, ¶¶ 12, 15, 19-26, 28-33, 37, 38-42, 45, 47 51-53; Schwartz Decl., ECF No. 73-58, ¶¶ 7, 9, 11, 14, 15; Chin Decl., ECF No. 73-16, ¶¶ 16-19, 20-24, 30; Corona Decl., ECF No. 73-23, ¶¶ 4, 6, 8, 9-12; Albanese Decl., ECF No. 73- 15, ¶¶ 4, 5, 9-10, 12, 13; Lesperance Decl., ECF No. 73-49, ¶¶ 6-12; Frost Decl., ECF No. 73-36, ¶¶ 9-11, 13-17; Schmitt Decl., ECF No. 73-55, ¶¶ 7, 9; Declaration of Julie White, ¶¶ 13-16, Declaration of Ruth Weinstock, ¶¶ 3-5; and Declaration of Sharon Brangman, MD, ¶¶ 6-12. These declarations speak to Plaintiff's insubordination, poor performance, poor judgment, financial waste, inappropriate interference with searches, inappropriate conduct and comments and undermining the President.**

14. Plaintiff also called out the lack of open job searches at the college, in contravention of SUNY bylaws. (Licinio Tr., 314:3-16).

**RESPONSE**: **DENY that the citation supports this assertion. Regardless, DENY. See, Dewan Decl., ECF No. 73-26, ¶¶ 69-72; Chin Decl., ECF No. 73-16, ¶¶ 25-28; Frost Decl., ECF No. 73-36, ¶ 5.**

15. The aforementioned efforts put Plaintiff at odds with the entrenched conservative culture and administration at SUNY Upstate. (Licinio Tr., 315:7-10).

**RESPONSE**: **This assertion is an improper argumentative narrative and should be disregarded. Regardless, DENY that the citation supports this assertion. See, Dewan Decl., ECF No. 73-26, ¶¶ 69-72; Chin Decl., ECF No. 73-16, ¶¶ 25-28.**

16. Plaintiff's efforts, as fully set forth in Plaintiff's Declaration, pushing back

9

against discriminatory comments, as well as his overall efforts to increase diversity, and his

leading of the accreditation process, resulted in a full, 8-year accreditation from LCME. (Licinio

Dec., ¶40)

**RESPONSE**: **DENY that the citation supports this assertion. Plaintiff has not specified**

**what "discriminatory comments" he allegedly "push[ed] back" against.**

**Regardless, see, Dewan Decl., ECF No. 73-26, ¶¶ 48-63. See also, Plaintiff's**

**Responses to Defendants' Statement of Material Facts, ECF No. 78, ¶¶ 35-**

**38; ECF No. 73-73 at 24-27.**

17. On September 11, 2019, Plaintiff was honored as a Distinguished Professor at the

SUNY Upstate Annual Convocation.  (Licinio Dec., ¶24).

**RESPONSE**: **ADMIT. But Defendants note that Plaintiff was actually selected as a**

**Distinguished Professor months prior, in April 2019. See, Cowan Reply Decl.,**

**Ex. B; Cowan Reply Decl., Ex. E, at 138-140.**

18. "Distinguished Professor" is the highest honor awarded to Upstate professors. Id.

**RESPONSE**: **This assertion is an improper argumentative narrative and should be**

**disregarded. Defendants can neither admit nor deny. There are other honors**

**that may be awarded to Upstate professors that subjectively may be**

**perceived as a "higher" honor. Defendants note that a Distinguished**

**Professor title reflects a faculty member's accomplishments as a professor—**

**it in no way reflects accomplishments as a Dean.**

19. The next day on September 12, 2019, Plaintiff was demoted to tenured Professor

in the Department of Psychiatry. (Licinio Dec., ¶146).

A1068

**RESPONSE**: **ADMIT that Plaintiff was removed as Dean on September 12, 2019, and his state title became Distinguished Professor in the Department of Psychiatry & Behavioral Sciences. Again, Defendants note that Plaintiff was actually selected as a Distinguished Professor months prior, in April 2019. See, Cowan Reply Dec., Ex. B; see also, Cowan Reply Decl., Ex. E, at 138-140. Plaintiff's selection as a Distinguished Professor does not reflect any accomplishments as a Dean and instead only reflects performance as a professor. Additionally, please note that his selection took place prior to some of the inappropriate behavior discussed in Defendants' previously filed motion for summary judgment. See, e.g., ECF No. 73-73 at 21-27 and 31-32; Dewan Decl., ECF No. 73-26, ¶¶ 12, 15, 19-26, 28-33, 37, 38-42, 45, 47 51-53; Schwartz Decl., ECF No. 73-58, ¶¶ 7, 9, 11, 14, 15; Chin Decl., ECF No. 73-16, ¶¶ 16-19, 20-24, 30; Corona Decl., ECF No. 73-23, ¶¶ 4, 6, 8, 9-12; Albanese Decl., ECF No. 73- 15, ¶¶ 4, 5, 9-10, 12, 13; Lesperance Decl., ECF No. 73-49, ¶¶ 6-12; Frost Decl., ECF No. 73-36, ¶¶ 9-11,  13-17; Schmitt Decl., ECF No. 73-55, ¶¶ 7, 9; Declaration of Julie White, ¶¶ 13-16, Declaration of Ruth Weinstock, ¶¶ 3-5; and Declaration of Sharon Brangman, MD, ¶¶ 6-12.**

20. At no time during his tenure did Plaintiff commit misconduct in his capacity as Dean, nor had he ever been accused of committing misconduct, either as defined by the employment contract or by any other definition or standard.  (Licinio Dec., ¶25.)

**RESPONSE**: **DENY that Plaintiff's March 14, 2017 letter was an employment contract. See, ECF No. 73-3; Cowan Reply Decl., Exhibit "A."  DENY that Plaintiff**

11

never committed misconduct. <u>See</u>, Dewan Decl., ECF No. 73-26, ¶¶ 12, 15, 19-26, 28-33, 37, 38-42, 45, 47 51-53; Schwartz Decl., ECF No. 73-58, ¶¶ 7, 9, 11, 14, 15; Chin Decl., ECF No. 73-16, ¶¶ 16-19, 20-24, 30; Corona Decl., ECF No. 73-23, ¶¶ 4, 6, 8, 9-12; Albanese Decl., ECF No. 73- 15, ¶¶ 4, 5, 9-10, 12, 13; Lesperance Decl., ECF No. 73-49, ¶¶ 6-12; Frost Decl., ECF No. 73-36, ¶¶ 9-11,  13-17; Schmitt Decl., ECF No. 73-55, ¶¶ 7, 9; Declaration of Julie White,  ¶¶ 13-16, Declaration of Ruth Weinstock, ¶¶ 3-5; and Declaration of Sharon Brangman, MD, ¶¶ 6-12. These declarations speak to Plaintiff's insubordination, poor performance, poor judgment, financial waste, inappropriate interference with searches, inappropriate conduct and comments and undermining the President.

21. Plaintiff was not afforded the requisite eight-month transition period. (Licinio Dec., ¶224).

<u>RESPONSE</u>: **ADMIT that Plaintiff's offer letter dated March 14, 2017 referred to an eight-month transition period (<u>See</u>, ECF No. 73-3) but DENY that it was an employment contract. <u>See</u>, Cowan Reply Decl., Exhibit "A."  The Court of Claims held on December 31, 2020 that Plaintiff's March 14, 2017 letter was not an enforceable employment contract. <u>Id.</u>, at 4-10. <u>See also</u>, Dewan Decl., ECF No. 73-26, ¶ 46. Given the Plaintiff's acts of insubordination and inappropriate behavior leading up to that point, which were preventing UMU from functioning properly, President Dewan felt it best for the institution to remove him effective immediately. <u>See</u>, Dewan Decl., ECF No. 73-26, ¶¶ 12, 15, 19-26, 28-33, 37, 38-42, 45, 47 51-53; Schwartz Decl., ECF**

12

No. 73-58, ¶¶ 7, 9, 11, 14, 15; Chin Decl., ECF No. 73-16, ¶¶ 16-19, 20-24, 30; Corona Decl., ECF No. 73-23, ¶¶ 4, 6, 8, 9-12; Albanese Decl., ECF No. 73-15, ¶¶ 4, 5, 9-10, 12, 13; Lesperance Decl., ECF No. 73-49, ¶¶ 6-12; Frost Decl., ECF No. 73-36, ¶¶ 9-11, 13-17; Schmitt Decl., ECF No. 73-55, ¶¶ 7, 9; Declaration of Julie White, ¶¶ 13-16, Declaration of Ruth Weinstock, ¶¶ 3-5; and Declaration of Sharon Brangman, MD, ¶¶ 6-12. These declarations speak to Plaintiff's insubordination, poor performance, poor judgment, financial waste, inappropriate interference with searches, inappropriate conduct and comments and undermining the President.

22. Nor was he given eight-months' salary at the Dean level. Id.

RESPONSE: ADMIT that Plaintiff's offer letter dated March 14, 2017 referred to an eight-month transition period (See, ECF No. 73-3) but DENY that it was an employment contract. See, Cowan Reply Decl., Exhibit "A." The Court of Claims held on December 31, 2020 that Plaintiff's March 14, 2017 letter was not an enforceable employment contract. Id., at 4-10. See also, Dewan Decl., ECF No. 73-26, ¶ 46. Given the events leading up to that point which were preventing UMU from functioning properly, President Dewan felt it best for the institution to remove him effective immediately. See, Dewan Decl., ECF No. 73-26, ¶¶ 12, 15, 19-26, 28-33, 37, 38-42, 45, 47 51-53; Schwartz Decl., ECF No. 73-58, ¶¶ 7, 9, 11, 14, 15; Chin Decl., ECF No. 73-16, ¶¶ 16-19, 20-24, 30; Corona Decl., ECF No. 73-23, ¶¶ 4, 6, 8, 9-12; Albanese Decl., ECF No. 73- 15, ¶¶ 4, 5, 9-10, 12, 13; Lesperance Decl., ECF No. 73-49, ¶¶ 6-12; Frost Decl., ECF No. 73-36, ¶¶ 9-11, 13-17; Schmitt Decl., ECF No. 73-55, ¶¶

13

**7, 9; Declaration of Julie White, ¶¶ 13-16, Declaration of Ruth Weinstock, ¶¶ 3-5; and Declaration of Sharon Brangman, MD, ¶¶ 6-12. These declarations speak to Plaintiff's insubordination, poor performance, poor judgment, financial waste, inappropriate interference with searches, inappropriate conduct and comments and undermining the President.**

23. The final LCME report, released on October 29, 2019, contained comments that were highly supportive of Plaintiff's work. (Licinio Dec., ¶39).

**RESPONSE**: **ADMIT that Plaintiff's declaration makes this statement, however, since Plaintiff has not provided a copy of the final report with citations to the comments that he deems as "highly supportive" of his work, Defendants cannot fully respond to this assertion.**

Dated: June 6, 2024

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
300 S. State Street, Ste. 300
Syracuse, New York 13202

By: _s/Aimee Cowan_____
Aimee Cowan, Esq.
Assistant Attorney General
Bar Roll No. 516178
Telephone:    (315) 448-4800
Fax:  (315) 448-4853
Email: aimee.cowan@ag.ny.gov

A-1073

UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK
..........................................................................X
JULIO LICINIO, MD, PhD, MBA, MS,

                         Plaintiff,              **DECLARATION OF
RUTH WEINSTOCK, MD, PhD**

                                                       Case No.: **5:21-cv-387(GTS/TWD)**

                - against -

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,

                          Defendants
..........................................................................X

      **RUTH WEINSTOCK, MD, PhD**, pursuant to § 1746 of Title 28 of the United States

Code, declares the following to be true and correct under penalty of perjury under the laws of the

United States of America:

      1.  I am currently employed by SUNY Upstate Medical University ("UMU") as a

Distinguished Service Professor and the Division Chief of Endocrinology, Diabetes and

Metabolism. I have been on the faculty at UMU since 1984 and I have been licensed to practice

medicine for over 40 years.

      2.  I make this Declaration based upon my personal knowledge.

      3.  I participated on a search committee for a new Chair of UMU's Department of

Medicine. The search committee convened in 2018 and committee members searched for, and

interviewed candidates. The committee recommended certain individuals to be put forward for

1

consideration for the position. Plaintiff, who was the Dean of the College of Medicine at that time, moved forward at least one applicant that the committee had already rejected.

4.   I felt Plaintiff's behavior to be inappropriate, and accordingly, I approached interim President Mantosh Dewan with my concerns. I communicated with President Dewan regarding Plaintiff's interference in the search process. As a result, President Dewan spoke with the committee members about my concerns. They reiterated similar concerns about Plaintiff's subversion of the search process.

5.   As a result, President Dewan advised Plaintiff to call off the search, which essentially resulted in months of wasted time for the committee members, all of whom are very busy doctors and faculty members.

Dated:        June 4, 2024
              Syracuse, New York

_Ruth S. Weinstock_ MD PhD
_____
Ruth Weinstock, MD, PhD

2

A-1075

**UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK**

.......................................................................................X

**JULIO LICINIO, MD, PhD, MBA, MS,**

<table>
<tr><td style="text-align:center">Plaintiff,</td><td><b>DECLARATION OF<br>SHARON A. BRANGMAN, MD</b></td></tr>
<tr><td></td><td>Case No.: <b>5:21-cv-387(GTS/TWD)</b></td></tr>
</table>

- against -

**STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,**

Defendants

.......................................................................................X

**SHARON A. BRANGMAN, MD**, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.      I am a geriatrician and have been licensed to practice medicine since 1982. I am currently employed by SUNY Upstate Medical University ("UMU") as Distinguished Service Professor and Chair of the Department of Geriatrics and have been employed by UMU since 1989. I was appointed as the inaugural Department Chair of Geriatrics in July 2018, when the Department of Geriatrics was created by former President Danielle Laraque-Arena.

2.      I make this Declaration based upon my personal knowledge.

3.      During the time that Plaintiff was Dean, I interacted with him on a number of occasions, particularly in my role as the Geriatrics Department Chair when I reported to him directly. My interactions with Plaintiff, or lack thereof, were frustrating. I found him to be an

1

ineffective leader who was difficult to communicate with and exhibited bizarre, unusual, and inappropriate behavior.

4.     After Dr. Laraque-Arena had created the Department of Geriatrics and Plaintiff appointed me Chair, I needed a financial package to operationalize the Department. I reached out to Plaintiff multiple times requesting assistance putting together a Departmental financing plan but he never responded to my requests.

5.     In approximately March 2019, I contacted President Dewan and relayed that Plaintiff had been non-responsive to my requests to help me get financial support for the Geriatrics Department for almost a year, and his lack of responses was preventing me from getting my Department up and running.

6.     I also relayed to President Dewan other concerns about Plaintiff making inappropriate comments and not behaving appropriately as Dean. By way of example, I shared with him that, during an admissions committee end of year dinner which I had attended along with Plaintiff, other faculty and students, Plaintiff told several students and faculty a story about a patient who he treated at University of Miami where he used to work. As part of the story, Plaintiff shared explicit details about the sexual issues that the individual was having. I was shocked that Plaintiff shared this story at this dinner, much less at all, and viewed it to be uncalled for, tactless, and inappropriate.

7.     I further shared with President Dewan my concerns about Plaintiff's attempt to subvert a search committee process that I had been involved in. I was co-chair of a search committee for a new Chair of the Department of Medicine, with Dr. Lawrence Chin. During the search, Plaintiff attempted to interfere with the search committee's process by selecting individuals

2

whom he personally knew, but whom the committee deemed were not qualified. The members of the search committee complained about Plaintiff's subversion of the process.

8.      After requesting assistance from President Dewan, he assembled a leadership team to assist me in securing financing for my Department. I do not believe that this would have gotten done without Dr. Dewan's assistance.

9.      After that, I began communicating directly with President Dewan instead of Plaintiff because President Dewan was responsive to me. However, in approximately the Summer of 2019, Plaintiff instructed me not to go to Dr. Dewan and to go to Plaintiff with Departmental issues instead. On August 13, 2019, Plaintiff held a 7am meeting with Department Chairs and scolded all Chairs, telling them that they were not to go to Dr. Dewan with concerns. This put me in a challenging situation as, in my experience, Plaintiff was either not responsive or not assisting in addressing the Department matters that I brought forward to him. Dr. Dewan, on the other hand, helped me to move matters forward.

10.      On September 2, 2019, Dr. Dewan reached out to me by email to inform me that we should move forward on recruiting researchers with the EIP grant dollars that we had been awarded. I relayed to President Dewan via email that I would like to do that, but that Plaintiff was continuing to refuse to assist me and downplayed the importance of the grant dollars that I had been awarded. I also relayed that Plaintiff had chastised the clinical chairs for "going around him" to talk to President Dewan so I was not sure how to proceed in utilizing the grant without his support. See, **Exhibit "A."**

11.      Around the same time, I observed additional instances of Plaintiff behaving strangely and being ineffective in his role. In late August 2019, I attended a Department Chairs meeting in which Plaintiff spoke about incoming students whom he identified as "Generation Z."

3

A-1078

Plaintiff told the Chairs at the meeting that Generation Z was focused on diversity and discrimination, and has the highest levels of depression, anxiety and ADHD. He then played music that he said Generation Z listens to as part of his presentation. When it was over, another Chair asked him what action item would be taken to address the issue that he was raising. Plaintiff replied that there were no action items planned and that he just wanted Chairs to be aware. The meeting itself was bizarre and unproductive.

12.     On August 22, 2019, I attended a white coat ceremony, which was attended by incoming first-year medical students and their families during which students received white doctors' coats to honor their entry into medical school. When Plaintiff addressed students and their families during this honorary ceremony, he inappropriately spoke at length about student suicide and depression. This ceremony was a first impression of UMU for these students and their families so Plaintiff's decision to raise these topics at the ceremony was highly inappropriate.

Dated:       June 5, 2024
             Syracuse, New York

                                         Sharon A. Brangman, MD
                                    _____
                                       Sharon A. Brangman, MD

4

A-1079

**Michael V. Jurbala**

| | |
|---|---|
| **From:** | Sharon Brangman <brangmas@upstate.edu> <brangmas@upstate.edu> |
| **Sent:** | Monday, September 2, 2019 11:30 AM |
| **To:** | Mantosh Dewan |
| **Cc:** | Eileen Pezzi |
| **Subject:** | Re: Research |

Hi Mantosh,

I know. This issue has been top of my list but I need some help. I met with Julio the other day since I need assistance identifying someone in the basic sciences and the pragmatic way to get them to campus etc for one of the EIP positions. The clinical/translational EIP position would likely be in Neurology since that's the specialty doing dementia research. I need some other eyes and hands to assist me in surveying the national landscape and I was thinking today that maybe I'd contact Louis Mejico.

Plus I have tons of clinical work to do, 2 grants I'm launching and nursing admin at 550 that's systematically breaking down the nurses in my office which threatens my clinical team....so lots of things taking my attention all at once.

Also, Julio played down the value of EIP money since it doesn't come with a state line as in years past and is less money than in previous years. He told me these funds should just be part of my Chair "package" which I told him doesn't make sense and won't help me in terms of Geri faculty and growing Geriatrics. EIP was targeted to support the Nappi Longevity Institute and start our Alzheimer's Reseach program going. Julio then said he would use the basic science funds of EIP for a position in pharmacology which he told me he would "take care of". Apparently they are recruiting in pharmacology. So now I'm totally confused since this wasn't really the point of my meeting with him. I need support/assistance in fulfilling the EIP as it was written. Julio also chastised the clinical Chairs last week for going "around him" to you with Dean issues.

Trying to sort this all out and get the work done.

Sharon

Sent from my iPhone

> On Sep 2, 2019, at 4:07 AM, Mantosh Dewan <DEWANM@upstate.edu> wrote:
>
> Dear Sharon,
>
> Would love to move forward on the research recruitments. They start pressuring us to take the EIP monies back if we don't use them within a year or so. Also, would like to leverage a real person [or two] and get matching money from Sam.
>
> Could you target a few potential well funded folks please. Let's go after them...
>
> Thanks and warm regards
> Mantosh

Licinio v. SUNY Upstate, et al., 5:21-CV-387   005029

A-1080

UNITED STATES DISTRICT
COURT NORTHERN DISTRICT OF
NEW YORK

......................................................................X

JULIO LICINIO, MD, PhD, MBA, MS,

                              Plaintiff,                    REPLY DECLARATION OF
                                                           ERIC FROST

                                                           Case No.: **5:21-cv-387(GTS/TWD)**

        - against -

**STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE
STATE UNIVERSITY OF NEW YORK
UPSTATE MEDICAL UNIVERSITY,**

                              Defendants
......................................................................X

        **ERIC FROST**, pursuant to § 1746 of Title 28 of the United States Code, declares the

following to be true and correct under penalty of perjury under the laws of the United States of

America:

        1.       I submit this declaration in further support of Defendants' motion for summary

judgment.

        2.       In his opposition papers, Plaintiff contends that I testified at my deposition that a

contributing factor in Plaintiff's removal as Dean was Plaintiff's intent to promote diversity. This

is simply untrue and a mischaracterization of my deposition testimony.

        3.       During my deposition, Plaintiff's counsel asked me whether Plaintiff was

promoting diversity efforts during his time as Dean, to which I replied that I believed he was. See,

**Exhibit A,** at 56.  I then went on to discuss some of Plaintiff's actions as Dean with respect to

creating new positions, such as the Assistant Dean of Diversity and Inclusion. Id., at 56-57.  I

1

testified that it was frustrating for me from a Human Resources perspective, because Plaintiff failed to consult with me, as Associate Vice President for Human Resources, before he established those roles. Id., at 57-58. I specifically testified that I believed Plaintiff's intent was good, but that the way he went about creating those roles was troublesome. Id., at 57.

4.      When Plaintiff's counsel asked me whether Plaintiff's "intents" were grounds for his demotion, I understood that to mean—was the inappropriate way that he went about creating those diversity roles grounds for his demotion? I replied that I believed it [the demotion] was [due to] a multitude of things, but "it could have been part of it." What my answer was referring to is connected to my testimony immediately prior and immediately after that question. I testified that Plaintiff was assigning management confidential titles to faculty members (without consulting with the Human Resources department) and Plaintiff was giving "also receives" compensation to the individuals for whom he was creating roles—an area for which SUNY Upstate was audited by the Office of the New York State Comptroller. Id., at 58-59.

5.      In his opposition papers, Plaintiff misrepresents my deposition testimony and takes it out of context. My testimony was in no way meant to insinuate that Plaintiff was removed from his Dean position, either in whole or in part, because he supported and promoted diversity. My testimony both before and after my statement that "it could have been part of it" makes it clear that this was not my intent. Instead, what I meant was that Plaintiff's actions of: (a) unilaterally creating management/confidential positions for union-represented faculty, and (b) issuing "also receives" compensation without documentation to substantiate the additional compensation, could have factored into his removal.

6.      The Office of the New York State Comptroller's audit of SUNY Upstate's practices

2

specifically found that the College of Medicine was inappropriately issuing "also receives" to faculty members for roles without proper substantiating documentation. It determined that this practice was inappropriate since the faculty members were receiving State dollars to hold these titles without proper documentation to justify the additional compensation. Id., at 58:14-59:25. A copy of the OSC audit can be found at https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2019-18s57.pdf and is attached to my original declaration. See, ECF No. 73-39 at 7.

7.     President Dewan ultimately made the decision to remove Plaintiff from the Dean position, which I supported. At no time did President Dewan ever state or even imply that his decision to remove Plaintiff was because Plaintiff was promoting diversity. President Dewan informed me of many other reasons for Plaintiff's removal, such as: Plaintiff making indiscrete and inappropriate comments during meetings and presentations (including to students), verbally attacking the President during a recent meeting, and instructing Department Chairs not to go to President Dewan with concerns. See, ECF No. 73-36, ¶ 17.

8.     As I stated in my previous Declaration, and at my deposition, Plaintiff gave titles and additional compensation to faculty that were not appropriate. See, ECF No. 73-36, ¶ 9; Exhibit A at 37-38, 56-57. This behavior was problematic and I explained to Plaintiff that he could not unilaterally assign roles and titles to union-represented faculty. ECF No. 73-36, ¶9; Exhibit A at 37. My previous Declaration further detailed other instances in which Plaintiff exercised poor judgment, as did my deposition testimony. Id., ¶¶ 12-17; Exhibit A at 37-43, 56-59.

9.     Diversity was important to SUNY Upstate while Plaintiff was Dean, and in fact, after Plaintiff was removed, I worked with Dean Chin and President Dewan to reorganize the Office of Diversity and Inclusion and to appoint a new Chief Diversity Officer to focus on setting high level strategic diversity initiatives. ECF No. 73-36, ¶ 11.

3

10.     Plaintiff's Declaration states that the titles/roles he assigned to non-union represented faculty are "routinely given to union members…when the management/confidential roles are not over 50% effort, which was the case in all of my appointments." ECF No. 78-4, ¶ 201. This is not accurate. Simply put, if an administrative role was less than 50% and the employee continued to serve in a position that fell within a state negotiating unit, s/he could not be given a management/confidential title for an additional role. The titles of "Assistant Dean" and "Director" were not appropriate, which can be confirmed via the SUNY website. *See* https://www.suny.edu/hr/compensation/unclassified/a/assistant-dean-medicine-sl6/, https://www.suny.edu/hr/compensation/unclassified/d/director-mp/

11.     In his Declaration, Plaintiff further contends that "multiple" staff and students reported discrimination to him while he was Dean. ECF No. 78-4, ¶ 199. While Plaintiff was Dean, the Office of Diversity and Inclusion ("ODI") was responsible for receiving complaints and concerns of discrimination and harassment and conducting investigations into those complaints. Had Plaintiff been so concerned about these alleged discrimination complaints, he could have interfaced with ODI to address these concerns instead of taking inappropriate unilateral action and inviting students to email him directly. Interestingly, Plaintiff does not indicate that these complaints were reflected in the LCME accreditation survey.

12.     Additionally, Plaintiff insinuates that the staff and students with complaints did not "trust HR to deal with their complaints." Id., ¶ 200. Plaintiff knew as Dean that complaints of discrimination are not reported to Human Resources and that Human Resources does not play a

4

A-1084

role regarding a student's complaint of discrimination unless they are employed by UMU or an incident involves one or more employees. Again, if Plaintiff was concerned about student complaints of discrimination, he could have and should have directed those individuals to ODI—or reported them to ODI himself, as he was required to do in his role as Dean.

Dated:     June  3 , 2024
           Hilton Head, South Carolina            Eric Frost

Case 5:21-cv-00387-GTS-TWD   Document 81-6   Filed 06/06/24   Page 1 of 11

Page 37

                              FROST
1
2       the decision-making process.
3            Q.    Okay.  Did you ever personally
4       suggest to Dr. Licino that there were any
5       performance issues that he had incurred
6       during his time as Dean?
7            A.    I think there were -- a number
8       of things that occurred, that, with me,
9       wearing a human resources hat, I disagreed
10      with, and I think some of them did cross
11      the line, in my opinion.
12               A couple of examples I can
13      think of is; he gave roles to faculty, and
14      gave them titles that were not appropriate.
15               I explained that to the Dean,
16      and he didn't -- comply.  That was with
17      guidance with SUNY's administration.
18               I can also recall another time
19      where he put out a communication wanting
20      all complaints of discrimination,
21      harassment, etcetera, to go through him.
22               That was not consistent with
23      Upstate policy, and was not appropriate.
24               Another thing that kind of came
25      up that struck me -- that comes to mind --

Page 38

1                        FROST
2   is he -- at least it's my understanding --
3   it was even something that came up -- but I
4   think he involved himself in matters
5   involving his spouse's salary and
6   compensation.
7              I -- I was an ethics officer
8   for ten years, and I think, in my personal
9   opinion, it's not a direct violation, it
10  certainly is skirting close to being that
11  of a violation of Public Officer's Law,
12  SUNY policy, and Upstate policy, to involve
13  yourself in any matter, employment action,
14  taken with your relative, including spouse.
15  So that was somewhat concerning to me.
16        Q.    All right.  Now --
17        A.    I struggle a little bit with
18  some of his decision making with respect to
19  chairs.
20              I think he did not -- he wanted
21  harmony, he did not want to rock the boat
22  that much.  But there were some issues with
23  some chairs that he tended, not to take a
24  real strong position, and rather, continue
25  as is, rather than make -- maybe make

A-1087

Page 39

1                    FROST

2    harder decisions, in my opinion, may have

3    been more appropriate.

4         Q.    Let's unpack that a little.

5         A.    Yes.

6         Q.    So the first point you

7    mentioned was an e-mail, I think it was the

8    first or it might have been the second, but

9    it was early you stated, I believe, that he

10   sent an e-mail saying that all complaints

11   of discrimination, harassment, are to go

12   through him.

13             He said, all; is that correct?

14        A.    I would have to -- again, that

15   was a long time ago -- I would have to --

16   pull up the e-mail and look.

17        Q.    All right.

18        A.    I think he means, within the

19   College of Medicine, for medical students,

20   residents staff, etcetera; that's the way I

21   took it.

22        Q.    You said that that is a

23   violation of SUNY policies?

24        A.    Correct.

25        Q.    And earlier you did say that

Page 40

```
 1                    FROST
 2   one of the ways that discrimination is
 3   reported is through the -- is up the chain
 4   of command -- or -- you know -- through the
 5   Dean -- you did say that, right?
 6        A.    Correct.
 7        Q.    All right.
 8        A.    I think the issue was saying
 9   all.  He was making it look like he was
10   filtering or he had to be the step in the
11   process.
12        Q.    So that's why I'm -- kind of
13   trying to nail down whether he said, all,
14   because that is important; would you agree?
15        A.    Yes, yup.
16        Q.    So him saying, all, is a
17   violation of policies.
18            So you testified that if he
19   said, all, that would be a violation of
20   policies?
21            I'm wondering, what policies,
22   what written policies, are there that he
23   would be violating?
24        A.    I'm not as familiar with the
25   ones that apply to students, but I think
```

Case 5:21-cv-00387-GTS-TWD   Document 81-6   Filed 06/06/24   Page 5 of 11

Page 41

```
 1                    FROST
 2   there are policies that apply specifically
 3   to students that could report via, over
 4   alternative means.
 5              For Upstate, we have got a
 6   non-discrimination and E.E.O. policy.
 7              There is a complaint process.
 8              There is -- on our internet,
 9   all of those are posted that explain
10   offices that can provide information and
11   accept information and complaints.
12        Q.    All right.  Do you know what
13   prompted this e-mail?
14        A.    I don't.
15        Q.    All right.
16        A.    I became aware of it when our
17   union, that represents our faculty, brought
18   it to my attention.  And that's when I
19   alerted the Dean.
20              And then I assisted him, I
21   believe, in sending -- again, I'm going
22   from memory -- sending out a clarifying
23   e-mail which -- made the union not pursue
24   more formal action.
25        Q.    All right.  So you interacted
```

Case 5:21-cv-00387-GTS-TWD   Document 81-6   Filed 06/06/24   Page 6 of 11

Page 42

```
1                    FROST
2    with Dr. Licino at or around the time of
3    this e-mail, let's say, shortly thereafter?
4         A.    Correct.
5         Q.    And do you know when that was?
6         A.    Oh, boy?  I could not even
7    venture a guess.  It was several years ago,
8    but I don't know what year.
9         Q.    All right.  So Dr. Licino was
10   demoted in September 2019; would that make
11   sense?
12        A.    Again, I don't know the exact
13   date, but sounds like it could be, sure?
14        Q.    It doesn't sound wrong?
15        A.    No.
16        Q.    All right.  Now, do you know
17   how close in time this e-mail was to the
18   demotion?
19        A.    It wasn't real close, but I
20   could not give you an exact timeframe.
21        Q.    All right.  Did you interact
22   with the President of the college, about
23   this e-mail?
24        A.    I do not recall doing so.
25        Q.    And you use the phrase -- I
```

Case 5:21-cv-00387-GTS-TWD   Document 81-6   Filed 06/06/24   Page 7 of 11

Page 43

1                          FROST

2      believe you said -- that the union -- the

3      follow up e-mail that you helped Dr. Licino

4      with, allowed the union not to take further

5      action; is that right?

6          A.    Yes.

7          Q.    Okay.  Do you know whether the

8      union considered that matter resolved?

9          A.    I don't recall exactly.  They

10     must have thought it was resolved to some

11     extent.

12              We -- at least in my opinion --

13     we have a very good relationship with them,

14     and they do give us some latitude.

15              But they must have thought it

16     was resolved, at least to some extent, or

17     they would have -- they're not shy in

18     pursuing formal action, when it's

19     appropriate.

20         Q.    All right.  And you mentioned

21     Dr. Licino involving himself in matters

22     concerning his wife, okay?

23         A.    (Indicating.)

24         Q.    That's Dr. Molly Wong; is that

25     correct?

