# 24-2564-CV

## United States Court of Appeals

*for the*

## Second Circuit

JULIO LICINIO, MD, PHD, MBA, MS,

*Plaintiff-Appellant,*

– v. –

STATE OF NEW YORK, STATE UNIVERSITY OF NEW YORK,
STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORHTERN DISTRICT OF NEW YORK

### BRIEF FOR PLAINTIFF-APPELLANT
### AND SPECIAL APPENDIX

DANIEL GRACE
DANNY GRACE PLLC
*Attorneys for Plaintiff-Appellant*
225 Broadway, Suite 1200
New York, New York 10007
(212) 202-2485

CP COUNSEL PRESS     (800) 4-APPEAL • (334400)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ i
JURISDICTIONAL STATEMENT................................................1
ISSUES PRESENTED FOR REVIEW ........................................1
STATEMENT OF THE CASE......................................................2
I.   Nature of the Action ...........................................................2
II.      Result Below.....................................................................2
STANDARD OF REVIEW ...........................................................3
SUMMARY OF THE ARGUMENT..............................................3
ARGUMENT .................................................................................4
I.   THE DISTRICT COURT ERRED IN DISMISSING APPELLANT'S TITLE VII RETALIATION CLAIM ...............................................................4
   A.   Protected Activities ........................................................7
      1.   Protected Activity – Promoting Diversity in Furtherance of LCME Accreditation ..............................................................9
      2.   Protected Activity – Creation of an External Scientific Advisory Board 10
      3.   Protected Activity – Diversity Committee .............................11
      4.   Protected Activity – Budget Committee/University Executive Committee ..................................................................12
      5.   Protected Activity – Attempts to Improve the Division of Student Affairs and Creation of the Director of College of Medicine Career Development Position ...................................................14
      6.   Protected Activity – Creation of a Part-time Assistant Dean for Cultural Competence ...................................................................16
      7.   Protected Activity – Promoting Diversity Among Appointments to Chair Positions..........................................................17
      8.   Protected Activity – Lobbying Against a Discriminatory Salary Reduction........................................................................20
      9.   The Totality of Appellant's Protected Activities...................21
   B.   Appellees Were Aware of Appellant's Protected Activities.....................22
   C.   Adverse Employment Action................................................23

I

D.   Causal Connection Exists Between the Protected Activities and the Adverse Action ................................................................................24

1.   Causal Connection – Retaliatory Motive Played a Role .......................24

2.   Causal Connection - Temporal Proximity ..............................................25

CONCLUSION ................................................................................30

# TABLE OF AUTHORITIES

## Cases

Bentley v. AutoZoners, LLC,
    935 F.3d 76 (2d Cir. 2019)............................................................................27

Bostock v. Clayton Cnty., Georgia,
    590 U.S. 644, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020).................. 24, 25

Bowen-Hooks v. City of New York,
    13 F.Supp.3d 179 (E.D.N.Y. 2014) ...............................................................5

Chung v. City Univ. of New York,
    605 F. App'x 20 (2d Cir. 2015) ....................................................................23

Cifra v. Gen. Elec. Co.,
    252 F.3d 205 (2d Cir.2001)...........................................................................26

Crawford v. Metropolitan Government of Nashville and Davidson County,
    Tennessee,
    555 U.S. 271, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009)................... 7, 8, 22

Davis v. Metropolitan Transp. Auth.,
    07-CV-3561 (DAB), 2012 WL 727696 (S.D.N.Y. Mar. 6, 2012) ...............4

El Saved v. Hilton Hotels Corp.,
    627 F.3d 931 (2d Cir. 2010)............................................................................6

Ellis v. Century 21 Dept Stores,
    975 F.Supp.2d 244  (E.D.N.Y. 2013) ............................................................5

Fincher v. Depository Trust and Cleaning Corp.,
    604 F.3d 712 (2d Cir. 2010).......................................................................4, 5

Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,
    136 F.3d 276 (2d Cir.1998).............................................................................6

Horn v. Med. Marijuana, Inc.,
    80 F.4th 130 (2d Cir. 2023). ..........................................................................4

i

Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs. P.C.,
    716 F.3d 10 (2d Cir. 2013)..............................................................4

Kwan v. Andalex Group,
    737 F.3d 834 (2d Cir. 2013) ..........................................................6

Littlejohn v. City of New York,
    795 F.3d 297 (2d Cir. 2015)............................................ 7, 8, 9, 21

McDonnell Douglas Corp. v. Green,
    411 U.S. 792,93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), holding modified by
    Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338
    (1993) .........................................................................................5

McGuire v. U.S. Postal Serv.,
    749 F.Supp 1275 (S.D.N.Y. 1990) ................................................6

Perrin v. United States,
    444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)......................7

Raniola v. Bratton,
    243 F.3d 610 (2d Cir. 2001)...........................................................6

Russo v. New York Presbyterian Hosp.,
    972 F.Supp.2d 429 (E.D.N.Y. 2013) ..............................................5

Russo v. Wyandanch Union Free Sch. Dist.,
    No. 23-716-cv, 2024 WL 2350314 2d Cir. May 23, 2024).........27

Sanders v. New York City Human Res. Admin.,
    361 F.3d 749 (2d Cir. 2004)...........................................................6

Summa v. Hofstra Univ.,
    708 F.3d 115 (2d Cir. 2013)......................................................6, 26

Sumner v. U.S. Postal Serv.,
    899 F.2d 203(2d Cir.1990).........................................................8, 9

Tafolla v. Heilig,
    80 F.4th 111 (2d Cir. 2023) ...........................................................27

Univ. of Texas Southwestern Med. Ctr. v. Nassar,
    570 U.S. 338, 133 S.Ct 2517, 186 L. Ed.2d 503 (2013)................................5

Vega v. Hempstead Union Free School Dist.,
    801 F.3d 72 (2d. Cir. 2015)...........................................................26

Zann Kwan v. Andalex Grp. LLC,
    737 F.3d 834 (2d Cir.2013).........................................................26

**Statutes**

42 U.S.C. § 1981 ....................................................................5
Fed. R. Civ. P. 56(a)..............................................................2
Title VII...........................................................................5, 6

**Other Authorities**

Random House Dictionary of the English Language 1359 (2d ed.1987)..................7
Webster's New International Dictionary....................................................7

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1343 as this action involves a federal question regarding the deprivation of Plaintiff-Appellant's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

By order dated August 28, 2024, the Court granted Defendants-Appellees' Motion for Summary Judgment on the basis that Appellant failed to raise a triable issue of fact with respect to whether Appellant's demotion was retaliatory.

This appeal was timely filed on September 25, 2024, within 30 days of the August 28, 2024 Judgment of the District Court.

This appeal is from the Memorandum-Decision and Order granting Appellees' Motion for Summary Judgment dismissing the operative complaint entered on August 28, 2024, at A-1149, and the Judgment against Appellant entered on August 28, 2024, at A-1230.

## ISSUES PRESENTED FOR REVIEW

Whether the District Court erred as a matter of law in granting Appellees' Motion for Summary Judgment based on a finding that Appellant had failed to raise a triable issue of fact with respect to whether his demotion was retaliatory.

The District Court's conclusions of law are reviewed *de novo*.

1

## STATEMENT OF THE CASE

### I.  Nature of the Action

On April 4, 2021, Appellant commenced the underlying action in the District Court of the State of New York, Northern District of New York, alleging that Appellant's demotion from the position of Senior Vice President and Dean of the College of Medicine was discriminatory, and in retaliation for his efforts to address and redress a pervasive discriminatory environment among the student body and faculty at The State University of New York Upstate Medical University. (A-0001).

On May 9, 2024, Appellees filed their motion for summary judgment. (A-0072).

On August 28, 2024, the District Court granted Appellees' motion, dismissing Appellant's action. (A-1149).

### II.  Result Below

Appellees filed a Fed. R. Civ. P. 56(a) Motion for Summary Judgment to Dismiss Appellant's Complaint arguing that "[f]or these reasons, Plaintiff cannot establish that UMU's legitimate, non-discriminatory business reasons for removing him as Dean and not selecting him for certain other positions are a pretext for retaliation." (A-227).

The District Court found that "[f]or each of the above-stated alternative reasons, the Court finds that Plaintiff has not shown that he could establish a prima facie case of discrimination under Title VII even if it were to find that he had

2

exhausted his administrative remedies as to that claim. The Court therefore grants summary judgment to Defendants on Plaintiff's First and Second Claims." (A-1206).

And that, "[b]ecause none of the evidence Plaintiff cites could reasonably establish that Defendants' legitimate, non-discriminatory reasons for removing him from the position of Dean were mere pretext for retaliation, Plaintiff cannot succeed on his retaliation claims. Accordingly, Plaintiff's Third, Fourth, and Fifth Claims must be dismissed." (A-1228).

The instant appeal concerns whether the dismissal based on alleged retaliation is proper.

## STANDARD OF REVIEW

"The Court of Appeals reviews a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." Horn v. Med. Marijuana, Inc., 80 F.4th 130, 133 (2d Cir. 2023).

## SUMMARY OF THE ARGUMENT

Plaintiff, as Senior Vice President and Dean of the College of Medicine, sought to address and correct what he perceived as an entrenched system of discriminatory practices and policies at Upstate, that had been consistently flagged by the accreditation services by which SUNY Upstate were bound. He made numerous efforts over the course of his tenure as Dean and engaged in numerous

protected activities, but was resisted, and ultimately demoted, because of his efforts that proved a thorn in the side of the SUNY Administration. The District Court erred in finding that his efforts did not constitute protected activities, and/or the totality of his efforts did not constitute a protected activity, that his efforts at addressing the systemic discriminatory policies were not a cause of his demotion despite their employee's own admission, and that his demotion was not retaliatory.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN DISMISSING APPELLANT'S TITLE VII RETALIATION CLAIM

To establish a prima facie retaliation claim under Title VII "a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Fincher v. Depository Trust and Cleaning Corp., 604 F.3d 712, 720 (2d Cir. 2010) ; see also, Davis v. Metropolitan Transp. Auth., No. 07-CV-3561 (DAB), 2012 WL 727696, at *10 (S.D.N.Y. Mar. 6, 2012); Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs. P.C., 716 F.3d 10, 14 (2d Cir. 2013). Claims of retaliation brought under Title VII are subject to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817,

1824-25, 36 L. Ed. 2d 668 (1973), <u>holding modified by</u> <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993); <u>Bowen-Hooks v. City of New York</u>, 13 F.Supp.3d 179, 220 (E.D.N.Y. 2014) ("Retaliation claims under Title VII…are assessed using the McDonnell Douglas burden-shifting framework"); <u>Fincher</u>, 604 F.3d at 720 ("Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using a three-step burden shifting analysis").

Pursuant to <u>McDonnell Douglas</u>, "first a plaintiff must prove a prima facie case of retaliation. If the plaintiff succeeds, there is a presumption [of retaliation] and the employer must articulate a legitimate, non-retaliatory reason for [its actions.]" <u>Fincher</u>, 604 F.3d at 720. Should the employer articulate a legitimate, non-retaliatory reason, "the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, she would not have been terminated." <u>Bowen-Hooks</u>, 13 F.Supp.3d at 220 (emphasis in original). *See also*, <u>Univ. of Texas Southwestern Med. Ctr. v. Nassar</u>, 570 U.S. 338, 362, 133 S.Ct 2517, 2534, 186 L. Ed.2d 503 (2013) (holding that "a plaintiff making a retaliation claim ... must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); <u>Ellis v. Century 21 Dept Stores</u>, 975 F.Supp.2d 244, 277-79 (E.D.N.Y. 2013); <u>Russo v. New York Presbyterian Hosp.</u>, 972 F.Supp.2d 429, 454-55 (E.D.N.Y. 2013).

Moreover, Appellant need not prove that that retaliation was the *sole* cause of his termination. Rather, Appellant need only show that the termination would not have occurred absent a retaliatory motive. <u>Kwan v. Andalex Group</u>, 737 F.3d 834, 847 (2d Cir. 2013).

As with claims of discrimination, most retaliation "is not carried out so openly as to provide direct proof of it". <u>Sanders v. New York City Human Res. Admin</u>., 361 F.3d 749, 755 (2d Cir. 2004). Therefore, "[a] causal connection can be proved ... indirectly by showing that the protected activity is followed by adverse treatment". <u>McGuire v. U.S. Postal Serv</u>., 749 F.Supp 1275, 1282 (S.D.N.Y. 1990); *see also*, <u>El Saved v. Hilton Hotels Corp</u>., 627 F.3d 931, 932-33 (2d Cir. 2010); <u>Raniola v. Bratton</u>, 243 F.3d 610, 624 (2d Cir. 2001)([P]laintiff's burden with respect to causation is "a light one, usually demanding only that the protected activity preceded the adverse action"); <u>Summa v. Hofstra Univ</u>., 708 F.3d 115, 128 (2d Cir. 2013)("[A] temporal connection is enough, in and of itself,... to permit a reasonable jury to find causation").

Further, Appellant "need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute. <u>Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp</u>., 136 F.3d 276, 292 (2d Cir.1998)(internal quotation marks omitted)." <u>Summa</u>, 708 F.3d at 126.

As set forth throughout Appellant's Declaration, Appellant engaged in a plethora of protected activities aimed at promoting diversity and opposing and eliminating discrimination at SUNY Upstate. (A-0820-0874). It is well-settled that "Title VII…forbids retaliation by employers against employees who report workplace race or gender discrimination." Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, 555 U.S. 271, 273, 129 S. Ct. 846, 849, 172 L. Ed. 2d 650 (2009).

Further, "[t]he opposition clause makes it unlawful for an employer to retaliate against an individual because she 'opposed any practice' made unlawful by Title VII…." Littlejohn v. City of New York, 795 F.3d 297, 316 (2d Cir. 2015); 42 U.S.C. § 2000e-3(a). The term "oppose," being left undefined by the statute, carries its ordinary meaning, Perrin v. United States, 444 U.S. 37, 42-43, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979), i.e., "[t]o resist or antagonize ...; to contend against; to confront; resist; withstand," Webster's New International Dictionary 1710 (2d ed.1957). Although these actions entail varying expenditures of energy, "Resist frequently implies more active striving than Oppose." Ibid.; see also, Random House Dictionary of the English Language 1359 (2d ed.1987) (defining "oppose" as "to be hostile or adverse to, as in opinion"). Id. at 276.

### A. Protected Activities

The Supreme Court has clarified that "[w]hen an employee communicates to her employer a belief that the employer has engaged in ... a form of employment

discrimination, that communication virtually always constitutes the employee's opposition to the activity." Crawford, 555 U.S. at 276. Indeed, "protected activities are not limited to complaints involving discrimination against the complainant herself, but also extend to complaints of discrimination on behalf of other employees and complaints of discriminatory practices generally." Littlejohn, 795 F.3d at 317.

Further, "[i]n addition to protecting the filing of formal charges of discrimination, § 704(a)'s opposition clause protects [formal] as well [as] informal protests of discriminatory employment practices, including making complaints to management…protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges. Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir.1990).

In fact, any activity that seeks "'to resist or antagonize ...; to contend against; to confront; resist; [or] withstand' discrimination prohibited by Title VII constitutes a protected oppositional activity." Littlejohn, 795 F.3d at 317.

Further, "there is a significant distinction between merely reporting or investigating other employees' complaints of discrimination, which simply fulfills a personnel manager's daily duties, and communicating to the employer the manager's own 'belief that the employer has engaged in...a form of employment discrimination,' which 'virtually always constitutes' opposition notwithstanding the employee's underlying job responsibilities." Littlejohn, 795 F.3d at 318. ("Littlejohn

8

argues on appeal that she stepped outside her role as EEO Director when she advocated for minority DJJ employees, but regardless of whether she made these complaints in her capacity as EEO Director, '§ 704(a)'s opposition clause protects' such 'complaints to management' and 'protest[s] against discrimination.' Sumner,899 F.2d at 209. Littlejohn was not simply conveying others' complaints of discrimination…she was complaining about what she believed was unlawful discrimination…Her complaints of discrimination were protected activities under § 704(a)'s opposition clause." Littlejohn, 795 F.3d at 318-19.

Further, Appellant in his capacity of Dean "repeatedly objected and complained" to defendants about defendants' selection process and failure to abide by proper policies and procedures." Littlejohn, 795 F.3d at 319; Compl. ¶¶ 63–64

### 1. Protected Activity – Promoting Diversity in Furtherance of LCME Accreditation

Appellant's opposition to Appellees' deeply entrenched culture of discrimination and its resistance to diversity was unwavering for the entirety of his tenure as Dean. (A-0826-0840). As Dean, Appellant championed the rights of minorities. Id. In particular, Appellant made great efforts to recruit minority faculty. (A-0826). In response to these efforts, Appellant would often receive multiple verbal comments from Dr. Mantosh Dewan, Appellee SUNY Upstate's President severely questioning the 'need for' various minority professors and the extent of their contributions to the University. (A-0826).

9

Specifically, Appellant received questions about what a particular Native American Professor does all day. (A-0827). Appellant repeatedly explained that the Professor was the Assistant Dean for Diversity and had a crucial role in supporting diversity efforts within the Native American Community. (A-0827). Moreover, Appellant explained on several occasions that it had been previously determined that the Professor should be promoted to Assistant Vice-President for Native American Affairs, a move that Appellees refused to make. (A-0827).

Appellant also received questions about what a particular Professor of Neurosurgery, who is female and Hispanic, "does in diversity." Appellant repeatedly explained that the Professor organized Appellee SUNY Upstate's diversity data for purposes of LCME accreditation and was the only person able to provide that data within the tight timeframe of the accreditation process. (A-0827).

Appellant also received questions regarding the need for the Director of Multicultural Affairs & Student Inclusion, who is African American. Appellant repeatedly explained that the named Director does substantial work supporting Appellee SUNY Upstate's minority students. (A-0827).

## 2. Protected Activity – Creation of an External Scientific Advisory Board

Appellee SUNY Upstate ranks very poorly in terms of gender balance nationwide. Significantly, SUNY Upstate ranks 116 out of 128 medical schools in

terms of male to female faculty ratio, with only 15% of the faculty being female.[1] (A-0828).

In efforts to combat the underrepresentation of female employees, Appellant appointed an all-female External Scientific Advisory Board (the "Board"), with members of the National Academies of Science and Medicine. (A-0829).

Appellant's purpose in having this group and working with them over time was to have outside input aimed at improving University programs and making Appellee SUNY Upstate more attractive and more competitive, and to provide much needed input from highly successful women in academic medicine in order to bridge the gender equity gap at SUNY Upstate. (A-0829).

But in the summer of 2019, when Appellant discussed the upcoming meeting with SUNY Upstate's President, he replied with sarcasm "Oh, do we have an External Scientific Advisory Board?" [sic]. (A-0829).

Following Appellant's unlawful demotion on September 12, 2019, the Board was never convened again, and it was ultimately disbanded by Appellees. (A-0829).

### 3. Protected Activity – Diversity Committee

As part of his continued work in advancing diversity in the face of a lack thereof in SUNY Upstate, Appellant strongly supported a Diversity Committee (the "Committee") within the SUNY Upstate College of Medicine. The Committee was

---

[1] https://www.statnews.com/2016/01/12/women-medical-school-faculty/

an important component for Appellee SUNY Upstate's review and accreditation by the LCME. (A-0830).

The Committee was led by a female Hispanic neurosurgeon. On several occasions, Appellees aggressively questioned Appellant as to why this abundantly qualified individual had that role. It was clear to Appellant that the principal reason for Appellees' questions was because of the individual's identity as a Hispanic woman, since Appellant never received the same pushback regarding non-minority employees, nor would Appellees ever single-out non-minority employees in the same fashion. (A-0830).

After the LCME visit and after Appellant's demotion, the Diversity committee was downgraded to meeting quarterly, and given a much-reduced role of only providing some oversight to the Office of Diversity and Inclusion. (A-0830).

### 4. Protected Activity – Budget Committee/University Executive Committee

Appellant also acted in opposition to discrimination in May and June 2019, when he notified Appellees about his concern regarding the gender-imbalance of the Budget Committee and recommended that women be included. (A-0831).

Appellee SUNY Upstate's administrative structure includes a University Executive Committee (the "UEC"), which is presented to accreditation agencies as SUNY Upstate's decision-making body as the UEC is gender-balanced. (A-0831). But although the UEC is held out by Appellees to be a decision-making body, at that

time the UEC rarely met, with scheduled meetings every other week that were often cancelled. (A-0831).

Instead, the Budget Committee, which at that time met every Tuesday and reviewed every executive-level decision for SUNY Upstate, was the *de facto* decision-making body for Appellees. (A-0831).

In June of 2019, the Budget Committee consisted of six men. On several occasions, Appellant heard women employees of Appellees refer to the Budget Committee as the "new boy's club" and the place "where all the decisions are made." [sic]. The lone female who routinely attended the Budget Committee meetings was tasked only with taking notes and did not act as a decision-maker. (A-0831).

In June of 2019, Appellant notified Appellees that the decision-making Budget Committee was too gender-imbalanced and suggested that the female Chief Medical Officer and the female Senior Associate Dean of Faculty Affairs and Faculty Development should be added to the Budget Committee group. (A-0831-0832).

