# 24-2564

## United States Court of Appeals
## for the Second Circuit

JULIO LICINIO, MD, PhD, MBA, MS,

*Plaintiff-Appellant,*

v.

STATE OF NEW YORK; STATE UNIVERSITY OF NEW YORK; STATE UNIVERSITY OF NEW YORK UPSTATE MEDICAL UNIVERSITY,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees
The Capitol
Albany, New York 12224
(518) 776-2042

Dated: March 3, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT ...........................................................1

ISSUES PRESENTED ......................................................................2

STATEMENT OF THE CASE ............................................................2

    A.   Plaintiff's Unprofessional and Inappropriate Conduct............4

    B.   Plaintiff's Wasteful Spending and Improper Creation of Employment Positions ...............................................................15

    C.   Plaintiff's Challenges to His Wife's Salary.............................18

    D.   Plaintiff's Advocacy to Expand the Budget Committee .........22

    E.   Plaintiff's Alleged Efforts to Promote Diversity and Report Discrimination ...............................................................24

    F.   Plaintiff's Demotion ...............................................................27

    G.   Plaintiff's Proceeding Before the New York State Department of Human Rights ................................................29

    H.   The Present Suit ......................................................................29

STANDARD OF REVIEW.................................................................31

SUMMARY OF ARGUMENT ...........................................................32

ARGUMENT .................................................................................34

POINT I

    PLAINTIFF FAILED TO MAKE OUT A PRIMA FACIE CASE OF RETALIATION .................................................................................35

**Page**

POINT II

UPSTATE HAD A LEGITIMATE, NON-DISCRIMINATORY REASON TO DEMOTE PLAINTIFF BASED ON HIS PATTERN OF INAPPROPRIATE AND UNPROFESSIONAL CONDUCT AND WASTEFUL SPENDING ............... 50

POINT III

UPSTATE'S BASIS FOR DEMOTING PLAINTIFF WAS NOT PRETEXTUAL .................................................................... 56

CONCLUSION ........................................................ 62

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Cassidy v. N.Y. State Ins. Fund,*
No. 23-496-cv, 2023 WL 8801035 (2d Cir. Dec. 20, 2023)..................38

*Durakovic v. Bldg. Serv. 32 BJ Pension Fund,*
609 F.3d 133 (2d Cir. 2010) ...............................................................31

*Fabrikant v. French,*
691 F.3d 193 (2d Cir. 2012) .........................................................31, 57

*Grillo v. N.Y.C. Transit Auth.,*
291 F.3d 231 (2d Cir. 2002) ...............................................................50

*Harlen Assocs. v. Incorporated Village of Mineola,*
273 F.3d 494 (2d Cir. 2001) ...............................................................59

*Horn v. Medical Marijuana, Inc.,*
80 F.4th 130 (2d Cir. 2023).............................................................3, 31

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs,*
716 F.3d 10 (2d Cir. 2013) ........................................................36-37, 39

*Littlejohn v. City of New York,*
795 F.3d 297 (2d Cir. 2015) .......................................................36, 39-40

*Lore v. City of Syracuse,*
670 F.3d 127 (2d Cir. 2012) ...............................................................35

*LoSacco v. City of Middletown,*
71 F.3d 88 (2d Cir. 1995) ...................................................................29

*McElwee v. County of Orange,*
700 F.3d 635 (2d Cir. 2012) ...............................................................50

*McPherson v. N.Y.C. Dep't of Educ.,*
457 F.3d 211 (2d Cir. 2006) ...............................................................50

*Meiri v. Dacon,*
759 F.2d 989 (2d Cir. 1985) ...............................................................50

iii

| Cases | Page(s) |
|---|---|

*Norton v. Sam's Club*,
145 F.3d 114 (2d Cir. 1998) ...................................................... 38

*Richardson v. Comm'n on Hum. Rts. & Opportunities*,
532 F.3d 114 (2d Cir. 2008) ........................................... 50, 54

*Rizzo-Puccio v. College Auxiliary Servs., Inc.*,
216 F.3d 1073 (2d Cir. 2000) ................................................. 51

*Rojas v. Roman Catholic Diocese of Rochester*,
660 F.3d 98 (2d Cir. 2011) ............................................... 37, 40

*Slattery v. Swiss Reins. Am. Corp.*,
248 F.3d 87 (2d Cir. 2001) ...................................................... 51

*Williams v. Alliance Nat'l Ins.*,
24 F. App'x 50 (2d Cir. 2001) ................................................ 51

*Wimmer v. Suffolk Cty. Police Dep't*,
176 F.3d 125 (2d Cir. 1999) ....................................... 36, 39-40

*Wong v. New York*,
No. 21-cv-1338, 2024 WL 3936762 (N.D.N.Y. Aug. 26, 2024) ............ 49

*Zann Kwan v. Andalex Grp. LLC*,
737 F.3d 834 (2d Cir. 2013) ...................... 34-35, 56, 59-60

**Rules**

Fed. R. Civ. P. 56(a) .................................................................. 31

## PRELIMINARY STATEMENT

In 2017, plaintiff Julio Licinio was appointed Dean of the College of Medicine for the State University of New York Upstate Medical University ("Upstate"). Over the next two years, he engaged in a pattern of unprofessional and inappropriate conduct that included insubordination toward multiple Upstate presidents, unwanted direct contact with members of the State University of New York ("SUNY") leadership, conversations with faculty and students about sexual topics, speeches to medical students about suicide and depression that prompted a formal complaint, the playing of a video for colleagues and subordinates that contained ethnic slurs, and the unilateral creation of numerous new roles at the College of Medicine that violated Upstate policy and cost hundreds of thousands of dollars in unnecessary expenditures. As a result, in September 2019, plaintiff was relieved of his position as Dean and reverted to his position as Distinguished Professor with tenure in Upstate's Psychiatry Department.

Plaintiff thereafter brought suit alleging that his demotion was retaliation for opposing employment discrimination in violation of Title VII of the Civil Rights Act. The U.S. District Court for the Northern

District of New York (Scullin, J.) granted defendants' motion for summary judgment, concluding that plaintiff failed to make out a prima facie case of retaliation, and that in any event defendants demonstrated a legitimate and nondiscriminatory reason for demoting plaintiff, which plaintiff failed to demonstrate was pretextual. That decision was correct and should be affirmed.

## ISSUES PRESENTED

1.     Whether summary judgment was warranted because plaintiff failed to make out a prima facie case of retaliation pursuant to Title VII.

2.     Alternatively, whether summary judgment was warranted because (a) defendants offered a legitimate, nondiscriminatory reason for demoting plaintiff, and (b) plaintiff failed to meet his burden of showing that the proffered reason for plaintiff's demotion was mere pretext.

## STATEMENT OF THE CASE[1]

The State University of New York Upstate Medical University ("Upstate") is one of five health centers within the State University of

---

[1] This statement of the case includes only the facts found by the district court to be deemed admitted by plaintiff, and those facts are

*(continued on the next page)*

2

New York ("SUNY") and the only public academic medical center in the region of Syracuse, New York. (SA3; A302-03, A701.) Upstate has four colleges within it—the Colleges of Medicine, Nursing, Health Professions, and Graduate Studies. (SA3; A302-03, A701.)

In March 2017, plaintiff was offered the position of Dean of Upstate's College of Medicine by Upstate's president at that time, Danielle Laraque-Arena, M.D. (SA3-4; A84-91, A702.) Plaintiff's appointment to that position was effective July 1, 2017. (SA4; A702.) As Dean of the College of Medicine, plaintiff served at the pleasure of Upstate's President. (SA4; A84, A702.) And, pursuant to plaintiff's offer letter, in the event he no longer held the position of Dean of the College of Medicine, he would "revert to a faculty position at the rank of Professor with tenure in the Department of Psychiatry," with salary set "no lower than that of the highest paid faculty member at the same rank in the Psychiatry Department." (SA4; A85, A702-03.)

---

presented in the light most favorable to plaintiff, as required on a motion for summary judgment. *Horn v. Medical Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023). Plaintiff does not dispute any of the district court's factual determinations in his brief to this Court. (*See* Br. 2-3 (containing no recitation of facts or challenge to the facts as found by the district court).)

## A. Plaintiff's Unprofessional and Inappropriate Conduct

Problems with plaintiff's leadership quickly emerged. By the summer of 2018, Dr. Laraque-Arena was no longer comfortable having one-on-one meetings with plaintiff and began requiring another member of staff to attend all meetings between the two. (SA5-6; A295, A304, A703.) Dr. Laraque-Arena was agitated with plaintiff's "frequent emails questioning her decisions and off-putting comments during meetings." (A295.) She told another colleague that plaintiff was demeaning, hostile, inappropriate, and undercut her. (SA6; A304, A703.) She shared that plaintiff had given her a book about sexual dreams. (A304, A703.) Accordingly, Dr. Laraque-Arena advised plaintiff by email that meetings with her would only last for 30 minutes, that the President's Chief of Staff would be present at all their meetings, and that their meetings should focus on brief reports of plaintiff's work and address only operational issues. (SA6; A295, A299.) Dr. Laraque-Arena also spoke with plaintiff repeatedly in meetings about his lack of professional demeanor (SA6; A98, A703), insubordination (SA6; A102, A703), divisiveness (A102, A703), and penchant to show up late for meetings (SA6; A99, A703).