A-1092

Page 56

```
 1                    FROST
 2   people in key roles now.
 3        Q.    All right.
 4        A.    I think Darrell Dicks is the --
 5   Chief Diversity Officer -- and a very, very
 6   highly respected and phenomenal
 7   credentials.
 8              I think they are making
 9   positive en routes, even some of the things
10   I'm following, I think they are making very
11   positive changes because it's the right
12   thing to do.
13              But also for accreditation
14   purposes and -- I think SUNY has gotten --
15   more serious about it as well.
16              So -- you know, it could --
17   could it have been better?  Yes.
18              But I think it's on the road,
19   at this point, to getting where it needs to
20   be.
21        Q.    That's good.  Good.
22        A.    (Indicating.)
23        Q.    Now, was Dr. Licino promoting
24   diversity efforts during him time as Dean?
25        A.    I believe he did.  He assigned
```

A-1093

Page 57

```
 1                      FROST
 2   -- that was part of what I referred to
 3   earlier -- where he gave what really
 4   amounted to as an M.C. of management
 5   confidential titles to faculty members.
 6              I think the intent was good.
 7              It was how it was done.
 8              But he appointed -- I think
 9   Assistant Dean of Diversity and Inclusion.
10              I think he even named someone
11   to help with disabled individuals.
12      Q.    All right.
13      A.    He had someone that was -- a
14   specific to native American Indigenous
15   population.  So he did make some roles
16   there.  I think a lot of it -- or at least
17   some of it -- was in preparation for LCME.
18              And some of some of it was
19   just, again, because it was the right thing
20   to do and -- (Indicating.)
21              I guess the question is; is how
22   successful some of those roles have been?
23              And I guess the other part of
24   it -- again, a little frustrating for me --
25   human resources was not consulted before he
```

A-1094

Page 58

```
 1                    FROST
 2   established those roles.
 3            So, again, I think the intent
 4   is good.  I think they were trying to move
 5   in the right direction.
 6            I'm not sure if they did it
 7   exactly the way that I would have done it?
 8            But he was, at least, showing
 9   an intent to try to improve, I think.
10       Q.    Were those intents, grounds for
11   his demotion?
12       A.    I think it was a multitude of a
13   lot of things.  I think it could have been
14   part of it.
15            Something I did not mention is
16   that, one of the audits that we were
17   audited on was for additional compensation,
18   referred to by SUNY as Also Receives.
19            Also Receives, that's extra
20   money for going above and beyond your
21   normal professional obligation.
22            So, normally a faculty member
23   teaches, performs clinical work, university
24   service, this was above; so they got Also
25   Receives.  And we got dinged on our audit
```

A-1095

Page 59

```
1                    FROST
2  of State Comptroller because it was not
3  appropriate documentation; and a good
4  number of those cases where in the College
5  of Medicine.
6              But, again, it could have been
7  just a long-standing practice, but it was
8  something that had to get cleaned up within
9  the College of Medicine.
10             But these individuals were all
11  given, Also Receives, for the additional
12  work that they performed.
13      Q.    The comptroller ultimately
14  approved these additional pays?
15      A.    We process that locally.
16             They did not -- you know,
17  discharge or interrupt those payments.
18             It was more of an issue of, did
19  we have adequate documentation in our files
20  to explain what the extra duties were, and
21  how the compensation amount was calculated.
22      Q.    All right.
23      A.    We had to establish a tighter
24  parameters around that, which we did, when
25  we responded to that audit.
```

A-1096

**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF NEW YORK**

.........................................................................X

**JULIO LICINIO, MD, PhD, MBA, MS,**

                                   Plaintiff,          **DECLARATION OF**
                                                       **JULIE R. WHITE, PhD**

                                                       Case No.: **5:21-cv-387(GTS/TWD)**

                    - against -

**STATE OF NEW YORK, THE STATE UNIVERSITY OF NEW YORK, and THE STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,**

                                   Defendants
.........................................................................X

     **JULIE R. WHITE, PhD**, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

     1.    I am currently employed by SUNY Upstate Medical University ("UMU") as the Associate Vice President for Educational Services and Dean of Student Affairs and have been employed by UMU since November 2007.

     2.    I make this Declaration based upon my personal knowledge.

     3.    As Associate Vice President for Educational Services and the Dean of Student Affairs, I oversee all aspects of student affairs in UMU's four colleges: the College of Medicine, the College of Health Professions, the College of Graduate Studies, and the College of Nursing. My duties include overseeing student admissions, multicultural student affairs, the library, student

1

life, student concerns and complaints, financial aid, student career development plans, among other matters relating to students.

4.      I have served as Dean of Student Affairs for the entire duration of my employment at UMU since November 2007.

5.      I was appointed Associate Vice President of Educational Services on April 1, 2018 by Plaintiff Julio Licinio, who was my direct supervisor while he was UMU's College of Medicine Dean. A copy of the UMU organizational chart as of July 17, 2019, is attached as **Exhibit "A."**

6.      I have read the portion of Plaintiff's declaration sworn to on May 9, 2024 that relate to me and my commitment to diversity in my role.

7.      If Plaintiff felt that I was not adequately performing my duties as Dean of Student Affairs, as my supervisor, he had the ability to address those concerns with me directly. However, Plaintiff never provided me with any constructive feedback or criticism about my work performance in general or with respect to my efforts related to diversity and inclusion.

8.      Instead, Plaintiff appointed me Associate Vice President of Educational Services in April 1, 2018 and, in his final performance evaluation of me while he was Dean in January 2019, rated my performance as having "exceeded expectations" overall. See, **Exhibit "B,"** at 4.  He specifically rated me as having "exceeded expectations" with respect to supporting diversity and Office of Inclusion programs, fostering a culturally diverse and inclusive environment, and in all areas of professional development. Id. at 2. In my evaluation, Plaintiff's only comment was: "Outstanding performance." Id., at 4.

9.      My significant accomplishments for 2017 are attached to my evaluation as well, which include: "Demonstrated the need for and received funding for new positions in Multicultural Affairs, Academic Support and Admissions;" "Responded, in real time, to triggering political and

2

social events affecting our students" (this refers to the Black Lives Matter movement); and "Supported 105 CSTEP-eligible students through active programming, counseling, and academic enrichment" (CSTEP is the Collegiate Science and Technology Entry Program).

10.     The purpose of the CSTEP program is to increase the number of students from underrepresented groups who are pursing professional licensure and careers in mathematics, science, technology and health related fields. In 2020 our CSTEP-eligible students increased to 160 as I became the Principal Investigator on that grant for another cycle.

11.     Plaintiff states in his Declaration that the Division of Student Affairs was "plagued" by multiple complaints of discrimination. ECF No. 78-4, ¶ 65. This characterization is hyperbole. Based on my recollection, there were 2-3 complaints filed while Plaintiff was Dean. When the complaint referenced in Plaintiff's Declaration (id., ¶66) was filed, Plaintiff was still my supervisor and was very supportive. He offered to assist me in any way he could, assuring me that he thought that the complaint was not legitimate.

12.     The assertions that Plaintiff now makes in his Declaration, including that I lacked a commitment to diversity, that I did not actively work with students from marginalized backgrounds, and that I "never showed interest in the plight of the 'lost students'" (ECF No. 78-4, ¶ 71) are directly contradicted by his evaluation of my performance while he was actually my direct supervisor from July 2017 through September 2019. See, Exhibit "B."

13.     I echo President Dewan's concerns about administrative "bloat." While Plaintiff was Dean, Plaintiff proposed the creation of a new Associate Dean for Student Advising position (referred to as the "Director of College of Medicine Career Development" in Plaintiff's Declaration) to oversee the career development plans of all students in the College of Medicine. ECF No. 78-4, ¶ 74. However, part of my duties as the Dean of Student Affairs already included—

3

and still include—student advising relating to career development. Both President Dewan and Plaintiff are correct that I had concerns that Plaintiff was attempting to create a position that overlapped with student affairs' already existing duties. My team was already engaged in many of the tasks that this position would be given. I spoke with President Dewan about my concerns, expressing that I did not believe that a dedicated Dean position was necessary and that creating such a position would be duplicative and inefficient.

14.     Plaintiff contends that I was insulted that I was not included in the search for the new Director and that after his removal, the search was discontinued. Id., ¶¶ 80-81. Plaintiff did ask Associate Dean Huard and myself to review a resume of the spouse of a recent faculty hire for this position, but I do not recall there being a formal search. Regardless, neither Associate Dean Huard nor I found the person qualified for any position in Student Affairs at that time.

15.     Further, Plaintiff appointed Dr. Tovar-Spinoza to a diversity position in the College of Medicine. He relayed to me that Dr. Tovar-Spinoza's gender and background would advantage UMU despite her lack of leadership. I found her to be ineffective in this role despite regular monthly meetings. Associate Dean Sharon Huard and I met with Dr. Tovar-Spinoza several times in an effort to bring her up to speed on medical education and student-related issues, but it proved to be unproductive.  When I brought my concerns about Dr. Tovar-Spinoza's ineffectiveness to Plaintiff, my concerns were ignored. This demonstrated to me that the *appearance* of a commitment to diversity and to improving students' experience at UMU was more important than actually following through on that commitment.

16.     Plaintiff states in his Declaration that he worked to address the decline in minority enrollment by recruiting minority faculty and creating institutional partnerships offering "novel" accelerated combined BS/BA-MD programs. ECF No. 78-4, ¶ 28. However, in practice, these

4

A-1100

partnerships did not result in increased diversity. In fact, the opposite is true, which led to the recent discontinuation of the Accelerated Scholars Program.

Dated:    June ___, 2024
          Syracuse, New York

Julie R. White, PhD

5

Case 5:21-cv-00387-GTS-TWD   Document 81-8   Filed 06/06/24   Page 1 of 1



A-1102

**SUNY UPSTATE**
**M/C Performance Appraisal Form**

Employee Name: **JULIE WHITE**                Employee ID#: **77187**

Job Title: **ASSOC VICE PRESIDENT**           Descriptive Title: _____

Department: **STUDENT AFFAIRS**               Supervisor's Name: **JULIO LICINIO**

Period Covered by this Appraisal: **4/1/2018 to 12/31/2018**    Discussed with Employee on: _1/29.19_

| INSTRUCTIONS: | Complete section A of this form for all staff members. |
|---|---|
| | Complete sections A & B of this form for staff with **supervisory & budgetary responsibilities**. |

*Refer to the following definitions and <u>circle</u> the appropriate abbreviation for each performance statement.*

### Definition of Ratings

| | |
|---|---|
| **EE – Exceeds Expectations** | Performance consistently exceeds expectations of current position. Demonstrates initiative and teamwork, and requires minimal direction and guidance. |
| **E – Effective** | Performance is at an acceptable level. |
| **ME – Minimally Effective** | Performance is at a minimally acceptable level. Employee requires prompting, guidance or direction to take action. There is need for improvement in one or more areas of performance. |
| **DNM – Does Not Meet Expected Level** | Performance does not meet minimally acceptable standards. There is need for immediate and significant improvement. |
| **N/A – Not Applicable** | This item does not apply. |

<u>Section A:</u>

**1. ACCOUNTABILITY**                              <u>**Please Circle Rating**</u>

| | | | | | | |
|---|---|---|---|---|---|---|
| A. | Stated goals and objectives are met; work assignments and resources are effectively managed to complete tasks in a timely and effective manner. Reports are submitted in a timely fashion. | (EE) | E | ME | DNM | N/A |
| B. | Overall employee performance meets the reasonable expectations of customers and administration. | EE | (E) | ME | DNM | N/A |
| C. | Problems are presented with alternative solutions and recommendations. | (EE) | E | ME | DNM | N/A |
| D. | Consistently meets all applicable mandatory, compliance, and accreditation standards, and satisfactorily handles related reviews/audits. | (EE) | E | ME | DNM | N/A |
| E. | Takes responsibility for own actions and work outcomes. | (EE) | E | ME | DNM | N/A |
| ***OVERALL CATEGORY RATING:*** | | (EE) | E | ME | DNM | N/A |

Comments:

A1102

**2. ORGANIZATIONAL AND PERSONAL INTERACTION**          **Please Circle Rating**

A.  Supports goals and objectives of the University; long-range     EE   (E)   ME   DNM   N/A
    unit/department plans reflect initiatives in support of engaging
    Upstate's Mission, Vision and Values.

B.  Demonstrates awareness of the relationship between department    (EE)   E   ME   DNM   N/A
    function and the total Upstate operation and works effectively with
    other departments on joint projects or issues.

C.  Contributes to a professional environment for customers,         (EE)   E   ME   DNM   N/A
    employees, patients, visitors, and other staff demonstrating the
    University's values and beliefs.

D.  Behaves in a professional and respectful manner, modeling the Upstate   (EE)   E   ME   DNM   N/A
    Code of Conduct, and expects that direct reports do the same.

*OVERALL CATEGORY RATING:*                                           (EE)   E   ME   DNM   N/A
Comment:

_____

**3. COMMUNICATION**                                        **Please Circle Rating**

A.  Communicates effectively with supervisor, peers, and customers
    Demonstrates written and oral communication skills
    consistent with the position requirements.                       (EE)   E   ME   DNM   N/A

B   Maintains well-defined lines of communication at all levels.     (EE)   E   ME   DNM   N/A
    Supervisor is consulted, when appropriate, and made aware
    of changes/plans affecting them or the unit/department's operation.

C   Information flow is timely, complete, and accurate.              EE   (E)   ME   DNM   N/A

D.  Respects confidentiality.                                        EE   (E)   ME   DNM   N/A

*OVERALL CATEGORY RATING:*                                          (EE)   E   ME   DNM   N/A
Comments:

_____

**4. PROFESSIONAL DEVELOPMENT**                             **Please Circle Rating**

A.  Participates in learning opportunities which contribute          (EE)   E   ME   DNM   N/A
    to the enhancement of job performance and/or career advancement.

B.  Consistently demonstrates competence and initiative.            (EE)   E   ME   DNM   N/A

C.  Supports Diversity and Office of Inclusion programs             (EE)   E   ME   DNM   N/A
    and fosters a culturally diverse and inclusive environment.

D.  Participates in organizations and committees which enhance       (EE)   E   ME   DNM   N/A
    professional development and performance.

*OVERALL CATEGORY RATING:*                                          (EE)   E   ME   DNM   N/A
Comments:

_____

A-1104

**5.  SELF MANAGEMENT**                                          **Please Circle Rating**

A.   Consistently meets established goals, objectives, and timeframes     (EE)   E   ME   DNM   N/A
      as established.  Demonstrates ability to work independently.

B.   Exercises sound judgment in the decision-making process; applies     (EE)   E   ME   DNM   N/A
      creativity in accomplishing assigned responsibilities, problem
      solving, and in the utilization of resources.

C.   Keeps abreast of, and implements as appropriate, technical knowledge,  (EE)  E   ME   DNM   N/A
      and advances related to the position.

***OVERALL CATEGORY RATING:***                                   (EE)   E   ME   DNM   N/A
Comments:

---

**Section: B**

**1.  BUDGETARY/FISCAL MANAGEMENT**                              **Please Circle Rating**

A.   Unit/departmental budget is correctly and completely prepared,     EE   (E)   ME   DNM   N/A
      and submitted on a timely basis.

B.   Unit/departmental budget is prudently administered and            EE   (E)   ME   DNM   N/A
      unanticipated expenses are minimized by appropriate planning.

C.   Contributes to financial viability of Upstate by suggesting and/or   EE   (E)   ME   DNM   N/A
      implementing cost-saving measures within the unit/department.

***OVERALL CATEGORY RATING:***                                   EE   (E)   ME   DNM   N/A
Comments:

---

**2.  LEADERSHIP AND MANAGEMENT**                               **Please Circle Rating**

A.   Mission, goals, policies and priorities have been effectively      (EE)   E   ME   DNM   N/A
      communicated to all staff and are consistently monitored.

B.   Ensures timeliness of performance evaluations, sets measurable     (EE)   E   ME   DNM   N/A
      goals for staff, and provides constructive feedback regarding
      successes and opportunities for growth.

C.   Demonstrates acceptable managerial techniques with respect to      (EE)   E   ME   DNM   N/A
      coaching, counseling, delegation, encouraging employee feedback,
      documentation, and progressive corrective action.

D.   Structures projects and assignments to strengthen teamwork among   (EE)   E   ME   DNM   N/A
      employees.  Consistently practices and emphasizes the importance of
      teamwork in the department and cross functionally.

E.   Ensures requests for new and vacant positions are submitted        (EE)   E   ME   DNM   N/A
      accurately and timely with the appropriate hiring director.

F.   Demonstrates leadership ability in specialty area or department.    (EE)   E   ME   DNM   N/A

G.   Creates a positive environment for employee recognition in order to  (EE)  E   ME   DNM   N/A
      increase employee satisfaction.

**_OVERALL CATEGORY RATING:_**
Comments:

(EE)   E      ME      DNM    N/A

**_ACCOMPLISHMENTS_**

Period:   From **4/1/2018** to **12/31/2018**

Summarize accomplishments achieved during this rating period to include outcomes from the program goals.

*see attached*

---

**_PLEASE CIRCLE OVERALL EVALUATION RATING:_**

(EE)   E      ME      DNM   N/A

**Supervisor's Comments:**

*Outstanding performance*

**Supervisor's Signature:** _____   **Date:** 1/29/2019

**Employee's Comments (Optional):**

I have read and understand this evaluation and discussed it with my supervisor.

**Employee's Signature:** _____   **Date:** 1/29/19

A1105

***PROGRAM GOALS***                              ***NAME:*** **JULIE WHITE**

Period:  From <u>1/1/2019</u> to <u>12/31/2019</u>

List expectations based on metrics and timeframes derived from discussion between the manager and the employee.

*See attached*

I have reviewed these goals and discussed them with my supervisor.

**Employee's Signature:** _____     **Date:** _1/29/19_

Rev. 12/7/2018

Julie R. White, PhD
Division of Student Affairs

**Significant Accomplishments:  Calendar Year 2017**

<u>University Wide</u>
- Ensured compliance with state and federal mandates relative to sexual assault, Title IX, and others.
- Completed internal program reviews for each office in preparation for Middle States Self-Study.
- Demonstrated the need for and received funding for new positions in Multicultural Affairs, Academic Support and Admissions
- Aligned functions and activities in Student Affairs to the University's Strategic Plan
- Responded, in real time, to triggering political and social events affecting our students
- Supported 105 CSTEP-eligible students through active programming, counseling, and academic enrichment
- Developed robust financial literacy program for students

<u>COM</u>
- Continued to work with chairs/faculty to enhance advising through the Learning Communities
- Continued to adapt Academic Review Board process to best align with changes in curriculum and calendar
- Developed longitudinal report of ARB actions
- Intentional monthly visits to Binghamton to meet with students
- Updated MSPE/Appendices format and content
- Began to develop new pathway programs for Admission

**Goals: Calendar Year 2018**

<u>University Wide</u>
- Work to implement Student Affairs defined initiatives in support of the University's Strategic Plan
  - Assess Climate for Students from Marginalized Identities
  - Increase Professional Development for Staff and Students
  - Explore Implementation of Learning Communities Campus Wide
  - Better Use Data for Planning and Assessment
  - Increase Interactions and Communication with all Deans/Colleges
  - Explore Possibility of a Single Fall Academic Start and All-Inclusive New Student Orientation Program
  - Determine Need for dedicated Cultural Humility Course for All Students
- Administer Student Opinion Survey with return rate of at least 70%
- Ensure Office "Swaps" for Financial Aid (w/Computer Cluster) and Success Center (w/Library Staff)
- Continue to Work Toward Campus Wide Ownership of Geneva Tower (e.g. Physical Plant, Housekeeping, etc)
- Acquire and Implement CRM (Customer Relationship Management)
  - Enhanced Marketing
  - Greater Recruitment Efforts
  - Improved Communications
- Ensure that the President has ample opportunities to interact with students
  - Monthly Breakfasts with Student Government Officers
  - Student Government Open Forum Each Semester
  - Small Group Interactions with Affinity Groups (e.g. SNMA, AMA, AMWA)
- Continue intentional interactions with students in all colleges
  - CHP and CON open forums
  - Lunches with COGS students and Dean
  - Class Officer meetings in COM
  - Continue to meet with Bing-assigned students
- Develop strong working relationship with new CON Dean and better define partnership
  - Admissions
  - Student Events:  Orientation/Commencement/White Coat
- Plan for 2019 "One University" Commencement
  - Prepare for backlash from faculty and students
  - Marketing
  - Move COM Awards to Match Day & Work with Other Colleges re: Awards Ceremonies/Convocations

<u>COM</u>
- Select, Offer and Implement Campus Student Health Insurance Plan (LCME Mandate)
- Facilitate One White Coat Ceremony to Include COM and CHP
- Finalize New Pathway Programs for Admissions

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
......................................................................X
**JULIO LICINIO, MD, PhD, MBA, MS,**

<table>
<tr><td></td><td>Plaintiff,</td><td><b>ATTORNEY REPLY</b><br><b>DECLARATION</b></td></tr>
</table>

Case No.: **5:21-cv-387(GTS/TWD)**

- against -

**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, and THE**
**STATE UNIVERSITY OF NEW YORK**
**UPSTATE MEDICAL UNIVERSITY,**

Defendants
......................................................................X

Aimee Cowan, pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under penalty of perjury under the laws of the United States of America:

1.       I am an Assistant Attorney General for the State of New York and appear in this action on behalf of Letitia James, Attorney General for the State of New York, attorney for State of New York, the State University of New York, and the State University of New York Upstate Medical University ("Defendants") in this action.

2.       I make this Reply Declaration in further support of Defendants' motion pursuant to Federal Rule of Civil Procedure 56(a) for an order granting summary judgment and dismissing Plaintiff's Complaint in its entirety and with prejudice.

3.       The alleged facts and legal arguments are set forth in detail in the previously filed motion for summary judgment (ECF No. 73) and the accompanying Reply Memorandum of Law

1

A-1109

and Declarations of Julie White, PhD, Sharon Brangman, MD, Ruth Weinstock, MD, and Eric Frost.

4.    Attached as **Exhibit "A"** is a true and accurate copy of a December 31, 2020 Court of Claims' decision dismissing Plaintiff's companion Court of Claims action.

5.    Attached as **Exhibit "B"** is a true and accurate copy of an Upstate Medical University article dated April 4, 2019, reporting that Plaintiff was named as a Distinguished Professor.

6.    Attached as **Exhibit "C"** is a portion of President Dewan's deposition transcript.

7.    Attached as **Exhibit "D"** is a portion of Ann Botash, MD's deposition transcript.

8.    Attached as **Exhibit "E"** is a portion of Plaintiff's deposition transcript.

9.    Based upon Defendants' previously filed motion for summary judgment (ECF No. 73), the accompanying Declarations of Julie White, PhD, Sharon Brangman, MD, Ruth Weinstock, MD, and Eric Frost, and Defendants' Reply Memorandum of Law, Defendants respectfully request that this Court grant their motion for summary judgment and dismiss Plaintiff's Complaint in its entirety, with prejudice.

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 6, 2024

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
Office of the Attorney General
Syracuse Regional Office
300 S. State Street, Ste. 300
Syracuse, New York 13202


*s/Aimee Cowan*
Aimee M. Cowan, Esq.

2

A-1110

Assistant Attorney General
Federal Bar Roll No. 516178

3

A-1111

```
FILED
01/08/2021
NY COURT OF CLAIMS
ALBANY, NY
```

**STATE OF NEW YORK          COURT OF CLAIMS**

**JULIO LICINIO, M.D., PHD, MBA, MS,**

Claimant,  **DECISION AND ORDER**

-v-

**STATE OF NEW YORK,**

Claim No.    134212
Motion Nos.  M-95233
             M-95828
             CM-95334

Defendant.

---

**BEFORE:**    **HON. DIANE L. FITZPATRICK**
              **Judge of the Court of Claims**

**APPEARANCES:**    **For Claimant:**
                    **ROMANO LAW FIRM**
                    **By: Siddartha Rao, Esquire**

                    **For Defendant:**
                    **LETITIA JAMES**
                    **Attorney General of the State of New York**
                    **By: Bonnie Gail Levy, Esquire**
                    **Assistant Attorney General**

---

Defendant brings a pre-answer motion to dismiss the claim based upon documentary

evidence, failure to state a cause of action, and lack of subject matter jurisdiction pursuant to

CPLR sections 3211 (a) (1), (2) and (7) and Court of Claims Act sections 8, 9, 10 (4) and 11 (b).

Claimant filed a cross motion for leave to amend the claim or permission to file a late claim in

accordance with Court of Claims Act section 10 (6). In response, Defendant brings a second

A-1112

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                                      Page 2

motion to dismiss the amended claim. Both parties submitted opposition to the motions and cross motion.

The claim alleges a breach of contract cause of action arising from Claimant's acceptance of a position at Upstate Medical University (UMU) as Senior Vice President and Dean of Upstate College of Medicine. The letter offer, dated March 14, 2017, was signed on March 15, 2017 by Claimant and then president of Upstate, Dr. Danielle Laraque-Arena, to be effective on July 1, 2017. In addition, Claimant was to be a tenured professor in the Department of Psychiatry and Behavioral Sciences along with secondary appointments in the Departments of Pharmacology and Medicine, Division of Endocrinology, Diabetes and Metabolism. The position was a Management/Confidential appointment in which Claimant reported to the president and served at the pleasure of the president.

The contract provided for a compensation package that included an annual salary of $585,000; additional compensation of $48,000 to be paid bi-weekly for the first 12 bi-weekly pay periods; reimbursement for academic conferences and the costs associated with participation, continuing medical education, and professional society memberships, and secretarial support. The contract also provided that in the event that Claimant no longer served in the position as Senior Vice President and Dean of the College of Medicine, he would revert to a faculty position and receive a salary no less than that of the total salary of the highest paid faculty member in the Psychiatry Department to be paid entirely by the State of New York. In the event that either Claimant or UMU decided that Claimant would no longer serve as Senior Vice President and Dean of the College of Medicine, each party was entitled to eight months notice in writing of the

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                         Page 3

end date, and they would work together for a smooth transition of leadership. The time frame
could be modified by agreement.

Claimant asserts in the claim that he held the position as Senior Vice President and Dean
of the College of Medicine from July 1, 2017 until September 12, 2019 when he received a
"Demotion Letter" from Interim president Mantosh Dewan (Dr. Dewan). The letter informed
Claimant that his position as Senior Vice President and Dean of the College of Medicine was
terminated as of September 13, 2019. He would be a Distinguished Professor in the Department
of Psychiatry and Behavioral Sciences with a salary of $227,000. At the time he was demoted, his
salary as Senior Vice President and Dean of the College of Medicine had increased to $605,000.

It is Claimant's contention that the State breached the employment contract by failing to
give him eight months notice before demoting him; failing to pay him the salary of the highest paid
professor in the Psychiatry Department ($363,000); failing to continue paying for his academic
conferences and terminating his secretarial support. In addition to money damages, Claimant has
requested equitable relief seeking a declaration that he was entitled to eight months notice before
he was demoted, declaring that he is entitled to compensation no lower than the highest paid
faculty member in the Psychiatry Department and ordering SUNY Upstate to provide him this
compensation, declaring that he is entitled to reimbursement of the costs incurred for his
participation in academic conferences, travel, continuing medical education, publications, and
professional society memberships; and declaring that he is entitled to secretarial support.

On November 15, 2019, Claimant served a notice of intention to file a claim upon the
Attorney General by personal service. The claim was filed on December 26, 2019, and personally
served upon the Office of the Attorney General on December 23, 2019. As set forth above,

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                           **Page 4**

Defendant brings a motion to dismiss the claim, and Claimant has cross moved for permission to

amend the claim to add additional causes of action. In addition, Claimant seeks permission to file

a late claim. The Court will decide the Defendant's motion to dismiss the claim with the cross

motion to amend, since Claimant includes the breach of contract cause of action in his proposed

amended claim.[1] The Court's consideration of Claimant's motion to amend will render the late

claim application unnecessary.

*Defendant's Motion to Dismiss the Claim - Breach of Contract Cause of Action*

*Cross Motion to Amend the Claim*

Defendant argues that the claim which asserts only a cause of action for breach of contract

and which is also the first cause of action in the proposed amended claim must be dismissed.

Defendant, by this motion, argues that the offer letter signed by Claimant and Dr. Laraque-Arena

was not approved or filed by the New York State Comptroller in accordance with State Finance

Law section 112 (2) (a). State Finance Law section 112 (2) (a) provides in pertinent part that

> "[b]efore any contract made for or by any state agency, department, board, officer,
> commission, or institution . . . shall be executed or become effective, whenever such
> contract exceeds fifty thousand dollars in amount . . . it shall first be approved by the
> comptroller and filed in his or her office."

Defendant argues that the approval and filing with the New York State Comptroller is a

condition precedent to having an enforceable contract with the State of New York for any

contract exceeding $50,000. This requirement, Defendant contends, is not waivable, and the State

---

[1] As set forth above, Defendant has also brought a motion to dismiss the amended claim. However, after
reviewing the documents filed with the Clerk of the Court, the amended claim was never filed and, therefore, it is not
pending before the Court.

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                    Page 5

may not be estopped from asserting the statute's applicability in any action to enforce an

unapproved, unfiled agreement.

Submitted in support of Defendant's motion is an affidavit from Sandra Delaney, an

Assistant Vice President for Shared Business Services at the SUNY, UMU who oversees UMU's

Contracts Department as part of her duties. Administrators in the Contracts Department forward

UMU contracts that require pre-approval and filing to the New York State Office of the State

Comptroller (OSC). Neither Ms. Delaney nor the administrators received or forwarded the

document Claimant contends is the employment contract to the OSC for pre-approval and filing.

Furthermore, there is an electronic database (openbooknewyork.com) that shows the UMU

contracts which have been submitted and ultimately approved by OSC; there is no contract

between Claimant and any State entity listed therein.

Defendant proffers that the claim fails to state a cause of action pursuant to CPLR section

3211 (a) (7) as compliance with State Finance Law section 112 is a "condition precedent" to the

existence of a valid contract and an issue upon which Claimant had the burden of proof (*Matter of

Konski Engrs. v Levitt*, 69 AD2d 940, 941 [3d Dept 1979], *affd* 49 NY2d 850 [1980], *cert

denied* 449 US 840 [1980]).

Claimant responds detailing the meetings with numerous department heads, vice

presidents, deans and UMU's legal counsel prior to signing the letter offer, and at no time was he

ever informed of the requirement that OSC had to pre-approve his contract for it to be

enforceable. He notes that the letter specifically refers to his employment being contingent upon a

routine criminal background investigation; subject to the policies of the Board of Trustees for

SUNY and compliance with the responsibilities of a State employee described in Public Officers

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                    Page 6

Law, with no mention of the State Finance Law or approval of the New York State Comptroller.
He also listed many contracts in excess of $50,000 that he approved while Senior Vice President
and Dean, none of which were never sent for pre-approval and filing to OSC.  Further, Claimant
describes how he met regularly with Chief of Staff VanNortwick, Senior Vice President for
Finance and Management Smith, and Senior Associate Dean for Resource Management Gardner
from whom these employment contracts were submitted to Claimant for approval. Associate Vice
President for Human Resources Frost would also review employment contracts although he didn't
attend the meetings. Claimant was never instructed to forward these contracts to OSC and, to his
knowledge, no one else submitted them.

   Claimant also argues that Defendant's evidence fails to resolve the factual issues as a
matter of law and doesn't conclusively dispose of the cause of action on the ground of
documentary evidence pursuant to CPLR section 3211 (a) (1). Claimant also takes issue with the
electronic database identifying contracts approved by the OSC, as none of the contracts on the
site reflect individuals as the contracting party. Claimant contends that this raises questions of fact
not resolved by Defendant's documentary evidence - whether Claimant's letter agreement with
UMU had to be approved by OSC at all.  Although Claimant was represented by an attorney
during the negotiations, he argues that until the filing of this motion to dismiss, at no time was he
made aware of the State Finance Law requirements. The letter agreement referenced and
contained links to the Policies of the Board of Trustees for the State University of New York and
the Public Officers Law but not the State Finance Law.

   Claimant also argues that the State should be estopped from arguing that the contract is
unenforceable, as the State made a clear and unambiguous promise upon which the Claimant

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                    Page 7

reasonably relied to his detriment. After many months of negotiations and meetings, Claimant

was offered and accepted the positions with UMU. At the time of these negotiations, Claimant

and his wife were living and working in Australia. Claimant was also being recruited by the

University of Arizona. Based upon the offers and terms contained in the March 14, 2017 letter

offer, including the provision that he would have an eight-month transition period if he was no

longer  Senior Vice President and Dean of the College of Medicine, Claimant moved himself and

his wife to Syracuse to work at UMU.

On a motion to dismiss, the Court must accept Claimant's allegations as true and assess

whether they fit into any "cognizable legal theory" (*Divito v Fiandach,* 166 AD3d 1356, 1357

[4th Dept 2018]). Affidavits may be utilized by Claimant to supplement his pleading, affidavits

from Defendant may be relied upon only where the submissions "establish conclusively" that

Claimant has no cause of action (*Rovello v Orofino Realty Co.,* 40 NY2d 633, 636 [1976]; *Olney*

*v Town of Barrington,* 180 AD3d 1364 [4th Dept 2020]).

"As a general matter, contracts entered into with state or municipal entities that are not
approved by the necessary public officials in compliance with statutory requirements are invalid
and unenforceable (see *Parsa v. State of New York,* 64 N.Y.2d 143, 147 [1984]; *Becker & Assoc.*
*v. State of New York,* 48 NY2d 867 [1979]; *Hamlin Beach Camping, Catering & Concessions*
*Corp. v. State of New York,* 303 AD2d 849, 851 [2003])." (*Cointech Inc. v Masaryk Towers*
*Corp.,* 7 AD3d 376, 380 [1st Dept 2004]).

Although an offer for employment was made by the Defendant in its March 14, 2017 letter

to Claimant, which Claimant accepted by signing the letter on March 15, 2017, the letter

agreement for employment could not become an enforceable contract until the State  Comptroller

approved it in accordance with State Finance Law section 112 (2) (a) (State Finance Law section

112 [2] [a]; *Parsa,* 64 NY2d at 147). Compliance with the State Finance Law "is a 'condition

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                                    Page 8

precedent' to the existence of a valid contract" (*Hamlin Beach Camping, Catering &*

*Concessions, Corp.,* 303 AD2d at 851; *Rosefsky v State of New York,* 205 AD2d 120 [3d Dept

1994]; *Schenker v State of New York,* 126 Misc 2d 1038, 1041 [Ct Cl 1984]). There is no dispute

or allegation that the State Comptroller was ever presented with the contract for approval or

otherwise approved it.