Appellant's communication of the gender-imbalance and efforts to abolish gender discrimination in the decision-making processes of Appellees constituted a protected activity. After Appellant's protected activity, notifying Appellees of a potential discriminatory gender-imbalance, Appellees retaliated against Appellant and unlawfully demoted him. (A-0832).

13

**5. Protected Activity – Attempts to Improve the Division of Student Affairs and Creation of the Director of College of Medicine Career Development Position**

Appellee SUNY Upstate has a Division of Student Affairs ("Student Affairs"), which is the office responsible for career planning and career development of all students, including those in the College of Medicine. (A-0832). The Division of Student Affairs has been plagued by multiple complaints of discrimination. (A-0832).

Earlier in 2019, Appellant referred African-American medical students from SUNY Upstate to a colleague of his at a highly-ranked, Ivy League-affiliated, national institution so that they could negotiate to do external rotations there. (A-0833). After each of those SUNY Upstate African-American medical students contacted that highly-ranked national institution, Appellant received phone calls expressing serious concerns about how unprepared the SUNY Upstate medical students were and how they seemed to be "lost" and not well mentored in terms of their career development. (A-0833).

Each time Appellant was called about each student that he had referred, he promptly raised this with Appellee SUNY Upstate's Dean of Student Affairs. (A-0833). During each of those interactions, the Dean of Student Affairs was

14

exceptionally defensive and would only say very angrily "N-of-1," meaning that this was a sporadic case and that it did not need to be taken seriously[2]. (A-0833).

Based on the negative feedback Appellant received regarding SUNY Upstate students and their career development and his concerns that there was a discriminatory motive behind Student Affair's actions, he reported his concerns and referred the Dean of Student Affairs to the Appellee SUNY Upstate's Organizational Training and Development Office to receive standardized feedback. (A-0834).

However, the Organizational Training and Development Office only recommended numerical feedback because they were concerned that any written comments could include the accusations of racism or discrimination and, if they did, the written comments would be required to be reported to the Appellee SUNY Upstate's Department of Human Resources and potentially subject SUNY Upstate to liability. (A-0834).

In light of this and in a continuing effort to promote diversity, Appellant also decided to create a new position of Director of College of Medicine Career Development to oversee the career development plans of all students in the SUNY Upstate College of Medicine, particularly those from underrepresented diverse backgrounds who are members of protected categories. (A-0834).

---

[2] In scientific circles, an "N-of-1" trial is a clinical trial in which a single patient represents the entire investigation: a single case study.

15

Appellant posted the position of Director of College of Medicine Career Development and created a search committee, emphasizing the need to promote diversity and inclusion in the search process. (A-0834).

Appellant referred as a candidate to the search process an African-American female Educator who had an MSEd with a concentration in Student Affairs Administration and who was working towards her EdD in Higher Education Leadership and Policy. (A-0835). Appellant's initiatives towards diversity and increasing support in student affairs for minority students were intolerable to Appellees, and prior to his unlawful demotion, he received protest from Appellee SUNY Upstate's Dean of Student Affairs regarding his appointment of a Director of College of Medicine Career Development. (A-0835).

After Appellant's unlawful demotion, the search committee that he had created was rapidly disbanded and recruitment for the position of Director of College of Medicine Career Development was discontinued. (A-0835).

### 6. Protected Activity – Creation of a Part-time Assistant Dean for Cultural Competence

In July of 2019, Appellant created a new part-time position of Assistant Dean for Cultural Competence in SUNY Upstate, and identified an Assistant Professor of Orthopedic Surgery, a well-respected African-American orthopedic surgeon, as an ideal candidate, who would himself be an outstanding role model for

underrepresented students. (A-0835). In the face of aggressive objections by Appellee SUNY Upstate's President, including demanding to know what the other specifically named individuals of diverse backgrounds were contributing to the University and why there existed a need for another position related to Diversity and Inclusion, on August 7, 2019, Appellant verbally offered that position to the previously mentioned Assistant Professor. (A-0836).

Fewer than three months after Appellant fought for this appointment, Appellant was unlawfully demoted from his position of Senior Vice President and Dean. (A-0836). Following Appellant's unlawful demotion, the processing of that appointment was discontinued. (A-0836).

### 7. Protected Activity – Promoting Diversity Among Appointments to Chair Positions

Appellee SUNY Upstate runs a multitude of departments which are each headed by a Department Chair. (A-0836). Should a Chair position need to be temporarily filled while a long-term successor be appointed, as Senior Vice President and Dean, it was Appellant's responsibility to oversee the process resulting in the nomination of finalists for Interim Chair roles. (A-0836).

In Appellant's employment contract with Appellee SUNY Upstate, it is stated that Appellant would "Lead efforts for national searches for new chairs in the departments of Medicine, Pediatrics and Psychiatry." (A-0836).

Appellant had emphasized to an external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories. (A-0836). Following Appellant's unlawful demotion, Appellees ended the Medicine Chair search efforts and appointed the Interim Chair to the (permanent) Chair of Medicine position without the national search explicitly specified in Appellant's employment contract. (A-0837).

The Individual who was appointed as Chair of Medicine was not a member of a group that Appellees presented to the LCME as being targets for diversity, and he was appointed without a search process which would have given candidates of diverse backgrounds an opportunity to be considered. (A-0837).

Appellees were also informed by the external search firm, on or around September 5, 2019, that they were making sure to "move quickly to launch the [national] Chair [search] of Otolaryngology" and Communication. (A-0837). Again, Appellant had emphasized to the external search firm the need to actively approach and engage with highly qualified candidates of diverse backgrounds, including members from protected and underrepresented categories. (A-0837).

After Appellant was demoted Appellees ended that search effort and appointed the Interim Chair to the position of (permanent) Chair of Otolaryngology and Communication. (A-0837). The Individual who was appointed as Chair of

18

Medicine was not a member of a group that Appellees presented to the LCME as being targets for diversity, and he was appointed without a search process which would have given candidates of diverse backgrounds an opportunity to be considered. (A-0838).

During Appellant's term as Dean, it became necessary to replace the Chair of Anesthesiology. (A-0838). Appellees then immediately began pressuring Appellant to appoint a male faculty member from the Anesthesiology Department as Interim Chair, stating on three different occasions in sum and substance that that specific (male) individual was the "only one who could do the job." (A-0838). Appellant heard that women employees considered the push for that specific man to be strongly suggestive of gender discrimination because that individual was not entirely qualified for the position. (A-0838).

Therefore, Appellant in his capacity as Dean organized a broad and diverse interview panel and on or around August 8, 2019, the panel interviewed four candidates for the Interim Chair of Anesthesiology role. (A-0838). Following the interviews, the panel unanimously recommended the selection of a female candidate as Interim Chair based on her abundant experience in managing clinical affairs. (A-0838).

On August 13, 2019, Appellant informed Appellees of the panel's unanimous choice for interim successor. (A-0838). Appellant's insistence upon a gender-neutral

search process for the Interim Chair was actively designed to contend against discrimination. (A-0838). According to Appellee SUNY Upstate Board of Trustees' policies, Chair appointments are made by the President; however, by creating a panel that assessed diverse candidates fairly and objectively, Appellant effectively challenged Appellees not to appoint the female whom the committee unanimously identified as the most qualified. (A-0839). Thus, at the very next one-on-one meeting with Appellees, Appellant was abruptly and unlawfully demoted from his position as Senior Vice President and Dean, without any cause being presented to him. (A-0839).

### 8. Protected Activity – Lobbying Against a Discriminatory Salary Reduction

Appellant's wife also works for Appellee SUNY Upstate as a Professor of Psychiatry and Behavioral Sciences and Professor of Neuroscience and Physiology. (A-0839). At the beginning of 2019, she was notified that her salary was going to be reduced by $45,000.00. Id. During an August 2019 meeting with Appellee SUNY Upstate's President, Appellant asked if it would be appropriate to discuss this Professor's salary reduction to which the President agreed. (A-0839).

Appellant stated that his wife, the Professor, is of Asian ancestry, she is culturally Hispanic and Latin American, and her national origin is Brazilian. (A-0839). Appellant further stated that, based on his understanding of the situation and facts, the Professor felt she may have a claim under Title VI and/or Title IX for

20

discrimination since, to her knowledge, no white male professor was ever subjected to a salary reduction of this type. Id.

Less than a month after Appellant opposed discrimination by reporting this employee's potential discrimination claims, and less than a month since his actions to prevent discrimination in the appointment of an Interim Chair Appellant was unlawfully and suddenly demoted, in the absence of any other intervening interactions with the Appellees. (A-0840).

### 9. The Totality of Appellant's Protected Activities

Appellant in his capacity as Dean "'repeatedly objected and complained to defendants about defendants' selection process and failure to abide by proper policies and procedures.'" Littlejohn, F.3d at 318 ("Littlejohn also claimed that…Plaintiff objected to defendants…discriminatory policies during scheduled meetings with them.")

But in the instant case, the District Court incorrectly adopted an approach which addressed in isolation each of the eight bases for Appellant's allegation that he engaged in protected activities and found that individually, none of them qualified as a protected activity. But even if the individual bases had not risen to the level of a protected activity – which Appellant strenuously denies - clearly, the totality of Appellant's longstanding efforts to address the discriminatory practices and policies in place at Upstate "were protected activities under § 704(a)'s opposition clause." Littlejohn, F.3d at 319. Appellant even went so far as to file a complaint with the

21

NY State Executive Division of Human Rights after his demotion, with the Division finding probable cause that Appellee Upstate "has engaged in or is engaging in the unlawful discriminatory practice complained of." (A-0896). Even if the complaint is not in and of itself a protected activity, it speaks to the intent behind all of Appellant's other efforts as set forth in Appellant's opposition to Appellees' motion and in this brief. Appellant contends that it defies credulity to suggest that the entirety of Appellant's efforts to object to and resist Upstate's discriminatory practices did not rise to the level of a protected activity, immediately followed by demotion.

## B. Appellees Were Aware of Appellant's Protected Activities

Whether an employer is aware of an employee's protected activities requires a factual inquiry: "[a]s a result, an employee claiming retaliation may be able to establish causation simply by showing that, within some time period prior to the adverse action, the employer, by some indirect means, became aware of the views that the employee had expressed." Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee, 555 U.S. 271, 283, 129 S. Ct. 846, 855, 172 L. Ed. 2d 650 (2009) (Concurring Opinion).

In the instant case, it is undisputed that Appellees were aware of Appellant's protected activities. Each protected activity described above was done in the open and in Appellant's official capacity as Dean. At no point in Appellees' motion do

they allege that they were unaware of Appellant's efforts. Quite the contrary: they opposed those efforts at every turn. (A-0826-0840).

## C. <u>Adverse Employment Action</u>

It is well-settled that "[f]or purposes of a Title VII discrimination claim by a person already employed, an adverse employment action is defined in our Circuit as a materially adverse change in the terms and conditions of employment. Such a change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples include…a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities" <u>Chung v. City Univ. of New York</u>, 605 F. App'x 20, 22 (2d Cir. 2015) (internal citations and quotations marks omitted).

It is undisputed that Appellant was demoted and that his demotion had a catastrophic effect on his career, including a significant decrease in his salary which is ongoing, a less distinguished title, a material loss of benefits, and significantly diminished material responsibilities. (A-0871).

Furthermore, Appellant's reputation and distinguished scientific career have been almost irreparably and publicly damaged, such that he has lost both identifiable and unidentifiable employment opportunities, and as a consequence his future earnings are significantly harmed. (A-0825).

It appears that the District Court agreed with this assertion. (A-1207-1208).

23

**D. Causal Connection Exists Between the Protected Activities and the Adverse Action**

**1. Causal Connection – Retaliatory Motive Played a Role**

A causal connection exists between Appellant's protected activities and the adverse action taken against him, i.e., that a retaliatory motive played a part in the adverse employment action – a demotion that actually violated the terms of his employment contract. (A-0840). Further, "causation is established whenever a particular outcome would not have happened "but for" the purported cause." Bostock v. Clayton Cnty., Georgia, 590 U.S. 644, 656, 140 S. Ct. 1731, 1739, 207 L. Ed. 2d 218 (2020)

There can be more than one but-for cause of an adverse employment action. Id. ("[t]his can be a sweeping standard. Often, events have multiple but-for causes.") In fact, Appellee's Associate Vice President for Human Resources, Eric J. Frost, admitted under oath that Appellant made efforts to address a lack of diversity during his time as Dean (A-1092). Mr. Frost further stated that "I think the intent was good." (A-1093). But dispositively to Appellee's motion, Mr. Frost concedes that Appellant's "intent" to promote diversity "could have been" a cause of Appellant's demotion (A-1094).

The District Court found that Mr. Frost's deposition statement undermines Appellant's argument in this case, given that he states that, although Appellant's

intent to promote diversity could have been a part of the decision to demote him he also acknowledged that it was a multitude of a lot of things. (A-1094).

Throughout the District Court's decision, the Court states that Appellant failed to show that his efforts to address the Appellees' discriminatory practices and policies was "the but-for cause" for his demotion. (A-1207, 1224, 1226-27). The Court does not state or even address that retaliation need only be one of possibly many but-for causes. Bostock, 590 U.S. at 656. Nor does the Court cite to or address Bostock.

The Court continues "[b]ecause Plaintiff must show that retaliation was the but-for cause of his demotion and not just a motivating factor, Mr. Frost's deposition statement does not add any weight to Plaintiff's argument." (A-1227). But the Court was wrong. Mr. Frost creates a triable issue of fact with respect to whether Appellant's efforts constituted *a* but-for cause, rather than *the* but-for cause.

### 2. Causal Connection - Temporal Proximity

As stated in the NY State Executive Division of Human Rights' preliminary finding, "[t]he lack of documentation, *coupled with the short time frame between Complainant's claim that he opposed discrimination and the adverse employment action*, raises material issues of fact." (emphasis added). (A-0906).

The Second Circuit has consistently held that "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the

protected activity was closely followed in time by the adverse action." Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir.2001) (internal quotation marks omitted). Furthermore, "[w]e have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" Summa, 708 F.3d at 128.

Appellee demoted Appellant in September 2019, in the midst of Appellant's ongoing efforts to address a lack of diversity at SUNY Upstate, and only a few weeks after he voiced his concerns about a lack of diversity at an August 2019 meeting with President Dewan. (A-1002; A-1003). ("'[B]ut-for' causation does not [, however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.' Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013). Further, 'the but-for causation standard does not alter the plaintiff's ability to demonstrate causation ... through temporal proximity.' Id. at 845. Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 90 (2d. Cir. 2015).

With respect to temporal proximity, the District Court held that "temporal proximity alone, while sufficient to establish the *de minimis* burden at the prima facie stage…is insufficient to establish retaliatory intent (through pretext or otherwise) at the third stage of the burden-shifting framework." Russo v.

26

*Wyandanch Union Free Sch. Dist.*, No. 23-716-cv, 2024 WL 2350314, *2 (2d Cir. May 23, 2024) (citing *Tafolla v. Heilig*, 80 F.4th 111, 125-26 (2d Cir. 2023); *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019))." (A-1226).

Additionally, this Court has held that "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case ... under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext…" *Bentley*, 935 F.3d at 90.

However, the Appellant does not rely solely on temporal proximity to establish causation. In fact, as previously stated, Appellee's Associate Vice President for Human Resources admitted that Appellant's efforts to counter a lack of diversity at Upstate could have been a but-for cause of Appellant's demotion ("I think it could have been part of it"). Appellant contends that this, coupled with the unrelenting resistance that Appellant faced with respect to his efforts to counter the lack of diversity at Upstate, along with the temporal proximity of Appellant's demotion creates a triable issue of fact with respect to causation.

Further supporting a finding that causation could be demonstrated by temporal proximity is that Appellant was not given notice of the contemplated demotion, nor was he provided any transition period, and was instead demoted only a few weeks after he voiced his concerns about a lack of diversity at an August 2019 meeting with

27

President Dewan, in complete disregard of Appellant's Employment Contract (A-0840). At no point did Appellant ever enter into an agreement to modify his contractually provided transition and notice period or give any indication that he no longer wanted to maintain his position as Dean. Id. Even if, as the District Court held, that "this agreement has been found to not be a binding contract and Defendants therefore had no legal obligation to abide by its terms," it does not alter the fact that Appellees completely disregarded the contract, which is in and of itself retaliatory. (A-1228).

Moreover, referring to Appellant's demotion, in Appellee SUNY Upstate's September 16, 2019 Council Meeting, Appellees stated to the Faculty Council that "there is not one horrible thing that happened for this change to occur, rather a change was needed in leadership" and "overall, this is not a negative change, but rather a moving forward change and a removal of barriers," (A-0920) these statements are wholly indicative of the fact that performance issues were not the cause of the unlawful demotion. (A-0840-0841). Moreover, these statements suggest that Appellant was a barrier to the institution's entrenched discriminatory policies.

Ultimately, Appellant was never provided with any negative feedback whatsoever with regard to his performance, or that it had to improve in a specific way. (A-0860).

The fact that there was no documentation of any performance issues at the time of Appellant's demotion was a key reason identified by the NY State Executive Division of Human Rights when issuing its preliminary finding of probable cause. ("It is the prerogative of the Respondent to establish terms, conditions, and standards of Complainant's employment. However, there is very little documentation that would establish that his removal from his position as Dean resulted from Complainant's behaviors and/or actions, especially because there is no record of prior discipline. There is also a dispute among the parties concerning Complainant's knowledge of Respondent's dissatisfaction. The lack of documentation, coupled with the short time frame between Complainant's claim that he opposed discrimination and the adverse employment action, raises material issues of fact that should be resolved at public hearing.") (A-0906).

Appellant's complaints disrupted a workplace culture where a lack of diversity was the norm, and his demotion was in retaliation for both his complaints and his attempts to make SUNY Upstate more in line with other medical schools across the country with regard to diversity initiatives. See (A-0828).

Consistent with the holdings of the Second Circuit and with the preliminary finding of the NY State Executive Division of Human Rights, Appellant's demotion was retaliatory and can be established by a lengthy history of protected activities and Appellees' utter resistance to those activities, the admission of Appellees'

Associate Vice President for Human Resources, and the temporal proximity of the adverse action to Appellant's protected complaints.

## **CONCLUSION**

Based on the foregoing, Appellant respectfully requests that the Second Circuit reverse the Northern District of New York's Order granting Appellees' Motion for Summary Judgment, dismissing Appellant's Complaint, and remand this matter to the Northern District of New York.

Dated: New York, NY
November 25, 2024

/s/ Daniel Grace
_____
Daniel Grace
Danny Grace PLLC
225 Broadway, Suite 1200
New York, NY 10007

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [6,330] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*], *or*

[   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: November 25, 2024

*/s/ Daniel Grace*
_____

Daniel Grace, Esq.

SPECIAL APPENDIX

i

# **<u>TABLE OF CONTENTS</u>**

Decision and Order Granting Defendants Summary Judgment ....................... SA-1

Judgment Granting Defendants Summary Judgment ..................................... SA-82

SA-1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JULIO LICINIO,** *MD, PhD, MBA, MS,*

                    **Plaintiff,**

          v.                                            **5:21-CV-387**
                                                         **(FJS/TWD)**

**STATE OF NEW YORK; THE STATE**
**UNIVERSITY OF NEW YORK; THE STATE**
**UNIVERSITY OF NEW YORK UPSTATE**
**MEDICAL UNIVERSITY,**

                    **Defendants.**
_____

**APPEARANCES**                                 **OF COUNSEL**

**DANNY GRACE PLLC**                            **DANIEL GRACE, ESQ.**
225 Broadway, Suite 1200                        **DOUGLAS MACE, ESQ.**
New York, New York 10007
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                      **AIMEE COWAN, AAG**
**NEW YORK STATE ATTORNEY GENERAL**
300 South State Street, Suite 300
Syracuse, New York 13202
Attorneys for Defendants

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

        Currently before the Court, in this workplace discrimination action filed by Dr. Julio

Licinio ("Plaintiff") against the State of New York, the State University of New York ("SUNY"),

and the State University of New York Upstate Medical University ("SUNY Upstate")

(collectively "Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R.

Civ. P. 56.  *See* Dkt. No. 73.   For the reasons set forth below, the Court grants Defendants'

motion and dismisses Plaintiff's Complaint.

SA-2

## I. RELEVANT BACKGROUND

### A.    Plaintiff's Complaint

Generally, in his Complaint, Plaintiff asserts five causes of action, two of which are based in discrimination related to his race/color and national origin ("First Claim" and "Second Claim" respectively), and three of which are based in retaliation related to his reporting discrimination suffered by other employees or students of Defendant SUNY Upstate on the basis of race/color, gender, and national origin ("Third Claim," "Fourth Claim," and "Fifth Claim" respectively).   *See* Dkt. No. 1.   The factual circumstances involved in these claims will be discussed in more detail in the following section.

### B.    Undisputed Material Facts on Defendants' Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, No. 17-CV-1206, 2021 WL 921688, *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging

2

genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendants and either expressly admitted or denied without a supporting record citation by Plaintiff.

1.      SUNY Upstate, with most of its operations in Syracuse, New York, is the region's only public academic medical center.

2.      It is one of five health science centers within the SUNY system.

3.      SUNY Upstate has four colleges: the College of Medicine; the College of Nursing; the College of Health Professions; and the College of Graduate Studies (biomedical sciences).   The faculty in these colleges comprise 26 Departments and provide clinical and didactic training to students and trainees in medicine and sub-specialties of medicine, nursing, health sciences, and graduate studies across SUNY Upstate's health and research enterprises.