4

In the fall of 2018, Dr. Laraque-Arena called Dr. Mantosh Dewan, a Distinguished Service Professor in the Department of Psychiatry at the time, to ask if he would be willing to assume the responsibilities of Dean under the title "Vice President of Administration." (SA4-5; A304, A703.) Dr. Laraque-Arena explained that she was unhappy with plaintiff's performance and that the College of Medicine had become dysfunctional under his leadership, but that she did not want to remove plaintiff from his position at that time because doing so could create an appearance of instability at Upstate. (SA5; A304, A703.) Dr. Dewan declined the position to avoid a conflict with plaintiff. (SA6; A304, A704.) Dr. Laraque-Arena resigned as president in December 2018, and Dr. Dewan was appointed to serve as interim president. (SA7; A304-05, A704.) Later that month, Dr. Laraque-Arena made Dr. Dewan aware that several female faculty members had filed a discrimination complaint against plaintiff relating to plaintiff's search for a department chair. (SA7; A304, A329, A704.)

Upon Dr. Dewan's assumption of the role of interim president, members of the senior leadership at SUNY System Administration promptly expressed their concerns about plaintiff continuing to serve as

Dean of the College of Medicine. (SA7; A305, A704, A1027, A1029-30.) Dr. Ricardo Azziz, then the SUNY Chief Officer of Academic Health and Hospital Affairs, told Dr. Dewan that plaintiff had poor judgment and lacked the professional diplomacy needed to interact with constituents of Upstate. (SA7; A305, A1027.) Dr. Azziz supported his assessment by pointing to plaintiff's frequent direct contacts to SUNY leadership to complain about former president Dr. Laraque-Arena and his refusal to abide by the directives of members of SUNY leadership telling him not to do so. (A305-06.) Dr. Azziz pressed Dr. Dewan to remove plaintiff from his position as dean every month at their one-on-one meeting. (SA7; A305, A704, A1027-28.) Dr. Dewan informed plaintiff at that time that he had been instructed by SUNY administration that his "highest priority" was to remove plaintiff from the dean position but that he wished to give plaintiff the benefit of the doubt and a chance to prove himself. (SA7-8; A306, A704-05.)

Dr. Dewan was also approached by an employee, Dr. Ruth Weinstock, who had concerns about plaintiff's interference with the search process for a new Chair of Upstate's Department of Medicine. (SA9-10; A307, A706.) According to Dr. Weinstock, the search committee

for the new chair had recommended several individuals be put forward for consideration, but plaintiff was ignoring those recommendations and insisting that his personal friends be moved forward instead. (SA10; A307, A706-07.) Plaintiff's friends had already been rejected by the search committee, however. (SA10; A307, A706-07.) Dr. Dewan spoke with the other search committee members, who reiterated what Dr. Weinstock had said and declined to endorse any of plaintiff's friends. (SA10; A307, A707.) Dr. Dewan advised plaintiff to call off the search, resulting in months of wasted time for approximately 20 busy Upstate doctors and faculty. (SA10; A307, A707.)

On January 24, 2019, plaintiff emailed a group of approximately 80 faculty and students inviting them to email him at his personal email address to report instances of discrimination or offensive behavior and to label the email "confidential." (SA13; A366, A399-400, A709.) The faculty union brought the email to the attention of Eric Frost, Upstate's Associate Vice President for Human Resources. (SA13; A366.) Frost instructed plaintiff that the email was inappropriate and inconsistent with Upstate's collective bargaining agreements, policies, and established practices, which required that complaints of discrimination be

7

reported to the Office of Diversity and Inclusion rather than be maintained as confidential. (A365-66, A709.) Frost assisted plaintiff in drafting a clarifying follow-up email to the faculty and students. (SA14; A366, A709.)

In February 2019, Dr. Dewan made plans for himself and SUNY Upstate leaders to take the SUNY Chancellor to lunch. (SA11; A308, A707.) Dr. Dewan included plaintiff in the invitation but spoke to plaintiff in advance to ask that he keep the conversation high level and pleasant. (SA11; A308, A707.) Two days later, the Chancellor forwarded Dr. Dewan an email she had received from plaintiff—on which Dr. Dewan had not been copied—requesting $5 million to recruit a specific doctor for a Chair of Medicine position at Upstate. (SA11; A308, A333-34, A707.) Dr. Dewan apologized to the Chancellor and told her that he did not know plaintiff had written to her. (SA11; A308, A707-08.) Dr. Dewan and the Chancellor spoke on the phone, and the Chancellor asked why Dr. Dewan had not fired plaintiff yet. (SA11; A308, A708.) The Chancellor expressed her ongoing concerns about plaintiff serving as Dean of the College of Medicine and asked Dr. Dewan to ensure that plaintiff not contact her directly again in the future. (SA11-12; A308, A708.)

In March 2019, Dr. Dewan was contacted by the Chair of the newly created Geriatrics Department, Dr. Sharon Brangman, who relayed concerns about plaintiff making inappropriate comments and not behaving appropriately as dean. (SA12; A309, A708.) Dr. Brangman shared that during an end-of-year dinner of the Admissions Committee in 2018, plaintiff had shared with students and faculty explicit details about a former patient's sexual issues, which both violated that patient's privacy and was extremely inappropriate and unprofessional. (SA12-13; A309, A708-709.) Dr. Brangman also reiterated concerns about plaintiff's attempts to subvert the committee search process during the search for a new Chair of the Department of Medicine. (SA13; A310, A709.)

Although Dr. Dewan believed he had more than sufficient grounds to dismiss plaintiff as Dean by early 2019, he wanted to maintain the appearance of stability of the College of Medicine because there was a site visit scheduled for March 2019 by the Liaison Committee on Medical Education ("LCME"). (A310.) The LCME is the accrediting body of the College of Medicine. (SA8; A310, A705.) In 2011, the College of Medicine had been placed on probation because LCME had determined that the College was not then compliant with several accreditation standards.

9

(SA8; A321, A705.) The College of Medicine had employed remedial measures, made significant progress, and been released from probation in June 2013. (SA8; A321, A705.) The upcoming LCME site visit was thus a significant event. (SA8; A313.) And although that LCME visit did not result in probation, LCME did identify areas needing to be monitored, including the area of diversity. (SA9; A261, A706.) For example, LCME noted that there had been only modest gains in diversity of senior administrative staff and faculty under plaintiff's leadership. (SA9; A261, A706.)

In May 2019, plaintiff gave a speech at the orientation for third-year medical students. (SA19; A541, A712.) During his speech, plaintiff advised the students that "it's only going to get worse and worse—residency, fellowship and having a family will be very hard" and that if students did not do well in their clerkships, they would not get into their chosen specialty. (SA19-20; A542, A712-13.) Plaintiff then went on to talk about student depression and suicide. (SA20; A542, A713.) After the speech, Dean of Student Affairs Dr. Julie White received an email informing her that a student wanted to make a complaint regarding plaintiff's speech. (SA20; A542-43, A569-572, A713.) Dean White contacted plaintiff to inform him that a group of students and faculty members were upset

with the content of his speech and that a student wanted to file a complaint against him. (SA20; A543, A577-581, A713.) Dean White also drafted a letter for plaintiff to disseminate to students regarding his speech. (SA20; A543, A577-581.)

Also in May 2019, Chair of the Psychiatry Department Dr. Thomas Schwartz emailed Dr. Dewan and Hospital CEO Dr. Robert Corona in support of Dr. Brangman, who was at that time the newly appointed Chair of the Geriatrics Department. (SA21; A599-600, A713-14.) Dr. Schwartz explained that he was worried that Dr. Brangman was not being treated fairly, specifically with respect to a lack of financial backing for the Geriatrics Department. (SA21; A600, A714.) The Hospital CEO added plaintiff to the email, and plaintiff responded by emailing only Dr. Schwartz, chastising him for emailing the Hospital CEO and Dr. Dewan about the issue. (SA21-22; A600, A610-12, A714.) Specifically, in an email with thirteen numbered paragraphs purporting to explain why Dr. Schwartz's email was improper, plaintiff mocked Dr. Schwartz for raising the concern and accused him of being a "busybody" and a "vigilante." (SA22; A600, A610-612, A714.)