Claimant tries to argue that as a management/confidential employee, this contract did not

have to be approved by the Comptroller because it was subject to article 14 of the Civil Service

Law, also known as the Taylor Law (*see* State Finance Law section 112 [4]; Civil Service Law

sections 200-214). However, those sections of the Civil Service Law involves the relationship

and rights of employees to form and be represented by employee organizations for collective

bargaining with the State. In his position as Senior Vice President and Dean of the College of

Medicine, Claimant was not part of and he does not allege that he was part of an employee

organization, as that term is defined in Civil Service Law section 201 (5).

Claimant's lack of knowledge of the requirement for approval by the Comptroller and the

State's acceptance of the benefits of Claimant's employment, without fulfilling the eight-month

notice requirement before he could be removed from his position as Senior Vice President and

Dean of the College of Medicine, cannot be used to avoid the application of State Finance Law

section 112 (2) (a).

> "A party contracting with the State is chargeable with knowledge of the
> statutes which regulate its contracting powers and is bound by them (*Belmar
> Contr. Co. v State of New York,* 233 NY189, 194 [1922]). Moreover, the State's
> acceptance of benefits furnished under a contract made without authority does not
> estop it from challenging the validity of the contract or from denying liability
> pursuant to it (*Becker & Assoc. v State of New York*, 48 NY2d 867 [1884], *affd* 65
> AD2d 65 [3d Dept 1978]; *see, also, Seif v City of Long Beach,* 286 NY 382

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                          Page 9

[1941]; *McDonald v Mayor of City of N.Y.* 68 NY 23 [1876]).￼" (*Parsa,* 64 NY2d

at 147)."

Where there is no contract for employment for a specific duration, the employment

relationship is considered "at will". (*Sabetay v Sterling Drug, Inc.,* 69 NY2d 329, 333 [1987]).

Claimant served at the pleasure of the President of UMU and this was set forth in the offer letter

dated March 14, 2017 (*see* Policies of the Board of Trustees [Title B, para. 4, and 8 NYCRR

section 333.8] which read "Persons appointed pursuant to this Title shall serve at the pleasure of

the appointing officer or body."). Under these circumstances, there is no question whether

Claimant could be removed from his position as Senior Vice President and Dean of the College of

Medicine, since he could be discharged, or in this case demoted, at the employer's discretion (*see*

*Murphy v American Home Prods. Corp.,* 58 NY2d 293 [1983]). Although the agreement

expressly limited his discharge or demotion unless there was compliance with the eight-month

notice provision or some other term of notice was agreed upon, that provision is unenforceable.

Based upon the submissions and the foregoing, Claimant has failed to state a cause of

action for breach of contract in either the claim or proposed amended claim.

Claimant seeks permission to amend the claim to add four additional causes of action, a

cause of action for breach of an implied contract, breach of the covenant of good faith and fair

dealing, fraudulent misrepresentation, and fraudulent concealment. Leave to amend a pleading

should be liberally granted where there is no surprise or prejudice, and the proposed amendment is

not patently lacking in merit or insufficient on its face (*see Holst v Liberatore*, 105 AD3d 1374

[4th Dept 2013]; *Lucido v Mancuso*, 49 AD3d 220 [2d Dept 2008]; *Gross, Shuman, Brizdle &*

*Gilfillan v Bayger*, 256 AD2d 1187 [4th Dept 1998]). Movant is not required to make an

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                    **Page 10**

evidentiary showing of merit (*Holst,* 105 AD3d at 1374). Whether to grant permission to amend a

pleading is a matter of discretion (*NYAHSA Servs., Inc., Self-Ins. Trust v People Care, Inc.,* 156

AD3d 99 [3d Dept 2017]). The motion should be granted if the amendment does not cause

prejudice or surprise to the nonmoving party, and the amendment is not "palpably insufficient or

patently devoid of merit" (*NYAHSA Servs., Inc., Self-Ins. Trust,* 156 AD3d at 102). In deciding

the motion to amend the claim, the Court should consider whether "the proposed amendment is

palpably improper or insufficient as a matter of law" (*Williams v State of New York,* UID No.

2019-028-553 [Ct Cl, Sise, Presiding J., June 20, 2019]). After such consideration, leave should

be denied if the proposed amendment is legally insufficient (*Id.*).

      CPLR 3025 (b) provides that:

> "[a] party may amend his or her pleading, or supplement it by setting forth additional or
> subsequent transactions or occurrences, at any time by leave of court or by stipulation of
> all parties.  Leave shall be freely given upon such terms as may be just including the
> granting of costs and continuances. Any motion to amend or supplement pleadings shall be
> accompanied by the proposed amended or supplemental pleading clearly showing the
> changes or additions to be made to the pleading."

### *Breach of Implied Contract*

      There are two types of implied contract, a contract implied-in-fact and a contract implied-

in-law (*Parsa,* 64 NY2d at 148). A contract implied-in-law "is an obligation which the law creates

in the absence of agreement when one party possesses money that in equity and good conscience

he ought not to retain and that belongs to another." (*Id., quoting Miller v Schloss,* 218 NY 400,

406-407 [1916]). A contract implied-in-fact is a contract based upon an implied promise which

arises from the parties conduct, not their verbal or written words (*Id.*).  Claimant relies upon the

lengthy negotiations and meetings he had with various employees of UMU to establish an implied

**Claim No.  134212, Motion Nos.  M-95233, M-95828, CM-95334**                                    **Page 11**

contract in fact. Although the State Finance Law section 112 does not prevent recovery where a

contract is implied-in-law to restore money to its rightful owner, a contract implied-in-fact is

subject to the statute and "a contract between them may not be implied to provide 'rough justice'

and fasten liability on the State when applicable statutes expressly prohibit it". (*M/A-Com, Inc., v*

*State of New York*, 78 AD3d 1293, 1294 [3rd Dept 2010], *quoting Parsa*, 64 NY2d at 147). As a

result, this cause of action is patently lacking in merit.

" A claim for 'breach of the implied covenant of good faith and fair dealing . . . may not be

used as a substitute for a nonviable claim of breach of contract' ". (*Smile Train, Inc. v Ferris*

*Consulting Corp.*, 117 AD3d 629, 630 [1st Dept 2014] *quoting Sheth v New York Life Ins. Co.*,

273 AD2d 72, 73, [1st Dept.2000]; *NYAHSA Servs., Inc., Self-Ins. Trust*, 141 AD3d 785; *Fahs*

*Constr. Group, Inc. v State of New York*, 123 AD3d 1311, 1312-1313 [3d Dept 2014]). The third

cause of action also patently lacks merit.

The proposed fourth cause of action, fraudulent misrepresentation, and the fifth,

fraudulent concealment, will be discussed together. To assert a cause of action for fraudulent

misrepresentation a party must allege "a misrepresentation or a material omission of fact which

was false and known to be false by defendant, made for the purpose of inducing the other party to

rely upon it, justifiable reliance of the other party on the misrepresentation or material omission,

and injury" (*Lama Holding Co., v Smith Barney*, 88 NY2d 413, 421 [1996]; *Mandarin Trading*

*Ltd. v Wildenstein*, 16 NY3d 173, 178 [2011]; *see also Channel Master Corp. v Aluminum Ltd.*

*Sales*, 4 NY2d 403, 406–407 [1958]).

A cause of action for fraudulent concealment requires the same factors to be alleged - a

known false material misrepresentation or omission of fact by defendant, to induce reliance, which

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                                    **Page 12**

induces justifiable reliance and injury - and in addition to those four foregoing elements, there must be an allegation that "the defendant had a duty to disclose material information and that it failed to do so" (*P.T. Bank Cent. Asia, N.Y. Branch  v ABN AMRO Bank N.V.* 301 AD2d 373, 376 [1st Dept 2003]; *Wiscovitch Assoc. v Philip Morris Cos.*, 193 AD2d 542 [1st Dept 1993]).

The proposed amended claim alleges that the State failed to provide Claimant information about the requirements of State Finance Law section 112 (2) (a) during the negotiations and during his employment as Senior Vice President and Dean of the College of Medicine. Claimant contends that without knowing that his contract must be approved and filed by the State Comptroller, he relied on the provisions in the letter agreement causing him to leave his employment in Australia, forego potential employment in Arizona and accept the position at UMU. He further alleges that his demotion has negatively affected his career. For the fraudulent concealment cause of action, he also included a bare allegation that the State had a duty to inform him of the requirement to have the agreement approved by the OSC.

Claimant is presumed to have knowledge of the law, and the failure of the State to disclose this cannot be considered fraudulent (*cf., Merchants' Bank v Spalding,* 12 Barb 302 [1851]; *Donnelly v Margolis,* 265 AD2d 523 [2d Dept 1999]; *Diocese of Buffalo v McCarthy*, 91 AD2d 1210 [4th Dept 1983]; *Bayer v Sarot,* 51 AD2d 366, 369 [1st Dept 1976]). Moreover, the provisions of the State Finance Law cannot be avoided by asserting a fraudulent misrepresentation cause of action or fraudulent concealment (*see Hamlin Beach Camping, Catering & Concessions, Corp.,* 303 AD2d at 853; *Pankewycz v State of New York,* [Ct Cl, Weinstein, J., Cl No. 134290, Motion No. M-95419 signed Aug. 7, 2020]). Claimant has failed to allege that Defendant misrepresented or withheld any material facts or information that it had a duty to disclose or were

A-1123

Claim No.  134212, Motion Nos.  M-95233, M-95828, CM-95334                    **Page 13**

unavailable to Claimant. As a result, Claimant's proposed fourth and fifth cause of action are
patently insufficient.

      Although the Court finds the State's reliance upon the application of the State Finance
Law section 112 (2) (a) under Claimant's circumstances unfair, leaving him without an adequate
remedy, as other courts have found, "the over-all benefit accruing to the citizens of the State from
its application has been determined by the Legislature, to be worth the risk of such a casualty,
ostensibly because contracting parties are better able to protect themselves from State Finance
Law section 112 than the people would be to protect themselves without it". (*Rosefsky*, 205
AD2d at 124).

      Accordingly, based upon the foregoing, Defendant's motion is GRANTED, and
Claimant's cross motion to amend the claim or for late claim relief is DENIED in its entirety.
Defendant's motion to dismiss the amended claim is DENIED as unnecessary.

A-1124

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                          **Page 14**

Syracuse, New York
December 31, 2020

*Diane L. Fitzpatrick*

**DIANE L. FITZPATRICK**
**Judge of the Court of Claims**

The Court has considered the following in deciding these motions:

<u>M-95233</u>

1)   Notice of Motion.

2)   Affirmation of Bonnie Gail Levy, Esquire, Assistant Attorney General, in support, with exhibits attached thereto.

3)   Affirmation of Siddartha Rao, Esquire, in opposition, with exhibits attached thereto.

4)   Memorandum of Law filed August 25, 2020, in opposition.

5)   Sur-Reply affirmation of Siddartha Rao, Esquire, in opposition, with exhibits attached thereto.

<u>M-95828</u>

6)   As noted in the Decision and Order the Amended Claim was never filed so this motion is presently not before this Court.

<u>CM-95334</u>

7)   Notice of cross motion.

8)   Affirmation of Siddartha Rao, Esquire, in support, with exhibits attached thereto.

9)   Affirmation of Bonnie G. Levy, Essquire, Assistant Attorney General, in opposition, with exhibits attached thereto.

10)  Memorandum of Law in support.

Claim No. 134212, Motion Nos. M-95233, M-95828, CM-95334                Page 15

11)      Memorandum of Law in opposition.

SUNY honors two with Distinguished Faculty rank | Upstate News | SUNY Upstate Medical University                    10/1/21, 2:44 PM







# SUNY honors two with Distinguished Faculty rank



Julio Licinio, MD, PhD, and Margaret Turk, MD, have been named by the SUNY Board of Trustees to SUNY Distinguished Faculty ranks in acknowledgement of their teaching, research and service. They join 16 other faculty members from SUNY campuses across the state in receiving this faculty designation.

"As witnessed by their massive accomplishments and groundbreaking research in their academic areas, each individual is passionate about their field of expertise, and shares that energy with their students," said SUNY Board Chairman H. Carl McCall. "We are pleased to congratulate this most recent class of distinguished faculty."

"The SUNY faculty being honored today with the distinguished ranking are leaders in innovation, research, environmental and cultural studies, and serve as a strong and constant reminder of the quality higher education students receive at our campuses," said SUNY Chancellor Kristina M. Johnson. "On behalf of all our faculty, staff and students, I congratulate these individuals on this honorable distinction."

Licinio v. SUNY Upstate, et al., 5:21-CV-387          002526

A-1127

SUNY honors two with Distinguished Faculty ranks | Upstate News | SUNY Upstate Medical University    10/1/21, 2:44 PM

"We congratulate Drs. Licinio and Turk on their honor as SUNY Distinguished Faculty," said Mantosh Dewan, MD, interim president of Upstate Medical University. "This honor salutes their great accomplishment in science and service and showcases the outstanding faculty members we have at Upstate Medical University."

**Julio Licinio, MD, PhD, received the rank of Distinguished Professor**

The Distinguished Professorship is conferred upon individuals who have achieved national or international prominence and a distinguished reputation within a chosen field. This distinction is attained through significant contributions to the research literature or through artistic performance or achievement in the case of the arts. The candidate's work is of such character that the individual's presence elevates the standards of scholarship of colleagues both within and beyond these persons' academic fields.

Julio Licinio, MD, PhD is an internationally recognized leader in translational and clinical research in psychiatry and neuroendocrinology, including depression and obesity. He has established, led, and obtained competitive funding for numerous major national and international research and clinical projects and programs in these areas for over 25 years at Yale, NIH, UCLA, the University of Miami, the South Australian Health and Medical Research Institute, and SUNY Upstate Medical University.

He has obtained over $20 million in competitive grant funding from sponsors throughout the world; his work has resulted in over 300 publications and been cited over 27,000 times. He is founding and Chief Editor of three Springer Nature journals: *Molecular Psychiatry*, *Translational Psychiatry*, and *The Pharmacogenomics Journal*. In the last six years, he has published collaboratively with 190 colleagues from 54 institutions located in 19 countries, evidence of the strength and productivity of his strong and unique international partnerships in psychiatric research. Licinio has received many national and international awards for his exceptional achievements.

As dean of the College of Medicine at Upstate Medical University, Licinio has shared an exciting vision for education, clinical care, and research growth and has recruited additional outstanding scientists, clinicians and leaders to join the faculty in making that vision a reality.

**Margaret Turk, MD, received the rank of Distinguished Service Professor**

The Distinguished Service Professorship honors and recognizes extraordinary service. This distinction honors and recognizes individuals for extraordinary service not only at the campus and the State University, but also at the community, regional, state, national and international levels.

Licinio v. SUNY Upstate, et al., 5:21-CV-387    002527

A-1128

SUNY honors two with Distinguished Faculty ranks | Upstate News | SUNY Upstate Medical University                                                    10/1/21, 2:44 PM

Turk has dedicated her career to improving the health and wellbeing of people with disability. An academician and clinical expert in Pediatric Rehabilitation Medicine and Neuromuscular and Electrodiagnostic Medicine, Turk currently serves as her department's vice chair and quality officer, director of Pediatric Rehabilitation, associate director of University Hospital's Rehabilitation Units, director for Clinical Research, and director for Student Education.

She has chaired both the Medical College Assembly and the Faculty Organization and currently chairs the College of Medicine Appointment and Promotions Committee. Turk has participated in and/or led multiple initiatives at the regional, state and national level to enhance care for patients with disability, including work with the New York State Department of Health, American Board of Physical Medicine and Rehabilitation (serving as its first woman chairman), American Board of Medical Specialties, Association of Academic Physiatrists, Center for Disease Control, National Institutes of Health, Agency for Health Care Research and Quality, Institute of Medicine, Association of American Medical Colleges, and World Health Organization.

She is founding co-editor of the *Disability and Health Journal*, a high impact journal in the field, has edited several books, authored 25 book chapters/monographs and over 40 journal articles, and has been recognized with multiple regional, national and international awards for her work.

SUNY has honored 33 Upstate faculty with Distinguished faculty ranks. Last year, Paula Trief, PhD, was honored as a Distinguished Service Professor.

Written by Darryl Geddes 315-464-4828

Published on Thursday, April 4, 2019

News

Licinio v. SUNY Upstate, et al., 5:21-CV-387                                                    002528

Page 45

1                        M. DEWAN

2    given that this was already done, there was

3    no way I was going to rescind it.

4         Q.    How would you describe your

5    relationship with Dr. Licinio?

6              MS. COWAN:   Objection.   Go

7         ahead.

8         A.    I think that you should know

9    that I know a lot about Dr. Licinio, being

10   in the same field and crossing paths since

11   at least 1999.   I have a lot of

12   information, direct and indirect.

13             When he came for an interview,

14   I chose not to interview any dean

15   candidates.   I did offer to meet with each

16   of the dean candidates, and my only

17   recommendation to Dr. Laraque-Arena was to

18   say please check very carefully.   All

19   candidates, not just Julio.

20             When I took over as interim

21   president, I met with him, and was very

22   clear that everyone at SUNY and Dr.

23   Laraque-Arena, who I met with just before

24   she left, they had all said your highest

25   priority is to get rid of the dean.   I

Page 46

1                          M. DEWAN

2    shared this with him because I wanted to

3    work with him and see if we could make it

4    work.  I gave him very specific reasons

5    that I had heard.  Again, as you asked me,

6    was I there?  I was not there, but I shared

7    with him collectively all the reasons I had

8    heard.

9              That was our sort of our first

10   meeting.  A little awkward, but I said I've

11   just come back from Albany, we need to work

12   together.  The dean is a critical part of

13   what I think is a trio that runs this

14   place:  The dean, the CEO of the hospital,

15   and the president.  I shared with him

16   exactly what I had heard, and the very

17   clear direction that I had gotten from SUNY

18   leadership that my highest priority was to

19   get rid of him.  I then told him I would

20   not do that.  I appreciated the direction,

21   but I would not do that.  And it was partly

22   based on the fact that, candidly, the

23   president had been difficult.  I was

24   willing to give him the benefit of the

25   doubt that he would have done well had it

Page 47

1                    M. DEWAN
2  not been for -- even if you just call it a
3  personality clash, forget anything else.
4  So we had a very clear agreement that there
5  were things that were troubling to us,
6  definitely troubling to me, you know,
7  hostile undercutting of the president,
8  appropriate sexual stuff.  The word that I
9  heard almost as a common thread was he's
10 crazy.  So, I talked about with Julio very
11 directly, and said I want this to work, I'm
12 not going to follow the advice, but you
13 have just got to be careful about all of
14 this and I will give you the benefit of the
15 doubt now that there's a new president.  I
16 will support you.  I want you to do well.
17           Now, I should say, that as he
18 has said a hundred times, he is a very
19 bright man, he has very good ideas, he's
20 very accomplished in research, and then
21 he's a terrible team player.  That's where
22 it sort of falls apart.  No one wants him
23 on their team, and I had multiple examples
24 of people, including when he applied for
25 the job of chair at Upstate.  He was

Case 5:21-cv-00387-GTS-TWD   Document 81-13   Filed 06/06/24   Page 4 of 5

Page 48

1                        M. DEWAN
2    amazingly well-qualified.  We would have
3    taken him sight unseen.  Unfortunately, we
4    did interview him and did not take him.
5              The same thing happened
6    Downstate.  I have a lot of friends that
7    would say Julio is applying, but we cannot
8    take him because of who he is.  His
9    credentials are terrific, a great
10   researcher, I will hire him for that; team
11   player, dean, no one wants to hire him.  He
12   had trouble in multiple places, multiple
13   countries, so I had a very candid
14   conversation saying, Julio, let's work
15   together to make this work.  That was step
16   one.
17       Q.    If I can, if I may.  I do
18   appreciate that.  My question was what is
19   your relationship like with Dr. Licinio?
20       A.    Now or then?
21       Q.    Now.
22       A.    I have not had any contact with
23   him since we parted ways.
24       Q.    What was your relationship like
25   at the time you parted ways, before the

Page 144

```
 1                    M. DEWAN

 2      Q.     You went to the legal team and

 3  the HR team instead of ODI after this

 4  conversation?

 5      A.     So, actually, let me just fill

 6  you in. This happened on the evening of the

 7  12th, the afternoon of the 12th.  The next

 8  morning, once I was thinking over all these

 9  things, the next morning, August 13th, the

10  dean called an urgent 6:00 meeting of some

11  of the leaders including the CEO, some of

12  the chairs, and a bunch of other people.

13  Maybe ten people.  Urgent with no

14  indication of what it's about.

15            It was supposedly about

16  anesthesia or something like that when he

17  started off, but then he went completely

18  blatantly, directly to attack me, undercut

19  me, and said he's a wonderful dean except

20  for me not letting him do what he needs to

21  do.  This surprised and shocked me,

22  horrified some of the people there, and I

23  walked out of that meeting saying I am

24  done.

25            Just to be very clear, it has
```

Page 96

```
 1                        A. BOTASH

 2            MS. COWAN:  Objection.

 3       A    I only know one.  It wasn't a

 4   physician, it was a nurse practitioner.  I

 5   don't really know how to answer that.

 6            MR. GRACE:  Okay.  Just give me --

 7       maybe we'll take another -- I only need

 8       just a two-minute -- if we go off the

 9       record, just a two-minute break.

10            MS. COWAN:  Okay.

11            THE REPORTER:  It is 12:16 p.m.  I am

12       now pausing the record.

13            (Off the record.)

14            THE REPORTER:  Okay, it is now 12:20

15       p.m.  We are back on the record.

16   BY MR. GRACE:

17       Q    In 2019, and before that to the

18   beginning of your interactions with

19   Dr. Licinio, did you believe him to be

20   respectful to other faculty members?

21       A    Yes.

22       Q    Did you believe him to be

23   courteous to other staff members?

24       A    Yes.

25       Q    Did you believe him to be
```

A-1135

Page 97

```
 1                          A. BOTASH
 2    professional with other faculty members?
 3         A     Occasionally he was not.
 4         Q     Okay.  Do you have any reason to
 5    believe he was disrespectful to any
 6    faculty or staff?
 7         A     No.
 8         Q     Okay.  Have you ever heard the
 9    phrase men's club being used to describe
10    the current administration of SUNY
11    Upstate?
12         A     The current administration?  Not
13    so much, no.
14         Q     Okay.  In general, have you ever
15    used the -- have you ever heard the term
16    men's club being used to describe an
17    administration in SUNY Upstate?
18         A     I have heard it used to describe
19    the chairs.  They were all men.
20         Q     Okay.  When was this?
21         A     Over the years.
22         Q     Okay.  And what did you
23    understand this to mean in that context?
24         A     Well, they were all men in the
25    chairs group.  There were a few women, but
```

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 138

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                        A.   I don't recall specifically what

3         I did back then.

4                        Q.   Do you recall who you recommended

5         that they speak to about these recommendations?

6                        A.   Not on top of my head.  It's

7         because it's -- it's a long list, you know, it's

8         external, internal, then they -- they want you to

9         give some extra names because not everybody that they

10        invite is going to accept it.

11                       So we have to give a big list and then

12        from that they have -- need to get recommendations

13        internal and the same number external.  So it should

14        be direct answer to your question, I don't recall who

15        I nominated.  It's part of the record that Upstate

16        has those names and has the package but I don't

17        recall.

18                       Q.   Do you recall when you were

19        officially given that title or told that you would be

20        awarded that title?

21                       A.   Yes.

22                       Q.   When was that?

23                       A.   It was in -- that was -- it was a

24        multi-step process, so I got an initial communication

25        via email.  Then there was a ceremony in Albany and

ARII@courtsteno.com                              www.courtsteno.com

800.523.7887                              Associated Reporters Int'l., Inc.

Page 139

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2        then there was a ceremony at Upstate.  So the
 3        ceremony on Upstate, the last one was on September
 4        9th of 2019 and there was like a convocation and
 5        people received different, you know, kind of
 6        distinctions.
 7                    And then I was given that one and the
 8        president praised my, you know, my capability and
 9        spoke very positively of me.  And there was a party
10        afterwards, and then the next day in the morning, I
11        was asked to step down.
12                    Q.   Okay.  So you said that there was
13        a ceremony in Albany and a ceremony at Upstate,
14        correct?
15                    A.   Yes.
16                    Q.   Where was the ceremony -- when --
17        when was the ceremony in Albany?
18                    A.   Sometime between -- around May of
19        2019, could have been April -- April to June of 2019,
20        I don't remember the exact date.
21                    Q.   And when were you given that
22        email that said that you were being awarded that
23        position -- or that title?
24                    A.   It was before that, but I don't
25        recall the date.
```

A-1138

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 140

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2                        Q.   Okay.  And then -- so there was
 3    another ceremony at SUNY Upstate in September 2019,
 4    right?
 5                        A.   September 9 --.
 6                        Q.   Obviously, you didn't --?
 7                        A.   No, September 10th -- yeah, 10th.
 8                        Q.   All right.  You already knew that
 9    you had that title by then obviously, right?
10                        A.   Yes.
11                        Q.   And you said that the president
12    spoke highly of you at that ceremony?
13                        A.   Yes, incited my academic
14    accomplishments and my citations and my -- my work
15    and spoke very highly of me.
16                        Q.   Okay.  So -- and the president
17    you're referring to is President Dewan (phonetic
18    spelling)?
19                        A.   Yes.
20                        Q.   And I think you said he spoke
21    highly of your academic accomplishments, correct?
22                        A.   Yes.
23                        Q.   This distinguished professorship,
24    this is for accomplishments as a professor, correct?
25                        A.   Yes, there's a --.
```

ARII@courtsteno.com                             www.courtsteno.com
                                                        A1138

A-1139

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 158

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2         role.  Does that sound familiar to you?
 3                        A.   Yes.
 4                        Q.   When you say defendants
 5         aggressively questioned you, who are you referring
 6         to?
 7                        A.   Dr. Mantosh Dewan.
 8                        Q.   Just him alone?
 9                        A.   Yes.
10                        Q.   Okay.  And you said on several
11         occasions he questioned you, do you recall when those
12         occasions occurred?
13                        A.   It was in -- I had regular
14         meetings with him, so it was in my meetings with him
15         through like May and June, early July of 2019.
16                        Q.   And these were face-to-face
17         verbal meetings that you had with him?
18                        A.   Yes.
19                        Q.   When you say aggressively
20         question, what you mean by that?
21                        A.   Say, why do you have a
22         neurosurgeon who is very busy, why is this person
23         spending time in diversity.  Well, why is -- you're
24         pulling her from -- and like in a very kind of rough
25         voice, multiple times.
```

ARII@courtsteno.com                          www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 273

```
 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2                        A.   I cannot comment on that.  I
 3         don't know to Dr. Swortz specifically, I was not in
 4         the meetings.
 5                        Q.   Okay.
 6                        MR. GRACE:  I just want to note my
 7         objection for the record.
 8                        BY MS. COWAN::  (Cont'g.)
 9                        Q.   During that meeting with Dr.
10         Dewan on August 12, 2019, you indicated in your
11         complaint that you told him you felt that she was
12         being discriminated against because no other white
13         male professor was facing the same salary challenges.
14         Is that --
15                        A.   Yeah.
16                        Q.    -- is that fair to say?
17                        A.   Yes.  And I even -- yeah, I
18         specifically said that she would have reason both
19         under Title Seven, and I use those words, both under
20         Title 7 and Title 9, to file a complaint.  But I hope
21         we could resolve this amicably, something along those
22         lines, but I just -- I -- I did say that I felt she
23         would have reason to file a complaint under Title 7.
24                        Q.   So you told Dr. Dewan in this
25         meeting between the two of you that she could file a
```

800.523.7887                            Associated Reporters Int'l., Inc.

Page 274

1    Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.
2         lawsuit against -- against --.
3                    A.   I said that she could, but I
4         said, she would have -- there would be grounds for
5         her to file a complaint and that she was feeling
6         discriminated and she was very unhappy about it.
7                    Q.   Okay.  Did you discuss with Dr.
8         Dewan during that meeting that you were -- that your
9         marriage was suffering because she was not happy
10        working at Upstate?
11                   A.   Our marriage has never suffered,
12        you know, and actually, many people are surprised
13        that we've been married -- because we're not that
14        old, you know, we were married very young.  So we've
15        been married for how -- many years now, thirty, you
16        know, many years.  Thirty-five I think or, you know,
17        thirty-five, thirty-seven, yeah.
18                    So we've been married like a long
19        time, and -- and our marriage is not -- does not
20        suffer I mean, we have, you know, challenges that
21        every married couple faces.  But our marriage is rock
22        solid and I -- I -- I may have said I mean, our
23        relationship was suffering like, it was tense
24        because, you know, she had this major issue.
25                    Normally she would go to the dean, I

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2    am the dean, she cannot come to me so, you know, when

3    you go to the president of the different level -- so

4    she was unhappy and her unhappiness makes me unhappy.

5    But I don't think our marriage was suffering.  I

6    mean, I was unhappy because of her unhappiness, I

7    think it's the best way to put it.

8                   Q.   Did you tell Dr. Dewan that your

9    marriage was in jeopardy if the salary complaints

10   were not addressed?

11                  A.   I never said that -- I never used

12   that word, I can say positive I never used that word

13   to anybody that our marriage was never in jeopardy

14   and I never said that to anyone.

15                  Q.   What did doctor respond -- Dr.

16   Dewan respond with when you told him that she could

17   file a lawsuit under Title 7 or Title 9?

18                  A.   I didn't say lawsuit, I said that

19   you could file the complaint with O.D.I.  I didn't

20   say lawsuit, I didn't use the word lawsuit, I never

21   use that word.  I think it's a very threatening word

22   and I'm positive I never used it.

23                  I said that she would have grounds to

24   go through O.D.I. under that Title 7 and 9, but I was

25   talking about internal Office of Diversity and

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 276

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2         Inclusion.  I never brought up going to court or

3         going through, you know, external litigation.

4                        So I said that she would have grounds

5         to go to O.D.I. and under Title Seven and Nine and

6         that she was being discriminated.  But that's what I

7         recall, you know, so what was your question

8         specifically?

9                        Q.   Well, my question -- I guess my

10        new question now is that, during your meeting you

11        told Dr. Dewan that she would have or could have a

12        claim under Title 7 or Title 9.  I thought that's

13        what you told me earlier?

14                       A.   Yes -- yes, she believes that she

15        had it, you know, yes -- yes, I conveyed that to him.

16                       Q.   Okay.  And then you listed off

17        all the protected classes that your wife is a part

18        of, according to you?

19                       A.    Yes.  And I did -- just to be

20        clear for the context that I said that like she would

21        have grounds to go to O.D.I. with those claims.  I

22        never said that she would go to, you know, file a

23        lawsuit outside of the university, but I said that

24        she would have grounds to go to O.D.I. with those

25        complaints.

ARII@courtsteno.com                            www.courtsteno.com

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 277