4.      SUNY Upstate's health enterprise consists of two hospitals, including the region's only level-one trauma center and the region's only children's hospital, as well as a cancer center, and many outpatient clinical locations across Upstate New York.

5.      SUNY Upstate serves approximately 1.8 million patients across a 17-county region and is the region's largest employer with approximately 10,000 employees.

6.      Plaintiff was appointed as the Dean of SUNY Upstate's College of Medicine by

3

SA-4

SUNY Upstate's former President Danielle Laraque-Arena, M.D.

7.     A letter dated March 14, 2017, memorializes Plaintiff's offer from SUNY Upstate for the positions of Senior Vice President for Academic Health Affairs and Dean of the College of Medicine.

8.     Plaintiff's appointment at SUNY Upstate was effective July 1, 2017.

9.     Plaintiff was responsible for overseeing operations for SUNY Upstate's College of Medicine, including its educational programs, accreditations, admissions, research, and hiring, and for supervising 26 Department Chairs, at least six Deans within the College of Medicine, and all staff members within the College of Medicine Dean's Office.

10.     The offer letter explicitly states that the Senior Vice President for Academic Health Affairs and Dean of the College of Medicine positions are management confidential positions that report to and serve at the pleasure of the President.

11.     The letter states, "In the event that you no longer hold the position of Senior Vice President and Dean of the College of Medicine you will revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry, with secondary appointments in the departments of pharmacology and medicine, division of endocrinology, diabetes and metabolism, and your total compensation, funded entirely by New York State, will be set no lower than that of the highest paid faculty member of the same rank in the Psychiatry Department."

**Concerns About Plaintiff's Leadership As Dean**

12.     In the fall of 2018, then-President of SUNY Upstate Dr. Laraque-Arena called Dr.

4

SA-5

Mantosh Dewan, who was a Distinguished Service Professor in the Department of Psychiatry at the time, and asked him if he would be willing to assume the responsibilities of Dean under the title of Vice President of Administration.

13.     Dr. Laraque-Arena told Dr. Dewan that she was offering him that position because she was unhappy with Plaintiff's performance as Dean.[1]

14.     Dr. Laraque-Arena further told Dr. Dewan in the fall of 2018 that she was so uncomfortable working with Plaintiff that she refused to meet with him one-on-one without another person present.[2]

15.     Dr. Laraque-Arena further told Dr. Dewan in the fall of 2018 that Plaintiff was

---

[1]  Plaintiff disputes this asserted fact because "[t]he only time Dr. Laraque-Arena provided performance-related feedback to [him], that feedback was positive."  *See* Dkt. No. 78 at ¶ 13. However, even if true, that fact does not controvert the uncontroverted evidence that Dr. Laraque-Arena *told* Dr. Dewan that she was offering him that position because she was unhappy with Plaintiff's performance as Dean.

[2]  Plaintiff disputes this asserted fact for two reasons: (1) he argues that the evidence relied upon is inadmissible hearsay, and (2) he denies that he acted in a manner that made her uncomfortable, citing evidence that they had a lengthy one-on-one meeting not long before she ended her tenure as President.  *See* Dkt. No. 78 at ¶ 14.   The first of these reasons is insufficient to preclude consideration of this fact because the Court finds that, even if the proffered evidence is hearsay, it can be presented in an admissible form at trial.   *See Bowling v. Nolette*, No. 18-CV-0597, 2021 WL 4134733, *7 n.3 (N.D.N.Y. Sept. 10, 2021) (Suddaby, C.J.) ("[E]vidence considered on a motion for summary judgment need not be in an admissible form, so long as it 'can be presented in a form that would be admissible in evidence.'" (citing Fed. R. Civ. P. 56[c][2])). As to the second of these reasons, even if true, the fact that Plaintiff never actually acted in a manner that made Dr. Laraque-Arena uncomfortable does not contradict the uncontroverted evidence that Dr. Laraque-Arena *told* Dr. Dewan that Plaintiff acted in a manner that made her uncomfortable.   Furthermore, although it might be true that Plaintiff and Dr. Laraque-Arena met one-on-one after the time she made this statement to Dr. Dewan, such evidence does not contradict the fact that she told Dr. Dewan such meetings made her uncomfortable or that she did indeed inform Plaintiff, as documented by evidence dated July 10, 2018, that Dr. Laraque-Arena's Chief of Staff would attend their half-hour weekly meetings.   *See* Dkt. No. 73, Attach. 24.

A1153

demeaning, hostile, inappropriate, and undercut her.[3]

16.      By that time, Dr. Laraque-Arena had spoken to Plaintiff about his penchant for arriving late to meetings.

17.      Plaintiff admits that, at some point while Dr. Laraque-Arena was President, CEO of SUNY Upstate University Hospital Dr. Robert Corona began attending the meetings between her and Plaintiff.

18.      Plaintiff also admits that Dr. Laraque-Arena had a conversation with him during which she indicated that they needed to work on their "communication."[4]

19.      Dr. Laraque-Arena sent a letter to Plaintiff in the summer of 2018, copying Dr. Corona, that set parameters for their meetings and confirmed that someone would attend their one-on-one meetings in the future.

20.      Dr. Dewan declined Dr. Laraque-Arena's offer to assume the responsibilities of Dean under the title of Vice President of Administration because he did not want to clash with Plaintiff, who still held the role of Dean.

_____

[3] Plaintiff disputes this asserted fact on the basis that it is inadmissible hearsay and that he denies communicating with Dr. Laraque-Arena in a demeaning, inappropriate, hostile, or aggressive way.   *See* Dkt. No. 78 at ¶ 15.   Again, his argument regarding hearsay is insufficient for the reasons stated in Note 2 of this Memorandum-Decision and Order.   Moreover, Plaintiff's denial about communicating in the relevant way does not dispute the actual asserted fact, which is that Dr. Laraque-Arena *told* Dr. Dewan that Plaintiff had acted in such a manner.   *See Yetman v. Capital Dis. Trans. Auth.*, No. 12-CV-1670, 2015 WL 4508362, *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).   The Court, therefore, deems this asserted fact admitted.

[4] Although Plaintiff denies this fact, he cites pages of his deposition transcript that actually support the fact.   (Dkt. No. 78, Attach. 2, at 35-36 ["So she said so we have to work on our communication, et cetera"].)

6

SA-7

21.     Following Dr. Laraque-Arena's resignation in December 2018, Dr. Dewan became the interim president of SUNY Upstate.

22.     Dr. Dewan is of Indian descent.

23.     In late December 2018, President Laraque-Arena emailed Dr. Dewan to alert him to a discrimination complaint that several female faculty members had filed against Plaintiff with SUNY Upstate's Office of Diversity and Inclusion ("ODI") relating to a search for a Department Chair.

24.     When Dr. Dewan became Interim President, some members of senior leadership at the SUNY System Administration immediately expressed their concerns about Plaintiff remaining in the Dean position.[5]

25.     Dr. Ricardo Azziz, the former SUNY Chief Officer of Academic Health and Hospital Affairs, persistently encouraged Dr. Dewan to remove Plaintiff from the Dean position.[6]

26.     Plaintiff informed Dr. Dewan that Dr. Azziz had told Plaintiff to begin looking for another job.

---

[5] Plaintiff disputes this asserted fact on the basis that it is inadmissible hearsay and adds facts regarding from which specific senior leadership members such concerns originated.   *See* Dkt. No. 78 at ¶ 25.   His argument regarding hearsay is insufficient for the reasons stated in Note 2. Regarding Plaintiff's other objection, it does not contradict the asserted fact (which is supported both by declaration testimony that regards concerns from "senior leadership" and merely gives one "instance," and by deposition testimony that regards concerns from "every source" and merely "touche[s] on a couple things . . . people actually stated").   *See* Dkt. No. 73, Attach. 26, at ¶ 17; Dkt. No. 78, Attach. 3, at 10-13.   However, the Court has amended the asserted fact here to reflect that it was perhaps not every member of SUNY senior leadership who expressed such concerns.

[6] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

7

A1155

27.     However, Dr. Dewan told Plaintiff that, despite instructions from SUNY to remove Plaintiff, he was willing to give Plaintiff a chance to prove himself and give him the benefit of the doubt.

28.     Between the winter of 2018 and the spring of 2019, Plaintiff began seeking employment elsewhere.

29.     The Liaison Committee on Medical Education ("LCME") is an accrediting body of SUNY Upstate's College of Medicine and sets forth accreditation standards by which medical schools are evaluated.

30.     In 2011, the College of Medicine was placed on probation because the LCME had determined that the College of Medicine was not compliant with several accreditation standards largely relating to the curriculum at SUNY Upstate's Binghamton Clinical Campus.

31.     Under the leadership of former College of Medicine Dean David Duggan, the College of Medicine employed remedial measures, "made swift and significant progress," and was released from probation and received accreditation from LCME as of June 2013.

32.     Academic probation was a one-time event that was corrected by the College of Medicine, and the LCME scheduled the next site visit for six years later in 2019.[7]

33.     A "whole team" at SUNY Upstate was involved in the LCME process in 2019 while Plaintiff was Dean.

_____

[7] Plaintiff disputes this asserted fact and adds facts regarding the additional remedial actions that SUNY Upstate was required to take in terms of monitoring for continued compliance, as well as the fact that SUNY Upstate was required to submit a status report regarding those in April 2014. *See* Dkt. No. 78 at ¶ 34.   However, Plaintiff's additional facts do not dispute the above-stated fact, which asserts that academic probation did not again occur, the corrections were made, and the next site visit was scheduled for 2019.   Therefore, the Court deems this asserted fact admitted.

A1156

34.     In fact, that team was already formed and had begun to work on the LCME accreditation process before Plaintiff arrived at SUNY Upstate.

35.     Plaintiff and then-President Dr. Laraque-Arena hired an outside consultant to assist with the LCME accreditation process, agreeing to pay the consultant approximately $1 million.

36.     Use of a consultant for the LCME process was unprecedented at SUNY Upstate.

37.     There were discussions held with Dr. Dewan and senior leadership on how to minimize Plaintiff's role in the accreditation process given the concerns over Plaintiff's behavior.[8]

38.     While the College of Medicine's accreditation status was not put on probation by LCME during Plaintiff's tenure as Dean, the LCME's review was not perfect.

39.     There were areas that LCME identified as needing to be monitored, including the area of diversity.

40.     For example, the LCME noted that, although new policies, procedures, and programs designed to increase diversity among students, faculty, and senior administrative staff were implemented under Plaintiff's leadership, there were only modest gains in diversity of senior administrative staff and faculty during the first year of implementation.

41.     After Dr. Dewan became Interim President, Dr. Ruth Weinstock approached him about concerns she had regarding Plaintiff's interference in the search process for the new Chair

---

[8]     Plaintiff states that he "cannot respond to this allegation as the facts are unavailable to him."  *See* Dkt. No. 78 at ¶ 39.   However, a lack of knowledge is not a proper basis for denying or properly disputing an asserted fact.  *See Disability Rights New York v. New York State Dep't of Corr. And Cmty. Supervision*, No. 20-CV-1487, 2024 WL 184248, *3 n.3 (N.D.N.Y. Jan. 16, 2024) (Suddaby, J.) (collecting cases).   Therefore, the Court deems this asserted fact admitted.

9

SA-10

of SUNY Upstate's Department of Medicine.[9]

42.     The search committee members had been searching for and interviewing candidates for months and the committee had recommended that certain individuals be put forward for consideration; but Plaintiff was ignoring the committee's recommendations and insisting that his personal friends be moved forward in the process even though the committee had already rejected them.[10]

43.     Dr. Dewan spoke with the committee members following the concerns raised by Dr. Weinstock, and they reiterated their exasperation with Plaintiff's subversion of their search process and recommended that Dr. Dewan not approve the hire of the individual selected by Plaintiff, whom they did not believe to be qualified.[11]

44.     Dr. Dewan advised Plaintiff to call off the search, resulting in months of wasted time for the approximately 20 busy SUNY Upstate doctors and faculty who sat on the search committee.[12]

---

[9]  Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[10]  Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.   In addition, the Court notes Plaintiff's conspicuous omission of a citation to any declaration testimony by him disputing this fact, which would certainly be within his personal knowledge.   *See* Dkt. No. 78 at ¶ 44.

[11]  Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[12]  Plaintiff disputes this asserted fact, but that denial involves the addition of facts related to potential alternative reasons as to why the search might have been ended at that time other than his alleged actions.   *See* Dkt. No. 78 at ¶ 46.   Although this does properly dispute why the search was ended (and the Court has therefore omitted a portion of the asserted fact), it does not deny the remainder of the fact, *i.e.*, that the search was ended and resulted in wasted time.

10

45.     Later that month, Dr. Dewan made plans for himself, the President of SUNY ESF, and other SUNY Upstate leaders to take the SUNY Chancellor to lunch, and he included Plaintiff in that invitation.

46.     Before that lunch, Dr. Dewan spoke with Plaintiff and asked him to please keep the conversation high-level and pleasant.[13]

47.     Two days later, Dr. Dewan received an email from the Chancellor that forwarded an email that Plaintiff had sent to her immediately following the lunch asking for $5 million to recruit a specific doctor for the position of Chair of Medicine at SUNY Upstate.[14]

48.     Plaintiff did not copy Dr. Dewan on this email.[15]

49.     Dr. Dewan apologized to the Chancellor and told her that he did not know that Plaintiff had written to her and assured her that he would address it with Plaintiff.

50.     Dr. Dewan also spoke on the phone with the Chancellor following the email exchange, at her request.[16]

51.     The Chancellor asked Dr. Dewan why he had not yet fired Plaintiff, expressed her

_____

[13] Plaintiff denies this asserted fact, but the evidence cited does not support that denial.  *See* Dkt. No. 78 at ¶ 49.   Therefore, the Court deems this asserted fact admitted.

[14] Plaintiff disputes Defendants' characterization of this email but does not dispute that he sent such an email in the manner or circumstances described.  *See* Dkt No. 78 at ¶ 50.   Because Plaintiff's cited evidence does not dispute the asserted fact, which is supported by the evidence presented by Defendants, the Court deems this asserted fact admitted.

[15] Although Plaintiff denies a perceived "implication" of the above-stated fact, that denial is ineffective for the reasons stated above in Note 3.   *See also Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).

[16] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

11

ongoing concerns about Plaintiff continuing as the Dean of SUNY Upstate's College of

Medicine, and asked him to ensure that Plaintiff not contact her again directly in the future.[17]

52.    In approximately March 2019, Dr. Dewan was contacted by Dr. Sharon

Brangman, who had been appointed Chair of the newly created Geriatrics Department.[18]

53.    Dr. Brangman was distressed and relayed concerns regarding the level of funding

she had received for that Department, which had been created in July 2018 under Dr. Laraque-

Arena's leadership.[19]

54.    Dr. Brangman also relayed other concerns about Plaintiff making inappropriate

comments and not behaving appropriately as Dean.[20]

55.    She shared that, during an Admissions Committee end-of-year dinner that she,

Plaintiff, and other faculty and students had attended in 2018, Plaintiff had told a story about a

patient he used to treat as a psychiatrist in Miami.[21]

56.    As part of the story, he shared with students and other faculty explicit details

---

[17] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[18] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[19] Plaintiff sufficiently disputes the portion of this asserted fact that he had been "non-responsive to her requests to help her get financial support" and that part has therefore been omitted here; however, the evidence cited does not contradict the rest of the asserted fact.   *See* Dkt. No. 78 at ¶ 56.

[20] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[21] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

A1160

about the sexual issues that the patient was having, which was a violation of patient privacy and completely inappropriate and unprofessional.[22]

57.     Dr. Brangman shared that she was horrified by Plaintiff's actions.

58.     Dr. Brangman also reiterated the concern that Dr. Dewan had previously learned about Plaintiff's attempt to subvert the committee search process during the search for a new Chair for the Department of Medicine.[23]

59.     On January 24, 2019, Plaintiff emailed a group of approximately 80 faculty and students inviting them to email him at his personal email address to report instances of discrimination or offensive behavior and to label the mail "confidential."[24]

60.     The faculty union brought Plaintiff's email to the attention of then-Vice President for Human Resources Eric Frost.

61.     This communication required Mr. Frost to instruct Plaintiff that his email was inappropriate and inconsistent with SUNY Upstate's collective bargaining agreements, policies, and established practices.[25]

---

[22] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[23] Plaintiff's denial of the asserted fact is insufficient for the reasons stated above in Notes 2 and 8.

[24] Plaintiff purports to dispute the asserted fact, but his explanation addresses his intentions for sending this email and does not actually dispute that he did indeed send such an email.  *See* Dkt. No. 78 at ¶ 64.   Because Plaintiff's explanation is non-responsive to the fact actually asserted, the Court deems this asserted fact admitted.

[25] Although Plaintiff disputes that the instruction was "required," the record evidence he cites in support of that denial, *i.e.* his own deposition testimony, is insufficient to create a genuine dispute of material fact because it does not demonstrate personal knowledge of the "multiple Upstate polices" on which Mr. Frost relied (but merely expresses Plaintiff's opinion that "H.R. didn't like the . . . way the email was worded").   *See* Dkt. No. 78, Attach. 2, at 20-21.

13

A1161

62.     Mr. Frost assisted Plaintiff with sending a clarifying follow-up email to the same

faculty and students.

63.     When Dr. Dewan took over as President, he learned that Dr. Laraque-Arena had

significantly increased the number of administrative positions in the President's office and that

Plaintiff had done the same in the College of Medicine.[26]

64.     Faculty had shared their dissatisfaction with SUNY Upstate money being spent on

hiring so many administrators, and Dr. Dewan was of the mindset that they needed to model and

ensure administrative efficiency in the same manner they asked others to be efficient and

accountable.[27]

65.     Dr. Dewan began to reduce the number of administrative staff in the President's

_____

[26] Plaintiff does not expressly dispute this asserted fact but instead attempts to add facts regarding his reasons for increasing the number of such positions in the College of Medicine. *See* Dkt. No. 78 at ¶ 68.   Such an attempt is improper for multiple reasons.   *See* N.D.N.Y. L.R. 56.1(b) ("The opposing party shall file a response to the Statement of Material Facts.   The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs."); *Willis v. Cty. of Onondaga*, No. 14-CV-1306, 2016 WL 7116126, *2 n.1 (N.D.N.Y. Dec. 6, 2016) (Suddaby, C.J.) ("[A]ny additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not."), *aff'd*, 710 F. App'x 47 (2d Cir. 2018); *Zuk v. Onondaga Cty.*, No. 07-CV-0732, 2010 WL 3909524, *2 (N.D.N.Y. Sept. 30, 2010) ("Plaintiff . . .   included several qualifying statements in his responses.   The Court notes that, . . . , in many of Plaintiff's qualifying statements, he asserts additional facts.   This is improper."), *aff'd*, 471 F. App'x 70 (2d Cir. 2012);*Maioriello v. New York State Office for People With Developmental Disabilities*, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017) (Suddaby, C.J.) ("[T]hroughout Plaintiff's Rule 7.1 Response, she . . . includes additional facts and/or legal argument in those responses. . . .") (emphasis added).   Therefore, the Court deems this asserted fact admitted.

[27] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

14

A1162

office by eliminating what he viewed as unnecessary and/or duplicative functions.[28]

66.    During his first year as President, Dr. Dewan eliminated eight positions in the President's office, which resulted in a savings of more than $1 million annually.[29]

67.    Dr. Dewan became aware that Plaintiff was creating a significant number of new positions within the College of Medicine.

68.    Dr. Dewan had three serious concerns regarding such expansion: (1) the cost of unnecessary administrative bloat; (2) the lack of clarity regarding the responsibilities of these new positions; and (3) the lack of connection between these positions and the objective outcomes that had been agreed upon for the College of Medicine.[30]

69.    As to his concerns about the cost of unnecessary administrative bloat, Dr. Dewan learned that Plaintiff had grown the Dean's staff from four to eleven people and was in the process of creating additional positions.[31]

70.    That was a 250% increase that cost hundreds of thousands of dollars in additional

---

[28] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[29] Plaintiff disputes that these actions resulted in the stated savings but fails to cite any evidence in support of that contention.  *See* Dkt. No. 78 at ¶ 71.  Therefore, the Court deems this asserted fact admitted.

[30] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[31] Plaintiff adds facts regarding his reasons for creating such positions but does not deny the asserted fact.  *See* Dkt. No. 78 at ¶ 74.  To the extent that Plaintiff disputes the implication that his new hires constituted "unnecessary administrative bloat," that denial is ineffective for the reasons stated above in Note 3.  *See also Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).  In any event, the Court has clarified that the hires were relevant to Dr. Dewan's *concerns* regarding such bloat.

15

expense.[32]

71.     In addition to the new positions that Plaintiff created in the Dean's office, Plaintiff created a Director of Special Programs position in Student Affairs and was proposing to create an additional position of Assistant Dean of Cultural Competency in the Dean's office.