11

In the summer of 2019, Dr. Dewan arranged for local political representatives to visit Upstate's campus to increase their understanding of Upstate's services and to garner political support for Upstate's initiatives. (SA18; A313-14, A711-12.) Dr. Dewan had concerns that plaintiff would say something or behave in a way that would reflect poorly on Upstate. (SA18; A314, A712.) And, in fact, during one such visit, plaintiff went off on a tangent in a manner that, in Dr. Dewan's view, embarrassed him and Upstate. (SA18; A314, A712.) After that visit, Dr. Dewan instructed staff to preferably schedule representative visits when plaintiff was not going to be on campus. (SA19; A314, A712.)

During that same period, Dr. Dewan also learned that plaintiff was instructing department chairs not to talk to Dr. Dewan about departmental concerns and blaming Dr. Dewan for preventing him from doing his job. (SA19; A314, A598-599, A712.) On August 8, 2019, Dr. Dewan met with former Upstate President Dr. Gregory Eastwood to discuss his concerns about plaintiff's troubling conduct, including disparaging the interim president. (SA19; A314, A712.)

A few days later, on August 13, 2019, plaintiff held an "urgent" meeting at 6 a.m. regarding the Department of Anesthesia and asked

12

Dr. Dewan to attend. (SA32; A314; A335; A723.) Also in attendance were the CEO of Upstate's hospital, Upstate's Chief Medical Officer, plaintiff's chief of staff, and various department chairs. (SA32; A314, A723.) During the meeting, plaintiff expressed frustration about Dr. Dewan's interventions in his selections of appointments and spoke emphatically about his need for autonomy to appoint a person of his choosing as Chair of the Anesthesiology Department. (SA33; A315, A723.) As one attendant described the meeting, plaintiff "spent the hour disparaging President Dewan in front of the group and the President, making the individuals in the room—and me—visibly uncomfortable." (A297.) Dr. Dewan perceived this as plaintiff "attacking [him] in front of the group," an "overt attempt to undermine [his] leadership," "highly insubordinate," and "inappropriate." (A315.)

At the beginning of a leadership meeting held shortly thereafter, plaintiff played a video on his phone in view of others of a public figure using ethnic slurs and making derogatory comments about Italians. (SA20; A255, A315, A713.) Dr. Dewan's Chief of Staff, an Italian individual, was visibly offended by the video. (SA21; A255, A315, A713.)

13

On August 22, 2019, plaintiff was supposed to give a brief speech and make farewell remarks at a white coat ceremony. (SA22; A543, A714.) The white coat ceremony is held annually as a rite of passage for students entering the medical field, during which students receive a white doctor's coat and recite the Hippocratic Oath. (SA22; A543, A714.) The event was attended by incoming first-year medical students and their families. (SA22; A543, A714.) When plaintiff came on stage to thank students and guardians for attending, he talked for 10-15 minutes in a manner described as "a long, rambling diatribe." (SA22; A543, A715.) He also again talked about suicide and depression and dwelled on related statistics, despite having been recently informed that students and faculty had complained about a similar speech, *see supra* at 10-11. (SA23; A543-44, A715.) The Dean of Student Affairs eventually intervened to close the meeting. (SA23; A544, A715.) The Associate Dean for Academic Affairs contacted the Dean of Student Affairs to say that plaintiff should never be allowed to address students "off script" again given how disastrous his remarks had been. (SA23; A544, A715.)

14

## B.   Plaintiff's Wasteful Spending and Improper Creation of Employment Positions

After becoming interim president, Dr. Dewan was made aware of significant and wasteful spending at the College of Medicine.

More particularly, Dr. Dewan learned that plaintiff and then-president Dr. Laraque-Arena had earlier hired an outside consultant to assist with the LCME accreditation process, agreeing to pay the consultant about $1 million. (SA9; A313, A706.) Paying a consultant was unprecedented for the College of Medicine and raised concerns for Dr. Dewan about plaintiff's fiscal responsibility. (SA9; A313, A706.)

Dr. Dewan also learned that plaintiff had significantly increased the number of administrative positions in the College of Medicine, as Dr. Laraque-Arena had done in the President's office. (SA14; A310, A709.) Faculty had shared their dissatisfaction with Upstate's dollars being spent on hiring so many administrators, and Dr. Dewan believed that the administration needed to be efficient and accountable in their spending. (SA14; A310, A709.) Dr. Dewan accordingly eliminated eight positions in the President's office during his first year as interim president, saving over $1 million annually. (SA15; A311, A710.)

Dr. Dewan learned, however, that plaintiff had not only grown the Dean's staff from four to eleven people, but was also in the process of creating still more positions. (SA15; A311, A710.) Dr. Dewan had three serious concerns about those added positions: the cost of unnecessary bloat, the lack of clarity regarding the duties to be assigned to the respective positions, and the disconnect between these positions and the objective outcomes that plaintiff and Dr. Dewan had agreed on for the College of Medicine. (SA15; A311, A710.)

As to cost, the newly created positions had already added hundreds of thousands of dollars in additional expense; the creation of additional positions would add still more cost. (SA15-16; A311, A710.)

As to lack of clarity in duties, Dr. Dewan believed that these additional positions would overlap existing positions. (SA16; A312, A710.) For instance, around the spring and summer of 2019, the College of Medicine's Assistant Dean for Diversity, Dr. Brian Thompson, complained to Dr. Dewan that plaintiff had demoted and sidelined him by creating a new Associate Dean for Diversity and Inclusion position that would perform the same functions Dr. Thompson already performed. (SA16; A312, A711.) Likewise, the Dean of Students, Julie White, complained to

16

Dr. Dewan that plaintiff was proposing a new Associate Dean for Student Advising position even though she already was responsible for student advising. (SA16-17; A312, A711.) When Dr. Dewan asked about the nature of these newly created positions, plaintiff never provided an organizational chart or written job descriptions, but instead was angered by the inquiry. (SA17; A312, A711.) In his inquiries, Dr. Dewan never said anything about the gender, race, or national origin of any employee in any of the positions. (SA24; A716.) Dr. Dewan did, however, ask how these new positions would serve the College's objective to increase the number of Under-Represented in Medicine (sometimes referred to as "URiM") students entering Upstate. (SA17; A312, A711.)

The Associate Vice President for Human Resources, Eric Frost, also disagreed with a number of plaintiff's personnel decisions from a human resources perspective. (SA25; A363, A716.) For instance, plaintiff appointed a number of faculty members to new Associate Dean or Assistant Dean positions that he created and gave those individuals non-union management/confidential titles, even though the individuals affected were union members. (SA25; A363, A717.) Plaintiff arranged to pay these individuals additional state compensation in the form of what is known

17

as "also receives" ("ALR") compensation, even though ALR funds were inappropriate because the positions appeared to overlap with other existing positions. (SA25; A363, A717.) And plaintiff did not consult with Human Resources before establishing these positions. (SA25-26; A363, A717.) Moreover, when Frost informed plaintiff that he could not assign roles and titles to faculty unilaterally, plaintiff did not comply with that guidance. (SA26; A363-64, A717.)

## C.    Plaintiff's Challenges to His Wife's Salary

Upstate hired plaintiff's wife, Dr. Ma-Li Wong, in 2017. (SA27; A601, A718.) She is currently a Distinguished Professor of Psychiatry and Behavioral Sciences and a research faculty member in the Department of Psychiatry. (SA27; A601, A718.) When Dr. Wong was hired, she was offered a total starting salary package of $220,000. (SA27; A601-602, A718.) This starting salary was higher than the total starting salary of each of the 26 other research faculty members hired between 2017 and 2020. (SA27-28; A604, A719.) Dr. Wong's salary was comprised of a $120,000 state base salary and $100,000 in ALR compensation. (SA27; A602, A718.)

18

ALR compensation is permitted for employees or faculty members who assume responsibility for additional duties or assignments that may be unrelated to, or independent of, their standard work responsibilities. (SA28; A718.) ALR is also given to new research faculty members in the Psychiatry Department to assist them with starting up their research at Upstate, with the expectation that they will apply for and receive grant funding to supplement their base salary. (SA28; A602, A719.) Accordingly, the ALR portion of a new member of the Psychiatry Department is expected to be reduced, eliminated, or transitioned to departmental funding within two to three years of hiring. (SA28; A719.) ALR funding is reviewed and renewed on an annual basis. (SA28; A719.)