```
 1     Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.
 2                         Q.   You specifically said O.D.I.?
 3                         A.   O.D.I.
 4                         Q.   And what was Dr. Dewan's
 5     response?
 6                         A.   He said -- he looked concerned.
 7     Dr. Dewan doesn't talk very much, so we're very
 8     different, you know, styles.  So he -- he is very
 9     more quiet and more -- less outspoken.  And -- so he
10     -- he -- since you're talking about Dr. Dewan, he did
11     bring up, you know, you're asking me before, we know
12     where he was born, et cetera, he was born in India.
13                         There is something in -- in diversity
14     that's called groups that are underrepresented in
15     medicine --
16                         Q.   So --
17                         A.    -- he is underrepresented in
18     medicine but the question that you asked --.
19                         Q.   No, I'm asking you a question
20     right now.  Dr. Licinio, please.
21                         A.   So -- so -- please -- yeah, so go
22     ahead.  The whole -- I -- I have to tell you this,
23     you have been very professional.  And you know, I
24     don't think there's anything not professional that
25     you could do.  But I'm just -- a situation that
```

ARII@courtsteno.com                              www.courtsteno.com
                                                         A1144

800.523.7887                                Associated Reporters Int'l., Inc.

Page 278

1   Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

2       upsets me a lot, so I am upset not with you, or with

3       your line of questioning, but with the reality of

4       what happened back then, you know/

5                    Q.   Sure.

6                    MR. GRACE:  Let's get to the point,

7       Doctor.

8                    THE WITNESS:  Yeah, I'll keep to the

9       point.  It just that the whole situation was so

10      stressful and so upsetting that I think some of that

11      stress comes up as I'm talking, but not related to

12      you personally or to your questions.  So, you know,

13      can you give me the question again and I'll -- I'll

14      answer more objectively.

15                   BY MS. COWAN::  (Cont'g.)

16                   Q.   My only question was, what was

17      Dr. Dewan's response when you told him that she could

18      file a complaint alleging discrimination?

19                   A.   He was very quiet and he didn't

20      say anything specifically.  And he just looked kind

21      of quiet and nodded, and then at the end, I said,

22      okay, and then what happens next, and he said, well,

23      you know, you -- thanks for bringing this to my

24      attention, and you'll hear from me.  And then the

25      next meeting that I had with him was to tell me that

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 279

 1   Licinio, M.D. v SONY, et al – 5/31/2022 – J. Licinio, M.D.

 2        I am demoted.

 3                    Q.   Did you encourage your wife to

 4        file a complaint with O.D.I. or with H.R.?

 5                    MR. GRACE:  Objection.

 6                    THE WITNESS:  She didn't file with

 7        H.R.  She filed with O.D.I., but I didn't encourage,

 8        I didn't discourage.  If you knew my wife you would

 9        know that you cannot encourage, so that's what she

10        wants to do.  So you cannot like, you know, tell her

11        what to do and then she goes and does it.

12                    She's very much her own person, so I

13        don't think that neither me nor anybody could tell

14        her, you know, what to do.  So I didn't encourage, I

15        didn't discourage her, I didn't say no, don't file

16        it.  And I said, yes, go ahead and file it.

17                    I didn't do either of those things, so

18        I didn't encourage, I didn't discourage.

19                    Q.   When did --?

20                    A.   But she was -- yeah, she was

21        profoundly upset with the level of discrimination and

22        harassment that she was going through.

23                    Q.   When did she file a complaint

24        with O.D.I.?

25                    MR. GRACE:  Objection.

A-1147

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 399

 1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

 2                    So -- and with lifetime security.  So

 3    I could stay there until I retired.  You know they

 4    don't have mandatory retirement.  So I could stay

 5    there until I'm, you know, no longer able to work,

 6    you know.  So I end up secure lifetime tenured

 7    position.

 8                    Q.   With respect to your SUNY

 9    Downstate application, you had testified earlier that

10    the dean indicated it to be challenging to hire you

11    without research filing in United States?  Is that

12    right?

13                    A.   Yeah -- yes.

14                    Q.   Did he say why it would be

15    challenging for them to hire you?

16                    A.   Yes, because when you hire

17    somebody for that role, you have to give a package.

18    So usually and I've done these negotiations a lot.

19    So I -- I, you know, so I know how that process works

20    very well.

21                    So it's usually like an exchange.  So

22    like you give -- they give you a package to come and

23    then you can recruit people.  You can, you know,

24    build.  And then they expect that you are going to

25    bring research grants as well.

ARII@courtsteno.com                        www.courtsteno.com
                                                  A1147

800.523.7887                                    Associated Reporters Int'l., Inc.

Page 400

1    Licinio, M.D. v SONY, et al - 5/31/2022 - J. Licinio, M.D.

2                    And so if you work in another, I -- I

3    had funding in Australia, but the funding from

4    Australia does not transfer to the U.S.  So in

5    another institution, they would just bring my grants

6    to them and I had no grants to bring.  So in some

7    places, it's a -- a challenge when you -- when you're

8    applying for a position, when you don't bring

9    anything with you.

10                    And that's -- you -- you asked me if I

11   know why I wasn't hired at Upstate, but I was coming

12   from N.I.H.  When you leave N.I.H. interview it's

13   like that.  You're a government employee.  You go and

14   don't take any money with you.

15                    So U.C.L.A. gave me a two-million-

16   dollar package.  My wife and I like, you know, a

17   joint like one million for each.  But Upstate, if I

18   had been hired here as chair when you asked, I would

19   have -- I'd come empty-handed.

20                    So you are not a particularly

21   attractive recruit when you come from a place that

22   you cannot bring any resources with you.  At that

23   level, and at the level of chair, when you come as

24   dean typically at -- at the dean level, people don't

25   have -- their individual grants anymore.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────────

**JULIO LICINIO, *MD, PhD, MBA, MS*,**

**Plaintiff,**

v.                                     **5:21-CV-387**
                                         **(FJS/TWD)**

**STATE OF NEW YORK; THE STATE**
**UNIVERSITY OF NEW YORK; THE STATE**
**UNIVERSITY OF NEW YORK UPSTATE**
**MEDICAL UNIVERSITY,**

**Defendants.**

─────────────────────────────────────

**APPEARANCES**                                **OF COUNSEL**

**DANNY GRACE PLLC**                   **DANIEL GRACE, ESQ.**
225 Broadway, Suite 1200              **DOUGLAS MACE, ESQ.**
New York, New York 10007
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**           **AIMEE COWAN, AAG**
**NEW YORK STATE ATTORNEY GENERAL**
300 South State Street, Suite 300
Syracuse, New York 13202
Attorneys for Defendants

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

Currently before the Court, in this workplace discrimination action filed by Dr. Julio

Licinio ("Plaintiff") against the State of New York, the State University of New York ("SUNY"),

and the State University of New York Upstate Medical University ("SUNY Upstate")

(collectively "Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R.

Civ. P. 56. *See* Dkt. No. 73. For the reasons set forth below, the Court grants Defendants'

motion and dismisses Plaintiff's Complaint.

A-1150

# I. RELEVANT BACKGROUND

**A.     Plaintiff's Complaint**

Generally, in his Complaint, Plaintiff asserts five causes of action, two of which are based in discrimination related to his race/color and national origin ("First Claim" and "Second Claim" respectively), and three of which are based in retaliation related to his reporting discrimination suffered by other employees or students of Defendant SUNY Upstate on the basis of race/color, gender, and national origin ("Third Claim," "Fourth Claim," and "Fifth Claim" respectively).   *See* Dkt. No. 1.   The factual circumstances involved in these claims will be discussed in more detail in the following section.

**B.     Undisputed Material Facts on Defendants' Motion for Summary Judgment**

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, No. 17-CV-1206, 2021 WL 921688, *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging

2

genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendants and either expressly admitted or denied without a supporting record citation by Plaintiff.

1.      SUNY Upstate, with most of its operations in Syracuse, New York, is the region's only public academic medical center.

2.      It is one of five health science centers within the SUNY system.

3.      SUNY Upstate has four colleges: the College of Medicine; the College of Nursing; the College of Health Professions; and the College of Graduate Studies (biomedical sciences).   The faculty in these colleges comprise 26 Departments and provide clinical and didactic training to students and trainees in medicine and sub-specialties of medicine, nursing, health sciences, and graduate studies across SUNY Upstate's health and research enterprises.

4.      SUNY Upstate's health enterprise consists of two hospitals, including the region's only level-one trauma center and the region's only children's hospital, as well as a cancer center, and many outpatient clinical locations across Upstate New York.

5.      SUNY Upstate serves approximately 1.8 million patients across a 17-county region and is the region's largest employer with approximately 10,000 employees.

6.      Plaintiff was appointed as the Dean of SUNY Upstate's College of Medicine by

3

SUNY Upstate's former President Danielle Laraque-Arena, M.D.

7.      A letter dated March 14, 2017, memorializes Plaintiff's offer from SUNY Upstate for the positions of Senior Vice President for Academic Health Affairs and Dean of the College of Medicine.

8.      Plaintiff's appointment at SUNY Upstate was effective July 1, 2017.

9.      Plaintiff was responsible for overseeing operations for SUNY Upstate's College of Medicine, including its educational programs, accreditations, admissions, research, and hiring, and for supervising 26 Department Chairs, at least six Deans within the College of Medicine, and all staff members within the College of Medicine Dean's Office.

10.      The offer letter explicitly states that the Senior Vice President for Academic Health Affairs and Dean of the College of Medicine positions are management confidential positions that report to and serve at the pleasure of the President.

11.      The letter states, "In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member of the same rank in the Psychiatry Department."

**Concerns About Plaintiff's Leadership As Dean**

12.      In the fall of 2018, then-President of SUNY Upstate Dr. Laraque-Arena called Dr.

4

Mantosh Dewan, who was a Distinguished Service Professor in the Department of Psychiatry at the time, and asked him if he would be willing to assume the responsibilities of Dean under the title of Vice President of Administration.

13.   Dr. Laraque-Arena told Dr. Dewan that she was offering him that position because she was unhappy with Plaintiff's performance as Dean.[1]

14.   Dr. Laraque-Arena further told Dr. Dewan in the fall of 2018 that she was so uncomfortable working with Plaintiff that she refused to meet with him one-on-one without another person present.[2]

15.   Dr. Laraque-Arena further told Dr. Dewan in the fall of 2018 that Plaintiff was

---

[1] Plaintiff disputes this asserted fact because "[t]he only time Dr. Laraque-Arena provided performance-related feedback to [him], that feedback was positive." *See* Dkt. No. 78 at ¶ 13. However, even if true, that fact does not controvert the uncontroverted evidence that Dr. Laraque-Arena *told* Dr. Dewan that she was offering him that position because she was unhappy with Plaintiff's performance as Dean.

[2] Plaintiff disputes this asserted fact for two reasons: (1) he argues that the evidence relied upon is inadmissible hearsay, and (2) he denies that he acted in a manner that made her uncomfortable, citing evidence that they had a lengthy one-on-one meeting not long before she ended her tenure as President. *See* Dkt. No. 78 at ¶ 14.   The first of these reasons is insufficient to preclude consideration of this fact because the Court finds that, even if the proffered evidence is hearsay, it can be presented in an admissible form at trial.   *See Bowling v. Nolette*, No. 18-CV-0597, 2021 WL 4134733, *7 n.3 (N.D.N.Y. Sept. 10, 2021) (Suddaby, C.J.) ("[E]vidence considered on a motion for summary judgment need not be in an admissible form, so long as it 'can be presented in a form that would be admissible in evidence.'" (citing Fed. R. Civ. P. 56[c][2])).   As to the second of these reasons, even if true, the fact that Plaintiff never actually acted in a manner that made Dr. Laraque-Arena uncomfortable does not contradict the uncontroverted evidence that Dr. Laraque-Arena *told* Dr. Dewan that Plaintiff acted in a manner that made her uncomfortable.   Furthermore, although it might be true that Plaintiff and Dr. Laraque-Arena met one-on-one after the time she made this statement to Dr. Dewan, such evidence does not contradict the fact that she told Dr. Dewan such meetings made her uncomfortable or that she did indeed inform Plaintiff, as documented by evidence dated July 10, 2018, that Dr. Laraque-Arena's Chief of Staff would attend their half-hour weekly meetings.   *See* Dkt. No. 73, Attach. 24.

5

demeaning, hostile, inappropriate, and undercut her.[3]

16.     By that time, Dr. Laraque-Arena had spoken to Plaintiff about his penchant for arriving late to meetings.

17.     Plaintiff admits that, at some point while Dr. Laraque-Arena was President, CEO of SUNY Upstate University Hospital Dr. Robert Corona began attending the meetings between her and Plaintiff.

18.     Plaintiff also admits that Dr. Laraque-Arena had a conversation with him during which she indicated that they needed to work on their "communication."[4]

19.     Dr. Laraque-Arena sent a letter to Plaintiff in the summer of 2018, copying Dr. Corona, that set parameters for their meetings and confirmed that someone would attend their one-on-one meetings in the future.

20.     Dr. Dewan declined Dr. Laraque-Arena's offer to assume the responsibilities of Dean under the title of Vice President of Administration because he did not want to clash with Plaintiff, who still held the role of Dean.

---

[3] Plaintiff disputes this asserted fact on the basis that it is inadmissible hearsay and that he denies communicating with Dr. Laraque-Arena in a demeaning, inappropriate, hostile, or aggressive way.  *See* Dkt. No. 78 at ¶ 15.   Again, his argument regarding hearsay is insufficient for the reasons stated in Note 2 of this Memorandum-Decision and Order.   Moreover, Plaintiff's denial about communicating in the relevant way does not dispute the actual asserted fact, which is that Dr. Laraque-Arena *told* Dr. Dewan that Plaintiff had acted in such a manner.  *See Yetman v. Capital Dis. Trans. Auth.*, No. 12-CV-1670, 2015 WL 4508362, *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).   The Court, therefore, deems this asserted fact admitted.

[4] Although Plaintiff denies this fact, he cites pages of his deposition transcript that actually support the fact.   (Dkt. No. 78, Attach. 2, at 35-36 ["So she said so we have to work on our communication, et cetera"].)

6

A-1155

21.     Following Dr. Laraque-Arena's resignation in December 2018, Dr. Dewan became the interim president of SUNY Upstate.

22.     Dr. Dewan is of Indian descent.

23.     In late December 2018, President Laraque-Arena emailed Dr. Dewan to alert him to a discrimination complaint that several female faculty members had filed against Plaintiff with SUNY Upstate's Office of Diversity and Inclusion ("ODI") relating to a search for a Department Chair.

24.     When Dr. Dewan became Interim President, some members of senior leadership at the SUNY System Administration immediately expressed their concerns about Plaintiff remaining in the Dean position.[5]

25.     Dr. Ricardo Azziz, the former SUNY Chief Officer of Academic Health and Hospital Affairs, persistently encouraged Dr. Dewan to remove Plaintiff from the Dean position.[6]

26.     Plaintiff informed Dr. Dewan that Dr. Azziz had told Plaintiff to begin looking for another job.

---

[5] Plaintiff disputes this asserted fact on the basis that it is inadmissible hearsay and adds facts regarding from which specific senior leadership members such concerns originated.  *See* Dkt. No. 78 at ¶ 25.   His argument regarding hearsay is insufficient for the reasons stated in Note 2. Regarding Plaintiff's other objection, it does not contradict the asserted fact (which is supported both by declaration testimony that regards concerns from "senior leadership" and merely gives one "instance," and by deposition testimony that regards concerns from "every source" and merely "touche[s] on a couple things . . . people actually stated").  *See* Dkt. No. 73, Attach. 26, at ¶ 17; Dkt. No. 78, Attach. 3, at 10-13.   However, the Court has amended the asserted fact here to reflect that it was perhaps not every member of SUNY senior leadership who expressed such concerns.

[6] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

7

27.     However, Dr. Dewan told Plaintiff that, despite instructions from SUNY to remove Plaintiff, he was willing to give Plaintiff a chance to prove himself and give him the benefit of the doubt.

28.     Between the winter of 2018 and the spring of 2019, Plaintiff began seeking employment elsewhere.

29.     The Liaison Committee on Medical Education ("LCME") is an accrediting body of SUNY Upstate's College of Medicine and sets forth accreditation standards by which medical schools are evaluated.

30.     In 2011, the College of Medicine was placed on probation because the LCME had determined that the College of Medicine was not compliant with several accreditation standards largely relating to the curriculum at SUNY Upstate's Binghamton Clinical Campus.

31.     Under the leadership of former College of Medicine Dean David Duggan, the College of Medicine employed remedial measures, "made swift and significant progress," and was released from probation and received accreditation from LCME as of June 2013.

32.     Academic probation was a one-time event that was corrected by the College of Medicine, and the LCME scheduled the next site visit for six years later in 2019.[7]

33.     A "whole team" at SUNY Upstate was involved in the LCME process in 2019 while Plaintiff was Dean.

---

[7] Plaintiff disputes this asserted fact and adds facts regarding the additional remedial actions that SUNY Upstate was required to take in terms of monitoring for continued compliance, as well as the fact that SUNY Upstate was required to submit a status report regarding those in April 2014. *See* Dkt. No. 78 at ¶ 34.   However, Plaintiff's additional facts do not dispute the above-stated fact, which asserts that academic probation did not again occur, the corrections were made, and the next site visit was scheduled for 2019.   Therefore, the Court deems this asserted fact admitted.

8

34.     In fact, that team was already formed and had begun to work on the LCME accreditation process before Plaintiff arrived at SUNY Upstate.

35.     Plaintiff and then-President Dr. Laraque-Arena hired an outside consultant to assist with the LCME accreditation process, agreeing to pay the consultant approximately $1 million.

36.     Use of a consultant for the LCME process was unprecedented at SUNY Upstate.

37.     There were discussions held with Dr. Dewan and senior leadership on how to minimize Plaintiff's role in the accreditation process given the concerns over Plaintiff's behavior.[8]

38.     While the College of Medicine's accreditation status was not put on probation by LCME during Plaintiff's tenure as Dean, the LCME's review was not perfect.

39.     There were areas that LCME identified as needing to be monitored, including the area of diversity.

40.     For example, the LCME noted that, although new policies, procedures, and programs designed to increase diversity among students, faculty, and senior administrative staff were implemented under Plaintiff's leadership, there were only modest gains in diversity of senior administrative staff and faculty during the first year of implementation.

41.     After Dr. Dewan became Interim President, Dr. Ruth Weinstock approached him about concerns she had regarding Plaintiff's interference in the search process for the new Chair

---

[8]     Plaintiff states that he "cannot respond to this allegation as the facts are unavailable to him." *See* Dkt. No. 78 at ¶ 39.   However, a lack of knowledge is not a proper basis for denying or properly disputing an asserted fact.   *See Disability Rights New York v. New York State Dep't of Corr. And Cmty. Supervision*, No. 20-CV-1487, 2024 WL 184248, *3 n.3 (N.D.N.Y. Jan. 16, 2024) (Suddaby, J.) (collecting cases).   Therefore, the Court deems this asserted fact admitted.

9

of SUNY Upstate's Department of Medicine.[9]

42.     The search committee members had been searching for and interviewing candidates for months and the committee had recommended that certain individuals be put forward for consideration; but Plaintiff was ignoring the committee's recommendations and insisting that his personal friends be moved forward in the process even though the committee had already rejected them.[10]

43.     Dr. Dewan spoke with the committee members following the concerns raised by Dr. Weinstock, and they reiterated their exasperation with Plaintiff's subversion of their search process and recommended that Dr. Dewan not approve the hire of the individual selected by Plaintiff, whom they did not believe to be qualified.[11]

44.     Dr. Dewan advised Plaintiff to call off the search, resulting in months of wasted time for the approximately 20 busy SUNY Upstate doctors and faculty who sat on the search committee.[12]

---

[9] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[10] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.   In addition, the Court notes Plaintiff's conspicuous omission of a citation to any declaration testimony by him disputing this fact, which would certainly be within his personal knowledge.  *See* Dkt. No. 78 at ¶ 44.

[11] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[12] Plaintiff disputes this asserted fact, but that denial involves the addition of facts related to potential alternative reasons as to why the search might have been ended at that time other than his alleged actions.  *See* Dkt. No. 78 at ¶ 46.   Although this does properly dispute why the search was ended (and the Court has therefore omitted a portion of the asserted fact), it does not deny the remainder of the fact, *i.e.*, that the search was ended and resulted in wasted time.

10

45.     Later that month, Dr. Dewan made plans for himself, the President of SUNY ESF, and other SUNY Upstate leaders to take the SUNY Chancellor to lunch, and he included Plaintiff in that invitation.

46.     Before that lunch, Dr. Dewan spoke with Plaintiff and asked him to please keep the conversation high-level and pleasant.[13]

47.     Two days later, Dr. Dewan received an email from the Chancellor that forwarded an email that Plaintiff had sent to her immediately following the lunch asking for $5 million to recruit a specific doctor for the position of Chair of Medicine at SUNY Upstate.[14]

48.     Plaintiff did not copy Dr. Dewan on this email.[15]

49.     Dr. Dewan apologized to the Chancellor and told her that he did not know that Plaintiff had written to her and assured her that he would address it with Plaintiff.

50.     Dr. Dewan also spoke on the phone with the Chancellor following the email exchange, at her request.[16]

51.     The Chancellor asked Dr. Dewan why he had not yet fired Plaintiff, expressed her

---

[13] Plaintiff denies this asserted fact, but the evidence cited does not support that denial.  *See* Dkt. No. 78 at ¶ 49.   Therefore, the Court deems this asserted fact admitted.

[14] Plaintiff disputes Defendants' characterization of this email but does not dispute that he sent such an email in the manner or circumstances described.  *See* Dkt No. 78 at ¶ 50.   Because Plaintiff's cited evidence does not dispute the asserted fact, which is supported by the evidence presented by Defendants, the Court deems this asserted fact admitted.

[15] Although Plaintiff denies a perceived "implication" of the above-stated fact, that denial is ineffective for the reasons stated above in Note 3.   *See also Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).

[16] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

11

ongoing concerns about Plaintiff continuing as the Dean of SUNY Upstate's College of

Medicine, and asked him to ensure that Plaintiff not contact her again directly in the future.[17]

52.     In approximately March 2019, Dr. Dewan was contacted by Dr. Sharon

Brangman, who had been appointed Chair of the newly created Geriatrics Department.[18]

53.     Dr. Brangman was distressed and relayed concerns regarding the level of funding

she had received for that Department, which had been created in July 2018 under Dr. Laraque-

Arena's leadership.[19]

54.     Dr. Brangman also relayed other concerns about Plaintiff making inappropriate

comments and not behaving appropriately as Dean.[20]

55.     She shared that, during an Admissions Committee end-of-year dinner that she,

Plaintiff, and other faculty and students had attended in 2018, Plaintiff had told a story about a

patient he used to treat as a psychiatrist in Miami.[21]

56.     As part of the story, he shared with students and other faculty explicit details

---

[17] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[18] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[19] Plaintiff sufficiently disputes the portion of this asserted fact that he had been "non-responsive to her requests to help her get financial support" and that part has therefore been omitted here; however, the evidence cited does not contradict the rest of the asserted fact.  *See* Dkt. No. 78 at ¶ 56.

[20] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[21] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

A1160

about the sexual issues that the patient was having, which was a violation of patient privacy and completely inappropriate and unprofessional.[22]

57.    Dr. Brangman shared that she was horrified by Plaintiff's actions.

58.    Dr. Brangman also reiterated the concern that Dr. Dewan had previously learned about Plaintiff's attempt to subvert the committee search process during the search for a new Chair for the Department of Medicine.[23]

59.    On January 24, 2019, Plaintiff emailed a group of approximately 80 faculty and students inviting them to email him at his personal email address to report instances of discrimination or offensive behavior and to label the mail "confidential."[24]

60.    The faculty union brought Plaintiff's email to the attention of then-Vice President for Human Resources Eric Frost.

61.    This communication required Mr. Frost to instruct Plaintiff that his email was inappropriate and inconsistent with SUNY Upstate's collective bargaining agreements, policies, and established practices.[25]

---

[22] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[23] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[24] Plaintiff purports to dispute the asserted fact, but his explanation addresses his intentions for sending this email and does not actually dispute that he did indeed send such an email.  *See* Dkt. No. 78 at ¶ 64.   Because Plaintiff's explanation is non-responsive to the fact actually asserted, the Court deems this asserted fact admitted.

[25] Although Plaintiff disputes that the instruction was "required," the record evidence he cites in support of that denial, *i.e.* his own deposition testimony, is insufficient to create a genuine dispute of material fact because it does not demonstrate personal knowledge of the "multiple Upstate polices" on which Mr. Frost relied (but merely expresses Plaintiff's opinion that "H.R. didn't like the . . . way the email was worded").   *See* Dkt. No. 78, Attach. 2, at 20-21.

13

62.    Mr. Frost assisted Plaintiff with sending a clarifying follow-up email to the same faculty and students.

63.    When Dr. Dewan took over as President, he learned that Dr. Laraque-Arena had significantly increased the number of administrative positions in the President's office and that Plaintiff had done the same in the College of Medicine.[26]

64.    Faculty had shared their dissatisfaction with SUNY Upstate money being spent on hiring so many administrators, and Dr. Dewan was of the mindset that they needed to model and ensure administrative efficiency in the same manner they asked others to be efficient and accountable.[27]

65.    Dr. Dewan began to reduce the number of administrative staff in the President's

_____

[26] Plaintiff does not expressly dispute this asserted fact but instead attempts to add facts regarding his reasons for increasing the number of such positions in the College of Medicine. *See* Dkt. No. 78 at ¶ 68.   Such an attempt is improper for multiple reasons.   *See* N.D.N.Y. L.R. 56.1(b) ("The opposing party shall file a response to the Statement of Material Facts.   The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs."); *Willis v. Cty. of Onondaga*, No. 14-CV-1306, 2016 WL 7116126, *2 n.1 (N.D.N.Y. Dec. 6, 2016) (Suddaby, C.J.) ("[A]ny additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not."), *aff'd*, 710 F. App'x 47 (2d Cir. 2018); *Zuk v. Onondaga Cty.*, No. 07-CV-0732, 2010 WL 3909524, *2 (N.D.N.Y. Sept. 30, 2010) ("Plaintiff . . .   included several qualifying statements in his responses.   The Court notes that, . . . , in many of Plaintiff's qualifying statements, he asserts additional facts.   This is improper."), *aff'd*, 471 F. App'x 70 (2d Cir. 2012); *Maioriello v. New York State Office for People With Developmental Disabilities*, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017) (Suddaby, C.J.) ("[T]hroughout Plaintiff's Rule 7.1 Response, she . . . includes additional facts and/or legal argument in those responses. . . .") (emphasis added).   Therefore, the Court deems this asserted fact admitted.

[27] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

14

office by eliminating what he viewed as unnecessary and/or duplicative functions.[28]

66.     During his first year as President, Dr. Dewan eliminated eight positions in the

President's office, which resulted in a savings of more than $1 million annually.[29]

67.     Dr. Dewan became aware that Plaintiff was creating a significant number of new

positions within the College of Medicine.

68.     Dr. Dewan had three serious concerns regarding such expansion: (1) the cost of

unnecessary administrative bloat; (2) the lack of clarity regarding the responsibilities of these

new positions; and (3) the lack of connection between these positions and the objective outcomes

that had been agreed upon for the College of Medicine.[30]

69.     As to his concerns about the cost of unnecessary administrative bloat, Dr. Dewan

learned that Plaintiff had grown the Dean's staff from four to eleven people and was in the

process of creating additional positions.[31]

70.     That was a 250% increase that cost hundreds of thousands of dollars in additional

---

[28] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[29] Plaintiff disputes that these actions resulted in the stated savings but fails to cite any evidence in support of that contention.  *See* Dkt. No. 78 at ¶ 71.   Therefore, the Court deems this asserted fact admitted.

[30] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[31] Plaintiff adds facts regarding his reasons for creating such positions but does not deny the asserted fact.  *See* Dkt. No. 78 at ¶ 74.   To the extent that Plaintiff disputes the implication that his new hires constituted "unnecessary administrative bloat," that denial is ineffective for the reasons stated above in Note 3.  *See also Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).   In any event, the Court has clarified that the hires were relevant to Dr. Dewan's *concerns* regarding such bloat.

15

expense.[32]

71.     In addition to the new positions that Plaintiff created in the Dean's office, Plaintiff created a Director of Special Programs position in Student Affairs and was proposing to create an additional position of Assistant Dean of Cultural Competency in the Dean's office.

72.     It was unclear what duties these positions would be responsible for performing.[33]

73.     The titles of the positions Plaintiff was creating suggested that their duties might overlap with the duties that individuals in existing positions were already responsible for performing.[34]

74.     This generated complaints from those holding the existing positions in or around the spring and summer of 2019.[35]

75.     For example, SUNY Upstate's longtime College of Medicine Assistant Dean for Diversity Dr. Brian Thompson complained to Dr. Dewan that Plaintiff had demoted and sidelined him by creating an Associate Dean for Diversity and Inclusion position that would be performing essentially the same functions that he was already responsible for performing.[36]

76.     Similarly, SUNY Upstate's Dean of Students Dr. Julie White complained that

---

[32] Plaintiff adds facts regarding his reasons for creating such positions but does not deny the asserted fact.   *See* Dkt. No. 78 at ¶ 75.

[33] Plaintiff denies the asserted fact but the evidence cited does not support Plaintiff's reasons for that denial.   *See* Dkt. No. 78, at ¶ 77.   Therefore, the Court deems this asserted fact admitted.

[34] The Court deems this asserted fact admitted for the reasons discussed above in Note 33.

[35] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[36] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

16

Plaintiff was proposing to create a new Associate Dean for Student Advising position even though she was already responsible for student advising.[37]

77.     Finally, Dr. Dewan had concerns that there was no connection between these new positions and the objective outcomes on which he and Plaintiff had agreed, *i.e.*, to increase the number of Under-Represented in Medicine ("URiM") students entering SUNY Upstate.[38]

78.     Dr. Dewan asked Plaintiff how each position would help recruit more URiM students.[39]

79.     Dr. Dewan also emphasized that Plaintiff needed to manage the performance of the individuals who already held existing positions to ensure their success before creating new positions that had the same responsibilities.

80.     Plaintiff never provided Dr. Dewan with an organizational chart or written job descriptions related to these new positions but, instead, became angry in response to Dr. Dewan's inquiries.[40]

---

[37] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[38] Plaintiff disputes the asserted fact on the basis that recruiting URiM students was not the only objective, and these positions in fact were made with a focus on increasing diversity among the faculty and staff.   *See* Dkt. No. 78 at ¶ 82.   However, Plaintiff does not present any evidence to address the asserted fact, which is that Dr. Dewan had concerns that the positions did not advance the goal of increasing the number of URiM students.   Therefore, the Court deems this asserted fact admitted.

[39] Plaintiff disputes this fact by citing evidence that Dr. Dewan asked him what certain minority faculty members "did all day," but he does not provide any evidence indicating that, even if Dr. Dewan did question what certain faculty were responsible for, he did not also ask how the new positions would help recruit more URiM students.   *See* Dkt. No. 78, at ¶ 84.   Therefore, the Court deems this asserted fact admitted.

[40] Although Plaintiff denies that Dr. Dewan ever asked him for such a chart or such descriptions, the above-stated fact never asserts that Dr. Dewan did so.   Again, Plaintiff's denial of a

17

81.     In the summer of 2019, Dr. Dewan arranged for local political representatives to separately visit SUNY Upstate's campus so that they could describe the significance of SUNY Upstate's services to the Upstate New York community and garner political support for SUNY Upstate's initiatives.

82.     Dr. Dewan invited all members of SUNY Upstate's University Executive Committee to attend one-hour meetings with representatives when they visited to provide an overview of SUNY Upstate.

83.     Due to Plaintiff's history of making inappropriate statements and going off on tangents, Dr. Dewan had concerns that Plaintiff might say something or behave in a manner that would leave these representatives with a negative impression of SUNY Upstate.[41]

84.     During one such visit, Plaintiff went off on a tangent in a manner that (in Dr. Dewan's view) was contrary to how one would expect SUNY Upstate's Dean of the College of Medicine to present himself and (again, in Dr. Dewan's view) was an embarrassment to SUNY Upstate and himself as President.[42]

_____

perceived implication of fact is ineffective for the reasons stated above in Note 3.   As for Plaintiff's denial of the reason for his anger, the Court has modified the above-stated fact to better conform with the record evidence Plaintiff cited.

[41] Plaintiff denies that he had a history of making inappropriate statements.   *See* Dkt. No. 78 at ¶ 89.   Although he does not provide a copy of the supporting evidence that he cites (pages "96" and "97" of the deposition transcript from Ann Botash), Defendant has done so.   *See* Dkt. No. 81, Attach. 14, at 1-2.)   However, this evidence (which expresses only one person's experience that is not based on *all* interactions that Plaintiff had with other employees and students at Upstate, and which in any event admits that Plaintiff was "[o]ccasionally" unprofessional with other faculty members) in no way controverts the undisputed evidence of Plaintiff's inappropriate statements, as described above in Fact Numbers 15, 55, 56, and 61 of this Statement of Facts. Therefore, the Cour deems this asserted fact admitted.