72.     It was unclear what duties these positions would be responsible for performing.[33]

73.     The titles of the positions Plaintiff was creating suggested that their duties might overlap with the duties that individuals in existing positions were already responsible for performing.[34]

74.     This generated complaints from those holding the existing positions in or around the spring and summer of 2019.[35]

75.     For example, SUNY Upstate's longtime College of Medicine Assistant Dean for Diversity Dr. Brian Thompson complained to Dr. Dewan that Plaintiff had demoted and sidelined him by creating an Associate Dean for Diversity and Inclusion position that would be performing essentially the same functions that he was already responsible for performing.[36]

76.     Similarly, SUNY Upstate's Dean of Students Dr. Julie White complained that

---

[32] Plaintiff adds facts regarding his reasons for creating such positions but does not deny the asserted fact.   *See* Dkt. No. 78 at ¶ 75.

[33] Plaintiff denies the asserted fact but the evidence cited does not support Plaintiff's reasons for that denial.   *See* Dkt. No. 78, at ¶ 77.   Therefore, the Court deems this asserted fact admitted.

[34] The Court deems this asserted fact admitted for the reasons discussed above in Note 33.

[35] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[36] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

16

Plaintiff was proposing to create a new Associate Dean for Student Advising position even though she was already responsible for student advising.[37]

77.    Finally, Dr. Dewan had concerns that there was no connection between these new positions and the objective outcomes on which he and Plaintiff had agreed, *i.e.*, to increase the number of Under-Represented in Medicine ("URiM") students entering SUNY Upstate.[38]

78.    Dr. Dewan asked Plaintiff how each position would help recruit more URiM students.[39]

79.    Dr. Dewan also emphasized that Plaintiff needed to manage the performance of the individuals who already held existing positions to ensure their success before creating new positions that had the same responsibilities.

80.    Plaintiff never provided Dr. Dewan with an organizational chart or written job descriptions related to these new positions but, instead, became angry in response to Dr. Dewan's inquiries.[40]

---

[37] Plaintiff's argument that this is inadmissible hearsay is insufficient for the reasons stated in Note 2.

[38] Plaintiff disputes the asserted fact on the basis that recruiting URiM students was not the only objective, and these positions in fact were made with a focus on increasing diversity among the faculty and staff.   *See* Dkt. No. 78 at ¶ 82.   However, Plaintiff does not present any evidence to address the asserted fact, which is that Dr. Dewan had concerns that the positions did not advance the goal of increasing the number of URiM students.   Therefore, the Court deems this asserted fact admitted.

[39] Plaintiff disputes this fact by citing evidence that Dr. Dewan asked him what certain minority faculty members "did all day," but he does not provide any evidence indicating that, even if Dr. Dewan did question what certain faculty were responsible for, he did not also ask how the new positions would help recruit more URiM students.   *See* Dkt. No. 78, at ¶ 84.   Therefore, the Court deems this asserted fact admitted.

[40] Although Plaintiff denies that Dr. Dewan ever asked him for such a chart or such descriptions, the above-stated fact never asserts that Dr. Dewan did so.   Again, Plaintiff's denial of a

17

81.     In the summer of 2019, Dr. Dewan arranged for local political representatives to separately visit SUNY Upstate's campus so that they could describe the significance of SUNY Upstate's services to the Upstate New York community and garner political support for SUNY Upstate's initiatives.

82.     Dr. Dewan invited all members of SUNY Upstate's University Executive Committee to attend one-hour meetings with representatives when they visited to provide an overview of SUNY Upstate.

83.     Due to Plaintiff's history of making inappropriate statements and going off on tangents, Dr. Dewan had concerns that Plaintiff might say something or behave in a manner that would leave these representatives with a negative impression of SUNY Upstate.[41]

84.     During one such visit, Plaintiff went off on a tangent in a manner that (in Dr. Dewan's view) was contrary to how one would expect SUNY Upstate's Dean of the College of Medicine to present himself and (again, in Dr. Dewan's view) was an embarrassment to SUNY Upstate and himself as President.[42]

_____

perceived implication of fact is ineffective for the reasons stated above in Note 3.   As for Plaintiff's denial of the reason for his anger, the Court has modified the above-stated fact to better conform with the record evidence Plaintiff cited.

[41] Plaintiff denies that he had a history of making inappropriate statements.   *See* Dkt. No. 78 at ¶ 89.   Although he does not provide a copy of the supporting evidence that he cites (pages "96" and "97" of the deposition transcript from Ann Botash), Defendant has done so.   *See* Dkt. No. 81, Attach. 14, at 1-2.)   However, this evidence (which expresses only one person's experience that is not based on *all* interactions that Plaintiff had with other employees and students at Upstate, and which in any event admits that Plaintiff was "[o]ccasionally" unprofessional with other faculty members) in no way controverts the undisputed evidence of Plaintiff's inappropriate statements, as described above in Fact Numbers 15, 55, 56, and 61 of this Statement of Facts. Therefore, the Cour deems this asserted fact admitted.

[42] Plaintiff disputes this asserted fact "insofar as this does not appear to be a fact capable of being proven or disproven" and is too vague and ambiguous.   *See* Dkt. No. 78, at ¶ 90.

18

85.     After that incident, Dr. Dewan spoke with his staff and asked them to preferably

schedule these visits when Plaintiff was not going to be on campus.[43]

86.     Dr. Dewan also learned that Plaintiff had begun to instruct Chairs within the

College of Medicine not to talk to Dr. Dewan about certain Departmental concerns and that he

blamed Dr. Dewan for being unable to do his job.[44]

87.     On August 8, 2019, Dr. Dewan met with former SUNY Upstate President Dr.

Gregory Eastwood and discussed his concerns about Plaintiff's troubling conduct, including his

disparaging remarks about Dr. Dewan.[45]

88.     In May 2019, Plaintiff gave a speech at the third-year medical student orientation.

89.     During his speech, Plaintiff advised third-year medical students, among other

things, that "it's only going to get worse and worse – residency, fellowship and having a family

will be very hard" and that, if the students do not do well in their clerkships, they will not get

--------------------

However, Plaintiff cites no evidence to contradict the proffered testimony of Dr. Dewan on this
matter, nor any legal citation to show that such fact is improper for consideration.   Further, to
the extent that Plaintiff argues that this fact cannot be presented in a form that would be
admissible at trial, the Court disagrees, given that Dr. Dewan can testify regarding his own
observations and impressions of Plaintiff's conduct.   Therefore the Court deems this asserted
fact admitted.

[43] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that
fact for the reasons stated above in Note 8.

[44] Plaintiff purports to deny this asserted fact but admits that he instructed Chairs not to speak
with Dr. Dewan about any Departmental concerns that should be addressed to Plaintiff; he does
not appear to specifically deny any of the remainder of the fact.   *See* Dkt. No. 78, at ¶ 92.
Therefore, the Court deems this asserted fact admitted.

[45] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that
fact for the reasons stated above in Note 8.

19

into their chosen specialty, and he then talked about student depression and suicide.[46]

90.     Associate Dean of Student Affairs and Campus Life Sharon Huard emailed Dean of Student Affairs Dr. Julie White and notified her that a student wanted to make a complaint regarding Plaintiff's speech.

91.     Dr. Leann Lesperance (a SUNY Upstate clinical professor and Associate Dean for Academic Affairs at the Binghamton Clinical Campus) emailed SUNY Upstate Audio-Video Technician Gerard Roy and instructed him not to publish the portion of the orientation that contained Plaintiff's speech.

92.     Plaintiff's speech was the only speech made at orientation that was not published.

93.     Dr. White emailed Plaintiff to inform him that a group of students and faculty members were upset with the content of his speech and that a student wanted to file a complaint against him as a result.

94.     Dr. White suggested and helped draft a letter for Plaintiff to disseminate to students after the complaints were brought to his attention.[47]

95.     At the beginning of a leadership meeting, Plaintiff played a video on his phone as people were walking into the meeting that depicted a public figure using ethnic slurs and making derogatory comments about Italians using vulgar language.[48]

---

[46] Plaintiff disputes the "characterization and selective omission of context" and adds facts related to this incident.   *See* Dkt. No. 78 at ¶ 95.   However, the evidence Plaintiff cites does not contradict the asserted fact, which the Court finds to be supported by the presented evidence (which includes contemporaneous text messages about the speech).   Therefore, the Court deems this asserted fact admitted.

[47] *See* Dkt. No. 78, Attach. 2, at 45-46; Dkt. No. 73, Attach. 49, at ¶ 10; Dkt. No. 73, Attach. 53-54.

[48] Plaintiff purports to dispute this asserted fact, but he admits that he was playing such a video

20

96.     Dr. Dewan's Chief of Staff, Linda Viet, who is Italian, was visibly offended by

the video.[49]

97.     In May 2019, Chair of the Psychiatry Department Dr. Thomas Schwartz emailed

Plaintiff, Dr. Dewan, and Dr. Corona in support of Dr. Brangman, who was at that time newly

appointed as the Chair of the Geriatrics Department.

98.     Dr. Schwartz believed that Plaintiff supported this role for Dr. Brangman given

that he had directly appointed her, but he was concerned that other agencies were not as

supportive.

99.     Dr. Schwartz expressed to Dr. Corona and Dr. Dewan that he was worried as a

colleague of Dr. Brangman that she was not being treated fairly as a new Chair, specifically with

respect to the hospital's lack of financial backing of the Geriatrics Department.

100.    Dr. Corona added Plaintiff to the email, and Plaintiff responded by emailing only

Dr. Schwartz, criticizing him for emailing Dr. Corona and Dr. Dewan about the issue; Dr.

Schwartz felt he was lobbying on Plaintiff's behalf and on behalf of the College of Medicine.[50]

---

on his phone and that it was still playing when people began to enter the room.  *See* Dkt. No. 78
at ¶ 101.   Because Plaintiff has not actually provided any basis for his denial, the Court deems
this asserted fact admitted.

[49] Plaintiff denies this asserted fact, but the cited evidence does little more than appear to suggest
that Dr. Chin was the only person in the room at the relevant time.  *See* Dkt. No. 78 at ¶ 102
[citing ¶ 156 of Plf.'s Decl.].   However, the evidence does not specifically state that Ms. Viet
was absent from the room at the time.  *See* Dkt. No. 78, Attach. 4, at ¶ 156.   In any event,
Plaintiff's declaration regarding who was in the room appears contradicted by his previous
deposition testimony.  *See* Dkt. No. 78, Attach. 2, at 53-54.  *See Guerra v. Swanstrom*, No. 21-
CV-0459, 2023 WL 5528721, *8 (N.D.N.Y. Aug. 28, 2023) (Kahn, S.J.) ("[I]t has long been the
law in the Second Circuit that a party may not avoid summary judgment by submitting a
declaration in opposition to summary judgment that contradicts his sworn deposition
testimony.").   Therefore, the Court deems this asserted fact admitted.

[50] Plaintiff purports to dispute this fact but, instead of citing record evidence that actually

21

A1169

101.    In his response, Plaintiff reprimanded Dr. Schwartz for being a "busybody" and a "vigilante" for raising the issue and for insinuating to Dr. Corona and Dr. Dewan that Plaintiff was not doing his job.[51]

102.    Plaintiff's response to Dr. Schwartz contained 13 numbered paragraphs that explained how and why he took offense to the email.

103.    On August 22, 2019, Dr. Lesperance attended a white coat ceremony that is held annually as a rite of passage for students entering the medical school.

104.    It is a ceremony attended by incoming first-year medical students and their families during which students receive a white doctor's coat and recite the Hippocratic Oath.

105.    The room was full of first-year medical students and their parents/guardians.

106.    Plaintiff was supposed to speak and then later close the ceremony by spending no more than five minutes thanking everyone for attending.

107.    When Plaintiff came back to thank the students and their parents/guardians and close the ceremony, he talked for 10-15 minutes (longer than scheduled) in what Dr. Lesperance perceived to be a long rambling diatribe.[52]

_____

controverts this fact, his response is an explanation of why he found Dr. Schwartz's actions to be worthy of criticism, which does not dispute, and actually supports, the asserted fact.   *See* Dkt. No. 78 at ¶ 107.   Therefore, the Court deems this asserted fact admitted.

[51]  The Court agrees with Plaintiff that whether Plaintiff "mocked" Dr. Schwartz is a somewhat subjective interpretation and has therefore omitted that portion of the asserted fact, but the Court deems the rest of the asserted fact admitted as Plaintiff offers no basis for denying it.   *See* Dkt. No. 78 at ¶ 108.

[52]  Plaintiff denies the asserted fact but merely adds facts regarding the content of his speech (which he admits regarded "the difficulties and stresses of medical school" and his own "specialty on depression and suicide").   *See* Dkt. No. 78 at ¶ 114.   In addition, his denial relies on a portion of his declaration (paragraph 221) that is inapposite and a portion of his deposition transcript (page 221) that the parties have not provided.   *See* (Dkt. No. 78, Attach. 4, at ¶ 202;

22

108.    Despite having recently been informed that students and faculty had complained about a similar speech he had given at the third-year orientation only a few months earlier, Plaintiff again talked about suicide and depression and dwelled on related statistics.

109.    Dr. White eventually intervened and closed the meeting.

110.    After his speech, Dr. Lesperance went to Dr. White and told her that Plaintiff should never be allowed to address students "off script" again given how disastrous his remarks had been.[53]

### Plaintiff's Allegations

111.    There are multiple ways that a position at SUNY Upstate can be filled.

112.    An open national search involves outside consultants and provides the largest pool of applicants but is costly and takes a great deal of time.

113.    For leadership positions, individuals are frequently appointed on an interim basis until the position is filled.

114.    Sometimes an interim appointee will be appointed to the position permanently if the interim appointee has performed satisfactorily and circumstances warrant the appointment.

115.    As Dean, Plaintiff used each of these processes.

116.    Dr. Lawrence Chin was appointed as interim Dean of the College of Medicine after Plaintiff was removed.

---

Dkt. No. 73, Attach. 11; Dkt. No. 78, Attach. 2; Dkt. No. 81, Attach. 15.)   The asserted fact is deemed to be admitted.

[53] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

23

SA-24

117.    Dr. Chin was selected to be interim Dean based on his exceptional qualifications.

118.    Dr. Chin has appointed nine Department Chairs since becoming Dean.

119.    All those Department Chairs were appointed pursuant to external searches except

Dr. Xiuli Zhang, Dr. Francesca Pignoni, and Dr. Thomas Schwartz.

120.    Dr. Zhang and Dr. Schwartz were appointed to permanent Chair positions without

searches being conducted because they had served as interim Department Chairs of their

Departments throughout the COVID-19 pandemic; Dr. Chin assessed, with input from faculty

within their departments, that they were highly qualified as judged by their credentials and the

fact that they had performed exceptionally well as interim Chairs during a difficult time.

121.    Dr. Pignoni was appointed Chair of her Department for similar reasons after an

attempted but failed search.

122.    While serving as Dean, Plaintiff had appointed several Department Chairs and

Associate Deans without conducting searches.

123.    In his deposition, Plaintiff admitted that, when Dr. Dewan allegedly objected to

the positions that Plaintiff had created, Dr. Dewan never specifically said anything about

anyone's gender, race, or national origin.[54]

---

[54] Plaintiff denies this asserted fact, arguing that Dr. Dewan "implicitly referred to gender, race, or national origin when he objected only to individuals Dr. Licinio appointed or attempted to appoint who were of URiM races (Hispanic, Black) or female."  *See* Dkt. No. 78, at ¶ 130.   The above-stated fact says nothing about Dr. Dewan's "implicit" statements.  *See Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).   Moreover, Plaintiff's denial contains a legal argument regarding how Dr. Dewan's words or actions should be interpreted, not evidence to dispute the asserted fact.  *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts."); *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) ("[T]he [Rule 56.1] Statement improperly interjects

24

SA-25

124.    Despite his overall concerns, Dr. Dewan allowed Plaintiff to make those appointments since it was in the purview of Plaintiff's position as Dean.

125.    Mr. Frost disagreed with a number of decisions Plaintiff made regarding those positions from a human resources perspective.

126.    Plaintiff gave roles and titles to faculty that Mr. Frost deemed not to be appropriate.

127.    For example, Plaintiff appointed a number of faculty members to Associate Dean and Assistant Dean positions that he had created and gave those individuals non-union management/confidential titles despite the fact they were union members.[55]

128.    Plaintiff paid the individuals in these new positions additional state compensation in the form of an "also receives" ("ALR") even though the positions appeared to overlap with other existing positions.[56]

129.    Plaintiff did not consult with Human Resources before he established these

_____

arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts.").   Therefore, the Court deems this asserted fact admitted.

[55] Plaintiff denies that he (as opposed to the university administration) assigned the above-stated titles and improperly attempts to add other facts.   However, the evidence he cites in support of his denial (paragraph 200 of his Declaration) does not support that denial.  *See* Dkt. No. 78, Attach. 4, at ¶ 200.   Nor is the denial supported by the next paragraph of his Declaration, which states merely that the giving of such titles is "routine[]."   *See id.* at ¶ 201.   Finally, the attempt to add facts is improper.  *See, supra,* Note 26.

[56] Plaintiff denies that these new positions in fact overlapped with existing positions but the asserted fact states only that the positions "appeared" to overlap.   *See* Dkt. No. 78 at ¶ 135.) Further, his cited evidence states only that the positions were typically meant to be part-time add-on roles rather than full-time positions with full benefits; thus, this evidence does not dispute the assertion that even a part-time role could appear to overlap with the existing positions.  *See* Dkt. No. 78, Attach. 2, at 76-77.   Therefore, the Court deems this asserted fact admitted.

25

roles.[57]

130.    Mr. Frost told Plaintiff that he could not assign roles and titles to faculty

unilaterally, but Plaintiff did not comply with his guidance.[58]

131.    Plaintiff alleges that, while he was Dean in 2018, he appointed an all-female

External Scientific Advisory Board.

132.    Dr. Dewan had no input into whether that Board would continue to meet.[59]

133.    Plaintiff organized the Board, and it met on one occasion in June 2018.

134.    Dr. Dewan never made any comments to Plaintiff about the gender of the Board

members.

135.    Dr. Dewan did not make any comments to Plaintiff about whether the Board was

_____

[57] Plaintiff disputes this asserted fact, stating that he "coordinated with Human Resources in the hiring process and met with Human Resources twice a week."  *See* Dkt. No. 78 at ¶ 136.   Yet the evidence on which Plaintiff relies for this statement does not clearly establish the statement; it establishes only that Mr. Frost had not asked Plaintiff for a position description for any positions and that Plaintiff had "formal meetings . . . [with] Mary Grace and Eric Smith and others about that issue of the college twice a week."  *See* Dkt. No. 78, Attach. 2, at 58. Moreover, the fact that Plaintiff had formal meetings with Human Resources personnel twice a week about position descriptions (in general) does not mean that he consulted with Human Resources about the relevant positions before he established them.   Therefore, the Court deems this asserted fact admitted.

[58] Plaintiff denies the asserted fact, asserting that he did not administratively assign any of these roles unilaterally, but that the offers for them came through the institution.  *See* Dkt. No. 78 at ¶ 137.   However, the evidence that he cites in support of this assertion, *i.e.* Paragraph 198 of his Declaration, does not substantiate the assertion and indeed does not appear to address it at all. *See* Dkt. No. 78, Attach. 4, at ¶ 198.   Nor does his Declaration, which states merely that the giving of such titles is "routine[]."  *See id.* at ¶ 201.   On the other hand, the evidence on which Defendant relies (Paragraph 9 of Mr. Frost's Declaration) is corroborated by Exhibits A and B to that Declaration.  *See* Dkt. No. 73, Attach. 37-38.   Therefore, the Court deems this asserted fact admitted.

[59] Plaintiff disputes this asserted fact, but the evidence he cites does not support that denial.  *See* Dkt. No. 73, Attach. 26, at ¶ 54.   Therefore, the Court deems this asserted fact admitted.

26

necessary or not, and he did not tell Plaintiff to not have the Board meet.[60]

136.    Plaintiff admitted that he never inquired as to why the Board did not continue to

meet after he was removed from the Dean position and had never found out why it did not

continue to meet.

137.    Plaintiff never made any complaints about the Board not continuing.

138.    A Diversity Committee already existed prior to Plaintiff's employment at SUNY

Upstate.

139.    After Plaintiff's removal from the position of Dean, Dr. Chin assumed oversight

responsibilities of the Diversity Committee.

140.    A current Distinguished Professor of Psychiatry and Behavioral Sciences,

Plaintiff's wife, Dr. Ma-Li Wong, is a Department of Psychiatry research faculty member who

partners with Plaintiff to conduct research.

141.    When SUNY Upstate hired Dr. Wong in 2017, she was paid a total starting salary

package of $220,000, which was comprised of $120,000 in state base salary and $100,000 in

ALR.

142.    This salary is above the median salary for psychiatry research faculty in the

---

[60] Plaintiff denies the asserted fact, arguing that a remark by Dr. Dewan that Plaintiff interpreted to be sarcastic (specifically, Dr. Dewan's remark, "Oh, do we have an external scientific advisory board?") implied that Dr. Dewan "felt the board was unnecessary and a waste of [SUNY Upstate] resources."  *See* Dkt. No. 78 at ¶ 142.   Setting aside the fact that Plaintiff's objection is based on perceived implication of a statement rather than the statement itself (*see, supra,* Note 3 of this Decision and Order), the uncorroborated deposition testimony that he cites in support of his objection flatly contradicts his subsequent deposition testimony that Dr. Dewan did not make any comments about whether the Board was necessary or not and did not tell Plaintiff not to do it or question him "in any way as to whether the meeting was necessary."  *See* Dkt. No. 78, Attach. 2, at 7-8.   As a result, Plaintiff has triggered the limited exception to the rule against making credibility determinations, as set forth in *Jeffreys v. New York*, 426 F.3d 549 (2d Cir.2005).   Therefore, the Court deems this asserted fact admitted.