Dr. Wong received two additional benefits, as well. First, she received a $30,000 stipend from the Psychiatry Faculty Practice, Inc., which is a group made up of psychiatry clinicians and researchers at Upstate. (SA28; A603, A719.) Second, Upstate made a "startup commitment" of $5,386,668 to Dr. Wong to design and build her a lab; move the lab and Dr. Wong's specimens; and pay for staff, equipment, and lab operating expenses. (SA29; A602-03, A719-720.) This startup commitment far surpassed the commitment made to any other faculty member

19

hired during the same timeframe. (SA29; A603-604, A720.) Further, the commitment was unprecedented because Dr. Wong was not funded by any grants at the time she was hired. (SA29; A601-602, A720.) Offering the commitment was risky: without grant funding, Upstate paid for all of Dr. Wong's startup costs and risked never recouping those costs. (SA29; A601-602, A720.) Indeed, a researcher in Dr. Wong's position would have little incentive to bring in grants with a guaranteed salary. (SA29; A601-602, A720.)

After agreeing to Upstate's offer letter but before she began her employment, Dr. Wong asked if Upstate would be willing to increase her state base salary. (SA30; A604, A720.) Upstate informed Dr. Wong that she was expected to abide by the agreed upon offer letter that she had signed. (SA30; A604, A721.) Dr. Wong began her employment with Upstate in December 2017. She continued to request that her base pay be increased and her ALR be decreased. (SA30; A604, A721.) In 2018, Upstate granted that request in part, modifying Dr. Wong's salary package by increasing her base salary from $120,000 to $177,400 and decreasing her ALR from $100,000 to $45,000. (SA28-29; A606, A719.)

In March 2019, Psychiatry Department Chair Dr. Schwartz informed Dr. Wong that her ALR and PFP stipend were both scheduled to expire in July 2019. (SA30; A606, A721.) That same month, plaintiff emailed Dr. Dewan regarding his wife's salary. (SA30; A721.) Plaintiff made no mention of any complaints of discrimination in that email. (SA30; A721.)

In April 2019, Dr. Dewan met with Dr. Wong and Dr. Schwartz to discuss Dr. Wong's salary. (SA30; A606-607, A721.) Dr. Wong objected to her salary structure and requested a further increase of her base salary to $220,000. (SA31; A606, A721.) But Dr. Wong still did not have any grants by this time to supplement her base salary. (SA31; A606, A721.) Dr. Dewan and Dr. Schwartz informed Dr. Wong that increasing her base salary would be inequitable to the grant-funded tenure research faculty within the department. (SA31; A606, A721.) They agreed, however, to extend Dr. Wong's $45,000 in ALR compensation for a year and a half past its originally planned end date of July 2019, until December 31, 2020. (SA31; A606-607, A722.) And Dean Chin subsequently approved that arrangement. (SA31; A607, A722.) Dr. Wong did not make any complaints of discrimination to anyone at Upstate about discrimination

21

at this time (other than her alleged reports to her husband); her first complaint of discrimination to another Upstate employee occurred in October 2019. (SA32; A722.)

Also in April 2019, plaintiff sent an email to his colleague Dr. Corona in which he expressed his belief that Dr. Wong's salary was being reduced—an apparent reference to her upcoming loss of ALR and PFP stipend—as a punishment for "bad political moves" he had made. (SA32; A722.)

Plaintiff, as Dean of the College of Medicine, approved all salaries and ALRs during his tenure. (SA31; A722.) Indeed, plaintiff does not dispute that he had direct knowledge that Dr. Wong received when hired a far more favorable salary package than any other research faculty member who was hired to work in the College of Medicine between 2017 and 2019 and that her lab was the largest lab buildout done while he was Dean. (SA31; A722.)

## D. Plaintiff's Advocacy to Expand the Budget Committee

While serving as President of Upstate, Dr. Laraque-Arena had created a Budget Committee as a platform for senior leadership to discuss confidential financial matters regarding Upstate. (SA35; A725.)

The committee is comprised of individuals in certain senior leadership positions within Upstate that directly oversee Upstate's finances, including the President; Hospital CEO; Hospital Chief Financial Officer; Upstate's Senior Vice President for Finance and Administration; Dean of the College of Medicine; President of Upstate University Medical Associates at Syracuse, Inc.; and the President's chief of staff. (SA35; A725.) Membership on the Budget Committee is based on function and title. (SA35; A725.) While plaintiff was serving as Dean, all of the above-listed positions were filled by men. And plaintiff was unaware of any woman, regardless of function or title, who had expressed an interest in becoming a member of the Budget Committee and was denied membership. (SA37; A726.)

At some point during his tenure as Dean, plaintiff suggested to Dr. Dewan that Dr. Ann Botash be named to the Budget Committee. (SA36; A726.) Dr. Botash served as Senior Associate Dean for Faculty Affairs and did not directly oversee finances for Upstate in her role. (SA36; A725.) Dr. Botash never spoke with plaintiff or the Budget Committee about an interest in joining the committee; nor did she recall being recommended to be added as a member. (SA36; A725-726.) In

23

response to plaintiff's suggestion, Dr. Dewan made no comment regarding Dr. Botash's gender or national origin. (SA36-37; A726.) Dr. Botash was not added to the Budget Committee.

Plaintiff also suggested that Dr. Amy Tucker be added to the Budget Committee. (SA37; A726.) Dr. Tucker never expressed an interest in becoming a member of the Budget Committee, nor did she ever complain about not being a member. (SA37; A726.) And Dr. Tucker reported directly to Dr. Robert Corona, who was already a member of the Budget Committee in his role as Hospital CEO. (SA37; A726.) Dr. Tucker also did not become a member of the Budget Committee.

## E. Plaintiff's Alleged Efforts to Promote Diversity and Report Discrimination

In 2018, while serving as Dean of the College of Medicine, plaintiff created an External Scientific Advisory Board and appointed only women to serve as board members. (SA26; A153, A717.) The Board met on only one occasion in June 2018. (SA26; A717.) Dr. Dewan had no input into whether the Board would continue to meet. (SA26; A717.) Dr. Dewan never made any comments to plaintiff about the gender of the Board members, never made any comments to plaintiff about whether the

24

Board was necessary, and never told plaintiff not to have the Board meet. (SA26-27; A156, A717.) Plaintiff never made any complaints about the Board not continuing after its June 2018 meeting; nor did he inquire as to why the Board did not meet again after he was removed from the position of dean. (SA27; A156, A717-18.)

A Diversity Committee existed at Upstate prior to plaintiff's appointment as Dean of the College of Medicine. (SA27; A154, A718.) After plaintiff's demotion, Dr. Chin assumed oversight responsibilities of the Diversity Committee. (SA27; A718.)

During his tenure as Dean of the College of Medicine, plaintiff never filed any formal complaints with Upstate's Office of Diversity, Equity and Inclusion or Office of Institutional Equity on behalf of himself or any other individual. (SA41-42; A730.) Plaintiff received training on Upstate's Non-Discrimination Policy and Harassment Prevention Policy, which required that all complaints of discrimination and harassment be brought to the Office of Diversity, Equity and Inclusion for investigation. (SA41; A729.) And plaintiff was given specific training on his responsibility as a supervisor to raise concerns of discrimination or harassment

with Upstate's Chief Diversity Officer or Affirmative Action Officer within the Office of Diversity, Equity and Inclusion. (SA41; A729-730.)

While plaintiff makes allegations of retaliation against him for allegedly complaining about specified forms of discrimination against specified individuals who worked at Upstate, he made no such complaints to the Office of Diversity, Equity and Inclusion or the Human Resources department. In particular, plaintiff never made a report that Dr. Brian Thompson was being discriminated against. (SA33-34; A724, A996.) Indeed, Dr. Brian Thompson never indicated to plaintiff that he was being discriminated against based on his Native American heritage. (*See* SA34 n.67; A994-96.) And plaintiff never made any report—to the Office of Diversity, Equity and Inclusion; Human Resources; or to anyone else— that Nakeia Chambers had been discriminated against on the basis of gender, race, or national origin. (SA35; A724.) And to the extent that Dr. Dewan discussed Chambers' position with plaintiff, he asked about the duties of her position and whether they overlapped with the duties of another position. (SA34; A724.) Dr. Dewan never brought up the subject of Chambers' gender, race, or national origin. (SA34-35; A724.) Plaintiff also never made a complaint of discrimination on the basis of race or

national origin on behalf of any medical students attending Upstate. (SA35; A724-725.)

In 2019, plaintiff created a panel to consider candidates to fill an Anesthesiology Department Interim Chair position. (SA37; A205, A726.) The panel chose Dr. Xiuli Zhang to fill the position, and plaintiff presented the results to Dr. Dewan in August 2019. (SA37; A726.) Dr. Dewan never expressed to plaintiff any concerns or any dissatisfaction with Dr. Zhang being chosen for the position; nor did he ever say that a female doctor was not fit for the position. (SA37; A726-727.) To the contrary, Dr. Dewan signed off on Dr. Zhang as the panel's choice for the position and later appointed Dr. Zhang as permanent Chair of the Anesthesiology Department. (SA38; A727.) No complaint was ever filed by anyone regarding the selection of the position for Interim Chair of the Anesthesiology Department. (SA38; A727.)