[42] Plaintiff disputes this asserted fact "insofar as this does not appear to be a fact capable of being proven or disproven" and is too vague and ambiguous.   *See* Dkt. No. 78, at ¶ 90.

18

85.     After that incident, Dr. Dewan spoke with his staff and asked them to preferably schedule these visits when Plaintiff was not going to be on campus.[43]

86.     Dr. Dewan also learned that Plaintiff had begun to instruct Chairs within the College of Medicine not to talk to Dr. Dewan about certain Departmental concerns and that he blamed Dr. Dewan for being unable to do his job.[44]

87.     On August 8, 2019, Dr. Dewan met with former SUNY Upstate President Dr. Gregory Eastwood and discussed his concerns about Plaintiff's troubling conduct, including his disparaging remarks about Dr. Dewan.[45]

88.     In May 2019, Plaintiff gave a speech at the third-year medical student orientation.

89.     During his speech, Plaintiff advised third-year medical students, among other things, that "it's only going to get worse and worse – residency, fellowship and having a family will be very hard" and that, if the students do not do well in their clerkships, they will not get

---

However, Plaintiff cites no evidence to contradict the proffered testimony of Dr. Dewan on this matter, nor any legal citation to show that such fact is improper for consideration.   Further, to the extent that Plaintiff argues that this fact cannot be presented in a form that would be admissible at trial, the Court disagrees, given that Dr. Dewan can testify regarding his own observations and impressions of Plaintiff's conduct.   Therefore the Court deems this asserted fact admitted.

[43] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[44] Plaintiff purports to deny this asserted fact but admits that he instructed Chairs not to speak with Dr. Dewan about any Departmental concerns that should be addressed to Plaintiff; he does not appear to specifically deny any of the remainder of the fact.   *See* Dkt. No. 78, at ¶ 92. Therefore, the Court deems this asserted fact admitted.

[45] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

19

into their chosen specialty, and he then talked about student depression and suicide.[46]

90.     Associate Dean of Student Affairs and Campus Life Sharon Huard emailed Dean of Student Affairs Dr. Julie White and notified her that a student wanted to make a complaint regarding Plaintiff's speech.

91.     Dr. Leann Lesperance (a SUNY Upstate clinical professor and Associate Dean for Academic Affairs at the Binghamton Clinical Campus) emailed SUNY Upstate Audio-Video Technician Gerard Roy and instructed him not to publish the portion of the orientation that contained Plaintiff's speech.

92.     Plaintiff's speech was the only speech made at orientation that was not published.

93.     Dr. White emailed Plaintiff to inform him that a group of students and faculty members were upset with the content of his speech and that a student wanted to file a complaint against him as a result.

94.     Dr. White suggested and helped draft a letter for Plaintiff to disseminate to students after the complaints were brought to his attention.[47]

95.     At the beginning of a leadership meeting, Plaintiff played a video on his phone as people were walking into the meeting that depicted a public figure using ethnic slurs and making derogatory comments about Italians using vulgar language.[48]

---

[46] Plaintiff disputes the "characterization and selective omission of context" and adds facts related to this incident.  *See* Dkt. No. 78 at ¶ 95.  However, the evidence Plaintiff cites does not contradict the asserted fact, which the Court finds to be supported by the presented evidence (which includes contemporaneous text messages about the speech).  Therefore, the Court deems this asserted fact admitted.

[47] *See* Dkt. No. 78, Attach. 2, at 45-46; Dkt. No. 73, Attach. 49, at ¶ 10; Dkt. No. 73, Attach. 53-54.

[48] Plaintiff purports to dispute this asserted fact, but he admits that he was playing such a video

20

96.     Dr. Dewan's Chief of Staff, Linda Viet, who is Italian, was visibly offended by the video.[49]

97.     In May 2019, Chair of the Psychiatry Department Dr. Thomas Schwartz emailed Plaintiff, Dr. Dewan, and Dr. Corona in support of Dr. Brangman, who was at that time newly appointed as the Chair of the Geriatrics Department.

98.     Dr. Schwartz believed that Plaintiff supported this role for Dr. Brangman given that he had directly appointed her, but he was concerned that other agencies were not as supportive.

99.     Dr. Schwartz expressed to Dr. Corona and Dr. Dewan that he was worried as a colleague of Dr. Brangman that she was not being treated fairly as a new Chair, specifically with respect to the hospital's lack of financial backing of the Geriatrics Department.

100.    Dr. Corona added Plaintiff to the email, and Plaintiff responded by emailing only Dr. Schwartz, criticizing him for emailing Dr. Corona and Dr. Dewan about the issue; Dr. Schwartz felt he was lobbying on Plaintiff's behalf and on behalf of the College of Medicine.[50]

---

on his phone and that it was still playing when people began to enter the room.  *See* Dkt. No. 78 at ¶ 101.  Because Plaintiff has not actually provided any basis for his denial, the Court deems this asserted fact admitted.

[49] Plaintiff denies this asserted fact, but the cited evidence does little more than appear to suggest that Dr. Chin was the only person in the room at the relevant time.  *See* Dkt. No. 78 at ¶ 102 [citing ¶ 156 of Plf.'s Decl.].  However, the evidence does not specifically state that Ms. Viet was absent from the room at the time.  *See* Dkt. No. 78, Attach. 4, at ¶ 156.  In any event, Plaintiff's declaration regarding who was in the room appears contradicted by his previous deposition testimony.  *See* Dkt. No. 78, Attach. 2, at 53-54.  *See Guerra v. Swanstrom*, No. 21-CV-0459, 2023 WL 5528721, *8 (N.D.N.Y. Aug. 28, 2023) (Kahn, S.J.) ("[I]t has long been the law in the Second Circuit that a party may not avoid summary judgment by submitting a declaration in opposition to summary judgment that contradicts his sworn deposition testimony.").  Therefore, the Court deems this asserted fact admitted.

[50] Plaintiff purports to dispute this fact but, instead of citing record evidence that actually

21

101.    In his response, Plaintiff reprimanded Dr. Schwartz for being a "busybody" and a "vigilante" for raising the issue and for insinuating to Dr. Corona and Dr. Dewan that Plaintiff was not doing his job.[51]

102.    Plaintiff's response to Dr. Schwartz contained 13 numbered paragraphs that explained how and why he took offense to the email.

103.    On August 22, 2019, Dr. Lesperance attended a white coat ceremony that is held annually as a rite of passage for students entering the medical school.

104.    It is a ceremony attended by incoming first-year medical students and their families during which students receive a white doctor's coat and recite the Hippocratic Oath.

105.    The room was full of first-year medical students and their parents/guardians.

106.    Plaintiff was supposed to speak and then later close the ceremony by spending no more than five minutes thanking everyone for attending.

107.    When Plaintiff came back to thank the students and their parents/guardians and close the ceremony, he talked for 10-15 minutes (longer than scheduled) in what Dr. Lesperance perceived to be a long rambling diatribe.[52]

---

controverts this fact, his response is an explanation of why he found Dr. Schwartz's actions to be worthy of criticism, which does not dispute, and actually supports, the asserted fact.  *See* Dkt. No. 78 at ¶ 107.   Therefore, the Court deems this asserted fact admitted.

[51] The Court agrees with Plaintiff that whether Plaintiff "mocked" Dr. Schwartz is a somewhat subjective interpretation and has therefore omitted that portion of the asserted fact, but the Court deems the rest of the asserted fact admitted as Plaintiff offers no basis for denying it.  *See* Dkt. No. 78 at ¶ 108.

[52] Plaintiff denies the asserted fact but merely adds facts regarding the content of his speech (which he admits regarded "the difficulties and stresses of medical school" and his own "specialty on depression and suicide").  *See* Dkt. No. 78 at ¶ 114.   In addition, his denial relies on a portion of his declaration (paragraph 221) that is inapposite and a portion of his deposition transcript (page 221) that the parties have not provided.  *See* (Dkt. No. 78, Attach. 4, at ¶ 202;

22

108.    Despite having recently been informed that students and faculty had complained about a similar speech he had given at the third-year orientation only a few months earlier, Plaintiff again talked about suicide and depression and dwelled on related statistics.

109.    Dr. White eventually intervened and closed the meeting.

110.    After his speech, Dr. Lesperance went to Dr. White and told her that Plaintiff should never be allowed to address students "off script" again given how disastrous his remarks had been.[53]

**Plaintiff's Allegations**

111.    There are multiple ways that a position at SUNY Upstate can be filled.

112.    An open national search involves outside consultants and provides the largest pool of applicants but is costly and takes a great deal of time.

113.    For leadership positions, individuals are frequently appointed on an interim basis until the position is filled.

114.    Sometimes an interim appointee will be appointed to the position permanently if the interim appointee has performed satisfactorily and circumstances warrant the appointment.

115.    As Dean, Plaintiff used each of these processes.

116.    Dr. Lawrence Chin was appointed as interim Dean of the College of Medicine after Plaintiff was removed.

---

Dkt. No. 73, Attach. 11; Dkt. No. 78, Attach. 2; Dkt. No. 81, Attach. 15.)   The asserted fact is deemed to be admitted.

[53] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

23

117.    Dr. Chin was selected to be interim Dean based on his exceptional qualifications.

118.    Dr. Chin has appointed nine Department Chairs since becoming Dean.

119.    All those Department Chairs were appointed pursuant to external searches except Dr. Xiuli Zhang, Dr. Francesca Pignoni, and Dr. Thomas Schwartz.

120.    Dr. Zhang and Dr. Schwartz were appointed to permanent Chair positions without searches being conducted because they had served as interim Department Chairs of their Departments throughout the COVID-19 pandemic; Dr. Chin assessed, with input from faculty within their departments, that they were highly qualified as judged by their credentials and the fact that they had performed exceptionally well as interim Chairs during a difficult time.

121.    Dr. Pignoni was appointed Chair of her Department for similar reasons after an attempted but failed search.

122.    While serving as Dean, Plaintiff had appointed several Department Chairs and Associate Deans without conducting searches.

123.    In his deposition, Plaintiff admitted that, when Dr. Dewan allegedly objected to the positions that Plaintiff had created, Dr. Dewan never specifically said anything about anyone's gender, race, or national origin.[54]

---

[54] Plaintiff denies this asserted fact, arguing that Dr. Dewan "implicitly referred to gender, race, or national origin when he objected only to individuals Dr. Licinio appointed or attempted to appoint who were of URiM races (Hispanic, Black) or female." *See* Dkt. No. 78, at ¶ 130. The above-stated fact says nothing about Dr. Dewan's "implicit" statements. *See Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts). Moreover, Plaintiff's denial contains a legal argument regarding how Dr. Dewan's words or actions should be interpreted, not evidence to dispute the asserted fact. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts."); *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) ("[T]he [Rule 56.1] Statement improperly interjects

24

124.   Despite his overall concerns, Dr. Dewan allowed Plaintiff to make those appointments since it was in the purview of Plaintiff's position as Dean.

125.   Mr. Frost disagreed with a number of decisions Plaintiff made regarding those positions from a human resources perspective.

126.   Plaintiff gave roles and titles to faculty that Mr. Frost deemed not to be appropriate.

127.   For example, Plaintiff appointed a number of faculty members to Associate Dean and Assistant Dean positions that he had created and gave those individuals non-union management/confidential titles despite the fact they were union members.[55]

128.   Plaintiff paid the individuals in these new positions additional state compensation in the form of an "also receives" ("ALR") even though the positions appeared to overlap with other existing positions.[56]

129.   Plaintiff did not consult with Human Resources before he established these

_____

arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts.").   Therefore, the Court deems this asserted fact admitted.

[55] Plaintiff denies that he (as opposed to the university administration) assigned the above-stated titles and improperly attempts to add other facts.   However, the evidence he cites in support of his denial (paragraph 200 of his Declaration) does not support that denial.   *See* Dkt. No. 78, Attach. 4, at ¶ 200.   Nor is the denial supported by the next paragraph of his Declaration, which states merely that the giving of such titles is "routine[]."   *See id.* at ¶ 201.   Finally, the attempt to add facts is improper.   *See, supra,* Note 26.

[56] Plaintiff denies that these new positions in fact overlapped with existing positions but the asserted fact states only that the positions "appeared" to overlap.   *See* Dkt. No. 78 at ¶ 135.) Further, his cited evidence states only that the positions were typically meant to be part-time add-on roles rather than full-time positions with full benefits; thus, this evidence does not dispute the assertion that even a part-time role could appear to overlap with the existing positions.   *See* Dkt. No. 78, Attach. 2, at 76-77.   Therefore, the Court deems this asserted fact admitted.

25

roles.[57]

130.    Mr. Frost told Plaintiff that he could not assign roles and titles to faculty

unilaterally, but Plaintiff did not comply with his guidance.[58]

131.    Plaintiff alleges that, while he was Dean in 2018, he appointed an all-female

External Scientific Advisory Board.

132.    Dr. Dewan had no input into whether that Board would continue to meet.[59]

133.    Plaintiff organized the Board, and it met on one occasion in June 2018.

134.    Dr. Dewan never made any comments to Plaintiff about the gender of the Board

members.

135.    Dr. Dewan did not make any comments to Plaintiff about whether the Board was

─────────────

[57] Plaintiff disputes this asserted fact, stating that he "coordinated with Human Resources in the hiring process and met with Human Resources twice a week."  *See* Dkt. No. 78 at ¶ 136.  Yet the evidence on which Plaintiff relies for this statement does not clearly establish the statement; it establishes only that Mr. Frost had not asked Plaintiff for a position description for any positions and that Plaintiff had "formal meetings . . . [with] Mary Grace and Eric Smith and others about that issue of the college twice a week."  *See* Dkt. No. 78, Attach. 2, at 58. Moreover, the fact that Plaintiff had formal meetings with Human Resources personnel twice a week about position descriptions (in general) does not mean that he consulted with Human Resources about the relevant positions before he established them.  Therefore, the Court deems this asserted fact admitted.

[58] Plaintiff denies the asserted fact, asserting that he did not administratively assign any of these roles unilaterally, but that the offers for them came through the institution.  *See* Dkt. No. 78 at ¶ 137.  However, the evidence that he cites in support of this assertion, *i.e.* Paragraph 198 of his Declaration, does not substantiate the assertion and indeed does not appear to address it at all. *See* Dkt. No. 78, Attach. 4, at ¶ 198.  Nor does his Declaration, which states merely that the giving of such titles is "routine[]."  *See id.* at ¶ 201.  On the other hand, the evidence on which Defendant relies (Paragraph 9 of Mr. Frost's Declaration) is corroborated by Exhibits A and B to that Declaration.  *See* Dkt. No. 73, Attach. 37-38.  Therefore, the Court deems this asserted fact admitted.

[59] Plaintiff disputes this asserted fact, but the evidence he cites does not support that denial.  *See* Dkt. No. 73, Attach. 26, at ¶ 54.  Therefore, the Court deems this asserted fact admitted.

26

necessary or not, and he did not tell Plaintiff to not have the Board meet.[60]

136.   Plaintiff admitted that he never inquired as to why the Board did not continue to meet after he was removed from the Dean position and had never found out why it did not continue to meet.

137.   Plaintiff never made any complaints about the Board not continuing.

138.   A Diversity Committee already existed prior to Plaintiff's employment at SUNY Upstate.

139.   After Plaintiff's removal from the position of Dean, Dr. Chin assumed oversight responsibilities of the Diversity Committee.

140.   A current Distinguished Professor of Psychiatry and Behavioral Sciences, Plaintiff's wife, Dr. Ma-Li Wong, is a Department of Psychiatry research faculty member who partners with Plaintiff to conduct research.

141.   When SUNY Upstate hired Dr. Wong in 2017, she was paid a total starting salary package of $220,000, which was comprised of $120,000 in state base salary and $100,000 in ALR.

142.   This salary is above the median salary for psychiatry research faculty in the

---

[60] Plaintiff denies the asserted fact, arguing that a remark by Dr. Dewan that Plaintiff interpreted to be sarcastic (specifically, Dr. Dewan's remark, "Oh, do we have an external scientific advisory board?") implied that Dr. Dewan "felt the board was unnecessary and a waste of [SUNY Upstate] resources." *See* Dkt. No. 78 at ¶ 142.   Setting aside the fact that Plaintiff's objection is based on perceived implication of a statement rather than the statement itself (*see, supra,* Note 3 of this Decision and Order), the uncorroborated deposition testimony that he cites in support of his objection flatly contradicts his subsequent deposition testimony that Dr. Dewan did not make any comments about whether the Board was necessary or not and did not tell Plaintiff not to do it or question him "in any way as to whether the meeting was necessary." *See* Dkt. No. 78, Attach. 2, at 7-8.   As a result, Plaintiff has triggered the limited exception to the rule against making credibility determinations, as set forth in *Jefreys v. New York,* 426 F.3d 549 (2d Cir.2005).   Therefore, the Court deems this asserted fact admitted.

27

United States according to the Association of American Medical Colleges ("AAMC") salary survey.

143.    ALR is permitted where an employee or faculty member assumes responsibility for additional duties or assignments (typically within their primary department) which may be unrelated to, or independent of, their standard work responsibilities.

144.    It is also given to research faculty members in the Psychiatry Department to assist them with starting their research at SUNY Upstate with the expectation that they will apply for and receive grant funding that will supplement their base salary.

145.    Each ALR given to employees and faculty members is reviewed and renewed on an annual basis; it is not intended to supplement that employee or faculty member's income indefinitely.

146.    Instead, the ALR portion of their salary is expected either to be reduced, eliminated, or transitioned to departmental funding within two-to-three years of their hire, unless additional duties or assignments continue.

147.    In addition to her state compensation package, Dr. Wong was also offered a $30,000 stipend from the Psychiatry Faculty Practice, Inc. ("PFP").

148.    Providing such a stipend was a bit unusual, as it is usually offered only to brand new researchers.

149.    According to SUNY Upstate's records, Dr. Wong's total starting institutional salary was more than the total starting salary of each of the 26 other research faculty members that SUNY Upstate hired between 2017 and 2020.

150.    Her salary was modified in July 2018 so that much of her ALR was absorbed into

28

her state base salary, such that her state base salary became $177,400 and her ALR was reduced to $45,000.

151.    Additionally, Dr. Wong's total "startup commitment" was for $5,386,668.

152.    The startup commitment promised to Dr. Wong included a promise to pay $1,400,000 to design and build her a lab, $75,000 to move the lab and Dr. Wong's specimens, and $3,911,668 for staff, equipment, and lab operating expenses.

153.    Dr. Wong's startup commitment far surpassed any other faculty member hired during the timeframe mentioned.

154.    The package promised to Dr. Wong was not only in excess of all other research faculty members at SUNY Upstate but was (to the knowledge of Senior Associate Dean Richard Gardner) unprecedented in light of the fact that Dr. Wong was not funded by any grants at the time SUNY Upstate hired her.[61]

155.    According to Dr. Schwartz, it is risky to offer a guaranteed position to an unfunded researcher.

156.    No other researcher in the Psychiatry Department has ever received as generous a compensation package as Dr. Wong.[62]

157.    Without grant funding to conduct research, the institution needs to pay for the researcher's startup costs and runs the risk that such costs may never be recouped, as the researcher has little incentive to bring in grants with a guaranteed position.

---

[61] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[62] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

29

158.    After agreeing to the offer letter of March 13, 2017, but before she began her employment, Dr. Wong asked Dr. Schwartz in October 2017 if SUNY Upstate would be willing to increase her state base salary.

159.    Dr. Schwartz asked Dr. Laraque-Arena for permission to respectfully tell Dr. Wong that she was not entitled to an increase in her state base pay, particularly because she was coming without any grants.

160.     Dr. Laraque-Arena replied that it was ultimately his decision but that her advice was to tell Dr. Wong that she had not yet begun her position so it was expected that she would abide by the agreed upon offer letter that she had signed.

161.    Dr. Schwartz followed her advice and informed Dr. Wong of this.

162.    With the knowledge that her state base salary would remain at $120,000, Dr. Wong began her employment at SUNY Upstate in December 2017.

163.    Thereafter, Dr. Wong continued to request that her state base pay be increased and her ALR decreased.

164.    In March 2019, Dr. Schwartz informed Dr. Wong that her ALR and PFP stipend were both scheduled to expire in July 2019.

165.    Also in March 2019, Plaintiff emailed Dr. Dewan regarding his wife's salary.

166.    Plaintiff made no mention of any complaints of discrimination in his March 2019 email.

167.    Dr. Dewan met with Dr. Schwartz and Dr. Wong soon after the email and discussed the issue with her.

168.    Dr. Dewan and Dr. Schwartz informed Dr. Wong during an April 2019 meeting

30

that granting her request for such a high state base salary would be inequitable for all of the other grant-funded tenured research faculty within the department.

169.   Dr. Wong still did not have any grants by that time.

170.   Dr. Wong voiced an objection to the salary structure that she had agreed to a year earlier and requested another increase in her base salary to $220,000.

171.   Dr. Dewan and Dr. Schwartz agreed to extend her $45,000 ALR through December 31, 2020, a year past its originally planned end date of July 2019.

172.   Dr. Chine subsequently approved that request on October 28, 2019.

173.   Plaintiff, as Dean of the College of Medicine, had access to the respective salaries of employees within Dr. Wong's department and was fully aware that her salary was commensurate to others in her department.

174.   Salary and startup funding data is maintained in the ordinary course of business by the SUNY Upstate College of Medicine Dean's Office.

175.   All salaries and ALRs had to be approved by the Dean of the College of Medicine every year, including when Plaintiff was Dean from 2017-2019.

176.   Plaintiff set the salary and startup packages for faculty, although the initial package for Dr. Wong specifically was set by Dr. Laraque-Arena.

177.   Plaintiff had direct knowledge that Dr. Wong received a far greater salary and startup package than any other research faculty member who was hired to work in SUNY Upstate's College of Medicine between 2017 and 2019 and that her lab was the largest lab buildout done while he was Dean.

178.   Dr. Wong did not make any complaints of discrimination during any of the

31

meetings she had regarding her salary dispute.[63]

179.    Dr. Wong did not make any complaints of discrimination to anyone at SUNY

Upstate (other than her alleged reports to her husband) before October 2019.[64]

180.    Months prior to his meeting with Dr. Dewan, in April 2019, Plaintiff had sent an

email to Dr. Corona in which he expressed his belief that Dr. Wong's salary reduction was a

punishment for "bad political moves" he had made.[65]

181.    On August 13, 2019, Plaintiff held an "urgent" meeting regarding the Department

of Anesthesia and requested that Dr. Dewan attend.

182.    Also in attendance were Dr. Corona, SUNY Upstate's Chief Medical Officer Dr.

Amy Tucker, Plaintiff's Chief of Staff Grace VanNortwick, and various Department Chairs who

---

[63] Plaintiff denies the asserted fact, stating that Dr. Wong believed she was being discriminated against based on her race and/or gender (citing his own declaration testimony as supporting evidence).  *See* Dkt. No. 78 at ¶ 188.   For the sake of brevity, the Court will not linger on whether Plaintiff possesses personal knowledge of complaints made by Dr. Wong during meetings at which he was not apparently present.   In any event, regardless of what Dr. Wong may or may not have believed, Plaintiff has not provided evidence showing that Dr. Wong made any complaints of discrimination during her meetings with the relevant individuals.   Therefore, the Court deems this asserted fact admitted.

[64] Plaintiff denies the asserted fact, stating that he informed Dr. Dewan in August 2019 that Dr. Wong was being discriminated against compared to her white male colleagues.  *See* Dkt. No. 78 at ¶ 189.   However, Plaintiff reporting alleged discrimination to Dr. Dewan does not contradict the asserted fact, which is that *Dr. Wong* did not make any complaints of discrimination. Plaintiff notably does not cite any evidence that suggests Dr. Wong asked Plaintiff to make such complaints on her behalf (or testimony by Dr. Wong herself that she made any such complaints), only that he reported that Dr. Wong was feeling discriminated against and was very unhappy about it.  *See* Dkt. No. 78, Attach. 2, at 60-61.

[65] Although Plaintiff denies the above-stated fact, the above-stated fact is supported by the record evidence cited by Defendants, *see* Dkt, No. 73, Attach. 23, at ¶ 5; Dkt. No. 73, Attach. 25, and the denial is not supported by the record evidence cited by Plaintiff, *see* Dkt. No. 78, Attach. 4, at ¶ 221.

32

oversaw different areas of surgery, including Dr. Randy Green, Dr. Stephen Albanese, Dr. Chin, Dr. Robert Cooney, and Dr. Gennady Bratlavsky.

183.    During the meeting, Plaintiff expressed frustration about Dr. Dewan's interventions in his selections of appointments and spoke emphatically about the need for the Dean to have autonomy to appoint a person he thought was competent for the job of Chair of the Anesthesiology Department.[66]

184.    On September 12, 2019, Dr. Dewan met with Plaintiff and Mr. Frost and told Plaintiff that he had made the decision to remove Plaintiff as Dean effective immediately.

185.    Plaintiff informed Dr. Dewan that he was already in the process of interviewing for another job.

186.    Plaintiff was terminated from his employment as the Dean of the College of Medicine and his new title became Distinguished Professor in the Department of Psychiatry and Behavioral Sciences.

### Title VII Retaliation Claims

187.    Plaintiff contends that he was retaliated against for reporting race discrimination on behalf of Dr. Brian Thompson.

188.    Plaintiff never made any complaints on behalf of Dr. Thompson to ODI or Human

---

[66] Although Plaintiff denies the above-stated fact, he does not cite record evidence that actually supports that denial.   *See* Dkt. No. 78, Attach. 2, at 51-53 [attaching pages "248" through "250" of his deposition transcript, stating "I don't remember the exact words that I said," "I don't recall," "I don't remember . . . being more critical of him," "I don't think I did . . . I don't recall . . . I don't recall the exact words I said . . . I don't recall"].)   As stated above in Note 8, a lack of knowledge is not a proper basis for denying or properly disputing an asserted fact.

33

Resources that Dr. Thompson was personally being discriminated against.[67]

189.    Plaintiff also contends that he was retaliated against for reporting race discrimination on behalf of Dr. Nakeia Chambers.

190.    Dr. Dewan's relevant discussions with Plaintiff centered around requesting additional information about the new positions Plaintiff had created, whether the duties performed in the new positions overlapped with existing positions, and how the newly created positions would add value to SUNY Upstate and help it to meet its goals.[68]

191.    Dr. Dewan never specifically said anything about, or even brought up the subjects

---

[67] Plaintiff denies this asserted fact by stating that he relayed to Dr. Dewan the "concerns" or "complain[t]," communicated to him by Dr. Thompson, that "Native Americans were underrepresented at [SUNY] Upstate and that [SUNY Upstate] should follow through with its commitment under President Laraque-Arena to appoint an Assistant Vice President for Native American Affairs." *See* Dkt. No. 78 at ¶ 198.   As an initial matter, Plaintiff's reporting a generic concern that Native Americans were underrepresented and a desire to see a new Native American-focused administrative position established does not constitute a complaint that Dr. Thompson was being discriminated against.   In any event, the above-stated fact expressly regards complaints to *ODI or Human Resources*, and Plaintiff's own cited evidence states that he acknowledged that he did not make any complaints to ODI or Human Resources.   *See* Dkt. No. 78, Attach. 2, at 70.   Further, Plaintiff's testimony establishes that (1) Dr. Thompson did not say that SUNY Upstate was discriminating against him specifically, and (2) an alleged promise to promote Dr. Thompson to the position of Assistant Vice President for Native American Affairs was made by "the previous president," not Dr. Dewan.   *See* Dkt. No. 78, Attach. 2, at 71-73.   Because the cited evidence does not support Plaintiff's objection, the Court deems the asserted fact admitted.

[68] Plaintiff properly disputes the portion of the fact related to whether Dr. Dewan requested that he provide organizational charts or related information; but he does not provide evidence to support a denial of the remainder of the asserted fact, because his testimony at his deposition that Dr. Dewan repeatedly asked what certain new faculty members such as Dr. Chambers "do all day" does not in any way mean that Dr. Dewan did not speak with Plaintiff about any of the three above-mentioned subjects (and indeed supports that fact).   *See* Dkt. No. 78 at ¶ 200. Furthermore, Plaintiff's assertion is an improper attempt to add facts.   *See, supra*, Note 26. Therefore, the Court deems this asserted fact admitted.

34

of, Dr. Chambers' gender, race, or national origin.[69]

192.    Dr. Chambers never complained to Plaintiff that she was being discriminated against based on her race.

193.    Plaintiff never made a report that anyone had discriminated against Dr. Chambers.

194.    Plaintiff never made any complaints on behalf of Dr. Chambers to ODI or Human Resources that she was being discriminated against based on her race.

195.    Plaintiff contends that he "reported race discrimination" for "numerous medical students enrolled with SUNY Upstate," but he never filed any formal complaints with ODI or Human Resources on their behalf.

196.    Plaintiff alleges that he also reported "national origin discrimination" to Defendants on behalf of "numerous medical students enrolled with SUNY Upstate."

197.    However, Plaintiff never filed any formal complaints on their behalf.

198.    The Budget Committee was for senior leadership to have a platform to discuss confidential financial matters regarding SUNY Upstate.   Committee membership was based on the functions and/or title of each member.

199.    Senior leadership members include the President, the Hospital CEO, the Hospital Chief Financial Officer, SUNY Upstate's Senior Vice President for Finance and Administration, the Dean of the College of Medicine, the President of Upstate University Medical Associates at

---

[69] Plaintiff disputes this fact, but evidence that Dr. Dewan might have asked what certain new URiM faculty members "do all day" does not constitute evidence that Dr. Dewan specifically said anything about, or brought up the subjects of, Dr. Chambers' race or gender; to the extent that Plaintiff asks the Court to interpret the evidence in that manner, such a determination is not appropriate in a statement of material facts.   *See, supra*, Notes 3 and 26.   Therefore, the Court deems this asserted fact admitted.

35

Syracuse ("UUMAS"), and the President's Chief of Staff.

200.   The members of the Budget Committee directly oversee the finances of SUNY

Upstate.

201.   Dr. Ann Botash is currently the Senior Associate Dean for Faculty Affairs and has

been in that role since 2017.

202.   Dr. Botash testified that she did not recall being recommended to be added to the

Budget Committee.[70]

203.   Plaintiff admitted that he did not speak with Dr. Botash about whether or not she

wanted to be added to the Budget Committee.[71]

204.   Dr. Botash never spoke with Plaintiff or the Budget Committee about an interest

in joining the Budget Committee.[72]

205.   In her position as a Senior Associate Dean of Faculty Affairs, Dr. Botash did not

directly oversee finances for the college.

206.   Plaintiff testified that he does not recall when he allegedly suggested to Dr.

Dewan that Dr. Botash be named to the Budget Committee; however, he also testified that Dr.

---

[70] Plaintiff admits the asserted fact and merely adds facts to say that he did, in fact, recommend to Dr. Dewan that she join the Budget Committee.  *See* Dkt. No. 78 at ¶ 213.   This attempt to add a fact (and deny an "implied fact") is improper.  *See, supra,* Note 3 and 26.   Therefore, the Court deems this asserted fact admitted.

[71] Plaintiff denies the asserted fact by stating that he "understood" from his conversation with Dr. Botash, in which they spoke about the Budget Committee being a "boys' club," that she wanted to be a member of the Committee; however, he prefaces that statement with a concession that he never actually spoke to her about whether she wanted to be a member.  *See* Dkt. No. 78 at ¶ 214.   Because Plaintiff's additional facts do not actually contradict the asserted fact, the Court deems this asserted fact admitted.  *See, supra,* notes 3 and 26.

[72] The Court deems this asserted fact admitted for the reasons discussed in Note 71.

36

Dewan made no comment regarding Dr. Botash's gender or national origin during that conversation or otherwise.[73]

207.    Plaintiff is unaware of any woman who expressed interest in becoming a member of the Budget Committee but was denied membership.[74]

208.    Plaintiff never asked Dr. Amy Tucker if she wanted to be part of the Budget Committee.

209.    Dr. Tucker herself never expressed interest in becoming part of the Budget Committee and never complained about not being a member of the Budget Committee.

210.    Dr. Tucker reported directly to Dr. Corona, who is already a member of the Budget Committee.

211.    Plaintiff created a panel to consider candidates to fill the position of Interim Chair of the Anesthesiology Department.

212.    The panel chose Dr. Zhang to fill the position, and Plaintiff presented the results Dr. Dewan in August 2019.

213.    Dr. Dewan never expressed to Plaintiff any concerns or any dissatisfaction with Dr. Zhang being chosen for the position and never said that a female doctor was not fit for the position.[75]

---

[73] Although Plaintiff purports to dispute this asserted fact, his response states only that Dr. Dewan made no comment at all but responded with "glacial silence."   *See* Dkt. No. 78 at ¶ 217. Plaintiff's attempt to add a fact (and deny an "implied fact") is improper.   *See, supra,* Notes 3 and 26.   Therefore, the Court deems this asserted fact admitted.

[74] The Court deems this asserted fact admitted for the reasons discussed in Note 71.

[75] Plaintiff denies this asserted fact by stating that Dr. Dewan had pushed for a male candidate, Dr. Gorji, to be selected (as "the only person who's qualified to have that role").   *See* Dkt. No. 78 at ¶ 225.   As a threshold matter, Plaintiff's "denial" improperly relies on an implication of

37

214.   Dr. Dewan "signed off" on Dr. Zhang as the panel's choice for the position and later appointed her as the permanent Chair.

215.   No complaint was ever filed regarding the selection of the position for the Interim Chair of the Anesthesiology Department.

216.   Plaintiff contends that he was retaliated against also for reporting gender discrimination to Defendants on behalf of Dr. Chambers, but he cannot "parcel out to what degree" he believed she was discriminated against based on her race versus her gender.

217.   The only basis for Plaintiff's allegation that he opposed discrimination with respect to Dr. Chambers was the fact that, when Dr. Dewan allegedly asked him what Dr. Chambers "did all day," Plaintiff responded with an account of her multiple job duties and statement that she is "very busy."[76]

218.   According to Plaintiff, Dr. Dewan also inquired as to what Dr. Thompson's (a male faculty member) responsibilities were.

219.   Plaintiff alleges that, after his demotion, he was not provided with an adequate

---

fact (*i.e.*, that a prior endorsement of Gorji constituted a subsequent expression of dissatisfaction with Zhang) and/or improperly attempts to add a fact.   *See, supra,* Notes 3 and 27.   In any event, the "fact" that Plaintiff attempts to add is not actually supported by the portion of deposition testimony Plaintiff cites (and provides).   *See* Dkt. No. 78, Attach. 2, at 27-32. Finally, Plaintiff's own evidence shows that Dr. Dewan did not express any disagreement with the panel's selection of Dr. Zhang when it was presented to him and that he "signed off" on her appointment as the Interim Chair.   *See* Dkt. No. 78, Attach. 2, at 31-32; Dkt. No. 73, Attach. 11, at 22-23.   For all of these reasons, the Court deems this asserted fact admitted.