27

A1175

United States according to the Association of American Medical Colleges ("AAMC") salary survey.

143.    ALR is permitted where an employee or faculty member assumes responsibility for additional duties or assignments (typically within their primary department) which may be unrelated to, or independent of, their standard work responsibilities.

144.    It is also given to research faculty members in the Psychiatry Department to assist them with starting their research at SUNY Upstate with the expectation that they will apply for and receive grant funding that will supplement their base salary.

145.    Each ALR given to employees and faculty members is reviewed and renewed on an annual basis; it is not intended to supplement that employee or faculty member's income indefinitely.

146.    Instead, the ALR portion of their salary is expected either to be reduced, eliminated, or transitioned to departmental funding within two-to-three years of their hire, unless additional duties or assignments continue.

147.    In addition to her state compensation package, Dr. Wong was also offered a $30,000 stipend from the Psychiatry Faculty Practice, Inc. ("PFP").

148.    Providing such a stipend was a bit unusual, as it is usually offered only to brand new researchers.

149.    According to SUNY Upstate's records, Dr. Wong's total starting institutional salary was more than the total starting salary of each of the 26 other research faculty members that SUNY Upstate hired between 2017 and 2020.

150.    Her salary was modified in July 2018 so that much of her ALR was absorbed into

A1176

her state base salary, such that her state base salary became $177,400 and her ALR was reduced to $45,000.

151.    Additionally, Dr. Wong's total "startup commitment" was for $5,386,668.

152.    The startup commitment promised to Dr. Wong included a promise to pay $1,400,000 to design and build her a lab, $75,000 to move the lab and Dr. Wong's specimens, and $3,911,668 for staff, equipment, and lab operating expenses.

153.    Dr. Wong's startup commitment far surpassed any other faculty member hired during the timeframe mentioned.

154.    The package promised to Dr. Wong was not only in excess of all other research faculty members at SUNY Upstate but was (to the knowledge of Senior Associate Dean Richard Gardner) unprecedented in light of the fact that Dr. Wong was not funded by any grants at the time SUNY Upstate hired her.[61]

155.    According to Dr. Schwartz, it is risky to offer a guaranteed position to an unfunded researcher.

156.    No other researcher in the Psychiatry Department has ever received as generous a compensation package as Dr. Wong.[62]

157.    Without grant funding to conduct research, the institution needs to pay for the researcher's startup costs and runs the risk that such costs may never be recouped, as the researcher has little incentive to bring in grants with a guaranteed position.

---

[61] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

[62] Plaintiff's statement that he lacks knowledge of the asserted fact is insufficient to dispute that fact for the reasons stated above in Note 8.

29

SA-30

158.    After agreeing to the offer letter of March 13, 2017, but before she began her employment, Dr. Wong asked Dr. Schwartz in October 2017 if SUNY Upstate would be willing to increase her state base salary.

159.    Dr. Schwartz asked Dr. Laraque-Arena for permission to respectfully tell Dr. Wong that she was not entitled to an increase in her state base pay, particularly because she was coming without any grants.

160.     Dr. Laraque-Arena replied that it was ultimately his decision but that her advice was to tell Dr. Wong that she had not yet begun her position so it was expected that she would abide by the agreed upon offer letter that she had signed.

161.    Dr. Schwartz followed her advice and informed Dr. Wong of this.

162.    With the knowledge that her state base salary would remain at $120,000, Dr. Wong began her employment at SUNY Upstate in December 2017.

163.    Thereafter, Dr. Wong continued to request that her state base pay be increased and her ALR decreased.

164.    In March 2019, Dr. Schwartz informed Dr. Wong that her ALR and PFP stipend were both scheduled to expire in July 2019.

165.    Also in March 2019, Plaintiff emailed Dr. Dewan regarding his wife's salary.

166.    Plaintiff made no mention of any complaints of discrimination in his March 2019 email.

167.    Dr. Dewan met with Dr. Schwartz and Dr. Wong soon after the email and discussed the issue with her.

168.    Dr. Dewan and Dr. Schwartz informed Dr. Wong during an April 2019 meeting

30

that granting her request for such a high state base salary would be inequitable for all of the other grant-funded tenured research faculty within the department.

169.   Dr. Wong still did not have any grants by that time.

170.   Dr. Wong voiced an objection to the salary structure that she had agreed to a year earlier and requested another increase in her base salary to $220,000.

171.   Dr. Dewan and Dr. Schwartz agreed to extend her $45,000 ALR through December 31, 2020, a year past its originally planned end date of July 2019.

172.   Dr. Chine subsequently approved that request on October 28, 2019.

173.   Plaintiff, as Dean of the College of Medicine, had access to the respective salaries of employees within Dr. Wong's department and was fully aware that her salary was commensurate to others in her department.

174.   Salary and startup funding data is maintained in the ordinary course of business by the SUNY Upstate College of Medicine Dean's Office.

175.   All salaries and ALRs had to be approved by the Dean of the College of Medicine every year, including when Plaintiff was Dean from 2017-2019.

176.   Plaintiff set the salary and startup packages for faculty, although the initial package for Dr. Wong specifically was set by Dr. Laraque-Arena.

177.   Plaintiff had direct knowledge that Dr. Wong received a far greater salary and startup package than any other research faculty member who was hired to work in SUNY Upstate's College of Medicine between 2017 and 2019 and that her lab was the largest lab buildout done while he was Dean.

178.   Dr. Wong did not make any complaints of discrimination during any of the

31

meetings she had regarding her salary dispute.[63]

179.   Dr. Wong did not make any complaints of discrimination to anyone at SUNY

Upstate (other than her alleged reports to her husband) before October 2019.[64]

180.   Months prior to his meeting with Dr. Dewan, in April 2019, Plaintiff had sent an

email to Dr. Corona in which he expressed his belief that Dr. Wong's salary reduction was a

punishment for "bad political moves" he had made.[65]

181.   On August 13, 2019, Plaintiff held an "urgent" meeting regarding the Department

of Anesthesia and requested that Dr. Dewan attend.

182.   Also in attendance were Dr. Corona, SUNY Upstate's Chief Medical Officer Dr.

Amy Tucker, Plaintiff's Chief of Staff Grace VanNortwick, and various Department Chairs who

---

[63] Plaintiff denies the asserted fact, stating that Dr. Wong believed she was being discriminated against based on her race and/or gender (citing his own declaration testimony as supporting evidence).   *See* Dkt. No. 78 at ¶ 188.   For the sake of brevity, the Court will not linger on whether Plaintiff possesses personal knowledge of complaints made by Dr. Wong during meetings at which he was not apparently present.   In any event, regardless of what Dr. Wong may or may not have believed, Plaintiff has not provided evidence showing that Dr. Wong made any complaints of discrimination during her meetings with the relevant individuals.   Therefore, the Court deems this asserted fact admitted.

[64] Plaintiff denies the asserted fact, stating that he informed Dr. Dewan in August 2019 that Dr. Wong was being discriminated against compared to her white male colleagues.   *See* Dkt. No. 78 at ¶ 189.   However, Plaintiff reporting alleged discrimination to Dr. Dewan does not contradict the asserted fact, which is that *Dr. Wong* did not make any complaints of discrimination. Plaintiff notably does not cite any evidence that suggests Dr. Wong asked Plaintiff to make such complaints on her behalf (or testimony by Dr. Wong herself that she made any such complaints), only that he reported that Dr. Wong was feeling discriminated against and was very unhappy about it.   *See* Dkt. No. 78, Attach. 2, at 60-61.

[65] Although Plaintiff denies the above-stated fact, the above-stated fact is supported by the record evidence cited by Defendants, *see* Dkt, No. 73, Attach. 23, at ¶ 5; Dkt. No. 73, Attach. 25, and the denial is not supported by the record evidence cited by Plaintiff, *see* Dkt. No. 78, Attach. 4, at ¶ 221.

A1180

SA-33

oversaw different areas of surgery, including Dr. Randy Green, Dr. Stephen Albanese, Dr. Chin, Dr. Robert Cooney, and Dr. Gennady Bratlavsky.

183.    During the meeting, Plaintiff expressed frustration about Dr. Dewan's interventions in his selections of appointments and spoke emphatically about the need for the Dean to have autonomy to appoint a person he thought was competent for the job of Chair of the Anesthesiology Department.[66]

184.    On September 12, 2019, Dr. Dewan met with Plaintiff and Mr. Frost and told Plaintiff that he had made the decision to remove Plaintiff as Dean effective immediately.

185.    Plaintiff informed Dr. Dewan that he was already in the process of interviewing for another job.

186.    Plaintiff was terminated from his employment as the Dean of the College of Medicine and his new title became Distinguished Professor in the Department of Psychiatry and Behavioral Sciences.

**Title VII Retaliation Claims**

187.    Plaintiff contends that he was retaliated against for reporting race discrimination on behalf of Dr. Brian Thompson.

188.    Plaintiff never made any complaints on behalf of Dr. Thompson to ODI or Human

---

[66] Although Plaintiff denies the above-stated fact, he does not cite record evidence that actually supports that denial.   *See* Dkt. No. 78, Attach. 2, at 51-53 [attaching pages "248" through "250" of his deposition transcript, stating "I don't remember the exact words that I said," "I don't recall," "I don't remember . . . being more critical of him," "I don't think I did . . . I don't recall . . . . I don't recall the exact words I said . . . I don't recall"].)   As stated above in Note 8, a lack of knowledge is not a proper basis for denying or properly disputing an asserted fact.

33

Resources that Dr. Thompson was personally being discriminated against.[67]

189.   Plaintiff also contends that he was retaliated against for reporting race discrimination on behalf of Dr. Nakeia Chambers.

190.   Dr. Dewan's relevant discussions with Plaintiff centered around requesting additional information about the new positions Plaintiff had created, whether the duties performed in the new positions overlapped with existing positions, and how the newly created positions would add value to SUNY Upstate and help it to meet its goals.[68]

191.   Dr. Dewan never specifically said anything about, or even brought up the subjects

---

[67]  Plaintiff denies this asserted fact by stating that he relayed to Dr. Dewan the "concerns" or "complain[t]," communicated to him by Dr. Thompson, that "Native Americans were underrepresented at [SUNY] Upstate and that [SUNY Upstate] should follow through with its commitment under President Laraque-Arena to appoint an Assistant Vice President for Native American Affairs."  *See* Dkt. No. 78 at ¶ 198.   As an initial matter, Plaintiff's reporting a generic concern that Native Americans were underrepresented and a desire to see a new Native American-focused administrative position established does not constitute a complaint that Dr. Thompson was being discriminated against.   In any event, the above-stated fact expressly regards complaints to *ODI or Human Resources*, and Plaintiff's own cited evidence states that he acknowledged that he did not make any complaints to ODI or Human Resources.   *See* Dkt. No. 78, Attach. 2, at 70.   Further, Plaintiff's testimony establishes that (1) Dr. Thompson did not say that SUNY Upstate was discriminating against him specifically, and (2) an alleged promise to promote Dr. Thompson to the position of Assistant Vice President for Native American Affairs was made by "the previous president," not Dr. Dewan.   *See* Dkt. No. 78, Attach. 2, at 71-73.   Because the cited evidence does not support Plaintiff's objection, the Court deems the asserted fact admitted.

[68]  Plaintiff properly disputes the portion of the fact related to whether Dr. Dewan requested that he provide organizational charts or related information; but he does not provide evidence to support a denial of the remainder of the asserted fact, because his testimony at his deposition that Dr. Dewan repeatedly asked what certain new faculty members such as Dr. Chambers "do all day" does not in any way mean that Dr. Dewan did not speak with Plaintiff about any of the three above-mentioned subjects (and indeed supports that fact).   *See* Dkt. No. 78 at ¶ 200. Furthermore, Plaintiff's assertion is an improper attempt to add facts.   *See, supra*, Note 26. Therefore, the Court deems this asserted fact admitted.

A1182

of, Dr. Chambers' gender, race, or national origin.[69]

192.    Dr. Chambers never complained to Plaintiff that she was being discriminated against based on her race.

193.    Plaintiff never made a report that anyone had discriminated against Dr. Chambers.

194.    Plaintiff never made any complaints on behalf of Dr. Chambers to ODI or Human Resources that she was being discriminated against based on her race.

195.    Plaintiff contends that he "reported race discrimination" for "numerous medical students enrolled with SUNY Upstate," but he never filed any formal complaints with ODI or Human Resources on their behalf.

196.    Plaintiff alleges that he also reported "national origin discrimination" to Defendants on behalf of "numerous medical students enrolled with SUNY Upstate."

197.    However, Plaintiff never filed any formal complaints on their behalf.

198.    The Budget Committee was for senior leadership to have a platform to discuss confidential financial matters regarding SUNY Upstate.   Committee membership was based on the functions and/or title of each member.

199.    Senior leadership members include the President, the Hospital CEO, the Hospital Chief Financial Officer, SUNY Upstate's Senior Vice President for Finance and Administration, the Dean of the College of Medicine, the President of Upstate University Medical Associates at

---

[69] Plaintiff disputes this fact, but evidence that Dr. Dewan might have asked what certain new URiM faculty members "do all day" does not constitute evidence that Dr. Dewan specifically said anything about, or brought up the subjects of, Dr. Chambers' race or gender; to the extent that Plaintiff asks the Court to interpret the evidence in that manner, such a determination is not appropriate in a statement of material facts.   *See, supra*, Notes 3 and 26.   Therefore, the Court deems this asserted fact admitted.

A1183

SA-36

Syracuse ("UUMAS"), and the President's Chief of Staff.

200.    The members of the Budget Committee directly oversee the finances of SUNY Upstate.

201.    Dr. Ann Botash is currently the Senior Associate Dean for Faculty Affairs and has been in that role since 2017.

202.    Dr. Botash testified that she did not recall being recommended to be added to the Budget Committee.[70]

203.    Plaintiff admitted that he did not speak with Dr. Botash about whether or not she wanted to be added to the Budget Committee.[71]

204.    Dr. Botash never spoke with Plaintiff or the Budget Committee about an interest in joining the Budget Committee.[72]

205.    In her position as a Senior Associate Dean of Faculty Affairs, Dr. Botash did not directly oversee finances for the college.

206.    Plaintiff testified that he does not recall when he allegedly suggested to Dr. Dewan that Dr. Botash be named to the Budget Committee; however, he also testified that Dr.

---

[70] Plaintiff admits the asserted fact and merely adds facts to say that he did, in fact, recommend to Dr. Dewan that she join the Budget Committee.  *See* Dkt. No. 78 at ¶ 213.  This attempt to add a fact (and deny an "implied fact") is improper.  *See, supra,* Note 3 and 26.  Therefore, the Court deems this asserted fact admitted.

[71] Plaintiff denies the asserted fact by stating that he "understood" from his conversation with Dr. Botash, in which they spoke about the Budget Committee being a "boys' club," that she wanted to be a member of the Committee; however, he prefaces that statement with a concession that he never actually spoke to her about whether she wanted to be a member.  *See* Dkt. No. 78 at ¶ 214.  Because Plaintiff's additional facts do not actually contradict the asserted fact, the Court deems this asserted fact admitted.  *See, supra,* notes 3 and 26.

[72] The Court deems this asserted fact admitted for the reasons discussed in Note 71.

36

Dewan made no comment regarding Dr. Botash's gender or national origin during that conversation or otherwise.[73]

207.   Plaintiff is unaware of any woman who expressed interest in becoming a member of the Budget Committee but was denied membership.[74]

208.   Plaintiff never asked Dr. Amy Tucker if she wanted to be part of the Budget Committee.

209.   Dr. Tucker herself never expressed interest in becoming part of the Budget Committee and never complained about not being a member of the Budget Committee.

210.   Dr. Tucker reported directly to Dr. Corona, who is already a member of the Budget Committee.

211.   Plaintiff created a panel to consider candidates to fill the position of Interim Chair of the Anesthesiology Department.

212.   The panel chose Dr. Zhang to fill the position, and Plaintiff presented the results Dr. Dewan in August 2019.

213.   Dr. Dewan never expressed to Plaintiff any concerns or any dissatisfaction with Dr. Zhang being chosen for the position and never said that a female doctor was not fit for the position.[75]

---

[73]  Although Plaintiff purports to dispute this asserted fact, his response states only that Dr. Dewan made no comment at all but responded with "glacial silence."  *See* Dkt. No. 78 at ¶ 217. Plaintiff's attempt to add a fact (and deny an "implied fact") is improper.  *See, supra,* Notes 3 and 26.   Therefore, the Court deems this asserted fact admitted.

[74]  The Court deems this asserted fact admitted for the reasons discussed in Note 71.

[75]  Plaintiff denies this asserted fact by stating that Dr. Dewan had pushed for a male candidate, Dr. Gorji, to be selected (as "the only person who's qualified to have that role").  *See* Dkt. No. 78 at ¶ 225.   As a threshold matter, Plaintiff's "denial" improperly relies on an implication of

SA-38

214.    Dr. Dewan "signed off" on Dr. Zhang as the panel's choice for the position and later appointed her as the permanent Chair.

215.    No complaint was ever filed regarding the selection of the position for the Interim Chair of the Anesthesiology Department.

216.    Plaintiff contends that he was retaliated against also for reporting gender discrimination to Defendants on behalf of Dr. Chambers, but he cannot "parcel out to what degree" he believed she was discriminated against based on her race versus her gender.

217.    The only basis for Plaintiff's allegation that he opposed discrimination with respect to Dr. Chambers was the fact that, when Dr. Dewan allegedly asked him what Dr. Chambers "did all day," Plaintiff responded with an account of her multiple job duties and statement that she is "very busy."[76]

218.    According to Plaintiff, Dr. Dewan also inquired as to what Dr. Thompson's (a male faculty member) responsibilities were.

219.    Plaintiff alleges that, after his demotion, he was not provided with an adequate

_____

fact (*i.e.*, that a prior endorsement of Gorji constituted a subsequent expression of dissatisfaction with Zhang) and/or improperly attempts to add a fact.   *See, supra,* Notes 3 and 27.   In any event, the "fact" that Plaintiff attempts to add is not actually supported by the portion of deposition testimony Plaintiff cites (and provides).   *See* Dkt. No. 78, Attach. 2, at 27-32. Finally, Plaintiff's own evidence shows that Dr. Dewan did not express any disagreement with the panel's selection of Dr. Zhang when it was presented to him and that he "signed off" on her appointment as the Interim Chair.   *See* Dkt. No. 78, Attach. 2, at 31-32; Dkt. No. 73, Attach. 11, at 22-23.   For all of these reasons, the Court deems this asserted fact admitted.

[76] Plaintiff purports to dispute this asserted fact, but his response does not state that his opposition consisted of anything more than his "advocacy" of Dr. Chambers (and others) when Dr. Dewan asked what such individuals "did all day" (in response to Plaintiff's attempt to appoint them to a new position in order to increase diversity).   (Dkt. No. 78, at ¶ 229.) Furthermore, the evidence cited (and provided) by Plaintiff does not controvert the above-stated fact.   Plaintiff has therefore admitted the asserted fact.

38

research support package and funding for his laboratory or reimbursement for membership fees, license fees, and academic travel.

220.   After he was demoted, Plaintiff continued to be a tenured Distinguished Research Professor in the Department of Psychiatry and received the highest State salary out of any other research faculty in that Department despite having no current grants.

221.   In January 2020, after Plaintiff requested that Dr. Schwartz provide him with a startup package for his research lab, Dr. Schwartz asked that he provide a list of startup items he believed he was entitled to so that he could bring his requests to the Dean and negotiate for the College of Medicine to provide those for him.

222.   Plaintiff never provided any such list.

223.   The denial of Plaintiff's request for the reimbursement of certain expenses (such as license fees and travel to scientific meetings) following his removal as Dean was consistent with the policy of the Psychiatry Department not to reimburse faculty members for such expenses.[77]

---

[77] Plaintiff denies the asserted fact despite relying on deposition testimony in which he admits that it is not the policy of the Psychiatry Department to reimburse faculty members for such expenses and that, at the time of denial, he was a mere faculty member (and not Dean).  *See* Dkt. No. 78, Attach. 2, at 86-89.   Instead, Plaintiff argues that he was "contractually obligated [sic] to have his expenses reimbursed" pursuant to the offer letter he received related to the Dean position, and that the expenses "were not reimbursed out of retaliation for [his] opposing discrimination."  *See* Dkt. No. 78 at ¶ 235.   This argument is based on Plaintiff's own interpretation of a document that, regardless of how it should be interpreted, has since been found by a judge of the New York State Court of Claims to be an unenforceable contract because it was not approved by the State Comptroller in accordance with N.Y. Fin. L. § 112(2)(a).  *See* Dkt. No. 81, Attach. 11.   Further, Plaintiff's argument that his expense reimbursement was denied in retaliation for opposing discrimination rather than the department's policy is pure legal argument that cannot contradict the asserted fact.   Therefore, the Court deems this asserted fact admitted.

39

224.    Plaintiff contends that, following his demotion and the filing of his complaint

with the New York State Department of Human Rights ("NYSDHR"), he was either denied or

not considered for the following positions: (1) President of SUNY Upstate; (2) SUNY

Chancellor; (3) Dean of Medicine; (4) Director of the MD-PhD program; and (5) Chair of the

Department of Psychiatry.