## F. Plaintiff's Demotion

On September 12, 2019, Dr. Dewan informed plaintiff that he was removing plaintiff as Dean of the College of Medicine, effective immediately. (SA33; A316, 341-342.) Plaintiff informed Dr. Dewan that he was already in the process of interviewing for another job. (SA33; A723.)

27

Plaintiff was terminated from the position as the Dean of the College of Medicine and reverted to his full-time faculty position as Distinguished Professor in the Department of Psychiatry and Behavioral Sciences. (SA33; A723.) Dr. Dewan thereupon appointed Dr. Lawrence Chin as interim Dean of the College of Medicine based on his exceptional qualifications. (SA23; A257-58, A326, A715-716.)

In his role as Distinguished Professor in the Department of Psychiatry and Behavioral Sciences, plaintiff received the highest state salary of any research faculty member in that department, even though he had no current grant funding. (SA39; A727.) In January 2020, plaintiff requested that the Department Chair provide him with a startup package for his research lab. (SA39; A727-728.) The Department Chair asked for a list of startup items so that the Chair could bring the request to the Dean and negotiate for the College of Medicine to provide the items. (SA39; A728.) Plaintiff never provided any such list. (SA39; A728.) As a Distinguished Professor, plaintiff was not entitled to reimbursement of certain expenses such as license fees and travel to scientific meetings, and when plaintiff requested such reimbursement, his requests were denied consistent with Psychiatry Department policy. (SA39; A728.)

28

## G.    Plaintiff's Proceeding Before the New York State Department of Human Rights

In November 2019, plaintiff filed a complaint with the New York State Division of Human Rights alleging retaliation in violation of the Human Rights Law. (A896.) The Division of Human Rights issued a probable cause determination. (A896-917.) In October 2020, plaintiff requested an order dismissing the complaint, which was subsequently granted. (A146-147.)

## H.    The Present Suit

In April 2021, plaintiff initiated the present suit by filing a complaint in the U.S. District Court for the Northern District of New York, alleging among other things that defendants retaliated against him for opposing discrimination on the basis of race, gender, and national origin, in violation of Title VII of the Civil Rights Act of 1964.[2] (A1-38.) Following discovery, defendants moved for summary judgment.

---

[2] Plaintiff additionally alleged that defendants discriminated against him on the basis of race and national origin. However, plaintiff's brief to the Court does not challenge the district court's decision (SA51-58) to grant defendants summary judgment dismissing his direct discrimination claims. Accordingly, plaintiff has waived any such challenge, *LoSacco v. City of Middletown*, 71 F.3d 88, 92-93 (2d Cir. 1995), and the district court's resolution of those claims is not discussed further.

The district court (Scullin, J.) granted defendants' motion for summary judgment. After a thorough determination of the undisputed facts (*see* SA2-42), the district court concluded that plaintiff failed to make out a prima facie case of retaliation under Title VII because he had not demonstrated that he engaged in any protected activity giving rise to a retaliation claim (SA59-80). While plaintiff's alleged actions constituted general efforts to increase diversity, they did not give defendants any basis to think that plaintiff was opposing an act constituting discrimination within the meaning of Title VII. (SA60-71.) As for plaintiff's advocacy on behalf of his wife with respect to her salary, the district court concluded that plaintiff did not have a reasonable good-faith belief that she had experienced discrimination because plaintiff knew Dr. Wong had in fact been given a salary package that was unusually favorable but that nonetheless obligated her to seek outside grant money because her ALR compensation would expire after two to three years consistent with Upstate policy. (SA71-75.)

The district court further concluded that even if plaintiff satisfied his burden to establish that he had engaged in a protected activity, defendants met their burden to proffer legitimate, nondiscriminatory

reasons for his demotion, namely a pattern of unprofessional conduct by plaintiff, along with his wasteful spending to create duplicative positions that did not further Upstate's goals. (SA76-78.) And plaintiff failed in turn to meet his burden to demonstrate that defendants' legitimate non-discriminatory reasons for demoting him were mere pretext. (SA78-80.)

Plaintiff timely appealed. (A1232.)

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-movant. *Horn v. Medical Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023). Summary judgment is warranted when the movant shows that there is no genuine dispute as to any material fact, and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 137 (2d Cir. 2010) (cleaned up) (citation omitted). Accordingly, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient' to defeat a summary judgment motion." *Fabrikant v.*

31

*French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## SUMMARY OF ARGUMENT

Summary judgment is warranted in this case because plaintiff's retaliation claim fails at each step of the *McDonnell Douglas* burden-shifting framework.

To begin, plaintiff failed to make out a prima facie case of retaliation under Title VII. Specifically, he did not demonstrate that he engaged in any protected activity of which his employer was aware. Although plaintiff outlines a host of actions he purportedly took to promote greater diversity at Upstate, those actions do not constitute activities to oppose specific instances of employment discrimination targeted at any Upstate employee. And plaintiff has not demonstrated that he had an objective good-faith belief that any action he took opposed specific instances of employment discrimination against an Upstate employee. Plaintiff likewise failed to demonstrate that he said anything to defendants sufficient to apprise them of the fact that plaintiff believed they had committed employment discrimination against an Upstate employee. Accordingly, defendants are entitled to judgment as a matter of law.

32

Even if plaintiff met his burden of establishing a prima facie case of retaliation, defendants provided ample evidence of a legitimate, non-discriminatory reason for demoting plaintiff. That evidence established that plaintiff engaged in a pattern of inappropriate and unprofessional conduct that included exposing students and colleagues to offensive and inappropriate communications, violating numerous Upstate policies and practices, acting insubordinately toward multiple bosses, embarrassing Upstate in front of a local political representative, wasting hundreds of thousands of dollars on new employment roles that were duplicative of existing positions, and drawing the ire of multiple members of SUNY leadership through incessant and unwanted communications. Plaintiff has not disputed that these events occurred. Nor can there be any reasonable dispute about whether such inappropriate and unprofessional behavior was sufficient to warrant his demotion.

Finally, plaintiff did not meet his burden of demonstrating that defendants' reason for the demotion at issue was merely pretextual. In arguing to the contrary, plaintiff relies on an ambiguous statement from an Upstate employee who was not responsible for the decision to demote plaintiff, in which that employee speculated without a stated basis that

33

plaintiff's activities to promote diversity "might have" been a factor in his demotion. Any such statement is insufficient to suggest that plaintiff's participation in a protected activity constituted a but-for cause of his demotion. In addition, plaintiff incorrectly relies on the temporal proximity between his alleged actions to promote diversity and his demotion. Temporal proximity alone cannot demonstrate that a defendant's stated reason is pretextual, and in any event, plaintiff committed numerous inappropriate actions warranting his demotion *after* his purported protected activities but before he was demoted.

## ARGUMENT

Title VII claims are reviewed under the *McDonnell Douglas* burden-shifting framework. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). Under the first step of this framework, "plaintiff must establish a prima facie case of retaliation." *Id.* at 844. If plaintiff successfully meets his burden, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Id.* at 845. Once a defendant has articulated such a non-retaliatory reason for the employment action, "the presumption of retaliation arising from the establishment of the prima facie case drops from

the picture," and the plaintiff must demonstrate that the non-retaliatory reason given "is a mere pretext." *Id.*

Plaintiff's retaliation claim fails at every step of the *McDonnell Douglas* framework: plaintiff failed to establish a prima facie case of retaliation under Title VII; defendants in any event demonstrated a legitimate, non-discriminatory reason for demoting plaintiff; and plaintiff failed to present evidence sufficient to suggest that reason was mere pretext.

## POINT I

### PLAINTIFF FAILED TO MAKE OUT A PRIMA FACIE CASE OF RETALIATION

To make out a prima facie case of retaliation, a plaintiff must demonstrate "(1) [ ]he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). Plaintiff here failed to meet his burden of demonstrating that he engaged in any protected activity of which his employer was aware.

35

A "protected activity" that can give rise to a retaliation claim occurs if an employee "'opposed any practice' made unlawful by Title VII" or "'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII." *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015) (citation omitted). For an employee's action to be a "protected activity," the employee "is 'required to have had a good faith, reasonable belief that [the employee] was opposing an employment practice made unlawful by Title VII.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs*, 716 F.3d 10, 14 (2d Cir. 2013) (citation omitted). The employee thus must demonstrate a reasonable, good-faith belief that the employee opposed a discriminatory action or practice against specific employees that would raise a cognizable claim under Title VII for employment discrimination. *Id.* at 15 (citing *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590 (2d Cir. 1988), and *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125 (2d Cir. 1999)). A general opposition to perceived bias or inequity is insufficient. *See, e.g.*, *Wimmer*, 176 F.3d at 134-36 (reporting use of racial epithets directed at non-employees is not a protected activity). Whether an employee's belief is "reasonable" is an objective inquiry and "is to be

36

evaluated from the perspective of a reasonable similarly situated person." *Kelly*, 716 F.3d at 16-17.