[76] Plaintiff purports to dispute this asserted fact, but his response does not state that his opposition consisted of anything more than his "advocacy" of Dr. Chambers (and others) when Dr. Dewan asked what such individuals "did all day" (in response to Plaintiff's attempt to appoint them to a new position in order to increase diversity).   (Dkt. No. 78, at ¶ 229.) Furthermore, the evidence cited (and provided) by Plaintiff does not controvert the above-stated fact.   Plaintiff has therefore admitted the asserted fact.

38

research support package and funding for his laboratory or reimbursement for membership fees, license fees, and academic travel.

220.    After he was demoted, Plaintiff continued to be a tenured Distinguished Research Professor in the Department of Psychiatry and received the highest State salary out of any other research faculty in that Department despite having no current grants.

221.    In January 2020, after Plaintiff requested that Dr. Schwartz provide him with a startup package for his research lab, Dr. Schwartz asked that he provide a list of startup items he believed he was entitled to so that he could bring his requests to the Dean and negotiate for the College of Medicine to provide those for him.

222.    Plaintiff never provided any such list.

223.    The denial of Plaintiff's request for the reimbursement of certain expenses (such as license fees and travel to scientific meetings) following his removal as Dean was consistent with the policy of the Psychiatry Department not to reimburse faculty members for such expenses.[77]

---

[77] Plaintiff denies the asserted fact despite relying on deposition testimony in which he admits that it is not the policy of the Psychiatry Department to reimburse faculty members for such expenses and that, at the time of denial, he was a mere faculty member (and not Dean).  *See* Dkt. No. 78, Attach. 2, at 86-89.  Instead, Plaintiff argues that he was "contractually obligated [sic] to have his expenses reimbursed" pursuant to the offer letter he received related to the Dean position, and that the expenses "were not reimbursed out of retaliation for [his] opposing discrimination."  *See* Dkt. No. 78 at ¶ 235.  This argument is based on Plaintiff's own interpretation of a document that, regardless of how it should be interpreted, has since been found by a judge of the New York State Court of Claims to be an unenforceable contract because it was not approved by the State Comptroller in accordance with N.Y. Fin. L. § 112(2)(a).  *See* Dkt. No. 81, Attach. 11.  Further, Plaintiff's argument that his expense reimbursement was denied in retaliation for opposing discrimination rather than the department's policy is pure legal argument that cannot contradict the asserted fact.  Therefore, the Court deems this asserted fact admitted.

224.    Plaintiff contends that, following his demotion and the filing of his complaint
with the New York State Department of Human Rights ("NYSDHR"), he was either denied or
not considered for the following positions: (1) President of SUNY Upstate; (2) SUNY
Chancellor; (3) Dean of Medicine; (4) Director of the MD-PhD program; and (5) Chair of the
Department of Psychiatry.

225.    With respect to the position of President, Dr. Dewan was appointed as the
permanent President after he interviewed with then-Chancellor Jim Malatras and a subcommittee
of the Board of Trustees, and after SUNY Upstate faculty members wrote letters of support for
him to become permanent.

226.    The Board of Trustees and the SUNY Chancellor make the final hiring decision
for the position of President.

227.    Further, the Board of Trustees appoints the SUNY Chancellor.

228.    On March 13, 2020, Dr. Amit Dhamoon was appointed Program Director of the
MD/PhD program after students of that program brought concerns to Dr. Dewan, Dr. White, Dr.
Chin, and Dean of Graduate Studies Dr. Schmitt about the existing program directors and their
effectiveness in their role.

229.    Dr. Dhamoon was a graduate of the MD/PhD program and had significant
experience mentoring students; he was selected as the top candidate by the students and was
subsequently appointed by Dr. Chin (as the Dean of the College of Medicine) based on his
having graduated from the program, his qualifications, and his reputation as an excellent mentor
to students.

230.    In September 2020, Dr. Chin made the decision to make Dr. Schwartz (who was

40

the Interim Chair for the Psychiatry Department) the permanent Chair because he had served as

the Interim Chair throughout the COVID-19 pandemic and was assessed (with input from faculty

within the Department) as having performed exceptionally well in that role during a very

difficult time.

231.    Dr. Dewan approved that decision, given that Dr. Schwartz had already been

performing the Interim role for four years and had done exceptionally well financially with the

Department despite the COVID-19 pandemic.

232.    SUNY Upstate had a Non-Discrimination Policy and Harassment Prevention

Policy in place while Plaintiff was Dean from July 1, 2017, through September 12, 2019.

233.    Plaintiff was trained on these policies.

234.    During his training, Plaintiff was made aware that all complaints of discrimination

and harassment were to be brought to the ODI, which investigated such complaints.[78]

235.    Plaintiff was given training specifically with respect to a supervisor's

responsibility to raise concerns of discrimination or harassment to SUNY Upstate's Chief

Diversity Officer or Affirmative Action Officer in ODI.

236.    After completing a diligent search of its records, SUNY Upstate's Office of

---

[78] Plaintiff disputes this asserted fact, citing his deposition testimony in which he stated that there are three ways to report discrimination and harassment: (1) going straight to ODI and launch a complaint there; (2) reporting to a supervisor who could then pass the complaint to ODI; and (3) going straight to Human Resources.   *See* Dkt. No. 78 at ¶ 245.   However, in the deposition testimony on which Plaintiff relies, he acknowledged that the third way was one where "I would imagine that they would refer [the person] to [ODI]," resulting in the fact that all three "pathways would converge at [ODI]."   *See* Dkt. No. 78, Attach. 2, at 3-5.   In addition, the record evidence on which Defendants relied in support of the above-stated fact is itself corroborated by other record evidence.   *See* Dkt. No. 73, Attach. 44, at ¶¶ 8-9; *see, e.g.,* Dkt. No. 73, Attach. 47, at 10, 14-15, 20-22.)   Therefore, the Court deems this asserted fact admitted.

41

Institutional Equity ("OIE") has found no record of Plaintiff having filed any complaints of discrimination with OIE or ODI – either on his own behalf or on anyone else's behalf – before his removal from the role of Dean on September 12, 2019.[79]

237.    Plaintiff never filed any complaints about any alleged discrimination based on his national origin.

## C.    Parties' Arguments on Defendants' Motion for Summary Judgment

### 1. Defendants' Memorandum of Law

Generally, in their motion, Defendants make three arguments.   *See* Dkt. No. 73, Attach. 73.   First, Defendants argue that Plaintiff's discrimination claims must be dismissed because he failed to exhaust his administrative remedies with respect to those claims.   *See id.* at 17-19. More specifically, Defendants argue that, although Plaintiff filed a complaint with the NYSDHR, that complaint does not assert any claim of discrimination based on Plaintiff's race or national origin, nor are any such discrimination claims reasonably related to the retaliation claims that he did assert in that complaint.   *See id.*

Second, Defendants argue that, in the alternative, Plaintiff's discrimination claims must be dismissed because (1) he is unable to establish a prima facie case of discrimination, (2) Defendants have proffered legitimate non-discriminatory reasons for removing him from the position of Dean, and (3) Plaintiff cannot show that those reasons are a pretext for

---

[79]  Although Plaintiff denies the above-stated fact, he states only that he did not file such complaints "formal[ly]" (but rather "informed" certain persons of "reports" of discrimination). *See* Dkt. No. 78 at ¶ 247.   Because the above-stated fact makes no distinction between "formal" and "informal" complaints, Plaintiff's denial (which attempts to respond to a *perceived* implication of fact and/or add facts) is ineffective.   *See, supra,* Notes 3 and 26.

42

discrimination.   *See id.* at 19-34.   More specifically, Defendants argue that (1) Plaintiff was not satisfactorily performing the duties required of the Dean position as shown by the undisputed evidence related to his inappropriate behavior; (2) his removal as Dean did not occur under circumstances giving rise to an inference of discrimination because Plaintiff has not shown that similarly situated employees were treated more favorably than him, he has not shown any remarks that can be reasonably viewed as discriminatory based on his race or national origin, and he has not shown that other circumstances suggest discrimination; (3) Plaintiff's poor conduct during his tenure as Dean was a legitimate non-discriminatory reason for his removal; and (4) Plaintiff cannot show that Defendants' reliance on his poor conduct is pretext for discrimination. *See id.*

Third, Defendants argue that Plaintiff's retaliation claims must also be dismissed because he is unable to establish a prima facie case of retaliation with regard to any of the instances of race, gender, or national origin discrimination that he allegedly reported, and because Defendants have provided legitimate non-discriminatory reasons for his demotion that Plaintiff cannot show are pretextual.   *See id.* at 34-53.   More specifically, Defendants argue that (1) Plaintiff cannot show that any of the alleged reports of discrimination he made constitute protected activity because they represent mere efforts to promote diversity rather than actual reports or opposition to any discrimination against specific individuals; (2) he cannot show that there is a causal connection between his alleged protected activities and his removal as Dean because most of the comments, conversations, or incidents Plaintiff relies upon for causation occurred months before his demotion or do not implicate any discrimination, he has not shown that any similarly situated employees were treated differently, and there is no direct evidence of retaliation; (3) he cannot

43

show that he was retaliated against by being denied or not considered for other positions at

SUNY Upstate or within the SUNY system because there is no evidence to support a finding that

a causal connection existed between the filing of his NYSDHR complaint and such failure to

hire; and (4) for many of the same reasons discussed earlier with regard to his discrimination

claims, Plaintiff cannot show that the legitimate non-discriminatory reasons provided by

Defendants for the adverse actions he suffered were a pretext for discrimination.   *See id.*

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion for summary judgment, Plaintiff makes

three arguments.   *See* Dkt. No. 78, Attach. 10.   First, Plaintiff argues that he exhausted his

administrative remedies related to his Title VII discrimination claims because those claims are

reasonably related to the retaliation claims he asserted in his NYSDHR complaint.   *See id.* at 11-

13.   More specifically, Plaintiff argues that his NYSDHR complaint alleged institutional

discrimination based on sex, race/color, and national origin and that such an allegation was

sufficient to raise the Title VII direct discrimination claims he now asserts.   *See id.*

Second, Plaintiff argues that he has shown that he can establish a prima facie case of

discrimination based on his race and national origin and that Defendants' reasons for removing

him as Dean are merely pretextual.   *See id. Id.* at 13-18.   More specifically, Plaintiff argues that

(1) he is a member of a protected class; (2) he was qualified for the position of Dean based on his

credentials and experience; (3) he was subjected to an adverse employment action in the form of

being demoted from the position of Dean; (4) his demotion occurred under circumstances giving

rise to an inference of discrimination because he was the first Hispanic/Latino Dean of the

44

College of Medicine and was demoted not long after the completion of the LCME accreditation

process (which in part hinged on diversity metrics); and (5) Defendants' reasons for his demotion

are pretextual because, viewing the evidence in the light most favorable to him, a reasonable

factfinder could conclude that "Defendant demoted [him] as the result of his well-documented

efforts to address the lack of diversity at SUNY Upstate."   *See id.*

      Third, Plaintiff argues that he has sufficiently shown that he can establish a prima facie

case of retaliation.   *See id.* at 18-36.   More specifically, Plaintiff argues as follows: (a) he

engaged in various actions constituting protected activity including (i) opposing "Defendants'

deeply entrenched culture of discrimination and its resistance to diversity," "champion[ing] the

rights of minorities," making "great efforts to recruit minority faculty," and explaining to Dr.

Dewan why certain new positions held or to be held by certain minority faculty were warranted,

which resulted in "multiple verbal comments" from Dr. Dewan "severely questioning the 'need

for' various minority professors and the extent of their contributions to the University" such as

asking what certain minority professors "d[o] all day" or "do[] in diversity, (and sarcastically

asking "oh, do we have an External Scientific Review Board?" when Plaintiff discussed that

Board's provisionally scheduled second meeting); (ii) supporting SUNY Upstate's Diversity

Committee and explaining to Defendants why a female Hispanic neurosurgeon was leading that

Committee; (iii) notifying Defendants regarding concerns that the Budget Committee was not

gender-balanced and recommending that women be included; (iv) raising concerns that certain

Black students were not being adequately prepared to the Dean of Student Affairs and then

creating the position of Director of College of Medicine Career Development to remedy those

concerns and referring a Black woman as a candidate for appointment to that role, and receiving

a "protest" from the Dean of Student Affairs for doing so; (v) creating a position for a part-time
Assistant Dean for Cultural Competence and offering that position to a Black male despite
"aggressive objections" by Dr. Dewan as to why another position related to Diversity and
Inclusion was required; (vi) making efforts to search for and appoint diverse individuals for
various Chair appointments during his tenure as Dean; and (vii) reporting to Dr. Dewan that he
felt that Defendants' decision to lower his wife's salary meant she might have a claim under Title
VII or Title IX; (b) Defendants were aware of this protected activity; (c) he suffered an adverse
employment action in the form of being removed from the position of Dean; and (d) there is a
causal connection between his protected activities and his demotion because (i) Associate Vice
President for Human Resources Mr. Frost conceded that Plaintiff's intent to promote diversity
might have been a factor in his demotion; (ii) he was given no notice of the demotion; (iii)
statements made at a Council meeting following his demotion suggest that performance issues
were not the cause of his demotion and that he was a "barrier" to Defendants continuing their
discriminatory policies; (iv) he was never provided any negative feedback on his job
performance; and (v) there is a temporal proximity between his various efforts to promote
diversity and oppose discrimination and his demotion in September 2019.   *See id.*

### 3. *Defendants' Reply Memorandum of Law*

Generally, in reply to Plaintiff's opposition, Defendants make four arguments.   *See* Dkt.
No. 81.   First, Defendants argue that Plaintiff failed to exhaust his administrative remedies as to
his Title VII discrimination claims, specifically arguing that the case upon which Plaintiff
primarily relied for his counterargument (*i.e., Dixit v. City of New York Dept. of Gen. Servs.*, 972

46

F. Supp. 730, 734 [S.D.N.Y. 1997]), is inapplicable to the circumstances here.  *See id.* at 7-8.

Second, Defendants argue that, in the alternative, Plaintiff has failed to establish a prima facie case of Title VII discrimination and cannot show that the non-discriminatory reasons that Defendants offered are pretextual.  *See id.* at 8-14.   More specifically, Defendants argue that (1) Plaintiff has not made any concrete argument regarding the question of whether he was satisfactorily performing his job as Dean despite the evidence showing that he was not; (2) he cannot show that his removal as Dean occurred under circumstances raising an inference of discrimination and indeed has not provided any argument as to why he can other than pointing to the fact he is of a certain race and national origin and was mistreated; and (3) Plaintiff cannot show that Defendants' legitimate non-discriminatory reasons for his removal were pretextual because he has not pointed to any evidence to support that that notion.  *See id.*

Third, Defendants argue that Plaintiff has not shown that he can establish a claim of retaliation.  *See id.* at 14-26.   More specifically, Defendants argue that (1) Plaintiff has not shown that he engaged in any protected activity because the various activities he has alleged do not constitute opposition to discrimination, but mere advocacy for certain professors or promotion of greater diversity, and he could not have had an objectively good faith belief that his wife was being discriminated against on the basis of her race, national origin, or gender given evidence she was hired with compensation and benefits better than many of the other faculty at the College of Medicine and had a salary commensurate with other Department of Psychiatry faculty; (2) Plaintiff has not shown that there is a causal connection between his alleged protected activity and his removal as Dean because there is no direct evidence to support such a finding and, with the exception of alleged concerns he raised regarding a lack of diversity at an

47

August 2019 meeting with Dr. Dewan and a discussion related to his wife's salary reduction with Dr. Dewan in August 2019, all the activities he alleges occurred months before his removal; and those two August activities are insufficient to suggest retaliation was the but-for cause of that removal; and (3) Plaintiff has not shown that Defendants' reliance on evidence of Plaintiff's unsatisfactory behavior was a pretext for retaliation because his mere disagreement with Defendants' evaluation of his performance is insufficient to meet his burden on this issue. *See id.*

Fourth, Defendants argue that Plaintiff has abandoned his retaliation claims to the extent they are based on an adverse action of not being considered or hired for certain other high-ranking positions or provided with a research support package and funding following his removal as Dean because he did not raise any counterarguments in his response memorandum of law as to those claims. *See id.* at 26.

## II. LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[80] As for the materiality requirement, a dispute of fact is

---

[80] As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

48

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[81]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.). What the non-

---

[81] Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

49

movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[82]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, No. 07-CV-0279, 2009 WL 3672105, at *1 n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, No. 09-CV-0722, 2009 WL 2473509, *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[82] *See, e.g., Beers v. GMC*, No. 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, *27-*31 (N.D.N.Y. Mar. 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, No. 02-CV-0745, 2004 WL 3691343, *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

50

## III. ANALYSIS

**A.    Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Discrimination Claims**

After careful consideration, the Court finds that Defendants are entitled to summary judgment on Plaintiff's discrimination claims for the reasons stated in Defendants' memoranda of law.   *See, supra,* Parts I.C.1 and I.C.3 of this Memorandum-Decision and Order.   To those reasons, the Court adds the following analysis.

### *1. Exhaustion of Administrative Remedies*

"Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (quoting 42 U.S.C. § 2000e-5).   "An exception to the exhaustion requirement may be made for claims not formally asserted before the agency if they are 'reasonably related' to those properly filed with the agency." *Moore v. DeJoy*, 600 F. Supp. 3d 332, 343 (S.D.N.Y. 2022) (citing *Williams*, 458 F.3d at 70).   "There are three types of claims which may be considered 'reasonably related' for purposes of satisfying the exhaustion requirement: (1) claims that 'fall within the scope of the [administrative agency's] investigation which can reasonably be expected to grow out of the charge of discrimination;' (2) claims that allege retaliation for filing an administrative charge; and (3) claims that allege 'further incidents of discrimination carried out in the same manner alleged in [the administrative] charge.'" *Wilson-Richardson v. Reg'l Transit Serv., Inc.*, 948 F. Supp. 2d 300, 305 (W.D.N.Y. 2013) (quoting *Carter v. New Venture Gear, Inc.*, 310 Fed. App'x 454, 455 (2d Cir. 2009) (summary order)).   "In examining what issues would be expected to

51

'grow out of the charge of discrimination,' the Court looks to 'the factual allegations made in the . . . charge itself,' and determines 'whether the complaint filed with the [administrative agency] gave that agency adequate notice to investigate discrimination on both bases.'"  *Id.* (quoting *Williams*, 458 F.3d at 70).

In his charge filed with the NYSDHR, Plaintiff asserted that Defendant SUNY Upstate engaged in "unlawful discriminatory practices relating to employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) on the basis of my opposition to discrimination."  *See* Dkt. No. 73, Attach. 8, at 2.   In addition, he provided facts regarding his "opposition to gender, race, and national origin discrimination," all of which related to his alleged advocacy on behalf of various professors who were female, minorities, or both, and his alleged opposition to decisions or practices by others at Defendant SUNY Upstate that he considered discriminatory against those individuals, as well as facts related to "actions taken against me in retaliation for my opposition to discrimination."  *See* Dkt. No. 73, Attach. 8, at 4-10.   However, nowhere in this charge does Plaintiff allege that he was directly discriminated against on the basis of his own race or national origin; he does not even provide allegations related to his own race and national origin, much less allege that any of the actions taken against him were because of those characteristics.   *See id.* at 2-13.

In the document entitled Final Investigation Report and Basis of Determination, the NYSDHR summarized Plaintiff's positions as that he was "demoted in retaliation for opposing discrimination when he made Respondent aware of discrimination as it relates to women and minority staff and students," and noted the following when discussing the allegations made in those proceedings:

52

> It should be further noted that Complainant is male and so has the same protected characteristic of those whom Complainant maintains received more favorable treatment, and Complainant was hired into the position(s) in question despite his race/color and/or national origin.   However, Complainant is alleging that due to his engagement in protected activity, he became a target of Respondent.

*See* Dkt. No. 73, Attach. 9, at 9.

This statement shows that, although the NYSDHR may have briefly examined whether there was any obvious basis to consider direct discrimination against Plaintiff related to his own protected traits, it ultimately acknowledged that Plaintiff was alleging only that he was targeted not because of those traits but rather because of his protected activity, *i.e.*, reporting discrimination against others.

The remainder of the determination discusses Plaintiff's alleged protected activity of reporting or opposing various instances of discrimination against other faculty and students and the parties' arguments related to those allegations.   *See* Dkt. No. 73, Attach. 9, at 8-11. Although this determination references the fact that Plaintiff is "male, Hispanic, [and] Brazilian," it never indicates that there was any suggestion of discrimination against Plaintiff personally as a result of those characteristics, nor does it assess whether any such direct discrimination occurred; it assesses only whether Plaintiff experienced retaliation for reporting discrimination against others.   *See id.*

Based on the above evidence, the Court finds that Plaintiff's claims of direct discrimination based on his race and national origin are not reasonably related to the claims of retaliation he asserted in the NYSDHR complaint.   Given the complete lack of any allegations regarding direct discrimination, it cannot be said that the complaint provided adequate notice to

53

the NYSDHR to investigate any such direct discrimination.   Indeed, the NYSDHR's

determination suggests that it was of the opinion that Plaintiff's complaint did not assert any such

claims, nor did it investigate or address any such potential claims other than its brief notation that

Plaintiff was hired for the relevant positions despite Defendants' knowledge of his race and

national origin; such a passing comment is insufficient to suggest that the NYSDHR had

adequate notice that Plaintiff intended to assert any type of direct discrimination claim.   Further,

although the NYSDHR was made aware of Plaintiff's gender, race, and national origin at some

point during the proceedings (as evident from its notation of those characteristics in its

determination), it is telling that Plaintiff did not include such facts in his charge and did not

include any allegations regarding any instances of discrimination against him based on his own

race or national origin.

 Plaintiff's reliance on *Dixit v. City of New York Dep't of Gen. Servs.*, 972 F. Supp. 730

(S.D.N.Y. 1997), is unavailing.   Not only did the plaintiff in that case check boxes indicating the

presence of discrimination based on religion, national origin, and age despite the fact he

discussed only retaliation in his EEOC complaint (a circumstance that is not present here, given

that Plaintiff never mentioned discrimination of any sort against himself nor did he specify his

race or national origin in the charge), but the EEOC in that case did conduct an investigation into

discrimination as well as retaliation based on the content of the plaintiff's complaint.   *See Dixit*,

972 F. Supp. at 734.   Here, the NYSDHR made no such interpretation of Plaintiff's complaint,

nor did it conduct an investigation of any discrimination claims.

 It is also notable that, in making his argument in opposition, Plaintiff relies almost solely

on the somewhat vague language used in the NYSDHR's short Determination After

54

Investigation, but he does not mention at all the content of the Final Investigation Report and Basis of Determination.  *See* Dkt. No. 78, Attach. 10, at 11-13.   Although the stilted and ungrammatical language of the relevant portion of the Determination After Investigation could potentially be interpreted as implicating a claim of direct discrimination in the abstract, when that portion is considered in conjunction with the document that explains the basis of that determination, it is abundantly clear that the NYSDHR found no such claim.

Based on the evidence presented, Plaintiff failed to exhaust his administrative remedies related to any direct discrimination claims (as opposed to his retaliation claims based on protected activity related to reporting or opposing discrimination against other individuals). Therefore, the Court dismisses Plaintiff's First and Second Claims.

### 2. Merits of Plaintiff's Discrimination Claims

In the alternative, even if the Court were to construe Plaintiff's discrimination claims as having been properly exhausted, the undisputed evidence shows that he would be unable to establish discrimination.   To establish a prima facie case of discrimination, a plaintiff must show that "'(1) []he is a member of a protected class; (2) []he is qualified for h[is] position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (quoting *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 [2d Cir. 2023]).   "Once the plaintiff has established a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its adverse action." *Bart*, 96 F.4th at 570 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 [2d Cir. 2015]).   "Upon that showing, the burden then shifts back to

55

the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id.* (quoting *Vega*, 801 F.3d at 83). At this third step, "a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff my also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Id.* at 576.

Notwithstanding the other elements of the prima facie test, Plaintiff's claims fail to clear the hurdle of showing that his demotion occurred under circumstances that give rise to an inference of discrimination. The only argument Plaintiff offers regarding this element is that he was the first Latino/Hispanic Dean and was hired only so that Defendants could use him as a diverse figurehead in order to obtain accreditation for the College of Medicine, a fact that he asserts is evident given that he was demoted after Defendant SUNY Upstate had secured that accreditation. *See* Dkt. No. 78, Attach. 10, at 16-17. However, the fact that Defendant SUNY Upstate had never had a Latino/Hispanic Dean before hiring Plaintiff in that role does not in any sense raise a reasonable inference of discrimination against Plaintiff as a Latino/Hispanic individual. After all, regardless of whether any past Dean had been Latino/Hispanic, Defendants made the choice to hire Plaintiff as Dean and he served in that role for more than two years. Nor could a reasonable factfinder accept Plaintiff's theory that Defendants used his protected characteristics to obtain accreditation and then "tossed him aside" in an act of discrimination based on those characteristics. Plaintiff was removed from the Dean position on September 12, 2019, and the LCME did not make the accreditation decision until October 15-17, 2019. *See* Dkt. No. 73, Attach. 21; Dkt. No. 73, Attach. 26, at ¶ 46.) The College of Medicine therefore had not actually secured reaccreditation at the time Plaintiff was demoted. More

56

importantly, even if it could be inferred that Defendants had hired Plaintiff as Dean in order to

benefit from Plaintiff's protected characteristics in the accreditation process (conduct that by

itself is not actionable given that *hiring* an individual based on their protected characteristics is

not an adverse action), there is no such corresponding inference that he was later demoted

because of his race or national origin.

It is undisputed that Dr. Dewan became interim President of the College of Medicine in

late December 2018, and that Plaintiff was made aware in January 2019 that SUNY

administration had instructed Dr. Dewan that his "highest priority" as interim President was "to

remove [Plaintiff] from the Dean position."   *See* Dkt. No. 73, Attach. 26, at ¶¶ 16-18.   It is

further not disputed that Dr. Dewan had been asked by then-President Dr. Laraque-Arena in the

fall of 2018 to assume the responsibilities of Dean under a different title because Dr. Laraque-

Arena was "unhappy" with Plaintiff's performance in that role, "but did not want to terminate

Plaintiff, however, due to her strong desire to maintain the appearance of stability for [SUNY

Upstate's] College of Medicine."   *See* Dkt. No. 73, Attach. 26, at ¶ 12.   LCME did not conduct

its site review of the College of Medicine until April of 2019.   *See* Dkt. No. 73, Attach. 16, at

¶ 29.)   The evidence therefore shows that SUNY administrators wanted to remove Plaintiff

(based on Dr. Laraque-Arena's unhappiness with his performance) while the accreditation

process was still ongoing, a fact that undermines his interpretation that they were holding him

out as proof of diversity within the College of Medicine only to demote him once accreditation

was secured.   As a result, and in the absence of any other evidence to suggest that his demotion

was related to his race or national origin, the fact that Plaintiff was demoted after the substantive

work of the reaccreditation process was completed does not by itself raise an inference of

discrimination.

Moreover, and most importantly, Plaintiff has offered no evidence to suggest that any of the relevant decisionmakers or others at Defendant SUNY Upstate possessed discriminatory intent related to Plaintiff's race and/or national origin.   Although he cites language from various case law regarding the fact that plaintiffs in such cases must generally rely on "bits and pieces of information to support an inference of discrimination," he presents no such bits and pieces of evidence to the Court to support his argument.   *See* Dkt. No. 78, Attach. 10, at 16-17.   Without any admissible record evidence tying Plaintiff's demotion to conduct that rationally suggests a discriminatory motive, Plaintiff cannot succeed on his claims.

For each of the above-stated alternative reasons, the Court finds that Plaintiff has not shown that he could establish a prima facie case of discrimination under Title VII even if it were to find that he had exhausted his administrative remedies as to that claim.[83]   The Court therefore grants summary judgment to Defendants on Plaintiff's First and Second Claims.

---

[83] The Court also finds that Plaintiff's discrimination claims would be dismissed in the alternative because he has not shown that Defendants' proffered non-discriminatory reasons for his demotion (*i.e.*, the various performance issues discussed in Part I.B of this Memorandum-Decision and Order) were a pretext for discrimination.   In his opposition memorandum of law, Plaintiff's only argument regarding pretext is that "[D]efendant demoted Plaintiff as a result of his well-documented efforts to address the lack of diversity at SUNY Upstate." *See* Dkt. No. 78, Attach. 10, at 17-18.   This argument more appropriately applies to his retaliation claims and does not support his claim that Defendants were motivated to demote him based at least in part on his race and/or national origin.   *See Buon v. Spindler*, 65 F.4th 64, 82-83 (2d Cir. 2023) (noting that "[a]n action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action").

58

**B.      Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Retaliation Claims**

After careful consideration, the Court finds that Defendants are entitled to summary judgment on Plaintiff's retaliation claims for the reasons stated in Defendants' memoranda of law.   *See, supra,* Parts I.C.1 and I.C.3 of this Memorandum-Decision and Order.   To those reasons, the Court adds the following analysis.

"To present a prima facie case of retaliation under [Title VII], a plaintiff must show that (1) '[]he participated in an activity protected by Title VII,' (2) this 'participation was known to h[is] employer,' (3) the employer 'subjected h[im] to a materially adverse' action thereafter, and (4) a 'causal connection' existed between the 'protected activity' and the adverse action."   *Moll v. Telesector Resources Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 [2d Cir. 2010]).   As with discrimination claims, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for the adverse actions(s), after which the burden shifts back to the plaintiff to show that those reasons are pretextual.   *See King v. Aramark Servs. Inc.*, 96 F.4th 546, 565 (2d Cir. 2024) ("Title VII retaliation claims are also evaluated under the *McDonnell Douglas* framework." (citing *Kaytor*, 609 F.3d at 552)).   Unlike discrimination claims, however, causation on a Title VII retaliation claim requires a plaintiff to establish that "retaliation would not have occurred in the absence of the alleged wrongful actions or action of the employer," *i.e.*, that retaliation was the but-for cause of the adverse action as opposed to merely a motivating factor.   *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Defendants do not appear to dispute that they were *aware* of the various conduct that

59

Plaintiff asserts constituted protected activity or that he was subjected to a materially adverse action (in the form of removal from the position of Dean and loss of the related advantages of that position).   Instead, they argue that Plaintiff's actions did not actually *constitute* protected activity and that he has not raised a genuine dispute of material fact regarding the existence of a causal connection between such activity and the adverse action.

### 1. Protected Activities

"[I]f an employee -- even one whose job responsibilities involve investigating complaints of discrimination -- actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of h[is] employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause." *Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 [2d Cir. 1999]).   To show that he has engaged in protected activity, a plaintiff "need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a good faith, reasonable belief that the underlying employment practice was unlawful under the statute."   *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013).   "Whether a belief is reasonable is an objective standard that is 'to be evaluated from the perspective of a reasonable similarly situated person.'"   *Meagher v. State Univ. of New York*, No. 17-CV-0903, 2020 WL 5504011, *17 (N.D.N.Y. Sept. 11, 2020) (Suddaby, C.J.) (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 16-17 [2d Cir. 2013]). Complaints that are so vague or generalized that the employer "could not reasonably have understood that [the plaintiff] was complaining of 'conduct prohibited by Title VII'" do not

suffice. *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)

(quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 [2d Cir. 1998]).

Merely advocating for a promotion or other such benefits on behalf of a person who falls

under a protected status is insufficient to constitute a protected activity; instead, there must be at

least some evidence to suggest that the plaintiff complained of discrimination (or other conduct

prohibited by Title VII) *on behalf of* the relevant individual(s) in a manner that the employer

could reasonably understand that prohibited conduct *was being reported*. *Brown v. Xerox

Corp.*, 170 F. Supp. 3d 518, 526-27 (W.D.N.Y. 2016) (citing *Rojas*, 660 F.3d at 108).

### a. Plaintiff's Efforts to Promote Diversity

Plaintiff first argues that he engaged in protected activity through various efforts to

promote diversity in the Dean's Office and the College of Medicine.   These included