225.    With respect to the position of President, Dr. Dewan was appointed as the

permanent President after he interviewed with then-Chancellor Jim Malatras and a subcommittee

of the Board of Trustees, and after SUNY Upstate faculty members wrote letters of support for

him to become permanent.

226.    The Board of Trustees and the SUNY Chancellor make the final hiring decision

for the position of President.

227.    Further, the Board of Trustees appoints the SUNY Chancellor.

228.    On March 13, 2020, Dr. Amit Dhamoon was appointed Program Director of the

MD/PhD program after students of that program brought concerns to Dr. Dewan, Dr. White, Dr.

Chin, and Dean of Graduate Studies Dr. Schmitt about the existing program directors and their

effectiveness in their role.

229.    Dr. Dhamoon was a graduate of the MD/PhD program and had significant

experience mentoring students; he was selected as the top candidate by the students and was

subsequently appointed by Dr. Chin (as the Dean of the College of Medicine) based on his

having graduated from the program, his qualifications, and his reputation as an excellent mentor

to students.

230.    In September 2020, Dr. Chin made the decision to make Dr. Schwartz (who was

A1188

the Interim Chair for the Psychiatry Department) the permanent Chair because he had served as

the Interim Chair throughout the COVID-19 pandemic and was assessed (with input from faculty

within the Department) as having performed exceptionally well in that role during a very

difficult time.

231.    Dr. Dewan approved that decision, given that Dr. Schwartz had already been

performing the Interim role for four years and had done exceptionally well financially with the

Department despite the COVID-19 pandemic.

232.    SUNY Upstate had a Non-Discrimination Policy and Harassment Prevention

Policy in place while Plaintiff was Dean from July 1, 2017, through September 12, 2019.

233.    Plaintiff was trained on these policies.

234.    During his training, Plaintiff was made aware that all complaints of discrimination

and harassment were to be brought to the ODI, which investigated such complaints.[78]

235.    Plaintiff was given training specifically with respect to a supervisor's

responsibility to raise concerns of discrimination or harassment to SUNY Upstate's Chief

Diversity Officer or Affirmative Action Officer in ODI.

236.    After completing a diligent search of its records, SUNY Upstate's Office of

---

[78] Plaintiff disputes this asserted fact, citing his deposition testimony in which he stated that
there are three ways to report discrimination and harassment: (1) going straight to ODI and
launch a complaint there; (2) reporting to a supervisor who could then pass the complaint to
ODI; and (3) going straight to Human Resources.   *See* Dkt. No. 78 at ¶ 245.   However, in the
deposition testimony on which Plaintiff relies, he acknowledged that the third way was one
where "I would imagine that they would refer [the person] to [ODI]," resulting in the fact that all
three "pathways would converge at [ODI]."   *See* Dkt. No. 78, Attach. 2, at 3-5.   In addition, the
record evidence on which Defendants relied in support of the above-stated fact is itself
corroborated by other record evidence.   *See* Dkt. No. 73, Attach. 44, at ¶¶ 8-9; *see, e.g.,* Dkt.
No. 73, Attach. 47, at 10, 14-15, 20-22.)   Therefore, the Court deems this asserted fact admitted.

41

SA-42

Institutional Equity ("OIE") has found no record of Plaintiff having filed any complaints of discrimination with OIE or ODI – either on his own behalf or on anyone else's behalf – before his removal from the role of Dean on September 12, 2019.[79]

237.   Plaintiff never filed any complaints about any alleged discrimination based on his national origin.

### C.   Parties' Arguments on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law

Generally, in their motion, Defendants make three arguments.   *See* Dkt. No. 73, Attach. 73.   First, Defendants argue that Plaintiff's discrimination claims must be dismissed because he failed to exhaust his administrative remedies with respect to those claims.   *See id.* at 17-19. More specifically, Defendants argue that, although Plaintiff filed a complaint with the NYSDHR, that complaint does not assert any claim of discrimination based on Plaintiff's race or national origin, nor are any such discrimination claims reasonably related to the retaliation claims that he did assert in that complaint.   *See id.*

Second, Defendants argue that, in the alternative, Plaintiff's discrimination claims must be dismissed because (1) he is unable to establish a prima facie case of discrimination, (2) Defendants have proffered legitimate non-discriminatory reasons for removing him from the position of Dean, and (3) Plaintiff cannot show that those reasons are a pretext for

---

[79]   Although Plaintiff denies the above-stated fact, he states only that he did not file such complaints "formal[ly]" (but rather "informed" certain persons of "reports" of discrimination). *See* Dkt. No. 78 at ¶ 247.   Because the above-stated fact makes no distinction between "formal" and "informal" complaints, Plaintiff's denial (which attempts to respond to a *perceived* implication of fact and/or add facts) is ineffective.   *See, supra,* Notes 3 and 26.

discrimination.  *See id.* at 19-34.  More specifically, Defendants argue that (1) Plaintiff was not

satisfactorily performing the duties required of the Dean position as shown by the undisputed

evidence related to his inappropriate behavior; (2) his removal as Dean did not occur under

circumstances giving rise to an inference of discrimination because Plaintiff has not shown that

similarly situated employees were treated more favorably than him, he has not shown any

remarks that can be reasonably viewed as discriminatory based on his race or national origin, and

he has not shown that other circumstances suggest discrimination; (3) Plaintiff's poor conduct

during his tenure as Dean was a legitimate non-discriminatory reason for his removal; and (4)

Plaintiff cannot show that Defendants' reliance on his poor conduct is pretext for discrimination.

*See id.*

       Third, Defendants argue that Plaintiff's retaliation claims must also be dismissed because

he is unable to establish a prima facie case of retaliation with regard to any of the instances of

race, gender, or national origin discrimination that he allegedly reported, and because Defendants

have provided legitimate non-discriminatory reasons for his demotion that Plaintiff cannot show

are pretextual.  *See id.* at 34-53.  More specifically, Defendants argue that (1) Plaintiff cannot

show that any of the alleged reports of discrimination he made constitute protected activity

because they represent mere efforts to promote diversity rather than actual reports or opposition

to any discrimination against specific individuals; (2) he cannot show that there is a causal

connection between his alleged protected activities and his removal as Dean because most of the

comments, conversations, or incidents Plaintiff relies upon for causation occurred months before

his demotion or do not implicate any discrimination, he has not shown that any similarly situated

employees were treated differently, and there is no direct evidence of retaliation; (3) he cannot

43

show that he was retaliated against by being denied or not considered for other positions at

SUNY Upstate or within the SUNY system because there is no evidence to support a finding that

a causal connection existed between the filing of his NYSDHR complaint and such failure to

hire; and (4) for many of the same reasons discussed earlier with regard to his discrimination

claims, Plaintiff cannot show that the legitimate non-discriminatory reasons provided by

Defendants for the adverse actions he suffered were a pretext for discrimination.   *See id.*

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion for summary judgment, Plaintiff makes

three arguments.   *See* Dkt. No. 78, Attach. 10.   First, Plaintiff argues that he exhausted his

administrative remedies related to his Title VII discrimination claims because those claims are

reasonably related to the retaliation claims he asserted in his NYSDHR complaint.   *See id.* at 11-

13.   More specifically, Plaintiff argues that his NYSDHR complaint alleged institutional

discrimination based on sex, race/color, and national origin and that such an allegation was

sufficient to raise the Title VII direct discrimination claims he now asserts.   *See id.*

Second, Plaintiff argues that he has shown that he can establish a prima facie case of

discrimination based on his race and national origin and that Defendants' reasons for removing

him as Dean are merely pretextual.   *See id. Id.* at 13-18.   More specifically, Plaintiff argues that

(1) he is a member of a protected class; (2) he was qualified for the position of Dean based on his

credentials and experience; (3) he was subjected to an adverse employment action in the form of

being demoted from the position of Dean; (4) his demotion occurred under circumstances giving

rise to an inference of discrimination because he was the first Hispanic/Latino Dean of the

44

College of Medicine and was demoted not long after the completion of the LCME accreditation

process (which in part hinged on diversity metrics); and (5) Defendants' reasons for his demotion

are pretextual because, viewing the evidence in the light most favorable to him, a reasonable

factfinder could conclude that "Defendant demoted [him] as the result of his well-documented

efforts to address the lack of diversity at SUNY Upstate."   *See id.*

Third, Plaintiff argues that he has sufficiently shown that he can establish a prima facie

case of retaliation.   *See id.* at 18-36.   More specifically, Plaintiff argues as follows: (a) he

engaged in various actions constituting protected activity including (i) opposing "Defendants'

deeply entrenched culture of discrimination and its resistance to diversity," "champion[ing] the

rights of minorities," making "great efforts to recruit minority faculty," and explaining to Dr.

Dewan why certain new positions held or to be held by certain minority faculty were warranted,

which resulted in "multiple verbal comments" from Dr. Dewan "severely questioning the 'need

for' various minority professors and the extent of their contributions to the University" such as

asking what certain minority professors "d[o] all day" or "do[] in diversity, (and sarcastically

asking "oh, do we have an External Scientific Review Board?" when Plaintiff discussed that

Board's provisionally scheduled second meeting); (ii) supporting SUNY Upstate's Diversity

Committee and explaining to Defendants why a female Hispanic neurosurgeon was leading that

Committee; (iii) notifying Defendants regarding concerns that the Budget Committee was not

gender-balanced and recommending that women be included; (iv) raising concerns that certain

Black students were not being adequately prepared to the Dean of Student Affairs and then

creating the position of Director of College of Medicine Career Development to remedy those

concerns and referring a Black woman as a candidate for appointment to that role, and receiving

45

A1193

a "protest" from the Dean of Student Affairs for doing so; (v) creating a position for a part-time Assistant Dean for Cultural Competence and offering that position to a Black male despite "aggressive objections" by Dr. Dewan as to why another position related to Diversity and Inclusion was required; (vi) making efforts to search for and appoint diverse individuals for various Chair appointments during his tenure as Dean; and (vii) reporting to Dr. Dewan that he felt that Defendants' decision to lower his wife's salary meant she might have a claim under Title VII or Title IX; (b) Defendants were aware of this protected activity; (c) he suffered an adverse employment action in the form of being removed from the position of Dean; and (d) there is a causal connection between his protected activities and his demotion because (i) Associate Vice President for Human Resources Mr. Frost conceded that Plaintiff's intent to promote diversity might have been a factor in his demotion; (ii) he was given no notice of the demotion; (iii) statements made at a Council meeting following his demotion suggest that performance issues were not the cause of his demotion and that he was a "barrier" to Defendants continuing their discriminatory policies; (iv) he was never provided any negative feedback on his job performance; and (v) there is a temporal proximity between his various efforts to promote diversity and oppose discrimination and his demotion in September 2019.   *See id.*

### 3. Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiff's opposition, Defendants make four arguments.   *See* Dkt. No. 81.   First, Defendants argue that Plaintiff failed to exhaust his administrative remedies as to his Title VII discrimination claims, specifically arguing that the case upon which Plaintiff primarily relied for his counterargument (*i.e., Dixit v. City of New York Dept. of Gen. Servs.*, 972

A1194

SA-47

F. Supp. 730, 734 [S.D.N.Y. 1997]), is inapplicable to the circumstances here.  *See id.* at 7-8.

Second, Defendants argue that, in the alternative, Plaintiff has failed to establish a prima facie case of Title VII discrimination and cannot show that the non-discriminatory reasons that Defendants offered are pretextual.  *See id.* at 8-14.   More specifically, Defendants argue that (1) Plaintiff has not made any concrete argument regarding the question of whether he was satisfactorily performing his job as Dean despite the evidence showing that he was not; (2) he cannot show that his removal as Dean occurred under circumstances raising an inference of discrimination and indeed has not provided any argument as to why he can other than pointing to the fact he is of a certain race and national origin and was mistreated; and (3) Plaintiff cannot show that Defendants' legitimate non-discriminatory reasons for his removal were pretextual because he has not pointed to any evidence to support that that notion.  *See id.*

Third, Defendants argue that Plaintiff has not shown that he can establish a claim of retaliation.  *See id.* at 14-26.   More specifically, Defendants argue that (1) Plaintiff has not shown that he engaged in any protected activity because the various activities he has alleged do not constitute opposition to discrimination, but mere advocacy for certain professors or promotion of greater diversity, and he could not have had an objectively good faith belief that his wife was being discriminated against on the basis of her race, national origin, or gender given evidence she was hired with compensation and benefits better than many of the other faculty at the College of Medicine and had a salary commensurate with other Department of Psychiatry faculty; (2) Plaintiff has not shown that there is a causal connection between his alleged protected activity and his removal as Dean because there is no direct evidence to support such a finding and, with the exception of alleged concerns he raised regarding a lack of diversity at an

47

SA-48

August 2019 meeting with Dr. Dewan and a discussion related to his wife's salary reduction with Dr. Dewan in August 2019, all the activities he alleges occurred months before his removal; and those two August activities are insufficient to suggest retaliation was the but-for cause of that removal; and (3) Plaintiff has not shown that Defendants' reliance on evidence of Plaintiff's unsatisfactory behavior was a pretext for retaliation because his mere disagreement with Defendants' evaluation of his performance is insufficient to meet his burden on this issue.  *See id.*

Fourth, Defendants argue that Plaintiff has abandoned his retaliation claims to the extent they are based on an adverse action of not being considered or hired for certain other high-ranking positions or provided with a research support package and funding following his removal as Dean because he did not raise any counterarguments in his response memorandum of law as to those claims.  *See id.* at 26.

## II. LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[80]  As for the materiality requirement, a dispute of fact is

---

[80] As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

48

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."   *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ.

P. 56(a), (c), (e).[81]

      Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute.   Of course, when

a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there

has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted

automatically."   *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).   Rather, as indicated

above, the Court must assure itself that, based on the undisputed material facts, the law indeed

warrants judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v. Comprehensive*

*Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.).   What the non-

---

[81] Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

A1197

movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[82]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, No. 07-CV-0279, 2009 WL 3672105, at *1 n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, No. 09-CV-0722, 2009 WL 2473509, *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[82] *See*, *e.g.*, *Beers v. GMC*, No. 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, *27-*31 (N.D.N.Y. Mar. 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, No. 02-CV-0745, 2004 WL 3691343, *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

A1198

SA-51

## III. ANALYSIS

**A.      Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Discrimination Claims**

After careful consideration, the Court finds that Defendants are entitled to summary judgment on Plaintiff's discrimination claims for the reasons stated in Defendants' memoranda of law.   *See, supra,* Parts I.C.1 and I.C.3 of this Memorandum-Decision and Order.   To those reasons, the Court adds the following analysis.

### 1. Exhaustion of Administrative Remedies

"Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency."   *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (quoting 42 U.S.C. § 2000e-5).   "An exception to the exhaustion requirement may be made for claims not formally asserted before the agency if they are 'reasonably related' to those properly filed with the agency."   *Moore v. DeJoy*, 600 F. Supp. 3d 332, 343 (S.D.N.Y. 2022) (citing *Williams*, 458 F.3d at 70).   "There are three types of claims which may be considered 'reasonably related' for purposes of satisfying the exhaustion requirement: (1) claims that 'fall within the scope of the [administrative agency's] investigation which can reasonably be expected to grow out of the charge of discrimination;' (2) claims that allege retaliation for filing an administrative charge; and (3) claims that allege 'further incidents of discrimination carried out in the same manner alleged in [the administrative] charge.'"   *Wilson-Richardson v. Reg'l Transit Serv., Inc.*, 948 F. Supp. 2d 300, 305 (W.D.N.Y. 2013) (quoting *Carter v. New Venture Gear, Inc.*, 310 Fed. App'x 454, 455 (2d Cir. 2009) (summary order)).   "In examining what issues would be expected to

51

'grow out of the charge of discrimination,' the Court looks to 'the factual allegations made in the . . . charge itself,' and determines 'whether the complaint filed with the [administrative agency] gave that agency adequate notice to investigate discrimination on both bases.'"  *Id.* (quoting *Williams*, 458 F.3d at 70).

In his charge filed with the NYSDHR, Plaintiff asserted that Defendant SUNY Upstate engaged in "unlawful discriminatory practices relating to employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) on the basis of my opposition to discrimination."  *See* Dkt. No. 73, Attach. 8, at 2.   In addition, he provided facts regarding his "opposition to gender, race, and national origin discrimination," all of which related to his alleged advocacy on behalf of various professors who were female, minorities, or both, and his alleged opposition to decisions or practices by others at Defendant SUNY Upstate that he considered discriminatory against those individuals, as well as facts related to "actions taken against me in retaliation for my opposition to discrimination."  *See* Dkt. No. 73, Attach. 8, at 4-10.   However, nowhere in this charge does Plaintiff allege that he was directly discriminated against on the basis of his own race or national origin; he does not even provide allegations related to his own race and national origin, much less allege that any of the actions taken against him were because of those characteristics.   *See id.* at 2-13.

In the document entitled Final Investigation Report and Basis of Determination, the NYSDHR summarized Plaintiff's positions as that he was "demoted in retaliation for opposing discrimination when he made Respondent aware of discrimination as it relates to women and minority staff and students," and noted the following when discussing the allegations made in those proceedings:

52

> It should be further noted that Complainant is male and so has the same protected characteristic of those whom Complainant maintains received more favorable treatment, and Complainant was hired into the position(s) in question despite his race/color and/or national origin.   However, Complainant is alleging that due to his engagement in protected activity, he became a target of Respondent.

*See* Dkt. No. 73, Attach. 9, at 9.

This statement shows that, although the NYSDHR may have briefly examined whether there was any obvious basis to consider direct discrimination against Plaintiff related to his own protected traits, it ultimately acknowledged that Plaintiff was alleging only that he was targeted not because of those traits but rather because of his protected activity, *i.e.*, reporting discrimination against others.

The remainder of the determination discusses Plaintiff's alleged protected activity of reporting or opposing various instances of discrimination against other faculty and students and the parties' arguments related to those allegations.   *See* Dkt. No. 73, Attach. 9, at 8-11. Although this determination references the fact that Plaintiff is "male, Hispanic, [and] Brazilian," it never indicates that there was any suggestion of discrimination against Plaintiff personally as a result of those characteristics, nor does it assess whether any such direct discrimination occurred; it assesses only whether Plaintiff experienced retaliation for reporting discrimination against others.   *See id.*

Based on the above evidence, the Court finds that Plaintiff's claims of direct discrimination based on his race and national origin are not reasonably related to the claims of retaliation he asserted in the NYSDHR complaint.   Given the complete lack of any allegations regarding direct discrimination, it cannot be said that the complaint provided adequate notice to

the NYSDHR to investigate any such direct discrimination.   Indeed, the NYSDHR's

determination suggests that it was of the opinion that Plaintiff's complaint did not assert any such

claims, nor did it investigate or address any such potential claims other than its brief notation that

Plaintiff was hired for the relevant positions despite Defendants' knowledge of his race and

national origin; such a passing comment is insufficient to suggest that the NYSDHR had

adequate notice that Plaintiff intended to assert any type of direct discrimination claim.   Further,

although the NYSDHR was made aware of Plaintiff's gender, race, and national origin at some

point during the proceedings (as evident from its notation of those characteristics in its

determination), it is telling that Plaintiff did not include such facts in his charge and did not

include any allegations regarding any instances of discrimination against him based on his own

race or national origin.

Plaintiff's reliance on *Dixit v. City of New York Dep't of Gen. Servs.*, 972 F. Supp. 730

(S.D.N.Y. 1997), is unavailing.   Not only did the plaintiff in that case check boxes indicating the

presence of discrimination based on religion, national origin, and age despite the fact he

discussed only retaliation in his EEOC complaint (a circumstance that is not present here, given

that Plaintiff never mentioned discrimination of any sort against himself nor did he specify his

race or national origin in the charge), but the EEOC in that case did conduct an investigation into

discrimination as well as retaliation based on the content of the plaintiff's complaint.   *See Dixit*,

972 F. Supp. at 734.   Here, the NYSDHR made no such interpretation of Plaintiff's complaint,

nor did it conduct an investigation of any discrimination claims.

It is also notable that, in making his argument in opposition, Plaintiff relies almost solely

on the somewhat vague language used in the NYSDHR's short Determination After

54

Investigation, but he does not mention at all the content of the Final Investigation Report and Basis of Determination.   *See* Dkt. No. 78, Attach. 10, at 11-13.   Although the stilted and ungrammatical language of the relevant portion of the Determination After Investigation could potentially be interpreted as implicating a claim of direct discrimination in the abstract, when that portion is considered in conjunction with the document that explains the basis of that determination, it is abundantly clear that the NYSDHR found no such claim.

Based on the evidence presented, Plaintiff failed to exhaust his administrative remedies related to any direct discrimination claims (as opposed to his retaliation claims based on protected activity related to reporting or opposing discrimination against other individuals). Therefore, the Court dismisses Plaintiff's First and Second Claims.