As this Court has additionally made clear, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at *conduct prohibited by Title VII*." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107-08 (2d Cir. 2011) (alteration in original) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). Accordingly, complaints that are so vague and generalized that an employer could not have reasonably understood that the plaintiff was complaining of conduct prohibited by Title VII do not suffice to confer knowledge on the employer. *Id.*

Applying these principles, the district court correctly concluded that plaintiff failed to demonstrate that he had engaged in any protected activity of which his employer was aware.

As an initial matter, plaintiff does not challenge either the factual or legal basis for the district court's decision, instead simply restating in conclusory terms what actions plaintiff took in his position as Dean. (*See*

37

Br. 7-21.) Because plaintiff does not "explain how the district court erred" in granting defendants' motion for summary judgment, plaintiff has effectively abandoned his challenge to the district court's ruling. *See Cassidy v. N.Y. State Ins. Fund*, No. 23-496-cv, 2023 WL 8801035, at *1 (2d Cir. Dec. 20, 2023) (unpublished); *see also Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). This is itself a sufficient basis to affirm the district court's grant of summary judgment.

In any event, plaintiff's retaliation claim fails because he did not demonstrate that he engaged in any "protected activity" of which defendants were aware. Although plaintiff purports to identify ten kinds of actions he allegedly took (*see* Br. 9-20)*,* not one constituted a protected activity.

First, plaintiff relies upon receiving and, in some cases, responding to, "questions" (Br. 10) about the job duties of several Upstate employees in relation to overlap between existing positions and newly created positions. However, he offers no rational basis to conclude that his responses—when he even alleges he responded—constituted complaints

about discrimination on the basis of a protected characteristic. Indeed, the record provides no basis to dispute defendants' evidence that Dr. Dewan raised the subject questions out of concern that plaintiff was creating new, unnecessary positions with overlapping job duties. And plaintiff does not dispute that the employees in question never complained to him about any discrimination against them. (SA34-35 & n.67; A724, A994-96.)

Nor did plaintiff demonstrate that a reasonable person in his position would have believed that plaintiff merely being asked and responding to questions about an employee's duties would be sufficient to give rise to a cognizable Title VII employment discrimination claim by any of these employees. *See Kelly*, 716 F.3d at 14-17; *Wimmer*, 176 F.3d at 134-35. There is no suggestion that defendants took any actual adverse employment actions against any of the employees affected, nor has plaintiff alleged that the employees were exposed to a hostile work environment. *See Littlejohn*, 795 F.3d at 316. In fact, plaintiff does not even suggest that defendants ever questioned these employees directly about their duties.

Moreover, plaintiff failed to demonstrate that his responses to the subject questions put defendants on notice that he reasonably believed he was opposing a practice made illegal under Title VII. *See Rojas*, 660 F.3d at 108. To the contrary, plaintiff does not suggest he ever mentioned Title VII or discrimination to Dr. Dewan, instead merely explaining the roles and duties of the employees involved. (*See* Br. 10.) This is not sufficient to make defendants aware of plaintiff's alleged protected activity.

Second, plaintiff mistakenly relies on his creation of an all-female External Scientific Advisory Board (*see* Br. 11), but that action also does not constitute protected activity under Title VII. Such action did not "oppose" any act of employment discrimination that would give rise to a Title VII claim by any employee. *See Littlejohn*, 795 F.3d at 316; *Wimmer*, 176 F.3d at 134-35. Nor has plaintiff demonstrated that he had a reasonable, good-faith belief that any employee had a cognizable claim of employment discrimination under Title VII absent the creation of the scientific advisory board. Moreover, plaintiff has not demonstrated that he said anything to Dr. Dewan or other Upstate leadership about the External Scientific Advisory Board that would put defendants on notice

that plaintiff's action was directed at opposing an allegedly discriminatory practice under Title VII.

Third, plaintiff relies on his generalized support for a preexisting Diversity Committee (*see* Br. 11-12), but such support does not constitute protected activity, either. Plaintiff does not indicate what his purported support entailed, nor does he offer any basis to conclude that a reasonable person in his position would believe he was acting in opposition to a discriminatory practice that was cognizable under Title VII. Plaintiff claims that he was "questioned" about why a particular doctor led the committee (Br. 12), but he proffers no evidence that Upstate took any adverse action against that doctor. Nor does plaintiff offer evidence that defendants ever stated that she was not qualified because of her race, national origin, or gender. Instead, plaintiff offers a generic, conclusive statement from his own affidavit that he believed these questions were based on the doctor's race and gender because he "never received the same pushback regarding non-minority employees." (Br. 12.) But plaintiff failed to demonstrate any non-minority employee was similarly situated to the doctor in question in *any* regard. Moreover, plaintiff has not demonstrated that he said anything in response to defendants'

41

alleged questioning that would confer knowledge on defendants that plaintiff was opposing discrimination made illegal under Title VII.

Fourth, plaintiff singles out his advocacy to add two female employees, Drs. Botash and Tucker, to the Budget Committee (*see* Br. 12-13), but plaintiff could not have had a reasonable, good-faith belief that either woman (or any other female employee for that matter) had a cognizable employment discrimination claim arising from the fact that they were not on the Budget Committee. In particular, plaintiff does not dispute that he knew of no woman who wanted to become a member of the Budget Committee and that neither Dr. Botash nor Dr. Tucker ever told him that they wanted to join the committee. (SA37; A726.) Moreover, as Dean of the College of Medicine, plaintiff was aware that membership on the Budget Committee was not offered to individuals, but rather assigned to those in the specific job titles within Upstate that directly made financial decisions. (A725.) Accordingly, no reasonable person in plaintiff's position would have believed that female employees who were *not* responsible for Upstate's financial decisions (*see* SA36-37) were being discriminated against by not being appointed to the Budget Committee. And plaintiff admits that defendants never made a comment regarding

42

female employees' gender or national origin as a basis to deny their membership on the Budget Committee. (*See* SA36-37.) Further, although plaintiff argues that he "notified" defendants "about his concerns regarding the gender-imbalance of the Budget Committee" (Br. 12), any such generalized statement was insufficient to confer on defendants knowledge that plaintiff was acting in opposition to a discriminatory employment practice cognizable under Title VII.

Fifth, plaintiff argues that he engaged in protected activity related to advocating for Black medical students (Br. 14-16), but that argument fares no better. As an initial matter, it was not objectively reasonable for plaintiff to believe that he was opposing a discriminatory employment practice under Title VII when he advocated on behalf of medical students who were not Upstate employees. In any event, plaintiff has not demonstrated a reasonable basis to believe that Upstate was discriminating against Black medical students in its preparation of such students for career opportunities. Plaintiff states that he received phone calls that Black students he referred to a program were unprepared (Br. 14), but he does not state that he ever referred a non-Black student to the same program. Nor does plaintiff indicate that students of other races were

43

found to be more prepared for those programs. Accordingly, there is no basis to conclude that plaintiff had a reasonable, good-faith belief that Upstate was acting in a racially discriminatory manner. Nor has plaintiff provided any evidentiary basis to conclude that plaintiff put defendants on notice that he was opposing a discriminatory practice made illegal under Title VII.

Sixth, plaintiff is likewise mistaken to rely on his subsequent referral of the Dean of Student Affairs for standardized feedback (Br. 15) as a protected activity. Here again, a reasonable person in plaintiff's position would have known that he was not opposing employment discrimination because the students on whose behalf he was acting were not Upstate employees. Nor has plaintiff presented evidence sufficient to show that the Dean of Student Affairs was acting in a discriminatory manner or with a discriminatory motive in his alleged failure to prepare medical students for career opportunities. And although plaintiff states in generalized terms that he "reported his concerns" about the Dean of Student Affairs (Br. 15), plaintiff does not provide sufficient detail to conclude that plaintiff's report conferred knowledge on defendants that

plaintiff was opposing an action that could give rise to a cognizable employment discrimination claim under Title VII.

Seventh, plaintiff argues that he engaged in protected activity by creating new positions in the College of Medicine, including a Director of College of Medicine Career Development (Br. 15) and an Assistant Dean for Cultural Competence (Br. 16). But no reasonable person in plaintiff's position would have believed that by *creating* such positions, he was *opposing* a discriminatory employment practice made illegal by Title VII, because no Upstate employee would have had a cognizable Title VII discrimination claim due to the prior absence of such positions. And plaintiff does not dispute that Dr. Dewan never referred to the gender, race, or national origin of any employee in a position plaintiff created; rather, Dr. Dewan's purpose in questioning plaintiff about these positions was about the cost and duplicative nature of them. (SA15-16, SA24; A710, A716.) Nor has plaintiff established that he communicated anything to defendants about these positions, much less that he clearly communicated that he was creating the positions to oppose what he reasonably believed to be employment discrimination under Title VII.