"champion[ing] the rights of minorities" and making "great efforts to recruit minority faculty,"

which he claims resulted in "multiple verbal comments" by Dr. Dewan "severely questioning the

'need for' various minority professors and the extent of their contributions to the University."

*See* Dkt. No. 78, Attach. 10, at 21.   These questions included inquiries into what a Native

American professor "does all day," what a Hispanic female professor "does in diversity," and

why there was a need for a Director of Multicultural Affairs, a position that was filled by a Black

individual.   *See id.*   Plaintiff states that, in response to these questions, he explained to Dr.

Dewan what those individuals did and why they were important.   *See id.*

Plaintiff's actions of merely explaining the roles that certain faculty fulfilled, explaining

why diversity was important, and mentioning to Dr. Dewan that the Native American professor

61

had been told he would be promoted but that Defendant SUNY Upstate had failed to do so do not rise to the level of protected activities.   Nor does the fact that these conversations regarded individuals who are members of protected classes or were viewed by Plaintiff as promoting diversity elevate them to complaints about activity prohibited by Title VII.   Plaintiff's explaining what certain professors do or that they had been determined to be the choice for promotion are simply too generalized for Defendants to have reasonably understood that Plaintiff was reporting discriminatory conduct, especially because there is nothing in Dr. Dewan's questioning of Plaintiff about these individuals that a reasonable factfinder can construe as being discriminatory; asking what certain professors accomplish in order to determine whether the positions they hold are necessary is simply not discriminatory on its face, and the fact that Plaintiff may have interpreted those questions in a different manner does not change that fact. As was noted above, although conduct reported need not actually be a violation of Title VII so long as the plaintiff believed it to be a violation, the relevant assessment is one of objective reasonableness; and here Plaintiff's asserted interpretation is simply not objectively reasonable on the record presented.   Because there is nothing in Plaintiff's responses to Dr. Dewan's questions that was specific enough to lead to a rational finding that Dr. Dewan should have reasonably understood that Plaintiff was reporting conduct that violates Title VII, these asserted actions do not constitute protected activity.

### b. Plaintiff's Creation of an External Scientific Advisory Board

Plaintiff argues that his action of appointing an all-female External Scientific Advisory Board to "combat the underrepresentation of female employees" is a protected activity.   He

62

states that, when he discussed an upcoming second meeting of that Board with Dr. Dewan, Dr. Dewan "replied with sarcasm 'Oh, do we have an External Scientific Advisory Board?'" and the Board did not meet after Plaintiff was demoted, and it was ultimately disbanded. *See* Dkt. No. 78, Attach. 10, at 22-23.

This is insufficient evidence to establish a protected activity. Whether or not the Court must accept Plaintiff's interpretation of Dr. Dewan's purported comment as sarcastic, it is undisputed that Plaintiff did not raise any objections to that comment or complain to Dr. Dewan that his words or actions were discriminatory. Even if Plaintiff believed Dr. Dewan's comment was hostile to female diversity, Plaintiff did not make that belief known to Dr. Dewan (or, apparently, anyone else) and therefore did not report any discrimination related to this instance. Appointing the Board, or merely talking about it and its merits or functioning, is not a protected activity.

### c. Plaintiff's Work with the College of Medicine Diversity Committee

Plaintiff next argues that he engaged in protected activity because he "strongly supported a Diversity Committee" within the College of Medicine; and, in response to being "aggressively questioned" why a female Hispanic neurosurgeon was in the lead role of that Committee, Plaintiff "continuously affirmed the neurosurgeon's qualifications and the work she did to advance the missions of the Committee to Defendants." *See* Dkt. No. 78, Attach. 10, at 23-24. As with Plaintiff's explanations regarding what role certain professors performed within their various positions (discussed previously), Plaintiff's explaining why this individual held the lead role in the Committee was too vague and generalized to have led Defendants to reasonably

63

understand that Plaintiff might have been intending to report discriminatory conduct.   This conduct also therefore does not constitute a protected activity.

### d. Plaintiff's Reports of Gender Imbalance on the Budget Committee

Plaintiff argues that he "acted in opposition to discrimination in May and June 2019, when he notified Defendants about his concern regarding the gender-imbalance of the Budget Committee and recommended that women be included."   *See* Dkt. No. 78, Attach. 10, at 24-25.

As has been discussed, a plaintiff "need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a good faith, reasonable belief that the underlying employment practice was unlawful under the statute."   *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013).   Title VII makes it unlawful for an employer to (a) "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," or (b) "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a).

The employment practice that Plaintiff asserts he was reporting was the failure to include women on the Budget Committee.   However, inclusion on the Budget Committee does not constitute a separate job for which an individual can be "hired," nor does the omission of any individuals from the Budget Committee appear otherwise related to the compensation, terms,

64

conditions, or privileges of any women faculty, including those that Plaintiff specifically names

as individuals who should be invited to join the Budget Committee.   Plaintiff does not dispute

evidence in Dr. Dewan's declaration that indicates the following about the Budget Committee:

(1) "[t]he purpose of the Budget Committee was for senior leadership to have a platform to

discuss confidential financial matters regarding [SUNY Upstate]," and senior leadership includes

"the President, the Hospital CEO, the Hospital Chief Financial Officer, [SUNY Upstate's] Senior

Vice President for Finance and Administration, the Dean of the College of Medicine, the

President of UUMAS, and the President's Chief of Staff"; (2) "Committee membership was

based on the functions/title of each member"; and (3) the positions of the female administrators

that Plaintiff suggested for inclusion on the Budget Committee -- Chief Medical Officer and

Senior Associate Dean of Faculty Affairs and Faculty Development – "did not justify their

inclusion in the Budget Committee as they did not directly deal with the finances of [SUNY

Upstate]." *See* Dkt. No. 73, Attach. 26, at ¶ 55.

Because inclusion on the Budget Committee was inherent and, as far as can be gleaned

from the evidence, automatic for only certain specific job titles, the failure to include individuals

in other job titles (particularly job titles that have no relevant tie to financial affairs) facially does

not constitute a prohibited employment practice under the express terms of Title VII, no matter

the genders of the individuals involved.   Because Plaintiff himself was a member of the Budget

Committee by virtue of being Dean of the College of Medicine and would have had some

awareness of its structure and purpose as a result, it was not reasonable for him to believe that

reporting a gender imbalance on the Budget Committee merely because all the persons holding

the specified positions included on that Committee were male at the relevant time constituted a

65

challenge of an employment practice prohibited by Title VII.[84]   Plaintiff's actions here again essentially amount to a nebulous effort to "promote diversity" that is insufficient to constitute a protected activity.

### e. Plaintiff's Advocating for Black Medical Students

Plaintiff argues that he further engaged in protected activity by (1) reporting to the Dean of Student Affairs that various Black medical students were not being adequately prepared related to career development, (2) reporting concerns regarding these students' experiences and referring the Dean of Student Affairs to Defendant SUNY Upstate's Organizational Training and Development Office to receive an evaluation and feedback, and (3) attempting to create a new position of Director of College of Medicine Career Development to oversee career development plans of College of Medicine Students (particularly those from diverse backgrounds) and referring a Black female individual to the search committee for that position, which subjected him to "protest" from the Dean of Student Affairs, who did not approve of the creation of that position.   *See* Dkt. No. 78, Attach. 10, at 26-27.

As an initial matter, merely creating an administrative position with the intent to improve career development for students from diverse backgrounds does not constitute a protected activity for the reasons already discussed related to previous activities; efforts to promote diversity in the abstract do not reasonably constitute complaints of discriminatory employment

---

[84] Notably, Plaintiff does not assert that he held any belief that the hiring of any of the individuals into positions that were on the Budget Committee -- all of whom happened to be males at the relevant time -- was somehow discriminatory, only that other administrative titles should be added to the Budget Committee in order to create gender diversity because those titles were currently being held by women.

66

practices.

Moreover, as to Plaintiff's reporting of concerns regarding his belief that certain Black students were not being adequately prepared for the next stages of their career paths, this activity also does not involve an objectively reasonable belief that he was reporting discrimination prohibited by Title VII.   The evidence upon which Plaintiff relies (his own declaration) states that "I referred African-American medical students from SUNY Upstate to a colleague of mine at a highly-ranked, Ivy League-affiliated, national institution so that they could negotiate to do external rotations there," and that, after each of those African-American medical students contacted that institution, "I received phone calls expressing serious concerns about how unprepared the SUNY Upstate Medical students were and how they seemed to be 'lost' and not well mentored in terms of their career development."   *See* Dkt. No. 78, Attach. 4, at ¶¶ 67-68. Plaintiff does not state that he referred any non-Black medical students to this institution or that he failed to receive the same types of phone calls regarding any non-Black medical students' preparedness; the fact that these students were not sufficiently prepared does not raise a reasonable suggestion of discrimination unless there is evidence suggesting that non-Black students were better prepared by Defendants' career services resources.

Plaintiff states that, because the Dean of Student Affairs did not seem to take his concerns about these students' lack of preparedness seriously, he was concerned "that there was a discriminatory motive behind Student Affairs' actions."   (Dkt. No. 78, Attach. 4, at ¶¶ 70-72.) Plaintiff has offered no evidence to substantiate or even suggest that it was only Black students, or minority students, who had this perceived lack of preparedness, or to support his belief that this lack of preparedness of a few students he referred to one institution represented

67

discriminatory conduct on the part of Student Affairs, or even that Student Affairs' (in Plaintiff's opinion) insufficient response to his concerns was based on a discriminatory motive.[85]   Without some indication that Plaintiff had reason to believe that non-Black students were being better prepared in terms of career development, his belief that he was reporting discriminatory conduct prohibited by Title VII is not objectively reasonable.

Based on his interaction with the Dean of Student Affairs, Plaintiff also "referred the Dean of Student Affairs to the Defendant SUNY Upstate's Organizational Training and Development Office to receive standardized feedback by way of a '360-evaluation,' which usually includes both numerical feedback and written comments."   *See* Dkt. No. 78, Attach. 4, at ¶ 72.   It is not clear what Plaintiff specifically reported to this Office when he made that referral, only that the Office "only recommended numerical feedback because they were concerned that any written comments could include the accusations of racism or discrimination and, if they did, the written comments would be required to be reported to the Defendant SUNY Upstate's Department of Human Resources and potentially subject SUNY Upstate to liability."   *See* Dkt. No. 78, Attach. 4, at ¶ 73.   Because the only "accusations of racism or discrimination" that

---

[85]  Plaintiff does state in his declaration that Student Affairs "has been plagued by multiple complaints of discrimination," and quotes from a social media post regarding one such complaint of race discrimination that was publicly filed by a former employee with the NYSDHR in 2019. *See* Dkt. No. 78, Attach. 4, at ¶¶65-66.   Yet Dean of Student Affairs Dr. Julie White clarifies in an affidavit that there were only two or three such complaints filed while Plaintiff was Dean and that when the complaint referenced in Plaintiff's declaration was filed, Plaintiff, who was Dr. White's supervisor, "was very supportive[] [and] offered to assist [her] in any way he could, assuring [her] that he thought that the complaint was not legitimate."   *See* Dkt. No. 81, Attach. 7, at ¶ 11.   The Court also notes that evidence submitted with Defendants' reply memorandum of law shows that Plaintiff provided an evaluation of Dr. White's job performance in January 2019 in which he rated her as "effective" or "exceeds expectations" in all rated areas, including an "exceeds expectations" in the area of "supports Diversity and Office of Inclusion programs and fosters a culturally diverse and inclusive environment."   *See* Dkt. No. 81, Attach. 9.

68

Plaintiff seems to have reported in referring the Dean of Student Affairs to the Office for evaluation were (1) a discriminatory failure to prepare Black students and (2) the Dean of Student Affairs' response to Plaintiff's reports regarding those students, those reports fail to rise to the level of a protected activity for the reasons already discussed.

Because Plaintiff cannot show that he had a good faith, reasonable belief that the conduct he was reporting was a violation of Title VII, these actions do not constitute protected activity.

### (j) *Plaintiff's Creation of a Position for a Part-Time Assistant Dean for Cultural Competence*

Plaintiff next argues that he engaged in protected activity by creating a part-time position for Assistant Dean of Cultural Competence and offered that position to a Black orthopedic surgeon and assistant professor, but that Dr. Dewan made "aggressive objections" and "demand[ed] to know what the other specifically named individuals of diverse backgrounds were contributing to the University and why there existed a need for another position related to Diversity and Inclusion." *See* Dkt. No. 78, Attach. 10, at 27-28.

These activities do not constitute protected activities for the same reasons discussed above related to Plaintiff's explaining to Dr. Dewan what certain professors did in their roles. Plaintiff does not appear to assert that he made any comments to Dr. Dewan or anyone else that he believed Dr. Dewan's reactions were discriminatory or otherwise informed Dr. Dewan that he believed they was discriminatory.   The fact that Plaintiff was advocating for diversity in the abstract is simply not sufficient.   This incident therefore does not include any protected activity.

69

### (g) Plaintiff's Efforts to Promote Diversity Among Appointments to Chair Positions

Plaintiff next argues that he engaged in protected activity through his efforts to promote diversity in candidates during the search and appointment process to fill vacancies for Department Chair positions, including (1) using an external search firm when searching for Chairs of the Department of Medicine and Otolaryngology, and emphasizing to that firm that they needed to engage with "highly qualified candidates of diverse backgrounds," and (2) organizing an interview panel who selected a female candidate for the position of the Chair of the Anesthesiology Department despite pressure from Defendants to appoint a certain male candidate.  See Dkt. No. 78, Attach. 10, at 28-31.

These actions do not constitute protected activities.   As with other alleged protected activities already discussed, Plaintiff does not argue that he made any indication to Defendants that he believed Defendants were engaging in discrimination.   Regarding the searches conducted by the search firm, Plaintiff does not even suggest that he made any comments regarding those searches to Defendant at all, only that he told the search firm they needed to assess diverse candidates; the fact that Defendants did not hire any candidate referred by the search firm does not somehow turn this conduct into protected activity.   Similarly, even if Defendants indicated to Plaintiff they had a male candidate they wanted to hire for the position of Chair of the Anesthesiology Department, the fact that Plaintiff instead decided to conduct a search that resulted in the selection of a female candidate is insufficient on its own to constitute protected activity.   Although Plaintiff views his conduct as a "challenge" to Defendants wanting to appoint a male, it appears undisputed that (1) he did not make any statement or otherwise

70

indicate in more than a vague or generalized way to Defendants that he believed the appointment of the male candidate without a search effort would be discriminatory, and (2) Dr. Dewan ultimately appointed the female candidate on the recommendation of the interview panel with no apparent objection.   Because neither of these actions can be reasonably construed as allowing Defendants to understand that Plaintiff was reporting conduct prohibited by Title VII, they cannot be found to constitute protected activity.

### (h) Plaintiff's Complaints Regarding Dr. Wong's Salary Reduction

Lastly, Plaintiff alleges that he engaged in protected activity by complaining to Dr. Dewan about a reduction to his wife, Dr. Wong's, salary.   *See* Dkt. No. 78, Attach. 10, at 31. Specifically, Plaintiff argues that, during a meeting with Dr. Dewan on August 12, 2019, Plaintiff told Dr. Dewan that Dr. Wong "felt she may have a claim under Title VI and/or Title IX for discrimination since, to her knowledge, no white male professor was ever subjected to a salary reduction of this type."   *See id.*   This argument is consistent with Plaintiff's deposition testimony, in which he responded, "yeah," to the question of whether, "[d]uring that meeting with Dr. Dewan on August 12, 2019, you indicated in your complaint that you told him you felt that she was being discriminated against because no other white male professor was facing the same salary challenges," and that he "specifically said that she would have reason both under Title Seven, and I used those words, both under Title 7 and Title 9, to file a complaint."   *See* Dkt. No. 73, Attach. 11, at 32.

There is no question that this type of report would give Defendants reasonable notice that Plaintiff was attempting to report conduct prohibited by Title VII.   The remaining question is

71

therefore whether Plaintiff's belief that the salary reduction violated Title VII was a good faith, reasonable one.   The Court finds that the undisputed evidence presented does not substantiate the reasonableness of that belief.

The following relevant facts are undisputed: (1) Dr. Wong's total starting salary of $220,000 (her base salary of $120,000 plus her ALR of $100,000) was higher than the total starting salary of each of the 26 other research faculty that Defendant SUNY Upstate hired between 2017 and 2020, and she was provided a start-up commitment that "far surpasses any other faculty member hired during the timeframe" despite her being not funded by any grants when hired; (2) this starting salary made her "one of the highest paid research faculty in the psychiatry department," and she was in fact among the top three highest paid tenured research professors in the Department at all times since her hire; (3) in addition to her state salary, Dr. Wong was offered a temporary PFP stipend of $30,000; (4) the offer letter Dr. Wong received and signed related to her hire states that, as to her initial ALR amount, "[t]his additional compensation is not subject to UUP negotiated raises, is reviewed annually and is subject to adjustment or renewal, which may also result in an increase in base salary"; (5) the signed agreement regarding faculty expectations states that Dr. Wong was required to seek out grant support and submit grant proposals as part of her research duties; (6) in July 2018, her total salary allocation was altered to $177,400 in base salary and $45,000 in ALR for a total salary of $222,400, with statements in emails from Dr. Schwartz communicating to Dr. Wong that neither the ALR nor the PFP stipend was permanent and she was expected to obtain grants to supplement her base salary within a few years after hire when those would be removed; (7) although Dr. Wong's ALR was set to expire in July 2019, Defendants extended it to December

72

31, 2020, to accommodate for the fact she had not yet obtained any grants, but eliminated her

$30,000 PFP stipend; and (8) Plaintiff, as Dean, had access to all the data regarding faculty

salary and startup information.  *See* Dkt. No. 73, Attachs. 42, 58, 63, 64, 66.

Although there is some evidence indicating that Dr. Wong and Plaintiff may have

misinterpreted or misunderstood statements regarding the impermanency of the ALR funding (or

received misleading information from Dr. Laraque-Arena),[86] such a misunderstanding does not

create a genuine dispute of fact regarding the relevant question here, which is not whether

Plaintiff had a reasonable belief that Dr. Wong's salary was improperly reduced in the abstract,

but rather whether his belief that the reduction was rooted in discriminatory reasons was

objectively reasonable.   From the evidence presented on this motion, no reasonable factfinder

could conclude that to be the case.

Specifically, Plaintiff has offered no evidence to support his apparent belief that the

reduction was because of Dr. Wong's gender or other protected characteristic, other than

Plaintiff's statements in his declaration that, "to [Dr. Wong's] knowledge, no white male

professor was ever subjected to a salary reduction of this type," and Dr. Wong's deposition

testimony in which she stated that she was told by Dr. Dewan and/or Dr. Schwartz that she

"could not earn more than" the two other people in the department who had the highest salaries,

both of whom were men, and she was not comfortable being compared to just men and being

told her salary could not be higher than those of the two men.  *See* Dkt. No. 73, Attach. 14, at 4-

5; Dkt. No. 78, Attach. 4, at ¶ 111.   However, the fact that the other two highest earning

professors in the Department happened to be male does not automatically make a refusal to pay

---

[86] *See* Dkt. No. 73, Attachs. 67, 68.

73

Dr. Wong a higher salary than those individuals inherently discriminatory based on gender, and any such inference is undermined by the other undisputed evidence that Dr. Wong was at the relevant time approaching the two-year mark in her employment with Defendant SUNY Upstate, which was when her PFP stipend was due to expire (and would have expired for any employee, given that the grant was limited by its very terms to a two-year period), and that Defendants extended her ALR for another year beyond when they were planning in order to give Dr. Wong additional time to secure grants to supplement her salary before the ALR would be removed. Indeed, the institutional evidence and affidavits that Defendants provided substantiate that ALR was a method to provide newer hires who did not have current grant funding time to obtain such funding while being maintained at a higher salary.   There has been no evidence presented to suggest that a white male professor would not also have an ALR removed under the circumstances in which Defendants were attempting to remove Dr. Wong's ALR, or that any grant-funded persons to whom Plaintiff was comparing Dr. Wong were receiving ALR.

It also cannot be ignored that the evidence shows that, even as a non-grant funded researcher, Dr. Wong's salary was the third-highest in the Department; the fact that Defendants refused to make her the highest paid individual in the Department is not evidence of discrimination, particularly as there is no evidence regarding whether the two male individuals who had higher salaries than Dr. Wong had been employed by Defendant SUNY Upstate longer or other such relevant factors.   Most importantly, Plaintiff, as Dean, would have had access to all of this information, both related to Dr. Wong's compensation package and the process and purpose of ALR and PFP stipends because it was part of the Dean's duties to set the salary and start up packages for faculty as well as approve all salaries and ALR for faculty on a yearly basis

74

(although Plaintiff did not have approval over Dr. Wong's salary due their relationship).   Given that Plaintiff had access to information regarding the salaries of all other faculty, no reasonable factfinder could conclude that he had an objectively reasonable belief that Dr. Wong's salary adjustment was the product of discrimination.

Based on the undisputed evidence, no factfinder could conclude that Plaintiff's belief that he was reporting gender and/or race/national origin discrimination on behalf of his wife that violated Title VII was objectively reasonable.   As a result, his statements to Dr. Dewan on this matter do not constitute protected activity.

### (ı) *Plaintıff's Filing of the NYSDHR Charge*

Plaintiff also alleges in the Complaint that he experienced additional retaliatory actions after he filed a charge with the NYSDHR, including the refusal or failure to consider him for multiple high-level positions within SUNY and the College of Medicine, causing him reputational damage and loss of income, failing to provide him with a laboratory startup funding package, denying him reimbursement for certain expenses, and removing the salary increase for his title as a Distinguished Professor from his base salary.   *See* Dkt. No. 1, at ¶¶ 157-85. However, in his opposition memorandum of law (despite Defendants making arguments regarding those allegations in their memorandum of law), Plaintiff makes no mention of his NYSDHR charge as a protected activity or the above alleged retaliatory actions.   Because Plaintiff has not opposed those arguments, the Court deems them to be abandoned.   *See Martinez v. United States*, No. 20-CV-7275, 2021 WL 4224955, *14 n.13 (S.D.N.Y. Sept. 16, 2021); *see Lomonoco v. Saint Anne Inst.*, No. 15-CV-1163, 2018 WL 2324051, *12 (N.D.N.Y.

75

May 22, 2018) (Suddaby, C.J.) (finding that "the Court may, and does, construe the failure to respond to an opposing party's arguments as an effective abandonment of the claim").

Moreover, in the alternative, even if Plaintiff could show a prima facie case of retaliation based on the NYSDHR charge and alleged retaliatory actions that followed, such claim would fail for the same reasons as will be discussed below in Parts III.B.2 and 3 of this Memorandum-Decision and Order, namely Plaintiff's conduct and performance as Dean provides a legitimate, nonretaliatory reason for choosing not to hire him for other high-level positions, and Plaintiff has not established that any protected action by him was the but-for cause of any action taken against him.

### 2. Legitimate, Non-Discriminatory Reasons

Even assuming that at least some of Plaintiff's alleged actions could be considered protected activities, and assuming that there was at least a temporal proximity between those activities and his demotion, Defendants have met their burden to proffer legitimate, non-discriminatory reasons for his demotion.   Although some of the material facts related to Plaintiff's purported behavior during his tenure as Dean have been properly disputed, many others have not, and those that have not been disputed are sufficient to show behavioral or other performance issues that would provide a sufficient basis for the decision to remove Plaintiff from the position of Dean.   *See, supra,* Statement of Undisputed Material Facts in Part I.B. of this Memorandum-Decision and Order.

For example, the undisputed evidence establishes the following: (1) Dr. Laraque-Arena had personal and communication issues with Plaintiff that caused her to limit the number of

76

meetings they had, require that another person be present at their meetings, and eventually to ask

Dr. Dewan to informally assume the duties of Dean; (2) a discrimination complaint had been

filed against Plaintiff by several female faculty members in December 2018; (3) members of

SUNY administration encouraged Dr. Dewan to remove Plaintiff from his position and Plaintiff

was informed by one SUNY administrator that he should begin looking for a new job; (4)

Plaintiff made only modest gains in diversity of senior administrative staff despite policies,

procedures, and programs designed to increase diversity among students and faculty as well; (5)

Plaintiff improperly interfered with a search committee and the whole committee had to be

disbanded; (6) Plaintiff sent an email to the SUNY Chancellor requesting millions of dollars in

funding to recruit a specific doctor, which resulted in the Chancellor telling Dr. Dewan that

Plaintiff should not contact her again and that he should be removed as Dean; (7) Plaintiff made

comments that colleagues and students found to be inappropriate and unprofessional on various

occasions, including at formal College of Medicine ceremonies where he was acting in his

capacity as Dean; (8) Plaintiff sent an email to various faculty and students asking them to report

instances of discrimination directly to him despite that being inappropriate under the College of

Medicine's collective bargaining agreements, policies, and procedures; (9) Plaintiff was creating

multiple administrative positions within the Dean's Office that Dr. Dewan viewed as being

unnecessary or duplicative of existing positions and did not further the goal of increasing URiM

students; (10) Plaintiff instructed Chairs not to speak with Dr. Dewan about Departmental

concerns and otherwise made comments to faculty that undermined Dr. Dewan's authority; (11)

Plaintiff played a video in a public meeting space that included offensive and derogatory

language; and (12) Plaintiff made appointments under management/confidential titles that

77

Human Resources found to be inappropriate.

Based on the undisputed evidence, Defendants have shown a legitimate, non-retaliatory reason for the adverse action taken against Plaintiff.

### 3. Pretext

"[T]emporal proximity alone, while sufficient to establish the *de minimis* burden at the prima facie stage . . . is insufficient to establish retaliatory intent (through pretext or otherwise) at the third stage of the burden-shifting framework." *Russo v. Wyandanch Union Free Sch. Dist.*, No. 23-716-cv, 2024 WL 2350314, *2 (2d Cir. May 23, 2024) (citing *Tafolla v. Heilig*, 80 F.4th 111, 125-26 [2d Cir. 2023]; *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 [2d Cir. 2019]).   As was discussed above, at this stage, the plaintiff must show that retaliation was the "but-for" cause of the adverse action such that it "'would not have occurred in the absence of the retaliatory motive.'" *Macri v. Herkimer Cnty.*, No. 20-CV-1414, 2023 WL 6295590, *6 (N.D.N.Y. Sept. 27, 2023) (Sharpe, J.) (citing *Nassar*, 570 U.S. at 346-47; *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 [2d Cir. 2013]).

Plaintiff cannot meet the requisite burden.   Notably, Plaintiff does not appear to make a specific argument regarding pretext as to his retaliation claim, but he has not abandoned that point because other arguments could be construed as applying to that question.   Specifically, Plaintiff argues that there is a causal connection between his demotion and his alleged protected activity because (1) there is a close temporal proximity; (2) Human Resources Vice President Mr. Frost made a statement in his deposition testimony that could be construed as stating that he believed it was possible that Plaintiff's intent to promote diversity may have been part of the

78

decision to demote him, although Mr. Frost also stated that "I think it was a multitude of a lot of things"; (3) he was demoted without being provided notice or a transition period as required by the contract he signed when he accepted the position; (4) notes from a September 16, 2019 Council Meeting indicate that it was stated that "there is not one horrible thing that happened for this change to occur, rather a change was needed in leadership," and "overall, this is not a negative change, but rather a moving forward change and a removal of barriers"; and (5) he was not provided with any negative feedback related to his performance and there is no documentation of performance issues.  *See* Dkt. No. 78, Attach. 10, at 33-36.

As was discussed above, any temporal proximity is insufficient to carry the burden alone at this stage, and Plaintiff's other arguments do not add sufficient weight to tip the scales.  Mr. Frost's deposition statement actually undermines Plaintiff's argument in this case, given that he states that, although Plaintiff's intent to promote diversity "could have" been a part of the decision to demote him (a statement that in any event is conditional and not concrete), he also acknowledged that "it was a multitude of a lot of things" and even discussed some of the conduct issues already discussed above in the surrounding context of this comment.  *See* Dkt. No. 81, Attach. 6, at 9-11.  Because Plaintiff must show that retaliation was the but-for cause of his demotion and not just a motivating factor, Mr. Frost's deposition statement does not add any weight to Plaintiff's argument.  Similarly, the statements cited from the September 16, 2019 Council Meeting do not support a rational finding that retaliation was the but-for cause of Plaintiff's demotion, and Plaintiff's interpretation of such statements as evidence Defendants saw him as a barrier to diversity at the College of Medicine is simply not supported by any evidence. Additionally, the fact that there is no written documentation of performance issues in the form of

any formal performance review or notification to Plaintiff is immaterial given the amount of

undisputed evidence that Defendants have submitted on this motion establishing that

performance and behavioral issues existed.   Indeed, there is no dispute that Plaintiff himself was

aware by January 2019 that individuals within Defendant SUNY wanted him to be removed as

Dean.   Lastly, the fact that the agreement Plaintiff signed provides for a transition period if he

were to be removed as Dean also does not stand as evidence of retaliatory motive, not least

because, as was discussed previously, this agreement has been found to not be a binding contract

and Defendants therefore had no legal obligation to abide by its terms.

Because none of the evidence Plaintiff cites could reasonably establish that Defendants'

legitimate, non-discriminatory reasons for removing him from the position of Dean were mere

pretext for retaliation, Plaintiff cannot succeed on his retaliation claims.   Accordingly, Plaintiff's

Third, Fourth, and Fifth Claims must be dismissed.


## IV. CONCLUSION

Having reviewed the entire file in this case, the parties' submissions and the applicable

law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 73, is

**GRANTED**; and the Court further

A-1229

**ORDERS** that Plaintiff's Complaint, *see* Dkt. No. 1, is **DISMISSED**; and the Court further

　　　　**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and

close this case.

Dated: August 28, 2024
　　　　Syracuse, New York

Frederick J. Scullin, Jr.
**Senior United States District Judge**

81

A-1230

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

## JUDGMENT IN A CIVIL CASE

**Julio Licinio, MD, PhD, MBA, MS**
      Plaintiff

    vs.                   **CASE NUMBER: 5:21-CV-387**

**State of New York**; **The State University of New York**; **The State University of New York Upstate Medical University**
      Defendant(s)

  **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

That Defendants' motion for summary judgment is **GRANTED**; and the Court further **ORDERS** that Plaintiff's Complaint is **DISMISSED**; and the Court further **ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

All of the above pursuant to the order of the Honorable **Frederick J. Scullin, Jr.**, dated August 28, 2024.

DATED: August 28, 2024

Clerk of Court

s/ _____
Teri Lambert
Deputy Clerk

# Federal Rules of Appellate Procedure
## Rule 4. Appeal as of Right

### (a) Appeal in a Civil Case.

1. (1) *Time for Filing a Notice of Appeal.*

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

(i) the United States;

(ii) a United States agency;

(iii) a United States officer or employee sued in an official capacity; or

(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf — including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

(2) *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) *Effect of a Motion on a Notice of Appeal.*

(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(5) *Motion for Extension of Time.*

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77 (d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77 (d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) *Entry Defined.*

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58 (a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79 (a); or

(ii) if Federal Rule of Civil Procedure 58 (a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79 (a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order.

A-1232

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JULIO LICINIO, MD, PhD, MBA, MS,

                              Plaintiff,

                                              Case No.: 5:21-cv-387
          - against -                                (GTS/TWD)

STATE OF NEW YORK, THE STATE
UNIVERSITY OF NEW YORK, and THE STATE
UNIVERSITY OF NEW YORK UPSTATE
MEDICAL UNIVERSITY,

                              Defendants
-------------------------------------------------------------X

NOTICE IS HEREBY GIVEN that the following party: Julio Licinio, MD, PhD,

MBA, MS, in the above-named case appeals to the United States Court of Appeals

for the Second Circuit from the Memorandum-Decision and Order granting

Defendants' Motion for Summary Judgment dismissing the operative complaint