### 2. Merits of Plaintiff's Discrimination Claims

In the alternative, even if the Court were to construe Plaintiff's discrimination claims as having been properly exhausted, the undisputed evidence shows that he would be unable to establish discrimination.   To establish a prima facie case of discrimination, a plaintiff must show that "'(1) []he is a member of a protected class; (2) []he is qualified for h[is] position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (quoting *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 [2d Cir. 2023]).   "Once the plaintiff has established a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its adverse action." *Bart*, 96 F.4th at 570 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 [2d Cir. 2015]).   "Upon that showing, the burden then shifts back to

55

the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id.*
(quoting *Vega*, 801 F.3d at 83).   At this third step, "a plaintiff may, but need not, show that the
employer's stated reason was false, and merely a pretext for discrimination; a plaintiff my also
satisfy this burden by producing other evidence indicating that the employer's adverse action was
motivated at least in part by the plaintiff's membership in a protected class." *Id.* at 576.

Notwithstanding the other elements of the prima facie test, Plaintiff's claims fail to clear
the hurdle of showing that his demotion occurred under circumstances that give rise to an
inference of discrimination.   The only argument Plaintiff offers regarding this element is that he
was the first Latino/Hispanic Dean and was hired only so that Defendants could use him as a
diverse figurehead in order to obtain accreditation for the College of Medicine, a fact that he
asserts is evident given that he was demoted after Defendant SUNY Upstate had secured that
accreditation.   *See* Dkt. No. 78, Attach. 10, at 16-17.   However, the fact that Defendant SUNY
Upstate had never had a Latino/Hispanic Dean before hiring Plaintiff in that role does not in any
sense raise a reasonable inference of discrimination against Plaintiff as a Latino/Hispanic
individual.   After all, regardless of whether any past Dean had been Latino/Hispanic,
Defendants made the choice to hire Plaintiff as Dean and he served in that role for more than two
years.   Nor could a reasonable factfinder accept Plaintiff's theory that Defendants used his
protected characteristics to obtain accreditation and then "tossed him aside" in an act of
discrimination based on those characteristics.   Plaintiff was removed from the Dean position on
September 12, 2019, and the LCME did not make the accreditation decision until October 15-17,
2019.   *See* Dkt. No. 73, Attach. 21; Dkt. No. 73, Attach. 26, at ¶ 46.)   The College of Medicine
therefore had not actually secured reaccreditation at the time Plaintiff was demoted.   More

56

importantly, even if it could be inferred that Defendants had hired Plaintiff as Dean in order to benefit from Plaintiff's protected characteristics in the accreditation process (conduct that by itself is not actionable given that *hiring* an individual based on their protected characteristics is not an adverse action), there is no such corresponding inference that he was later demoted because of his race or national origin.

It is undisputed that Dr. Dewan became interim President of the College of Medicine in late December 2018, and that Plaintiff was made aware in January 2019 that SUNY administration had instructed Dr. Dewan that his "highest priority" as interim President was "to remove [Plaintiff] from the Dean position."  *See* Dkt. No. 73, Attach. 26, at ¶¶ 16-18.   It is further not disputed that Dr. Dewan had been asked by then-President Dr. Laraque-Arena in the fall of 2018 to assume the responsibilities of Dean under a different title because Dr. Laraque-Arena was "unhappy" with Plaintiff's performance in that role, "but did not want to terminate Plaintiff, however, due to her strong desire to maintain the appearance of stability for [SUNY Upstate's] College of Medicine."  *See* Dkt. No. 73, Attach. 26, at ¶ 12.   LCME did not conduct its site review of the College of Medicine until April of 2019.  *See* Dkt. No. 73, Attach. 16, at ¶ 29.)   The evidence therefore shows that SUNY administrators wanted to remove Plaintiff (based on Dr. Laraque-Arena's unhappiness with his performance) while the accreditation process was still ongoing, a fact that undermines his interpretation that they were holding him out as proof of diversity within the College of Medicine only to demote him once accreditation was secured.   As a result, and in the absence of any other evidence to suggest that his demotion was related to his race or national origin, the fact that Plaintiff was demoted after the substantive work of the reaccreditation process was completed does not by itself raise an inference of

57

SA-58

discrimination.

Moreover, and most importantly, Plaintiff has offered no evidence to suggest that any of the relevant decisionmakers or others at Defendant SUNY Upstate possessed discriminatory intent related to Plaintiff's race and/or national origin.   Although he cites language from various case law regarding the fact that plaintiffs in such cases must generally rely on "bits and pieces of information to support an inference of discrimination," he presents no such bits and pieces of evidence to the Court to support his argument.   *See* Dkt. No. 78, Attach. 10, at 16-17.   Without any admissible record evidence tying Plaintiff's demotion to conduct that rationally suggests a discriminatory motive, Plaintiff cannot succeed on his claims.

For each of the above-stated alternative reasons, the Court finds that Plaintiff has not shown that he could establish a prima facie case of discrimination under Title VII even if it were to find that he had exhausted his administrative remedies as to that claim.[83]   The Court therefore grants summary judgment to Defendants on Plaintiff's First and Second Claims.

---

[83] The Court also finds that Plaintiff's discrimination claims would be dismissed in the alternative because he has not shown that Defendants' proffered non-discriminatory reasons for his demotion (*i.e.*, the various performance issues discussed in Part I.B of this Memorandum-Decision and Order) were a pretext for discrimination.   In his opposition memorandum of law, Plaintiff's only argument regarding pretext is that "Defendant demoted Plaintiff as a result of his well-documented efforts to address the lack of diversity at SUNY Upstate."   *See* Dkt. No. 78, Attach. 10, at 17-18.   This argument more appropriately applies to his retaliation claims and does not support his claim that Defendants were motivated to demote him based at least in part on his race and/or national origin.   *See Buon v. Spindler*, 65 F.4th 64, 82-83 (2d Cir. 2023) (noting that "[a]n action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action").

58

B.      **Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Retaliation Claims**

After careful consideration, the Court finds that Defendants are entitled to summary judgment on Plaintiff's retaliation claims for the reasons stated in Defendants' memoranda of law.   *See, supra,* Parts I.C.1 and I.C.3 of this Memorandum-Decision and Order.   To those reasons, the Court adds the following analysis.

"To present a prima facie case of retaliation under [Title VII], a plaintiff must show that (1) '[]he participated in an activity protected by Title VII,' (2) this 'participation was known to h[is] employer,' (3) the employer 'subjected h[im] to a materially adverse' action thereafter, and (4) a 'causal connection' existed between the 'protected activity' and the adverse action."   *Moll v. Telesector Resources Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 [2d Cir. 2010]).   As with discrimination claims, once a plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, non-retaliatory reason for the adverse actions(s), after which the burden shifts back to the plaintiff to show that those reasons are pretextual.   *See King v. Aramark Servs. Inc.*, 96 F.4th 546, 565 (2d Cir. 2024) ("Title VII retaliation claims are also evaluated under the *McDonnell Douglas* framework." (citing *Kaytor*, 609 F.3d at 552)).   Unlike discrimination claims, however, causation on a Title VII retaliation claim requires a plaintiff to establish that "retaliation would not have occurred in the absence of the alleged wrongful actions or action of the employer," *i.e.*, that retaliation was the but-for cause of the adverse action as opposed to merely a motivating factor.   *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Defendants do not appear to dispute that they were *aware* of the various conduct that

Plaintiff asserts constituted protected activity or that he was subjected to a materially adverse

action (in the form of removal from the position of Dean and loss of the related advantages of

that position).   Instead, they argue that Plaintiff's actions did not actually *constitute* protected

activity and that he has not raised a genuine dispute of material fact regarding the existence of a

causal connection between such activity and the adverse action.


### 1. Protected Activities

"[I]f an employee -- even one whose job responsibilities involve investigating complaints

of discrimination -- actively 'support[s]' other employees in asserting their Title VII rights or

personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of h[is]

employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause."

*Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal

Serv.*, 899 F.2d 203, 209 [2d Cir. 1999]).   To show that he has engaged in protected activity, a

plaintiff "need not establish that the conduct [he] opposed was actually a violation of Title VII,

but only that [he] possessed a good faith, reasonable belief that the underlying employment

practice was unlawful under the statute."   *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir.

2013).   "Whether a belief is reasonable is an objective standard that is 'to be evaluated from the

perspective of a reasonable similarly situated person.'"   *Meagher v. State Univ. of New York*, No.

17-CV-0903, 2020 WL 5504011, *17 (N.D.N.Y. Sept. 11, 2020) (Suddaby, C.J.) (quoting *Kelly

v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 16-17 [2d Cir. 2013]).

Complaints that are so vague or generalized that the employer "could not reasonably have

understood that [the plaintiff] was complaining of 'conduct prohibited by Title VII'" do not

suffice.   *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)

(quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 [2d Cir. 1998]).

Merely advocating for a promotion or other such benefits on behalf of a person who falls

under a protected status is insufficient to constitute a protected activity; instead, there must be at

least some evidence to suggest that the plaintiff complained of discrimination (or other conduct

prohibited by Title VII) *on behalf of* the relevant individual(s) in a manner that the employer

could reasonably understand that prohibited conduct *was being reported*.   *Brown v. Xerox*

*Corp.*, 170 F. Supp. 3d 518, 526-27 (W.D.N.Y. 2016) (citing *Rojas*, 660 F.3d at 108).


### a. Plaintiff's Efforts to Promote Diversity

Plaintiff first argues that he engaged in protected activity through various efforts to

promote diversity in the Dean's Office and the College of Medicine.   These included

"champion[ing] the rights of minorities" and making "great efforts to recruit minority faculty,"

which he claims resulted in "multiple verbal comments" by Dr. Dewan "severely questioning the

'need for' various minority professors and the extent of their contributions to the University."

*See* Dkt. No. 78, Attach. 10, at 21.   These questions included inquiries into what a Native

American professor "does all day," what a Hispanic female professor "does in diversity," and

why there was a need for a Director of Multicultural Affairs, a position that was filled by a Black

individual.   *See id.*   Plaintiff states that, in response to these questions, he explained to Dr.

Dewan what those individuals did and why they were important.   *See id.*

Plaintiff's actions of merely explaining the roles that certain faculty fulfilled, explaining

why diversity was important, and mentioning to Dr. Dewan that the Native American professor

A1209

had been told he would be promoted but that Defendant SUNY Upstate had failed to do so do not rise to the level of protected activities.   Nor does the fact that these conversations regarded individuals who are members of protected classes or were viewed by Plaintiff as promoting diversity elevate them to complaints about activity prohibited by Title VII.   Plaintiff's explaining what certain professors do or that they had been determined to be the choice for promotion are simply too generalized for Defendants to have reasonably understood that Plaintiff was reporting discriminatory conduct, especially because there is nothing in Dr. Dewan's questioning of Plaintiff about these individuals that a reasonable factfinder can construe as being discriminatory; asking what certain professors accomplish in order to determine whether the positions they hold are necessary is simply not discriminatory on its face, and the fact that Plaintiff may have interpreted those questions in a different manner does not change that fact. As was noted above, although conduct reported need not actually be a violation of Title VII so long as the plaintiff believed it to be a violation, the relevant assessment is one of objective reasonableness; and here Plaintiff's asserted interpretation is simply not objectively reasonable on the record presented.   Because there is nothing in Plaintiff's responses to Dr. Dewan's questions that was specific enough to lead to a rational finding that Dr. Dewan should have reasonably understood that Plaintiff was reporting conduct that violates Title VII, these asserted actions do not constitute protected activity.

### b. Plaintiff's Creation of an External Scientific Advisory Board

Plaintiff argues that his action of appointing an all-female External Scientific Advisory Board to "combat the underrepresentation of female employees" is a protected activity.   He

62

states that, when he discussed an upcoming second meeting of that Board with Dr. Dewan, Dr. Dewan "replied with sarcasm 'Oh, do we have an External Scientific Advisory Board?'" and the Board did not meet after Plaintiff was demoted, and it was ultimately disbanded.  *See* Dkt. No. 78, Attach. 10, at 22-23.

This is insufficient evidence to establish a protected activity.   Whether or not the Court must accept Plaintiff's interpretation of Dr. Dewan's purported comment as sarcastic, it is undisputed that Plaintiff did not raise any objections to that comment or complain to Dr. Dewan that his words or actions were discriminatory.   Even if Plaintiff believed Dr. Dewan's comment was hostile to female diversity, Plaintiff did not make that belief known to Dr. Dewan (or, apparently, anyone else) and therefore did not report any discrimination related to this instance. Appointing the Board, or merely talking about it and its merits or functioning, is not a protected activity.

### c. Plaintiff's Work with the College of Medicine Diversity Committee

Plaintiff next argues that he engaged in protected activity because he "strongly supported a Diversity Committee" within the College of Medicine; and, in response to being "aggressively questioned" why a female Hispanic neurosurgeon was in the lead role of that Committee, Plaintiff "continuously affirmed the neurosurgeon's qualifications and the work she did to advance the missions of the Committee to Defendants."   *See* Dkt. No. 78, Attach. 10, at 23-24. As with Plaintiff's explanations regarding what role certain professors performed within their various positions (discussed previously), Plaintiff's explaining why this individual held the lead role in the Committee was too vague and generalized to have led Defendants to reasonably

63

understand that Plaintiff might have been intending to report discriminatory conduct.   This conduct also therefore does not constitute a protected activity.

### d. Plaintiff's Reports of Gender Imbalance on the Budget Committee

Plaintiff argues that he "acted in opposition to discrimination in May and June 2019, when he notified Defendants about his concern regarding the gender-imbalance of the Budget Committee and recommended that women be included."   *See* Dkt. No. 78, Attach. 10, at 24-25.

As has been discussed, a plaintiff "need not establish that the conduct [he] opposed was actually a violation of Title VII, but only that [he] possessed a good faith, reasonable belief that the underlying employment practice was unlawful under the statute."   *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013).   Title VII makes it unlawful for an employer to (a) "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," or (b) "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a).

The employment practice that Plaintiff asserts he was reporting was the failure to include women on the Budget Committee.   However, inclusion on the Budget Committee does not constitute a separate job for which an individual can be "hired," nor does the omission of any individuals from the Budget Committee appear otherwise related to the compensation, terms,

64

conditions, or privileges of any women faculty, including those that Plaintiff specifically names

as individuals who should be invited to join the Budget Committee.   Plaintiff does not dispute

evidence in Dr. Dewan's declaration that indicates the following about the Budget Committee:

(1) "[t]he purpose of the Budget Committee was for senior leadership to have a platform to

discuss confidential financial matters regarding [SUNY Upstate]," and senior leadership includes

"the President, the Hospital CEO, the Hospital Chief Financial Officer, [SUNY Upstate's] Senior

Vice President for Finance and Administration, the Dean of the College of Medicine, the

President of UUMAS, and the President's Chief of Staff"; (2) "Committee membership was

based on the functions/title of each member"; and (3) the positions of the female administrators

that Plaintiff suggested for inclusion on the Budget Committee -- Chief Medical Officer and

Senior Associate Dean of Faculty Affairs and Faculty Development – "did not justify their

inclusion in the Budget Committee as they did not directly deal with the finances of [SUNY

Upstate]."   *See* Dkt. No. 73, Attach. 26, at ¶ 55.

  Because inclusion on the Budget Committee was inherent and, as far as can be gleaned

from the evidence, automatic for only certain specific job titles, the failure to include individuals

in other job titles (particularly job titles that have no relevant tie to financial affairs) facially does

not constitute a prohibited employment practice under the express terms of Title VII, no matter

the genders of the individuals involved.   Because Plaintiff himself was a member of the Budget

Committee by virtue of being Dean of the College of Medicine and would have had some

awareness of its structure and purpose as a result, it was not reasonable for him to believe that

reporting a gender imbalance on the Budget Committee merely because all the persons holding

the specified positions included on that Committee were male at the relevant time constituted a

A1213

challenge of an employment practice prohibited by Title VII.[84]   Plaintiff's actions here again

essentially amount to a nebulous effort to "promote diversity" that is insufficient to constitute a

protected activity.

### e. Plaintiff's Advocating for Black Medical Students

Plaintiff argues that he further engaged in protected activity by (1) reporting to the Dean

of Student Affairs that various Black medical students were not being adequately prepared

related to career development, (2) reporting concerns regarding these students' experiences and

referring the Dean of Student Affairs to Defendant SUNY Upstate's Organizational Training and

Development Office to receive an evaluation and feedback, and (3) attempting to create a new

position of Director of College of Medicine Career Development to oversee career development

plans of College of Medicine Students (particularly those from diverse backgrounds) and

referring a Black female individual to the search committee for that position, which subjected

him to "protest" from the Dean of Student Affairs, who did not approve of the creation of that

position.   *See* Dkt. No. 78, Attach. 10, at 26-27.

As an initial matter, merely creating an administrative position with the intent to improve

career development for students from diverse backgrounds does not constitute a protected

activity for the reasons already discussed related to previous activities; efforts to promote

diversity in the abstract do not reasonably constitute complaints of discriminatory employment

---

[84]  Notably, Plaintiff does not assert that he held any belief that the hiring of any of the
individuals into positions that were on the Budget Committee -- all of whom happened to be
males at the relevant time -- was somehow discriminatory, only that other administrative titles
should be added to the Budget Committee in order to create gender diversity because those titles
were currently being held by women.

A1214

practices.

Moreover, as to Plaintiff's reporting of concerns regarding his belief that certain Black students were not being adequately prepared for the next stages of their career paths, this activity also does not involve an objectively reasonable belief that he was reporting discrimination prohibited by Title VII.   The evidence upon which Plaintiff relies (his own declaration) states that "I referred African-American medical students from SUNY Upstate to a colleague of mine at a highly-ranked, Ivy League-affiliated, national institution so that they could negotiate to do external rotations there," and that, after each of those African-American medical students contacted that institution, "I received phone calls expressing serious concerns about how unprepared the SUNY Upstate Medical students were and how they seemed to be 'lost' and not well mentored in terms of their career development."   *See* Dkt. No. 78, Attach. 4, at ¶¶ 67-68. Plaintiff does not state that he referred any non-Black medical students to this institution or that he failed to receive the same types of phone calls regarding any non-Black medical students' preparedness; the fact that these students were not sufficiently prepared does not raise a reasonable suggestion of discrimination unless there is evidence suggesting that non-Black students were better prepared by Defendants' career services resources.

Plaintiff states that, because the Dean of Student Affairs did not seem to take his concerns about these students' lack of preparedness seriously, he was concerned "that there was a discriminatory motive behind Student Affairs' actions."   (Dkt. No. 78, Attach. 4, at ¶¶ 70-72.) Plaintiff has offered no evidence to substantiate or even suggest that it was only Black students, or minority students, who had this perceived lack of preparedness, or to support his belief that this lack of preparedness of a few students he referred to one institution represented

67

discriminatory conduct on the part of Student Affairs, or even that Student Affairs' (in Plaintiff's

opinion) insufficient response to his concerns was based on a discriminatory motive.[85]   Without

some indication that Plaintiff had reason to believe that non-Black students were being better

prepared in terms of career development, his belief that he was reporting discriminatory conduct

prohibited by Title VII is not objectively reasonable.

      Based on his interaction with the Dean of Student Affairs, Plaintiff also "referred the

Dean of Student Affairs to the Defendant SUNY Upstate's Organizational Training and

Development Office to receive standardized feedback by way of a '360-evaluation,' which

usually includes both numerical feedback and written comments."   *See* Dkt. No. 78, Attach. 4, at

¶ 72.   It is not clear what Plaintiff specifically reported to this Office when he made that referral,

only that the Office "only recommended numerical feedback because they were concerned that

any written comments could include the accusations of racism or discrimination and, if they did,

the written comments would be required to be reported to the Defendant SUNY Upstate's

Department of Human Resources and potentially subject SUNY Upstate to liability."   *See* Dkt.

No. 78, Attach. 4, at ¶ 73.   Because the only "accusations of racism or discrimination" that

---

[85]  Plaintiff does state in his declaration that Student Affairs "has been plagued by multiple
complaints of discrimination," and quotes from a social media post regarding one such complaint
of race discrimination that was publicly filed by a former employee with the NYSDHR in 2019.
*See* Dkt. No. 78, Attach. 4, at ¶¶65-66.   Yet Dean of Student Affairs Dr. Julie White clarifies in
an affidavit that there were only two or three such complaints filed while Plaintiff was Dean and
that when the complaint referenced in Plaintiff's declaration was filed, Plaintiff, who was Dr.
White's supervisor, "was very supportive[] [and] offered to assist [her] in any way he could,
assuring [her] that he thought that the complaint was not legitimate."   *See* Dkt. No. 81, Attach.
7, at ¶ 11.   The Court also notes that evidence submitted with Defendants' reply memorandum of
law shows that Plaintiff provided an evaluation of Dr. White's job performance in January 2019
in which he rated her as "effective" or "exceeds expectations" in all rated areas, including an
"exceeds expectations" in the area of "supports Diversity and Office of Inclusion programs and
fosters a culturally diverse and inclusive environment."   *See* Dkt. No. 81, Attach. 9.

A1216

Plaintiff seems to have reported in referring the Dean of Student Affairs to the Office for

evaluation were (1) a discriminatory failure to prepare Black students and (2) the Dean of

Student Affairs' response to Plaintiff's reports regarding those students, those reports fail to rise

to the level of a protected activity for the reasons already discussed.

Because Plaintiff cannot show that he had a good faith, reasonable belief that the conduct

he was reporting was a violation of Title VII, these actions do not constitute protected activity.