Eighth, plaintiff mistakenly argues that he engaged in protected activity by promoting diverse appointments to Chair positions at Upstate. (Br. 17-19.) But plaintiff has not offered any basis to conclude that the mere act of attempting to hire a Chair of Medicine who came from a diverse background opposed a specific practice by Upstate that constituted unlawful employment discrimination under Title VII. Nor does plaintiff meet his burden to demonstrate that he said anything to defendants that would adequately convey that he believed they were engaging in unlawful employment discrimination. In fact, plaintiff has proffered no evidence that he said anything to defendants *at all* about the Chair of Medicine position. Moreover, the undisputed facts in this case demonstrate that the reason Upstate terminated the search for a Chair of the Department of Medicine was because the members of the selection committee complained to Dr. Dewan that plaintiff was ignoring the panel's recommendations and pushing for his personal friends to be moved forward in the process despite the panel's determination that the individuals were not qualified. (A307, A706-07.)

Ninth, to the extent plaintiff organized a panel that selected a female candidate for the Chair of Anesthesiology (Br. 19), plaintiff has

46

not demonstrated that leadership at Upstate had a discriminatory motive when they initially favored a different candidate who happened to be male. Rather, it is undisputed that Dr. Dewan never suggested that a female doctor would be unfit for the position, nor did Dr. Dewan express any concern or dissatisfaction when a female doctor was recommended by the panel. (SA37; A205, A726.) To the contrary, Dr. Dewan signed off on Dr. Xiuli Zhang as interim Chair of the Anesthesiology Department and later appointed her to the position permanently. (SA38.) Moreover, plaintiff has not proffered evidence that he communicated to defendants that he believed defendants were engaging in unlawful employment discrimination prohibited by Title VII.

Tenth, plaintiff did not engage in a protected activity when he complained to Upstate about his wife's ALR funding being discontinued in 2019. (*See* Br. 20-21.) Plaintiff argues that he communicated to Dr. Dewan that his wife believed she may have a discrimination claim under Title XI or Title IX. (Br. 20.) Even assuming that any such communication was sufficient to confer knowledge to defendants that *plaintiff* believed Upstate had engaged in unlawful discrimination under Title VII, plaintiff ignores that any such belief was not reasonable. As the

district court correctly concluded, plaintiff was involved in setting salaries in his role as Dean of the Medical College and, as a result, was aware that Dr. Wong's ALR was being phased out pursuant to Upstate's existing policy and practice. (SA31, SA71-75.) In particular, it is undisputed that ALR funding given to new professors in the Psychiatry Department was phased out after two to three years. (SA28; A719.) And, in the summer of 2019, Dr. Wong had been at Upstate for approximately two years. Plaintiff was also aware that Dr. Wong's starting salary made her the highest paid of any research faculty hired between 2017 and 2019 and the third-highest-paid research faculty in the Psychiatry Department. (SA28-29; A608). It is also undisputed that after two years, Dr. Wong had still not obtained any grants to replace her ALR funding despite Upstate's express expectation that she, like all new faculty in the Psychiatry Department, apply for such funding. (SA30-31.) And plaintiff was aware that Dr. Dewan and Dr. Schwartz extended Dr. Wong's ALR from July 2019 until December 31, 2020, to accommodate for the fact that she had not obtained such grants. In light of the above, no reasonable person in plaintiff's position could have had a good-faith belief that Dr. Wong was being discriminated against on the basis of her race or gender when

Dr. Dewan and Dr. Schwartz informed Dr. Wong that her ALR would be discontinued. Accordingly, plaintiff had no reasonable, good-faith belief that discussing Dr. Wong's salary with Dr. Dewan constituted opposition to any such discrimination made unlawful by Title VII.[3]

Finally, plaintiff mistakenly argues (Br. 21-22) that even if none of plaintiff's individual actions constituted protected activities, "the totality" of plaintiff's actions constitute a protected activity under Title VII. Plaintiff can only demonstrate that he engaged in a protected activity for purposes of a Title VII retaliation claim by showing that he took an action that opposed employment discrimination and that his employer was aware that he believed Upstate had engaged in such discrimination. Plaintiff cannot cobble together many actions that do not meet those criteria and somehow satisfy the test of demonstrating a protected activity. Plaintiff thus fails to make out a prima facie case of retaliation.

---

[3] Indeed, a federal court agreed that Dr. Wong had not demonstrated that she was discriminated against when her ALR was reduced, granting summary judgment to Upstate in Dr. Wong's discrimination suit. *See Wong v. New York*, No. 21-cv-1338, 2024 WL 3936762, at *10-*12 (N.D.N.Y. Aug. 26, 2024).

## POINT II

### UPSTATE HAD A LEGITIMATE, NON-DISCRIMINATORY REASON TO DEMOTE PLAINTIFF BASED ON HIS PATTERN OF INAPPROPRIATE AND UNPROFESSIONAL CONDUCT AND WASTEFUL SPENDING

Even if plaintiff met his burden of demonstrating a prima facie case of retaliation—and he did not—plaintiff's claim would nevertheless fail at the second step of the *McDonnell Douglas* burden-shifting framework because defendants had a legitimate, non-discriminatory reason to demote plaintiff. Specifically, Upstate demoted plaintiff due to his consistent pattern of engaging in inappropriate and unprofessional behavior, along with his refusal to stop creating duplicative positions that cost hundreds of thousands of dollars.

This Court has repeatedly held that inappropriate conduct by an employee, including insubordination, provides a legitimate, non-discriminatory reason for taking an adverse employment action against that individual. *See, e.g.*, *McElwee v. County of Orange*, 700 F.3d 635, 644 (2d Cir. 2012); *Richardson v. Comm'n on Hum. Rts. & Opportunities*, 532 F.3d 114, 125-26 (2d Cir. 2008); *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006); *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985).

50

Likewise, unsatisfactory job performance provides a legitimate, non-discriminatory reason for taking an adverse employment action. *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 93 (2d Cir. 2001); *Williams v. Alliance Nat'l Ins.*, 24 F. App'x 50, 52-53 (2d Cir. 2001); *Rizzo-Puccio v. College Auxiliary Servs., Inc.*, 216 F.3d 1073, at *4 (2d Cir. 2000) (unpublished).

The undisputed facts here show that plaintiff engaged in a multi-year pattern of inappropriate and unprofessional conduct and improper personnel actions more than sufficient to vitiate the presumption of discrimination. These include plaintiff's pattern of inappropriate contact with SUNY leadership despite leadership's directives to cease such communication, which caused multiple individuals to pressure Dr. Dewan to terminate plaintiff promptly upon assuming the position of Upstate's president. (SA7, SA11-12; A305-06, A704, A1027, A1029-30.) And even after admonishment from Dr. Dewan, plaintiff directly contacted the SUNY Chancellor to request millions of dollars in funding, causing the Chancellor to question Dr. Dewan about why plaintiff had not yet been fired. (SA11-12; A308, A708.)

Plaintiff likewise acted inappropriately and unprofessionally with the prior Upstate president, Dr. Laraque-Arena, including by questioning her decisions, acting insubordinate, showing up late for meetings, and giving her a book about sexual dreams. (A99, A295, A304, A703.) Plaintiff's pattern of behavior was so severe that Dr. Laraque-Arena refused to attend meetings one-on-one with plaintiff without another individual present and limited the topic of one-on-one meetings to updates on plaintiff's work and operational issues. (SA5-6; A295, A299.) Indeed, plaintiff's pattern of inappropriate and unprofessional behavior, coupled with his unsatisfactory work performance, caused Dr. Laraque-Arena to attempt to get another employee to take on some of plaintiff's duties. (SA5; A304, A703-04.)

Plaintiff also repeatedly made inappropriate comments to students and faculty, including divulging personal details about a former patient's mental issues and sexual issues during an Admissions Committee dinner attended by faculty and students (SA12-13; A309, A708-709); repeatedly giving public speeches at which he told medical students that they were likely to experience depression and may attempt suicide (SA19-20, SA23; A541-544, A569-572, A712, A714-715); and playing an offensive video for

52

colleagues in which ethnic slurs and derogatory comments about certain ethnicities were used (SA20-21; A255, A315, A713). At least one of these actions resulted in a formal complaint from a student. (SA20; A542-543, A569-572, A713.) On another occasion, plaintiff sent an overtly aggressive email to a colleague, referring to him as a "busybody" and a "vigilante" for encouraging Dr. Dewan to provide greater funding to the newly created Geriatrics Department. (SA22; A599-600, A713-714.) Plaintiff's behavior was so consistently inappropriate that Dr. Dewan and other Upstate leaders began minimizing plaintiff's involvement in important events, including scheduling activities for when plaintiff was not on campus. (SA9, SA19; A314, A712.)