entered on August 28, 2024, at Dkt. No. 84, and the Judgment against Plaintiff

entered on August 28, 2024, at Dkt. No. 85.

    09/25/2024

                                        _____

                                        Douglas Mace, Esq.
                                        Danny Grace PLLC

A-1233

APPEAL,CLOSED

## U.S. District Court
## Northern District of New York − Main Office (Syracuse) [NextGen CM/ECF Release 1.7 (Revision 1.7.1.2)] (Syracuse)
## CIVIL DOCKET FOR CASE #: 5:21−cv−00387−FJS−TWD
### *Internal Use Only*

| | |
|---|---|
| Licinio v. State of New York et al | Date Filed: 04/04/2021 |
| Assigned to: Senior Judge Frederick J. Scullin, Jr | Date Terminated: 08/28/2024 |
| Referred to: Magistrate Judge Therese Wiley Dancks | Jury Demand: Both |
| Cause: 42:2000e Job Discrimination (Employment) | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Julio Licinio**
*MD, PhD, MBA, MS*

represented by **Daniel Grace**
Danny Grace PLLC
225 Broadway − Suite 1200
New York, NY 10007
212−202−2485
Fax: 718−732−2821
Email: danny@dannygracepc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*
*Fee Status: paid_2023*

**Douglas Mace**
Danny Grace, PLLC
225 Broadway − Suite 1200
Brooklyn, NY 11217
347−528−8229
Email: douglas@dannygracepc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*
*Fee Status: paid_2023*

**Athena Pantelopoulos**
Danny Grace, PC
222 Broadway − 19th Floor
New York, NY 10038
646−515−2821
Email: athena@dannygracepc.com
*TERMINATED: 05/02/2022*
*Bar Status: Removed2023Biennial*
*Fee Status: none*

V.

**Defendant**

**State of New York**

represented by **Aimee Cowan**
New York State Attorney General −
Syracuse Regional Office
300 South State Street − Suite 300
Syracuse, NY 13202
315−448−4808
Fax: 315−448−4808
Email: aimee.cowan@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*
*Fee Status: waived_2023*

A-1234

**William E. Arnold , IV**
New York State Supreme Court −
Onondaga County
333 E. Washington Street − 8th Floor
Syracuse, NY 13202
315−395−6120
Email: wearnold1984@gmail.com
*TERMINATED: 11/21/2022*
*Bar Status: Active*
*Fee Status: waived_2023*

**Defendant**

**The State University of New York**       represented by   **Aimee Cowan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*
*Fee Status: waived_2023*

**William E. Arnold , IV**
(See above for address)
*TERMINATED: 11/21/2022*
*Bar Status: Active*
*Fee Status: waived_2023*

**Defendant**

**The State University of New York**       represented by   **Aimee Cowan**
**Upstate Medical University**                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*
*Fee Status: waived_2023*

**William E. Arnold , IV**
(See above for address)
*TERMINATED: 11/21/2022*
*Bar Status: Active*
*Fee Status: waived_2023*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 04/04/2021 | 1 | COMPLAINT against State of New York, The State University of New York and The State University of New York Upstate Medical University (Filing fee $402 receipt number ANYNDC−5482207) filed by Julio Licinio. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet) (dpk) (Entered: 04/05/2021) |
| 04/05/2021 | 2 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 7/7/2021 at 10:00 AM before Magistrate Judge Therese Wiley Dancks. All conferences are conducted by telephone. Plaintiff's attorney will initiate the call (unless the Court directs differently) and shall contact Judge Dancks' Chambers at 315−234−8618 (a dedicated line solely for telephone conferences) once all parties are on the line. Counsel may use a teleconferencing service for assistance initiating conference calls to the Court. For cases involving pro se parties, the Court will initiate the call for the Rule 16 Conference. Pro se parties are instructed to provide the Court with a telephone number where they may be reached for a conference call. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 6/30/2021. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (dpk) (Main Document 2 replaced on 4/6/2021 (khr, ). (Entered: 04/05/2021) |

| 04/05/2021 | 3 | Summons Issued as to State of New York, The State University of New York and The State University of New York Upstate Medical University. (Attachments: # 1 Summons Issued as to the State University of New York, # 2 Summons Issued as to the State University of New York Upstate Medical University) (dpk) (Entered: 04/05/2021) |
|---|---|---|
| 04/06/2021 | | CLERK'S CORRECTION OF DOCKET ENTRY re 2 G.O. 25 Filing Order. Replaced the General Order #25 to reflect the name of the correct Judges. (khr) (Entered: 04/06/2021) |
| 04/21/2021 | 4 | NOTICE of Appearance by William E. Arnold, IV on behalf of All Defendants (Arnold, William) (Entered: 04/21/2021) |
| 05/03/2021 | 5 | ANSWER to 1 Complaint, by State of New York, The State University of New York, The State University of New York Upstate Medical University.(Arnold, William) (Main Document 5 replaced on 5/4/2021 (khr, ). (Entered: 05/03/2021) |
| 05/04/2021 | | CLERK'S CORRECTION OF DOCKET ENTRY re 5 Answer to Complaint. The original answer field was numbered incorrectly, replaced with a corrected numbered Answer. (khr) (Entered: 05/04/2021) |
| 05/04/2021 | | TEXT NOTICE −RESCHEDULING OF RULE 16 CONFERENCE: The Telephone Initial Conference has been RESCHEDULED for 6/14/2021 at 10:30 AM before Magistrate Judge Therese Wiley Dancks. Civil Case Management Plan must be filed no later than 6/7/2021, and Mandatory Disclosures are to be exchanged by the parties on or before 6/7/2021. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) **Counsel are directed to call the following number for this conference: 1−877−336−1829, access code 8029754, security code 9342.** (sg ) (Entered: 05/04/2021) |
| 05/24/2021 | 6 | AMENDED ANSWER to 1 Complaint, by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Arnold, William) (Entered: 05/24/2021) |
| 06/07/2021 | 7 | CIVIL CASE MANAGEMENT PLAN by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Arnold, William) (Entered: 06/07/2021) |
| 06/07/2021 | 8 | TEXT ORDER: Court has reviewed the Civil Case Management Plan submitted by the parties. (Dkt. No. 7 .) A corrected Civil Case Management Plan should be filed by 6/9/2021, signed by attorney of record for plaintiff who is admitted in the Northern District of NY. Electronic signatures are acceptable. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 6/7/2021.(sg) (Entered: 06/07/2021) |
| 06/08/2021 | 9 | CIVIL CASE MANAGEMENT PLAN by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Arnold, William) (Entered: 06/08/2021) |
| 06/14/2021 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Initial Pretrial Conference held on 6/14/2021. Appearances: Daniel Grace, Esq. for Plaintiff; William Arnold, Esq. for Defendants. Court reviews Civil Case Management Plan. Rule 26 Mandatory Disclosures completed. Stipulated protective order to be submitted for Court approval by 8/2/2021. Mandatory Mediation deferred (not opted out) and will be discussed at future conferences. Pretrial deadlines are established, a scheduling order will be issued. (sg) (Entered: 06/14/2021) |
| 06/14/2021 | 10 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: 5 days, to be held at Syracuse, NY. Joinder of Parties due by 9/17/2021. Amended Pleadings due by 9/17/2021. Plaintiff's Expert Disclosure Deadline is 1/4/2022. Defendant's Expert Disclosure Deadline is 2/28/2022. Rebuttal Expert Disclosure Deadline is 3/15/2022. Discovery due by 4/14/2022. Discovery Motions due 5/16/2022. Dispositive Motions due by 7/14/2022. Mandatory Mediation deferred. Signed by Magistrate Judge Therese Wiley Dancks on 6/14/2021. (sg) (Entered: 06/14/2021) |
| 06/14/2021 | | TEXT NOTICE of Telephone Conference: A Telephone Status Conference has been set for 11/4/2021 at 9:30 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 1−877−336−1829, access code 8029754, security code 2493.(sg) (Entered: 06/14/2021) |

A-1236

| | | |
|---|---|---|
| 06/15/2021 | 11 | NOTICE of Appearance by Athena Pantelopoulos on behalf of Julio Licinio (Pantelopoulos, Athena) (Entered: 06/15/2021) |
| 07/29/2021 | 12 | Letter Motion from William Arnold for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting that Defendants be permitted to submit a proposed protective order at a future date if necessary submitted to Judge Dancks . (Arnold, William) (Entered: 07/29/2021) |
| 07/29/2021 | 13 | TEXT ORDER: Court reviewed letter motion (Dkt. No. 12 ) regarding need for protective order at the present time. Since the parties do not believe a protective order is necessary at this time, the deadline to submit a proposed order is adjourned without new date. If the parties determine a protective order is needed in the future, they should immediately submit a proposed order such that discovery will not be held up unnecessarily. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/29/2021. (sg) (Entered: 07/29/2021) |
| 11/04/2021 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Status Conference held on 11/4/2021. Appearances: Athena Pantelopoulos, Esq. for Plaintiff; William Arnold, Esq. for Defendants. Counsel report on status of discovery and depositions anticipated. Court issues directives and sets deadlines, a separate text order will follow. (sg) (Entered: 11/04/2021) |
| 11/04/2021 | 14 | TEXT ORDER: The Court made the following directives and set deadline during the 11/4/2021 Telephone Conference: All responses to discovery demands due by 11/12/2021. Any objections to responses must be detailed and specific. A detailed privilege log must be provided for any responses where privilege is claimed. Plaintiff to file joint status report by 12/13/2021 re: sufficiency of discovery responses and any issues the parties are working on; and confirmed dates for depositions to include the name of the individual being deposed and date of deposition. Mediation deferral continued. All deadlines remain as previously established. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/4/2021. (sg) (Entered: 11/04/2021) |
| 11/09/2021 | 15 | Letter Motion from William Arnold for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting proposed confidentiality stipulation submitted to Judge Dancks . (Arnold, William) (Entered: 11/09/2021) |
| 11/10/2021 | 16 | Confidentiality Stipulation and Protective Order. Signed by Magistrate Judge Therese Wiley Dancks on 11/10/2021. (sg) (Entered: 11/10/2021) |
| 12/13/2021 | 17 | STATUS REPORT by Julio Licinio. (Pantelopoulos, Athena) (Entered: 12/13/2021) |
| 12/13/2021 | 18 | TEXT ORDER: Court reviewed status report (Dkt. No. 17 ) regarding discovery. The parties are directed to meet and confer in good faith regarding the discovery issues identified concerning their respective responses to the other party's demands. The parties should serve any supplemental responses by 1/18/2022. Plaintiff to file a further status report by 1/31/2022 regarding paper discovery issues that have not been resolved. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 12/13/2021. (sg) (Entered: 12/13/2021) |
| 01/17/2022 | 19 | Letter Motion from Counsel for Plaintiff for Julio Licinio requesting Extension to serve supplemental responses to discovery and complete party depositions submitted to Judge Therese Wiley Dancks . (Pantelopoulos, Athena) (Entered: 01/17/2022) |
| 01/18/2022 | 20 | TEXT ORDER: Court reviewed status report/letter motion (Dkt. No. 19 ) seeking an extension of time regarding discovery which is granted. The parties should serve all supplemental responses to discovery demands as referenced in Dkt. No. 19 by 2/24/2022. Plaintiff to file further status report by 2/28/2022 regarding any further paper discovery issues that have not been resolved. All discovery is now due 5/16/2022; discovery motions due 5/31/2022; dispositive motions remain due 7/14/2022. All other deadlines also remain as previously set in Dkt. No. 10 . SO ORDERED by Magistrate Judge Therese Wiley Dancks on 1/18/2022. (sg) (Entered: 01/18/2022) |
| 02/19/2022 | 21 | NOTICE of Appearance by Aimee Cowan on behalf of State of New York, The State University of New York, The State University of New York Upstate Medical University (Cowan, Aimee) (Entered: 02/19/2022) |

| | | |
|---|---|---|
| 02/28/2022 | 22 | STATUS REPORT *pursuant to the Courts January 18, 2022 Text Order* by Julio Licinio. (Pantelopoulos, Athena) (Entered: 02/28/2022) |
| 03/02/2022 | 23 | TEXT ORDER: Court has reviewed status report (Dkt. No. 22 ) regarding discovery progress. The parties are to confer in good faith to set a deposition schedule. Plaintiff to file status report by 3/18/2022 regarding confirmed dates for depositions. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/2/2022. (sg) (Entered: 03/02/2022) |
| 03/18/2022 | 24 | STATUS REPORT/Letter Motion by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/18/2022 (sg, ). (Entered: 03/18/2022) |
| 03/21/2022 | 25 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 24 ) for an extension of the remaining discovery deadlines which is granted as follows: All discovery is now due 7/15/2022; discovery motions due 7/29/2022; dispositive motions remain due 8/31/2022. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/21/2022. (sg) (Entered: 03/21/2022) |
| 05/02/2022 | 26 | Letter Motion from Athena Pantelopoulos for Julio Licinio requesting Withdraw as Attorney submitted to Judge Therese Wiley Dancks . (Pantelopoulos, Athena) (Entered: 05/02/2022) |
| 05/02/2022 | 27 | TEXT ORDER granting 26 Letter Request. Attorney Athena Pantelopoulos no longer represents Plaintiff. Plaintiff continues to be represented by Daniel Grace, Esq. and the law firm of Danny Grace PLLC. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 5/2/2022. (sg) (Entered: 05/02/2022) |
| 07/06/2022 | 28 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting discovery deadline and dispositive motion deadline extension submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 07/06/2022) |
| 07/06/2022 | 29 | TEXT ORDER: Court reviewed letter request (Dkt. No. 28 ) for extensions which is granted for the reasons stated. All discovery is now due 9/16/2022; discovery motions due 9/30/2022; dispositive motions due 10/28/2022. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/6/2022. (sg) (Entered: 07/06/2022) |
| 09/01/2022 | 30 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting Joint parties' request for 60–day deadline extension submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 09/01/2022) |
| 09/02/2022 | 31 | TEXT ORDER granting 30 Letter Request as follows: Discovery due by 11/15/2022. Discovery Motions due 11/29/2022. Dispositive Motions to be filed by 12/27/2022. **The Court has granted several extensions (Dkt. Nos. 20, 25, 29) since the initial scheduling order was issued. Counsel therefore must provide extraordinary cause for any further requests for extension.** SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/2/2022. (sg) (Entered: 09/02/2022) |
| 09/27/2022 | 32 | NOTICE of Appearance by Douglas Mace on behalf of All Plaintiffs (Mace, Douglas) (Entered: 09/27/2022) |
| 10/19/2022 | 33 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting discovery conference submitted to Judge Therese Wiley Dancks . (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D)(Cowan, Aimee) (Entered: 10/19/2022) |
| 10/26/2022 | 34 | TEXT ORDER : Court reviewed letter motion (Dkt. No. 33 ) regarding discovery dispute and requesting a discovery conference which is denied at this time without prejudice. From a review of Dkt. No. 33, it appears that the parties have only exchanged written notice of the perceived deficiencies in their respective responses. Defendant does not identify any conference that counsel had to confer in good faith by speaking to each other regarding the deficiencies. Additionally, a review of counsel's respective deficiency letters (Dkt. Nos. 33–3, 33–4), and in consideration of the claims and defenses alleged, the Court finds the information requested by both parties to be relevant. Therefore, both parties are directed to serve supplemental responses which |

| | | |
|---|---|---|
| | | fully respond to the various deficiencies set forth in Dkt. Nos. 33−3 and 33−4 by 11/4/2022. If either party claims any responsive documents are privileged, a complete privilege log must be provided with the responses. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 10/26/2022. (sg) (Entered: 10/26/2022) |
| 11/09/2022 | 35 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting discovery conference and deadline extension submitted to Judge Therese Wiley Dancks . (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B)(Cowan, Aimee) (Entered: 11/09/2022) |
| 11/16/2022 | 36 | TEXT ORDER granting 35 Letter Request for a telephone conference with the Court: Telephone Discovery Conference set for 11/21/2022 at 10:00 AM before Magistrate Judge Therese Wiley Dancks. **The parties are each directed to submit a short letter brief, no longer than 3pp, single spaced, 12pt font, by 4pm on 11/18/2022, setting forth their respective positions on the disputed discovery.** The remaining discovery deadlines are held in abeyance at this time and will be reset at the conference. Counsel are directed to call the following number for this conference: 1−877−336−1829, access code 8029754, security code 2493. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/16/2022. (sg) (Entered: 11/16/2022) |
| 11/18/2022 | 37 | LETTER BRIEF *in Response to ECF #36* by Julio Licinio. (Attachments: # 1 Appendix)(Grace, Daniel) (Entered: 11/18/2022) |
| 11/18/2022 | 38 | LETTER BRIEF by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) A)(Cowan, Aimee) (Entered: 11/18/2022) |
| 11/21/2022 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Discovery Conference held on 11/21/2022. Appearances: Douglas Mace, Esq. for Plaintiff; Aimee Cowan, Esq. for Defendants. Court reviews discovery issues, makes rulings and sets deadlines. A separate text order will follow. (sg) (Entered: 11/21/2022) |
| 11/21/2022 | 39 | TEXT ORDER: Court made the following rulings during the 11/21/2022 Telephone Discovery Conference: Plaintiff to respond to Defendants' Requests for Production 1 & 2 by providing to defendant authorizations and provider names of physical and/or mental health care/treatment received by Plaintiff during the period of 2009 to present, or file a letter with the Court clearly stating that those damages claims will not be pursued by Plaintiff, by 11/30/2022. Defendants' Request for Production 4 is denied without prejudice, Plaintiff does not need to further respond. With respect to Defendants' Requests for Production 6 and 7, plaintiff is to provide the names of places Plaintiff applied for jobs, and the offers or rejections received by text, email, letter or other written communication, for the period 2009 to present, by 12/16/2022. Any other disputes between the parties have either been resolved or waived. Court extends remaining deadlines as follows: Discovery due by 1/9/2023. Discovery Motions due 1/23/2023. Dispositive Motions to be filed by 3/3/2023. Court received oral request from defendant that Attorney Arnold is no longer representing the defendant and should be terminated from the docket, which is granted by the Court. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/21/2022. (sg) (Entered: 11/21/2022) |
| 11/29/2022 | 40 | LETTER BRIEF by Julio Licinio. (Mace, Douglas) (Entered: 11/29/2022) |
| 11/30/2022 | 41 | TEXT ORDER: Court reviewed plaintiff's letter (Dkt. No. 40 ) regarding update on discovery and damages issues. Defendants to file status report regarding remaining discovery by 1/3/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/30/2022. (sg) (Entered: 11/30/2022) |
| 12/16/2022 | 42 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 12/16/2022 (sg, ). (Entered: 12/16/2022) |
| 12/19/2022 | | TEXT NOTICE of Telephone Discovery Conference: A Telephone Discovery Conference has been set for 1/5/2023 at 11:00 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 1−877−336−1829, access code 8029754, security code 2493.(sg ) (Entered: |

| | | 12/19/2022) |
|---|---|---|
| 01/05/2023 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Discovery Conference held on 1/5/2023. Appearances: Douglas Mace, Esq. for Plaintiff; Aimee Cowan, Esq. for Defendants. After hearing from the parties during this telephone conference, which included discussion of the parties' submissions and positions re: the discovery dispute, the Court made rulings which will be memorialized in a written order. Court encourages the parties to discuss resolving the case and advises the Court is available for a settlement conference at the parties' request. (sg) (Entered: 01/05/2023) |
| 01/05/2023 | 43 | ORDER: for the reasons set forth herein it is ORDERED: Court GRANTS Defendants' 42 Letter Request; Plaintiff's emotional distress damages are limited to garden variety emotional distress as set forth herein; Plaintiff shall provide employment authorizations as directed herein to Defendants' counsel by 1/17/2023; Plaintiff shall provide a detailed written settlement demand to Defendants by 1/17/2023 and the parties shall confer in good faith regarding settlement; Defendants shall file a status report by 2/17/2023 regarding obtaining the employment records pursuant to the authorizations, and settlement negotiations; and all deadlines remain as previously established, and no other discovery is permitted except as directed in this Order. Signed by Magistrate Judge Therese Wiley Dancks on 1/5/2023. (sg) (Entered: 01/05/2023) |
| 02/17/2023 | 44 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 2/17/2023 (sg, ). (Entered: 02/17/2023) |
| 02/22/2023 | 45 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 44 ) regarding discovery completion and settlement potential. To the extent defendants request an adjournment of the dispositive motion deadline so the parties may explore settlement, the request is granted. The dispositive motion deadline is held in abeyance at this time. Defendants to file further status report on settlement and whether a settlement conference is definitely requested by 3/6/2023.SO ORDERED by Magistrate Judge Therese Wiley Dancks on 2/22/2023. (sg) (Entered: 02/22/2023) |
| 03/05/2023 | 46 | STATUS REPORT?Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/6/2023 (sg, ). (Entered: 03/05/2023) |
| 03/08/2023 | 47 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 46 ) and grants the defendants' request to extend the time to file a status report on settlement and whether a settlement conference is requested. Defendants to file the report by 3/15/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/8/2023. (sg) (Entered: 03/08/2023) |
| 03/15/2023 | 48 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/15/2023 (sg, ). (Entered: 03/15/2023) |
| 03/15/2023 | 49 | TEXT ORDER: Court reviewed status report/letter request (Dkt. No. 48 ) and grants the defendants' request to extend the time to file a further status report on settlement and whether a settlement conference is requested. If so, Court will then schedule the conference at a mutually agreeable date and time. Defendants to file the report by 4/3/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 3/15/2023. (sg) (Entered: 03/15/2023) |
| 03/31/2023 | 50 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 3/31/2023 (sg, ). (Entered: 03/31/2023) |
| 04/03/2023 | 51 | TEXT ORDER granting 50 Letter Request for a settlement conference with the Court. The Court will reach out separately to counsel with proposed dates for the in person settlement conference. The parties should make a good faith effort to settle the matter amongst themselves prior to the conference, and be prepared to report to the court all efforts made to resolve the case if it is not settled before the conference. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 4/3/2023. (sg) (Entered: 04/03/2023) |

A-1240

| 04/12/2023 | | TEXT NOTICE of In Person Settlement Conference: In Person Settlement Conference set for 5/18/2023 at 10:00 AM in Syracuse before Magistrate Judge Therese Wiley Dancks. The parties will meet in Chambers of Judge Wiley Dancks located on the 3rd floor, James M. Hanley Federal Building, 100 South Clinton Street, Syracuse, New York. Parties must appear in person as directed by the Court. The Confidential Settlement Statement is being sent to counsel via separate email with instructions on submission to the Court and is due to be submitted NO LATER THAN 5PM ON 5/11/2023. The settlement statement MUST NOT be electronically filed with the Court or exchanged among the parties. (sg) (Entered: 04/12/2023) |
|---|---|---|
| 04/13/2023 | 52 | TEXT ORDER : In view of the difficulties in scheduling the upcoming settlement conference, any request to amend the date of the conference MUST be received by the Court a minimum of 72 hours prior to the currently scheduled date and time of the conference, and MUST state good cause for the request. Any request that does not comport with this directive will be summarily denied, and any party or counsel who does not appear for the conference in person as directed may be sanctioned. The parties should continue to negotiate in good faith in efforts to settle the matter between now and the conference as directed in Dkt. No. 51 . SO ORDERED by Magistrate Judge Therese Wiley Dancks on 4/13/2023. (sg) (Entered: 04/13/2023) |
| 05/18/2023 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Settlement Conference held on 5/18/2023. Appearances: Daniel Grace, Esq. and Douglas Mace, Esq. for Plaintiff; Plaintiff Julio Licinio; Aimee Cowan, Esq. for Defendants; Anne Dotzler, Esq., SUNY Office of General Counsel, for Defendants. Settlement conference held and was adjourned after progress made. Parties will continue to discuss settlement. Defendants to file a status report by 6/30/2023 re: status of progress of settlement and whether the parties want to revisit another settlement conference with the Court. Dispositive Motions deadline continues to be held in abeyance. (sg) (Entered: 05/18/2023) |
| 06/30/2023 | 53 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 7/5/2023 (sg, ). (Entered: 06/30/2023) |
| 07/05/2023 | 54 | TEXT ORDER : Court reviewed 53 status report/letter request regarding further settlement negotiations. To the extent the parties request additional time to submit a status report on settlement progress, that request is granted. Defendant to file a further status report on settlement by 7/17/2023. The dispositive motion deadline, which has been held in abeyance while the parties attempted to reach a settlement agreement, is reset to 8/31/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/5/2023. (sg) (Entered: 07/05/2023) |
| 07/17/2023 | 55 | STATUS REPORT by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) (Entered: 07/17/2023) |
| 07/21/2023 | 56 | TEXT ORDER: Court reviewed status report (Dkt. No. 55 ) and directs defendant to file a further status report on settlement by 8/4/2023. Dispositive motion deadline remains set at 8/31/2023. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 7/21/2023. (sg) (Entered: 07/21/2023) |
| 08/04/2023 | 57 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 8/4/2023 (sg, ). (Entered: 08/04/2023) |
| 08/07/2023 | 58 | TEXT ORDER : Court reviewed status report/letter request (Dkt. No. 57 ) regarding settlement negotiations and dispositive motion deadline. Defendants to file a further status report on settlement by 9/8/2023; dispositive motion deadline extended to 10/6/2023. No further extensions will be granted. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 8/7/2023. (sg) (Entered: 08/07/2023) |
| 09/07/2023 | 59 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B)(Cowan, Aimee) Modified on 9/7/2023 (sg, ). (Entered: 09/07/2023) |

A-1241

| | | |
|---|---|---|
| 09/07/2023 | 60 | TEXT ORDER: Court reviewed status report/letter request (Dkt. No. 59 ) for extension of dispositive motion deadline which is granted for the reasons stated. The dispositive motion deadline is reset to 10/31/2023. The parties are to confer in good faith regarding potential further document discovery as discussed in Dkt. No. 59 and plaintiff to produce supplemental responses to defendants' demands 8, 10, and 17 by 9/21/2025 if further responses are located. No other discovery is permitted. Defendants to file a further status report regarding the additional document discovery outlined in Dkt. No. 59 by 9/25/2023 SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/7/2023. (sg) (Entered: 09/07/2023) |
| 09/25/2023 | 61 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 9/26/2023 (sg, ). Modified on 9/26/2023 (sg, ). (Entered: 09/25/2023) |
| 09/26/2023 | 62 | TEXT ORDER granting 61 Letter Request for a Court conference for the reasons stated. Telephone Discovery Conference set for 10/2/2023 at 11:00 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 315−691−0477, and enter ID code 615 018 984 to connect to the conference. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/26/2023. (sg) (Entered: 09/26/2023) |
| 09/26/2023 | 63 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting reschedule 10/2/23 conference submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 09/26/2023) |
| 09/26/2023 | 64 | TEXT ORDER granting 63 Letter Request for the reasons stated. Telephone Discovery Conference RESCHEDULED for 10/3/2023 at 9:30 AM before Magistrate Judge Therese Wiley Dancks. Counsel are directed to call the following number for this conference: 315−691−0477, and enter ID code 615 018 984 to connect to the conference. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/26/2023. (sg) (Entered: 09/26/2023) |
| 10/03/2023 | | TEXT Minute Entry for proceedings held before Magistrate Judge Therese Wiley Dancks: Telephone Discovery Conference held on 10/3/2023. Appearances: Douglas Mace, Esq. for Plaintiff; Aimee Cowan, Esq. for Defendants. Court discusses issues raised in Dkt. 61. Court issues directives, a separate text order will follow. (sg) (Entered: 10/03/2023) |
| 10/03/2023 | 65 | TEXT ORDER: As directed during the 10/3/2023 Telephone Discovery Conference, Defendants to file a status report by 10/16/2023 re: whether counsel has received the transcripts as discussed during the conference, any issues re: the emails, and any progress with respect to resolving the case. Dispositive motions deadline remains as currently set. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 10/3/2023. (sg) (Entered: 10/03/2023) |
| 10/16/2023 | 66 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 10/16/2023 (sg, ). (Entered: 10/16/2023) |
| 10/17/2023 | 67 | TEXT ORDER: Court reviewed 66 status report request for extension of dispositive motion deadline which is granted for the reasons stated. The dispositive motion deadline is extended to 12/1/2023. Defendants to file status report by 11/13/2023 regarding whether the transcripts of Drs. Schwartz and Laraque−Arena have been received, and the status of settlement negotiations. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 10/17/2023. (sg) (Entered: 10/17/2023) |
| 11/13/2023 | 68 | STATUS REPORT/Letter Request by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Cowan, Aimee) Modified on 11/14/2023 to reflect letter request (jcl). (Entered: 11/13/2023) |
| 11/14/2023 | 69 | TEXT ORDER: Court reviewed status report/letter request (Dkt. No. 68 ) for further extension of the dispositive motion deadline. Letter request granted for the reasons stated. Dispositive motions due 1/5/2024. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 11/14/2023. (jcl) (Entered: 11/14/2023) |

A-1242

| | | |
|---|---|---|
| 12/30/2023 | 70 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting 2−week dispositive motion deadline and 20−page memo of law page extension submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 12/30/2023) |
| 01/02/2024 | 71 | RESPONSE in Opposition re 70 Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting 2−week dispositive motion deadline and 20−page memo of law page extension submitt filed by Julio Licinio. (Mace, Douglas) (Entered: 01/02/2024) |
| 01/03/2024 | 72 | TEXT ORDER : Court reviewed defendants' letter request (Dkt. No. 70 ) for extension of dispositive motion deadline and a request to exceed the memorandum of law page limit, and plaintiff's opposition (Dkt. No. 71 ) to the request. Letter request granted. Dispositive motion due 1/19/2024; both parties may submit a 45−page brief if necessary. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 1/3/2024. (sg) (Entered: 01/03/2024) |
| 01/19/2024 | 73 | MOTION for Summary Judgment filed by State of New York, The State University of New York, The State University of New York Upstate Medical University. Motion returnable before Judge Glenn T. Suddaby. Response to Motion due by 2/9/2024. Reply to Response to Motion due by 2/16/2024 (Attachments: # 1 Declaration, # 2 Exhibit(s) A, # 3 Exhibit(s) B, # 4 Exhibit(s) C, # 5 Exhibit(s) D, # 6 Exhibit(s) E, # 7 Exhibit(s) F, # 8 Exhibit(s) G, # 9 Exhibit(s) H, # 10 Exhibit(s) I, # 11 Exhibit(s) J, # 12 Exhibit(s) K, # 13 Exhibit(s) L, # 14 Exhibit(s) M, # 15 Declaration, # 16 Declaration, # 17 Exhibit(s) A, # 18 Exhibit(s) B, # 19 Exhibit(s) C, # 20 Exhibit(s) D, # 21 Exhibit(s) E, # 22 Exhibit(s) F, # 23 Declaration, # 24 Exhibit(s) A, # 25 Exhibit(s) B, # 26 Declaration, # 27 Exhibit(s) A, # 28 Exhibit(s) B, # 29 Exhibit(s) C, # 30 Exhibit(s) D, # 31 Exhibit(s) E, # 32 Exhibit(s) F, # 33 Exhibit(s) G, # 34 Exhibit(s) H, # 35 Exhibit(s) I, # 36 Declaration, # 37 Exhibit(s) A, # 38 Exhibit(s) B, # 39 Exhibit(s) C, # 40 Exhibit(s) D, # 41 Exhibit(s) E, # 42 Declaration, # 43 Exhibit(s) A, # 44 Declaration, # 45 Exhibit(s) A, # 46 Exhibit(s) B, # 47 Exhibit(s) C, # 48 Exhibit(s) D, # 49 Declaration, # 50 Exhibit(s) A, # 51 Exhibit(s) B, # 52 Exhibit(s) C, # 53 Exhibit(s) D, # 54 Exhibit(s) E, # 55 Declaration, # 56 Exhibit(s) A, # 57 Exhibit(s) B, # 58 Declaration, # 59 Exhibit(s) A, # 60 Exhibit(s) B, # 61 Exhibit(s) C, # 62 Exhibit(s) D, # 63 Exhibit(s) E, # 64 Exhibit(s) F, # 65 Exhibit(s) G, # 66 Exhibit(s) H, # 67 Exhibit(s) I, # 68 Exhibit(s) J, # 69 Exhibit(s) K, # 70 Exhibit(s) L, # 71 Exhibit(s) M, # 72 Exhibit(s) N, # 73 Memorandum of Law, # 74 Statement of Material Facts) (Cowan, Aimee) (Entered: 01/19/2024) |
| 01/23/2024 | 74 | Letter Motion from Douglas Mace for Julio Licinio requesting Extension of time oppose summary judgment submitted to Judge Hon. Glenn T. Suddaby . (Mace, Douglas) (Entered: 01/23/2024) |
| 01/23/2024 | 75 | TEXT ORDER granting Plaintiff's 74 letter−motion requesting a 90 day extension of time to respond to Defendants' 73 Motion for Summary Judgment. Plaintiff's Response to this Motion is due by 5/9/2024. Any reply to this motion is due by 5/23/2024. SO ORDERED by U.S. District Judge Glenn T Suddaby on 1/23/2024. (sal) (Entered: 01/23/2024) |
| 05/06/2024 | 76 | Letter Motion from Douglas Mace for Julio Licinio requesting Extension of Page Limit submitted to Judge Therese Wiley Dancks . (Mace, Douglas) (Entered: 05/06/2024) |
| 05/06/2024 | 77 | TEXT ORDER granting Plaintiff's 76 letter requesting a 20−page extension of the page limit for Plaintiff's Memorandum of Law in response to Defendants' Motion for Summary Judgment, for a total of 45 pages. SO ORDERED by U.S. District Judge Glenn T Suddaby on 5/6/2024. (sal ) (Entered: 05/06/2024) |
| 05/09/2024 | 78 | RESPONSE in Opposition re 73 Motion for Summary Judgment,,,,,,, filed by Julio Licinio. (Attachments: # 1 Declaration of Douglas Mace, Esq., # 2 Exhibit(s) 6, # 3 Exhibit(s) 7, # 4 Declaration of Plaintiff Julio Licinio, # 5 Exhibit(s) 1, # 6 Exhibit(s) 2, # 7 Exhibit(s) 3, # 8 Exhibit(s) 4, # 9 Exhibit(s) 5, # 10 Memorandum of Law)(Grace, Daniel) (Entered: 05/09/2024) |
| 05/20/2024 | 79 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting |

A-1243

| | | |
|---|---|---|
| | | 2−week extension to reply to summary judgment opposition and 10−page memo of law enlargement submitted to Judge Therese Wiley Dancks . (Cowan, Aimee) (Entered: 05/20/2024) |
| 05/20/2024 | 80 | TEXT ORDER granting Defendants' 79 letter requesting an extension of time to file a reply on or before June 6, 2024 to Defendants' 73 summary judgment motion and a 10−page enlargement for the reply memorandum of law, for a total of twenty pages. SO ORDERED by U.S. District Judge Glenn T Suddaby on 5/20/2024. (sal ) (Entered: 05/20/2024) |
| 06/06/2024 | 81 | REPLY to Response to Motion re 73 Motion for Summary Judgment,,,,,,,, filed by State of New York, The State University of New York, The State University of New York Upstate Medical University. (Attachments: # 1 Statement of Material Facts Response to Plaintiff's Counterstatement of Material Facts, # 2 Declaration, # 3 Declaration, # 4 Exhibit(s) A, # 5 Declaration, # 6 Exhibit(s) A, # 7 Declaration, # 8 Exhibit(s) A, # 9 Exhibit(s) B, # 10 Declaration, # 11 Exhibit(s) A, # 12 Exhibit(s) B, # 13 Exhibit(s) C, # 14 Exhibit(s) D, # 15 Exhibit(s) E)(Cowan, Aimee) (Entered: 06/06/2024) |
| 08/21/2024 | 82 | TEXT ORDER REASSIGNING CASE. Having reviewed this matter more closely, it has come to my attention that I may have a conflict of interest, and therefore I recuse myself from this case. WHEREFORE, it is hereby ORDERED that the Clerk enter this Text Order of Recusal for the undersigned; and it is further ORDERED that the Clerk shall randomly reassign this case to another United States District Judge. (U.S. District Judge Glenn T. Suddaby recused. Case reassigned to Senior Judge Senior Judge Frederick J. Scullin, Jr. for all further proceedings. Magistrate Judge Therese Wiley Dancks remains the assigned magistrate judge in this action). SO ORDERED by U.S. District Judge Glenn T Suddaby on 8/21/2024. (sal) (Entered: 08/21/2024) |
| 08/27/2024 | 83 | Letter Motion from Aimee Cowan for State of New York, The State University of New York, The State University of New York Upstate Medical University requesting District Judge Mae A. D'Agostino's summary judgment decision in Wong v. State of New York, et al. be considered by the Court for the pending summary judgment motion submitted to Judge Frederick J. Scullin, Jr. . (Attachments: # 1 Exhibit(s) A)(Cowan, Aimee) (Entered: 08/27/2024) |
| 08/28/2024 | 84 | DECISION AND ORDER granting 73 Motion for Summary Judgment; ORDER DISMISSING Plaintiff's Complaint 1 ; and further ORDERS that the Clerk of the Court shall enter judgment in favor of Defendants and close this case. Signed by Senior Judge Frederick J. Scullin, Jr on 8/28/2024. (tll) (Entered: 08/28/2024) |
| 08/28/2024 | 85 | JUDGMENT: IT IS ORDERED that Defendants' motion for summary judgment 73 is GRANTED; and the Court further ORDERS that Plaintiff's Complaint 1 is DISMISSED; and the Court further ORDERS that the Clerk of the Court shall enter judgment in favor of State of New York, The State University of New York, The State University of New York Upstate Medical University and close this case. Pursuant to the order of the Honorable Frederick J. Scullin, Jr., dated August 28, 2024. (tll) (Entered: 08/28/2024) |
| 09/25/2024 | 86 | NOTICE OF APPEAL as to # 84 Order on Motion for Summary Judgment filed by Julio Licinio. (Mace, Douglas) (Entered: 09/25/2024) |
| 09/25/2024 | | Clerk's Correction of Docket Entry: Docket # 86 Notice of Appeal was removed from the docket and re−filed as it was filed using the incorrect event. The Notice of Appeal was re−filed using the "Notice of Appeal" event so that it will transmit to the Second Circuit Court of Appeals via NEF. Because the incorrect event was used, no appeal fee was received. (lmw) (Entered: 09/25/2024) |