### (f) Plaintiff's Creation of a Position for a Part-Time Assistant Dean for Cultural Competence

Plaintiff next argues that he engaged in protected activity by creating a part-time position

for Assistant Dean of Cultural Competence and offered that position to a Black orthopedic

surgeon and assistant professor, but that Dr. Dewan made "aggressive objections" and

"demand[ed] to know what the other specifically named individuals of diverse backgrounds were

contributing to the University and why there existed a need for another position related to

Diversity and Inclusion."  *See*  Dkt. No. 78, Attach. 10, at 27-28.

These activities do not constitute protected activities for the same reasons discussed

above related to Plaintiff's explaining to Dr. Dewan what certain professors did in their roles.

Plaintiff does not appear to assert that he made any comments to Dr. Dewan or anyone else that

he believed Dr. Dewan's reactions were discriminatory or otherwise informed Dr. Dewan that he

believed they was discriminatory.   The fact that Plaintiff was advocating for diversity in the

abstract is simply not sufficient.   This incident therefore does not include any protected activity.

69

### (g) Plaintiff's Efforts to Promote Diversity Among Appointments to Chair Positions

Plaintiff next argues that he engaged in protected activity through his efforts to promote diversity in candidates during the search and appointment process to fill vacancies for Department Chair positions, including (1) using an external search firm when searching for Chairs of the Department of Medicine and Otolaryngology, and emphasizing to that firm that they needed to engage with "highly qualified candidates of diverse backgrounds," and (2) organizing an interview panel who selected a female candidate for the position of the Chair of the Anesthesiology Department despite pressure from Defendants to appoint a certain male candidate.  *See* Dkt. No. 78, Attach. 10, at 28-31.

These actions do not constitute protected activities.  As with other alleged protected activities already discussed, Plaintiff does not argue that he made any indication to Defendants that he believed Defendants were engaging in discrimination.  Regarding the searches conducted by the search firm, Plaintiff does not even suggest that he made any comments regarding those searches to Defendant at all, only that he told the search firm they needed to assess diverse candidates; the fact that Defendants did not hire any candidate referred by the search firm does not somehow turn this conduct into protected activity.  Similarly, even if Defendants indicated to Plaintiff they had a male candidate they wanted to hire for the position of Chair of the Anesthesiology Department, the fact that Plaintiff instead decided to conduct a search that resulted in the selection of a female candidate is insufficient on its own to constitute protected activity.  Although Plaintiff views his conduct as a "challenge" to Defendants wanting to appoint a male, it appears undisputed that (1) he did not make any statement or otherwise

70

indicate in more than a vague or generalized way to Defendants that he believed the appointment of the male candidate without a search effort would be discriminatory, and (2) Dr. Dewan ultimately appointed the female candidate on the recommendation of the interview panel with no apparent objection.   Because neither of these actions can be reasonably construed as allowing Defendants to understand that Plaintiff was reporting conduct prohibited by Title VII, they cannot be found to constitute protected activity.

### (h) Plaintiff's Complaints Regarding Dr. Wong's Salary Reduction

Lastly, Plaintiff alleges that he engaged in protected activity by complaining to Dr. Dewan about a reduction to his wife, Dr. Wong's, salary.   *See* Dkt. No. 78, Attach. 10, at 31. Specifically, Plaintiff argues that, during a meeting with Dr. Dewan on August 12, 2019, Plaintiff told Dr. Dewan that Dr. Wong "felt she may have a claim under Title VI and/or Title IX for discrimination since, to her knowledge, no white male professor was ever subjected to a salary reduction of this type." *See id.*   This argument is consistent with Plaintiff's deposition testimony, in which he responded, "yeah," to the question of whether, "[d]uring that meeting with Dr. Dewan on August 12, 2019, you indicated in your complaint that you told him you felt that she was being discriminated against because no other white male professor was facing the same salary challenges," and that he "specifically said that she would have reason both under Title Seven, and I used those words, both under Title 7 and Title 9, to file a complaint." *See* Dkt. No. 73, Attach. 11, at 32.

There is no question that this type of report would give Defendants reasonable notice that Plaintiff was attempting to report conduct prohibited by Title VII.   The remaining question is

71

therefore whether Plaintiff's belief that the salary reduction violated Title VII was a good faith, reasonable one.   The Court finds that the undisputed evidence presented does not substantiate the reasonableness of that belief.

The following relevant facts are undisputed: (1) Dr. Wong's total starting salary of $220,000 (her base salary of $120,000 plus her ALR of $100,000) was higher than the total starting salary of each of the 26 other research faculty that Defendant SUNY Upstate hired between 2017 and 2020, and she was provided a start-up commitment that "far surpasses any other faculty member hired during the timeframe" despite her being not funded by any grants when hired; (2) this starting salary made her "one of the highest paid research faculty in the psychiatry department," and she was in fact among the top three highest paid tenured research professors in the Department at all times since her hire; (3) in addition to her state salary, Dr. Wong was offered a temporary PFP stipend of $30,000; (4) the offer letter Dr. Wong received and signed related to her hire states that, as to her initial ALR amount, "[t]his additional compensation is not subject to UUP negotiated raises, is reviewed annually and is subject to adjustment or renewal, which may also result in an increase in base salary"; (5) the signed agreement regarding faculty expectations states that Dr. Wong was required to seek out grant support and submit grant proposals as part of her research duties; (6) in July 2018, her total salary allocation was altered to $177,400 in base salary and $45,000 in ALR for a total salary of $222,400, with statements in emails from Dr. Schwartz communicating to Dr. Wong that neither the ALR nor the PFP stipend was permanent and she was expected to obtain grants to supplement her base salary within a few years after hire when those would be removed; (7) although Dr. Wong's ALR was set to expire in July 2019, Defendants extended it to December

72

31, 2020, to accommodate for the fact she had not yet obtained any grants, but eliminated her $30,000 PFP stipend; and (8) Plaintiff, as Dean, had access to all the data regarding faculty salary and startup information.   *See* Dkt. No. 73, Attachs. 42, 58, 63, 64, 66.

Although there is some evidence indicating that Dr. Wong and Plaintiff may have misinterpreted or misunderstood statements regarding the impermanency of the ALR funding (or received misleading information from Dr. Laraque-Arena),[86] such a misunderstanding does not create a genuine dispute of fact regarding the relevant question here, which is not whether Plaintiff had a reasonable belief that Dr. Wong's salary was improperly reduced in the abstract, but rather whether his belief that the reduction was rooted in discriminatory reasons was objectively reasonable.   From the evidence presented on this motion, no reasonable factfinder could conclude that to be the case.

Specifically, Plaintiff has offered no evidence to support his apparent belief that the reduction was because of Dr. Wong's gender or other protected characteristic, other than Plaintiff's statements in his declaration that, "to [Dr. Wong's] knowledge, no white male professor was ever subjected to a salary reduction of this type," and Dr. Wong's deposition testimony in which she stated that she was told by Dr. Dewan and/or Dr. Schwartz that she "could not earn more than" the two other people in the department who had the highest salaries, both of whom were men, and she was not comfortable being compared to just men and being told her salary could not be higher than those of the two men.   *See* Dkt. No. 73, Attach. 14, at 4-5; Dkt. No. 78, Attach. 4, at ¶ 111.   However, the fact that the other two highest earning professors in the Department happened to be male does not automatically make a refusal to pay

_____

[86] *See* Dkt. No. 73, Attachs. 67, 68.

Dr. Wong a higher salary than those individuals inherently discriminatory based on gender, and any such inference is undermined by the other undisputed evidence that Dr. Wong was at the relevant time approaching the two-year mark in her employment with Defendant SUNY Upstate, which was when her PFP stipend was due to expire (and would have expired for any employee, given that the grant was limited by its very terms to a two-year period), and that Defendants extended her ALR for another year beyond when they were planning in order to give Dr. Wong additional time to secure grants to supplement her salary before the ALR would be removed. Indeed, the institutional evidence and affidavits that Defendants provided substantiate that ALR was a method to provide newer hires who did not have current grant funding time to obtain such funding while being maintained at a higher salary. There has been no evidence presented to suggest that a white male professor would not also have an ALR removed under the circumstances in which Defendants were attempting to remove Dr. Wong's ALR, or that any grant-funded persons to whom Plaintiff was comparing Dr. Wong were receiving ALR.

It also cannot be ignored that the evidence shows that, even as a non-grant funded researcher, Dr. Wong's salary was the third-highest in the Department; the fact that Defendants refused to make her the highest paid individual in the Department is not evidence of discrimination, particularly as there is no evidence regarding whether the two male individuals who had higher salaries than Dr. Wong had been employed by Defendant SUNY Upstate longer or other such relevant factors. Most importantly, Plaintiff, as Dean, would have had access to all of this information, both related to Dr. Wong's compensation package and the process and purpose of ALR and PFP stipends because it was part of the Dean's duties to set the salary and start up packages for faculty as well as approve all salaries and ALR for faculty on a yearly basis

74

(although Plaintiff did not have approval over Dr. Wong's salary due their relationship).   Given that Plaintiff had access to information regarding the salaries of all other faculty, no reasonable factfinder could conclude that he had an objectively reasonable belief that Dr. Wong's salary adjustment was the product of discrimination.

Based on the undisputed evidence, no factfinder could conclude that Plaintiff's belief that he was reporting gender and/or race/national origin discrimination on behalf of his wife that violated Title VII was objectively reasonable.   As a result, his statements to Dr. Dewan on this matter do not constitute protected activity.

### (i) Plaintiff's Filing of the NYSDHR Charge

Plaintiff also alleges in the Complaint that he experienced additional retaliatory actions after he filed a charge with the NYSDHR, including the refusal or failure to consider him for multiple high-level positions within SUNY and the College of Medicine, causing him reputational damage and loss of income, failing to provide him with a laboratory startup funding package, denying him reimbursement for certain expenses, and removing the salary increase for his title as a Distinguished Professor from his base salary.   *See* Dkt. No. 1, at ¶¶ 157-85. However, in his opposition memorandum of law (despite Defendants making arguments regarding those allegations in their memorandum of law), Plaintiff makes no mention of his NYSDHR charge as a protected activity or the above alleged retaliatory actions.   Because Plaintiff has not opposed those arguments, the Court deems them to be abandoned.   *See Martinez v. United States*, No. 20-CV-7275, 2021 WL 4224955, *14 n.13 (S.D.N.Y. Sept. 16, 2021); *see Lomonoco v. Saint Anne Inst.*, No. 15-CV-1163, 2018 WL 2324051, *12 (N.D.N.Y.

75

A1223

May 22, 2018) (Suddaby, C.J.) (finding that "the Court may, and does, construe the failure to respond to an opposing party's arguments as an effective abandonment of the claim").

Moreover, in the alternative, even if Plaintiff could show a prima facie case of retaliation based on the NYSDHR charge and alleged retaliatory actions that followed, such claim would fail for the same reasons as will be discussed below in Parts III.B.2 and 3 of this Memorandum-Decision and Order, namely Plaintiff's conduct and performance as Dean provides a legitimate, nonretaliatory reason for choosing not to hire him for other high-level positions, and Plaintiff has not established that any protected action by him was the but-for cause of any action taken against him.

### 2. Legitimate, Non-Discriminatory Reasons

Even assuming that at least some of Plaintiff's alleged actions could be considered protected activities, and assuming that there was at least a temporal proximity between those activities and his demotion, Defendants have met their burden to proffer legitimate, non-discriminatory reasons for his demotion.   Although some of the material facts related to Plaintiff's purported behavior during his tenure as Dean have been properly disputed, many others have not, and those that have not been disputed are sufficient to show behavioral or other performance issues that would provide a sufficient basis for the decision to remove Plaintiff from the position of Dean.   *See, supra,* Statement of Undisputed Material Facts in Part I.B. of this Memorandum-Decision and Order.

For example, the undisputed evidence establishes the following: (1) Dr. Laraque-Arena had personal and communication issues with Plaintiff that caused her to limit the number of

76

meetings they had, require that another person be present at their meetings, and eventually to ask Dr. Dewan to informally assume the duties of Dean; (2) a discrimination complaint had been filed against Plaintiff by several female faculty members in December 2018; (3) members of SUNY administration encouraged Dr. Dewan to remove Plaintiff from his position and Plaintiff was informed by one SUNY administrator that he should begin looking for a new job; (4) Plaintiff made only modest gains in diversity of senior administrative staff despite policies, procedures, and programs designed to increase diversity among students and faculty as well; (5) Plaintiff improperly interfered with a search committee and the whole committee had to be disbanded; (6) Plaintiff sent an email to the SUNY Chancellor requesting millions of dollars in funding to recruit a specific doctor, which resulted in the Chancellor telling Dr. Dewan that Plaintiff should not contact her again and that he should be removed as Dean; (7) Plaintiff made comments that colleagues and students found to be inappropriate and unprofessional on various occasions, including at formal College of Medicine ceremonies where he was acting in his capacity as Dean; (8) Plaintiff sent an email to various faculty and students asking them to report instances of discrimination directly to him despite that being inappropriate under the College of Medicine's collective bargaining agreements, policies, and procedures; (9) Plaintiff was creating multiple administrative positions within the Dean's Office that Dr. Dewan viewed as being unnecessary or duplicative of existing positions and did not further the goal of increasing URiM students; (10) Plaintiff instructed Chairs not to speak with Dr. Dewan about Departmental concerns and otherwise made comments to faculty that undermined Dr. Dewan's authority; (11) Plaintiff played a video in a public meeting space that included offensive and derogatory language; and (12) Plaintiff made appointments under management/confidential titles that

77

SA-78

Human Resources found to be inappropriate.

Based on the undisputed evidence, Defendants have shown a legitimate, non-retaliatory reason for the adverse action taken against Plaintiff.

### 3. Pretext

"[T]emporal proximity alone, while sufficient to establish the *de minimis* burden at the prima facie stage . . . is insufficient to establish retaliatory intent (through pretext or otherwise) at the third stage of the burden-shifting framework."   *Russo v. Wyandanch Union Free Sch. Dist.*, No. 23-716-cv, 2024 WL 2350314, *2 (2d Cir. May 23, 2024) (citing *Tafolla v. Heilig*, 80 F.4th 111, 125-26 [2d Cir. 2023]; *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 [2d Cir. 2019]).   As was discussed above, at this stage, the plaintiff must show that retaliation was the "but-for" cause of the adverse action such that it "'would not have occurred in the absence of the retaliatory motive.'"   *Macri v. Herkimer Cnty.*, No. 20-CV-1414, 2023 WL 6295590, *6 (N.D.N.Y. Sept. 27, 2023) (Sharpe, J.) (citing *Nassar*, 570 U.S. at 346-47; *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 [2d Cir. 2013]).

Plaintiff cannot meet the requisite burden.   Notably, Plaintiff does not appear to make a specific argument regarding pretext as to his retaliation claim, but he has not abandoned that point because other arguments could be construed as applying to that question.   Specifically, Plaintiff argues that there is a causal connection between his demotion and his alleged protected activity because (1) there is a close temporal proximity; (2) Human Resources Vice President Mr. Frost made a statement in his deposition testimony that could be construed as stating that he believed it was possible that Plaintiff's intent to promote diversity may have been part of the

decision to demote him, although Mr. Frost also stated that "I think it was a multitude of a lot of things"; (3) he was demoted without being provided notice or a transition period as required by the contract he signed when he accepted the position; (4) notes from a September 16, 2019 Council Meeting indicate that it was stated that "there is not one horrible thing that happened for this change to occur, rather a change was needed in leadership," and "overall, this is not a negative change, but rather a moving forward change and a removal of barriers"; and (5) he was not provided with any negative feedback related to his performance and there is no documentation of performance issues.  *See* Dkt. No. 78, Attach. 10, at 33-36.

As was discussed above, any temporal proximity is insufficient to carry the burden alone at this stage, and Plaintiff's other arguments do not add sufficient weight to tip the scales.   Mr. Frost's deposition statement actually undermines Plaintiff's argument in this case, given that he states that, although Plaintiff's intent to promote diversity "could have" been a part of the decision to demote him (a statement that in any event is conditional and not concrete), he also acknowledged that "it was a multitude of a lot of things" and even discussed some of the conduct issues already discussed above in the surrounding context of this comment.  *See* Dkt. No. 81, Attach. 6, at 9-11.   Because Plaintiff must show that retaliation was the but-for cause of his demotion and not just a motivating factor, Mr. Frost's deposition statement does not add any weight to Plaintiff's argument.   Similarly, the statements cited from the September 16, 2019 Council Meeting do not support a rational finding that retaliation was the but-for cause of Plaintiff's demotion, and Plaintiff's interpretation of such statements as evidence Defendants saw him as a barrier to diversity at the College of Medicine is simply not supported by any evidence. Additionally, the fact that there is no written documentation of performance issues in the form of

A1227

any formal performance review or notification to Plaintiff is immaterial given the amount of undisputed evidence that Defendants have submitted on this motion establishing that performance and behavioral issues existed.   Indeed, there is no dispute that Plaintiff himself was aware by January 2019 that individuals within Defendant SUNY wanted him to be removed as Dean.   Lastly, the fact that the agreement Plaintiff signed provides for a transition period if he were to be removed as Dean also does not stand as evidence of retaliatory motive, not least because, as was discussed previously, this agreement has been found to not be a binding contract and Defendants therefore had no legal obligation to abide by its terms.

Because none of the evidence Plaintiff cites could reasonably establish that Defendants' legitimate, non-discriminatory reasons for removing him from the position of Dean were mere pretext for retaliation, Plaintiff cannot succeed on his retaliation claims.   Accordingly, Plaintiff's Third, Fourth, and Fifth Claims must be dismissed.


## IV. CONCLUSION

Having reviewed the entire file in this case, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 73, is **GRANTED**; and the Court further

A1228

SA-81

**ORDERS** that Plaintiff's Complaint, *see* Dkt. No. 1, is **DISMISSED**; and the Court further

    **ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and

close this case.

Dated: August 28, 2024
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

81

SA-82

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

## JUDGMENT IN A CIVIL CASE

**Julio Licinio, MD, PhD, MBA, MS**
      Plaintiff

    vs.                **CASE NUMBER: 5:21-CV-387**

**State of New York; The State University of New York; The State University of New York Upstate Medical University**
      Defendant(s)

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

That Defendants' motion for summary judgment is **GRANTED**; and the Court further **ORDERS** that Plaintiff's Complaint is **DISMISSED**; and the Court further **ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

All of the above pursuant to the order of the Honorable **Frederick J. Scullin, Jr.**, dated August 28, 2024.

DATED: August 28, 2024

Clerk of Court

s/_____
Teri Lambert
Deputy Clerk

A1230

SA-83

# Federal Rules of Appellate Procedure
## Rule 4. Appeal as of Right

### (a) Appeal in a Civil Case.

1. (1) *Time for Filing a Notice of Appeal.*

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

(i) the United States;

(ii) a United States agency;

(iii) a United States officer or employee sued in an official capacity; or

(iv) a current or former United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf — including all instances in which the United States represents that person when the judgment or order is entered or files the appeal for that person.

(C) An appeal from an order granting or denying an application for a writ of error *coram nobis* is an appeal in a civil case for purposes of Rule 4(a).

(2) *Filing Before Entry of Judgment.* A notice of appeal filed after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry.

(3) *Multiple Appeals.* If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later.

(4) *Effect of a Motion on a Notice of Appeal.*

(A) If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion:

(i) for judgment under Rule 50(b);

(ii) to amend or make additional factual findings under Rule 52(b), whether or not granting the motion would alter the judgment;

(iii) for attorney's fees under Rule 54 if the district court extends the time to appeal under Rule 58;

(iv) to alter or amend the judgment under Rule 59;

(v) for a new trial under Rule 59; or

(vi) for relief under Rule 60 if the motion is filed no later than 28 days after the judgment is entered.

(B)(i) If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

(ii) A party intending to challenge an order disposing of any motion listed in Rule 4(a)(4)(A), or a judgment's alteration or amendment upon such a motion, must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion.

(5) *Motion for Extension of Time.*

(A) The district court may extend the time to file a notice of appeal if:

(i) a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and

(ii) regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause.

(B) A motion filed before the expiration of the time prescribed in Rule 4(a)(1) or (3) may be ex parte unless the court requires otherwise. If the motion is filed after the expiration of the prescribed time, notice must be given to the other parties in accordance with local rules.

(C) No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

(6) *Reopening the Time to File an Appeal.* The district court may reopen the time to file an appeal for a period of 14 days after the date when its order to reopen is entered, but only if all the following conditions are satisfied:

(A) the court finds that the moving party did not receive notice under Federal Rule of Civil Procedure 77 (d) of the entry of the judgment or order sought to be appealed within 21 days after entry;

(B) the motion is filed within 180 days after the judgment or order is entered or within 14 days after the moving party receives notice under Federal Rule of Civil Procedure 77 (d) of the entry, whichever is earlier; and

(C) the court finds that no party would be prejudiced.

(7) *Entry Defined.*

(A) A judgment or order is entered for purposes of this Rule 4(a):

(i) if Federal Rule of Civil Procedure 58 (a) does not require a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79 (a); or

(ii) if Federal Rule of Civil Procedure 58 (a) requires a separate document, when the judgment or order is entered in the civil docket under Federal Rule of Civil Procedure 79(a) and when the earlier of these events occurs:

• the judgment or order is set forth on a separate document, or

• 150 days have run from entry of the judgment or order in the civil docket under Federal Rule of Civil Procedure 79 (a).

(B) A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58 (a) does not affect the validity of an appeal from that judgment or order.

A1231