And plaintiff repeatedly acted insubordinately towards his boss, Dr. Dewan, in front of other Upstate employees. Plaintiff instructed department chairs not to talk to Dr. Dewan about any concerns within their departments and blamed Dr. Dewan for inhibiting plaintiff from doing his job. (SA19; A314, A712.) He also held a meeting, which he deemed "urgent," where he publicly disparaged Dr. Dewan for an hour in front of multiple Upstate leaders and department chairs within the College of Medicine because Dr. Dewan had intervened on his selection

of certain appointments. (SA32-33; A297, A315, A723.) Such behavior alone was sufficient to warrant plaintiff's demotion. *Richardson*, 532 F.3d at 125-26.

Plaintiff also repeatedly violated Upstate policy and procedure. He encouraged students to email him directly about instances of discrimination, and offered confidentiality to those who obliged, which was contrary to Upstate's collective bargaining agreements and policies that required any such complaints to be reported to the Office of Diversity and Inclusion. (SA13; A365-66, A709.) He unilaterally created new personnel positions without input from the Human Resources department, which resulted in him improperly conferring non-union titles on union members and promising ALR funds to employees to take on duties that were already handled by other employees. (SA25-26; A363, A716.) Indeed, multiple other Upstate employees complained that plaintiff's newly created positions interfered with duties they already performed. (SA16-17; A312, A711.)

Moreover, plaintiff's creation of numerous new positions resulted in hundreds of thousands of dollars of expenses at a time when Dr. Dewan was attempting to minimize unnecessary spending and model efficiency

within Upstate. (SA15-16; A311, A710.) Yet plaintiff became angry when asked how expenditures for these new positions would meet the objective outcome set forth by Dr. Dewan to increase the number of Under-Represented in Medicine students at Upstate. (SA17; A711.)

And plaintiff hindered the progress of the College of Medicine and wasted his colleagues' and employees' time by inappropriately thwarting at least one hiring committee. Plaintiff hindered the search for and appointment of a new Chair for the Department of Medicine by ignoring the committee's recommendations and insisting that his personal friends advance in the hiring process despite the committee's determination that these individuals were not qualified. (SA9-10; A307, A706-07.) Ultimately, the search was called off as a result of plaintiff's behavior, wasting the time of 20 Upstate doctors and faculty.

In sum, it is undisputed that plaintiff consistently acted inappropriately and unprofessionally and failed to adequately perform in the role of Dean of the College of Medicine. Upstate thus had ample legitimate, non-discriminatory bases to remove plaintiff from his position as Dean and return him to a faculty position.

## POINT III

### UPSTATE'S BASIS FOR DEMOTING PLAINTIFF WAS NOT PRETEXTUAL

Plaintiff did not meet his burden of demonstrating that these legitimate, non-discriminatory bases for removing plaintiff from his position as Dean—namely, his pattern of inappropriate and unprofessional conduct as well has his wasteful spending—were merely pretext.

To satisfy this third step of the *McDonnell Douglas* framework, a plaintiff must establish that retaliation was "a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845. To prove retaliation was a but-for cause of an adverse employment action, an employee can "demonstrat[e] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 846. While the temporal proximity between an employee's protected conduct and adverse employment action may be relevant to this inquiry, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Id.* at 847.

Plaintiff here does not attempt to prove any weaknesses, implausibilities, inconsistencies, or contradictions in defendants' legitimate

56

reasons for removing plaintiff from his position as Dean. Instead, plaintiff relies on an inconclusive snippet of the deposition testimony of Upstate's Associate Vice President for Human Resources, Eric Frost. (Br. 24 (citing A1092-94).) This single line of deposition testimony is the type of "mere . . . scintilla of evidence" that is insufficient to preclude summary judgment. *Fabrikant*, 691 F.3d at 205.

In any event, that deposition testimony is insufficient to suggest that retaliation against plaintiff for opposing employment discrimination was a but-for cause of his demotion. The relevant deposition testimony is as follows:

> A: But [plaintiff] was, at least, showing an intent to try to improve, I think.
>
> Q: Were those intents, grounds for his demotion?
>
> A: I think it was a multitude of a lot of things. I think it could have been part of it.

(A1094.) The deposition testimony is insufficient to suggest that retaliation was a but-for cause of his demotion, for four independent reasons.

First, the deposition testimony is taken entirely out of context in an attempt to mislead the Court about what Frost was referring to. In context, Frost describes at length the inappropriate method in which

plaintiff went about creating new positions, which, among other things, resulted in an audit by the State Comptroller. (A1092-1095.) Indeed, as Frost explained in an affidavit submitted with defendants' reply in support of their motion for summary judgment, he understood the question from plaintiff's counsel about whether plaintiff's "intent" was a ground for his dismissal "to mean—was the inappropriate way that he went about creating those diversity roles grounds for his demotion?" (A1081.) Frost responded in the affirmative—that plaintiff's inappropriate creation of management-level titles for union members and other improper personnel actions may have been a ground for his dismissal. (A1081, A1094.)

Second, even assuming the deposition testimony referred to plaintiff's "intent" to promote diversity as plaintiff claims (Br. 24), the promotion of diversity, while laudable, is not itself a protected activity that can give rise to a retaliation claim under Title VII because it does not oppose any instance of employment discrimination against a particular individual. *See supra* at 46.

Third, nothing in Frost's statement indicates that plaintiff would not have been demoted absent a retaliatory motive. At most, Frost

suggested that retaliation could have been "a part of" the grounds for his demotion, not that it was a but-for cause of his demotion. As this Court has instructed, something can be a motivating factor in an employer's decision without it rising to the level of but-for causation. *See Zann Kwan*, 737 F.3d at 846. And here, Upstate had ample ground for the decision it made.

Fourth, this single line from Frost's deposition is insufficient to create a genuine issue of material fact because it appears to be purely speculative. Frost did not decide to demote plaintiff; that decision belonged to Dr. Dewan. And Frost does not offer any basis for a belief that Upstate might have been motivated to demote plaintiff because of plaintiff's attempt to promote diversity. Accordingly, Frost's unsubstantiated speculation about what might have motivated Dr. Dewan is insufficient to defeat summary judgment. *See Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 502 (2d Cir. 2001) ("[W]e will uphold a grant of summary judgment where the nonmoving party adduces nothing more than speculation to support its claims.").

Plaintiff's only other basis to believe the given reason for his demotion was pretextual is the alleged temporal proximity between his

"ongoing efforts to address a lack of diversity" and his demotion in September 2019. (Br. 26.) But such temporal proximity, without more, is insufficient to defeat summary judgment. *Zann Kwan*, 737 F.3d at 847. Moreover, plaintiff ignores that serious instances of misconduct *also* occurred immediately before his demotion, and, indeed, were the basis for that demotion. Specifically, plaintiff argues that he met with Dr. Dewan in August 2019 and presented the hiring committee's recommendation that Dr. Xiuli Zhang be appointed interim chair of the Anesthesiology Department. (Br. 26.) That meeting occurred on or before August 15, 2019. (*See* A321, A349-50.) During that same week, Dr. Dewan learned that plaintiff was instructing department chairs not to speak to him, and plaintiff spent an hour criticizing Dr. Dewan in front of Dr. Dewan, Upstate leaders, and the chairs of multiple departments in the college of medicine during a meeting he had called. (SA32-33; A297, A314, A712, A723.) Dr. Dewan perceived that meeting in particular as an overt attempt to undermine his leadership and highly insubordinate. (A315.) Shortly thereafter, but before plaintiff's demotion, plaintiff played an offensive video containing ethnic slurs at the beginning of a leadership meeting that visibly offended an individual in the room.

60

(A255, A315, A713.) And on August 22, plaintiff made a speech in front of students and their families in which he talked about suicide and depression and dwelled on related statistics despite a similar earlier speech resulting in a student complaint. (A542-44, A713-14.)

Plaintiff's demotion was thus most temporally proximate to a string of unprofessional and inappropriate actions that warranted his demotion for legitimate, nondiscriminatory reasons. Accordingly, the temporal proximity between plaintiff's efforts to promote diversity and his demotion do not suggest that the true reason for his demotion was retaliation. Plaintiff has thus failed to meet his burden at the third step of the *McDonnell Douglas* framework.

## CONCLUSION

For the above-stated reasons, the district court's decision should be affirmed.

Dated:  Albany, New York
       March 3, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees


By:  /s/ Alexandria Twinem
    ALEXANDRIA TWINEM
    Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

    The Capitol
    Albany, New York 12224
    (518) 776-2042

62

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alexandria Twinem, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,669 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Alexandria Twinem*